**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHAD LINDSEY MOSHELL, Individually and On Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| SASOL LIMITED, DAVID EDWARD CONSTABLE, BONGANI NQWABABA, STEPHEN CORNELL, PAUL VICTOR, and FLEETWOOD GROBLER, | |
| Defendants. | |

Plaintiff Chad Lindsey Moshell ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Sasol Limited ("Sasol" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Sasol securities between March 10, 2015 and January 13, 2020, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Sasol was founded in 1950 and is headquartered in Johannesburg, South Africa. Sasol operates as an integrated chemical and energy company in South Africa.  The Company operates through Mining, Exploration and Production International, Energy, Base Chemicals, and Performance Chemicals segments.

2

3.      On October 27, 2014, Sasol announced the construction of a of an $8.1 billion ethane cracker and derivatives complex in Lake Charles, Louisiana, dubbed the Lake Charles Chemicals Project ("LCCP").    According to the Company, the LCCP includes seven manufacturing units, some of which are in continued development, including the low-density polyethylene ("LDPE") facility and Ziegler alcohol, ethoxylates and Guerbet alcohol facilities, among others.

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Sasol had conducted insufficient due diligence into, and failed to account for multiple issues with, the LCCP, as well as the true cost of the project; (ii) construction and operation of the LCCP was consequently plagued by control weaknesses, delays, rising costs, and technical issues; (iii) these issues were exacerbated by Sasol's top-level management, who engaged in improper and unethical behavior with respect to financial reporting for the LCCP and the project's oversight; (iv) all the foregoing was reasonably likely to render the LCCP significantly more expensive than disclosed and negatively impact the Company's financial results; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.      On June 6, 2016, Sasol reported "that the expected total capital expenditure for the [LCCP] could increase up to US$11 billion, including site infrastructure and utility improvements";  a slower rate of capital "resulted in an extended project schedule and contributed to further project cost increases"; "[t]he expected returns for the project have reduced due to changes in long-term price assumptions and the higher capital estimates"; and "[t]he increase in

the estimated LCCP capital cost and extended schedule will reduce the expected project returns by approximately the same amount as the Company's lower long-term price assumptions."

6.      Following these disclosures, Sasol's American depositary receipt ("ADR") price fell $3.53 per share, or 10.99%, to close at $28.60 per share on June 6, 2016.

7.      On May 22, 2019, during pre-market hours, Sasol disclosed that "the cost estimate for the LCCP has been revised to a range of $12,6 to $12,9 billion which includes a contingency of $300 million."  Sasol cited a $530 million change in the project's cost forecast because of a "[c]orrection for duplication of investment allowances of approximately $230 million"; a "[c]orrection for certain contracts and variation orders managed by Sasol, outside the primary engineering, procurement and construction contract, of approximately $180 million"; and forecast improvements that were "not expected to be realised and adjustments for potential insurance claims and procurement back-charges of approximately $120 million."

8.      Following these disclosures, Sasol's ADR price fell $4.50 per share, or 14.93%, to close at $25.64 per share on May 22, 2019.

9.      Later, on August 16, 2019, during pre-market hours, Sasol issued a press release disclosing that it was delaying the announcement of its 2019 financial results because of "possible LCCP control weaknesses."

10.      On this news, Sasol's ADR price fell $0.74 per share, or 4.02%, to close at $17.67 per share on August 16, 2019.

11.      Then, on October 28, 2019, Sasol disclosed that its review of the LCCP control weaknesses had brought to light "errors, omissions, and inaccuracies in the [LCCP] cost estimate," and a number of unethical and improper reporting activities that took place at the highest level of management.  Sasol also announced the resignation of, *inter alia*, its Joint Presidents and Chief

Executive Officers ("CEOs"), effective November 1, 2019, and Senior Vice Presidents and others previously in charge of the LCCP.

12.     Finally, on January 14, 2020, Sasol issued a press release confirming that on January 13, 2020, the Company "experienced an explosion and fire at its LCCP low-density polyethylene (LDPE) unit."  Sasol stated that "[t]he unit was in the final stages of commissioning and startup when the incident occurred" and "has been shut down and an investigation is underway to determine the cause of the incident, the extent of the damage and resulting impact on the LDPE unit's [beneficial operation] schedule."

13.     Following these disclosures, Sasol's ADR price fell $1.70 per share, or 7.84%, over the following two trading days, closing at $19.99 per share on January 15, 2020.

14.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

17.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Sasol securities trade on the New York Stock Exchange ("NYSE") located within this Judicial District.

18.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

19.     Plaintiff, as set forth in the attached Certification, acquired Sasol securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

20.     Defendant Sasol is organized under the laws of the Republic of South Africa, with principal executive offices located at Sasol Place, 50 Katherine Street, Sandton, 2196, South Africa.  Sasol's ADRs trade on the NYSE under the ticker symbol "SSL."

21.     Defendant David Edward Constable ("Constable") served as Sasol's President and CEO from before the start of the Class Period until June 30, 2016.

22.     Defendant Bongani Nqwababa ("Nqwababa") served as Sasol's Chief Financial Officer ("CFO") from before the start of the Class Period until July 1, 2016, when he was appointed as one of Sasol's Joint Presidents and CEOs.  Nqwababa served in this capacity until October 31, 2019, when he was forced to resign as a result of his improper oversight of the LCCP.

23.     Defendant Stephen Cornell ("Cornell") served as one of Sasol's Joint Presidents and CEOs from July 1, 2016 until October 31, 2019, when he was forced to resign as a result of his improper oversight of the LCCP.

24.     Defendant Paul Victor ("Victor") has served as Sasol's CFO since July 1, 2016.

25.     Defendant Fleetwood Grobler ("Grobler") has served as Sasol's President and CEO since November 1, 2019.

26.     Defendants Constable, Nqwababa, Cornell, Victor, and Grobler are sometimes referred to herein collectively as the "Individual Defendants."

27.     The Individual Defendants possessed the power and authority to control the contents of Sasol's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Sasol's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Sasol, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

28.     Sasol and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

29.     Sasol was founded in 1950 and is headquartered in Johannesburg, South Africa.  Sasol operates as an integrated chemical and energy company in South Africa.  The Company operates through Mining, Exploration and Production International, Energy, Base Chemicals, and Performance Chemicals segments.

30.     On October 27, 2014, Sasol announced the construction of an $8.1 billion ethane cracker and derivatives complex in Lake Charles, Louisiana, dubbed the LCCP.  According to the Company, the LCCP includes seven manufacturing units, some of which are in continued

development, including the LDPE facility and Ziegler alcohol, ethoxylates and Guerbet alcohol facilities, among others.

**Materially False and Misleading Statements Issued During the Class Period**

31.     The Class Period begins on March 10, 2015.  On March 9, 2015, during after-market hours, Sasol filed a Report of Foreign Issuer on Form 6-K with the SEC, which enclosed the Company's interim financial results for the six months ended December 31, 2014.  The report touted that Sasol was "making good progress" on the LCCP as one of the "Salient features" of its financial results.  The report further asserted that the LCCP was an $8.9 billion project, while touting the Company's secured facilities for financing that project, stating, in relevant part:

> We are making steady progress with the advancement of our US$8,9 billion ethane cracker and downstream derivatives complex (including infrastructure and utilities) in Lake Charles, Louisiana. Site preparation is underway, and we expect that the plant will achieve beneficial operation during the 2018 calendar year. In December 2014, we established a US$4,0 billion banking facility which will be used to finance the project. Approximately 80% of the funds required are in place through a combination of project finance and our own equity contributions. The remainder of the funds required will be raised in a phased manner, including accessing capital markets and further equity contributions.

32.     On October 9, 2015, Sasol filed an Annual Report on Form 20-F with the SEC, reporting the Company's financial and operating results for the quarter and year ended June 30, 2015 (the "2015 20-F").  The 2015 20-F represented that, as of the date of the period covered by that report, Sasol's disclosure controls and procedures and internal control over financial reporting were effective.

33.     The 2015 20-F further touted the Company's code of ethics, which "embodies a requirement of compliance with all applicable laws and regulations as a minimum standard," and "includes a commitment to conducting [Sasol's] business with due regard to the interests of all [its] stakeholders."

34.     Additionally, the 2015 20-F asserted that Sasol had "started detailed engineering and infrastructure work" on the LCCP, and that, with respect to funding the LCCP, "[t]o date, [Defendants] have secured 80% of the funding required for the construction of the LCCP."

35.     Despite these assertions, the 2015 20-F contained the merely generic, boilerplate representation that Sasol's "large capital projects may not prove sufficiently viable or as profitable as planned and may be affected by delays or cost overruns," and that "[t]he development of these projects is a capital-intensive process carried out over long durations and requires us to commit significant capital expenditure and devote considerable management resources in utilising our existing experience and know-how."  Plainly, these risk warnings were generic "catch-all" provisions that were not tailored to Sasol's actual known risks with respect to the LCCP's development.

36.     Appended as exhibits to the 2015 20-F were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Constable and Nqwababa certified that "[t]he [2015 20-F] fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934" and that "[t]he information contained in the [2015 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

37.     The statements referenced in ¶¶ 31-36 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Sasol had conducted insufficient due diligence into, and failed to account for multiple issues with, the LCCP, as well as the true cost of the project; (ii) construction and operation of the LCCP was consequently plagued by control weaknesses, delays, rising costs, and technical issues; (iii) these issues were

exacerbated by Sasol's top-level management, who engaged in improper and unethical behavior with respect to financial reporting for the LCCP and the project's oversight; (iv) all the foregoing was reasonably likely to render the LCCP significantly more expensive than disclosed and negatively impact the Company's financial results; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

## **The Truth Begins to Emerge**

38.     On June 6, 2016, Sasol filed a Report of Foreign Private Issuer on Form 6-K with the SEC, disclosing "that the expected total capital expenditure for the [LCCP] could increase up to US$11 billion, including site infrastructure and utility improvements";  a slower rate of capital "resulted in an extended project schedule and contributed to further project cost increases"; that "[t]he expected returns for the project have reduced due to changes in long-term price assumptions and the higher capital estimates"; and that "[t]he increase in the estimated LCCP capital cost and extended schedule will reduce the expected project returns by approximately the same amount as the Company's lower long-term price assumptions" (the "June 2016 6-K").

39.     Following these disclosures, Sasol's ADR price fell $3.53 per share, or 10.99%, to close at $28.60 per share on June 6, 2016.  Nonetheless, the Company's securities continued to trade at artificially inflated prices throughout the Class Period as a result of Defendants' continued positive statements touting the progress of the LCCP's development and management's oversight over that project.

40.     For example, the June 2016 6-K represented that the LCCP's extended project schedule and consequent cost increases were "partially offset by productivity benefits due to improved phasing of engineering and construction activities" and that, "[a]s of 30 April 2016 . . . the overall project completion has progressed beyond 40%."  The June 2016 6-K also assured

investors that "management is setting firm targets and objectives for the project team in order to minimise the capital expenditure and optimise the overall project schedule."  Finally, the June 2016 6-K represented that "the ethane cracker will achieve beneficial operation in the second half of calendar year 2018, which will enable around 80% of the total output from LCCP to reach beneficial operation later in 2018 and early 2019," and that "[t]he remaining volumes from the other derivative units will reach beneficial operation by the second half of 2019."

41.     Then, on August 23, 2016, Sasol filed another Report of Foreign Private Issuer on Form 6-K with the SEC, disclosing that a "detailed review has confirmed that the total capital cost for the project is expected to be US$11 billion, which includes site infrastructure and utility improvements," or "an increase of $2,1 billion from the original estimate at the time of final investment decision (FID) in October 2014" (the "August 2016 6-K").  According to Sasol, this increase was "mostly attributable" to several factors in "approximately equal" proportion, including, in relevant part:

> *   a significant increase in site and civil costs due to much more ground works required to establish the site compared to what was estimated at FID as a result of poorer than anticipated subsurface conditions . . . and much lower field productivity resulting from a conscious decision to proceed with out-of-sequence site preparation activities while waiting for a variation of permit conditions to be granted . . . . ;
>
> *   an increase in the home office and construction costs of the Engineering, Procurement, Construction and Management Contractor (EPCm) mainly as a result of a increase in contractor wage rates compared to what were assumed at FID, lower engineering productivity, and an increase in contractor engineering hours as a result of the increased material quantities; and
>
> *   an increase in labour costs as a result of higher quantities of material for installation, the decision to change to a higher-skilled and thus higher cost crew mix to enable planned labour productivity improvements for the remainder of the project, and lump-sum contracts placed at higher rates than estimated.

42.     Additionally, the August 2016 6-K disclosed that "[a]n impairment of $65 million has been recognised for our 2016 financial year pertaining to the [LDPE] unit."

43.     Following these disclosures, Sasol's ADR price fell $0.14 per share, or 0.51%, to close at $27.21 per share on August 23, 2016.  This share price drop was largely buttressed by Defendants' continued promises that they were remediating issues with the LCCP's workforce, scheduling, and construction, and had a solid plan in place to mitigate future negative impacts on the project.

44.     For example, the August 2016 6-K represented that Sasol had implemented, or was in the process of implementing, "[m]itigation actions to ensure successful project delivery," which included, *inter alia*, "improved productivity and construction readiness that will be achieved through focused risk management processes, improved phasing of engineering, cost-effective mobilisation of resources and synchronized workface planning; improved change management practices; and key project leadership personnel changes."

45.     The August 2016 6-K also included a quote from the Chairman of Sasol's Board of Directors, Mandla Gantsho, who represented that Defendants "have taken decisive action to address the issues raised" by the LCCP's delayed construction.

46.     Finally, the August 2016 6-K assured investors that "[a]t 30 June 2016 . . . the overall project completion was around 50%"; that "[t]he schedule for LCCP remains the same as communicated on 6 June 2016"; that the new US$11 billion "estimate includes a contingency . . . [Defendants] consider being sufficient to effectively take the project to beneficial operation within the revised cost estimate"; that the Company did not expect to "exceed[] its self-imposed gearing targets"; and that Defendants are "confident that the remaining construction, procurement,

execution and business readiness risks can be managed within the estimate as a result of these changes."

47.    On September 27, 2016, Sasol filed an Annual Report on Form 20-F with the SEC, reporting the Company's financial and operating results for the quarter and year ended June 30, 2016 (the "2016 20-F").   The 2016 20-F represented that, as of the date of the period covered by the 2016 20-F, Sasol's disclosure controls and procedures and internal control over financial reporting were effective, and that "[t]here were no changes in [Sasol's] internal control over financial reporting that occurred during the year ended 30 June 2016 that have materially affected, or are likely to materially affect, [its] internal control over financial reporting as at 30 June 2016."

48.    The 2016 20-F further touted the Company's "code of ethics that applies to all of [its] directors, officers and employees, including the Joint Presidents and [CEOs], [CFO] and the Senior Vice President: Financial Control Services," and that Defendants "conducted an extensive awareness campaign for [their] employees."

49.    With respect to the LCCP, 2016 20-F touted that "[o]verall construction on the project continues on all fronts, with most engineering activities nearing completion and procurement well advanced"; and that, "[a]t 30 June 2016, the capital expenditure to date on LCCP was US$4,8 billion, and the overall project completion was around 50%."

50.    The 2016 20-F also contained substantively the same positive statements as the August 2016 6-K concerning the remedial steps taken by Defendants for oversight of the LCCP.

51.    The 2016 20-F also contained substantively the same merely generic, boilerplate representations as referenced in ¶ 35 above, which were plainly "catch-all" provisions that were not tailored to Sasol's actual known risks with respect to the LCCP's development.

52.     Appended as exhibits to the 2016 20-F were signed SOX certifications, wherein Defendants Nqwababa, Cornell, and Victor certified that "[t]he [2016 20-F] fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934" and that "[t]he information contained in the [2016 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

53.     On August 28, 2017, Sasol filed an Annual Report on Form 20-F with the SEC, reporting the Company's financial and operating results for the quarter and year ended June 30, 2017 (the "2017 20-F").  The 2017 20-F touted that, as of the date of the period covered by that report, Sasol's disclosure controls and procedures and internal control over financial reporting were effective, and that "[t]here were no changes in [Sasol's] internal control over financial reporting that occurred during the year ended 30 June 2017 that have materially affected, or are likely to materially affect, [its] internal control over financial reporting as at 30 June 2017."

54.     The 2017 20-F further touted the Company's "code of ethics that applies to all of [its] directors, officers and employees, including the Joint Presidents and [CEOs], [CFO] and the Senior Vice President: Financial Control Services," and that Defendants "conducted an extensive awareness campaign for [their] employees."

55.     With respect to the LCCP, the 2017 20-F touted that "[o]verall construction on the project continues on all fronts, with most engineering and procurement activities nearing completion"; that, "[a]t 30 June 2017, the capital expenditure to date is $7,5 billion, and the overall project completion is around 74%"; that "[t]he total forecasted capital cost for the project remains within the revised estimate of US$11 billion"; and that "[t]his US$11 billion estimate includes a contingency, which measured against industry norms for this stage of project completion,  is

considered sufficient to effectively take the project to beneficial operation within the revised cost estimate."

56.     The 2017 20-F also contained substantively the same merely generic, boilerplate representations as referenced in ¶ 35 above, which were plainly "catch-all" provisions that were not tailored to Sasol's actual known risks with respect to the LCCP's development.

57.     Appended as exhibits to the 2017 20-F were signed SOX certifications, wherein Defendants Nqwababa, Cornell, and Victor certified that "[t]he [2017 20-F] fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934" and that "[t]he information contained in the [2017 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

58.     On August 28, 2018, Sasol filed an Annual Report on Form 20-F with the SEC, reporting the Company's financial and operating results for the quarter and year ended June 30, 2018 (the "2018 20-F").  The 2018 20-F touted that, as of the date of the period covered by that report, Sasol's disclosure controls and procedures and internal control over financial reporting were effective, and that "[t]here were no changes in [Sasol's] internal control over financial reporting that occurred during the year ended 30 June 2018 that have materially affected, or are likely to materially affect, [its] internal control over financial reporting as at 30 June 2018."

59.     The 2018 20-F further touted "a new Code of Conduct (Code) was adopted effective 1 March 2018," which "adopts a behaviours-based approach which reinforces the importance of linking [Sasol's] day-to-day actions to Sasol's shared values and [its] aspirational culture"; "is further underpinned by policies and guidance notes to enhance its everyday application"; and "applies to all of [Sasol's] directors, officers and employees, including the Joint Presidents and [CEOs], [CFO] and the Senior Vice President: Financial Control Services."

60.     With respect to the LCCP, the 2018 20-F touted that "indications are that the cost of the project will remain within the previous market guidance of US$11,13 billion"; that, "[a]s at the end of June 2018, engineering, equipment fabrication and procurement were substantially complete and construction progress reached 68% completion"; that the "[o]verall the project is 88% complete with capital expenditure amounting to US$9,85 billion"; and that "[p]rogress on the LCCP units are reviewed and considered internally and by third party consultants regularly."

61.     The 2018 20-F also contained substantively the same merely generic, boilerplate representations as referenced in ¶ 35 above, which were plainly "catch-all" provisions that were not tailored to Sasol's actual known risks with respect to the LCCP's development.

62.     Appended as exhibits to the 2018 20-F were signed SOX certifications, wherein Defendants Nqwababa, Cornell, and Victor certified that "[t]he [2018 20-F] fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934" and that "[t]he information contained in the [2018 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

63.     On February 8, 2019, during pre-market hours, Sasol filed a Report of Foreign Private Issuer on Form 6-K with the SEC, disclosing that "the overall [LCCP] project capital cost estimate [was] revised from US$11,13 billion to a range of US$11,6 – 11,8 billion," citing, *inter alia*, "[l]ate scope additions for the Cracker as a result of incomplete engineering work not timeously identified"; "[i]ncreased scope to ensure process safety for the Cracker and Ethylene oxide/Ethylene Glycol (EO/EG) unit due to defective carbon steel forgings"; "[p]roductivity losses exacerbated by high absenteeism around public holidays and construction rework since end November 2018"; and "[s]chedule delays of the remaining units," which would "result in additional overhead costs."

64.     Following these disclosures, Sasol's ADR price fell $1.18 per share, or 3.94%, to close at $28.79 per share on February 8, 2019.

65.     Then, on May 22, 2019, during pre-market hours, Sasol filed another Report of Foreign Private Issuer on Form 6-K with the SEC, disclosing that the cost estimate for completing the LCCP had been raised by around $1 billion (the "May 2019 6-K").   Specifically, Sasol disclosed that "the cost estimate for the LCCP has been revised to a range of $12,6 to $12,9 billion which includes a contingency of $300 million," citing a $530 million change in the project's cost forecast because of a "[c]orrection for duplication of investment allowances of approximately $230 million"; a "[c]orrection for certain contracts and variation orders managed by Sasol, outside the primary engineering, procurement and construction contract, of approximately $180 million"; and forecast improvements that were "not expected to be realised and adjustments for potential insurance claims and procurement back-charges of approximately $120 million."

66.     The May 2019 6-K also cited a $470 million impact from numerous additional defects and construction finishing oversights, including, *inter alia*, "defective carbon steel forgings"; "[r]eplacement of the internals of numerous heat exchangers due to corrosion"; "[t]he completion of painting, insulation and fireproofing"; and a review that "identified a significant increase in required finishing activities such as heat tracing, insulation, fireproofing and associated work as well as additional infrastructure costs."

67.     Finally, the May 2019 6-K cited "[a] contingency amount for items that could impact the cost forecast" of $300 million, including, *inter alia*, "[l]ower than assumed productivity and associated time extension"; "[a] new risk identified relating to bolting materials that may need to be replaced"; and "[o]ther unforeseen items impacting finishing and commissioning activities."

68.     Following these disclosures, Sasol's ADR price fell $4.50 per share, or 14.93%, to close at $25.64 per share on May 22, 2019.  Nonetheless, the Company's securities continued to trade at artificially inflated prices throughout the Class Period as a result of Defendants' continued positive statements, which touted the progress of the LCCP's development and management's oversight of that project.

69.     For example, the May 2019 6-K touted that "[e]xecutive management has implemented several changes since February 2019 to further strengthen the oversight, leadership for the project and frequency of reporting," including "segregation of duties between project controls and finance functions and assigning a Senior Vice-President to have responsibility for the LCCP project controls."  The May 2019 6-K also touted that "[i]nitiatives to improve decision-making, transparency and documentation within the project management team are also in progress," and assured investors that "new project leadership has been instrumental in identifying and remediating these issues."

70.     On July 25, 2019, during pre-market hours, Sasol issued a press release announcing further delays on construction of certain aspects of the LCCP—specifically, the LDPE plant and Ziegler units (the "July 2019 Press Release").  According to that press release, Defendants were "experiencing some schedule pressure on the [LDPE] plant and expect BO [*i.e.*, beneficial operation] to be delayed by four to six weeks as it has taken longer than planned to complete the construction, as well as the cleaning and preparation of critical equipment."  The press release also disclosed that "the Ziegler unit BO is expected to be delayed by four to eight weeks mainly due to slower piping hydro-testing completion."

71.     Following these disclosures, Sasol's ADR price fell $1.60 per share, or 6.76%, to close at $22.06 per share on July 25, 2019.  However, as before, the Company's securities

continued to trade at artificially inflated prices following this disclosure as a result of Defendants' continued positive statements touting the progress of the LCCP's development, as well as management oversight of the project.

72.     For example, the July 2019 Press Release touted that "[m]itigation plans are in place to minimise the delay to the maximum extent possible," that "independent review on the project" was "ongoing and is conducted by independent external experts," and that this review was "an in depth exercise entailing the review of a voluminous amount of documents and numerous interview."

73.     On August 16, 2019, during pre-market hours, Sasol issued another press release disclosing that it was delaying the announcement of its 2019 financial results as a result of "possible LCCP control weaknesses" (the "August 2019 Press Release").  That press release did not go into further detail regarding the nature of these control weaknesses, but noted that "[m]anagement and the Board will assess such control weaknesses and identify whether any further remedial actions are required," and that "the Company's auditors are required to consider these assessments in terms of International Standards on Auditing and the Auditing Standards of the Public Company Accounting Oversight Board."

74.     On this news, Sasol's ADR price fell $0.74 per share, or 4.02%, to close at $17.67 per share on August 16, 2019.

75.     On August 26, 2019, Sasol filed a Report of Foreign Private Issuer on Form 6-K with the SEC, disclosing that the Company had halved expected earnings from the LCCP after technical difficulties and schedule pressures forced it to push back operational dates for a number of its units.  Specifically, Sasol reported that the LCCP's beneficial operation dates for its LDPE, Ziegler, Ethoxylates, and Guerbet units were being pushed back as far as a month, and that, "[a]s

a consequence of these technical issues and the revised beneficial operation dates, the LCCP earnings before interest, tax, depreciation and amortisation (EBITDA) guidance for the 2020 financial year has been adjusted from US$300-350 million to US$150-300 million."

76.     Following these disclosures, Sasol securities closed at the same price as the previous trading day.  As noted by a senior portfolio manager involved in the Johannesburg financial market, "[t]he relatively mild reaction to the news was probably the result of the market already pricing in much of the bad news," and "[t]he market is waiting to see how long it is actually going to take them to get the right product levels, and the output they are supposed to have."

77.     The statements referenced in ¶¶ 40, 44-62, 69 and 72 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Sasol had conducted insufficient due diligence into, and failed to account for multiple issues with, the LCCP, as well as the true cost of the project; (ii) construction and operation of the LCCP was consequently plagued by control weaknesses, delays, rising costs, and technical issues; (iii) these issues were exacerbated by Sasol's top-level management, who engaged in improper and unethical behavior with respect to financial reporting for the LCCP and its oversight; (iv) all the foregoing was reasonably likely to render the LCCP significantly more expensive than disclosed and negatively impact the Company's financial results; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Regarding LCCP's Deficient Reporting Controls Is Fully Revealed**

78.     On October 28, 2019, Sasol filed another Report of Foreign Private Issuer on Form 6-K with the SEC, during pre-market hours, disclosing that its review of the LCCP control

weaknesses had brought to light "errors, omissions, and inaccuracies in the [LCCP] cost estimate," and a number of unethical and improper reporting activities that took place at the highest level of management (the "October 2019 6-K").  As a result of its review, the Company announced the resignation of, *inter alia*, its Joint Presidents and CEOs, Defendants Nqwababa and Cornell, effective November 1, 2019, and Senior Vice Presidents and others previously in charge of the LCCP.  With respect to the specific causal factors that led to these issues, the October 2019 6-K stated, in relevant part:

- Conduct - Inappropriate conduct and an improper tone at the top of the LCCP, including an excessive focus on maintaining cost and schedule estimates at the expense of providing accurate cost and schedule estimation to oversight bodies (including Joint Presidents and Chief Executive Officers (Joint CEOs)) within the Company.

- Segregation of duties - Insufficient segregation of duties of the LCCP project controls environment from the LCCP project execution environment, which prevented the identification of certain potential errors in cost and schedule estimation.

- Control procedures - Inadequate control procedures within the LCCP control environment that allowed erroneous and/or unsupported reporting by the LCCP leadership to go unchallenged without proper escalation of potential red flags.

- Ethics process - Inadequate procedures to ensure that internal ethics complaints as to the LCCP were escalated appropriately.

- Project-related Control Environment - A culture of excess deference within the control environment that oversaw the LCCP caused certain individuals with control responsibilities and in oversight committees, including but not limited to the Steering Committee created to oversee the LCCP, to exhibit insufficient scepticism toward reporting by the LCCP leadership team.

It is the Board's assessment that the former leadership of the LCCP PMT's conduct was inappropriate, demonstrated a lack of competence, and was not transparent . . . . The Board believes these factors compromised the ability of the various LCCP governance structures, including the Board in relation to LCCP matters, to perform their oversight role effectively on behalf of shareholders.

79.     Sasol additionally confirmed that "[n]o earnings, financial position, or cash flow restatements are required," and disclosed a large and purportedly detailed remediation plan, including, among a variety of other steps taken, "[r]educed incentives awards for individuals company-wide based on relation and/or proximity to LCCP"; "[r]equiring that various employees involved in the LCCP and/or its oversight engage in additional training, including on reporting obligations"; and "[r]evising the Company's procedures regarding the escalation of ethics complaints and internal investigation findings."

80.     The October 2019 6-K further assured investors that, "[b]ased on remediation measures taken, the Board is confident that the cost to completion estimate for the LCCP, confirmed by the Board's most recent assessment of LCCP management's reporting, is tracking the 22 May 2019 announced cost guidance range of between $12,6 billion and $12,9 billion."

81.     Additionally, on October 28, 2019, Sasol filed an Annual Report on Form 20-F with the SEC, reporting the Company's financial and operating results for the quarter and year ended June 30, 2019 (the "2019 20-F").  The 2019 20-F made further assurances as to the project timing and control of the LCCP, touting that "indications are that the cost of the project will remain within the updated market guidance of US$12,6 - 12,9 billion"; that, "[a]s at the end of June 2019, engineering, equipment fabrication and procurement were substantially complete and construction progress had reached 94% completion and overall the project completion is 98%"; that the LDPE "facility [is] anticipated to reach beneficial operation during the remainder of calendar year 2019"; and THAT "[p]rogress on the LCCP units is reviewed and considered internally and by third party consultants regularly, with past reviews identifying increased scope and slower construction and commissioning ramp-down curves as units reached start-up."

82.     The 2019 20-F also contained substantively the same merely generic, boilerplate representations as referenced in ¶ 35 above, which were plainly "catch-all" provisions that were not tailored to Sasol's actual known risks with respect to the LCCP's development.

83.     Appended as exhibits to the 2019 20-F were signed SOX certifications, wherein Defendants Nqwababa, Cornell, and Victor certified that "[t]he [2019 20-F] fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934" and that "[t]he information contained in the [2019 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

84.     The statements referenced in ¶¶ 79-83 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Sasol had conducted insufficient due diligence into, and failed to account for multiple issues with, the LCCP, as well as the true cost of the project; (ii) construction and operation of the LCCP was consequently plagued by control weaknesses, delays, rising costs, and technical issues; (iii) all the foregoing was reasonably likely to render the LCCP significantly more expensive than disclosed and negatively impact the Company's financial results; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Regarding Deficient Due Diligence for the LCCP Is Fully Revealed**

85.     On January 14, 2020, Sasol issued a press release confirming that on January 13, 2020, the Company "experienced an explosion and fire at its LCCP low-density polyethylene (LDPE) unit" of its Lake Charles chemicals project in Louisiana.   Sasol stated that "[t]he unit was in the final stages of commissioning and startup when the incident occurred" and "has been shut

down and an investigation is underway to determine the cause of the incident, the extent of the damage and resulting impact on the LDPE unit's [beneficial operation] schedule."

86.     Following these disclosures, Sasol's ADR price fell $1.70 per share, or 7.84%, over the following two trading days, closing at $19.99 per share on January 15, 2020.

87.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

88.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Sasol securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

89.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Sasol securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Sasol or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

90.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

91.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

92.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Sasol;

- whether the Individual Defendants caused Sasol to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Sasol securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

93.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

94.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Sasol securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Sasol securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

95.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

96.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

97.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

98.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

99.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Sasol securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Sasol securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

100.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Sasol securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Sasol's finances and business prospects.

101.     By virtue of their positions at Sasol, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended

thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

102.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Sasol, the Individual Defendants had knowledge of the details of Sasol's internal affairs.

103.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Sasol. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Sasol's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Sasol securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Sasol's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Sasol securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

104.    During the Class Period, Sasol securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Sasol securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Sasol securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Sasol securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

105.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

106.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## <u>COUNT II</u>

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

107.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

108.    During the Class Period, the Individual Defendants participated in the operation and management of Sasol, and conducted and participated, directly and indirectly, in the conduct of Sasol's business affairs.  Because of their senior positions, they knew the adverse non-public information about Sasol's misstatement of income and expenses and false financial statements.

109.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Sasol's financial condition and results of operations, and to correct promptly any public statements issued by Sasol which had become materially false or misleading.

110.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Sasol disseminated in the marketplace during the Class Period concerning Sasol's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Sasol to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Sasol within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Sasol securities.

111.    Each of the Individual Defendants, therefore, acted as a controlling person of Sasol. By reason of their senior management positions and/or being directors of Sasol, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Sasol to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Sasol and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

30

112.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Sasol.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated:  February 5, 2020

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603

Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

**THE SCHALL LAW FIRM**
Brian Schall
(*pro hac vice* application forthcoming)
Rina Restaino
(*pro hac vice* application forthcoming)
Kate Kearney
(*pro hac vice* application forthcoming)
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com
Email: rina@schallfirm.com
Email: kate@schallfirm.com

***Attorneys for Plaintiff***

## CERTIFICATION PURSUANT
## <u>TO FEDERAL SECURITIES LAWS</u>

1.   I, Chad Lindsey Moshell, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against Sasol Limited ("Sasol" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.   I did not purchase or acquire Sasol securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Sasol securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.   To the best of my current knowledge, the attached sheet lists all of my transactions in Sasol securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.


**Executed** __2/4/2020_____
                              **(Date)**


DocuSigned by:

_____
               7 12634EBDD3548E...
                    **(Signature)**


Chad Lindsey Moshell
        **(Type or Print Name)**

**Sasol Limited (SSL)**                                                          **Moshell, Chad Lindsey**

### List of Purchases and Sales

| Date | Transaction Type | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| 7/24/2015 | Purchase | 150 | $33.0500 |
| 10/22/2015 | Dividend Reinvestment of $53.56 | | |
| 4/21/2016 | Dividend Reinvestment of $23.52 | | |
| 10/14/2016 | Dividend Reinvestment of $48.41 | | |
| 3/31/2017 | Dividend Reinvestment of $24.35 | | |
| 9/22/2017 | Dividend Reinvestment of $41.28 | | |
| 4/2/2018 | Dividend Reinvestment of $23.92 | | |
| 9/21/2018 | Dividend Reinvestment of $27.34 | | |
| 3/29/2019 | Dividend Reinvestment of $26.03 | | |