K4nWmosO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CHAD LINDSEY MOSHELL,
Individually and on Behalf of
All Others Similarly Situated,

                    Plaintiff,

          v.                          20 Civ. 1008 (JSR)

SASOL LIMITED, *et al.*,

                    Defendants.
                                      Oral Argument
                                      (via telephone)

------------------------------x
                                      New York, N.Y.
                                      April 23, 2020
                                      2:15 p.m.

Before:

                    HON. JED S. RAKOFF,

                                      District Judge


                         APPEARANCES

HAGENS BERMAN SOBOL SHAPIRO LLP
      Attorneys for Movant Cohn
BY:  LUCAS E. GILMORE
      JASON A. ZWEIG

GLANCY PRONGAY & MURRAY LLP
      Attorneys for Movant Saratoga
BY:  KEVIN R. RUF
      -and-
FINKELSTEIN & KRINSK LLP
BY:  JEFFREY R. KRINSK

WEIL GOTSHAL & MANGES LLP
      Attorneys for Defendants
BY: CAROLINE ZALKA

Also Present:  Laura Portuondo

K4nWmosO

THE COURT:  This is Judge Rakoff.  Would counsel please identify themselves for the record.

MR. KRINSK:  Yes.  Good morning -- I guess afternoon in your case, Judge Rakoff.  This is Jeffrey Krinsk from Finkelstein & Krinsk.  I'm working with Kevin, who also is on the phone there, from the Glancy firm, and we are cocounsel representing Saratoga Capital's portfolio of these stocks.  And as we were directed, Bruce Ventimiglia, who is the chairman, president, chief executive officer of Saratoga Capital is also on the phone.

Thank you.

THE COURT:  Thank you.

MR. GILMORE:  Good afternoon.  Lucas Gilmore from Hagens Berman Sobol & Shapiro.  I'm representing the movant David Cohn, who is also appearing telephonically.

MR. ZWEIG:  This is Jason Zweig -- good afternoon, your Honor -- from Hagens Berman Sobol Shapiro, also for movant David Cohn.

THE COURT:  All right.  Thank you, all, for calling.

Let me mention at the outset that Mr. Zweig was my summer intern 24 years ago, when I was only 13 years old, and we have been periodically in communication since then, as I have been with all my summer interns, but my policy in situations like this is I will have no personal contact of any kind whatsoever with Mr. Zweig during the course of this

litigation.  I just wanted to put that on the record.

I think I would like to talk, first, to Mr. Cohn, and then, second, to the representative from Saratoga.

Mr. Cohn, are you there?

MR. COHN:  I am here, Judge.

THE COURT:  Have you been involved in any class actions previously?

MR. COHN:  I have not.

THE COURT:  And what do you understand to be your duties if I were to select you as lead plaintiff?

MR. COHN:  To be a representative for all of the other shareholders.

THE COURT:  By the way, is there someone on from the defendant?  I should have asked that before.

MS. ZALKA:   I actually had announced myself but was on mute.  This is Caroline Zalka from Weil Gotshal for the defendant.

THE COURT:  Thank you very much.

Supposing at some point, Mr. Cohn, an offer is made through counsel to settle the case.  How are you going to evaluate that?  What are you going to do?

THE DEFENDANT:  Well, I'd probably look at the advice of my legal counsel to see if it was a, you know, reasonable settlement, you know, look at what percent of the losses it would cover.

K4nWmosO

THE COURT: The point is that anyone I appoint as lead counsel needs to be someone who will not just be a potted plant but will take affirmative steps to make sure that whatever is being presented by counsel is given scrutiny by you.

THE DEFENDANT: Well, I mean, they have much more experience dealing with these type of settlements than I do. I mean, I would personally like to get all of the losses back, but I understand that isn't how it works in the real world, and so, you know, it's their job.

THE COURT: I'll give you an example. Supposing they said to you we have a settlement that is ten cents on the dollar and also there's a settlement fund and we will apply to the Court to give us 30 percent of that settlement fund as our attorney's fees. What would you do if presented with that?

THE DEFENDANT: Well, is that after all the discovery has been done?

THE COURT: I'm going to assume that. Sure.

THE DEFENDANT: Well, if all of the discovery has been done and no new facts came to light, I would think that settlement's a little low. I already have an agreement with the firm about what their fees would be. I think 30 percent is way up the high end of what we've agreed that their fees are going to be anyway.

THE COURT: Yes, but just so you understand, I've looked at that agreement, and I want to see the one from

Saratoga as well.  I've looked at that agreement and it does have a range, and the highest range is 30 percent.  But that's not binding on me, and I might give them 10 percent.

THE DEFENDANT:  Well, I understand that ultimately they have to ask you for the reimbursement.  I mean, if you thought 10 percent was a fairer amount, I don't think I'd be arguing that you reduced it to 10 percent.

THE COURT:  Well, it would be more money.  You understand this is one pot of money.

THE DEFENDANT:  Yeah.

THE COURT:  So the more they get the less the shareholders, the members of the class, get.  The less they get the more you get.

MR. COHN:  No.  I understand that, but they are entitled to some fee, and they will have presumably earned it at that point if they've went through all the discovery.  I mean, I was happy with the fee schedule we set up with them.  I mean, ultimately, your hypothetical -- is ten cents on the dollar with 30 percent off the top reasonable -- if all of this discovery has been made and nothing new has come to light, I think that's a little low.

THE COURT:  Just so you're aware, if there is a proposed settlement, under the law, I would hold a preliminary hearing to make a preliminary determination as to whether it's reasonable, fair and adequate, and I would want you at that

K4nWmosO

hearing because I would want to know what steps you had taken on behalf of the class to make sure this was the best settlement from the class' standpoint that you could obtain.

You understand that's part of your duty; yes?

THE DEFENDANT:  Yes.  I understand that.

THE COURT:  All right.

MR. COHN:  Counsel informed me that I should -- you know, they asked if I was willing to travel, willing to attend hearings over the phone, willing to attend them over the internet.  You know, I'm willing to do all that.

THE COURT:  I would not recommend that over the next few weeks.

OK.  Let's turn to the representative from Saratoga.

I'm sorry.  I missed your name before.  Would you identify yourself again.

MR. VENTIMIGLIA:  Bruce Ventimiglia.

THE COURT:  Tell me a little bit about yourself.

MR. VENTIMIGLIA:  Well, I was happy to tell you that I was born in Jamaica Hospital, in New York, if you want to go that far back, and ultimately found my way to Michigan with my family when we moved there and was raised in Michigan, and headed back to New York to take a nice position on the Prudential Securities operating council in downtown Manhattan, on Water Street, where I was the national director of financial services for that firm.  And now I'm working with a company

called Saratoga Capital Management, and I'm the -- as

Mr. Krinsk mentioned, I'm the chairman, president and chief

executive officer of Saratoga Capital Management and the

29-fund mutual fund family that we represent.

THE COURT:  And have you been involved in any prior

class action suits?

MR. VENTIMIGLIA:  I have.

THE COURT:  As a plaintiff.

MR. VENTIMIGLIA:  Yes.

THE COURT:  Were you ever lead plaintiff?

MR. VENTIMIGLIA:  Yes.

THE COURT:  And tell me, was that on one occasion,

several occasions; what?

MR. VENTIMIGLIA:  I believe we were leader in one or

two occasions.  I don't recall the exact number, but it was one

or two.  Not many more than that.

THE COURT:  And what happened in those cases?

MR. VENTIMIGLIA:  They were resolved favorably.  We,

in one case, got an out-of-court settlement with a company --

I'm not sure I should mention the amount, but it was a $100

million-plus out-of-court settlement, and the other case was

settled favorably as well to the plaintiff, to us.

THE COURT:  Were the law firms that are now seeking to

represent you also who represented you in those cases?

MR. VENTIMIGLIA:  Mr. Krinsk's firm, yes.

K4nWmosO

THE COURT:  And if you recall, what percentage fee did his firm get?

MR. VENTIMIGLIA:  I do apologize.  I don't recall.

THE COURT:  Yes.

MR. KRINSK:  I wanted to just say, if my recollection is correct, I believe it was 24 percent.

THE COURT:  OK.  Thank you very much.

Going back to Mr. Ventimiglia, what do you understand to be your responsibilities as lead plaintiff if I were to select you?

MR. VENTIMIGLIA:  I assume to engage in a very active, involved, responsible role that is -- it's a very daunting role.  I would be representing all classes of investors that we believe were harmed, so it would be my responsibility to be intimately familiar with the facts surrounding the case and the harm, legal arguments presented by both counsel; that is, our plaintiff counsel and defense counsel.  Although I'm not a lawyer and I'm not in a position where I can second-guess their argument, I think it's my responsibility to understand their arguments and then ultimately understand any particular outcome, and then it would be my job to weigh that outcome by asking for empirical evidence of similar situations; *i.e.*, if there's a settlement proposed, I'd want empirical documentation from our counsel about similarly situated sorts of situations where settlements were proposed and what the outcomes were; try

to determine on behalf of the class whether or not it's a reasonable settlement offer in light of all the facts and circumstances and legal arguments.  It's a big task.

THE COURT:  Does Saratoga have a retainer agreement with one or both of these firms?

MR. VENTIMIGLIA:  Not yet.

MR. KRINSK:  There's an agreement to --

Well, I'll let the judge --

MR. VENTIMIGLIA:  Yeah, an agreement to -- I mean, I told Mr. Krinsk that I would like to retain him and will formally retain him, you know, upon your approval, your Honor.

THE COURT:  Does counsel have a standard form retainer agreement in class actions?

MR. KRINSK:  We do, your Honor.

THE COURT:  And what percentage fees do you put in that --

MR. KRINSK:  We normally say in an amount determined by the Court not to exceed 30 percent.

THE COURT:  OK.  Those were all the questions I had for the witnesses.  Let me turn to counsel.

I guess my question for Saratoga's counsel is it appears that Mr. Cohn has by far the largest loss, something just shy of $72,000, whereas Saratoga, if I understand this correctly, only lost 16,000.  Now, that's not the end of the story in appointment of counsel, but of course, there is a

K4nWmosO

presumption in favor of the plaintiff who had the largest loss. What about that?

MR. KRINSK:  Are you asking counsel, your Honor?

THE COURT:  Yes.

MR. KRINSK:  Let me first go -- though I'm sure, I'm certain that my cohort Kevin from the Glancy firm will add to this.

My thought's a very simple one.  We have two people here that are vying for position.  One is actively involved. I'll get to answering your question specifically.  One has been involved and was involved in purchasing this stock that I'm talking about, Saratoga, which did this at the beginning of the class period.  What we have here is a class period that really is too lengthy, may be too lengthy -- we'll see -- but it's over five years.  That's tough for the Court to look at.  It's difficult for the counsel in a situation like this to even consider that.

However, if you end up looking at what happened, we have Saratoga buying at the beginning of the class period and continuing through the class period, whereas we have Mr. Cohn -- and I think the world of the counsel that he has designated, I don't mean to say anything's wrong with it, but he didn't get involved in buying this stock in a single transaction on June 5 of 2019.  That's almost four and a half years after the beginning of the class.  It's very unlikely

K4nWmosO

that he's aware intimately of what took place earlier or could understand the importance that it, that those, that the events during that period provided to an average investor or a professional investor who saw that.

The only things that happened, because obviously this is an individual who bought the stock believing that the worst information was out and it was the -- a majority of the price had already been eviscerated from its market value, in a single transaction, hoping that it would appreciate after the bad news.  It didn't, but it wasn't because there was new news that came out.  It's just was that the gravity of what previously came out became better appreciated.  And I would say -- again, let me emphasize I have no reason to believe that David Cohn isn't a suitable class rep, but he certainly is involved in the events that pertain to this lawsuit at least four and a half years after the important events took place.

THE COURT:  OK.

Now let me hear from counsel for Mr. Cohn --

MR. GILMORE:  Yes, your Honor.

THE COURT:  -- on the points that were just made, and then I have one or two other questions.

MR. GILMORE:  Sure, your Honor.

As the Court pointed out, and the Court is very familiar with the analysis under the PSLRA, Mr. Cohn is the presumptive lead plaintiff.  He has, by far, the most

K4nWmosO

significant financial interest in the case, four to five times the claimed losses of Mr. Saratoga.

He's also made a showing of his typicality.  He, like other class members, bought, in reliance on defendants' representations, at inflated values and suffered losses and he's proven his adequacy.  He's offered, unlike Saratoga, a declaration setting forth his background, his capabilities and his understanding of his obligations of lead plaintiff and having no conflicts.

THE COURT:  The suggestion from Saratoga's counsel, as I understood it, is that whereas Saratoga was investing from early on in the alleged fraud period, your client made a one-time risky investment, as it turned out, late in the day. It doesn't mean he didn't rely on the misrepresentations, but they're suggesting that his position is less sensitive to the overall class than they would be.

MR. GILMORE:  Understood.  Let me address that directly.

First, Mr. Cohn bought right in the heart of the class period.  He bought after the May statement of a cost estimate on the Lake Charles project, bought on June in reliance, and then later, in August, the company then discloses that it turns out they had done -- they had internal control problems with their cost estimates, which is the center of this case.

In contrast, Saratoga, while they did buy early, if

you take a look at their loss chart, they're constantly also selling out at different times and completely had sold out in August of 2019, before there's even disclosure in October of the results of the investigation. So in real, in reality, the atypical investment, inadequate investment, would be Saratoga.

I should also note that the Court mentioned Saratoga's losses of 15- to 16,000. In preparing for this hearing we recalculated the losses, and we came up with only net losses of $300 and change; that he bought a total of $65,362 in funds and then sold 64,981, so his net losses are really only $381.40, and the claimed interest is exaggerated.

And then I would also note that Saratoga mentions to you they have participated as a representative party in prior class actions, and that is not disclosed on the certification.

And then moreover, there is no retention and there appears to be a cocounsel arrangement, with no explanation. So I think by any measure, Mr. Cohn is the most adequate plaintiff to represent the class.

MR. KRINSK: May I respond?

THE COURT: Yes. Let me hear from Saratoga's counsel.

MR. KRINSK: First of all, of course, it's easy to make up items after the fact when they're not contained in anything that's been presented to the Court. As a matter of fact, if you look at the application, none of the points that were just made, or effectively made up, by the Glancy firm, who

K4nWmosO

were apparently unaware of the unsuitability, the lower suitability of Mr. Cohn.

MR. GILMORE:  Jeff, you just said the Glancy firm. You meant Hagens.

MR. KRINSK:  The Hagens firm.  I am sorry.

While he said, while we just heard counsel for the -- for Mr. Cohn say he bought right in the middle of things as they were going on, in fact, the principal events that took place that would have placed anyone on knowledge of these was the termination of the co -- was before the termination of the co-CEOs in October of 2'19 and the purported fire and explosion that took place at the factory at 1/13 of 2020.  These were impacts of things that happened during the period that my client was a holder of the stock.  For him to say somehow over the last six months of what's a five-year period, his client somehow was involved in the middle of these items is simply an attempt to recover credibility in a circumstance where none exists.

I would say when you compare, in trying to say that there was some lack of, there would be some lack of enthusiasm in monitoring this by Saratoga Capital, there could be nothing farther from the truth.

THE COURT:  The suggestion is that your net loss was $300.  Is that right?

MR. KRINSK:  No, that's not right, your Honor, and if

K4nWmosO

that was going to be advocated, it certainly hasn't in any filings or through any --

THE COURT:  Well, let me ask you.  What was your net loss?

MR. KRINSK:  The net loss that we have in this particular case is, I believe, about --

Kevin, what was the final calculation?

MR. RUF:  15,127 LIFO and 16,825 adjusted.

MR. KRINSK:  And I would say to you that neither our amount of 15,000 or for that amount the purported loss that Mr. Cohn has is of, I think, 71,000 is really that significant to change the motivation of the respective parties.  One's been through this many times with much larger sums involved.

THE COURT:  That's why I asked about the $300.  That would be a different situation, a very different situation than 16,000.

What is your arrangement with cocounsel?

MR. KRINSK:  I am -- cocounsel, like myself, will provide ultimately the time that they have put into this case; it will be aggregated and presented as a single-fee application at the end of the case.  I think you'll find that my firm is not one of these firms that sees how close they can get to the 33 percent number.  We keep good records and we maintain them and we don't use an advantageous situation to get an outrageous fee.

K4nWmosO

THE COURT:  There is also the suggestion that you failed to disclose --

MR. KRINSK:  Yeah, that's a good point also.

THE COURT:  Yes.

MR. KRINSK:  Let me say that what we have to disclose isn't the nature of our client's business.  It's whether or not we proceeded in a case in which there were particular holdings held for any number of times in this particular, this particular division of Saratoga are.  The particular portfolio that we're talking about in which the thousands of people have money invested is one of many that Saratoga maintains.  The net money, the money under management is a bit under $2 billion, but there is nothing that comes close to there being repetitive, repetitive use of the same portfolios, of the same funds.  This fund is completely different and run differently than the other funds, and if it had been used before it would have been identified.

THE COURT:  All right.  A question for counsel for both sides.

There were originally four applications for lead plaintiff, two of which were subsequently withdrawn.  Do either of you, your firms, have any written or oral understanding with the firms that withdrew their applications?

MR. KRINSK:  I can say on behalf --

Go on, please.

K4nWmosO

MR. GILMORE:  Your Honor, the answer's no.

MR. KRINSK:  For the Glancy firm and Finkelstein & Krinsk, the answer is the same.  No.

THE COURT:  OK.  Very good.

Here's what I think we should do.  This has been very helpful, and I appreciate all the arguments and the testimony.

If anyone wants to make any further written submission -- you're not required to, but you are invited to -- on any of the issues that came up today or on anything else that you think is important, you can file supplemental motion papers provided they are filed no later than April 30, a week from today.

Also, I would like to see either the standard form retainer agreement between now and April 30 or, if it's executed by Saratoga, then the signed agreement.

MR. KRINSK:  No problem at all, your Honor.

THE COURT:  Very good.  I will then decide who is to be the plaintiff and lead counsel no later than May 7.

Whoever is then appointed lead counsel will have until May 21 to file any amended complaint.

Now let me ask defense counsel, who has appropriately been quiet, do you plan to make a motion to dismiss?

MS. ZALKA:  Yes, I anticipate we will, your Honor.

THE COURT:  OK.  That's what I figured.

How long after May 21 do you want for your motion to

K4nWmosO

dismiss?

MS. ZALKA:  I'm just looking at the calendar.

I think we could move to dismiss within five weeks of the filing.

THE COURT:  I'm sure you could, but that's a lot more than I would normally expect a firm as experienced as yours to need.  I was thinking two weeks, but how about four weeks.

MS. ZALKA:  Absolutely, your Honor.  Yes.

THE COURT:  All right.  I don't have a calendar.  What is four weeks from May 21?

MS. ZALKA:  I think it's June 18.

THE COURT:  OK.  At this point, plaintiff's counsel doesn't know which one of them is going to be plaintiff's counsel, but my suggestion would be that you have the same four weeks to answer.  Any problem with that?

MR. GILMORE:  Your Honor, for Hagens Berman, we do not have any kind of problem with four weeks in opposing a motion to dismiss.  I would simply ask that, in setting the amended complaint, to ask for four weeks from the appointment, and that will ensure that we can get you the best product that we can. Given these trying times, with other cases I'm working on, I know that there are a lot of witnesses who want to speak with us, but because they're staying home and taking care of child care or doing home schooling, it's very difficult to schedule that, so in order to get you the best product, I would ask, you

K4nWmosO

know, that we'd ask for four weeks from the May 7 date.

THE COURT:  All right.  Again, I don't have a calendar in front of me.  What is four weeks from May 7?

MR. GILMORE:  That would take us to June 4.

THE COURT:  And four weeks from that would be July 1.

MS. ZALKA:  I think it's July 2, your Honor.

THE COURT:  July 2.

MS. ZALKA:  Yes.

THE COURT:  July 2 for moving papers on motion to dismiss.  July 30 for answering papers.  August --

Linda, are you on the phone?

MS. PORTUONDO:  She's not, but I am, Judge.

THE COURT:  OK.  What day of the week is August 10?

MS. PORTUONDO:  August 10 is a Monday.

THE COURT:  OK.  Reply papers August 10, and we will have oral argument on any motion to dismiss on August 20 at 4 p.m.

Now, those are much more extended dates than I normally give.  I'm giving the extended dates because of the coronavirus situation.  Nevertheless, don't come back and ask me for any more time; it will not be granted.  Those dates are fixed in stone.

MR. KRINSK:  Certainly, your Honor.

May I make one more point, since you seem to be using this as an opportunity to bestow your thoughts as to what's

K4nWmosO

important in your designation of lead counsel?

I just wanted to say that I believe, unlike most of the other counsel on the phone, and it was not mentioned, but the principal defendant, Sasol Ltd., is a South African corporation, a huge South African corporation, I might add, and I believe only myself and perhaps part of the Glancy firm have had extensive experience with litigation down in South Africa. I did that while being the head of licensing some years ago, and I am familiar with the legal firms that are worthy of participation, and it may end up saving -- I don't care about my time but saving the class a significant amount of money.

THE COURT:  All right.  That's helpful to know.

As I say, anything else, even if you only think of it after we get off this call, anything else anyone wanted to add, you can do so.  The supplemental papers, however, will be limited to ten double-spaced pages.  They are to be filed -- and you're not required to file anything, but if you want to file anything, they must be filed by April 30.

Good.  Anything else that anyone wanted to bring up?

MR. GILMORE:  No, your Honor.

MR. KRINSK:  If I can say this?

This is Jeff Krinsk.  I'm out in California, although I'm a member of the New York bar as well.  I just wanted to say I've admired your opinions for an awfully long time so I'm very happy to be in front of you today, and I'm even happier to hear

K4nWmosO

that things are well there and you're surviving a very difficult period.

THE COURT:  Well, you're very gracious to say that.  I will now have to put my wife on the phone to give you the rebuttal.

MR. KRINSK:  Thank you, your Honor.

THE COURT:  Anything else?

All right.  Very good.  Thanks so much.  Bye-bye.

(Adjourned)