**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHAD LINDSEY MOSHELL, Individually and On Behalf of All Others Similarly Situated, | |
| Plaintiff, | Case No. 1:20-cv-01008-JSR |
| -v- | Hon. Jed S. Rakoff |
| SASOL LIMITED, DAVID EDWARD CONSTABLE, BONGANI NQWABABA, STEPHEN CORNELL, PAUL VICTOR, FLEETWOOD GROBLER, and STEPHAN SCHOEMAN, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

*Attorneys for Defendants Sasol Limited, David Edward Constable, Bongani Nqwababa, Stephen Cornell, Paul Victor, Fleetwood Grobler, and Stephan Schoeman*

July 2, 2020

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS .............................................................................................4

      **A.**    Spring/Summer 2016 Cost Increase: Construction Delays...............................5

      **B.**    Fall 2017 Cost Increase: Hurricanes ................................................................7

      **C.**    Winter 2019 Cost Increase: Inclement Weather ...............................................8

      **D.**    Spring/Summer 2019 Cost Increase: Control Weaknesses...............................9

ARGUMENT...............................................................................................................11

    I.     PLAINTIFF FAILS TO STATE A SECTION 10(B) CLAIM....................................11

      **A.**    LCCP Cost and Schedule Estimates Are Forward-Looking Statements
          Protected by the PSLRA Safe Harbor................................................................11

      **B.**    Plaintiff Fails to Plead an Actionable Misstatement.......................................23

      **C.**    Plaintiff Fails to Plead Scienter........................................................................27

    II.    IN THE ALTERNATIVE, DEFENDANTS SEEK LEAVE TO TAKE
         DEPOSITIONS OF PLAINTIFF'S CWS. .................................................................33

CONCLUSION............................................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito v. IMCERA Grp., Inc.*,
   47 F.3d 47 (2d Cir. 1995) ........................................................................................28

*In re Adient PLC Sec. Litig.*,
   2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020).............................................................27

*In re Agnico-Eagle Mines Ltd. Sec. Litig.*,
   2013 WL 144041 (S.D.N.Y. Jan. 14, 2013), *aff'd sub nom. Forsta AP-Fonden
   v. Agnico-Eagle Mines Ltd.*, 533 F. App'x 38 (2d Cir. 2013) .............................4, 28

*In re Aratana Therapeutics Inc. Sec. Litig.*,
   315 F. Supp. 3d 737 (S.D.N.Y. 2018).....................................................................26

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..................................................................................................11

*Athale v. SinoTech Energy Ltd.*,
   2015 WL 13145808 (S.D.N.Y. Jan. 23, 2015) .........................................................31

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007).......................................................................................11

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*,
   757 F. Supp. 2d 260 (S.D.N.Y. 2010).......................................................................25

*In re Barrick Gold Sec. Litig.*,
   2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015)..................................................... *passim*

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..................................................................................................11

*In re Braskem S.A. Sec. Litig.*,
   246 F. Supp. 3d. 731 (S.D.N.Y. 2017).......................................................................27

*Campo v. Sears Holdings, Corp.*,
   371 F. App'x 212 (2d Cir. 2010) .........................................................................14, 34

*Chapman v. Mueller Water Prods., Inc.*,
   2020 WL 3100243 (S.D.N.Y. June 11, 2020) ..........................................................20

*In re China Mobile Games & Entm't Grp., Ltd. Sec. Litig.*,
   2016 WL 922711 (S.D.N.Y. Mar. 7, 2016)...............................................................24

*In re China Organic Sec. Litig.*,
2013 WL 5434637 (S.D.N.Y. Sept. 30, 2013)..........................................................................11

*In re Deutsche Bank AG Sec. Litig.*,
2017 WL 4049253 (S.D.N.Y. June 28, 2017), *aff'd sub nom. Sfiraiala v. Deutsche Bank AG*, 729 F. App'x 55 (2d Cir. 2018).............................................................18

*In re Duane Reade Inc. Sec. Litig.*,
2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003), *aff'd sub nom. Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004)............................................................27

*In re EDAP TMS S.A. Sec. Litig.*,
2015 WL 5326166 (S.D.N.Y. Sept. 14, 2015)..........................................................................26

*Feiner Family Tr. v. Xcelera.com, Inc.*,
2008 WL 5233605 (S.D.N.Y. Dec. 15, 2008), *aff'd sub nom. Feiner Family Tr. v. VBI Corp.*, 352 F. App'x 461 (2d Cir. 2009) ...................................................................29

*In re Frontier Commc'ns Corp. S'holder Litig.*,
2019 WL 1099075 (D. Conn. Mar. 8, 2019) ...........................................................................16

*Gamm v. Sanderson Farms, Inc.*,
944 F.3d 455 (2d Cir. 2019)......................................................................................................23

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011)...........................................................................15, 20, 31

*Gray v. Wesco Aircraft Holdings, Inc.*,
2020 WL 1904019 (S.D.N.Y. Apr. 16, 2020), *appeal filed*, Case No. 20-1530
(2d Cir. May 6, 2020) ...............................................................................................................12

*Gregory v. ProNAi Therapeutics Inc.*,
297 F. Supp. 3d 372 (S.D.N.Y. 2018), *aff'd*, 757 F. App'x 35 (2d Cir. 2018)..................13, 32

*Halperin v. eBanker USA.com, Inc.*,
295 F.3d 352 (2d Cir. 2002).....................................................................................................14

*Hutchinson v. Perez*,
2012 WL 5451258 (S.D.N.Y. Nov. 8, 2012)............................................................................31

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001)..........................................................................................27, 28, 29

*Karasick v. ProShares Trust (In re ProShares Trust Sec. Litig.)*,
728 F.3d 96 (2d Cir. 2013)........................................................................................................24

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
  897 F. Supp. 2d 168 (S.D.N.Y. 2012) , *aff'd sub nom. Cent. States, S.E. &
  S.W. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72
  (2d Cir. 2013)..................................................................................................................29

*Lewis v. YRC Worldwide Inc.*,
  2020 WL 1493915 (N.D.N.Y. Mar. 27, 2020) ........................................................17

*Liplow v. Net 1 UEPS Techs. Inc.*,
  131 F. Supp. 3d 144 (S.D.N.Y. 2015).......................................................................28

*In re Livent, Inc. Noteholders Sec. Litig.*,
  151 F. Supp. 2d 371 (S.D.N.Y. 2001).......................................................................35

*Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*,
  724 F. Supp. 2d 447 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011)..................15, 20

*Long Miao v. Fanhua, Inc.*,
  2020 WL 996602 (S.D.N.Y. Mar. 2, 2020) ..................................................... *passim*

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015)....................17, 24

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
  26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015)..................18, 29

*Maverick Fund. L.D.C. v. Comverse Tech., Inc.*,
  801 F. Supp. 2d 41 (E.D.N.Y 2011) ........................................................................26

*In re Millennial Media, Inc. Sec. Litig.*,
  2015 WL 3443918 (S.D.N.Y. May 29, 2015) ....................................................14, 34

*In re Molycorp, Inc. Sec. Litig.*,
  2015 WL 1097355 (S.D.N.Y. Mar. 12, 2015) ..........................................................32

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC
  Partners, Inc.*,
  2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016).........................................................17

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)......................................................................... *passim*

*In re PetroChina Co. Sec. Litig.*,
  120 F. Supp. 3d 340 (S.D.N.Y. 2015).......................................................................30

*Pirnik v. Fiat Chrysler Autos., N.V.*,
  2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) .............................................................29

iv

*Plumbers & Pipefitters Local Union No. 719 Pension Tr. Fund v. Conseco Inc.*,
    2011 WL 1198712 (S.D.N.Y. Mar. 30, 2011) ........................................................................25

*In re PXRE Grp., Ltd., Sec. Litig.*,
    600 F. Supp. 2d 510 (S.D.N.Y.), *aff'd*, 357 F. App'x 393 (2d Cir. 2009)..............................29

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)....................................................................................................23

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009).................................................................................................29, 30

*San Leandro Emergency Med. Plan. v. Philip Morris, Co.*,
    75 F.3d 801 (2d Cir. 1996)......................................................................................................22

*Santa Fe Indus., Inc. v. Green,*
    430 U.S. 462 (1977).................................................................................................................18

*Schiro v. Cemex, S.A.B. de C.V.*,
    396 F. Supp. 3d 283 (S.D.N.Y. 2019)......................................................................................32

*Shemian v. Research In Motion Ltd.*,
    2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013), *aff'd*, 570 F. App'x 32 (2d Cir.
    2014) ...................................................................................................................................30, 33

*In re ShengdaTech, Inc. Sec. Litig.*,
    2014 WL 3928606 (S.D.N.Y. Aug. 12, 2014)..........................................................................30

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019).......................................................................................................27

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010).................................................................................12, 13, 14, 33

*Stratte-McClure v. Morgan Stanley*,
    598 F. App'x 25 (2d Cir. 2015) ...............................................................................................24

*In re Supercom Inc. Sec. Litig.*,
    2018 WL 4926442 (S.D.N.Y. Oct. 10, 2018) ..........................................................................31

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008)....................................................................................................28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).....................................................................................................14, 28, 32

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011)......................................................................................18

*Warchol v. Green Mountain Coffee Roasters, Inc.*,
  2012 WL 256099 (D. Vt. Jan. 27, 2012) ..................................................................14

*In re WEBMD Health Corp. Sec. Litig.*,
  2013 WL 64511 (S.D.N.Y. Jan. 2, 2013) ...............................................................14

*Wyche v. Advanced Drainage Sys., Inc.*,
  710 F. App'x 471 (2d Cir. 2017)...........................................................................28

**Statutes & Rules**

15 U.S.C. § 78u-4 .......................................................................................1, 11, 23, 27

15 U.S.C. § 78u-5 ...................................................................................................12, 14

Fed. R. Civ. P. 8..........................................................................................................1

Fed. R. Civ. P. 9......................................................................................................1, 11, 24

Fed. R. Civ. P. 11.......................................................................................................34

Fed. R. Civ. P. 12......................................................................................................1, 11

**Other Authorities**

H.R. Rep. No. 104–369 (1995).....................................................................................35

Defendants Sasol Limited, Messrs. Constable, Nqwababa, Cornell, Victor, Grobler, and Schoeman (collectively, the "Defendants") respectfully submit this memorandum of law in support of their Motion to Dismiss the Amended Class Action Complaint ("AC") under Rules 8, 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure (the "Rules") and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(3) ("PSLRA").

## PRELIMINARY STATEMENT

Construction projects come in late and over budget. This immutable law of nature is true for home renovations, and even more so for mega-construction projects—those taking years to complete at a cost of billions of dollars. The Lake Charles Chemicals Project ("LCCP") built by Sasol is such a mega-construction project. With a work site spanning approximately 3 million square meters and a plant size of approximately 540,000 square meters, Sasol anticipated needing nearly 1,500 workers on site by early 2015 and 5,000 workers by early 2016, and required 240,000 cubic yards of concrete, nearly 59,000 tons of steel and more than 120km of pipes. The budget had over 60,000 separate line items for services and material.

Sure enough, the LCCP came in late and over budget. Sasol announced its investment decision on the project in October 2014, with an estimated budget of $8.9 billion and an initial operation date of 2018. After this kickoff, the project suffered three epic hurricanes, absenteeism, contractor underperformance, and myriad management and control problems. As of Q1 2020, the project was 99% complete with a cost of $12.8 billion. Between 2014 and the present, Sasol made four separate disclosures, revising estimates of completion date and cost. Sasol also reported extensively about ongoing reviews of the LCCP budget.

Naturally, a plaintiff has come forward to allege securities fraud. This Plaintiff claims that Sasol secretly knew all along that the project would cost billions more than Sasol disclosed initially, and for no particular reason, Sasol withheld this actual amount from the public for nearly

five years. But this is little more than a theory: Plaintiff offers no particularized factual support—no document, no email, no admission from any Defendant. Instead, Plaintiff relies on window dressing in the form of six confidential witnesses ("CWs") who, for the most part, assert conclusory rumors and make post hoc complaints that no doubt have plagued every construction project since the beginning of time.

Plaintiff's flimsy allegations are insufficient to survive a motion to dismiss and cannot justify forcing Sasol into multi-million dollar discovery. *First*, the overwhelming majority of Sasol's challenged LCCP projections are textbook forward-looking statements, protected by the PSLRA safe harbor. They were clearly identified as such in all public disclosures, and they were accompanied by meaningful cautionary language. Sasol warned that the LCCP was "***subject to risks of delay and cost overruns inherent in any large construction project***," including "unexpected delays in delivery times, shortages or unforeseen increases in the cost of equipment, labour and raw materials," "unforeseen design and engineering problems," "failure or delay of third-party service providers and disputes with suppliers," and "adverse weather conditions." No reasonable investor, having read Sasol's extensive cautionary language, could have been misled about the potential that these risks could materialize. *See infra* Section I.A.1.

Independently fatal to his claim*,* Plaintiff also offers no specific factual allegations demonstrating that Sasol's forward-looking statements were made with actual knowledge of their falsity. Plaintiff pleads no facts demonstrating that Defendants were contemporaneously aware that the then-current LCCP estimate was false. Plaintiff offers only the uncorroborated statements of low-level, short-term CWs who were in no position to ascertain Defendants' actual knowledge at the relevant time. *See infra* Section I.A.2.

*Second*, for all the same reasons, Plaintiff fails to pass the PSLRA's heightened pleading

hurdle, which requires particularized factual allegations demonstrating that Sasol's estimates were false and misleading. Sasol's end-of-class period disclosures concerning its review of the LCCP cost estimate process similarly do not support the notion that Sasol's earlier statements were actionably false. Indeed, Plaintiff does not dispute that the investigation Sasol commenced in May 2019 was what uncovered these issues. *See infra* Section I.B.

*Third,* Plaintiff fails to plead any particularized facts giving rise to a strong inference of scienter. Plaintiff's principal "motive" for the fraud is that Defendants' compensation was tied to the performance of Sasol securities. But it is blackletter law in this Circuit that standard executive compensation does not serve as a motive, as it is a goal broadly shared by all corporate officers. Similarly, the grab bag of circumstantial facts Plaintiff invokes—including Defendants' positions, the importance of the LCCP to Sasol, and later officer resignations—are well recognized to be insufficient to raise a strong inference of scienter. *See infra* Section I.C.

*Finally*, Plaintiff also attributes to CW-1 allegations that something called a Change Order went from Fluor (a company CW-1 did not work for) to Sasol (a company CW-1 did not work for) in February 2016, and that under provisions of the construction contract (which CW-1 neither identifies nor claims to have seen), this Change Order mandatorily raised the projected cost to $11.7 billion. These allegations lack fundamental indicia of credibility. Moreover, in fact, none of this happened—there was no Change Order. If the Court deems these allegations material to its decision, we respectfully request depositions of the CWs and an opportunity to submit a supplemental brief. *See infra* Section II.

At bottom, Plaintiff's made-up story that Defendants knew for years what the eventual cost of the project would be, then conspired to hide that actual cost (while continually investigating and publicly disclosing cost increases) is far less compelling than the perfectly ordinary, non-

fraudulent alternative: the LCCP was a megaproject that came in late and over budget, with Sasol repeatedly and specifically cautioning about this possibility in advance, and investigating and disclosing updated estimates in real-time, as new developments occurred.

## STATEMENT OF FACTS[1]

On October 27, 2014, Sasol announced its plan to build the LCCP in Lake Charles, Louisiana. AC ¶ 58. The LCCP would include an ethane cracker, which transforms ethane into ethylene by heating it at super high temperatures, and six chemical manufacturing units, including facilities for the production of low-density polyethylene ("LDPE"). AC ¶ 58-59; Ex. A (Sasol 6-K dated Oct. 27, 2014) at 1. With a work site spanning approximately 3 million square meters and a plant size of around 540,000 square meters, Sasol considered the LCCP a "mega-project"—a "'capital-intensive process carried out over long durations.'" AC ¶ 60. Sasol projected that there would be approximately 1,500 workers on site by early 2015, and nearly 5,000 workers by early 2016. Ex. B (Investor Presentation LCCP Site Visit dated Feb. 2, 2015) at 28. Construction of the LCCP required over 22,000 piles, 240,000 cubic yards of concrete, 59,000 tons of steel and more than 120 km of underground pipes. Ex. C (Investor Presentation LCCP Site Visit dated Mar. 24, 2017) at 44.

Sasol engaged the joint venture Fluor Technip Integrated ("FTI")[2] as the "primary engineering, procurement, and construction management contractor" for the project. Ex. A (Sasol

---

[1] These facts are drawn only from the AC, documents incorporated therein, documents filed with the SEC, and documents relied on by Plaintiff in bringing suit. *See In re Agnico-Eagle Mines Ltd. Sec. Litig.*, 2013 WL 144041, at *1 n.2 (S.D.N.Y. Jan. 14, 2013), *aff'd sub nom. Forsta AP-Fonden v. Agnico-Eagle Mines Ltd.*, 533 F. App'x 38 (2d Cir. 2013).

[2] Contractors Fluor Enterprises Inc. ("Fluor") and Technip USA Inc. created a joint venture for the purpose of the LCCP known as "FTI." Ex. A (Sasol 6-K dated Oct. 27, 2014) at 2. References in the AC to "Fluor" are assumed to be references to Fluor alone, not FTI.

6-K dated Oct. 27, 2014) at 2. Concurrent with its announcement on October 27, 2014, to move forward with the LCCP, Sasol disclosed an $8.9 billion[3] cost estimate for the megaproject (*Id.* at 2-3), an estimate it reiterated in its March 9, 2015 and September 7, 2015 disclosures. AC ¶¶ 100, 130, 136. The October 2014 announcement included cautionary language about the "inherent risks and uncertainties" in making forward-looking statements and referred to the risks disclosed in Sasol's most recent annual report (Ex. A (Sasol 6-K dated Oct. 27, 2014) at 2), which expressly warned that Sasol's "large capital projects . . . may be affected by delays or cost overruns." Ex. D (Sasol 20-F dated Sept. 29, 2014) at 14.

### A.     Spring/Summer 2016 Cost Increase: Construction Delays

On March 7, 2016, when the LCCP was approaching 50% completion by June (AC ¶ 165), Sasol announced that it would "pace the execution of the LCCP" to support its plan to conserve cash in light of decreased global oil prices. AC ¶ 140; *see* Ex. E (Sasol 6-K dated Jan. 28, 2015) at 2. In connection with this announcement, Sasol disclosed that it expected the "project cost estimate [to] remain under pressure," and that a "detailed review of the project cost and schedule" was underway, with results expected in mid-2016. Ex. F (Sasol 6-K dated Mar. 7, 2016) at 7.

On June 6, 2016, Sasol reported its preliminary findings, disclosing that "the expected total capital expenditure for the [LCCP] could increase up to US$11 billion, including site infrastructure and utility improvements." AC ¶¶ 19, 106, 145. Although the review was still in progress, Sasol explained that the increase was primarily "due to construction delays caused by higher-than-expected rainfall, higher labour costs, certain of the lump-sum bid contracts prices being higher

---

[3] Plaintiff and CW-2 claim the Class Period begins on March 9, 2015 with Sasol "[q]uietly [i]ncreas[ing]" the LCCP cost estimate from $8.1 billion to $8.9 billion in its March 9, 2015 6-K. AC ¶ 130; *see also* AC ¶ 76. This is false. Sasol's disclosed cost estimate for the LCCP was $8.9 billion starting with its October 27, 2014 6-K. Ex. A (Sasol 6-K dated Oct. 27, 2014) at 1-2.

than originally estimated, as well as quantities of bulk materials being in excess of those included in the original estimate." Ex. G (Sasol 6-K dated June 6, 2016) at 2.

At the same time, Sasol specifically identified that its forward-looking statements included "statements regarding … executing our growth projects and cost reductions" and explained that "[b]y their very nature, forward-looking statements involve inherent risks and uncertainties," and that "a number of important factors could cause actual results to differ materially from … estimates and intentions expressed in such forward-looking statements." *Id.* at 2-3. Sasol disclosed, with specific reference to the LCCP: "Our large capital projects … may be affected by delays or cost overruns" and set forth each of the factors that could cause actual results to differ from its LCCP estimate, including "the capital cost of projects (including material, engineering and construction cost) and the timing of project milestones." Ex. H (Sasol 20-F dated Oct. 09, 2015) at 6, 14-15.

The following day, Sasol held an investor call. AC ¶ 147. Mr. Constable, Sasol's CEO at the time, told investors that "[t]he 'management team remains closely involved in guiding the project team,'" with the goal of "'minimiz[ing] capital expenditure and further optimiz[ing] overall project efficiency.'" AC ¶ 147. Mr. Constable reminded investors of the challenging nature of the project, stating "[t]his is an extremely complex project with six downstream derivative units which must be integrated and fully aligned in order to perform as required," and explained that execution had "been more difficult" than foreseen "particularly given the development of the overall site and the requirements related to utilities, off-sites and infrastructure." Ex. I (Business Update Call held on June 7, 2016) at 3-4.

On August 23, 2016, Sasol announced that it had completed its detailed LCCP review (AC ¶ 151) and explained that cost evaluations of this sort are normal in large megaprojects. Ex. J (Investor Fact Sheet dated Aug. 23, 2016) at 6. Sasol disclosed (and Plaintiffs do not challenge),

that the review included verifying the amounts and details of approximately 60,000 individual budget line items, "based on actual costs, detailed engineering, benchmarking against other projects as well as actual field construction productivity factors." Ex. K (Sasol 6-K dated Aug. 23, 2016) at 1. Based on this painstaking work, Sasol confirmed that the total capital cost of the project was indeed expected to be $11 billion—an increase of 23.5% over the initial $8.9 billion estimate—and at the top end of the budget range provided a few months earlier due to increased site and civil costs, wage rates, and labor costs. *Id.* at 2. Sasol disclosed that the estimate included a contingency, "which measured against industry norms for this stage of project completion, [was] consider[ed] [ ] sufficient to effectively take the project to beneficial operation within the revised cost estimate." AC ¶ 151. Once again, Sasol warned investors of potential cost overruns and delays at the LCCP, with reference to specific factors that could cause the estimate to increase and results to differ. Ex. K (Sasol 6-K dated Aug. 23, 2016) at 3. In its September 27, 2016 20-F, Sasol explicitly disclosed that because "the LCCP is particularly material to Sasol, any further cost overruns or adverse changes in assumptions affecting the viability of the project could have a material adverse effect[.]" Ex. L (Sasol 20-F dated Sept. 27, 2016) at 9.

From September 2016 to August 2017, the LCCP estimated total cost remained at $11 billion and Sasol disclosed unchallenged details about the LCCP's progress, particularly that "[o]verall construction on the project continues on all fronts, with most engineering activities nearing completion and procurement well advanced" (AC ¶ 165); the facility was "on track for start-up of the first units in the second half of 2018" (AC ¶ 168); and "project progress is tracking the approved schedule." AC ¶ 176.

### B.    Fall 2017 Cost Increase: Hurricanes

On November 23, 2017, Sasol announced an increase to the LCCP cost forecast of $130 million—or about 1.2%—and revised the total estimate to $11.13 billion. AC ¶ 181. Mr.

Nqwababa, one of Sasol's Joint Presidents and CEOs, explained on an investor call that the addition of this $130 million was due to "extreme weather events in the U.S. . . . caused initially by Hurricane Harvey and thereafter, Hurricanes Irma and Nate," which adversely "impact[ed] … construction productivity levels." Ex. M (Analyst Call held on Nov. 23, 2017) at 8.

The presentation accompanying this announcement identified "statements regarding … executing our growth projects (including LCCP)" as forward-looking, and described the "inherent risks and uncertainties" involved in such forward-looking statements, incorporating Sasol's most recent annual report that included an extensive list of ten risk factors specific to "[p]rojects like LCCP," including "natural disasters and adverse weather conditions, including … hurricanes," "unforeseen construction problems," and "inadequate workforce planning or productivity." Ex. N (Markets Day Presentation dated Nov. 23, 2017) at 2; Ex. O (Sasol 20-F dated Aug. 28, 2017) at 8-9.

For the rest of 2017 and through 2018, Sasol reported to investors that the LCCP's cost and schedule "remained 'on track,'" and that the LCCP had reached 85% completion by May 2018. AC ¶¶ 187-90, 194.

### C.    Winter 2019 Cost Increase: Inclement Weather

On February 8, 2019—with overall project completion having reached 94% in December 2018 (AC ¶ 197)—new information about the LCCP's progress emerged and Sasol once again updated investors. AC ¶ 196-97. Sasol announced that due to "several factors within and beyond [Sasol's] control" in the last quarter of CY 2018, the overall projected budget for the LCCP was updated to be $11.6–11.8 billion—a 4–6% increase over the $11.13 billion estimate announced in November 2017. AC ¶ 197. Sasol explained that "[w]hile our underlying productivity factor remained on track, the inclement weather, scope additions and absenteeism had a significant impact on actual productivity." Ex. P (Sasol 6-K dated Feb. 8, 2019) at 3. Although Sasol had

implemented "interventions" to halt "controllable trends," Sasol explained that these efforts could not completely negate the overall impact on schedule and project cost. *Id.*

In its February 8, 2019, disclosure, Sasol again identified that "statements regarding … executing our growth projects (including LCCP)" were forward-looking. *Id.* And, once again, Sasol described the "inherent risks and uncertainties" involved in such forward-looking statements, incorporating Sasol's 2018 annual report that identified the same ten project-specific factors disclosed in Sasol's 2017 20-F that could create a "risk of delays and cost overruns." *Id.* at 4; Ex. Q (Sasol 20-F dated Aug. 27, 2018) at 10-11. By April 2019, the LCCP was 96% complete and "tracking the schedule and the upper end of the cost estimate." Ex. R (Sasol 6-K dated Apr. 18, 2019) at 3.

### D.    Spring/Summer 2019 Cost Increase: Control Weaknesses

The final increase in the LCCP cost forecast came as a result of a "review of the costs and schedule until project completion" initiated in response to the February 2019 cost increase. Ex. S (Sasol 6-K dated May 22, 2019) at 2.  As with the 2016 review, Sasol shared the results of its investigation of these developments in real-time. Sasol first disclosed the findings of management's initial review in May 2019 and explained that Sasol's board "commissioned a review to be conducted by independent external experts," the results of which would be addressed when available. *Id.*

On May 22, 2019, Sasol disclosed that management's review identified "concerns related to the LCCP forecasting process," leading to an increase in the projected total cost. *Id.* Sasol's updated LCCP cost estimate was $12.6–12.9 billion (including a $300 million contingency), an approximately 10% increase over the prior estimate of $11.6–11.8 billion. *Id.* at 3. Management provided investors with a detailed breakdown of the basis for this budget increase—most of which was the result of recent developments as the project neared completion—including a $230 million

9

correction for duplicate investment allowances; a $180 million correction for certain contracts and variation orders; $120 million in forecast improvements not expected to be realized; $210 million ethane cracker updates including work to correct defective carbon steel forgings; and $260 million for infrastructure costs. Ex. S (Sasol 6-K dated May 22, 2019) at 3. Sasol explained that it took action to strengthen LCCP oversight in response to this preliminary review. AC ¶ 203.

Over the following months, Sasol disclosed the results of the Board-commissioned independent review as they became available. In August 2019, Sasol disclosed that the preliminary report of the independent review revealed "possible LCCP control weaknesses." Ex. T (Sasol 6-K dated Aug. 16, 2019) at 2. Accordingly, "Management and the Board [decided to] assess such control weaknesses and identify whether any further remedial actions [were] required" and opted to delay the announcement of Sasol's financial results until the independent review was complete. *Id*. On September 6, Sasol provided another update, explaining that the Board would commission further work to "allow a complete and thorough investigation, enabling the effective conclusion of the audit of the Company's 2019 financial results." Ex. U (Sasol 6-K dated Sept. 6, 2019) at 2. Sasol aimed to release its audited 2019 financial statements by October 31, 2019. *Id*.

In line with that target date, Sasol announced the completion of this independent review on October 28, 2019. Ex. V (Sasol 20-F dated Oct. 28, 2019) at 96. As set forth in Sasol's disclosure, the Board concluded that certain failures of project management and governance had delayed the prompt identification and reporting of the LCCP cost and schedule overruns. *Id.* Sasol explained that "the Company's disclosure controls and procedures were not effective [as of June 30, 2019] due to a material weakness in internal control over financial reporting with respect to the capital cost estimation process implemented in connection with the LCCP." AC ¶ 220. Despite this material weakness, however, Sasol confirmed that "the consolidated financial statements included

10

in this annual report on Form 20-F present[ed Sasol's financial position] fairly, in all material respects." AC ¶ 220. Sasol made no further revisions to the LCCP cost forecast for the remainder of the putative class period, which ends on January 13, 2020.

With each disclosure about the 2019 review of LCCP costs, as with Sasol's prior disclosures, Sasol specifically identified that its "cost estimates and expected timing of beneficial operation of LCCP" were forward-looking, and cautioned that "a number of important factors could cause actual results to differ materially from the plans," referring again to Sasol's 2018 annual report for a detailed description of those risk factors. Ex. S (Sasol 6-K dated May 22, 2019) at 6. The October 2019 Form 20-F disclosing the final results of the Board-commissioned external review likewise included a description of these forward-looking statements and risk factors. Ex. V (Sasol 20-F dated Oct. 28, 2019) at 4-5, 7-8.

## ARGUMENT

To avoid dismissal under Rule 12(b)(6), Plaintiff must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), so a complaint offering nothing more than "labels and conclusions" will not suffice. *In re China Organic Sec. Litig.*, 2013 WL 5434637, at *6 (S.D.N.Y. Sept. 30, 2013). This is especially so because Plaintiff also must meet the "heightened pleading requirements" of Rule 9(b) and the PSLRA, 15 U.S.C. § 78u-4(b), which require Plaintiff to plead his claims "with particularity." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

I.    **PLAINTIFF FAILS TO STATE A SECTION 10(B) CLAIM**

    A.    **LCCP Cost and Schedule Estimates Are Forward-Looking Statements Protected by the PSLRA Safe Harbor**

11

Plaintiff primarily challenges Defendants' statements about the LCCP cost and schedule estimates. AC ¶¶ 100, 110, 127, 133, 138, 141, 144, 163, 167-78, 180, 185, 195. Virtually all of these statements are "forward-looking statements" protected by the PSLRA's safe harbor provision. *See* 15 U.S.C. § 78u-5(c). Framed in the disjunctive, the safe harbor applies if a forward-looking statement is "identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

### 1. *LCCP Cost and Schedule Estimates Were Identified as Forward-Looking and Accompanied by Meaningful Cautionary Language*

The PSLRA defines "forward-looking statement" to include "a projection of . . . capital expenditures" and "a statement of the plans and objectives of management for future operations." 15 U.S.C. § 78u-5(i)(1). The LCCP cost estimate and estimate of the schedule for completion are exactly that, and have been identified as such by courts. *See*, *e.g.*, *In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *8 (S.D.N.Y. Apr. 1, 2015) (megaproject cost and schedule estimates are forward looking); *see also Gray v. Wesco Aircraft Holdings, Inc.*, 2020 WL 1904019, at *13 (S.D.N.Y. Apr. 16, 2020) (statements containing a projection or estimate qualify as forward looking), *appeal filed*, Case No. 20-1530 (2d Cir. May 6, 2020).[4] Indeed, Sasol itself specifically identified LCCP cost and scheduling estimates as "forward-looking" in every Form 20-F.[5]

---

[4] Plaintiff directly challenges Sasol's "estimate[s]" and "expect[ations]." *See e.g.*, "[W]e *expect* to achieve BO [beneficial operation] during [] 2018 . . . The final *estimated* project cost . . . . AC ¶ 136 (emphasis added); "[T]he increase in the *estimated* LCCP capital cost and extended schedule . . ." AC ¶ 145 (emphasis added); "'[T]otal capital cost for the project *is expected* to be US$11 billion . . . This *estimate* includes a contingency." AC ¶ 158 (emphasis added).

[5] *See* Ex. H (Sasol 20-F dated Oct. 9, 2015) at 14-15; Ex. L (Sasol 20-F dated Sept. 27, 2016) at 8-9; Ex. O (Sasol 20-F dated Aug. 28, 2017) at 8-9; Ex. Q (Sasol 20-F dated Aug. 27, 2018) at 10-11; Ex. V (Sasol 20-F dated Oct. 28, 2019) at 7-8.

Each of Sasol's forward-looking LCCP statements was accompanied by meaningful cautionary language sufficient to satisfy the PSLRA safe harbor. To qualify as "meaningful," the cautionary language must not be boilerplate and must convey substantive information. *Slayton*, 604 F.3d at 772. Here, Sasol warned, from the outset in its 2014 Form 20-F, that Sasol's "large capital projects"—including the LCCP—"may be affected by delays or cost overruns," and are "subject to risks of delay and cost overruns inherent in any large construction project," including "unexpected delays in delivery times, shortages or unforeseen increases in the cost of equipment, labour and raw materials," "unforeseen design and engineering problems," "failure or delay of third-party service providers and disputes with suppliers," "adverse weather conditions," and "defective construction and the resultant need for remedial work." *See* Ex. D (Sasol 20-F dated Sept. 29, 2014) at 14-15. Sasol reiterated these risk disclosures in every Form 20-F throughout the putative class period.[6]

This cautionary language "identified with specificity the types of risks that might lead the estimates to be inaccurate" and so is sufficiently meaningful to satisfy the PSLRA's safe harbor. *Barrick*, 2015 WL 1514597, at *8 (safe harbor applies to cost and schedule estimates that warned of "availability and costs associated with mining inputs and labor," "operating or technical difficulties in connection with mining or development activities," and "the risks of obtaining necessary licenses and permits").[7] Simply put, no reasonable investor, having read Sasol's

---

[6] *See* Ex. H (Sasol 20-F dated Oct. 9, 2015) at 14-15; Ex. L (Sasol 20-F dated Sept. 27, 2016) at 8-9; Ex. O (Sasol 20-F dated Aug. 28, 2017) at 8-9; Ex. Q (Sasol 20-F dated Aug. 27, 2018) at 10-11; Ex. V (Sasol 20-F dated Oct. 28, 2019) at 7-8.

[7] *See also Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 405 (S.D.N.Y. 2018) (affirming dismissal under PSLRA safe harbor where risk disclosures warned of "precise risks" that "eventually materialized"), *aff'd*, 757 F. App'x 35 (2d Cir. 2018).

13

extensive risk disclosures specifically concerning the LCCP, could have been misled into thinking there was no risk of cost overruns and delays at the LCCP.[8]

### 2.   *Plaintiff Fails to Plead Actual Knowledge of Falsity*

Sasol's forward-looking statements are separately and additionally immunized from liability because Plaintiff fails to plead the statements were "made or approved by [an executive officer] with *actual knowledge by that officer* that the statement was false or misleading." *Slayton*, 604 F.3d at 773 (emphasis added); 15 U.S.C. § 78u-5(c)(1)(B)(i). To plead "actual knowledge," Plaintiff must demonstrate more than recklessness—he must plead particularized facts demonstrating Defendants' "actual subjective knowledge." *Slayton*, 604 F.3d at 776 n.9.

Plaintiff's allegations about Defendants' supposed knowledge of undisclosed LCCP costs and delays rest on a random assortment of wholly uncorroborated statements by six CWs. AC ¶¶ 69, 72, 76, 78, 82, 87, 90, 91, 95, 98. This handicaps Plaintiff at the outset, as courts are "loathe . . . to sustain as sufficiently particular securities fraud complaints based on uncorroborated statements by CWs." *Long Miao v. Fanhua, Inc.*, 2020 WL 996602, at *17 (S.D.N.Y. Mar. 2, 2020); *see also* W*archol v. Green Mountain Coffee Roasters, Inc.*, 2012 WL 256099, at *11 (D. Vt. Jan. 27, 2012) ("Since *Tellabs*, skepticism of using CW sources to prove scienter has grown.") (citing *Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 216 n.4 (2d Cir. 2010)); *In re Millennial Media, Inc. Sec. Litig.*, 2015 WL 3443918, at *10 (S.D.N.Y. May 29, 2015) (finding "pervasive" deficiencies in CW allegations, including "statements that witnesses denied making, statements

---

[8] *See In re WEBMD Health Corp. Sec. Litig.*, 2013 WL 64511, at *7 (S.D.N.Y. Jan. 2, 2013) ("[T]he question is instead whether 'a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist.'") (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)). *See also* Ex. L (Sasol 20-F dated Sept. 27, 2016) at 9.

14

that were made but which [were] presented out of context, and statements of knowledge or opinion for which the witness lacked a factual basis.").

Far from supporting Plaintiff's claims, the CWs serve only to illustrate the myriad, fundamental problems presented by uncorroborated CW allegations, and do not remotely pass muster under well-settled Second Circuit law.[9]

### a.    The CWs' Positions and Periods of Employment Do Not Support Their Allegations

To stave off dismissal, a complaint must describe each CW with "sufficient particularity to support the probability that a person in the [CW's] position . . . would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). Unless Plaintiff's description of each CW indicates "a high likelihood that they actually knew facts underlying their allegations," this Court should decline to credit their allegations. *Long Miao*, 2020 WL 996602, at *17.

Here, half of the CWs are not even Sasol employees, but instead work for Sasol's contractors, or are subcontractors even further removed. AC ¶¶ 65 79, 96.[10] *See*, *e.g.*, *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 594 (S.D.N.Y. 2011) (rejecting CW allegations by CWs who worked for a third party that contracted with the defendant, not the defendant itself); *Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express. Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y.

---

[9] As explained below, to the extent the Court finds CW-1's Change Order story (or any other aspect of Plaintiff's CW allegations) material to deciding this motion, Defendants respectfully request leave to conduct limited discovery on the CW allegations and file a supplemental brief in support of their motion to dismiss. *See infra* at p. 33.

[10] CW-1 was a subcontractor of a contractor (Fluor) (AC ¶ 65); CW-3 was a Fluor contractor (AC ¶ 79); CW-6 was a contractor with TRS Staffing Solutions (AC ¶ 96). Accordingly, their testimony provides more insight into their own employers than Sasol's. For example, CW-3 explains that Fluor "didn't care about streamlining" because "they were paid regardless of whether they worked or not" and, as a result, "[e]veryone knew" that the subcontractors "didn't do anything but were billing hours to the company." AC ¶ 82.

15

2010) (same), *aff'd*, 430 F. App'x 63 (2d Cir. 2011). These three non-employees also admit they had nothing to do with the overall LCCP budget or financials: CW-1 was a "senior engineer" (among thousands)[11]; CW-3's role was to "commission, or start up, the ethane cracker"; and CW-6 was a "scheduler" for one LCCP unit. AC ¶¶ 65, 79, 96. Nothing in their titles or job descriptions indicates a "high likelihood" that any of these CWs were in a position to know anything about Sasol's overall cost and budget estimate for the LCCP. *Long Miao*, 2020 WL 996602 at *17.

The CWs actually employed by Sasol fare no better. CW-4 fails even to state his supposed title, position, reporting line, division or location. AC ¶ 85. This alone is disqualifying. *See Novak*, 216 F.3d at 314.[12] CW-5 was purportedly a "risk assessor" for the LCCP (AC ¶ 95), but Plaintiff omits any further detail, like what it is that a "risk assessor" does, CW-5's reporting line or location, or how his position made him privy to Sasol's overall LCCP budgeting process. *See In re Frontier Commc'ns Corp. S'holder Litig.*, 2019 WL 1099075, at *23 (D. Conn. Mar. 8, 2019) (dismissing allegations where CW's "access to company-wide data [was] not described with sufficient particularity" and his statements did not suggest knowledge of particularized contradictory information).

---

[11] Plaintiff alleges that CW-1 generated reports of LCCP's indirect costs every two weeks that were integrated into a consolidated cost report that CW-1 saw. AC ¶ 65. Notably, CW-1 provides no explanation as to what these consolidated cost reports revealed about the LCCP's cost estimate. AC ¶ 65. Nor does CW-1 allege that the individual Defendants ever reviewed these consolidated cost reports. AC ¶ 65.

[12] Even crediting CW-4's vague description of working "on accounting matters," CW-4 admits that he did so only "for six downstream chemical units." AC ¶ 85. That CW-4 worked on "accounting" for what appears to be a few units of a multi-faceted, multi-billion dollar megaproject involving thousands of workers says nothing about how CW-4 would have known the "facts underlying [his] allegations" about Defendants' knowledge of the overall LCCP cost estimate. *Long Miao*, 2020 WL 996602, at *17.

The CWs' periods of employment likewise impose severe limitations on their ability to "situate in time relevant occurrences." *Long Miao*, 2020 WL 996602, at *17. Three of the CWs left the LCCP within the first six months of the five-year putative class period: CW-2 left in July 2015 (present for 4 months), and CW-3 and CW-5 left in fall 2015 (present for approximately 6 months). AC ¶¶ 76, 79, 95. *See N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Res. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774, *10 (S.D.N.Y. Sept. 30, 2016) (discounting allegations from a CW "regarding nonpublic information that postdates his tenure"); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580-81 (S.D.N.Y. 2014) (rejecting CW allegations of issues predating the class period because they "sa[id] nothing about" any events transpiring during the class period), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).[13]

### b.   The CWs' Allegations Fail to Demonstrate Defendants' "Actual Subjective Knowledge" that the LCCP Projections Were False

Given the threshold failures above, it is unsurprising that the substance of the CWs' allegations is deficient. *First*, the CWs mostly offer vague assertions based on opinion and rumor. CW-2 describes CW-2's view that contractor arrangements were a "disaster" (AC ¶ 77); CW-3 openly acknowledges that CW-3 is regurgitating "rumors" that the LCCP budget was "unrealistic" (AC ¶ 82); and CW-5 opines that the $8.9 billion cost estimate was "ridiculously low," but the only basis offered for his belief was that he purportedly "heard everyone talking about [an $11 billion] number" (AC ¶ 95).[14] This hearsay and conjecture cannot satisfy the PSLRA's heightened pleading standard. *See Lewis v. YRC Worldwide Inc.,* 2020 WL 1493915, at *7 (N.D.N.Y. Mar.

---

[13] For similar reasons, CW-1 and CW-6's allegations can be credited only toward very limited periods: CW-1 and CW-6 were at the LCCP for less than a year: CW-1 from "early fall 2015 to mid-summer July 2016" and CW-6 from "early summer 2018 to late winter 2019." AC ¶¶ 65, 96.

[14] *See also e.g.* AC ¶¶ 70-71, 76-77, 87, 93, 97.

27, 2020) (CW allegations must be "based on personal knowledge" not "inadmissible hearsay").

Nor can a complaint be sustained on "colorful accusations." *In re Wachovia Equity Sec. Litig.*, 753

F. Supp. 2d 326, 352 (S.D.N.Y. 2011) (disregarding CW allegations that characterized defendant's

underwriting as "deteriorating, riddled with risky lending practices").[15]

 *Second*, the CWs offer up their own personal critiques of unidentified Sasol employees.

CW-2 alleges that the South African management team was "very dogmatic" and "not open to

constructive criticism or change" (AC ¶ 78); CW-3 believed the project commissioners were

"amateurs" (AC ¶ 79); CW-4 thought that executives from South Africa "were the wrong people

to run it," and that they were "not well regarded or liked." AC ¶ 92. But gripes about

mismanagement do nothing to demonstrate Defendants' actual subjective knowledge of falsity,

nor do they support a claim for securities fraud. *See Santa Fe Indus., Inc. v. Green,* 430 U.S. 462,

479 (1977); *In re Deutsche Bank AG Sec. Litig.*, 2017 WL 4049253, at *2, *6 (S.D.N.Y. June 28,

2017) (finding insufficient allegations that internal programs were "ineffective and poorly

managed" and that there was a "significant need for more management oversight"), *aff'd sub nom.*

*Sfiraiala v. Deutsche Bank AG*, 729 F. App'x 55 (2d Cir. 2018); *In re Magnum Hunter Res. Corp.*

*Sec. Litig.*, 26 F. Supp. 3d 278, 295 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015) (same).

---

[15] Sasol repeatedly disclosed that it had included a contingency for the LCCP. AC ¶¶ 151, 158, 169, 172, 179, 181, 185, 197. CW-1 alleges that Sasol used this contingency as a "dark art" and a "shell game" to conceal the true anticipated cost of the LCCP, and that this negative contingency was reported in an October 2015 External Cost report that "would have been" provided to the individual Defendants. AC ¶¶ 71-72. Beyond this, CW-1 offers no particularized allegations as to when this negative contingency was introduced internally, how it was previously incorporated or reported as part of the overall project budget, and how the contingency renders Sasol's contemporaneous disclosures concerning the contingency misleading.

*Third*, five of the six CWs allege no direct communication with any of the Defendants about the topics of the alleged misstatements.[16] CW-4 claims he "believed" that Mr. Cornell was aware of construction delays and incorrect cost estimates but never explains the basis for this belief or offers particularized allegations to support it. AC ¶ 86.[17] Similarly, CW-5 vaguely alleges that a higher cost estimate was "socialized among senior management" but never specifies who, when or how, asserting only that Mr. Cornell "would have" known about cost overruns because he was "informed and involved" with the LCCP. AC ¶ 95. CW-1 offers the unsubstantiated and wholly unparticularized supposition that a "Change Order" providing a $11.7 billion estimate "would have gone" to a Sasol VP who "would have" submitted it to more unidentified Sasol senior executives. AC ¶ 73.[18] CW-6 asserts that the LCCP was "behind schedule" (AC ¶¶ 96-97), but offers no particulars as to when this occurred, to whom this information was purportedly conveyed, and how it rendered Sasol's contemporaneous disclosures false.[19] And as discussed, CW-3 bases senior management's knowledge on "widespread rumors." AC ¶ 82.

---

[16] Indeed, CW-3, CW-4, CW-5, and CW-6 do not claim *any* personal contact with any of the individual Defendants. AC ¶¶ 79-95.

[17] CW-4 also alleges that they prepared presentations that went to "five individuals, who in turn reported to the Sasol's Group Executive Committee . . . and some board members." AC ¶ 85. But CW-4 does not identify the five individuals, specify the reports (what information they contained, when they were written, how often CW-4 provided them), or allege that the reports *actually went* to the Committee. *See* AC ¶ 85. CW-4 further alleges that Mr. Cornell was aware of the low cost estimates and construction delays based on CW-4's own calculations of the cost and reported progress of the LCCP, which CW-4 completed, in part after leaving Sasol. AC ¶ 86.

[18] CW-1 also alleges that Mr. Schoeman told CW-1 "'things are not good" with the [LCCP] based on the updates on progress and costs.'" AC ¶ 69. However, CW-1 provides no information regarding when or under what circumstances Mr. Schoeman purportedly made this comment.

[19] CW-6 also asserts that he "or [his] colleagues" were directed by "management" to alter the LCCP anticipated completion dates to make it appear as if the project was on schedule. AC ¶ 97. But CW-6 does not specify when this instruction was given or who in Sasol management it came from. CW-6 certainly does not allege that any of the Defendants made this request or that this

19

Plaintiff's failure to plead (much less with particularity) that the CWs "communicated with the individual defendants" or were "privy to the individual defendants' knowledge" is fatal. *Glaser*, 772 F. Supp. 2d at 589-90, 594; *see also Chapman v. Mueller Water Prod., Inc.*, 2020 WL 3100243, at *11 (S.D.N.Y. June 11, 2020) (holding that failure to identify "senior management" to whom issues were allegedly reported was insufficient to demonstrate actual knowledge); *Local No. 38*, 724 F. Supp. 2d at 460 (S.D.N.Y. 2010) (rejecting CWs employed "in rank-and-file positions or by outside contractors" with no contact with the defendants), *aff'd*, 430 F. App'x 63 (2d Cir. 2011).[20]

*Finally*, although CW-1's uncorroborated statements fail for all the reasons set forth above, in light of Plaintiff's heavy reliance on CW-1's "Change Order" allegation as the lynchpin of his securities fraud claim from 2016 on,[21] we briefly address its infirmities. CW-1, who "worked as a subcontractor for Fluor," alleges the existence of a so-called "Change Order" in February 2016 (created by Sasol's contractor Fluor, not Sasol itself) that allegedly reflected a Fluor (not Sasol) LCCP cost estimate of $11.7 billion, and then claims that Sasol was "contractually obligated" to

---

directive was given at the request of the Defendants, or even that the Defendants had any knowledge of this purported instruction whatsoever.

[20] CW-2 purportedly had contact with Mr. Nqwababa, Mr. Cornell and Mr. Victor. AC ¶ 76. However, CW-2 asserts only that CW-2 told those individuals CW-2 had "concerns" about "cost overruns and timeline for completion of the project." AC ¶ 76. But Plaintiff never specifies how or when CW-2 did so. Plaintiff also fails to offer even one detail about what exactly CW-2's concerns were, how they impacted the LCCP estimate or schedule, and what Defendants' reactions were. Thus, CW-2 offers no particularized allegations showing how CW-2's "concerns" rendered Sasol's overall multi-billion dollar LCCP cost estimate false at that time. *See Chapman*, 2020 WL 3100243, at *11 (rejecting CW statement that "conspicuously fails to identify information provided at the meeting" purportedly demonstrating the defendants' awareness of misstatements).

[21] According to Plaintiff, each of Sasol's disclosures concerning the LCCP cost estimate made after February 2016, was "false and misleading" because Sasol failed to disclose Fluor's mandatory $11.7 billion cost estimate for the LCCP. AC ¶¶ 144, 150, 163, 167, 174, 180, 185, 195, 199.

pay that amount. AC ¶¶ 65, 67-68.[22] But Plaintiff notably neglected to attach the Change Order as an exhibit to the AC and has otherwise pleaded nothing to demonstrate that the Change Order actually exists, or that CW-1's description of it is accurate (and no other CW mentions this purportedly seismic event).

The AC elsewhere casts grave doubt on the unsupported claim that Sasol was locked in to a fixed $11.7 billion cost as of February 2016. By Plaintiff's own description, the cost estimate of the LCCP hinged on its contractors' productivity and shortening time to completion would lead to a decrease in cost (the opposite of a fixed cost estimate). *See e.g.*, AC ¶¶ 82, 91 ("This [massive] rainfall had a substantial negative impact on productivity;" describing Fluor's contract as "reimbursable."). Indeed, Sasol continually disclosed (and Plaintiff does not challenge) its ongoing efforts to manage the LCCP's cost—confirming that such cost *could be* managed over time.[23] This is fundamentally inconsistent with the unsupported notion that CW-1 urges—namely, that costs were fixed by contractor fiat with zero allowance for change. And, in any event, CW-1's story about a so-called February 2016 Change Order does nothing to demonstrate that Sasol's subsequent disclosures were false. Plaintiff ignores that Defendants launched—and publicly announced—a detailed review of the LCCP cost and schedule in March 2016. As a result of that review, in August 2016, Defendants raised their cost estimate, and informed the public that a

---

[22] As discussed, Plaintiff fails to plead that the purported Change Order was communicated to any individual Defendant, independently dooming Plaintiff's reliance on this allegation. *See supra* at p. 19.

[23] "The management team remains closely involved in guiding the project team so that we can minimize capital expenditure and further optimize overall project efficiency" (AC ¶ 147); Sasol was "focused on driving the final CapEx as low as possible, primarily through … productivity and labor rate improvements, coupled with bulk quantity and related engineering cost reductions" (Ex. I (Business Update Call held on June 7, 2016) at 4); "productivity in the short-term impacted by extreme weather events" (Ex. N (Markets Day Presentation dated Nov. 23, 2017) at 13).

21

portion of the increase was attributed to "an increase in the home office and construction costs of the Engineering, Procurement, Construction and Management Contractor (EPCm)," *i.e.* FTI, the Fluor and Technip joint venture. Ex. L (Sasol 20-F dated Sept. 27, 2016) at 66; *see also* Ex. J (Investor Fact Sheet dated Aug. 23, 2016) at 7. So even had Plaintiff offered particularized allegations showing that the individual Defendants were aware that Fluor's estimate had increased to $11.7 billion as of February 2016 (Plaintiff did not), Plaintiff has pled nothing to suggest that Sasol's announcement the following month that it was undertaking a detailed line-item review of the LCCP project budget and its subsequent upward revision of the LCCP cost estimate were made with actual knowledge of their falsity. *See San Leandro Emergency Med. Plan. v. Philip Morris, Co.*, 75 F.3d 801, 812 (2d Cir. 1996) (disclosure of adverse information three weeks after positive representation is insufficient to support a finding that the prior statement was false when made).

* * * *

The Court's decision in *In re Barrick Gold Securities Litigation*, 2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015), is on all fours with this case. There, a company attempted to build a massive gold mine in a megaproject presenting "many logistical, operational, and environmental challenges." *Id.* at *1 (internal quotation marks omitted). In a story that may sound familiar, the company initially estimated the megaproject's cost at $2.8-3.0 billion in 2009, updated it to $3.3-3.6 billion in February 2011, $4.7-5.0 billion in July 2011, $7.5-8.0 billion by July 2012, and finally $8.0-8.5 billion in November 2012, ending with a cost estimate nearly triple the initial forecast before the project was ultimately discontinued. *Id.* at *2.

To show defendants had actual knowledge that their cost and schedule estimates were misleading, the *Barrick* plaintiffs alleged there were "reports that suggested the cost estimate and production schedule were inaccurate," including an initial contractor bid of more than $5 billion,

an external report calling cost estimates into question, and an internal report finding "[i]naccurate reporting" and a "failure to adequately monitor progress." *Id.* at *2-3. Plaintiffs also pointed to specific "Project Plan Reports" that purportedly "concluded that the current estimate of $2.8 billion capital budget was infeasible" and that "the timeline was at least 18 months too short." *Id.* at *10. The *Barrick* plaintiffs also relied on CW statements, including from the Project Manager who stated that he personally told an individual defendant that "the timeframe and budget was 'unrealistic,' but was told 'the budget was what [it] was, and the Project Manager had to deal with it.'" *Id* at *10. Based on these allegations, plaintiffs contended that "every cost and schedule estimate that defendants reported was false and misleading, because defendants concealed that the Project was not economically or technically feasible under the parameters they disclosed." *Id.* at *8 (internal quotation marks omitted).

But notwithstanding these allegations—which are far more particularized and connected to individual defendants than any allegation here—the court in *Barrick* held that Plaintiffs failed to adequately plead that "the estimates were announced with actual knowledge of their falsity, as required for forward-looking statements." *Id.* at *10. The same result follows here.

### B.    Plaintiff Fails to Plead an Actionable Misstatement

The PSLRA requires any party alleging a violation of Section 10(b) to "specify each statement alleged to have been misleading" and the "reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). "[P]laintiffs must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang,* 355 F.3d 164, 174 (2d Cir. 2004). To adequately plead falsity, Plaintiff must specify the allegedly fraudulent statements, identify the speaker, state where and when the statements were made, and supply particularized factual allegations demonstrating why the statements were fraudulent. *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019). Pleading fraud by hindsight is not

23

enough, rather, a statement must be false *at the time it was made*. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 571 (emphasis added). Accordingly, the alleged misstatements must be analyzed in context, by taking into account all cautionary language used by defendants. *See Stratte-McClure v. Morgan Stanley*, 598 F. App'x 25, 27-28 (2d Cir. 2015); *Karasick v. ProShares Trust (In re ProShares Trust Sec. Litig.),* 728 F.3d 96, 105 (2d Cir. 2013).

###### 1.   *Plaintiff Fails to Adequately Plead that Sasol's Forward-Looking Cost and Schedule Estimates Were Contemporaneously False*

As discussed, Section 10(b) claims that rely on CW allegations are particularly unlikely to meet Rule 9(b)'s and the PSLRA's heightened pleading standards. Here, Plaintiff's CW allegations fail to offer the requisite particularity showing how, when or why Sasol's initial estimate—and its later upward revisions of the estimate as the project progressed and new events (hurricanes, labor shortages, etc. . . . .) occurred—were false when made. *See supra* at pp. 15-24; *see, e.g.*, *In re China Mobile Games & Entm't Grp., Ltd. Sec. Litig.*, 2016 WL 922711, at *4 (S.D.N.Y. Mar. 7, 2016) (CW allegations were not sufficiently particularized to support a finding of contemporaneous falsity); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 579 (dismissing claims where "[n]o CW sets forth facts that suggest that any of the alleged statements were false when they were made.").

Outside of the CWs, Plaintiff relies principally on Sasol's October 2019 announcement concerning the results of its Board review commissioned in May 2019. AC ¶¶ 117-19, 215-20. But this publicly disclosed review, which Plaintiff embraces, rather than disputes, fundamentally undermines his claims.[24]

---

[24] Plaintiff also suggests that Sasol's lack of internal controls led to an explosion at the LCCP in January 2020 (AC ¶¶ 120, 223), but offers only the conclusory, generalized statement that the explosion was a result of unspecified "undisclosed effects" revealed by the May 2019 investigation. This fails to satisfy Plaintiff's pleading burden. AC ¶ 120. And Plaintiff does not dispute Sasol's disclosure that the explosion was caused by a failure of a piping support structure

Plaintiff himself alleges that "Sasol "disclos[ed] that its review of the LCCP control weaknesses had brought to light 'errors, omissions, and inaccuracies in the [LCCP] cost estimate.'" AC ¶ 215 (second alteration in original); *see also* AC ¶¶ 29, 117-18. Indeed, the 2019 review revealed shortcomings in Sasol's ability to assess LCCP costs that explain exactly why it did not uncover these issues earlier. *See, e.g.,* "the LCCP project management team, although working very hard, did not have adequate segregation of duties and failed to engage the wider financial organization to verify the accuracy of their forecast" (AC ¶ 205); "But clearly, our internal cross-checks were not robust enough. The previous LCCP leadership was not transparent in these matters[. . .]" Ex. X (Business Update Call held on May 22, 2019) at 4. Thus, on the face of the AC, Plaintiff does not dispute that these issues were uncovered during the course of the investigation Sasol commenced in May 2019, not earlier. AC ¶¶ 117, 215, 219-20. And the results of Sasol's review uncovered that its internal controls for financial reporting were ineffective only as of June 30, 2019, not earlier. AC ¶¶ 117, 215, 219-20. Accordingly, the publicly disclosed results of the 2019 review do not support that earlier statements about the LCCP's budget were false when made. *See In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.,* 757 F. Supp. 2d 260, 312 (S.D.N.Y. 2010) (holding that "retrospective critiques" are not sufficient to show that statements as to corporate due diligence were false at the time they were made.)[25]

---

that caused a pipe to dislodge. No major equipment was damaged and the incident was isolated. *See* Ex. W (Sasol 6-K dated Feb. 24, 2020) at 3.

[25] Plaintiff also alleges that Defendants' certifications about the sufficiency of Sasol's internal controls were misleading because Sasol later admitted to internal control weaknesses. AC ¶ 129. But this does not remotely suffice unless Plaintiff can demonstrate that Defendants were aware of the control weaknesses at the time of the certifications, which Plaintiff fails to do here. *See Plumbers & Pipefitters Local Union No. 719 Pension Tr. Fund v. Conseco Inc.,* 2011 WL 1198712, at *22 (S.D.N.Y. Mar. 30, 2011) ("A failure 'to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for § 10(b) liability.'") (quoting *Novak*, 216 F.3d at 309).

### 2.    *Plaintiff Fails to Adequately Plead that Sasol's Disclosures Concerning LCCP Construction Progress Were Contemporaneously False*

To the extent certain of Sasol's statements can be characterized as present-tense "statements about progress made on the LCCP," Plaintiff's claim also fails. First, many such present-tense statements are covered by the PSLRA safe harbor because they are bound up with predictions of future events. *See Maverick Fund L.D.C. v. Comverse Tech., Inc.,* 801 F. Supp. 2d 41, 59 (E.D.N.Y 2011) (finding present-tense portion of a mixed-tense statement protected by the PSLRA safe harbor where it was "inseparable from the forward-looking portions of the statements.") Second, courts consistently reject statements of precisely this sort because they are "too general to cause a reasonable investor to rely upon them." *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 757 (S.D.N.Y. 2018) (finding inactionable statements that the company had "made remarkable progress" and was "on track to have [its] products reach the market in 2016"); *In re EDAP TMS S.A. Sec. Litig.*, 2015 WL 5326166, at *9–10 (S.D.N.Y. Sept. 14, 2015) (finding inactionable statements indicating that the FDA approval "process was 'on track' and making continued 'progress'").

Third, Plaintiff pleads no particularized facts showing that these statements were false when made. For example, in 2015, Sasol disclosed that the LCCP was "on track" to meet its initial schedule, and affirmed in early 2016 that the project was "progressing." AC ¶¶ 100, 102. Similarly, from 2016 through its February 2019 disclosure, Sasol again disclosed that the project was "on track" and that costs "remained within" the disclosed budget. *See supra* pp. 7-8; AC ¶ 111; *see also* AC ¶¶ 17, 100, 102, 131, 135, 136, 168, 170, 187, 191, 193, 204. Plaintiff generally alleges that these statements misrepresented the project's actual progress, but offers no specifics as to how the percentage construction completion figures Sasol disclosed throughout the class period were false—i.e. by how many months the project was behind or what percentage had not been

26

completed, inconsistent with Sasol's disclosures. Instead, Plaintiff's CWs offer only vague generalities.[26] *See In re Adient plc Sec. Litig.,* 2020 WL 1644018, at \*13 (S.D.N.Y. Apr. 2, 2020) (rejecting allegations that defendant was not achieving certain specific improvements as evidence of falsity because they lacked particularity and "such a finding does not lead to the conclusion that [defendant's] overall projected margin expansion or plan to improve" were false at the time the statements were made).[27]

### C.    Plaintiff Fails to Plead Scienter

To survive a motion to dismiss, Plaintiff must state "with particularity" facts giving rise to a "strong inference" of scienter 15 U.S.C. §§ 78u-4(b)(2), (b)(3). Specifically, Plaintiffs must particularized facts demonstrating either (1) motive and opportunity to commit the fraud or (2) conscious misbehavior or recklessness. *Kalnit v. Eichler*, 264 F.3d 131, 138-39 (2d Cir. 2001).

---

[26] The CWs' vague generalities are unmoored from time and Sasol's disclosures. *See e.g.,* CW-1's generalized assertion that Sasol's senior management "would have had to have known" that the LCCP was "'behind schedule and over budget'" (AC ¶ 69); CW-6's allegation that the project was "significantly behind schedule" (AC ¶ 97). However, CW-1 and CW-6 were both at the LCCP for less than a year and therefore, have no knowledge of the LCCP's progress throughout the entire class period.

[27] Any remaining statements about the LCCP cost or schedule are nothing more than corporate optimism "too general to cause a reasonable investor to rely upon them." *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019). Defendants' statements that outlook remained "robust," (e.g. AC ¶¶ 111, 132, 143 204, 215), that Defendants are "confident" they will "'be able to push the CapEx down,'" that they "can deliver" on the Project, or that "'the fundamentals for the LCCP are sound'" (e.g. AC ¶¶ 107, 147, 152, 162, 197, 198) are all examples of non-actionable corporate optimism. *See In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416 at \*5 (S.D.N.Y. Nov. 25, 2003) (finding statements that "we have a positive outlook and remain confident in our ability to achieve our sales and earnings targets" nonactionable), *aff'd sub nom. Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004). The same is true for statements about Sasol's code of ethics and allegations that Sasol acted contrary to its "commitment to conducting [Sasol's] business with due regard to the interests of all [its] stakeholders." AC ¶ 1 (alterations in original). Statements pertaining generally to Sasol's "culture, reputation, and compliance [that] were all pitched at a general and an aspirational level . . . do not contain historical representations" that are actionable under the securities laws. *In re Braskem S.A. Sec. Litig.,* 246 F. Supp. 3d. 731, 756 (S.D.N.Y. 2017).

And to qualify as "strong," an inference of scienter "must be more than merely plausible or reasonable." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 324 (2007). It "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.*

### 1.    *Plaintiff Fails to Plead Motive and Opportunity*

Plaintiff's abject failure to plead *why* Defendants purportedly committed a 5-year scheme of securities fraud—the central question underpinning any Section 10(b) claim—confirms that the AC must be dismissed. All Plaintiff can muster is that the individual Defendants' compensation was tied to the performance of Sasol's securities and to the LCCP's progress. AC ¶¶ 22, 233. But the Second Circuit has consistently held that such "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit*, 264 F.3d at 139 (citing *Novak*, 216 F.3d at 307-08); *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 197 (2d Cir. 2008); *Wyche v. Advanced Drainage Sys., Inc.*, 710 F. App'x 471, 473 (2d Cir. 2017) (Rakoff, J.); *Barrick*, 2015 WL 1514597, at *9 (no motive alleged where plaintiffs only claimed "a desire for profits that is 'common to most corporate officers'"). Incentive compensation tied to other corporate goals—such as progress on a particular project— has repeatedly been deemed insufficient to support scienter. *See, e.g.*, *Liplow v. Net 1 UEPS Techs. Inc.*, 131 F. Supp. 3d 144, 160 (S.D.N.Y. 2015) (compensation tied to securing a contract insufficient to support scienter); *Agnico-Eagle Mines*, 2013 WL 144041 at *16 (stretch production targets tied to compensation are insufficient to adequately allege scienter).

Were incentive-based compensation sufficient to uphold a strong inference of scienter, the Second Circuit has explained, then "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Dynex*, 531 F.3d at 197 (citing *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995)).

28

### 2.    *Plaintiff Fails to Plead Conscious Misbehavior or Recklessness*

Unable to plead motive and opportunity, Plaintiff must allege either conscious misbehavior or recklessness, that is, conduct which is "highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Pirnik v. Fiat Chrysler Autos, N.V.*, 2016 WL 5818590, at *6 (S.D.N.Y. Oct. 5, 2016) (quoting *Kalnit*, 264 F.3d at 142). Plaintiff's allegations on this score fail on a host of independent grounds.

As to conscious misbehavior, as explained above, Plaintiff offers no particularized allegations supporting that Defendants knew of any undisclosed LCCP cost overruns or delays. *See supra* at pp. 15-22. Accordingly, Plaintiff cannot show "deliberate illegal behavior." *Novak*, 216 F.3d at 308; *see Feiner Family Tr. v. Xcelera.com, Inc.*, 2008 WL 5233605, at *6 (S.D.N.Y. Dec. 15, 2008) ("Unlike these cases where intent to defraud and deceive is readily apparent, here Defendants' actions (or inactions) could have been made for legitimate business reasons") *aff'd sub nom. Feiner Family Tr. v. VBI Corp.*, 352 F. App'x 461 (2d Cir. 2009).

Recklessness, meanwhile, is a mental state "approximating actual intent" where "the danger was either known to the defendant or so obvious that the defendant must have been aware." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009). Claiming that a defendant "ought to have known" is insufficient to allege recklessness. *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 184 (S.D.N.Y. 2012) (internal citation omitted), *aff'd sub nom. Cent. States, S.E. & S.W. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013). Nor can recklessness be "merely enhanced negligence." *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 535 (S.D.N.Y.), *aff'd*, 357 F. App'x 393 (2d Cir. 2009); *see Magnum Hunter Res.*, 26 F. Supp. 3d at 297-98 ("While [defendant] clearly made numerous accounting errors and revealed internal control weaknesses…plaintiffs do not allege specific facts

29

[sufficient to show recklessness]. Rather, it is equally plausible that defendants were in a constant game of '[c]atch up'—acknowledging the company's material weaknesses and disclosing their continued efforts to resolve them, only to learn of yet more.").

Plaintiff's remaining allegations purporting to show recklessness amount to nothing more than a grab bag of circumstantial facts about the individual Defendants and the LCCP that do not remotely support (much less with particularity) that the cost overruns were "so obvious that the defendant must have been aware" of them. *S. Cherry*, 573 F.3d at 109.

*First,* Plaintiff alleges that by virtue of "their positions with Sasol, and their access to material information," the Individual Defendants should have known that statements made to the public were false and misleading. AC ¶ 104. But Plaintiff "must do more than allege that the individual defendants had or should have had knowledge of certain facts . . . simply by virtue of their high-level positions." *In re PetroChina Co. Sec. Litig.*, 120 F. Supp. 3d 340, 366 (S.D.N.Y. 2015). At bottom, Plaintiff offers only the oft-rejected "core operations" inference that because the LCCP was important to Sasol, the individual Defendants should have known they were misrepresenting its cost and schedule. *See Shemian v. Research In Motion Ltd.,* 2013 WL 1285779, at *18 (S.D.N.Y. Mar. 29, 2013) (finding no scienter based on allegations that individual defendants knew of product deficiencies because the product comprised 80.2% of company revenue), *aff'd*, 570 F. App'x 32 (2d Cir. 2014); *In re ShengdaTech, Inc. Sec. Litig.*, 2014 WL 3928606, at *9 (S.D.N.Y. Aug. 12, 2014) (rejecting the argument that defendants' positions "as 'key officers' involved in [the company's] 'core operations'" implied scienter because "courts in this Circuit have held that general allegations regarding a defendant's involvement in the 'core operations' of a business cannot serve as an independent basis for scienter").

30

*Second*, Plaintiff alleges that the magnitude of Sasol's increase of the LCCP cost estimate over the course of five years yields a strong inference of scienter. AC ¶ 230. But it is well-settled that magnitude alone does not support an inference of scienter. *See Hutchinson v. Perez*, 2012 WL 5451258, at *6 (S.D.N.Y. Nov. 8, 2012) ("[T]he courts in this district have held that the size of the fraud alone does not create an inference of scienter.") (internal citation omitted). This was precisely the case in *Barrick* where even though the final cost forecast of $8-8.5 billion was nearly three times the initial projection of $2.8-3 billion, that delta did not alone support an inference of scienter. *Barrick*, 2015 WL 1514597, at *7; *see also, Athale v. SinoTech Energy Ltd.*, 2015 WL 13145808, at *7 (S.D.N.Y. Jan. 23, 2015) (finding no scienter based on allegation that defendant "simply could not have missed" an overstatement of assets by about 45%, production equipment by over 400%, and revenue by approximately 75%); *In re Supercom Inc. Sec. Litig.*, 2018 WL 4926442, at *32 (S.D.N.Y. Oct. 10, 2018) (finding that the "sheer magnitude" of a revenue miss did not adequately allege scienter).

*Third,* Plaintiff alleges that scienter is implied by the late 2019 resignations of Joint CEOs Mr. Nqwababa and Mr. Cornell. AC ¶¶ 231, 234. For resignations to add to circumstantial evidence of fraud, however, they must be "highly unusual and suspicious" and accompanied by indications that the resignation was tied to the alleged fraud, that the resignation somehow alerted the defendants to the alleged fraud, or that the defendants' scienter was otherwise evident. *Glaser*, 772 F. Supp. 2d at 598. That is not the case here. On October 28, 2019, Quad announced that it was implementing a "leadership reset" and that as a result, "Mr. Bongani Nqwababa and Mr. Stephen Cornell, Joint CEOs, have agreed to an amicable mutual separation with the Company . . . To be clear, the Board has neither identified misconduct nor incompetence on the part of the Joint CEOs." AC ¶ 215. In *Barrick*, the company's CEO was terminated as megaproject costs rose, yet that

31

management change likewise did not support an inference of scienter. *See Barrick*, 2015 WL 1514597, at *4.[28]

### 3.    *Plaintiff's Theory of Fraud is Not Cogent and More Compelling Than the Non-Fraudulent Alternative*

*Finally*, the Supreme Court has instructed that, to survive a motion to dismiss, the inference of scienter "must be more than merely plausible or reasonable." *Tellabs*, 551 U.S. at 314. It "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id*. Plaintiff's complaint does not remotely pass muster.

On one hand, Plaintiff alleges Defendants knew all along that the "true budget" for the LCCP was more than it originally estimated. AC ¶ 133. But for reasons Plaintiff does not cognizably explain, Sasol allegedly chose to parcel that information out over five years through contemporaneously disclosed investigations (whose results were contemporaneously disclosed) into cost overruns, weather delays, and control shortcomings, as they occurred and were discovered.

The pleaded facts and Sasol's disclosures, on the other hand, all support the inference that the LCCP megaproject ended up costing more and taking longer than expected, and that as the project progressed, Sasol updated its disclosures accordingly. *See Novak*, 216 F.3d 309 ("Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them.") Directly contrary to Plaintiff's claim (AC ¶¶ 16, 130, 140, 145, 151, 181, 196, 200, 204-05, 207, 210-11, 215, 220), Sasol's retrospective acknowledgement of project management shortcomings and inability to accurately predict the cost of the LCCP does

---

[28] *See also Gregory*, 757 F. App'x at 38 n.4 (affirming dismissal where complaint included no allegations that executives resigned because the company was behaving fraudulently); *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 303 (S.D.N.Y. 2019) (dismissing on same grounds); *In re Molycorp, Inc. Sec. Litig.*, 2015 WL 1097355, at *12 (S.D.N.Y. Mar. 12, 2015) (same).

not support an inference of scienter. *See Shemian*, 2013 WL 1285779, at \*18 (finding plaintiff failed to raise an inference of scienter as compelling as the non-fraudulent alternative that that statements resulted from "misplaced optimism or sloppy management, or both."). As the court in *Barrick* emphasized, a company that "continually updated the cost and schedule estimates with the public" "raises a strong inference that [the company] was continually investigating and relaying updated information to the public" by "working to confirm that its estimates were accurate and to make corrections where needed." *Barrick*, 2015 WL 1514597, at \*10. Following Second Circuit precedent, the court concluded, that this is "a prudent course of action that weakens rather than strengthens an inference of scienter." *Id.* (quoting *Slayton,* 604 F.3d at 777). Sasol's repeated updates to investors about increases to the LCCP estimate and delays to the schedule—contemporaneously disclosed as new events occurred throughout the putative class period—dispositively reinforces this benign inference. *See* AC ¶¶ 130, 140, 145, 151, 181, 196, 200, 204-05, 207, 210-11, 215, 220.

## II.   IN THE ALTERNATIVE, DEFENDANTS SEEK LEAVE TO TAKE DEPOSITIONS OF PLAINTIFF'S CWS.

As discussed, CW allegations must be assessed carefully and do not automatically afford Plaintiff a green light to proceed past a motion to dismiss. *See supra* pp. 15-22.

In particular, with regard to the Change Order story, CW-1 does not identify the contract provisions relied on, which purportedly permit Fluor simply to present Sasol with a nearly $3 billion dollar price increase, and unilaterally require Sasol to pay it. CW-1 does not say if they even saw these contract provisions nor does CW-1 explain how they became aware of them, given that CW-1 did not work for either of the contract counterparties. CW-1 does not say who at Fluor communicated it to whom at Sasol, what Sasol said in response, or explain the actual circumstances

33

around the transmission. Moreover, none of the relevant documents—the Change Order, the contract or communications transmitting the Change Order—are attached as exhibits to the AC.

CW-1's allegations are utterly false. There is no document from February 2016 called a Change Order. There are no contract provisions that permit unilateral, mandatory Change Orders for the overall LCCP project estimate through which a contractor can wish itself a nearly $3 billion dollar price increase and make it so. The Change Order story never happened. To the contrary, what actually happened, just as was publicly disclosed, was that Fluor and Sasol engaged in a deep dive review of all 60,000 line items of the cost estimate, at the conclusion of which they determined that the revised estimate was $11 billion. Obviously, a motion to dismiss is not the place to debate the facts. But neither is a complaint the place to make baseless and reckless allegations. Rule 11 requires a good faith basis to make allegations, and the Change Order story does not pass muster. *See* Fed. R. Civ. P. 11(b).

Accordingly, should the Court deem the Change Order story (or any other aspect of Plaintiff's CW allegations) material to its ruling on Defendants' motion, Defendants respectfully request that the Court follow the procedural device approved by the Second Circuit in *Campo v. Sears Holdings, Corp.,* and allow Defendants to depose Plaintiff's CWs and file a supplemental brief in support of their motion to dismiss.[29]

---

[29] The Second Circuit there recognized that "[b]ecause [Rule] 11 requires that there be a good faith basis for the factual and legal contentions contained in a pleading, the district court's use of the confidential witnesses' testimony to test the good faith basis of plaintiffs' [allegations of scienter] was permissible." *Campo v. Sears Holdings, Corp.*, 371 F. App'x 212, 216 n.4 (2d Cir. 2010); *see also Long Miao*, 2020 WL 996602, at *16 ("Where a securities fraud complaint relies on uncorroborated confidential witnesses or CWs, courts presented with challenges to particularity have, on occasion, used procedural devices to test whether such CWs in fact had made the statements attributed to them," citing *Campo*); *Millennial Media*, 2015 WL 3443918, at *12 (acknowledging the dangers of uncorroborated CW testimony and noting a "meaningful possibility that a court will order counsel to reveal the names of CWs, so as to enable these presumably knowledgeable fact witnesses to be deposed").

To be clear, the testimony of CW-1 is so unparticularized and uncorroborated that it cannot survive a motion to dismiss under well-settled Second Circuit law. But to the extent the issue is material to the Court's decision-making, Defendants respectfully submit that this is an appropriate occasion to allow CW depositions to be taken in connection with this motion. Otherwise, Defendants could be exposed to millions of dollars in purposeless discovery, simply to refute allegations not made in good faith. *See Novak*, 216 F.3d at 306 (PSLRA was enacted in part to prevent "the abuse of the discovery process to impose costs so burdensome that it is often economical for the victimized party to settle" (quoting H.R. Rep. No. 104–369, at 31 (1995) (Conf. Rep.)); *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 424-25 (S.D.N.Y. 2001) ("[D]efendants should not be put to the test of and burdened by defeating baseless charges only after full discovery or trial . . . To encourage or tolerate unrestrained accusations of deception to be turned into sport and profit not only minimizes the perceived infamy and wrongfulness of fraud, but also depreciates the real hardships that unfounded charges visit upon the undeservedly maligned persons whose names and livelihoods may be placed in the balance.").

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed in its entirety and with prejudice.

Dated: New York, New York
      July 2, 2020

Respectfully submitted,

  /s/ Jonathan D. Polkes
Jonathan D. Polkes
Caroline H. Zalka
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

*Counsel for Defendants Sasol Limited, David Edward Constable, Bongani Nqwababa, Stephen Cornell, Paul Victor, Fleetwood Grobler, and Stephan Schoeman*

36