# EXHIBIT Q

Use these links to rapidly review the document
TABLE OF CONTENTS
ITEM 13. DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES

Table of Contents

As filed with the Securities and Exchange Commission on 27 August 2018

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 20-F

☐ **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934**

**OR**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934—for the year ended 30 June 2018**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**OR**

☐ **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Commission file number: 001-31615

## Sasol Limited
(Exact name of registrant as Specified in its Charter)

**Republic of South Africa**
(Jurisdiction of Incorporation or Organisation)

**Sasol Place, 50 Katherine Street, Sandton, 2196**
**South Africa**
(Address of Principal Executive Offices)

**Paul Victor, Chief Financial Officer, Tel. No. +27 10 344 7896, Email paul.victor@sasol.com**
**Sasol Place, 50 Katherine Street, Sandton, 2196, South Africa**
(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
| --- | --- |
| American Depositary Shares | New York Stock Exchange |
| Ordinary Shares of no par value* | New York Stock Exchange |
| 4,50% Notes due 2022 issued by Sasol Financing International Limited | New York Stock Exchange |

\* Listed on the New York Stock Exchange not for trading or quotation purposes, but only in connection with the registration of American Depositary Shares pursuant to the requirements of the Securities and Exchange Commission.

Securities registered pursuant to Section 12(g) of the Act: **None**

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act: **None**

---

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

**623 081 550 Sasol ordinary shares of no par value**
**16 085 199 Sasol preferred ordinary shares of no par value**
**6 394 179 Sasol BEE ordinary shares of no par value**

---

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232 405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☐ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or an emerging growth company. See definition of "large accelerated filer," "accelerated filer," and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒          Accelerated filer ☐          Non-accelerated filer ☐          Emerging growth company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act. ☐

†       The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☐                    International Financial Reporting Standards as issued                    Other ☐
                               by the International Accounting Standards Board ☒

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.

Item 17 ☐ Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

Table of Contents

**3.D Risk factors**

**Fluctuations in crude oil, natural gas, ethane and petroleum product prices and refining margins may adversely affect our business, operating results, cash flows and financial condition**

Market prices for crude oil, natural gas, ethane and petroleum products fluctuate as they are subject to local and international supply and demand fundamentals and other factors over which we have no control. Worldwide supply conditions and the price levels of crude oil may be significantly influenced by general economic conditions, industry inventory levels, technology advancements, production quotas or other actions that might be imposed by international cartels that control the production of a significant proportion of the worldwide supply of crude oil, weather-related damage and disruptions, competing fuel prices and geopolitical risks, especially in the Middle East, North Africa and West Africa.

During 2018, the dated Brent crude oil price averaged US$63,62/bbl and fluctuated between a high of US$80,29/bbl and a low of US$46,53/bbl. This compares to an average dated Brent crude oil price of US$49,77/bbl during 2017, which fluctuated between a high of US$56,30/bbl and a low of US$40,26/bbl.

A substantial proportion of our turnover is derived from sales of petroleum, natural/piped gas and petrochemical products, prices for which have fluctuated widely in recent years and are affected by crude oil prices, the price and availability of substitute fuels, changes in product inventory, product specifications and other factors.

The South African government controls and/or regulates certain fuel prices. The pump price of petrol is regulated at an absolute level. Furthermore maximum price regulation applies to the refinery gate price of liquefied petroleum gas (LPG) and the sale of unpacked illuminating paraffin. South African liquid fuels are valued using the "Basic Fuel Price" (BFP). BFP is a formula-driven price that considers, amongst others, the international prices of refined products (petrol, diesel and illuminating

paraffin), the rand/US dollar exchange rate and the logistical cost of transporting liquid fuels to South Africa. The BFP is then used as a component in the regulated prices that are published by the government on a monthly basis. Piped gas prices are approved at a maximum level by the National Energy Regulator of South Africa (NERSA) from time to time.

Through our equity participation in the National Petroleum Refiners of South Africa (Pty) Ltd (Natref) crude oil refinery, we are exposed to fluctuations in refinery margins resulting from fluctuations in international crude oil and petroleum product prices. We are also exposed to changes in absolute levels of international petroleum product prices through our synthetic fuel operations.

Prolonged periods of low crude oil and natural gas prices could also result in projects being delayed or cancelled, as well as the impairment of certain assets. In Canada, low gas prices resulted in an impairment of our shale gas assets of R2,8 billion (CAD281 million) in 2018. The total cumulative impairments recognised between 2014 and 2017 on our Canadian shale gas assets were R16,5 billion (CAD1,6 billion). The valuation of the Production Sharing Agreement (PSA) in Mozambique in 2018 was impacted by weaker long-term macro economic assumptions and lower than expected oil volumes. This resulted in a partial impairment of R1,1 billion (US$94 million).

We use derivative financial instruments to partially protect us against day-to-day, and longer-term fluctuations in US dollar oil, export coal and ethane prices. The oil price affects the profitability of both our energy and chemical products. See "Item 11—Quantitative and qualitative disclosures about market risk". While the use of these instruments may provide some protection against fluctuations in crude oil prices, it does not protect us against longer-term fluctuations in crude oil prices or differing trends between crude oil and petroleum product prices.

We are unable to accurately forecast fluctuations in crude oil, ethane, natural/piped gas and petroleum products prices. Fluctuations in any of these may have a material adverse effect on our business, operating results, cash

8

Table of Contents

flows and financial condition. Refer "Item 5A—Operating results" for the impact of the crude oil prices on the results of our operations.

**Fluctuations in exchange rates may adversely affect our business, operating results, cash flows and financial condition**

The rand is the principal functional currency of our operations and we report our results in rand. However, a significant majority of our turnover is impacted by the US dollar and the price of most petroleum and chemical products is based on global commodity and benchmark prices which are quoted in US dollars.

Further, as explained above, the components that constitute BFP are US dollar-denominated and converted to rand, which impacts the price at which we can sell fuel in South Africa.

A significant part of our capital expenditure is US dollar-denominated, as it is directed to investments outside South Africa or constitutes materials, engineering and construction costs imported into South Africa. Fluctuations in the rand/US dollar exchange rate impacts our gearing and estimated capital expenditure.

We also generate turnover and incur operating costs in euro and other currencies.

Fluctuations in the exchange rates of the rand against the US dollar, euro and other currencies impacts the comparability of our financial statements between periods due to the effects of translating the functional currencies of our foreign subsidiaries into rand at different exchange rates.

Accordingly, fluctuations in exchange rates between the rand and US dollar, and/or euro may have a material effect on our business, operating results, cash flows and financial condition. As a result of the continued and sustained strengthening of the exchange rate outlook and the resulting impact on our Base Chemicals margins we fully impaired our South African Chlor Vinyls cash generating unit in the amount of R5,2 billion (R3,7 billion after tax).

During 2018, the rand/US dollar exchange rate averaged R12,85, fluctuating between a high

of R14,48 and a low of R11,55. This compares to an average exchange rate of R13,61 during 2017, which fluctuated between a high of R14,75 and a low of R12,44. At 30 June 2018 the closing rand/US dollar exchange rate was R13,73 as compared to R13,06 at 30 June 2017.

The rand exchange rate is affected by various international and South African economic and political factors. Subsequent to 30 June 2018, the rand has on average weakened against the US dollar and the euro, closing at R14,41 and R16,62, respectively, on 23 August 2018. In general, a weakening of the rand would have a positive effect on our operating results. Conversely, strengthening of the rand would have an adverse effect on our operating results, cash flows and financial condition. Refer to "Item 5.A—Operating results" for further information regarding the effect of exchange rate fluctuations on our results of operations. We engage in hedging activities which partially protects the balance sheet and our earnings against fluctuations in the rand exchange rate. While the use of these instruments may provide some protection against fluctuations in the rand exchange rate, it does not protect us against a longer term strong rand/US dollar exchange rate. Refer to "Item 11—Quantitative and qualitative disclosures about market risk".

Although the exchange rate of the rand is primarily market-determined, its value at any time may not be an accurate reflection of its underlying value, due to the potential effect of, among other factors, exchange controls. For more information regarding exchange controls in South Africa see "Item 10.D—Exchange controls".

**Cyclicality in petrochemical product prices and demand may adversely affect our business, operating results, cash flows and financial condition**

The demand for chemicals and especially products such as polymers, solvents, olefins, surfactants and fertilisers are cyclical. Typically, higher demand during peaks in the industry business cycle leads producers to increase their production capacity. Although peaks in the business cycle have been characterised by

9

Table of Contents

increased selling prices and higher EBIT margins in the past, such peaks have led to overcapacity with supply exceeding demand growth. Low periods during the industry business cycle are characterised by a decrease in selling prices and excess capacity, which can depress EBIT margins. We are unable to accurately forecast the timing of the industry business cycle, and lower prices for chemical products during downturns in the cycle may have a material adverse effect on our business, operating results, cash flows and financial condition.

**Our large projects are subject to schedule delays and cost overruns, and we may face constraints in financing our existing projects or new business opportunities, which could render our projects unviable or less profitable than planned**

We are progressing with the construction of our Lake Charles Chemicals Project in Louisiana, US (LCCP) and indications are that the cost of the project will remain within the previous market guidance of US$11,13 billion. As at the end of June 2018, engineering, equipment fabrication and procurement were substantially complete and construction progress reached 68% completion. Overall the project is 88% complete with capital expenditure amounting to US$9,85 billion. We achieved first steam production in July 2018, a critical component to the operation of the LCCP and a key enabler for further commissioning. The progressive start-up of utilities is ongoing and gaining momentum, as we approach start-up of the first units by the second half of calendar year 2018. The remainder of the derivative units are expected to start up in calendar year 2019. Progress on the LCCP units are reviewed and considered internally and by third party consultants regularly. As we move toward start-up, we will update guidance in the event we confirm a materially different view of unit startup and/or cost.

In Mozambique, the PSA Phase 1 and Phase 2 drilling activities have been completed. In total, 11 wells were drilled comprising of seven oil wells and four gas wells. The Inhassoro oil reservoirs have proved more complex than

expected and, with the reduced expectation of recoverable oil volumes and uncertainty on the oil price, we are looking to maximise the use of existing processing facilities in the adjacent Petroleum Production Agreement (PPA) facilities. While Phase 1 gas results confirmed gas resources cover for the planned Central Termica Temane (CTT), formerly Mozambique Gas to Power Project (MGtP), Phase 2 appraisal drilling results however indicate gas volumes to be at the lower end of our initial estimates. Focused efforts are underway to assess the range of options and possibilities to sustainably secure and source gas feedstock.

The development of these projects are capital intensive processes carried out over long durations and requires us to commit significant capital expenditure and allocate considerable management resources in utilising our existing experience and know-how.

Projects like the LCCP and PSA are subject to the risk of delays and cost overruns which are inherent in any large construction project, including as a result of, among other factors:

- shortages or unforeseen increases in the cost of equipment, labour and raw materials;

- unforeseen design and engineering problems;

- unforeseen construction problems;

- inadequate phasing of activities;

- labour disputes;

- inadequate workforce planning or productivity of workforce;

- inadequate change management practices;

- natural disasters and adverse weather conditions, including excessive winds, higher-than-expected rainfall patterns, tornadoes, cyclones and hurricanes;

- failure or delay of third-party service providers; and

- changes to regulations, such as environmental regulations.

10

Table of Contents

In addition, significant variations in the assumptions we make in assessing the viability of our projects, including those relating to commodity prices and the prices for our products, exchange rates, import tarrifs, interest rates, discount rates (due to change in country risk premium) and the demand for our products, may adversely affect the profitability or even the viability of our investments.

As the LCCP capital investment is particularly material to Sasol, any further cost overruns or adverse changes in assumptions affecting the viability of the project could have a material adverse effect on our business, cash flows, financial condition and prospects. We have updated the LCCP economics with the latest view of long-term market assumptions obtained from independent market consultants. Due to the uncertainty and volatility in the market, the views from the independent market consultants differ significantly from period to period. Views provided also differ on where ethane will be sourced from in the long-term. This divergence in views makes it more difficult to accurately evaluate the project economics and increases the risk that the assumptions underlying our assessment of the viability of the project may prove incorrect.

Our operating cash flow and banking facilities may be insufficient to meet our capital expenditure plans and requirements, depending on the timing and cost of development of our existing projects and any further projects we may pursue, as well as our operating performance and the utilisation of our banking facilities. As a result, new sources of capital may be needed to meet the funding requirements of these projects, to fund ongoing business activities and to pay dividends. Our ability to raise and service significant new sources of capital will be a function of macroeconomic conditions, our credit rating, our gearing and other risk metrics, the condition of the financial markets, future prices for the products we sell, the prospects for our industry, our operational performance and operating cash flow and debt position, among other factors.

In the event of unanticipated operating or financial challenges, any dislocation in financial

markets, any downgrade of our credit ratings by ratings agencies or new funding limitations, our ability to pursue new business opportunities, invest in existing and new projects, fund our ongoing business activities and retire or service outstanding debt and pay dividends, could be constrained, any of which could have a material adverse effect on our business, operating results, cash flows and financial condition.

**Our access to and cost of funding is affected by our credit rating, which in turn is affected by the sovereign credit rating of the Republic of South Africa**

Our credit rating may be affected by our ability to maintain our outstanding debt and financial ratios at levels acceptable to the credit ratings agencies; our business prospects; the sovereign credit rating of the Republic of South Africa and other factors, some of which are outside our control. The credit rating assigned by the ratings agencies is dependent on a number of factors, including the gearing levels of the group. In assessing these gearing levels, performance guarantees which have been issued by Sasol are taken into account as potential future exposure, which may impact the liquidity of the group. Our credit rating has been affected by movements in the sovereign credit rating of the Republic of South Africa.

Any future adverse rating actions or downgrade of the South African sovereign credit rating may have an adverse effect on our credit rating, which could negatively impact our ability to borrow money and could increase the cost of debt finance.

**Our ability to respond to climate change could negatively impact our growth strategies, reduce demand for our products and increase our operational costs.**

Key processes in South Africa, especially coal gasification and combustion, result in relatively high carbon dioxide emissions. Sasol is committed to reducing its overall impact on the environment, while developing and implementing an appropriate climate change mitigation response to enable the long-term resilience of the company's strategy and business operations.

11

Table of Contents

In light of this, Sasol has identified environmental sustainability as one of our top risk events, including climate change as a key issue in the context of our support for the Paris Agreement and the national circumstances of the countries in which we operate.

Sasol's ability to develop and implement an appropriate climate change mitigation response poses a significant transitional risk for our current business in South Africa. This is enhanced by the necessity to appropriately address increasing societal pressures and shifts away from carbon intensive processes and products, as well as meeting new and anticipated policy and legislative requirements including carbon tax, carbon budgets and reduction targets. It is particularly challenging in South Africa where access to lower carbon energies are limited.

Further, climate change poses a significant risk for our business as it relates to potential physical impacts including change of weather patterns, extreme events, hurricanes, tornadoes, flooding, sea level rise and water scarcity. In this regard, we are advancing work in developing an adaptation strategy for the identified key priority regions such as the US Gulf Coast, Mozambique, Secunda and Sasolburg. Ongoing monitoring efforts accordingly also guide our interventions to improve our maintenance and asset integrity processes.

These climate change related risks could negatively impact Sasol's growth strategies and targets, reduce demand for our products and are likely to increase our operational costs.

A substantial carbon tax, such as that currently under consideration in South Africa, may negatively impact free cash flows generated from our South African operations from 2019. Considering South Africa's developmental challenges, the structure of its economy and the fact that the carbon tax design is not aligned with the carbon budget, Sasol believes alternative mechanisms could achieve the outcome sought by the proposed stand-alone carbon tax. We continue to work to identify and debate with authorities an appropriate response that balances the need for economic

development, job creation, energy security and greenhouse gas (GHG) emission reductions.

Our international operations are less carbon-intensive and have been operating for some time in a more mature GHG regulatory regime. However, continued political attention to issues concerning climate change and potential mitigation through regulation could have a material impact on our business, operating results, cash flows and financial condition.

**Exposure related to investments in associates and joint arrangements may adversely affect our business, operating results, cash flows and financial condition**

We have invested in a number of associates and joint arrangements and will consider opportunities for further upstream oil and gas and downstream investments (including licensing opportunities), where appropriate, as well as opportunities in chemicals. The development of these projects may require investments in associates and joint arrangements, some of which are aimed at facilitating entry into countries and/or sharing risk with third parties. Although the risks are shared, the objectives of our associates, and joint arrangement partners, their ability to meet their financial and/or contractual obligations, their behaviour, their compliance with legal and ethical standards, as well as the increasing complexity of country-specific legislation and regulations may adversely affect our reputation and/or result in disputes and/or litigation, all of which may have a material adverse effect on our business, operating results, cash flows and financial condition, and may constrain the achievement of our growth objectives.

**Our coal, synthetic oil, natural oil and natural gas reserve estimates may be materially different from quantities that we eventually recover**

Our reported coal, synthetic oil, natural oil and gas reserves are estimated quantities based on applicable reporting regulations that, under present conditions, have the potential to be economically mined, processed and produced.

There are numerous uncertainties inherent in estimating quantities of reserves and in

12

Table of Contents

projecting future rates of production, including factors which are beyond our control. The accuracy of any reserve estimate is a function of the quality of available data, engineering and geological interpretation, costs to develop and market prices for related products.

Reserve estimates will require revision based on improved data acquired from actual production experience and other factors, including resource extensions and new discoveries. In addition, regulatory changes, market prices, increased production costs and other factors may result in a revision to estimated reserves. Revised estimates may have a material adverse effect on our business, operating results, cashflows and financial condition. See "Item 4.D—Property, plants and equipment".

**We may be unable to access, discover, appraise and develop new coal, synthetic oil, natural oil and natural gas resources at a rate that is adequate to sustain our business and/or enable growth**

Competition for suitable opportunities, increasing technical difficulty, stringent regulatory and environmental standards, large capital requirements and existing capital commitments may negatively affect our ability to access, discover, appraise and develop new resources in a timely manner, which could adversely impact our ability to support and sustain our current business operations.

Our future growth could also be impacted by these factors, potentially leading to material adverse effect on our business, operating results, cash flows and financial condition.

**We may not achieve projected benefits of acquisitions or divestments**

We may pursue acquisitions or divestments. With any such transaction, there is the risk that any benefits or synergies identified at the time of acquisition may not be achieved as a result of changing or inappropriate assumptions or materially different market conditions, or other factors. Furthermore, we could be found liable, regardless of extensive due diligence reviews, for

past acts or omissions of the acquired business without any adequate right of redress.

In addition, delays in the sale of assets, or reductions in value realisable, may arise due to changing market conditions. Failure to achieve expected values from the sale of assets, or delays in expected receipt or delivery of funds may result in higher debt levels, underperformance of those businesses and loss of key personnel.

**There are country-specific risks relating to the countries in which we operate that could adversely affect our business, operating results, cash flows and financial condition**

Several of our subsidiaries, joint arrangements and associates operate in countries and regions that are subject to significantly differing political, social, economic and market conditions. See "Item 4.B—Business overview" for a description of the extent of our activities in the main countries and regions in which we operate. Although we are a South African-domiciled company and the majority of our operations are located in South Africa, we also have significant energy businesses in other African countries, chemical businesses in Europe, the US, the Middle East and Asia, a joint venture GTL facility in Qatar, joint operations in the US and Canada and a 10% indirect economic interest in the Escravos GTL (EGTL) project in Nigeria which is an upstream joint venture between Chevron Nigeria Limited (CNL) and Nigerian National Petroleum Corporation (NNPC).

Particular aspects of country-specific risks that may have a material adverse impact on our business, operating results, cash flows and financial condition include:

**(a) Political and socio-economic issues**

      i. Political, social and economic uncertainty

We have invested, or are in the process of investing in, significant operations in Southern African, Western African, European, North American, Asian and Middle Eastern countries that have in the past, to a greater or lesser extent, experienced political, social and economic uncertainty.

Table of Contents

In particular, in South Africa, the current risks to the country's medium-term economic prospects and its fiscal challenges have led to credit rating agencies downgrading the South African sovereign credit rating. In Mozambique, the ongoing fiscal crisis has led to a significant currency weakening and downgrades in its credit rating by all the major rating agencies, which complicated debt restructuring discussions between the country and the International Monetary Fund. Other countries in which we operate may also face sovereign downgrade risks and risks that may impact their ability to access funding and honour commitments.

Government policies, laws and regulations in countries in which we operate, or plan to operate, may change in the future. Governments in those countries have in the past and may in the future pursue policies of resource nationalisation and market intervention, including through protectionism like import tariffs and subsidies. The impact of such changes on our ability to deliver on planned projects cannot be determined with any degree of certainty and such changes may therefore have an adverse effect on our operations and financial results.

Sasol's strategic objective to progressively grow a resilient oil-based portfolio in its preferred West African countries, inherently carries frontier basin exploration and new country entry risks, off-set by potential high reward through unlocking of new exploration plays. Sasol managed the associated exploration and new country risks through building a balanced portfolio of exploration and production assets, rigorously ensuring compliance with all corporate and legislative governance requirements, and following its internal technical and business quality assurance processes.

### ii. Transformation and localisation issues

In some countries, our operations are required to comply with local procurement, employment equity, equity participation, corporate social responsibility and other regulations that are designed to address

country-specific social and economic transformation and localisation issues.

In South Africa, there are various transformation initiatives with which we are required to comply since Sasol operates in more than one sector of the economy. We believe transformation to be a strategic, business and social imperative that would enable Sasol to become more competitive in the markets in which it operates. The broad risks that we face should we not comply with these transformation initiatives include the inability to obtain licences to operate in certain sectors such as mining and liquid fuels, limited ability to successfully tender for government and public entity tenders and potential loss of customers (as private sector customers increasingly require their suppliers to have a minimum B-BBEE rating).

The draft Mining Charter III was published on 15 June 2018, for comments within 30 days. Although the 2018 draft is an improvement on the 2017 draft, there are a number of contentious issues that are being debated by industry stakeholders. We are participating in these discussions and are providing input to the draft Mining Charter III on those issues that may have an impact on our business. Once the final Mining Charter III is published Sasol will undertake a comprehensive study to understand the impact on our business and to determine the steps necessary to ensure our operations are not adversely affected. For more information refer to "Item 3.D—Risk Factors—South African mining legislation may have an adverse effect on our mineral rights".

The revised Codes of Good Practice for Broad-Based Black Economic Empowerment (B-BBEE) (the Revised Codes), which came into effect on 1 May 2015, provide a standard framework for the measurement of B-BBEE across all sectors of the economy, other than sectors that have their own sectorial transformation charters (e.g. the mining and liquid fuels industries). The Revised Codes provide more stringent targets, which negatively impacted on Sasol's B-BBEE contributor status.

Since our announcement during September 2017 to unwind the Sasol Inzalo B-BBEE transaction and introduce Sasol Khanyisa,

14

Table of Contents

specific management focus was placed on engaging with trade unions on issues pertaining to employee share ownership levels. Two of the five Sasol trade unions, Solidarity and CEPPWAWU, have declared disputes relating individually to Sasol Khanyisa and the unwind of Sasol Inzalo which, if not resolved, may result in industrial action, which could adversely affect our operations and could give rise to costs which would impact earnings.

We believe that the long-term benefits of Sasol Khanyisa to the company and South Africa should outweigh any possible adverse effects, such as dilution to existing shareholders, but we cannot assure you that future implications of compliance with these requirements or with any newly imposed conditions will not have a material adverse effect on our shareholders or business, operating results, cash flows and financial condition. See "Item 4.B— Empowerment of historically disadvantaged South Africans".

iii. Disruptive industrial action

The majority of our employees worldwide belong to trade unions. These employees comprise mainly of general workers, artisans and technical operators. The South African labour market remains volatile and can be characterised by major industrial action in key sectors of the economy especially during wage negotiations.

In Sasol South Africa, only petroleum sector wage negotiations took place during 2018. These negotiations have been successfully concluded with a three-year wage agreement effective 1 July 2018 to 30 June 2021. Sasol operations falling within the industrial chemicals sector are not negotiating during 2018 as this sector is covered by a multi-year agreement valid until 30 June 2019.

Sasol Mining concluded a three-year wage agreement with all five of its participating trade unions in August 2017, paving the way for stable labour relations over the next three years.

Sasol remains committed to resolve current disputes and will continue to engage with key players to ensure a successful conclusion hereof.

Although we have positive relationships with our employees and their unions, significant

labour disruptions could occur in the future and our labour costs could increase significantly in the future.

**(b) Fiscal**

Macroeconomic factors, such as higher inflation and interest rates, could adversely impact our ability to contain costs and/or ensure cost-effective debt financing in the countries in which we operate.

Our sustainability and competitiveness is influenced by our ability to optimise our cost base. As we are unable to control the price at which our products are sold, an increase in inflation in countries in which we operate may result in significantly higher future operational costs.

In South Africa, consumer price inflation averaged 4,5% in 2018, from 6,1% in 2017. The lower rate of consumer inflation can be attributed mainly to an appreciation in the exchange rate and easing food and services price inflation over the course of the year. The easing in inflationary pressures promoted the South African Reserve Bank to cut interest rates by 25 basis points in both July 2017 and March 2018, taking the policy interest rate to 6,5% by 30 June 2018.

The exchange rate remains a key risk to the inflation outlook. Global financial conditions, escalating trade tensions, emerging market sentiment swings and domestic political and policy developments are likely to contribute to ongoing currency volatility.

Higher confidence levels and a more stable political environment are expected to provide support to the South African economy. However, the business environment is likely to remain challenging as South Africa faces a number of structural, policy and financial challenges to growth. While the interest rate outlook remains data dependent, the SARB is expected to hike interest rates during the course of 2019 as inflation starts moving towards the upper end of the 3-6% inflation target range.

15

Table of Contents

**(c) Legal and regulatory**

    i. Exchange control regulations

South African law provides for exchange control regulations which apply to transactions involving South African residents, including both natural persons and legal entities. These regulations may restrict the export of capital from South Africa, including foreign investments. The regulations may also affect our ability to borrow funds from non-South African sources for use in South Africa, including the repayment of these borrowings from South Africa and, in some cases, our ability to guarantee the obligations of our subsidiaries with regard to these funds. These restrictions may affect the manner in which we finance our transactions outside South Africa and the geographic distribution of our debt. See "Item 10.D— Exchange controls" and "Item 5.B—Liquidity and capital resources".

    ii. Tax laws and regulations

We operate in multiple tax jurisdictions globally and are subject to both local and international tax laws and regulations. Although we aim to fully comply with tax laws in all the countries in which we operate, tax is a highly complex area leading to the risk of unexpected tax uncertainties. Tax laws are changing regularly and their interpretation may potentially result in ambiguities and uncertainties, in particular in the areas of international taxation and transfer pricing. Where the tax law is not clear, we interpret our tax obligations in a responsible way, with the support of legal and tax advisors as deemed appropriate. Tax authorities and courts may arrive at different interpretations to those taken by Sasol, which may lead to substantial increases in tax payments. Although we believe we have adequate systems, processes and people in place to assist us with complying with all applicable tax laws and regulations, the outcomes of certain tax disputes and assessments may have a material adverse effect on our business, operating results, cash flows and financial position.

We could also be exposed to significant fines and penalties and to enforcement measures, including, but not limited to, tax assessments, despite our best efforts at compliance. In response to tax assessments or similar tax deficiency notices in particular jurisdictions, we may be required to pay the full amount of the tax assessed (including stated

penalties and interest charges) or post security for such amounts notwithstanding that we may contest the assessment and related amounts.

In particular, one of our subsidiaries, Sasol Oil (Pty) Ltd ("Sasol Oil"), has received assessments on its international crude oil procurement activities and the proceedings relating to these assessments are ongoing.

For more information regarding pending tax disputes and assessments refer to "Legal proceedings and other contingencies" under Item 4.B Business overview.

Any of these risks may materially and adversely affect our business, results of operations, cash flows and financial condition.

    iii. Ownership rights

We operate in several countries where ownership of rights in respect of land and resources is uncertain and where disputes in relation to ownership or other community matters may arise. For example, the South African government is considering the expropriation of land without compensation to enhance land reform and redistribution. The impact of these policy intentions and related disputes are not always predictable and may cause disruption to our operations or development plans.

    iv. Legal and regulatory uncertainties

Some of the countries where we have already made investments, or other countries where we may consider making investments are in various stages of developing institutions and legal and regulatory systems that are characteristic of democracies and market economies.

The procedural safeguards of the legal and regulatory regimes in these countries in many cases are still being developed and, therefore, existing laws and regulations may be applied inconsistently. In some circumstances, it may not be possible to obtain the legal remedies provided

16

Table of Contents

under those laws and regulations in a timely manner. In particular in South Africa the legal landscape is rapidly evolving, amongst others, due to increasing societal and enforcement pressure. Therefore, the risk of uncertainty is higher in South Africa and that could have a material adverse effect on our business, operating results, cash flows, financial condition and future growth.

**(d) Transportation, water, electricity and other infrastructure**

The infrastructure in some countries in which we operate, such as rail infrastructure, electricity and water supply, may need to be further upgraded and expanded, and in certain instances, possibly at our own cost. Reliable supply of electricity is important to run our plants optimally. Unplanned power outages as we experienced at our South African plants in 2018 have a negative impact on our production volumes, cost and profitability. Back-up systems increase the cost of production and only mitigate the risk partially as we remain dependent on external electricity supply.

Water, as a resource, is becoming increasingly limited as global demand for water increases. A significant part of our operations, including mining, chemical processing and others, requires use of large volumes of water. South Africa is generally an arid country and prolonged periods of drought or significant changes to current water laws could increase the cost of our water supplies or otherwise impact our operations. Water use by our operations varies widely depending largely on feedstock and technology choice. Water to our South African operations is supplied from the Integrated Vaal River System (IVRS). While the water supply to these operations remains secure the revised water balance for the IVRS shows a worsening of the water supply imbalance which could result in an increasing probability of water restrictions being imposed. Although various technological advances may improve the water efficiency of our processes, we may experience limited water availability and other infrastructure challenges which could have a material adverse effect on our business, operating results, cash flows, financial condition and future growth.

**(e) Stakeholder relationships**

Sasol has a complex network of stakeholders, often with competing interests. Our stakeholders are persons or groups who are directly or indirectly affected by our operations, as well as those who have interests in our business and/or the ability to influence its outcomes. Stakeholders may include local communities, national, provincial or local government authorities, politicians, religious leaders, civil society organisations and groups with special interests, the academic community and media. In addition, they include employees, investors, suppliers, customers and business partners. Failure to manage relationships with local communities, governments and non-governmental organisations may harm our reputation as well as our ability to conduct our operations effectively. Our stakeholder objective is to position Sasol as a credible partner and build trust with all our stakeholders. Our engagement approach is supported by open and effective communication, clear and agreed-on feedback, mutually beneficial outcomes where possible, as well as inclusiveness and integrity. However, we cannot assure you that the strategy will mitigate the risk fully and therefore, stakeholder relations could have a material adverse effect on our business, operating results, cash flows, financial condition and future growth.

**(f) Contract stability**

Host governments in some of the resource-rich countries in which we operate or consider making investments in may display tendencies of wanting to change existing contracts through early terminations, non-renewal or cancellation of contractual rights, or we may not be able to fully enforce our contractual rights in those jurisdictions or enforce judgements obtained in the courts of other jurisdictions, should they hold the view that these contracts are not beneficial to their countries.

**(g) Other specific country risks that are applicable to countries in which we operate and which may have a material adverse effect on our business include:**

- acts of warfare and civil clashes;

- the loss of control of oil and gas field developments and transportation infrastructure;

- failure to receive new permits and consents;

- expropriation of assets;

- lack of capacity to deal with emergency response situations;

17

Table of Contents

- social and labour unrest due to economic and political factors in host countries;

- terrorism, xenophobia and kidnapping threats;

- security threats to assets, employees and supply chain;

- possible demands to participate in unethical or corrupt conduct that lead us to forgo certain opportunities;

- feedstock security of supply; and

- sanctions against countries in which we operate.

**Actual or alleged non-compliance with laws could result in criminal or civil sanctions and could harm our reputation**

Non-compliance with competition laws, anti-corruption laws, sanction laws and environmental laws have been identified as our top four legal risks.

*Anti-corruption and anti-bribery laws*

Ethical misconduct and non-compliance with applicable anti-corruption laws could result in criminal or civil sanctions and could have a material adverse impact on our reputation, operations and licence to operate.

Petrochemical and energy companies need to be particularly vigilant with regard to the risk of bribery, especially when the scale of investments and the corruption perception of the countries where operations take place are considered. We, like other international petrochemical companies, have a geographically diverse portfolio and conduct operations in countries, some of which have a perceived high prevalence of corruption. Our operations must comply with the US Foreign Corrupt Practices Act and similar anti-corruption and anti-bribery laws of South Africa and other applicable jurisdictions. There has been a substantial increase in the global enforcement of these laws. In particular, major investments in countries with a high corruption risk are subject to an elevated risk in dealings with private companies, governments or government-controlled entities. Although we have an anti-corruption and

anti-bribery compliance programme in place designed to reduce the likelihood of violations of such laws, any violation could result in substantial criminal or civil sanctions and could damage our reputation.

*Sanctions laws*

Our international operations require compliance with trade and economic sanctions or other restrictions imposed by the US or other governments or organisations, including the United Nations, the European Union and its member countries. These trade and economic sanctions are not always aligned which increases the complexities when a company has operations in various countries. Under economic and trading sanctions laws, governments may seek to impose modifications to business practices, and modifications to compliance programmes, which may increase compliance costs, and may subject us to fines, penalties and other sanctions.

Although we believe that we are in compliance with all applicable sanctions and embargo laws and regulations, and intend to maintain such compliance, there can be no assurance that we will be in compliance in the future, particularly as the scope of certain laws may be unclear and may be subject to changing interpretations.

We are monitoring developments in the US, the European Union (EU) and other jurisdictions that maintain sanctions programmes, including developments in implementation and enforcement of such sanctions programmes. Expansion of sanctions programmes, embargoes and other restrictions in the future (including additional designations of countries subject to sanctions), or modifications in how existing sanctions are interpreted or enforced, could have a material adverse effect on our business, operating results, cash flows and financial condition.

*Environmental laws and regulations*

In recent years, the environmental legislation in South Africa has resulted in significantly stricter standards than in the past which poses a risk to some of our operations in South Africa. For instance, by 2020, our existing

18

Table of Contents

plants are required to meet more stringent point source standards for air quality emissions applicable to newly commissioned plants. Meeting some of these requirements will require retrofitting of some of our existing plants and we are on track with the implementation of committed roadmaps intended to bring us into compliance with most of the new plant standards by 2025. The new plant standard for boiler sulfur dioxide could pose significant compliance challenges for our existing plants from a technical and financial feasibility point of view. Accordingly, Sasol continues discussions with key stakeholders regarding sustainable longer-term solutions and to investigate technologies that may enable us to comply and advance the necessary environmental compliance and improvement roadmaps.

To mitigate associated compliance risks in the short and long term, Sasol will be reliant on mechanisms available in law and decisions thereon by the relevant authorities to obtain postponements on the requisite compliance time frames. We also rely on other mechanisms, such as the implementation of air quality offsets as per our approved plans, to address our compliance challenges.

We remain concerned about the limitations of the postponement mechanism, which is currently the only formalised mechanism provided in law, to provide longer-term certainty in the face of these significant compliance challenges with the continued focus on sustainable ambient air quality improvement. Proposed changes to the regulatory framework could also negatively impact Sasol's approach to place reliance on compliance extensions beyond 2025. Consequently, we continue to participate in the pending law reform processes, including the recent proposed amendments to the National Air Quality Framework and the relevant regulations governing minimum emission standards and associated compliance time frames in the interest of ensuring a reasonable and sustainable legal framework enabling air quality improvements and sustainable compliance. We also continue to engage with the regulatory authorities to provide for the legislated recognition of offsets. The success of these engagements and our participation in the law

reform processes cannot be guaranteed. Where we are unable to rely on mechanisms available in law or find appropriate feasible solutions, we may, of necessity, elect to decommission or mothball essential parts of our plant for purposes of mitigating the potential non-compliance risks.

The outcome of these processes and applications cannot be guaranteed and may be successfully challenged by third parties. Non-compliance may result in the violation of licence conditions with the associated consequence of administrative enforcement action, which may include directions to cease operations, as well as criminal prosecution. This may have a material adverse impact on our business.

Some of our operations are carried out in declared air quality priority areas which are further subject to the requirements of the Vaal Triangle and Highveld Priority Area Air Quality Improvement Plans. These plans are currently under review, subject to the completion of source apportionment studies. Accordingly, further emission reduction commitments may be required from Sasol and are likely to trigger additional cost for air quality improvements in these priority areas.

*Competition laws/Anti-Trust Laws*

Violations of competition/antitrust legislation could expose the group to administrative penalties and civil claims and damages, including punitive damages by entities which can prove they were harmed by such conduct. Such penalties and damages could be significant and have an adverse impact on our business, operating results, cash flows and financial condition. In addition, our reputation could be damaged by findings of such contraventions and individuals could be subject to imprisonment or fines in some countries where competition/anti-trust violations are a criminal offence. Competition authorities are increasingly engaging with each other to exchange information relating to violations of competition/anti-trust laws and enforce competition/antitrust laws.

19

Table of Contents

The South African Competition Commission has, in the past, conducted proceedings against various petroleum products producers, including Sasol. Sasol concluded a settlement agreement with the Competion Commission on a no admission of guilt and no penalty basis. On 3 May 2018, the Competition Tribunal of South Africa approved the settlement agreement. This effectively closed the proceedings with no penalty imposed on Sasol. We continue to interact and co-operate with the South African Competition Commission in respect of leniency applications as well as in the areas that are subject to the Commission's investigations. In June 2017, Sasol Germany received a request for information from the European Commission regarding the ethylene market in Europe. Sasol responded to this request for information.

Although it is our policy to comply with all laws, and notwithstanding training and compliance programmes, we could inadvertently contravene competition/anti-trust laws and be subject to the imposition of fines, criminal sanctions and/or civil claims and damages. This could have a material adverse impact on our reputation, business, operating results, cash flows and financial condition.

**South African mining legislation may have an adverse effect on our mineral rights**

Certain amendments to the Mineral and Petroleum Resource Development Act, 28 of 2002 (MPRDA) are currently under consideration. The impact thereof on our operations will be considered once we have clarity on the nature of the amendments.

The revised Mining Charter published on 15 June 2018 contains a number of revisions, including but not limited to an increase in the minimum black shareholding requirement from 26% to 30% for current and new mining rights, subject to certain provisions as well as the requirement for a free carry to be given to employees and communities. The new draft contains more stringent compliance criteria than the previous Mining Charter, which may have a material adverse effect on Sasol Mining. The potential impact on Sasol Mining may be two-fold: higher cost of production and the risk of being in non-compliance with the requirements of the revised Mining Charter, which could lead to the suspension or

cancellation of Sasol Mining's mining and/or prospecting rights. If a holder of a prospecting right or mining right in South Africa conducts prospecting or mining operations in contravention of the MPRDA, including the revised Mining Charter and Social and Labour Plans, the converted mining rights can be suspended or cancelled by the Minister of Mineral Resources. The entity, upon receiving a notice of breach from the Minister, has a specific period of time to remedy such breach. The MPRDA and applicable provisions in the National Environmental Management Act and National Water Act impose additional responsibilities with respect to environmental management as well as the prevention of environmental pollution, degradation or damage from mining and/or prospecting activities.

The effect of the proposed changes to the MPRDA, associated regulations to be promulgated and the revised Mining Charter on our mining and petroleum rights in the future may have a material adverse effect on our business, operating results, cash flows and financial condition. See "Item 4.B—Business overview—The Mining Charter and the Mineral and Petroleum Resources Development Amendment Bill".

**Legislation in South Africa on petroleum and energy activities may have an adverse impact on our business, operating results, cash flows and financial condition**

*Regulation of Petroleum Products*

**The Petroleum Products Amendment Act**

The Petroleum Products Amendment Act (the Petroleum Products Act) requires persons involved in the manufacturing, wholesale and retail sale of petroleum products to obtain relevant licences for such activities. Sasol Oil, Natref and Sasol South Africa Limited submitted applications for their respective operations. The Sasol Oil wholesale licence; and Sasol South Africa Limited manufacturing licence applications have been approved and the licences issued. The Sasol Oil manufacturing licence application has been accepted, however the licence has not yet been issued. As provided in the Petroleum Products Act, Sasol Oil continues to act as a deemed licence holder in relation to its manufacturing activities. The

20

Table of Contents

Natref manufacturing licence application is also still under review by the Department of Energy.

Accordingly, Sasol Oil and Natref continue to operate as being persons who, as of the effective date of the Petroleum Products Act, are deemed to be holders of a licence until their applications have been finalised. Until these applications have been finalised, we cannot provide assurance that the conditions of the licences may not have a material adverse impact on our business, operating results, cash flows and financial condition.

The Petroleum Products Act entitles the Minister of Energy to regulate the prices, specifications and stock holding of petroleum products and the status in this regard is as follows:

- The Retail-Pump prices of petrol, Maximum Refinery Gate Price of Liquid Petroleum Gas (LPG) and the Single Maximum National Price of Illuminating Paraffin are regulated. Prices are adjusted monthly according to published working rules and pricing formulae; and

- Regulations to better align South African liquid fuels specifications with those prevailing in Europe were intended to become effective on 1 July 2017. None of the local refineries, including those of Sasol, would have been able to comply with these new specifications. The Minister of Energy rescinded and amended the regulations and will announce a new implementation date in due course. There is a significant risk that the market demand and imported supply of cleaner fuels could overtake the regulatory date of the introduction of these fuel specifications and/or the date by which we can upgrade our plants to meet this demand. Compliance with these new fuel specifications will require substantial capital investments at both Natref and Secunda Synfuels Operations. The amount of capital investment required has not yet been finalised and discussions with the South African government regarding potential investment incentives are on-going.

- Regulations to oblige licenced manufacturers and/or wholesalers to keep minimum levels of market-ready petrol, diesel, illuminating paraffin, jet fuel and liquid petroleum gas (LPG) have been under consideration by the Department of Energy since 2007. No indications on volumes, cost recovery, implementation date and compensation mechanisms are available yet.

### *Regulation of pipeline gas activities in South Africa*

**The Gas Act**

The Gas Act provides that the National Energy Regulatory of South Africa (NERSA) has the authority to issue licences for construction and operation of gas pipelines and trading in gas. NERSA also has the authority to approve gas transmission tariffs and maximum gas prices that may be charged by gas traders, where there is inadequate competition as contemplated in the South African Competition Act. The Gas Act further gives NERSA the authority to impose fines and other punitive measures for failure to comply with the licence conditions and/or the provisions of the Gas Act. Future regulation of maximum gas prices may have a material adverse effect on our business, operating results, cash flow and financial condition.

Pursuant to the 2013 NERSA decisions approving the Sasol Gas maximum gas prices and transmission tariffs, Sasol Gas implemented a standardised pricing mechanism in its supply agreements with customers in compliance with the applicable regulatory and legal framework. NERSA approved further maximum gas prices and transmission tarrifs based on the same pricing and tariff mechanisms in November 2017.

Seven of Sasol Gas's largest customers initiated a judicial review of the 2013 NERSA decisions relating to its maximum price and tariff methodologies and NERSA's decision on Sasol Gas's maximum price and transmission tariff applications. The review application proceedings were completed and the High Court judgement upheld the NERSA approved pricing methodology. The gas customers have appealed this outcome in the Supreme Court of Appeal

21

Table of Contents

(SCA). In May 2018 the SCA upheld the appeal. This SCA ruling overturned the 2013 NERSA maximum price decisions and ordered NERSA to revise its decisions and also ordered that the revised NERSA maximum price decisions will apply retrospectively from 26 March 2014 when the original decisions became effective. NERSA has applied to the Constitutional Court for leave to appeal the SCA decision. Sasol is supporting NERSA in this application. The outcome of this application for leave to appeal remains pending.

While the current contractual agreements with the Sasol Gas customers remain in place in terms of the November 2017 maximum price and transmission tariff decisions of NERSA, we cannot assure you that the provisions of the Gas Act and the future implementation of a new gas price and tariff methodology pursuant to the NERSA approvals, and the outcome of the appeal application, will not have a material adverse impact on our business, operating results, cash flows and financial condition.

**Changes in safety, health and environmental regulations and legislation and public opinion may adversely affect our business, operating results, cash flows and financial condition**

We are subject to a wide range of general and industry-specific environmental, health and safety and other legislation in jurisdictions in which we operate. See "Item 4.B—Business overview—Regions in which Sasol operates and their applicable legislation".

One of our most material challenges is the ability to anticipate and respond to the rapidly changing regulatory and policy context and associated stakeholder challenges, in particular relating to environmental legislation in South Africa. Evolving legislation relating to air quality, climate change, water and waste management introduce profound regulatory challenges to our existing plants in South Africa. The quality, emission and disposal limit requirements imposed in our air quality, waste management and water use licences for our South African operations are consequently becoming increasingly more stringent. These laws and regulations and their enforcement are likely to become more stringent over time in all

jurisdictions in which we operate, although these laws in some jurisdictions are already more established than in others. These compliance challenges are further impacted by the fact that, in some instances, legislation does not adequately provide for sufficient and/or flexible transitional arrangements for existing plants to comply with the imposed more stringent requirements. Compliance with these requirements is a significant factor in our business. We continue to effectively invest in significant capital expenditures in order to comply with these requirements, our committed environmental roadmaps and offset commitments. We continue with transparent disclosures and engagements with our key stakeholders in an effort to address these challenges. A failure to comply could have an impact on our licence to operate, as well as result in administrative and criminal enforcement, and could harm our relationships with stakeholders.

Sasol's highly energy intensive operations in South Africa exist in the midst of rapidly evolving national legislation on GHG emissions. In support of the Paris Agreement, the government has recently published for comment the Climate Change and Carbon Tax Bills and promulgated the Pollution Prevention Plan and Greenhouse Gas Mandatory Reporting regulations. Sasol has submitted its GHG inventory data for South Africa in compliance with the regulations and successfully obtained approval for its first mandatory Pollution Prevention Plan. We envisage that compliance with carbon budgets will become mandatory in 2021. For further information on the impact of carbon taxes refer to "Item 3.D—Our inability to respond to climate change could negatively impact our growth strategies, reduce demand for our products and increase our operational costs".

Changes to waste management legislation in South Africa, particularly around landfill prohibitions, are compelling our South African operations to find alternative solutions to waste management and disposal. The changing regulatory landscape introduces increasingly stringent waste disposal restrictions and punitive fiscal reform measures including waste levies. We

22

Table of Contents

are quantifying the potential costs associated with meeting these requirements. We will be dependent on regulatory authorities clarifying the interpretation and applicability of specific requirements to our waste streams, to determine whether there would be compliance challenges associated with technical and feasibility constraints. We may have to rely on mechanisms in law, such as exemption applications, to address potential waste management compliance challenges, the outcome of which cannot be guaranteed.

Regarding the regulation of water activities, we have noticed an increase in the number of policy and regulatory documents issued by the South African Department of Water and Sanitation (DWS) for public consultation, proposing new institutional arrangements for governing water resources, economic regulation including the imposition of waste discharge limits and infrastructure investment. At present it is too early to gauge the likely impact on our operations, in particular in relation to access to water and supply, once these are implemented.

Although systems and processes are in place, monitored and improved upon, to ensure compliance with applicable laws and regulations, we cannot assure you that we will be in compliance with all laws and regulations at all times. For example, non-compliance with environmental, health or safety laws may occur from system or human errors in monitoring our emissions of hazardous or toxic substances into the environment, such as our use of incorrect methodologies or defective or inappropriate measuring equipment, errors in manually capturing results, or other mistaken or unauthorised acts of our employees.

Public opinion and awareness is growing and challenges are increasingly being raised to community and consumer health and safety associated with the manufacturing and use of chemicals and industries reliant on fossil fuels. Our manufacturing processes may utilise and result in the emission of or exposure to substances with potential health risks. We also manufacture products which may pose health risks. Although we remain committed to apply a duty of care principle and implement measures

to eliminate or mitigate associated potential risks, including through our commitment to the Responsible Care® programme, we may be subject to liabilities as a result of the use or exposure to these materials or emissions. See Item 4.B "Business overview—Regulation" for more detail.

Consequently, markets may apply pressure on us concerning certain of our products, feedstock, manufacturing processes, transportation and distribution arrangements. As a result of these additional pressures, the associated costs of compliance and other factors, we may be required to withdraw certain products from the market, which could have a material adverse effect on our business, operating results, cash flows, financial condition and reputation. In addition, as currently framed, the draft South African Chemicals Management Bill may impose significant requirements for the management of chemicals in our South African value chain. The scope of the impact on Sasol's business cannot be predicted at this time.

**We may not be successful in attracting and retaining sufficiently skilled employees**

We are highly dependent on effectively operating and continuously improving existing as well as future assets and technologies.

In order to achieve this, we need to maintain a focus on recruiting and retaining qualified scientists, engineers, project execution managers, artisans and operators. In addition, we are dependent on highly skilled employees in business and functional roles to establish new business ventures as well as to maintain existing operations.

The quality and availability of skills in certain labour markets is impacted by the challenges within the education and training systems in certain countries in which we operate.

Localisation, diversity and other similar legislation in countries in which we operate are also key considerations in the attraction and retention of sufficiently skilled employees. In an increasingly competitive market for limited skills, failure to attract and retain people with the right capabilities and experience could negatively

23

Table of Contents

affect our ability to operate existing facilities, to introduce and maintain the appropriate technological improvements to our business, as well as our ability to successfully construct and commission new plants or establish new business.

The increasing use of digital technologies across our industry is placing increasing demand on data and digital technology skills. The availability and supply of these new skill sets are limited due to demand outweighing supply.

**Intellectual property risks may adversely affect our freedom to operate our processes and sell our products and may dilute our competitive advantage**

In many instances we employ proprietary technology and processes and certain of our products, including some of our commodity chemical and energy products, have unique characteristics and chemical structures. These unique characteristics can also render some of these products suitable for applications outside of the typical commodity type applications for which they would normally be employed, for instance we or our customers may utilise certain products as feedstock to manufacture specialty chemicals or products with specialised applications.

We believe that our proprietary technology, know-how, confidential information and trade secrets provide us with a competitive advantage. Arms-length licensing of technology, operating and licensing technology in countries in which intellectual property laws are not well established and enforced, and the possible loss of experienced personnel to competitors increases the risk of possible transfer of know-how and trade secrets, including attendant patenting by our competitors, which may negatively impact this advantage.

Changes in our technology commercialization and business strategies may result in misalignment between the countries in which we have intellectual property protection and the countries in which we operate, license technology and sell products. The disclosure of our confidential information and/or the expiry of a patent may result in increased competition in the market in relation to our products and

proprietary processes, although the continuous supplementation of our patent portfolio reduces such risk to an extent.

In addition, aggressive patenting by our competitors, particularly in places like the US, China, Japan and Europe may result in an increased patent infringement risk and may constrain our ability to operate, license and sell products in our preferred markets. Similarly there may be an increased risk of exposure to claims under the limited indemnities and warranties for patent infringement that we may provide to licensees and customers.

The above risks may adversely affect our business, operating results, cash flows and financial condition.

**Increasing competition in relation to products originating from countries with low production costs may adversely affect our business, operating results, cash flows and financial condition**

Certain of our chemical production facilities are located in developed countries, including the US and in Europe. Economic and political conditions in these countries result in relatively high labour costs and, in some regions, relatively inflexible labour markets. Increasing competition from regions with lower production costs and more flexible labour markets, for example the Middle East, India and China, exerts pressure on the competitiveness of our chemical products and, therefore, on our profit margins. This could result in the withdrawal of particular products or the closure of specific facilities, which may have a material adverse effect on our business, operating results, cash flows and financial condition.

**We may face potential costs in connection with industry-related accidents or deliberate acts of terror causing property damage, personal injuries or environmental contamination**

We operate coal mines, explore for and produce oil and gas and operate a number of plants and facilities for the manufacture, storage, processing and transportation of oil, chemicals and gas, related raw materials, products and wastes. These facilities and their respective

24

Table of Contents

operations are subject to various risks, such as fires, explosions, releases and loss of containment of hazardous substances, soil and water contamination, flooding and land subsidence, among others. As a result, we are subject to the risk of, and in the past have experienced, industry-related incidents. Such incidents can be subjected to inspections by relevant authorities, with the associated potential consequences of enforcement action, including directions to temporarily cease and desist operations and the imposition of fines and penalties. This may have a material adverse effect on our business.

Our facilities are also subject to the risk of deliberate acts of terror.

Our main Secunda Synfuels production facilities are concentrated in a relatively small area in Secunda, South Africa. The size of the facility is approximately 82,5 square kilometres ($km^2$) with operating plants accounting for 8,35 $km^2$. This facility utilises feedstock from our mining and gas businesses, while the chemical and energy businesses rely on the facility for the raw materials it produces. Accidents and acts of terror may result in damage to our facilities and may require shutdown of the affected facilities, thereby disrupting production and increasing production costs and may in turn disrupt the mining, gas, chemicals and oil businesses which make up a significant portion of our total income. Furthermore, accidents or acts of terror at our operations may have caused, or may in future cause, environmental contamination, personal injuries, health impairment or fatalities and may result in exposure to extensive environmental remediation costs, civil litigation, the imposition of fines and penalties and the need to obtain or implement costly pollution-control technology.

Our products are ultimately sold to customers around the world and this exposes us to risks related to the transportation of such products by road, rail, pipelines or marine vessels. Such activities take place in the public domain exposing us to incident risks over which we have limited control.

It is Sasol's policy to procure appropriate property damage and business interruption

insurance cover for its production facilities above acceptable deductible levels at acceptable commercial premiums. However, full cover for all loss scenarios may not be available at acceptable commercial rates, and we cannot give any assurance that the insurance procured for any particular year would cover all potential risks sufficiently or that the insurers will have the financial ability to pay all claims that may arise.

The costs we may incur as a result of the above or related factors could have a material adverse effect on our business, operating results, cash flows and financial condition.

**We may face the risk of information security breaches or attempts to disrupt critical information technology services, which may adversely impact our operations**

The increasing use of information technology (IT) and digital infrastructure systems in operations is making all industries, including the energy and chemicals industries, much more susceptible to cyber threats and information security breaches. IT and digital systems with related services include our financial, commercial, transacting and production systems. Sasol has an information security program in place to mitigate the risks that come with cyber threats and information security breaches but recognises that if there is a breach of information security we can experience disruptions of critical services, or in the worst case scenario, could have a material adverse effect on our business, operating results, cash flows and financial condition and our disclosure control processes.

In addition, applicable privacy laws require us to store, manage and safeguard personal data. We have adopted a global privacy policy to set a group-wide standard regarding the protection and appropriate use of personal data. This includes establishing the supporting governance structure including a Group Data Privacy Officer, a privacy culture within Sasol and conducting training and awareness sessions for employees. Although it is our policy to comply with all applicable laws, and notwithstanding training, awareness and compliance programmes,

25

Table of Contents

we could inadvertently contravene applicable national or EU privacy laws and be subject to the imposition of fines and/or civil claims and damages. This could have a material adverse impact on our reputation and consequential financial impact.

**We may not be able to exploit technological advances quickly and successfully or competitors may develop superior technologies**

Most of our operations, including the gasification of coal and the manufacture of synfuels and petrochemical products, are highly dependent on the use of advanced technologies. The development, commercialisation and integration of the appropriate advanced technologies can affect, among other things, the competitiveness of our products, the continuity of our operations, our feedstock requirements and the capacity and efficiency of our production.

It is possible that new technologies or novel processes may emerge and that existing technologies may be further developed in the fields in which we operate. Unexpected advances in employed technologies or the development of novel processes can affect our operations and product ranges in that they could render the technologies we utilise or the products we produce obsolete or less competitive in the future. Difficulties in accessing new technologies may impede us from implementing them and competitive pressures may force us to implement these new technologies at a substantial cost.

In addition to the technological challenges, a number of our expansion projects are integrated across our value chain. Delays with the development of an integrated project might, accordingly, have an impact on more than one business segment.

Our ability to compete will depend on our timely and cost effective implementation of new technological advances. It will also depend on our success in commercialising these advances irrespective of competition we face. Any failure to do so could result in a material adverse effect on our business, operating results, cash flows and financial condition.

In the US, we recognised a loss on scrapping in 2018 of R1,1 billion (US$83 million), relating to our GTL project in Louisana, mainly driven by a strategic decision to no longer invest in new equity owned GTL ventures.

**The exercise of voting rights by holders of American Depositary Receipts is limited in some circumstances**

Holders of American Depositary Receipts (ADRs) may exercise voting rights with respect to the ordinary shares underlying their American Depositary Shares (ADSs) only in accordance with the provisions of our deposit agreement (Deposit Agreement) with The Bank of New York Mellon, as the depositary (Depositary). For example, ADR holders will not receive notice of a meeting directly from us. Rather, we will provide notice of a shareholders meeting to The Bank of New York Mellon in accordance with the Deposit Agreement. The Bank of New York Mellon has undertaken in turn, as soon as practicable after receipt of our notice, to mail voting materials to holders of ADRs. These voting materials include information on the matters to be voted on as contained in our notice of the shareholders meeting and a statement that the holders of ADRs on a specified date will be entitled, subject to any applicable provision of the laws of South Africa and our Memorandum of Incorporation, to instruct The Bank of New York Mellon as to the exercise of the voting rights pertaining to the shares underlying their respective ADSs.

Upon the written instruction of an ADR holder, The Bank of New York Mellon will endeavour, in so far as practicable, to vote or cause to be voted the shares underlying the ADSs in accordance with the instructions received. If instructions from an ADR holder are not received by The Bank of New York Mellon by the date specified in the voting materials, The Bank of New York Mellon will not request a proxy on behalf of such holder. The Bank of New York Mellon will not vote or attempt to exercise the right to vote other than in accordance with the instructions received from ADR holders.

26

Table of Contents

We cannot assure you that you will receive the voting materials in time to ensure that you can instruct The Bank of New York Mellon to vote the shares underlying your ADSs. In addition, The Bank of New York Mellon and its agents are not responsible for failing to carry out voting instructions or for the manner of carrying out voting instructions. This means that you may not be able to exercise your right to vote and there may be no recourse if your voting rights are not exercised as you directed.

**Sales of a large amount of Sasol's ordinary shares and ADSs could adversely affect the prevailing market price of the securities**

Historically, trading volumes and the liquidity of shares listed on the JSE Limited (JSE) have been low in comparison with other major markets. The ability of a holder to sell a substantial number of Sasol's ordinary shares on the JSE in a timely manner, especially in a large block trade, may be restricted by this limited liquidity. The sales of ordinary shares or ADSs, if substantial, or the perception that these sales may occur and be substantial, could exert downward pressure on the prevailing market prices for the Sasol ordinary shares or ADSs, causing their market prices to decline.

## ITEM 4. INFORMATION ON THE COMPANY

### 4.A History and development of the company

Sasol Limited, the ultimate holding company of our group, is a public company. It was incorporated under the laws of the Republic of South Africa in 1979 and has been listed on the JSE Limited (JSE) since October 1979. Our registered office and corporate headquarters are at Sasol Place, 50 Katherine Street, Sandton, 2196, South Africa, and our telephone number is +27 10 344 5000. Our agent for service of process in the US is Puglisi & Associates, 850 Library Avenue, Suite 204, P.O. Box 885, Newark, Delaware 19715.

For a description of the company's principal capital expenditures and divestitures refer to "Item 5.B—Liquidity and capital resources".

### 4.B Business overview

Sasol is an international integrated chemicals and energy company that, through its talented people, uses selected technologies to safely and sustainably source, produce and market chemical and energy products competitively to create superior value for our customers, shareholders and other stakeholders.

For details regarding the following sections, refer as indicated.

- For information regarding our Business Overview, refer "Our Operating Model Structures" as contained in Exhibit 99.4;

- For information regarding our Strategy, refer "Integrated Report—Our value-based strategy" as contained in Exhibit 99.5; and "Integrated Report—Our integrated value chain" as contained in Exhibit 99.6;

- For a description of the company's operations and principal activities refer "Our Operating Model Structures" as contained in Exhibit 99.4; "Integrated Report—Operational Overviews" as contained in Exhibit 99.7; and Item 18—"Annual Financial Statements—Segment information"; and

- For a description of our principal markets, refer to Item 18—"Annual Financial Statements—Geographic segmentation", which provides information regarding the geographic location of the principal markets in which we generate our turnover, as well as of our asset base.

**Seasonality**

Sales volumes of our products are generally not subject to seasonal fluctuations, but tend to follow broader global industry trends and are therefore impacted by macroeconomic factors. Sasol operates globally and in many diverse markets, and accordingly, no element of seasonality is likely to be material to the results of Sasol as a whole. For further information regarding cyclicality and prices and demand, refer to "Item 3.D—Risk Factors".