# EXHIBIT V

Use these links to rapidly review the document
TABLE OF CONTENTS
Item 17. FINANCIAL STATEMENTS

Table of Contents

As filed with the Securities and Exchange Commission on 28 October 2019

---

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

# FORM 20-F

☐  **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 —for the year ended 30 June 2019**

OR

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☐  **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Commission file number: 001-31615

## Sasol Limited
(Exact name of registrant as Specified in its Charter)

**Republic of South Africa**
(Jurisdiction of Incorporation or Organisation)

**Sasol Place, 50 Katherine Street, Sandton, 2196**
**South Africa**
(Address of Principal Executive Offices)

**Paul Victor, Chief Financial Officer, Tel. No. +27 10 344 7896, Email paul.victor@sasol.com**
**Sasol Place, 50 Katherine Street, Sandton, 2196, South Africa**
(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol | Name of Each Exchange on Which Registered |
|---|---|---|
| American Depositary Shares | SSL | New York Stock Exchange |
| Ordinary Shares of no par value* | SSL | New York Stock Exchange |
| 4,50% Notes due 2022 issued by Sasol Financing International Limited | SOLJAS | New York Stock Exchange |
| 5,875% Notes due 2024 issued by Sasol Financing USA LLC | SOLJL | New York Stock Exchange |
| 6,50% Notes due 2028 issued by Sasol Financing USA LLC | SOLJL | New York Stock Exchange |

\*    Listed on the New York Stock Exchange not for trading or quotation purposes, but only in connection with the registration of American Depositary Shares pursuant to the requirements of the Securities and Exchange Commission.

---

Securities registered pursuant to Section 12(g) of the Act: **None**

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act: **None**

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

**624 696 971 Sasol ordinary shares of no par value**

**6 331 347 Sasol BEE ordinary shares of no par value**

---

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232 405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or an emerging growth company. See definition of "large accelerated filer," "accelerated filer," and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

| Large accelerated filer ☒ | Accelerated filer ☐ | Non-accelerated filer ☐ | Emerging growth company ☐ |
|---|---|---|---|

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act. ☐

†          The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

| U.S. GAAP ☐ | International Financial Reporting Standards as issued by the International Accounting Standards Board ☒ | Other ☐ |
|---|---|---|

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.

Item 17 ☐ Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

Table of Contents

## FORWARD-LOOKING STATEMENTS

We may from time to time make written or oral forward-looking statements, including in this Form 20-F, in other filings with the US Securities and Exchange Commission, in reports to shareholders and in other communications. These statements may relate to analyses and other information which are based on forecasts of future results and estimates of amounts not yet determinable. These statements may also relate to our future prospects, developments and business strategies. Examples of such forward-looking statements include, but are not limited to:

- the capital cost of our projects, including the Lake Charles Chemicals Project (including material, engineering and construction cost) and the timing of project milestones;

- our ability to obtain financing to meet the funding requirements of our capital investment programme, as well as to fund our ongoing business activities and to pay dividends;

- changes in the demand for and international prices of crude oil, gas, petroleum and chemical products and changes in foreign currency exchange rates;

- statements regarding our future results of operations and financial condition and regarding future economic performance including cost-containment and cash-conservation programmes;

- statements regarding recent and proposed accounting pronouncements and their impact on our future results of operations and financial condition;

- statements of our business strategy, business performance outlook, plans, objectives or goals, including those related to products or services;

- statements regarding future competition, volume growth and changes in market share in the industries and markets for our products;

- statements regarding our existing or anticipated investments (including the Lake

Charles Chemicals Project, Mozambique exploration and development activities, the GTL joint ventures in Qatar and Nigeria, chemical projects and joint arrangements in North America and other investments), acquisitions of new businesses or the disposal of existing businesses, including estimates or projections of internal rates of return (IRR) and future profitability;

- statements regarding our estimated oil, gas and coal reserves;

- statements regarding the probable future outcome of litigation and regulatory proceedings and the future development in legal and regulatory matters including statements regarding our ability to comply with future laws and regulations;

- statements regarding future fluctuations in refining margins and crude oil, natural gas and petroleum product prices;

- statements regarding the demand, pricing and cyclicality of oil, gas and petrochemical product prices;

- statements regarding changes in the fuel and gas pricing mechanisms in South Africa and their effects on prices, our operating results and profitability;

- statements regarding future fluctuations in exchange and interest rates and changes in credit ratings;

- statements regarding total shareholder return;

- statements regarding our growth and expansion plans;

- statements regarding our current or future products and anticipated customer demand for these products;

- statements regarding acts of war, terrorism or other events that may adversely affect the group's operations or that of key stakeholders to the group;

- statements and assumptions relating to macro-economics;

4

Table of Contents

- statements regarding tax litigation and assessments; and

- statements of assumptions underlying such statements.

Words such as "believe", "anticipate", "expect", "intend", "seek", "will", "plan", "could", "may", "endeavour", "target", "forecast" and "project" and similar expressions are intended to identify forward-looking statements, but are not the exclusive means of identifying such statements.

By their very nature, forward-looking statements involve inherent risks and uncertainties, both general and specific, and there are risks that the predictions, forecasts, projections and other forward-looking statements will not be achieved. If one or more of these risks materialise, or should underlying assumptions prove incorrect, our actual results may differ materially from those anticipated in such forward-looking statements. You should understand that a number of important factors could cause actual results to differ materially from the plans, objectives, expectations, estimates and intentions expressed in such forward-looking statements. These factors include among others, and without limitation:

- the outcome in pending and developing regulatory matters and the effect of changes in regulation and government policy;

- the political, social and fiscal regime and economic conditions and developments in the world, especially in those countries in which we operate;

- the outcome of legal proceedings including tax litigation and assessments;

- our ability to maintain key customer relations in important markets;

- our ability to improve results despite increased levels of competition;

- our ability to exploit our oil, gas and coal reserves as anticipated;

- the continuation of substantial growth in significant developing markets;

- the ability to benefit from our capital investment programme;

- the accuracy of our assumptions in assessing the economic viability of our large capital projects and growth in significant developing areas of our business;

- the ability to gain access to sufficient competitively priced gas, oil and coal reserves and other commodities;

- the impact of environmental legislation and regulation on our operations and access to natural resources;

- our success in continuing technological innovation;

- the success of our B-BBEE ownership transaction;

- our ability to maintain sustainable earnings despite fluctuations in oil, gas and commodity prices, foreign currency exchange rates and interest rates;

- our ability to attract and retain sufficient skilled employees;

- the risk of completing major projects like, for instance, our Lake Charles Chemicals Project (LCCP) within budget and schedule; and

- our success at managing the foregoing risks.

The foregoing list of important factors is not exhaustive; when relying on forward-looking statements to make investment decisions, you should carefully consider the foregoing factors and other uncertainties and events, and you should not place undue reliance on forward-looking statements. Forward-looking statements apply only as of the date on which they are made and we do not undertake any obligation to update or revise any of them, whether as a result of new information, future events or otherwise. See "Item 3.D—Risk factors"

5

Table of Contents

data set forth below have been derived were prepared in accordance with IFRS.

|  | 30 June 2019(1) | 30 June 2018(1) | 30 June 2017(1) | 30 June 2016(1) | 30 June 2015(1) |
|---|---|---|---|---|---|
|  | (Rand in millions) (except per share information and weighted average shares in issue) | | | | |
| **Income Statement data:** | | | | | |
| Turnover | 203 576 | 181 461 | 172 407 | 172 942 | 185 266 |
| Earnings before interest and tax | 9 697 | 17 747 | 31 705 | 24 239 | 46 549 |
| Earnings attributable to owners of Sasol Limited | 4 298 | 8 729 | 20 374 | 13 225 | 29 716 |
| **Statement of Financial Position data:** | | | | | |
| Total assets | 469 968 | 439 235 | 398 939 | 390 714 | 323 599 |
| Total equity | 225 795 | 228 608 | 217 234 | 212 418 | 196 483 |
| Total liabilities | 244 173 | 210 627 | 181 705 | 178 296 | 127 116 |
| Share capital(2) | 9 888 | 15 775 | 29 282 | 29 282 | 29 228 |
| **Per share information (rand):** | | | | | |
| Basic earnings per share | 6,97 | 14,26 | 33,36 | 21,66 | 48,71 |
| Diluted earnings per share | 6,93 | 14,18 | 33,27 | 21,66 | 48,70 |
| Dividends per share(3) | 5,90 | 12,90 | 12,60 | 14,80 | 18,50 |
| **Weighted average shares in issue (in millions):** | | | | | |
| Average shares outstanding—basic(4) | 616,6 | 612,2 | 610,7 | 610,7 | 610,1 |
| Average shares outstanding—diluted(5) | 620,3 | 615,9 | 612,4 | 610,7 | 610,2 |

(1)    From 1 July 2018 the group has applied IFRS 15 'Revenue from Contracts with Customers' using the modified retrospective approach, by recognising the cumulative effect of initially applying IFRS 15 as an adjustment to the opening balance of equity. For the comparative financial years, 2015 to 2018, the principles of the previous revenue standard, IAS 18 'Revenue', were applied.

(2)    For information regarding the share repurchases and cancellations please refer to "Item 18—Financial Statements—Note 15 Share capital".

(3)    The total dividend includes the interim and final dividend. Dividends per share in dollars are as follows: $0,42 for 30 June 2019, $0,97 for 30 June 2018, $0,95 for 30 June 2017, $1,03 for 30 June 2016 and $1,43 for 30 June 2015.

(4)    Increase in basic average shares outstanding is due to shares issued as long-term incentives (LTIs) to employees.

(5)    The number of shares outstanding is adjusted to show the potential dilution if the LTIs and Sasol Khanyisa Tier 1 were settled in Sasol Limited shares. The Sasol Khanyisa Tier 2 and Khanyisa Public schemes are anti-dilutive in 2019.

**3.B Capitalisation and indebtedness**

Not applicable.

**3.C Reasons for the offer and use of proceeds**

Not applicable.

**3.D Risk factors**

**Our large projects are subject to schedule delays and cost overruns, and we may face constraints in financing our existing projects or new business opportunities, which could render our projects unviable or less profitable than planned**

We are progressing with the construction of our Lake Charles Chemicals Project (LCCP) in the US and indications are that the cost of the project will remain within the updated market guidance of US$12,6 - 12,9 billion. As at the end of June 2019, engineering, equipment fabrication and procurement were substantially complete and construction progress had reached 94% completion and overall the project completion is 98% with capital expenditure amounting to US$11,8 billion. During the financial year, we achieved first steam production in August 2018, followed by beneficial operation of our linear low density polyethylene (LLDPE) unit in February 2019, the ethylene oxide/ethylene glycol (EO/EG) unit in May 2019 and the ethane cracker in August 2019. The cracker remains stable at approximately 50% - 60% of design capacity, limited by operating issues with the acetylene removal system. A two to three week planned shutdown to replace the acetylene reactor catalyst is expected to address these issues. Normal production ramp up will occur after the acetylene reactor issues are resolved. These units, combined with the utilities that support them, comprise approximately 65% of LCCP's total capital cost. The progressive commissioning and start-up of the remainder of the derivative units is ongoing, with our low-density polyethylene (LDPE) facility anticipated to reach beneficial operation during the remainder of calendar year 2019 and our Ziegler alcohol, ethoxylates and Guerbet alcohol facilities completed shortly thereafter, to bring the LCCP to full completion during the remainder of 2020. Progress on the LCCP units is reviewed and considered internally and by third party consultants regularly, with past reviews identifying increased scope and slower construction and commissioning ramp-down curves as units reached start-up. As the start-up of the remaining units continues, we will update guidance in the event we confirm a materially different view of unit startup and/or cost.

Table of Contents

In Mozambique, Phase 1 and Phase 2 drilling activities in the Production Sharing Agreement (PSA) licence area have been completed. In total, 11 wells were drilled comprising of seven oil wells and four gas wells. We forecast recoverable volumes of light oil to be around the low end of the range presented in the field development plan, 8MMbbl compared to the midpoint of 55MMbbl. This has required a review of the development programme. While Phase 1 gas results confirmed gas resources cover for the planned Central Termica Temane (CTT), formerly Mozambique Gas to Power Project (MGtP), Phase 2 appraisal drilling results however indicate gas volumes to be at the lower end of our initial estimates. We plan to submit a revised field development plan encompassing an integrated oil, gas and LPG development for the whole licence area in 2020.

The development of these projects involve capital-intensive processes carried out over long durations. It requires us to commit significant capital expenditure and allocate considerable management resources in utilising our existing experience and know-how.

Projects like the LCCP and PSA are subject to the risk of delays and cost overruns inherent in any large construction project, including as a result of:

- shortages or unforeseen increases in the cost of equipment, labour and raw materials;

- unforeseen design and engineering problems, contributing to or causing late additions and/or increases to scope;

- unforeseen construction problems;

- unforeseen failure of mechanical parts or equipment;

- unforeseen technical challenges on start-up causing delays in beneficial operations being achieved;

- inadequate phasing of activities;

- labour disputes;

- inadequate workforce planning or productivity of workforce;

- inadequate change management practices;

- natural disasters and adverse weather conditions, including excessive winds, higher-than-expected rainfall patterns, tornadoes, cyclones and hurricanes;

- failure or delay of third-party service providers; and

- regulatory approvals and compliance obligations, including changes to regulations, such as environmental regulations, and/or identification of changes to project scope necessary to ensure safety, process safety, and environmental compliance.

In addition, significant variations in the assumptions we make in assessing the viability of our projects, including those relating to commodity prices and the prices for our products, exchange rates, import tariffs, interest rates, discount rates (due to change in country risk premium) and the demand for our products, may adversely affect the profitability or even the viability of our investments.

As the LCCP capital investment is particularly material to Sasol, any further cost overruns or adverse changes in assumptions affecting the viability of the project could have a material adverse effect on our business, cash flows, financial condition and prospects. We have updated the LCCP economics with the latest view of long-term market assumptions obtained from independent market consultants. Due to the uncertainty and volatility in the market, the views from the independent market consultants differ significantly from period to period. Views provided also differ on ethane price assumptions in the long term. This divergence in views makes it more difficult to accurately evaluate the project economics and increases the risk that the assumptions underlying our assessment of the viability of the project may prove incorrect.

Our operating cash flow and credit facilities may be insufficient to meet our capital expenditure plans and requirements, depending on the timing and cost of development of our existing projects and any further projects we may pursue, as well as our operating performance and the utilisation of our credit facilities. As a result, new sources of capital may be needed to meet the

8

Table of Contents

funding requirements of these projects and to fund ongoing business activities. Our ability to raise and service significant new sources of capital will be a function of macro-economic conditions, our credit rating, our gearing and other risk metrics, the condition of the financial markets, future prices for the products we sell, the prospects for our industry, our operational performance and operating cash flow and debt position, among other factors.

In the event of unanticipated operating or financial challenges, any dislocation in financial markets, any downgrade of our credit ratings by ratings agencies or new funding limitations, our ability to pursue new business opportunities, invest in existing and new projects, fund our ongoing business activities and retire or service outstanding debt and pay dividends, could be constrained, any of which could have a material adverse effect on our business, operating results, cash flows and financial condition.

**Fluctuations in crude oil, natural gas, ethane and petroleum product prices and refining margins may adversely affect our business, operating results, cash flows and financial condition**

Market prices for crude oil, natural gas, ethane and petroleum products fluctuate as they are subject to local and international supply and demand fundamentals and other factors over which we have no control. Worldwide supply conditions and the price levels of crude oil may be significantly influenced by general economic conditions; industry inventory levels; technology advancements; production quotas or other actions that might be imposed by international associations that control the production of a significant proportion of the worldwide supply of crude oil; weather-related damage and disruptions; competing fuel prices and geopolitical risks, including warfare; especially in the Middle East, North Africa and West Africa.

During 2019, the dated Brent crude oil price averaged US$68,63/bbl and fluctuated between a high of US$86,16/bbl and a low of US$50,21/bbl. This compares to an average dated Brent crude oil price of US$63,62/bbl during 2018, when it fluctuated between a high of US$80,29/bbl and a low of US$46,53/bbl.

A substantial proportion of our turnover is derived from sales of petroleum, natural/piped gas and petrochemical products, prices for which have fluctuated widely in recent years and are affected by crude oil prices, the price and availability of substitute fuels, changes in product inventory, product specifications and other factors.

The South African government controls and/or regulates certain fuel prices. The pump price of petrol is regulated at an absolute level. Furthermore, maximum price regulation applies to the refinery gate price of liquefied petroleum gas (LPG) and the sale of unpacked illuminating paraffin. South African liquid fuels are valued using the "Basic Fuel Price" (BFP) mechanism. BFP is a formula-driven price that considers, amongst others, the international prices of refined products (petrol, diesel, jet fuel and illuminating paraffin), the rand/US dollar exchange rate and the logistical cost of transporting liquid fuels to South Africa. The BFP is then used as a component in the regulated prices that are published by the government on a monthly basis. Piped gas prices are regulated through the approval of maximum piped gas prices by the National Energy Regulator of South Africa (NERSA) from time to time.

Through our equity participation in the National Petroleum Refiners of South Africa (Pty) Ltd (Natref) crude oil refinery, we are exposed to fluctuations in refinery margins resulting from fluctuations in international crude oil and petroleum product prices. We are also exposed to changes in absolute levels of international petroleum product prices through our synthetic fuel operations.

Prolonged periods of low crude oil, natural gas and petroleum prices could also result in projects being delayed or cancelled, as well as the impairment of certain assets. In North America, softer ethylene and global mono-ethylene glycol prices and an increase in the capital cost of our LCCP in Louisiana, US, resulted in the impairment of our Tetramerization and EO/EG cash generating units (CGU) by R7,4 billion (US$ 526 million) and R5,5 billion (US$ 388 million), respectively in 2019. Our shale gas assets in Canada were impaired by a further R1,9 billion (CAD181 million) as at 30 June 2019

9

Table of Contents

to a carrying value of R22 million (CAD2 million). The total cumulative impairments recognised between 2014 and 2018 on our Canadian shale gas assets were R19,3 billion (CAD1,8 billion), mainly due to the declining gas prices. The valuation of the ammonia value chain in Southern Africa in 2019 was negatively impacted by softer international ammonia sales prices and higher gas feedstock prices. This resulted in an impairment of R3,3 billion.

We use derivative financial instruments to partially protect us against day-to-day and longer-term fluctuations in US dollar oil, export coal and ethane prices. The oil price affects the profitability of both our energy and chemical products. See "Item 11—Quantitative and qualitative disclosures about market risk". While the use of these instruments may provide some protection against fluctuations in crude oil prices, it does not protect us against longer-term fluctuations in crude oil prices or differing trends between crude oil and petroleum product prices.

We are unable to accurately forecast fluctuations in crude oil, ethane, natural/piped gas and petroleum products prices. Fluctuations in any of these may have a material adverse effect on our business, operating results, cash flows and financial condition. Refer "Item 5A—Operating results" for the impact of the crude oil prices on the results of our operations.

**Fluctuations in exchange rates may adversely affect our business, operating results, cash flows and financial condition**

The rand is the principal functional currency of our operations and we report our results in rand. However, a significant majority of our turnover is impacted by the US dollar and the price of most petroleum and chemical products is based on global commodity and benchmark prices which are quoted in US dollars.

Further, as explained above, the components of the BFP are US dollar-denominated and converted to rand, which impacts the price at which we sell fuel in South Africa.

A significant part of our capital expenditure and borrowings are US dollar-denominated, as

they relate to investments outside South Africa or constitutes materials, engineering and construction costs imported into South Africa. Fluctuations in the rand/US dollar exchange rate impacts our gearing and estimated capital expenditure.

We also generate turnover and incur operating costs in euro and other currencies.

Fluctuations in the exchange rates of the rand against the US dollar, euro and other currencies impact the comparability of our financial statements between periods due to the effects of translating the functional currencies of our foreign subsidiaries into rand at different exchange rates.

Accordingly, fluctuations in exchange rates between the rand and US dollar, and/or euro may have a material effect on our business, operating results, cash flows and financial condition.

During 2019, the rand/US dollar exchange rate averaged R14,20, fluctuating between a high of R15,44 and a low of R13,11. This compares to an average exchange rate of R12,85 during 2018, when it fluctuated between a high of R14,48 and a low of R11,55. At 30 June 2019 the closing rand/US dollar exchange rate was R14,08 as compared to R13,73 at 30 June 2018.

The rand exchange rate is affected by various international and South African economic and political factors. Subsequent to 30 June 2019, the rand has on average weakened against the US dollar and the euro, closing at R14,63 and R16,21, respectively, on 25 October 2019. In general, a weakening of the rand would have a positive effect on our operating results. Conversely, strengthening of the rand would have an adverse effect on our operating results, cash flows and financial condition. However, given the significance of our foreign currency denominated long-term debt a weaker rand against the US dollar has a negative impact on our gearing. Refer to "Item 5.A—Operating results" for further information regarding the effect of exchange rate fluctuations on our results of operations. We engage in hedging activities which partially protects the balance sheet and our earnings against fluctuations in the rand exchange rate. While the use of these instruments may provide some protection against fluctuations in the rand exchange rate, it does not protect us against a

10

Table of Contents

longer term strong rand/US dollar exchange rate. Refer to "Item 11—Quantitative and qualitative disclosures about market risk".

Although the exchange rate of the rand is primarily market-determined, its value at any time may not be an accurate reflection of its underlying value, due to the potential effect of, among other factors, exchange controls. For more information regarding exchange controls in South Africa see "Item 10.D—Exchange controls".

**Cyclicality in petrochemical product prices and demand may adversely affect our business, operating results, cash flows and financial condition**

The demand for chemicals, especially products such as polymers, solvents, surfactants and fertilisers is cyclical. Typically, higher demand during peaks in the industry business cycle leads producers to increase their production capacity. Although peaks in the business cycle have been characterised by increased EBIT margins in the past, such peaks have led to overcapacity with supply exceeding demand growth. Low periods during the industry business cycle are characterised by excess capacity, which can depress EBIT margins. Currently, shorter term factors including the current US/China trade dispute, 'Brexit' the scheduled withdrawal of the United Kingdom from the European Union, business and consumer confidence trends as well as other geo-political tensions pose significant risks to demand. Supply is currently largely affected by the US-China trade tensions and the capacity overbuild taking place in China. Consequently, forecasting the timing of the industry business cycle, and prices for chemical products during downturns in the cycle, remain difficult and a deterioration in overall conditions may have a material adverse effect on our business, operating results, cash flows and financial condition.

**Our access to and cost of funding is affected by our credit rating, which in turn is affected by the sovereign credit rating of the Republic of South Africa**

Our credit rating may be affected by our ability to maintain our outstanding debt and

financial ratios at levels acceptable to the credit ratings agencies; our business prospects; the sovereign credit rating of the Republic of South Africa and other factors, some of which are outside our control. The credit rating assigned by the ratings agencies is dependent on a number of factors, including the gearing levels of the group. In assessing these gearing levels, performance guarantees which have been issued by Sasol are taken into account as potential future exposure, which may impact the liquidity of the group. Our credit rating has been affected by movements in the sovereign credit rating of the Republic of South Africa.

Any future adverse rating actions or downgrade of the South African sovereign credit rating may have an adverse effect on our credit rating, which could negatively impact our ability to borrow money and could increase the cost of debt finance.

**Failure to comply with any debt covenant could have an adverse impact on our financial position and results and/or liquidity**

Our principal credit facilities contain restrictive covenants. These covenants limit, among other things, encumbrances on assets of Sasol and its subsidiaries, the ability of our subsidiaries to incur debt and the ability of Sasol and its subsidiaries to dispose of assets in certain circumstances. These restrictive and financial covenants could limit our operating and financial flexibility. Failure to comply with any covenant would enable the lenders to accelerate repayment obligations or may result in unfavourable changes to the credit facilities. Moreover, Sasol's credit facilities have standard provisions whereby certain events relating to other borrowers within the Group could, under certain circumstances, lead to acceleration of debt repayment under the credit facilities and the acceleration of debt repayment under the group's credit facilities and other borrowings under these cross-acceleration clauses could create liquidity pressures. In addition, the mere market perception of a potential breach of any financial covenant could have a negative impact on our ability to refinance indebtedness or the terms on which this could be achieved.

11

Table of Contents

**We identified a material weakness in our internal control over financial reporting as of 30 June 2019, which we are still in the process of remediating. If we are unable to remediate this material weakness, or if we experience additional material weaknesses or other deficiencies in the future or otherwise fail to maintain an effective system of internal controls, we may not be able to accurately and timely report our financial results, which could cause shareholders to lose confidence in our financial and other public reporting, and adversely affect our share price**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting and for evaluating and reporting on the effectiveness of our system of internal control. As disclosed below under Item 15. Controls and Procedures, during 2019, management identified a material weakness in internal control over financial reporting with respect to the capital cost estimation process implemented in connection with the LCCP which resulted from the aggregation of a series of individual control and project related control environment deficiencies. As a result, management concluded that our internal control over financial reporting was not effective as of 30 June 2019. While we are currently implementing remedial measures, there can be no assurance that our efforts will be successful. The material weakness cannot be considered remediated until the remedial controls operate for a sufficient period of time and management has time to conclude, through testing, that these controls are operating effectively. As a result of the material weakness described above, our management also concluded that our disclosure controls and procedures were not effective as of 30 June 2019.

We cannot be certain that any remedial measures we are currently in the process of implementing, or our internal control over financial reporting more generally, will ensure that we design, implement and maintain adequate controls over our financial processes and reporting in the future. Our failure to implement our remediation plan referred to above, or to implement newly required or improved controls or adapt our controls, or difficulties encountered in their operation, or difficulties in the assimilation

of acquired businesses into our control system, could prevent us from meeting our financial reporting obligations, including filing our periodic reports with the SEC on a timely basis and maintaining compliance with applicable NYSE listing requirements, or result in a restatement of previously disclosed financial statements.

The material weakness identified during 2019 resulted in a revision of capital commitments as at 30 June 2018. If other currently undetected material weaknesses in our internal controls exist, it could result in material misstatements in our financial statements requiring us to restate previously issued financial statements. In addition, material weaknesses, and any resulting restatements, could cause investors to lose confidence in our reported financial information, and could subject us to regulatory scrutiny and to litigation from shareholders, which could have a material adverse effect on our business and the price of our ordinary shares or ADSs. Furthermore, the remediation of any such material weaknesses could require additional remedial measures including additional personnel, which could be costly and time-consuming. If we do not maintain adequate financial and management personnel, processes and controls, we may not be able to manage our business effectively or accurately report our financial performance on a timely basis, which could cause a decline in our share price and adversely affect our results of operations and financial condition. Failure to comply with the Sarbanes-Oxley Act of 2002 could potentially subject us to sanctions or investigations by the SEC or other regulatory authorities, which would require additional financial and management resources.

Certain of the factors identified as resulting in the material weakness discussed above, in particular, that certain persons within the LCCP project management team responsible for the management of the Company reported inaccurate capital cost projections to senior executives and the board, may also constitute a reportable irregularity in accordance with the South African Auditing Profession Act 26 of 2005, on the basis that such persons may not have acted with the necessary care, skill and diligence required, which failure has caused, or is likely to cause material financial loss to the entity or stakeholders in its dealings with the entity, or, alternatively, this

12

Table of Contents

activity may have constituted a material breach of fiduciary duties by such persons. As a result of this activity, the Company removed all work responsibilities and initiated disciplinary action against one individual and negotiated the separation of three additional individuals, and took other remedial actions. Management believe that actions taken effectively remediate the activities that gave rise to a reportable irregularity. PricewaterhouseCoopers Incorporated (PwC) reported a reportable irregularity to the Independent Regulatory Board for Auditors in South Africa and concluded that these matters have been remediated and are no longer continuing.

**Our ability to respond to climate change could negatively impact our growth strategies, reduce supply/demand for our products, increase our operational costs, reduce our competitiveness, negatively impact our stakeholder relations and affect our future legal licence to operate**

Key manufacturing processes in South Africa, especially coal gasification and combustion, result in relatively high carbon dioxide emissions. Sasol is committed to reducing its overall impact on the environment, while developing and implementing an appropriate climate change management response to enable the long-term resilience of the company's strategy and business operations. Sasol's ability to develop and implement an appropriate climate change mitigation response poses a significant transitional risk for our business in South Africa. This is heightened by the necessity to appropriately address increasing societal pressures and shifts away from carbon intensive processes and products, as well as meeting new and anticipated policy and legislative requirements including carbon tax, budgets and reduction targets. It is particularly challenging in South Africa where access to lower carbon energies is limited and related infrastructure is under-developed.

A carbon tax was implemented in South Africa from 1 June 2019, which will significantly increase the operational costs of our South African operations post 2022. For the first phase to 2022, several transitional tax-free allowances are provided. The headline carbon tax is R120 per ton of $CO_2e$ (carbon dioxide equivalent) before

tax-free allowances, for emissions above the tax-free thresholds. At the same time the South African government is developing carbon budgets. Currently, there is uncertainty on how the mandatory carbon budget will be implemented and aligned to the carbon tax. The future risk that Sasol faces is how much the group will need to pay for either the carbon tax or possible penalties for exceeding the carbon budgets for the subsequent phases from 2023 onwards should the scale of mitigation not be possible in the timeframe required. Sasol's current carbon tax liability pre-tax is approximately R800 million to R1 billion per annum pre-tax in 2020, escalating at CPI + 2 percentage points until 2022. Considering South Africa's developmental challenges, the structure of its economy and the fact that the carbon tax design is not aligned with the carbon budget system, Sasol is supportive of carbon pricing but believes that alternative mechanisms could achieve the outcome sought by the proposed stand-alone carbon tax. In this instance, the alignment of the carbon budget with the carbon tax offers an efficient and effective solution for the South African economy to still grow while transitioning to a lower carbon economy. We continue to work to advocate for such a solution and actively engage with government and various stakeholders to appropriately manage these challenges that balance the need for economic development, job creation, energy security and greenhouse gas (GHG) emission reductions. Whilst we are not supportive of the Carbon Tax Act in its current form, Sasol is adhering to the Act and is participating in the relevant government process to develop the operating rules for the tax.

The group sees a lower carbon emission world representing changes to energy demand, regulations and commodity consumption patterns (also seen in externally validated data). Companies that do not respond to these possible realities could find parts of their portfolios, or potentially their entire business model, becoming less robust over time. Through our scenario analysis, Sasol visualises the potential areas where our business might be less robust to further changes in demand patterns, regulations or technology changes. This enables proactive mitigation action to be taken so that our

13

Table of Contents

operations (and our overall value chain) remain robust, as the world transitions to a lower carbon future. Given future uncertainty, Sasol has used a rigorous process to develop a set of scenarios based on an understanding of global and national energy system fundamentals, including government policy and carbon risk. There are, however, risks associated with accuracy, completeness and correctness of various assumptions that are used as inputs to scenario analysis work undertaken, including scenarios developed to test resilience to climate change threats. Should these assumptions prove to be inaccurate, incomplete or incorrect this could potentially significantly impact our resilience. In addition, scenarios by their very nature are inherently risky as it relates to limited ability to predict future outcomes.

Sasol's preliminary 2030 analysis of the Paris Agreement focuses our attention on reducing the use of coal to produce electricity as an immediate and critical mitigation opportunity for reducing emissions and will form part of a broader initiative to remain resilient. Sasol's foundation business portfolio in South Africa is sensitive to climate related risks if further reductions are not undertaken.

Further, climate change poses a significant risk for both our South African and global business as it relates to potential physical impacts including change of weather patterns, water scarcity and extreme weather events such as, hurricanes, tornadoes, flooding and sea level rise. In this regard, work is underway to develop an adaptation strategy for the identified key priority regions such as the US Gulf Coast, Mozambique, and South African operations (Secunda and Sasolburg). Ongoing monitoring efforts accordingly also guide our interventions to improve our maintenance, asset integrity processes and response procedures. While we are in the process of implementing an emission reduction framework based on the three pillars of reducing our emissions, transforming our coal-based operations and shifting our portfolio to a lower-carbon business, this framework may not be adequate to enable us to fully comply with any current or future regulations over GHG emissions.

Our international operations are less carbon-intensive and have been operating for some time in a more mature GHG regulatory regime. However, enhanced focus on issues concerning environmental quality and climate change may result not only in a more complex regulatory environment, but also additional legal risk, to the extent that damages relating to climate change and other air quality impacts are brought into judicial systems around the world. In addition our permits and operational licences are subject to public comment and/or input from stakeholders in certain of the jurisdictions in which we operate and there is an emerging trend by activists to use the public comment period to challenge a company's response to climate change.

**Our coal, synthetic oil, natural oil and natural gas reserve estimates may be materially different from quantities that we eventually recover**

Our reported coal, synthetic oil, natural oil and gas reserves are estimated quantities based on applicable reporting regulations that, under present conditions, have the potential to be economically mined, processed, produced, delivered to market and sold.

There are numerous uncertainties inherent in estimating quantities of reserves and in projecting future rates of production, including factors that are beyond our control. The accuracy of any reserve estimate is a function of the quality of available data, engineering and geological interpretation, costs to develop and produce, and market prices for related products.

Reserve estimates are adjusted from time to time to reflect improved recovery and extensions, and also revised from time to time based on improved data acquired from actual production experience and other factors, including resource extensions and new discoveries. In addition, regulatory changes, market prices, increased production costs and other factors may result in a revision to estimated reserves. Revised estimates may have a material adverse effect on our business, operating results, cash flows and financial condition. See "Item 4.D—Property, plants and equipment".

14

Table of Contents

**We may be unable to access, discover, appraise and develop new coal, synthetic oil, natural oil and natural gas resources at a rate that is adequate to sustain our business and/or enable growth**

Competition for suitable opportunities, increasing technical difficulty, stringent regulatory and environmental standards, large capital requirements and existing capital commitments may negatively affect our ability to access, discover, appraise and develop new resources in a timely manner, which could adversely impact our ability to support and sustain our current business operations. We acquire certain of these feedstocks through long term supply agreements and if the price levels at which replacement agreements are put into place are less favourable when such long term supply agreements come to an end it could adversely affect our business, cash flows and financial condition.

Our future growth could also be impacted by these factors, potentially leading to a material adverse effect on our business, operating results, cash flows and financial condition.

**We may not achieve projected benefits of acquisitions or divestments**

We may pursue acquisitions or divestments. With any such transaction, there is the risk that any benefits or synergies identified at the time of acquisition may not be achieved as a result of changing or inappropriate assumptions or materially different market conditions, or other factors. Furthermore, we could be found liable, regardless of extensive due diligence reviews, for past acts or omissions of the acquired business without any adequate right of redress.

In addition, delays in the sale of assets, or reductions in value realisable, may arise due to changing market conditions. Failure to achieve expected values from the sale of assets, or delays in expected receipt or delivery of funds may result in higher debt levels, the underperformance of those businesses and the loss of key personnel.

**There are country-specific risks relating to the countries in which we operate that could adversely affect our business, operating results, cash flows and financial condition**

Several of our subsidiaries, joint arrangements and associates operate in countries and regions that are subject to significantly differing political, social, economic and market conditions. See "Item 4.B—Business overview" for a description of the extent of our activities in the main countries and regions in which we operate. Although we are a South African-domiciled company and the majority of our operations are located in South Africa, we also have significant energy businesses in other African countries, chemical businesses in Europe, the US, the Middle East and Asia, a joint venture GTL facility in Qatar, joint operations in the US and Canada and a 10% indirect economic interest in the Escravos GTL (EGTL) project in Nigeria, which is an upstream joint venture between Chevron Nigeria Limited (CNL) and Nigerian National Petroleum Corporation (NNPC).

Particular aspects of country-specific risks that may have a material adverse impact on our business, operating results, cash flows and financial condition include:

**(a) Political and socioeconomic issues**

i. Political, social and economic uncertainty

We have invested, or are in the process of investing in, significant operations in Southern African, Western African, European, North American, Asian and Middle Eastern countries that have in the past, to a greater or lesser extent, experienced political, social and economic uncertainty.

South Africa faces ongoing challenges in improving the country's long-term growth potential and weak public sector revenue growth, stabilising debt levels and addressing weaknesses at state-owned enterprises and other institutions. These factors continue to pose a risk to South Africa's sovereign credit rating outlook. In Mozambique, there has been an improvement in economic conditions. However, very high levels of public sector debt, insufficient governance, accountability and transparency, the need to

15

Table of Contents

strengthen institutions, security concerns and extreme weather events are expected to remain significant risks to the sovereign credit and operational outlook for the foreseeable future.

At a global level, the trade dispute between the US and China, the evolution of the Brexit process, geo-political tensions and conflicts, potential financial vulnerabilities that have been built up over years due to low-to-zero interest rates, abrupt shifts in financial conditions and weakening economic growth can also all have an influence on the macro-economic outlook in the countries in which we operate.

Other countries in which we operate could from time-to-time face sovereign rating risks, which may impact our counterparties' ability to access funding and honour commitments.

Government policies, laws and regulations in countries in which we operate, or plan to operate, may change in the future. Governments in those countries have in the past and may in the future pursue policies of resource nationalisation and market intervention, including through protectionism like import tariffs and subsidies. The impact of such changes on our ability to deliver on planned projects cannot be determined with any degree of certainty and such changes may therefore have an adverse effect on our operations and financial results.

Sasol's strategic objective to progressively grow a resilient oil-based portfolio in selected West African countries, inherently carries frontier basin exploration and new country entry risks, offset by potential high reward through unlocking of new exploration plays. Sasol manages the associated exploration and new country risks through building a balanced portfolio of exploration and production assets, rigorously ensuring compliance with all corporate and legislative governance requirements, and following its internal technical and business quality assurance processes.

### ii. Transformation and local content

In all countries, our operations are required to comply with local procurement, employment equity, equity participation, corporate social responsibility and other regulations that are designed to address country-specific social and economic transformation and local content issues. Should we not meet or are perceived to not be meeting country-specific transformation or local content requirements or regulations, our ability to sustainably deliver on our business objectives may be impacted.

In South Africa, there are various transformation initiatives with which we are required to comply since Sasol operates in more than one sector of the economy. The broad risks that we face should we not comply with these transformation initiatives include the inability to obtain licences to operate in certain sectors such as mining and liquid fuels, limited ability to successfully tender for government and public entity business and potential loss of customers (as private sector customers increasingly require their suppliers to have a minimum B-BBEE rating).

The 2018 Mining Charter was published for implementation on 27 September 2018. On 19 December 2018 certain amendments were published in the Government Gazette which provided that existing mining right holders must implement the 2018 Mining Charter from 1 March 2019. Although the 2018 Mining Charter is an improvement on the 2017 draft, the Minerals Council commenced with a judicial review of certain aspects of the 2018 Mining Charter. Sasol Mining will monitor the outcome of this process which may either result in the status quo being retained or certain amendments being made to the 2018 Mining Charter that may address the Minerals Council's concerns. For more information refer to "Item 3.D—Risk Factors—South African mining legislation may have an adverse effect on our mineral rights".

The revised Codes of Good Practice for Broad-Based Black Economic Empowerment (B-BBEE) (the Revised Codes), which came into effect on 1 May 2015, provide a standard framework for the measurement of B-BBEE across all sectors of the economy, other than sectors that have their own sectorial transformation charters (e.g. the mining and liquid fuels industries). The Revised Codes provide more stringent targets, which negatively impacted on Sasol's B-BBEE contributor status. The liquid fuels industry is currently developing the

16

Table of Contents

"Petroleum and Liquid Fuels Sector Charter" (PLFSC) which will regulate B-BBEE in the liquid fuels and gas sector. While it is too early to assess the impact of the PLFSC, the PLFSC will be required to set industry-specific targets that cannot be more lenient than those in the Revised Codes.

Since our September 2017 announcement of plans to unwind the Sasol Inzalo B-BBEE transaction and introduce the Sasol Khanyisa B-BBEE transaction, we placed specific management focus on engaging with trade unions on issues pertaining to employee share ownership levels. Two of the five Sasol trade unions, Solidarity and CEPPWAWU, declared disputes relating individually to Sasol Khanyisa and the unwind of Sasol Inzalo which, if not resolved, might result in industrial action, which could adversely affect our operations and could give rise to costs which would impact earnings. In the case of the Solidarity trade union, the Sasol Khanyisa dispute is similar to disputes the trade union has with three other large employers in South Africa. The President of the Labour Court requested the various employers to prepare a stated case in order to allow the Labour Court to give guidance in this regard. It is therefore not a Sasol only matter in South Africa and affects other large companies as well. The Sasol Inzalo dispute lodged by the CEPPWAWU trade union has lost its momentum and it is no longer regarded as a major threat to Sasol. The time frame within which the matter was to be continued has become stale.

On 6 May 2019, Sasol received a statement of claim filed by the trade union Solidarity with the Labour Court in Johannesburg, alleging that the Sasol Khanyisa Employee Share Option Plan (ESOP) element of the Sasol Khanyisa transaction is discriminatory as it does not include white employees in South Africa and employees working for Sasol outside South Africa. This litigation is ongoing and we are unable at this time to assess the potential effect the ultimate outcome of the matter may have on the Sasol Khanyisa B-BBEE transaction. In addition, the Department of Mineral Resources and Energy may not recognise the ownership component of Sasol Khanyisa in which case we may be unable to fully comply with the 2018 Mining Charter requirements related to

new or amended licence applications, or the B-BBEE Commissioner may not recognise that the vendor financing mechanism allows us to be allocated points on Enterprise Supplier Development. Although Sasol Mining has applied for recognition of the Sasol Khanyisa ESOP to meet the ownership requirements contained in the 2018 Mining Charter, the Department of Mineral Resources and Energy has not yet formally responded to the request. The litigation instituted by Solidarity is of importance since the Department of Mineral Resources and Energy might be awaiting the outcome thereof before a final decision will be taken in respect of Sasol Khanyisa. At this stage all applications submitted prior to the 2018 Mining Charter becoming effective are being processed based on Sasol Mining's historic ownership level.

We expect that the long-term benefits of Sasol Khanyisa to the company and South Africa should outweigh any possible adverse effects, such as dilution to existing shareholders, but we cannot assure you that future implications of compliance with these requirements or with any newly imposed conditions will not have a material adverse effect on our shareholders or business, operating results, cash flows and financial condition. See "Item 4.B—Empowerment of historically disadvantaged South Africans".

Value creation, if any, to the majority of the Khanyisa shareholders at the conclusion of the transaction is exposed to the inherent business risks of Sasol South Africa during the empowerment period. This could potentially have an impact on dividend distributions to those Khanyisa shareholders that are required to settle funding obligations or otherwise negatively impact the valuation of the Sasol South Africa business on conclusion of the transaction.

### iii. Disruptive industrial action

The majority of our employees worldwide belong to trade unions. These employees comprise mainly of general workers, artisans and technical operators. While Sasol believes its labour relations are currently stable, the South African labour market remains volatile and can be characterised by major industrial action in key sectors of the economy especially during wage negotiations.

17

Table of Contents

In Sasol South Africa, only the industrial chemicals sector is scheduled for wage negotiations during 2019. The petroleum sector is covered by a three-year wage agreement effective 1 July 2018 to 30 June 2021.

Sasol Mining concluded a three-year wage agreement with all five of its participating trade unions in August 2017 valid until June 2020, paving the way for stable labour relations over the duration of three years.

Although we have positive relationships with our employees and their unions, significant labour disruptions could occur in the future and our labour costs could increase significantly in the future.

**(b) Fiscal and monetary policies**

Macro-economic factors, such as higher inflation and interest rates, could adversely impact our ability to contain costs and/or ensure cost-effective debt financing in the countries in which we operate.

Our sustainability and competitiveness is influenced by our ability to optimise our cost base. As we are unable to control the price at which our products are sold, an increase in inflation in countries in which we operate may result in significantly higher future operational costs.

South African consumer price inflation averaged 4,6% in 2019, from 4,5% in 2018. During the year, inflation was impacted mainly by muted food price increases, electricity tariff hikes and higher fuel prices. Despite relatively stable inflation, the South African Reserve Bank decided to hike the policy interest rate by 25 basis points to 6,75%, citing potential upside inflationary pressures emanating from tightening global financial conditions, exchange rate weakness, higher wage growth, global oil price trends and possible above-inflation target electricity and water tariff adjustments as reasons for the decision. The policy interest rate was maintained at 6,75% for the rest of 2019.

South Africa's economic outlook remains constrained as policy uncertainty, weak levels of business and consumer confidence, and a generally weaker global outlook weigh on the country's growth prospects. Ongoing economic weakness and subdued inflation already prompted the Reserve Bank to cut the policy interest rate by 25 basis points to 6,50% in July 2019.

The exchange rate remains a key risk to the inflation outlook. Global financial conditions, trade disputes, emerging market sentiment swings and domestic political and policy developments are likely to contribute to ongoing currency volatility.

The already weakening global growth outlook is clouded by the US and China trade dispute, while the Brexit process, weak euro area growth prospects and heightened geo-political tensions could result in even weaker than currently expected global growth. South African policy uncertainty, potential electricity supply constraints, limited fiscal space and low confidence levels are likely to constrain the country's near-term growth prospects. Against this background, Sasol's product sales in key markets are likely to remain under pressure for the foreseeable future.

**(c) Legal and regulatory**

i. Exchange control regulations

South African law provides for exchange control regulations which apply to transactions involving South African residents, including both natural persons and legal entities. These regulations may restrict the export of capital from South Africa, including foreign investments. The regulations may also affect our ability to borrow funds from non-South African sources for use in South Africa, including the repayment of these borrowings from South Africa and, in some cases, our ability to guarantee the obligations of our subsidiaries with regard to these funds. These restrictions may affect the manner in which we finance our transactions outside South Africa and the geographic distribution of our debt. See "Item 10.D—Exchange controls" and "Item 5.B—Liquidity and capital resources". We may also be impacted by new exchange control regulations affecting our operations in Gabon. See "Item 4.B—Business overview—Regulation—Safety, health and environment—Regions in which Sasol operates and their applicable legislation—Gabon".

18

Table of Contents

ii. Tax laws and regulations

We operate in multiple tax jurisdictions globally and are subject to both local and international tax laws and regulations. Although we aim to fully comply with tax laws in all the countries in which we operate, tax is a highly complex area leading to the risk of unexpected tax uncertainties. Tax laws are changing regularly and their interpretation may potentially result in ambiguities and uncertainties, in particular in the areas of international taxation and transfer pricing. Where the tax law is not clear, we interpret our tax obligations in a responsible way, with the support of legal and tax advisors as deemed appropriate. Tax authorities and courts may arrive at different interpretations to those taken by Sasol, which may lead to substantial increases in tax payments. Although we believe we have adequate systems, processes and people in place to assist us with complying with all applicable tax laws and regulations, the outcomes of certain tax disputes and assessments may have a material adverse effect on our business, operating results, cash flows and financial position.

We could also be exposed to significant fines and penalties and to enforcement measures, including, but not limited to, tax assessments, despite our best efforts at compliance. In response to tax assessments or similar tax deficiency notices in particular jurisdictions, we may be required to pay the full amount of the tax assessed (including stated penalties and interest charges) or post security for such amounts notwithstanding that we may contest the assessment and related amounts.

In particular, two of our subsidiaries, Sasol Oil (Pty) Ltd ("Sasol Oil") and Sasol Financing International (SFI), have received assessments in relation to international business activities. The litigation in respect of the Sasol Oil matter has been resolved with Sasol no longer exposed to a potential liability and the litigation proceedings relating to the assessments in respect of SFI are still ongoing.

For more information regarding pending tax disputes and assessments see "Item 4.B—Business overview—Legal proceedings and other contingencies".

Any of these risks may materially and adversely affect our business, results of operations, cash flows and financial condition.

iii. Ownership rights

We operate in several countries where ownership of rights in respect of land and resources is uncertain and where disputes in relation to ownership or other community matters may arise. For example, the South African government is considering the expropriation of land without compensation to enhance land reform and redistribution. The impact of these policy intentions and related disputes are not always predictable and may cause disruption to our operations or development plans.

iv. Legal and regulatory uncertainties

Some of the countries where we have already made investments, or other countries where we may consider making investments are in various stages of developing institutions and legal and regulatory systems that are characteristic of democracies and market economies.

The procedural safeguards of the legal and regulatory regimes in these countries in many cases are still being developed and, therefore, existing laws and regulations may be applied inconsistently. In some circumstances, it may not be possible to obtain the legal remedies provided under those laws and regulations in a timely manner.

**(d) Transportation, water, electricity and other infrastructure**

Our operations are located in multiple regions across the world and are reliant upon stable supply of electricity, availability of water and access to transportation routes in order to optimally run our operations and/or move our products. The infrastructure in some countries in which we operate, such as rail infrastructure, inland water systems, electricity and water supply, may need to be further upgraded and expanded, and in certain instances, possibly at our own cost. Should we not have access to reliable electricity supply, or should we have limited access to water or experience infrastructure challenges in the regions in which we operate, this could have a

19

Table of Contents

material adverse effect on our business, operating results, cash flows, financial condition and future growth.

Reliable supply of electricity is important to run our plants optimally. The South African power system specifically remains tight. Unplanned power outages as we experienced at our South African plants in 2019 have a negative impact on our production volumes, cost and profitability. Backup systems increase the cost of production and while we have the capacity to generate the majority of our own requirements, this only mitigates the risk partially as we remain dependent on external electricity supply.

Water, as a resource, is becoming increasingly limited as global demand for water increases. A significant part of our operations, including mining, chemical processing and others, requires use of large volumes of water. South Africa is generally an arid country and prolonged periods of drought or significant changes to current water laws could increase the cost of our water supplies or otherwise impact our operations. Water use by our operations varies widely depending largely on feedstock and technology choice. Water to our South African operations is supplied from the Integrated Vaal River System (IVRS), making up 86% of Sasol's total water demand. While the water supply to these operations remains secure the revised water balance for the IVRS continues to show a worsening of the water supply imbalance which may result in an increasing probability of water restrictions being imposed. Although various technological advances may improve the water efficiency of our processes they are capital intensive. We may experience limited water availability and other infrastructure challenges related to our South African operations which could have a material adverse effect on our business, operating results, cash flows, financial condition and future growth.

Transportation of inbound materials to plants and products to customers is reliant on the region's available infrastructure. Numerous factors like natural disasters or extreme weather events may impact on transportation modes which could have a material adverse effect on our business, operating results, cash flows, financial condition and future growth.

**(e) Stakeholder relationships**

Sasol has a complex network of stakeholders, often with competing interests. Our stakeholders are persons or groups who are directly or indirectly affected by our operations, as well as those who have interests in our business and/or the ability to influence its outcomes. Stakeholders may include members of local communities and their representatives, national, provincial or local government authorities, officials at all spheres of government, government agencies, multilateral organisations, regulators, political and religious leaders, civil society organisations and groups with special interests, suppliers, investors, business partners, customers, employees, trade unions, academics and media. Failure to manage relationships with our stakeholders may harm our reputation as well as our ability to conduct our operations effectively. Our stakeholder objective is to position Sasol as a credible partner and build trust with all our stakeholders. Our engagement approach is premised on open and effective communication, clear feedback, mutually beneficial outcomes where possible, as well as inclusiveness and integrity. However, we cannot assure you that the strategy will mitigate the risk fully and therefore, actions taken by stakeholders could have a material adverse effect on our business, operating results, cash flows, financial condition and future growth.

**(f) Contract stability**

Host governments in some of the resource-rich countries in which we operate or consider making investments may display tendencies of wanting to change existing contracts through early terminations, non-renewal or cancellation of contractual rights, or we may not be able to fully enforce our contractual rights in those jurisdictions or enforce judgements obtained in the courts of other jurisdictions, should they hold the view that these contracts are not beneficial to their countries.

**(g) Other specific country risks that are applicable to countries in which we operate and which may have a material adverse effect on our business include:**

- acts of warfare and civil clashes;

20

Table of Contents

- the loss of control of oil and gas field developments and transportation infrastructure;

- failure to receive new permits and consents;

- expropriation of assets;

- lack of capacity to deal with emergency response situations;

- social and labour unrest due to economic and political factors in host countries;

- terrorism, xenophobia and kidnapping threats;

- security threats to assets, employees and supply chain;

- possible demands to participate in unethical or corrupt conduct that lead us to forgo certain opportunities;

- feedstock security of supply; and

- sanctions against countries in which we operate.

**Actual or alleged non-compliance with laws could result in criminal or civil sanctions and could harm our reputation**

Non-compliance with competition laws, anti-corruption laws, sanction laws and environmental laws have been identified as our top four legal risks.

*Anti-corruption and anti-bribery laws*

Ethical misconduct and non-compliance with applicable anti-corruption laws could result in criminal or civil sanctions and could have a material adverse impact on our reputation, operations and licence to operate.

Petrochemical and energy companies need to be particularly vigilant with regard to the risk of bribery, especially when the scale of investments and the corruption perception of the countries where operations take place are considered. We, like other international petrochemical companies, have a geographically diverse portfolio and conduct operations in countries, some of which have a perceived high prevalence of corruption. Our operations must comply with applicable

anti-bribery laws, such as the US Foreign Corrupt Practices Act as well as similar anti-corruption and anti-bribery laws of South Africa and other applicable jurisdictions. There has been a substantial increase in the global enforcement of these laws. In particular, major investments in countries with a high corruption risk are subject to an elevated risk in dealing with other private companies, governments or government-controlled entities. Although we have an anti-corruption and anti-bribery compliance programme in place which is designed to prevent and reduce the likelihood of violations of such laws by our employees and companies associated with us, any violation could result in substantial criminal or civil sanctions and could damage our reputation.

*Sanctions laws*

Our international operations require compliance with applicable trade and economic sanctions or other restrictions imposed by governments, such as the US and United Kingdom, or organisations, including the United Nations, the European Union (EU) and its member countries. These trade and economic sanctions are not always aligned and this increases the complexities when a company has operations in various countries. Under economic and trading sanctions laws, governments may seek to impose modifications to business practices, and modifications to compliance programmes, which may increase compliance costs, and may subject us to fines, penalties and other sanctions.

Although we believe that we are in compliance with all applicable sanctions and embargo laws and regulations, and intend to maintain such compliance, there can be no assurance that we will be in compliance in the future, particularly as the scope of certain laws may be unclear and may be subject to frequent amendments or changing interpretations.

We are monitoring developments in the US, the EU and other jurisdictions that maintain sanctions programmes, including developments in implementation and enforcement of such sanctions programmes. Expansion of sanctions programmes, embargoes and other restrictions in the future (including additional designations of persons, entities and countries subject to

21

Table of Contents

sanctions), or modifications in how existing sanctions are interpreted or enforced, could have a material adverse effect on our business, operating results, cash flows and financial condition.

*Environmental laws and regulations*

In recent years, the environmental legislation in South Africa has resulted in significantly stricter standards. For instance, by 1 April 2020, our existing plants are required to meet more stringent point source standards for air quality emissions applicable to newly commissioned plants. Meeting some of these requirements will require retrofitting of some of our existing plants, we continue to invest significant capital and are on track with the implementation of committed roadmaps intended to bring us into compliance with most of the new plant standards by 2025, supported by pending postponement applications for extension of compliance timeframes. We submitted these to the National Air Quality Officer in the first quarter of 2019. The new plant standard for boiler sulphur dioxide could pose significant compliance challenges for our existing plants beyond 2025 from a technical and financial feasibility point of view. Accordingly, Sasol continues discussions with key stakeholders, including support to the technical panel of experts being appointed by the Department of Environment, Forestry and Fisheries to provide strategic and technical guidance towards effective management of sulphur dioxide emissions from old plants. These efforts are aimed at the identification of sustainable longer-term solutions and technologies to enable us to comply and advance the necessary environmental compliance and improvement roadmaps.

To mitigate associated air quality compliance risks in the short and long term, Sasol will be reliant on mechanisms available in law and decisions thereon by the relevant authorities to obtain postponements on the requisite compliance timeframes. We also rely on other mechanisms, such as the implementation of air quality offsets as per our approved plans, to achieve our compliance obligations. We recognise that existing standards may become stricter over time which may pose a risk to some of our maturing operations in South Africa. This may, in some

cases, adversely affect our business, financial condition, results of operations and cash flows.

The outcome of these processes and applications cannot be guaranteed and may be successfully challenged by third parties. Non-compliance may result in the violation of licence conditions with the associated consequence of administrative enforcement action, which may include directions to cease operations, fines and penalties including criminal prosecution. This may have a material adverse impact on our business.

Some of our South African operations are carried out in declared air quality priority areas which are further subject to the requirements of the Vaal Triangle Air-Shed Priority Area Air Quality Management Plan and the Highveld Priority Area Air Quality Management Plan. These plans are currently under review, subject to the completion of source apportionment studies. Accordingly, further emission reduction commitments may be required from Sasol and are likely to trigger additional cost for air quality improvements in these priority areas.

Outside of South Africa, we operate a number of plants and facilities for the storage and processing of chemical feedstock, products and wastes. These operations are subject to numerous laws, regulations and ordinances relating to safety, health and the protection of the environment which may also affect our operating results and financial condition. The essential objectives of these legal frameworks are largely consistent with that of the South African framework, although regulatory and permitting requirements are more established and entrenched in some regions.

*Competition laws/Anti-trust laws*

Violations of competition/anti-trust legislation could expose the group to administrative penalties, civil claims and damages, including punitive damages by companies which can prove they were harmed by the violation of competition/anti-trust legislation. Such penalties and damages could be significant and have an adverse impact on Sasol's business, operating results, cash flows and financial condition. In addition, Sasol's reputation could be damaged by findings of such contraventions and individuals could be subject to imprisonment or fines in countries where

22

Table of Contents

competition/anti-trust violations are a criminal offence.

On 16 June 2017, Sasol Germany GmbH received a request for information issued by the European Commission. The request for information related to agreements and /or concerted practices regarding the purchasing of ethylene since 2008. On 31 July 2017, Sasol Germany GmbH responded to the request for information. On 5 March 2019, the European Commission confirmed that Sasol Germany GmbH was not a party to the investigations.

Although it is Sasol's policy to comply with all laws, and notwithstanding training and compliance programmes, we could inadvertently contravene competition/anti-trust laws and be subject to the imposition of fines, criminal sanctions and/or civil claims and damages. We endeavour to remain compliant with competition/anti-trust legislation in all the jurisdictions in which we operate to avoid any material adverse impact on our reputation, business, operating results, cash flows and financial condition.

**South African mining legislation may have an adverse effect on our mineral rights**

The Minister of Mineral Resources has indicated Government's intention to withdraw the Mineral and Petroleum Resource Development Amendment Bill in order to separate oil and gas related matters from that of mineral related matters. It is anticipated that the new "Petroleum Bill" will be introduced to the South African parliament formed following the elections held in May 2019. The impact thereof on our operations will be considered once we have clarity on the nature of the amendments.

The Broad-Based Socio-Economic Empowerment Charter for the Mining and Minerals Industry, 2018 (2018 Mining Charter) was published on 27 September 2018 for implementation. The 2018 Mining Charter contains a number of changes compared to the previous Mining Charter including but not limited to an increase in the BEE shareholding requirement from 26% to 30% in respect of new

mining right applications. Furthermore, recognition is given to mining right holders who have achieved 26% BEE shareholding and whose shareholders exited prior to commencement of the 2018 Mining Charter. Such recognition is however only applicable for the duration of the right and not for subsequent renewals in which instance a 30% BEE shareholding is required. The 2018 Mining Charter contains more stringent compliance criteria than the previous Mining Charter, especially in respect of applications for new mining rights and the requirements in respect of procurement of mining goods which may have a material adverse effect on Sasol Mining. The potential impact on Sasol Mining may be two-fold: higher cost of production and the risk of being in non-compliance with the requirements of the 2018 Mining Charter which could lead to the suspension or cancellation of Sasol Mining's mining and/or prospecting rights. If a holder of a prospecting right or mining right in South Africa conducts prospecting or mining operations in contravention of the MPRDA, the converted mining rights can be suspended or cancelled by the Minister of Mineral Resources. The entity, upon receiving a notice of breach from the Minister, has a specific period of time to remedy such breach.

The MPRDA and applicable provisions in the National Environmental Management Act and National Water Act impose additional responsibilities with respect to environmental management as well as the prevention of environmental pollution, degradation or damage from mining and/or prospecting activities.

The effect of the possible future amendments to the MPRDA, associated regulations to be promulgated and the 2018 Mining Charter on our mining and petroleum rights in the future may have a material adverse effect on our business, operating results, cash flows and financial condition. See "Item 4.B—Business overview—The Mining Charter and the Mineral and Petroleum Resources Development Amendment Bill".

23

Table of Contents

**Legislation in South Africa on petroleum and energy activities may have an adverse impact on our business, operating results, cash flows and financial condition**

*Regulation of Petroleum Products*

**The Petroleum Products Amendment Act**

The Petroleum Products Amendment Act (the Petroleum Products Act) requires persons involved in the manufacturing, wholesale and retail sale of petroleum products to obtain relevant licences for such activities. Sasol Oil, Natref and Sasol South Africa Limited have submitted applications for their respective operations. The Sasol Oil wholesale licence and Sasol South Africa Limited manufacturing licence applications have been approved and the licences issued. The Sasol Oil manufacturing licence application has been accepted, however the licence has not yet been issued. As provided in the Petroleum Products Act, Sasol Oil continues to act as a deemed licence holder in relation to its manufacturing activities. The Natref manufacturing licence application is also still under review by the Department of Mineral Resources and Energy.

Accordingly, Sasol Oil and Natref continue to operate as being persons who, as of the effective date of the Petroleum Products Act, are deemed to be holders of a licence until their applications have been finalised. Until these applications have been finalised, we cannot provide assurance that the conditions of the licences may not have a material adverse impact on our business, operating results, cash flows and financial condition.

The Petroleum Products Act entitles the Minister of Energy to regulate the prices, specifications and stock holding of petroleum products and the status in this regard is as follows:

- The retail-pump prices of petrol, maximum refinery gate price of liquid petroleum gas (LPG) and the single maximum national price of illuminating paraffin are regulated. Prices are adjusted monthly according to published working rules and pricing formulae.

- The Department of Mineral Resources and Energy is currently reviewing the BFP mechanism. Revisions to the formula used to calculate the BFP could significantly impact revenue derived from liquid fuel sales in South Africa.

- Regulations to better align South African liquid fuels specifications with those prevailing in Europe were intended to become effective on 1 July 2017. As none of the local refineries, including those of Sasol, would have been able to comply with these new specifications, the Minister of Energy rescinded and amended the regulations and will announce a new implementation date in due course. There is a significant risk that the market demand and imported supply of cleaner fuels could overtake the regulatory date of the introduction of these fuel specifications and/or the date by which we can upgrade our plants to meet this demand. Compliance with these new fuel specifications will require substantial capital investments at both Natref and Secunda Synfuels Operations. The amount of capital investment required has not yet been finalised and discussions with the South African government regarding potential investment incentives are on-going.

- While regulations obliging licensed manufacturers to blend bio fuels with petrol and diesel are in force in South Africa, the enabling legislation to enable bio-fuels manufacturing has however not been enacted. The effect of bio-fuels blending on Sasol's liquid fuels production and sales and our financial condition cannot be determined at this time.

*Regulation of pipeline gas activities in South Africa*

**The Gas Act**

The Gas Act provides that the National Energy Regulator of South Africa (NERSA) has the authority to issue licences for construction and operation of gas pipelines and trading in gas. NERSA also has the authority to approve gas transmission tariffs and maximum gas prices that may be charged by gas traders, where there is

24

Table of Contents

inadequate competition as contemplated in the South African Competition Act. The Gas Act further gives NERSA the authority to impose fines and other punitive measures for failure to comply with the licence conditions and/or the provisions of the Gas Act. Future regulation of maximum gas prices may have a material adverse effect on our business, operating results, cash flow and financial condition.

Pursuant to the 2013 NERSA decisions approving the Sasol Gas maximum gas prices and transmission tariffs, Sasol Gas implemented a standardised pricing mechanism in its supply agreements with customers in compliance with the applicable regulatory and legal framework. NERSA approved further maximum gas prices and transmission tariffs based on the same pricing and tariff mechanisms in November 2017.

Seven of Sasol Gas's largest customers initiated a judicial review of the 2013 NERSA decisions relating to its maximum price and tariff methodologies and NERSA's decision on Sasol Gas's maximum price and transmission tariff applications. The review application proceedings were completed and the High Court upheld the NERSA-approved pricing methodology. The gas customers appealed this outcome in the Supreme Court of Appeal (SCA). In May 2018 the SCA upheld the appeal. NERSA appealed the SCA decision to the Constitutional Court. Sasol supported NERSA in this appeal. On 15 July 2019 the Constitutional Court handed down its decision. The Constitutional Court overturned the 2013 NERSA maximum price decisions and ordered NERSA to revise its decisions. The new decision by NERSA regarding the maximum gas price to be approved for Sasol will apply retrospectively from 26 March 2014 when the original decisions (now overturned) became effective. Pursuant to the decision by the Constitutional Court, Sasol will in terms of the process to be determined by NERSA bring a revised application for the approval of maximum gas prices for approval by NERSA.

The current contractual agreements with the Sasol Gas customers remain in place in terms of the November 2017 maximum price and transmission tariff decisions of NERSA. However, following the abovementioned outcome of the

appeal to the Constitutional Court, NERSA has to approve new maximum gas prices for Sasol in terms of the provisions of the Gas Act. The future implementation of such a new maximum gas price could have a material adverse effect on our business, operating results, cash flows and financial condition. If the new maximum gas price approved by NERSA for the period of the overturned decision is lower than the actual price charged to customers, then a retrospective liability may arise for Sasol Gas as a result. It is not possible to determine at this time what the outcome of such a price decision by NERSA will be. Therefore, the likelihood of a future obligation cannot be determined currently and neither can an amount for such a possible obligation be reliably estimated. Therefore, no provision has been raised at 30 June 2019.

**Changes in safety, health, environmental and chemical regulations and legislation and public opinion may adversely affect our business, operating results, cash flows and financial condition**

We are subject to a wide range of general and industry-specific environmental, health and safety and other legislation in jurisdictions in which we operate. See "Item 4.B—Business overview—Regions in which Sasol operates and their applicable legislation".

One of our most material challenges is the ability to anticipate and respond to the rapidly changing regulatory and policy context and associated stakeholder challenges, in particular relating to environmental legislation in South Africa. Evolving legislation relating to air quality, climate change, water and waste management introduces profound regulatory challenges to our existing plants in South Africa. The quality, emission and disposal limit requirements imposed in our air quality, waste management and water use licences for our South African operations are consequently becoming increasingly stringent. These laws and regulations and their enforcement are likely to become more stringent over time in all jurisdictions in which we operate, although these laws in some jurisdictions are already more established than in others. These compliance challenges are further impacted by the fact that, in some instances, legislation does not adequately

25

Table of Contents

provide for sufficient and/or flexible transitional arrangements for existing plants to comply with the imposed more stringent requirements. Compliance with these requirements is a significant factor in our business. We continue to effectively invest in significant capital expenditures in order to comply with these requirements, our committed environmental roadmaps and offset commitments. We continue with transparent disclosures and engagements with our key stakeholders in an effort to address these challenges. A failure to comply could have an impact on our licence to operate, as well as result in administrative and criminal enforcement, and could harm our relationships with stakeholders.

Sasol's highly energy intensive operations in South Africa exist in the midst of rapidly evolving national legislation on GHG emissions. In support of the Paris Agreement, the government has recently published the Draft Climate Change Bill, promulgated the Carbon Tax Act effective 1 June 2019 and has promulgated the Pollution Prevention Plan and Greenhouse Gas Mandatory Reporting Regulations. Sasol has submitted its GHG inventory data for South Africa in compliance with the regulations and successfully obtained internal approval for its first mandatory Pollution Prevention Plan. We subsequently submitted our first annual report on our Pollution Prevention Plan in March 2019. We envisage that compliance with carbon budgets will become mandatory in 2021. For further information on the impact of carbon taxes refer to "Item 3.D—Risk factors—Our ability to respond to climate change could negatively impact our growth strategies, reduce demand for our products, increase our operational costs, reduce our competitiveness, negatively impact our stakeholder relations and affect our future legal licence to operate".

Changes to waste management legislation in South Africa, particularly around landfill prohibitions being progressively implemented, are compelling our South African operations to find alternative solutions to waste management and disposal. The changing regulatory landscape introduces increasingly stringent waste disposal restrictions and punitive fiscal reform measures including waste levies. We are quantifying the potential costs associated with meeting these requirements. We will be dependent on regulatory

authorities clarifying the interpretation and applicability of specific requirements to our waste streams, to determine whether there would be compliance challenges associated with technical and feasibility constraints. We may have to rely on mechanisms in law, such as exemption applications, to address potential waste management compliance challenges, the outcome of which cannot be guaranteed.

Regarding the regulation of water activities, we have noticed an increase in the number of policy and regulatory documents issued by the Department of Human Settlements, Water and Sanitation for public consultation, proposing new institutional arrangements for governing water resources, economic regulation including the imposition of waste discharge limits and infrastructure investment. At present it is too early to gauge the likely impact on our operations, in particular in relation to access to water supply, once these are implemented.

From a chemicals management perspective, our products are required to be registered in accordance with regulatory requirements for many of the countries in which we operate, and sold in line with permit conditions, amongst other considerations. This includes filing of REACH (Registration, Evaluation, Authorisation and Restriction of Chemicals) registrations for chemicals we produce or import into Europe, and chemical notifications for other regions, especially the United States, Canada and China, as well as South Korea, Taiwan and other Asian countries. South Africa is also in the process of localising international commitments on safe chemicals management in national regulations. This includes the adoption of the Globally Harmonized System of Classification and Labelling of Chemicals (GHS) through the Department of Employment and Labour's draft Hazardous Chemical Agents Regulations and anticipated changes to regulations regarding the phase-out and management of ozone-depleting substances in line with the Montreal Protocol.

Although systems and processes are in place, monitored and improved upon, to ensure compliance with applicable laws and regulations applicable to Sasol and its obligations downstream in the value chain, we cannot assure you that we

26

Table of Contents

will be in compliance with all laws and regulations at all times. For example, non-compliance with environmental, health or safety laws may occur from system or human errors in monitoring our emissions of hazardous or toxic substances into the environment, such as the use of incorrect methodologies or defective or inappropriate measuring equipment, errors in manually capturing results, or other mistaken or unauthorised acts of our employees or service providers.

Public opinion and awareness is growing and challenges are increasingly being raised on community and consumer health and safety associated with the manufacturing and use of chemicals and industries reliant on fossil fuels. Our manufacturing processes may utilise and result in the emission of or exposure to substances with potential health risks. We also manufacture products which may pose safety, health and environmental risks. Although we remain committed to apply a duty of care principle and implement measures to eliminate or mitigate associated potential risks, including through our commitment to the Responsible Care® programme and adoption of the GHS, we may be subject to liabilities as a result of the use or exposure to these materials or emissions. See "Item 4.B—Business overview—Regulation" for more detail.

We recognise that evolving chemicals control regulations globally may require additional product safety evaluations with the potential for restrictions on product uses. Consequently, markets may apply pressure on us concerning certain of our products, feedstock, manufacturing processes, transportation and distribution arrangements. As a result of these additional pressures, the associated costs of compliance and other factors, we may be required to modify or withdraw certain products from the market, which could have a material adverse effect on our business, operating results, cash flows, financial condition and reputation.

For example, the fast growth of plastics, combined with challenges in effective waste disposal, has resulted in a global problem associated with plastics waste in the environment. The main source of the problem is identified as

short-life consumer packaging-type applications, often referred to as single-use plastics. Consumer and regulator sentiment regarding the plastic pollution challenge may pose future responsibilities and business constraints on the wider industry, including Sasol, amongst other things through extended producer responsibility, bans on certain polymer product applications and reduced demand for polymers where alternatives are perceived to be more acceptable to the markets they serve.

**We are subject to risks associated with litigation and regulatory proceedings**

As with most large corporations, we are involved from time to time as a party to various lawsuits, arbitrations, regulatory proceedings, investigations or other disputes. Litigation, arbitration and other such legal proceedings or investigations involve inherent uncertainties and, as a result, we face risks associated with adverse judgments or outcomes in these matters. Even in cases where we may ultimately prevail on the merits of any dispute, we may face significant costs defending our rights, lose certain rights or benefits during the pendency of any proceeding or suffer reputational damage as a result of our involvement. We are currently engaged in a number of legal and regulatory proceedings and arbitrations in various jurisdictions including the litigation relating to the Sasol Khanyisa B-BBEE transaction described under "—There are country specific risks relating to the countries in which we operate that could adversely affect our business, operating results, cash flows and financial condition—(a) Political and socioeconomic issues—ii. Transformation and local content" and the SFI tax proceedings described under "—There are country specific risks relating to the countries in which we operate that could adversely affect our business, operating results, cash flows and financial condition—(c) Legal and regulatory—ii. Tax laws and regulations", as well as described under "Item 4.B—Business overview—Legal proceedings and other contingencies". We could also face potential litigation or governmental investigations or regulatory proceedings in connection with the material weakness in our internal control over financial reporting or the reportable irregularity relating to the same matter (see "—We identified

27

Table of Contents

a material weakness in our internal control over financial reporting as of 30 June 2019 which we are still in the process of remediating. If we are unable to remediate this material weakness, or if we experience additional material weaknesses or other deficiencies in the future or otherwise fail to maintain an effective system of internal controls, we may not be able to accurately and timely report our financial results, which could cause shareholders to lose confidence in our financial and other public reporting and adversely affect our share price").

There can be no assurance as to the outcome of any litigation, arbitration or other legal proceeding or investigation, and the adverse determination of material litigation could have a material adverse effect on our business, operational results, cash flows and financial condition.

**We may not be successful in attracting and retaining sufficiently skilled employees**

In order for Sasol to deliver on its strategic objectives, sustainably grow into the future, and effectively operate and continuously improve existing and future assets and technologies, we are highly dependent on our human capital.

While we maintain a focus on attracting and retaining sufficiently skilled and experienced employees, including critical or scarce skills like qualified scientists, engineers, project execution managers, artisans and operators and highly skilled employees in business and functional roles, there exist various risks that may impact our ability to attract and retain required skills.

There is increasing competition in global labour markets for critical or scarce skills. The quality and availability of skills in certain labour markets may also be impacted by the challenges within the education and training systems in certain countries in which we operate. Localisation, diversity and other similar legislation in countries in which we operate are also key considerations in the attraction and retention of sufficiently skilled employees. The increasing use of digital technologies across our industry is placing increasing demand on data and digital technology skills. The availability and supply of these new skill sets are limited due to demand

outweighing supply. In addition, as the move into the digital space intensifies, future labour market dynamics may significantly change and we may fail to adequately or timeously anticipate and respond to such changes.

Without adequate investment in, effective management and deployment of our human capital, and failure to adequately or timeously anticipate changing labour market dynamics, our ability to meet current and future business needs, deliver on our strategy, perform to expectations, remain competitive and deliver stakeholder value may be compromised.

**Intellectual property risks may adversely affect our freedom to operate our processes and sell our products and may dilute our competitive advantage**

Our various products and processes, including most notably our specialty chemical and energy products and processes, have unique characteristics and chemical structures and, as a result, are subject to confidentiality and/or patent protection, the extent of which varies from country to country. Rapid changes in our technology commercialisation strategy may result in a misalignment between our intellectual property protection filing strategy and the countries in which we operate. The disclosure of our confidential information and/or the expiry of a patent may result in increased competition in the market for our products and processes, although the continuous supplementation of our patent portfolio reduces such risk to an extent. In addition, aggressive patenting by our competitors, particularly in countries like the US, China, Japan and Europe may result in an increased patent infringement risk and may constrain our ability to operate in our preferred markets.

A significant percentage of our products can be regarded as commodity chemicals, some of which have unique characteristics and chemical structure which make the products suitable for different applications than typical commodity products. These products are normally utilised by ourselves or our customers as feedstock to manufacture specialty chemicals or application-type products. We have noticed a worldwide trend of increased filing of patents

28

Table of Contents

relating to the composition of product formulations and the applications thereof. These patents may create pressure on both Sasol and those of our customers who market these product formulations which may adversely affect our sales to these customers. These patents may also increase our risk to exposure from limited indemnities provided to our customers of these products in case there is a patent infringement which may impact the use of the product on our customers' side. Patent-related pressures may adversely affect our business, market reputation, operating results, cash flows and financial condition.

We believe that our proprietary technology, know how, confidential information and trade secrets provide us with a competitive advantage. A possible loss of experienced personnel to competitors, and a possible transfer of know-how and trade secrets associated therewith, including the patenting by our competitors of technology built on our know-how obtained through former employees may negatively impact this advantage.

Similarly, operating and licensing technology in countries in which intellectual property laws are not well established and enforced may result in an inability to effectively enforce our intellectual property rights. The risk of some transfer of our know how and trade secrets to our competitors is increased by the increase in the number of licenses granted under our intellectual property, as well as the increase in the number of licensed plants which are brought into operation through entities which we do not control. As intellectual property warranties and indemnities are provided under each new licence granted, the cumulative risk increases accordingly. These risks may adversely affect our business, operating results, cash flows and financial condition.

**Increasing competition in relation to products originating from countries with low production and logistical costs may adversely affect our business, operating results, cash flows and financial condition**

Certain of our chemical production facilities are located in developed countries, including the US and in Europe. Economic and political conditions in these countries result in relatively

high labour costs and, in some regions, relatively inflexible labour markets. Increasing competition from regions with lower production costs and more flexible labour markets, for example the Middle East, India and China, exerts pressure on the competitiveness of our chemical products and, therefore, on our profit margins. This could result in the withdrawal of particular products or the closure of specific facilities, which may have a material adverse effect on our business, operating results, cash flows and financial condition.

**We may face potential costs in connection with industry and value chain-related operational interruptions, accidents or deliberate acts of terror causing property damage, personal injuries or environmental contamination**

Operational interruptions impacting our operations or value chains may have a material adverse effect on volumes produced and costs. This can be as a result of failure of critical assets, extreme weather events or natural disasters, lack of feedstock (coal, natural gas, ethane, ethylene), supply chain disruption (inbound and outbound), utility interruption (electricity, water, oxygen, steam, hydrogen, nitrogen) or a breach of our license to operate (non-compliance with regulatory requirements or permits).

We operate coal mines, explore for and produce oil and gas and operate a number of plants and facilities for the manufacture, storage, processing and transportation of oil, chemicals and gas, related raw materials, products and wastes. These facilities and their respective operations are subject to various risks, such as fires, explosions, releases and loss of containment of hazardous substances, soil and water contamination, flooding and land subsidence, among others. As a result, we are subject to the risk of, and in the past have experienced, industry-related incidents. Such incidents can be subjected to inspections by relevant authorities, with the associated potential consequences of enforcement action, including directions to temporarily cease and desist operations and the imposition of fines and penalties. This may have a material adverse effect on our business.

Our facilities are also subject to the risk of deliberate acts of terror.

29

Table of Contents

Our main Secunda production facilities are concentrated in a relatively small area in Secunda, South Africa. The size of the facility is approximately 83 square kilometres ($km^2$) with operating plants accounting for 9 $km^2$. This facility utilises feedstock from our mining and gas businesses, while the chemical and energy businesses elsewhere also rely on the facility for the raw materials it produces. Accidents and acts of terror may result in damage to our facilities and may require the shutdown of the affected facilities, thereby disrupting production and increasing production costs and may in turn disrupt the mining, gas, chemicals and oil businesses which make up a significant portion of our total income. Furthermore, accidents or acts of terror at our operations may have caused, or may in future cause, environmental contamination, personal injuries, health impairment or fatalities and may result in exposure to extensive environmental remediation costs, civil litigation, the imposition of fines and penalties and the need to obtain or implement costly pollution-control technology.

Sasol operates the Pande and Temane gas fields in Mozambique. Gas is produced from a portfolio of wells, and then processed through a Central Processing Facility (CPF). Gas is sold to our operations in Secunda and Sasolburg as well as to external customers in Mozambique and South Africa. The production of gas through wells, pipelines and a processing plant is inherently exposed to the risk of integrity failures which may result in a loss of containment and/or a disruption of gas supply to our own and/or customers operations. The risk of any well, pipeline or plant equipment failure is managed through a structured, continuously ongoing maintenance and management programme. Were Sasol's Mozambique gas wells or facilities to experience a catastrophic, simultaneous, long-term outage, particularly if we are unable to offset such outages through existing contractual gas sales agreement mechanisms, this could have a material adverse effect on our revenue, cash flows and costs.

Our products are ultimately sold to customers around the world and this exposes us to risks related to the transportation of such products by road, rail, pipelines or marine vessels or the nefarious use of our products for illegitimate

purposes, such as the manufacture of illicit drugs and chemical weapons, or the use of explosives for violent and criminal acts. Such activities would generally take place in the public domain exposing us to incident risks over which we have limited control.

It is Sasol's policy to ensure effective service provider management and procure appropriate property damage and business interruption insurance cover for its production facilities above acceptable deductible levels at acceptable commercial premiums. However, full cover for all loss scenarios may not be available at acceptable commercial rates, and we cannot give any assurance that the insurance procured for any particular year would cover all potential risks sufficiently or that the insurers will have the financial ability to pay all claims that may arise.

The costs we may incur as a result of the above or related factors could have a material adverse effect on our business, operating results, cash flows and financial condition.

**Exposure related to investments in associates and joint arrangements may adversely affect our business, operating results, cash flows and financial condition**

We have invested in a number of associates and joint arrangements and will consider opportunities for further upstream oil and gas and downstream investments (including licensing opportunities), where appropriate, as well as opportunities in chemicals. The development of these projects may require investments in associates and joint arrangements, some of which are aimed at facilitating entry into countries and/or sharing risk with third parties. Although the risks are shared, the objectives of our associates and joint arrangement partners; their ability to meet their financial and/or contractual obligations; their behaviour; their compliance with legal and ethical standards; and the increasing complexity of country-specific legislation and regulations may adversely affect our reputation and/or result in disputes and/or litigation. All of these may have a material adverse effect on our business, operating results, cash flows and financial condition, and may constrain the achievement of our growth objectives.

30

Table of Contents

**We may face the risk of information security breaches or attempts to disrupt critical information technology services, which may adversely impact our operations**

The increasing use of information technology (IT) and digital infrastructure systems in operations is making all industries, including the energy and chemicals industries, much more susceptible to cyber threats and information security breaches. IT and digital systems with related services include our financial, commercial, transacting and production systems. Sasol has an information security programme in place to mitigate the risks that come with cyber threats and information security breaches but recognises that if there is a breach of information security we could experience disruptions of critical services, or in the worst case scenario, this could have a material adverse effect on our business, operating results, cash flows and financial condition and our disclosure control processes.

In addition, we operate in countries that have data protection laws and regulations. Although it is our policy to comply with all applicable laws, and notwithstanding training, awareness and compliance programmes, non-compliance with data protection laws could result in fines and/or civil claims and damages. This could have a material adverse impact on our reputation and a consequential financial impact.

**We may not pay dividends or make similar payments to shareholders in the future due to various factors**

As further described under Item 8. Financial Information, the company's dividend policy takes into consideration various factors, including overall market and economic conditions, the group's financial position, capital investment plans as well as earnings growth. Whether funds are available for distribution to shareholders depends on a variety of factors, including the amount of cash available and our capital expenditures and other liquidity requirements existing at the time. Under South African law, the company will be entitled to pay a dividend or similar payment to its shareholders only if it meets the solvency and liquidity tests set out in the Companies Act of South Africa 71 of 2008, and is permitted to do so

in terms of the Memorandum of Incorporation. Given these factors and our board's discretion to declare cash dividends or other similar payments, dividends may not be paid in the future.

After careful consideration of our current leverage and the volatility in the macro-economic environment, we have decided to pass the final dividend in order to protect and strengthen our balance sheet. We may further consider the passing of the 2020 interim dividend based on the health of the balance sheet credit metrics at that stage.

Our dividend cover for 2017 was 2,8 times based on HEPS and 2,8 times based on CHEPS for 2018. Interim dividend for 2019 was 6,5 times based on CHEPS. We usually distribute dividends twice a year.

**We may not be able to exploit technological advances quickly and successfully or competitors may develop superior technologies**

Most of our operations, including the gasification of coal and the manufacture of synthetic fuels and petrochemical products, are highly dependent on the use of advanced technologies. The development, commercialisation and integration of the appropriate advanced technologies can affect, among other things, the competitiveness of our products, the continuity of our operations, our feedstock requirements and the capacity and efficiency of our production.

It is possible that new technologies or novel processes may emerge and that existing technologies may be further developed in the fields in which we operate. Unexpected advances in employed technologies or the development of novel processes can affect our operations and product ranges in that they could render the technologies we utilise or the products we produce obsolete or less competitive in the future. Difficulties in accessing new technologies may impede us from implementing them and competitive pressures may force us to implement these new technologies at a substantial cost.

In addition to the technological challenges, a number of our expansion projects are integrated across our value chain. Delays with the development of an integrated project might,

31

Table of Contents

accordingly, have an impact on more than one business segment.

Our ability to compete will depend on our timely and cost effective implementation of new technological advances. It will also depend on our success in commercialising these advances irrespective of competition we face. Any failure to do so could result in a material adverse effect on our business, operating results, cash flows and financial condition.

**The exercise of voting rights by holders of American Depositary Receipts is limited in some circumstances**

Holders of American Depositary Receipts (ADRs) may exercise voting rights with respect to the ordinary shares underlying their American Depositary Shares (ADSs) only in accordance with the provisions of our deposit agreement (Deposit Agreement) with J.P. Morgan Chase Bank N.A. (J.P. Morgan), as the depositary (Depositary). For example, ADR holders will not receive notice of a meeting directly from us. Rather, we will provide notice of a shareholders meeting to J.P. Morgan in accordance with the Deposit Agreement. J.P. Morgan has undertaken in turn, as soon as practicable after receipt of our notice, to mail voting materials to holders of ADRs. These voting materials include information on the matters to be voted on as contained in our notice of the shareholders meeting and a statement that the holders of ADRs on a specified date will be entitled, subject to any applicable provision of the laws of South Africa and our Memorandum of Incorporation (MOI), to instruct J.P. Morgan as to the exercise of the voting rights pertaining to the shares underlying their respective ADSs.

Upon the written instruction of an ADR holder, J.P. Morgan will endeavour, in so far as practicable, to vote or cause to be voted the shares underlying the ADSs in accordance with the instructions received. If instructions from an ADR holder are not received by J.P. Morgan by the date specified in the voting materials, J.P. Morgan will not request a proxy on behalf of such holder. J.P. Morgan will not vote or attempt to exercise the right to vote other than in accordance with the instructions received from ADR holders.

We cannot assure you that you will receive the voting materials in time to ensure that you can instruct J.P. Morgan to vote the shares underlying your ADSs. In addition, J.P. Morgan and its agents are not responsible for failing to carry out voting instructions or for the manner of carrying out voting instructions. This means that you may not be able to exercise your right to vote and there may be no recourse if your voting rights are not exercised as you directed.

**Holders of Sasol's ordinary shares or ADSs may be subject to dilution as a result of any non-pre-emptive share issuance, and shareholders or ADS holders outside South Africa may not be able to participate in future offerings of securities (including Sasol's ordinary shares) carried out by or on behalf of Sasol**

Future share issuances by Sasol, with or without subscription rights, could (depending on how the share issuance is structured) dilute the interests of existing shareholders or require them to invest further funds to avoid such dilution.

In the case of an equity offering with subscription rights, holders of Sasol's shares in certain jurisdictions may not be entitled to exercise such rights unless the rights and the related shares are registered or qualified for sale under the relevant legislation or regulatory framework. In particular, holders of Sasol's securities who are located in the United States (including those who hold ordinary shares or ADSs) may not be able to participate in securities offerings by or on behalf of Sasol unless a registration statement under the U.S. Securities Act of 1933 (the Securities Act) is effective with respect to such securities or an exemption from the registration requirements of the Securities Act is available thereunder. Holders of these shares in these jurisdictions may therefore suffer dilution of their shareholding should they not be permitted to, or otherwise choose not to, participate in future equity offerings with subscription rights.

**Sales of a large amount of Sasol's ordinary shares and ADSs could adversely affect the prevailing market price of the securities**

Historically, trading volumes and the liquidity of shares listed on the JSE Limited (JSE) have

32

Table of Contents

been low in comparison with other major markets. The ability of a holder to sell a substantial number of Sasol's ordinary shares on the JSE in a timely manner, especially in a large block trade, may be restricted by this limited liquidity. The sales of ordinary shares or ADSs, if substantial, or the perception that these sales may occur and be substantial, could exert downward pressure on the prevailing market prices for Sasol ordinary shares or ADSs, causing their market prices to decline.

## ITEM 4. INFORMATION ON THE COMPANY

### 4.A History and development of the company

Sasol Limited, the ultimate holding company of our group, is a public company. It was incorporated under the laws of South Africa in 1979 and has been listed on the JSE Limited (JSE) since October 1979. Our registered office and corporate headquarters are at Sasol Place, 50 Katherine Street, Sandton, 2196, South Africa, and our telephone number is +27 10 344 5000. Our agent for service of process in the US is Puglisi & Associates, 850 Library Avenue, Suite 204, P.O. Box 885, Newark, Delaware 19715.

The SEC maintains an internet site that contains reports, proxy and information statements, and other information regarding Sasol that we file electronically with the SEC. To find the required information please visit www.sec.gov/. For further information please visit www.sasol.com. This website is not incorporated by reference in this annual report.

For a description of the company's principal capital expenditures and divestitures refer to "Item 5.B—Liquidity and capital resources".

### 4.B Business overview

Sasol is an international integrated chemicals and energy company that, through its talented people, uses selected technologies to safely and sustainably source, produce and market chemical and energy products competitively to create superior value for our customers, shareholders and other stakeholders.

For details regarding the following sections, refer as indicated.

- for information regarding our Business Overview, refer "How we structure ourselves to create value" as contained in Exhibit 99.4;

- for information regarding our Strategy, refer "Integrated Report—Progressing on our value-based strategy" as contained in Exhibit 99.5; and "Integrated Report—Our integrated value chain" as contained in Exhibit 99.6;

- for a description of the company's operations and principal activities refer "How we structure ourselves to create value" as contained in Exhibit 99.4; "Integrated Report—Operational and Strategic Overviews" as contained in Exhibit 99.7; and Item 18—"Financial Statements—Segment information"; and

- for a description of our principal markets, refer to Item 18—"Financial Statements—Geographic segment information", which provides information regarding the geographic location of the principal markets in which we generate our turnover, as well as of our asset base.

### Seasonality

Sales volumes of our products are generally not subject to seasonal fluctuations, but tend to follow broader global industry trends and are therefore impacted by macro-economic factors. Sasol operates globally and in many diverse markets, and accordingly, no element of seasonality is likely to be material to the results of Sasol as a whole. For further information regarding cyclicality and prices and demand, refer to "Item 3.D—Risk Factors".

### Raw materials

In the Southern Africa value chain, the main feedstock components for the production of fuels and chemical products are coal obtained from Sasol Mining, natural gas obtained from Sasol Exploration and Production International and crude oil purchased from external suppliers.

In our Chemicals business, the main feedstocks used are kerosene, benzene, ethane, ethylene, oleochemicals, slack wax and aluminium.

33

Table of Contents

from the Bank of New York Mellon in respect of the 2018 year end final dividend and the 2019 interim dividend respectively.

## ITEM 13. DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES

Not applicable.

## ITEM 14. MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS

Not applicable.

## ITEM 15. CONTROLS AND PROCEDURES

### Board review

In May 2019, the Board commissioned an independent review into the circumstances that may have delayed the prompt identification and reporting of the LCCP cost and schedule overruns. The purpose of the review was to consider the circumstances that may have delayed the prompt identification and reporting of these developments, root causes and the legal consequences thereof. The review has now been concluded. The Board has made the following key findings:

- The primary responsibility for shortcomings in relation to the LCCP lies with the former leadership of the LCCP's Project Management Team (PMT), which engaged in conduct that was inappropriate, demonstrated a lack of competence, and was not transparent. However, on balance, the Board finds that there is not sufficient evidence to conclude that these individuals acted with an intent to defraud.

- In addition, certain governance shortcomings relating to the LCCP also contributed, including a culture of excess deference within the project-related control environment and governance structures that oversaw LCCP.

- Certain persons within the PMT responsible for the management of the Company reported inaccurate capital cost projections to senior executives and the board.

As a result of this activity, the Company removed all work responsibilities and initiated disciplinary action against one individual and negotiated the separation of three additional individuals, and took other remedial actions.

### (a) Disclosure controls and procedures

The Company's Joint Presidents and Chief Executive Officers and Chief Financial Officer, performed an evaluation of the effectiveness of the group's disclosure controls and procedures (required by paragraph (b) of 17 CFR 240.13a-15) as of the end of the period covered by this annual report on Form 20-F.

Based on this evaluation, our Joint Chief Executive Officers and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were not effective as of 30 June 2019 due to a material weakness in internal control over financial reporting with respect to the capital cost estimation process implemented in connection with the LCCP, which resulted from the aggregation of a series of individual control and project-related control environment deficiencies described below in Management's annual report on internal control over financial reporting.

Notwithstanding this material weakness, management concluded that the consolidated financial statements included in this annual report on Form 20-F present fairly, in all material respects, our financial position, results of operations and cash flows as of and for the periods presented in accordance with International Financial Reporting Standards (IFRS), as issued by the International Accounting Standards Board (IASB). Management further concluded that prior year financial statements were accurate in all material respects. Management's assessment is based upon a number of factors, including, but not limited to:

- The completion of the independent review commissioned by the Board (the Board review) concerning the errors in the capital cost estimate for the LCCP previously announced on 8 February 2019;

- The ongoing monitoring of progress in executing the LCCP since 30 June 2019; and

- A quantification of the potential financial statement effect of the control failures described below.

Table of Contents

**(b) Management's annual report on internal control over financial reporting**

Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934, as amended. Under Section 404 of the Sarbanes-Oxley Act of 2002, management is required to assess the effectiveness of the Company's internal control over financial reporting as of the end of each financial year and report, based on that assessment, whether the Company's internal control over financial reporting is effective.

The Company's internal control over financial reporting is a process designed under the supervision of the Joint Presidents and Chief Executive Officers and Chief Financial Officer to provide reasonable assurance as to the reliability of the Company's financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

Internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of our assets; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures are being made only in accordance with authorisations of our management and directors; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorised acquisition, use or disposition of assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those processes of internal control over financial reporting determined to be effective can provide only reasonable assurance with respect to the reliability of financial reporting and preparation of financial statements for external purposes in accordance with IFRS.

Management assessed the effectiveness of the Company's internal control over financial reporting as of 30 June 2019. In making these assessments, management used the criteria set forth by the Committee of Sponsoring Organisations of the Treadway Commission (COSO) in "Internal Control—Integrated Framework (2013)".

*Material Weakness*

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of financial statements will not be prevented or detected on timely basis.

Based on this assessment, our management has determined that, as of 30 June 2019, the Company's internal control over financial reporting was ineffective due to the existence of a material weakness with respect to the capital cost estimation process implemented in connection with the LCCP, which resulted from the aggregation of a series of individual control and project-related control environment deficiencies, the remediation of which had not been fully implemented and validated as of year-end. Our management, based on both its own analysis and based on the information identified during the Board review, concluded that the material weakness identified above was the result of a number of deficiencies:

- *Competence*—Insufficient experience within the LCCP leadership team in executing mega projects;

- *Conduct*—Inappropriate conduct and an improper tone at the top of the LCCP, including an excessive focus on maintaining cost and schedule estimates at the expense of providing accurate cost and schedule estimation to oversight bodies (including the Joint Chief Executive Officers) within the Company;

- *Segregation of Duties*—Insufficient segregation of duties of the LCCP project controls environment from the LCCP project execution environment, which prevented the identification of certain potential errors in cost and schedule estimation;

97

Table of Contents

- *Control Procedures*—Inadequate control procedures within the LCCP control environment that allowed erroneous and/or unsupported reporting by the LCCP leadership to go unchallenged without proper escalation of potential red flags;

- *Ethics Process*—Inadequate procedures to ensure that internal complaints as to the LCCP were escalated appropriately; and

- *Project-related Control Environment*—A culture of excess deference within the control environment that oversaw LCCP that caused certain individuals with control responsibilities and in oversight committees, including but not limited to the Steering Committee created to oversee LCCP, to exhibit insufficient scepticism toward reporting by the LCCP leadership team.

Our management has further determined that this unremediated material weakness led to a misstatement in the disclosure of the Company's capital commitments for the year ended 30 June 2018, which has been revised in the Company's consolidated financial statements. Additionally, this material weakness could result in misstatements of the LCCP capital cost and related assets under construction and property, plant and equipment impairment account balances or disclosures that would result in a material misstatement to the consolidated financial statements that would not be prevented or detected.

*Remediation Plan with Respect to the Material Weakness*

The Company is committed to ensuring a strong internal control environment and to ensuring that a proper, consistent tone is communicated throughout the organization. To that end, the Company began efforts to remediate the material weakness identified above prior to 30 June 2019, and is currently still implementing additional measures to remediate the underlying causes that gave rise to the material weakness.

To date, the Company has already completed the following measures to remediate the identified material weakness:

- Reassigned LCCP oversight and accountability to a new Executive Vice President as of 1 April 2019 and added additional project management resources to the LCCP;

- Implemented a new LCCP controls structure, independent from LCCP execution activities, and redesigned the controls regarding cost reporting regarding the LCCP, to ensure segregation of duties, control effectiveness, and appropriate oversight; and

- Commissioned additional external assurance work to validate aspects of the Company's estimates regarding the LCCP's cost and schedule.

In addition, the Company is engaging in a number of ongoing remedial steps to address the inappropriate conduct, tone and cultural aspects of the identified root causes of the material weakness. These include:

- Engaging in consequence management, including removing from all work responsibilities and initiating disciplinary action against the Executive Vice President previously in charge of LCCP and negotiating the separation of the three Senior Vice Presidents with roles in the project; as well as reducing compensation or bonuses to over a dozen other individuals who had involvement in the project;

- Requiring that various employees involved in the LCCP and/or its oversight engage in additional training, including as to reporting obligations;

- Engaging in benchmarking exercise to reevaluate the effectiveness of functions within the United States;

- Continuing with the roll-out of the Aspirational Culture programme;

- Reconfirming critical leadership behaviors;

98

Table of Contents

- Introducing cultural/ behavioral moments in business meetings to start dialogue on ways of working and our aspirational culture;

- Revising its procedures regarding the escalation of ethics complaints and internal investigation findings; and

- Directing Operating Model Entities (OME) to define and implement action plans with employees to address areas to improve culture within each OME.

While significant progress was made to remediate the material weakness as of 30 June 2019, the Company is still in the process of testing the operating effectiveness of certain of the new and enhanced controls and is continuing with the implementation of some of the longer-term remediation efforts described above. We believe our actions will be effective in remediating the material weakness, and we continue to devote significant time and attention to these efforts. The material weakness will not be considered remediated until we have completed designing and implementing the longer-term remediation efforts and the applicable remedial controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively.

**(c) Attestation report of the registered public accounting firm**

The effectiveness of the Company's internal control over financial reporting as of 30 June 2019 was audited by PricewaterhouseCoopers Inc., an independent registered public accounting firm, as stated in its report on page F-1 of this Form 20-F.

**(d) Changes in internal control over financial reporting**

Except for the identification of the material weakness and remediation efforts in connection therewith described above, no other change in the Company's internal control over financial reporting occurred during the year ended 30 June 2019 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

**Item 16.A AUDIT COMMITTEE FINANCIAL EXPERT**

Mr. Colin Beggs, an independent member of the audit committee and its chairman since 1 January 2011, was determined by our board to be the audit committee's financial expert within the meaning of the Sarbanes-Oxley Act, in accordance with the Rules of the NYSE and the SEC.

**Item 16.B CODE OF ETHICS**

Sasol adopted a new Code of Conduct effective 1 March 2018, previously called "Code of Ethics". The Code of Conduct adopts a behaviours-based approach which reinforces the importance of linking our day-to-day actions to Sasol's shared values and our aspirational culture. The Code of Conduct is further underpinned by policies and guidance notes to enhance its everyday application. The Code of Conduct applies to all of our directors, officers and employees, including the Joint Presidents and Chief Executive Officers, Chief Financial Officer and the Senior Vice President: Financial Control Services.

Any amendment or waiver of the Code of Conduct as it relates to our Joint Presidents and Chief Executive Officers or Chief Financial Officer will be posted on our website within five business days following such amendment or waiver. No such amendments or waivers are anticipated.

The Code of Conduct is available on our internet website. The website address is https://www.sasol.com/sustainability/ethics/sasol-code-conduct. This website is not incorporated by reference in this annual report.

We operate an independent ethics reporting telephone line through external advisors. This confidential and anonymous ethics hotline provides an impartial facility for all stakeholders to report deviations from ethical behaviour, including fraud and unsafe behaviour or environmental misconduct. Our Code of Conduct and related policies guide our interactions with all government representatives. Our policy prohibits contributions to political parties or government officials since these may be interpreted as an inducement for future beneficial treatment, and as interference in the democratic process.

99