UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHAD LINDSEY MOSHELL, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>v.<br><br>SASOL LIMITED, DAVID EDWARD CONSTABLE, BONGANI NQWABABA, STEPHEN CORNELL, PAUL VICTOR, and FLEETWOOD GROBLER,<br><br>      Defendants. | Case No. 1:20-cv-01008-JSR<br><br>**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**<br><br><u>CLASS ACTION</u> |

010886-11/1323966 V3

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...............................................................................................................1

II.     STATEMENT OF FACTS .................................................................................................2

      A.      Defendants Knew the LCCP's Costs Far Exceeded Their Public
            Statements .....................................................................................................................3

      B.      Defendants' Concealment of the Fluor Change Order, Lack of
            Controls and Malfeasance at the LCCP ......................................................................5

      C.      The Consequences of Defendants' False Cost and Schedule
            Projections and Deficient Project Management and Controls Are
            Revealed.......................................................................................................................7

III.    ARGUMENT......................................................................................................................9

      A.      The Complaint Amply Alleges Falsity .......................................................................9

            1.      Sasol Falsely Certified the Effectiveness of its Internal
                  Controls Over Financial Reporting and Project
                  Management...................................................................................................10

            2.      Defendants Made Materially False and Misleading
                  Misrepresentations Regarding the LCCP's Cost and
                  Construction Schedule ...................................................................................12

      B.      The PSLRA's Safe Harbor Provision Does Not Protect Defendants ....................13

            1.      Statements Were False When Made ..............................................................13

            2.      Sasol's Boilerplate Disclosures Did Not Warn Investors of
                  the Real Risks ...............................................................................................17

            3.      The Statements Were Made with Actual Knowledge That
                  They Were False and Misleading ..................................................................19

      C.      The CWs' Statements Collectively Paint a Common Picture of
             Sasol's Longstanding Knowledge of Increased Costs and Project
             Overruns.....................................................................................................................19

      D.      The Complaint Adequately Alleges Defendants' Scienter ....................................24

            1.      The Board's Admissions of "Inappropriate Conduct,"
                  "Significant Remediation," and "Further Accountability
                  Measures" Contribute to a Strong Inference of Scienter .........................25

2.    Internal Documents and Witness Accounts Support of Scienter ..................................................................................29

3.    Strong Circumstantial Evidence of Scienter ...............................................30

4.    The Executive Defendants' Compensation Plans Uniquely Incentivized and Rewarded the Fraud........................................................33

IV.    CONCLUSION............................................................................................................35

**TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).............................................................................................9, 22

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004).........................................................................33

*In re Barrick Gold Sec. Litig.*,
2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015)............................................9, 12, 14, 15

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
763 F. Supp. 2d 423 (S.D.N.Y. 2011)...................................................................17, 27

*Campo v. Sears Holdings Corp.*,
371 F. App'x 212 (2d Cir. 2010) ...............................................................................23

*In re Cell Therapeutics, Inc.*,
2010 WL 4791808 (W.D. Wash. Nov. 18, 2010).......................................................23

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
957 F. Supp. 2d 277 (S.D.N.Y. 2013).................................................................12, 14

*City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012) (Rakoff, J.) ......................................9, 12, 17

*In re Cornerstone Propane Partners, L.P. Sec. Litig.*,
355 F. Supp. 2d 1069 (N.D. Cal. 2005) .....................................................................35

*Cornwell v. Credit Suisse Grp.*,
689 F. Supp. 2d 629 (S.D.N.Y. 2010).........................................................................30

*Darquea v. Jarden Corp.*,
2007 WL 1610146 (S.D.N.Y. May 31, 2007) ............................................................35

*In re Deutsche Bank Aktiengesellshaft Sec. Litig.*,
2017 WL 4049253 (S.D.N.Y. June 28, 2017) ............................................................21

*In re Dynex Capital, Inc. Sec. Litig.*,
2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009).............................................................33

*In re Eletrobras Sec. Litig.*,
245 F. Supp. 3d 450 (S.D.N.Y. 2017).........................................................................29

*Freudenberg v. E\*Trade Fin. Corp.*,
   712 F.Supp.2d 171 (S.D.N.Y. 2010)..................................................................9, 19, 29, 31

*In re Frontier Commc'ns Corp. Stockholders Litig.*,
   2019 WL 1099075 (D. Conn. Mar. 8, 2019) ........................................................................22

*Galestan v. OneMain Holdings, Inc.*,
   348 F. Supp. 3d 282 (S.D.N.Y. 2018)........................................................................15, 16, 22

*In re Gen. Elec. Co. Sec. Litig.*,
   857 F. Supp. 2d 367 (S.D.N.Y. 2012)..................................................................................32

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011)..............................................................................22, 28

*Gray v. Wesco Aircraft Holdings, Inc.*,
   2020 WL 1904019 (S.D.N.Y. Apr. 16, 2020)........................................................................15

*Hall v. The Children's Place Retail Stores, Inc.*,
   580 F. Supp. 2d 212 (S.D.N.Y. 2008)..............................................................................26, 28

*In re IMAX Sec. Litig.*,
   587 F. Supp. 2d 471 (S.D.N.Y. 2008)..................................................................................32

*In re Insys Therapeutics, Inc. Sec. Litig.*,
   2018 WL 2943746 (S.D.N.Y. June 12, 2018) ......................................................................26

*Lewis v. YRC Worldwide Inc.*,
   2020 WL 1493915 (N.D.N.Y. Mar. 27, 2020) ......................................................................21

*Local No. 38 Int'l Bhd. Of Elec. Workers Pension Fund v. Am. Express Co.*,
   724 F. Supp. 2d 447 (S.D.N.Y. 2010)..................................................................................22

*Long Miao v. Fanhua, Inc.*,
   2020 WL 996602 (S.D.N.Y. Mar. 2, 2020) ..........................................................................20

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014)....................................................................................21

*Maverick Fund, L.D.C. v. Comverse Tech., Inc.*,
   801 F. Supp. 2d 41 (E.D.N.Y. 2011) ....................................................................................16

*Meyer v. JinkoSolar Holdings Co., Ltd.*,
   761 F.3d 245 (2d Cir. 2014)....................................................................................................9

*In re Millennial Media, Inc. Sec. Litig.*,
   2015 WL 3443918 (S.D.N.Y. May 29, 2015) ......................................................................20

*In re Mylan N.V. Sec. Litig.*,
  2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ...........................................................................30

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty.*
  *Res. Ass'n v. MDC Partners, Inc.*,
  2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016).............................................................................21

*New Orleans Emps Ret. Sys. V. Celestica, Inc.*,
  455 Fed. App'x 10 (2d Cir. 2011) ................................................................................................33

*Nguyen v. New Link Genetics Corp.*,
  297 F. Supp. 3d 472 (S.D.N.Y. 2018)...........................................................................................35

*In re Nortel Networks Corp. Secs. Litig.*,
  238 F. Supp. 2d 613 (S.D.N.Y. 2003)...........................................................................................19

*In re NovaGold Res. Inc. Sec. Litig.*,
  629 F. Supp. 2d 272 (S.D.N.Y. 2009).....................................................................................14, 23

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)................................................................................14, 25, 29, 31

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)........................................................................................................................9

*In re OSG Sec. Litig.*,
  12 F. Supp. 3d 622 (S.D.N.Y. 2014).............................................................................................27

*P. Stolz Family P'ship L.P. v. Daum*,
  355 F.3d 92 (2d Cir. 2004).............................................................................................................13

*In re Petrobras Sec. Litig.*,
  116 F. Supp. 3d 368 (S.D.N.Y. 2015) (Rakoff, J.) ...............................................................10, 12

*Pirnik v. Fiat Chrysler Autos., N.V.*,
  2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) .................................................................................32

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
  930 F. Supp. 68 (S.D.N.Y. 1996)..................................................................................................16

*In re QLT Inc. Sec. Litig.*,
  312 F. Supp. 2d 526 (S.D.N.Y. 2004)...........................................................................................12

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007)...........................................................................................33

*Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017)................................................................................. *passim*

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..................................................................................17

*In re Salix Pharm., Ltd.*,
    2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)...................................................27, 32

*In re Scottish Re Grp. Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y.2007)..............................................................11, 28

*Shenk v. Karmazin*,
    867 F. Supp. 2d 379 (S.D.N.Y. 2011)...................................................................32

*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010).............................................................................17, 18

*In re SLM Corp. Sec. Litig.*,
    740 F. Supp. 2d 542 (S.D.N.Y. 2010)..............................................................34, 35

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)....................................................................................19, 25, 31

*In re Veeco Instruments, Inc. Sec. Litig.*,
    235 F.R.D. 220 (S.D.N.Y. 2006) .........................................................................26

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
    195 F.Supp.3d 528 (S.D.N.Y. 2016)....................................................................10

*In re Vivendi Universal, S.A. Sec. Litig.*,
    2004 WL 876050 (S.D.N.Y. Apr. 22, 2004).........................................................12

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011)...................................................................21

*Wilson v. LSB Indus., Inc.*,
    2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) ........................................................16

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 392 (S.D.N.Y. 2003).................................................................9, 24

*Yanek v. Staar Surgical Co.*,
    388 F. Supp. 2d 1110 (C.D. Cal. 2005) ...............................................................18

**STATUTES**

15 U.S.C. § 78u–4(b)(3)(B) ......................................................................................23

15 U.S.C. §78u-5(c)..................................................................................................19

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12(d) ............................................................................................................23

Fed. R. Civ. P. 15(a)(2)........................................................................................................35

Rule 11 ..................................................................................................................................23

## I.    INTRODUCTION

This securities class action arises from Defendants' material misrepresentations and omissions about the cost, development, and internal controls over Sasol's megaproject, the Lake Charles Chemicals Project (the "LCCP"). When the truth eventually emerged, shareholders learned that: (i) the LCCP's true cost was nearly $13 billion (or more than 60% than initially represented); (ii) beneficial operation at the LCCP would not occur until years after Sasol promised; (iii) according to Sasol's own account, "errors, omissions, and inaccuracies in the project cost estimate" stemmed from "inadequate control procedures," "inappropriate conduct" and "an improper tone at the top;" (iv) a multitude of Sasol senior executives, including the Executive Vice President overseeing the Project (Defendant Schoeman) and Co-CEOs (Defendants Nqwababa and Cornell) were fired or otherwise forced to leave; and (v) safety violations and risks materialized with a devastating explosion at the LCCP.

As revealed through internal documents and confidential witness accounts, even before the Class Period, the Executive Defendants knew that construction of the LCCP would far exceed initial cost and schedule estimates.  Due to an "inexperienced" and "incompetent" project management team, the LCCP was plagued by massive cost overruns, labor inefficiencies, and safety violations. These control weaknesses pushed the true cost and completion date for the LCCP well beyond Defendants' public disclosures. They also rendered the LCCP a dangerous worksite. Yet, despite knowing of the LCCP's problems – including through direct communications with former Sasol project managers, receipt of internal and third party reports, and briefings in executive-level meetings – the Executive Defendants concealed these facts from investors.  To trigger lucrative compensation packages tied to Sasol's inflated stock price and the LCCP's development, the Executive Defendants deliberately and repeatedly underreported Sasol's

projected LCCP costs and embellished the anticipated completion timeline. Moreover, the Executive Defendants fostered an unethical project management culture that promoted accounting malfeasance and silenced whistleblowers.

Rather than grapple with Plaintiff's well-pled allegations, Defendants' Motion to Dismiss ("Mot.") mischaracterizes the Complaint as solely pleading inactionable forward-looking statements. But in doing so, Defendants ignore entire categories of false statements, including Sasol's admittedly false internal control certifications over the project and financial reporting. Even the cherry-picked statements Defendants challenge are representations of current or historical fact and verifiably false. Nor do Defendants meaningfully describe the real risks of the project, as the safe harbor provision requires.

Similarly, in attacking scienter, Defendants ignore or distort key allegations demonstrating their knowledge or reckless disregard for the falsity of their statements. Chief among them are the findings of the Independent Board Review and detailed confidential witness accounts showing the Executive Defendants' awareness of, and active participation in, malfeasance relating to the LCCP. Considering Plaintiff's scienter allegations holistically, the Complaint creates a strong inference of scienter. Accordingly, Defendants' motion to dismiss should be denied in full.

## II.    STATEMENT OF FACTS

Sasol is a leading global energy company based in South Africa. ¶ 53.[1] The Company is best known for developing liquid fuels from coal. ¶ 6. On October 27, 2014, Sasol announced the construction of an ethane cracker and derivatives complex in Lake Charles, Louisiana, dubbed the LCCP. ¶ 58. At the time, Sasol claimed the LCCP's development would cost $8.1 billion. *Id.*

---

[1] Citations to the Amended Complaint appear as "¶__."

Defendants claimed the "mega project" would convert Sasol into a chemicals powerhouse and transform the Company's fortunes. ¶¶ 55, 59-61.

Sasol had a history of failing to timely disclose massive cost overruns and construction delays on past large projects, including most recently on a troubled wax factory expansion in Sasolburg, South Africa. ¶ 62. Internal probes revealed Sasol senior management, including Defendant Victor, deliberately concealed problems at the wax project from Sasol's Board and investors. *Id*. The internal investigation led to rebukes of top management and tarnished Sasol's reputation. *Id*.

In response to this crisis, and to regain investors' confidence, Sasol's top executives, including CEO Cornell, expressed complete commitment and involvement in the "game changer" project. ¶ 9. Sasol also promised a well-run and efficient project, given the "experienced owner team in place to oversee Execution phase," the "Excellent Project Controls team in place to [] monitor cost and schedule … [and] give accurate predictability," and the "world-class roster of contractors" including Fluor and TechnipFMC, which would serve as the main subcontractors for the project. ¶¶ 9, 11-12, 131.

## A.  Defendants Knew the LCCP's Costs Far Exceeded Their Public Statements

The Class Period begins on March 10, 2015, when Sasol disclosed that the LCCP's development costs had increased from $8.1 billion to $8.9 billion. ¶¶ 100, 130.[2] Defendants stated the Company was "making steady progress with the advancement of" the LCCP, that "[s]ite preparation is underway," and that the LCCP "will achieve beneficial operation during the 2018

---

[2] Defendants claim Sasol's March 9, 2015 SEC filings did not increase the LCCP cost estimate, contending that Sasol previously disclosed the $8.9 billion figure on October 27, 2014. Mtn. 5, n.3. But in Sasol's most immediate public filing in February 2, 2015, Defendants unequivocally referred to the LCCP as an $8.1 billion project. ¶ 130; *see also* Sasol, Report of Foreign Private Issuer (Form 6-K) (Feb. 2, 2015).

calendar year." *Id*. Thereafter, Defendants repeatedly affirmed the LCCP's $8.9 billion development cost, that the development schedule remained "on track," and claimed the "Project economics remain robust." ¶¶ 100, 131. Defendants also emphasized project controls and execution, stating there was an "[e]xperienced owner's team in place to oversee execution phase," that the Company had "progressed several key milestones," that "[s]ite work is proceeding safely and efficiently," and that the project remained on track "for mechanical completion in late CY17 with beneficial operation in CY18." ¶¶ 131, 132.

Unbeknownst to investors, Defendants knew – including through contractor estimates, internal reports, Executive Committee meetings, and direct communications with project management team members – that the projected cost of the LCCP was well beyond $8.9 billion. ¶¶ 76, 82, 86, 90, 92, 95. According to well-placed former Sasol employees, cost estimates for the LCCP were at least $11 billion "from the beginning" of the project. ¶¶ 90, 95. The $11 billion cost estimate was the topic of extensive discussion among Sasol executives, including Defendant Cornell. ¶ 95. The $11 billion figure was so widely accepted among Sasol senior management that $11 billion became "socialized" and universally understood by LCCP team members as the operative project budget. *Id*.

As a result, Defendants knew that Sasol was neither "on track" nor making "significant progress" in terms of timing and costs for the LCCP's development. ¶¶ 76, 82, 86, 90, 92. Rather, the project was plagued with cost overruns, massive delays, and lack of labor productivity stemming from "inexperienced" and "incompetent" project management, such that the LCCP was nowhere close to mechanical completion in late 2017 with beneficial operation in 2018 at a cost of $8.9 billion. *Id*.; ¶ 215. A principal driver for these delays and exploding expenses was Sasol's agreements with Fluor and TechnipFMC, which paid them for time and materials spent on the

- 4 -

LCCP, regardless of the progress on the project. ¶¶ 77, 82. As a result of the "unusual" arrangement, the contractors billed for their time even as no progress was being made. *Id*.

Project costs and construction delays were compounded by poor, inexperienced leadership. ¶ 79. According to a Fluor contractor, the LCCP was led by "amateur" Commissioners that lacked an engineering background and had no experience commissioning a project, let alone one the size of LCCP. *Id*. The inexperienced leadership led to poor labor cost management, "dangerous engineering" designs, constant order changes, and safety violations. ¶¶ 81-83. Rather than disclose these known problems, Sasol continued to represent that the LCCP's development was "on track," that "[t]he final estimated project cost remains at US$8.9 billion," and that "Cost control remains a primary focus for the team." ¶¶ 136, 140. Sasol also emphasized the project's safety and management controls, stating "The safety, reliability and sustainability of our operations remain paramount and no compromise will be made." ¶ 137; *see also* ¶¶ 140, 142. Defendants also affirmed the effectiveness of its internal controls over the project and financial reporting. ¶ 128.

**B.    Defendants' Concealment of the Fluor Change Order, Lack of Controls and Malfeasance at the LCCP**

Defendants could not sustain their false cost and scheduling estimates. On June 6, 2016, Sasol announced that "the expected total capital expenditure for the [LCCP] could increase up to US$11 billion, including site infrastructure and utility improvements." ¶ 106. Defendants explained that a slower rate of capital "resulted in an extended project schedule and contributed to further project cost increases," and consequently "[t]he expected returns for the project have reduced due to changes in long-term price assumptions and the higher capital estimates." *Id*. However, CEO Constable softened the news by characterizing the $11 billion figure as a "worst-case scenario," and "strongly messag[ed] ... that we'll be able to push the CapEx down." ¶ 107. Constable also assured investors that the "management team remains closely involved in guiding

the project team, so that we can minimize capital expenditure and further optimize overall project efficiency," and that Sasol had "bolstered the senior staffs' resources on the ground to enable an even greater focus on a range of execution activities." *Id*.

Even this disclosure of $11 billion was false and misleading. Months earlier, in February 2016, Sasol's senior management, including its Executive Directors, had received a Change Order from Fluor, confirming that Fluor's cost would be at least $11.7 billion. ¶¶ 66, 68.  This figure did not even include Sasol's $300 million contingency; the actual amount of underreported costs was closer to $1 billion. ¶ 70. The revised figure from Sasol did not represent a "worst-case scenario," but was a legally binding amount that Sasol had to pay pursuant to the terms of its contract. ¶¶ 66-68. Accordingly, a senior engineer for the LCCP project who saw this Change Order said Defendants' disclosure that capital expenditures "could" equal $11 billion was a "fraud." ¶ 67.

Following the June 2016 disclosure, for nearly three years – from June 2016 to February 2019 – Sasol continued to falsely reassure investors that the LCCP's economic outlook remained "robust," that Sasol was "on track and delivering on key milestones" to complete the project on time, and that LCCP cost expenditures "remained within" the disclosed budget. ¶¶ 151, 158, 165-66, 170, 176, 178, 187-91, 193-94. Defendants repeatedly highlighted Sasol's "control base management process" designed to keep the LCCP within the revised schedule and budget, including "key management changes." ¶¶ 153-54, 160, 162, 175. As a result, Sasol's ADR share prices soared, reaching a Class Period high of $39.26 on August 27, 2018. ¶ 111. This allowed the Executive Defendants to collect lucrative executive compensation packages tied to Sasol's stock price and LCCP milestones. ¶ 233.

In truth, construction and operation of the LCCP continued to be plagued by control weaknesses, delays, rising costs, and technical issues. ¶ 90. These issues were exacerbated by the

- 6 -

new project management at the LCCP, who engaged in improper and unethical behavior with respect to financial reporting for the LCCP and the project's oversight. ¶ 87. As one example, to artificially keep costs down, project managers directed finance personnel to engage in accounting gimmickry. *Id*. This malfeasance included reducing the value of the work already performed, thereby reducing the Company's accrued liabilities.   *Id*. Sasol's top-level management also encouraged reporting false values for Fluor's "self-performing construction" and "management negotiated savings." ¶¶ 87, 89. CWs explained that this accounting misconduct – known by Defendant Constable – led to material understatement of costs, and was so widespread that finance personnel refused to sign off on the reports. ¶ 88. CWs also confirmed that Sasol senior management, including Defendant Schoeman, directed colleagues to change anticipated completion dates for projects to make it appear on paper that the project would be completed on time. ¶ 97.

**C.    The Consequences of Defendants' False Cost and Schedule Projections and Deficient Project Management and Controls Are Revealed**

Despite Defendants' repeated assurances of a timely and within-budget project and the effectiveness of Sasol's internal controls, it ultimately became clear that these statements were false. On February 8, 2019, Sasol disclosed that "the overall [LCCP] project capital cost estimate [was] revised from US$11.13 billion to a range of US$11.6 – 11.8 billion," as well as a five month delay in the project. ¶ 113.

Then, on May 22, 2019, Defendants shocked investors when they disclosed that "the cost estimate for the LCCP has been revised to a range of $12.6 to $12.9 billion which includes a contingency of $300 million." ¶ 114. Sasol cited a $530 million change in the LCCP's cost forecast due to corrections for, among other items, "certain contracts and variation orders managed by

Sasol, outside the primary engineering, procurement and construction contract." *Id*. Following these disclosures, Sasol's ADR price fell 15%. ¶ 115.

Then, on August 16, 2019, Sasol delayed the release of its 2019 financial results. ¶ 116. Sasol stated that the Board received a preliminary report following an independent review of the obstacles that hampered LCCP, which "contains observations which point to possible LCCP control weaknesses." *Id*. Sasol's ADRs declined 4% in response to the news.

Thereafter, on October 28, 2019, Sasol disclosed that the independent review had brought to light "errors, omissions, and inaccuracies in the [LCCP] cost estimate," and "inappropriate conduct and an improper tone at the top of the LCCP, including an excessive focus on maintaining cost and schedule estimates at the expense of providing accurate cost and schedule estimation to oversight bodies (including the Joint Chief Executive Officers) within the Company." ¶ 117. Sasol also announced the departure of several members of its executive leadership, including its Joint Presidents and Chief Executive Officers, certain Senior Vice Presidents (presumably including Defendant Schoeman), and other individuals previously charged with responsibility of the LCCP. *Id*. As the market digested this news, and analyst downgrades, Sasol's ADR price fell nearly 11% over the next three trading days. ¶ 119.

Finally, on January 13 and 14, 2020, the undisclosed safety risks materialized when the Company announced it "experienced an explosion and fire at its LCCP low-density polyethylene (LDPE) unit," a major unit of LCCP. ¶ 121. The explosion shut down the LDPE unit. In turn, Sasol's ADR price fell $1.70 per share, or 7.84%, over the following two trading days, closing at $19.99 per share on January 15, 2020. ¶ 122. All told, Sasol's ADRs have lost over hundreds of millions of dollars in shareholder value, and the Company remains in a tailspin. ¶¶ 33, 123-26.

### III.    ARGUMENT

To state a claim for securities fraud under Section 10(b), Plaintiffs must allege "(1) a material misrepresentation or omission by the defendant [i.e., falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at \*5 (S.D.N.Y. Apr. 1, 2015). Here, Defendants only challenge falsity and scienter. When considering such motions, the Court must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 406 (S.D.N.Y. 2003) (citation omitted). The test is whether the complaint contains "sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A.    The Complaint Amply Alleges Falsity

A statement to investors "is misleading if a reasonable investor would have received a false impression from the statement." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F.Supp.2d 171, 180 (S.D.N.Y. 2010). Likewise, material omissions by a company can be as misleading as affirmative misrepresentations: in choosing to offer a statement to investors, Defendants are under an obligation to ensure that the statement is not only accurate, but complete.[3] While the Supreme Court in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186

---

[3] *See Meyer v. JinkoSolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) (even in the absence of an independent duty to disclose information, once a company speaks on an issue, it has a duty to be accurate and complete); *see also City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 366 (S.D.N.Y. 2012) (Rakoff, J.) (defendant's statement that he did not "see anything that would cause us to back off" an assumption that a Lockheed division would meet its profitability projections was false and misleading when defendant knew (but failed to disclose) projections were overstated).

(2015) set out certain protections for representations that qualify as statements of opinion, even opinion statements are actionable where: (1) "the speaker did not hold the belief she professed"; (2) "the supporting fact[s] she supplied were untrue"; or (3) the speaker omits information that was "necessary to make the statements therein not misleading." *Id.* at 1327. And although "[e]xpressions of puffery and corporate optimism do not give rise to securities violations," even "Pollyannaish statements couched as rosy corporate-speak may be actionable if they contradict facts known to a defendant." *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F.Supp.3d 528, 537 (S.D.N.Y. 2016) (citing *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000)); *see also In re Petrobras Sec. Litig.,* 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (Rakoff, J.) (false statements reassuring investors about the company's integrity, taken together, were actionable and not puffery).

As explained below, the Complaint alleges a multitude of false and misleading misrepresentations and omissions.

### 1. Sasol Falsely Certified the Effectiveness of its Internal Controls Over Financial Reporting and Project Management

Throughout the Class Period, Sasol affirmed the effectiveness of its internal controls over financial reporting. ¶ 128. Sasol also touted its controls, processes, and oversight at the LCCP, emphasizing the "[e]xperienced owner's team in place to oversee execution phase," (¶ 131), that "[c]ost control remains a primary focus for the team" (¶ 140), and that "[t]he management team remains closely involved in guiding the project team, so that we can minimize capital expenditure and further optimize overall project efficiency." ¶ 147. Defendants also emphasized its safety processes, stating that "[s]ite work is proceeding safely and efficiently" (¶¶ 131-32), and that "safety, reliability and sustainability of our operations remain paramount and no compromise will be made." ¶ 137. Later, after Sasol announced the LCCP capital cost increases and extended

schedule and conducted a "detailed review process," Defendants stressed the "remedial," "decisive" action taken to deliver successful execution of the LCCP, including "improvement of the control base management process" and "key project management changes." ¶¶ 153-54, 161-62. Thereafter, Defendants repeatedly highlighted the robust project control base Sasol had put in place, which acted as "LCCP enablers for success and sustainable improvement." ¶¶ 175, 178.

These statements were false and misleading. As Sasol would later admit, Defendants maintained ineffective internal controls, including in (i) the accuracy of its reporting of cost and schedule estimates for the LCCP; (ii) the segregation of duties of the LCCP project controls environment from the LCCP project execution environment, which prevented the identification of errors in cost and schedule estimation; (iii) control procedures within the LCCP control environment that led to false statements made by LCCP leadership; (iv) procedures to ensure that internal ethics complaints as to the LCCP were escalated appropriately; and (v) the oversight of the LCCP leadership team.  The CWs' accounts demonstrate that at the time of making the statements, Defendants knew of these precise control weaknesses, including inaccurate cost and schedule reporting at the LCCP and safety violations, and knew that Sasol's senior management were directing employees to alter the records to exaggerate progress on the project, and separately to engage in double-counting on the books to artificially lower costs. ¶¶ 79, 81-83, 87-89, 97. These allegations establish Defendants could not possibly have believed the alleged internal control statements at the time they were made. *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 398 (S.D.N.Y.2007).  This conclusion is bolstered by the Board's Independent Review's findings, which attributed the control weaknesses to "an improper tone at the top." ¶ 215. Significantly, Defendants do not address the false internal control statements, which standing alone this Court and Defendants' own cited authorities have found sufficient to state a Section 10(b)

- 11 -

claim. *See In re Petrobras Sec. Litig.,* 116 F.Supp.3d at 381*; see also Barrick Gold*, 2015 WL 1514597, at \*14.

> **2.    Defendants Made Materially False and Misleading Misrepresentations Regarding the LCCP's Cost and Construction Schedule**

The Complaint alleges with sufficient particularity that throughout the Class Period Defendants repeatedly published false cost estimates and development schedules for the LCCP, coupled with misleading assurances that Sasol was "on track" with the targeted budget and schedule, or "making good progress," "steady progress," and "significant progress" on the end-of-job project cost and time estimates.[4] These statements were false and misleading. Internal reports and contractor change orders that Defendants had at the time showed that the cost and time to completion estimates for the LCCP were materially different than those represented to investors. ¶¶ 66-70, 86, 90, 91, 95, 97-98.  Consequently, Defendants knew they were neither "on track" nor making "significant progress" in meeting the cost and schedule targets. *Id*.; *see City of Pontiac*, 875 F. Supp. 2d at 366 (statements that Lockheed division was "doing well, had no performance issues, had a 'solid backlog,' and had a strong 'win rate' driving its performance" were not forward-looking statements and were actionable).[5]

Even Defendants' partial disclosures on June 6, 2016 of LCCP cost increases were false and misleading.  For example, CEO Constable assured investors that "[w]e really want to strongly message that we are confident that we'll be able to push the CapEx down." He also described it as

---

[4] ¶¶ 130-32, 135-36, 140-42, 147, 151, 158, 169, 173, 176-77, 187-91.

[5] *See also In re Vivendi Universal, S.A. Sec. Litig.*, 2004 WL 876050, at \*7 (S.D.N.Y. Apr. 22, 2004) (statement that company was "'on track' to achieve earnings targets" actionable); *In re QLT Inc. Sec. Litig.*, 312 F. Supp. 2d 526, 533 (S.D.N.Y. 2004) (rejecting application of safe harbor to statement "we're comfortable with the 35% quarter-over-quarter growth"); *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 305 (S.D.N.Y. 2013) (statement that a company was "on track" to meet a development schedule was not forward-looking).

a "worst-case scenario," and that the $11 billion figure was an "extremely comfortable number for us." *Id.* ¶ 19. In truth, there was no legal basis to "push the CapEx down" because it was legally obligated to pay the amount on the Change Order. ¶¶ 66-68.

Moreover, Defendants made materially misleading statements concerning LCCP's cost contingencies. For example, on November 23, 2017, Sasol (through its co-CEO Nqwababa) disclosed in an investor call for the first time that the cost expenditures will increase from $11 billion to $11.13 billion, but sought to downplay its significance by claiming that "you'll remember that we did give a guidance that the contingence was between $400 million and $500 million when we revised our estimate in August last year. And we were also very clear that the estimate of $11 billion does not include event-driven risks, like a hurricane or some other event like that." ¶¶ 181-82. This is false: Sasol never disclosed in August 2016 that Sasol retained a "contingence between $400 and $500 million." ¶ 185. Sasol made no disclosure in August 2016 about the specific amount of contingency, other than to state that it was smaller compared to its prior contingency of $300 million. *Id.*

In response to these well-pled allegations, Defendants stuff "virtually all" of their LCCP end-of-job cost and schedule statements into the safe harbor provision (Mot. at 12), and wage a number of attacks on the CWs in an attempt to discredit their accounts. Both arguments fail.

**B.    The PSLRA's Safe Harbor Provision Does Not Protect Defendants**

**1.    Statements Were False When Made**

As alleged, Defendants had access to and obtained information that rendered their purported forward-looking statements false when made. Here, the false statements at issue concerned contemporaneous facts and disclosures that were contradicted by information known to Defendants when they spoke. *See P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) ("Historical or present fact - knowledge within the grasp of the offeror - is a different matter.

- 13 -

Such facts exist and are known; they are not unforeseen or contingent."); *Novak*, 216 F.3d at 315 ("[D]efendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true.").  For example, from the beginning, Sasol's internal cost estimate for the LCCP was well in excess of $11 billion, but Defendants repeatedly told investors Sasol's internal cost estimate was much lower.  ¶¶ 66, 76, 86, 95, 96. And, at the time of making the statements, Sasol verifiably was neither "on track" nor "making good progress" in meeting the phony end-of-job project cost and schedule estimates Defendants presented to shareholders. *Id*.

Moreover, having spoken regarding the end-of-job cost and time of the LCCP, even if couched in terms of estimates, Defendants had a duty to speak truthfully. *See In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 301 (S.D.N.Y. 2009) ("Having chosen to speak out publicly regarding the Project's cost estimates, NovaGold was under a duty to 'speak truthfully about material issues,' and to correct misleading statements, regardless of whether or not they were 'forecasts.'").

*Barrick Gold*, which Defendants cite extensively, provides them with no support.[6] Contrary to Defendants' suggestion, *Barrick Gold* did not erect a *per se* bar on false cost and schedule estimates for projects. Nor did the statements at issue contain the present tense false

---

[6] Defendants suggest that because the LCCP was a "mega-construction project" it should be assumed that it will come in late and over budget, which negates the falsity of their budget and schedule statements. Mot. at 1. But there is nothing unique about mega-project cases; courts routinely deny motions to dismiss based on false statements or omissions about budget or cost estimates for mega-projects comparable to LCCP.  *See id.* at *14; *NovaGold.*, 629 F. Supp. 2d at 299 (S.D.N.Y. 2009) (crediting CW statements regarding cost overruns at $5 billion gold mine project and finding defendants falsely omitted these overruns in statements); *see also City of Austin*, 957 F. Supp. 2d at 305 (false statements about development schedule of large gold mine were actionable).

- 14 -

assurances in Sasol's disclosures about the Company staying "on track" with the phony forecasts.[7]

Instead, in that case, the defendant made "extensive disclosures" regarding the anticipated costs of the projects, and plaintiffs' allegations of false statements were not well-supported. *Id.* at \*7. For example, the *Barrick Gold* plaintiffs alleged that the cost estimates were false and misleading, based partly on a prior third-party *bid* for the work that Barrick rejected. *Id.* at \*8. Plaintiffs also relied on CWs who stated that the budget and time frame were unrealistic, but – unlike this case – in response Barrick hired a third party consulting firm to audit the project and the projected estimates. These results were promptly disclosed in its monthly report, and repeated in subsequent reports. *Id.* at \*10. As a result, the court found that Barrick continually updated the cost and schedule estimates with the public, including one raise in February 2011 and another in July 2011. *Id.* at \*10. Hence, there was no evidence that the stated estimates were false when made. Here, in contrast, Defendants' statements were false and concealed material information necessary to render them not misleading. Defendants possessed reports and the Fluor Change Order, and thereafter "socialized" an internal cost and schedule to completion project estimate entirely different from the one represented to investors.

*Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282 (S.D.N.Y. 2018), is instructive. There, the defendant loan broker knew a recent merger caused productivity declines because of different business models and acceptance of more risky loans. *Id.* at 287. Defendants concealed these problems, while touting the new company's *projected* earnings per share, and the "great opportunity we have to ramp up originations at OneMain, including secured lending," *Id.* The court

---

[7] Similarly, in *Gray v. Wesco Aircraft Holdings, Inc.*, 2020 WL 1904019, at \*14 (S.D.N.Y. Apr. 16, 2020), the court held that "statements which merely endorse or state the speaker's belief in a certain future outlook satisfy the PSLRA forward-looking requirement." But plaintiffs there did not claim the forward-looking statements were false – only that they were "reasonable" or "legitimate." *Id.* at \*16. *Gray* never suggested that estimates and projections will always be covered by the safe harbor provision.

held these statements actionable as "statements of present fact." *Id*. at 295. As is the case here, the complaint included credible accounts from former employees detailing that these estimates – and reassuring words about its previous guidance – were false when made as the individual defendants "participated in numerous meetings and conference calls during which the negative effects of integration-related activities were discussed." *Id.* at 300. In addition, former employees "identified specific reports that were circulated during the Class Period . . . detailing decreases in productivity," which "'*would have* gone to any executive in charge of the Legacy OneMain branches,' which *presumably* would have included the Individual Defendants." *Id.* at 301 (emphasis added).

In any event, Defendants are liable for their omission of material information in their disclosures, which squarely fall outside the safe harbor provision. "[Courts] in this circuit have consistently held that neither the PSLRA safe harbor, nor the bespeaks-caution doctrine protects material omissions." *Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at *3 (S.D.N.Y. Mar. 2, 2017). "Bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996). The Grand Canyon in this case is the true estimated cost and schedule of the project, which were known to the Individual Defendants virtually from the beginning of the project but not disclosed to investors. ¶¶ 66-68. Sasol never confronts this issue in its Motion, or even attempts to explain why these material omissions are not actionable or fall within the safe harbor provision.[8]

---

[8] Defendants assert that many "present-tense statements are covered by the PSLRA safe harbor because they are bound up with predictions of future events." Mot. at 26 (citing *Maverick Fund, L.D.C. v. Comverse Tech., Inc.*, 801 F. Supp. 2d 41, 59 (E.D.N.Y. 2011). But in *Maverick*,

### 2.      Sasol's Boilerplate Disclosures Did Not Warn Investors of the Real Risks

"To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Slayton v. Am. Exp. Co*., 604 F.3d 758, 772 (2d Cir. 2010);[9] *see City of Pontiac*, 875 F. Supp. 2d at 365 (disclosure of a "'non-exclusive list of fifteen specific risks factors'" were "largely generalized boilerplate, not 'meaningful' cautionary language that speaks to the substantive information that plaintiff alleges the defendants misrepresented.") (citation omitted). "To be 'meaningful,' a 'cautionary statement must discredit the alleged misrepresentations to such an extent that the 'risk of real deception drops to nil.'" *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011) (citation omitted).  In addition, '[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).

Sasol's disclosures fail to meet these standards. First, Defendants admit that Sasol's cautionary language was virtually unchanged throughout the Class Period (Mot. at 13), even as new risks arose and new cost estimates were presented to senior management, including the Executive Defendants. The failure to modify its cautionary language to reflect actual risks demonstrates that it is impermissibly boilerplate. *See Slayton*, 604 F.3d at 773 (consistency of language over time despite new information received "belies any contention that the cautionary

---

the court stressed that the present-tense statement was merely used to show that the future projection was unattainable; the present-tense statement did not stand alone as a false statement. Here, the present-tense statements were false standing on their own, including false statements about cost estimates.

[9] Defendants "carry the burden of demonstrating that they are protected by the meaningful cautionary language prong of the safe harbor." *Slayton*, 604 F.3d at 773.

language was 'tailored to the specific future projection'"). Similarly, failure to account for past events reveals that the cautionary language is not meaningful and not designed to adequately warn investors of the risks. *See id.* at 770 ("cautionary language that is misleading in light of historical fact cannot be meaningful").

For example, Sasol's language covers "unexpected delays in delivery times" and "unforeseen increases in the cost of equipment, labour and raw materials." But – particularly following the Fluor Change Order in February 2016 – this risk had already transpired, and was not "unforeseen" in any sense. ¶¶ 64-69. Similarly, the language covers "failure or delay of third-party service providers and disputes with suppliers," even as these delays have *already occurred* and were inherent in the structure of the project and Sasol's contract with Fluor. ¶¶ 16, 66, 76, 86, 90, 95.

In addition, Sasol's purported warnings were not even limited to LCCP. Instead, its language covered Sasol's "large capital projects," which in 2014 included five separate gas-to-liquids plants in Qatar, Nigeria, Uzbekistan, the United States, and Canada, along with the LCCP ethane cracker plant. A reasonable investor would have no idea which cautionary language applied to which project or the degree to which each project was at risk, particularly when the projects involved vastly different countries, products, and yields. Sasol simply included generic cautionary language that could apply to any project, anywhere in the world – which provides no guidance at all. *See Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1123 (C.D. Cal. 2005) (rejecting safe harbor when cautionary language regarding regulatory approval was not specific to the product at issue, and warning regarding the variability of acceptance of new products was "so broad that they apply to *any* business that sells products to consumers.") (emphasis in original).

- 18 -

### 3.     The Statements Were Made with Actual Knowledge That They Were False and Misleading

Finally, to the extent any of Defendants' statements actually were forward looking, the safe harbor protection does not apply because they were made with actual knowledge that they were false and misleading. 15 U.S.C. §78u-5(c). There is no safe harbor protection when a complaint alleges that defendants "had no basis for their optimistic statements and already knew (allegedly) that certain risks had become reality." *In re Nortel Networks Corp. Secs. Litig*., 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003); *see also Patriot Exploration, LLC v. Sandridge Energy*, Inc., 951 F. Supp. 2d 331, 357 (D. Conn. 2013) (the safe harbor does not apply where projections for future profitability were based on historical data that defendants "knew, or should have known, understated the expenses"). As described fully in §III.D, each of the Defendants knew that the Company's end of job cost and schedule for the LCCP were based on phony projections, accounting manipulations and misclassifications, failures to correct accounting errors and a lack of disclosure and internal financial controls.

### C.     The CWs' Statements Collectively Paint a Common Picture of Sasol's Longstanding Knowledge of Increased Costs and Project Overruns

Defendants attack the CWs' accounts as unreliable and "wholly uncorroborated." But in doing so, Defendants improperly analyze each allegation in isolation. As the U.S. Supreme Court and the Second Circuit have emphasized, to determine whether allegations plausibly allege a claim, they should be considered collectively, in relation to each other.[10] Here, the CWs' accounts are consistent in disclosing that Defendants knew from the beginning that the true costs of the LCCP

---

[10] *See Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322-23 (2007) ("courts must consider the complaint in its entirety … The inquiry, as several Courts of Appeals have recognized, is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."); *see Freudenberg*, 712 F. Supp. 2d at 197 (plaintiffs adequately pled scienter when the CWs' accounts and other evidence corroborated each other).

were dramatically higher than what was disclosed, and congruent with the Board's ultimate findings released in October 2019. ¶¶ 66, 76, 86, 95, 96, 215.

Next, citing *Long Miao v. Fanhua, Inc.*, 2020 WL 996602, at *18 (S.D.N.Y. Mar. 2, 2020), Defendants erroneously suggest that courts are "loathe … to sustain as sufficiently particular securities fraud complaints based on uncorroborated statements by CWs." Mot. at 14. But *Long Miao* merely held that courts are "loathe" to credit CW accounts in at least "four contexts," none of which applies here.[11] Indeed, *Long Miao* cited another case as an example of well-pled allegations where (just as here) witnesses' statements "were further corroborated by other witnesses' accounts." *Id.* at *18 (citing *Emps. Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015)). *Long Miao* ultimately found the allegations insufficient because plaintiffs made five "threadbare allegations," which were attributable to a nebulous group of people – e.g., "[f]our 'longtime Fanhua employees" and "[s]everal interviewees." *Id.* at *19. In contrast, the allegations here are detailed and attributed to specific individuals.[12]

Contrary to Defendants' contentions, the CWs were present at the LCCP during key moments of the Class Period. For instance, on October 27, 2014, Sasol published the false $8.9 billion cost estimate for the LCCP, and later reiterated that false number on numerous occasions when the CWs were at the LCCP, including on February 2, 2015 (¶ 130) (**CW-2; CW-3; CW-4; CW-5**); March 9, 2015 (¶ 100) (**CW-2; CW-3; CW-4; CW-5**), and September 7, 2015

---

[11] Those four contexts are when (1) there is insufficient information about the CWs or why they would be in a position to make their allegations; (2) the statements of CWs "cannot situate in time relevant occurrences are sometimes disregarded"; (3) allegations are "insufficiently particular," and (4) "uncorroborated statements of CWs who are sourced secondhand." *Id.* at *17. Defendants do not identify which of these four context applies here, because none of them do.

[12] *In re Millennial Media, Inc. Sec. Litig.*, 2015 WL 3443918, at *10 (S.D.N.Y. May 29, 2015) is also inapt. There, plaintiffs *voluntarily* dismissed their complaint after the CWs recanted. There is no such record here.

(¶ 102) (**CW-4; CW-5**). On June 6, 2016, when Sasol falsely disclosed that the cost overruns were limited to $11 billion, but that this was the "worst-case scenario," two employees (CW-1; CW-4) were still employed and had knowledge of the falsity of the figure. *See* ¶¶ 17, 144.[13]

Likewise, the CWs' accounts are not "personal critiques of unidentified Sasol employees" (Mot. at 18), but instead identify specific Sasol employees by name. For example, Defendants selectively quote CW's statement that the newly installed South African management team was "very dogmatic" as an example of "unidentified employees," but the passage plainly refers to three of the Executive Defendants: Defendants Cornell, Nqwababa and Schoeman.[14] Accordingly, Defendants' reliance on cases holding that the securities laws are not meant to police mismanagement is misplaced. *See* Mot. at 18.[15]

---

[13] Defendants' other authorities on this point are equally unpersuasive. *See N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Res. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774, at *10 (S.D.N.Y. Sept. 30, 2016) (court discounted allegations that "postdate [the CW's] tenure"); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580-81 (S.D.N.Y. 2014) (CW allegations concerned events that occurred "well before the class period," which did not support the falsity of subsequent statements); *Lewis v. YRC Worldwide Inc.*, 2020 WL 1493915, at *7 (N.D.N.Y. Mar. 27, 2020) (CWs' accounts were based on "inadmissible hearsay"); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011) (noting "there is no allegation that any CW met the Individual Defendants, reported any concerns, received any instructions, or made any personal contact with them during the Class Period.").

[14] *See* ¶ 78 ("CW-2's efforts to raise concerns with Sasol's executive management in Houston (including Defendants Cornell and Nqwababa), 'fell on deaf ears,' particularly because the South Africans in management were 'very dogmatic' and not open to constructive criticism or change."); *see also* ¶ 79 (identifying Nadine Kruger and Oscar A. Febres Cordero as lacking experience and "amateurs."); ¶ 90 (CW-4 identified Defendant Cornell as a person with knowledge of construction delays and deliberate understatement of costs); ¶ 95 (CW-5 stated Defendant Cornell would have been "'100% informed and involved' with issues concerning contracting, cost overruns, and construction delays," and was the "'ultimate arbiter' of costs"); ¶ 98 (CW-6 identifying Defendant Schoeman as engaging in "'schedule manipulation'" to overstate the project's progress). These allegations are not "gripes," but directly probative of management's knowledge of the actual falsity of their representations. ¶¶ 104-05.

[15] *See, e.g.*, *In re Deutsche Bank Aktiengesellshaft Sec. Litig.*, 2017 WL 4049253, at *6 (S.D.N.Y. June 28, 2017) (plaintiffs failed to sufficiently allege any statements were false).

- 21 -

Defendants also erroneously assert that "five of the six CWs allege no direct communication with any of the Defendants about the topics of the allege misstatements." Mot. at 19. CW-4, for example, did not simply "believe" Defendant Cornell knew about cost overruns, but provided the basis for this belief. *See, e.g.*, ¶ 87 (Constantly knew about practice of falsely reducing the amount of accrued liabilities); ¶ 91 (providing an example of Cornell's knowledge that the LCCP was behind schedule based on misleading statements about project being "on track."). Sasol also attempts to minimize CW-4's account by asserting that there is no evidence that the damning cost reports "*actually went* to the Committee." Mot. at 19 n.17. This argument dramatically overstates Plaintiff's burden, which is limited to alleging plausible facts in support – not proving its case outright. *Iqbal*, 556 U.S. at 678; *see also Galestan*, 348 F. Supp. 3d at 301. Similarly, CW-5 explained that the higher cost estimate was "'socialized' among senior management" because "it was an estimate that was widely promulgated as the truth from upper management," with Cornell being the "'ultimate arbiter' of costs." ¶ 95.

Similarly, that half of the CWs are Fluor employees is irrelevant. A CW's credibility hinges on the witness's responsibilities and access to decision-makers, not the witness's employer.[16] Here, the complaint details the CWs' extensive contacts with senior management, including the Individual Defendants. ¶¶ 65, 69, 73, 79, 84, 96-98.

---

[16] *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573 (S.D.N.Y. 2011) is unavailing. There the CWs worked for a third party, "***and plaintiffs make no allegation that those sources ever had any contact with anyone at The9, much less with the Individual Defendants***." *Id.* at 594 (emphasis added); *see also Local No. 38 Int'l Bhd. Of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010) (CWs were "low-level employees [who] had no contact with the Individual Defendants"); *In re Frontier Commc'ns Corp. Stockholders Litig.*, 2019 WL 1099075, at *23 (D. Conn. Mar. 8, 2019) (CW (a director of one state) apparently lacked access to data from the other states at issue).

Contrary to Defendants' contentions, CW-1's account of the $11.7 billion Change Order is not "wholly unparticularized supposition" Mot. at 19. CW-1 describes the Change Order with specificity, including Sasol's proprietary system that created it, why CW-1 would have seen it, the significance and legally binding nature of the Change Order, why three Individual Defendants would have seen it, and a first-hand account of Defendant Schoeman's negative opinion on the project. ¶¶ 65-69. It is further corroborated by Sasol's later disclosure of an $11 billion budget. *See NovaGold*, 629 F. Supp. 2d at 301 (CW's statements that mega-project was over budget was corroborated by company's subsequent announcement that budget was over budget). Indeed, it is the very specificity of CW-1's account that drives Defendants' misplaced demand for a deposition. *See* Mot. at 15 n.9.[17]

CW-6 also describes with particularity how the project was "significantly behind schedule" upon CW-6's arrival, and, "[a]s a result," management directed CW-6 and CW-6's colleagues to make changes to make it appear the project would be completed on time." ¶¶ 96-97. Defendants contend that CW-6 "certainly does not allege that any of the Defendants made this request" (Mot. at 19 n.19), but that again misstates Plaintiff's actual allegations. *See* ¶ 98 ("CW-6 said senior Sasol executives, including Defendant Schoeman and Mike Kane, decided to decouple LCCP's construction schedules from its commission, or startup, schedules, to show that more work had

---

[17] Defendants suggest that they should be allowed to conduct discovery to build a record for their motion to dismiss, even as they acknowledge that "a motion to dismiss is not the place to debate the facts." Mot. at 34. External evidence is not properly permitted in a motion to dismiss. Fed. R. Civ. P. 12(d); 15 U.S.C. § 78u–4(b)(3)(B). The language Defendants relied on from *Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 216 n.4 (2d Cir. 2010) is pure *dicta*, and the decision improperly conflated Rule 11 standards with 12(b)(6). *See id.* (district court did not use deposition to weigh competing evidence, but to determine if Rule 11 standards were met). *Campo* has never been followed by a district court to allow discovery at this stage. *See In re Cell Therapeutics, Inc.*, 2010 WL 4791808, at*1, *2 (W.D. Wash. Nov. 18, 2010) ("Defendants point to no other court which has cited the *Campo* holding to affirm the practice which Defendants are encouraging the Court to adopt here. In fact, Plaintiffs point to other District Court rulings which specifically reject the argument that limited use of depositions is permissible at this juncture in cases of this sort.") (citations omitted).

been completed on LCCP than actually had been… . CW-6 described Schoeman as very detail-oriented.").

Defendants are also wrong in arguing that CW-2's account did not specify how or when CW-2 expressed concerns to Defendants Nqwababa, Cornell, and Victor. Mot. at 20 n.20. CW-2 said cost overruns were "clear from the beginning," that CW-2 had "direct contact" with these three defendants, and that "on several occasions told each of these Defendants about CW-2's concerns regarding the cost overruns and timeline for completion of the project." ¶ 76.

Finally, Defendants dispute CW-1's claims that Sasol was "contractually obligated" to pay Fluor $11.7 billion based on its Change Order and fault Plaintiff for not attaching it to the Complaint. But CW-1 left the company and was in no position to take business records, and Plaintiff is under no obligation to offer documentary evidence at this stage. *See In re WorldCom*, 294 F. Supp. 2d at 406. Defendants also argue that the Complaint "casts grave doubt" that Sasol was legally required to pay the $11.7 billion because it quotes Defendants as stating that cost overruns *could be managed* over time. Mot. at 21. Defendants miss the point here – the Complaint specifically alleges that those assurances *were false*, and statements that costs could be pushed downward were deliberately and materially false when made. *See* ¶¶ 21, 148, 150, 174. Indeed, the history of the project bore this out – the numbers continued to rise (to $12.8 billion (¶ 225)), and to this day the project is still not complete. *See* ¶ 32. Sasol cites statements from March 2016 that it engaged in a "detailed review of the LCCP cost and schedule," which led to a cost increase in Sasol's September 2016 Form 20-F. Mot. at 22. Left unmentioned is Plaintiff's allegations that the $11 billion cost estimate deliberately misstated the true cost by $1 billion. ¶ 167.

## D.    The Complaint Adequately Alleges Defendants' Scienter

In determining whether scienter is pled, "courts must, as with any motion to dismiss. . ., accept all factual allegations in the complaint as true." *Tellabs,* 551 U.S. at 309. The question is

- 24 -

"whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. at 322-23. A complaint gives rise to a strong inference of scienter by pleading that Defendants "engaged in deliberately illegal behavior," "knew facts or had access to information suggesting that their public statements were not accurate," "failed to check information they had a duty to monitor," or "ignoring obvious signs of fraud." *Novak*, 216 F.3d at 308-9.  The inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324.

### 1.     The Board's Admissions of "Inappropriate Conduct," "Significant Remediation," and "Further Accountability Measures" Contribute to a Strong Inference of Scienter

The Board's October 28, 2019 admissions that the "errors, omissions, and inaccuracies in the [LCCP] cost estimate" were attributable to "inappropriate conduct" provides the starting point for the Court's scienter analysis. ¶ 215; *Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 551 (S.D.N.Y. 2017) (Board's admission of "wrongful conduct" contributed to strong inference of scienter). Significantly, the Board did not claim Sasol's misrepresentations to investors resulted from issues flowing from the bottom-up. Instead, it identified unethical and improper reporting activities that took place at the highest level of management.  For example, as causal factors for the misstated project costs and schedule, the Board identified "inappropriate conduct and an improper tone at the top of the LCCP, including an excessive focus on maintaining cost and schedule estimates at the expense of providing accurate cost and schedule estimation to oversight bodies (including Joint Presidents and Chief Executive Officers (Joint CEOs)) within the Company." ¶ 215; *In re Insys Therapeutics, Inc. Sec. Litig.*, 2018 WL 2943746, at *6 (S.D.N.Y. June 12, 2018) ("tone at the top" internal control deficiencies supports scienter).

- 25 -

The Board's admitted internal control weaknesses further supports Defendants' scienter. *See Hall v. The Children's Place Retail Stores, Inc*., 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) ("The Company admitted that it had material weaknesses in its internal controls—weaknesses probative of scienter."). The Board concluded that "certain governance shortcomings relating to the LCCP also contributed, including a culture of excess deference within the control environment and governance structures that oversaw the LCCP." ¶ 220. The Board determined that there was "insufficient experience within the LCCP leadership team in executing mega projects," "insufficient segregation of duties of the LCCP project controls environment from the LCCP project execution environment," "inadequate control procedures within the LCCP control environment that allowed erroneous and/or unsupported reporting by the LCCP leadership to go unchallenged without proper escalation of potential red flags," "inadequate procedures to ensure that internal ethics complaints as to the LCCP were escalated appropriately" and "[a] culture of excess deference within the control environment that oversaw the LCCP caused certain individuals with control responsibilities and in oversight committees, including but not limited to the Steering Committee created to oversee the LCCP, to exhibit insufficient scepticism toward reporting by the LCCP leadership team." *Id*. These control weaknesses point squarely at the Executive Defendants. *See In re Veeco Instruments, Inc. Sec. Litig*., 235 F.R.D. 220, 232 (S.D.N.Y. 2006) (holding that executives' "failure to maintain sufficient internal controls to avoid fraud is ... indicative of scienter").

Importantly, these findings directly contradicted the Individuals Defendants' repeated public statements about the project's internal controls, of which the Individual Defendants claimed to have special knowledge and repeatedly approved. That the Board and its independent consultants were able to complete their investigation and prepare a report detailing these systemic

- 26 -

internal control weaknesses in just a few months makes it all the more plausible that the Individual Defendants knew of these deficiencies. *See Bear Stearns*, 763 F. Supp. 2d at 517 (scienter is strongly inferred when outside parties quickly or easily discover the undisclosed facts); *In re Salix Pharm., Ltd.*, 2016 WL 1629341, at *14 (S.D.N.Y. Apr. 22, 2016) (same).

The "significant remediations" the Board "implemented or initiated to hold the responsible individuals to account and to address the shortcomings identified during the Review" further support scienter.  Specifically, the Board approved a remedial plan to effectuate a "culture transformation." ¶ 215.  Among these remedial steps was the implementation of an entirely "new LCCP controls structure, independent from the LCCP's execution activities, and redesigned controls on cost reporting regarding the LCCP to ensure segregation of duties, control effectiveness, and appropriate oversight," as well as "[r]e-evaluating the effectiveness of the finance function holistically" and "[r]evising the Company's procedures regarding the escalation of ethics complaints and internal investigation findings."  And, even after making these systemic changes, the Board stated that "further remedial steps are required to embed a new culture at all levels in the Company. At the leadership level, there needs to be more robust challenge of key decision making." *See comScore,* 268 F. Supp. 3d at 542, 551 (audit committee's recommended remedial plan directed at executive defendants supported scienter).

The key executive terminations and resignations add one more piece to the scienter puzzle. *See, e.g., In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632-33 (S.D.N.Y. 2014) (key executive terminations suggest "a higher level of wrongdoing approaching recklessness or even conscious malfeasance."). The Board took "disciplinary action against the Executive Vice President previously in charge of the LCCP and removing him from all work responsibilities, and led to the negotiated separation from the Company of the three Senior Vice Presidents with roles in the

project."  Although not expressly named, this announcement immediately succeeded Defendant Schoeman's departure in February 2019, who was an Executive Vice President responsible for the LCCP.  Notably, coinciding with the Board's findings, the Company disclosed that Mr. Schoeman had been "removed from all his duties to work and is on extended leave" and that "[t]here is an ongoing employment dispute."[18]  As a further "accountability measure," the Board announced the "resignations" and replacement of Joint CEO Defendants Nqwababa and Cornell.[19]

Defendants contend that Defendants Nqwababa's and Cornell's resignations do not support scienter since the Board stated "there is not sufficient evidence to conclude that these individuals acted with an intent to defraud," and claimed "the Board has neither identified misconduct nor incompetence on the part of the Joint CEOs." But courts give no weight to such self-serving legal conclusions, which seemed in any event to preserve its ability to pursue insurance claims. ¶ 226; *see comScore, Inc.*, 268 F. Supp. 3d at 55 (carefully crafted Board statement admitting misconduct but falling short of accusing CEO of securities fraud "must be viewed with increased suspicion."). The "clear implication" of the Board's disclosures were that Defendants Nqwababa and Cornell were complicit in the "inappropriate conduct." *See In re Eletrobras Sec. Litig.,* 245 F. Supp. 3d 450, 469 n.12 (S.D.N.Y. 2017) (finding that the "clear implication of the [Board's] disclosure" was that the individual defendant CEO was complicit in the alleged scheme).

---

[18] *See* Sasol, Annual Report of Foreign Private Issuer (Form 20-F) (Oct. 28, 2019).

[19] *See Glaser*, 772 F.Supp.2d at 598 (S.D.N.Y.2011) ("highly unusual or suspicious" resignations "add to [the overall] pleading of circumstantial evidence of fraud," including "when independent facts indicate that the resignation was somehow tied to the fraud alleged"); *Hall*, 580 F.Supp.2d at 233 (resignations of company's CEO and auditor supported inference of scienter); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n. 176 (S.D.N.Y.2007) ( "the resignations of [the defendants], although not sufficient in and of themselves, add to the overall pleading of circumstantial evidence of fraud").

### 2.    Internal Documents and Witness Accounts Support of Scienter

"[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308. "Such 'allegations alone are enough to satisfy the pleading requirement for scienter.'" *Freudenberg*, 712 F. Supp. 2d at 197.

As noted above, Plaintiffs have alleged that Defendants knew, received, and had access to documents – dating back to before the Class Period – that confirmed the LCCP was not deliverable within the cost or time frame promised in Defendants' public pronouncements. Plaintiffs have alleged that as the Class Period progressed, the Company received additional documents repeatedly concluding that costs would exceed the public numbers and that Sasol's internal controls over both the project and financial reporting were inadequate to ensure reporting on, or delivery of, the LCCP as promised. These reports included Contract Management System consolidated cost reports, ¶ 65, cost presentations, ¶ 85, monthly reports summarizing the status of the progress and the cost estimates, ¶ 69, the October 2015 External Cost Report, ¶ 72, and the Fluor Change Order, ¶¶ 66-68, 73, among others.

These reports are further corroborated by accounts from former LCCP managers who confirmed that based on their direct knowledge or experience the Individual Defendants were informed that the LCCP was not deliverable within the timeframe or costs presented publicly. ¶¶ 76, 78, 69, 73, 86, 90-91, 95, 98. Indeed, one witness raised concerns regarding the cost overruns and timeline for completion of the project directly to Defendants Nqwababa, Cornell, and Victor. ¶¶ 76, 78. Another witness observed Defendant Schoeman admit that Sasol was off pace and over budget. ¶69. A third witness confirmed that secret internal estimates of the LCCP's cost, which vastly exceeded the cost projected to investors, were so widely accepted among senior

- 29 -

management that the $11 billion budget became "socialized" and universally understood by LCCP team members. Thus, at a minimum, the CWs show that the Executive Defendants were reckless in not knowing, or knew, about the widespread cost and schedule overruns.[20]

Confidential witness accounts also establish Defendants' knowledge of internal control weaknesses over both project management and financial reporting. The former employees detail Defendants' deceptive accounting, ¶¶ 71-72, 87-89, 93, as well as false reports that the LCCP's development was on schedule. ¶¶ 75, 90.  In fact, one CW details Defendant Schoeman's direction and active involvement in manipulation of the construction schedule. ¶¶ 97-99.  Notably, the CW accounts line up precisely with the findings from the Board's Independent Review. *See, e.g.*, ¶ 215; *see also Cornwell*, 689 F. Supp. 2d at 637-38 (pre-class period reports and confidential witness allegations combined with "massive write downs" during class period "suggest that analogous information was available to Defendants during the Class Period").

The CWs further detail management's knowledge of safety violations. In particular, CW-3 describes the incompetent and inexperienced leadership over the project, ¶¶ 79-82, which led to dangerous engineering, including unauthorized shortcuts Defendants took to fast track the project, "dangerous flaws" in the plant's water cooling system, and CW-3's firing a week after raising safety concerns. ¶ 84. Altogether, these facts readily meet the required standard to plead scienter under *Novak* and *Tellabs*.

### 3. Strong Circumstantial Evidence of Scienter

The Complaint also alleges a multitude of circumstantial evidence probative of scienter.

---

[20] *See, e.g., In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at \*12 (S.D.N.Y. Mar. 28, 2018) (scienter pled where risk was "so obvious that the defendant must have been aware of it"); *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637-38 (S.D.N.Y. 2010) (allegations of widespread internal knowledge of problems supported scienter).

*First*, the Executive Defendants were personally responsible for and integrally involved in the identification and reporting of the LCCP's cost and development. As a result of their responsibilities with respect to the LCCP, the Executive Defendants knew or were reckless in not knowing about the problems, including the errors, omissions, and inaccuracies in the project cost estimate, construction delays, and project and safety control deficiencies. Specifically, each of the Executive Defendants were members of the Group Executive Committee ("GEC"), which had the ultimate authority to set Sasol's strategy and direction for LCCP. ¶ 85. Defendant Schoeman was the Group Executive Committee member responsible for the LCCP project and in 2016, was the Executive Vice Primarily responsibility for the LCCP project. ¶ 50. In carrying out their responsibilities, Defendants personally visited the LCCP site to monitor its progress (¶¶ 56, 175), and held regular meetings in which the cost, development and control system of the LCCP were discussed directly with the Executive Defendants. ¶¶ 85, 95, 105; *see Freudenberg*, 712 F. Supp. 2d at 198 ("[D]irect conversations with Individual Defendants [and] meetings at which Individual Defendants were present . . . demonstrate their access to and actual knowledge of facts which contradicted their public statements.").

*Second*, the Executive Defendants represented throughout the Class Period that the management team was "closely involved in guiding the LCCP project team so that we can minimize capital expenditure and further optimize overall project efficiency" (¶ 147) that cost control was a "primary focus" (¶ 140), and spoke repeatedly to investors on the LCCP's enhanced project and safety controls and management. ¶¶ 128, 131, 137, 153, 160. Thus, the Executive Defendants either spoke on these subjects with knowledge or failed to investigate the true facts underlying their statements.[21] When Defendants were asked by an analyst if LCCP was going to

---

[21] *See, e.g., Pirnik v. Fiat Chrysler Autos., N.V.*, 2016 WL 5818590, at *7 (S.D.N.Y. Oct. 5, 2016) (defendant's statement that he was "tak[ing] a harder look" at compliance supported

have the same cost overrun problems as another Sasol project (Gemini), Defendant Schoeman assured the analyst that Sasol would not have the same cost escalation by noting the "significant changes" and "structural differences that were implemented" "after learning some lesson on LCCP." ¶ 172. Defendants' denials further support scienter. *See comScore*, 268 F. Supp. 3d at 552 ("campaign by [defendants] to placate the market in reaction to the inquiries by the media, analysts, investors and the SEC . . . provides cogent support for the inference of scienter").

*Third*, the LCCP was undeniably important to Sasol, which touted it as a "mega project," the "largest investment in company history," a "game changer for Sasol" and "enabling Sasol to further strengthen our position in a growing global chemicals market." ¶¶ 55. The cost and timely development of LCCP were core to Sasol's operations, revenue, and growth. *Salix*, 2016 WL 1629341, at *16 (scienter pled where fraud involved company's core operations).[22]

*Fourth*, the LCCP's estimated cost and development were subjects of intense market scrutiny and concern. Investors scrutinized the LCCP, and analysts asked the Executive Defendants numerous questions about these topics on conference calls. *See, e.g.*, ¶¶ 15, 142, 173, 193, 198.[23]

---

scienter); *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395-96 (S.D.N.Y. 2012) (highly "improbable" that defendant who said he was familiar with company "would not inquire into whether his company was exposed to the subprime consumer borrower").

[22] *See also Shenk v. Karmazin*, 867 F. Supp. 2d 379, 387 (S.D.N.Y. 2011) (scienter pled where defendants made "statements that contradicted reasonably available data and that concerned major transactions or touched upon the heart of their companies' businesses"); *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 481 (S.D.N.Y. 2008) (scienter pled where "defendants undoubtedly appreciated that theater system revenue was of singular importance to the financial well-being and market perception of the Company").

[23] *See New Orleans Emps Ret. Sys. V. Celestica, Inc.*, 455 Fed. App'x 10, 14 & n.3 (2d Cir. 2011) (scienter pled where subject of fraud was "key to measuring . . . performance and . . . a subject about which investors and analysts often inquired"); *comScore*, 268 F. Supp. 3d at 553 (fraud concerned "a subject about which investors and analysts often inquired," which "reinforces the inference of scienter").

***Fifth***, the magnitude of Sasol's more than $8 to now $13 billion project also yields a strong inference. *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) (magnitude of company's financial adjustments contributed to strong inference of scienter).[24]

***Sixth***, Defendants' past misconduct with respect to the Sasolberg wax project constitutes "pattern evidence" indicative of scienter. ¶¶ 62, 229.[25]

Defendants characterize Plaintiff's scienter allegations as an "abject failure" because Plaintiff purportedly did not explain why Defendants engaged in securities fraud. Mot. at 28. But Sasol knew exactly why: it previously hid from the public details about its wax factory project because – as Defendant Victor described it – it would "not go down well" if investors knew the truth. ¶ 62. As detailed below, Sasol was similarly (and correctly) concerned that disclosure of the truth about LCCP would be negatively received by investors and affect its bottom line. ¶¶ 235-238.

### 4. The Executive Defendants' Compensation Plans Uniquely Incentivized and Rewarded the Fraud

Finally, the Executive Defendants' compensation packages richly rewarded them for their false LCCP project cost and construction schedule estimates and maintaining the artificial inflation of Sasol's stock price throughout the Class Period. *See* ¶¶ 233. As revealed in Defendants' 20-F

---

[24] Defendants suggest that Plaintiff's scienter allegations are inadequate because "core operations" or the magnitude of the fraud are not independently sufficient. Mot. at 30. But here, Plaintiff pleads core-operations and the magnitude of the fraud allegations along with multiple other allegations indicative of scienter. *See In re Dynex Capital, Inc. Sec. Litig.*, 2009 WL 3380621, at *17 (S.D.N.Y. Oct. 19, 2009) (assessing scienter facts "holistically").

[25] *See In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 387 F. Supp. 2d 1130, 1138–39, 1147 (D.Colo.2005) (pattern of "accounting manipulations and misrepresentations" supported inference of scienter); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) ("[S]cienter may be found where there are 'specific allegations of various reasonably available facts, or 'red flags,' that should have put the officers on notice' that the public statements were false").

filings (2015 - 2019), Defendants had Short Term Incentives (STI) and Long Term Incentives (LTI) compensation plans that included Sasol's share price, targets on the LCCP cost and schedule, financial targets, and meeting major project milestones.   During that time, the Executive Defendants submitted admittedly erroneous LCCP cost and construction schedule estimates and repeatedly stated that the LCCP was "on track" with "significant progress."   Defendants' false project cost and construction schedule estimates and announcements that the LCCP's economic outlook remained "robust" drove Sasol's stock higher and higher. ¶ 111. The Executive Defendants' compensation packages made them both fearful of the reaction when the market learned that the LCCP's costs and timetable increased, and eager to benefit from the market's reaction should LCCP cost expenditures continue to remain within the disclosed budget.  Sasol's Board acknowledged that this compensation structure provided perverse incentives to misrepresent and conceal information from the market when, as part of its remediation plan it "reduced incentives awards for individuals company-wide based on relation and/or proximity to LCCP." ¶ 233.

Where a plaintiff alleges unique executive compensation triggers like those here, courts find that the allegations support a strong inference of scienter. *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 557-58 (S.D.N.Y. 2010) (plaintiffs adequately pled scienter when defendant stood to receive multimillion-dollar payment and stock options upon completion of a merger if company's stock did not fall below certain trigger prices, "an event that would have torpedoed the merger and [the officer]'s payout."); *Darquea v. Jarden Corp.*, 2007 WL 1610146 at \*10 (S.D.N.Y. May 31, 2007) (plaintiffs pled scienter when "the Individual Defendants gained millions of dollars in incentive payments keyed to Jarden's stock price performance.").

Here, the Executive Defendants' compensation packages more compellingly demonstrate scienter than in *SLM* and *Jarden* since Sasol "specifically and directly tied executive bonuses to the very instrument used to commit the alleged fraud." *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1092 (N.D. Cal. 2005) (executive compensation "programs which specifically and directly tied executive bonuses to the very instrument used to commit the alleged fraud . . . squarely contribute to a strong inference of scienter."); *see also Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 498 (S.D.N.Y. 2018) (executive compensation contributed to strong inference of scienter where "the bonus program incentivized a specific form of misconduct which, if true, threatened the foundational integrity of the Phase 3 trial."). Accordingly, the uniqueness and specificity of the compensation program as it relates to Defendants' fraud differentiates this case from those cases Defendants cite involving run-of-the-mill "executive compensation." Mtn. at 28.

## IV.    CONCLUSION

Defendants' motions to dismiss should be denied.  If any claims are dismissed, Lead Plaintiff respectfully requests leave to replead.  *See* Fed. R. Civ. P. 15(a)(2).

DATED: July 30, 2020                    Respectfully submitted,

                                        HAGENS BERMAN SOBOL SHAPIRO LLP

                                        By */s/ Lucas E. Gilmore*

                                        Reed R. Kathrein
                                        Lucas E. Gilmore (admitted *Pro Hac Vice*)
                                        Danielle Smith
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        715 Hearst Avenue, Suite 202
                                        Berkeley, CA 94710
                                        Telephone: (510) 725-3000
                                        Facsimile:  (510) 725-3001
                                        reed@hbsslaw.com
                                        lucasg@hbsslaw.com
                                        danielles@hbsslaw.com

                                        Steve W. Berman (admitted *Pro Hac Vice*)
                                        Jerrod C. Patterson (admitted *Pro Hac Vice*)
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        1301 Second Avenue, Suite 2000
                                        Seattle, WA 98101
                                        Telephone: (206) 623-7292
                                        Facsimile:  (206) 623-0594
                                        steve@hbsslaw.com
                                        jerrodp@hbsslaw.com

                                        *Counsel for Lead Plaintiff David Cohn*

- 36 -

**CERTIFICATE OF SERVICE**

I hereby certify that on July 30, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

                                        */s/ Lucas E. Gilmore*
                                        LUCAS E. GILMORE

- - 1 - -