UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHAD LINDSEY MOSHELL,
Individually and On Behalf of
All Others Similarly Situated

          Plaintiff,

     -against-

SASOL LIMITED, DAVID EDWARD
CONSTABLE, BONGANI NQWABABA,
STEPHEN CORNELL, PAUL VICTOR,
FLEETWOOD GROBLER, and
STEPHAN SCHOEMAN,

          Defendants.

20-cv-1008 (JSR)

MEMORANDUM ORDER

JED S. RAKOFF, U.S.D.J.

     This is a putative class action brought against defendants
Sasol, Ltd. ("Sasol") and six of its executive officers for
alleged securities fraud. The gist of the allegations is that
between March 10, 2015 and January 13, 2020, defendants made
numerous misrepresentations concerning Sasol's construction of
an ethane cracker and derivatives complex in Louisiana, known as
the Lake Charles Chemicals Project (the "LCCP"). Defendants now
move to dismiss the Amended Complaint ("AC" or "the complaint"),
ECF No. 59, in its entirety pursuant to Fed. R. Civ. P. 12(b)(6)
for failure to state a claim. Following extensive briefing, the
Court heard oral argument on August 20, 2020. Having now
carefully reviewed the parties' submissions and arguments, the

1

Court concludes that the motion to dismiss must be granted in part and denied in part.

I.   The Complaint's Allegations

Sasol is a global energy company based in South Africa. AC ¶ 53. The complaint's allegations surround Sasol's construction of an ethane cracker and derivatives complex in Lake Charles, Louisiana, dubbed the LCCP. ¶ 58. According to the complaint, when Sasol announced on October 27, 2014 its decision to construct the LCCP, which would expand Sasol's position in the global chemical production market, Sasol announced that the project would cost about $8.1 billion. Id. ¶¶ 58-59. The complaint alleges that because Sasol had a public history of failing to disclose, and at times deliberately concealing, cost overruns and construction delays on past large projects, id. ¶ 62, Sasol's senior management was particularly attuned to its representations regarding cost and timing of the completion of the LCCP. Id. ¶ 63. Moreover, Sasol allegedly promised a well-run and efficient project this time, to be ensured by close oversight, project controls, and a "world-class roster of contractors" including Fluor and TechnipFMC. Id. ¶¶ 9-12, 131.

The class period begins on March 10, 2015, when Sasol allegedly first disclosed that the LCCP's development costs had increased from $8.1 billion to $8.9 billion. Id. ¶¶ 100, 130. This disclosure was, however, accompanied by statements that the

LCCP was progressing on track, that the project was well-
managed, and that the LCCP was expected to start operating
sometime in 2018. Id. Over the course of the next four years,
defendants allegedly began to disclose increasing costs and
extended timelines for the LCCP, including announced cost-
estimate increases to $11 billion in June 2016, id. ¶ 145,
$11.13 billion in November 2017, id. ¶¶ 181-84, $11.6 to $11.8
billion in February 2019, id. ¶ 196, and $12.6 to $12.9 billion
in May 2019, id. ¶ 200. Each of these announced cost increases
and delays was once again accompanied by assurances that
defendants were now on track, would stick to the new budget, and
had put remediation measures in place to prevent further
problems. See, e.g., id. ¶¶ 147, 151-55, 187-94, 197, 209. For
example, after the announcement of an increased budget of $11
billion in June 2016, defendants allegedly assured investors
that this figure was a "worst case type of scenario," that the
project was continuing to progress, and that it continued to be
well-managed. Id. ¶ 147.

Notwithstanding all the above, the complaint alleges that
defendants knew from the very beginning of the class period that
that the projected cost of the LCCP was well beyond $8.9 billion
and that the initial schedule was entirely unrealistic. To
support these allegations, the complaint materially relies on
the testimony of six confidential witnesses ("CWs") who worked

3

in some capacity on the LCCP. These CWs allegedly reported to plaintiff that cost estimates for the LCCP were at least $11 billion from the beginning of the project, id. ¶¶ 90, 95, and that the project was plagued with obvious cost overruns, delays, and poor management throughout the class period, id. ¶¶ 18, 79, 81-83. Particularly damning, according to the complaint, is one CW's revelation that defendants had received a contractually binding "Change Order" from Sasol's subcontractor Fluor in February 2016 that confirmed that Fluor's costs would be at least $11.7 billion, a figure much higher than the $8.9 billion cost estimate that defendants were publicizing at that time. Id. ¶¶ 66, 68.

The complaint further alleges that defendants' knowledge of the unrealistic nature of their budget and timeline -- and thus the falsity of their initial projections and updates to investors -- is also supported by Sasol's October 2019 disclosure of the results of an independent review and external audit of the LCCP. Sasol allegedly disclosed that the review had brought to light "errors, omissions, and inaccuracies in the [LCCP] cost estimate," and "inappropriate conduct and an improper tone at the top of the LCCP, including an excessive focus on maintaining cost and schedule estimates at the expense of providing accurate cost and schedule estimation to oversight bodies." ¶ 117. Contemporaneously with its announcement of the

4

results of the review, Sasol also allegedly announced the departure of several members of its executive leadership, including its Joint Presidents and Chief Executive Officers, certain Senior Vice Presidents, and other individuals previously charged with responsibility of the LCCP. Id.

While the complaint alleges that the foregoing misrepresentations resulted in losses to investors throughout the class period, the complaint alleges that these losses ballooned on the final day of the class period, January 13, 2020, when there was an explosion and fire at the LCCP plant. Id. ¶ 121. The complaint alleges that defendants' disclosure of this explosion, which the complaint attributes to the undisclosed mismanagement of the LCCP, resulted in losses of over hundreds of millions of dollars in shareholder value, and that Sasol remains in a tailspin. Id. ¶¶ 33, 123-26.

The complaint claims that defendants' misrepresentations and omissions relating to the LCCP constituted violations of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. The complaint further claims that the involvement of each of the six individual defendants constituted a violation of Section 20(a) of the Exchange Act. These individual defendants include David Edward Constable, who was President and CEO of Sasol between the start of the class period and June 2016; Bongani Nqwababa and Stephen Cornell, who

were Joint Presidents and CEOs of Sasol between July 2016 and
October 2019; Fleetwood Grobler, who has served as President and
CEO of Sasol since November 1, 2019; Paul Victor, who has served
as CFO of Sasol since July 2016 and was Vice President of its
chemical business during the class period; and Stephan Schoeman,
who was Sasol's Vice President of technology and who took
responsibility for the LCCP starting in 2016. Id. ¶¶ 40-52.

II.  Legal Standard

As noted, all defendants have now moved to dismiss the
complaint pursuant to Rule 12(b)(6). In general, for a claim to
survive a motion to dismiss under Rule 12(b)(6), the "complaint
must contain sufficient factual matter, accepted as true, to
state a claim for relief that is plausible on its face."
Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). After discarding
allegations that amount to nothing more than legal conclusions,
see Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007),
the court should "accept as true" what remains and "draw all
reasonable inferences in plaintiff's favor." Beazley Ins. Co.,
Inc. v. Ace American Ins. Co., 150 F. Supp. 3d 345, 354
(S.D.N.Y. 2015) (citing In re Elevator Antitrust Litig., 502
F.3d 47, 50 (2d Cir. 2007) (per curiam)). The net result must be
"enough to raise a right to relief above the speculative level"
for the claim to survive. Twombly, 550 U.S. at 555.

In addition, a complaint alleging securities fraud must satisfy the heightened pleading requirements of both Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). The former requires the complaint to state "with particularity the circumstances constituting fraud," Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford, 794 F.3d 297, 304 (2d Cir. 2015) (citation omitted), while the latter extends the heightened pleading requirement to the requirement of pleading allegations that strongly imply fraudulent intent.

III. Alleged Violation of Rule 10b-5

SEC Rule 10b-5 renders it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. A private civil action alleging a violation of Rule 10b-5 must allege: "(1) a material misrepresentation or [actionable] omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, 552 U.S. 148, 157 (2008).

Although the complaint alleges numerous purported misrepresentations, plaintiff usefully groups these misrepresentations into two categories. First, the complaint alleges that defendants repeatedly misrepresented the actual estimated costs and schedules of the LCCP in their disclosures from June 2015 to February 2018. AC ¶¶ 100, 130, 135-43, 145, 147, 151, 158, 169, 173, 176-77, 181-91, 181-84, 196, 211. Second, the complaint alleges that defendants falsely certified the effectiveness of Sasol's internal controls over financial reporting and management of the LCCP. Id. ¶¶ 128, 131-32, 137, 147, 153-54, 160-62, 172, 175, 178.

Defendants move to dismiss plaintiff's Rule 10b-5 claim on the ground that: i) any alleged misrepresentation about the cost and schedule of the LCCP falls within the PSLRA safe harbor; ii) the complaint does not adequately plead any actionable misrepresentations or omissions; and iii) the complaint fails to plead defendants' scienter. The Court addresses each argument in turn.

A. PSLRA Safe Harbor

Defendants first move to dismiss on the ground that the alleged misrepresentations about the costs and schedule for the LCCP are not actionable because they are covered by the PSLRA's safe harbor for certain "forward-looking statements." 15 U.S.C. § 78u-5(c). As an initial matter, defendants' LCCP cost and

schedule estimates do constitute, contrary to plaintiff's
argument, forward-looking statements as defined by the PSLRA,
which expressly includes "statement[s] containing a projection
of . . . capital expenditures" and "statement[s] of the plans
and objectives of management for future operations." 15 U.S.C. §
78u-5(i)(1)(A). This, however, does not complete the Court's
safe harbor analysis. Under the safe harbor, a forward-looking
statement is inactionable only if "the forward-looking statement
is identified and accompanied by meaningful cautionary
language," "the statement is immaterial," or "the plaintiff
fails to prove that [the forward-looking statement] was made
with actual knowledge that it was false or misleading." In re
Vivendi, S.A. Sec. Litig., 838 F.3d 223, 245 (2d Cir. 2016)
(citation and internal quotation marks omitted). Defendants
argue that both the cautionary language they included alongside
their alleged misstatements, and defendants' lack of knowledge
of these statements' falsity triggers the application of the
PSLRA safe harbor. Neither argument is persuasive.

     i. Cautionary Language

    In support of their argument that their forward-looking
statements about the LCCP cost and schedule estimates qualify
for the safe harbor because they were "accompanied by meaningful
cautionary language," defendants point to disclosures in each
Form 20-F Sasol released during the class period that Sasol's

"large capital projects," including the LCCP, "may be affected
by delays or cost overruns" and are "subject to risks of delay
and cost overruns inherent in any large construction project,"
such as "unexpected delays in delivery times, shortages or
unforeseen increases in the cost of equipment, labour and raw
materials," "failure or delay of third-party service providers,"
and more. See Decl. of Caroline Hickey Zalka in Support of Mot.
to Dismiss, ECF No. 67, Exh. D at 14-15, Exh. H at 14-15, Exh. L
at 8-9, Exh. O at 8-9, Exh. Q at 10-11, Exh. V at 7-8.
Defendants argue that this cautionary language was meaningful
because, as required by the PSLRA, it "was not boilerplate and
conveyed substantive information." Slayton v. Am. Exp. Co., 604
F.3d 758, 772 (2d Cir. 2010).

Even assuming the language was not boilerplate,[1] however,
the complaint alleges that it suffers from the more fundamental
problem that it was "misleading in light of historical fact" and
thus "cannot be meaningful." Id. at 770. In particular, the
complaint describes the testimony of CWs who worked on the LCCP
that, accepted as true, demonstrates that Sasol's public cost

_____

[1] At least one alleged misrepresentation by the defendants
undermines this argument. On a June 2016 call with investors,
defendant Constable called the recently announced cost estimate
increase to $11 billion a "worse case scenario and we don't
expect it." AC ¶ 147. This directly contradicts the generalized
cautionary language defendants included elsewhere, and suggests
that the above-mentioned warnings were in fact boilerplate.

estimates and schedule were entirely inconsistent with the
reality of progress at the LCCP. Most notably, the complaint
recounts CW-1's testimony that Sasol received a "Change Order"
from Sasol's subcontractor Fluor in February 2016 that
contractually obligated Sasol to pay at least $11.7 billion to
Fluor. AC ¶¶ 66. This is billions more than the cost estimates
Sasol had announced, not just before, but for at least three
years thereafter.[2] Another witness, CW-4, testified that Sasol
employees were directed to manipulate accounting to hide
increasing costs. Id. ¶¶ 87-89. Another, CW-3, testified that
Sasol executives altered anticipated completion dates for
projects to make it appear that the LCCP was on schedule when it
was not. Id. ¶ 97. Taken as true, these allegations indicate
that, even at the time they were announced, Sasol's public cost
estimates and projected schedules totally failed to account for
already existing cost overruns and delays. This renders the
defendants' cautionary statements that their announced budgets

-------------------

[2] Defendants argue that CW-1's contention that Fluor gave Sasol a
legally binding $11.7 billion Change Order in February 2016
should not be credited because it cannot be squared with Fluor's
participation in a 2016 cost review process that resulted in
defendants announcing an increased cost estimate to $11 billion
in June 2016. Reply Mem. of Law in Further Support of Defts.
Mot. to Dismiss at 6, ECF No. 69. However, plaintiffs allege
that this $11 billion estimate was itself a lie, rendering these
facts perfectly consistent.

and schedules "may be affected by delays or cost overruns"
misleading because, among other things, the risk they warned of
"had already transpired." Slayton, 604 F.3d at 770.

   Defendants counter that the Court should not take account
of the CWs testimony at all. For a complaint to rely on
information provided by confidential sources, however, such a
source need only be "described in the complaint with sufficient
particularity to support the probability that a person in the
position occupied by the source would possess the information
alleged." Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000). The
complaint meets this burden. It alleges that CW-1 was an LCCP
engineer responsible for undertaking cost reviews, id. ¶ 65;
that CW-2 was high-ranking employee responsible for all
financial matters for Sasol's U.S. projects, id. ¶ 76; that CW-3
was a contractor working at the LCCP, id. ¶ 79; that CW-4 was a
Sasol employee who worked on LCCP accounting matters, id. ¶ 85;
that CW-5 worked as a risk assessor for the LCCP, id. ¶ 95; and
finally that CW-6 was a scheduler for part of the LCCP, id. ¶
96. In short, the complaint alleges that each CW was working
directly on the LCCP in a manner that would have provided him or
her with direct, contemporaneous information about the costs and
schedule for the LCCP. Thus, the Court may credit their
testimony, and defendants' cautionary language does not trigger
the safe harbor.

ii.   Actual Knowledge of Falsity

Defendants next argue that the safe harbor applies because the complaint does not allege that any "forward-looking statement was made with actual knowledge that it was false or misleading." In re Vivendi, 838 F.3d at 245 (citation omitted). To allege such knowledge, a complaint must "state with particularity . . . the defendant's intention 'to deceive, manipulate, or defraud.'" Slayton, 604 F.3d at 773 (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007)). In other words, plaintiff must plead facts supporting a strong inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. (quoting Tellabs, 551 U.S. at 314). This is the same showing that is required to allege scienter as to any misrepresentation under the PSLRA, with one important distinction. Under the general PSLRA standard, a complaint may allege scienter based on "either knowing falsity or recklessness." Id. In contrast, because the safe harbor specifies an "actual knowledge" standard, a complaint may allege scienter as to a forward-looking statement only by alleging "knowing falsity." Id.

Defendants dedicate most of their briefing on this issue to arguing that the CWs' testimony cannot give rise to a strong inference of scienter. It is true that some CWs' testimony, even though it supports the falsity of defendants' statements about

13

the LCCP cost and schedule, less directly supports actual knowledge of this falsity by any given defendant. For example, while CW-6 asserts that "management" directed him and his colleagues to manipulate construction schedules, he does not identify any defendant as having done so. AC ¶ 97. And, while CW-5 testified that an $11 billion cost estimate was "socialized among senior management" from the beginning, he never specifies any one defendant's knowledge beyond asserting that defendant Cornell "would have" known about the cost issues as the "ultimate arbiter of costs." Id. ¶ 95. These allegations are not particularized enough to support scienter as to any individual defendant, especially the heightened scienter required for forward-looking statements. See In re Citigroup Inc. Sec. Litig., 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010).

While other CW testimony is far more particularized, taken in isolation it only supports a finding of recklessness. CW-2, for example, claims that he expressed concerns about the cost and timeline of the LCCP to defendants Nqwababa, Cornell, and Victor on several occasions, id. ¶ 76, and that they rejected his criticism, id. ¶ 78. Further, CW-1 alleges that defendant Schoeman told him that "'things are not good' with the [LCCP] project based on the updates on progress and costs." Id. ¶ 69. Perhaps most significantly, CW-1 attests that the defendants would have seen the $11.7 billion Change Order because it "would

have gone to" the company's Vice President, "who in turn would
have submitted the Change Order to the senior executives." Id. ¶
73. These allegations, accepted as true, indicate that the
defendants were repeatedly alerted to problems with the budget
and schedule of the LCCP, raising an inference of recklessness.
See Novak, 216 F.3d at 308 (holding that plaintiffs have alleged
"recklessness when they have specifically alleged defendants'
knowledge of facts or access to information contradicting their
public statements"). Standing alone, however, these allegations
do not support a strong inference that these defendants actually
knew they were making false statements.

The testimony of the CWs, however, must not be "be reviewed
independently or in isolation," and instead must be "taken
collectively" with other alleged evidence of scienter. Slayton,
604 F.3d at 766. Here, the complaint alleges very strong
additional evidence of scienter, most particularly, Sasol's
October 2019 disclosure of the results of an independent review
and audit of the LCCP (the "internal review"). Sasol explained
that the internal review uncovered not only "errors, omissions,
and inaccuracies in the [LCCP] cost estimate," but also
"inappropriate conduct and an improper tone at the top of the
LCCP, including an excessive focus on maintaining cost and
schedule estimates at the expense of providing accurate cost and
schedule estimation to oversight bodies." Id. ¶ 117. Taken in

15

the light most favorable to plaintiff, this strongly indicates that some individuals managing the LCCP actually knew announced cost and schedule estimates were false and were simply trying to hide the truth. Sasol's "remediation plan" for this problem indicates at least some defendants were among those who knew of and tried to hide the truth. Sasol explained that "[a]s a result of" the internal review, Sasol "remov[ed] from all work responsibilities and initiat[ed] disciplinary action against the Executive Vice President previously in charge of LCCP," id. ¶ 220, who the complaint identifies as defendant Schoeman. Additionally, Sasol announced the resignation of its Joint Presidents and CEOs, defendants Nqwababa and Cornell. Id. ¶ 215. This is strong evidence of knowing falsity on the part of these three defendants.

Defendants in their brief argue that the internal review is of no moment because any inappropriate conduct "w[as] uncovered during the course of the investigation Sasol commenced in May 2019, not earlier," and thus cannot support either falsity or knowledge of falsity earlier than May 2019. Mem. of Law in Support of Defts. Mot. to Dismiss at 25, ECF No. 66. This, however, amounts to arguing that a fraudulent state of mind does not exist until it is discovered. While this suggestion might succeed in a quantum physics lab, it does not succeed before a court of law. No more persuasive is a variation of this argument

that defendants offered at oral argument. Defendants suggested
that the review was designed to investigate a very narrow time
period in the LCCP's construction, and thus cannot support
scienter as to the full class period. See Tr. 8/20/2020. No
matter the precise time period under review, however, there is
no reason to conclude that misconduct was limited to that time
period. It is just as plausible, if not more so, that such
misconduct stretched to the very beginning of the LCCP.
Plaintiff is entitled to such a plausible inference here.
Finally, defendants' argument that the internal review cannot
support scienter as to defendants Nqwababa and Cornell because
they participated in the internal review is unpersuasive given
these defendants' prompt resignation upon announcement of the
results of the review. Glaser v. The9, Ltd., 772 F. Supp. 2d
573, 598 (S.D.N.Y. 2011) (holding that "highly unusual and
suspicious" resignations support scienter).

Defendants' heavy reliance on In re Barrick Gold Sec.
Litig., No. 13 CIV. 3851 SAS, 2015 WL 1514597 (S.D.N.Y. Apr. 1,
2015), does no more to undermine the strong inference of
scienter created by the combination of the CW testimony and the
internal review. In Barrick, Judge Scheindlin held that the
PSLRA safe harbor applied to alleged misrepresentations of the
estimated cost and schedule of a large mining project because
investors failed to allege scienter based on i) an unsuccessful

17

bid from a third-party contractor that was above announced cost
estimates, ii) an internal report finding "inaccuracies,
omissions and inconsistencies in" cost reports, and iii)
confidential witness testimony. Id. at *9-11. While defendants
argue that the similarity of the kinds of evidence at issue in
that case suggest that the Court should similarly find no
scienter here, an examination of Barrick only highlights the
comparative strength of the evidence in the present case. First,
the allegedly contractually binding Change Order plaintiff
relies on is far more indicative of knowing falsity than an
unsuccessful contractor bid, which by its very nature is
nonbinding. Second, the internal report in this case, unlike
that in Barrick, did not merely report "inaccuracies, omissions
and inconsistencies in" cost reports, but also reported
"inappropriate conduct" in the form of individuals prioritizing
"maintaining cost and schedule estimates" at the expense of
"accura[cy]." Third, the testimony of the CWs in this case is
less speculative than in Barrick. Thus, when read closely,
Barrick (which, of course, is not binding on this Court in any
case) far from forecloses a finding of scienter here.

In short, the complaint alleges facts that, "taken
collectively" and taken as true, give rise to an inference of
scienter that is "cogent and at least as compelling as any
opposing inference one could draw from the facts alleged," even

18

as to the forward-looking LCCP cost and schedule estimates. Slayton, 604 F.3d at 774. The testimony of the CWs suggests that the defendants had access to the Change Order and other information that contradicted their public cost and schedule estimates. The results of the internal investigation, accompanied by the termination of defendants Schoeman, Nqwababa, and Cornell, indicate that these defendants did not simply recklessly disregard this information, but instead knowingly misrepresented cost and schedule estimates to keep up appearances. Thus, the PSLRA safe harbor does not apply to at least those misrepresentations about the LCCP cost and schedule made by defendants Schoeman, Nqwababa, and Cornell.

The statements of Constable, President and CEO of Sasol between the start of the class period and June 2016, and Victor, CFO of Sasol since July 2016 and Vice President of its chemical business during the class period, also do not qualify for application of the safe harbor. Although these defendants did not leave Sasol in relation to the internal review, they were present during the period of time prior to the review. Moreover, they were in positions that indicate that they would have been aware of the Change Order as well as the true state of the LCCP cost and schedule estimates. These allegations are at least enough to support a finding of recklessness. This, combined with CW-2's specific allegations that he spoke with Victor on

19

multiple occasions regarding the cost overruns and timeline of
completion of the LCCP, AC ¶ 76, is enough to allege actual
knowledge as to Victor. Furthermore, it is enough to allege
scienter as to Constable because Constable made at least some
allegedly false statements that were not forward-looking during
the class period, such as his statement in June 2016 that the
$11 billion cost estimate represented a "worst-case scenario."
Id. ¶ 19.

There is not, however, sufficient evidence of scienter as
to defendant Fleetwood Grobler. First, the complaint does not
allege any false statements by Grobler at all prior to the
internal review, and only alleges that he was present on phone
calls with investors in his capacity as Executive Vice President
of Sasol's chemical business. The complaint attributes only one
misstatement by Grobler -- a forward-looking price estimate --
which he made after the internal review, when he was appointed
to replace defendants Nqwababa and Cornell. Id. ¶ 222. The
internal review thus cannot support scienter as to Grobler's
statement, and the plaintiff offers no particularized facts
beyond Grobler's position at the company to suggest he knew that
the statement was false. Grobler's one alleged misstatement is
thus subject to the PSLRA safe harbor and is not actionable, and
Grobler is hereby dismissed from this case.

   B. Misrepresentations and Omissions

Failing their PSLRA safe harbor argument, defendants next argue that plaintiff's Rule 10b-5 claim should be dismissed because the complaint fails to allege any misrepresentations or omissions. As noted, Rule 10b-5 makes it unlawful both to "make any untrue statement of a material fact," and to "omit to state a material fact necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5(b). Thus, the complaint may state a claim either by alleging a false statement or by alleging a "half-truth," that is, a "literally true statement[] that create[s] a materially misleading impression" by omitting certain information. In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 240 (2d Cir. 2016). The complaint must, however, in accordance with Rule 9(b) and the PSLRA, state with particularity "the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1), in terms of the relevant audience of "reasonable investor[s]." Kleinman v. Elan Corp., PLC, 706 F.3d 145, 153 (2d Cir. 2013) (citation omitted). Defendants' argument utterly fails with respect to the alleged misrepresentations concerning the cost and schedule of the LCCP because, as explained above, the complaint alleges with particularity that Sasol's public cost estimates and projected schedules hugely failed to account for already existing cost overruns and delays the day they were announced.

But defendants' argument has more merit when it comes to the second category of alleged misrepresentations concerning the adequacy of LCCP controls. In his brief, plaintiff argues that "[t]hroughout the Class Period, Sasol affirmed the effectiveness of its internal controls over financial reporting" and "touted its controls, processes, and oversight at the LCCP." Pls. Opposition to Defts. Mot. to Dismiss at 10, ECF No. 68. To support this proposition, however, the complaint itself points only to defendants' statements that Sasol had an "[e]xperienced owner's team in place to oversee" the LCCP, AC ¶ 131; that "[c]ost control remains a primary focus for the team," id. ¶ 140; that "[t]he management team remains closely involved in guiding the project team" to "minimize capital expenditure and further optimize overall project efficiency," id. ¶ 147; and other similar statements. A close examination of these statements in context reveals that they offer no such affirmation of the effectiveness of Sasol's internal controls, but instead simply describe those controls in a positive light. Nor do defendants' descriptions of the "remedial" or "decisive" action they took to correct cost overruns and delays, including "improvement of the control base management process" and "key project management changes," Id. ¶¶ 153-54, 160-62, in any way constitute a guarantee that these actions would be effective.

Additional alleged misstatements within this category are no more definitive. See ¶¶ 128, 132, 137, 147, 172, 175, 178.

Without pointing to any more definitive assurance or guarantee by defendants that LCCP controls were in fact effective or that any issues had been totally corrected, plaintiff fails to allege with particularity why any of these statements would be misleading to a reasonable investor. The primary evidence of falsity that plaintiff points to in this regard demonstrates why this is the case. Plaintiff argues that defendants' statements about the LCCP controls were false because "Sasol itself later admitted," presumably in its disclosure of the results of the internal review, that "Sasol maintained ineffective internal controls over the LCCP." Id. ¶ 174. While Sasol's alleged admission that its internal controls over LCCP were ineffective would render false and misleading a definitive statement that Sasol's controls were in fact effective, it is not clear how this statement renders defendants' optimistic descriptions of Sasol's efforts to institute effective controls false. Accordingly, the Court dismisses plaintiff's Rule 10b-5 claim insofar as it relies on this second category of alleged misrepresentations.

C. Scienter

Defendants next argue that even if the complaint has alleged some actionable misrepresentations that do not fall under the

PSLRA safe harbor, the Court should dismiss the complaint for failure to allege scienter. The PSLRA requires that a complaint alleging securities fraud "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). A complaint meets this standard "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324. The scienter requirement is met where a complaint alleges facts showing, inter alia, "strong circumstantial evidence of conscious misbehavior or recklessness." Blanford, 794 F.3d at 306. As indicated above, this standard is less stringent than the scienter required to avoid application of the PSLRA safe harbor. It follows that since, for the reasons above, the complaint avoids the safe harbor by alleging facts indicating that defendants' statements regarding the LCCP cost and schedule were knowingly false, the complaint alleges scienter for purposes of Rule 10b-5 more generally. The Court need not reach the question of scienter as to the latter category of alleged misrepresentations because, again as explained above, the complaint has not alleged with particularity why they were misleading.

IV. Defendants' Alternative Requested Relief

In the alternative to dismissal, defendants request that the Court "allow Defendants to depose Plaintiff's CWs and file a supplemental brief in support of their motion to dismiss." Deft. Mem. at 33-35. The Court is somewhat perplexed by this request, as it amounts to defendants requesting discovery at the very time that the PSLRA denies discovery. Moreover, while defendants cite to an unpublished and non-precedential Second Circuit case suggesting that a district court may in its discretion allow depositions of confidential witnesses to aid it at the motion to dismiss stage, Campo v. Sears Holdings Corp., 371 F. App'x 212, 216 n.4 (2d Cir. 2010), such a device is entirely unwarranted in a case such as this, where the CWs' testimony is corroborated by external evidence such as the internal review. Furthermore, while defendants suggest that the CWs' allegations are false and not made in good faith, they provide no basis for this suggestion beyond their own unsubstantiated assertions that "CW-1's allegations are utterly false." Deft. Mem. at 34. Accordingly, the Court declines to grant this alternative relief.

V.   Conclusion

For the foregoing reasons, the motion to dismiss is denied as to defendants Sasol, Constable, Nqwababa, Cornell, Victor, and Schoeman insofar as it relies on alleged misrepresentations related to the estimated costs and schedule of the LCCP. The

motion to dismiss is granted as to defendant Grobler, as well as with regard to any alleged misrepresentation regarding the effectiveness of Sasol's internal controls over financial reporting and management of the LCCP.

The remaining parties in this matter should meet and confer and prepare a proposed case management plan in accordance with the Court's Form D that ensures the case is ready for trial by March 1, 2021. The parties should submit this proposed case management plan by close of business on August 27, 2020. If the parties cannot agree on a plan or if the Court is unsatisfied with any provision of the proposed case management plan, the Court will convene a telephonic conference to discuss the plan.

SO ORDERED.

Dated:    New York, NY

August 24, 2020                                    JED S. RAKOFF, U.S.D.J.