k8k2CohA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DAVID COHEN; and CHAD LINDSEY
MOSHELL, Individually and on
behalf of all others similarly
situated,

              Plaintiffs,        New York, N.Y.

          v.              20 Civ. 1008 (JSR)

SASOL LIMITED, et al.,

              Defendants.

------------------------------x    Teleconference

                             August 20, 2020
                             4:00 p.m.

Before:

              HON. JED S. RAKOFF,

                       District Judge

                  APPEARANCES

HAGENS BERMAN SOBOL SHAPIRO, LLP
     Attorneys for Plaintiff Cohn
BY:  LUCAS E. GILMORE
     STEVE W. BERMAN
     JERROD PATTERSON

POMERANTZ LLP
     Attorneys for Plaintiff Moshell
BY:  JOSEPH A. HOOD, III
     JEREMY A. LIEBERMAN

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

k8k2CohA

APPEARANCES
(continued)


LEVI &  KOVINSKY, LLP
     Attorneys for Movant Bagley
BY:  SHANNON L. HOPKINS


GLANCY PRONGAY & MURRAY, LLP
     Attorneys for Movant Saratoga
BY:  CASEY E. SADLER
     GREGORY B. LINKH


FINKELSTEIN & KRINSK, LLP
     Attorneys for Movant Saratoga
BY:  JEFFREY R. KRINSK


GLANCY BINKOW & GOLDBERG, LLP
     Attorneys for Movant Saratoga
BY:  KEVIN F. RUF


WEIL GOTSHAL & MANGES, LLP
     Attorneys for Defendants
BY:  JONATHAN P. POLKES
     CAROLINE J. HICKEY ZALKA

k8k2CohA

THE COURT:  This is Judge Rakoff.  Would counsel please identify themselves.

MR. BERMAN:  Good afternoon, your Honor.  Steve Berman and Lucas Gilmore on behalf of the lead plaintiff.

THE COURT:  Anyone here for the defense?

MR. POLKES:  Your Honor, yes, this is Jonathan Polkes from Weil Gotshal.  I'm with my partner, Caroline Zalka.  We represent all the defendants.  And with me at the virtual counsel table is someone from counsel's office at Sasol, Jens Straatman.

(Court and court reporter confer)

THE COURT:  All right.  So this is the argument on the defendants' motion to dismiss.  I should probably make clear at the outset that I do not expect oral argument to be a recitation of the many points and arguments already made in your briefs.  The purpose of the briefs was to set that all out in more than adequate length.  And so why do we have oral argument?  We have oral argument so that if, on the part of the moving parties, they think there is some point that they didn't have as much opportunity as they would have liked to develop and want to develop at greater length or some point, frankly, that they maybe didn't emphasize particularly in their papers but now think they ought to emphasize more, they may do so.

And on part of the plaintiffs, it is that same

opportunity, plus responding to anything that was in the reply papers of the moving parties that they didn't feel they had adequately dealt with in their own prior papers or anything they want to say in response to the arguments now being made by defense counsel.

So while I am not going to set time limits, I can't imagine that, for those limited purposes, moving counsel would need more than 15 minutes initially, ditto for plaintiffs' counsel in response, and maybe we will have time for very brief rebuttal and surrebuttal.

So let me hear first from moving counsel.

MR. POLKES:  Thank you, your Honor, this is Jonathan Polkes from Weil.  Hopefully you can hear me better than before.

THE COURT:  Yes.

MR. POLKES:  Your Honor, I had no intention of repeating the arguments in our brief.  There is one aspect of -- that I would like to emphasize, and although it is in our brief, I don't think we did it -- now that I sort of understand the whole case and see the picture from the other side, I think the chronology here is critically important to sort of -- I think it's the key to the case in terms of analyzing the CW allegations and the 2019 report.  So if I could spend five or ten minutes, no more than that, discussing the chronology and --

k8k2CohA

THE COURT:  Go ahead.

MR. POLKES:  -- then after that I would like to focus on why I do think it is the key to sort of analyzing this.

The first budget process was done in 2014 for the LCCP project, and it was announced that the $8.9 billion number in October of 2014 stayed the same.  It was repeated twice in 2015.  But in March of 2016, after a year of exceptionally high rainfall, Sasol actually announced the schedule was late and that they thought the budget was under pressure and they were going to do a deep dive.  So there was a subsequent announcement over the summer that the number was going to increase, and ultimately, in August of 2016, they announced that it was going to -- sort of finally going to be 11 billion.

That review, that deep dive that was done in 2016, was done together with the subcontractor for or particularly their joint venturer FTI, Fluor Technip, that was the contractor working on the entire project, and it was independently audited.  We mention in our brief there were 60,000 separate line items.  It is all in the disclosures which we have cited in our brief.  I won't repeat them.  But it was an extremely formal and elaborate process with modeling, assumptions were explained, benchmarking against progress, they at that point had a significant amount of progress under their belts, and the new number was announced.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

It stayed that way with some minor changes until 2019, and it was noncontroversial in the sense that there were no lawsuits that were brought.  No one alleged fraud at that time.  Everything sort of stayed as it was.  It wasn't until there was a subsequent review done in 2019 -- and that's the one that has a lot of the language that's quoted extensively in the demonstrative that was submitted to your Honor yesterday from paragraph 215 of their complaint -- that presumably that's what triggered this lawsuit.  However, that 2019 review was for an extremely limited purpose and extremely limited period, and I don't think that's been made sufficiently clear in our papers or in the other side's papers.

In 2019, what happened was, in February of that year, there was an announcement that there was going to be a revision to the budget, and the budget was going to move from slightly north of 11 billion at that point to 11.6 to 11.8 billion.  But under three months later, they announced that there actually was going to be 12.6 to 12.8 billion.  So there was a billion dollar discrepancy that had arisen and been announced within a three-month period.  It was that discrepancy which triggered the review.  That's what all the public disclosure documents state, and no CW or no one else contradicts that.

THE COURT:  Just so I am clear, when they announced the increased budget of $11 billion in June of 2016, did not the company say that this figure was a "worst case type of

k8k2CohA

scenario."

MR. POLKES:  They said that's what they believed based on the review that was done with the subcontractor and based on the auditor and based on the modeling, but they were still years away from --

THE COURT:  Well, I mean, the question is -- what they thought is a different question and a question we will need to come to when we get to scienter, but I just want to make sure I understand --

MR. POLKES:  That's correct, yes.

THE COURT:  -- what was said.  Yes.

MR. POLKES:  Yes, that's correct.

THE COURT:  Not withstanding that, they increased it to -- modestly, but still somewhat, in November of 2017 and February of 2019 and then made a big jump that you just referred to in May of 2019.

MR. POLKES:  That's correct.

THE COURT:  So if the statement worst case type of scenario was made falsely, that's all plaintiffs would have to show, right?

MR. POLKES:  If they -- yes, I agree that that would be helpful to them if they could show that there was no basis for that belief at the time or that it was made without forward-looking protective language, because clearly that would be a forward-looking statement, I think.  And so even if it was

merely accompanied by cautionary language, that alone would insulate them under the safe harbor, and that would be an independent basis, I think, for that to be nonactionable. Separately and independently of that, they would have to have allegations of fact that tended to show that it was made with actual knowledge of falsity, that it was in fact not going to stay at 11 billion as a worst case scenario. But that would be separate and apart from the cautionary language.

THE COURT: So --

MR. POLKES: And I don't think that's what they say. I'm sorry to interrupt, Judge. I was going to say, in the chart that they provided yesterday, which I was going to go through afterwards, one has to sort of figure out exactly what it is they are saying are the false statements, but I don't think that that is the focus, based on what the CW said, but I could turn to that in a second.

THE COURT: So then they say, based on CW statements, that that they received a contractually binding change order from Fluor in February 2016 that confirmed that Fluor's costs would be at least 11.7 billion. That is before they made the announcement in June 2016 that we have just been referring to.

MR. POLKES: That is true, but I think what is important about -- everything you just said, Judge, is an accurate reflection, as I understand it, of what the allegations are. But I think the point here is that CW-1 says

that that change order arrived in February of 2016.  In March of 2016, Sasol announced its review.  Its review was fully participated in by Fluor.  So there is a fundamental problem with the allegation.

The allegation is that Fluor sent a change order that was contractually mandatory and that in fact the costs, no matter what happened, now are going to be 11.7 billion.  And yet just a month later, actually less than 30 days later, Sasol announces it is going to do a review which includes Fluor as well as these independent auditors, and then a few months later, Fluor -- Sasol announces the result of that review in which Fluor fully participated as 11 billion.  So there is a fundamental problem with the nature of the allegations.

THE COURT:  That sounds like a factual dispute, not an argument about the adequacy of the allegations.

MR. POLKES:  The reason I think that -- two answers to that, Judge.  There is no factual dispute that there was a three-month review in 2016 of the budget that included Fluor. I don't think there is a factual dispute about that.  And no CW says otherwise.  Nor does any CW have anything to say about the integrity of that review.  No one -- CW-1 didn't participate in it, didn't know --

THE COURT:  Where is that in the complaint?

MR. POLKES:  It is a publicly -- it is in a publicly disclosed document that's referenced in the complaint.

k8k2CohA

THE COURT:  All right.

MR. POLKES:  And we put it into the record and no one has challenged it.  It is unchallenged that Fluor participated in a review -- in the 2016 review which resulted in the $11 billion revised budget.  To the extent that's true -- and, again, it is unchallenged, publicly disclosed and unchallenged and part of the record -- CW-1's allegation simply doesn't make sense.

CW allegations are supposed to be -- I say this, you know, based on my time in court, but there is a notion that CW allegations need to be scrutinized very carefully, because it is very easy to get people -- disgruntled former employees or whoever -- to say things out of context.  And this is a particular allegation which simply on its face, on the four corners of the documents, based on what we know from the public record, literally doesn't make sense.  And when you couple that with the fact that CW-1 didn't work for Sasol, didn't work for Fluor, but worked for a subcontractor of Fluor and had no participation in the review that Fluor itself participated in when Fluor was supposedly the entity that gave this mandatory change order, he literally has no idea what he is talking about, again, when one scrutinizes it.

So that's why I think that it is not a matter of sort of just blindly accepting the allegations, but they have to be scrutinized and weighed and measured.  And this particular

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

allegation, absent some explanation or some detail or some missing piece, literally doesn't make sense based on the publicly available facts.

THE COURT:  Wasn't there also, as subsequently disclosed by Sasol in October 2019, the results of an independent review that complain not only about errors and inaccuracies in these estimates, but also inappropriate conduct and improper tone at the top, including an excessive focus on maintaining cost of the schedule estimates at the expense of providing accurate costs and schedule estimation?  What about that?

MR. POLKES:  That is, again, all accurate based on the allegations in the complaint, your Honor, and I would like to make two statements about that -- one with regard to the scope of that review and the second with regard to what it shows with regard to knowledge of falsity.  And in connection with both, your Honor, I note that all of that is quoted extensively in paragraph 215 of the complaint and a demonstrative chart that the plaintiff submitted yesterday.

But I noted, when preparing for today's argument, that the actual document itself, which is an October 6-K in which all of this is contained, was not made part of the record, and I think it is very important that it be made part of the record, and I asked the plaintiffs for consent before this call and suggested that I would like to ask your Honor for

k8k2CohA

permission -- I have the consent of the plaintiffs -- to submit it as Exhibit Y.  If I was in court, I would hand it up to the court, but we would send it electronically after this.

The point I wanted to make is that it is clear, when one looks at that report, that it was -- that all the statements that your Honor made -- first of all, that all the statements that your Honor made pertain to the discrepancy between the February 2019 budget estimate of 11.6 to 11.8 and the 12.6 to $12.8 billion estimate that was made less than three months later, and that's what triggered the independent review.  And you can see from the face of the actual disclosure itself that that is the entirety of the time period that it was focused on.

THE COURT:  Yes, but I'm not so sure how far that carries you on a motion to dismiss.  In other words, what we have here, as I understand the allegations, is a constantly moving target, where the costs and estimates keep getting larger and larger, and what you are saying, it sounds like, forgive me, is that, oh, this was the most unlucky company in the world.  They never set out to make false or misleading estimate costs, and they didn't conceal information they had that would have revealed higher costs.  They just had this problem arose, that problem arose, a third problem arose, and when someone issued a report that was negative, it was only about the fifth problem.  Why shouldn't I be looking at the

entirety of that history and saying, well, it is certainly enough to get through past a motion to dismiss?

MR. POLKES:  Because the statements that are being allegedly demonstrated as false by reference to that 2019 report had nothing to do with the 2019 report.  That's my answer.  If one looks at the demonstrative that was submitted yesterday, that 2019 report and quotes from it are used throughout as evidence.  But all the statements -- for example, there is one on page 2 of the demonstrative.  I don't know if the court has it handy, but this goes to the issue that --

THE COURT:  Well, and I say this with apologies to plaintiffs' counsel, it took me a long time to get through the excellent briefs from both sides in this case, so I wasn't going to waste my time on a demonstrative.  So I haven't looked at it and don't intend to look at it.  And even if they had handed it up in open court, I wouldn't be looking at it.  But I am perfectly happy, I think you are right, if the quotes that they are referring to come from an 8-K, I should take a look at the entire 8-K.  So you may definitely, right after our oral argument, send me the 8-K.

MR. POLKES:  Thank you, your Honor.

And here is the point I was trying to make in answer to your Honor's concern.  The statement that the plaintiffs assert was false in this particular example is that the $8.9

k8k2CohA

billion budget was being reiterated as on track in 2015, and then, as evidence that that statement is false, they refer to the 2019 report.  But as I mentioned, the 2019 report did in no way look back at the $8.9 billion budget, opine on what was happening in 2015 or 2016 or 2017, for that matter, and so there is a sort of an apples and oranges or a sort of a confusion going on.

I take your Honor's point that there is a holistic aspect to the analysis, but I still think it is very important to sort of unpack what statements we are talking about and what time or we end up in a world of puzzle pleading, where they sort of just throw everything into the kitchen sink and just sort of you know -- and then there is no need for any analysis, and I think that there is.

In other words, all the statements your Honor made about tone at the top and management controls had nothing to do with what the plaintiffs were asserting were false statements in 2015 or '16, and they did have to do with this one particular issue.

Now with regard to the particular issue, which was that billion-dollar discrepancy I mentioned in 2019 which, as I say, was the sole focus of the report, it is very clear from the report itself, which is all in the record, and including from an admission in the plaintiffs' brief, that the report says it uncovered all of these things for the first time.  And

so as bad as it sounds in terms of where there being smoke, you know, management control issues do not equal fraud.  That is sort of a fairly well-trod concept, and it finds and identifies management control errors.  There were problems with people reporting information up.  But the whole nature of all of those disclosures is that good information was not rising to the level of the people who were making the public statements, and I respectfully submit that nowhere in the amended complaint does it say anything about people at the top being aware of the problems before that 2019 report was issued.  So I --

THE COURT:  All right.

MR. POLKES:  Yeah.

THE COURT:  That's very helpful.  We have gone, I think --

MR. POLKES:  Okay, thank you, Judge.

THE COURT:  -- 20 minutes of our 15, but that's fine. I interrupted you frequently.

MR. POLKES:  Thank you, your Honor.

THE COURT:  So let me hear from plaintiffs' counsel.

MR. GILMORE:  Yes, your Honor.  Lucas Gilmore on behalf of the lead plaintiff.  I will also let you know that I am told that the lead plaintiff, David Cohn, is also listening in.

I wanted to take the time just to clarify one issue that wasn't clear in the papers, and then I will respond to

k8k2CohA

defense counsel's arguments.

One thing that we want to make clear is that we allege two categories of false statements.  The one are what we spent a bit of time talking about, the cost and construction estimates.  The other, which there was silence in defendants' papers about, are the defendants' control statements, and that is controls over their financial disclosures as well as the defendant --

THE COURT:  Well, I didn't see -- maybe I missed it in your brief complaint -- anything like the detail of that second category that I saw with respect to the first category.

MR. GILMORE:  Well, your Honor, I would point you to our CW allegations, where the CW-1 talks about, in 71, paragraph 71 and 72, about the deceptive accounting.  CW-4 talks about the shell game with deceptive accounting that they are doing with the contingency.  CW-4 talks about how management was instructing to reduce the book value of work already performed.  And then we even have CW-6, who points out defendant Schoeman, an undisputed control officer here and a speaker, was deliberate -- was instructing deliberate misconduct to decouple the LCCP's construction schedules from its commission or start-up schedules to falsely show that the LCCP was on track.

So certainly the CWs show the contemporaneous knowledge about the internal controls.  It is undisputed that

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

k8k2CohA

the internal control statements are statements of present fact. They are not shielded by the safe harbor and it's not a forward-looking statement. I am happy to go into it further, but we think that we have met with scienter. And the first start of that inquiry over scienter is looking at the board's findings.

Now, defense counsel has an interesting view on what the board's findings were. While it is true that the board's findings were prompted by a billion-dollar increase over just three months, the actual findings weren't limited to that three-month time frame. Nor is it plausible that it could be. Nor is that how the market understood it.

So the board found that these weren't innocent errors or mismanagement, as defense counsel said. The board found that there were errors and omissions and inaccuracies in the LCCP cost estimate that was attributable to "inappropriate conduct." And the board was clear that this was not a rogue, singular employee, but it was caused by an improper tone at the top.

And you look further at the remediations that were implemented. They are specifically directed towards --

THE COURT: Maybe I didn't make this clear, the point I was trying to ask you about with respect to the second group of allegations. It is not enough simply to say that there may have been in fact inadequate internal controls. What you

k8k2CohA

allege is that there were intentional misrepresentations regarding internal controls.  You say in your brief, for example, that "throughout the class period, Sasol affirmed the effectiveness of its internal controls over financial reporting and touted its controls, processes, and oversight," but at least on a first reading -- and I am obviously going to go back and read everything that the parties have submitted again before making a decision, but as a first reading, the only statements that I saw that you cite with reference to the second group is the statement, defendants' statements that Sasol had "experienced owner's team in place to oversee the project," "that cost control remains a primary focus for the team," and that "the management team remains closely involved in guiding the project team."  That seems to me much vaguer and less subject to the kinds of requirements that are required in this kind of case for a survival of the complaint as compared to things like specific cost projections and statements that this is a worst case scenario and so forth.

So but if I missed it, were there other misrepresentations in the second group that you are relying on?

MR. GILMORE:  Yes, your Honor.  Just for the record, I can point them out.  Those misrepresentations would cover paragraph 128, which are the controls over the financial reporting, typical Sarbanes-Oxley type disclosures, and then

k8k2CohA

there are repeated statements about the operational control processes and oversight over the LCCP, which are paragraphs 131-32, 137, 147, 153-54, 160, 162, 172, 175, and 178.  I don't want to take the time, I don't think it is necessary to go over there -- over each one of them.

THE COURT:  No, but the ones I just read to you were from paragraphs 131, 140, 147, 153, 154, 161, and 162.  I will certainly now go back and look at the other ones you mentioned, but at least the ones that I quoted, which included about half of the ones you just cited, seem to me of a different vagueness than the ones you are relying on in the first group.

MR. GILMORE:  Understood, your Honor.  However, I think it has to be viewed in context.  They are saying throughout the class period that they have designed financial controls, that they have also designed controls over their project.  They then supplement those statements by talking about the management team that's in place, that's closely involved and that's guiding the project, about the safety, and those are false and misleading statements because they are omitting and concealing facts.  The fact of the matter is that -- and those facts were ultimately revealed in the board of directors' findings, the talking about the systemic internal control weaknesses that they had, and then it is then filled in by the CW statements that talk about management's knowledge of cost overruns and delays, management's knowledge and active

k8k2CohA

participation in deceptive accounting, yet their public statements to investors are affirming internal controls and the effectiveness.

Back to the first set of statements, the cost estimates, I also believe that that category of statements is being mischaracterized.  This is not a case where the defendant was simply publishing its estimate to investors.  It published specific dollar amounts and schedules and then coupled that with present facts by saying that they were on track, that they were tracking with this cost and construction schedule.

And I submit that throughout -- counsel spoke about the chronology with our CWs.  They show that throughout the entire time, the entire class period, that the amount that was reported, in terms of cost and in terms of when it was going to be completed, was misrepresented from the outset when they said that it was going to be 8.9 billion.  It was socialized and it was communicated to each of the executive defendants and it was communicated down to individuals on the project that it was going to be 11 billion.

And then we then go through and we speak about the Fluor order, change order, which set it at a minimum 11.7 billion in February of 2016.  Yet Sasol doesn't tell the market that until approximately summer of 2016 and then reiterates -- what they tell the market is it is 11 billion, so it is 700

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

million understated, and they say that that's at the top, absolute worst.

THE COURT:  Well, you allege, based on statements from one or more CWs, that the Fluor -- there was a contractually required payment of Fluor of 11.7 billion, or words to that effect, and your adversary says that there is no basis for that, as shown by the fact that Fluor then participated in the review that led to numbers inconsistent with that.  So what about that?

MR. GILMORE:  Yes, your Honor.  That is a counter-narrative, and at trial, if defendants are able to show that, that is their defense.  However, at this stage the court can take judicial notice.

THE COURT:  I guess my question is a little bit more narrow.  Have you seen the alleged contract that Fluor had a contractually binding payment due of 11.7 billion?

MR. GILMORE:  Your Honor, no, I have not.  However, CW-1 provides a very detailed account about how he saw it.  He explains how he would be in a position to see it.  He also explains how, in numerous different ways, the executive defendants would see it, and then it is then corroborated as the events play out and culminated through the board of directors's findings.

And so while the court can take judicial notice that Sasol said that they did a review alongside Fluor, you don't

k8k2CohA

accept the truth of that, that Fluor and --

THE COURT:  Remind me --

MR. GILMORE:  -- parties agreed upon.

THE COURT:  Remind me what the background or you say this CW was in a position to see the contract.  Remind me of who that CW was and why he was in that position.

MR. GILMORE:  Yes.  So CW-1 served as a senior engineer for LCCP -- that's the project -- from early fall 2015 to July 2016 as a subcontractor for Fluor.  He worked in Sasol's Houston office and was consistently on site at Lake Charles.  He was familiar with the way -- he actually used Sasol's proprietary system for payments and cost forecasting and would provide direct -- or indirect cost reports.  So he explained in detail how he had access to that site.  He then explains that he saw the $11.7 billion change order, and then explains the falsity of --

THE COURT:  How did he know it was legally binding?

MR. GILMORE:  He knew it was legally binding by virtue of the agreement that Fluor, as an engineer, had with Sasol, which is corroborated by other CWs, I believe also CW-5, that they had a very -- what -- what our CWs have explained was unusual for a megaproject, and that it was a reimbursable contract, where whatever Fluor time and materials they were going to be reimbursed.

And that's part of the internal control problems that

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

k8k2CohA

we have.  We have management that was leading the project that had no experience in dealing with these megaprojects and allowing Fluor to basically take control of costs and time and then no real way of holding Fluor accountable, and that's why you have these other CWs, like CW-3, explain the labor inefficiencies and change orders that were dramatically increasing the cost and showing how --

THE COURT:  Okay.

MR. GILMORE:  -- they were not on track.

THE COURT:  Thank you.

So once again, despite my best intentions, I have interrupted you so often that we have now gone about 20 minutes for you as well.  But is there anything else you wanted to cover this afternoon?

MR. GILMORE:  No, your Honor, unless you had further questions.

THE COURT:  No.  That's very good.

Let me hear a brief rebuttal from defense counsel.

(Pause)

THE COURT:  Hello?  I think you are on mute.

MR. POLKES:  I was on mute, your Honor.  Sorry.

Your Honor, on paragraph 67 of the complaint, which is the change order story, there is actually an interesting shift in perspective in the middle of the paragraph.  It starts where CW-1 is quoted as saying it was going to be 11.7 billion.  But

k8k2CohA

then there is no quote and no attribution to the rest of the paragraph, which says the cost of the project is straightforward, there was no basis for Sasol to renegotiate or bargain down the price Sasol was contractually obligated to pay.  It is not a quote.  It doesn't say CW-1 said this.  It is a separate sentence.

Now, I don't know if that is deliberate or otherwise, but it is a profound weakness in the allegation because, as your Honor noted, this guy or gal, CW-1, worked for a subcontractor to the contractor, was involved in something called processing invoices for indirect costs, including OSHA compliance.  There is no reason why this person would have had any visibility into the actual budgeting process.  This person claims to have seen something called the change order, but then, as I say, it shifts perspective, and there is a statement made in the complaint with no attribution that it was mandatory and couldn't be renegotiated.  And I think that is a significant weakness.

And to the extent that I just heard CW-5 corroborates the change order story, I think your Honor will see, if you look at the complaint, that's simply not true.  CW-5, who is on pages 36 and 37 of the complaint, and paragraphs 95 -- it's one paragraph, actually, paragraph 95, says nothing whatsoever about a change order, has no idea what it is, doesn't say anything about the budgeting process.

k8k2CohA

And to the extent your Honor does think that this is a material issue, I heard the defendants -- excuse me, the plaintiffs just say, well, if they can prove that at trial, that's fine. But as your Honor knows, if we lose the motion to dismiss and have to proceed to discovery, it is going to be millions of dollars and many months from now before we are able to do that. And for that reason, I would ask -- renew the request in our brief that if your Honor has any real concerns about this, I think there is a high degree of confidence based on the weakness of these allegations that if we challenge CW-1 in a deposition, there will be very little, if any, substance to these allegations, and in particular this one thing about what he knew about the contract and this change order being mandatory or not. So we would ask that in the alternative, your Honor.

THE COURT: I am curious about that alternative because -- are you saying, for example, if you depose CW-1, and he said, I saw that change order and it says X, Y, and Z, and then the plaintiffs' counsel said, We ask for production of that change order, and your response is, Oh, no, discovery hasn't yet begun except for this limited discovery of deposing the CWs, that seems out of whack to me.

MR. POLKES: I understand, your Honor. It is clearly unorthodox. It's been done a handful of times in the Southern District. As I say, the rationale seems --

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

k8k2CohA

THE COURT:  As everyone knows, there is no accounting for the Southern District.

MR. POLKES:  Yeah, no, I'm -- you know, I have never done it before, your Honor, and actually I have never asked for it before, but I am aware of it, and this just struck me as a case where this just seems like such a sort of concocted allegation that is so plainly false on its face, it can't be right, and I can't believe that the CW is actually going to say he even knew about it.  And now, as I say, I am focused, because of this argument, I am looking at paragraph 67, where there is this very conspicuous change in speaker, where there is actually no attribution to the particular allegation.

THE COURT:  Let's find out.  Let's go -- because we are running out of time, let's go back to plaintiffs' counsel.

So is all of that paragraph coming from CW-1 or just portions of it?

MR. GILMORE:  All of that paragraph is the CW statement, and we were careful in providing it to the court.  That is the CW's statement.  We confirmed it.

Also, your Honor, just so I'm clear, to clarify the record, when I said CW-5, I meant CW-2 at paragraph 77, where he says, "Fluor and Technip were paid on a time and material basis regardless of progress.  They had limited risk with respect to timely completion of the project."

THE COURT:  But I just want to be absolutely sure.

k8k2CohA

Your representation is that CW-1 told you that he had seen this change order and that he saw from it and from other documents he had seen that it was a binding order.  Do I have that right?

MR. GILMORE:  Your Honor, to be exactly correct, it would be told a colleague in our firm, but, yes, we -- yes.

THE COURT:  Okay.  All right.

I know there are a hundred other issues that we could discuss, but I will, as I always would, but particularly in an interesting case like this, go back and reread everything before making a decision, and of course under the PSLRA, everything is on hold until I make that decision.

I would normally set myself a deadline, but things are a little uncertain because of the pandemic in particular.  My court is still struggling with exactly when we will begin jury trials or not.  But I will say this:  Under any set of circumstances, I am sure I will have a decision for you by the end of September.  I hope to have it considerably sooner than that, but I can't guarantee that.  But I will have a decision for you, worst case, by the end of September.

What I may do is try to get you a bottom-line order sooner, so you will both be held in suspense as to the bottom line with opinion to follow, but it would still -- everything will continue to be stayed until the opinion issued.

So I thank counsel for both sides for what I thought

k8k2CohA

was excellent argument.

I will take this matter *sub judice*, and that's the end of this argument.

Thank you very much.  Bye-bye.

MR. GILMORE:  Thank you, your Honor.

MR. POLKES:  Thank you, your Honor.

(Adjourned)