UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHAD LINDSEY MOSHELL, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SASOL LIMITED, DAVID EDWARD CONSTABLE, BONGANI NQWABABA, STEPHEN CORNELL, PAUL VICTOR, and STEPHAN SCHOEMAN,<br><br>Defendants. | Case No. 1:20-cv-01008-JPC<br><br>CLASS ACTION<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES, AND APPOINTMENT OF CLASS COUNSEL** |

010886-11/1344703 V1

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ..............................................................................................1

II.   STATEMENT OF ALLEGATIONS AND FACTS..........................................2

III.  LEGAL STANDARD.......................................................................................8

IV.   ARGUMENT....................................................................................................9

     A.    The proposed Class satisfies Rule 23(a). ..............................................9

          1.    Plaintiffs satisfy the numerosity requirement. .............................9

          2.    Questions of law and fact are common to the Class. ..................10

          3.    Plaintiffs' claims are typical of Class members' claims............11

          4.    Plaintiffs will fairly and adequately protect the interests of
the Class. ....................................................................................12

     B.    The proposed Class is ascertainable. ...................................................13

     C.    The proposed Class satisfies Rule 23(b)(3). ........................................13

          1.    Common questions of law and fact predominate for the
Class claim against all Defendants under section 10(b) of
the Exchange Act and Rule 10b-5. .............................................13

              a.    Plaintiffs and the Class are entitled to a presumption
of reliance under the *Basic* fraud-on-the-market
theory. ..............................................................................14

                   (1)    *Cammer* 1—trading volume. .............................17

                   (2)    *Cammer* 2—analyst coverage. ...........................17

                   (3)    *Cammer* 3—market makers. ..............................18

                     (4)    *Cammer* 4—eligibility to file SEC
registration Form S-3. ........................................18

                     (5)    *Cammer* 5—price reaction. ...............................19

                     (6)    *Krogman* 1—market capitalization....................21

                     (7)    *Krogman* 2—bid-ask spread. ............................21

010886-11/1344703 V1

(8)    *Krogman* 3—stock float.......................................................22

    b.    Damages will be calculated using a common methodology that is consistent with the classwide theory of liability...........................................................22

    2.    Common questions predominate for the claim under section 20(a) of the Exchange Act against all Defendants except Sasol.....................................................................................23

    3.    A class action is superior to other available methods for the fair and efficient adjudication of this action. ............................................24

    D.    Hagens Berman should be appointed as Class Counsel under Rule 23(g).................................................................................................................25

V.    CONCLUSION.................................................................................................................25

010886-11/1344703 V1

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*In re Alstom SA Sec. Litig.*,
253 F.R.D. 266 (S.D.N.Y. 2008) ...................................................................................18

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) .............................................................................................2, 8, 12

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013) ..................................................................................... *passim*

*Arkansas Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
955 F.3d 254 (2d Cir. 2020) .......................................................................................8

*Arkansas Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*,
879 F.3d 474 (2d Cir. 2018) ................................................................................14, 15

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ........................................................................................23

*In re Bank of Am. Corp. Sec., Deriv. & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
281 F.R.D. 134 (S.D.N.Y. 2012) ................................................................................9

*In re Barrick Gold Sec. Litig.*,
314 F.R.D. 91 (S.D.N.Y. 2016) ...........................................................................11, 22

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) .........................................................................................14, 16, 17

*Brown v. Kelly*,
609 F.3d 467 (2d Cir. 2010) ......................................................................................13

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ..................................................................... *passim*

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ........................................................11

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) .............................................................................................8, 14

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
312 F.R.D. 332 (S.D.N.Y. 2015) ...............................................................................13

- iii -

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009)...........................................................................................12

*Fogarazzo v. Lehman Bros. Inc.*,
    263 F.R.D. 90 (S.D.N.Y. 2009) .................................................................................9, 13

*Gruber v. Gilbertson*,
    2019 WL 4439415 (S.D.N.Y. Sept. 17, 2019)...........................................................11

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)....................................................................................................8, 15

*Hevesi v. Citigroup Inc.*,
    366 F.3d 70 (2d Cir. 2004)...........................................................................................11

*Johnson v. Nextel Commc'ns Inc.*,
    780 F.3d 128 (2d Cir. 2015).........................................................................................10

*JPMorgan Chase & Co. Sec. Litig.*,
    2015 WL 10433433 (S.D.N.Y. Sept. 29, 2015)........................................................23

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) ........................................................16, 17, 21, 22

*Lapin v. Goldman Sachs & Co.*,
    254 F.R.D. 168 (S.D.N.Y. 2008) .................................................................................24

*McIntire v. China MediaExpress Holdings, Inc.*,
    38 F. Supp. 3d 415 (S.D.N.Y. 2014)..................................................19, 20, 21, 22

*In re Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.*,
    2013 WL 396117 (D.N.J. Jan. 30, 2013)....................................................................23

*In re MF Global Holdings Ltd. Inc. Litig.*,
    310 F.R.D. 230 (S.D.N.Y. 2015) .................................................................................24

*Nguyen v. Radient Pharms. Corp.*,
    287 F.R.D. 563 (C.D. Cal. 2012),................................................................................21

*In re Petrobras Sec. Litig.*,
    312 F.R.D. 354 (S.D.N.Y. 2016) .................................................................................20

*In re Petrobras Sec. Litig.*,
    862 F.3d 250 (2d Cir. 2017)...........................................................................13, 15, 24

*Pirnik v. Fiat Chrysler Autos., N.V.*,
    327 F.R.D. 38 (S.D.N.Y. 2018) ...................................................................................17

- iv -

010886-11/1344703 V1

*Saravia v. 2799 Broadway Grocery LLC*,
    2014 WL 2011720 (S.D.N.Y. May 16, 2014) ........................................................................9

*Scheufele v. Tableau Software, Inc.*,
    2020 WL 2553100 (S.D.N.Y. Feb. 13, 2020).........................................................................10

*In re SCOR Holding (Switz.) AG Litig.*,
    537 F. Supp. 2d 556 (S.D.N.Y. 2008).....................................................................................25

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2019 WL 3001084 (S.D.N.Y. July 10, 2019) ...................................................................10, 17

*Strougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. 2016) .............................................................................14, 15, 19

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016).............................................................................................................10

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001)....................................................................................................12

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017)................................................................................................16, 22

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011).................................................................................................................11

*Wallace v. IntraLinks*,
    302 F.R.D. 310 (S.D.N.Y. 2014) ......................................................................................17, 23

*Wilson v. LSB Indus., Inc.*,
    2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018)...................................................................15, 21

*In re Winstar Commc'ns Sec. Litig.*,
    290 F.R.D. 437 (S.D.N.Y. 2013), ...........................................................................................18

*In re WorldCom, Inc. Sec. Litig.*,
    219 F.R.D. 267 (S.D.N.Y. 2003) ............................................................................................12

010886-11/1344703 V1

## I.    INTRODUCTION

This securities action is ideally suited for class certification under Rule 23 of the Federal Rules of Civil Procedure. As Judge Rakoff explained in ruling on Defendants' motion to dismiss, the "gist of the allegations is that between March 10, 2015 and January 13, 2020, defendants made numerous misrepresentations concerning Sasol's construction of an ethane cracker and derivatives complex in Louisiana, known as the Lake Charles Chemicals Project (the 'LCCP')." Memorandum Order, Aug. 24, 2020, ECF No. 74, at 1. Judge Rakoff ordered that "the motion to dismiss is denied as to defendants Sasol, Constable, Nqwababa, Cornell, Victor, and Schoeman insofar as it relies on alleged misrepresentations related to the estimated costs and schedule of the LCCP." *Id.* at 25.

Plaintiffs move for certification under Rule 23(a) and (b)(3) of a class ("Class") of all persons or entities who purchased or otherwise acquired publicly traded Sasol Limited American Depository Receipts during the period from March 10, 2015, to January 13, 2020, inclusive, and were damaged thereby.[1] Plaintiffs seek certification of the Class for a claim against all Defendants under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, and for a claim against all Defendants except Sasol Limited ("Sasol") under Section 20(a) of the Exchange Act.

The Rule 23 requirements are met. Numerosity and commonality are satisfied because the proposed Class comprises many thousands of investors whose claims involve multiple common questions capable of classwide proof, including whether Defendants made classwide misstatements and omissions. *See* Rule 23(a), (b). Typicality and adequacy are met because Plaintiffs: (i) assert the same claims based on the same misconduct by Defendants as proposed

---

[1] Excluded from the Class are Defendants, the officers and directors of Sasol Limited, all entities in which any Defendant has or had a controlling interest, and the legal representatives, members of immediate families, heirs, successors, or assigns of any excluded person or entity.

010886-11/1344703 V1

Class members; (ii) have actively prosecuted this action, including opposing the motion to dismiss; and (iii) have no conflicts with Class members. *See* Rule 23(c), (d). And under Rule 23(b)(3), common issues predominate because this case concerns classwide questions that will be answered on a classwide basis. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("Predominance is a test readily met in certain cases alleging consumer or securities fraud…."). In particular, individualized issues of reliance will not predominate, because the fraud-on-the-market presumption of reliance applies. *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 467 (2013) ("The fraud-on-the-market premise is that the price of a security traded in an efficient market will reflect all publicly available information about a company; accordingly, a buyer of the security may be presumed to have relied on that information in purchasing the security.").

Plaintiffs respectfully request that the Court certify the Class, appoint Plaintiffs as Class Representatives, and appoint Hagens Berman Sobol Shapiro LLP as Class Counsel.

## II.    STATEMENT OF ALLEGATIONS AND FACTS

Sasol is a leading global energy company based in South Africa best known for developing liquid fuels from coal. ¶¶ 6, 52.[2] The Company's ADRs, which each represent one Sasol ordinary share, are traded on the New York Stock Exchange under the symbol "SSL." ¶ 40.[3]

On October 27, 2014, Sasol announced the construction of an ethane cracker and derivatives complex in Lake Charles, Louisiana, dubbed the "LCCP." ¶ 57. Sasol claimed the LCCP's development would cost $8.1 billion. *Id.* Defendants claimed the "mega project" would convert Sasol into a chemicals powerhouse and transform the Company's fortunes. ¶¶ 54, 58-60.

---

[2] All references to "¶ _" are to the Second Amended Complaint for Violations of the Federal Securities Laws, ECF No. 81, unless otherwise indicated.

[3] Sasol's ordinary shares are listed on the Johannesburg Stock Exchange. Investments in those shares are not the subject of this motion.

010886-11/1344703 V1

Sasol had a public history of failing to disclose, and at times deliberately concealing, cost overruns and construction delays on past large projects. ¶ 61. Sasol's senior management was attentive to its representations regarding cost and timing of the completion of the LCCP. ¶ 62. Moreover, Sasol promised a well-run and efficient project, ensured through close oversight, project controls, and "a world-class roster of contractors" including Fluor and Technip. ¶¶ 10-13, 131.

On March 9, 2015, after close of market,[4] Sasol disclosed that the LCCP's development costs had increased from $8.1 billion to $8.9 billion. ¶¶ 101, 129; Ex. 2.[5] Defendants stated, however, that Sasol was "making steady progress with the advancement of" the LCCP, that "[s]ite preparation is underway," and that the LCCP "will achieve beneficial operation during the 2018 calendar year." Exs. 2-4.

In truth, Defendants knew—through contractor estimates, Executive Committee meetings, internal reports, and direct communications with project management team members—that the projected cost of the LCCP was well beyond $8.9 billion. ¶¶ 75, 81, 85, 89, 91, 94. According to well-placed former Sasol employees, cost estimates for the LCCP were at least $11 billion "from the beginning" of the project. ¶¶ 89, 94. The $11 billion cost estimate was the topic of extensive discussion among Sasol executives, including defendant Cornell. ¶ 94. The $11 billion figure was so widely accepted among Sasol senior management that $11 billion became "socialized" and universally understood by LCCP team members as the operative project budget. *Id.*

So Defendants knew that Sasol was neither "on track" nor making "significant progress" in terms of timing and costs for the LCCP's development. ¶¶ 75, 81, 85, 89, 91; Exs. 5-9. Rather,

---

[4] The Class Period begins on March 10, 2015, the first trading day after Defendants' allegedly false statements.

[5] All references in this memorandum to "Ex. _" or "Exs. _" refer to exhibits attached to the accompanying Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel.

010886-11/1344703 V1

the project was plagued with cost overruns, massive delays, and lack of labor productivity stemming from "inexperienced" and "incompetent" project management, such that the LCCP was nowhere close to mechanical completion in late 2017 with beneficial operation in 2018 at a cost of $8.9 billion. *Id.*; ¶ 214. A principal driver for these delays and exploding expenses was Sasol's agreements with Fluor and TechnipFMC, which paid them for time and materials spent on the LCCP, regardless of the progress on the project. ¶¶ 76, 81. As a result of the "unusual" arrangement, the contractors billed for their time even as no progress was being made. *Id.*

As costs mounted and construction puttered along, Defendants could not sustain their false cost and scheduling estimates. On June 6, 2016, Sasol announced that "the expected total capital expenditure for the [LCCP] could increase up to US$11 billion, including site infrastructure and utility improvements." ¶ 105; Ex. 10. Defendants explained that a slower rate of capital "resulted in an extended project schedule and contributed to further project cost increases," and consequently "[t]he expected returns for the project have reduced due to changes in long-term price assumptions and the higher capital estimates." *Id.* However, CEO Constable softened the news by characterizing the $11 billion figure as a "worst case type of scenario," and "strongly messag[ed] ... that we'll be able to push the CapEx down." ¶ 106; Ex. 11. Constable also assured investors that the "management team remains closely involved in guiding the project team, so that we can minimize capital expenditure and further optimize overall project efficiency," and that Sasol had "bolstered the senior staffs' resources on the ground to enable an even greater focus on a range of execution activities." *Id.* Following this news, Sasol's ADR price fell $3.53 per share, or 10.99%, to close at $28.60 per share on June 6, 2016. ¶ 148; Ex. 1 (Expert Report of Michael L. Hartzmark, Ph.D.) ("Hartzmark Report"), Appendix C, at 60-61.

- 4 -

But even this disclosure of $11 billion was false and misleading. Months earlier, in February 2016, Sasol's senior management, including its Executive Directors, had received a Change Order from Fluor, confirming that Fluor's cost would be at least $11.7 billion. ¶¶ 65, 67. This figure did not even include Sasol's $300 million contingency; the actual amount of underreported costs was closer to $1 billion. ¶ 69. The revised figure from Sasol did not represent a "worst case type of scenario," but was a legally binding amount that Sasol had to pay pursuant to the terms of its contract. ¶¶ 65-67. Accordingly, a senior engineer for the LCCP project who saw this Change Order said Defendants' disclosure that capital expenditures "could" equal $11 billion was a "fraud." ¶ 66.

Following the June 2016 disclosure, for nearly three years—from June 2016 to February 2019—Sasol continued to falsely reassure investors that the LCCP's economic outlook remained "robust," that Sasol was "on track and delivering on key project milestones" to complete the project on time, and that LCCP cost expenditures "remained within" the disclosed budget. ¶¶ 150, 157, 164-165, 169, 175, 177, 186-190, 192-193; Exs. 12-22.

In truth, the LCCP continued to be plagued by delays, rising costs, and technical issues. ¶ 89. These issues were exacerbated by the project management at the LCCP. First, the LCCP was led by "amateur" Commissioners who lacked engineering backgrounds and had no experience commissioning any project, let alone one the size of LCCP. *Id.* The inexperienced leadership led to "dangerous engineering" designs and safety violations. ¶¶ 81-83. Moreover, LCCP leadership engaged in improper and unethical behavior with respect to financial reporting for the LCCP and the project's oversight. ¶ 86. As one example, to artificially keep costs down, project managers directed finance personnel to engage in accounting gimmickry. *Id.* This malfeasance included reducing the value of the work already performed, thereby reducing the Company's accrued

010886-11/1344703 V1

liabilities. *Id.* Sasol's top-level management also encouraged reporting false values for Fluor's "self-performing construction" and "management negotiated savings." ¶¶ 86, 88. CWs explained that this accounting misconduct—known by Defendant Constable—led to material understatement of costs, and was so widespread that finance personnel refused to sign off on the reports. ¶ 86. CWs also confirmed that Sasol senior management, including Defendant Schoeman, directed colleagues to change anticipated completion dates for projects to make it appear on paper that the project would be completed on time. ¶¶ 96-97.

Defendants' misleading statements and omissions artificially inflated the price of Sasol's ADRs, causing the shares to reach a Class Period high of $39.26 on August 27, 2018. ¶ 110. This allowed the Executive Defendants to collect lucrative executive compensation packages tied to Sasol's stock price and LCCP milestones. ¶ 232.

By early 2019, Defendants' repeated assurances of a timely and within-budget project were revealed to be false. Specifically, on February 8, 2019, before the market opened, Sasol disclosed that "the overall [LCCP] project capital cost estimate [was] revised from US$11.13 billion to a range of US$11.6 – 11.8 billion," as well as a five-month delay in the project. ¶ 112; Ex. 23. On this news, Sasol's ADR price fell $1.18 per share, or approximately 4%, to close at $28.79 per share on February 8, 2019. ¶ 112; Ex. 1. On May 22, 2019, Defendants disclosed that "the cost estimate for the LCCP has been revised to a range of $12.6 to $12.9 billion which includes a contingency of $300 million." ¶ 113; Exs. 24, 25. Sasol cited a $530 million change in the LCCP's cost forecast due to corrections for, among other items, "certain contracts and variation orders managed by Sasol, outside the primary engineering, procurement and construction contract." *Id.* Following these disclosures, Sasol's ADR price fell $4.50 per share, or 14.93%, to close at $25.64 per share on May 22, 2019. ¶ 114; Ex. 1 (Hartzmark Report), Appendix C, at 194-95.

- 6 -

On July 25, 2019, during pre-market hours, Sasol announced further delays on construction of certain aspects of the LCCP—specifically, the LDPE plant and Ziegler units, claiming Sasol was "experiencing some schedule pressure on the [LDPE] plant and expect BO [beneficial operation] to be delayed by four to six weeks as it has taken longer than planned to complete the construction, as well as the cleaning and preparation of critical equipment." ¶ 206. Sasol also disclosed that "the Ziegler unit BO is expected to be delayed by four to eight weeks mainly due to slower piping hydro-testing completion." *Id.*; Ex. 26. Following these disclosures, Sasol's ADR price fell $1.60 per share, or 6.76%, to close at $22.06 per share on July 25, 2019. ¶ 207; Ex. 1 (Hartzmark Report).

On August 16, 2019, Sasol delayed releasing its 2019 financial results. ¶ 115; Ex. 27. Sasol said its Board received a preliminary report from an independent review of the obstacles that hampered LCCP, which "contains observations which point to possible LCCP control weaknesses." *Id.*; ¶ 210. On this news, Sasol's ADR price fell $0.74 per share, or 4.02%, to close at $17.67 per share on August 16, 2019. ¶ 211; Ex. 1 (Hartzmark Report), Appendix C, at 204.

On October 28, 2019, Sasol disclosed that the independent review brought to light "errors, omissions, and inaccuracies in the [LCCP] cost estimate," as well as "inappropriate conduct and an improper tone at the top of the LCCP, including an excessive focus on maintaining cost and schedule estimates at the expense of providing accurate cost and schedule estimation to oversight bodies (including the Joint Chief Executive Officers) within the Company." ¶ 116; Ex. 28. Sasol also announced the departure of several members of its executive leadership, including its Joint Presidents and Chief Executive Officers, certain Senior Vice Presidents (including Defendant Schoeman), and other individuals previously charged with responsibility of the LCCP. *Id.*

- 7 -

Finally, on January 13 and 14, 2020, the concealed safety risks materialized when Sasol "experienced an explosion and fire at its LCCP low-density polyethylene (LDPE) unit," a major unit of LCCP. ¶ 120; Ex. 29. The explosion shut down the LDPE unit. In turn, Sasol's ADR price fell $1.70 per share, or 7.84%, over the following two trading days, closing at $19.99 per share on January 15, 2020. ¶ 121; Ex. 1 (Hartzmark Report), Appendix C, at 232. All told, Sasol's ADRs have lost over hundreds of millions of dollars in shareholder value, and the Company remains in a tailspin. ¶¶ 32, 122-125.

### III.    LEGAL STANDARD

Plaintiffs must demonstrate that the Class satisfies the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—and the "prerequisite for classes primarily seeking money damages, found in Rule 23(b)(3), that common questions of law or fact predominate over individual questions that pertain only to certain class members." *Arkansas Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 258 (2d Cir. 2020) ("*ATRS II*").

Securities fraud cases are well suited to class certification. *See Amchem*, 521 U.S. at 625 (1997) ("Predominance is a test readily met in certain cases alleging consumer or securities fraud…."). Moreover, the Supreme Court has rejected attempts to limit the certification of classes in securities actions. *See Amgen*, 568 U.S. at 467 ("[B]ecause '[t]he question of materiality ... is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor,' materiality can be proved through evidence common to the class."); *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812-13 (2011) ("*Halliburton I*") ("The Court of Appeals erred by requiring [the plaintiff] to show loss causation as a condition of obtaining class certification."); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014) ("*Halliburton II*") (reaffirming presumption "that a public, material misrepresentation will distort

- 8 -

the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation").

The Supreme Court has explained that "[a]lthough we have cautioned that a court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim,' … Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 568 U.S. at 465-66 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 466.

## IV.    ARGUMENT

### A.    The proposed Class satisfies Rule 23(a).

#### 1.    Plaintiffs satisfy the numerosity requirement.

The proposed Class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Impracticable does not mean impossible; joinder may merely be difficult or inconvenient, rendering use of a class action the most efficient method to resolve plaintiffs' claims." *Fogarazzo v. Lehman Bros. Inc.*, 263 F.R.D. 90, 96 (S.D.N.Y. 2009). "Numerosity is presumed when a class consists of forty or more members." *Saravia v. 2799 Broadway Grocery LLC*, 2014 WL 2011720, at *3 (S.D.N.Y. May 16, 2014) (Crotty, J.). "In securities fraud class actions relating to publicly owned and nationally listed corporations, 'the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period.'" *In re Bank of Am. Corp. Sec., Deriv. & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 138 (S.D.N.Y. 2012) (citation omitted).

Here, the proposed Class includes many thousands of investors. During the Class Period, Sasol had between 16.6 million and 44.6 million shares of ADRs, which were actively traded on

the NYSE. *See* Ex. 1 (Hartzmark Report) ¶ 27. Additionally, 371.1 million ADRs of Sasol traded hands during the Class Period, at an average weekly trading volume of 1.47 million ADRS, and an average weekly trading volume of 5.4% of shares outstanding. *Id.* ¶ 29. Numerous courts in this District have consistently found numerosity established based on similar metrics. *See, e.g.*, *Scheufele v. Tableau Software, Inc.*, 2020 WL 2553100, at *3 (S.D.N.Y. Feb. 13, 2020) (numerosity found based on outstanding shares and average shares traded each day); *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *8 (S.D.N.Y. July 10, 2019) (same). And the number of institutional investors that owned Sasol ADRs—which totaled 457 institutions (Ex. 1 (Hartzmark Report) ¶ 44)—by itself demonstrates numerosity is met.

### 2.    Questions of law and fact are common to the Class.

The Class satisfies Rule 23(a)(2)'s requirement that "there are questions of law or fact common to the class." A "common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196-97 (5th ed. 2012)). A question is common to the Class "if the question is 'capable of classwide resolution—which means that its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015) (quoting *Dukes*, 564 U.S. at 350).

This case raises common questions of law and fact that will yield answers common to all Plaintiffs and Class members, including whether: (i) Defendants' statements and omissions were materially false or misleading; (ii) Defendants' misrepresentations and omissions were made with scienter; (iii) the price of Sasol's ADRs was artificially inflated during the Class Period; and (iv) Defendants' misrepresentations and omissions caused economic harm to Class members. These common questions will "'generate common *answers* apt to drive the resolution of the

010886-11/1344703 V1

litigation.'" *Dukes*, 564 U.S. at 350 (citation omitted). The commonality requirement is satisfied here. *See In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at \*11 (S.D.N.Y. Mar. 23, 2020) ("Rule 23(a) commonality is satisfied because Plaintiffs allege the same injury and claims resulting common misrepresentations and omissions concerning Defendants' business. All plaintiffs were impacted by disclosures affecting equally all market participants who transacted CBI stock."); *Gruber v. Gilbertson*, 2019 WL 4439415, at \*3 (S.D.N.Y. Sept. 17, 2019) ("Rule 23(a)(2) is satisfied because the class proceeding will generate common answers to several key questions, including whether defendants engaged in deceptive conduct and omitted the disclosure of material facts, [and] whether there was scienter….").

### 3. Plaintiffs' claims are typical of Class members' claims.

Plaintiffs satisfy the typicality requirement under Rule 23(a)(3). A "class representative can establish the requisite typicality under Rule 23 if the defendants 'committed the same wrongful acts in the same manner against all members of the class.'" *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 (2d Cir. 2004) (citation omitted); *see also In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 103 (S.D.N.Y. 2016) ("[T]ypicality is established because all class members' claims arise from the same course of events and involve similar arguments on liability."). Here, the claims asserted by Plaintiffs are typical of the claims of all Class members. Plaintiffs allege that Defendants violated Sections 10(b) and 20(a) of the Exchange Act by issuing materially false and misleading public statements to all Sasol ADR investors. They also allege that they and other members of the Class purchased Sasol ADRs at artificially inflated prices as a result of the Defendants' material misrepresentations and omissions and were damaged when share prices dropped after Defendants' misrepresentations were disclosed to the market. Ex. 30 (Cohn Decl.) ¶ 3; Ex. 31 (Moshell Decl.) ¶ 3. All Class members' claims arise from the same course of events and will be resolved based on similar legal arguments.

- 11 -

### 4. Plaintiffs will fairly and adequately protect the interests of the Class.

The Rule 23(a)(4)'s requirement that "the representative parties will fairly and adequately protect the interests of the class" is met. "Adequacy 'entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.'" *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)). "'The conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental,'" and "'speculative conflict should be disregarded at the class certification stage.'" *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001) (citation omitted), *abrogated on other grounds by In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006).

Plaintiffs "possess the same interest and suffer[ed] the same injury as the class members," *Amchem*, 521 U.S. at 625-26, and no actual or potential conflicts exist. Plaintiffs and all Class Members suffered losses from purchasing Sasol's ADRs at artificially inflated prices. They have been injured by the identical misrepresentations and omissions of Defendants. *See In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 282 (S.D.N.Y. 2003) ("[N]amed plaintiffs' interests are directly aligned with those of the absent class members: they are purchasers of WorldCom equity and debt securities who suffered significant losses as a result of the investments."). When Plaintiffs prove their claims, they will also prove the Class members' claims. Plaintiffs know their obligations as representatives of the Class, and have diligently protected absent class members' interests. Plaintiff Moshell instituted the instant action, and since appointment on May 4, 2020 (ECF No. 1), Lead Plaintiff Cohn has actively supervised and monitored this litigation. Ex. 30 (Cohn Decl.) ¶¶ 4-5. And Plaintiffs have protected the interests of the class by retaining "qualified, experienced and able to conduct the litigation." *Flag Telecom*, 574 F.3d at 35; *see* § IV(D), below.

- 12 -

**B.    The proposed Class is ascertainable.**

"The ascertainability doctrine that governs in this Circuit requires only that a class be defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec. Litig.*, 862 F.3d 250, 264 (2d Cir. 2017) ("*Petrobras II*"). Here, the class definition is ascertainable, because it delineates the Class's boundaries by the dates of their transactions in Sasol ADRs, so that Class members can readily be identified from investor records. *See In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 312 F.R.D. 332, 353 (S.D.N.Y. 2015) (members "may be ascertained with reference to investor records"); *Fogarazzo*, 263 F.R.D. at 101 ("putative class members can be readily identified from '[defendant's] books and records, as well as records maintained by the applicable transfer agents'") (citation omitted).

**C.    The proposed Class satisfies Rule 23(b)(3).**

Rule 23(b)(3) requires that common questions of law or fact "predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Petrobras II*, 862 F.3d at 260. Plaintiffs meet both requirements.

**1.    Common questions of law and fact predominate for the Class claim against all Defendants under section 10(b) of the Exchange Act and Rule 10b-5.**

The "predominance requirement is met if the plaintiff can establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole … predominate over those issues that are subject only to individualized proof." *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010). The elements of a claim under section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 are: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic

- 13 -

loss; and (6) loss causation. *Halliburton I*, 563 U.S. at 810. Falsity, materiality, and loss causation are common issues. *See Amgen*, 568 U.S. at 467 ("materiality can be proved through evidence common to the class"); *Halliburton I*, 563 U.S. at 812 ("The Court of Appeals erred by requiring [plaintiff] to show loss causation as a condition of obtaining class certification."). Therefore, "[w]hether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Amgen*, 568 U.S. at 474-75. *See also Strougo v. Barclays PLC*, 312 F.R.D. 307, 312 n.17 (S.D.N.Y. 2016) ("Reliance is typically the only ground on which to challenge predominance because section 10(b) claims will almost always arise from a common nucleus of facts surrounding the fraudulent misrepresentation of material facts and the causal relationship between the correction of that misrepresentation and the price of the security."), *aff'd sub nom. Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017). And as explained below, reliance may be presumed on a classwide basis under the fraud-on-the-market presumption.

### a. Plaintiffs and the Class are entitled to a presumption of reliance under the *Basic* fraud-on-the-market theory.

The Supreme Court has "endorsed the fraud-on-the-market theory and applied it to class action lawsuits for securities fraud." *Arkansas Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 483 (2d Cir. 2018) ("*ATRS I*") (citing *Basic Inc. v. Levinson*, 485 U.S. 224 (1988)). *Basic* held that "if plaintiff-investors prove that a company's misstatement was public, the company's stock traded in an efficient market, and the plaintiffs purchased the stock after the misstatement was made but before the truth was revealed, they are entitled to a presumption that the misstatement affected the stock price and that they purchased stock in reliance on the integrity of that price." *Id.* Moreover, "[u]nder the *Basic* presumption, individual class members need not prove they actually relied upon (or even knew about) the misstatement giving rise to their claim; 'anyone who buys or sells the stock at the market price may be considered to have relied on th[e]

misstatement.'" *Id.* (quoting *Halliburton II*, 573 U.S. at 263). To invoke this presumption, a plaintiff must show: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 268.

Plaintiffs make the requisite showing here. *First*, as to publicity, Plaintiffs allege that Defendants made material misrepresentations and omissions in their public statements to investors that artificially inflated or maintained the market price of Sasol's ADRs. ¶¶ 129-198. *Second*, although "materiality is an essential predicate of the fraud-on-the-market theory," plaintiffs "are not required to prove materiality at the class-certification stage." *Amgen*, 568 U.S. at 467-68. *Third*, as to market timing, Plaintiffs allege they bought Sasol ADRs during the Class Period and suffered losses when the artificial inflation came out of the share price when the truth was disclosed, which is the definition of trading between the time the misrepresentations were made and when the truth was revealed. ¶¶ 234-237. *Fourth*, because Sasol ADRs traded in an efficient market, as demonstrated below, all prerequisites for the fraud-on-the-market presumption are satisfied.

Under Second Circuit law, the burden to show market efficiency "is not an onerous one." *Petrobras II*, 862 F.3d at 278. Plaintiffs meet that burden. During the Class Period, Sasol's ADRs were traded on the NYSE (¶¶ 36, 52), which courts uniformly find efficient. *See, e.g.*, *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *15 (S.D.N.Y. Aug. 13, 2018) ("Plaintiffs also assert that the fact that LSB's stock traded on the NYSE during the Class Period is sufficient to create a presumption of efficiency…. Numerous cases in this district have so held."); *see also Barclays*, 312 F.R.D. at 318 (a listing on the NYSE is a "good indicator of efficiency").

- 15 -

In addition, factors known as the *Cammer* factors and *Krogman* factors demonstrate that the Sasol securities traded in an efficient market. The Second Circuit has "repeatedly—and recently—declined to adopt a particular test for market efficiency." *Waggoner*, 875 F.3d at 94. But the Court recognizes that district courts "regularly consider five factors first set forth in *Cammer*." *Id.* (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989)). Those five factors are: (1) the average weekly trading volume of the stock, (2) the number of securities analysts following and reporting on it, (3) the extent to which market makers traded in the stock, (4) the issuer's eligibility to file an SEC registration Form S-3, and (5) the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the stock's price. *Id.*

The "first four '*Cammer* factors examine indirect indicia of market efficiency for a particular security.'" *Id.* (quoting *Petrobras II*, 862 F.3d at 276). The "fifth factor—'*Cammer* 5'— permits plaintiffs to submit direct evidence consisting of 'empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price.'" *Id.* (quoting *Petrobras II*, 862 F.3d at 276). "Plaintiffs generally attempt to satisfy *Cammer* 5 by submitting an event study. Such studies are 'regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events.'" *Id.* (quoting *Halliburton II*, 573 U.S. at 280). Courts also consider *Krogman* factors when analyzing the market's efficiency. *Id.* at 94-95 (citing *Petrobas II*, 862 F.3d at 276). Those factors are (1) the capitalization of the company; (2) the bid–ask spread of the stock; and (3) the percentage of stock not held by insiders ("the float"). *Id.* at 95 (citing *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001)). If a plaintiff shows "the market for the stock is efficient and that the other requirements for the *Basic* presumption are met, the presumption applies and § 10(b)'s reliance requirement is satisfied at the class certification stage." *Id.*

- 16 -

The Hartzmark Report submitted by Plaintiffs proves that the market for Sasol's American Depository Receipts ("ADRs") was efficient during the Class Period.[6] Based on a thorough analysis of the *Cammer* and *Krogman* factors, Plaintiff's market efficiency expert, Dr. Michael Hartzmark, Ph.D., has found that Sasol's American Depository Receipts ("ADRs") traded in an open, developed and efficient market during the Class Period. Dr. Hartzmark's findings on each market efficiency factor are summarized below.

### (1)   *Cammer* 1—trading volume.

Courts consistently hold that "'[t]urnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one....'" *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 44 (S.D.N.Y. 2018) (quoting *Cammer*, 711 F. Supp. at 1293). Sasol's average weekly trading volume of 5.4% of outstanding ADRs vastly exceeds this benchmark. Ex. 1 (Hartzmark Report) ¶ 29.

### (2)   *Cammer* 2—analyst coverage.

Dr. Hartzmark found that Sasol was covered during the Class Period by at least 30 analysts, with an average of 14 firms as recorded on Bloomberg, and identified multiple firms providing substantive analysis based on availability of reports on databases— including Auerbach Grayson, Barclays, Cormark Securities Inc., Credit Suisse, Deutsche Bank, HSBC, Investec Bank, JPMorgan, Moody's, Morgan Stanley, Morningstar, Inc., Renaissance Capital, and UBS. Ex. 1 (Hartzmark Report) ¶ 33. In addition, there were approximately 5,250 news articles written about

---

[6] Courts in this District have rejected challenges to Dr. Hartzmark's methodologies, analyses, and opinions on market efficiency. *See, e.g.*, *Wallace v. IntraLinks*, 302 F.R.D. 310, 318 (S.D.N.Y. 2014) ("The court therefore finds that IntraLinks shares traded in an efficient market during the proposed class period, and that defendants have failed to rebut a presumption of class-wide reliance on the integrity of the market."); *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *15-16 (S.D.N.Y. July 10, 2019) (certifying class and rejecting defendants' attempt to rebut *Basic* presumption of reliance).

010886-11/1344703 V1

Sasol during the Class Period. *Id.* ¶ 36. The significant number of analysts and news reports covering Sasol indicates greater information flow that is reflected in its ADR price and, therefore, supports a finding of market efficiency. *See In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 446 (S.D.N.Y. 2013) (market efficient where three analysts followed security).

### (3)    *Cammer* 3—market makers.

A market maker is an entity that agrees to purchase or sell securities on demand, to support a liquid market for the shares. *See Winstar*, 290 F.R.D. at 446. As noted above, Sasol ADRs traded on the NYSE, one of the largest and most liquid exchanges in the world; as such, it was assigned a Designated Market Maker. Ex. 1 (Hartzmark Report) ¶¶ 41-42 & nn.74-75. In addition, 457 institutional investors held Sasol ADRs, and those institutions with the largest positions held a substantial proportion (between 43% and 71%) of Sasol ADRs' public float. *Id.* ¶ 44; *see, e.g.*, *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) ("[B]ecause institutional investors held a substantial percentage of Alstom's securities and because these investors could easily buy and sell Alstom's securities on exchanges such as the NYSE…, they have likely acted as arbitrageurs and facilitated the efficiency of the market."). Sasol ADRs also evinced a wide range of short interest, ranging from 0.4% to 10.9% of the public float, suggesting that investors with negative views on Sasol were able to remain active in the market. Ex. 1 (Hartzmark Report) ¶¶ 46-47. That Sasol ADRs traded on the NYSE, had substantial institutional holdings and trading activity, and a wide-ranging short interest is additional strong evidence that Sasol ADRs traded in an efficient market.

### (4)    *Cammer* 4—eligibility to file SEC registration Form S-3.

*Cammer* held that eligibility for S-3 registration is indicative of market efficiency because a company is entitled to S-3 registration when, among other things, it has filed Exchange Act

010886-11/1344703 V1

reports for a specified length of time and has an outstanding "float" of shares above a certain sizable value. *See Cammer*, 711 F. Supp. at 1271 n.5, 1287; *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014). As Dr. Hartzmark notes, Sasol ADRs easily met public float requirements—indeed, the public float of Sasol ADRs was more than 11 times the required threshold—and it filed a SEC Form F-3 during the Class Period. Ex. 1 (Hartzmark Report) ¶ 49.

In sum, based on all the factors set forth above, efficiency is established. *See Barclays*, 875 F.3d at 99 (holding that the first four *Cammer* factors are sufficient to demonstrate efficiency). Moreover, although not required to do so, Plaintiffs have proffered additional evidence of efficiency, as set forth directly below.

### (5)    *Cammer* 5—price reaction.

The final *Cammer* factor asks whether Plaintiffs can make a *prima facie* showing that, during the Class Period, Sasol's ADRs' price quickly responded to the release of new Company-specific "unexpected" news. *Cammer*, 711 F. Supp. at 1287. The Second Circuit has held that such a showing is not necessary where, as here, all of the indirect factors demonstrate market efficiency. *Barclays*, 875 F.3d at 97 (A plaintiff "need not always present direct evidence of price impact through event studies [or a statistical, empirical analysis].").

Even though it is not required, the fifth *Cammer* factor also supports a finding of market efficiency here. Dr. Hartzmark has shown through empirical analyses based on the results of his event study that Sasol's ADR price reacted in an efficient manner to new information about the Company. *See* Ex. 1 (Hartzmark Report) ¶¶ 61-90. Dr. Hartzmark performed empirical analysis based on the generally accepted and commonly utilized event study methodology to determine whether Sasol ADRs had a greater frequency of statistically significant price movements on "news

- 19 -

days"—days on which there were Sasol earnings, guidance or sales update-related news announcements—than on more typical "no-news" days. *Id.* ¶¶ 72-77. To conduct the study, Dr. Hartzmark examined all 1,182 days when trading occurred in both the U.S. and South Africa within the Class Period+ (i.e., Class Period and January 14-15, 2020). *Id.* ¶ 72. Dr. Hartzmark determined (i) which days exhibited statistically significant abnormal returns, and (ii) whether earnings, guidance and sales and update-related news was released on that date (i.e., whether it was a "news day" or a "no-news day"). *Id.* ¶ 73. Dr. Hartzmark compared the proportion of "news days" exhibiting statistically significant abnormal returns to the proportion of "no-news days" exhibiting statistically significant abnormal returns. *Id.*

Dr. Hartzmark found a pattern of more frequent statistically significant ADR price movement on "news days" than "no-news days," and accordingly concluded that, based on scientific evidence, the market for Sasol ADRs was informationally efficient during the Class Period. *Id.* ¶¶ 74-77. Specifically, Sasol's ADRs' price exhibited a statistically significant abnormal price reaction on 29% of "news days" (with significant abnormal returns on 9 of 31 "news days"), compared to just 6.9% of "no-news days" (with significant abnormal returns on only 79 of 1,151 "no-news days"). *Id.* ¶ 74. Sasol's ADRs were more than four times as likely to have a statistically significant abnormal return on "news days" than on "no-news days." *Id.* Through these analyses, Dr. Hartzmark's event study analysis demonstrates market efficiency during the Class Period. *See In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 367-69 (S.D.N.Y. 2016), *aff'd in part* 862 F.3d 250 (2d Cir. 2017) (approving use of similar test to demonstrate market efficiency); *McIntire*, 38 F. Supp. 3d at 429-30 (accepting event study that looked at stock return on days with news versus days with no news).

- 20 -

Dr. Hartzmark also conducted an autocorrelation analysis, which showed that there is no persistent and systematic significant autocorrelation in Sasol's ADR price returns. Ex. 1 (Hartzmark Report) ¶¶ 78–82. This finding is consistent with the conclusion that Sasol's ADRs traded in an efficient market. *Id.* Further, Dr. Hartzmark analyzed the ten corrective disclosure dates alleged in the Complaint, and found that, for six of those dates, the alleged price impact of the disclosures exhibited statistically significant, negative abnormal returns. *Id.* ¶¶ 83-84. The price reaction on the other four dates are also consistent with the information disclosed on these dates. *Id.* ¶¶ 85–89.[7] This result was also consistent with a security that trades in an efficient market. *Id.* ¶ 90.

### (6) *Krogman* 1—market capitalization.

During the Class Period, the market capitalization of Sasol ADRs averaged $860.8 million, peaking at $1.7 billion. *Id.* ¶ 53. This satisfies the first *Krogman* factor. *Wilson*, 2018 WL 3913115, at 815 (average market capitalization of $751.3 million supported market efficiency); *McIntire*, 38 F. Supp. 3d at 433 (market capitalization between $292 million and $585 favored a finding an efficient market).

### (7) *Krogman* 2—bid-ask spread.

During the Class Period, the average bid-ask spread for Sasol ADRs was 0.05%. Ex. 1 (Hartzmark Report) ¶¶ 58, 59. This spread compares favorably to the findings of the courts in other cases where the courts concluded that the security traded in efficient markets. *See Nguyen v. Radient Pharms. Corp.*, 287 F.R.D. 563, 574 (C.D. Cal. 2012) (finding a much larger bid-ask

---

[7] These dates are June 6, 2016; February 8, 2019; May 22, 2019; July 25, 2019; August 16, 2019; and January 14, 2020. The other alleged corrective disclosure dates were repetitive in that they disclosed confirmatory or anticipated information or contained other offsetting news. *Id.* ¶¶ 89-89.

spread of 0.58% supported market efficiency); *McIntire*, 38 F. Supp. 3d at 433 (bid-ask spread of 0.27% was "indicative of an efficient market"). Indeed, the average daily spread for Sasol ADRs was approximately **one 22nd** the size of the NYSE spreads and **one 54th** the size of the NASDAQ spreads. Ex. 1 (Hartzmark Report) ¶ 59.

### (8)   *Krogman* 3—stock float.

During the Class Period, Sasol ADRs' public float comprised virtually all of the outstanding ADRs, meaning that there was a large proportion of Sasol ADRs that was available to non-insiders who could trade without restrictions and profit by trading on new information. On average, insiders held only 0.02% of Sasol ADRs, and the public float was thus, on average, 99.98% during the Class Period. Ex. 1 (Hartzmark Report) ¶ 56; *McIntire*, 38 F. Supp. 3d at 433 (public float of between 31% and 43% supported market efficiency).

In sum, the *Cammer* and *Krogman* factors support a finding that the market for Sasol ADRs was efficient during the Class Period. Thus, class-wide reliance is presumed.

### b.   Damages will be calculated using a common methodology that is consistent with the classwide theory of liability.

Courts in this Circuit routinely find that an expert's damages methodology in securities cases is common to all class members because damages can be calculated on a class-wide basis using an event study that measures the price impact of company-specific information alleged to be a corrective disclosure. *See Waggoner*, 875 F.3d at 106; *In re Barrick Gold Sec. Litig.*, 314 F.R.D. at 106 (§ 10(b) damages are "measurable on a class-wide basis" and "do[] not create individualized damages issues that defeat predominance").

The same is true here. Dr. Hartzmark has opined that damages can be readily calculated in this action using the generally accepted event-study methodology discussed above with respect to market efficiency, which ties Plaintiffs' damages calculation to their theory of injury, as well as

other empirical analyses if necessary. Ex. 1 (Hartzmark Report) ¶¶ 94-106; *JPMorgan Chase & Co. Sec. Litig.*, 2015 WL 10433433, at \*7 (S.D.N.Y. Sept. 29, 2015) (event studies are capable of measuring damages on a class-wide basis). Dr. Hartzmark explains that class-wide damages can be calculated using a variety of commonly utilized methods to measure the amount of artificial inflation caused by Defendants' alleged misstatements and omissions, all of which can be applied on a class-wide basis. *Id.*; *cf. JP Morgan Chase & Co. Sec. Litig.*, 2015 WL 10433433, at \*7 (accepting method to "calculate classwide, per-share damages through an event study analysis of the stock price inflation caused by Defendants' alleged misrepresentations or omission"); *see also Wallace*, 302 F.R.D. at 318 ("Plaintiff's proposed determination of damages by event study appears to be a workable methodology of determining damages on a class-wide basis that conforms to its theory of liability[.]"). Under such an approach, a Class Member's actual trading activity in the security can be used to calculate damages on an individual basis in a mechanical fashion. Ex. 1 (Hartzmark Report) ¶ 101.

### 2. Common questions predominate for the claim under section 20(a) of the Exchange Act against all Defendants except Sasol.

Because Plaintiffs' claim under § 10(b) and Rule 10b-5 should be certified, their claim under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), should also be certified. The elements of a claim under § 20(a) are: "(1) a primary violation [of the securities laws] by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). Whether the individual Defendants are liable under Section 20(a) for control of Sasol for the primary violation of section 10(b) depends solely on common issues of law and fact as to all Class members. *See In re Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.*, 2013 WL 396117, at \*13 (D.N.J. Jan. 30, 2013) ("Lead Plaintiffs'

- 23 -

attempt to establish control person liability as to the entire class of investors will be based on common evidence of each § 20(a) Defendant's alleged exercise of control over Merck and whether his or her conduct constitutes culpable participation in Merck's Rule 10b-5 violations.").

### 3. A class action is superior to other available methods for the fair and efficient adjudication of this action.

Under Rule 23(b)(3), "the superiority analysis … is explicitly comparative in nature: courts must ask whether 'a class action is *superior to other available methods* for fairly and efficiently adjudicating the controversy.'" *Petrobras II*, 862 F.3d at 268 (quoting Rule 23(b)(3)).[8] "Though a court may not ignore concerns about the manageability of a putative class action, it may be that challenges of administrative feasibility are most prevalent in cases 'in which there may be no realistic alternative to class treatment,' … underscoring the importance of a comparative inquiry." *Id.* (citation omitted). Securities actions "easily satisfy" this requirement "because the alternatives are either no recourse for thousands of stockholders or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake." *In re MF Global Holdings Ltd. Inc. Litig.*, 310 F.R.D. 230, 239 (S.D.N.Y. 2015).

Here, Plaintiffs seek to represent a Class consisting of a large number of geographically dispersed purchasers of Sasol ADRs whose individual damages are likely small enough to render individual litigation prohibitively expensive. The Class members thus have little interest in asserting separate claims. *See, e.g.*, *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 187 (S.D.N.Y. 2008) ("the amount of potential recovery per plaintiff is not so high as to ensure that each plaintiff

---

[8] The "matters pertinent" to findings under Rule 23(b)(3) include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class embers; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

could or would bring an action individually"). Second, Plaintiffs are aware of no other litigation concerning these claims on behalf of any individual class members. Third, concentrating this litigation in a single forum eliminates the risk of inconsistent adjudications and promotes the fair and efficient use of the judicial system. *See id.* Last, managing this case as a class action presents no unusual difficulties that would preclude certification. Indeed, litigating each claim separately would be wasteful and effectively preclude numerous investors from obtaining redress. *See In re SCOR Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 579 (S.D.N.Y. 2008) ("Litigating each case separately would be wasteful, and result in delay and an inefficient expenditure of judicial resources.").

### D.      Hagens Berman should be appointed as Class Counsel under Rule 23(g).

Rule 23(g) requires a court to appoint class counsel when certifying a class action. Hagens Berman has conducted considerable work investigating and prosecuting the claims in this action, and is ready and willing to continue to do so in the future. After being appointed lead counsel, Hagens Berman conducted an extensive investigation, filed comprehensive amended complaints, successfully opposed a motion to dismiss, negotiated a case schedule, propounded discovery requests on Defendants, responded to Defendants' request for the production of documents, commenced its review and evaluation of documents, and issued third-party subpoenas. Berman Decl. ¶ 3. Hagens Berman is highly experienced in complex class litigation, especially securities fraud actions, and has the ability and willingness to prosecute this action vigorously. Ex. 32 (Hagens Berman's resume). Because Hagens Berman has devoted substantial time and resources to the litigation and will continue to do so, it should be appointed as Class Counsel.

### V.      CONCLUSION

Plaintiffs respectfully request that the Court certify the Class, appoint Plaintiffs as Class Representatives, and appoint Hagens Berman Sobol Shapiro as Class Counsel.

010886-11/1344703 V1

DATED: October 2, 2020

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By:  */s/ Steve W. Berman*
     STEVE W. BERMAN

Steve W. Berman (admitted *Pro Hac Vice*)
Jerrod C. Patterson
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
jerrodp@hbsslaw.com

Lucas E. Gilmore (admitted *Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
lucasg@hbsslaw.com

*Counsel for Lead Plaintiff David Cohn and*
*Additional Representative Plaintiff Chad L. Moshell*

- 26 -

010886-11/1344703 V1

- 27 -

**CERTIFICATE OF SERVICE**

I hereby certify that on October 2, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

*/s/ Steve W. Berman*
STEVE W. BERMAN

010886-11/1344703 V1