**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| CHAD LINDSEY MOSHELL, Individually and On Behalf of All Others Similarly Situated, | : : : : | |
| Plaintiff, | : : | Case No. 1:20-cv-01008-JPC |
| v. | : : | Hon. John Peter Cronan |
| SASOL LIMITED, DAVID EDWARD CONSTABLE, BONGANI NQWABABA, STEPHEN CORNELL, PAUL VICTOR, and STEPHAN SCHOEMAN, | : : : : : | |
| Defendants. | : : : : | |

**THE SASOL DEFENDANTS'**
**ANSWER TO THE SECOND AMENDED COMPLAINT**

Defendants Sasol Limited ("Sasol"), David Edward Constable, Bongani Nqwababa, Stephen Cornell, Paul Victor, and Stephan Schoeman (together, "Defendants" or "Sasol Defendants") by and through their undersigned counsel, for their Answer to the Second Amended Complaint (the "SAC"), responds as follows.

With respect to the SAC in its entirety, Defendants deny that they engaged in any wrongful, illegal, or improper conduct, made any false or misleading statements or omissions, or caused or are responsible in any way for any injuries or damages purportedly suffered by Plaintiffs or any member of the purported putative class. No response to any allegation herein waives or otherwise controverts the partial dismissal of the Amended Complaint (ECF No. 59) as provided in the Court's Memorandum Order dated August 24, 2020 ("MTD Order"). *See* ECF No. 74. This Answer is based on the Defendants' investigation to date, and Defendants reserve the right to amend this Answer as the investigation continues and during the course of litigation. This Answer restates the allegations in the SAC solely for the convenience of the Court and the parties. Any allegation not expressly admitted is denied. In particular, the headings and prefatory material contained in the SAC are not substantive allegations to which an answer is required; to the extent a response is required, Defendants deny the allegations.

Defendant Constable lacks knowledge or information sufficient to form a belief as to the truth or falsity of allegations in the SAC that postdate June 30, 2016; Defendant Schoeman lacks knowledge or information sufficient to form a belief as to the truth or falsity of allegations in the SAC that postdate April 1, 2019; Defendants Nqwababa and Cornell lack knowledge or information sufficient to form a belief as to the truth or falsity of allegations in the SAC that postdate October 31, 2019.

With respect to the unenumerated paragraph at the beginning of the SAC, Defendants respond as follows: admit that Plaintiffs purport to describe the claims asserted in the SAC; denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding Plaintiffs' "personal knowledge," "information and belief," and the purported "investigation" by Plaintiffs' counsel; and otherwise denies the allegations contained in such paragraphs. [1]

## I.    NATURE OF THE ACTION

1.    This securities class action arises from Defendants' materially false and misleading statements and omissions about the Company's violations of its business, operational, and compliance policies with respect to its ethane cracker and derivatives complex in Lake Charles, Louisiana, known as the Lake Charles Chemicals Project ("LCCP"). Throughout the Class Period, Sasol certified that it was exercising sound project and financial management, including "maintaining adequate internal control over financial reporting" pursuant to the Sarbanes-Oxley Act. It routinely cited in its SEC filings its code of ethics, which "embodies a requirement of compliance with all applicable laws and regulations as a minimum standard," and

---

[1] For the convenience of the Court and Defendants, Plaintiffs attach a "redline" version of this pleading showing the changes between the Amended Complaint and the Second Amended Complaint. *See* Exhibit A.

**ANSWER**: State that no response is required.

- 1 –

"includes a commitment to conducting [Sasol's] business with due regard to the interests of all [its] stakeholders."[2]

**ANSWER**:    To the extent the allegations contained in Paragraph 1 constitute legal conclusions, no response is required. To the extent the allegations contained in Paragraph 1 relate to the effectiveness of Sasol's internal controls over financial reporting and management of the LCCP, no response is required given the Court's dismissal of these allegations pursuant to the MTD Order, and Plaintiffs' inclusion of these claims is solely to preserve the issues for appeal. To the extent a response is required, Defendants deny the allegations contained in Paragraph 1, except admits that Sasol commissioned an ethane cracker and derivatives complex in Lake Charles, Louisiana known as the Lake Charles Chemicals Project ("LCCP"); admits that throughout the purported Class Period, Sasol's Annual Reports certified that "[m]anagement of Sasol is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934, as amended"; admits that Sasol's Form 20-F for the period ended June 30, 2015, stated that Sasol's code of ethics "includes a commitment to conducting our business with due regard to the interests of all our stakeholders and the environment. The code embodies a requirement of compliance with all applicable laws and regulations as a minimum standard."

2.    But Sasol concealed from investors and the public that Sasol's upper management knew or recklessly disregarded that Sasol's projected LCCP costs were continually and deliberately underreported to investors and the public, in an effort to artificially prop up Sasol's securities prices and trigger lucrative executive bonus packages. Sasol also concealed from investors and the public that Sasol's upper management knew or recklessly disregarded that Sasol's anticipated timeline for completion of the project was deliberately understated, to

---

[2] The Court dismissed claims predicated on Defendants' false certification of the effectiveness of Sasol's internal controls over financial reporting and management of the LCCP by Memorandum Order dated August 24, 2020. Plaintiffs include these claims and the related allegations in this second amended complaint to preserve the issues for appeal.

**ANSWER**: States that no response is required.

misleadingly suggest that the project was going to be on time, when in fact upper management knew that the project was substantially behind schedule.

**ANSWER**:     Denies the allegations contained in Paragraph 2.

3.     Despite these persistent problems in meeting the announced deadline and budget, senior management rushed the Lake Charles project to completion and cut corners, because – as a well-placed former employee explained – senior management had significant stock in the company, and it was in their financial interest to complete the project as quickly as possible. But this rush to completion created a hidden culture in which employees and subcontractors cut corners and took unnecessary risks to meet deadlines.

**ANSWER**:     Denies the allegations contained in Paragraph 3.

4.     These acts of concealment and misrepresentations inflated the price of Sasol's ADRs until Defendants' belated disclosure of its misrepresentations and omissions caused Sasol's securities price to plummet, including failures to disclose Sasol's known higher and longer cost and scheduling estimates of the LCCP project, the accuracy of the cost and scheduling estimates given to investors, the LCCP projects' profitability, and the true lack of internal controls over its financial and operational reporting.

**ANSWER**:     Denies the allegations contained in Paragraph 4.

5.     Since this time, Sasol has descended on a downward spiral, reporting mounting losses at the project, the risk of violating debt covenants, and the need to sell a stake in the LCCP to shore up its finances. Accordingly, Plaintiffs bring this action under Sections 10(b) and 20(a) on behalf of purchasers of Sasol securities during the Class Period.

**ANSWER**:     Denies the allegations contained in Paragraph 5, except admits that Plaintiffs

purport to bring this action under Sections 10(b) and 20(a) of the Exchange Act on behalf of

purchasers of Sasol securities during the purported Class Period.

6.     Sasol is a South African-based energy company. Sasol rose to prominence by developing coal-to-liquids, or CTL, and gas-to-liquids, or GTL, technologies, which convert low-cost coal and natural gas feedstock into higher-value liquid fuels.

**ANSWER**:     Admits the allegations contained in Paragraph 6.

7.     On October 27, 2014, in a bid to diversify earnings and take advantage of inexpensive shale gas, Sasol announced the construction of an ethane cracker and derivatives complex in Lake Charles, Louisiana, which Sasol estimated at the time would cost $8.1 billion.

**ANSWER**:    Denies the allegations contained in Paragraph 7, except admits that on October 27, 2014, Sasol issued a Form 6-K announcing the construction of the LCCP and refers to that Form 6-K for a complete and accurate description of its contents.

8.    Sasol's decision to invest in the LCCP was closely followed in the press: it represented Sasol's efforts to move past its reliance on coal, and was part of an investment "boom" in natural gas that one trade association predicted would be worth $137 billion by the year 2023.[3] The Louisiana Economic Development group described it as the "largest manufacturing investment in Louisiana history," with a total economic impact over 20 years of over $46 billion.[4] And Sasol announced it was the "largest investment in company history."[5]

**ANSWER**:    Denies the allegations contained in Paragraph 8, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in the first sentence of Paragraph 8; refers to the cited sources for a complete and accurate description of their contents.

9.    From the beginning, Sasol's top executives expressed complete commitment and involvement to this core project; Defendant David Constable – Sasol's CEO from the beginning of the project through June 2016 – called it a "game-changer" in 2012,[6] a boast that Sasol repeated in a tweet in November 2018.[7] In promoting the project, Sasol promised a "new world-scale ethane cracker."[8] It promised to differentiate itself based on "capacity expansion and new

---

[3] *See* Patrick McGroarty and Alison Sider, *Scrapped: Oil Prices Shelve an $11 Billion Gulf Coast Project*, Wall Street Journal (Jan. 28, 2015), https://www.wsj.com/articles/sasol-reviewsinvestment-plans-for-louisiana-gas-to-liquids-plant-1422446980.

[4] *See* Press Release, *Sasol Announces Largest Manufacturing Investment In Louisiana History, Creating More Than 7,000 Direct And Indirect Jobs*, Louisiana Economic Development (Dec. 3, 2012), https://www.opportunitylouisiana.com/led-news/newsreleases/news/2012/12/03/sasol-announces-largest-manufacturing-investment-in-louisianahistory-creating-more-than-7-000-direct-and-indirect-jobs.

[5] *See* Louisiana Case Studies, *New investment opportunities emerge as natural gas prices fall*, Council of American States in Europe, http://www.invest-in-usa.org/case-studies/37louisiana-case-studies/87-sasol-la (last visited June 4, 2020).

[6] *See Sasol CEO Says La. Gas-to-Liquids Plant 'Can Be a Game-Changer' Despite Risks*, Business Report (Dec. 18, 2012), https://www.businessreport.com/article/sasol-ceo-says-la-gasto-liquids-plant-can-be-a-game-changer-despite-risks.

[7] *See* Sasol (@SasolSA), TWITTER (Nov. 1, 2018, 2:27 a.m.), https://twitter.com/sasolsa/status/1057927198491983878.

[8] Site Visit Presentation, Lake Charles, La., Sasol (Feb. 2, 2015), https://www.sasol.com/sites/default/files/content/files/Investor_Presentation_Site%20visit_LCCP_28012015_VersionFINAL_website%20version_1.pdf.

capabilities to exploit growing demand; Derivative products enhance and expand Sasol's existing global chemical business; [and] Alcohols and ethoxylates provide premium uplift over ethane."[9]

**ANSWER**:    Denies the allegations contained in Paragraph 9, except admits that the February 2, 2015, "Sasol Site Visit" presentation referenced in Paragraph 9 exists, and refers to that presentation for a complete and accurate description of its contents; refers to the cited sources for a complete and accurate description of their contents.

10.    Sasol also promised a well-run and efficient project. Mike Thomas, the Senior Vice President of U.S. Operations, claimed that its existing operations had an "excellent operational track record." Mr. Thomas listed among its three priorities "Reliability and plant operations" and "Cost/profitability improvement focus." A history of Lake Charles' production volume showed "steadily higher volumes and revenues without a major debottlenecking." *Id.*

**ANSWER**:    Denies the allegations contained in Paragraph 10, except admits that the February 2, 2015, "Sasol Site Visit" presentation referenced in Paragraph 10 exists, and refers to that presentation for a complete and accurate description of its contents.

11.    In October 2014, Defendant Steve Cornell, then the Executive Vice President of International Operations, promised that the "project will establish Sasol's Lake Charles location as an integrated, multi-asset site – similar to our Secunda site – that will enable growth for decades to come." Defendant Cornell projected a nearly five-fold increase in ethylene production, a doubling of alcohols and ethoxylates production, and new polyethylene production totaling approximately 900 kilo-tons per annum. *Id.* at 23. Sasol outlined a 3-year construction phase, with operations beginning in the year 2018, which it projected would roughly coincide with an increase in oil prices. Among the "world-class roster of contractors" it referenced was Fluor and Technip, both of whom served as the main subcontractors for the project.

**ANSWER**:    Denies the allegations contained in Paragraph 11, except admits that the February 2, 2015, "Sasol Site Visit" presentation referenced in Paragraph 11 exists, and refers to that presentation for a complete and accurate description of its contents.

12.    Sasol further promised investors that it would have an "experienced owner team in place to oversee Execution phase," and that there was an "Excellent Project Controls team in place to [] monitor cost and schedule; [and] give accurate predictability." Defendant Paul Victor claimed that Sasol's cash flow would cover its financing by the year 2018, and that the "project economics [are] robust, ***even under extreme scenarios***." *Id.* at 49 (emphasis added).

---

[9] *Id.*

**ANSWER**:    Denies the allegations contained in Paragraph 12, except admits that the February 2, 2015, "Sasol Site Visit" presentation referenced in Paragraph 12 exists, and refers to that presentation for a complete and accurate description of its contents.

13.    Sasol also changed its senior leadership for the stated purpose of executing on the LCCP project. On June 8, 2015, Sasol announced that Defendant Constable, the Company's then President and CEO, had decided not to extend his contract with Sasol beyond June 30, 2016.

**ANSWER**:    Denies the allegations contained in Paragraph 13, except admits that Defendant Constable, Sasol's then President and CEO, decided not to extend his contract with Sasol beyond June 30, 2016.

14.    On December 11, 2015, Sasol announced the appointment of Defendant Nqwababa and Defendant Cornell as Joint-Presidents and Chief Executive Officers ("Joint-CEOs") of the Company, effective July 1, 2016, the beginning of the Company's next financial year.

**ANSWER**:    Admits the allegations contained in Paragraph 14.

15.    Analysts immediately remarked that the appointment of Defendants Nqwababa and Cornell as Joint CEOs, rather than an outsider, was driven by the importance of timely delivering the LCCP. In a December 13, 2015 report entitled "CEO succession decision endorses continuity," Deutsche Bank wrote, "We believe the board's decision underscores the continuity of the company's strategy. Sasol is in the middle of completing an $8.1bn chemicals project in Lake Charles (LCCP) with the remaining spend of $6.3bn until FY 2019 representing 42% of the company's market capitalization . . . . We believe completing LCCP on time and on budget remains the single most important priority for the incoming co-CEOs. The project will consume not only the management resources, but also the majority of Sasol's funding potential, meaning that the opportunities for new strategic moves are limited for the next few years."

**ANSWER**:    Lacks knowledge or information to form a belief as to the truth or falsity of the allegations contained in the first sentence of Paragraph 15; admits that the December 13, 2015, Deutsche Bank report entitled "CEO succession decision endorses continuity," exists, and refers to that report for a complete and accurate description of its contents.

16.    But unbeknownst to investors, throughout the Class Period, Sasol failed to disclose substantial cost overruns and delays in completion of the project, even as Sasol's senior management and Executive Defendants received reports that the project was going to cost substantially more than Sasol disclosed publicly. According to well-placed, reliable former Sasol employees with personal knowledge of the subject matter, corroborated and strengthened by

Defendants' post-Class Period admissions, concerns about accounting practices, cost overruns, and delays in project completion were routinely relayed to senior management, but these concerns were continually ignored because senior management was incentivized to drive up the stock price of their own holdings. These concerns were documented in reports and PowerPoint presentations, but deliberately and routinely ignored in order to prop up Sasol's ADR prices.

**ANSWER**:    Denies the allegations contained in Paragraph 16.

17.    Nevertheless, throughout the Class Period, Sasol primarily represented that the project was on time and on budget, even as Sasol's well-placed former employees confirmed this to be far from the truth. For example, in its September 7, 2015 6-K, Sasol reported to investors that "[c]ash flow generation remains robust, which, together with our solid, ungeared balance sheet, enables us to execute our growth projects in Southern Africa and the United States. Our US$8.9 billion world-scale ethane cracker and downstream derivatives complex in Lake Charles, Louisiana remains on track to reach beneficial operation in 2018." It also touted that "significant progress has been made in detailed engineering and infrastructure work at the site. We expect to achieve BO [beneficial operation] during the 2018 calendar year. The final estimated project cost remains at US$8.9 billion (including infrastructure and utilities)."

**ANSWER**:    Denies the allegations contained in Paragraph 17, except admits that Paragraph 17 purports to quote and characterize a September 7, 2015, Form 6-K issued by Sasol, and refers to that Form 6-K for a complete and accurate description of its contents.

18.    These statements were false and misleading. Contrary to being "on track" with "significant progress," in truth, according to well-placed former Sasol employees, the cost estimates for the project were at least $11 billion "from the beginning" of the project. Delays and lack of progress hampered the project from the beginning as well, according to former employees. The main subcontractors on the project billed for their time even as no progress was being made on the project; the work was not being completed because the site was not ready. As a result, workers were on-site and getting paid, but not doing any work and not advancing the project. As one former employee described it, the subcontractors "didn't care about streamlining" project costs because they operated on a reimbursable contract under which they were paid regardless of whether they worked or not. According to this former employee, "[e]veryone knew they didn't do anything but were billing hours to the company."

**ANSWER**:    Denies the allegations contained in Paragraph 18, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of whether the confidential witnesses described in Paragraph 18 made the statements attributed to them and whether the characterizations of their statements are accurate.

19.    The culmination of false cost and scheduling estimates, along with a known lack of internal controls, eventually caught up to Sasol. On June 6, 2016, Sasol announced for the first

time that "the expected total capital expenditure for the [LCCP] could increase up to US$11 billion, including site infrastructure and utility improvements"; a slower rate of capital "resulted in an extended project schedule and contributed to further project cost increases"; "[t]he expected returns for the project have reduced due to changes in long-term price assumptions and the higher capital estimates"; and "[t]he increase in the estimated LCCP capital cost and extended schedule will reduce the expected project returns by approximately the same amount as the Company's lower long-term price assumptions." Even as Sasol made this disclosure, it sought to reassure investors that this revised figure of $11 billion would be the absolute upper limit of cost expenditures. CEO Constable, on a call with investors that same day, stated "[w]e really want to strongly message that we are confident that we'll be able to push the CapEx down." He also described it as a "worst-case scenario," and that the $11 billion figure was an "extremely comfortable number for us." He also assured investors that the "management team remains closely involved in guiding the project team, so that we can minimize capital expenditure and further optimize overall project efficiency. To support these efforts, we have also bolstered the senior staffs' resources on the ground to enable an even greater focus on a range of execution activities."

**ANSWER**:    Denies the allegations contained in Paragraph 19, excepts admits that the second sentence of Paragraph 19 purports to quote and characterize a June 6, 2016, Form 6-K issued by Sasol, and refers to that Form 6-K for a complete and accurate description of its contents; admits that the fourth, fifth, and sixth sentences of Paragraph 19 purport to quote and characterize a June 7, 2016, business update call, and refers to the transcript of that call for a complete and accurate description of its contents.

20.    On this news, Sasol's American Depository Receipt price declined nearly 11%, and on June 6, 2016 closed at $28.60.

**ANSWER**:    Denies the allegations contained in Paragraph 20, except states that the allegations in Paragraph 20 purport to describe the price of Sasol's ADRs, which are matters of public record, and refers to such public records.

21.    However, Defendants' disclosure was false and misleading, for at least four reasons: (1) Sasol's senior management, including its Executive Directors, had already received a Change Order from Fluor, its main subcontractor, in February 2016 confirming that the subcontractor's cost would be at least $11.7 billion – an underreporting of $700 million in costs; (2) according to Sasol, the $11 billion figure included a $300 million contingency, which was not included in the subcontractor's costs, such that the actual amount of underreported costs was closer to $1 billion; (3) Sasol's subcontractor costs did not represent all costs of the Lake Charles project, and Sasol knew that the subcontractor's Change Order amount did not represent the full price of the project; and (4) the revised figure from Sasol did not represent a "worst-case

scenario," but was a legally binding amount that Sasol had to pay pursuant to the terms of the contract. A former employee, who saw this Change Order and remembers the dramatic change in anticipated costs, stated that the public disclosure in June 2016 that capital expenditures "could" equal $11 billion was a "fraud" and "wrong," because the capital expenditures were known to be at least $11.7 billion at that time. And, according to the former employee, senior management "would have had to have known" that the LCCP project was behind schedule and over budget, because they were receiving monthly reports on its cost and progress toward completion.

**ANSWER**:    Denies the allegations contained in Paragraph 21, except lacks knowledge or

information sufficient to form a belief as to the truth or falsity of whether the confidential

witness described in Paragraph 21 made the statements attributed to them and whether the

characterizations of their statements are accurate.

22.    According to the well-placed former Sasol employees, the motive for the Executive Defendants to make false representations and omissions was clear: the Executive Defendants' compensation was tied to performance of Sasol's securities. Falsely assuring investors that the project was on budget and will be delivered on time propped up the price of Sasol's securities, to the benefit of the Executive Defendants. As one example of this, Defendant Constable held an investor call on June 7, 2016. He acknowledged on this call that he would be leaving Sasol on June 30, 2016. During this call, he falsely assured the market and investors that the projected increase in costs to $9 billion was a "worst case scenario," whereas in fact the $9 billion figure not only underreported the known costs of its main subcontractor, but also falsely suggested that Sasol would be able to reduce the costs it was contractually obligated to pay its subcontractor. From 2012 to 2016, more than half of Constable's remuneration was based on Sasol's "Short Term Incentive" plan; the remainder was a base salary.[10]

**ANSWER**:    Denies the allegations contained in Paragraph 22, except admits that the third,

fourth, and fifth sentences of Paragraph 22 purport to quote and characterize a June 7, 2016,

business update call, and refers to the transcript of that call for a complete and accurate

description of its contents; lacks knowledge or information sufficient to form a belief as to the

truth or falsity of whether the confidential witness described in Paragraph 22 made the

statements attributed to them and whether the characterizations of their statements are accurate;

---

[10] *See* Annual Financial Statements, at 49, Sasol (June 30, 2016), https://www.sasol.com/ sites/sasol/files/financial_reports/Annual%20Financial%20Statements,%2030%20June%202016.pdf.

refers to Sasol's public disclosures for a complete and accurate description Defendant

Constable's remuneration.

23.    Following the June 2016 disclosure, for nearly three years – from June 2016 to February 2019 – Sasol made only one adjustment to its cost expenditures, although it also made a transparently false statement about its prior disclosures. On November 23, 2017, Sasol (through its co-CEO Nqwababa) disclosed in an investor call for the first time that the cost expenditures will increase from $11 billion to $11.13 billion, but sought to downplay its significance by claiming that "you'll remember that we did give a guidance that the contingence was between $400 million and $500 million when we revised our estimate in August last year. And we were also very clear that the estimate of $11 billion does not include event-driven risks, like a hurricane or some other event like that." This is false: Sasol never disclosed in August 2016 that Sasol retained a "contingence between $400 and $500 million." Sasol made no disclosure in August 2016 about the specific amount of contingency, other than to state that it was smaller compared to its prior contingency of $300 million.

**ANSWER**:    Denies the allegations contained in the first sentence of Paragraph 109, except

admits that on June 6, 2016, Sasol disclosed that expected total capital expenditure could

increase up to $11 billion, on November 23, 2017, Sasol disclosed that the projected project

budget was revised to $11.13 billion, and on February 8, 2019, Sasol disclosed a revision in the

projected project budget to a range of $11.6 - $11.8 billion; denies the remaining allegations in

Paragraph 23, except admits that the second sentence of Paragraph 23 purports to quote and

characterize a November 23, 2017, investor call, and refers to the transcript of that call for a

complete and accurate description of its contents; admits that on August 23, 2016, Sasol issued a

Form 6-K and "Investor Fact Sheet," and refers to that Form 6-K and "Investor Fact Sheet" for a

complete and accurate description of their contents; and admits that Sasol did not disclose a

specific contingency amount in that Form 6-K and "Investor Fact Sheet".

24.    Other than this disclosure (and misrepresentation), during this period Sasol continued to reassure investors that its economic outlook remained "robust," that it was "on track" to complete the project on time, and that cost expenditures "remained within" the disclosed budget. During this period, on August 27, 2018, Sasol's ADRs reached a high of $39.26 per share.

**ANSWER**:    Denies the allegations contained in Paragraph 24, except to the extent Plaintiffs purport to quote and characterize unidentified public disclosures during an unidentified time period, and refers to those unidentified public disclosures for a complete and accurate description of their contents; states that the phrase "[d]uring this period" in the second sentence of Paragraph 24 is vague and subject to multiple interpretations and thus denies on that basis; states that the second sentence of Paragraph 24 purports to describe the prices of Sasol's ADRs, which are matters of public record, and refers to such public records.

25.    Its subsequent disclosures demonstrate that Sasol's assurances of a timely and within-budget project were false. On May 22, 2019, during pre-market hours, Sasol surprised investors when it disclosed that "the cost estimate for the LCCP has been revised to a range of $12.6 to $12.9 billion which includes a contingency of $300 million." Sasol cited a $530 million change in the project's cost forecast because of a "[c]orrection for duplication of investment allowances of approximately $230 million"; a "[c]orrection for certain contracts and variation orders managed by Sasol, outside the primary engineering, procurement and construction contract, of approximately $180 million"; and forecast improvements that were "not expected to be realised and adjustments for potential insurance claims and procurement back-charges of approximately $120 million."

**ANSWER**:    Denies the allegations contained in Paragraph 25, except admits that the second and third sentences of Paragraph 25 purport to quote and characterize a May 22, 2019, Form 6-K issued by Sasol, and refers to that Form 6-K for a complete and accurate description of its contents.

26.    Even as it abruptly adjusted its anticipated cost expenditures by nearly $1.5 billion, it sought to reassure investors that it had righted the ship and was prepared for the future. Sasol claimed that "[e]xecutive management has implemented several changes since February 2019 to further strengthen the oversight, leadership for the project and frequency of reporting," including "segregation of duties between project controls and finance functions and assigning a Senior Vice-President to have responsibility for the LCCP project controls." Sasol also represented that "[i]nitiatives to improve decision-making, transparency and documentation within the project management team are also in progress," and assured investors that "new project leadership has been instrumental in identifying and remediating these issues."

**ANSWER**:    Denies the allegations contained in Paragraph 26, except admits that Paragraph 26

purports to quote and characterize a May 22, 2019, Form 6-K issued by Sasol, and refers to that

Form 6-K for a complete and accurate description of its contents.

27.    Following these disclosures, Sasol's ADR price fell $4.50 per share, or 14.93%, to close at $25.64 per share on May 22, 2019.

**ANSWER**:    Denies the allegations contained in Paragraph 27, except states that the allegations

in Paragraph 27 purport to describe the prices of Sasol's ADRs, which are matters of public

record, and refers to such public records.

28.    But then, on August 16, 2019, during pre-market hours, Sasol issued a press release disclosing that it was delaying the announcement of its 2019 financial results because of possible LCCP control weaknesses. Sasol stated that the Board received a preliminary report earlier in the week following an independent review of the obstacles that have hampered LCCP, which "contains observations which point to possible LCCP control weaknesses." Sasol also announced a fresh problem, saying the start of an ethane cracker had been delayed by a technical glitch.

**ANSWER**:    Denies the allegations contained in Paragraph 28, except admits that Paragraph 28

purports to quote and characterize an August 16, 2019, Form 6-K issued by Sasol, and refers to

that Form 6-K for a complete and accurate description of its contents.

29.    On October 28, 2019, Sasol disclosed that its review of the LCCP control weaknesses had brought to light "errors, omissions, and inaccuracies in the [LCCP] cost estimate," and "inappropriate conduct and an improper tone at the top of the LCCP, including an excessive focus on maintaining cost and schedule estimates at the expense of providing accurate cost and schedule estimation to oversight bodies (including the Joint Chief Executive Officers) within the Company."

**ANSWER**:    Denies the allegations contained in Paragraph 29, except admits that Paragraph 29

purports to quote and characterize the independent review commissioned by the Board as

disclosed in the October 28, 2019, Form 6-K and October 28, 2019, Form 20-F, and refers to

those public filings for a complete and accurate description of their contents.

30.    Sasol also announced the resignation of several members of its executive leadership, including its Joint Presidents and Chief Executive Officers, Senior Vice Presidents,

- 12 –

and other individuals previously charged with responsibility of the LCCP, which news was well-received by investors.

**ANSWER**:    Denies the allegations contained in Paragraph 30, except admits that in its

October 28, 2019, Form 6-K, Sasol announced changes to its Board and refers to that Form 6-K

for a complete and accurate description of its contents.

31.    Finally, on January 14, 2020, Sasol issued a press release confirming that on January 13, 2020, the Company "experienced an explosion and fire at its LCCP low-density polyethylene (LDPE) unit." Sasol stated that "[t]he unit was in the final stages of commissioning and startup when the incident occurred" and "has been shut down and an investigation is underway to determine the cause of the incident, the extent of the damage and resulting impact on the LDPE unit's [beneficial operation] schedule." The explosion shut down the LDPE unit – a major unit of LCCP. Slowly, as the company disclosed the impact, the further delays caused, and the reduction of revenues expected as a result, investors punished Sasol's ADR price.

**ANSWER**:    Denies the allegations contained in Paragraph 31, except admits that Paragraph 31

purports to quote and characterize a January 14, 2020, Form 6-K issued by Sasol, and refers to

that Form 6-K for a complete and accurate description of its contents.

32.    Immediately following the disclosure of the explosion potentially resulting from the cost cutting and undue pressure to rush the project to completion, Sasol's ADR price fell $1.70 per share, or 7.84%, over the following two trading days, closing at $19.99 per share on January 15, 2020. Then as management dribbled out more news of the financial impact of the explosion, by May 29, 2020, Sasol's stock plunged to $5.15 per share.

**ANSWER**:    Denies the allegations contained in Paragraph 32, except states that the allegations

contained in Paragraph 32 purport to describe the prices of Sasol's ADRs, which are matters of

public record, and refers to such public records.

33.    All told, Sasol's ADRs lost over hundreds of millions in shareholder value as a result of Defendants' fraud. By this action, investors seek redress pursuant to the federal securities laws.

**ANSWER**:    Denies the allegations contained in Paragraph 33.

## II.    JURISDICTION AND VENUE

34.    This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), and 78t-1(a)), and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated under the Exchange Act.

**ANSWER**:   States that Paragraph 34 contains legal conclusions, to which no response is

required.

35.   This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

**ANSWER**:   States that Paragraph 35 contains legal conclusions, to which no response is

required.

36.   This Court has personal jurisdiction over Sasol because it deliberately availed itself of this jurisdiction by using the New York Stock Exchange (located in this District) to trade its ADRs. Sasol also purposefully availed itself of this jurisdiction by employing BNY Brokerage, Inc., which is a subsidiary of the Bank of New York, which is located in New York City in this District. The Court has personal jurisdiction over the Executive Defendants because the Executive Defendants at all relevant times acted as Sasol's officers and agents, directed Sasol's business operations and public statements and disclosures, and made the decision to trade ADRs on the NYSE.

**ANSWER**:   States that Paragraph 36 contains legal conclusions, to which no response is

required.

37.   Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) and (c). At all relevant times, Sasol listed its ADRs on the NYSE, which is located in this District. It also used BNY Brokerage, Inc., a subsidiary of the Bank of New York, which is located in this District.

**ANSWER**:   States that Paragraph 37 contains legal conclusions, to which no response is

required.

### III.   PARTIES

**A.   Plaintiffs**

38.   Lead Plaintiff David Cohn is an individual investor who resides in The Woodlands, Texas. As set forth in the certification filed with this Court (ECF No. 23-1), Lead Plaintiff purchased Sasol ADRs during the Class Period and was damaged by Defendants' conduct alleged herein.

**ANSWER**:   Denies the allegations contained in Paragraph 38, except admits that Lead

Plaintiff David Cohn filed a certification with the Court on April 6, 2020, regarding his

purchases of Sasol ADRs, but lacks knowledge or information sufficient to form a belief as to

- 14 –

the truth or falsity of that certification; lacks knowledge or information sufficient to form a belief

as to the truth or falsity of Lead Plaintiff Cohn's residence.

39.     Additional Representative Plaintiff Chad Lindsey Moshell is an individual investor who resides in Rowell, Georgia. As set forth in the attached certification, Mr. Moshell purchased Sasol ADRs during the Class Period and was damaged by Defendants' conduct alleged herein.

**ANSWER**:     Denies the allegations contained in Paragraph 39, except admits that Additional

Representative Plaintiff Chad Lindsey Moshell filed a certification with the Court on September

11, 2020, regarding his purchases of Sasol ADRs, but lacks knowledge or information sufficient

to form a belief as to the truth or falsity of that certification; lacks knowledge or information

sufficient to form a belief as to the truth or falsity of Plaintiff Moshell's residence.

**B.     Corporate Defendant**

40.     Defendant Sasol is organized under the laws of the Republic of South Africa, with principal executive offices located at Sasol Place, 50 Katherine Street, Sandton, 2196, South Africa. Sasol's ADRs are listed and trade on the NYSE under the ticker symbol "SSL." Because Sasol ADRs are sponsored Level II ADR, Sasol must comply with the SEC full registration and reporting requirements.

**ANSWER**:     Admits the allegations contained in Paragraph 40.

**C.     Executive Defendants**

41.     Defendant David Edward Constable ("Constable") served as Sasol's President and CEO from before the start of the Class Period until June 30, 2016. Sasol decided to not renew his contract after June 2016. He previously worked for the Fluor Corporation for nearly thirty years, and from 2009 to 2011 served as Fluor's President of the Project Operations Group. Even as he was effectively terminated by Sasol following partial disclosures of cost overruns, he was appointed to serve on Fluor's Board of Directors, which he joined in September 2019 and where he remains today.

**ANSWER**:     Denies the allegations contained in Paragraph 41, except admits that David

Constable was Sasol's President and CEO from before the start of the Class Period until June 30,

2016; admits that David Constable worked for the Fluor Corporation from 1982 to 2011; admits

that from 2009 to 2011, David Constable served as Fluor's Group President, Operations; admits

that David Constable has served on Fluor's Board of Directors since September 2019.

42.     During the Class Period, Constable made materially false and misleading statements and omissions about Sasol's financial performance, stated metrics, and internal controls for financial reporting, in the Company's public filings, at investor presentations, and during conference calls. Constable also was present at and participated in earnings calls when other Defendants made materially false and misleading statements or omissions on these subjects, which Constable knew to be false and misleading, yet failed to correct. Constable executed certifications relating to Sasol's false and misleading reports on the Company's SEC filings. Constable also directly participated in and controlled the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning the Company and its business, operations, and financial performance. Further, Constable shared primary responsibility for ensuring that the Company's SEC filings and other public statements or releases were complete, accurate, and did not omit material information necessary under the circumstances to make them not misleading. Because of his position of control and authority, his ability to exercise power and influence over Sasol's conduct, and his access to material inside information about Sasol during the Class Period, Defendant Constable was a controlling person within the meaning of Section 20(a) of the Exchange Act.

**ANSWER**:     To the extent the allegations in Paragraph 42 consist of legal conclusions, no

response is required. To the extent the allegations contained in Paragraph 42 relate to the

effectiveness of Sasol's internal controls over financial reporting and management of the LCCP,

no response is required given the Court's dismissal of these allegations pursuant to the MTD

Order, and Plaintiffs' inclusion of these claims is solely to preserve the issues for appeal. To the

extent a response is required, denies the allegations contained in Paragraph 42.

43.     Defendant Bongani Nqwababa ("Nqwababa") served as Sasol's Chief Financial Officer ("CFO") from before the start of the Class Period until July 1, 2016, when he was appointed as one of Sasol's Joint Presidents and CEOs. Nqwababa served in this capacity until October 31, 2019, when he was forced to resign as a result of his improper oversight of the LCCP. He also sat on Sasol's Board from March 2015 to October 2019.

**ANSWER**:     Denies the allegations contained in Paragraph 43, except admits that Bongani

Nqwababa was Sasol's CFO from before the start of the Class Period until July 1, 2016; admits

that Bongani Nqwababa served as Sasol's Co-President and Co-CEO from July 1, 2016 to

October 31, 2019; admits that Bongani Nqwababa sat on Sasol's Board from March 2015 to

October 2019.

44.    During the Class Period, Nqwababa made materially false and misleading statements and omissions about Sasol's financial performance, stated metrics, and internal controls for financial reporting, in the Company's public filings, at investor presentations, and during conference calls. Nqwababa also was present at and participated in earnings calls when other Defendants made materially false and misleading statements or omissions on these subjects, which Nqwababa knew to be false and misleading, yet failed to correct. Nqwababa executed certifications relating to Sasol's false and misleading reports on the Company's SEC filings. Nqwababa also directly participated in and controlled the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning the Company and its business, operations, and financial performance. Further, Nqwababa shared primary responsibility for ensuring that the Company's SEC filings and other public statements or releases were complete, accurate, and did not omit material information necessary under the circumstances to make them not misleading. Because of his position of control and authority, his ability to exercise power and influence over Sasol's conduct, and his access to material inside information about Sasol during the Class Period, Defendant Nqwababa was a controlling person within the meaning of Section 20(a) of the Exchange Act.

**ANSWER**:    To the extent the allegations in Paragraph 44 consist of legal conclusions, no

response is required. To the extent the allegations contained in Paragraph 44 relate to the

effectiveness of Sasol's internal controls over financial reporting and management of the LCCP,

no response is required given the Court's dismissal of these allegations pursuant to the MTD

Order, and Plaintiffs' inclusion of these claims is solely to preserve the issues for appeal. To the

extent a response is required, denies the allegations contained in Paragraph 44.

45.    Defendant Stephen Cornell ("Cornell") served as one of Sasol's Joint Presidents and CEOs from July 1, 2016 until October 31, 2019, when he was forced to resign as a result of his improper oversight of the LCCP. From February 2014 to July 2016, he served as Executive Vice President for International Operations. From December 2015 to October 2019, Cornell served on Sasol's Board.

**ANSWER**:    Denies the allegations contained in Paragraph 45, except admits that Stephen

Cornell served as Sasol's Co-President and Co-CEO from July 1, 2016 to October 31, 2019;

admits that Stephen Cornell was Sasol's Executive Vice President for International Operations

- 17 –

from February 2014 to July 2016; states that Stephen Cornell sat on Sasol's Board from July 1, 2016 to October 2019.

46.     During the Class Period, Cornell made materially false and misleading statements and omissions about Sasol's financial performance, stated metrics, and internal controls for financial reporting, in the Company's public filings, at investor presentations, and during conference calls. Cornell also was present at and participated in earnings calls when other Defendants made materially false and misleading statements or omissions on these subjects, which Cornell knew to be false and misleading, yet failed to correct. Cornell executed certifications relating to Sasol's false and misleading reports on the Company's SEC filings. Cornell also directly participated in and controlled the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning the Company and its business, operations, and financial performance. Further, Cornell shared primary responsibility for ensuring that the Company's SEC filings and other public statements or releases were complete, accurate, and did not omit material information necessary under the circumstances to make them not misleading. Because of his position of control and authority, his ability to exercise power and influence over Sasol's conduct, and his access to material inside information about Sasol during the Class Period, Defendant Cornell was a controlling person within the meaning of Section 20(a) of the Exchange Act.

**ANSWER**:     To the extent the allegations contained in Paragraph 46 consist of legal conclusions, no response is required. To the extent the allegations contained in Paragraph 46 relate to the effectiveness of Sasol's internal controls over financial reporting and management of the LCCP, no response is required given the Court's dismissal of these allegations pursuant to the MTD Order, and Plaintiffs' inclusion of these claims is solely to preserve the issues for appeal. To the extent a response is required, denies the allegations contained in Paragraph 46.

47.     Defendant Paul Victor ("Victor") has served as Sasol's CFO and sat on the Board since July 1, 2016. From March 2015 to July 2016, Victor was Senior Vice President for Financial Control Services. From September 2013 to February 2015, he served as Acting CFO and Director of Finance.

**ANSWER**:     Admits the allegations contained in Paragraph 47.

48.     During the Class Period, Victor made materially false and misleading statements and omissions about Sasol's financial performance, stated metrics, and internal controls for financial reporting, in the Company's public filings, at investor presentations, and during conference calls. Victor also was present at and participated in earnings calls when other Defendants made materially false and misleading statements or omissions on these subjects, which Victor knew to be false and misleading, yet failed to correct. Victor executed certifications relating to Sasol's false and misleading reports on the Company's SEC filings. Victor also

- 18 –

directly participated in and controlled the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning the Company and its business, operations, and financial performance. Further, Victor shared primary responsibility for ensuring that the Company's SEC filings and other public statements or releases were complete, accurate, and did not omit material information necessary under the circumstances to make them not misleading. Because of his position of control and authority, his ability to exercise power and influence over Sasol's conduct, and his access to material inside information about Sasol during the Class Period, Defendant Victor was a controlling person within the meaning of Section 20(a) of the Exchange Act.

**ANSWER**:   To the extent the allegations contained in Paragraph 48 consist of legal conclusions, no response is required. To the extent the allegations contained in Paragraph 48 relate to the effectiveness of Sasol's internal controls over financial reporting and management of the LCCP, no response is required given the Court's dismissal of these allegations pursuant to the MTD Order, and Plaintiffs' inclusion of these claims is solely to preserve the issues for appeal. To the extent a response is required, denies the allegations contained in Paragraph 48.

49.    Defendant Stephan Schoeman worked for Sasol for 30 years, and ostensibly "retired" in February 2019.[11] Prior to his departure, he was the Group Executive Committee ("GEC") member responsible for the LCCP project. In 2014, he was appointed to Executive Vice President – Technology, and in 2016 he took on responsibility for the LCCP project. In Sasol's own description, he was "instrumental in overseeing the engineering and construction works of the new plant." Schoeman participated in conference calls during which Sasol made incomplete and misleading disclosures about the LCCP project. He also directed at least one former employee to manipulate the schedule for the LCCP, to make it falsely appear on paper that the project was proceeding faster than it was in reality.

**ANSWER**:   Denies the allegations contained in Paragraph 49, except admits that Paragraph 49 purports to quote and characterize a February 25, 2019, Form 6-K issued by Sasol, and refers to that Form 6-K for a complete and accurate description of its contents; admits that Stephan Schoeman worked for Sasol for 30 years; admits that Stephan Schoeman was the Group Executive Committee ("GEC") member responsible for, among others, the LCCP; admits that

---

[11] Schoeman's departure coincided with several other senior executives leaving Sasol in the wake of disclosures that Sasol's stated cost and timeline estimates were inaccurate.

**ANSWER:** Denies the allegations contained in footnote 11.

Stephan Schoeman was appointed as Sasol's Executive Vice President – Technology in 2014; admits that Stephan Schoeman took on responsibility for the LCCP in 2016.

50.     During the Class Period, Schoeman made materially false and misleading statements and omissions about Sasol's financial performance, stated metrics, and internal controls for financial reporting, in the Company's public filings, at investor presentations, and during conference calls. Schoeman also was present at and participated in earnings calls when other Defendants made materially false and misleading statements or omissions on these subjects, which Schoeman knew to be false and misleading, yet failed to correct. Schoeman also directly participated in and controlled the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning the Company and its business, operations, and financial performance. Further, Schoeman shared primary responsibility for ensuring that the Company's SEC filings and other public statements or releases were complete, accurate, and did not omit material information necessary under the circumstances to make them not misleading. Because of his position of control and authority, his ability to exercise power and influence over Sasol's conduct, and his access to material inside information about Sasol during the Class Period, Defendant Schoeman was a controlling person within the meaning of Section 20(a) of the Exchange Act.

**ANSWER**:     To the extent the allegations in Paragraph 50 consist of legal conclusions, no response is required. To the extent the allegations contained in Paragraph 50 relate to the effectiveness of Sasol's internal controls over financial reporting and management of the LCCP, no response is required given the Court's dismissal of these allegations pursuant to the MTD Order, and Plaintiffs' inclusion of these claims is solely to preserve the issues for appeal. To the extent a response is required, denies the allegations contained in Paragraph 50.

51.     Defendants Constable, Nqwababa, Cornell, Victor, and Schoeman are sometimes referred to herein collectively as the "Executive Defendants."

**ANSWER**:     The allegations in Paragraph 51 consist of Plaintiffs' characterization of this action, to which no response is required.

### IV.     SUBSTANTIVE ALLEGATIONS

### A.     Sasol and Its Business

52.     Sasol was founded in 1950 during the apartheid era of South Africa. It is headquartered in Johannesburg. The Company produces various liquid fuels, chemicals, and electricity. It employs approximately 30,100 individuals, and operates in 33 countries. Sasol is

listed on the Johannesburg Stock Exchange, and trades its ADRs on the New York Stock Exchange under the ticker symbol SSL.

**ANSWER**:    Denies the allegations contained in the fourth sentence of Paragraph 52 as to the number of current employees and operating countries, and otherwise admits the allegations contained in Paragraph 52.

53.    Sasol began as an effort to develop its own gasoline production facilities as other countries imposed restrictions on trade with South Africa's apartheid regime. Now, Sasol operates as an integrated chemical and energy company in South Africa. From the beginning, Sasol relied on the LCCP project to diversify its business and deliver continued profitability for the Company. As it described in an August 23, 2016 "Investor Fact Sheet," "Despite the current cost estimate of $11 billion, we still consider the LCCP to be a sound strategic investment that is of significant importance to Sasol's future growth and will return value to our shareholders for many years into the future. LCCP will transform the existing Lake Charles site into an integrated, multi-asset site that will allow fixed and infrastructure costs to be spread over multiple product lines, and provide opportunities for investment in additional downstream chemical facilities in the future."

**ANSWER**:    Denies the allegations contained in Paragraph 53, except admits that Sasol is an international integrated chemical and energy company headquartered in South Africa; admits that the August 23, 2016, "Investor Fact Sheet" referenced in Paragraph 53 exists, and refers to that "Investor Fact Sheet" for a complete and accurate description of its contents.

54.    Sasol and the Executive Defendants continually referred to Lake Charles as pivotal to its future success. For example, on a November 23, 2017 investor call, Nqwababa explained that, "[f]ollowing a structural shift to a low oil price environment, our chemical business has increased its contribution to grow profit from 40% to 50%. This will further increase cost commissioning of the LCCP. We believe that Sasol's diversified revenue base covering different geographies, sectors and currencies will remain a strong component of Sasol's ability to remain robust through different oil and chemical price cycles." He also described LCCP as a "game changer for Sasol. Once commissioned, this well-scaled petrochemical complex will triple our chemical production capacity in the U.S., enabling Sasol to further strengthen our position in a growing global chemicals market."

**ANSWER**:    Denies the allegations contained in Paragraph 54, except admits that Paragraph 54 purports to quote and characterize a November 23, 2017, investor call, and refers to the transcript of that call for a complete and accurate description of its contents.

55.     Given the sheer size of the LCCP investment, Defendants repeatedly highlighted the effectiveness of the Company's controls over the project. For example, in a February 2, 2015 Sasol Site Visit conference with investors led by Defendant Cornell, Defendants highlighted the "Excellent Project Controls team in place to: monitor cost and schedule; give accurate predictability:



**ANSWER**:   Denies the allegations contained in Paragraph 55, except admits that Paragraph 55

purports to quote and excerpt a February 2, 2015, Sasol Site Visit presentation, and refers to that

presentation for a complete and accurate description of its contents.

56.     Despite this rosy picture painted by Sasol executives, as detailed below, during the Class Period Defendants made numerous materially false and misleading statements regarding Sasol's business, and deliberately omitted and withheld material information about its operations. These included knowingly false estimates and failure to disclose material LCCP cost and schedule overruns, and – as described in Sasol's 2019 Management's annual report on internal control over financial reporting – "material weakness in internal control over financial reporting with respect to the capital cost estimation process implemented in connection with the LCCP, which resulted from the aggregation of a series of individual control and project-related control environment deficiencies." As result of this conduct and failure to manage the LCCP project, Defendants deliberately concealed the negative impact of the project on Sasol's financial results, which – when finally made public to investors – caused Sasol's stock price to drop significantly. In addition, in the rush to complete the project even based on the extended timeline, Sasol management cut corners and created what a former Sasol employee described as an unsafe environment, which on January 14, 2020 resulted in an explosion and shutdown of the most critical unit at the plant.

**ANSWER**:   To the extent the allegations contained in Paragraph 56 consist of legal

conclusions, no response is required. To the extent the allegations contained in Paragraph 56

relate to the effectiveness of Sasol's internal controls over financial reporting and management of the LCCP, no response is required given the Court's dismissal of these allegations pursuant to the MTD Order, and Plaintiffs' inclusion of those claims is solely to preserve the issues for appeal. To the extent a response is required, denies the allegations contained in Paragraph 56.

**B.    The Lake Charles Chemicals Project (LCCP)**

57.    On October 27, 2014, Sasol announced its intent to construct an $8.1 billion ethane cracker and derivatives complex in Lake Charles, Louisiana, which came to be known as the Lake Charles Chemicals Project ("LCCP"). "Cracking" refers to the process of breaking down long-chain hydrocarbons into short-chain hydrocarbons. An "ethane cracker" processes ethane (a natural gas) and cracks or converts it into ethylene by subjecting ethane to extremely hot temperatures. Ethylene is the most commonly produced petrochemical used in the manufacturing of plastics, resins, adhesives, and synthetic products. Ethane crackers can emit large amounts of ethylene, propylene, and other highly reactive volatile organic compounds. Below is a schematic diagram outlining the anticipated flow of LCCP's operations, including the LDPE unit which comprised a major part of the production at LCCP.



**ANSWER**:    Denies the allegations contained in Paragraph 57, except states that Paragraph 57 purports to excerpt an August 23, 2016, "Investor Fact Sheet", and refers to that "Investor Fact Sheet" for a complete and accurate description of its contents.

58.    Sasol announced that the LCCP would include seven manufacturing units, including a facility dedicated to the production of low-density polyethylene ("LDPE"), and a separate facility manufacturing Ziegler alcohol, ethoxylates, and Guerbet alcohol. Sasol

promised that, "once commissioned, this world-scale petrochemicals complex will roughly triple the company chemical production in the United States, enabling Sasol to further strengthen its position in a growing global chemicals market."

**ANSWER**:    Denies the allegations contained in Paragraph 58, except admits the allegations contained in the first sentence of Paragraph 58; admits that the second sentence of Paragraph 58 purports to quote and characterize an October 27, 2014, Form 6-K issued by Sasol, and refers to that Form 6-K for a complete and accurate description of its contents.

59.    Sasol referred to the project as a "mega-project." The LCCP work site is approximately 3 million square meters, and the plant size is approximately 540,000 square meters. As Sasol describes, the development of this project (along with another project in Mozambique) "is a capital-intensive process carried out over long durations and requires us to commit significant capital expenditure and devote considerable management resources in utilizing our existing experience and know-how."[12]

**ANSWER**:    Denies the allegations contained in Paragraph 59, except admits the allegations contained in the first sentence of Paragraph 59; admits that the second and third sentences of Paragraph 59 purport to quote and characterize an October 9, 2015, Form 20-F issued by Sasol, and refers to that Form 20-F for a complete and accurate description of its contents.

60.    Investors were initially bullish on LCCP. A September 1, 2015 report from Deutsche Bank gave Sasol a "buy" rating, noting that "Sasol stands out among EM oil stocks via its low leverage, dividend certainty and growth plans related to the construction of the Lake Charles chemical facility. As Sasol shifts from a predominantly oil company to a chemical company, we believe its rating will rise closer to global chemical company multiples."

**ANSWER**:    Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in the first sentence of Paragraph 60, and admits that the September 1, 2015, Deutsche Bank report described in Paragraph 60 exists, and refers to that report for a complete and accurate description of its contents.

---

[12] Sasol 2015 Form 20-F, https://www.sasol.com/sites/default/files/financial_reports/ Sasol%20Form%2020F%2C%2030%20June%202005.pdf (last visited June 3, 2020).

## C.      Sasol's Troubled History on New Projects

61.      Sasol's failure to disclose the true costs of the LCCP was nothing new.  Sasol has a history of cost overruns and incomplete disclosures; according to Forbes, "Sasol had a history of shaky performance on managing big projects."[13] For example, prior to LCCP Sasol had attempted to launch a wax factory project in Sasolburg, South Africa. According to Bloomberg, this project "provided warning signs about potential cultural problems earlier."[14] This project – known as FTWEP (FT Wax Expansion Project") – incurred cost overruns "of about 40%, for which Sasol took a 1.5 billion rand ($100 million) write-down." *Id.* The South African law firm, Werksmans Attorneys, was commissioned by the Sasol Board to investigate the issue in 2013, and found that management exchanged emails about problems with the project as early in August 2012, but did not fully disclose the cost overruns until May 2013. *Id.* The law firm cited problems with "transparency, conflicts of interest, and 'potentially gross negligence.'" The law firm's report, which Bloomberg had reviewed, also found "that there are attempts at withholding information from business units and from the Sasol Ltd. board and that there are attempts to make the picture that is FTWEP look better than it actually is." It also revealed that Executive Defendant Paul Victor "had cautioned against giving investors too much detail about the problems with the wax facility, saying in a February 2013 email that it would 'not go down well,' according to the probe. Victor was financial controller at the time." *Id.* In the end, "the 2013 warning by [the South African law firm] proved prescient for Lake Charles, where costs swelled before and throughout construction." *Id.* The warnings, which must have been known by top management and each director, clearly showed Defendant Victor's mindset against "giving investors too much detail about the problems," including at LCCP.

**ANSWER**:      Denies the allegations contained in Paragraph 61, except states that Sasol

commissioned and completed its FT Wax Expansion Project; admits that *Forbes* published an

article entitled "Sasol's CEO Odd Couple Talk Up Their $11 Billion Bet On Louisiana," dated

December 13, 2017, and refers to that article for a complete and accurate description of its

contents; admits that *Bloomberg* published an article entitled "A Management 'Culture of Fear'

Derailed a South African Icon," dated February 20, 2020, and refers to that article for a complete

and accurate description of its contents.

---

[13] *See* Christopher Helman, *Sasol's ECO Odd Couple Talk Up their $11 Billion Bet on Louisiana,* Forbes (Dec. 13, 2017), https://www.forbes.com/sites/christopherhelman/2017/12/13/ sasols-co-ceos-talk-up-their-11billion-bet-on-louisiana/#1f8882084202.

[14] *See* Antony Sguazzin and Paul Burkhardt, *A Management 'Culture of Fear' Derailed a South African Icon*, Bloomberg (Feb. 20, 2020), https://www.bloombergquint.com/ businessweek/a-management-culture-of-fear-derailed-southafrica-s-sasol.

62.    Because of this history, Sasol's senior management was attuned to and cognizant of the materiality of its representations regarding costs and cost overruns, and the timeliness of completion of the projects. Similarly, investors and analysts – as reflected in Forbes' comments cited above – paid particularly close attention to the veracity and accuracy of Sasol's disclosures and representations based on Sasol's previous difficulties with timely and accurate disclosures.

**ANSWER**:    Denies the allegations contained in Paragraph 62, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in the second sentence of Paragraph 62.

### D.    From the Beginning, Defendants Knew Their Cost and Timeline Estimates Were False, as Confirmed by Confidential Witnesses

63.    Sasol initially announced that its expected capital expenditure for LCCP would be $8.9 billion. But according to well-placed insiders at the company, the LCCP was plagued by cost overruns and mismanagement almost from the start, even as Sasol falsely claimed that the project was on budget and would be delivered on time. One of these employees stated that Sasol's June 6, 2016 disclosure of an $8.9 billion cost estimate was a "fraud" and "wrong" because it was directly contradicted by a Change Order, submitted by Fluor, that senior executives must have seen. The accounts of these insiders, recounted below, are corroborated by each other, by Sasol's eventual admissions of misconduct, and Sasol's eventual decision to fire or replace key personnel on the project.

**ANSWER**:    Denies the allegations contained in Paragraph 63, except admits the allegation contained in the first sentence of Paragraph 63 as to Sasol's initial expected capital expenditure; lacks knowledge or information sufficient to form a belief as to the truth or falsity of whether the confidential witness described in Paragraph 63 made the statements attributed to them and whether the characterizations of their statements are accurate.

#### 1.    CW-1: A February 2016 Change Order for $11.7 Billion Confirms Sasol Did Not Timely Disclose True Cost.

64.    CW-1 served as a senior engineer for the LCCP project from early fall 2015 to mid-summer July 2016, and worked as a subcontractor for Fluor, the main subcontractor on the project. CW-1 worked both in Sasol's Houston office, and on-site at Lake Charles. CW-1 was responsible for undertaking reviews and estimates and processing invoices for indirect costs, including expenses related to maintaining OSHA compliance. CW-1 used Sasol's proprietary Contract Management System ("CMSi") for payment, monthly accruals, and cost forecasting, and used CMSi to generate a report of LCCP's indirect costs every two weeks. CW-1's reports were incorporated into a consolidated cost report, also generated through CMSi that went to

LCCP's project leader and managers. CW-1 saw these consolidated costs reports in the course of CW-1's work.

**ANSWER**:    Denies the allegations contained in Paragraph 64, except admits that Fluor

Enterprises Inc. ("Fluor") was a subcontractor on the LCCP through its joint venture with

TechnipFMC, which together formed Fluor Technip Integrated ("FTI"); lacks knowledge or

information sufficient to form a belief as to the truth or falsity of whether the confidential

witness described in Paragraph 64 made the statements attributed to them and whether the

characterizations of their statements are accurate.

65.    CW-1 stated that, in February 2016, Fluor submitted a Change Order for $11.7 billion for the LCCP project — which is nearly $3 billion more than Sasol's $8.9 billion disclosure on March 9, 2015. (Sasol waited several months to disclose its cost overruns, and even then its June 2016 disclosure only reported that costs "could" increase to $11 billion, which Constable described as a "worst case scenario," and underreporting the true costs by $700 million). A Change Order is a formal notice by a contractor to its client that a project's initial, approved budget has been exhausted and that more money is needed to continue work. CW-1 saw this Change Order because it covered both direct and indirect costs for LCCP, and CW-1 was responsible for indirect costs. CW-1 remembered this change because it was such a huge increase. Sasol did not disclose to shareholders a revised cost of $11.6 - $11.8 billion until February 25, 2019 — three years after the Fluor Change Order. The Change Order cited "lack of progress" on LCCP construction and a request by Fluor to "increase the indirects" (referring to indirect costs). CW-1 stated Fluor was requesting payment despite construction delays because projects "are based on time and materials. Whether they're getting done or not."

**ANSWER**:    Denies the allegations contained in Paragraph 65, except lacks knowledge or

information sufficient to form a belief as to the truth or falsity of whether the confidential

witness described in Paragraph 65 made the statements attributed to them and whether the

characterizations of their statements are accurate.

66.    CW-1 stated that the public disclosure in June 2016 that capital expenditures "could" equal $11 billion was a "fraud" and "wrong," because the capital expenditures were known to be at least $11.7 billion at that time. The cost of the project is straightforward — it is based on quantity multiplied by price. There was no basis for Sasol to renegotiate or bargain down the price; Sasol was contractually obligated to pay Fluor's costs because it was based on a simple time and materials formulation. To that extent, Sasol was not in a position to reject the Change Order, but instead was contractually obligated to pay that amount as it came due.

**ANSWER**:    Denies the allegations contained in Paragraph 66, except lacks knowledge or

information sufficient to form a belief as to the truth or falsity of whether the confidential

witness described in Paragraph 66 made the statements attributed to them and whether the

characterizations of their statements are accurate.

67.    In addition, the Fluor contract does not represent the full price of the project. Sasol entered into separate stand-alone contracts for certain major equipment, such that the $11.7 billion Change Order represents the floor of what the project will cost. When told that senior management, in June 2016, stated that the $11 billion figure was a "worst case scenario," CW-1 stated that there was no basis to make that claim.

**ANSWER**:    Denies the allegations contained in Paragraph 67, except lacks knowledge or

information sufficient to form a belief as to the truth or falsity of whether the confidential

witness described in Paragraph 67 made the statements attributed to them and whether the

characterizations of their statements are accurate.

68.    CW-1 stated that Sasol's senior management (including Defendants Constable, Cornell, and Nqwababa) "would have had to have known" that the LCCP project was behind schedule and over budget, partly through Sasol's reports on LCCP's external costs. It was also apparent because the work was not getting done, even as Sasol continued to spend money on the project. CW-1 stated the executive team would have received monthly reports summarizing the status of the progress and the cost estimates. In fact, Defendant Schoeman told CW-1 "things are not good" with the project based on the updates on progress and costs.

**ANSWER**:    Denies the allegations contained in Paragraph 68, except lacks knowledge or

information sufficient to form a belief as to the truth or falsity of whether the confidential

witness described in Paragraph 68 made the statements attributed to them and whether the

characterizations of their statements are accurate.

69.    In addition, Sasol was reporting internally a $300 million negative contingency every month. Contingencies are funds that are set aside by Sasol in case of a "black swan" event – unforeseen events that substantially alter the cost estimates of the project, like dramatic weather events. According to CW-1, the $300 million contingency would not be part of the $11.7 billion Change Order: in fact, typically contingencies are an internal figure that is not disclosed to the contractor or subcontractor. (In truth, in an August 2016 Form 6-K, Sasol disclosed that the $11 billion estimate *did* include a $300 million contingency, which means in June 2016 Sasol underreported the true costs of the project by at least $1 billion). As a result, as the project nears completion, the contingency should "minimize as progress progresses." To that extent, CW-1

- 28 –

stated that a $300 million contingency for a project that was nearly complete does not make sense, because at that point Sasol would have been confident that its costs estimates were accurate, and that there was little likelihood of "black swan" events occurring prior to the project coming online.

**ANSWER**:   Denies the allegations contained in Paragraph 69, except admits that Paragraph 69 purports to characterize an August 2016, Form 6-K issued by Sasol, and refers to that Form 6-K for a complete and accurate description of its contents; lacks knowledge or information sufficient to form a belief as to the truth or falsity of whether the confidential witness described in Paragraph 69 made the statements attributed to them and whether the characterizations of their statements are accurate.

70.    CW-1 believed that Sasol used the contingency as a means of hiding the true anticipated costs of the project; CW-1 characterized it as a "dark art" and a "shell game." In particular, Sasol's use of a contingency on a project it reported as nearly complete means "you're hiding something." CW-1 also stated that it was unusual for Sasol to book the $300 million at the beginning of a month, remove at the end of the month, and then re-book it the following month. Typically, a contingency was put on the books for a specified period of time (e.g., 24 months).

**ANSWER**:   Denies the allegations contained in Paragraph 70, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of whether the confidential witness described in Paragraph 70 made the statements attributed to them and whether the characterizations of their statements are accurate.

71.    This $300 million contingency was reported in an October 2015 External Cost Report, which would have been sent to senior management (including the Executive Defendants). As a result, senior management would have known about the $300 million contingency. Finally, CW-1 noted that when in May 2019 Sasol disclosed a $300 million contingency for a project that it reported was 96% complete; this figure is a "very large number" for a project that is near completion. In CW-1's opinion, LCCP will ultimately cost around $17 billion. CW-1 based this estimate on the delays in the project, the costs associated with the project, and the fact that the plant is still not complete or earning a profit.

**ANSWER**:   Denies the allegations contained in Paragraph 71, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of whether the confidential

witness described in Paragraph 71 made the statements attributed to them and whether the characterizations of their statements are accurate.

72.    CW-1 stated that, as a matter of standard practice, Fluor would have given Sasol executives a "heads up" in the weeks before it issued the Change Order that the official document was coming their way. According to CW-1, the Change Order would have gone to Jim Shoriak, Sasol's Vice President of U.S. Mega Projects, who in turn would have submitted the Change Order to the senior executives. CW-1 stated that Fluor "would not have expended that money [the additional $3 billion] until Sasol approved it."

**ANSWER**:    Denies the allegations contained in Paragraph 72, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of whether the confidential witness described in Paragraph 72 made the statements attributed to them and whether the characterizations of their statements are accurate.

73.    When told that Sasol did not disclose to shareholders a revised LCCP cost of $11.6 billion - $11.8 billion until February 2019, CW-1 stated, "That is out of order. That is just wrong."

**ANSWER**:    Denies the allegations contained in Paragraph 73, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of whether the confidential witness described in Paragraph 73 made the statements attributed to them and whether the characterizations of their statements are accurate.

74.    CW-1 stated that a colleague (CW-6) told CW-1 that CW-6 was asked to "mess around with the [LCCP] schedule" – to falsely report that the project would be complete in advance of its actual estimated completion date. CW-6 responded that CW-6 refused to do this, and CW-6 quit the Company in protest.

**ANSWER**:    Denies the allegations contained in Paragraph 74, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of whether the confidential witness described in Paragraph 74 made the statements attributed to them and whether the characterizations of their statements are accurate.

2.      **CW-2: The Executive Defendants Were Told of Cost Overruns and Delays in Project Timeline.**

75.      One high-ranking former employee ("CW-2") came on board around the time that the Sasol board authorized its Final Investment Decision of $8.1 billion for LCCP in October 2014, and worked out of Sasol's Houston office. CW-2 left in mid-summer July 2015. CW-2 was responsible for all financial matters for Sasol's U.S. projects, including cost control, budgeting, forecasting, treasury, financial reporting, and tax reporting. As a result, CW-2 had a direct window into LCCP's burgeoning costs, internal control weaknesses, financial reporting, and management knowledge of cost overruns and delays with the LCCP mega project. CW-2 stated that it was "clear from the beginning" that the mega project was going to cost more than $8.1 billion. CW-2 had direct contact with Defendants Nqwababa, Cornell, and Victor, and on several occasions told each of these Defendants about CW-2's concerns regarding the cost overruns and timeline for completion of the project.

**ANSWER**:      Denies the allegations contained in Paragraph 75, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of whether the confidential witness described in Paragraph 75 made the statements attributed to them and whether the characterizations of their statements are accurate.

76.      In particular, LCCP had subcontracted with two companies for the mega-project, Fluor and Technip FMC, which proved to be a "disaster." According to a Fluor press release, Fluor "provided front-end engineering and design and, in a joint venture with TechnipFMC, served as the primary engineering, procurement and construction management contractor."[15] Fluor and Technip were paid for their time and materials spent on the project, regardless of whether work was completed or not; there was no fixed price set by contract, which meant that both subcontractors had limited risk with respect to actual or timely completion of the project — an arrangement that CW-2 called "unusual."

**ANSWER**:      Denies the allegations contained in Paragraph 76, except admits that Fluor and TechnipFMC were subcontractors on the LCCP through their joint venture, FTI; admits that the second sentence of Paragraph 76 purports to quote and characterize a press release issued by Fluor, and refers to that press release for a complete and accurate description of its contents; lacks knowledge or information sufficient to form a belief as to the truth or falsity of whether the

---

[15] *See* Fluor Projects: Sasol Ethane Cracker and Derivatives Project, Fluor Corp., https://www.fluor.com/projects/construction-management-ethane-cracker-sasol.

confidential witness described in Paragraph 76 made the statements attributed to them and

whether the characterizations of their statements are accurate.

77.    CW-2 efforts to raise concerns with Sasol's executive management in Houston (including Defendants Cornell and Nqwababa), "fell on deaf ears," particularly because the South Africans in management were "very dogmatic" and not open to constructive criticism or change. They exercised absolute control over the project. At the same time, CW-2 stated that Sasol was launching a mega project in a new for the first time, and doing so in the United States, where Sasol had limited experience. CW-2 ultimately left the company out of frustration with mismanagement and the lack of ability of CW-2 to fulfill CW-2's job responsibilities.

**ANSWER**:    Denies the allegations contained in Paragraph 77, except lacks knowledge or

information sufficient to form a belief as to the truth or falsity of whether the confidential

witness described in Paragraph 77 made the statements attributed to them and whether the

characterizations of their statements are accurate.

3.    **CW-3: Senior Management Knew LCCP Would Exceed Its Budget before It Disclosed Upward Cost Estimates.**

78.    CW-1 and CW-2's observations are echoed by others at the Company. A Fluor contractor who started before the Class Period and left in October 2015, CW-3, worked in Houston and on-site at the LCCP. CW-3's role was to commission, or start up, the ethane cracker. CW-3's responsibilities included working on the procedures and processes to get every operational component of the plant up and running in terms of performance, reliability, safety, and information reporting. CW-3 stated that Sasol's senior management was trying to "fast track" the project at the expense of safety amid persistent rumors of cost overruns. In addition, two Commissioners who oversaw the project at the time (Nadine Kruger and Oscar A. Febres Cordero) lacked the experience to supervise the project. Mr. Cordero in particular represented that he was an "engineer," when in fact he was not.[16] Mr. Cordero had no experience commissioning a project, and had a "phony resume." Overall, CW-3 stated that Kruger and Cordero were "amateurs."

**ANSWER**:    Denies the allegations contained in Paragraph 78, except lacks knowledge or

information sufficient to form a belief as to the truth or falsity of whether the confidential

---

[16] It is notable that Mr. Cordero's LinkedIn profile provides no information at all on his educational background. *See* Oscar A. Febres Cordero, LINKEDIN, https://www.linkedin.com/in/oscar-a-febres-cordero-60a3382a/ (last visited June 3, 2020).

**ANSWER:** Denies the allegations contained in footnote 16 and refers to Mr. Cordero's LinkedIn profile for a complete and accurate description of its contents.

witness described in Paragraph 78 made the statements attributed to them and whether the

characterizations of their statements are accurate.

79.     Consistent with CW-2's recollection, CW-3 stated that CW-3 was brought into the mega-project "way too early. I almost had a full team there, and it was at least two years before start up." According to CW-3, typically commissioners are brought into the project when construction is 70% complete. But for LCCP, CW-3 and CW-3's team were brought in before Sasol had even broken ground on the project: "They were trying to fast track everything, but it doesn't work like that. It was way too early for me to be there." For example, part of commissioning involving cleaning compressors and pumps, drying out the load catalyst and reviewing engineering drawings. But CW-3 could not complete those tasks because "there was nothing to commission." Part of the problem was that, even as they sought to fast-track the project, Sasol's management kept changing its mind about how to do it. First, management wanted to do a traditional "stick build" of the plant, then switched to a "modular build" approach.

**ANSWER**:     Denies the allegations contained in Paragraph 79, except lacks knowledge or

information sufficient to form a belief as to the truth or falsity of whether the confidential

witness described in Paragraph 79 made the statements attributed to them and whether the

characterizations of their statements are accurate.

80.     CW-3 provided the following example of mismanagement. Cordero and Kruger wanted to "flush out"[17] modules in China, then ship them back to Lake Charles for assembly and installation. But "that's crazy; you can't do that," according to CW-3, because the modules would just corrode again once placed in the hull of a ship.

**ANSWER**:     Denies the allegations contained in Paragraph 80, except lacks knowledge or

information sufficient to form a belief as to the truth or falsity of whether the confidential

witness described in Paragraph 80 made the statements attributed to them and whether the

characterizations of their statements are accurate.

81.     More broadly, CW-3 said that, starting at least in June or July of 2015, there were widespread rumors that the $8.9 billion cost estimate was unrealistic, and at that time senior management knew that they were not going to make that budget. Similar to CW-2's observations, CW-3 stated that Fluor/Technip "didn't care about streamlining" project costs

---

[17] The "flush out' process involves cleaning out the scale and dirt on carbon steel pipes, then applying dry air or nitrogen to prevent corrosion.

**ANSWER:** Denies the allegations contained in footnote 17.

because they operated on a reimbursable contract under which they were paid regardless of whether they worked or not. According to CW-3, "[e]veryone knew they didn't do anything but were billing hours to the company." CW-3 said Cordero in particular was intent on bringing on as many people as possible on Sasol's payroll, even as CW-3 and CW-3's team was able to do the work.

**ANSWER**: Denies the allegations contained in Paragraph 81, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of whether the confidential witness described in Paragraph 81 made the statements attributed to them and whether the characterizations of their statements are accurate.

82. CW-3 also provided an example of what CW-3 described as dangerous engineering. CW-3 delivered a presentation to Cordero and Kruger on the "dangerous flaws" in the plant's water cooling system. CW-3 contended that there was not an effective means to circulate fluid through the large pumps needed for the project, but Cordero and Kruger "totally missed the whole point" and did not see the need for the changes CW-3 was proposing. CW-3 also opposed Cordero and Kruger's idea to install a 72-inch line in a water cooling unit with a butterfly valve, which would have required a worker to go down a concrete box with 135,000 gallons of water running through it a minute. CW-3 stated the worker "would have needed a scuba outfit" and that "the way they were designing stuff wasn't right; it was dangerous, you know."

**ANSWER**: Denies the allegations contained in Paragraph 82, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of whether the confidential witness described in Paragraph 82 made the statements attributed to them and whether the characterizations of their statements are accurate.

83. CW-3 decided to write a letter to Cordero's boss, Richard Brink, Sasol's VP of Commissioning and Operations Readiness for LCCP that Cordero was "incompetent and dangerous." CW-3 was fired a week later. According to Cordero's LinkedIn page, in contrast Cordero remained as Sasol until July 2019. From CW-3's perspective, "It was a terrible project. I was happy to get out of there. I didn't think it was safe. It was poorly managed."

**ANSWER**: Denies the allegations contained in Paragraph 83, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in the third sentence of Paragraph 83; lacks knowledge or information sufficient to form a belief as to

the truth or falsity of whether the confidential witness described in Paragraph 83 made the

statements attributed to them and whether the characterizations of their statements are accurate.

4.    **CW-4: Senior Management Disclosed Inaccurate Information About the Project's Cost and Schedule, and Defendant David Constable Knew About Double-Counting in Accounting.**

84.    A fourth individual at Sasol (CW-4) corroborated CW-1, CW-2, and CW-3's accounts of persistent problems at Sasol and LCCP. CW-4 worked on accounting matters for infrastructure, offsite facilities, and utilities for six downstream chemical units. CW-4 provided presentations regarding costs to five individuals, who in turn reported to the Sasol's Group Executive Committee ("GEC"), which included Sasol's most senior executives (including Defendants Nqwababa, Cornell, Victor, and Schoeman) and some board members. Each of the Executive Defendants was a member of the GEC.  CW-4 started before the Class Period, and left in mid-summer 2018.

**ANSWER**:    Denies the allegations contained in Paragraph 84, except lacks knowledge or

information sufficient to form a belief as to the truth or falsity of whether the confidential

witness described in Paragraph 84 made the statements attributed to them and whether the

characterizations of their statements are accurate.

85.    According to CW-4, from the moment CW-4 started working at Sasol in summer 2014, he/she saw that the LCCP project was behind schedule, and saw that both the initial $8.9 billion cost estimate and the revised $11.1 billion cost estimate, both presented to shareholders and investors, were too low. Based on CW-4's calculations of the cost and reported  progress made to date (which CW-4 conducted in part after CW-4 left Sasol), CW-4 believed that Defendant Cornell was aware of the construction delays and the too-low cost estimates.

**ANSWER**:    Denies the allegations contained in Paragraph 85, except lacks knowledge or

information sufficient to form a belief as to the truth or falsity of whether the confidential

witness described in Paragraph 85 made the statements attributed to them and whether the

characterizations of their statements are accurate.

86.    According to CW-4, Sasol's accounting for LCCP "stinks to high heaven." As CW-4 described it, "They [management] clearly did not disclose the real health of the project forecasting and scheduling from the people who were paid to do that, which was me. They didn't disclose it to the market. We gave them indications very early on." CW-4 provided the following example of accounting irregularities: an accounting gimmick that Sarbanes-Oxley outlawed is the practice of reducing on the books the value of work already performed in order to improve earnings reports. One of the five individuals to whom CW-4 reported instructed him to "reduce

- 35 –

the value of work done." CW-4 stated, "I'm not gonna do that; I don't want to share a jail cell with you." CW-4 stated the five individuals referenced above "took my cost reports, rolled them up and added in unsubstantiated accrual." This means that CW-4 was asked to lower the value of work done by reducing the amount of accrued liabilities (expenses that have been incurred but not yet paid; not including expenses owed reduces the apparent cost of a project). In effect, he said that Sasol was "double counting.' This practice – which CW-4 said David Constable knew about – continued over a period of months in 2016.

**ANSWER**:    Denies the allegations contained in Paragraph 86, except lacks knowledge or

information sufficient to form a belief as to the truth or falsity of whether the confidential

witness described in Paragraph 86 made the statements attributed to them and whether the

characterizations of their statements are accurate.

87.    CW-4's colleagues were also suspicious of the accounting, and some control managers would not sign the reports created by the five individuals referenced above. At one point, CW-4 was in a meeting with other cost control managers, and they all told management "you may as well fire us and hire a graphics designer or artist who can paint the picture you want to see. They [management] heard it [our message] clearly."

**ANSWER**:    Denies the allegations contained in Paragraph 87, except lacks knowledge or

information sufficient to form a belief as to the truth or falsity of whether the confidential

witness described in Paragraph 87 made the statements attributed to them and whether the

characterizations of their statements are accurate.

88.    There were other accounting irregularities as well. For example, the LCCP project stipulated $36 million of negative value for Fluor "self-performing construction" (which means that Fluor would perform the work on its own). But this was "ridiculous," CW-4 said, because "Fluor was never going to be performing self-construction on this job"; as CW-4 told senior management, the contracts for the work Fluor was allegedly going to self-perform was already contracted out to other third parties. CW-4 also noted that there was a $55 million negative number on the books for "management negotiated savings," which should not have been there.

**ANSWER**:    Denies the allegations contained in Paragraph 88, except lacks knowledge or

information sufficient to form a belief as to the truth or falsity of whether the confidential

witness described in Paragraph 88 made the statements attributed to them and whether the

characterizations of their statements are accurate.

89.     From the first moment CW-4 began working at Sasol (shortly before LCCP was officially launched), CW-4 saw that the LCCP project was behind schedule. According to CW-4, the initial $8.9 billion estimate was "ridiculously low," and the revised $11.1 billion estimate was too low as well. CW-4 believed Defendant Cornell knew about the construction delays and knew that the cost estimates were too low, but Defendant Cornell was incentivized to push the project to completion: all of the South African executives with Sasol shares stood to benefit from any boosts to Sasol's stock price. CW-4 believed that Defendant Nqwababa – who was ultimately fired in October 2019 – "knew nothing about executing projects."

**ANSWER**:    Denies the allegations contained in Paragraph 89, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of whether the confidential witness described in Paragraph 89 made the statements attributed to them and whether the characterizations of their statements are accurate.

90.     One example of Defendant Cornell's knowledge was the massive rainfall that hit Lake Charles in late 2018, which was twice the annual norm. This rainfall had a substantial negative impact on productivity. Nevertheless, Defendant Cornell told investors in November 2018 that the project was on track, when it was clear it was not.

**ANSWER**:    Denies the allegations contained in Paragraph 90, except states that there was excessive rainfall in Q4 CY2018 that impacted productivity; admits that the third sentence of Paragraph 90 purports to characterize an unidentified November 2018 public disclosure, and refers to that disclosure for a complete and accurate description of its contents.

91.     In June 2016, after Sasol publicly revised the cost estimate up to $11.1 billion, it brought over executives from South Africa to work on the LCCP project and supposedly get it on track. But these executives "had no idea how to administer contracts in the U.S. . . . they were the wrong people to run it." CW-4 said these executives were not well regarded or liked, in either a professional or personal sense, by their American counterparts.

**ANSWER**:    Denies the allegations contained in Paragraph 91, except admits that the first sentence of Paragraph 91 purports to characterize a June 6, 2016, Form 6-K issued by Sasol and refers to that Form 6-K for a complete and accurate description of its contents; lacks knowledge or information sufficient to form a belief as to the truth or falsity of whether the confidential witness described in Paragraph 91 made the statements attributed to them and whether the characterizations of their statements are accurate.

92.     CW-4 further corroborated CW-1's statements about how the use of a high contingency late in the project reflects cost overruns and delays in the project. As CW-4 explains it, "how could you have $300 million of contingency on 8 percent of work to go? It's mind-blowing, so much contingency."

**ANSWER**:    Denies the allegations contained in Paragraph 92, except lacks knowledge or

information sufficient to form a belief as to the truth or falsity of whether the confidential

witness described in Paragraph 92 made the statements attributed to them and whether the

characterizations of their statements are accurate.

93.     Overall, CW-4 believed that Sasol executives would go to any lengths to keep up the appearance of LCCP being on track because they wanted to cash in on their Sasol shares.

**ANSWER**:    Lacks knowledge or information sufficient to form a belief as to the truth or

falsity of whether the confidential witness described in Paragraph 93 made the statements

attributed to them and whether the characterizations of their statements are accurate.

### 5.    CW-5: Defendant Cornell Was "100% Informed and Involved" On Cost Overruns and Construction Delays.

94.     A fifth individual (CW-5) provides yet more corroboration of the accounts of CW-1, -2, -3, and -4. At Sasol, CW-5 worked as a risk assessor for the LCCP project, starting before the Class Period and leaving in the fall of 2015. In 2015, CW-5 believed that the project was "on budget" – but CW-5 said "on budget" throughout 2015 means the $11 billion budget, which Sasol did not disclose to shareholders until June 2016. "I would never put down that it was an $8 billion project. Absolutely when I was there, we were talking $11 billion." (This statement is corroborated by CW-1's account of a February 2016 change order reflecting LCCP's costs were $11.7 billion.) CW-5 agreed with the characterization that the $8.9 billion cost estimate was "ridiculously low," particularly because the estimates from Fluor and Technip were higher than that. The $11 billion cost estimate from the beginning was "socialized" among senior management — meaning that it was an estimate that was widely promulgated as the truth from upper management; "whatever the board saw was a really low number." CW-5 knew this because C-5 heard everyone talking about that number.  In light of his role on the GEC, CS-5 said, Defendant Cornell would have been "100% informed and involved" with issues concerning contracting, cost overruns, and construction delays. CW-5 stated that Defendant Cornell would have been the "ultimate arbiter" of costs, meaning that Cornell knew about the cost issues and made the decisions about costs.  Cornell "became the main person steering the project. He was the ultimate decision maker" when CW-5 was on the project. CW-5 believes that there is a third party case study on LCCP as a model of what not to do.

**ANSWER**:   Denies the allegations contained in Paragraph 94, except lacks knowledge or

information sufficient to form a belief as to the truth or falsity of whether the confidential

witness described in Paragraph 94 made the statements attributed to them and whether the

characterizations of their statements are accurate.

> **6.   CW-6:  Management Directed Me to "Manipulate" the Schedule to Make It Look Better On Paper.**

95.   CW-6 worked as a scheduler for one of the main LCCP units in Lake Charles from early summer 2018 to late winter 2019. CW-6 was a contractor through Sasol's contracting agreement with TRS Staffing Solutions, and was based at LCCP's site in Lake Charles. CW-6 said that, from the time CW-6 arrived, "we were significantly behind schedule" on construction and commissioning in CW-6's group.

**ANSWER**:   Denies the allegations contained in Paragraph 95, except lacks knowledge or

information sufficient to form a belief as to the truth or falsity of whether the confidential

witness described in Paragraph 95 made the statements attributed to them and whether the

characterizations of their statements are accurate.

96.   As a result, CW-6 stated that management directed CW-6 or CW-6's colleagues to change anticipated completion dates for projects to make it appear on paper that the project would be completed on time by compressing the remaining schedule to meet the beneficial operating date. For example, for a given construction issue, "they would say, change it to two days from 7-8, and we were saying, you can't do that. We would present something, they'd say that doesn't work, go back and make it hit the dates." CW-6 stated it was a "continuous revision" and described his duties as "pencil whipping." CW-6 stated that this practice occurred over a large number of projects, such that the probability of completing the projects according to the schedule was extremely small.

**ANSWER**:   Denies the allegations contained in Paragraph 96, except lacks knowledge or

information sufficient to form a belief as to the truth or falsity of whether the confidential

witness described in Paragraph 96 made the statements attributed to them and whether the

characterizations of their statements are accurate.

97.   CW-6 said senior Sasol executives, including Defendant Schoeman and Mike Kane, decided to decouple LCCP's construction schedules from its commissioning, or startup, schedules, to show that more work had been completed on LCCP than actually had been. The

altered construction schedules "showed we were further along than what was happening." CW-6 stated that "this was schedule manipulation." CW-6 described Schoeman as very detail-oriented.

**ANSWER**:    Denies the allegations contained in Paragraph 97, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of whether the confidential witness described in Paragraph 97 made the statements attributed to them and whether the characterizations of their statements are accurate.

98.    CW-6 said he/she quit in part because the requests and practice were "highly unusual" and "not normal industry standard practice."

**ANSWER**:    Lacks knowledge or information sufficient to form a belief as to the truth or falsity of whether the confidential witness described in Paragraph 98 made the statements attributed to them and whether the characterizations of their statements are accurate.

**E.    Defendants Falsely Stated It was on Track with Initial Estimate**

99.    The Class Period begins on March 10, 2015. On the day prior (March 9, 2015), Sasol disclosed in SEC filings for the first time that the cost estimates for the project increased from $8.1 billion to $8.9 billion. Even as it made this disclosure, it reassured investors that the project was on track. Sasol stated that "[w]e are making steady progress with the advancement of our US$8.9 billion ethane cracker and downstream derivatives complex (including infrastructure and utilities) in Lake Charles, Louisiana. Site preparation is underway, and we expect that the plant will achieve beneficial operation during the 2018 calendar year."

**ANSWER**:    Denies the allegations contained in Paragraph 99, except admits that Paragraph 99 purports to quote and characterize a March 9, 2015, Form 6-K issued by Sasol and refers to that Form 6-K for a complete and accurate description of its contents.

100.    Investors responded enthusiastically. On March 9, 2015, Deutsche Bank released a "Buy" recommendation for Sasol's ADRs.

**ANSWER**:    Denies the allegations contained in Paragraph 100, except admits that the March 9, 2015, Deutsche Bank report referred to in Paragraph 100 exists, and refers to that report for a complete and accurate description of its contents.

101.    From the beginning of the Class Period, through the initial partial disclosure in June 2016, Sasol continually reassured investors that the project was on track and making good

- 40 –

progress. For example, on September 7, 2015, Sasol disclosed that "[c]ash flow generation remains robust, which, together with our solid, ungeared balance sheet, enables us to execute our growth projects in Southern Africa and the United States. Our US$8.9 billion world-scale ethane cracker and downstream derivatives complex in Lake Charles, Louisiana remains on track to reach beneficial operation in 2018." On March 7, 2016, Sasol announced that the "Lake Charles Chemicals Project (LCCP) is progressing. The engineering and procurement are at an advanced stage and site construction, mostly civil related, has fully commenced. We had some initial challenges associated with ground work due to the very heavy rainfall in 2015 and the regulatory need to relocate a small waterway. Cost control remains a primary focus for the team."

**ANSWER**:   Denies the allegations contained in Paragraph 101, except admits Paragraph 101

purports to quote and characterize a September 7, 2015, Form 6-K issued by Sasol, and refers to

that Form 6-K for a complete and accurate description of its contents; admits that Paragraph 101

purports to quote and characterize a March 7, 2016, Form 6-K issued by Sasol, and refers to that

Form 6-K for a complete and accurate description of its contents.

102.    This reassuring disclosure did not change investors' views of the project. In a March 8, 2016 report, Deutsche Bank noted, "Execution of Lake Charles Chemicals Project is being paced . . . Sasol reported yesterday that USD3.7bn (42% of total budget) had been invested into LCCP to date. It said it had slightly modified the commissioning phase with the launch of the cracker and some derivative units still scheduled for 2018, while full beneficial operation on the smaller derivative units moving into CY19. This change has no impact on our estimates, as we had already assumed a gradual commissioning of the project during CY19."

**ANSWER**:   Denies the allegations contained in Paragraph 102, except admits that the March

8, 2016, Deutsche Bank report referred to in Paragraph 102 exists and refers to that report for a

complete and accurate description of its contents.

**F.      The Executive Defendants Knew, Must Have Been Aware or Recklessly Disregarded the Non-Disclosure and Omissions of Adverse Facts**

103.    As corroborated by the former Sasol employees, the Executive Defendants possessed the power and authority to control the contents of Sasol's SEC filings, press releases, and other market communications. The Executive Defendants were provided with copies of Sasol's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Sasol, and their access to material information available to them but not to the public, the Executive Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Executive Defendants are liable for the false statements and omissions pleaded herein.

**ANSWER**:    To the extent the allegations contained in Paragraph 103 consist of legal conclusions, no response is required. To the extent a response is required, denies the allegations contained in Paragraph 103, except admits that while Messrs. Constable, Nqwababa, Cornell, and Victor were employed at Sasol, they were involved in the review and dissemination of Sasol's public statements; lacks knowledge or information sufficient to form a belief as to the truth or falsity of whether the confidential witnesses described in Paragraph 103 made the statements attributed to them and whether the characterizations of their statements are accurate.

104.    In addition, it is inconceivable that the senior management was not following this project closely and monitoring its developing. Well-placed former employees, including all six of the former employees cited above, confirmed as much, particularly through the reporting to the General Executive Group, which included the Executive Defendants. Former employees, including all six of the former employees cited above, report that the GEC was kept up to date regarding cost overruns and project delays, but GEC did not disclose this information to the public because the individual members were incentivized to pump up the stock price for their own benefit. Moreover, the management exhibited, as disclosed by the CWs above, and as revealed by Sasol in October 2019, conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care, such that the danger of misleading investors was either known to the Defendants or so obvious that the Defendants must have been aware of it.

**ANSWER**:    To the extent the allegations contained in Paragraph 104 consist of legal conclusions, no response is required. To the extent a response is required, denies the allegations contained in Paragraph 104, except states that the first sentence of Paragraph 104 consists of Plaintiffs' characterization of this action, to which no response is required; and lacks knowledge or information sufficient to form a belief as to the truth or falsity of whether the confidential witnesses described in Paragraph 104 made the statements attributed to them and whether the characterizations of their statements are accurate.

G.    **Defendants' Partial Disclosures of the True Cost and Scheduling Estimates, Lack of Controls and Malfeasance at the LCCP**

105.    Beginning on June 6, 2016, Defendants started to dribble out the truth about the correct estimates for LCCP. On June 6, 2016, in a Form 6-K filing, Sasol announced that "the expected total capital expenditure for the [LCCP] could increase up to US$11 billion, including site infrastructure and utility improvements"; a slower rate of capital "resulted in an extended

project schedule and contributed to further project cost increases"; "[t]he expected returns for the project have reduced due to changes in long-term price assumptions and the higher capital estimates"; and "[t]he increase in the estimated LCCP capital cost and extended schedule will reduce the expected project returns by approximately the same amount as the Company's lower long-term price assumptions."

**ANSWER**:    Denies the allegations contained in Paragraph 105, except admits that Paragraph

105 purports to quote and characterize a June 6, 2016, Form 6-K issued by Sasol and refers to

that Form 6-K for a complete and accurate description of its contents.

106.    Following this disclosure, Sasol sought to reassure investors that the new $11 billion would be the outer bound of cost expenditures, and that Sasol would work to complete the project under budget. CEO Constable, on a call with investors that same day, stated "[w]e really want to strongly message that we are confident that we'll be able to push the CapEx down." He also described it as a "worst-case scenario," and that the $11 billion figure was an "extremely comfortable number for us." He also assured investors that the "management team remains closely involved in guiding the project team, so that we can minimize capital expenditure and further optimize overall project efficiency. To support these efforts, we have also bolstered the senior staffs' resources on the ground to enable an even greater focus on a range of execution activities."

**ANSWER**:    Denies the allegations contained in Paragraph 106, except states that Paragraph

106 purports to quote and characterize a June 7, 2016, business update call and refers to the

transcript of that call for a complete and accurate description of its contents.

107.    Investors were skeptical. A June 7, 2016 Deutsche Bank analysis reported that "[w]hile the company was adamant that the new capex guidance of $11bn (+24%) includes a number of unspecified contingencies and represents the maximum possible spend, we believe it is prudent to take the full $11bn estimate at face value, until further details are revealed in September."

**ANSWER**:    Denies the allegations contained in Paragraph 107, except lacks knowledge or

information sufficient to form a belief as to the truth or falsity of the allegations contained in the

first sentence of Paragraph 107; and admits that the June 7, 2016, Deutsche Bank report referred

to in Paragraph 107 exists and refers to that report for a complete and accurate description of its

contents.

108.    Following these disclosures, Sasol's ADR price fell $3.53 per share, or 10.99%, to close at $28.60 per share on June 6, 2016.

**ANSWER**:    Denies the allegations contained in Paragraph 108, except states that the

allegations in Paragraph 108 purport to describe the prices of Sasol's ADRs, which are matters of

public record, and refers to such public records.

**H.    From June 2016 to February 2019, Sasol Continued to Make False Reassuring Statements about the Costs and Timeline of the Project, and Falsely Characterized Its Own Disclosures**

109.    After its June 2016 disclosure, and up through February 2019, Sasol made only one adjustment to its cost expenditures, although it also made a transparently false statement about its prior disclosures. On September 12, 2016, Defendants confirmed that the total capital cost for the LCCP "is expected to be US$11 billion, which includes site infrastructure and utility improvements," but assured the market that the amount contained an industry-norm contingency, the schedule had not been impacted, and that the "cost and schedule review process, which was completed in August 2016, has set a solid platform for the continued execution of this project, " Following this disclosure, the market only pushed the ADR price down $0.14 per share, or 0.51%, to close at $27.21 per share on September 12, 2016.

**ANSWER**:    Denies the allegations contained in the first sentence of Paragraph 109, except

admits that on June 6, 2016, Sasol disclosed that expected total capital expenditure could

increase up to $11 billion, on November 23, 2017, Sasol disclosed that the projected project

budget was revised to $11.13 billion, and on February 8, 2019, Sasol disclosed a revision in the

projected project budget to a range of $11.6 - $11.8 billion; refers to the June 6, 2016, Form 6-K

issued by Sasol, the November 23, 2017, Capital Markets Day Presentation issued by Sasol, and

the February 8, 2019, Form 6-K issued by Sasol, for a complete and accurate description of their

contents; denies the allegations contained in the second sentence of Paragraph 109 except admits

that the second sentence of Paragraph 109 purports to quote and characterize a September 12,

2016, Form 6-K issued by Sasol and refers to that Form 6-K for a complete and accurate

description of its contents; denies the allegations contained in the third sentence of Paragraph

109, except states that the third sentence of Paragraph 109 purports to describe the price of

Sasol's ADRs, which are matters of public record, and refers to such public records.

110.     Other than this disclosure (and misrepresentation), during this period Sasol continued to reassure investors that its economic outlook remained "robust," that it was "on track" to complete the project on time, and that cost expenditures "remained within" the disclosed budget. During this period, on August 27, 2018, Sasol's ADRs reached a high of $39.26 per share.

**ANSWER**:     Denies the allegations contained in Paragraph 110, except to the extent Plaintiffs purport to quote and characterize unidentified public disclosures during an unidentified time period, and refers to those unidentified public disclosures for a complete and accurate description of their contents; states that the phrase "during this period" in the second sentence of Paragraph 110 is vague and subject to multiple interpretations and thus denies on that basis; states that the allegations contained in Paragraph 110 purport to describe prices of Sasol's ADRs, which are matters of public record, and refers to such public records.

111.     On November 23, 2017, Sasol (through its co-CEO Nqwababa) made the new disclosure that cost expenditures will increase from $11 billion to $11.13 billion, but sought to soften the blow by claiming that "you'll remember that we did give a guidance that the contingence was between $400 million and $500 million when we revised our estimate in August last year. And we were also very clear that the estimate of $11 billion does not include event-driven risks, like a hurricane or some other event like that." This is false: Sasol never disclosed in August 2016 that Sasol retained a "contingence between $400 and $500 million." Sasol made no disclosure in August 2016 about the specific amount of contingency, other than to state that it was smaller compared to its prior contingency of $300 million.

**ANSWER**:     Denies the allegations contained in Paragraph 111, except admits that Paragraph 111 purports to quote and characterize a November 23, 2017, investor call and refers to the transcript of that call for a complete and accurate description of its contents; admits that on August 23, 2016, Sasol issued a Form 6-K and "Investor Fact Sheet" and refers to that Form 6-K and "Investor Fact Sheet" for a complete and accurate description of their contents; and admits that Sasol did not disclose a specific contingency amount in that Form 6-K or "Investor Fact Sheet."

I.      **Beginning in February 2019, Sasol Begins to Slow-Roll the True and Accurate Cost
and Scheduling Estimates, and Known Lack of Internal Controls**

112.    On February 8, 2019, during pre-market hours, Sasol filed a Form 6-K with the
SEC, disclosing that "the overall [LCCP] project capital cost estimate [was] revised from
US$11.13 billion to a range of US$11.6 – 11.8 billion," and with the disclosure of a five month
delay in the project, the market grew increasingly skeptical of Sasol's prospects. Analysts began
to suspect Sasol's credibility as the ADR price fell as much as 5.7%, ending in a drop of $1.18
per share, or 3.94%, in closing at $28.79 per share. Wall Street Journal reporter Maria Armental
reported that HSBC analysts said "there comes a point where a causal relationship between
disappointing execution and cheap valuation is established," and adds that Sasol may be well
past that point now. But within days, on February 13, 2019, Sasol reported that the first of its
seven productions units was online, countering this bad news.

**ANSWER**:     Denies the allegations contained in Paragraph 112, except admits that on February

8, 2019, Sasol issued a Form 6-K and refers to that Form 6-K for a complete and accurate

description of its contents; admits that on February 13, 2019, Sasol issued a Form 6-K and refers

to that Form 6-K for a complete and accurate description of its contents; states that the

allegations in Paragraph 112 purport to describe the prices of Sasol's ADRs, which are matters of

public record and refers to such public records; lacks knowledge or information sufficient to

form a belief as to the truth or falsity of the allegations contained in the third sentence in

Paragraph 112.

113.    Then, on May 22, 2019, during pre-market hours, Sasol disclosed that "the cost
estimate for the LCCP has been revised to a range of $12.6 to $12.9 billion which includes a
contingency of $300 million." Sasol cited a $530 million change in the project's cost forecast
because of a "[c]orrection for duplication of investment allowances of approximately $230
million"; a "[c]orrection for certain contracts and variation orders managed by Sasol, outside the
primary engineering, procurement and construction contract, of approximately $180 million";
and forecast improvements that were "not expected to be realised and adjustments for potential
insurance claims and procurement back-charges of approximately $120 million." Sasol also
announced:

> Following this announcement a number of changes were made to
> the management of the LCCP, with project accountability
> immediately reassigned to the Executive Vice President of
> Chemicals, Fleetwood Grobler and the strengthening of our project
> controls organisation.

> This team became concerned regarding the accuracy of the project's cost forecast and, as a consequence, our third quarter Business Performance Metrics announcement in April 2019 indicated that the LCCP's cost was tracking the upper end of the range. Management also initiated a full review of the costs and schedule until project completion with input from independent technical and financial advisers.
>
> This review identified significant additional concerns related to the LCCP forecasting process and a marked increase in the projected total cost.
>
> ****
>
> The Board has also commissioned a review to be conducted by independent external experts. This review will cover the circumstances that may have delayed the prompt identification and reporting of the above-mentioned matters. Upon conclusion of the review, the Board will take appropriate action to address the findings.

**ANSWER**:   Denies the allegations contained in Paragraph 113, except admits that Paragraph 113 purports to quote and characterize a May 22, 2019, Form 6-K issued by Sasol, and refers to that Form 6-K for a complete and accurate description of its contents.

114.   Following these disclosures, Sasol's ADR price fell $4.50 per share, or 14.93%, to close at $25.64 per share on May 22, 2019. With near-immediate analyst downgrades, on May 23, 2019, Sasol's ADRs dropped $.95 – a further drop of 3.7% – to close at $24.69.

**ANSWER**:   Denies the allegations contained in Paragraph 114, except states that the allegations in Paragraph 114 purport to describe the prices of Sasol's ADRs, which are matters of public record, and refers to such public records.

115.   Later, on August 16, 2019, during pre-market hours, Sasol issued a press release disclosing that it was delaying the announcement of its 2019 financial results "*because of possible LCCP control weaknesses.*" Sasol stated that "[t]he board has decided to delay the announcement of Sasol's 2019 financial results until the independent review and external audit has been completed. . . . The board therefore expects to announce the 2019 financial results on Sept. 19," a month later than planned. Following this disclosure, on that same day Sasol's ADR price fell $0.74 per share, or 4.02%, to close at $17.67 per share. Then, as Sasol's stock price was battered to lows not seen since 2004, on August 26, 2019 Sasol announce the consequence of these technical issues and the revised beneficial operation dates: the LCCP earnings before

interest, tax, depreciation and amortization (EBITDA) guidance for the 2020 financial year has been adjusted from US$300-350 million to US$150-300 million.

**ANSWER**:    Denies the allegations contained in Paragraph 115, except admits that Paragraph

115 purports to quote and characterize an August 16, 2019, press release issued by Sasol, and

refers to that press release for a complete and accurate description of its contents; states that the

allegations in Paragraph 115 purport to describe the prices of Sasol's ADRs, which are matters of

public record, and refers to such public records.

**J.      Sasol Reveals Executive Malfeasance at the LCCP and Lack of Adequate Financial Controls in Board-Commissioned Investigative Report**

116.    On October 28, 2019, Sasol disclosed that its review of the LCCP control weaknesses had brought to light "errors, omissions, and inaccuracies in the [LCCP] cost estimate," and "inappropriate conduct and an improper tone at the top of the LCCP, including an excessive focus on maintaining cost and schedule estimates at the expense of providing accurate cost and schedule estimation to oversight bodies (including the Joint Chief Executive Officers) within the Company." Sasol also announced the agreed upon resignation or firing of several members of its executive leadership, including its Joint Presidents and Chief Executive Officers, Senior Vice Presidents, and other individuals previously charged with responsibility of the LCCP.

**ANSWER**:    Denies the allegations contained in Paragraph 116, except admits that Paragraph

116 purports to quote and characterize an October 28, 2019, Form 6-K issued by Sasol and refers

to that Form 6-K for a complete and accurate description of its contents.

117.    The Company expressed its "profound regret" over the failures with the LCCP project, as follows:

However, it is a matter of profound regret for the Board that shortcomings in the execution of the LCCP have negatively impacted our overall reputation, led to a serious erosion of confidence in the leadership of the Company and weakened the Company financially. Sadly, the LCCP challenges have tarnished the entire Company, which has world-class assets and teams that have delivered a consistently strong performance.

**ANSWER**:    Denies the allegations contained in Paragraph 117, except admits that Paragraph

117 purports to quote and characterize an October 28, 2019, Form 6-K issued by Sasol and refers

to that Form 6-K for a complete and accurate description of its contents.

118.    As the market digested this news, and analyst downgrades, Sasol's ADR price fell $2.18 or 10.7% from $20.28 on October 28, 2019 to $18.10 on October 31, 2019.

**ANSWER**:    Denies the allegations contained in Paragraph 118, except states that the

allegations in Paragraph 118 purport to describe the prices of Sasol's ADRs, which are matters of

public record, and refers to such public records.

### K.    LCCP's Lack of Internal Controls Culminate in Plant Explosion

119.    Finally, even more of the undisclosed effects of the "inappropriate conduct and an improper tone at the top of the LCCP, including an "excessive focus on maintaining cost and schedule estimates at the expense of providing accurate cost and schedule estimation to oversight" came to roost with the devastating explosion and near destruction of the Lake Charles facility.

**ANSWER**:    Denies the allegations contained in Paragraph 119, except admits that Paragraph

119 purports to quote and characterize an October 28, 2019, Form 6-K issued by Sasol, and

refers to that Form 6-K for a full and accurate description of its contents.

120.    On January 13-14, 2020, Sasol confirmed and then issued a press release detailing that on January 13, 2020, the Company "experienced an explosion and fire at its LCCP low-density polyethylene (LDPE) unit." Sasol stated that "[t]he unit was in the final stages of commissioning and startup when the incident occurred" and "has been shut down and an investigation is underway to determine the cause of the incident, the extent of the damage and resulting impact on the LDPE unit's [beneficial operation] schedule."

**ANSWER**:    Admits that Paragraph 120 purports to quote and characterize a January 13, 2020,

Form 6-K issued by Sasol, and a January 14, 2020, press release issued by Sasol titled "Sasol

Confirms Incident at Lake Charles Chemicals Project (LCCP) Low-Density Polyethylene Unit,"

and refers to that Form 6-K and press release for a complete and accurate description of their

contents.

121.    Following these disclosures, Sasol's ADR price fell $1.70 per share, or 7.84%, over the following two trading days, closing at $19.99 per share on January 15, 2020. The stock then continued to drop over the next three months as investors assessed the impact of the fire and explosion at the company's $13 billion LCCP. On January 31, 2020, Sasol said told the market that the explosion would have a material impact on future earnings, as summed up in an article published by Bloomberg, entitled, "Sasol Cuts Lake Charles Guidance as Grim News Keeps Coming":

– 49 –

> South Africa's biggest fuel and chemicals producer said the Lake Charles Chemicals Project will make a smaller contribution to earnings, cutting its guidance for the second time in five months.
>
> The stock fell as much as 12% (Bloomberg) – to the lowest level since November 2008. The shares are down 22% this year, the worst performer in an index of South Africa's 40 largest companies.
>
> A fire and an explosion at one of the U.S. project's units about two weeks ago means LCCP will only add $50 million to $100 million to earnings before interest, tax, depreciation and amortization, Johannesburg-based Sasol said in a statement.
>
> "It has been one disappointment after another," said Cassie Treurnicht, a portfolio manager at Gryphon Asset Management Ltd. in Cape Town. "If you've been invested all along you simply reach a point where you are so fed up with management that you sell the share for emotional reasons rather than numerical ones."
>
> The setback comes as Sasol said first-half profit will plunge as much as 79%, weighed down by a weak macroeconomic environment that resulted in lower margins and operating profit. Earnings before onetime items in the six months through December will decline to between 4.79 rand and 7.11 rand per share from 23.25 rand ($1.57).

**ANSWER**:   Denies the allegations contained in Paragraph 121, except states that the allegations in Paragraph 121 purport to describe the prices of Sasol's ADRs, which are matters of public record, and refers to such public records; admits that Paragraph 121 purports to quote and characterize a January 31, 2020, *Bloomberg* article entitled "Sasol Cuts Lake Charles Guidance as Grim News Keeps Coming," and refers to that article for a complete and accurate description of its contents.

**L.   Sasol Enters Downward Spiral Following January 2020 Explosion**

122.    Following the explosion at the plant, the market noted that the project (and Sasol's value) continued to deteriorate.  On February 28, 2020, J.P. Morgan Cazenove analyst Alex Comer noted the stock had continued to fall more than 25% in 10 days and 55% since its December 2019 high and remained cautious on LCCP:

> Though we expect LCCP to materially contribute to Sasol's ability to de-lever, a series of cost overruns and delays has left us skeptical around project implementation and we also see downside risk from

a bearish petrochemicals outlook. Thus, while we still see upside from LCCP we are Neutral until we see evidence of completion within updated cost guidance ranges.

**ANSWER**:    Denies the allegations contained in Paragraph 122, except admits that the

February 28, 2020, J.P. Morgan Cazenove report referred to in Paragraph 122 exists, and refers

to that report for a complete and accurate description of its contents.

123.    The ADRs continued to fall to $12.15 on March 4, 2020 before the Coronavirus pandemic began to hit the stocks of its competitors as well.

**ANSWER**:    States that the allegations in Paragraph 123 purport to describe the prices of

Sasol's ADRs, which are matters of public record, and refers to such public records.

124.    Then, on April 23, 2020, Sasol again reduced the EBITDA for LCCP from a positive USD 50 million to USD 100 million to a loss of the same for fiscal year 2020. At the same time Sasol announced it was trying to find a buyer for a stake in LCCP.

**ANSWER**:    Denies the allegations contained in Paragraph 124, except admits that Paragraph

124 purports to characterize an April 23, 2020, Form 6-K issued by Sasol, and refers to that

Form 6-K for a complete and accurate description of its contents; admits that a March 17, 2020,

Form 6-K issued by Sasol announced that Sasol was reviewing the potential for partnering at the

LCCP.

125.    Between January 15, and April 23, 2020, Sasol's ADR price plunged from $19 to as low as $7.66 on June 3, 2020, reflecting in part the uncertainty of the state of LCCP as a result of the malfeasance identified above, the continual lowering of LCCP EBITDA estimates, and the wait for the LDPE and other units to come online.

**ANSWER**:    To the extent the allegations contained in Paragraph 125 consist of legal

conclusions, no response is required. To the extent a response is required, denies the allegations

contained in Paragraph 125, except states that the allegations in Paragraph 125 purport to

describe the prices of Sasol's ADRs, which are matters of public record, and refers to such public

records.

## V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS

126.     As outlined below, Sasol made a series of false and misleading statements to investors in order to convey the impression that the cost estimates were accurate, that the project was well-run and effectively managed, and that the project would end on time. Each of the statements was signed and/or approved by at least one of the Executive Defendants. In general, each of the statements below was false and misleading, in that Sasol failed to disclose Sasol's known higher and longer cost and scheduling estimates of the LCCP project, the accuracy of the cost and scheduling estimates given to investors, the LCCP projects' profitability, and the true lack of internal controls over its financial and operational reporting.

**ANSWER**:     To the extent the allegations contained in Paragraph 126 consist of legal conclusions, no response is required. To the extent the allegations contained in Paragraph 126 relate to the effectiveness of Sasol's internal controls over financial reporting and management of the LCCP, no response is required given the Court's dismissal of these allegations pursuant to the MTD Order, and Plaintiffs' inclusion of these claims is solely to preserve the issues for appeal. To the extent a response is required, denies the allegations contained in Paragraph 126, except admits that while Messrs. Constable, Nqwababa, Cornell, and Victor were employed at Sasol, they were involved in the review and dissemination of Sasol's public statements.

127.     In addition, each of the Form 20-Fs set forth below for the years 2015 to 2018 contained certifications pursuant to Section 13(a) of the Securities Exchange Act of 1934 ("SOX Certifications')  that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company" and attested to the Executive Defendants' design of disclosure controls and procedures, internal controls over financial reporting, their personal evaluation of their effectiveness, and any changes that could materially affect the controls or reporting. In addition the Executive Defendants attested, based on their actual recent evaluation, that they disclosed any deficiencies or material weaknesses to the Company's auditors and the audit committee of the board of directors. As detailed in the subsections that follow, this certification was false and misleading. Below is a chart summarizing the signatories of the Forms 20-F during the Class Period:

| Date | Signatory |
| --- | --- |
| October 9, 2015 | Constable and Nqwababa |
| September 27, 2016 | Nqwababa and Cornell and Victor |
| August 28, 2017 | Nqwababa and Cornell and Victor |
| August 20, 2018 | Nqwababa and Cornell and Victor |

| October 28, 2019 | Nqwababa and Cornell and Victor |

**ANSWER**:   To the extent the allegations contained in Paragraph 127 consist of legal conclusions, no response is required. To the extent the allegations contained in Paragraph 127 relate to the effectiveness of Sasol's internal controls over financial reporting and management of the LCCP, no response is required given the Court's dismissal of these allegations pursuant to the MTD Order, and Plaintiffs' inclusion of these claims is solely to preserve the issues for appeal. To the extent a response is required, denies the allegations contained in Paragraph 127, except admits that the chart contained in Paragraph 127 reflects the signatories for the Sasol Forms 20-F included in the chart.

128.   Defendants' certification of the effectiveness of Sasol's internal controls were false and misleading and omitted to disclose material facts. In truth, Defendants maintained ineffective internal controls, including in (i) the accuracy of its reporting of cost and schedule estimates for the LCCP; (ii) the segregation of duties of the LCCP project controls environment from the LCCP project execution environment, which prevented the identification of errors in cost and schedule estimation; (iii) control procedures within the LCCP control environment that led to false statements made by LCCP leadership; (iv) procedures to ensure that internal ethics complaints as to the LCCP were escalated appropriately; and (v) the oversight of the LCCP leadership team.

**ANSWER**:   To the extent the allegations contained in Paragraph 128 relate to the effectiveness of Sasol's internal controls over financial reporting and management of the LCCP, no response is required given the Court's dismissal of these allegations pursuant to the MTD Order, and Plaintiffs' inclusion of these claims is solely to preserve the issues for appeal. To the extent a response is required, denies the allegations contained in Paragraph 128.

**A.   Sasol's March 9, 2015 Interim Results – Sasol Quietly Increases Cost Estimates to $8.9 Billion**

- 53 –

129.    On March 9, 2015, during aftermarket hours, Sasol issued a press release and filed a Report of Foreign Issuer on Form 6-K[18] with the SEC, announcing the Company's interim financial results for the six months ended December 31, 2014. The report stated that Sasol was "making good progress" on the LCCP as one of the "Salient features" of its financial results. The report further asserted that the LCCP was an $8.9 billion project, without appearing to acknowledge that this was a $800 million increase from its disclosure in its February 2, 2015 Form 6-K of a $8.1 billion budget. The March 9, 2015 Form 6-K stated, in relevant part:

> We are making steady progress with the advancement of our US$8.9 billion ethane cracker and downstream derivatives complex (including infrastructure and utilities) in Lake Charles, Louisiana. Site preparation is underway, and we expect that the plant will achieve beneficial operation during the 2018 calendar year. In December 2014, we established a US$4.0 billion banking facility which will be used to finance the project. Approximately 80% of the funds required are in place through a combination of project finance and our own equity contributions. The remainder of the funds required will be raised in a phased manner, including accessing capital markets and further equity contributions.

**ANSWER**:    Denies the allegations contained in Paragraph 129, except admits that Paragraph 129 purports to quote and characterize a March 9, 2015, Form 6-K issued by Sasol, and refers to that Form 6-K for a complete and accurate description of its contents.

130.    That same day, Defendants David Constable and Paul Victor hosted an earnings call with analysts to discuss Sasol's Interim 2015 financial results. On the call, Defendants published an investor presentation, which: (i) touted the "good progress" Sasol was making on the Lake Charles Project; (ii) affirmed the $8.9 billion investment value the Company placed on the project in October 2014; (iii) claimed the "Project economics remain robust"; (iv) stated that an "Experienced owner's team in place to oversee execution phase"; (v) represented that "Site work proceeding safely and efficiently; and (vi) asserted that the project was "On track for mechanical completion in late CY17 with beneficial operation in CY18."

---

[18] Foreign private issuers of securities are required to submit a form 6-K to the SEC. For Sasol, it is required to submit the financial reports filed in South Africa with a "cover statement," which is the Form 6-K.

**ANSWER:** States that the allegations contained in footnote 18 constitute legal conclusions to which no response is required, except admits that Sasol issued Forms 6-K during the putative class period.



**ANSWER**:    Denies the allegations contained in Paragraph 130, except admits that on March 9, 2015, Defendants Constable and Victor appeared on Sasol's Q2 2015 earnings call, and refers to the transcript of that call and accompanying presentation for a complete and accurate description of their contents.

131.    On the call, Defendant Constable stated that "the Lake Charles chemicals project is advancing" and provided additional color regarding the LCCP project slide in the investor presentation:

> Looking at the US specifically, and turning to Slide 24, we're proceeding with the construction of our ZAR8.9b ethane cracker and derivatives complex in Louisiana, as all of you know.
>
> In December 2014 we established a $4b credit facility which will be used to finance the project. We've already secured 80% of the funds required through a combination of project finance and our own equity contributions.
>
> The robust project economics benefit from an advantaged site location which expands on our existing operations, economies of scale that improve our cost structure and upgraded infrastructure and utilities which drive further efficiencies.

- 55 –

The new cracker complex would roughly triple the capacity of the Lake Charles site. Furthermore, our product slate distinguishes our investment from most of the other crackers that have been announced.

Our project combines commodity and specialty products which will leverage low-cost US ethane feed stocks. And note that the specialty chemicals produced will deliver high-value returns even as chemical markets fluctuate.

***To oversee the execution phase of the projects we have an extremely experienced owner's team in place and have progressed several key milestones. Site work is proceeding safely and efficiently and we expect that the plant will achieve mechanical completion at the end of calendar-year 2017. Beneficial operations are on track for the first half of calendar-year 2018.***

**ANSWER**:   Admits that Paragraph 131 purports to quote and characterize a March 9, 2015, Sasol earnings call, and refers to the transcript of that call for a complete and accurate description of its contents.

132.   Defendants' March 9, 2015 statements regarding the LCCP were false and misleading and omitted material facts. Contrary to Defendants' statements, Sasol was not making "good progress" on the LCCP, the true cost of the investment in the LCCP was not $8.9 billion, and the project's economics were not robust. As stated above, Defendants knew by virtue of internal reports that their October 2014 cost estimate failed to account for multiple issues which substantially increased the cost of the project well beyond $8.9 billion. In addition, Defendants knew that the construction and operation of the LCCP was plagued by poor, inexperienced leadership, construction defects, control weaknesses, delays, rising costs, and technical issues, making the project an unsafe and inefficient worksite and taking the LCCP well off track from achieving mechanical completion at the end of calendar-year 2017 and having beneficial operations by the first half of calendar-year 2018. Indeed, as discussed above, Defendants knew from the beginning (before the project even started) that the true budget was going to be approximately $11 billion (even as it ended up being at least $12.6 billion), as CW-2 told senior management directly (including Defendants Nqwababa, Cornell, and Victor) "from the beginning" that the project was going to cost more than $8.9 billion, but Defendants did not disclose this material fact until fifteen months later, on June 6, 2016. CW-3 stated that senior management knew prior to June 2016 that the $8 billion budget was unrealistic. CW-4 stated that CW-4 believed that Defendant Cornell knew the $8.9 billion budget, and even the $11.1 billion budget, was too low, but neither Cornell nor anyone else at senior management disclosed this fact. CW-5 stated that Defendant Cornell would have been "100% informed and involved with issues concerning cost overruns and construction delays," including the fact that the $8.9 billion budget was disclosed, but this fact was not disclosed to investors.

– 56 –

**ANSWER**:   To the extent the allegations in Paragraph 132 consist of legal conclusions, no response is required. To the extent the allegations contained in Paragraph 132 relate to the effectiveness of Sasol's internal controls over financial reporting and management of the LCCP, no response is required given the Court's dismissal of these allegations pursuant to the MTD Order, and Plaintiffs' inclusion of these claims is solely to preserve the issues for appeal. To the extent a response is required, denies the allegations in Paragraph 132, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of whether the confidential witnesses described in Paragraph 132 made the statements attributed to them and whether the characterization of their statements are accurate.

**B.      Sasol's September 7, 2015 Filings Failed to Reveal True Cost Estimates and Delays**

133.   On September 7, 2015, Sasol released its full year results for the year ended June 30, 2015 by issuing a press release and Annual Report and filing a Current Report of Foreign Issuer on Form 6-K with the SEC.

**ANSWER**:   Admits that on September 7, 2015, Sasol released its full year results for the year ended June 30, 2015, including a press release, Annual Report, and Current Report of Foreign Issuer on Form 6-K.

134.   In the September 7, 2015 press release, Defendant Nqwababa updated investors on the LCCP project, stating, "Our US $8,9 billion world-scale ethane cracker and downstream derivatives complex in *Lake Charles, Louisiana* remains on track to reach beneficial operation in 2018."

**ANSWER**:   Admits that the allegations contained in Paragraph 134 purport to quote and characterize a September 7, 2015, press release issued by Sasol, and refers to that press release for a complete and accurate description of its contents.

135.   In the Form 6-K, Defendants similarly stated the cost and development of the LCCP remained "on track":

> Our US$8.9 billion world-scale ethane cracker and downstream derivatives complex in Lake Charles, Louisiana remains on track to reach beneficial operation in 2018.

\* \* \*

> Following the [decision] to proceed with our world-scale ethane cracker and downstream derivatives complex in Lake Charles, Louisiana (LCCP) at the end of October 2014, significant progress has been made in detailed engineering and infrastructure work at the site. We expect to achieve BO [beneficial operation] during the 2018 calendar year. The final estimated project cost remains at US$8.9 billion (including infrastructure and utilities). Approximately 80% of the funds required are in place through a combination of project finance and our own equity contributions. The remainder of the funds required will be raised in a phased manner, including accessing capital markets and further equity contributions.

**ANSWER**:    Denies the allegations contained in the introductory clause of Paragraph 135, purporting to characterize the September 7, 2015, Form 6-K issued by Sasol, and otherwise admits that Paragraph 135 purports to quote and characterize a September 7, 2015, Form 6-K issued by Sasol and refers to that Form 6-K for a complete and accurate description of its contents.

136.    On September 8, 2015, Defendants Constable, Nqwababa, Cornell, Victor, and others hosted an earnings call to discuss Sasol's Full Year 2015 results. On the call, Defendant Nqwababa highlighted the importance the Company placed on "safety" in its North American LCCP project:

> The safety, reliability and sustainability of our operations remain paramount and no compromise will be made in the critical sustenance capital spend. Strategic projects in North America and Southern Africa continue to remain our key focus areas.

**ANSWER**:    Denies the allegations contained in Paragraph 136, except admits that on September 8, 2015, Defendants Constable, Nqwababa, Cornell, and Victor appeared on Sasol's Q4 2015 earnings call, and refers to the transcript of that call for a complete and accurate description of its contents.

137.    Defendants' September 7-8, 2015 statements regarding the LCCP were false and misleading and omitted material facts. Contrary to Defendants' statements, the true cost of the investment in the LCCP was not $8.9 billion investment, and the LCCP did not remain on track to reach beneficial operation in 2018. As stated above, Defendants knew by virtue of internal reports that their October 2014 cost estimate failed to account for multiple issues which

– 58 –

substantially increased the cost of the project well beyond $8.9 billion. In addition, Defendants knew that the construction and operation of the LCCP was plagued by poor, inexperienced leadership, construction defects, control weaknesses, delays, rising costs, and technical issues. Moreover, as discussed above, Defendants knew from the beginning (before the project even started) that the true budget was going to be approximately $11 billion (even as it ended up being at least $12.6 billion). CW-2 told senior management directly (including Defendants Nqwababa, Cornell, and Victor) "from the beginning" that the project was going to cost more than $8.9 billion, but Defendants did not disclose this material fact until fifteen months later, on June 6, 2016.  Further, CW-3 stated that senior management knew prior to June 2016 that the $8 billion budget was unrealistic. CW-4 stated that CW-4 believed that Defendant Cornell knew the $8.9 billion budget, and even the $11.1 billion budget, was too low, but neither Cornell nor anyone else at senior management disclosed this fact. CW-5 stated that Defendant Cornell would have been "100% informed and involved with issues concerning cost overruns and construction delays," including the fact that the $8.9 billion budget was disclosed, but this fact was not disclosed to investors.

**ANSWER**:   To the extent the allegations contained in Paragraph 137 consist of legal

conclusions, no response is required. To the extent the allegations contained in Paragraph 137

relate to the effectiveness of Sasol's internal controls over financial reporting and management

of the LCCP, no response is required given the Court's dismissal of these allegations pursuant to

the MTD Order, and Plaintiffs' inclusion of these claims is solely to preserve the issues for

appeal. To the extent a response is required, denies the allegations contained in Paragraph 137,

except lacks knowledge or information sufficient to form a belief as to the truth or falsity of

whether the confidential witnesses described in Paragraph 137 made the statements attributed to

them and whether the characterizations of their statements are accurate.

C.    **Sasol's March 7, 2016 6-K Assures Investors of Progress But Fails to Mention the True Spiraling Cost Estimates**

138.    On March 7, 2016, Sasol released its financial results for the first half of the 2016 financial year ending December 31, 2016 by issuing a press release, publishing an investor presentation and filing a Current Report of Foreign Issuer on Form 6-K with the SEC.

**ANSWER**:   Admits that on March 7, 2016, Sasol issued a press release, a presentation on its

limited financial results for the six months ended December 31, 2015, and a Form 6-K

containing its interim financial results for the six months ended December 31, 2015, and refers to

that press release, presentation, and Form 6-K for a complete and accurate description of their

contents.

139.    The Form 6-K claimed the LCCP would incur delays as a result of the Company "pac[ing] the execution of the LCCP to support Company's response plan for purposes of cash conservation:

> The Lake Charles Chemicals Project (LCCP) is progressing. The engineering and procurement are at an advanced stage and site construction, mostly civil related, has fully commenced. We had some initial challenges associated with ground work due to the very heavy rainfall in 2015 and the regulatory need to relocate a small waterway. Cost control remains a primary focus for the team. Given the uncertain economic environment, we have taken a decision to pace the execution of the LCCP to support the Response Plan. This shift in schedule will also give us the opportunity to further optimise field efficiency. Our current view is that BO of some smaller derivative units will move into calendar year 2019 and the overall end-of-job project cost estimate will remain under pressure. A detailed review of the project cost and schedule is underway and likely to be completed by mid-calendar year 2016.

**ANSWER**:    Denies the allegations contained in Paragraph 139, except admits that Paragraph

139 purports to quote and characterize a March 7, 2016, Form 6-K issued by Sasol, and refers to

that Form 6-K for a complete and accurate description of its contents.

140.    In the March 7, 2016 Investor Presentation, Sasol highlighted that while the "Lake Charles Chemicals Project [was] progressing," the project cost and schedule was being reviewed, likely to be completed by mid CY2016."



**ANSWER**:    Denies the allegations contained in Paragraph 140, except admits that Paragraph

140 purports to quote, characterize, and excerpt a March 7, 2016, Sasol investor presentation,

and refers to that investor presentation for a complete and accurate description of its contents.

141.    On March 7, 2016, Defendants Constable, Nqwababa, and Cornell also hosted a conference call to discuss Sasol's financial results. On the call, analysts asked Defendant Constable about the LCCP project delays. Defendant Constable responded by minimizing the delays as a planned pacing of the execution of the project to support the Company's low oil price Response Plan geared to optimize cash flows:

> And as you point out, the LCCP, where we're again optimizing cash flows, we've given the project team a target to support the Response Plan so that we can keep the gearing in check which obviously drives credit ratings and supports our dividend policy continuing successfully and keeping the balance sheet strong. So those are the objectives, and obviously the background in taking the decision to pay for the project.
>
> Now, there's certainly some upside here. We believe that this will allow us to get engineering even further along. We are about 70% completed engineering. We are 80% complete on the cracker – 82% complete on the cracker's engineering, and 90% complete on the first big derivative unit there, LLDPE. So the engineering is growing extremely well. Procurement also is over 50%, I think it's at 51% or

- 61 –

52% of the (inaudible) today as recent as January, it's probably a little higher than that now.

This optimizing of the cash flow, storing the [stand-down], getting all the drawings AFC approved for construction to the field, all of the equipment and bulk, piping and vessels, equipment purchasing in the [way-down yard, the way-down being where the GTL is going to go. So we've got great space on the project to lay down our equipment and ramp up the later field accounts later. And that [wibbly] will feel more like a shutdown, and you'll have everything you require on-site to align with – get world-class productivity out of the trade arm on site.

So that's what we're looking at. Again, cracker and LLDPE still in 2018, with some smaller, derivative units pushing in into the 2019 calendar year. So because there is a cap on the cash flows, you're seeing a slight extension to the schedule.

Now, we've just told the project team, that's what their marching orders were. So obviously they're looking at the revised execution plans. Fortunately, we've not ramped up. I think we could probably accept 6,000 people on site as we speak, but we're only at or about 2,000. And we'll continue at that level or after we ramp up, probably we'll ramp it down a bit before picking back up, like I say, a little later in time. By mid-year the project team will have that execution approach finalized, costs schedule for us. And we'll take a look at how that all works out for the return sampling.

**ANSWER**:     Denies the allegations contained in Paragraph 141, except admits that on March 7,

2016, Defendants Constable, Nqwababa, and Cornell appeared on Sasol's Q2 2016 earnings call

and refers to the transcript of that call for a complete and accurate description of its contents.

142.    These statements were material and relied on by investors and securities analysts. In a March 8, 2016 report, Deutsche Bank noted that, "[a]lthough yesterday's EPS beat of 2% was not material, we believe the results and the conference call have demonstrated a robust underlying performance and an improved outlook against what remains a challenging commodities backdrop. With improved cost saving targets and more balance sheet flexibility, Sasol is well positioned to withstand a negative commodities cycle, in our view."

**ANSWER**:     To the extent the allegations in Paragraph 142 consist of legal conclusions, no

response is required. To the extent a response is required, denies the allegations contained in

Paragraph 142, except admits that the March 8, 2016, Deutsche Bank report referred to in

Paragraph 142 exists, and refers to that report for a complete and accurate description of its

contents.

143.    Defendants' March 7, 2016 statements regarding the LCCP were false and misleading and omitted material facts. Contrary to Defendants' statements of having to complete a cost and schedule review, Defendants knew at this time that the true cost of the investment in the LCCP was not $8.9 billion investment, and that far more of the LCCP than smaller derivative units would not be operating on schedule. As stated above, Defendants knew by virtue of internal reports that their October 2014 cost estimate failed to account for multiple issues which substantially increased the cost of the project well beyond $8.9 billion. In addition, Defendants knew that the construction and operation of the LCCP was plagued by poor, inexperienced leadership, construction defects, control weaknesses, delays, rising costs, and technical issues, making the project an unsafe and unreliable worksite. Moreover, as discussed above, Defendants knew from the beginning (before the project even started) that the true budget was going to be approximately $11 billion (even as it ended up being at least $12.6 billion). CW-1 stated that, in February 2016, Fluor submitted a Change Order for $11.7 billion for the LCCP project – which is nearly $2 billion more than Sasol's $8.9 billion disclosure on March 9, 2015. Sasol did not disclose to shareholders a revised cost of $11.6 billion - $11.8 billion until February 25, 2019 – three years after the Fluor Change Order. In addition, the $11 billion cost estimate (according to Sasol) included a $300 million contingency – but the Fluor Change Order did *not* include a contingency, which means that Sasol deliberately underreported the known costs by at least $1 billion. CW-2 told senior management directly (including Defendants Nqwababa, Cornell, and Victor) that "from the beginning, it was clear" that the project was going to cost more than $8.9 billion, but Defendants did not disclose this material fact until fifteen months later, on June 6, 2016. CW-3 stated that senior management knew prior to June 2016 that the $8 billion budget was unrealistic. CW-4 stated that CW-3 believed that Defendant Cornell knew the $8.9 billion budget, and even the $11.1 billion budget, was too low, but neither Cornell nor anyone else at senior management disclosed this fact. CW-5 stated that Defendant Cornell would have been "100% informed and involved" with issues concerning cost overruns and construction delays, including the fact that the $8.9 billion budget was disclosed, but this fact was not disclosed to investors.

**ANSWER**:    To the extent the allegations contained in Paragraph 143 consist of legal

conclusions, no response is required. To the extent the allegations contained in Paragraph 143

relate to the effectiveness of Sasol's internal controls over financial reporting and management

of the LCCP, no response is required given the Court's dismissal of these allegations pursuant to

the MTD Order, and Plaintiffs' inclusion of these claims is solely to preserve the issues for

appeal. To the extent a response is required, denies the allegations contained in Paragraph 143,

except lacks knowledge or information sufficient to form a belief as to the truth or falsity of

whether the confidential witnesses described in Paragraph 143 made the statements attributed to

them and whether the characterizations of their statements are accurate.

**D.    Sasol's June 6, 2016 6-K – Sasol Makes a Partial Disclosure of Cost Increases, But Falsely Characterizes It as a "Worst-Case Scenario"**

144.    On June 6, 2016, Sasol filed a Form 6-K with the SEC, disclosing "that the expected total capital expenditure for the [LCCP] could increase up to US$11 billion, including site infrastructure and utility improvements"; a slower rate of capital "resulted in an extended project schedule and contributed to further project cost increases"; that "[t]he expected returns for the project have reduced due to changes in long-term price assumptions and the higher capital estimates"; and that "[t]he increase in the estimated LCCP capital cost and extended schedule will reduce the expected project returns by approximately the same amount as the Company's lower long-term price assumptions" (the "June 2016 6-K").

**ANSWER**:    Admits that on June 6, 2016, Sasol issued a Form 6-K, and refers to that Form 6-

K for a complete and accurate description of its contents.

145.    But, the June 6, 2016 6-K represented that the LCCP's extended project schedule and consequent cost increases were "partially offset by productivity benefits due to improved phasing of engineering and construction activities" and that, "[a]s of 30 April 2016 . . . the overall project completion has progressed beyond 40%." The June 2016 6-K also assured investors that "management is setting firm targets and objectives for the project team in order to minimise the capital expenditure and optimise the overall project schedule." Finally, the June 2016 6-K represented that "the ethane cracker will achieve beneficial operation in the second half of calendar year 2018, which will enable around 80% of the total output from LCCP to reach beneficial operation later in 2018 and early 2019," and that "[t]he remaining volumes from the other derivative units will reach beneficial operation by the second half of 2019."

**ANSWER**:    Denies the allegations contained in Paragraph 145, except admits that Paragraph

145 purports to quote and characterize a June 6, 2016, Form 6-K issued by Sasol, and refers to

the Form 6-K for a complete and accurate description of its contents.

146.    In fact, in a call with investors the next day, Defendant Constable promptly minimized the importance of Sasol's disclosure. In a business investor call (with Defendants Nqwababa, Schoeman, and Victor participating), Constable made the following statements, all of which were designed to assuage investors' fears about rising costs and delays in completion of the project:

> • Total capital expenditure "could increase up to $11 billion. And I emphasize could increase, as this review is still a work in progress. . . . Again, it cannot be overstated that the review has

not been finalized, and so it's [sic] findings are preliminary and based on our work to-date."

- "We really want to strongly message that we are confident that we'll be able to push the CapEx down."

- "Bottom-line is ZAR [sic] 11 billion is an extremely comfortable number for us, and we are pushing it obviously in a downward direction and more to come on that in September."

- "We're trying to message that that would be a, if you will a worst case type of scenario and we don't expect it. We're working it in another direction."

- "The management team remains closely involved in guiding the project team, so that we can minimize capital expenditure and further optimize overall project efficiency. To support these efforts, we have also bolstered the senior staffs' resources on the ground to enable an even greater focus on a range of execution activities."

- Sasol has "progress[ed] the execution of the LCCP with limited slippage in schedule in the key deliverables despite the weather challenges in 2015 and 2016."

- LCCP's "good progress is allowing us to develop better estimates as indicated total cost along with an updated schedule that reflects our desire to pace capital spend."

- "We have included sufficient contingency related to the remaining engineering hours and field productivity assumptions in order to be very comfortable with the preliminary updated cost estimates. Overall, construction on the project is continuing in a cost-effective manner with most engineering activities nearing completion."

- "Let me just say that the overall project economics for the LCCP remain resilient, and the management and the project team are focused on driving the final CapEx as low as possible, primarily through feed field productivity and labor rate improvements, coupled with bulk quantity and related engineering cost reductions."

- In the context of cost and profit estimates, that Sasol was a "fairly conservative organization."

**ANSWER**:    Denies the allegations contained in Paragraph 146, except admits that Defendants

Constable, Nqwababa, Schoeman, and Victor, appeared on a June 7, 2016, Sasol business update

call, and refers to the transcript of that call for a complete and accurate description of its

contents.

147.    Defendants' June 6, 2016 statements regarding the LCCP were both a partial disclosure of Defendants' alleged fraud and false and misleading statements.

**ANSWER**:    To the extent the allegations contained in Paragraph 147 consist of legal

conclusions, no response is required. To the extent a response is required, denies the allegations

contained in Paragraph 147.

148.    Following this news, Sasol's ADR price fell $3.53 per share, or 10.99%, to close at $28.60 per share on June 6, 2016. In a June 7, 2016 report to clients, Deutsche Bank tied the drop to the Company's announced higher costs relating to the LCCP, stating that "[y]esterday's announcement of higher costs (up to $11bn vs. $8.9bn) and delayed commissioning (YE 2019 vs. YE 2018) for Sasol's Lake Charles chemicals project (LCCP) sent Sasol's share price down 10%, almost entirely wiping off the value of the $2.1bn announced overspend."

**ANSWER**:    Denies the allegations contained in Paragraph 148, except states that the

allegations in Paragraph 148 purport to describe the prices of Sasol's ADRs, which are matters of

public record and refers to such public records; admits that the June 7, 2016, Deutsche Bank

report referred to in Paragraph 148 exists and refers to that report for a complete and accurate

description of its contents.

149.    Nonetheless, the Company's securities continued to trade at artificially inflated prices throughout the Class Period as a result of Defendants' failure to disclose the entirety of the fraud and continued false and misleading statements and omissions regarding the purported progress of the LCCP's development and the LCCP management's oversight over that project. Specifically, Defendants' June 6, 2016 statements falsely stated that the total capital expenditure "*could*" increase up to $11 billion, and described it as a "worst-case scenario," when they knew full well that it would *easily* reach that amount. In truth, Defendants knew at this time that the true cost of the investment in the LCCP was well in excess of $11 billion by virtue of internal. Indeed, CW-1 stated that, in February 2016, Fluor submitted a Change Order for $11.7 billion for the LCCP project. The $11 billion cost estimate (according to Sasol) included a $300 million contingency — but the Fluor Change Order did *not* include a contingency, which means that Sasol deliberately underreported the known costs by at least $1 billion. In addition, Defendants knew but failed to disclose that the construction and operation of the LCCP was plagued by poor,

- 66 –

inexperienced leadership, construction defects, control weaknesses, delays, rising costs, and technical issues.

**ANSWER**:    To the extent the allegations contained in Paragraph 149 consist of legal conclusions, no response is required. To the extent the allegations contained in Paragraph 149 relate to the effectiveness of Sasol's internal controls over financial reporting and management of the LCCP, no response is required given the Court's dismissal of these allegations pursuant to the MTD Order, and Plaintiffs' inclusion of these claims is solely to preserve the issues for appeal. To the extent a response is required, denies the allegations contained in Paragraph 149, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of whether the confidential witness described in Paragraph 149 made the statements attributed to them and whether the characterizations of their statements are accurate.

E.    **Sasol's August 23, 2016 6-K and Investor Fact Sheet Emphasizes that $11 Billion Figure is "Upper End of the Range"**

150.    On August 23, 2016, Sasol filed a Form 6-K with the SEC, which reported as follows:

> The detailed review has confirmed that the total capital cost for the project is expected to be US$11 billion, which includes site infrastructure and utility improvements. This is an increase of $2.1 billion from the original estimate at the time of final investment decision (FID) in October 2014. This estimate includes a contingency, which measured against industry norms for this stage of project completion, we consider being sufficient to effectively take the project to beneficial operation within the revised cost estimate. At 30 June 2016, the capital expenditure to date on LCCP was $4.8 billion, and the overall project completion was around 50%.
>
> The schedule for LCCP remains the same as communicated on 6 June 2016. The first unit, the linear low-density polyethylene unit, is expected to achieve beneficial operation in the second half of calendar year 2018, which will be followed by the ethane cracker and ethylene oxide and mono ethylene glycol units later that year, with the low-density polyethylene unit shortly thereafter. This will result in over 80% of the total output from LCCP reaching beneficial

operation by early 2019. The remaining derivative units will reach beneficial operation by the second half of 2019.

**ANSWER**:    Admits that on August 23, 2016, Sasol issued a Form 6-K, and refers to that Form

6-K for a complete and accurate description of its contents.

151.    Also on August 23, 2016, Sasol released an "Investor Fact Sheet," which stated (under the header "Why we do not expect further cost overruns"), that Sasol "communicated in June 2016 that we were confident that we could reduce the project costs from the upper end of the range which was communicated as $11 billion. We are now working off a $11 billion project cost as base case having built in sufficient contingencies to have a high degree of certainty that we can avoid further cost overruns. Notwithstanding the current cost estimate, various other savings opportunities have been identified to mitigate the increase in the overall capital cost estimate."

**ANSWER**:    Admits that on August 23, 2016, Sasol released an "Investor Fact Sheet," and

refers to that "Investor Fact Sheet" for a complete and accurate description of its contents.

152.    The Investor Fact Sheet further emphasized that successful execution and cost estimate compliance were assured given the heightened controls the Company had implemented at the LCCP:

The LCCP funding strategy has not changed as a result of the higher capital expenditure estimates and Sasol does not expect to exceed its self-imposed gearing ceiling which is well below the gearing maintenance ratio covenant of 2,5 times, which Sasol is subject to in certain of its corporate funding agreements.

**Remedial action taken to deliver successful execution of the LCCP**

Several changes have been, or are in the process of being, implemented to ensure that the project has a good probability of being completed within the updated cost and schedule guidance. Some of the key actions implemented are as follows:

- Key project management changes on both sides, including deployment of three experienced Sasol project personnel to oversee engineering, procurement and construction have been effected;
- Improvement of the control base management process and associated change management process;
- Improvement in managing work packages to ensure first quintile productivity for the remainder of the project; and
- Realignment of contracting strategies to ensure that the desired level of cost and productivity is achieved.

In addition, the site and civil work is now complete and the operations are less exposed to adverse weather.

**Why we do not expect further cost overruns**

At 30 June 2016, the overall project completion was around 50%, with engineering around 85% complete, procurement of equipment almost 100% committed, and bulk materials procurement around two-thirds committed. In addition, fabrication of the modules and piping spool pieces is well advanced, with site, civil and concrete work nearing completion, resulting in overall construction progress around 15% complete. This, together with the detailed review process described above, results in a high degree of certainty for the cost and schedule provided by the review.

We communicated in June 2016 that we were confident that we could reduce the project costs from the upper end of the range which was communicated as $11 billion. We are now working off a $11 billion project cost as base case having built in sufficient contingencies to have a high degree of certainty that we can avoid further cost overruns. Notwithstanding the current cost estimate, various other savings opportunities have been identified to mitigate the increase in the overall capital cost estimate.

**ANSWER**:    Denies the allegations contained in Paragraph 152, except admits that Paragraph

152 purports to characterize and excerpt an August 23, 2016, "Investor Fact Sheet" issued by

– 68 –

Sasol, and refers to that "Investor Fact Sheet" for a complete and accurate description of its contents.

153.    The Investor Fact Sheet highlighted the specific remedial changes Sasol implemented at the LCCP:

> The review has also found that the project control base management system can be improved, which will result in a more effective, efficient and earlier detection of deviations from the control base, as well as the associated change management required. Management has subsequently implemented various risk and change management mitigating actions that will enhance preventative controls and optimise the project execution going forward.

> Further key mitigating actions include, but are not limited to, key project management changes on both sides, including the deployment of three experienced Sasol project personnel to oversee engineering, procurement, and construction, improvement in managing work packages to ensure first quintile productivity for the remainder of the project and realignment of contracting strategies to ensure that desired levels of cost and productivity are achieved.

**ANSWER**:    Denies the allegations contained in Paragraph 153, except admits that Paragraph 153 purports to quote and characterize an August 23, 2016, "Investor Fact Sheet" issued by Sasol, and refers to that "Investor Fact Sheet" for a complete and accurate description of its contents.

154.    The "Investor Fact Sheet" also stated the following (emphasis added): "The updated LCCP estimate includes a contingency allowance which is expected to be sufficient to effectively take the project to beneficial operation. Given that the project is around 50% complete and many of the risks that existed at the time of FID have since been reduced or removed, the updated estimate *includes a lower contingency allowance*."

**ANSWER**:    Admits that Paragraph 154 purports to quote and characterize an August 23, 2016, "Investor Fact Sheet" issued by Sasol, and refers to that "Investor Fact Sheet" for a complete and accurate description of its contents.

155.    Investors appears to have responded positively to the promise to these disclosures. A South African First National Bank report from August 24, 2016 commented that "[s]everal remedial steps have been undertaken to ensure successful project delivery at the revised budget.

- 69 –

These include among others, improved change management practices and key project leadership changes."

**ANSWER**:    Denies the allegations contained in Paragraph 155, except admits that the August

24, 2016, First National Bank report referred to in Paragraph 155 exists, and refers to that report

for a complete and accurate description of its contents.

156.    An August 23, 2016 Deutsche Bank analysis concluded that "[t]oday's announcement does not materially change our understanding of the project's economics, with capex guidance remaining at $11bn but total IRR estimate rising above 8% due to company's changes of commodity price assumptions. As DB commodity forecasts are unchanged, our own estimate of the project's full IRR remains at 7.9%. It is worth noting that in an IRR sensitivity range provided, no single favourable factor adjustment gets the project above the US hurdle rate of 10.4%. The project's design and the planned commissioning timeline remain unchanged. . . . Sasol said it has a "high degree of certainty" over the updated $11bn estimate, which includes contingencies sufficient for this stage of project completion."

**ANSWER**:    Admits that the August 23, 2016, Deutsche Bank report referred to in Paragraph

156 exists, and refers to that report for a complete and accurate description of its contents.

**F.    Sasol's September 12, 2016 6-K – Sasol Repeats the Misleading $11 Billion Figure**

157.    On September 12, 2016, Sasol filed a Form 6-K with the SEC, disclosing the following:

> A detailed review on the LCCP **confirmed that the total capital cost for the project is expected to be US$11 billion**, which includes site infrastructure and utility improvements. This is an increase of US$2.1 billion from the original estimate at the time of final investment decision (FID) in October 2014. This estimate includes a contingency, which measured against industry norms for this stage of project completion, is considered sufficient to effectively take the project to beneficial operation (BO) within the revised cost estimate. The schedule has not been impacted by the increase in cost estimate.

**ANSWER**:    Admits that on September 12, 2016, Sasol issued a Form 6-K, and refers to that

Form 6-K for a complete and accurate description of its contents.

158.    According to Sasol in the 6-K, the cost increase was "mostly attributable" to several factors in "approximately equal" proportion, including, in relevant part:

- *  a significant increase in site and civil costs due to much more ground works required to establish the site compared to what was estimated at FID as a result of poorer than anticipated subsurface conditions . . . and much lower field productivity resulting from a conscious decision to proceed with out-of-sequence site preparation activities while waiting for a variation of permit conditions to be granted . . . .

- *  an increase in the home office and construction costs of the Engineering, Procurement, Construction and Management Contractor (EPCm) mainly as a result of an increase in contractor wage rates compared to what were assumed at FID, lower engineering productivity, and an increase in contractor engineering hours as a result of the increased material quantities; and

- *  an increase in labour costs as a result of higher quantities of material for installation, the decision to change to a higher-skilled and thus higher cost crew mix to enable planned labour productivity improvements for the remainder of the project, and lump-sum contracts placed at higher rates than estimated.

**ANSWER**:    States that Paragraph 158 purports to quote and characterize an August 23, 2016, Form 6-K issued by Sasol, and refers to that Form 6-K for a complete and accurate description of its contents.

159.    Sasol also disclosed the following in the 6-K:

Although the capital expenditure for our Lake Charles Chemicals Project has increased, we remain confident that the fundamental drivers for this investment are sound. **The cost and schedule review process, which was completed in August 2016, has set a solid platform for the continued execution of this project."**

* * *

Notwithstanding these challenges, various other savings opportunities have been identified and are being implemented to mitigate the increase in the overall capital cost estimate. With the project now over 50% complete, several changes have been, or are in the process of being, implemented which are intended to ensure that the project has a good probability of being completed within the updated cost and schedule guidance. These actions address the root causes of process weaknesses identified during the detailed review process and include improved productivity and construction

- 71 –

readiness that will be achieved through focused risk management processes, improved phasing of engineering, cost-effective mobilisation of resources and synchronised workface planning, improved change management practices and key project leadership personnel changes.

Although unplanned event-driven risks may still impact the execution and cost of the project, we are confident that the remaining construction, procurement, execution and business readiness risks can be managed within the estimate as a result of these changes.

Even though the expected capital expenditure for LCCP has increased, we do not expect this to result in the company exceeding its self-imposed gearing targets. Our funding strategy has not changed as a result of the higher estimated capital expenditure and the project will continue to be funded from existing facilities and ongoing group cash flow. Despite the lower expected returns, we still consider the LCCP to be a sound investment that will return value to our shareholders for many years into the future. Further details are available in the Investor Fact Sheet on the Sasol website, www.sasol.com.

**ANSWER**:    Admits that Paragraph 159 purports to quote a September 12, 2016, Form 6-K issued by Sasol, and refers to that Form 6-K for a complete and accurate description of its contents.

160.    The September 12, 2016 6-K also included a quote from the Chairman of Sasol's Board of Directors, Mandla Gantsho, who represented that Defendants "have taken decisive action to address the issues raised" by the LCCP's delayed construction.

**ANSWER**:    Denies the allegations contained in Paragraph 160, and states that Paragraph 160 purports to quote and characterize an August 23, 2016, Form 6-K issued by Sasol, and refers to that Form 6-K for a complete and accurate description of its contents.

161.    On September 12, 2016, Defendants Nqwababa, Cornell and Victor hosted an earnings call. Defendant Nqwababa provided further detail regarding the LCCP review:

Last month, in August 2016, we completed a detailed LCCP review and confirmed the total capital quote for the project to be about $11 billion. This includes sufficient contingency to successfully complete the execution. We have confidence that we can deliver the LCCP within this revised budget.

- 72 –

We also confirmed a revised schedule for LCCP.

As a reminder, the first unit linear low-density polyethylene unit, is expected to achieve beneficial operation in the second half of calendar year 2018. This will be followed by the ethane cracker, the ethylene oxide and mono-ethylene glycol units, later that year. The low-density polyethylene unit will then follow in early calendar year 2019, allowing over 80% of total output from LCCP to reach beneficial operation.

While the capital requirement for LCCP has increased, returns are expected to be slightly above the US dollar-weighted cost of capital of 8%. Projected returns over the remaining construction period also remain in excess of our hurdle rate. Based on the detailed review process, management has taken decisive action to ensure that we successfully deliver the LCCP execution and start-up.

These actions include key project management changes, improvement of control base detail and changed management processes overlaying the control base, amongst others. We remain confident that the fundamentals for the LCCP are sound in regards to our strategy and future earnings. This project is an ideal opportunity to build a world-scale chemicals facility that will be placed in the bottom quartile of the cost base.

**ANSWER**:    Admits that on September 12, 2016, Defendants Nqwababa, Cornell, and Victor

appeared on Sasol's Q4 2016 earnings call, and refers to the transcript of that call for a complete

and accurate description of its contents.

162.    Defendants' September 12, 2016 statements regarding the LCCP were false and misleading and omitted material facts. Defendants knew at this time that the true cost of the investment in the LCCP was well in excess of $11 billion by virtue of internal. Indeed, CW-1 stated that, in February 2016, Fluor submitted a Change Order for $11.7 billion for the LCCP project. The $11 billion cost estimate (according to Sasol) included a $300 million contingency — but the Fluor Change Order did *not* include a contingency, which means that Sasol deliberately underreported the known costs by at least $1 billion. In addition, Defendants knew but failed to disclose that the construction and operation of the LCCP was plagued by poor, inexperienced leadership, construction defects, control weaknesses, delays, rising costs, and technical issues. Further, CW-1 stated that realistically there would be no additional "savings opportunities" to drive down the $11 billion figure.

**ANSWER**:    To the extent the allegations contained in Paragraph 162 consist of legal

conclusions, no response is required. To the extent the allegations contained in Paragraph 162

relate to the effectiveness of Sasol's internal controls over financial reporting and management

of the LCCP, no response is required given the Court's dismissal of these allegations pursuant to

the MTD Order, and Plaintiffs' inclusion of these claims is solely to preserve the issues for

appeal. To the extent a response is required, denies the allegations contained in Paragraph 162,

except lacks knowledge or information sufficient to form a belief as to the truth or falsity of

whether the confidential witness described in Paragraph 162 made the statements attributed to

them and whether the characterization of their statements are accurate.

163.    Moreover, contrary to Mr. Bantsho's statements, and as Sasol itself later admitted, Sasol had not taken "decisive action to address the issues raised" by LCCP's delayed construction. In truth, Defendants maintained ineffective internal controls over the LCCP, including in (i) the accuracy of its reporting of cost and schedule estimates for the LCCP; (ii) the segregation of duties of the LCCP project controls environment from the LCCP project execution environment, which prevented the identification of errors in cost and schedule estimation; (iii) control procedures within the LCCP control environment that led to false statements made by LCCP leadership; (iv) procedures to ensure that internal ethics complaints as to the LCCP were escalated appropriately; and (v) the oversight of the LCCP leadership team.

**ANSWER**:    To the extent the allegations contained in Paragraph 163 relate to the effectiveness

of Sasol's internal controls over financial reporting and management of the LCCP, no response is

required given the Court's dismissal of these allegations pursuant to the MTD Order, and

Plaintiffs' inclusion of these claims is solely to preserve the issues for appeal. To the extent a

response is required, denies the allegations contained in Paragraph 163, except states that the first

sentence of Paragraph 163 purports to quote and characterize an August 23, 2016, Form 6-K

issued by Sasol, and refers to that Form 6-K for a complete and accurate description of its

contents.

**G.    Sasol's September 27, 2016 20-F**

164.    On September 27, 2016, Sasol filed an Annual Report on Form 20-F with the SEC, reporting the Company's financial and operating results for the quarter and year ended June 30, 2016 (the "2016 20-F"). With respect to the LCCP, the 2016 20-F stated that "[o]verall construction on the project continues on all fronts, with most engineering activities nearing completion and procurement well advanced"; and that, "[a]t 30 June 2016, the capital

expenditure to date on LCCP was US$4.8 billion, and the overall project completion was around 50%."

**ANSWER**:   Admits that on September 27, 2016, Sasol issued a Form 20-F, and refers to that

Form 20-F for a complete and accurate description of its contents.

165.   The 2016 Form 20-F also stated that the "schedule for LCCP has not been impacted by the increase in cost estimate. The first unit, the linear low-density polyethylene unit, is expected to achieve beneficial operation in the second half of calendar year 2018, which will be followed by the ethane cracker and ethylene oxide and mono ethylene glycol units later that year, with the low-density polyethylene unit shortly thereafter. This will result in over 80% of the total output from LCCP reaching beneficial operation by early 2019. The remaining derivative units will reach beneficial operation by the second half of 2019."

**ANSWER**:   Admits that Paragraph 165 purports to quote and characterize a September 27,

2016, Form 20-F issued by Sasol, and refers to that Form 20-F for a complete and accurate

description of its contents.

166.   Defendants' September 27, 2016 statements regarding the LCCP were false and misleading and omitted material facts. Defendants knew at this time that the true cost of the investment in the LCCP was well in excess of $11 billion by virtue of internal.  Indeed, CW-1 stated that, in February 2016, Fluor submitted a Change Order for $11.7 billion for the LCCP project. The $11 billion cost estimate (according to Sasol) included a $300 million contingency – but the Fluor Change Order did not include a contingency, which means that Sasol deliberately underreported the known costs by at least $1 billion. In addition, Defendants knew but failed to disclose that the construction and operation of the LCCP was plagued by poor, inexperienced leadership, construction defects, control weaknesses, delays, rising costs, and technical issues, making the project an unsafe and unreliable worksite.

**ANSWER**:   To the extent the allegations contained in Paragraph 166 consist of legal

conclusions, no response is required. To the extent the allegations contained in Paragraph 166

relate to the effectiveness of Sasol's internal controls over financial reporting and management

of the LCCP, no response is required given the Court's dismissal of these allegations pursuant to

the MTD Order, and Plaintiffs' inclusion of these claims is solely to preserve the issues for

appeal. To the extent a response is required, denies the allegations contained in Paragraph 166,

except lacks knowledge or information sufficient to form a belief as to the truth or falsity of

whether the confidential witness described in Paragraph 166 made the statements attributed to

them and whether the characterization of their statements is accurate.

**H.    Sasol's February 27, 2017 6-K**

167.    On February 27, 2017, Sasol filed a Current Report of Foreign Issuer on Form 6-K with the SEC. In the Form 6-K, Sasol provided an update on the LCCP, stating "Our Lake Charles Chemicals Project in the United States is now 64% complete, and remains on track for start-up of the first units in the second half of 2018."

**ANSWER**:    Admits that on February 27, 2017, Sasol issued a Form 6-K, and refers to that

Form 6-K for a complete and accurate description of its contents.

168.    Sasol also disclosed that "total capital spent amounts to US$6.0 billion, and the overall project completion is 64%. The total forecasted capital cost for the project remains within the approved US$11 billion budget and approved schedule. The project's contingency which, measured against industry norms for this stage of project completion, is still considered sufficient to effectively complete the project to beneficial operation (BO) within the US$11 billion budget. Although unplanned event-driven risks may still impact the execution and cost of the project, we are confident that the remaining construction, procurement, execution and business readiness risks can be managed within the budget as a result of these changes. We still consider the LCCP to be a value-based investment that will return sustainable value to our shareholders for many years into the future. The project returns are still forecast to be above our weighted average cost of capital (WACC)."

**ANSWER**:    Admits that Paragraph 168 purports to quote and characterize a February 27,

2017, Form 6-K issued by Sasol, and refers to that Form 6-K for a complete and accurate

description of its contents.

169.    On February 27, 2017, Defendants Cornell, Nqwababa, Victor, and Schoeman hosted a conference call. On the call, these individuals published an investor presentation, emphasizing as one of their "Key Messages" to investors that the "Lake Charles Chemicals Project (US) [was] on track and delivering on key project milestones."



**ANSWER**:    Denies the allegations contained in Paragraph 169, except admits that on February 27, 2017, Defendants Cornell, Nqwababa, and Victor, appeared on Sasol's Q2 2017 earnings call, and refers to the transcript of that call and accompanying presentation for a complete and accurate description of their contents.

170.    On the February 27, 2017 earnings call, Defendant Cornell told analysts that the LCCP's "overall construction is progressing well and site utilization has been optimized:"

> Turning our attention now to North America, overall construction on the LCCP continues on all fronts with most engineering and procurement activities nearing completion. As of December 31, 2016, capital expenditure amounted to $6 billion.

> Overall project completion was 64%, with the startup of the first units forecasted in the second half of 2018 still on track.

> The modular approach we are following to build the various plants has ensured that overall construction is progressing well and site utilization has been optimized. Large laydown areas that can accommodate procured material and equipment have been established. This is positively influencing our synchronized work-phase planning.

> Fabrication of the modules and piping [scope] pieces is well advanced with critical site, civil and concrete work nearing completion. Overall construction progress is now around 25% complete.

> This, together with the detailed ongoing assurance processes, results in a high degree of certainty for achieving end of job cost and schedule targets. The total forecasted capital cost for the project remains within the approved the $11 billion budget. . . .
>
> We consider the LCCP a value-based investment that will return sustainable value to our shareholders for many years into the future. The project returns are still forecast to be above the weighted average cost of capital.

**ANSWER**:    Admits that Paragraph 170 purports to quote and characterize a February 27, 2017, earnings call, and refers to the transcript of that call for a complete and accurate description of its contents.

171.    On the call, Defendants disclosed a 20% cost escalation on its separate Gemini chemical project. Analysts questioned Defendants that "[i]f you have the same problems at the LCCP as you have had at Gemini, will your contingencies be sufficient?" Schoeman assured analysts that Sasol would not have the same cost escalation by noting the "significant changes," "structural differences that were implemented" "after learning some lesson on LCCP":

> I think we need to distinguish between the two projects in the sense that there were significant changes that we made after learning some lessons on LCCP.
>
> We also have a greater degree of modularization on LCCP, and it's going better than expected there; as well as some of the current productivity that we see, or as anticipated in our CBU.
>
> So, there are many structural differences that were implemented on the LCCP. And, yes, similar to the example you cited earlier, those projects were structurally different and ended up, at the end of the project phase, now with the complication of productivity.
>
> So, I think, of course, if we have significant issues on LCCP, the contingency will not be sufficient. But that is – that is definitely not anticipated and also not seen currently in what we are achieving, in actual fact, with above ground [level].

**ANSWER**:    Denies the allegations contained in Paragraph 171, except admits that Paragraph 171 purports to quote and characterize a February 27, 2017, earnings call, and refers to the transcript of that call for a complete and accurate description of its contents.

172.    These statements were material to investors and securities analysts. For example, on February 27, 2017 Deutsche Bank report stated:

**No change to LCCP budget or schedule**

Sasol reported that LCCP is now 64% complete; with most engineering and procurement processes having been completed and overall construction being about 25% complete. With $6bn spent on LCCP to date, we estimate that the NPV of remaining cash flows has now moved into positive territory with remaining IRR of 14%. We estimate that each $1bn increase in the project's budget will reduce remaining IRR by 2ppt, while a 12-month delay in the commissioning process would have a negative impact of 1ppt.

**ANSWER**:    To the extent the allegations in Paragraph 172 consists of legal conclusions, no response is required. To the extent a response is required, denies the allegations contained in Paragraph 172, except admits that the February 27, 2017, Deutsche Bank report referred to in Paragraph 172 exists, and refers to that report for a complete and accurate description of its contents.

173.    Defendants' February 27, 2017 statements regarding the LCCP were false and misleading and omitted material facts. Defendants knew at this time that the true cost of the investment in the LCCP was well in excess of $11 billion by virtue of internal. Indeed, CW-1 stated that, in February 2016, Fluor submitted a Change Order for $11.7 billion for the LCCP project. The $11 billion cost estimate (according to Sasol) included a $300 million contingency — but the Fluor Change Order did *not* include a contingency, which means that Sasol deliberately underreported the known costs by at least $1 billion. In addition, Defendants knew but failed to disclose that the construction and operation of the LCCP was plagued by poor, inexperienced leadership, construction defects, control weaknesses, delays, rising costs, and technical issues. Moreover, contrary to Schoeman's statements, and as Sasol itself later admitted, Sasol never made significant changes to address LCCP's cost escalations. In truth, Defendants knew Sasol maintained ineffective internal controls over the LCCP, including in (i) the accuracy of its reporting of cost and schedule estimates for the LCCP; (ii) the segregation of duties of the LCCP project controls environment from the LCCP project execution environment, which prevented the identification of errors in cost and schedule estimation; (iii) control procedures within the LCCP control environment that led to false statements made by LCCP leadership; (iv) procedures to ensure that internal ethics complaints as to the LCCP were escalated appropriately; and (v) the oversight of the LCCP leadership team."

**ANSWER**:    To the extent the allegations contained in Paragraph 173 consist of legal conclusions, no response is required. To the extent the allegations contained in Paragraph 173

relate to the effectiveness of Sasol's internal controls over financial reporting and management

of the LCCP, no response is required given the Court's dismissal of these allegations pursuant to

the MTD Order, and Plaintiffs' inclusion of these claims is solely to preserve the issues for

appeal. To the extent a response is required, denies the allegations contained in Paragraph 173,

except lacks knowledge or information sufficient to form a belief as to the truth or falsity of

whether the confidential witness described in Paragraph 173 made the statements attributed to

them and whether the characterizations of their statements are accurate.

## I.    March 24, 2017 Sasol Site Visit

174.    On March 24, 2017, Defendants Cornell, Schoeman, Victor, Nqwababa and other
Sasol representatives hosted a Sasol Site Visit at the LCCP with investors. In the investor
presentation, Defendants repeatedly highlighted the robust project controls Sasol had put in place
to execute the project within the revised schedule and budget:



**ANSWER**:    To the extent the allegations contained in Paragraph 174 relate to the effectiveness

of Sasol's internal controls over financial reporting and management of the LCCP, no response is

required given the Court's dismissal of these allegations pursuant to the MTD Order, and

Plaintiffs' inclusion of these claims is solely to preserve the issues for appeal. To the extent a

response is required, denies the allegations contained in Paragraph 174, except admits that on

March 24, 2017, Defendants Cornell, Schoeman, Victor, and Nqwababa, appeared at a Sasol Site

Visit in Lake Charles, Louisiana, and refers to that presentation for a complete and accurate

description of its contents.

**J.      Sasol's August 2017 6-K and 20-F Filings**

175.     On August 21, 2017, Defendants filed a Current Report of Foreign Issuer on Form 6-K reporting its fourth quarter 2017 financial results. In the Form 6-K, Defendants disclosed, "Lake Charles Chemicals Project 74% complete, capital expenditure to date of US$7.5 billion and tracking revised estimate." Defendants also repeated the false and misleading assurances that the estimated cost remained at $11 billion, and "project progress is tracking the approved schedule."

**ANSWER**:     Denies the allegations contained in Paragraph 175, except admits that on August

21, 2017, Sasol issued a Form 6-K reporting its financial results for the year ended June 30,

2017, and refers to that Form 6-K for a complete and accurate description of its contents.

176.     On August 21, 2017, Defendants Nqwababa, Cornell, and Victor hosted an earnings call.  In connection with the call, Defendants published an investor presentation highlighted that the "LCCP [was] on track and progressing well":



**ANSWER**:     Denies the allegations contained in Paragraph 176, except admits that on August

21, 2017, Defendants Nqwababa, Cornell, and Victor, appeared on Sasol's Q4 2017 earnings

call, and refers to the transcript of that call and accompanying presentation for a complete and

accurate description of their contents.

177.    On the call, Defendant Cornell emphasized the LCCP's development remained on schedule, that Defendants were "closely tracking spend against the revised cost estimate of USD$11 billion" and emphasized the "key mitigating action" the Company had implemented" to address cost and schedule overruns:

> Let's now discuss our Lake Charles Chemical Project or LCCP. The LCCP in Louisiana met key project milestones and were 74% complete by year-end. Construction execution now stands at 42%, with startup of the first units still forecast for the second half of calendar year 2018. Capital expenditure to date amounts to USD 7.5 billion, and we are closely tracking spend against the revised cost estimate of USD 11 billion.
>
> Key mitigating actions, which included project management changes and improvement in managing fieldwork execution, have ensured that productivity on construction has now been the first quintile of industry comparisons. The project's contingency, measured against industry norms for this stage of completion, is still considered sufficient to effectively complete the project to beneficial operation within the revised budget.
>
> We have also put in place a fully integrated business and operations readiness plan to enable the facility to successfully get product to market. Our commissioning and marketing plans are well developed in this regard. . . .
>
> We remain focused on improving future project returns and managing the capital expenditure of LCCP.

**ANSWER**:    Denies the allegations contained in Paragraph 177, except admits that Paragraph

177 purports to quote and characterize an August 21, 2017, earnings call, and refers to the

transcript for that call for a complete and accurate description of its contents.

178.    Then, on August 28, 2017, Sasol filed an Annual Report on Form 20-F with the SEC, reporting the Company's financial and operating results for the quarter and year ended June 30, 2017 (the "2017 20-F"). With respect to the LCCP, the 2017 20-F repeated the assurances that "[o]verall construction on the project continues on all fronts, with most engineering and procurement activities nearing completion"; that, "[a]t 30 June 2017, the capital expenditure to date is $7.5 billion, and the overall project completion is around 74%"; that "[t]he total forecasted capital cost for the project remains within the revised estimate of US$11 billion"; and that "[t]his US$11 billion estimate includes a contingency, which measured against industry

norms for this stage of project completion, is considered sufficient to effectively take the project to beneficial operation within the revised cost estimate."

**ANSWER**:     Denies the allegations contained in Paragraph 178, except admits that on August 28, 2017, Sasol issued a Form 20-F, and refers to that Form 20-F for a complete and accurate description of its contents.

179.     Defendants' August 2017 statements regarding the LCCP were false and misleading and omitted material facts. Defendants knew at this time that the true cost of the investment in the LCCP was well in excess of $11 billion by virtue of internal.  Indeed, CW-1 stated that, in February 2016, Fluor submitted a Change Order for $11.7 billion for the LCCP project. The $11 billion cost estimate (according to Sasol) included a $300 million contingency — but the Fluor Change Order did *not* include a contingency, which means that Sasol deliberately underreported the known costs by at least $1 billion. In addition, Defendants knew but failed to disclose that the construction and operation of the LCCP was plagued by poor, inexperienced leadership, construction defects, control weaknesses, delays, rising costs, and technical issues, making the project an unsafe and unreliable worksite. Moreover, contrary to Cornell's statements, and as Sasol itself later admitted, Sasol never made meaningful "mitigating actions" to address LCCP's execution issues and cost escalations. In truth, Defendants knew Sasol maintained ineffective internal controls over the LCCP, including in (i) the accuracy of its reporting of cost and schedule estimates for the LCCP; (ii) the segregation of duties of the LCCP project controls environment from the LCCP project execution environment, which prevented the identification of errors in cost and schedule estimation; (iii) control procedures within the LCCP control environment that led to false statements made by LCCP leadership; (iv) procedures to ensure that internal ethics complaints as to the LCCP were escalated appropriately; and (v) the oversight of the LCCP leadership team.

**ANSWER**:     To the extent the allegations contained in Paragraph 179 consist of legal conclusions, no response is required. To the extent the allegations contained in Paragraph 179 relate to the effectiveness of Sasol's internal controls over financial reporting and management of the LCCP, no response is required given the Court's dismissal of these allegations pursuant to the MTD Order, and Plaintiffs' inclusion of these claims is solely to preserve the issues for appeal. To the extent a response is required, denies the allegations contained in Paragraph 179, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of whether the confidential witness described in Paragraph 179 made the statements attributed to them and whether the characterizations of their statements are accurate.

K.    **Sasol's November 23, 2017 Investor Call – Sasol Slips in Material Disclosure of a $130 Million Increase in Costs, and Falsely States it Previously Disclosed Contingency of $400 to $500 Million**

180.    On November 23, 2017, Sasol's senior management, including Defendants Nqwababa, Victor, and Cornell, held an investor call. During this call, Sasol disclosed – for the first time – that the cost for the project had increased to $11.13 billion, a $130 million increase over Sasol's disclosure three months prior. Nqwababa told investors the following: "As communicated in our most recent quarterly performance update, we confirmed the impact of Harvey at USD 130 million. Just a reminder too, as we stated before in August last year, the project's budget cost does not cover unplanned event-driven risks. Owing to lower productivity levels post these extreme weather events, while we initially thought this could be absorbed within the existing project contingency, it is not possible at this rate – at this stage. The impact of this is therefore that the projected project budget will now be revised to $11.13 billion."

**ANSWER**:    Denies the allegations contained in Paragraph 180, except admits that on November 23, 2017, Defendants Nqwababa, Victor, and Cornell appeared on a Sasol investor call, and refers to the transcript of that call for a complete and accurate description of its contents.

181.    Nqwababa also stated as follows: "In terms of the contingency, you'll remember that we did give a guidance that the contingence was between $400 million and $500 million when we revised our estimate in August last year. And we were also very clear that the estimate of $11 billion does not include event-driven risks, like a hurricane or some other event like that."

**ANSWER**:    Admits that Paragraph 181 purports to quote and characterize a November 23, 2017 earnings call, and refers to the transcript of that call for a complete and accurate description of its contents.

182.    Cavan Hill, the then-Senior Vice President for Investor Relations, then stated, "Our view is we would love to say, and we're in such good shape that we consume another $130 million that wasn't expected. And what we're saying is, no, the budget is still $11 billion. We still have contingency in plants to deliver $11 billion, but we can't consume or can't take into that USD 130 million that wasn't anticipated."

**ANSWER**:    Admits that Paragraph 182 purports to quote and characterize a November 23, 2017 earnings call, and refers to the transcript of that call for a complete and accurate description of its contents.

183.    The market regarded Defendants' disclosure as new and material information. For example, a November 24, 2017 Deutsche Bank report expressed "surprise" at this "negative development":

> **Negative Developments**
>
> Due to the effects of Hurricane Harvey, the LCCP project costs increased by USD130m to USD11.13bn, which came as a surprise to us. We had understood that such effects were taken into account when management reviewed the project and updated the budget last year. We had assumed that it then made contingency plans for potential negative developments, including weather. In particular, in our report post the Hurricane Harvey-related cost announcement Sasol - 1Q18 operating results, LCCP update, completion of hedging programme dated 23 October, we erroneously concluded that LCCP was due to remain within the approved USD11bn budget. We note that there are still two hurricane seasons ahead before LCCP is fully operational in CY2H19. The USD130m extra cost resulting from Hurricane Harvey could increase in the future should weather conditions negatively affect LCCP progress in the coming two years. It is unclear as to whether those potential additional costs are a part of the revised USD11.13bn budget. The Hurricane Harvey-related project costs escalation story tells us they are likely not.

**ANSWER**:    To the extent the allegations contained in Paragraph 183 constitute legal conclusions, no response is required. To the extent a response is required, denies the allegations contained in Paragraph 183, except admits that the November 24, 2017, Deutsche Bank report referred to in Paragraph 183 exists, and refers to that report for a complete and accurate description of its contents.

184.    Defendants' November 23, 2017 statements regarding the LCCP were false and misleading and omitted material facts. In particular, Sasol's statement that, in August 2016, Sasol provided a "contingence between $400 and $500 million" is false and materially misleading. Sasol made no disclosure in August 2016 about the specific amount of contingency, other than to state that it was *smaller* compared to prior disclosures. As recounted above, Sasol stated in an Investor Fact Sheet that the $11 billion figure includes the contingency, and that the contingency was *smaller* than in previous years as Sasol approached completion: "The updated LCCP estimate includes a contingency allowance which is expected to be sufficient to effectively take the project to beneficial operation. Given that the project is around 50% complete and many of the risks that existed at the time of FID have since been reduced or removed, the updated estimate ***includes a lower contingency allowance***." Sasol announced a $300 million contingency in October 2015. Hence, Sasol disclosed in August 2016 that the

- 85 –

contingency would be less than $300 million – not, as Sasol falsely asserts, $400 to $500 million, which was not referenced in either the August 23, 2016 6-K or the August 23, 2016 Investor Fact Sheet.

**ANSWER**:     Denies the allegations contained in Paragraph 184, except admits that Paragraph 184 purports to quote and characterize an August 23, 2016, Form 6-K issued by Sasol, and an August 23, 2016 "Investor Fact Sheet" issued by Sasol, and refers to that Form 6-K and "Investor Fact Sheet" for a complete and accurate description of their contents; and admits that Sasol did not disclose a specific contingency amount in that Form 6-K or "Investor Fact Sheet".

185.     Moreover, Sasol's statement – in increasing the estimated cost to $11.13 billion — is false and misleading and omits material facts. According to CW-1, in February 2016, Fluor submitted a Change Order for $11.7 billion for the LCCP project. The $11 billion cost estimate (according to Sasol) included a $300 million contingency — but the Fluor Change Order did not include a contingency, which means that Sasol deliberately underreported the known costs by at least $870 million. In addition, Defendants knew but failed to disclose that the construction and operation of the LCCP was plagued by poor, inexperienced leadership, construction defects, control weaknesses, delays, rising costs, and technical issues, making the project an unsafe and unreliable worksite.

**ANSWER**:     To the extent the allegations contained in Paragraph 185 consist of legal conclusions, no response is required. To the extent the allegations contained in Paragraph 185 relate to the effectiveness of Sasol's internal controls over financial reporting and management of the LCCP, no response is required given the Court's dismissal of these allegations pursuant to the MTD Order, and Plaintiffs' inclusion of these claims is solely to preserve the issues for appeal. To the extent a response is required, denies the allegations contained in Paragraph 185, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of whether the confidential witness described in Paragraph 185 made the statements attributed to them and whether the characterization of their statements are accurate.

**L.     Sasol's Repeated Statements Throughout 2018 that LCCP "on Track"**

186.     Throughout 2018, Defendants repeatedly represented to investors, including in investor presentations, that the "cost and schedule" at the LCCP remained "on track." For example, on February 26, 2018, Defendants presented the following slide to investors:



**ANSWER**:    Denies the allegations contained in Paragraph 186, and states that Paragraph 186

purports to quote, characterize, and excerpt an August 20, 2018, Sasol presentation and refers to

that presentation for a complete and accurate description of its contents.

187.    Similarly, at a May 30, 2018 investor meeting, Defendants published the
following slide regarding the LCCP:



**ANSWER**:    Denies the allegations contained in Paragraph 187, except admits that Paragraph

187 purports to characterize and excerpt a May 30, 2018, Sasol presentation, and refers to that

presentation for a complete and accurate description of its contents.

188.    Likewise, on August 20, 2018, Defendants echoed the same refrain at an investor
conference:



**ANSWER**:   Denies the allegations contained in Paragraph 188, except admits that Paragraph 188 purports to characterize and excerpt an August 20, 2018, Sasol presentation, and refers to that presentation for a complete and accurate description of its contents.

189.   On August 20, 2018, Sasol also filed a Form 6-K with the SEC containing the following graphic:



**ANSWER**:   Admits that on August 20, 2018, Sasol filed a Form 6-K, and refers to that Form 6-K for a complete and accurate description of its contents.

190.   Sasol also disclosed the following on August 20, 2018:

> We are progressing with LCCP in Lake Charles and indications are that the cost of the project will remain within the previous market guidance of US$11.13 billion. As at end June 2018, engineering,

- 88 –

equipment fabrication and procurement were substantially complete and construction progress reached 68% completion. Overall the project is 88% complete with capital expenditure amounting to US$9.8 billion. The project remains on track to start up the first three manufacturing units in the second half of the 2018 calendar year. A significant milestone was reached when we achieved first steam production in July 2018. The expected start-up date of the remainder of the manufacturing units remains in the second half of the 2019 calendar year."

**ANSWER**:   Admits that Paragraph 190 purports to quote and characterize an August 20, 2018, Form 6-K issued by Sasol, and refers to that Form 6-K for a complete and accurate description of its contents.

191.   Sasol further stated that "2019 will be a defining year for Sasol with the start-up of the LCCP, a catalyst for transforming our earnings profile."

**ANSWER**:   Admits that Paragraph 191 purports to quote and characterize an August 20, 2018, Form 6-K issued by Sasol, and refers to that Form 6-K for a complete and accurate description of its contents.

192.   Investors and securities analysts relied on these positive representations regarding the LCCP's cost and construction schedule. An August 27, 2018 Deutsche Bank report summarized it as follows: "CFO Paul Victor announced that despite the capex profile revision, LCCP remains on track for the start-up of the first modules in 2H CY18. As of 31 December 2017, the project was 81% complete with construction execution at c. 54% (USD8.8bn capex spent of the USD11.13bn total). According to management, the project does not need to be 100% complete for the first units to launch. The construction of the entire LCCP facility will finish towards the middle of CY19, which comfortably provides management with more than one year for completion. We understand that the below guidance for the launch of units remains unchanged (we use this in our LCCP model)."

**ANSWER**:   Denies the allegations contained in Paragraph 192, except states that Paragraph 192 purports to quote and characterize a February 27, 2018, Deutsche Bank report, and refers to that report for a complete and accurate description of its contents.

193.   Then, on August 28, 2018, Sasol filed an Annual Report on Form 20-F with the SEC, reporting the Company's financial and operating results for the quarter and year ended June 30, 2018 (the "2018 20-F"). With respect to the LCCP, the 2018 20-F falsely stated that "We are progressing with the construction of our Lake Charles Chemicals Project in Louisiana,

US (LCCP) and indications are that the cost of the project will remain within the previous market guidance of US$11.13 billion."

**ANSWER**:    Denies the allegations contained in Paragraph 193, except admits that on August

28, 2018, Sasol filed a Form 20-F, and refers to that Form 20-F for a complete and accurate

description of its contents.

194.    Defendants' 2018 statements regarding the LCCP were false and misleading and omitted material facts. Indeed, CW-1 stated that, in February 2016, Fluor submitted a Change Order for $11.7 billion for the LCCP project. The $11 billion cost estimate (according to Sasol) included a $300 million contingency — but the Fluor Change Order did *not* include a contingency, which means that Sasol deliberately underreported the known costs by at least $1 billion. In addition, Defendants knew but failed to disclose that the construction and operation of the LCCP was plagued by poor, inexperienced leadership, construction defects, control weaknesses, delays, rising costs, and technical issues.

**ANSWER**:    To the extent the allegations contained in Paragraph 194 consist of legal

conclusions no response is required. To the extent the allegations contained in Paragraph 194

relate to the effectiveness of Sasol's internal controls over financial reporting and management

of the LCCP, no response is required given the Court's dismissal of these allegations pursuant to

the MTD Order, and Plaintiffs' inclusion of these claims is solely to preserve the issues for

appeal. To the extent a response is required, denies the allegations contained in Paragraph 194,

except lacks knowledge or information sufficient to form a belief as to the truth or falsity of

whether the confidential witness described in Paragraph 194 made the statements attributed to

them and whether the characterizations of their statements are accurate.

**M.    Sasol's February 2019 Statements**

195.    On February 8, 2019, during pre-market hours, Sasol filed a Form 6-K with the SEC, disclosing that "the overall [LCCP] project capital cost estimate [was] revised from US$11.13 billion to a range of US$11.6 – 11.8 billion," citing, inter alia, "[l]ate scope additions for the Cracker as a result of incomplete engineering work not timeously identified"; "[i]ncreased scope to ensure process safety for the Cracker and Ethylene oxide/Ethylene Glycol (EO/EG) unit due to defective carbon steel forgings"; "[p]roductivity losses exacerbated by high absenteeism around public holidays and construction rework since end November 2018"; and "[s]chedule delays of the remaining units," which would "result in additional overhead costs."

– 90 –

**ANSWER**:    Admits that on February 8, 2019, Sasol filed a Form 6-K, and refers to that Form 6-K for a complete and accurate description of its contents.

196.    Thereafter, on February 25, 2019, Sasol filed a Form 6-K, stating:

As at the end of December 2018, engineering and procurement activities were substantially complete and construction progress was at 84%. Our overall project completion was 94% and capital expenditure amounted to US$10.9 billion.

The first derivative unit, linear low-density polyethylene (LLDPE) reached beneficial operation on 13 February 2019, approximately two months late. Utilities to support the early process units were fully operational by end November 2018. These utilities together with LLDPE comprised ~40% of the LCCP total cost, prior to the revised estimate.

Unfortunately, during the last quarter of calendar 2018, several factors within and beyond our control impacted the completion schedule and associated cost for the remaining units resulting in the overall project capital cost estimate being revised from US$11.13 billion to a range of US$11.6 – 11.8 billion. The difference between the upper and lower end of the range is a contingency and weather provision of US$200 million.

Management maintains our unrelenting focus on delivering the remaining units per the revised schedule and we are confident that the fundamentals for the LCCP – being, among others, a feedstock advantaged plant, a world scale highly integrated facility, diverse product slate with high margin products and world class logistics and infrastructure - remain intact. We maintain our guidance that the project will deliver a steady state EBITDA of US$1.3 billion in financial year 2022.

**ANSWER**:    Admits that on February 25, 2019, Sasol filed a Form 6-K, and refers to that Form 6-K for a complete and accurate description of its contents.

197.    Analysts believed Sasol's promise to meet its new cost estimate and timeline for production. According to a February 26, 2019 Lucror Analytics Report:

Among the company's strategic projects, the LCCP is most important. While we are disappointed about the delays and cost overruns, management has assured investors that it remains confident of meeting the revised cost and scheduled guidance, with Sasol having taken actions to ensure that these issues do not recur.

> Furthermore, tough decisions to further improve management oversight and transparency of the project have been taken. The lessons learnt from LCCP will be shared across the organisation to aid future project planning. Progress across Sasol's African E&P projects has been slow, albeit we acknowledge that delays are inevitable (as is the case for Tullow Oil). With regard to the litigation issues, we do not see any cause for concern currently.
>
> We will closely monitor corporate governance (an issue which has impacted several South African names recently), although we do not see any particular cause for concern at this stage.

**ANSWER**:    Denies the allegations contained in Paragraph 197, except admits that the

February 26, 2019, Lucror Analytics report referred to in Paragraph 197 exists, and refers to that

report for a complete and accurate description of its contents.

198.    Sasol's February 2019 statements were false and misleading and omitted material facts. According to CW-1, in February 2016, Fluor submitted a Change Order for $11.7 billion for the LCCP project. The $11 billion cost estimate (according to Sasol) included a $300 million contingency – but the Fluor Change Order did not include a contingency, which means that Sasol deliberately underreported the known costs at this time by at least $870 million. In addition, Defendants knew but failed to disclose that the construction and operation of the LCCP was plagued by poor, inexperienced leadership, construction defects, control weaknesses, delays, rising costs, and technical issues.

**ANSWER**:    To the extent the allegations contained in Paragraph 198 consist of legal

conclusions, no response is required. To the extent the allegations contained in Paragraph 198

relate to the effectiveness of Sasol's internal controls over financial reporting and management

of the LCCP, no response is required given the Court's dismissal of these allegations pursuant to

the MTD Order, and Plaintiffs' inclusion of these claims is solely to preserve the issues for

appeal. To the extent a response is required, denies the allegations contained in Paragraph 198,

except lacks knowledge or information sufficient to form a belief as to the truth or falsity of

whether the confidential witness described in Paragraph 198 made the statements attributed to

them and whether the characterizations of their statements are accurate.

## VI.     SASOL CONTINUES TO DISCLOSE THE DEPTHS
## AND EFFECTS OF THE FRAUD

A.     **Sasol's May 22, 2019 6-K and Earnings Call –** *Sasol Makes Another Partial Disclosure of Under-Reported Cost Estimates and Other Malfeasance*

199.     On May 22, 2019, during pre-market hours, Sasol filed another Report of Foreign Private Issuer on Form 6-K with the SEC, disclosing that the cost estimate for completing the LCCP had been raised by around $1 billion (the "May 2019 6-K"). Specifically, Sasol disclosed that "the cost estimate for the LCCP has been revised to a range of $12.6 to $12.9 billion which includes a contingency of $300 million," citing a $530 million change in the project's cost forecast because of a "[c]orrection for duplication of investment allowances of approximately $230 million"; a "[c]orrection for certain contracts and variation orders managed by Sasol, outside the primary engineering, procurement and construction contract, of approximately $180 million"; and forecast improvements that were "not expected to be realised and adjustments for potential insurance claims and procurement back-charges of approximately $120 million."

**ANSWER**:     Denies the allegations contained in Paragraph 199, except admits that on May 22, 2019, Sasol filed a Form 6-K, and refers to that Form 6-K for a complete and accurate description of its contents.

200.     The May 2019 6-K also cited a $470 million impact from numerous additional defects and construction finishing oversights, including, inter alia, "defective carbon steel forgings"; "[r]eplacement of the internals of numerous heat exchangers due to corrosion"; "[t]he completion of painting, insulation and fireproofing"; and a review that "identified a significant increase in required finishing activities such as heat tracing, insulation, fireproofing and associated work as well as additional infrastructure costs."

**ANSWER**:     Denies the allegations contained in Paragraph 200, except admits that Paragraph 200 purports to quote and characterize a May 22, 2019, Form 6-K issued by Sasol, and refers to that Form 6-K for a complete and accurate description of its contents.

201.     Finally, the May 2019 6-K cited "[a] contingency amount for items that could impact the cost forecast" of $300 million, including, inter alia, "[l]ower than assumed productivity and associated time extension"; "[a] new risk identified relating to bolting materials that may need to be replaced"; and "[o]ther unforeseen items impacting finishing and commissioning activities."

**ANSWER**:     Denies the allegations contained in Paragraph 201, except admits that Paragraph 201 purports to quote and characterize a May 22, 2019, Form 6-K issued by Sasol, and refers to that Form 6-K for a complete and accurate description of its contents.

202.    On the other hand, the May 2019 6-K claimed that "[e]xecutive management has implemented several changes since February 2019 to further strengthen the oversight, leadership for the project and frequency of reporting," including "segregation of duties between project controls and finance functions and assigning a Senior Vice-President to have responsibility for the LCCP project controls." The May 2019 6-K also claimed that "[i]nitiatives to improve decision-making, transparency and documentation within the project management team are also in progress," and assured investors that "new project leadership has been instrumental in identifying and remediating these issues."

**ANSWER**:    Denies the allegations contained in Paragraph 202, except admits that Paragraph 202 purports to quote and characterize a May 22, 2019, Form 6-K issued by Sasol, and refers to that Form 6-K for a complete and accurate description of its contents.

203.    Sasol further comforted investors and provided guidance as follows:

> Following [the February 2019] announcement a number of changes were made to the management of the LCCP, with project accountability immediately reassigned to the Executive Vice-President of Chemicals, Fleetwood Grobler and the strengthening of our project controls organisation.
>
> This team became concerned regarding the accuracy of the project's cost forecast and, as a consequence, our third quarter Business Performance Metrics announcement in April 2019 indicated that the LCCP's cost was tracking the upper end of the range. Management also initiated a full review of the costs and schedule until project completion with input from independent technical and financial advisers. This review identified significant additional concerns related to the LCCP forecasting process and a marked increase in the projected total cost. The review also confirmed that the actual project expenditure (as at 31 December 2018) amounting to $10.9 billion was accurate and complete. Weaknesses in the project's integrated controls were identified and are being remediated.
>
> The Board has also commissioned a review to be conducted by independent external experts. This review will cover the circumstances that may have delayed the prompt identification and reporting of the abovementioned matters. Upon conclusion of the review, the Board will take appropriate action to address the findings.
>
> UPDATE ON KEY PROJECT PARAMETERS
>
> The first derivative unit, Linear Low Density Polyethylene, achieved beneficial operation on 13 February 2019 and the plant

- 94 –

continues to ramp up in line with expectations. We have achieved beneficial operation of the Ethylene Glycol unit (EG), with beneficial operation of the Ethylene Oxide unit (EO) expected in the coming days.  The Ethane Cracker is still expected to achieve beneficial operation in July 2019.

The remainder of the LCCP schedule for beneficial operation is as previously indicated in February 2019 apart from the beneficial operation of the last derivative plant (Guerbet unit), which is expected to be one month later in February 2020.

As of the end of March 2019, overall project completion was at 96%, with construction completion at 89% and capital expenditure on the project amounted to $11.4 billion.

* * *

3. A contingency amount for items that could impact the cost forecast - $300 million.

Worse than anticipated weather impact.

Lower than assumed productivity and associated time extension.

A new risk identified relating to bolting materials that may need to be replaced.

Other unforeseen items impacting finishing and commissioning activities.

ACTIONS TAKEN TO DATE

This increase in the anticipated LCCP capital costs is extremely disappointing.

Executive management has implemented several changes since February 2019 to further strengthen the oversight, leadership for the project and frequency of reporting. Actions include segregation of duties between project controls and finance functions and assigning a Senior Vice-President to have responsibility for the LCCP project controls. Initiatives to improve decision-making, transparency and documentation within the project management team are also in progress. The new project leadership has been instrumental in identifying and remediating these issues. The reviews and investigations initiated by management to date indicate that any impact on the underlying controls are limited to the LCCP.

FINANCIAL IMPACT

- 95 –

The increase in the LCCP's cost does not alter Sasol's capital allocation strategy.

The plan remains to reduce balance sheet gearing towards 30% followed by an increase in the dividend pay-out ratio to 40% and remains on track to occur between financial years 2020 to 2023. Over this period the anticipated contribution from the LCCP has been negatively impacted by a change in the short and medium-term pricing outlook. Operating costs for the LCCP, although projected to be slightly elevated during start-up, are otherwise still in line with previous guidance. As a result the earnings before interest, tax, depreciation and amortisation (EBITDA) for financial year 2022 of $1.3 billion have been revised to approximately $1 billion. The long-term market pricing outlook is still in support of a long-term run rate EBITDA contribution from the LCCP of $1.3 billion. The short-term market outlook for ethane and product pricing remains volatile and estimates will be updated periodically.

In light of the increase in capital costs as well as the latest market pricing outlook, the forecast internal rate of return for the LCCP has declined from 7.5% to 6.0 – 6.5%.

The larger part of this move comes from the change in chemical pricing assumptions given that a US10 cents change in ethane pricing impacts the EBITDA by approximately 150 million per annum.

The increased capital cost will result in the gearing level for Sasol remaining elevated for 18 to 24 months. Based on current assumptions, peak gearing is still expected to occur during financial year 2019 with forecast net debt to EBITDA remaining within the 2.0 to 2.3x guidance range. The Company's balance sheet continues to be actively managed in order to maintain a robust liquidity position and debt maturity profile. As part of this the Company recently issued a $2.25 billion bond which was used to partly settle the LCCP's project asset finance facility. The Company has been successful in extending the maturity profile of the debt portfolio over the last few years with the first significant repayment due in 3.5 years (November 2022). Efforts to further optimise the maturity profile continue as the Company executes its value-based strategy and moves towards targeted gearing levels. Retaining the Company's investment grade credit rating remains a priority. Several additional management actions have been identified and are in the process of being implemented in an effort to conserve cash over the following 12 to 18 months. These actions are focused on further cash fixed cost savings, capital portfolio optimisation, working capital improvements and asset disposals at value. As

> previously communicated to the market, management has substantially completed the detailed asset review programme. This process forms a key part of the portfolio optimisation strategy, and has now progressed to the stage where the disposal of larger noncore assets can be accelerated. The Company will target the disposal of assets which have an aggregate net asset value exceeding $2 billion.

**ANSWER**:    Denies the allegations contained in Paragraph 203, except admits that Paragraph

203 purports to quote and characterize a May 22, 2019, Form 6-K issued by Sasol, and refers to

that Form 6-K for a complete and accurate description of its contents.

204.    During a May 22, 2019 earning call with investors, Sasol made the following comforting statements, admissions and disclosures:

> This is a situation where a relatively small team, the LCCP project management team, although working very hard, did not have adequate segregation of duties and failed to engage the wider financial organization to verify the accuracy of their forecast. We did choose not to duplicate a project controls organization that was provided by FTI, but clearly, our internal cross checks were not robust enough. The previous LCCP leadership was not transparent in these matters, and the new LCCP leadership has been instrumental in identifying and remedying these issues. In terms of project planning and execution, the FTI transition was always planned for the beginning of commissioning of the major units.

> We are still on track to do this between 2020 and 2023. Unfortunately, during this 2020 to 2023 period, the anticipated contribution from the LCCP has been negatively impacted by weaker pricing outlook in the short to medium term. As a result of that, we now see that the 2022 EBITDA contribution from the LCCP to be at around $1 billion, down from the $1.3 billion. It's worth saying that the pricing in the market remains volatile and so it is possible that the recent downward trend unwinds, but obviously, we want to be conservative in our forecasting assumptions. There have been no major changes to the long-term outlook for either operating cost or product pricing, and therefore, we still see the long-term run rate contribution from the LCCP unchanged at USD 1.3 billion annually. In the light of the increase in capital cost as well as the latest market pricing outlook, the forecast for the LCCP internal rate of return, or IRR, has declined from 7.5% to a range of 6.0% to 6.5%, although the larger part of that move actually comes from the change in the pricing assumptions rather than the increase in the capital cost. The increased capital cost will result in a gearing level for Sasol remaining elevated for 18 to 24 months.

**ANSWER**:     Denies the allegations contained in Paragraph 204, except admits that Paragraph

204 purports to quote and characterize a May 22, 2019, business update call, and refers to the

transcript of that call for a complete and accurate description of its contents.

205.     Following these disclosures, Sasol's ADR price fell $4.50 per share, or 14.93%, to close at $25.64 per share on May 22, 2019. Nonetheless, the Company's securities continued to trade at artificially inflated prices throughout the Class Period as a result of Defendants' continued positive statements, which touted the progress of the LCCP's development and management's oversight of that project.

**ANSWER**:     Denies the allegations contained in Paragraph 205, except states that the

allegations in Paragraph 205 purport to describe the prices of Sasol's ADRs, which are matters of

public record, and refers to such public records.

**B.     The July 25, 2019 Press Release Announces Further Delays But Assures Investors of Material Progress**

206.     On July 25, 2019, during pre-market hours, Sasol issued a press release announcing further delays on construction of certain aspects of the LCCP—specifically, the LDPE plant and Ziegler units (the "July 2019 Press Release"). According to that press release, Defendants were "experiencing some schedule pressure on the [LDPE] plant and expect BO [beneficial operation] to be delayed by four to six weeks as it has taken longer than planned to complete the construction, as well as the cleaning and preparation of critical equipment." The press release also disclosed that "the Ziegler unit BO is expected to be delayed by four to eight weeks mainly due to slower piping hydro-testing completion."

**ANSWER**:     Denies the allegations contained in Paragraph 206, except admits that Paragraph

206 purports to quote and characterize a July 25, 2019, Form 6-K issued by Sasol, and refers to

that Form 6-K for a complete and accurate description of its contents.

207.     Following these disclosures, Sasol's ADR price fell $1.60 per share, or 6.76%, to close at $22.06 per share on July 25, 2019. However, as before, the Company's securities continued to trade at artificially inflated prices following this disclosure as a result of Defendants' continued positive statements touting the progress of the LCCP's development, as well as management oversight of the project.

**ANSWER**:     Denies the allegations contained in Paragraph 207, except states that the

allegations in Paragraph 207 purport to describe the prices of Sasol's ADRs, which are matters of

public record, and refers to such public records.

208.     For example, the July 2019 Press Release touted that "[m]itigation plans are in place to minimise the delay to the maximum extent possible," that "independent review on the project" was "ongoing and is conducted by independent external experts," and that this review was "an in depth exercise entailing the review of a voluminous amount of documents and numerous interview."

**ANSWER**:    Denies the allegations contained in Paragraph 208, except admits that Paragraph

208 purports to quote and characterize a July 25, 2019, Form 6-K issued by Sasol, and refers to

that Form 6-K for a complete and accurate description of its contents

**C.     August 16, 2019 Press Release and 6-K Disclose Further Delays and Possible LCCP Control Weaknesses**

209.     On August 16, 2019, during pre-market hours, Sasol issued another press release disclosing that it was delaying the announcement of its 2019 financial results as a result of "possible LCCP control weaknesses" (the "August 2019 Press Release"). That press release did not go into further detail regarding the nature of these control weaknesses, but noted that "[m]anagement and the Board will assess such control weaknesses and identify whether any further remedial actions are required," and that "the Company's auditors are required to consider these assessments in terms of International Standards on Auditing and the Auditing Standards of the Public Company Accounting Oversight Board."

**ANSWER**:    To the extent the allegations contained in Paragraph 209 relate to the effectiveness

of Sasol's internal controls over financial reporting and management of the LCCP, no response is

required given the Court's dismissal of these allegations pursuant to the MTD Order, and

Plaintiffs' inclusion of these claims is solely to preserve the issues for appeal. To the extent a

response is required, denies the allegations contained in Paragraph 209, except admits that

Paragraph 209 purports to quote and characterize an August 16, 2019, Form 6-K issued by Sasol,

and refers to that Form 6-K for a complete and accurate description of its contents.

210.     Sasol's August 16, 2019 Form 6-K stated the following:

> In the Company's Trading Statement of 25 July 2019, updated guidance was provided on the independent review commissioned by the Board to ascertain the factors that impacted the cost and schedule changes for the Lake Charles Chemicals Project (LCCP).
>
> A preliminary report from the independent review was presented to the Board on 14 August 2019. The report contains observations

- 99 –

which point to possible LCCP control weaknesses. Management and the Board will assess such control weaknesses and identify whether any further remedial actions are required. In addition, the Company's auditors are required to consider these assessments in terms of International Standards on Auditing and the Auditing Standards of the Public Company Accounting Oversight Board.

As a consequence, the Board has decided to delay the announcement of Sasol's 2019 financial results until the independent review and external audit has been completed. The Board therefore expects to announce the 2019 financial results on 19 September 2019. At that time, Sasol will also release its suite of reports including the Annual Financial Statements, Annual Integrated Report, Sustainable Development Report, Climate Change Report and Annual Report on Form 20-F. Notwithstanding the independent review, the Board remains confident that the guidance on the earnings ranges provided in the Trading Statement and the previous cost guidance for the LCCP of $12.6-12.9 billion remain unchanged.

**LCCP UPDATE**

Sasol provided an update on the LCCP in its Trading Statement of 25 July 2019, in which the Company stated that beneficial operation of the Ethane Cracker was expected at the end of July 2019 or soon thereafter.

The final stages of the Ethane Cracker startup were initiated in July 2019. As is often the case with major plant startups, a technical challenge relating to a large heat exchanger was encountered. As a result, the Cracker startup was interrupted for several days to resolve this issue. The startup has now resumed and an update on the achievement of beneficial operation will be provided on or before 26 August 2019.

**ANSWER**:   Admits that Paragraph 210 purports to quote and characterize an August 16, 2019, Form 6-K issues by Sasol, and refers to that Form 6-K for a complete and accurate description of its contents.

211.   On this news, Sasol's ADR price fell $0.74 per share, or 4.02%, to close at $17.67 per share on August 16, 2019.

- 100 –

**ANSWER**:    Denies the allegations contained in Paragraph 211, except states that the allegations in Paragraph 211 purport to describe the prices of Sasol's ADRs, which are matters of public record, and refers to such public records.

D.    **August 26, 2019 6-K –** *Sasol Discloses a Reduction of Earnings Expectation from LCCP for the 2020 from US$300-350 Million to US$150-300 Million*

212.    On August 26, 2019, Sasol filed a Report of Foreign Private Issuer on Form 6-K with the SEC, disclosing that the Company had halved expected earnings from the LCCP after technical difficulties and schedule pressures forced it to push back operational dates for a number of its units. Specifically, Sasol reported that the LCCP's beneficial operation dates for its LDPE, Ziegler, Ethoxylates, and Guerbet units were being pushed back as far as a month, and that, "[a]s a consequence of these technical issues and the revised beneficial operation dates, the LCCP earnings before interest, tax, depreciation and amortisation (EBITDA) guidance for the 2020 financial year has been adjusted from US$300-350 million to US$150-300 million."

**ANSWER**:    Denies the allegations contained in Paragraph 212, except admits that Sasol issued a Form 6-K on August 26, 2019, and refers to that Form 6-K for a complete and accurate description of its contents.

213.    Following these disclosures, Sasol securities closed at the same price as the previous trading day. As noted by a senior portfolio manager involved in the Johannesburg financial market, "[t]he relatively mild reaction to the news was probably the result of the market already pricing in much of the bad news," and "[t]he market is waiting to see how long it is actually going to take them to get the right product levels, and the output they are supposed to have.

**ANSWER**:    Denies the allegations contained in Paragraph 213, except states that the allegations in Paragraph 213 purport to describe the prices of Sasol's ADRs, which are matters of public record, and refers to such records; lacks knowledge or information sufficient to form a belief as to the truth or falsity of whether the unspecified senior portfolio manager described in Paragraph 213 made the statements attributed to them and whether the characterizations of their statements are accurate.

E.    **October 28, 2019 6-K, Form 20-F, and Earnings Call –** *Sasol Purports to Come Clean about Budget Overruns and Known Malfeasance with Respect to the LCCP Project, Admits Its Failure to Disclose Material Information to Investors, and Fires Top Management*

214.    On October 28, 2019, Sasol filed another Report of Foreign Private Issuer on Form 6-K with the SEC, during pre-market hours, disclosing that its review of the LCCP control weaknesses had brought to light "errors, omissions, and inaccuracies in the [LCCP] cost estimate," and a number of unethical and improper reporting activities that took place at the highest level of management (the "October 2019 6-K"). As a result of its review, the Company announced the resignation of, inter alia, its Joint Presidents and CEOs, Defendants Nqwababa and Cornell, effective November 1, 2019, and Senior Vice Presidents and others previously in charge of the LCCP. With respect to the specific causal factors that led to these issues, the October 2019 6-K stated, in relevant part:

- Competence - Insufficient experience within the LCCP leadership team in executing mega projects.

- Conduct - Inappropriate conduct and an improper tone at the top of the LCCP, including an excessive focus on maintaining cost and schedule estimates at the expense of providing accurate cost and schedule estimation to oversight bodies (including Joint Presidents and Chief Executive Officers (Joint CEOs)) within the Company.

- Segregation of duties - Insufficient segregation of duties of the LCCP project controls environment from the LCCP project execution environment, which prevented the identification of certain potential errors in cost and schedule estimation.

- Control procedures - Inadequate control procedures within the LCCP control environment that allowed erroneous and/or unsupported reporting by the LCCP leadership to go unchallenged without proper escalation of potential red flags.

- Ethics process - Inadequate procedures to ensure that internal ethics complaints as to the LCCP were escalated appropriately.

- Project-related Control Environment - A culture of excess deference within the control environment that oversaw the LCCP caused certain individuals with control responsibilities and in oversight committees, including but not limited to the Steering Committee created to oversee the LCCP, to exhibit insufficient scepticism toward reporting by the LCCP leadership team.

It is the Board's assessment that the former leadership of the LCCP PMT's conduct was inappropriate, demonstrated a lack of competence, and was not transparent . . . . The Board believes these factors compromised the ability of the various LCCP governance structures, including the Board in relation to LCCP matters, to perform their oversight role effectively on behalf of shareholders.

\* \* \*

The Board believes, however, that further remedial steps are required to embed a new culture at all levels in the Company. At the leadership level, there needs to be more robust challenge of key decision making. At the LCCP, the Company's executive leadership placed too much trust in the PMT leadership. A spirit of "constructive dialogue" which includes empowering challenge and avoiding conformity, needs to extend though the Company so that people always feel able and free to speak up without fear for their prospects.

To address this, in addition to ongoing culture transformation initiatives, the Company intends to focus on promoting leaders who have demonstrated their ability to promote transparency and constructive dialogue.

\* \* \*

However, it is a matter of profound regret for the Board that shortcomings in the execution of the LCCP have negatively impacted our overall reputation, led to a serious erosion of confidence in the leadership of the Company and weakened the Company financially. Sadly, the LCCP challenges have tarnished the entire Company, which has world-class assets and teams that have delivered a consistently strong performance.

The Board has resolved to ensure that the Company lives its values and to ensure that there is a culture of accountability and consequence management. It is also the judgement of the Board that, for trust to be restored in the Company, a leadership reset is required.

It is in this light that Mr Bongani Nqwababa and Mr Stephen Cornell, Joint CEOs, have agreed to an amicable mutual separation with the Company. Effective 31 October 2019, Bongani and Stephen will step down as Joint CEOs, and as executive directors of Sasol and its subsidiaries. To be clear, the Board has neither identified misconduct nor incompetence on the part of the Joint CEOs.

The Board has appointed Mr Fleetwood Grobler, EVP: Chemicals, to assume the role of President and CEO and as an executive director, with effect of 1 November 2019.

Dr Mandla Gantsho, Chairman of Sasol, said: "I would like to thank Bongani and Stephen for their long and loyal service to Sasol, and for showing exemplary leadership by putting the interests of the

Company first in agreeing to step down to allow for a leadership reset."

**ANSWER**:    Denies the allegations contained in Paragraph 214, except admits that on October 28, 2019, Sasol issued a Form 6-K, and refers to that Form 6-K for a complete and accurate descriptions of its contents.

215.    Sasol additionally disclosed a large and purportedly detailed remediation plan, including, among a variety of other steps taken, "[r]educed incentives awards for individuals company-wide based on relation and/or proximity to LCCP"; "[r]equiring that various employees involved in the LCCP and/or its oversight engage in additional training, including on reporting obligations"; and "[r]evising the Company's procedures regarding the escalation of ethics complaints and internal investigation findings."

**ANSWER**:    Denies the allegations in Paragraph 215, except admits that Paragraph 215 purports to quote and characterize an October 28, 2019, Form 6-K issued by Sasol, and refers to that Form 6-K for a complete and accurate description of its contents.

216.    The October 2019 6-K further assured investors that, "[b]ased on remediation measures taken, the Board is confident that the cost to completion estimate for the LCCP, confirmed by the Board's most recent assessment of LCCP management's reporting, is tracking the 22 May 2019 announced cost guidance range of between $12.6 billion and $12.9 billion."

**ANSWER**:    Denies the allegations contained in Paragraph 216, except admits that Paragraph 216 purports to quote and characterize an October 28, 2019, Form 6-K issued by Sasol, and refers to that Form 6-K for a complete and accurate description of its contents.

217.    As noted in an October 28, 2019 Lucror Analytics report, "[t]he latest numbers for the [Lake Charles] project indicate USD 12.612.9 bn of capex, which is in line with the May estimate but materially higher than initial projections made some years ago."

**ANSWER**:    States that Paragraph 217 purports to quote and characterize an October 29, 2019, Lucror Analytics report, and refers to that report for a complete and accurate description of its contents.

218.    Additionally, on October 28, 2019, Sasol filed an Annual Report on Form 20-F with the SEC, reporting the Company's financial and operating results for the quarter and year ended June 30, 2019 (the "2019 20-F"). The 2019 20-F stated as follows: "We are progressing with the construction of our Lake Charles Chemicals Project (LCCP) in the US and indications

- 104 –

are that the cost of the project will remain within the updated market guidance of US$12.6 - 12.9 billion. . . . . Various savings opportunities have been identified and are continuously being implemented to mitigate project risks. Although unplanned event-driven risks may still impact the execution and cost of the project, we are confident that the remaining construction, procurement, execution and business readiness risks can be managed within the revised cost estimate of US$12.6 - 12.9 billion."

**ANSWER**:    Admits that on October 28, 2019, Sasol filed a Form 20-F, and refers to that Form 20-F for a complete and accurate description of its contents.

219.    The Form 20-F further stated as follows:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting and for evaluating and reporting on the effectiveness of our system of internal control. As disclosed below under Item 15. Controls and Procedures, during 2019, management identified a material weakness in internal control over financial reporting with respect to the capital cost estimation process implemented in connection with the LCCP which resulted from the aggregation of a series of individual control and project related control environment deficiencies. As a result, management concluded that our internal control over financial reporting was not effective as of 30 June 2019. While we are currently implementing remedial measures, there can be no assurance that our efforts will be successful. The material weakness cannot be considered remediated until the remedial controls operate for a sufficient period of time and management has time to conclude, through testing, that these controls are operating effectively.
>
> As a result of the material weakness described above, our management also concluded that our disclosure controls and procedures were not effective as of 30 June 2019.
>
> We cannot be certain that any remedial measures we are currently in the process of implementing, or our internal control over financial reporting more generally, will ensure that we design, implement and maintain adequate controls over our financial processes and reporting in the future. Our failure to implement our remediation plan referred to above, or to implement newly required or improved controls or adapt our controls, or difficulties encountered in their operation, or difficulties in the assimilation of acquired businesses into our control system, could prevent us from meeting our financial reporting obligations, including filing our periodic reports with the SEC on a timely basis and maintaining compliance with applicable NYSE listing requirements, or result in a restatement of previously disclosed financial statements.

\* \* \*

Certain of the factors identified as resulting in the material weakness discussed above, in particular, that certain persons within the LCCP project management team responsible for the management of the Company reported inaccurate capital cost projections to senior executives and the board, may also constitute a reportable irregularity in accordance with the South African Auditing Profession Act 26 of 2005, on the basis that such persons may not have acted with the necessary care, skill and diligence required, which failure has caused, or is likely to cause material financial loss to the entity or stakeholders in its dealings with the entity, or, alternatively, this activity may have constituted a material breach of fiduciary duties by such persons. As a result of this activity, the Company removed all work responsibilities and initiated disciplinary action against one individual and negotiated the separation of three additional individuals, and took other remedial actions. Management believe that actions taken effectively remediate the activities that gave rise to a reportable irregularity. PricewaterhouseCoopers Incorporated (PwC) reported a reportable irregularity to the Independent Regulatory Board for Auditors in South Africa and concluded that these matters have been remediated and are no longer continuing.

\* \* \*

**Board Review**

In May 2019, the Board commissioned an independent review into the circumstances that may have delayed the prompt identification and reporting of the LCCP cost and schedule overruns. The purpose of the review was to consider the circumstances that may have delayed the prompt identification and reporting of these developments, root causes and the legal consequences thereof. The review has now been concluded. The Board has made the following key findings:

- The primary responsibility for shortcomings in relation to the LCCP lies with the former leadership of the LCCP's Project Management Team (PMT), which engaged in conduct that was inappropriate, demonstrated a lack of competence, and was not transparent. However, on balance, the Board finds that there is not sufficient evidence to conclude that these individuals acted with an intent to defraud.

- In addition, certain governance shortcomings relating to the LCCP also contributed, including a culture of excess deference

within the project-related control environment and governance structures that oversaw LCCP.

- Certain persons within the PMT responsible for the management of the Company reported inaccurate capital cost projections to senior executives and the board. As a result of this activity, the Company removed all work responsibilities and initiated disciplinary action against one individual and negotiated the separation of three additional individuals, and took other remedial actions.

**Disclosure controls and procedures**

The Company's Joint Presidents and Chief Executive Officers and Chief Financial Officer, performed an evaluation of the effectiveness of the group's disclosure controls and procedures (required by paragraph (b) of 17 CFR 240.13a-15) as of the end of the period covered by this annual report on Form 20-F. Based on this evaluation, our Joint Chief Executive Officers and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were not effective as of 30 June 2019 due to a material weakness in internal control over financial reporting with respect to the capital cost estimation process implemented in connection with the LCCP, which resulted from the aggregation of a series of individual control and project-related control environment deficiencies described below in Management's annual report on internal control over financial reporting.

Notwithstanding this material weakness, management concluded that the consolidated financial statements included in this annual report on Form 20-F present fairly, in all material respects, our financial position, results of operations and cash flows as of and for the periods presented in accordance with International Financial Reporting Standards (IFRS), as issued by the International Accounting Standards Board (IASB). Management further concluded that prior year financial statements were accurate in all material respects. Management's assessment is based upon a number of factors, including, but not limited to:

- The completion of the independent review commissioned by the Board (the Board review) concerning the errors in the capital cost estimate for the LCCP previously announced on 8 February 2019;

- The ongoing monitoring of progress in executing the LCCP since 30 June 2019; and

- A quantification of the potential financial statement effect of the control failures described below.

### *Material Weakness*

A material weakness is deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of financial statements will not be prevented or detected on a timely basis.

Based on this assessment, our management has determined that, as of 30 June 2019, the Company's internal control over financial reporting was ineffective due to the existence of a material weakness with respect to the capital cost estimation process implemented in connection with the LCCP, which resulted from the aggregation of a series of individual control and project-related control environment deficiencies, the remediation of which had not been fully implemented and validated as of year-end. Our management, based on both its own analysis and based on the information identified during the Board review, concluded that the material weakness identified above was the result of a number of deficiencies:

- Competence—Insufficient experience within the LCCP leadership team in executing mega projects;

- Conduct—Inappropriate conduct and an improper tone at the top of the LCCP, including an excessive focus on maintaining cost and schedule estimates at the expense of providing accurate cost and schedule estimation to oversight bodies (including the Joint Chief Executive Officers) within the Company;

- Segregation of Duties—Insufficient segregation of duties of the LCCP project controls environment from the LCCP project execution environment, which prevented the identification of certain potential errors in cost and schedule estimation;

- Control Procedures—Inadequate control procedures within the LCCP control environment that allowed erroneous and/or unsupported reporting by the LCCP leadership to go unchallenged without proper escalation of potential red flags;

- Ethics Process—Inadequate procedures to ensure that internal complaints as to the LCCP were escalated appropriately; and

- Project-related Control Environment—A culture of excess deference within the control environment that oversaw LCCP

that caused certain individuals with control responsibilities and in oversight committees, including but not limited to the Steering Committee created to oversee LCCP, to exhibit insufficient scepticism toward reporting by the LCCP leadership team.

Our management has further determined that this unremediated material weakness led to a misstatement in the disclosure of the Company's capital commitments for the year ended 30 June 2018, which has been revised in the Company's consolidated financial statements. Additionally, this material weakness could result in misstatements of the LCCP capital cost and related assets under construction and property, plant and equipment impairment account balances or disclosures that would result in a material misstatement to the consolidated financial statements that would not be prevented or detected.

**Remediation Plan with Respect to the Material Weakness**

The Company is committed to ensuring a strong internal control environment and to ensuring that a proper, consistent tone is communicated throughout the organization. To that end, the Company began efforts to remediate the material weakness identified above prior to 30 June 2019, and is currently still implementing additional measures to remediate the underlying causes that gave rise to the material weakness.

To date, the Company has already completed the following measures to remediate the identified material weakness:

- Reassigned LCCP oversight and accountability to a new Executive Vice President as of 1 April 2019 and added additional project management resources to the LCCP;

- Implemented a new LCCP controls structure, independent from LCCP execution activities, and redesigned the controls regarding cost reporting regarding the LCCP, to ensure segregation of duties, control effectiveness, and appropriate oversight; and

- Commissioned additional external assurance work to validate aspects of the Company's estimates regarding the LCCP's cost and schedule.

In addition, the Company is engaging in a number of ongoing remedial steps to address the inappropriate conduct, tone and

cultural aspects of the identified root causes of the material weakness. These include:

- Engaging in consequence management, including removing from all work responsibilities and initiating disciplinary action against the Executive Vice President previously in charge of LCCP and negotiating the separation of the three Senior Vice Presidents with roles in the project; as well as reducing compensation or bonuses to over a dozen other individuals who had involvement in the project;

- Requiring that various employees involved in the LCCP and/or its oversight engage in additional training, including as to reporting obligations;

- Engaging in benchmarking exercise to reevaluate the effectiveness of functions within the United States;

- Continuing with the roll-out of the Aspirational Culture programme;

- Reconfirming critical leadership behaviors;

- Introducing cultural/ behavioral moments in business meetings to start dialogue on ways of working and our aspirational culture;

- Revising its procedures regarding the escalation of ethics complaints and internal investigation findings; and

- Directing Operating Model Entities (OME) to define and implement action plans with employees to address areas to improve culture within each OME.

While significant progress was made to remediate the material weakness as of 30 June 2019, the Company is still in the process of testing the operating effectiveness of certain of the new and enhanced controls and is continuing with the implementation of some of the longer-term remediation efforts described above. We believe our actions will be effective in remediating the material weakness, and we continue to devote significant time and attention to these efforts. The material weakness will not be considered remediated until we have completed designing and implementing the longer-term remediation efforts and the applicable remedial controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively.

- 110 –

**ANSWER**:    Admits that on October 28, 2019, Sasol filed a Form 20-F, and refers to that Form

20-F for a complete and accurate description of its contents.

220.    Thus, while the Board revealed prior management malfeasance and revealed that it was taking steps to remediate, it was made clear that this effort was not complete, and more events or issues may still arise from the prior malfeasance of the Executive Defendants.

**ANSWER**:    Denies the allegations contained in Paragraph 220.

221.    Still, during the conference call with analysts that same day, Fleetwood Rawstorne Grobler, Sasol Limited - EVP of Chemicals Business, stated that Sasol updated the EBITA expected of LCCP to be in the range of USD 100 million to $200 million in FY 2020 with a steady-state run rate EBITA from FY 2022 of approximately $1 billion.

**ANSWER**:    Denies the allegations contained in Paragraph 221, except admits that Mr. Grobler

appeared on an October 28, 2019, earnings call, and refers to the transcript of that earnings call

for a complete and accurate description of its contents.

**F.    Further Results of the Executive Defendants' Malfeasance is Manifested in the January 13, 2020 Explosion at LCCP's Critical LDPE Unit**

222.    On January 14, 2020, Sasol issued a press release confirming that on January 13, 2020, the Company "experienced an explosion and fire at its LCCP low-density polyethylene (LDPE) unit" of its Lake Charles chemicals project in Louisiana. Sasol stated that "[t]he unit was in the final stages of commissioning and startup when the incident occurred" and "has been shut down and an investigation is underway to determine the cause of the incident, the extent of the damage and resulting impact on the LDPE unit's [beneficial operation] schedule."

**ANSWER**:    Admits that on January 14, 2020, Sasol issued a Form 6-K, and refers to that

Form 6-K for a complete and accurate description of its contents.

223.    Immediately following these disclosures, Sasol's ADR price fell $1.70 per share, or 7.84%, over the following two trading days, closing at $19.99 per share on January 15, 2020.

**ANSWER**:    Denies the allegations contained in Paragraph 223, except states that the

allegations in Paragraph 223 purport to describe the prices of Sasol's ADRs, which are matters of

public record, and refers to such public records.

## VII.    POST-CLASS PERIOD THE IMPACT OF DEFENDANTS' PREVIOUS NON-DISCLOSURES IS FURTHER REVEALED DRIVING DOWN THE PRICE OF SASOL ADRS

224.    Following the explosion, fire and shutdown of the LCCP LDPE unit, Sasol revealed that its investigation as to the root cause was complete and updated the financial impact. Without attributing personal blame, nor revealing any partial or final report on the root cause, Sasol stated only that the event on the piping support structure failed and, as a result of the event, that LCCP EBITA would be half that stated in October — US $50 to US $100 million. The February 24, 2020 Form 6-Kstated as follows:

> The investigation into the incident which occurred at the LDPE unit in January 2020 is complete. The root cause analysis determined that *a piping support structure, within the LDPE emergency vent system, failed during commissioning* causing a pipe to dislodge. No major equipment was damaged, and the incident was isolated. Remediation has commenced, however, the replacement of the high pressure piping material components have long lead times. We expect beneficial operation of the LDPE unit to be delayed to the second half of calendar year 2020. Parallel commissioning activities on the remainder of the LDPE unit continue during remediation and every effort will be made to expedite the restoration project. *The overall LCCP cost estimate is tracking US$12.8 billion, within our previous guidance of US$12.6 billion to US$12.9 billion, and our EBITDA estimate of US$50 million to US$100 million for FY20 remains*.
>
> During the time of the delay in the LDPE unit startup, the ethylene produced by the cracker and destined for the unit is sold externally. All previously commissioned units were unaffected and are operating to plan.

**ANSWER**:    Denies the allegations in Paragraph 224, except admits that Paragraph 224

purports to quote and characterize a February 24, 2020, Form 6-K issued by Sasol, and refers to

that Form 6-K for a complete and accurate description of its contents.

225.    Also on February 27, 2020, Sasol hosted an earnings call during which, upon questioning about the explosion, Sasol's management refused to reveal further details. In response to a question about the fire at LCCP, Sasol stated as follows: "So the response of how the systems reacted in terms of the incident that occurred, it worked exactly as intended. And the only thing that we are very disappointed about, is that a component then failed during such an incident of pressure relief. So that's as far as I would like to give context, in terms of that, rest assured, that we do know and that we would be able to remedy the situation in terms of that part of the plant." The reason given for being so opaque was, "[a]s you can imagine, at this point in time, we are busy with insurance dealings. We're busy with the commercial contracts that has

- 112 –

got certain things we need to consider. So I would not like to give you a final exact answer today." The reference to "insurance dealings," and Sasol's preference to not give a "final exact answer," is an unmistakable reference to the fact that Sasol would lose insurance coverage if it determined that the fire was caused by fraud or Sasol was otherwise at fault for the explosion. The company also handed out briefing books to analysts in which they downgraded LCCP EBITA from $ 1 billion to $700 - $900 million, and that the LCCP EBITA run rate had been pushed down to the $50 - $100 run rate for fiscal 2020: "And that itself is a significant shift also in our EBITA."

**ANSWER**: Denies the allegations contained in Paragraph 225, except states that the

allegations in Paragraph 225 purport to quote and characterize a February 24, 2020, earnings

call, and refers to the transcript of that call for a complete and accurate description of its

contents.

226. Then again, on April 23, 2020, Sasol reduced the EBITDA for LCCP from a positive USD 50 million to USD 100 million to a loss of the same for fiscal year 2020. At the same time Sasol announced it is trying to find a buyer for a stake in LCCP.

**ANSWER**: Denies the allegations contained in Paragraph 226, except states that Paragraph

226 purports to characterize an April 23, 2020, Form 6-K issued by Sasol, and refers to that

Form 6-K for a complete and accurate description of its contents.

227. Between January 15, and April 23, 2020, Sasol's ADR price plunged from $19 to as low as $7.66 on June 2, 2020, reflecting in part the uncertainty of the state of LCCP as a result of the malfeasance identified above, the continual lowering of LCCP EBITDA estimates, and the wait for the LDPE and other units to come online.

**ANSWER**: Denies the allegations contained in Paragraph 227, except states that the

allegations in Paragraph 227 purport to describe the prices of Sasol's ADRs, which are matters of

public record, and refers to such public records.

## VIII. ADDITIONAL ALLEGATIONS OF SCIENTER

228. The following allegations, taken as a whole with those set forth above, permit a strong inference of Defendants' scienter. First, Executive Defendants clearly understood the importance of its disclosures to investors, and their obligation to provide truthful disclosures. For example, in Sasol's June 7, 2016 call, Defendant Constable was asked about the accuracy of its disclosure that cost expenditures "could" reach $11 billion, based on prior representations that cost expenditures would reach $8.9 billion, along with a sufficient level of contingency. Defendant Constable responded, "We're seeing the number rise about the $8.9 billion. And

therefore, we had to communicate it to the market. So, that's where we're at. I do feel we're comfortable with contingency as I said. And we'll come back in September with the highlights." And, as discussed above, this was not the Executive Defendants' first experience with withholding material information from investors. The law firm investigation of the FTWEP (FT Wax Expansion Project) found an email from Defendant Victor where he "had cautioned against giving investors too much detail about the problems with the wax facility, saying in a February 2013 email that it would 'not go down well, according to the probe.'" The report also found "that there are attempts at withholding information from business units and from the Sasol Ltd. board and that there are attempts to make the picture that is FTWEP look better than it actually is."

**ANSWER**:     Denies the allegations contained in Paragraph 228, except states that the second

sentence of Paragraph 228 consists of Plaintiffs' characterization of this action, to which no

response is required; admits that Paragraph 228 purports to quote and characterize a June 7,

2016, business update call, and refers to the transcript of that call for a complete and accurate

description of its contents; states that Paragraph 228 purports to quote and characterize a

*Bloomberg* article entitled "A Management 'Culture of Fear' Derailed a South African Icon,"

dated February 20, 2020, and refers to that article for a complete and accurate description of its

contents.

229.     Second, the magnitude of Sasol's more than $8 to now $13 billion project yields a strong inference that the Executive Defendants were not in the blind as to what was going on at Lake Charles, but instead were actively involved in the closer monitoring of the project.

**ANSWER**:     To the extent the allegations contained in Paragraph 229 constitute legal

conclusions, no response is required. To the extent a response is required, denies the allegations

contained in Paragraph 229.

230.     Third, the admissions and findings of the Board and Auditors in October 2019 do not attribute the spiraling costs and delays to mere forecasting error or judgment errors, but rather to "inappropriate conduct" and an improper tone at the top of the LCCP, including an "excessive focus on maintaining cost and schedule estimates at the expense of providing accurate cost and schedule estimation." Sasol's Board then immediately forced the resignation of two of their fellow Board members who shared the joint CEO position as well as serving as executive directors: Defendants Mr. Bongani Nqwababa and Mr. Stephen Cornell, Joint CEOs.

**ANSWER**:     Denies the allegations contained in Paragraph 230, except admits that the first

sentence of Paragraph 230 purports to quote and characterize the independent review

- 114 –

commissioned by the Board as disclosed in the October 28, 2019, Form 6-K and October 28,

2019, Form 20-F, and refers to those public filings for a complete and accurate description of

their contents.

231.    Fourth, Defendants' false and misleading statements concerned the most
significant event, initiative, and issues in Sasol's business, including the Company's ability to
support top-line growth, which support a strong inference of scienter. Defendants focused
intensely on developing the now $13 billion project utilizing debt raised from an international
consortium of banks. Defendants promoted Lake Charles immediately after announcing it in
2012 and continued providing the market with consistent updates on the status of Lake Charles
on every earnings call.

ANSWER:    To the extent the allegations contained in Paragraph 231 constitute legal

conclusions, no response is required. To the extent a response is required, denies the allegations

contained in Paragraph 231, except admits that Sasol provided the market with consistent

updates on the status of the LCCP.

232.    Fifth, as noted by the Board, the Boards' compensation structure provided
perverse incentives to hide the information from the market when as part of its remediation plan
it "reduced incentives awards for individuals company-wide based on relation and/or proximity
to LCCP." In addition, as revealed in Defendants' 20-F filings (2015 - 2019), Defendants had, as
part of their remuneration and compensation, incentives under their Short Term Incentives (STI)
and Long Term Incentives (LTI) plans that included Sasol's share price, targets on the LCCP
cost and schedule, financial targets, and meeting major project milestones.

ANSWER:    Denies the allegations contained in Paragraph 232, except admits that the first

sentence of Paragraph 232 purports to quote and characterize an October 28, 2019, Form 6-K

issued by Sasol, and refers to that Form 6-K for a complete and accurate description of its

contents; admits that the second sentence of Paragraph 232 purports to characterize Sasol's

Forms 20-F from 2015 through 2019, and refers to those Form 20-Fs for a complete and accurate

description of their contents.

233.    Finally, the firing or forced resignation of two of Sasol's fellow board members
after investigation by the Board and the Auditors strengthens the inference of Defendants'
scienter. While the Board stop short of finding deliberate fraud, as it would have to keep from
handing an admission of liability to investors, it did not reach a similar conclusion on gross
negligence or recklessness. Indeed, in refusing to tell more of the findings concerning the cause

of the explosion at LCCP, Sasol stated: "[a]s you can imagine, at this point in time, we are busy with insurance dealings. We're busy with the commercial contracts that has got certain things we need to consider. So I would not like to give you a final exact answer today."

**ANSWER**:    Denies the allegations contained in Paragraph 233, except admits that Paragraph

233 purports to quote and characterize a February 24, 2020, earnings call, and refers to the

transcript of that call for a complete and accurate description of its contents.

## IX.    LOSS CAUSATION

234.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class. During the Class Period, Plaintiffs and the Class purchased Sasol ADRs at artificially inflated prices and were damaged thereby when the price of Sasol ADRs declined when the truth was revealed. Throughout the Class Period, the price of Sasol's ADRs were artificially inflated as a result of Defendants' materially false and misleading statements and omissions. The price of Sasol's ADRs significantly declined (causing investors to suffer losses) when Defendants' materially false and misleading statements, alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the risks that had been fraudulently concealed by the Defendants materialized.

**ANSWER**:    Denies the allegations contained in Paragraph 234.

235.    Specifically, Defendants' materially false and misleading statements misrepresented the adequacy truth about the Company's cost and scheduling estimates of the LCCP project, the nature of its financial struggles, and the lack of internal controls over its financial and operational reporting. When those misrepresentations and misstatements were corrected, and the risk concealed by them materialized, investors suffered losses as the price of Sasol's ADRs declined. As a result of the disclosure of the truth of Defendants' fraud, Sasol's ADR's declined 76 %, from a closing price of $32.59 per share on March 10, 2015 to a closing price of $7.66 June 3, 2020.

**ANSWER**:    Denies the allegations contained in Paragraph 235.

236.    The identified corrective events are set forth above and will be further identified through discovery.

**ANSWER**:    The allegations in Paragraph 236 consist of Plaintiffs' characterization of this

action, to which no response is required.

237.    It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate the price of Sasol's ADRs, It was also foreseeable to Defendants that the revelation of the truth about Sasol's failure to disclose the true estimates of the Lake Charles project, financial struggles, and materially inadequate internal controls over its financial reporting would cause the price of the Company's

- 116 –

securities to fall as the artificial inflation caused by Defendants' misstatements and omissions was removed. Thus, the ADR price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions.

**ANSWER**:     Denies the allegations contained in Paragraph 237.

## X.     NO SAFE HARBOR

238.     The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statutory safe harbor or bespeaks caution doctrine does not apply to statements included in financial statements prepared in accordance with generally accepted accounting principles. Moreover, none of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Sasol current and historical financial accounting practices, financial condition, and internal controls, among other topics.

**ANSWER**:     To the extent the allegations contained in Paragraph 238 constitute legal

conclusions, no response is required. To the extent a response is required, denies the allegations

contained in Paragraph 238.

239.     To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Sasol's financial accounting practices, financial condition, and internal controls, among others. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Sasol were insufficient to insulate Defendants from liability for their materially false and misleading statements.

**ANSWER**:     To the extent the allegations contained in Paragraph 239 constitute legal

conclusions, no response is required. To the extent a response is required, denies the allegations

contained in Paragraph 239.

## XI.     THE PRESUMPTION OF RELIANCE

240.     At all relevant times, the market for Sasol's ADRs were efficient for the following reasons, among others:

> (a) Sasol's ADRs met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Sasol filed periodic reports with the SEC and the NYSE;

(c) Sasol regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Sasol was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

**ANSWER**:    Denies the allegations contained in Paragraph 240, except admits that Sasol's ADRs were listed and actively traded on the New York Stock Exchange, that Sasol filed periodic reports with the SEC and the New York Stock Exchange, and that Sasol issued press releases; lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 240(d); states that to the extent the allegations contained in Paragraph 240 consist of legal conclusions, no response is required.

241.    As a result of the foregoing, the market for Sasol's ADRs reasonably promptly digested current information regarding Sasol from all publicly available sources and reflected such information in the price of Sasol's ADRs. All purchasers of Sasol common stock during the Class Period suffered similar injury through their purchase of Sasol ADRs at artificially inflated prices, and a presumption of reliance applies.

**ANSWER**:    Denies the allegations contained in Paragraph 241; states that the phrase "reasonably promptly" is vague and subject to multiple interpretations and thus denies the allegations in the first sentence of Paragraph 241 on that basis; states that the allegations contained in the second sentence of Paragraph 241 consist of legal conclusions, to which no response is required.

242.    A class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128

(1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

**ANSWER**:    To the extent the allegations contained in Paragraph 242 consist of legal conclusions, no response is required. To the extent a response is required, denies the allegations contained in Paragraph 242.

## XII.    CLASS ALLEGATIONS

243.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Sasol securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

**ANSWER**:    Denies the allegations contained in Paragraph 243, except admits that Plaintiffs purport to seek relief under the statutory provision and rules referenced.

244.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Sasol securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Sasol or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

**ANSWER**:    To the extent the allegations contained in Paragraph 244 consist of legal conclusions, no response is required. To the extent a response is required, denies the allegations contained in Paragraph 244, except admits that Sasol securities were traded on the New York Stock Exchange; lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in the third and fourth sentences of Paragraph 244.

245.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

**ANSWER**:    To the extent the allegations contained in Paragraph 245 consist of legal

conclusions, no response is required. To the extent a response is required, denies the allegations

contained in Paragraph 245.

246.    Plaintiff will fairly and adequately protect the interests of the members of the
Class and has retained counsel competent and experienced in class and securities litigation.
Plaintiff has no interests antagonistic to or in conflict with those of the Class.

**ANSWER**:    To the extent the allegations contained in Paragraph 246 consist of legal

conclusions, no response is required, and otherwise lacks knowledge or information sufficient to

form a belief as to the truth or falsity of the allegations contained in Paragraph 246.

247.    Common questions of law and fact exist as to all members of the Class and
predominate over any questions solely affecting individual members of the Class. Among the
questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Sasol;

- whether the Executive Defendants caused Sasol to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Sasol securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

**ANSWER**:    To the extent the allegations contained in Paragraph 247 consist of legal

conclusions, no response is required. To the extent a response is required, denies the allegations

contained in Paragraph 247.

248.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**ANSWER**:    Denies the allegations contained in Paragraph 248, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in the second clause of the first sentence, the second sentence, and the third sentence of Paragraph 248.

249.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Sasol securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Sasol securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

**ANSWER**:    To the extent the allegations contained in Paragraph 249 consist of legal conclusions, no response is required. To the extent a response is required, denies the allegations contained in Paragraph 249.

250.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

**ANSWER**:   Denies the allegations contained in Paragraph 250.

251.   Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**ANSWER**:   To the extent the allegations contained in Paragraph 251 consist of legal

conclusions, no response is required. To the extent a response is required, denies the allegations

contained in Paragraph 251.

### XIII.   CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

### COUNT I

### FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5 PROMULGATED THEREUNDER (AGAINST ALL DEFENDANTS)

252.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

**ANSWER**:   Repeats and re-alleges its answers to Paragraphs 1 through 251, as if fully set

forth here.

253.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

**ANSWER**:   The allegations in Paragraph 253 consist of Plaintiffs' characterization of this

action, to which no response is required.

254.   During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

**ANSWER**:   Denies the allegations contained in Paragraph 254.

255.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Sasol securities during the Class Period.

**ANSWER**:    Denies the allegations contained in Paragraph 255.

256.    Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of Sasol were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of Sasol, their control over, and/or receipt and/or modification of Sasol's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Sasol, participated in the fraudulent scheme alleged herein.

**ANSWER**:    Denies the allegations contained in Paragraph 256.

257.    Executive Defendants, who are or were the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Sasol personnel to members of the investing public, including Plaintiffs and the Class.

**ANSWER**:    Denies the allegations contained in Paragraph 257.

258.    As a result of the foregoing, the market price of Sasol securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Sasol securities during the Class Period in purchasing Sasol securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

**ANSWER**:    Denies the allegations contained in Paragraph 258.

259.    Had Plaintiffs and the other members of the Class been aware that the market price of Sasol securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Sasol securities at the artificially inflated prices that they did, or would not have purchased them at all.

**ANSWER**:    Denies the allegations contained in Paragraph 259.

260.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

**ANSWER**:    Denies the allegations contained in Paragraph 260.

261.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Sasol securities during the Class Period.

**ANSWER**:    Denies the allegations contained in Paragraph 261.

## COUNT II

## FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT (AGAINST EXECUTIVE DEFENDANTS)

262.    Plaintiffs repeats and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

**ANSWER**:    Repeats and re-alleges its answers to Paragraphs 1 through 261, as if fully set

forth here.

263.    During the Class Period, the Executive Defendants participated in the operation and management of Sasol, and conducted and participated, directly and indirectly, in the conduct of Sasol's business affairs. Because of their senior positions, they knew the adverse non-public information about Sasol's misstatement of revenue and profit and false financial statements.

**ANSWER**:    Denies the allegations contained in Paragraph 263, except admits that during their

respective periods of employment at Sasol, Messrs. Constable, Nqwababa, Cornell, Victor, and

Schoeman participated in the operation and management of Sasol and conducted and

participated, directly and indirectly, in the conduct of Sasol's business affairs.

264.    As officers and/or directors of a publicly owned company, the Executive Defendants had a duty to disseminate accurate and truthful information with respect to Sasol's financial condition and results of operations, and to correct promptly any public statements issued by Sasol which had become materially false or misleading.

**ANSWER**:    States that the allegations contained in Paragraph 264 consist of legal conclusions,

to which no response is required.

- 124 –

265.    Because of their positions of control and authority as senior officers, the Executive Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Sasol disseminated in the marketplace during the Class Period concerning Sasol's results of operations. Throughout the Class Period, the Executive Defendants exercised their power and authority to cause Sasol to engage in the wrongful acts complained of herein. The Executive Defendants, therefore, were "controlling persons" of Sasol within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Sasol securities.

**ANSWER**:    Denies the allegations contained in Paragraph 265, except admits that during their

respective periods of employment at Sasol, Messrs. Constable, Nqwababa, Cornell, and Victor

were involved in the review and dissemination of Sasol's public SEC filings.

266.    By reason of the above conduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Sasol.

**ANSWER**:    To the extent the allegations contained in Paragraph 266 consist of legal

conclusions, no response is required. To the extent a response is required, denies the allegations

contained in Paragraph 266.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as class representatives, and designating, Lead Counsel as Class Counsel;

B.    Awarding Plaintiffs and the other members of the Class compensatory damages at an amount to be determined at trial, together with pre-judgment and post-judgment interest thereon;

C.    Awarding Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this litigation, including attorneys' fees, accountants' and experts' fees, and other costs and disbursements; and

D.    Awarding such other further relief as the Court may deem just and proper.

**ANSWER**:    States that no answer is required in response to the statements in Plaintiffs' Prayer

for Relief. To the extent a response is required, denies them and requests that the Court deny all

– 125 –

relief requested by Plaintiffs, dismiss the Second Amended Complaint with prejudice, and order such further relief as the Court deems just and proper.

## DEFENSES AND AFFIRMATIVE DEFENSES

Sasol asserts the following affirmative and other defenses, without assuming the burden of proof on any such defenses or portions thereof which would otherwise rest with the Plaintiffs. Sasol expressly reserves the right to supplement, amend, or delete any or all of the following defenses, as warranted by discovery or other investigation, or as justice may require.

### FIRST DEFENSE

The Second Amended Complaint fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

Plaintiffs and the putative class members cannot show that the Defendants acted with scienter.

### THIRD DEFENSE

Defendants did not participate in any device, scheme, or artifice to defraud in connection with the purchase or sale of any security.

### FOURTH DEFENSE

Defendants at all times, and with respect to all matters contained herein, acted in good faith, exercised reasonable care, and did not know, and in the exercise of reasonable care could not have known, of the purported untruth, misstatements, and/or omissions alleged in the Second Amended Complaint.

### FIFTH DEFENSE

Plaintiffs have not adequately alleged that Defendants made any false or misleading statement of material fact or omitted to state any material fact.

- 126 –

**SIXTH DEFENSE**

The alleged misstatements concern nonactionable matters of opinion, or are puffery or soft information, rather than matters of material fact.

**SEVENTH DEFENSE**

The alleged misstatements were forward-looking and were accompanied by sufficient cautionary language and risk disclosure to be non-actionable under the Private Securities Litigation Reform Act, the safe harbor provisions of the federal securities laws, and/or the "bespeaks caution" doctrine.

**EIGHTH DEFENSE**

The allegedly false statements of material fact, and/or omissions of material fact, in the Sasol public disclosures were not material to the investment decisions of a reasonable investor.

**NINTH DEFENSE**

Neither Plaintiffs nor any putative class members relied, or could have reasonably or justifiably relied, upon the alleged misstatements or omissions alleged in the Second Amended Complaint.

**TENTH DEFENSE**

Plaintiffs' and the putative class members' losses (if any) were not caused by Defendants.

**ELEVENTH DEFENSE**

Any injury or loss allegedly incurred by Plaintiffs or any putative class member was not proximately caused by any wrongful conduct of Defendants, or was due to the intervening and/or superseding actions of individuals or parties over whom Sasol exercised no control and with respect to whom or for which Sasol bears no responsibility.

## TWELFTH DEFENSE

Plaintiffs' and the putative class members' claims are barred, in whole or in part, by the doctrines of waiver, estoppel, laches, acquiescence, and/or ratification.

## THIRTEENTH DEFENSE

Plaintiffs and the putative class members voluntarily assumed the risk of the losses alleged in the Second Amended Complaint.

## FOURTEENTH DEFENSE

Sasol denies that Plaintiffs, or any putative class member, was injured in the nature and to the extent claimed, and contests damages.

## FIFTEENTH DEFENSE

Plaintiffs and the putative class members failed to mitigate their alleged damages.

## SIXTEENTH DEFENSE

The damages sought by Plaintiffs for themselves and the putative class exceed those permitted under the Securities Exchange Act of 1934, the Private Securities Litigation Reform Act, common law, or any other applicable statute, rule, or regulation.

## SEVENTEENTH DEFENSE

Plaintiffs' and the putative class members' claims are barred, in whole or in part, because the alleged losses and damages, if any, are speculative.

## EIGHTEENTH DEFENSE

Plaintiffs' claims, and those of the putative class members' claims are barred, in whole or in part, by their own actions, omissions, and/or negligence.

## NINETEENTH DEFENSE

Plaintiffs' and the putative class members' claims are barred, in whole or in part, or are subject to offset, to the extent that the conduct complained of conferred a benefit upon Plaintiffs or the putative class members.

## TWENTIETH DEFENSE

Plaintiffs cannot establish the prerequisites for class certification under Federal Rule of Civil Procedure 23.

## TWENTY-FIRST DEFENSE

Plaintiffs are not adequate representatives of the putative class.

## TWENTY-SECOND DEFENSE

Plaintiffs and the putative class members are not entitled to recover attorneys' fees and/or costs of this suit.

## TWENTY-THIRD DEFENSE

Defendants Constable, Nqwababa, Cornell, Victor, and Schoeman are not subject to control person liability under Section 20(a) of the Exchange Act because they acted in good faith and they did not directly, or indirectly, induce any of the alleged acts that would constitute a violation of the Exchange Act.

## TWENTY-FOURTH DEFENSE

Defendants Constable, Nqwababa, Cornell, Victor, and Schoeman are not subject to control person liability under Section 20(a) of the Exchange Act because they did not exercise general or specific control over the alleged primary violations of section 10(b) of the Exchange Act.

## TWENTY-FIFTH DEFENSE

The alleged scienter of any director or officer, or any other party not named as a defendant, cannot be imputed to the Defendants.

## TWENTY-SIXTH DEFENSE

Defendants have insufficient knowledge or information upon which to form a belief about whether there may be as yet unstated defenses and affirmative defenses available, and therefore expressly: (i) reserves the right to amend or supplement this Answer, their defenses and affirmative defenses, and all other pleadings, and (ii) reserves the right to (a) assert any and all additional defenses under any applicable federal, state, common, or foreign law if discovery shows that such defense would be appropriate; and (b) assert any cross-claims, counterclaims, and third-party claims when and if they become appropriate in this action.

DATED: October 16, 2020                     Respectfully submitted,

                                            /s/ Jonathan D. Polkes
                                            _____
                                            Jonathan D. Polkes
                                            Caroline H. Zalka
                                            Luna Barrington
                                            Nicole E. Prunetti
                                            WEIL, GOTSHAL & MANGES LLP
                                            767 Fifth Avenue
                                            New York, New York 10153
                                            Tel: (212) 310-8000
                                            Fax: (212) 310-8007

                                            *Counsel for Defendants Sasol Limited, David Edward Constable, Bongani Nqwababa, Stephen Cornell, Paul Victor, and Stephan Schoeman*

- 130 –