**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CHAD LINDSEY MOSHELL, Individually and On Behalf of All Others Similarly Situated,

Plaintiff,

-v-

SASOL LIMITED, DAVID EDWARD CONSTABLE, BONGANI NQWABABA, STEPHEN CORNELL, PAUL VICTOR, and STEPHAN SCHOEMAN,

Defendants.

Case No. 1:20-CV-01008-JPC

Hon. John P. Cronan

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR RECONSIDERATION OF THE COURT'S AUGUST 24, 2020 MEMORANDUM ORDER; MOTION FOR SANCTIONS; AND MOTION FOR STAY OF DISCOVERY**

WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

*Attorneys for Defendants Sasol Limited, David Edward Constable, Bongani Nqwababa, Stephen Cornell, Paul Victor, and Stephan Schoeman*

October 30, 2020

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..... 1

FACTUAL AND PROCEDURAL BACKGROUND ..... 5

I. THE LCCP, THE COMPLAINT, AND THE MOTION TO DISMISS ..... 5

**A.** The LCCP ..... 5

**B.** The Complaint ..... 5

**C.** The Motion to Dismiss ..... 6

II. NEWLY DISCOVERED EVIDENCE PROVES THAT PLAINTIFFS FALSIFIED THE COMPLAINT'S ALLEGATIONS AND ARE ENGAGED IN AN INCREASINGLY DESPERATE ATTEMPT TO HIDE THEIR MISCONDUCT. ..... 7

**A.** Repudiating CWs Confirm that Plaintiffs Falsified the Complaint's Allegations. ..... 7

**B.** Plaintiffs are Engaging in an Unlawful Campaign to Obstruct Discovery and Avoid Scrutiny of Their CW Allegations. ..... 10

ARGUMENT ..... 13

I. RECONSIDERATION AND DISMISSAL IS JUSTIFIED BECAUSE PLAINTIFFS FALSIFIED THE ALLEGATIONS SUPPORTING THIS COURT'S RULING. ..... 13

**A.** Plaintiffs Submitted—and this Court Relied on—False CW Allegations. ..... 15

**B.** Once the CWs' Actual Allegations are Considered, the Complaint Fails to State a Claim for Securities Fraud. ..... 20

II. PLAINTIFFS' COUNSEL'S CONDUCT INDEPENDENTLY JUSTIFIES DISMISSAL AND FURTHER SANCTION. ..... 21

III. DISCOVERY MUST BE STAYED PENDING RESOLUTION OF THIS ISSUE. ..... 24

CONCLUSION ..... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdelhamid v. Altria Grp., Inc.*,
515 F. Supp. 2d 384 (S.D.N.Y. 2007)....................24

*AJ Energy LLC v. Woori Bank*,
18-CV-3735 (JMF), 2019 WL 4688629 (S.D.N.Y. Sept. 26, 2019),
*aff'd*, 2020 WL 5807568 (2d Cir. Sept. 30, 2020)....................24

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)....................14

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
579 F.3d 143 (2d Cir. 2009)....................22

*Belmont Holdings Corp. v. SunTrust Banks, Inc.*,
896 F. Supp. 2d 1210 (N.D. Ga. 2012)....................14

*Campo v. Sears Holdings, Corp.*,
371 F. App'x 212 (2d Cir. 2010).................... *passim*

*Campo v. Sears Holdings Corp.*,
635 F. Supp. 2d 323 (S.D.N.Y. 2009)....................14

*City of Livonia Employees' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*,
711 F.3d 754 (7th Cir. 2013).................... *passim*

*City of Livonia Employees' Ret. Sys. v. Boeing Co.*,
306 F.R.D. 175 (N.D. Ill. 2014)....................15

*Cunningham v. Cornell Univ.*,
No. 16-CV-6525 (PKC), 2020 WL 1165778 (S.D.N.Y. Mar. 11, 2020)....................13

*Johnson v. Smithkline Beecham Corp.*,
2015 WL 1004308 (E.D. Pa. Mar. 9, 2015)....................21

*JP Morgan Chase Bank, N.A., v. Reifler*,
11 Civ. 4016 (DAB), 2013 WL 12177061 (S.D.N.Y. Sep. 20, 2013)....................13, 14

*In re Millennial Media*, Inc.,
No. 14 Civ. 7923(PAE), 2015 WL 3443918 (S.D.N.Y. May 29, 2015)....................22

*Sampson v. Hagens Berman Sobol Shapiro, LLP*,
No. 20-2232, 2020 WL 5507823 (E.D. Pa. Sept. 11, 2020)....................4, 22

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010)....................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)....................4, 15, 19, 21, 25

*Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*,
956 F.2d 1245 (2d Cir. 1992)....................13

**Statutes & Rules**

15 U.S.C. § 78u-4(b)(3) .................... *passim*

Fed. R. Civ. P. 9(b) ....................14, 21

Fed. R. Civ. P. 11 .................... *passim*

Fed. R. Civ. P. 43(c) ....................15

Fed. R. Civ. P. 54(b) ....................1, 13, 14

Local Civ. R. 6.3 ....................13

**Other Authorities**

*John C. Coffee, Jr., Confidential Distortion: Dealing with Confidential Witnesses in Securities Litigation*, CLS Blue Sky Blog (Sept. 25, 2017), https://clsbluesky.law.columbia.edu/2017/09/25/confidential-distortion-dealing-with-confidential-witnesses-in-securities-litigation; ....................15

Defendants Sasol Limited ("Sasol"), David Edward Constable, Bongani Nqwababa, Stephen Cornell, Paul Victor, and Stephan Schoeman (collectively, "Defendants") respectfully submit this memorandum in support of their Motion for Reconsideration of the Court's August 24, 2020 Memorandum Order; Motion for Sanctions; and Motion for Stay of Discovery under Rules 11 and 54(b) of the Federal Rules of Civil Procedure (the "Rules") and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(3) ("PSLRA").

**PRELIMINARY STATEMENT**

The protections of the Rules and the PSLRA would be meaningless if plaintiffs could make-up fake facts, put them in the mouths of unwilling confidential witnesses ("CWs"), and thereby overcome a motion to dismiss. Yet that's exactly what happened here. Plaintiffs David Cohn and Chad Moshell ("Plaintiffs") submitted false CW allegations to this Court and those allegations formed the basis for Judge Jed Rakoff's denial of Defendants' Motion to Dismiss. What is more, Plaintiffs have since embarked on a scheme to obstruct discovery into these allegations. Accordingly, and with awareness of the gravity of this request, Defendants respectfully submit the evidence of Plaintiffs' wrongdoing is overwhelming, ongoing, and urgently requires this Court's intervention. Defendants therefore ask this Court to reconsider its ruling on Defendants' Motion to Dismiss and dismiss Plaintiffs' baseless complaint, stay all discovery pending expedited resolution of this issue, and impose any further sanction necessary to ensure that Plaintiffs cannot profit from their misconduct.

On August 24, 2020, Judge Rakoff denied Defendants' Motion to Dismiss, materially relying on the Amended Complaint's ("AC" or "Complaint") CW allegations to find that Plaintiffs stated a claim for securities fraud in connection with the disclosure of schedule delays and cost overruns at Sasol's Lake Charles Chemical Project (the "LCCP"). *See* Amended Complaint, [ECF

No. 59][1]; Motion to Dismiss [ECF No. 66] ("Sasol MTD"); Memorandum Order [ECF No. 74] ("MTD Order"). Judge Rakoff credited Plaintiffs' allegations, assuming that they were made in good faith in compliance with counsel's obligations under Rule 11.

But Defendants now have learned that the CW allegations Plaintiffs presented to this Court and on which Judge Rakoff relied were false. Half of the CWs submitted sworn declarations (attached hereto as exhibits) repudiating the statements attributed to them in the Complaint and explaining that they told Plaintiffs' investigator—in direct contradiction of Plaintiffs' central claim in the Complaint—that the LCCP was on time and on budget when they worked on the project or that they had no basis to believe otherwise. These repudiating CWs further describe how their accounts of the LCCP were falsely misrepresented in the Complaint, and how Plaintiffs' counsel ignored their express requests not to be involved in litigation, failed to inform them that they would be referenced, and never showed them the false statements the Complaint ascribed to them. Sworn declarations from executives at both Sasol and Fluor Enterprises, Inc. ("Fluor"), a main LCCP contractor, reveal that a centerpiece of Plaintiffs' CW allegations—that a supposed February 2016 "Change Order" from Fluor imposed a legally binding cost increase on Sasol—was false, as no such document exists or could have existed. Had Judge Rakoff been presented with a Complaint truthfully reporting the facts just described, it would have been rejected out of hand, much less passed the PSLRA's heightened pleading standard—accordingly, it must be dismissed. *See, e.g.*, *Campo v. Sears Holdings, Corp.*, 371 F. App'x 212 (2d Cir. 2010); *City of Livonia Employees' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754 (7th Cir. 2013). *See infra* Section I.

Separately and independently, Plaintiffs' ongoing misconduct in this litigation alone justifies a sanction of dismissal. Not only did Plaintiffs submit falsified allegations to this Court—

[1] After Judge Rakoff's ruling, Plaintiffs filed a Second Amended Complaint, which does not relevantly alter the substance of the allegations in the Amended Complaint. *See Second Amended Complaint* [ECF No. 81-1].

which they stood behind at a hearing before Judge Rakoff, and on which Judge Rakoff relied in denying the Motion to Dismiss—but Plaintiffs also have engaged in a highly troubling campaign designed to obstruct Defendants' and the Court's ability to learn the facts just described. Plaintiffs first refused to comply with Defendants' requests to disclose the CWs' identities, without any reasonable explanation and in contravention of the law and norms of this District. Defendants brought the issue to this Court, which promptly, and without need for briefing, ordered disclosure.

What then followed was an increasingly contradictory and desperate series of moves by Plaintiffs designed to obstruct and prevent Defendants from confronting the remaining CWs. Defendants subpoenaed three of the CWs to appear for depositions on or around October 30, 2020 (this Court's deadline for class-certification discovery). Notably, the CWs' counsel acknowledged and agreed to this timeline. But Plaintiffs then issued their own subpoenas for additional depositions of the repudiating CWs in November. Defendants, presuming counsel's good faith, agreed to Plaintiffs' later date, provided that Plaintiffs would agree to extend the class certification schedule by four weeks (because the CWs' deposition testimony self-evidently is relevant to that motion). Plaintiffs, however, refused that modest extension—thereby thwarting Defendants' ability to comply with this Court's scheduling order. Indeed, their refusal to move the class certification schedule plainly was a deliberate effort to delay the depositions of the CWs, in light of their having agreed to a multi-month extension of the case schedule at the same time.

To further prevent Defendants from confronting the remaining, non-repudiating CWs—the only CWs whose depositions Defendants need, given that the others have all repudiated the Complaint's allegations—and ensure that Defendants could not meet this Court's deadline, Plaintiffs sought duplicative depositions of those CWs, scheduled for December. Plaintiffs informed the CWs' counsel, *who had previously agreed to Defendants' proposed deposition dates*

*on and around October 30*, that the CWs must be deposed only once and only after document discovery was completed. This, notwithstanding that Defendants had agreed to produce all relevant discovery related to the CWs before the previously noticed depositions, and Plaintiffs have refused for over a month to produce any documents reflecting their communications with the CWs.

Plaintiffs' submission of falsified allegations to this Court, coupled with their efforts to obstruct discovery of this wrongdoing, violates counsel's responsibilities under Rule 11 and independently warrants—at a minimum—a sanction of dismissal with prejudice. Such a sanction is especially appropriate here given that Plaintiffs' counsel is a repeat offender. *See, e.g.*, *Sampson v. Hagens Berman Sobol Shapiro, LLP*, 2020 WL 5507823, at *2 (E.D. Pa. Sept. 11, 2020) ("As Hagens Berman finally began complying with discovery requests, numerous cases had to be dropped or involuntarily terminated because the actual facts differed critically from the allegations in the plaintiffs' complaints."). *See infra* Section II.

Whether arrived at through a reconsideration of the Motion to Dismiss or by finding that Plaintiffs' conduct in this litigation is deserving of sanction—or both—the result is the same: This Court should dismiss Plaintiffs' falsified Complaint with prejudice and impose any further sanction the Court deems appropriate.

This Court also should stay all discovery pending expedited resolution of this issue. Allowing this suit to proceed would handsomely reward Plaintiffs (and penalize Defendants) for Plaintiffs' counsel's misconduct. It would also embolden future plaintiffs in this District and elsewhere to do the same, and would violate Congress's purpose in enacting the PSLRA, which was "designed to curb perceived abuses of the § 10(b) private action." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007). It is imperative that this Court step in to ensure that Congress's promise in the PSLRA, and the fundamental ethical obligations owed by officers of

this Court, are not so easily evaded. *See infra* Section III.

## FACTUAL AND PROCEDURAL BACKGROUND

## I. THE LCCP, THE COMPLAINT, AND THE MOTION TO DISMISS

### A. The LCCP

On October 27, 2014, Sasol announced its plan to build the LCCP, an ethane cracker and derivatives megaproject, in Lake Charles, Louisiana. MTD Order at 2 (citing AC ¶ 58). Sasol engaged Fluor Technip Integrated ("FTI"), a joint venture of contractors Fluor and Technip USA Inc., as the primary contractor for the project. Sasol MTD, Ex. A (Sasol 6-K dated Oct. 27, 2014) at 2. As of the beginning of the Complaint's class period on March 10, 2015, Sasol had disclosed an $8.9 billion cost estimate. MTD Order at 2.

Sasol conducted periodic reviews of the LCCP budget and made four separate disclosures revising cost and schedule estimates. In August 2016, after an intricate review of over 60,000 individual budget line items that both Sasol and FTI approved, Sasol promptly disclosed an updated budget of $11 billion. *See* AC ¶ 151. Sasol further revised the total cost estimate to $11.13 billion in November 2017 and $11.6-11.8 billion in February 2019. AC ¶¶ 181, 197. On May 22, 2019, Sasol disclosed that, as a result of a review initiated in response to the February 2019 cost period—which covered only a limited period from 2018 to 2019—the updated LCCP cost estimate was $12.6-12.9 billion. *See* Sasol MTD, Ex. S (Sasol 6-K dated May 22, 2019) at 2-3.

### B. The Complaint

Plaintiffs filed the Complaint against Defendants for alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, claiming that Defendants knew all along that the LCCP would cost billions more than the disclosed budget. The Complaint materially relied on allegations attributed to six CWs. According to the Complaint, CW-1, an LCCP engineer, alleged that Sasol received a binding "Change Order" from Fluor in February 2016 contractually

obligating Sasol to pay at least $11.7 billion. AC ¶¶ 65-66. CW-2, who was responsible for Sasol's U.S. finances, claimed it was "clear from the beginning" that the LCCP would cost more than $8.9 billion, and that she repeatedly expressed concerns to several individual Defendants. AC ¶ 76. CW-5, an LCCP risk assessor, further alleged that an $11 billion cost was "'socialized among senior management.'" AC ¶ 95. And CW-4, who worked on LCCP accounting, alleged that Sasol was "double counting" and the LCCP accounting "stinks to high heaven." AC ¶ 87.

### C. The Motion to Dismiss

Defendants moved to dismiss the Complaint. *See* Sasol MTD. Defendants focused on the infirmity of Plaintiffs' CW allegations, arguing that the allegations—which were the linchpin of the Complaint's allegations of actual knowledge and scienter—failed to demonstrate Defendants' actual subjective knowledge that the LCCP projections were false. *Id.* at 17-20. Defendants further contended that CW-1's "Change Order" story—which claimed the existence of a February 2016 LCCP cost increase from Fluor of $11.7 billion that was legally binding on Sasol—was wholly unsupported. *Id.* at 20-22. While Defendants argued that the Complaint could not survive dismissal even crediting the CW allegations, Defendants also requested permission to depose the CWs so their allegations could be subjected to scrutiny. *See id.* at 33-35.

Thus challenged, Plaintiffs doubled-down on their CW allegations and their counsel's purported diligence. When asked, at the August 20, 2020 hearing on the Motion to Dismiss, if CW-1 made the "Change Order" allegation in paragraph 67 of the Complaint—which Defendants noted included a shift of perspective making it impossible to discern the source of the allegations—Plaintiffs' counsel responded: "All of that paragraph is the CW statement, and we were careful in providing it to the court. That is the CW's statement. We confirmed it." Tr. at 26; *see id.* at 23-24. Judge Rakoff again asked, "to be absolutely sure," whether "CW-1 told you that he had seen this change order and that . . . he had seen that it was a binding order[,]" and counsel confirmed, "it

would be told [to] a colleague in our firm, but, yes, we – yes." *Id*. at 26-27.

On August 24, 2020, Judge Rakoff relied on Plaintiffs' CW allegations to deny Defendants' Motion to Dismiss in substantial part.[2] The Court recognized that the Complaint "materially relies" on CW allegations for the assertion that Defendants "knew from the very beginning of the class period [that] the projected cost of the LCCP was well beyond $8.9 billion." MTD Order at 3-4. And in finding that Plaintiffs adequately alleged securities fraud with particularity, Judge Rakoff extensively relied upon the CW allegations. *See, e.g.*, *id.* at 19-20 (citing CW-2's allegation that she spoke with Defendant Victor regarding schedule and cost overruns). The Court explained that the "most notabl[e]" piece of evidence was CW-1's claim that Sasol received a binding Change Order from Fluor obligating Sasol to pay $11.7 billion in February 2016. *Id*. at 11. The Court concluded that the Complaint's allegations supported a finding of "knowing falsity." *Id*. at 15-16. The Court also denied Defendants' request for depositions on the ground that the CWs' allegations were "corroborated by external evidence" and because Defendants failed to "provide [any] basis for this suggestion" that the CWs' allegations were false. *Id.* at 25.

## II. NEWLY DISCOVERED EVIDENCE PROVES THAT PLAINTIFFS FALSIFIED THE COMPLAINT'S ALLEGATIONS AND ARE ENGAGED IN AN INCREASINGLY DESPERATE ATTEMPT TO HIDE THEIR MISCONDUCT.

In the weeks since Judge Rakoff's denial of Defendants' Motion to Dismiss, despite Plaintiffs' continuing efforts to obstruct discovery and shield their allegations from scrutiny, new and troubling evidence has emerged that reveals Plaintiffs' ongoing misconduct.

### A. Repudiating CWs Confirm that Plaintiffs Falsified the Complaint's Allegations.

Three of Plaintiffs' CWs—CW-2, CW-4, and CW-5—submitted signed declarations

---

[2] Judge Rakoff granted Defendants' Motion to Dismiss as to Defendant Fleetwood Grobler, and with regard to alleged misrepresentations regarding Sasol's internal controls over financial reporting and management of the LCCP. *See* MTD Order at 20, 22-23. Defendants do not seek reconsideration of these aspects of the Court's ruling.

repudiating the allegations attributed to them and impugning the conduct of Plaintiffs' counsel. All three of the repudiating CWs describe a similar experience. They were each approached by Plaintiffs' investigator, and each informed the investigator that they did not want to participate in any litigation. *See* CW-2 Decl., Ex. 2 ¶ 2 ("I expressly stated that I did not want to be involved in any litigation concerning Sasol and that she did not have permission to attribute any statements to me."); CW-4 Decl., Ex. 3 ¶ 3 (same); CW-5 Decl., Ex. 4 ¶ 2 (same). In one case, "Plaintiff's investigator explicitly told [CW-2] that [she] would not be involved in the litigation." CW-2 Decl. ¶ 2. Despite their refusal, the CWs were barraged with "repeated phone calls." CW-2 Decl. ¶ 2; *see* CW-4 Decl. ¶ 3. CW-5 found the calls and text messages so "harassing" that he "was forced to block [Plaintiffs' investigator's] phone number to make the contact stop." CW-5 Decl. ¶ 4. Of the three CWs, only one interacted with an attorney for Plaintiffs. *See* CW-5 Decl. ¶ 3. None of the three was told—much less asked—that statements would be attributed to them, and none was shown a draft or final version of the Complaint or a summary of the statements attributed. *See* CW-2 Decl. ¶ 4; CW-5 Decl. ¶ 6; CW-4 Decl. ¶¶ 3-4.

All three CWs were shocked to learn (only after being contacted by Defendants) that the Complaint was filed with statements ascribed to them. *See* CW-2 Decl. ¶ 3 ("surprised and upset"); CW-4 Decl. ¶ 5 ("concerned"); CW-5 Decl. ¶ 5 ("alarmed"). After reviewing the Complaint's allegations, all three CWs affirmed that they were false or misleading. *See* CW-2 Decl. ¶ 14 ("Plaintiffs' attorneys have falsely represented my statements"); CW-4 Decl. ¶ 6 ("I did not make these statements as quoted, and they are an inaccurate representation of my conversations with plaintiffs' investigator."); CW-5 Decl. ¶ 7 ("[P]laintiffs have falsely represented—in every critical respect—what I told their investigator and what I believe."). They each went allegation-by-

allegation to reject the statements attributed to them in the Complaint.[3] CW-5 further described how Plaintiffs' investigator repeatedly suggested to him that the LCCP budget had increased to $11 billion, but CW-5 "expressly rejected this theory outright." CW-5 Decl. ¶¶ 10, 11.

Not only do the CWs reject the allegations attributed to them, their accounts obliterate the fundamental premise of the Complaint—the premise Judge Rakoff relied on in denying the Motion to Dismiss—that the LCCP was known to be over budget and behind schedule. *See* CW-2 Decl. ¶ 9 ("[T]he LCCP was both on time and on budget for the $8.9 billion cost estimate based on everything I knew."); CW-5 Decl. ¶ 12 ("I told plaintiffs' investigator that . . . the LCCP was on budget for the initial $8.9 billion cost estimate based on everything I knew."); *see also* CW-4 Decl. ¶ 8 ("At no time did I examine the entire $8.9 billion dollar estimate to conclude that the overall estimate was too low.").

To be clear: Plaintiffs were fully aware of CW allegations that the LCCP was on time and on budget when the CWs worked on the project, yet Plaintiffs said the exact opposite in their Complaint—even ascribing that false and contradictory allegations to those very same CWs—and it was those false allegations that Judge Rakoff relied on in denying the Motion to Dismiss.

Plaintiffs' falsified allegations do not end there: CW-1's "Change Order" allegation, a centerpiece of the Complaint, is also false. A Sasol executive confirmed that no such document

---

[3] CW-2 "did not tell [P]laintiffs' investigator that it was 'clear from the beginning' that the LCCP would cost more than $8.1 billion." CW-2 Decl. ¶ 8. She also did not tell Plaintiffs' investigator that she had a "direct window" into "burgeoning costs, internal control weaknesses, financial reporting, and management knowledge of cost overruns and delays." *Id.* ¶ 10. Nor did she say that she raised concerns about cost overruns or the LCCP schedule that could render the then-$8.9 billion estimate or schedule false, even though she had "numerous general conversations" with certain individual defendants. *Id.* ¶ 11.

Similarly, CW-4, "did not tell the plaintiffs' investigator that Sasol's accounting for LCCP 'stinks to high heaven,'" did not recall saying or "understand what [the] allegation means" that "Sasol was 'double-counting,'" and, though he recalled saying that he was "told to reduce the value of work done," he affirmed that he never did so and that his cost reporting "was accurate and based on [his] calculations." CW-4 Decl. ¶¶ 11, 12. CW-4 "had no personal interactions with Mr. Cornell or Mr. Constable, and [did] not have any personal knowledge regarding what they knew or did not know." *Id.* ¶ 15.

And CW-5 was clear with the investigator that, while he was at Sasol, he had "*no knowledge* that the company considered the LCCP to be an '$11 billion project.'" CW-5 Decl. ¶ 11.

imposing a legally binding $11.7 cost increase existed or could have existed. Niemand Decl., Ex. 5 ¶ 5-6. And an executive from Fluor—the entity that CW-1 claimed issued the supposed Change Order—likewise confirmed that CW-1's statements are "absolutely false" and "reflect a complete ignorance of the contractual relationship between Sasol and [FTI] and the associated billing and budgeting practices of the LCCP." McNulty Decl. Ex. 6 ¶¶ 4, 10; *see id.* ¶ 5 ("Neither Fluor nor FTI ever [ ] unilaterally increased the cost of the LCCP from $8.9 billion to $11.7 billion in February 2016 nor at any other time."). Thus both the sender and the receiver of this supposed $3 billion Change Order deny it happened and assert there is not even such a thing as a Change Order that could unilaterally bind Sasol to a mandatory price increase. While Plaintiffs have thwarted Defendants' attempts to determine whether the allegation was falsified by CW-1 or by Plaintiffs on his behalf, the upshot is the same: the "Change Order" allegation ascribed to CW-1, just like the allegations Plaintiffs attributed to CW-2, CW-4, and CW-5, is false.

### B. Plaintiffs are Engaging in an Unlawful Campaign to Obstruct Discovery and Avoid Scrutiny of Their CW Allegations.

At every turn, Plaintiffs have sought to delay and obstruct scrutiny of their CW allegations, engaging in an aggressive and increasingly desperate scheme first to avoid disclosing those CWs' identities at all, and then to avoid their depositions entirely.

Plaintiffs first attempted to conceal the identities of their CWs—a move entirely out of step with the law and norms of this District, and one which this Court roundly rejected. Shortly after the Court's ruling on the MTD, Defendants asked Plaintiffs to identify the six CWs. *See* Ex. 7 (Email from N. Prunetti to J. Patterson dated Sept. 4, 2020). Plaintiffs initially replied that they would do so in their forthcoming Rule 26(a) disclosures, but then, when those disclosures arrived, they failed to specifically identify the CWs, including their names in a long list of witnesses. Defendants again asked Plaintiffs to identify the CWs. *See* Ex. 8 (Email from J. Patterson to N.

Prunetti dated Sept. 10, 2020); Ex. 9 (Email from N. Prunetti to S. Berman dated Sept. 12, 2020). Thus confronted, Plaintiffs changed tack and refused to disclose the CWs' identities. *See* Ex. 10 (Email from J. Patterson to N. Prunetti dated Sept. 14, 2020). Perplexed by Plaintiffs' flip-flop, and by any plaintiff taking such an abnormal stance in the Southern District, Defendants indicated they would ask this Court to order disclosure. *See* Ex. 11 (Email from N. Prunetti to J. Patterson dated Sept. 15, 2020). Plaintiffs argued that Defendants could not even go to the Court for relief. *See* Ex. 12 (Email from J. Patterson to N. Prunetti dated Sept. 15, 2020). Defendants did so nonetheless. At a hearing on September 16, 2020, Judge Rakoff—finding no need for briefing—rejected out-of-hand Plaintiffs' attempt to hide the CWs' names and ordered disclosure. Only then, after having prevaricated for nearly a month, did Plaintiffs reveal the CWs' identities, doing so on an unjustified "attorneys' eyes only" basis. Ex. 13 (Letter from L. Gilmore to N. Prunetti dated Sept. 21, 2020).

Plaintiffs next undertook aggressive and increasingly desperate attempts to prevent the CWs' depositions and to obstruct Defendants' compliance with this Court's Case Management Plan. After the CWs' identities were disclosed, Defendants connected with three of the CWs, who immediately repudiated the allegations ascribed to them. After numerous unsuccessful attempts to connect with the remaining CWs, Defendants subpoenaed them to appear for depositions on or around October 30, 2020.[4] Notably, the CWs' own counsel agreed to this timeline. But rather than accepting the dates set by Defendants' valid subpoenas and accepted by the CWs' counsel, which would have ensured compliance with this Court's October 30, 2020 deadline for class-certification discovery, Plaintiffs instead issued subpoenas to additional CWs for depositions in early November. *See* Scheduling Order [ECF No. 76]; Ex. 14 (Email from N. Grueneich to C. Zalka

---

[4] *See* Ex. 19 (Email from N. Prunetti to J. Patterson dated Oct. 18, 2020); Ex. 20 (Email from N. Prunetti to J. Patterson dated Oct. 19, 2020); Ex. 21 (Email from N. Prunetti to S. Berman dated Oct. 2, 2020).

dated Oct. 16, 2020). Defendants, presuming Plaintiffs' good faith, agreed to delay their properly noticed CW depositions, so long as Plaintiffs agreed to a four-week extension of the Court's class certification schedule to avoid violating the Court-ordered discovery deadline. *See* Ex. 15 (Email from N. Prunetti to L. Gilmore dated Oct. 19, 2020). Although Plaintiffs had agreed to extend the overall case schedule by several months—confirming they would not be prejudiced by a modest extension of the class-certification timeline—they inexplicably rejected Defendants' proposal, instead seeking time to prepare a counter-proposal and demanding that depositions be postponed to after document production, even though Defendants had agreed to produce all relevant documents related to the CWs before the noticed depositions. Ex. 15 (Email from N. Prunetti to L. Gilmore dated Oct. 19, 2020); Ex. 16 (Email from L. Gilmore to C. Zalka dated Oct. 21, 2020).

Plaintiffs next manufactured a scheduling conflict to ensure Defendants could not meet the Court's deadline and could not confront the remaining CWs. To do so, Plaintiffs issued their own subpoenas, with depositions scheduled in December, to the very same CWs Defendants already subpoenaed, and informed the CWs' counsel that the depositions should occur only once, and only after all document discovery in the case had concluded. Ex. 17 (Email from N. Grueneich to C. Zalka dated Oct. 21, 2020); Ex. 18 (Letter from L. Gilmore to F. Schirripa dated Oct. 21, 2020). Two days later, the CWs' counsel withdrew his prior consent and refused to produce the CWs for depositions on October 30, 2020, citing Plaintiffs' duplicative subpoenas as the reason for delay. *See* Ex. 22 (Letter from F. Schirripa to J. Polkes dated Oct. 23, 2020).[5] That same day, Plaintiffs conclusively rejected the proposed revised class certification schedule. Ex. 23 (Email from L.

[5] In response to a letter motion from the CWs' counsel seeking a pre-motion conference in connection with a motion for a protective order, Defendants agreed to adjourn the October 30, 2020, depositions pending this Court's November 5, 2020 scheduling hearing. *See* Letter Motion [ECF No. 95]; Letter Response [ECF No. 96]. Plaintiffs, in their apparent desperation to avoid the CW depositions, nonetheless filed a letter response the day after the dispute was rendered moot, raising a host of issues beyond the scope of the letter motion. *See* Letter Response [ECF No. 97]. This Court, on October 30, 2020, adjourned the deadline for the depositions and directed the parties to address issues raised in the Letter Motion at the Conference scheduled for November 5, 2020. *See* Order [ECF No. 98].

Gilmore to N. Prunetti dated Oct. 23, 2020).

Now, more than two months since Judge Rakoff's ruling on the Motion to Dismiss, Plaintiffs have obstructed Defendants from confronting the remaining CWs—in direct violation of validly issued subpoenas and this Court's scheduling order. And not only have Plaintiffs avoided the CWs' depositions with this series of pretextual and increasingly desperate maneuvers, they continue to refuse to produce any documents reflecting their communications with the CWs. Ex. 23 (Email from L Gilmore to N. Prunetti dated Sept. 28, 2020); Ex. 24 (Email from C. Zalka to L. Gilmore dated Oct. 26, 2020). The purpose of Plaintiffs' serial evasion has only become increasingly clear as their constantly changing explanations have grown increasingly irrational: Plaintiffs are attempting to avoid scrutiny of their remaining CW allegations at all costs.

## ARGUMENT

### I. RECONSIDERATION AND DISMISSAL IS JUSTIFIED BECAUSE PLAINTIFFS FALSIFIED THE ALLEGATIONS SUPPORTING THIS COURT'S RULING.

The Rules and Second Circuit precedent allow reconsideration of an interlocutory ruling that has been undermined by new factual developments. Federal Rule of Civil Procedure 54(b) provides that "any order . . . that adjudicates fewer than all the claims . . . may be revised at any time" before final judgment.[6] "The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992). "To grant a Rule 54(b) motion on the basis of newly discovered evidence, a movant must demonstrate that (1) the proffered evidence was unavailable . . . and (2) manifest injustice

---

6 "Although Local Rule 6.3 limits the time to file a motion for reconsideration to 'fourteen (14) days after the entry of the Court's determination of the original motion,' courts do not consider such motions untimely where newly-discovered evidence is the purported basis for reconsideration." *Cunningham v. Cornell Univ.*, 2020 WL 1165778, at *1 (S.D.N.Y. Mar. 11, 2020); *see also, e.g.*, *JP Morgan Chase Bank, N.A. v. Reifler*, 2013 WL 12177061, at *3 (S.D.N.Y. Sept. 20, 2013) (same).

will result if a court does not reconsider." *Reifler*, 2013 WL 12177061, at *3.

Accordingly, in this exact context—where Rule 9(b) and the PSLRA impose "heightened pleading requirements" designed to ensure that the motion to dismiss serves a meaningful gatekeeping function—courts will reconsider and grant a motion to dismiss where CWs' actual accounts undermine a complaint's allegations. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). As one court succinctly put it, "[i]n the securities litigation context, where there is a higher scienter pleading standard under the PSLRA, a district court may reconsider an order denying a motion to dismiss, even where the defendant relies upon extrinsic evidence outside the pleadings, when a manifest factual error was made by the court based on fraud by the plaintiff, carelessness by plaintiff's counsel in making its factual allegations, or by the court's own misperception of the facts." *Belmont Holdings Corp. v. SunTrust Banks, Inc.*, 896 F. Supp. 2d 1210, 1223 (N.D. Ga. 2012) (citations and alterations omitted).

That is what happened in *Campo*, 371 F. App'x 212. There, the District Court initially denied a motion to dismiss, relying on CW allegations in a securities-fraud complaint. *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 330 n.54 (S.D.N.Y. 2009). But after the CWs were deposed and disclaimed certain allegations attributed to them in the complaint, the District Court granted the motion, concluding that "[a] reasonable person could not infer from the statements these confidential witnesses acknowledged in their depositions that [the defendants] acted with the requisite recklessness or intent." *Id.* at 335-36; *see Campo*, 371 F. App'x at 217. The Second Circuit affirmed, finding "no error" in the District Court's use of deposition testimony to "determin[e] whether the confidential witnesses acknowledged the statements attributed to them in the complaint" or decision to rely only on the CWs' actual testimony rather than the complaint's allegations. *Id.* at 216 n.4. "Because [Rule 11] requires that there be a good faith basis for the

factual and legal contentions contained in a pleading," the Second Circuit explained, "the district court's use of the confidential witnesses' testimony to test the good faith basis of plaintiffs' compliance with *Tellabs* was permissible." *Id*.[7]

Similarly on point is *Boeing*, 711 F.3d 754. There, a District Court relied on the allegations of a CW—a "chief engineer" who had supposedly seen internal communications to senior executives that contradicted contemporaneous disclosures—to deny a motion to dismiss. *Id.* at 759. But after that initial dismissal, "investigation by [the defendant] soon revealed" that "[n]o one had bothered to show the complaint to the [CW]" and "the complaint's allegations concerning [the CW] could not be substantiated." *Id.* at 760. "Deposed by defendants' counsel, [the CW] denied virtually everything that the [plaintiffs'] investigator had reported." *Id.* Thus armed with the CW's repudiation, the "defendants asked the [district] judge to reconsider her denial of their motion to dismiss . . . [s]he reconsidered—and dismissed the complaint." *Id.* Rather than "try[ing] to determine when [the CW] had been lying and when telling the truth," the judge instead concluded that "[plaintiffs'] failure to attempt to verify the allegations . . . amounted to a fraud on the court." *Id.* at 760-61. The Seventh Circuit affirmed, *id.* at 762, and, on remand, the District Court imposed sanctions, *City of Livonia Employees' Ret. Sys. v. Boeing Co.*, 306 F.R.D. 175, 183 (N.D. Ill. 2014).

**A. Plaintiffs Submitted—and this Court Relied on—False CW Allegations.**

As in *Campo* and *Boeing*, dismissal is likewise required here. Declarations submitted by Plaintiffs' CWs reveal that Plaintiffs falsified the Complaint's CW allegations, and it was these very falsified allegations that Judge Rakoff relied on in denying Defendants' Motion to Dismiss.

---

7 Recognizing the potential for abuse of CW allegations, commentators have suggested that Rule 43(c) provides an alternative "procedural foundation" for the procedure employed in *Campo*. John C. Coffee, Jr., *Confidential Distortion: Dealing with Confidential Witnesses in Securities Litigation*, CLS Blue Sky Blog (Sept. 25, 2017), https://clsbluesky.law.columbia.edu/2017/09/25/confidential-distortion-dealing-with-confidential-witnesses-in-securities-litigation; *see* Fed. R. Civ. P. 43(c) ("When a motion relies on facts outside the record, the court may hear the matter on affidavits or may hear it wholly or partly on oral testimony or on depositions.").

Half of the CWs confirm in sworn declarations that the allegations attributed to them were fabricated by Plaintiffs. Two sworn declarations from Sasol and Fluor executives expose that Plaintiffs' "Change Order" allegation is also false. Plaintiffs' aggressive and unlawful obstruction of discovery to avoid scrutiny of the remaining allegations confirms their infirmity. Stripped of the CW allegations, the Complaint cannot stand.

Judge Rakoff's ruling on the Motion to Dismiss hinged on Plaintiffs' CW allegations. The Court first found that it "may credit [the CWs'] testimony" because "the complaint allege[d] that each CW was working directly on the LCCP in a manner that would have provided him or her with direct, contemporaneous information about the costs and schedule for the LCCP." MTD Order at 12. Accepting the truth of Plaintiffs' CW allegations as pleaded in the Complaint—and assuming counsel's good-faith compliance with their obligations under Rule 11—the Court concluded that, with the CWs' testimony, the Complaint alleged that LCCP cost and schedule estimates "failed to account for already existing cost overruns and delays" and that "defendants' statements regarding the LCCP cost and schedule were knowingly false." *Id.* at 11, 24.

**1. *The repudiating CWs alone justify dismissal.***

Half of Plaintiffs' CWs—CW-2, CW-4, and CW-5—have submitted sworn declarations affirming that the allegations attributed to them in the Complaint were false and contrary to their actual belief that the LCCP was on time and on budget to the best of their knowledge. *See supra* at 8-10. Just as in *Campo* and *Boeing*, the failure of these CWs to even recognize, much less stand by, the statements attributed to them justifies dismissal.

Start with CW-2, whose declaration explains in no uncertain terms that the allegations supposedly attributed to her "were not to be attributed to me," that "Plaintiffs' attorneys have falsely represented [her] statements," and that "[w]hen [she] left Sasol in July 2015, the LCCP was both on time and on budget for the $8.9 billion cost estimate based on everything I knew." CW-2

Decl. ¶¶ 7, 9, 14. Specifically, CW-2 rejected Plaintiffs' invented allegations connecting any individual Defendant to any knowledge of LCCP cost overruns or schedule delays. *See id.* ¶ 11 ("I had numerous general conversations with Messrs. Nqwababa, Cornell, and Victor" but "[c]ontrary to what is alleged . . . I did not raise any concerns regarding specific cost overruns or regarding the timeline for completion of the project that I knew or believed rendered the then $8.9 billion estimate or then-current schedule false.").

Yet these concocted allegations were exactly the ones Judge Rakoff relied on in denying the Motion to Dismiss. Specifically, Judge Rakoff relied on the allegation that CW-2 "expressed concerns about the cost and timeline of the LCCP to defendants Nqwababa, Cornell, and Victor on several occasions" to support the conclusion that Defendants "were repeatedly alerted to problems with the budget and schedule of the LCCP," supporting a finding of Defendants' actual knowledge. MTD Order at 14-15 (citations omitted); *see also id.* at 19-20 (explaining that other allegations, only when "combined with CW-2's specific allegations . . . [are] enough to allege actual knowledge"). The allegations supposedly offered by CW-2—the only "high-ranking employee" of the bunch, *id.* at 12—were the critical link between supposed LCCP cost and schedule overruns and the individual Defendants' "actual subjective knowledge." *Slayton v. Am. Express Co.*, 604 F.3d 758, 776 n.9 (2d Cir. 2010). Without these allegations—and especially had CW-2's account that the LCCP was "on time and on budget for the $8.9 billion cost estimate" been actually alleged—Plaintiffs have not adequately alleged that any false statement was "made or approved by [an executive] with actual knowledge by that officer that the statement was false or misleading." *Id.* at 773.

CW-4's and CW-5's declarations tell a similar story and strengthen the case for reconsideration and dismissal. Both CW-4 and CW-5 disavow the allegations ascribed to them in

the Complaint. *See* CW-5 Decl. ¶ 7 ("To be clear, plaintiffs have falsely represented—in every critical respect—what I told their investigator and what I believe."); CW-4 Decl. ¶ 20 ("Plaintiffs have misrepresented the allegations attributed to me."). And they make clear that they could offer no basis for connecting any alleged misstatement to any individual executive. *See* CW-4 Decl. ¶ 15 ("I had no personal interactions with Mr. Cornell or Mr. Constable, and do not have any personal knowledge regarding what they knew or did not know."); CW-5 Dec ¶ 13 ("I certainly never said, and have no basis to believe, that while I was at Sasol, Stephen Cornell 'knew' that the project would ultimately cost $11 billion."). To the contrary, their declarations—just like CW-2's—offer affirmative evidence that the LCCP was on budget and on schedule to the best of their knowledge, in direct contradiction of Plaintiffs' core allegations. *See* CW-4 Decl. ¶ 10 ("At no time did I examine the entire $8.9 billion dollar estimate to conclude that the overall estimate was too low."); CW-5 Decl. ¶ 12 ("[W]hen I left my employment at Sasol [in October 2015], the LCCP was on budget for the initial $8.9 billion cost estimate based on everything I knew.").

Again, Judge Rakoff relied on these CWs' now-disclaimed allegations in denying the Motion to Dismiss. The Court's opinion cited CW-4's supposed allegation that "Sasol employees were directed to manipulate accounting to hide increasing costs" to support the conclusion that "even at the time they were announced, Sasol's public cost estimates and projected schedules totally failed to account for already existing cost overruns and delays." MTD Order at 11. And it cited CW-5's supposed allegation that "an $11 billion cost estimate was 'socialized among senior management' from the beginning." MTD Order at 14.

But the allegations on which the Court relied were false and invented by Plaintiffs in direct contradiction to the information the CWs actually provided. Plaintiffs knew (or were reckless for not knowing) that the very CWs they claimed were well-positioned to allege Defendants'

knowledge that the LCCP cost over $11 billion from the outset instead confirmed the opposite: that the project was on budget at the time or that they had no basis to believe otherwise. Yet Plaintiffs submitted knowing falsehoods to this Court—and doubled down when pressed by Judge Rakoff—and it was on Plaintiffs' falsified allegations that this Court relied in denying Defendants' Motion to Dismiss. Had Judge Rakoff been aware that Plaintiffs' allegations were false and been able to consider allegations accurately reflecting what the CWs believed—namely, that the LCCP was in fact on budget and on schedule to the best of their knowledge and that the individual Defendants had no knowledge of any information to the contrary—it is self-evident that he would not have found that Defendants "knowingly misrepresented cost and schedule estimates to keep up appearances," MTD Order at 19, or that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference," *id.* at 24 (quoting *Tellabs*, 551 U.S. at 324). Rather, Judge Rakoff's opinion makes clear that a version of the Complaint where Plaintiffs' falsified allegations of undisclosed cost overruns and delays were swapped out for the CWs' sworn accounts would have been straightforwardly dismissed.

**2. *CW-1's Change Order allegation is false.***

Plaintiffs' pattern of including false allegations in the Complaint continues with CW-1's "notabl[e]," yet completely made up, "Change Order" allegation. MTD Order at 11. CW-1's principal allegation—a centerpiece of the Complaint—was that "defendants had received a contractually binding 'Change Order' from Sasol's subcontractor Fluor in February 2016 that confirmed that Fluor's costs would be at least $11.7 billion." MTD Order at 4. As with the false allegations ascribed to CW-2, CW-4, and CW-5, the Court also relied on CW-1's supposed Change Order allegation in denying the Motion to Dismiss. *See id.* at 9-11, 14-15 (explaining that this allegation "demonstrates that Sasol's public cost estimates and schedule were entirely inconsistent with the reality of progress at the LCCP").

But this allegation, too, is false. A Sasol executive intimately involved in the LCCP's cost and schedule has attested under penalty of perjury that no such Change Order exists, confirming that "CW-1's statements are utterly confused," with "[t]he confusion run[ning] the gamut from fundamental misrepresentations of the roles of the various players on the project to outright falsehoods." Niemand Decl. ¶¶ 5, 11. He goes on to offer multiple independent reasons why the existence of the supposed Change Order was impossible in light of the parties' contracts and practices. *See id.* ¶¶ 5-10. An executive from Fluor—who, according to the Complaint's allegations, actually issued the supposed Change Order—likewise confirmed that "[n]either Fluor nor FTI ever [ ] unilaterally increased the cost of the LCCP from $8.9 billion to $11.7 billion in February 2016 nor at any other time." McNulty Decl. ¶ 5; *see id.* ¶ 10 ("CW-1's description of an alleged 'Change Order' is absolutely false."). Plaintiffs' machinations to avoid CW-1's deposition have prevented Defendants from determining whether the false Change Order allegation was concocted by CW-1 himself or by Plaintiffs in his name, but either way it is false. And Plaintiffs' increasingly desperate attempt to avoid scrutiny of their CW allegations further supports the inference that the allegations of Plaintiffs' two remaining CWs—on whose supposed allegations Judge Rakoff did not meaningfully rely, *see* MTD Order at 11, 14, and whose depositions Plaintiffs continue to obstruct—cannot be credited.

**B. Once the CWs' Actual Allegations are Considered, the Complaint Fails to State a Claim for Securities Fraud.**

Imagine what Plaintiffs' Complaint would have looked like had they truthfully reported the CWs' allegations: three credible (in Plaintiffs' own view) CWs alleging that, to the best of their knowledge, the LCCP was on time and on budget; no allegation that any individual Defendant

had any knowledge to the contrary; and no imagined "Change Order" story.[8] That Complaint—that is, a *truthful* Complaint—would not have passed the laugh test, much less the heightened pleading standards of Rule 9(b) and the PSLRA, and Judge Rakoff no doubt would have dismissed it out of hand. Because Plaintiffs' Complaint survived Defendants' Motion to Dismiss only because it included—and this Court relied on—falsified allegations, as in *Campo* and *Boeing*, this Court's ruling must therefore be reconsidered and the Complaint dismissed with prejudice.

## II. PLAINTIFFS' COUNSEL'S CONDUCT INDEPENDENTLY JUSTIFIES DISMISSAL AND FURTHER SANCTION.

Even putting aside whether the Complaint can survive dismissal given the CWs' actual allegations—as just explained, it cannot—Plaintiffs' falsification of allegations in the Complaint and ongoing scheme to obstruct discovery (which is almost certainly designed to avoid disclosure of further misconduct) is conduct unbecoming of officers of this Court and separately and independently justifies a sanction of dismissal with prejudice. This is especially the case because it is not the first offense by Plaintiffs' law firm. A federal court previously sanctioned counsel "for the firm's bad faith and dishonesty" in "continu[ing] to prosecute [certain] actions well after it knew they were baseless, time-barred, or both." *See, e.g.*, *Johnson v. Smithkline Beecham Corp.*, 2015 WL 1004308, at *1 (E.D. Pa. Mar. 9, 2015). That court's later description of the firm's misconduct—in a lawsuit against the firm brought by a former client in that litigation—sounds troublingly familiar: "As [counsel] finally began complying with discovery requests, numerous cases had to be dropped or involuntarily terminated because the actual facts differed critically from

---

[8] While it is true that Judge Rakoff's opinion also references Sasol's 2019 disclosure of the results of an independent review as further supporting an inference of scienter, the opinion does so only in "combination [with] the CW testimony," MTD Order at 17, and nowhere suggests that the 2019 disclosures would be alone sufficient to survive a motion to dismiss. This is especially so when any inference supported by the 2019 disclosures is weighed against the CWs' accounts that the LCCP was on time and on budget to the best of their knowledge. *See Tellabs*, 551 U.S. at 324 (requiring an "inference of scienter [that is] cogent and at least as compelling as any opposing inference one could draw from the facts alleged").

the allegations in the plaintiffs' complaints." *Hagens Berman Sobol Shapiro*, 2020 WL 5507823, at *2; *see also id.* ("In the course of [a] hearing, a Hagens Berman attorney gave false testimony. Moreover, it was later disclosed that the lawyer had tampered with documents.").

Plaintiffs' "problematic" actions in this case, moreover, are part of a troubling trend whereby counsel invent or exaggerate CW allegations to force defendants into multimillion-dollar discovery or settlement. *In re Millennial Media Inc.*, 2015 WL 3443918, at *12 (S.D.N.Y. May 29, 2015) (describing "the growing body of cases chronicling the repudiation by CWs of statements attributed to them"). As Judge Engelmayer noted in *Millennial Media*,[9] this behavior sits at best "uneasily" alongside Rule 11, 2015 WL 3443918, at *11, which requires attorneys to "certif[y] that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances . . . factual contentions have evidentiary support," Fed. R. Civ. P. 11(b). This is especially the case in light of the PSLRA's command that sanctions are mandatory for Rule 11 violations. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 579 F.3d 143, 152 (2d Cir. 2009) ("The express congressional purpose of the PSLRA provision [making sanctions mandatory] was to increase the frequency of Rule 11 sanctions . . . and thus tilt the 'balance' toward greater deterrence of frivolous securities claims.").

Plaintiffs' counsel's ongoing campaign of falsification and obstruction plainly fails to meet the ethical standards demanded by Rule 11. First, as explained above, Plaintiffs included CW allegations in the Complaint that the CWs themselves said were not true. *See supra* at 8-10.

[9] The facts of *Millennial Media* are eerily familiar: Of 11 CWs, "10 were never told that they would be so identified" and "at least four [CWs] claim to have been misquoted or misleadingly quoted." *Millennial Media*, 2015 WL 3443918, at *5. There, as here, "[t]he deficiencies reported by the CWs [were] pervasive . . . [t]hey infect statements of major as well as minor importance," and "significantly undermine the integrity of the [Complaint]." *Id.* at *10. Finding it "difficult to come up with a good reason why counsel would not attempt to confirm with a witness . . . the accuracy of the statements that counsel intended to attribute to them," the Court concluded that "[t]he Court, the public, and above all such witnesses, have the right to expect better of counsel." *Id.* at *10, *14.

Plaintiffs lied to this Court time and again, first by including baseless allegations in the Complaint, then by affirming to Judge Rakoff that they had verified the Complaint's allegations. *See* Tr. at 26 (Aug. 20, 2020) ("We confirmed it."). In the process, Plaintiffs also abused the CWs themselves, violating the CWs' requests not to be involved in any litigation, never showing the CWs the (false) statements that would be attributed to them in the Complaint, and harassing the CWs with unwanted calls and text messages. *See* CW-2 Decl. ¶ 2; CW-5 Decl. ¶¶ 2, 3, 6; CW-4 Decl. ¶ 3.

Then, Plaintiffs engaged in an unusual—and, in retrospect, extremely suspicious—campaign to refuse to disclose the CWs' identities, in direct contravention of the law and norms of this District. *See supra* at 10-11. It was only once the Court ordered disclosure that Plaintiffs did so, and then only with gratuitous privilege designations.

Next, after the CWs' identities were finally revealed—and after half of them repudiated Plaintiffs' false allegations—Plaintiffs engaged in an aggressive, unlawful, and exceedingly desperate series of maneuvers designed to delay and avoid depositions of the CWs, in violation of validly issued subpoenas and this Court's scheduling order. *See supra* at 11-13. They first refused to follow Defendants' validly issued subpoenas for depositions of the remaining CWs on a schedule which the CWs' own counsel had agreed to. *See id.* They next subpoenaed additional CWs themselves—CWs whose depositions Defendants did not, in any event, need because those CWs repudiated Plaintiffs' allegations—for dates that would prevent Defendants from meeting this Court's class-certification discovery deadline, refusing to agree to a modest extension of that deadline even while agreeing to a significant extension of the case schedule. *See id.* Plaintiffs then proceeded to issue their own subpoenas for the non-repudiating CWs—the depositions that are most critical for Defendants, as they have not yet confronted these CWs—pushing those depositions back over a month and informing the CWs' counsel (who had agreed to Defendants'

earlier dates) that the CWs could be deposed only once. *See id.* Plaintiffs further sought to delay these critical depositions until after document discovery was complete, even though Defendants had agreed to produce documents related to the CWs before the earlier dates, and even though Plaintiffs refuse to produce documents reflecting their own communications with the CWs. *See id.* Plaintiffs' unlawful and increasingly desperate attempts to avoid scrutiny of their allegations is itself deeply troubling and—combined with sworn accounts that Plaintiffs' CW allegations were falsified—only suggests deeper misconduct that Plaintiffs are doing all they can to hide.

Plaintiffs' unethical and unlawful conduct in submitting falsified allegations and unlawfully obstructing discovery alone justifies dismissal with prejudice as a blatant violation of Rule 11.[10] As in *Boeing*, this Court need not reweigh the allegations in light of new developments and can simply dismiss on the ground that Plaintiffs' inappropriate behavior and, in particular, their "failure to attempt to verify the allegations[,] amounted to a fraud on the court" and merit sanction. *Boeing*, 711 F.3d at 760. While Defendants are mindful of the gravity of this charge, the only conclusion that can be drawn from these facts is that Plaintiffs' counsel's conduct has flouted the most basic obligations of ethics and decency. Dismissal with prejudice, along with an award of fees and expenses and any further sanction the Court deems appropriate, is accordingly justified.

## III. DISCOVERY MUST BE STAYED PENDING RESOLUTION OF THIS ISSUE.

In order to protect the Defendants from Plaintiffs' outlandish misbehavior, Defendants respectfully submit that the Court should act swiftly and decisively, including by staying further discovery pending expedited resolution of this matter.[11] It is only because Plaintiffs included false

---

[10] *See, e.g.*, *Abdelhamid v. Altria Grp., Inc.*, 515 F. Supp. 2d 384, 400 (S.D.N.Y. 2007) ("Although the Court has already decided to dismiss the Amended Complaint for failure to state a claim, this sanction under Rule 11 serves as an alternative ground for dismissal."); *AJ Energy LLC v. Woori Bank*, 2019 WL 4688629 (S.D.N.Y. Sept. 26, 2019) (dismissing with prejudice and awarding fees and costs as sanction for a facially-implausible complaint, forged supporting documents, and false statements in briefing), *aff'd*, 2020 WL 5807568 (2d Cir. Sept. 30, 2020).

[11] Defendants attach to this Memorandum a Draft Order staying discovery and setting a schedule for briefing and argument. *See* Draft Order, Ex 1.

allegations in their Complaint that they were able to secure any discovery at all—their now-exposed misconduct should not entitle them to any more.

The PSLRA imposes an automatic stay of discovery while a motion to dismiss is pending—a stay that was in place here until Plaintiffs defeated Defendants' motion to dismiss only by submitting and attesting to falsified allegations. *See* 15 U.S.C. § 78u-4(b)(3)(B). The stay exists precisely because Congress recognized that discovery in cases like this one is expensive and onerous, and that without the PSLRA's protections of an automatic stay and heightened pleading standards, plaintiffs could file suit "abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." *See Tellabs*, 551 U.S. at 313; *see id.* at 320-21 (describing the PSLRA's aim of limiting "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers" (citation omitted)).

For all of the reasons described above, Plaintiffs' actions represent a purposeful end run around these protections: Plaintiffs used falsified allegations to overcome the automatic stay and force Defendants into the very discovery the PSLRA sought to avoid. To reward Plaintiffs for their misconduct with further discovery—scheduled to include numerous depositions and thousands, if not millions, of pages of documents, all at horrendous cost to Defendants—while Defendants' motion is pending would violate the letter and the spirit of the PSLRA and create a perverse incentive for future plaintiffs to do the same. Had Plaintiffs properly complied with their ethical obligations to this Court and spoken the truth of their CWs' allegations in their Complaint, no discovery would have ensued. Now that the truth has come to light, none should follow.

## CONCLUSION

For the foregoing reasons, the Court's ruling on the Motion to Dismiss should be reconsidered; the Amended Complaint should be dismissed with prejudice, along with any further sanction the Court deems appropriate; and discovery should be stayed.

Dated: New York, New York
October 30, 2020

Respectfully submitted,

*/s/ Jonathan D. Polkes*

Jonathan D. Polkes
Caroline H. Zalka
Luna N. Barrington
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

*Counsel for Defendants Sasol Limited, David Edward Constable, Bongani Nqwababa, Stephen Cornell, Paul Victor, and Stephan Schoeman*