# EXHIBIT 2

## (Unredacted Version Filed Under Seal)

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| CHAD LINDSEY MOSHELL, Individually and On Behalf of All Others Similarly Situated, | : : : : | |
| Plaintiff, | : : | Case No. 1:20-cv-01008-JPC |
| v. | : : | Hon. John Peter Cronan |
| SASOL LIMITED, DAVID EDWARD CONSTABLE, BONGANI NQWABABA, STEPHEN CORNELL, PAUL VICTOR, and STEPHAN SCHOEMAN, | : : : : : : | |
| Defendants. | : : | |

**DECLARATION OF** ███████████

███████ hereby declares as follows:

1.      From September 2014 through July 2015, I served as the ███████ ███████ for Sasol's North American Operations. In this capacity, I was responsible for ███████████████ for Sasol's U.S. projects, including the Lake Charles Chemical Project ("LCCP") in Lake Charles, Louisiana.

2.      In the summer of 2020, a private investigator contacted me and told me that she worked on behalf of lawyers who wished to bring a lawsuit against Sasol. I spoke to her briefly on that occasion for approximately 20 minutes. I expressly stated that I did not want to be involved in any litigation concerning Sasol and that she did not have permission to attribute any statements to me in the contemplated lawsuit. Plaintiffs' investigator explicitly told me that I would not be involved in the litigation. After our initial conversation, I continued to receive repeated phone calls from plaintiffs' investigator and I stopped answering the calls. I never spoke with plaintiffs'

1

attorneys and they did nothing to verify with me the accuracy of what is attributed to me in the Second Amended Complaint.

3.    The week of October 5, 2020, a different investigator contacted me, this time on behalf of Sasol.  He made me aware of the fact that plaintiffs had filed a complaint against Sasol. I was surprised and upset to learn that, notwithstanding what I had said, plaintiffs included in their Second Amended Complaint certain statements that they claim I made, attributed to "Confidential Witness 2."

4.    Plaintiffs' attorneys did not provide me with a draft or final version of the Second Amended Complaint before or after it was filed. Plaintiffs' attorneys did not provide me with a summary of the statements purportedly attributed to me before they included them in their Second Amended Complaint. Plaintiffs' attorneys did not inform me that they intended to attribute statements to me, even though I had specifically told the investigator that she did not have my permission to use any statements by me. Plaintiffs' attorneys did not inform me that they intended to use the attributed statements to corroborate statements allegedly made by other confidential witnesses.

5.    I have now had the opportunity to review the statements attributed to me in the Second Amended Complaint.

6.    Specifically, I understand that plaintiffs' attorneys have claimed to attribute the following statements to me:

> 75.  One high-ranking former employee ("CW-2") came on board around the time that the Sasol board authorized its Final Investment Decision of $8.1 billion for LCCP in October 2014, and worked out of Sasol's Houston office. CW-2 left in mid-summer July 2015. CW-2 was responsible for all financial matters for Sasol's U.S. projects, including cost control, budgeting, forecasting, treasury, financial reporting, and tax reporting. As a result, CW-2 had a direct window into LCCP's burgeoning costs, internal control weaknesses, financial reporting, and management knowledge of cost overruns and delays with the LCCP mega project.

CW-2 stated that it was "clear from the beginning" that the mega project was going to cost more than $8.1 billion. CW-2 had direct contact with Defendants Nqwababa, Cornell, and Victor, and on several occasions told each of these Defendants about CW-2's concerns regarding the cost overruns and timeline for completion of the project.

76. In particular, LCCP had subcontracted with two companies for the mega-project, Fluor and Technip FMC, which proved to be a "disaster." According to a Fluor press release, Fluor "provided front-end engineering and design and, in a joint venture with TechnipFMC, served as the primary engineering, procurement and construction management contractor." Fluor and Technip were paid for their time and materials spent on the project, regardless of whether work was completed or not; there was no fixed price set by contract, which meant that both subcontractors had limited risk with respect to actual or timely completion of the project — an arrangement that CW-2 called "unusual."

77. CW-2 efforts to raise concerns with Sasol's executive management in Houston (including Defendants Cornell and Nqwababa), "fell on deaf ears," particularly because the South Africans in management were "very dogmatic" and not open to constructive criticism or change. They exercised absolute control over the project. At the same time, CW-2 stated that Sasol was launching a mega project in a new [sic] for the first time, and doing so in the United States, where Sasol had limited experience. CW-2 ultimately left the company out of frustration with mismanagement and the lack of ability of CW-2 to fulfill CW-2's job responsibilities.

7. These allegations in the Second Amended Complaint were not to be attributed to me.

8. I did not tell plaintiffs' investigator that it was "clear from the beginning" that the LCCP would cost more than $8.1 billion. I was employed at Sasol during the beginning stages of the LCCP and it was too early for me to know whether the project would remain on budget.

9. When I left Sasol in July 2015, the LCCP was both on time and on budget for the $8.9 billion cost estimate based on everything I knew.

10. Similarly, I did not tell plaintiffs' investigator that during my tenure at Sasol, I had a "direct window" into "burgeoning costs, internal control weaknesses, financial reporting, and management knowledge of cost overruns and delays with the LCCP mega project."

3

11.    In the routine course of my role as ███ , I had numerous general conversations with Messrs. Nqwababa, Cornell, and Victor about the potential risks and mitigation strategies for Sasol's North America, including the LCCP.  Contrary to what is alleged in the Second Amended Complaint, however, I did not raise any concerns regarding specific cost overruns or regarding the timeline for completion of the project that I knew or believed rendered the then $8.9 billion estimate or then-current schedule false.

12.    Before leaving Sasol, I had a conversation with Mr. Cornell and Mr. Nqwababa regarding some of my general concerns with the culture at Sasol, however, these concerns were not specifically related to the LCCP. To my knowledge, at the time of my departure, there were no significant deficiencies or material weaknesses related to external financial reporting of the LCCP by Sasol.

13.    Finally, I did find Sasol's contract with Fluor to lack some controls based on my industry experience (because Fluor was compensated based on time and materials rather than achievement of project milestones), however, I did not tell plaintiffs' investigator that the subcontracting relationship with Fluor was a "disaster."

14.    Plaintiffs' attorneys have falsely represented my statements and I submit this declaration to correct the record.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed in ___███████_____, on _October 16_____, 2020.

4