# EXHIBIT 3

## (Unredacted Version Filed Under Seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| CHAD LINDSEY MOSHELL, Individually and On Behalf of All Others Similarly Situated, | : : : : | |
| Plaintiff, | : : | Case No. 1:20-cv-01008-JPC |
| vs. | : : | Hon. John Peter Cronan |
| SASOL LIMITED, DAVID EDWARD CONSTABLE, BONGANI NQWABABA, STEPHEN CORNELL, PAUL VICTOR, and STEPHAN SCHOEMAN, | : : : : : | |
| Defendants. | : : : : | |

**DECLARATION OF** █████████████

█████████████ hereby declares as follows:

1.      From August 2014 through July 2018, I served as a ████████ ██████ at the Lake Charles Chemical Project ("LCCP") in Lake Charles, Louisiana. ████ ████████████████████████████████████████

2.      During my employment on the LCCP, I had two distinct scopes of work. From August 2014 to October 2016, █████████████████████████, ██████ ██████████████. In 2016, █████████████████████ ████████████████████████████████████████████ █████████████████████████████████████████. The LCCP was a massive project and I never worked any jobs other than the two described above.  Nor did I work on the LCCP as a whole in any capacity.

3.      In May 2020, a private investigator contacted me and told me that she worked on behalf of lawyers who wished to bring a lawsuit against Sasol. I spoke to her briefly

1

when she called. I told her I did not want to be involved in any litigation concerning Sasol. After our last conversation, I continued to receive multiple persistent phone calls from plaintiffs' investigator, but I made it clear that I did not want to speak with her. Plaintiffs' investigator never informed me that plaintiffs intended to attribute statements to me in a complaint and I believe I told the investigator that she did not have my permission to do so.

4.    Moreover, plaintiffs' counsel never attempted to contact me in order to discuss any of my statements. Plaintiffs did not provide me with a draft or final version of the Second Amended Complaint before or after it was filed.  Nor did they provide a summary of the statements that I supposedly made at any time.

5.    In October 2020, a different investigator contacted me, this time on behalf of Sasol.  He made me aware of this lawsuit and—for the first time—the fact that plaintiffs had filed a Second Amended Complaint against Sasol. I was concerned to learn that notwithstanding what I had said, and the fact that I had never had a conversation with plaintiffs' counsel, plaintiffs included in their Second Amended Complaint certain statements that they claim I made, describing me as "Confidential Witness 4."

6.    I have now had the opportunity to review the Second Amended Complaint. As I describe below, I did not make these statements as quoted, and they are an inaccurate representation of my conversations with plaintiffs' investigator.

7.    Specifically, I understand that plaintiffs have claimed that I made the following statements:

> 85.    According to CW-4, from the moment CW-4 started working at Sasol in summer 2014, he/she saw that the LCCP project was behind schedule, and saw that both the initial $8.9 billion cost estimate and the revised $11.1 billion cost estimate, both presented to shareholders and investors, were too low. Based on CW-4's calculations of the cost and reported progress made to date (which CW-4

conducted in part after CW-4 left Sasol), CW-4 believed that Defendant Cornell was aware of the construction delays and the too-low cost estimates.

86.     According to CW-4, Sasol's accounting for LCCP "stinks to high heaven." As CW-4 described it, "They [management] clearly did not disclose the real health of the project forecasting and scheduling from the people who were paid to do that, which was me. They didn't disclose it to the market. We gave them indications very early on." CW-4 provided the following example of accounting irregularities: an accounting gimmick that Sarbanes-Oxley outlawed is the practice of reducing on the books the value of work already performed in order to improve earnings reports. One of the five individuals to whom CW-4 reported instructed him to "reduce the value of work done." CW-4 stated, "I'm not gonna do that; I don't want to share a jail cell with you." CW-4 stated the five individuals referenced above "took my cost reports, rolled them up and added in unsubstantiated accrual." This means that CW-4 was asked to lower the value of work done by reducing the amount of accrued liabilities (expenses that have been incurred but not yet paid; not including expenses owed reduces the apparent cost of a project). In effect, he said that Sasol was "double counting.' This practice – which CW-4 said David Constable knew about – continued over a period of months in 2016.

87.   CW-4's colleagues were also suspicious of the accounting, and some control managers would not sign the reports created by the five individuals referenced above. At one point, CW-4 was in a meeting with other cost control managers, and they all told management "you may as well fire us and hire a graphics designer or artist who can paint the picture you want to see.  They [management] hear it [our message] clearly."

88.     There were other accounting irregularities as well. For example, the LCCP project stipulated $36 million of negative value for Fluor "self-performing construction" (which means that Fluor would perform the work on its own).  But this was "ridiculous", CW-4 said, because "Fluor was never going to be performing self-construction on this job"; as CW-4 told senior management, the contracts for the work Fluor was allegedly going to self-perform was already contracted out to other third parties.  CW-4 noted that there was a $55 million negative number on the books for "management negotiated savings" which should not have been there.

89.     From the first moment CW-4 began working at Sasol (shortly before LCCP was officially launched), CW-4 saw that the LCCP project was behind schedule. According to CW-4, the initial $8.9 billion estimate was "ridiculously low", and the revised $11.1 billion estimate was too low as well. CW-4 believed that Defendant Cornell knew about the construction delays and knew the cost estimates were too low, but Defendant Cornell was incentivized to push the project to completion:  all of the South African executives with Sasol shares stood to benefit from any boosts to Sasol's stock price. CW-4 believed that Defendant Nqwababa – who was ultimately fired in October 2019 – "knew nothing about executing projects."

90.    One example of Defendant Cornell's knowledge was the massive rainfall that hit Lake Charles in late 2018, which was twice the annual norm. This rainfall had a substantial negative impact on productivity. Nevertheless, Defendant Cornell told investors in November 2018 that the project was on track, when it was clear it was not.

91.    In June 2016, after Sasol publicly revised the cost estimate up to $11.1 billion, it brought over executives from South Africa to work on the LCCP project and supposedly get it on track. But these executives "had no idea how to administer contracts in the U.S…. they were the wrong people to run it." CW-4 said these executives were not well regarded or liked, in either a professional or personal sense, by their American counterparts.

92.    CW-4 further corroborated CW-1's statements about how the use of a high contingency late in the project reflects cost overruns and delays in the project.  As CW-4 explains it, how could you have $300 million of contingency on 8 percent of the work to go? It's mindblowing, so much contingency."

93.    Overall, CW-4 believed that Sasol executives would go to any lengths to keep up the appearance of LCCP being on track because they wanted to cash in on their Sasol shares.

132.    CW-4 stated that CW-4 believed that Defendant Cornell knew the $8.9 billion budget, and even the $11.1 billion budget, was too low, but neither Cornell nor anyone else at senior management disclosed this fact.

8.    Although I do not recall the exact conversation that I had with plaintiffs' investigator, many of the allegations attributed to me are fundamentally false or presented in a misleading manner.  Although I do recall stating my opinion that the pipe installation man-hours on the Ziegler Expansion Project were too low when I received the Ziegler estimate, that was only a small portion of the overall $8.9 billion estimate for the LCCP.  At no time did I examine the entire $8.9 billion dollar estimate to conclude that the overall estimate was too low.  It was not my responsibility to do so.

9.    Similarly, ███████████████████████████ in 2016, this was one aspect of the overall LCCP estimate.  Although I thought portions of the UO&I estimate appeared aggressive when I received that discrete portion of the overall $11.1 billion estimate, I did not form any opinion as to whether the many other pieces of the LCCP budget were aggressive or not.  I do

4

not have any personal basis to think or give the opinion that the $11.1 billion estimate for the overall project was too low, as is attributed to me in the Second Amended Complaint.

10.     With respect to the additional allegations in paragraph 85, I do not believe that I told the plaintiffs' investigator that I calculated cost estimates after my employment ended, nor would such a statement even make sense. I only had the ability to forecast costs during the term of my employment, and even then only for the ▮▮▮▮▮▮▮▮▮ units when I worked at each project respectively, as opposed to the overall LCCP project. I did not have access to project information after I left the LCCP in July 2018.

11.     With respect to the allegations in paragraph 86, I did not tell the plaintiffs' investigator that Sasol's accounting for LCCP "stinks to high heaven." This is not a phrase that I would use. Furthermore, my role was in project controls, not accounting, which was an entirely different function. During my time as a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮, I do recall forecasting the engineering costs to exceed budget, and those forecasts were included in the ▮▮▮▮▮▮▮ of the $11.1 billion estimate which, in turn, was disclosed to the market.  Likewise, during my time as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, I forecasted costs exceeding budget, but it is my understanding that Sasol also disclosed increases in the cost of the LCCP to the market.

12.     While I do recall telling the plaintiffs' investigator that I was told to reduce the value of work done in the UO&I accrual submission form as part of the official cost report in either late Q1 2018 or early to mid Q2 2018, I also told the plaintiffs' investigator that I refused to do so.  I recalled making a comment to my supervisor that "I don't want to share a jail cell with [him]," and the report I ultimately submitted was accurate and based on my calculations. As for the allegation that Sasol was "double-counting," I do not understand what this allegation means,

5

do not understand the context behind it, and do not believe I ever said it in regards to the context of the allegation.

13.    With respect to the allegations in paragraph 87, I did not state that "some control managers would not sign the reports." This statement is false because project control managers signed their respective cost reports, and did not review and approve the rolled up report. I also do not recall stating that my colleagues were suspicious of the reporting but I do recall calling my counterparts to state my position about not reducing the value of the work done and recommended that they not do so if told.

14.    The statement in paragraph 87 that "you may as well fire us and hire a graphics designer" is also inaccurate and misleading as it is presented in the Second Amended Complaint. While I recall the statement, I do not remember the context of the meeting in which the statement was made and whether it was related to cost, schedule, risk management or some other component.

15.    In various places, plaintiffs state that I believe what Mr. Cornell or Mr. Constable knew. Since Sasol disclosed to the market that schedule delays and cost over-runs were forecasted, I can only assume that Mr. Constable and Mr. Cornell knew about the delays. However, I had no personal interactions with Mr. Cornell or Mr. Constable, and do not have any personal knowledge regarding what they knew or did not know. I had no direct insight into any information provided to either Mr. Cornell or Mr. Constable.

16.    In this regard, several statements attributed to me are false. For example, paragraph 90 states that Defendant Cornell knew of massive rainfall in Lake Charles in late 2018. I left the project in July 2018 and did not track the rainfall in Louisiana after leaving the LCCP. Similarly, while I stated that "Defendant Cornell told investors in November 2018 that the project

6

was on track," I did not say that "it was clear it was not." I left Sasol in July 2018 and did not have the basis to assert whether the project was on track in November 2018.

17.    With respect to the allegation in paragraph 92 that "CW-4 further corroborated CW-1's statements about how the use of a high contingency late in the project reflects cost overruns and delays in the project," that is not true. I do not agree that applying a high contingency late in the project reflects cost overruns and delays in the project so I do not attest to corroborating CW-1's inaccurate statement.

18.    With respect to the allegation in paragraph 89, I do recall making the statement that Bongani "knew nothing about executing projects," but that was purely speculation because I understood Nqwababa to come from a heavy finance background.

19.    Finally, the statement in the Second Amended Complaint that I "believed that Sasol executives would go to any lengths to keep up the appearance of LCCP being on track because they wanted to cash in on their Sasol shares" misrepresents my conversation with plaintiffs' investigator. The phrase "go to any length" is not a phrase I would use, and I am not aware of the quantity of, or if Sasol executives had Sasol stock.

20.    Plaintiffs have misrepresented the allegations attributed to me, and I submit this declaration to correct the record.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed in ▮▮▮▮▮▮▮▮, on October 29, 2020.

7