# EXHIBIT 4

## (Unredacted Version Filed Under Seal)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| CHAD LINDSEY MOSHELL, Individually and On Behalf of All Others Similarly Situated, | : : : : | |
| Plaintiff, | : : | Case No. 1:20-cv-01008-JPC |
| vs. | : : | Hon. John Peter Cronan |
| SASOL LIMITED, DAVID EDWARD CONSTABLE, BONGANI NQWABABA, STEPHEN CORNELL, PAUL VICTOR, and STEPHAN SCHOEMAN, | : : : : : | |
| Defendants. | : : : : | |

**DECLARATION OF** ███████████

███████████████ hereby declares as follows:

1.    From April 2013 through October 2015, I served as the ███████ ███████████████ at Sasol. In this capacity, I worked on the Lake Charles Chemical Project ("LCCP") in Lake Charles, Louisiana, ███████████████ ███████████████.

2.    On May 5, 2020, a private investigator contacted me and told me that she worked on behalf of lawyers who wished to bring a lawsuit against Sasol. I spoke to her briefly on that occasion for approximately 20 minutes. I expressly stated that I did not want to be involved in any litigation concerning Sasol and that she did not have permission to attribute any statements to me. Plaintiffs' investigator said that that she was simply seeking background information on Sasol and the LCCP. At no time did plaintiffs' investigator inform me that plaintiffs intended to attribute statements to me in a federal complaint.

1

3.      The last time I spoke with plaintiffs' investigator was on June 1, 2020. Plaintiffs' investigator was joined by an attorney on this call. The call lasted less than five minutes, during which I reiterated that I did not want to be involved in any litigation concerning Sasol and then hung up.

4.      Notwithstanding this, I continued to receive harassing phone calls and text messages from plaintiffs' investigator and was forced to block her phone number to make the contact stop.

5.      Last week, a different investigator contacted me, this time on behalf of Sasol.  He made me aware of this lawsuit and – for the first time – the fact that plaintiffs had filed a complaint against Sasol. I was alarmed to learn that, notwithstanding what I had said, plaintiffs included in their Second Amended Complaint certain statements that they claim I made, attributed to "Confidential Witness 5."

6.      Plaintiffs did not provide me with a draft or final version of the Second Amended Complaint before or after it was filed. Plaintiffs did not provide me with a summary of the statements purportedly attributed to me before they included them in their Second Amended Complaint. Plaintiffs did not inform me that they intended to attribute statements to me, even though I had specifically and repeatedly told the investigator that she did not have my permission to use any statements by me. Plaintiffs did not inform me that they intended to use my falsely attributed statements to corroborate those allegedly made by other confidential witnesses.

7.      I have now had the opportunity to review the description of statements attributed to me in the Second Amended Complaint. To be clear, plaintiffs have falsely represented—in every critical respect—what I told their investigator and what I believe.

8.    Specifically, I understand that plaintiffs have claimed to attribute some statements to me in the following paragraphs:

> 94.    A fifth individual (CW-5) provides yet more corroboration of the accounts of CW-1, -2, -3, and -4. At Sasol, CW-5 worked as a risk assessor for the LCCP project, starting before the Class Period and leaving in the fall of 2015. In 2015, CW-5 believed that the project was "on budget" – but CW-5 said "on budget" throughout 2015 means the $11 billion budget, which Sasol did not disclose to shareholders until June 2016. "I would never put down that it was an $8 billion project. Absolutely when I was there, we were talking $11 billion." (This statement is corroborated by CW-1's account of a February 2016 change order reflecting LCCP's costs were $11.7 billion.) CW-5 agreed with the characterization that the $8.9 billion cost estimate was "ridiculously low," particularly because the estimates from Fluor and Technip were higher than that. The $11 billion cost estimate from the beginning was "socialized" among senior management — meaning that it was an estimate that was widely promulgated as the truth from upper management; "whatever the board saw was a really low number." CW-5 knew this because C-5 heard everyone talking about that number. In light of his role on the GEC, CS-5 said, Defendant Cornell would have been "100% informed and involved" with issues concerning contracting, cost overruns, and construction delays. CW-5 stated that Defendant Cornell would have been the "ultimate arbiter" of costs, meaning that Cornell knew about the cost issues and made the decisions about costs. Cornell "became the main person steering the project. He was the ultimate decision maker" when CW-5 was on the project. CW-5 believes that there is a third party case study on LCCP as a model of what not to do.

> 132.    CW-5 stated that Defendant Cornell would have been "100% informed and involved with issues concerning cost overruns and construction delays," including the fact that the $8.9 billion budget was disclosed, but this fact was not disclosed to investors.

9.    These allegations in the Second Amended Complaint are categorically false.

10.    I did not tell plaintiffs' investigator that "we were talking $11 billion" in connection with the LCCP cost estimate during the time that I was employed at Sasol. Indeed, I told the plaintiffs' investigator the *exact opposite*. During one conversation, plaintiffs' investigator repeatedly suggested to me that the LCCP budget had reached $11 billion while I was still employed with Sasol. The investigator urged me to say that I was aware

of an $11 billion cost estimate because my LinkedIn profile noted that I had worked on an $11 billion project at Sasol.

11. I expressly rejected this theory outright. I told plaintiffs' investigator that my LinkedIn profile was intended to document and quantify that I worked on complex multi-billion dollar projects, and my profile had previously reflected a lower dollar amount consistent with Sasol's public declarations about the project costs. This reference to an "$11 billion project" was only added to my LinkedIn profile following Sasol's public increase of the LCCP cost estimate to that level, and I was clear with the investigator that I had *no knowledge* that the company considered the LCCP to be an "$11 billion project" while I was at Sasol.

12. In fact, I told plaintiffs' investigator that when I left my employment at Sasol, the LCCP *was on budget for the initial $8.9 billion cost estimate based on everything I knew*. Thus every critical aspect of paragraph 94 of the Second Amended Complaint is false.

13. In terms of Mr. Cornell, I merely described what I understood his role to be as one of the primary persons in senior management who oversaw the project. I certainly never said, and have no basis to believe, that while I was at Sasol, Stephen Cornell "knew" that the project would ultimately cost $11 billion.

14. Plaintiffs have falsely represented my statements, and I submit this declaration to correct the record.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed in _____, on __October 22__. 2020.