# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHAD LINDSEY MOSHELL, Individually and On Behalf of All Others Similarly Situated,<br><br>　　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>SASOL LIMITED, DAVID EDWARD CONSTABLE, BONGANI NQWABABA, STEPHEN CORNELL, PAUL VICTOR, and STEPHAN SCHOEMAN,<br><br>　　　　　　　　　Defendants. | Case No. 1:20-cv-01008-JPC<br><br>Hon. John Peter Cronan |

## DECLARATION OF LISTER NIEMAND

Lister Niemand hereby declares as follows:

1.　　Currently I am Senior Manager for Capital Procurement, at the Lake Charles Chemical Project. My employer is Sasol Limited ("Sasol").

2.　　I first joined Sasol in March 2012 as the Senior Manager SC: Mega Projects for Sasol Mining. I then served as the Senior Manager International: Technology & Capital Project Contracting from October 2014 to May 2016. From June 2016 to April 2018, I worked on the Lake Charles Chemical Project ("LCCP") as the Project Controls Lead.

3.　　I have been aware of and involved with the LCCP beginning in June 2014 while Sasol was working toward a Final Investment Decision ("FID") on the project. I became more fully involved in the project beginning in November 2015.

4.　　I have seen and reviewed a copy of the CW allegations contained in the Second Amended Complaint ("SAC") filed in the above-captioned matter. In particular, I have read the statements in paragraphs 64 through 74, which purport to be allegations made by

Confidential Witness 1 ("CW-1"). CW-1 claims to have "served as a senior engineer for the LCCP project from early fall 2015 to mid-summer July 2016, and worked as a subcontractor for Fluor[1], the main subcontractor on the project." SAC ¶ 64. CW-1 primarily alleges that "in February 2016, Fluor submitted a Change Order for $11.7 billion for the LCCP project . . . ." SAC ¶ 65. CW-1 describes the Change Order as "a formal notice by a contractor to its client that a project's initial, approved budget has been exhausted and that more money is needed to continue work." SAC ¶ 65. CW-1 also alleges that "[t]here was no basis for Sasol to renegotiate or bargain down the price . . ." and Sasol "was not in a position to reject the Change Order, but instead was contractually obligated to pay that amount [$11.7 billion] as it came due." SAC ¶ 66.

5.    As someone who has worked at Sasol for more than eight years and who has been intimately involved in the cost and schedule of the LCCP since 2015, including during the period that CW-1 allegedly worked on the project, I can state that CW-1's statements are utterly confused. The confusion runs the gamut from fundamental misrepresentations of the roles of the various players on the project to outright falsehoods. Most fundamentally, the notion that Fluor presented Sasol with a supposedly binding $11.7 billion Change Order in February 2016, simply does not align with the contractual relationship of the parties.

6.    First, even assuming it was contractually possible, (which as I describe below, it was not) a mandatory, almost $3 billion cost increase, made unilaterally by Fluor on Sasol would have been a dramatic event that would have resulted in massive repercussions within Sasol and between Sasol and Fluor. If such an event happened, I would have known about it. In my role as Senior Manager International: Technology & Capital Project Contracting, I had direct

---

[1] All references to "Fluor" or "FTI" refer to the engineering, procurement and construction management contractor for the LCCP, including Fluor Enterprises, Inc. Technip USA, Inc., and the Fluor-Technip joint venture.

insight into the cost and budget issues related to the LCCP in February 2016 while conducting a review of the LCCP cost and schedule with external consultants. I can say categorically that I have never seen a document that Fluor submitted to Sasol which imposed a mandatory cost increase of $11.7 billion in February 2016, whether through a "Change Order" or otherwise. To confirm my recollection, I reviewed the records on the project from in and around February 2016, including contractual correspondence between Sasol and FTI, and can state that I did not find any such "Change Order."

7. Second, and more fundamentally, the Change Order could never have existed in the way CW-1 describes it given the structure of the Engineering, Procurement and Construction Management Agreement ("EPCM Agreement") entered into by Sasol and FTI, and the nature of the parties' relationship. FTI was the Engineering, Procurement and Construction Manager ("EPCM") for the LCCP, and was therefore responsible for conducting due diligence on the budgets submitted by the contractors and sub-contractors working on the project to monitor and ensure that the project remained in budget and on schedule. *FTI only billed Sasol for its own EPCM services.* The contractors and subcontractors would send their invoices through FTI for review and sign off by FTI and Sasol. In other words, once FTI reviewed and approved the invoice, FTI would then send the invoice to Sasol for final sign off. Upon final review, Sasol would release the necessary funds for payment through the project bank account to FTI, who would then remit the specific payment through its own Enterprise Resource Planning system to the appropriate contractor or subcontractor. Accordingly, CW-1's claim that FTI submitted a "binding" Change Order to Sasol that unilaterally increased the cost of the LCCP to $11.7 billion is not aligned with the contractual relationship of the parties and demonstrates a fundamental misunderstanding of FTI's role with respect to the LCCP. FTI cannot issue a binding change order that unilaterally

3

raises the price of a project. FTI had no power or authority to impose costs on Sasol, or to unilaterally bill Sasol, for any services other than its own. It could not and did not ever have authority to impose costs on Sasol for work done by any contractor or subcontractor.

8.    Further, CW-1's allegation that the Change Order was a binding, non-negotiable bill to Sasol for the actual cost of the project, and that Fluor even had the ability to do such a thing, is absurd in light of the EPCM Agreement. Under the EPCM Agreement, a contractor or subcontractor may submit a change order request through FTI acting in its role as EPCM. However, the change orders are not bills, nor are they binding, nor do they become automatically binding. Rather, the change order requests typically contained revised estimates of the time needed to complete a project and the new estimated cost, and were often heavily negotiated before they were either ultimately rejected or approved by Sasol. While there are a small handful of occasions in which work was completed before Sasol formally approved the change order request, those instances are rare and Sasol typically approved or rejected the change order request before any work was commenced.

9.    On the LCCP, there were thousands of change order requests submitted where a contractor or subcontractor wished to change the scope or cost of a previously-agreed upon component of the contract. But as set forth above, these proposed change order requests were heavily negotiated between the parties and far from being automatically accepted, Sasol had the option to reject a change order request. Moreover, each contractor or subcontractor could submit a change order request only for their particular contract. These change order requests would go to FTI as EPCM and were reviewed with Sasol. FTI might agree or disagree as to the reasonableness of the proposed contractor change order, but under no set of circumstances could Fluor submit a change order to Sasol for the project as a whole, let alone one that serves as a

4

binding revision of the overall cost.  Accordingly, there could have never been a Change Order submitted by Fluor that would have unilaterally increased the costs for the LCCP to $11.7 billion and been binding on Sasol under the terms of the EPCM Agreement.

10.    The third reason that CW-1's account of the Change Order does not align with the contractual relationship of the parties, is that Sasol's contract with FTI and the majority of other contractors on the LCCP, were cost reimbursable contracts.  All LCCP budget estimates were based on a reasonable estimate of the amount of hours, the rates per hour for the type of work to be performed, and the corresponding costs, such as materials and equipment associated with those estimates.  The estimates were based on prior work hours, and were forecasted based on the trends of the preceding months.  The contracts allowed Sasol to periodically review the scope of work which, in turn, allowed Sasol to identify any contractors that were underperforming and to move the scope of work to another contractor if necessary.  Once a contractor submitted their proposal, the hours, rates, crew mixes (the mix of people assigned to a particular scope), and subsequent budget were all subject to negotiation among FTI, the contractor and Sasol. Accordingly, CW-1's characterization of the alleged Change Order as a unilateral bill from Fluor for $11.7 billion shows a fundamental misunderstanding of reimbursable contracts and the nature of the billing procedures for the LCCP.

11.    I can state authoritatively and absolutely that, based on my direct experience and review of the documents, CW-1's description of an alleged Change Order as it relates to the LCCP does not align with the contractual relationship of the parties.  The allegations made by CW-1 are made with utter disregard and ignorance of the facts.

5

I declare under the penalty of perjury that the foregoing is true and correct.

Executed in _BEAUFORT_____, on _October 29_____, 2020.

_____
Lister Niemand

6