KBACMOSC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  MOSHELL,

4              Plaintiff,

5        v.                        20CV1008(JPC)
                                   Telephone Conference
6  SASOL LIMITED, et al.,

7              Defendants.

8  ------------------------------x
                                   New York, N.Y.
9                                  November 10, 2020
                                   4:02 p.m.
10
   Before:
11
                    HON. JOHN P. CRONAN,
12
                                   District Judge
13
                         APPEARANCES
14
   HAGENS BERMAN SOBOL SHAPIRO LLP
15      Attorneys for Plaintiff
   BY:  LUCAS E. GILMORE
16
   WEIL GOTSHAL & MANGES LLP
17      Attorneys for Defendants
   BY:  JONATHAN D. POLKES
18
   HACH ROSE SCHIRRIPA & CHEVERIE LLP
19      Attorneys for Movant
   BY:  FRANK R. SCHIRRIPA
20

21

22

23

24

25

KBACMOSC

1          (The Court and all parties appearing telephonically)

2          (Case Called)

3          MR. BERMAN:  Good afternoon, your Honor.  This is

4    Steve Berman for the plaintiffs.  With me is Lucas Gilmore from

5    my firm.

6          THE COURT:  This is Judge Cronan.

7          Who do we have for the defendants?

8          MR. POLKES:  Your Honor, this is Jonathan Polkes from

9    Weil Gotshal for all of the defendants.  I'm with my partner,

10   Caroline Zalka.

11         THE COURT:  Good afternoon, Mr. Polkes and Ms. Zalka.

12         Let me start with Mr. Berman or Mr. Gilmore.

13         As the parties know, this case was reassigned to me

14   from Judge Rakoff, probably about a month and a half ago or so.

15   I've reviewed the materials, including the most recent

16   submissions from the defendants pertaining to the motion for

17   reconsideration, sanctions, and the confidential witnesses.

18         Mr. Berman or Mr. Gilmore, I want to give you the

19   chance to respond to the issue with respect to the three

20   confidential witnesses who have submitted declarations.  Those

21   declarations are rather troubling, given what the allegations

22   were in the complaint.

23         Do you still stand by the allegations in the

24   complaint?

25         MR. GILMORE:  Your Honor, this is Lucas Gilmore.

KBACMOSC

1        The answer is, absolutely.  We intend to file an

2   opposition on Friday, and we want to be heard and briefed.

3        I want to highlight the three major points and preview

4   for the Court that we're going to make.

5        The first is that this motion, including the new

6   affidavits, has absolutely no merit.  The complaint accurately

7   alleges these three CWs' accounts, and all of the CW accounts.

8   There have been no fabrications, no exaggerations, period, and

9   we'll submit evidence to the Court proving this.

10        We have a trail of communications that our

11   investigator, a seasoned professional, had with each of these

12   confidential witnesses, that are going to show that the

13   confidential witnesses were cooperating.

14        The three recanting CWs' affidavits, which were

15   carefully crafted by defense counsel, are verifiably wrong.

16   They testify in their affidavits that they only spoke once to

17   our investigator for approximately 20 minutes.  We're going to

18   produce the phone records showing that that's verifiably false.

19   They spoke multiple times, on some occasions for hours on end,

20   and they weren't talking about the weather.  They were talking

21   about Sasol's fraud, which was corroborated through a variety

22   of other sources that the investigator documented every

23   conversation with contemporary notes and memos that our firm

24   was actively involved in directing the investigation.

25        However, each of the three confidential witnesses, now

KBACMOSC

represented by defense counsel, had expressed concerns about

their identity being learned by their former employer, Sasol,

and learning of their cooperation, but we told them that we

could not guarantee their confidentiality based off the state

of the law.

Two of the witnesses then asked to be compensated in

exchange for essentially blowing the whistle on their former

employer.  When we told those two witnesses that we could not

do that, the witnesses realized that there was no financial

upside for them and stopped cooperating.

The third witness, one of our attorneys expressly

spoke to that witness, confirmed that the witness had spoken

with our investigator, but when the witness asked again about

whether his or her identity would be learned, and whether we

could prevent him from being subpoenaed in the case, we told

him we could not, then his cooperation was lost.

So, we're also going to show -- we're going to have

text messages that are going to be presented in which one of

the witnesses actually refers to himself as a whistleblower.

So, I think, with this powerful evidence that's going

to be before the Court, the Court is going to come to the

conclusion that there was no attorney inaccuracy, fabrication,

or exaggeration, but rather that the witnesses' recent change

of heart has to do with pressure and coercion exerted by their

former employer, Sasol.

KBACMOSC

1          But, I do want to highlight a couple of other points.

2          The first is, both motions are procedurally defective

3     and brought for an improper purpose.  The defendants have

4     brought this motion under Rule 11.  It's very clear, under Rule

5     11(c), there is a notice period, it's called the safe harbor,

6     they didn't follow that, they didn't provide us notice of their

7     motion, they immediately filed it; they violated Rule 11.

8          They also violated Rule 12.  They have submitted

9     additional extrinsic evidence on a purported pleading motion

10    converting this into a summary judgment motion.

11         Moreover, they violated local Rule 6.3, which deals

12    with reconsiderations and says that you cannot submit

13    affidavits without Court approval.

14         They did all of this because it's part of a common

15    litigation strategy that the defendants have employed from the

16    outset.  They want to isolate and adjudicate the credibility of

17    the confidential witnesses' accounts.  The problem with that,

18    as Judge Rakoff made very clear in denying that multiple times

19    is, you cannot isolate the CW accounts from the additional

20    evidence, very strong evidence, what Judge Rakoff said, of

21    their fraud.  You have to look at it holistically.

22         So, we're not going to phase discovery or adjudicate a

23    single issue, but rather, we need to put a complete record

24    before the Court.

25         And then, lastly, Mr. Schirripa is here.  He

KBACMOSC

represents the remaining CWs.  They're going to submit

affidavits showing that our accounts were -- each and every one

of their allegations are entirely accurate.  It will also point

out, in our opposition, that in the affidavits from these

witnesses, even still, they're not denying key, core

allegations that we attribute to them that they said, including

cost overruns, Sarbanes-Oxley violations, at the direction of

Sasol managers.

So, even if the Court were to consider this, quote,

new evidence, which is improper, the Court would still come to

the same conclusion, that the motion to dismiss should be

denied and that we should proceed for trial.

THE COURT:  This is Judge Cronan.

Mr. Gilmore, will you also be addressing the issue of

the change order and, essentially, the declaration from, I

believe, McNulty, and I believe the other witness, as well,

whose name is escaping me, that the change order could not have

existed in the way that it is presented in the complaint?

MR. GILMORE:  Well, your Honor, we'll address that

through submitting a declaration by CW1, who says that -- who

confirms the existence of that change order, and then we're

going to -- we take major issue with these affidavits.  Again,

they're offered on a purported pleading motion, which is

extrinsic evidence outside of the complaint, so it's converted

to a summary judgment motion.

KBACMOSC

1          You have one individual, a Sasol representative who is

2    testifying as to the existence of a contract, making legal

3    conclusions of how it should be interpreted, but they haven't

4    even produced that contract to us or any of the contractual

5    communications.

6          You also have the Sasol-representative claim that

7    there is a lack of existence of this floor order based on his

8    review of records pertaining to the LCCP, but they admittedly

9    haven't produced the records that he is reviewing.

10         Lastly, the Sasol representative who offered the

11   declaration was not even identified on defendant's Rule 26

12   disclosures as having relevant information, and he was not

13   identified as the person from the CW who would have received

14   the floor change order.

15         So, one, it's completely improper on a pleading motion

16   to submit this extrinsic evidence.  Two, this is converted into

17   a summary judgment motion under the existing case management

18   plan.  That summary judgment motion is supposed to be

19   adjudicated after full discovery.  We're confident, after we

20   get that full discovery, that we will submit evidence

21   supporting defendant's knowledge that the costs were far

22   greater than what was represented to investors.

23         THE COURT:  This is Judge Cronan.

24         Thank you, Mr. Gilmore.

25         I apologize, I just briefly dropped off, but it was

KBACMOSC

1    not before I think you finished speaking, so I captured

2    everything that you said.

3            Mr. Polkes, can I ask you why a motion for

4    reconsideration is the proper posture here for some of the

5    reasons that Mr. Gilmore mentioned?  Wouldn't this be more of a

6    motion for summary judgment, given the nature of the

7    allegations you're making here?

8            MR. POLKES:  The answer to that is no, your Honor.

9    And thank you for giving me this opportunity.  And I would like

10   to respond to what you just heard, which was completely outside

11   the law with regard to this area.

12           Your Honor, one thing you didn't hear just now is a

13   reputation of the critical issue here, which is, did

14   plaintiff's counsel or didn't they advise these confidential

15   witnesses that their statements would be used in connection

16   with litigation?  Did they get their consent to it?  And did

17   they, the plaintiff's lawyers themselves, show a draft of the

18   attributions that were to be made to them in the complaint to

19   the witnesses in advance?

20           Our witnesses say, the three whose declarations you

21   saw, that the answer to every one of those questions is no.

22   And very, very conspicuously, I was listening for it, you did

23   not hear a denial of that once in that flurry of words that you

24   just heard from plaintiff's counsel.  If plaintiff's counsel

25   had shown a draft of the statements, a draft of the complaint

KBACMOSC

1    to the witnesses, we would not be here right now.

2              I want to direct your Honor to two cases.  One is

3    Millennial Media, which was written by Judge Engelmayer, and

4    the other is the Boeing case, which comes from the Seventh

5    Circuit; both were in our brief.  Your Honor should, you know,

6    we can send them, but obviously, your Honor's clerk can find

7    them.

8              THE COURT:  Sure.

9              MR. POLKES:  They both made a critical point, which I

10   want to make now.  The critical point is this, that it is

11   unseemly and inappropriate and outside the law to do exactly

12   what plaintiff's counsel are doing now, which is to get into a

13   fight as to where the CW is telling the truth before to our

14   investigator, or after, in other words, is what they're saying

15   now -- in their declarations, in their post-motion-to-dismiss

16   declarations -- true or false and put them on trial.  That is

17   exactly what you are not allowed to do and not supposed to do.

18             Both cases emphasize -- and Judge Engelmayer called it

19   a matter of basic human decency -- did plaintiff's counsel show

20   a draft of what the statements were to the CWs in advance or

21   not?  If they did not, they're in violation of Rule 11.

22             Rule 11(b) says, and it's called, importantly,

23   representations to the Court -- this is serious stuff.  And it

24   says, by presenting to the Court a pleading -- which is what

25   you have here and I'm skipping ahead -- an attorney certifies

KBACMOSC

1    that, to the best of the person's knowledge, information and

2    belief formed after an inquiry reasonable under the

3    circumstances.  That's what it says.  What Judge Engelmayer

4    says is, an inquiry reasonable and under the circumstances here

5    must mean -- must mean -- that plaintiff's counsel showed a

6    draft of the statements to the witnesses in advance.

7          And I am asking plaintiff's counsel right now, in

8    front of your Honor, they know the answer to this question and

9    they went through a lot of words and never said the answer, did

10   they or didn't they show a draft in advance to these people, or

11   were these people ambushed?

12         When we went to them, they didn't even know there was

13   a complaint.  They learned of the complaint for the first time

14   from us.  They saw it for the first time when we showed it to

15   them.  They were appalled, and you see all that in their sworn

16   statement.

17         So, notwithstanding all the verbiage that we just

18   heard, the whole concept of treating this like it's sort of a

19   game and saying, oh, no, no, no, it's the defendants that are

20   doing the wrong thing, it's exactly what you're not supposed to

21   do.  This is a serious matter of integrity.  Unless they can

22   testify right now or tell the Court right now, or challenge

23   whether or not they showed a draft of these statements in

24   advance, they are in violation of Rule 11.

25         And to answer your Honor's question very specifically,

KBACMOSC

1    under those circumstances, the right thing to do is dismiss the

2    complaint immediately, as a matter of Rule 11, as a matter of

3    fundamental integrity of the Court, and as a matter of

4    plaintiffs having overcome the PSLRA heightened pleading

5    standard by basically making stuff up.

6         Now, whether or not they want to show that they have a

7    text chain from their private investigator, none of that is

8    relevant, unless they can tell your Honor right now that they

9    showed a draft to the CWs, because we should not be in these

10   circumstances.

11        You know, the plaintiff just said, oh, this is

12   something the defense bar does; it's exactly the opposite,

13   that's not true.

14        What happened and what Judge Engelmayer says in

15   Millennial Media, that there is a growing and disturbing trend

16   in the plaintiff's bar of using CW attributions loosely.  The

17   reason for that, and the reason this is so, just, important is

18   the PSLRA, the Securities Litigation Reform Act, imposed

19   heightened pleading standards.  It made it harder for

20   plaintiffs to bring these cases, and congress did it on

21   purpose.  Congress did it because congress acknowledged, the

22   Supreme Court said it and we all sort of know this, that as

23   soon as plaintiff's lawyers get over a motion to dismiss and

24   can get a defendant in their discovery clutches, the case has

25   massive settlement value.  The numbers are so high, discovery

KBACMOSC

is so expensive that they basically extort a settlement, and because of that practical problem, congress imposed heightened requirements on plaintiffs wishing to get through to discovery.

In order to satisfy the heightened pleading requirement, the heightened scienter requirement, it has basically created, virtually, a necessity for plaintiffs to include confidential witness testimony.  That's the only way they're able to get through to discovery.  If plaintiffs are allowed to simply make things up and then get into a spitting match with regards to, well, the CW really was saying it's true before and they were coerced into changing their testimony, then the protections of the PSLRA become meaningless.

And in that regard, I want to emphasize two things, your Honor, that we haven't talked about yet today, and that is the overt efforts by plaintiff's counsel to prevent us from finding out what we have shown you now and getting it before the Court.  They are transparent and they show that this was part of, I submit, it appears to be, there is a prima facie case that this was all extremely deliberate.

Let me start with the first of the two incidents I want to call to your Honor's attention.

As soon as the motion to dismiss was granted, virtually, the first thing we did was, we said, tell us who your CWs are.  In the Southern District, your Honor, that is about as normal as saying what's the weather.  It's the first

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

KBACMOSC

1   thing every defendant does when they've lost the motion to

2   dismiss and it is always routinely provided by plaintiffs.  In

3   this case, and we thought it was bizarre, at first they said

4   they would do it with their 26.1 disclosure, but when we got

5   their 26.1 disclosure, we got 17 names and we couldn't tell who

6   the CWs were.  So then we said, okay, tell us who they are and

7   they said, no; they did a flip-flop.  We said, well, you have

8   to, and they said, we're not going to tell you.  This is all in

9   an email, and we included all of this in our motion.  And then

10  we said, we're going to go to the Judge.  And then they said --

11  and here's the tell -- you can't go to the Judge yet.  The only

12  time to go to the Judge is at the end of discovery or with an

13  omnibus motion with regard to issues and all other disputes.

14  In other words, they were suggesting that, first, they had to

15  get all the documents and all the discovery before this issue,

16  which I'm raising now, can even be raised here to your Honor,

17  and we obviously didn't know it yet.

18        The second thing they did is, when we took that to

19  Judge Rakoff, who basically laughed it off -- I mean, he was on

20  the phone, he said, well, of course you have to give them the

21  CWs' names.  So, we got them.  Then we tried to depose the

22  remaining CWs and the plaintiffs did exactly the same thing,

23  they served the subpoena for December and said there could be

24  no depositions of the remaining three CWs until after all the

25  documents were produced.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

KBACMOSC

```
 1          So that's twice that they took a position which was
 2    deliberately designed to prevent us from finding out what's
 3    going on until after they got the benefit of all the discovery,
 4    because that is the strategy here.  The strategy is, make stuff
 5    up, stick it in a complaint, don't diligence the complaint.  We
 6    get through the discovery stage, we get everything in the door,
 7    and then who cares what happened.  It's sort of a no harm, no
 8    foul, we'll find other stuff in discovery.  That is exactly the
 9    evil, the evil that the PSLRA and the automatic stay and the
10    heightened pleading standards, exactly what they were supposed
11    to stop.
12          So, yes, this is absolutely the time to be raising
13    these issues, because there has been a fraud on the Court.
14    They can't give -- I don't even understand what they're saying,
15    the CWs didn't say this.  They said what they said, your Honor
16    has it under oath, and now they're in this position of trying
17    to impeach their own confidential witnesses.  The whole thing
18    stinks.  They should not be allowed to get away with it.
19          And it happens, as I said, again, to answer your
20    Honor's question, the Millennial Media case in front of Judge
21    Engelmayer, he cites several other cases in the Southern
22    District and elsewhere, the Boeing case, the Campo case, they
23    all state, which is the Second Circuit, all state that this is
24    the proper procedure when there has apparently been invented CW
25    testimony.  You lose to reconsider, immediately.  You move to
```

KBACMOSC

dismiss for sanctions and you stop the whole thing in its

tracks.

So, the only question, the only thing -- and I can

hear what they're doing, your Honor just heard what they're

doing, they're going to raise a stink and say, no, no, no, it's

the defendants who violated the law and they've gotten the CWs

to change their testimony.  The whole thing is -- that's where

you should be looking.

But, no, there is one question and one question only,

and that question is, did they or didn't they show a draft to

these three CWs before they went ahead and used their names or

used their testimony and filed a complaint?  And that is the

procedure, if your Honor looks, again, at the Millennial Media

case with Judge Engelmayer.

What he did is, he asked for a series of inquiries

only from the plaintiffs in which he said:  I want to know the

procedure you used in order to get this information; I want to

know whether you diligenced it; I want to know whether you

showed the individuals who drafted the complaint; I want to

know if you just relied on what the PI said; and I want

declarations from each of them.  That's what he did.

What he found out was that, in that case, ten to the

eleven said they had never seen a draft of the complaint,

didn't know their names were being used in litigation, exactly

what these three said.  And as I said, he said that would both

KBACMOSC

1     violate Rule 11 and basic human decency.

2               So, yes, this is the time to raise these issues, they

3     cannot be allowed to get away with this, and they cannot be

4     allowed to get away with trying to change the subject and

5     turning this into a normal, sort of, litigation strategy issue.

6     Their conduct is on trial now and these three CWs' testimony

7     alone, coupled with the fact that CW1's testimony is plainly

8     false, all coupled with their incredibly inappropriate behavior

9     in discovery, blocking our ability to get the CWs' names,

10    blocking our ability to get their depositions, all expressly

11    trying to get all the document discovery in before we're able

12    to know what happened, all raises the question as to whether or

13    not this case can proceed at all.

14              THE COURT:  This is Judge Cronan.

15              Thank you, Mr. Polkes.

16              Mr. Gilmore, I think that question is a fair one from

17    reading Millennial Media.  Judge Engelmayer noted that it's

18    difficult to come up with a good reason why counsel would not

19    attempt to confirm, with a witness, the accuracy of the

20    statements that are going to be attributed to the witness and

21    the complaint.

22              Are you prepared to answer that question, whether or

23    not three confidential witnesses, or really all six of the

24    confidential witnesses, whether all six of them were shown the

25    statements in the complaint that were attributed to them?

KBACMOSC

1            MR. GILMORE:  Your Honor, Lucas Gilmore.

2            Yes, I am prepared.

3            No, they were not.

4            Number one, that's not the established practice or

5     what sets forth what Rule 11 is.

6            To your second question, we did take efforts to ensure

7     the accuracy.  We attempted to contact them multiple times.

8            For one of them, they chose not to participate after

9     they realized that they weren't being compensated and had no

10    upside.  One of our attorneys spoke directly to one of them and

11    verified that they did, in fact, speak to the investigator, but

12    stopped participating when he knew he was going to be -- or

13    when we couldn't guarantee he was not going to be subpoenaed.

14           Mr. Polkes is leaving out a great body of law that

15    shows that Millennial Media -- that is not the established

16    practice and not the parameters of Rule 11.  In fact, Judge

17    Engelmayer goes out of his way to say that this is not the law.

18    He's setting forth indicta what he believes to be are the

19    absolute best practices in order for attorneys to avoid or take

20    steps to mitigate avoiding the recanting issue.

21           The fact of the matter is, is three of the CWs, the

22    most prominently featured, stand behind each and every one of

23    the allegations.

24           Also, in your question, which was not answered by

25    Mr. Polkes, is why is this an appropriate motion, and it's not.

KBACMOSC

In each of the cases that they mentioned, Boeing, that had to do with one confidential witness that fully recanted and was done after there was full discovery, which is not the case here.

There were also charges about us trying to obstruct defendants, and that's been completely distorted.  It is common to include confidential witnesses.  We told them that the purpose of our call was to assist in our investigation for litigation against Sasol and senior executives.  They knew exactly that this was for purposes of litigation, so they were told that.

And the issue of obstructing, it's completely false. In order to facilitate a frank discussion, we say that we will do our best to maintain their confidentiality, particularly when each of the witnesses, whom Mr. Polkes talked about, expressed major concern about being contacted.

When the defendants informally asked us to provide, over email, the names of the confidential witnesses, we properly objected.  There is a split of authority, including cases authored by Judge Scheindlin and others that say the identity of the witnesses themselves is attorney-work product. We took that issue to the Court.

We also raised that there was an issue of privacy.  We took that issue, Judge Rakoff disagreed with the attorney-work product, but he agreed on if you do it privately, and we

KBACMOSC

1    provided the names, promptly, to the defendants and their

2    contact information for attorneys eyes only.

3           As for our objection for the depositions of the three

4    CWs, those were entirely well founded.  The defendants wanted

5    to take the depositions of three individuals on a single day,

6    they represented that they have tens of thousands of documents

7    in their custodial files; haven't produced a single one of

8    them.

9           There is a structure in place that the Court has set

10   where documents will be produced first, followed by Merit's

11   deposition, and these three CWs are Merit's depositions.  We

12   should have a full and accurate record, and that's the same

13   opinion that's shared by the CW's attorneys, Mr. Schirripa.

14           MR. POLKES:  Your Honor, it's Mr. Polkes.

15           Can I just add one thing?  I know we're throwing a lot

16   of stuff at you.

17           THE COURT:  You may.  Absolutely.

18           MR. POLKES:  Thank you, Judge.

19           I think what is really important is, I just heard some

20   confusing additional details about the process engaged in by

21   Hagens Berman.

22           Apparently, now what they're saying is some of the

23   CWs, I can't tell if what Mr. Gilmore is saying are the three

24   that are at issue here that submitted the declarations wanted

25   to be paid, and when they found out they weren't going to be

KBACMOSC

paid, they refused to cooperate, something like that.  And I
heard him say, with regard to another one, they said, can you
assure that my name won't get out, and then when they said no,
he then said he wouldn't cooperate.

     And if those are our three CWs, what they're now
telling your Honor is they have three people who specifically
expressed a desire not to be included in this litigation, who
they nonetheless included.  It is hardly a surprise, under the
circumstances, that things are getting messy.  And that is
exactly the issue that Judge Engelmayer focused on in
Millennial Media.

     And I think what those, sort of, dribbled out
additional details suggest, and I very respectfully submit,
rather than let plaintiffs turn this next round of briefing
into a circus where they raise every issue under the sun and
start challenging whether or not their own CWs are lying under
oath or changed their testimony from what they told the PI or
something else, that your Honor follow exactly the same
procedure as Judge Engelmayer, and make Hagens Berman submit
detailed declarations, under oath themselves, as to what
procedures they followed in connection with at least these
three CWs, if not all six, what they learned, what they were
told, whether they were instructed to follow through or not,
whether they showed them the complaints or not, which we now
have heard that they did not.

KBACMOSC

1      And, again, it's not hardly a surprise they were

2  specifically told by these people, I refuse to participate in

3  your lawsuit.  If that's an explanation as to why they then

4  didn't show them a draft complaint, that makes this even worse.

5      And so, those are the questions that need to be

6  addressed, I respectfully submit, before we can proceed, rather

7  than have Hagens Berman turn this into a circus.

8      I think the same procedure that was followed in

9  Millennial Media is imminently appropriate here, which is,

10  let's find out what Hagens Berman did, what they knew and when

11  they knew it.  That's the next step, I respectfully submit.

12      THE COURT:  This is Judge Cronan.

13      Mr. Polkes, would there be any benefit to conducting

14  limited discovery simply on this issue with respect to the six

15  confidential witnesses, whether it be narrowly-tailored

16  depositions to clarify any of the --

17      MR. POLKES:  Yes.  That makes sense to me, too, your

18  Honor, as the next step.  I agree with that.

19      I was originally thinking, Judge, let's just do it in

20  open court and your Honor can satisfy himself that these people

21  are telling the truth, but I'm being conscious of their desire

22  to preserve anonymity.  That's exactly what isn't supposed to

23  have happened; right?  They shouldn't be here.  They should

24  have never been named in the complaint.  So, I think asking to

25  do this in open court sort of undermines part of the principles

KBACMOSC

that we're trying to defend here.  So, I do agree that we could

do them as depositions, if they can be maintained pursuant to

the confidentiality order, and that when they're submitted to

your Honor, they're done with identifying names redacted.

Just on these very narrow provisions, again, my

concern here, and I think you've heard it loud and clear, is

the plaintiff's firm is treating this as a strategic issue

rather than that as an inquiry as to what has gone wrong.

Something has gone profoundly wrong.  We are not supposed to be

in a position like this where three names are being withheld

from us, are saying not only that they never said these things

to the investigator, but that, in fact, they said the exact

opposite.

I mean, what CW5 says is that the investigator was

pushing the concept of, didn't you know this project was going

to cost $11 billion all along.  And CW5 responded, no, that's

not true; as far as I was aware, it was $8.9 billion and that's

that.

And yet, by the time it ends up in the complaint, what

we see is, CW5 said that he always knew the project was going

to be $11 billion.  That is a fundamental lie.  That is a fraud

on the Court.  He has now said it under oath.

And, again, this whole question of, well, maybe he

wasn't telling the truth now, maybe he told our investigator

something different; you essentially waive the right to make

1   that argument if you didn't diligence your complaint with the

2   guy, you know, it's the paragraph you referred to in Millennial

3   Media, it's exactly right.  What good reason could you possibly

4   have, other than trying to bury your head in the sand for not

5   going back to CW5 saying, look, here's what we're going to say,

6   are you good with this or not.  And if CW5 is one of these

7   people who said, I don't want to cooperate with you, maybe that

8   explains why they didn't go back to him, but that's not good

9   enough.  That requires dismissal.

10          This is a serious, serious thing that requires --

11   again, I respectfully -- I never -- it's entirely up to your

12   Honor, obviously.  I know I'm sort of getting emotional about

13   this, repeated about this, but, your Honor, the inquiry has to

14   be into Hagens Berman's conduct.  How did we get here?  We are

15   in a place we should not be.  Things went seriously wrong.  And

16   Hagens firm should not be treating this just as a strategic,

17   you know, let's come back and attack them now.  That's not the

18   issue.

19          MR. GILMORE:  Your Honor, if I may be heard?  This is

20   Lucas --

21          THE COURT:  Go ahead.

22          MR. GILMORE:  So, what we've heard is that we're --

23   that our opposition brief and our opposition to this motion is

24   to be expressly limited and that we can't make out our case.

25          Also, this phenomenon is not extraordinary.  This

KBACMOSC

1   happens quite frequently, including in the Southern District of

2   New York, where witnesses, once the discovery process starts,

3   due to pressure and exertion of the defendants, change their

4   initial testimony, and that's precisely what happened here.  We

5   will show a record that it makes absolutely no sense.  These

6   witnesses spoke for hours on end with our investigator.

7           Then the issue of diligencing; we did due diligence.

8   It was corroborated by three other confidential witnesses who

9   testified to the same exact issue of cost overruns, it's

10  supported through our copious notes and memorandums of what

11  these individuals said, and it's corroborated by Sasol's own

12  board of directors, who have now -- who admitted that there are

13  errors and omissions in their costs and schedule, that it was

14  due to not inadvertence, but inappropriate conduct done by the

15  LCCP leadership, the same individuals who the three CWs that

16  Sasol now represents, and who we spoke to, identified the same

17  individuals who our other three CWs identified, and the same

18  individuals who Sasol later fired.

19          So, to suggest that this case hinges on now the

20  purported recantation by these individuals is wrong.  It's also

21  presumptuous because they haven't produced these individuals'

22  files, which will, in addition, corroborate what their initial

23  account was.  And so, that's exactly why we need a full record.

24          MR. POLKES:  Your Honor, may I?

25          THE COURT:  You may.

KBACMOSC

1          MR. POLKES:  They lost the right to all of this when

2     they failed to show the CWs a draft of the attributions they

3     intended to make.  That's the problem.  We just heard a whole

4     word salad about other people and it's corroborated.

5          Let me give you another example, specifically, your

6     Honor, what is off the rails here, if what they're incredibly

7     saying is normal.

8          CW2 is the lynchpin of the allegations for a

9     particular reason.  CW2 is a person who ostensibly told the

10    concerns about the project being way over budget to the

11    speakers of the allegedly false statements.  Without that nexus

12    of the CWs to the speakers of the false statements, the

13    allegations don't hold together and it gets dismissed, so CW2

14    is critical.  And what the complaint says about CW2 is CW2 was

15    in a senior position, knew the project was over budget, late,

16    and in no way was going to come in at $8.9 billion and told

17    that to senior management.  That's what it says.

18         You have CW2's sworn declaration now, your Honor, in

19    which CW2 says that he never said those things and, in fact,

20    that what he said was the exact opposite; the project was on

21    time and on budget.  That's what he says he told the

22    investigator and, obviously, therefore, that he never said to

23    senior management anything of the sort that the project was

24    late or over budget.

25         So, something is seriously wrong.  To even suggest

SOUTHERN DISTRICT REPORTERS, P.C.

KBACMOSC

that that's a normal thing that could possibly happen is

outrageous.

          The only issue that needs to be -- that can be, again,

I respectfully submit, investigated here is:  How did this

happen; what went wrong; what did they say to CW2; why didn't

they show CW2 a draft of the complaint; did they think about

it; is it true, as CW2 says, that the first time CW2 found out

about this is when we presented CW2 with a copy of the

complaint.

          Those are the facts at issue, that's what Millennial

Media is all about, and that is the only way to preserve the

integrity of this proceeding, as opposed to turning it into

just another, sort of, normal development in a litigation.

          That's not what this is.  This is a matter of

plaintiffs who, apparently, there is a prima facie case that

they literally made stuff up, stuck it in a complaint solely

for purposes of getting over the PSLRA heightened pleading

standards, and then tried to keep us from finding out long

enough until they could get the benefit of all the discovery,

at which point, they were going to try and change the subject.

That is exactly what you are not allowed to do.  It is a huge

problem.

          The entire process of the PSLRA depends on the

integrity of plaintiffs making accurate statements to the Court

and conforming to Rule 11, and if they're telling you, which

KBACMOSC

they did, they never even showed a draft to these witnesses,
which, as your Honor already said in that paragraph from Judge
Engelmayer, there is literally no good reason not to do that.
It is not an accepted practice.  That's crazy.

        And look where we are now.  We have witnesses
specifically saying that they said the exact opposite.  They
can't be put on trial.  This isn't just like a normal motion
you raise at the end of discovery.  This is a huge, serious,
profound problem because --

        MR. GILMORE:  Your Honor, if I may be heard again on
that issue.

        THE COURT:  Yes, just briefly and then we'll --

        MR. GILMORE:  Yes, very briefly.

        There is no established law that we need to obtain
consent from witnesses that they want to be involved in a case.
If that were the case, then you would virtually have no
confidential witness that would be involved.  That is not what
the law is.  In fact, it's established and accepted practice,
and we'll fight to multiple occasions, in which you can rely on
the investigator's investigation.

        With respect to CW2, you will see that there was first
a call for 22 minutes, during which the details of the account
came out, in which CW2 expressed skittishness about not wanting
to go forward, being involved.  But then, later, there is a
subsequent call for over 40 minutes, which this witness

KBACMOSC

1    provided.  It's strange credibility that the witness, during

2    that time, would tell the confidential -- would tell the

3    investigator that actually was on budget.  It further strains

4    credibility when you have other confidential witnesses, that

5    stand by that says that it wasn't, and they corroborate the

6    initial witness.  And then, lastly, it's further strains

7    credibility when you have Sasol's own board confirm what all of

8    these witnesses provided in their accounts.

9            So, that's my point.

10           THE COURT:  This is Judge Cronan.

11           All right.  Thank you, both.  This is certainly a

12   complicated situation.  Here is what I think we should do.  My

13   feeling is the more information we have regarding the

14   confidential witnesses, the better position I'll will be in

15   figuring out what to do with respect to the defendant's motion.

16           I'm going to stay discovery in this matter and stay

17   other deadlines, including the class certifications motions for

18   the pendency of the motion for reconsideration.  I think that's

19   appropriate under the PSLRA, both in terms of the spirit of

20   that statute, including to reduce a nuisance suit through a

21   heightened pleading standard, and also given the statute's

22   automatic stay while motions to dismiss are pending, granted

23   this is a motion for reconsideration of the denial or

24   dismissal, but given the nature of the motion, I think a stay

25   is warranted.

KBACMOSC

1          I will allow three weeks of limited discovery with

2     respect to the confidential witnesses, the six confidential

3     witnesses in the event either party wishes to depose those

4     witnesses.  I believe Judge Rakoff's order had originally

5     included language essentially showing that an individual, a

6     witness may only be deposed once unless there is a showing of

7     good cause.  Here, I find that a limited deposition as to these

8     witnesses, merely on the issues that we've been discussing

9     today, specifically whether or not they made the statements

10    that are attributed to them in the complaint, is good cause for

11    an initial deposition of them and the possibility of more

12    fulsome depositions of the witnesses in the future.  As I said,

13    that will be a three-week period during which the parties can

14    conduct those depositions.

15         I will then give the defendants a week after that to

16    submit any additional information they want to submit in

17    support of their motion for reconsideration.  Plaintiffs will

18    have three weeks after that to file the opposition to the

19    motion for reconsideration, and defendants will have a

20    reasonable period of time after that for reply.

21         So, three weeks from today will bring us to December

22    1st, that will be the close of limited discovery from the six

23    confidential witnesses.  Any supplemental submissions, December

24    8th from the defendants.  The plaintiff's opposition for

25    reconsideration, that should be due by December 29th.  Any

KBACMOSC

reply in further support of the reconsideration motion shall be

by December 8.

I've been referring to the reconsideration motion, but

if the defendants choose to persist with the motion for

sanctions, both issues should be briefed to be briefed together

at the same time.

Understanding that the parties may not agree with that

schedule, does either side have a reason why this schedule

cannot be one that we can enter in this case?

I'll start with you, Mr. Gilmore.

MR. GILMORE:  Yes, your Honor.  In principle, we would

agree with that schedule, but I would like to just get some

clarity.

THE COURT:  Sure.

MR. GILMORE:  One thing that the defendants had

previously offered, certified that they would do, is that they

would produce, a week in advance of the depositions, the

custodial files of these individuals.  We think that we should

certainly have those and would like -- and that should be a

part.

We've also asked for the defendants to produce the

communications that they had with the three CWs, including the

draft affidavits, and we think that should be a part of the

record so that the Court gets the fullest record.

THE COURT:  Mr. Polkes.

SOUTHERN DISTRICT REPORTERS, P.C.

KBACMOSC

1          MR. POLKES:  We're fine with the schedule, your Honor.

2          I would like to address the document issues that were

3     just raised by Mr. Gilmore and modify them slightly.

4          We absolutely should not be producing the entire case

5     file with regard to the CWs to them, because that would be for

6     purposes of a whole deposition for all purposes.  See, they're

7     at it again.  So, that has nothing to do with the specific

8     issue, the limited purpose as to which these depositions are

9     being ordered.

10          What we do think we should be exchanging, however, is

11     we're fine giving them our communications with the three CWs we

12     represent, up until the point where they became privileged

13     prior to their retaining us; however, they have the same thing,

14     and I think we should be entitled to see all their files, all

15     their communications with all of the CWs, including the

16     supposed record of people saying that they want to get paid or

17     they wanted assurance that their identities are going to remain

18     anonymous, we should be getting the same exact thing.

19          So, we're all for exchanging those files, those

20     limited files with regard to the limited issue your Honor is

21     ordering the deposition for in, say, seven days.

22          THE COURT:  Mr. Gilmore.

23          MR. GILMORE:  Your Honor, this is Mr. Gilmore.

24          Your Honor, the production of the files is something

25     that the defendants had previously agreed to, it's directly

KBACMOSC

1    relevant, there is a disputed fact here.  We say that the

2    witnesses had an initial account, the three initial had

3    account.  The defendants have submitted an affidavit that's

4    changed it.  We are entitled to show our -- make an evidentiary

5    showing that the initial account, which has been corroborated

6    from other witnesses, was the one that was accurate, and that

7    we'll show this through documents and their files.  And this is

8    something they previously agreed to, they didn't comply with

9    it, but there should be no reason why it can't be done.

10              MR. POLKES:  Your Honor, if I may.

11              THE COURT:  You may.

12              MR. POLKES:  No, this is not -- this is not supposed

13   to be -- I believe, your Honor, that your Honor did not just

14   order -- your Honor, very specifically, said this is a

15   preliminary deposition for the limited questions that are the

16   subject of the motion, in particular, what did these CWs say to

17   the plaintiff's investigator and what did they say to us; and

18   did they, in fact, say different things at different points in

19   time; were they, in fact, shown or not shown a draft of the

20   complaint, and so on; was there some story about them saying

21   that they wanted to get paid, and so on.

22              This is not an opportunity for the plaintiffs to

23   basically do a full-blown deposition on a full documentary

24   record, which is what it was before, and we will be objecting

25   seriously and instructing the witness not to answer for reasons

SOUTHERN DISTRICT REPORTERS, P.C.

KBACMOSC

1    of this deposition going beyond the limited purpose your Honor

2    ordered it for if they try to turn this into a circus in a

3    full-blown deposition of the witness.

4             THE COURT:  This is Judge Cronan.

5             I certainly agree as to the scope.  The depositions

6    should not go beyond the subject areas, Mr. Polkes, that you

7    just mentioned.

8             I guess what I'm struggling with, not having

9    familiarity with the file, is how much of that file would

10   relate to the appropriate subject matter of these limited

11   depositions?  What in the file would you be producing to --

12            MR. POLKES:  If I understand, the category that I'm at

13   least suggesting, your Honor, subject, you know, hopefully your

14   Honor will agree is fair play for this purpose, is our

15   communications with the witness up until the point the witness

16   retained us and it became privileged.  We think we should be

17   getting the same thing from the other side, which is to say,

18   all their communications with all the CWs, and there are no

19   privileged ones because they never were retained as counsel.

20   But all those, the issues that your Honor -- that they just

21   said to your Honor, oh, no, they spoke to us before each of the

22   minutes, and we have PI notes and so forth and so on, that

23   needs to be produced, that's what this inquiry is about.

24            There are emails, during the course of the class

25   period, to friends and other things are not what is at issue

KBACMOSC

1   right now.  They're not cited or referenced in the complaint,

2   none of them are material to the complaint.  The only question

3   is the integrity and truthfulness of the attributions made to

4   the CWs in the complaint, that is the only issue here.  And,

5   presumably, if there was to be a second deposition on for all

6   purposes, they would get the whole file at that point.

7           THE COURT:  I agree.  Mr. Gilmore, you're planning to

8   provide to Mr. Polkes the same materials in terms of

9   communication with the confidential witnesses in preparation of

10  the complaint; right?

11          MR. GILMORE:  Your Honor, yes.  To be clear,

12  communications, we are not -- now, our work product that

13  reflects our mental impressions, no, but we have nothing to

14  hide here and our intention is to submit that to the Court for

15  in-camera review so that we're not waiving any kind of work

16  product, we'll certainly do that.

17          What Mr. Polkes is breezing over is each of these CWs,

18  in their initial accounts, testified to generating or receiving

19  or sending specific documents to the senior executives, and if

20  we have -- we need that in order to show the accuracy of their

21  initial account.  It's not full-blown discovery.  It's limited

22  to these initial witnesses, because what's going to happen is,

23  with the other three CWs who stand by their allegations, the

24  defendants are going to ask substantive questions on those.

25  It's not providing us with a full and fair record.

KBACMOSC

1          MR. POLKES:  Your Honor, I think Mr. Gilmore -- I

2     think he just got carried away.

3          The complaint refers to no document sent, drafted, or

4     reviewed by any of the CWs.  The only exception, possibly, is

5     that CW1 is claiming to have seen a change order, which you now

6     know, by virtue of essentially the 30(b)(6) testimony, doesn't

7     exist.  But, setting that aside, and I'm happy to make that the

8     standard, there is no document referred to in any of the CW

9     attributions in this complaint, period, full stop.

10          THE COURT:  This is Judge Cronan.

11          Mr. Gilmore, after you said that, I was just pulling

12     up the complaint to look myself.  Are there particular

13     documents that you're referring to that were mentioned in the

14     complaint attributed to the CW?

15          MR. GILMORE:  Yes.  CW4 references signing off on

16     projects on his work and in terms of the LCC project being

17     stipulated for $36 million in negative value and

18     self-construction product -- construction.  He also talked

19     about signing off on their cost estimates.  This is all in

20     paragraph 83 through 90.  That's CW4.

21          CW6 says, as you mentioned -- excuse me, CW1, as you

22     mentioned, expressly talked about the floor change order, as

23     well as monthly reports received by him, as well as other

24     senior executives.

25          CW6 talked about, in paragraph 97, about completion

SOUTHERN DISTRICT REPORTERS, P.C.

KBACMOSC

1    dates that were made to appear on paper that were not completed

2    in time and expressly references those.  We need these types of

3    documents, the documents that they're generating to show that

4    their accounts are completely accurate.

5        MR. POLKES:  Your Honor, it's tens of thousands of

6    documents.  Again, they're basically just trying to turn this

7    into full-blown discovery so that they can impeach their own

8    CWs and get them to say that now they're lying.  It's just

9    totally -- we've turned this into a circus.  And none of those,

10   that I will add that you just heard about, are particular

11   documents that were relied upon in connection with the CWs'

12   attributions.  They're just categories of things like change

13   orders and so forth.  And you even just heard reference to one

14   of their own CWs, which isn't even relevant.  So, again, we

15   can't and shouldn't have to turn over tens of thousands of

16   documents that basically go to the guts of the whole case so

17   they can turn this into an opportunity to impeach their own CWs

18   and turn this whole thing inside out.

19        Again, the question is, did they show a draft to these

20   people, how did these -- did these people, in fact, tell them

21   something different the first time.  That is a limited issue.

22   That doesn't give them the ability to turn this whole thing

23   into a, sort of, crazy impeachment festival where they try and

24   say the whole thing is a lie and essentially trying to prove

25   their case in these limited-purpose depositions.

KBACMOSC

1          THE COURT:  If this case provides the defendant's

2     motion, there will be ample time for fuller depositions of the

3     CWs and with fuller record.

4          For now, I agree with Mr. Polkes, that the issue is a

5     pretty straightforward one, what did the CWs tell the

6     plaintiffs regarding -- that was later represented in the

7     complaint.  How did those communications occur; how were they

8     memorialized; how were they represented in the complaint; were

9     the CWs shown a copy of the complaint and what they would be --

10    how their statements would be characterized, regardless of

11    whether that's required or not.  I think that's relevant to

12    know.

13         For now, I think if we go down the road of

14    scrutinizing all the documents that could be potentially

15    relevant to the CWs' statements in the complaint, we're going

16    to be going far field from the limited focus of these

17    depositions.  So, for purposes of documents being stayed in

18    advance of depositions, I think we need to keep it to the

19    narrow scope that I just discussed.

20         MR. POLKES:  Judge, if I could make one request, Judge

21    Cronan, which is that prior to the depositions, Hagens Berman

22    be required to submit, give us and the Court, a declaration in

23    which they set forth the processes, procedures that they

24    followed in connection with putting the attributions of the CWs

25    in the complaint.  That's the same thing that was required by

KBACMOSC

1    Judge Engelmayer, and I think we need that before they go in

2    and start trying to cross examine people who didn't want to be

3    in this case in the first place.  We should be able to see what

4    it is that they're going to claim about them so that they have

5    the opportunity, so the CWs, in fairness, have the opportunity

6    to see what Hagens Berman is going to accuse them of before

7    they go ahead and do it in a deposition.

8              MR. GILMORE:  Your Honor, that's completely

9    inappropriate.  That's not the process.  We will submit

10   information showing, in our opposition to this motion, exactly

11   what we did, but we should have the opportunity to

12   appropriately cross examine, and we don't need to show an

13   outline or a preview of what our questions are going to be,

14   that's improper.

15             THE COURT:  I would agree with Mr. Gilmore on that.

16   I'm not going to order that declaration in advance of the

17   depositions.  I think --

18             MR. POLKES:  Your Honor -- but could your Honor order

19   them to do it in connection with their opposition so at least

20   it's part of the record?

21             THE COURT:  I think that's what Mr. Gilmore just said,

22   but I would agree that that would be appropriate to include as

23   part of their opposition.

24             Is that your intention, Mr. Gilmore?

25             MR. GILMORE:  This is Lucas Gilmore.

KBACMOSC

1          Yes, our intention is to show the full scale of our

2     robust in good faith and investigation that would include from

3     our investigator, and if you want it from counsel, we're happy

4     to provide that.

5          THE COURT:  I think we covered what we needed to and

6     have a way forward.  We'll have a docket entry.

7          MR. SCHIRRIPA:  Your Honor, this is Frank Schirripa.

8     I represent three of the CWs.  I haven't had an opportunity to

9     speak.  My limited involvement in the case is just limited to

10    the representation of three CWs, separate and apart from the

11    CWs that are now being represented by defense counsel.

12          I would just, by concern, if the parties -- the

13    plaintiffs and defendants here are going to be engaged in some

14    sort of preliminary review and production of documents perhaps

15    over the next week and a half leaving, really, Thanksgiving

16    week and a few other dates for depositions.  I am concerned

17    with receiving those documents late in the game and then having

18    to get my three clients available for depositions, which, by,

19    you know, way of today's hearing and certainly a copy of the

20    transcript, I think would be limited.  Can we establish any

21    sort of time limit on those depositions?  I'm just mindful of

22    Judge Rakoff's prior order and limitations on Merit's related

23    issues.  I think your order today and, really, the hearing

24    today is perhaps focused on three to four questions, which I

25    don't think would take more than an hour of deposition time.

KBACMOSC

1          THE COURT:  Thank you.  I did not realize you were on
2   the line.  Thank you for speaking up.  I think that's
3   completely reasonable.

4          I guess there are two questions.  One is whether or
5   not my timeline of three weeks was too ambitious, given the
6   Thanksgiving holiday the week after next, and two, what time
7   limits to put on the depositions.

8          Let me hear from Mr. Gilmore and Mr. Polkes, as well,
9   as to what you think a reasonable time limit on the deposition
10  would be.  I think Mr. Schirripa makes a good point that these
11  are pretty narrow questions.  You may need longer than an hour,
12  but I'm not sure we need that much longer than an hour.

13          Mr. Gilmore.

14          MR. GILMORE:  Yes, your Honor.  Just a quick question,
15  and just in seeking further clarity; I'm unclear as to why
16  Mr. Schirripa's clients would need to go forward with the
17  deposition.  That's their -- they're not at issue.  There is no
18  question -- and Mr. Schirripa will represent that, and we have
19  affidavits from them in our possession, that their allegations
20  are 100 percent accurate.  So, we're unclear why, if at all,
21  that deposition needs to go forward.

22          The only question are for the three CWs that are now
23  represented by defense counsel, who have recanted, and that's
24  the only type of question as to whether or not we accurately
25  reflected their accounts.  So, it's my understanding what the

KBACMOSC

1    Court was saying, was that it was limited to those witnesses.

2              THE COURT:  This is Judge Cronan.

3              I had not intended to limit it just to the other three

4    confidential witnesses, but also, I have not seen those

5    declarations from the three witnesses that Mr. Schirripa

6    represents.  I'm not sure if Mr. Polkes has.

7              Mr. Polkes, have you seen the declaration as of yet?

8              MR. POLKES:  No, your Honor, they haven't shown them

9    to us at all.

10             Let me say, I also assumed your Honor was ordering all

11   six, and it's only fair.  We produced declarations and they

12   want our depositions, they haven't produced declarations and we

13   want to see their people, too.  Remember, we tried to get them

14   in advance into a block.  We would like to know what it is that

15   they have to say.

16             THE COURT:  This is Judge Cronan.

17             I think that the declarations that have been submitted

18   create enough of a question that I think it would be

19   appropriate to have, if Mr. Polkes chooses to, depositions of

20   the witnesses represented by Mr. Schirripa, as well.  So, I do

21   think we're including -- I do intend to include all six within

22   this limited discovery over the next few weeks, but again,

23   these should be pretty short depositions.  I don't think there

24   is a need for them to be more than an hour or two hours.

25             MR. POLKES:  Your Honor, Mr. Polkes here.

KBACMOSC

1          I was going to say an hour is fine with us if that's

2     what Mr. Schirripa wants, as long as it's across the board for

3     everybody, we'll limit it to an hour.

4          THE COURT:  Mr. Gilmore.

5          MR. GILMORE:  Yes, your Honor, that's fine, as long as

6     the three CWs, the one hour is limited to the limited focus of

7     what the Court set out about their initial account and the

8     accuracy as put forward in the complaint.

9          THE COURT:  I would hope, at this point, we have

10    clarity on that, that that would be the limited scope of the

11    deposition and of the potentially six depositions.  And given

12    that scope, it should be within -- we should be able to handle

13    them within an hour.

14         The three attorneys who are speaking, Mr. Gilmore,

15    Mr. Polkes, and Mr. Schirripa, do you think that can be

16    accomplished within the next three weeks?  Should we push it

17    four weeks to December 8th?

18         MR. POLKES:  Your Honor, it's Mr. Polkes.

19         I'm just being mindful of the CWs who are civilians.

20    If we make it four weeks, that probably would help accommodate

21    people's Thanksgiving plans.

22         THE COURT:  Why don't we do that.  So, the schedule

23    will then be until December 8th to conduct any depositions of

24    those confidential witnesses, Mr. Polkes will have a week to

25    submit anything further he wishes to submit in support of his

KBACMOSC

1    motion, that will be December 15th, December 15th is a Tuesday,

2    two weeks from that is December 29th.  So, why don't we go to

3    January 5th for any opposition to do that motion for

4    reconsideration.  And then the week after that is the 12th for

5    any reply, January 12th.

6              Does that schedule work for the parties?

7              MR. POLKES:  Works for the defendants, your Honor.

8              MR. GILMORE:  Your Honor, it works for the plaintiffs.

9              Just a couple of points of clarification.

10             One is, we had entered into a deposition protocol

11   that, in light of the pandemic, these depositions would be

12   remote.  I wanted to confirm that these would be in accordance

13   with the deposition protocol.

14             THE COURT:  This is Judge Cronan.

15             That would seem appropriate, certainly to me, given

16   the current situation.

17             Mr. Polkes, do you have any objection to continuing

18   the prior protocol?

19             MR. POLKES:  No, no objections at all, your Honor.

20             MR. GILMORE:  The only other point of clarification

21   is, in terms of ground rules to the extent the witnesses are

22   going to be sent or shown any type of documents that haven't

23   already been produced, we would ask that those documents be

24   produced a week in advance.

25             THE COURT:  That seems appropriate to me.

KBACMOSC

1          Mr. Polkes, do you agree to that?

2          MR. POLKES:  Yes, of course, your Honor.

3          THE COURT:  I think we covered a lot.  Like I said, we

4    will issue a docket entry, a minute entry with the dates that

5    we discussed.

6          Otherwise, is there anything else, Mr. Gilmore,

7    Mr. Polkes, that you wish to raise while we're on the line?

8          MR. POLKES:  Yes.  One more date that would help, your

9    Honor, I think it would help us avoid a fight.  If we can agree

10   to exchange the documents that we had previously talked about,

11   which is to say that communications with the CWs and the record

12   back-and-forth and so on, say, in five days?

13         THE COURT:  Mr. Gilmore, does that work for you?

14         MR. GILMORE:  Your Honor, I don't believe that's a

15   problem.  If there is an issue in terms of producing any

16   documents we haven't harvested, we can work it out with

17   defendants, but we do intend to promptly produce it.

18         THE COURT:  Okay.  Well, I think that wraps it up.

19   Thank you, all, for your time today.  Thank you to the court

20   reporter for transcribing the proceedings.  It's certainly not

21   the easiest format for us to be conducting these proceedings,

22   so we appreciate the assistance.

23         I look forward to receiving the briefings from the

24   parties in a few weeks.  Have a good day, everyone.

25                            *  *  *


                    SOUTHERN DISTRICT REPORTERS, P.C.