**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHAD LINDSEY MOSHELL, Individually and On Behalf of All Others Similarly Situated, | |
| Plaintiff, | Case No. 1:20-CV-01008-JPC |
| -v- | Hon. John P. Cronan |
| SASOL LIMITED, DAVID EDWARD CONSTABLE, BONGANI NQWABABA, STEPHEN CORNELL, PAUL VICTOR, and STEPHAN SCHOEMAN, | |
| Defendants. | |

**SUPPLEMENTAL MEMORANDUM OF LAW AND REPORT OF INVESTIGATION IN SUPPORT OF DEFENDANTS' MOTION FOR RECONSIDERATION OF THE COURT'S AUGUST 24, 2020 MEMORANDUM ORDER AND <u>MOTION FOR SANCTIONS</u>**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

*Attorneys for Defendants Sasol Limited, David Edward Constable, Bongani Nqwababa, Stephen Cornell, Paul Victor, and Stephan Schoeman*

December 15, 2020

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...............................................................................................1

I. LEGAL BACKGROUND.....................................................................................................4

II. REPORT OF INVESTIGATION.........................................................................................7

    A.    CW-2, CW-4, and CW-5 confirmed everything in Defendants' Motion and revealed new depths to Counsel's misconduct. ...............................................7

        1.    CW-2 told Counsel their theory of the case was wrong yet Counsel pressed forward at great personal cost to CW-2. ...............................7

            a.    CW-2: ████████████████████████ ..........8

            b.    CW-2: "I continuously [said] I was not interested in being a part of this lawsuit"...............................................................9

        2.    Counsel viewed CW-4 as the lynchpin of the Complaint and so attributed false allegations to him despite glaring red flags. ...........10

            a.    Counsel: ██████████████████████ ........................10

            b.    CW-4: ██████████████████ ...........................................11

        3.    CW-5 confirmed that Counsel knowingly falsified allegations and abused nonconsenting CWs. ..............................................13

            a.    CW-5: "I can walk you through . . . my statement with your damn attorney present saying that it was on time and on budget for $8.9 billion, that was the correct number, nobody believed differently." ........................................13

            b.    CW-5: "[F]rankly I hope you get sanctioned." ..............................14

    B.    Counsel falsified CW-1's allegations—including the Change Order allegation. ........15

        1.    CW-1: "No change order is acted upon unless it's approved by the client."................................................................................16

        2.    Investigator: ████████████████████████████ ...................18

    C.    The remaining CWs revealed further misrepresentations and misconduct by Counsel. ...................................................................................19

        1.    CW-3: "I had no contact with senior management." .......................19

        2.    Counsel's decency and diligence with CW-3 and CW-6 confirms that mistreatment of other CWs was knowing and intentional. ..............................21

    D.    Counsel made false statements to this Court, repeatedly............................................21

III. CONCLUSIONS..................................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    579 F.3d 143 (2d Cir. 2009)............................................................................................4

*City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*,
    711 F.3d 754 (7th Cir. 2013) ..........................................................................................5

*City of Livonia Emps.' Ret. Sys. v. Boeing Co.*,
    306 F.R.D. 175 (N.D. Ill. 2014).....................................................................................5, 6

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
    952 F. Supp. 2d 633 (S.D.N.Y. 2013)..............................................................................4

*Johnson v. Smithkline Beecham Corp.*,
    2015 WL 1004308 (E.D. Pa. Mar. 9, 2015)..........................................................2, 3, 23, 25

*Long Miao v. Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020)..............................................................................5

*In re Millennial Media, Inc. Sec. Litig.*,
    2015 WL 3443918 (S.D.N.Y. May 29, 2015) ...............................................................2, 3, 6

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)..........................................................................................4, 5

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).....................................................................................................4, 25

**Statutes & Rules**

15 U.S.C. § 78u-4(b)(3) ..................................................................................... *passim*

Fed. R. Civ. P. 11.....................................................................................1, 4, 6, 24, 25

Fed. R. Civ. P. 54(b) ......................................................................................................1

Defendants respectfully submit this memorandum in further support of their Motion for Reconsideration of the Court's August 24, 2020 Memorandum Order and Motion for Sanctions under Rules 11 and 54(b) of the Rules and the PSLRA (the "Motion") [ECF No. 104].[1]

## PRELIMINARY STATEMENT

In the Motion, Defendants demonstrated that the Complaint should be dismissed with prejudice because of the misconduct and dishonesty surrounding Plaintiffs' counsel's ("Counsel's") collection and presentation of CW allegations. The Motion also explained why the Complaint survived the Motion to Dismiss only by dint of the false and illicitly obtained CW statements, and that, when the Complaint is corrected to accurately reflect the CW statements, dismissal is virtually automatic.

In particular, Defendants offered the signed declarations of three out of Counsel's six CWs stating that: (1) they told Counsel or their private investigators ("PI") that they wanted no part of any litigation; (2) they were never informed that, despite their wishes, Counsel used statements attributed to them anyway; (3) they were never shown a draft of their attributed statements and were unaware that they were included in any complaint; and (4) the statements attributed to them are false, as they told Counsel and PI the exact opposite of what is claimed in the Complaint. Indeed, the true statements made by the CWs to Counsel and the PI were fatal to Counsel's case. Defendants also offered declarations from representatives of both Sasol and its contractor Fluor, explaining that a centerpiece of the Complaint—the supposed statement by CW-1 that Fluor sent Sasol a legally binding, non-negotiable $11.7 billion Change Order—was false because there simply is no such thing as a legally binding, non-negotiable Change Order for Fluor to send. Finally, Defendants demonstrated that Counsel's conduct to date in this litigation appeared to be a

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

conscious cover-up of these facts.

Based on these "rather troubling" allegations, this Court ordered expedited discovery into Counsel's conduct, recognizing that, as Judge Engelmayer put it, it is "difficult to come up with a good reason why" counsel would ever do what Counsel appeared to have done here. Tr. at 2:21, 16:18 (Nov. 10, 2020) ("Nov. 10 Tr.") (citing *In re Millennial Media, Inc. Sec. Litig.*, 2015 WL 3443918, at *11 (S.D.N.Y. May 29, 2015)).

Defendants have now concluded this investigation and the results do far more than confirm beyond doubt all previously known facts. The record now reflects, based on sworn testimony from the CWs as well as internal records and notes from both Counsel and their PI, that:

- Counsel falsified numerous critical CW allegations that Judge Rakoff relied on in denying Defendants' Motion to Dismiss, including CW-1's central Change Order allegation.

- Counsel included allegations in the Complaint that the CWs never made, and knowingly proceeded in the face of glaring red flags.

- Counsel included CWs in the Complaint without their consent or even notification and left a trail of frustrated, abused CWs in their wake.

- Counsel made false statements to Judge Rakoff about the CW statements during oral argument on the Motion to Dismiss.

- Counsel made false statements to this Court at the November 10, 2020 conference on this Motion.

Defendants present this record below. This report is based entirely on the sworn deposition testimony of the CWs themselves, and on production of Counsel's own internal notes, emails and private investigator files, as directed by the Court. Yet unlike the plaintiffs in *Millennial Media*, who had the "professional responsibility" to voluntarily dismiss their case when their CW infirmities were exposed, Counsel continue to press their case and misrepresent the facts in doing so. *Millennial Media*, 2015 WL 3443918, at *14 n.11. Unfortunately, Counsel did exactly this once before, in a prior case where they were sanctioned. *See Johnson v. Smithkline Beecham Corp.*,

2

2015 WL 1004308, at *14 (E.D. Pa. Mar. 9, 2015) ("[I]n resisting sanctions, Hagens Berman felt no obligation to remain tethered to the truth.").

We respectfully submit that as a result, the Complaint must be dismissed and further sanctions imposed. For one thing, had the truth of the CW allegations been before the Court, the Complaint would have stood no chance of surviving a Motion to Dismiss. Counsel's own records concede this, describing now-repudiated CW testimony as necessary to ██████████████████ ████████ *See infra* at 10. The investigation has exposed the falsified allegations in the Complaint, namely: (1) Counsel and their PI were repeatedly told the Lake Charles Chemicals Project ("LCCP") was on time and on budget, contrary to their fundamental theory of the case; (2) Counsel falsified *all* of the critical allegations of the Individual Defendants' actual knowledge of any alleged misstatements; (3) Counsel falsified CW-1's account of a legally binding Change Order; and (4) Counsel had no CW allegations for nearly half of the Class Period. Each of these flaws could independently justify reconsideration and dismissal; together, they demand it. Second and independently, Counsel's grave misconduct in falsifying allegations, harassing CWs, obstructing discovery, and lying to this Court justify a sanction of dismissal and an award of fees and costs.

Counsel's actions here are the culmination of a disturbing trend of CW-related misrepresentation and misconduct that demands redress. *See Millennial Media*, 2015 WL 3443918, at *12 (lamenting the "growing body of cases chronicling the repudiation by CWs"). This record brings to a head years of judicial suspicion about misconduct in respect to CWs. The Court-ordered investigation here offers a peek behind the curtain to see that misconduct as plain as day. Below, Defendants briefly summarize the legal background regarding the PSLRA's demands for increased particularization of allegations of scienter, the perverse incentives behind the growing role of CWs, and the enhanced judicial controls placed around the use of CWs in

3

response. Then, Defendants present the factual report of the investigation into Counsel's conduct. The final section of this Memorandum discusses the conclusions Defendants respectfully ask the Court to draw from this factual record.

## I. LEGAL BACKGROUND

Although Counsel's misconduct here is uniquely egregious, it epitomizes a systemic problem. The heightened pleading standard imposed by the PSLRA has encouraged plaintiffs to rely on CW allegations, which carry manifest potential for fraud and abuse. In a growing number of cases, courts have found plaintiffs engaging in troubling and unethical conduct in securing CW allegations and have dismissed complaints rife with untrue CW allegations. This concern about problematic practices involving CW allegations frames Defendants' investigation into Counsel's conduct here and underscores the need for this Court's intervention.

Congress enacted the PSLRA, with a heightened pleading standard and automatic stay of discovery, to "curb perceived abuses of the § 10(b) private action" and prevent plaintiffs from forcing defendants into discovery (and settlement) on the basis of weak allegations of securities fraud. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007); *see Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (describing "the abuse of the discovery process to impose costs so burdensome that it is often economical for the victimized party to settle"). To that end, the PSLRA also makes sanctions for Rule 11 violations mandatory to "tilt the 'balance' toward greater deterrence of frivolous securities claims." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 579 F.3d 143, 152 (2d Cir. 2009). "While designed to give district courts a 'gatekeeper' responsibility to derail dubious class action lawsuits at the outset," Judge Rakoff has explained, "an unintended consequence" of the PSLRA has been the growing use of CW allegations. *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 952 F. Supp. 2d 633, 635 (S.D.N.Y. 2013).

Recognizing the potential for fraud and abuse with allegations attributed to secret sources,

courts are supposed to view CW allegations with skepticism. Courts may consider only allegations attributed to CWs described with "sufficient particularity to support the probability that a person in the [CW's] position . . . would possess the information alleged." *Novak*, 216 F.3d at 314. And courts are "loathe . . . to sustain as sufficiently particular securities fraud complaints based on uncorroborated statements by CWs." *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 798-99 (S.D.N.Y. 2020). As Judge Posner put it, CW allegations "require a heavy discount" because "[t]he sources may be ill-informed, may be acting from spite rather than knowledge, may be misrepresented, may even be nonexistent—a gimmick for obtaining discovery costly to the defendants and maybe forcing settlement." *City of Livonia Emps.' Ret. Sys. v. Boeing Co.*, 711 F.3d 754, 759 (7th Cir. 2013).

But in a growing number of cases, investigations have uncovered sanctionable misconduct in connection with CW allegations. In *Boeing*, the district court dismissed a securities-fraud complaint with prejudice and imposed sanctions where the key CW denied making nearly every statement attributed to him. *City of Livonia Emps.' Ret. Sys. v. Boeing Co.*, 306 F.R.D. 175 (N.D. Ill. 2014). Recognizing that "the PSLRA requires counsel to conduct a more diligent pre-filing investigation in cases involving securities fraud than in other contexts," *id.* at 180, the court found much to criticize in plaintiffs' pre-filing actions: "Plaintiffs' counsel never interviewed [the CW] themselves[,] and never attempted to verify any of the information [the CW] allegedly provided the[ir] investigator," which was particularly problematic because "the investigator herself noted in her report that some of the information the [CW] provided was unreliable." *Id.* at 181. The *Boeing* court summarized counsel's misconduct sharply: "Plaintiffs' counsel knew that the information [the CW] provided the investigator was unverified and potentially unreliable and that [he] refused to cooperate further, and yet repeatedly made assurances to the court as to the truth of the

5

allegations." *Id.* at 182. "The information turned out to be blatantly false," the court went on, "and if counsel had made any attempt to verify the information, they would have easily discovered this." *Id.* Such behavior, the court concluded, was "reckless and unjustified" and violated Rule 11. *Id.*

In this District, Judge Engelmayer outlined a similar standard in *Millennial Media*. There, of 11 CWs, "10 were never told that they would be so identified in a Complaint, [and] at least four . . . claim to have been misquoted or misleadingly quoted." *Millennial Media*, 2015 WL 3443918, at *5. Judge Engelmayer had "no occasion to rule on the propriety of counsel's practices" because the plaintiffs voluntarily dismissed the case in an "act of professional responsibility." *Id.* at *5, *14 n.11. But the Court nonetheless stated the expectations in this District for counsel relying on CW allegations. Recognizing that the complaint's "deficiencies could have been avoided had counsel sought to confirm with these witnesses the facts and quotations that counsel proposed to attribute," the Court found it "difficult to come up with a good reason why counsel would *not* attempt to confirm with a witness . . . the accuracy of the statements that counsel intended to attribute to them." *Id.* at *11. "Perhaps counsel were pleased with the pungent sound-bites that the investigator reported," or "[p]erhaps counsel feared that a follow-up call . . . might . . . result[ ] in adjustments that might weaken the draft Complaint," Judge Engelmayer hypothesized. *Id.* "But those are not good reasons to refrain from checking factual accuracy," because "the Federal Rules of Civil Procedure do not countenance a 'see no evil' approach to pleading." *Id.* Setting the rule for future cases, and putting plaintiffs on notice of the risk of sanctions for noncompliance, Judge Engelmayer concluded: "[W]here a Complaint proposes to rely on quotes drawn from an investigator's memo recounting an unrecorded witness interview, it is reasonable to expect counsel, before filing the Complaint, to attempt to confirm with the witness the statements that counsel proposes to attribute to him and to assure that the Complaint is presenting these statements

in fair context." *Id.*

## II. REPORT OF INVESTIGATION

A.    **CW-2, CW-4, AND CW-5 CONFIRMED EVERYTHING IN DEFENDANTS' MOTION AND REVEALED NEW DEPTHS TO COUNSEL'S MISCONDUCT.**

As Defendants explained in the Motion (and supported with sworn declarations) CW-2, CW-4, and CW-5 repudiated the statements attributed to them and explained that they told Counsel that the LCCP was on time and on budget when they worked on the project or that they had no basis to believe otherwise—directly contradicting the central theory of liability advanced in the Complaint. Counsel's own documents and depositions of these CWs confirm all of this and more.

1.    **CW-2 told Counsel their theory of the case was wrong yet Counsel pressed forward at great personal cost to CW-2.**

CW-2, the only "high-ranking" employee of the CWs, was Counsel's key connection to the Individual Defendants' actual knowledge. MTD Order at 12. This nexus to the knowledge of senior management is a required element of a securities fraud complaint. *Id.* at 13. In this regard, CW-2 supposedly "expressed concerns about the cost and timeline of the LCCP to defendants Nqwababa, Cornell, and Victor on several occasions," *id.* at 14 (citing AC ¶ 76), and said "that it was 'clear from the beginning' that the [LCCP] was going to cost more than $8.1 billion," AC ¶ 76. The former claim was cited by Judge Rakoff, along with CW-1's also now-disproved allegations, *see infra* at 15-19, as the only particularized allegations connecting any Individual Defendants' state of mind to any alleged misstatements. *See* MTD Order at 14, 19-20. But this allegation was false: CW-2 never said it and all other attributed allegations in an affidavit and deposition. What CW-2 instead said to Counsel's PI—directly contrary to Counsel's theory of the case—was the exact opposite: that there were no major cost issues with the LCCP. The investigation further revealed that Counsel attributed false allegations to CW-2 against CW-2's clear wishes and knowing that it could destroy CW-2's career.

a.    *CW-2:* ███████████████████████████████

CW-2 confirmed in a deposition—just as CW-2 had in her declaration—that the critical allegations attributed in the Complaint were invented by Counsel. *See* CW-2 Decl. CW-2 "did not tell [the] investigator that it was 'clear from the beginning' that the LCCP would cost more than $8.1 billion," and to the contrary said that the LCCP was on time and on budget. CW-2 Decl. ¶ 8. Nor did CW-2 raise concerns about cost overruns or the LCCP schedule to any Individual Defendant. Ex. 2, CW-2 Tr. 43:10-13 ("Q Did you, in fact, raise concerns with Mr. Cornell, Nqwababa and Victor about the risk of Sasol exceeding LCCP cost estimates? A No."); *see also id.* at 43:18-25 ("Q You told [the PI] that you raised concerns with Mr. Cornell, Nqwababa and Victor about the risk of Sasol staying on schedule for completion of the project, correct? A . . . I think words are being twisted here, that is not what I would have said.").

Indeed, the record confirms she never made the statements attributed to her: the PI notes reveal that CW-2 in fact said that ████████████████████████████████████ and that ████████████████████████████████████████—directly contrary to the allegations Counsel attributed to CW-2 and rebutting their central claim that the LCCP was billions of dollars over-budget. Ex. 7, PI Notes, PLAINTIFFS4094, 4101. At most, the PI notes state, ██████████████████████████████████████ *Id.* at PLAINTIFFS4095. But CW-2 repudiated ever making this statement, and has no idea what unspooling even means. *See* CW-2 Tr. 34:19-25 ("Q You told Ms. Browning that you were not surprised that things unspooled after you left, correct? [A] No that's not a word I would even use."). So despite these clear assertions by CW-2, recorded in contemporaneous notes and confirmed in a deposition, Counsel attributed falsified allegations "that it was 'clear from the beginning' that the [LCCP] was going to cost more than $8.1 billion" and that CW-2 told specific Defendants of these imagined overruns. AC ¶ 76.

The record even shows that Counsel recognized these deficiencies and the need for further

follow-up with CW-2, yet never did so. After CW-2's first interview, the investigator ███████ ████████████████████████████████████████████████████ but CW-2 ██████████ ████████████ Ex. 8, PLAINTIFFS4076. Counsel, in an email to their investigator, confirmed the need for follow-up: ██████████████████████████████████████████████████████ ████████████████████████████████████████████████ Ex. 9, Email from L. Gilmore to C. Szechenyi dated May 20, 2020, PLAINTIFFS4384. This email amounts to an admission by Counsel that they believed that in order to include CW-2 in the Complaint, they needed to follow up to verify the allegations and secure CW-2's consent. But Counsel never successfully followed up with CW-2, never secured consent, never confirmed the accuracy of these plainly false allegations, and proceeded anyway.

    **b.**  *CW-2: "I continuously [said] I was not interested in being a part of this lawsuit"*

Investigation further revealed that Counsel included CW-2 in the Complaint (after Counsel's PI told CW-2 they would not) despite CW-2's concern it could cause grave reputational harm. CW-2 made clear that "I continuously told [the PI] I was not interested in being a part of this lawsuit." CW-2 Tr. 15:17-19. The PI's notes reflect that CW-2 was ██████████████████ ██████████ and ████████████████████ Ex. 7, PI Notes, PLAINTIFFS4094-96; *see* Ex. 8, PI Memo dated May 20, 2020, PLAINTIFFS4075, 4078 (reporting this concern to counsel). The PI even quoted CW-2 to Counsel as saying that ███████████████████████████ ██████████ *Id.* In response, *the PI promised CW-2 she would not be included in the lawsuit.* This was not true. *See* CW-2 Tr. 18:9-12 ("[The PI] misled me by saying that I would not be a part of the lawsuit, so as a matter of fact I shouldn't be sitting here if she had honored my wishes."). So not only did Counsel attribute false allegations to CW-2 that CW-2 had no chance to review or verify (and roundly repudiated at the first opportunity), they did so without CW-2's consent and

after telling CW-2 they would not, all while knowing that doing so could harm CW-2's career.

>    **2.    Counsel viewed CW-4 as the lynchpin of the Complaint and so attributed false allegations to him despite glaring red flags.**

In the Complaint, Counsel attributed to CW-4 the allegation that Sasol employees were directed to manipulate accounting to hide increasing costs, AC ¶¶ 87-89, and claimed that "CW-4 believed that Defendant Cornell knew the . . . $11.1 billion budget, was too low," *id.* ¶ 133.[2] CW-4, like CW-5, and CW-2, already submitted a declaration repudiating the key allegations attributed to him. *See* CW-4 Decl. The investigation, however, has now revealed that Counsel believed CW-4 to be the lynchpin of the Complaint, as he was the only CW involved with the LCCP for much of the five-year Class Period, and that there were obvious red flags going to the heart of CW-4's supposed allegations—including that CW-4 himself denied the allegations outright in a text. Despite this, Counsel never verified the allegations with CW-4, who adamantly refused further contact, and attributed unverified and untrue allegations to him in the Complaint nonetheless.

>    a.    *Counsel:* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Counsel's own records make clear that they viewed CW-4's allegations as critical to the Complaint's survival. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ Counsel wrote to their PI just days before they filed the Complaint. Ex. 10, Email from J. Patterson to C. Szechenyi, dated May 27, 2020, PLAINTIFFS4771. ▮▮ ▮▮▮ Counsel continued, ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* Accordingly, Counsel told their investigator that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[2]    Judge Rakoff mentioned only the first of these two allegations in support of the conclusion that "the complaint . . . demonstrates that Sasol's public cost estimates and schedule were entirely inconsistent with the reality of progress at the LCCP." MTD Order at 10-11.

███████████████████████—making clear that the Complaint's viability hinged on CW-4's supposed allegations and that, as of a week before the Complaint was filed, those allegations needed follow-up. *Id.* That never happened.

     **b.**     ***CW-4:*** ████████████████████████████████████

Counsel's investigator interviewed CW-4 just once, and that interview left critical gaps in CW-4's supposed testimony that were never filled. It was clear to the PI from the outset that her interview was unclear and inadequate. *See* Ex. 11, Email from L. Browning to C. Szechenyi dated May 7, 2020, PLAINTIFFS5099 (describing CW-4's interview as ████████████████). Counsel, too, immediately raised a number of concerns, making clear that a re-interview was necessary. Ex. 12, Email from L. Gilmore to C. Szechenyi, dated May 8, 2020, PLAINTIFFS4414 (██████████████████████████████████████████████ ████████). Counsel followed up with a memo raising specific, fundamental questions for CW-4, including, ██████████████████████████████████████████ ████████████████████ and ████████████████████████ Ex. 13, Memo from L. Gilmore to C. Szechenyi, dated May 12, 2020, PLAINTIFFS4403-04.

But Counsel's own critical questions went unanswered, as CW-4 made clear that he refused to participate in any litigation against Sasol and refused further communications after the initial interview. Counsel's PI's notes describe how CW-4 said ████████████████████ ████████████████████ Ex. 14, PI Notes, PLAINTIFFS4917. And mere days before the Complaint was filed, the PI, reviewing a draft of the Complaint, confirmed that they could not be sure they ████████████████ because ████████████████████ *See* Ex. 15, Email from C. Szechenyi to J. Patterson dated June 3, 2020, PLAINTIFFS4274.

The PI's communications with CW-4, far from verifying the Complaint's allegations, instead raised blatant red flags. When the PI texted CW-4 after their initial conversation, CW-4

refused further contact and told her that ████████████████████████████████

██████ Ex. 16, Messages from L. Browning to CW-4, dated May 14, 2020, PLAINTIFFS4136.

CW-4—in an attempt to stop the PI's repeated, harassing contact—asked for a five-million-dollar

payout and said that ████████████████████████████████████████████████████

███████████████████████████ *Id.*[3] Based on this exchange, the PI assumed CW-4 could not be

included in the Complaint: ████████████████████████████████ the investigator wrote

in an email, pointing to ████████████████████████████████████ Ex. 17, Email

from L. Browning to C. Szechenyi, dated May 14, 2020, PLAINTIFFS5098. As stated by CW-4

in his deposition, they did not turn him. *See* CW-4 Tr. 45:20-23.

Thus Counsel, without CW-4's consent, without showing him the Complaint, without

answers to their own concerns about their investigator's sole interview with him, and despite CW-

4's express announcement that his statements were untrue, attributed false allegations to CW-4 in

the Complaint. This includes allegations about the LCCP cost estimate CW-4 has since repudiated,

*see* CW-4 Decl.; CW-4 Tr. 52:12-14, and which Counsel's own PI notes reveal to be falsified, as

CW-4 admitted to being in no position to speak about the project's overall budget. *Compare* AC

¶ 86 (CW-4 "saw [that] the revised $11.1 billion cost estimate [was] too low"), *with* Ex. 14, PI

Notes, PLAINTIFFS4925 (████████████████████████████████████████████

████████████████████████). And now the reason Counsel did so is clear: They believed

that only CW-4—the only CW covering several years of the Class Period—could ████████

████████████████ and without him their Complaint would be dismissed.

---

[3]       CW-4 explained in his deposition that he was "trying to get the [PI] to stop calling me and texting me and leaving voice messages, because it was disruptive . . . and I stated multiple times to that lady I don't want anything to do with this, and now here I am[.]" CW-4 Tr. 26:24-27:9.

**3.    CW-5 confirmed that Counsel knowingly falsified allegations and abused nonconsenting CWs.**

In the Complaint, Counsel asserted that CW-5 said (in the only allegation by CW-5 cited by Judge Rakoff) "that an $11 billion cost estimate was 'socialized among senior management' from the beginning" and that "defendant Cornell 'would have' known about the cost issues." MTD Order at 14 (quoting AC ¶ 95). Although Judge Rakoff already found these allegations "not particularized enough to support scienter as to any individual defendant," *id.*, and although CW-5 already repudiated these allegations in a declaration, *see* CW-5 Decl. ¶ 7, CW-5's deposition and Counsel's own documents reveal that CW-5 told *Counsel* (and their PI, too) that the LCCP was in fact on time and on budget and that he adamantly refused to participate in any litigation against Sasol. Yet Counsel included CW-5 in the Complaint anyway, attributing to him exactly the opposite of what he had said and leaving him furious.

**a.    *CW-5: "I can walk you through . . . my statement with your damn attorney present saying that it was on time and on budget for $8.9 billion, that was the correct number, nobody believed differently."***

CW-5's deposition and Counsel's documents not only confirm CW-5's repudiation of the allegations attributed to him, but also show how CW-5 (like CW-2) expressly rejected Counsel's basic theory of the case that the LCCP was over budget from the outset. CW-5 described Counsel's misrepresentation bluntly in his deposition. When asked whether he had agreed with Counsel's investigator "that the $8.9 billion estimate was low," CW-5 answered, "Not just no, but hell no." Ex. 5, CW-5 Dep. Tr. 27:3–6. PI notes confirm that CW-5 said that ███████████ and that ███████ Ex. 18, PI Notes, PLAINTIFFS4084-85. When asked if he had said that management knew about the $11 billion estimate—CW-5's only allegation specifically cited by Judge Rakoff, MTD Order at 14—CW-5 replied, "Absolutely not, no, no, no . . . this is a complete lie from your firm. I did not talk $11

13

billion at any point, no." CW-5 Dep. Tr. 38:14-22; *see also id.* 22:18-23 ("I was consistent in saying that I was at best fuzzy in terms of specific dates and numbers. So I did not confirm any specific numbers[.]"). "I can walk you through both multiple conversations with your investigator and also my statement with your damn attorney present," CW-5 went on, "saying that it was on time and on budget for $8.9 billion. That was the correct number, nobody believed differently, and you're fabricating something to try to prove it differently." *Id.* at 38:24–39:8. "You put words in my mouth in this case, against my express wishes, and you made it up." *Id.* at 39:10–12.

### b. *CW-5: "[F]rankly I hope you get sanctioned."*

The hearing before this Court and subsequent investigation further exposed Counsel's failure to secure the CWs' consent to be included in the Complaint, failure to verify the Complaint's allegations with the CWs, and the CWs' resulting—entirely justifiable—outrage. Indeed, Counsel admitted to this failure: When asked by the Court at the hearing on Defendants' Motion "whether or not . . . all six of the [CWs] were shown the statements in the complaint that were attributed to them," Counsel responded, "No, they were not." Nov. 10 Tr. at 16:22–17:3. And Counsel's own documents confirm that this was exactly the case with CW-5.[4]

But here, too, there is no substitute for the unmistakable clarity of CW-5's own words. When asked about a follow-up call CW-5 asked to schedule with Counsel, CW-5 said in deposition, "Yeah, so that your legal team would hear that I had no desire to be involved in your case." CW 5 Depo. Tr. 14:6-12. CW-5 also confirmed that when Defendants contacted him, months after the Complaint had been filed, "that was the first time at which I was aware that *despite my express wishes* that something actually got filed." *Id.* at 31:10–24 (emphasis added). CW-5

---

[4]     Counsel's notes of a conversation with CW-5 confirm CW-5's unwillingness to participate in this litigation, as CW-5 said, ███████████████████████████ Ex. 19, PI Notes dated June 1, 2020, PLAINTIFFS5124. The conversation ended when CW-5 was ████████████████████████████████████ *Id.*

concluded his deposition with a plea to the Court:

> Q    [Y]ou told [the investigator] that the $11 billion cost for LCCP at the time you were there was "socialized" correct?
>
> . . .
>
> A    This is wrong on a couple of levels. First I never referred to an $11 billion cost estimate, period, that's your fabrication a complete lie, made up by your team.
>
> Don't associate that with anything that I said; ever.
>
> And this should be criminal, I hope the judge in this case takes this into consideration and sanctions you.
>
> Because you had a legal team member present when I was very clear that this was on time, on budget for $8.9 billion and based on everything that I knew, and on top of that gave you no permission, none, to cite me in this case yet you dragged me into it.
>
> So I am angry about that, and frankly I hope you get sanctioned.

*Id.* at 65:14-17, 65:20-66:13.

## B.    COUNSEL FALSIFIED CW-1'S ALLEGATIONS—INCLUDING THE CHANGE ORDER ALLEGATION.

The primary allegation attributed to CW-1 in the Complaint was that Sasol received a "legally binding" Change Order in February 2016 non-negotiably raising the cost of the LCCP to $11.7 billion. AC ¶ 21. Counsel made this allegation a centerpiece of their case. They stood by this claim in the face of repeated questioning by Judge Rakoff and attested to their diligence in confirming this allegation. *See* Tr. at 26:17-19 (Aug. 20, 2020) ("All of that paragraph is the CW statement, and we were careful in providing it to the court. That is the CW's statement. We confirmed it."); *see also id.* at 22:18 ("[CW-1] knew it was legally binding"); *id.* at 26:25-27:6 (same); *see also* Opposition to Motion to Dismiss at 23, ECF No. 68 ("CW-1 describe[d] . . . [the] legally binding nature of the Change Order"). The Change Order thus became foundational to Judge Rakoff's opinion denying Defendants' Motion to Dismiss. *See* MTD Order at 4

("Particularly damning[,] is [CW-1's] revelation that defendants had received a contractually binding 'Change Order.'"); *see also id.* at 11, 18. Judge Rakoff also cited a second allegation attributed to CW-1—that Defendant Schoeman told CW-1 "things are not good" with the LCCP—explaining that CW-1's allegations, along with CW-2's, were the only particularized CW allegations of the Defendants' actual knowledge of alleged misstatements. *Id.* at 14-15 (quoting AC ¶ 69). But investigation confirmed that Counsel knew neither of CW-1's allegations was true.

### 1.    CW-1: "No change order is acted upon unless it's approved by the client."

Investigation revealed that Counsel had no basis whatsoever for alleging that the Change Order was legally binding, much less for telling this Court—repeatedly—that they verified this was true.[5] CW-1 confirmed in his deposition that he said nothing of the sort:

> Q. I'm asking you if you told them that as a matter of contract all Fluor has to do is revise its estimate and Sasol is legally obligated at that point with no ability to say anything, it has to pay whatever Fluor tells it to pay?
>
> A. No.
>
> Q. That's not true, is it?
>
> A. Correct[.]

Ex. 1, CW-1 Tr. 26:9-17. The Change Order, CW-1 confirmed, "is an estimate," *id.* at 17:16-19, that "would be reviewed by Sasol and discussed [and] [n]egotiated," *id.* at 27:3-9. "No change order is acted upon," he said "unless it's approved by the client." *Id.* at 18:19-20. CW-1 told this critical fact—that, contrary to Counsel's repeated representation, the Change Order was *not* legally binding—not just to Counsel's investigator, but also to Counsel directly. *Id.* at 27:3-9.

All of this fits perfectly with the declarations from Sasol and Fluor that Defendants

---

[5]    In connection with the Motion, Defendants submitted sworn affidavits from executives at Sasol and Fluor confirming that such a legally binding Change Order could not and did not exist. *See* Niemand Decl. [ECF No. 105-5]; McNulty Decl. [ECF No. 105-6]. While these declarations suffice to prove the falsity of the Change Order allegation, the Court need not rely on them, as the Court-ordered investigation has independently confirmed the same.

submitted together with the Motion. CW-1 entirely agrees with their descriptions of a Change Order. CW-1's deposition testimony also is fully corroborated by Counsel's own documents. Counsel told this Court that they had "copious notes and memorandums of what [the CWs] said." That is a false statement based on review of their production: *there is no record of CW-1 ever saying that the Change Order is legally binding*. Nov. 10 Tr. at 24:10-11. The opposite is true. A PI memorandum of an interview with CW-1 explains that when ████████████████████████ ████████████████████████████████████████████████████████ Ex. 20, PI Memo dated May 29, 2020, PLAINTIFFS4171 (emphasis added). ████████████████████

████████████████████████████████████████████████████████

████████████████████████████ *Id.* at PLAINTIFFS4172. Counsel recognized that this was a big problem. They immediately asked their PI in an email: ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ Ex. 21, Email from R. Kathrein to C. Szechenyi, dated May 29, 2020, PLAINTIFFS4157.

Investigators' notes from follow-up interviews with CW-1 nowhere refer to the Change Order as legally binding and instead confirm that Counsel knew that a Change Order was a negotiable estimate. In a follow-up interview, CW-1 explained (according to a PI memo) that ████████████████████████████████████████████ Ex. 22, PI Memo dated June 1, 2020, PLAINTIFFS4295 (emphasis added). Contemporaneous notes confirm that Counsel was concerned: Counsel asked ████████████████████████ and—████████████████████

████████████████████████████████████████████████████████

████████████████████ Ex. 23, PI Notes dated May 29, 2020, PLAINTIFFS4950 (emphasis added). PI notes from another follow-up call confirm that Counsel concluded that the Change Order was

17

just an estimate—exactly as CW-1 stated in his deposition. Counsel acknowledged that CW-1's

████████████████████████████████████████ but went on to describe the Change Order

as an ████████ Ex. 24, PI Notes, PLAINTIFFS5114-17 ████████████████████

████████████████████████████████████████████). These

notes also include an urgent note from Counsel, explaining that the Change Order story was far

from clear: ████████████████████████████████████████

████████████████ *Id.* at PLAINTIFFS5118. Thus the final pre-filing document supposedly

capturing CW-1's allegation that a legally binding Change Order was seen by senior management

instead shows that the Change Order was an estimate and counsel didn't know who saw it.

2.      **Investigator:** ████████████████████████████████

████████████████████████

Beyond the Change Order allegations, Judge Rakoff also cited CW-1's allegation "that

*defendant Schoeman* told him that 'things are not good' with the [LCCP] based on the updates on

progress and costs." MTD Order at 14 (emphasis added) (quoting AC ¶ 69). That this statement

was attributed to "defendant Schoeman" was critical and deliberate, because CW-1's allegations

were (along with CW-2's) the only sufficiently particularized allegations providing the essential

nexus between any alleged CW knowledge of falsity and senior management. *See id.* But this

allegation, too, was false.

The evidence is now clear that CW-1 never attributed this statement to Schoeman or any

other Defendant. What is more, Counsel knew as much and intentionally misrepresented the

allegation, presumably in an attempt to establish the necessary nexus to the Individual Defendants.

An investigators' memo to Counsel explains that CW-1 described cost reports that went to ████

████████████████ who was several layers less senior than Schoeman, and who said that

████████████████ Ex. 25, PI Memo dated June 3, 2020, PLAINTIFFS4264 (████████

████████████████████ ). Counsel's handwritten notes likewise reflect that Olaf Muller, and not Defendant Schoeman, made this statement. Ex. 26, J. Patterson's Notes, PLAINTIFFS5081-83 (██████████████████████████ ). *Critically, no contemporaneous records reflect CW-1 stating that it was Defendant Schoeman who made this statement.*

The attribution to Defendant Schoeman appears to have been a deliberate falsehood by Counsel. In an email to Counsel—subject line: ██████████████████████████ ██—the PI quoted Counsel's misrepresentation of this allegation from a draft of the Complaint and wrote beneath it in bold: ██████████████████████████ ██████████████████ Ex. 27, Email from C. Szechenyi to R. Kathrein, dated June 3, 2020, PLAINTIFFS4258. Counsel disregarded this warning and included it in the Complaint anyway.

## C.     THE REMAINING CWS REVEALED FURTHER MISREPRESENTATIONS AND MISCONDUCT BY COUNSEL.

The last two CWs, CW-3 and CW-6, were those least relevant to Judge Rakoff's ruling on the Motion to Dismiss. The Court cited just one of their supposed allegations—CW-6's claim that "'management' directed him and his colleagues to manipulate construction schedules"—and explained that it did not "directly support[ ] actual knowledge . . . by any given defendant." MTD Order at 14 (quoting AC ¶ 97).[6] Even so, investigation has shown that Counsel misrepresented these CWs' allegations, in a clear attempt by Counsel to bolster their claim of the Individual Defendants' knowledge. Moreover, Counsel's diligence in verifying these allegations only demonstrate their deliberate disregard with other, more significant CW allegations.

### 1.     CW-3: "I had no contact with senior management."

Although Judge Rakoff did not meaningfully rely on CW-3 or CW-6, their allegations were

---

[6]     The only apparent mention of CW-3's allegations cites this same CW-6 allegation. *Compare* MTD Order at 11 (citing paragraph 97 and attributing it to "CW-3"), *with* AC ¶ 97 (describing allegations attributed to CW-6).

nonetheless misrepresented by Counsel as part of their concerted attempt to falsely implicate senior management. Counsel attributed to CW-3 the allegation that "senior management knew prior to June 2016 that the $8 billion budget was unrealistic." AC ¶ 138. Yet CW-3 could attest to no such thing: he instead admitted that he told Counsel he knew nothing at all about what senior management knew and had no involvement in the preparation of the LCCP's overall cost projections. *See* Ex. 3, CW-3 Dep. Tr. 43:19–44:4 ("Q Am I correct that you did not have any firsthand knowledge concerning senior management's knowledge or lack thereof concerning cost overruns? . . . A Yes, I had no contact with senior management."); *id.* at 29:21–30:2 ("Q Did you tell [Counsel's investigator] that you had direct firsthand knowledge concerning the preparation of LCCP's overall cost projection? A No, I didn't have -- I didn't tell her that.").

As for CW-6, Counsel attributed the allegation that "Defendant Schoeman . . . decided to decouple LCCP's construction schedules from its [startup] schedules, to show that more work had been completed." AC ¶ 98. But in his deposition, CW-6 explained that he told Counsel he had no direct recollection of Schoeman's involvement. *See* Ex. 6, CW-6 Dep. Tr. 36:15-37:4 ("Q During your conversation with Mr. Patterson, were you clear . . . with respect to Mr. Schoeman's involvement, it was your estimate or your guess but you didn't specifically recall that he was involved in the e-mail decoupling the schedule? A Yes, I did not have specific recollection of him being directly involved . . . Q And you obviously explained that to Mr. Patterson[,] right? A Yes."). In both cases—as with the falsified allegations attributed to CW-1, *see supra* at 15-19—Counsel falsified allegations in an attempt to allege actual knowledge on the part of senior executives.[7]

---

[7]    To the extent CW-3's or CW-6's affidavits conflict with their deposition testimony, it is yet another instance of Counsel's own fabrications, as Counsel drafted these affidavits, which were signed without question or revision. *Compare* Ex. 30, Email from L. Gilmore to F. Schirripa, dated Nov. 5, 2020, PLAINTIFFS4357-60 (CW-3 draft), *and* Ex. 31, Email from L. Gilmore to F. Schirrippa, dated Nov. 9, 2020, PLAINTIFFS004338-42 (CW-6 draft), *with* Ex. 32, Email from F. Schirripa to L. Gilmore, dated Nov. 6, 2020, PLAINTIFFS4145, 4150-52 (CW-3 final), *and* Ex. 33, Email from F. Schirripa to L. Gilmore, dated Nov. 10, 2020, PLAINTIFFS004139–4141 (CW-6 final).

**2.    Counsel's decency and diligence with CW-3 and CW-6 confirms that mistreatment of other CWs was knowing and intentional.**

Discovery revealed that Counsel verified the allegations with CW-3 and CW-6—the least important CWs, whose testimony Counsel had little reason to question. *See* Ex. 28, PI Memo dated June 2, 2020, PLAINTIFFS4307; Ex. 29, PI Memo dated June 8, 2020, PLAINTIFFS4509. Counsel even sent CW-6—the only CW represented by his own lawyer at the time—the Complaint after it was filed. *See* CW-6 Dep. Tr. 17:6-10. So Counsel had the wherewithal to show certain CWs the Complaint and recognized that ethical practice and common decency required them to verify the accuracy of attributed quotations (at least when counsel was in the picture). Yet for the CWs who wanted no part of any litigation, and who were trusting enough to talk to Counsel without their own legal representation, Counsel did no such thing.[8]

**D.    COUNSEL MADE FALSE STATEMENTS TO THIS COURT, REPEATEDLY.**

Finally, Counsel made false statements to this Court time and again, in papers and in person, including after their behavior was called into question by Defendants' Motion. Defendants already described how Counsel made false statements to Judge Rakoff in the Complaint, in the Opposition to Defendants' Motion to Dismiss, and at the hearing on that motion: In the face of direct questioning about CW-1's Change Order allegation, Counsel told Judge Rakoff over and over that "[w]e confirmed it," a claim discovery has revealed to be false. *See supra* at 15-18.

But Counsel's dishonesty continued at this Court's November 10, 2020, hearing on Defendants' Motion. In response to the Court's question "Do you still stand by the allegations in the complaint?" Counsel answered "The answer is, absolutely . . . . The complaint accurately

---

[8]    The investigation also puts the lie to Counsel's representations to the Court that they initially resisted discovery for the sake of the CWs themselves. Counsel told this Court they had withheld the CWs' identities in an attempt to "do [their] best to maintain [the CWs'] confidentiality." Nov. 10 Tr. at 18:13–14. But Counsel's antagonistic relationship with certain CWs confirms that Counsel had no regard for the CWs' best interests.

alleges . . . all of the CW accounts. There have been no fabrications, no exaggerations, period, and we'll submit evidence to the Court proving this." Nov. 10 Tr. at 2:23–3:9. Of course, everything described above shows why this was untrue—the Complaint is full of fabrications and exaggerations, period. Moreover, the record just described makes it simply not credible that Counsel believed this statement when he made it.

Counsel immediately followed that statement up with another false statement: "We have a trail of communications that our investigator[,] had with each of these confidential witnesses, that are going to show that the confidential witnesses were cooperating." *Id.* at 3:10-13. But what trail of communications? What cooperation? There is no world in which CW-5's statement that he "gave [Counsel] no permission, none, to cite me in this case yet you dragged me into it" could rightly be described as "cooperating." CW-5 Dep. Tr. 66:10–11. Counsel's next sentence was a false and malicious attempt to tar the repudiating CWs: "The three recanting CWs' affidavits . . . are verifiably wrong." Nov. 10 Tr. at 3:14-15. Yet, as explained above, all three CWs stood by their declarations and were not proved wrong. Counsel's opening statement culminated in a promise so badly broken it is now impossible to take seriously: "[W]ith this powerful evidence that's going to be before the Court, the Court is going to come to the conclusion that there was no attorney inaccuracy, fabrication, or exaggeration." *Id.* at 4:20-23.

Next, Counsel promised that the three non-repudiating CWs were "going to submit affidavits showing that . . . each and every one of their allegations are entirely accurate." *Id.* at 6:1-3. Specifically regarding the Change Order, when asked by the Court to respond to Defendants' contention that "the change order could not have existed in the way that it is presented in the complaint" (*i.e.*, as legally binding), Counsel said that "we'll address that through submitting a declaration by CW1." *Id.* at 6:17–20. But CW-1's deposition testimony quickly revealed that the

22

critical Change Order allegation was not true. The generic declaration prepared by Counsel just furthered the false statement, which is yet another instance in a series of Counsel's false statements, including in the Complaint, to Judge Rakoff, and now to this Court.

Counsel also claimed that they "did take efforts to ensure the accuracy" of the CW allegations, that they "attempted to contact them multiple times," *id.* at 17:6–7, and that the CWs' allegations were "supported through our copious notes and memorandums of what these individuals said," *id.* at 24:10-11. Counsel omitted that their notes and memorandums may recount what these individuals said but do not recount what Counsel attributed to them in the Complaint, which contradicts the notes, as described previously. Counsel also did not tell the Court that when they did contact CW-4, he told them he was lying, and yet they included his allegations anyway. Unfortunately—to quote another court describing Counsel's actions in another case—"the firm's dishonesty in resisting sanctions . . . only confirm[s]" their wrongdoing. *Smithkline Beecham Corp.*, 2015 WL 1004308, at *1.

### III. CONCLUSIONS

The factual record just described is drawn entirely from Counsel's own files and the mouths of their own CWs. This official record paints a disturbing picture of Counsel's misconduct, misconduct far worse than in either *Millennial Media* or *Boeing*. It offers a casebook study of everything that can go wrong when plaintiffs improperly use CW allegations to end-run the PSLRA's heightened pleading standard and automatic stay of discovery. This record calls out for this Court's intervention. The misconduct here is egregious.

First, merely to ask the question of whether a truthful complaint would have survived a Motion to Dismiss is to answer it: There is no way Judge Rakoff's opinion would have come out the same way had he known what this investigation has now revealed. Counsel all but admit it themselves, describing now-repudiated allegations as necessary to ▮▮▮▮▮▮▮▮ in their

23

Complaint. *See supra* at 10. Specifically, discovery has confirmed four critical flaws in the Complaint, any one of which would justify dismissal: First, Counsel premised their case on the claim that the LCCP was behind schedule and over-budget, yet they in fact heard the exact opposite, including CW-5's "statement with [their] damn attorney present saying that [the LCCP] was on time and on budget for $8.9 billion," which CW-2 likewise confirmed. CW-5 Tr. 39:2-4; *see supra* at 7-9, 13-14. Second, the only particularized allegations Judge Rakoff cited as supporting a nexus between senior management and alleged misstatements—from CW-1 and CW-2, *see* MTD Order at 14, 19-20—were false, and investigation in fact revealed a pattern of Counsel falsifying CW allegations in an attempt to create such a nexus where none existed. *See supra* at 7-9, 15-20. Third, CW-1's binding Change Order story—which was key to Judge Rakoff's ruling— was false. *See supra* at 16-18. And fourth, without CW-4's now-repudiated allegations, Counsel lack CW allegations for nearly half of the Class Period—the very hole they needed to plug. *See supra* at 10-12. Any one of these flaws would have sunk the Complaint—all of them together demand reconsideration and dismissal.

Second, to ensure both specific and general deterrence of Counsel's manifestly unlawful and unethical conduct, Rule 11 requires a more severe sanction—not just dismissal (which is independently justified as a sanction for Counsel's misconduct), but also an award of fees and costs and any further rebuke the Court deems appropriate. Counsel knowingly falsified nearly every key CW allegation in their Complaint, and signed their names to a theory of the case they were repeatedly told was untrue. To facilitate their falsehoods, they failed to undertake even the most basic inquiry into the accuracy of allegations they had every reason to question, much less the "inquiry reasonable under the circumstances" that Rule 11 demands. They violated the CWs' consent by including them in the Complaint against their wishes and despite being told that this

could cause great harm. They have misrepresented the truth to two different District Judges, both on paper and in person, over and over and over again. And in addition to this first-order misconduct, Counsel engaged in a persistent and unlawful scheme to cover it all up—a course of action for which they have previously been sanctioned. *See Smithkline Beecham Corp.*, 2015 WL 1004308, at \*1. Counsel thus violated each and every rule outlined in *Millennial Media* for appropriately handling CW allegations, and have brought to life (and exceeded in ways previously unimaginable) courts' greatest concerns about the abuse of CW testimony.

Moreover, if Counsel are permitted to proceed in the face of this incontestable record, the genie will be out of the bottle. It will be open season for other plaintiffs' counsel to fabricate CW allegations from whole cloth, deceive CWs about their intentions, and disregard CWs' wishes. This would turn the PSLRA on its head. The PSLRA's and Federal Rules' "exacting pleading requirements" and automatic stay of discovery (not to mention the PSLRA's mandatory sanctions provision) are designed to prevent plaintiffs from "abusively . . . impos[ing] substantial costs on companies and individuals whose conduct conforms to the law." *Tellabs*, 551 U.S. at 313. They are designed to prevent plaintiffs from using thin—much less, falsified—allegations to secure burdensome discovery with the hopes of later finding a basis to allege fraud. But that is just what Counsel admit to doing here. *See* Nov. 10 Tr. at 7:19-22 ("We're confident, *after we get that full discovery*, that we will submit evidence supporting defendant's knowledge that the costs were far greater than what was represented to investors." (emphasis added)). Allowing Counsel's conduct here without sanction will not stop Counsel or others from doing exactly the same thing again with the hopes of forcing a lucrative settlement before their misconduct is discovered.

Dated: New York, New York
December 15, 2020

Respectfully submitted,

 /s/ Jonathan D. Polkes
Jonathan D. Polkes
Caroline H. Zalka
Luna N. Barrington
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

*Counsel for Defendants Sasol Limited, David Edward Constable, Bongani Nqwababa, Stephen Cornell, Paul Victor, and Stephan Schoeman*

26