# EXHIBIT 3

**(Unredacted Version Filed Under Seal)**

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------x

CHAD LINDSEY MOSHELL, Individually

and on Behalf of All Others

Similarly Situated,

              Plaintiffs,      Case no.

             v.         1:20-cv-01008-JPC

SASOL LIMITED, DAVID EDWARD

CONSTABLE, BONGANI NQWABABA,

STEPHEN CORNELL, PAUL VICTOR, and

STEPHAN SCHOEMAN,

            Defendants.

---------------------------------------------x

            10:00 a.m.

           December 2, 2020

     VIDEOTAPED VIRTUAL DEPOSITION of ██████

██████ a Witness in the above entitled matter,

pursuant to Order, before Stephen J. Moore, a

Registered Professional Reporter, Certified

Realtime Reporter and Notary Public of the State

of New York.

Page 2

A P P E A R A N C E S:


            HAGENS BERMAN SOBOL SHAPIRO LLP

                    Attorneys for Plaintiff

                    455 Noth Cityfront Plaza

                    Chicago, Illinois 60611


            BY:    JERROD PATTERSON, ESQ.


            WEIL, GOTSHAL & MANGES, LLP

                    Attorneys for Defendants and the

                    Witness

                    767 Fifth Avenue

                    New York, New York 10153-0119


            BY:    LUNA BARRINGTON, ESQ

                    - and -

                    INGRID EICHER, ESQ.

                    - and -

                    CAROLINE ZALKA, ESQ.

                    - and -

                    AMAMA RASANI, ESQ.

                    - and -

                    JENNIFER LAU, ESQ.

Page 3

A P P E A R A N C E S   (Continued:)


          HACH ROSE SCHIRRIPA & CEVERIE LLP

                Attorneys for Witness

                112 Madison Avenue

                New York, New York   10016


          BY:    FRANK SCHIRRIPA, ESQ.

Page 4

█████████████

I N D E X

EXAMINATION BY:                                              PAGE

MS. ZALKA                                                       5

E X H I B I T S

EXHIBIT                                                  FOR IDENT.

Exbt 1    Amended Complaint                              21    6

Exbt 3    Investigator notes                            23    11

Exbt 4    Investigator memo                             30    18

Exbt 5    Transcription of                              34    15
          conversation

Exbt 2    Declaration of █████████           52    24

Page 5

THE VIDEOGRAPHER:  We are now going on the record at approximately 9:58 a.m.  Today's date is December 2nd, 2020.

This is the media unit number 1 of the video recorded deposition of ▮▮▮▮▮▮ ▮▮▮▮ taken by counsel for the Defendant in the matter of Chad Lindsey Moshell, et al., versus Sasol Limited, et al.

It is filed in the United States District Court, Southern District of New York.  Case number is 1:20-CV-01008-JSR.

The deposition is being held via Zoom virtual conferencing.  My name is Kevin Gallagher, I am the videographer. The court reporter is Stephen Moore.  We are both from Veritext Legal Solutions.

At this time attorneys present will identify themselves for the record.

MR. SCHIRRIPA:  Good morning. This is Frank Schirripa from the law firm of Hach Rose Schirripa & Cheverie for the witness, ▮▮▮▮▮▮▮▮ Thank you.

Page 6

MR. PATTERSON:  Good morning.
Jerrod Patterson, Hagens Berman, for
the Plaintiffs.

MS. ZALKA:  Good morning,
everyone, it's Caroline Zalka from
Weil, Gotshal for the Defendants.

THE VIDEOGRAPHER:  Now our court
reporter will swear the witness and we
can proceed.

███████████           ███████████,           called as a
witness, having been first duly sworn by
the Notary Public, was examined and
testified as follows:

EXAMINATION BY

MS. ZALKA:

Q     Good morning, ███████████
A     Good morning.
Q     As I mentioned, I am Caroline
Zalka, I am one of the attorneys for Sasol and
the executives in the securities class action.
Have you been deposed before?

A        No.

Q        So we will take this slow.  Just try not to talk over me, I'll try not to talk over you.  We will give Mr. Schirripa a chance to object if he would like to do so.

If you don't understand my questions, just let me know, I can try and rephrase.

If you want to take a break, just let me know, we can do that as well. Okay?

A        Okay, sounds good, yeah.

Q        I know it's odd to be deposed for the first time, but then particularly virtually by Zoom as well.

A        Yes.

Q        Okay, so you were employed by ▮▮▮▮▮▮▮▮▮▮ to work on an aspect of the LCCP project, is that correct?

A        Yes, that's correct.

Q        Were you employed by ▮ from around October 2014 to October 2015?

A        Yes.

Q        And your title was first

Page 8

commissioning manager during your time at TRS?

A       Yes.

Q       And you spoke with the Plaintiffs' investigator, Ms. Browning, back in May and June of this year, is that correct?

A       Yes.

Q       You described your role to Ms. Browning when you spoke with her in May and June?

A       Yes.

Q       And you told her that during your time at ███ and working on the LCCP that your role was to start up the ethane cracker, correct?

A       Yes.

Q       And did you -- you explained to her that this means that you were responsible for cleaning and preparing the ethane cracker for start-up, correct?

A       Yes, that's part of it, yeah.

Q       And you told her that you oversaw the commissioning parts of the LCCP project, is that correct?

A       Yes.

Page 9

█████████████████████

Q        When you said you oversaw the commissioning part of the LCCP project, did you tell her anything else about what that meant?

A        A little bit, yeah, what my responsibilities were.

Q        What did you explain to Ms. Browning about what your responsibilities were in May and June?

MR. SCHIRRIPA:  Objection. Caroline, this is the first deposition. We are taking in a series of three.  We have a court order.  The court order has specific guidelines as to what you're supposed to be asking.

You're getting into the substance of ████████████  -- the paragraphs in the amended Complaint that deal with ██████████████

You're not asking the questions that the court ordered to be asked as to when you spoke with counsel, and what specifically -- whether you reviewed the Complaint.  These were the specific questions that the court ordered.

Now if you want to go line by line through the paragraphs in the Complaint, that's a substantive deposition, that's an entirely different deposition.

MS. ZALKA:  Are you done with your speech, Frank?

MR. SCHIRRIPA:  It's not a speech, it's an objection.

MS. ZALKA:  I am referring to the transcript of the proceeding before Judge Cronan at lines 32-12 to 33-7, in which the court specifically permitted questioning of the confidential witnesses concerning the subject of the motion, which is whether or not these confidential witness did say to the Plaintiffs what they said to the Plaintiffs' investigator, and what did they say to Defendants' investigator, and did they say in fact different things at different points in time, where they shown or not a draft of the Complaint and so on.

So if you want to review the

transcript, my last question specifically started with, "And did you explain to Ms. Browning when you spoke to her what your role and the description of that role in the Complaint?"

I specifically phrased my question as to what ███████ spoke with Ms. Browning about.

And so I refer you back to the transcript, and your objection is not well founded.

If you are going to waste time like this, this deposition is going to go more than an hour.

Q    ███████    let's go on with my questioning.  Would you like me to repeat it?

MR. PATTERSON:  Caroline, if I may.

MS. ZALKA:  You have no right to object here, you don't represent the witness.  We are now wasting, you guys are trying to waste my time.

MR. PATTERSON:  It was going to be to save time, which is to say to the

Page 12

████████████████

extent that Mr. Schirripa objects, I
hope we can have an understanding that
if he objects, then I preserve my right
to object, and so I'm not objecting on
top of his objection.

MS. ZALKA:  Sure.

Q       Okay, ████████████, are you ready?

A       Yes.

Q       A lot of lawyers' wrangling.
Would you like me to repeat my
question?

A       Yeah, why don't you repeat it,
yes.

Q       So when you spoke with Ms.
Browning back in May and June did you explain
to her what your role was at the LCCP in terms
of the commissioning part?

A       Yes.

Q       What did you tell Ms. Browning?

A       Well, I told her I was a
████████████████████████████████████████,
and told her what activities I did, but she
extracted a portion of that, the cleaning and
preparation of the unit, but we never got that

Page 13

far.

I left the project before we actually went to site and started cleaning the unit and stuff, but did I all the planning for that.

And then we were involved in some other activities at the contractor's office during the design -- it was the end of detailed design.

So there were a lot of meetings to review the design and, you know, make sure the unit is designed properly and things like that, for commissioning and things like that.

Because actually the commissioning goes all the way to start-up.

So I was a ▮▮▮▮▮▮ for that phase of the project, for that -- that was the biggest unit, and probably the more important unit in the complex, you know?

So anyway, that's what I told her.

She took part of that, the cleaning and preparation part, but my responsibility was a little broader than that,

[REDACTED]

and that's what I explained to her, you know?

Q        And you explained to her your responsibilities were a little broader than that.

What did you explain?

A        Well, I said that I was managing the whole commissioning, so there are people that I had to hire and different subcontractors that come in during different phases, so there was a lot of planning involved.

So that was mostly what I did at that time, because they hadn't started building the unit yet, you know?

Towards the end of my tenure they were just breaking ground.  They were cleaning the trees off and breaking ground and putting in foundations.

So there was nothing there to commission until after I left, you know.

Q        And so, just so I understand what you just said, did you explain to Ms. Browning that really during your time at [REDACTED] and working on the LCCP project that you were primarily involved in cleaning vis-a-vis the

commissioning project?

A       Yes, she -- that's the part she took from what I told her, but actually I was just trying to say, so I was mostly in the office dealing with, you know, some of the -- it was towards the end of design, when they were finishing the detailed design of the unit, and we do model reviews, PNID reviews, hazard reviews, things like that, so I was involved in a lot of that.

Anyway, she took that and kind of condensed it, but generally she was accurate, you know.

Q       When you say generally she was accurate, what are you referring to?

A       As far as my responsibilities, you know?

Q       So you told -- did you tell Ms. Browning that you had any involvement in the preparation of financial forecasts for the LCCP?

A       No.

Q       Did you tell Ms. Browning that you had any involvement or responsibility for

Page 16

███████████████
disclosures to Sasol's shareholders?

     A      No, I didn't tell her that.

     Q      Sorry, go ahead.

     A      No, that's it, yeah, I just --
no.

     Q      Did you tell Ms. Browning that
you had any role in or responsibility for
reporting of costs at the LCCP to senior
executives at Sasol?

          MR. PATTERSON:  I object to
     scope.

     Q      You can go ahead, ████████

          THE WITNESS:  Should I go ahead,
     Frank?

          MR. SCHIRRIPA:  Yes, if there is
     an objection you still can answer the
     question, provided you know the answer.

     A      I would say no, yeah.

     Q      Did Ms. Browning ask you any of
those questions when you spoke to her in May
and June?

     A      Yes, um-hum.

     Q      What do you recall Ms. Browning
asking you in that regard?

A    She asked me if I attended any meetings with some of the senior management at Sasol, which I didn't.

Q    Did she ask you anything else on that topic?

A    Yeah, she asked me about the schedule, and some of the details, about the overall cost and what I had heard about that.

Q    What did you tell her you had heard about?

A    Well, everyone at that time, when I was there, knew we were going to go over the budget, and they were very tight on money at that time to try to limit that, you know.

But it was pretty commonly known at the time.

Q    Let's go to if you -- do you have a box, a binder?

A    Yes, um-hum.

Q    Can you please open that.

A    Okay.

MR. PATTERSON:  Caroline, are you going to be sharing these virtually as well?

Page 18

MS. ZALKA:  Yes.

A       So, I have the package.

Q       Okay, let me know when you are ready,

A       Yeah, I am ready.  I don't know what you want me to look at yet.

Q       We will do this together.

Do you recall that you spoke with Ms. Browning three times, correct?

A       Yeah, maybe a few more, I think it was it might be five or six times.

She called briefly a few times just to ask me a simple question or something like that, but I think there were two or three that we got into a longer discussion, you know.

Q       Do you recall that you also spoke with Mr. Patterson from the Plaintiffs' law firm on June 1st?

A       Yeah, that's right.

Q       Was that the only phone call that Mr. Patterson participated in with you?

A       As far as I recall, yeah.  We went to the deposition, I think, before it was finalized, you know.

Q        When you say -- are you referring to the June 1st phone call that Mr. Patterson was on?

A        Yeah, I don't remember exactly the date, but he was on the call and read it to me over the phone, you know.

Q        Okay.

Was there at any point in May and June, let's say, so let's just say before July, because I'm not interested in the communications that may have taken place before you say they were occuring, so let's say before July 2020 did you speak to anybody else from the Plaintiffs' law firm other than Mr. Patterson?

A        No, I don't recall that, yeah.

Q        And was the call you had on or about June 1 the last call that you had with Mr. Patterson?

A        Um-hum, yes, as far as I remember, yes, um-hum.

Q        Okay, if you can take a look at tab 5 in your binder.

A        Um-hum.  Okay.

Page 20

Q        Have you seen this document before?

A        Yeah, I have a copy of it.

Q        When did you -- sorry, go ahead,

A        I got it on my computer, I have an electronic copy.

Q        Where did you get that copy from?

A        Maybe Frank sent it to me, I think, a few months ago, a couple of months ago.

Q        Okay.

So again, let's focus perhaps on the time frame before July 2020.

So during the time period when you were discussing, you know, your statements with Ms. Browning and Mr. Patterson --

A        Right.

Q        -- during that time frame were you provided with a copy of this document?

A        I didn't have a hard copy, no.

Q        Were you provided with an electronic copy before July 2020?

Page 21

A      No, no, just like I said, what he told me over the phone, he read it to me, or my portion of the document, you know.

Q      Was this a draft of the document or this document?

A      It was a draft, but it was pretty much the same, you know.

They went through the draft and I asked him to correct a couple of things, and then they corrected that, and then that came out in this copy, you know.

MR. PATTERSON:  Caroline, I apologize, are you going to be able to share this exhibit?

MS. ZALKA:  I thought it was up, sorry.

I mean, it's a copy of the amended Complaint, but --

MR. PATTERSON:  No, I understand, but just going forward. Thank you.

MR. SCHIRRIPA:  Now we can see it.  Thank you.

Q      Okay,              So in terms

Page 22

of, did anyone from the Plaintiffs' law firm, so Hagens Berman, provide you with a copy of this document after it was filed in June 2020?

A        I don't think so, no.

        (The above described document was marked Exhibit 1 for identification as of this date.)

Q        When did you learn that these specific statements had been attributed to you in the second amended -- in the amended Complaint that you have before you in tab 5?

A        I learned about that before it was issued, or that was like in June 1st, I think, when he said I talked to Mr. Patterson.

Q        Have you since reviewed the document in full?

A        I didn't read all of it, just my portion, I think it's like page 30, you know, because I am CW 3, so I read that portion.

Q        And when did you read that for the first time?

A        I can look, I got a copy on my hard drive, and I know the date that I received it.

████████████████████████

I think it was -- it's probably been a couple of months ago or so, two or three months ago, you know.

Q    Two or three months ago?

A    Yes, I don't know exactly.

Q    Okay.

And have you, two or three months ago, when you reviewed this document for the first time, did you review the allegations of the other confidential witnesses?

MR. SCHIRRIPA:  Objection.

A    No, I just paid attention to mine.

Q    When you spoke with Mr. Patterson and Ms. Browning in May and June of 2020, did you provide your permission for your statements to be included in the Complaint?

A    Yes, they told me it would be.

Q    Did you provide your permission for them to include them?

A    Yes.

Q    Did anyone explain to you at that time, when you spoke with Mr. Patterson

Page 24

and Ms. Browning, that you might be required to give a deposition in the action?

A        Yes.

Q        Did they tell you that you might have to testify at trial in the action?

A        They didn't say exactly, but I assumed that was probably going to be the case.

Q        Okay, so can we go to tab 6 in your binder?

                (The above described document was marked Exhibit 3 for identification, as of this date.)

A        Oh, sure, okay.

Q        Let me know when you are ready.

A        Yes, I got it here.

Q        Have you seen this document before?

A        No, I haven't seen this.

Q        Has any -- okay, if you could take a look, so there will be page numbers at the bottom, you will see there is like what we call Bates numbers, it says Plaintiff, has a series of numbers?

A        Um-hum.

██████████

Q    Go to 004882.

A    00 -- let's see.

MR. SCHIRRIPA:    ██████████    just for a second, take a second and look at the entire document.

You don't have to skip through to a specific page without first looking at the specific document.

I'm not trying to waste time, Caroline, I'm letting -- you know he has a right to look at the document.

A    Okay, yeah, so this is a transcript of our conversation, is that what it is?

Q    Yes, so this is a document that has been produced by Mr. Patterson's firm, Hagens Berman, and comes from their investigator's files.

So if we go to 4882, you see the entry under background which says May 4, 2020?

A    Oh, I see, okay.

MR. PATTERSON:  I have a standing objection to any questions about a document he doesn't recognize.

Page 26

████████████████████

MS. ZALKA:  Sure.

Q      So if you look at question number 3 there.

A      Um-hum.

Q      And your answer.

Could you just let me know, does that accurately reflect your description of your role to Ms. Browning on May 4th based on your recollection?

A      Yes.

Q      Okay, and if we could go to 4884, which is the next page.

A      Okay.

Q      You will see there is a section called cost increases.

A      Okay, let's see.

I think I -- oh, yes, yeah, got it, yeah.

Q      And just take a second to read that.

A      Yeah, that's pretty much what I told her, yes, um-hum.

Q      So this accurately reflects what you told Ms. Browning on May 4th?

A        Yes, that's right.

Q        Okay.

And now you mentioned that there was rumors that started in June and July of 2015, correct?

A        Yes.

Q        And did you tell Ms. Browning on this call, did she ask you any questions about substantiating these rumors when you spoke to her on May 4th?

A        Yeah, I told her I didn't really have any documents related to that, so yes, she asked me about that.

Q        Anything else concerning, that you recall concerning your discussion of the rumors of cost overrun?

A        No, it was pretty well know, I sent -- well, anyway, you know, at the time I was trying to get some modifications done to the unit that I thought were required due to safety and operations, and they were pushing back a lot on that because the money was tight, you know.

So everybody knew, it was very

common knowledge that we were over budget.

And then the time element, you know, at that time they were looking at starting up a year or so later, and, you know, when you have a big project like that, you delay time, and everyone knew we weren't going to make the schedule, because they were just starting to build it.

And so whenever you push time out it's going to cost a lot of money, you know.

So anyway, that was -- but everybody knew that, you know.  I mean, I had worked on big projects a lot, so I usually get in on the space, so I know that those things cost a lot and you end up over budget, you know.

So anyway, it was common knowledge, the project team I was working with was pretty experienced, most of them were contract people, you know.

Q     So going back to what you discussed with Ms. Browning on May 4th.

A       Um-hum.

Q        So what you say here is that there were rumors, correct?

A        Well, there were rumors, and also just based on my experience, you know.

I mean, I knew the rumors were true, because I have done this for 40 years, you know.

Q        Well, I think what I am trying to understand is did you ever tell Ms. Browning that you had direct firsthand knowledge concerning specific numbers of the projected costs for the LCCP project?

A        Not specific numbers, for the total project, no, not specific numbers.

We knew that this was the budget at the time, $8 billion roughly, so I knew that, because that was written in a lot of our documents at the site or at the engineering company, you know.

Q        Did you tell Ms. Browning that you had direct firsthand knowledge concerning the preparation of LCCP's overall cost projection?

A        No, I didn't have -- I didn't

Page 30

████████████████

tell her that.

Q        And why didn't you tell her that?

MR. SCHIRRIPA:  Objection to form.

A        Because I didn't have the documents.  The only thing I knew is what I was told in the meetings and things when I was there, you know.

Q        Why did you describe them as rumors to Ms. Browning?

MR. PATTERSON:  Objection.

Q        You can answer, ████████

MR. SCHIRRIPA:  Can you restate the question?  I didn't hear the question, it was muffled.

Q        ████████ would you like me to repeat the question?

A        Yes, please.

Q        Sure.  So on May 4th you described, you only described to Ms. Browning that you had heard rumors concerning the LCCP would not make budget, is that correct?

A        Yes.

████████████

Q       And you did not represent to Ms. Browning that you had direct firsthand knowledge of anything other than rumors, correct?

MR. SCHIRRIPA:  Objection.

A       I guess maybe I think rumors might be a little too loose, you know, because we knew, I mean, I was in several meetings, I knew what the budget was, you know, I knew we weren't going to make it, so anyway.  But she --

Q       You used the word rumors with Ms. Browning, correct, on May 4th?

A       I guess, yeah, um-hum.

Q       Let go to the May 12th call on tab 7, please.

(The above described document was marked Exhibit 4 for identification, as of this date.)

Q       Have you seen this document before?

A       I don't see it yet.

Q       It's in your binder as well. It's up to you, you can look at the hard copy?

Page 32

A        Number 7, okay, yeah.

            MR. PATTERSON:  Sorry, Caroline,
it's not coming up.

            MS. ZALKA:  I think it will take
a minute, but.

A        I don't recall seeing this, no.

Q        Okay, if you could go to page
6 --

A        Okay.

            MR. SCHIRRIPA:  I only have two
pages.

A        I only have two also, yeah.
Let's see.

Q        7A.

            MR. SCHIRRIPA:  7A.

A        7A, okay.  Page 6, okay.

Q        Now, you had a call with Ms.
Browning on May 12th, correct?

A        I think so, yes.

Q        If you could take a look at page
6 there is a quote saying, "The rumors were
going around about the increasing project
cost."  Do you see that?

A        Let me find it.

Page 33

Q       In the middle of the page in the bold.

A       In the bold, okay.  I guess I got a different -- I got the wrong page, okay, just a minute.

        MR. SCHIRRIPA:  ▮ just look, it's --

Q       On the Bates number on the bottom.

A       What page is that, 7 or 8?  Page 8.

Q       You can look at your screen as well if that's easier, ▮

A       Okay; yeah, let me find it here.

        MR. PATTERSON:  I will have a standing objection.

A       So rumors were going around that it's going to be over and they weren't going to make it.  Yeah, that's right.

        MR. PATTERSON:  Caroline, I will have a standing objection to questioning on a document he's never seen.

Q       Does this accurately reflect

Page 34

what you recall discussing with Ms. Browning concerning the rumors going around about increasing project costs on May 12th?

A        Well, he mentions ████████████ there and ████████.  ██████ was a project manager for the cracker, the unit I was working on, so he well knew.  That's who I heard it from.

Him and ██████████ was a Sasol -- a direct Sasol, he's from South Africa, he was the process manager for the unit during the design and description.

So anyway, that's who I heard it from, so it was a reliable source, it's more than just a rumor, you know.

Q        So, but am I correct that what you told Ms. Browning on May 12th was that you had heard rumors about increasing project costs from two individuals, ████████████ and ████████?

A        Right.

Q        Did you identify anybody else to Ms. Browning as the source of the rumor that you heard when you spoke with her on May 12th?

Page 35

A        No, I mean, those were the two that I mentioned, I think.

Q        And now let's go to tab -- you may not have it in hard copy, so we can just show it, it is tab -- it's tab 11 in my binder, but this was a document only recently produced, so we don't have it in hard copy.

A        Okay, so that was number, what did you say, 12?

Q        11.  It's basically notes, you see at the top it says ███████████ at 3:00 p.m. on June 1, 2020."

A        Okay.

                (The above described document was
        marked Exhibit 5 for identification, as of
        this date.)

Q        Do you see that?

A        Yeah, which tab is that, do you have?

Q        Unfortunately we weren't able to provide it in hard copy because it was only produced the other day.

A        Okay, so what does it say? Okay.

Page 36

Q        Now, you had a call on June 1st with Mr. Patterson and Ms. Browning, correct?

A        Yeah; okay.

MR. SCHIRRIPA:  Objection.  Just give him a second to look over the document, and also it's not in the binder.

Q        Let me know when you are ready.

MR. SCHIRRIPA:  In addition, this is a document he's never seen before, so the same standing objection.

MS. ZALKA:  Yes.

A        Yeah.

MR. SCHIRRIPA:  I think you control the screen, so you may want to minimize it or scroll so he can read it.  Thank you.

Q        You let me know when you are ready, ████████        I am going to point you to the first page of the screen.

It's the ultimate dash where it says, "Re: rumors on unrealistic $8.9 billion."

A        Okay, yeah, that one, yeah.  He wanted more detail, okay.

Yes, um-hum.

Q    During your call on June 1 with Mr. Patterson and Ms. Browning, did you identify that you had heard rumors of projected cost increases, correct?

A    Yes, um-hum, I guess it was -- I don't know if I used the term rumors.  I mean, that seems kind of light to me, because I heard this, you know.

It was from these people, so those were, █████████ and █████ were both -- they knew what they were talking about, because they were -- they were overall managers of this project, you know.

So I think rumors, maybe is an unfortunate term.  I don't know if I used that or not.

Q    Do you recall why you described this on three occasions, so May 4, May 12 and June 1, as rumors?

A    Well, I didn't write this.

MR. SCHIRRIPA:  Objection.

A    Well, I didn't write this.

Q    I am asking you what you recall,

though, right?

A    Well, I would have used a little stronger term than rumors, you know, it's not leak I heard it in the bathroom or something, I heard it from people that knew what they were talking about, you know.

That was the pushback I was getting on some of the changes that I wanted, you know.

Q    Do you have any reason to to believe that the three documents I have just shown you concerning the notes that were taken during your calls with Mr. Patterson and Ms. Browning incorrectly summarized that you used the word rumors during your calls with Mr. Patterson and Ms. Browning?

MR. SCHIRRIPA:    please let Ms. Zalka finish her question before you answer and then give me an opportunity to object.

I object.

A    Okay.

Q    You can go ahead and answer,

A       Yes, I don't remember the details, really, if I used that term or not, you know.

Q       What do you mean you don't remember the details?

A       I don't remember if I used the term rumors or not during this conversation.

This is the first time I have seen the transcript, and I guess if they recorded it, that's the term that we used, but if I -- like I say, I think it's a little stronger than that.

So anyway, whatever you want, that's fine, thanks.

Q       I just want to know what your recollection is of the calls.

A       Yeah, that's fine.  If it's written three times, maybe that's a term that was used, then.

Q       Well, the term that you used, right?

A       I don't know, I don't recall that.  You know, this is the transcript, so if it was accurate, that's what I used, I guess.

Q        When you say you don't recall, what do you mean what you don't recall your conversations with the Plaintiffs' investigator?

A        I don't recall the exact word that I used at that time, you know.

Q        Okay.

So do you recall ever identifying with Mr. Patterson or Ms. Browning anybody other than ▮▮▮▮▮▮▮ and Mr. ▮▮▮▮? Pardon if get that wrong.

A        ▮▮▮▮.

Q        As the source of the rumors?

A        That was I guess, how you say, I mean other people knew, but that was the main source or how you say, reliable source that I got it from, you know.

Q        Did you ever identify -- go ahead.

A        The people that would know that, because they were handling the budget on the project, you know.

▮▮▮▮ was the overall project manager for ▮▮▮▮▮▮▮▮▮▮▮ of this

Page 41

unit, so he knew -- he well knew what the budget was, you know, in that we were not going to make it, because he managed the project, you know.

Q        So just, my question again, just to be clear, did you ever identify anybody other than Mr. ▮▮▮ and Mr. ▮▮▮▮▮ as the source of the rumors that you heard?

A        No.

Q        If we can go to tab 6., and this is the document I showed you before.

If you look at the page ending 4882, that starts with the May 4th 2020.

A        Okay.  So you said tab 6?

Right, that's where I am at, okay.  And which page are you on?

Q        I will just refresh your recollection, if you go to 4882, the section starting "Background."

A        Okay.

Q        Okay, and you see that's May 4, 2020?

A        Yes.

MR. PATTERSON:  Caroline, I will

██████████████

have a standing objection to questioning on a document he hasn't seen.

MS. ZALKA:  Yeah.

Q    Okay, so if we can go to page 4885.

A    Okay.

Q    Do you recall -- sorry, go ahead.

A    4885, okay, I got it, okay.

Q    I am going to be asking you about questions 5 and 6; so you can --

A    Okay, let me read it.

Q    Exactly, let me know when you are ready.

A    Okay.

Q    Now, when you spoke with Ms. Browning on May 4th --

A    Yes.

Q    -- do you recall her asking you questions about what senior executives at the company knew about cost increases?

A    Yes, she asked me.

Q    And what do you recall telling

her?

A        I told her I didn't know, because I didn't talk directly with them, you know, just what I heard from other people, that's all.

Q        Did you tell her anything -- well, after you told her that you didn't know about senior management's knowledge -- so on May 4th you told Ms. Browning that you did not have knowledge of senior management's or senior executives' knowledge concerning cost increases, is that correct?

A        Um-hum, yes.

Q        On any of your subsequent calls with either Ms. Browning or Mr. Patterson, did you change your recollection concerning that?

A        No, I don't think so.

Q        Am I correct that you did not have any firsthand knowledge concerning senior management's knowledge or lack thereof concerning cost overruns?

MR. PATTERSON:   I object to scope.

A        Should I answer that?

Q      Yes.

A      Yes, I had no contact with senior management, so -- I told her that, yeah.

Q      Sorry, you told Ms. --

MS. ZALKA:  Mr. Patterson, let me just finish my question so that there is a clear transcript.

A      Okay, okay.

Q      My question is did you tell Ms. Browning that you had no contact with senior management concerning the LCCP costs?

MR. PATTERSON:  Same objection.

A      Yes, I told her that.

Q      And did you tell that to -- on the call with Ms. Browning and Mr. Patterson on June 1st?

A      Yes.

Q      Okay, with respect to you being on-site at the LCCP, I just wanted to ask you a couple of questions, okay?

A      Yes.

Q      Now, you were based in Houston, is that correct?

A      Yes.

Page 45

Q    When you spoke with Ms.
Browning, what did you tell her about where you
were based during your time at ███?

A    Yeah, I told her I was based in
Houston, I traveled to site off and on, and
then I worked mainly in the Houston, the
engineering office here in Houston, for
████████'s office.

Q    What did you tell Ms. Browning
concerning how much you went on-site?

A    I went -- I told her that I went
there occasionally, to site, it's like two
hours, so we would go over, probably one day a
week, I think I told her, something like that,
you know.

Q    Was that -- did you tell Ms.
Browning that that was consistent throughout
the year that you worked at ███?

A    No, well, towards -- no, I
didn't tell her that for all year.

Q    What did you tell her?

A    At first we didn't go to site,
because there was nothing there, and then
towards the end of my tenure I went there more

Page 46

often, you know.

Q        How often did you go --

MS. ZALKA:  Sorry, strike that.

Q        When you spoke with Ms. Browning, what did you tell her about how often you went on-site at the end?

A        I told her that we went -- I told her I went one or two days a week.

Q        At the end?

A        At the end, yes.

Q        When did you start going to the project once or twice a week?

MR. PATTERSON:  I object to scope.  Excuse me, I object to scope.

Q        When did you tell Ms. Browning when you started to go there once or twice a week?

A        I told her about midway through my year, you know, so probably the summer of 2015.

MS. ZALKA:  Okay we are going to take a quick break.  I'll be right with you.  Thanks.

THE VIDEOGRAPHER:  Going off the

record at approximately 10:38 a.m.

(At this point in the proceedings there was a recess, after which the deposition continued as follows:)

THE VIDEOGRAPHER:  This is the beginning of media 2.  We are now going back on the record at approximately 10:49 a.m.

Go ahead, counsel.

Q    Okay,

So we have a little time left, so we are nearly done.

A    Okay.

Q    I just wanted to follow up on a couple of questions.

So, when you spoke with Ms. Browning and Mr. Patterson in May and June of 2020, you recall them asking you questions concerning what Sasol's senior management knew about project costs, is that correct?

A    Yes.

Q    And in response to Ms. Browning's questions, what did you say?

A    I told her that I didn't have

Page 48

direct contact with senior management, so I was going through what the project manager and other people that, you know, were involved in that part of the project, what they told me, you know, so, they were involved with the financials and things like that.

And those kinds of meetings I was a technical guy, really, and I managed the startup, you know.

Q    And did you tell Ms. Browning when you spoke with her that you didn't know about Sasol's senior management's knowledge of the LCCP project costs?

A    I told her I didn't have any direct knowledge of that, you know, firsthand knowledge.

Q    What do you mean by you didn't have direct?  When you spoke to Ms. Browning, you told her you didn't have any firsthand knowledge?

A    Yeah, I remember she asked -- I remember that she asked me did I attend meetings with upper management, and I told her no, I didn't, I didn't have -- I wasn't like in

the meetings when they talked about these

things directly, or anything like that, so.  So

I had no direct knowledge.

I had firsthand knowledge from

what the thinking was of senior management, you

know.

Q     Do you recall Ms. Browning

asking you questions about what senior

executives and/or senior management at Sasol

knew about cost increases when you spoke with

her?

A     No, just -- I didn't have any

direct knowledge, just what, like I said

before, from the project managers that I was

told, you know.

Q     In response to Ms. Browning's

questions to you concerning what Sasol's senior

executives or senior management knew about cost

increases, what was your response?

MR. PATTERSON:  Objection.

A     That the only thing --

Q     Go ahead.

A     I told her the only thing I knew

is what I heard, like I said before, from the

project manager who was involved in those things.

I was just trying to, you know, I was trying to get some things done, and it was hard, because they didn't have money and they knew they were going to be over budget. That's what -- I already knew that, you know.

Q    In response to Ms. Browning's questions to you around what senior management knew, like had knowledge of concerning LCCP cost increases, did you tell her about the rumors that you had heard from Mr. Ben-Musa and Mr. Hart, is that what you are referencing?

A    Yes.

Q    Did you identify any other people in response to her questions around what Sasol's senior management knew concerning cost overruns?

MR. SCHIRRIPA:  Objection, asked and answered.

Q    You can answer.

A    Okay, yes, that's what I told her that I heard from those guys, from ▮▮▮▮ ▮▮▮ and ▮▮▮▮ .

Q    Now what was -- did you explain Mr. ████████'s role to Ms. Browning?

A    Yes, that he was project manager.

Q    Project manager for what?

A    For the ████████ unit, the unit that I worked on.

So he was -- he was overall the design and construction of that unit, up to completion, so he had overall control of that.

Q    And Mr. ██████, what was his -- did you explain what his role was?

A    He was ████████████████████ for the ████████ unit.

So ██████ was a ████████████████ from ████████████████ that was contracted for that position, very experienced project manager.  He was, I don't know, at least 40 years experience.

And then ████████████ worked directly for Sasol, he was a South African.  He had been with Sasol for several years, so Dave was pretty well connected with the South Africans that were here involved in the

Page 52

project, over here.

So he knew a lot about what was going on, because there were other units and there were other people, I don't know if you know the project, it was two big contracts, Technip and Fluor, both are big contractors, they were both involved.

I was at the ████████████, so I was aware of half. The cracker was done out of there, and the rest of the units were done out of Fluor. So they were physically separated here in Houston.

So I don't hear all the stuff that's at █████, I was at ████████, but █████ was down there pretty often, so I used to hear from him, you know.

Q    And when you -- if you could take a look at the amended Complaint, what's behind tab 5, which for the record I will designate as ██████ Exhibit 1.

A    Okay, tab 5, and what page was it?

Q    Okay, so if you could go to page 52.

Page 53

████████████

A       Okay.

        MR. PATTERSON:  Can we share it on the screen again, please?

A       52, okay.

Q       If you can go to the top of the page.

A       So page 52, okay.

Q       Um-hum?

A       Yes.  I am there now.  Okay.

Q       Do you see where it says, "CW 3 stated that senior management knew prior to June 2016 that the $8 billion budget was unrealistic"?

A       Yes.

Q       Was that one of the -- so if you could just go to your declaration now?

A       Okay.

Q       Which is tab, I believe 10 in your binder.

A       Okay.

        MS. ZALKA:  And I will mark your declaration as ██████ exhibit number 2.

        (The above described document was marked Exhibit 2 for identification, as of

███████████████

this date.)

A    Okay.  I don't have -- oh, wait a minute, 10.

Q    10A, I think, so it's your, this is the declaration that you signed?

A    Okay.

Q    Do you recognize this document?

A    Yes.

Q    What is it?

A    It this is a declaration for me.

Q    Okay.

Now -- and you can take your time to look at your declaration.  Let me know if you read through it.

A    Did you have a question about it or --

Q    I do.

In your declaration you do not address the allegation in paragraph 133 of the Complaint that I just showed you.

A    Yeah, that says that management knew prior to 2016, okay.

Yeah, I don't know, I don't know, okay.

Q       What do you mean you don't know?

A       Well, this was written by attorney, Mr. Patterson, so what he had written here I agreed with, I didn't know if there was something he left out, um-hum.

Q       Okay.  Did you make any edits to your declaration when it was provided by Mr. Patterson?

A       Some minor things about some of the just the wording of some things.

These guys are lawyers, they don't work in the industry, so some of the terminology they were using wasn't quite accurate, so I asked them to revise a couple of things like that, you know.

Q       What was the terminology that you asked for them to change?

A       I don't recall exactly, it was pretty minor stuff.  I mean, I think the overall substance of this was accurate.

It was just some minor things, like for example, what's commissioning or something like that, you know.

I don't recall exactly, but what

he's got written here is substantially correct, you know.

Q      When Ms. Browning spoke with you in May and June of 2020 --

A      Um-hum.

Q      -- you testified during this deposition that, in response to her questioning about what senior executives at the company knew about cost increase, you told her that you didn't know because you didn't talk directly with them.

Is that accurate testimony?

A      Yes, you know, but just looking at this now, if you look at item 81 on page 2 of that declaration, it says there that, "There was widespread rumors that the $8.9 billion cost estimate was unrealistic."

So it's part of that, you know.

Q      So let me just -- I want to break this down so I can really understand what you're saying.

A      Yeah.

Q      So do you recall that when Ms. Browning spoke with you --

███████████████

A        Um-hum.

Q        -- in May and June of 2020 that she asked you questions about what senior executives at Sasol knew about cost increases, correct?

A        Yes.

Q        Okay.  And that you told her that you didn't know because you didn't talk directly with them, is that accurate?

MR. SCHIRRIPA:  Objection.

A        Yes, I think so, yes.

Q        Go ahead.

A        I mean, I didn't talk directly with the senior executives is what you're asking, right?

Q        No, so let me just say, when you spoke with Ms. Browning in May and June of 2020 --

A        Um-hum.

Q        -- she asked you questions, and I am just -- so you had previously testified about this, so I just want to make sure that there is a clear record, so bear with me, okay?

A        Okay.

Page 58

█████████████

Q      So when you spoke with Ms. Browning in May and June of 2020, she asked you questions concerning what Sasol's senior management knew about LCCP cost increases, is that accurate?

A      Yes.

Q      And in response to her questions in May and June of 2020, you told her that you didn't know because you didn't talk directly with them, is that accurate?

A      Yes.

Q      Okay.

MS. ZALKA:  I have no further questions.  Thank you so much, ██████████████  I appreciate your time here today.

THE WITNESS:  Okay.

MS. ZALKA:  We actually gave you back a little bit of your hour, probably not that much, but I can tell you these are very efficient depositions from a lawyer's perspective.

THE WITNESS:  Okay, I appreciate

it.   Thank you.

MS. ZALKA:   Thank you.   Goodbye.

THE VIDEOGRAPHER:   Are there any other questions?

MR. SCHIRRIPA:   No further questions.

THE VIDEOGRAPHER:   We are going off the record at approximately 11:00 a.m.

Page 60

CERTIFICATE

I, the undersigned, a Certified Shorthand Reporter of the State of New York, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction;

That the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case before completion of the proceedings, review of the transcript [ ] was [x ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 12/3/20

Stephen J. Moore
RPR, CRR

Page 61

DECLARATION UNDER PENALTY OF PERJURY

Case Name: MOSHELL v. SASOL

Date of Deposition: December 2, 2020

I, ██████████ hereby certify

Under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

Executed this _____ day of _____, 2020, at _____.

_____

Page 62

DEPOSITION ERRATA SHEET
Case Name: MOSHELL v. SASOL
Name of Witness: 
Date of Deposition: December 2, 2020
Reason Codes:  1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page 63

███████████

DEPOSITION ERRATA SHEET

Page _____  Line _____  Reason _____
From _____ to _____

Page _____  Line _____  Reason _____
From _____ to _____

Page _____  Line _____  Reason _____
From _____ to _____

Page _____  Line _____  Reason _____
From _____ to _____

Page _____  Line _____  Reason _____
From _____ to _____

Page _____  Line _____  Reason _____
From _____ to _____

Page _____  Line _____  Reason _____
From _____ to _____

Page _____  Line _____  Reason _____
From _____ to _____

Page _____  Line _____  Reason _____
From _____ to _____

Page _____  Line _____  Reason _____
From _____ to _____

Page _____  Line _____  Reason _____
From _____ to _____

Page _____  Line _____  Reason _____
From _____ to _____

Page _____  Line _____  Reason _____
From _____ to _____

Page _____  Line _____  Reason _____
From _____ to _____

_____ Subject to the above changes, I certify that the transcript is true and correct

_____ No changes have been made. I certify that the transcript  is true and correct.

_____
███████████

[& - attorneys]                                                                    Page 1

**&**

**&**   2:11 3:4 5:23

**0**

**00**   25:3
**004882**   25:2
**01008**   1:8 5:13

**1**

**1**   4:12 5:6 19:19
  22:7 35:13 37:3
  37:21 52:21 62:7
**10**   53:19 54:4
**10016**   3:7
**10153-0119**   2:15
**10:00**   1:14
**10:38**   47:2
**10:49**   47:9
**10a**   54:5
**11**   4:14 35:6,11
**112**   3:6
**12**   35:10 37:20
**12/3/20**   60:16
**12th**   31:16 32:19
  34:4,18,25
**133**   54:20
**15**   4:18
**18**   4:16
**1:20**   1:8 5:13
**1st**   18:19 19:3
  22:14 36:2 44:17

**2**

**2**   1:14 4:21 47:7
  53:23,25 56:15
  61:4 62:5,9
**2014**   7:23
**2015**   7:23 27:6
  46:21
**2016**   53:13 54:23
**2020**   1:14 5:5
  19:14 20:16,25
  22:4 23:17 25:21

35:13 41:14,23
47:19 56:5 57:3
57:19 58:3,9 61:5
61:12 62:6
**20932**   60:19
**21**   4:12
**23**   4:14
**24**   4:21
**2nd**   5:5

**3**

**3**   4:14 22:20 24:12
  26:4 53:11 62:10
**30**   4:16 22:19
**32-12**   10:12
**33-7**   10:12
**34**   4:18
**3:00**   35:12

**4**

**4**   4:16 25:21 31:19
  37:20 41:22
**40**   29:7 51:19
**455**   2:6
**4882**   25:20 41:14
  41:19
**4884**   26:13
**4885**   42:7,11
**4th**   26:9,25 27:11
  28:24 30:21 31:14
  41:14 42:19 43:10

**5**

**5**   4:7,18 19:24
  22:12 35:16 42:13
  52:20,22
**52**   4:21 52:25 53:5
  53:8

**6**

**6**   4:12 24:9 32:9
  32:17,22 41:11,15
  42:13

**60611**   2:7

**7**

**7**   31:17 32:2 33:11
**767**   2:14
**7a**   32:15,16,17

**8**

**8**   29:17 33:11,12
  53:13
**8.9**   36:23 56:17
**81**   56:15

**9**

**9:58**   5:4

**a**

**a.m.**   1:14 5:4 47:2
  47:9 59:10
**able**   21:14 35:21
**accurate**   15:14,16
  39:25 55:15,21
  56:13 57:10 58:6
  58:11
**accurately**   26:8,24
  33:25
**action**   6:24 24:3,6
  60:13,14
**activities**   12:23
  13:8
**addition**   36:10
**address**   54:20
**africa**   34:12
**african**   51:22
**africans**   51:25
**ago**   20:12,13 23:3
  23:4,5,9
**agreed**   55:5
**ahead**   16:4,13,14
  20:5 38:24 40:20
  42:10 47:10 49:23
  57:13

**al**   5:10,10
**allegation**   54:20
**allegations**   23:10
**amama**   2:23
**amended**   4:12
  9:18 21:18 22:11
  22:11 52:19
**answer**   16:17,18
  26:6 30:14 38:20
  38:24 43:25 50:22
**answered**   50:21
**anybody**   19:14
  34:23 40:11 41:7
**anyway**   13:21
  15:12 27:19 28:13
  28:19 31:11 34:14
  39:14
**apologize**   21:14
**appreciate**   58:16
  58:25
**approximately**   5:3
  47:2,8 59:9
**asked**   9:21 17:2,7
  21:10 27:14 42:24
  48:22,23 50:20
  55:15,18 57:4,21
  58:3
**asking**   9:15,20
  16:25 37:25 42:12
  42:21 47:19 49:9
  57:16
**aspect**   7:19
**assumed**   24:8
**attend**   48:23
**attended**   17:2
**attention**   23:13
**attorney**   55:4
  60:13
**attorneys**   2:5,12
  3:5 5:19 6:23

[attributed - copy]                                                                 Page 2

attributed  22:10
avenue   2:14 3:6
aware   52:10

**b**

b   4:8 6:12
back   8:5 11:10
   12:16 27:23 28:23
   47:8 58:20
background   25:21
   41:20
barrington   2:17
based   26:9 29:5
   44:23 45:4,5
basically   35:11
bates   24:23 33:9
bathroom   38:5
bear   57:24
beginning   47:7
behalf   1:5
believe   38:12
   53:19
ben   34:5,6,20 41:8
   50:13 51:3
berman   2:4 6:3
   22:3 25:18
big   28:6,15 52:6,7
biggest   13:19
billion   29:17 36:23
   53:13 56:17
binder   17:19
   19:24 24:10 31:24
   35:6 36:8 53:20
bit   9:5 58:20

bold   33:3,4
bongani   1:9
bottom   24:22
   33:10
box   17:19
break   7:10 46:23
   56:21

breaking   14:16,17
briefly   18:13
broader   13:25
   14:4
browning   8:5,9
   9:8 11:4,9 12:16
   12:20 14:23 15:20
   15:24 16:7,20,24
   18:10 20:19 23:16
   24:2 26:9,25 27:8
   28:24 29:10,21
   30:12,22 31:3,14
   32:19 34:2,18,24
   36:3 37:4 38:15
   38:17 40:10 42:19
   43:10,16 44:11,16
   45:3,10,18 46:6,16
   47:18 48:11,19
   49:8 51:3 56:4,25
   57:18 58:3
browning's   47:24
   49:17 50:9
budget   17:14 28:2
   28:17 29:16 30:24
   31:10 40:22 41:3
   50:7 53:13
build   28:9
building   14:13

**c**

c   2:2 3:2 60:1,1
call   18:21 19:3,6
   19:18,19 24:23
   27:9 31:16 32:18
   36:2 37:3 44:16
called   6:12 18:13
   26:16
calls   38:14,16
   39:17 43:15
caroline   2:21 6:6
   6:22 9:11 11:18
   17:23 21:13 25:11

32:3 33:21 41:25
case   1:7 5:13 24:8
   60:10 61:3 62:3
certified   1:20 60:2
certify   60:3,12
   61:7 63:18,21
ceverie   3:4
chad   1:5 5:9
chance   7:5
change   43:17
   55:18
changes   38:9
   63:18,20
cheverie   5:23
chicago   2:7
cityfront   2:6
clarify   62:7
class   6:24
cleaning   8:19
   12:24 13:4,24
   14:17,25
clear   41:7 44:8
   57:24
codes   62:7
come   14:10
comes   25:18
coming   32:4
commission   14:20
commissioning
   8:2,23 9:3 12:18
   12:22 13:14,16
   14:8 15:2 55:23
common   28:2,19
commonly   17:16
communications
   19:12
company   29:20
   42:23 56:9
complaint   4:12
   9:18,24 10:3,24
   11:6 21:19 22:12

23:19 52:19 54:21
completion   51:11
   60:10
complex   13:20
computer   20:7
concerning   10:15
   27:15,16 29:12,22
   30:23 34:3 38:13
   43:12,17,20,22
   44:12 45:11 47:20
   49:18 50:11,18
   58:4
condensed   15:13
conferencing   5:15
confidential   10:14
   10:17 23:11
conform   62:9
connected   51:24
consistent   45:18
constable   1:9
construction
   40:25 51:10
contact   44:3,11
   48:2
continued   3:2 47:5
contract   28:22
   51:16
contracted   51:17
contractor's   13:8
contractors   52:7
contracts   52:6
control   36:16
   51:11
conversation   4:19
   25:14 39:8
conversations
   40:4
copy   20:4,8,9,22
   20:23,25 21:12,18
   22:3,23 31:25
   35:5,8,22

cornell   1:10
correct   7:20,21
  8:6,15,20,24 18:10
  21:10 27:6 29:3
  30:24 31:5,14
  32:19 34:17 36:3
  37:6 43:13,19
  44:24 47:21 56:2
  57:6 61:10 62:10
  63:19,22
corrected   21:11
cost   17:9 26:16
  27:17 28:11,17
  29:23 32:24 37:6
  42:23 43:12,22
  49:11,19 50:12,18
  56:10,18 57:5
  58:5
costs   16:9 29:13
  34:4,19 44:12
  47:21 48:14
counsel   5:8 9:22
  47:10
couple   20:12
  21:10 23:3 44:21
  47:16 55:15
court   1:2 5:12,17
  6:8 9:13,13,21,25
  10:13
cracker   8:14,19
  34:7 52:10
cracking   12:22
  51:7,15
cronan   10:12
crr   60:20
cv   1:8 5:13
cw   22:20 53:11

**d**

d   4:3
dash   36:22

date   5:4 19:6 22:8
  22:24 24:13 31:20
  35:17 54:2 60:15
  61:4 62:5
dated   60:16
dave   50:24 51:21
  51:23 52:15
david   1:9 34:6,10
  37:12 40:11
day   35:23 45:14
  61:11
days   46:9
deal   9:18
dealing   15:6
december   1:14 5:4
  61:4 62:5
declaration   4:21
  53:17,23 54:6,11
  54:14,19 55:8
  56:16 61:2
defendant   5:8
defendants   1:12
  2:12 6:7 10:20
delay   28:7
deposed   6:25 7:14
deposition   1:17
  5:7,14 9:11 10:4,5
  11:14 18:24 24:3
  47:5 56:8 60:10
  61:4 62:2,5 63:2
depositions   58:23
describe   30:11
described   8:8 22:6
  24:11 30:22,22
  31:18 35:15 37:19
  53:24
description   11:5
  26:8 34:13
design   13:9,10,12
  15:7,8 34:13
  40:25 51:10

designate   52:21
designed   13:13
detail   36:25
detailed   13:10
  15:8
details   17:8 39:3,6
different   10:5,21
  10:22 14:9,10
  33:5
direct   29:11,22
  31:3 34:11 48:2
  48:16,19 49:4,14
direction   60:7
directly   43:4 49:3
  51:22 56:11 57:10
  57:14 58:10
disclosures   16:2
discussed   28:24
discussing   20:18
  34:2
discussion   18:16
  27:16
district   1:2,3 5:12
  5:12
document   20:2,22
  21:4,5,6 22:4,6,17
  23:9 24:11,17
  25:6,9,12,16,25
  31:18,21 33:23
  35:7,15 36:7,11
  41:12 42:3 53:24
  54:8
documents   27:13
  29:19 30:8 38:12
draft   10:23 21:5,7
  21:9
drive   22:24
due   27:21
duly   6:13 60:6

**e**

e   2:2,2 3:2,2 4:3,8
  6:12 60:1,1
easier   33:14
edits   55:7
edward   1:9
efficient   58:22
eicher   2:19
either   43:16
electronic   20:8,25
element   28:3
employed   7:18,22
employee   60:13
engineering   29:19
  45:8 51:14
entire   25:6
entirely   10:5
entitled   1:18
entry   25:21
errata   62:2 63:2
errors   62:10
esq   2:9,17,19,21
  2:23,25 3:9
estimate   56:18
et   5:9,10
ethane   8:14,19
everybody   27:25
  28:14
exact   40:6
exactly   19:5 23:6
  24:7 42:15 55:19
  55:25
examination   4:5
  6:17
examined   6:14
example   55:23
exbt   4:12,14,16,18
  4:21
excuse   46:15
executed   61:11

**[executives - hum]**                                                    Page 4

**executives** 6:24 16:10 42:22 43:12 49:10,19 56:9 57:5,15
**exhibit** 4:10 21:15 22:7 24:12 31:19 35:16 52:21 53:23 53:25
**experience** 29:5 51:20
**experienced** 28:21 51:18
**explain** 9:7 11:3 12:16 14:6,22 23:24 51:2,13
**explained** 8:17 14:2,3
**extent** 12:2
**extracted** 12:24

**f**

**f** 60:1
**fact** 10:21
**facts** 62:9
**far** 13:2 15:17 18:23 19:21
**federal** 60:10
**fifth** 2:14
**filed** 5:11 22:4
**files** 25:19
**finalized** 18:25
**financial** 15:21
**financially** 60:13
**financials** 48:7
**find** 32:25 33:15
**fine** 39:15,18
**finish** 38:19 44:7
**finishing** 15:8
**firm** 5:23 18:19 19:15 22:2 25:17
**first** 6:13 7:15,25 9:11 22:22 23:10 25:8 36:21 39:9 45:23
**firsthand** 29:11,22 31:3 43:20 48:16 48:20 49:5
**five** 18:12
**fluor** 52:7,12,15
**focus** 20:15
**follow** 47:15
**follows** 6:15 47:5
**forecasts** 15:21
**foregoing** 60:4,5,8 60:9 61:10
**form** 30:6
**forth** 60:5
**forward** 21:21
**foundations** 14:18
**founded** 11:12
**frame** 20:16,21
**frank** 3:9 5:22 10:7 16:15 20:11
**full** 22:17
**further** 58:14 59:6 60:9,12

**g**

**g** 6:12
**gallagher** 5:16
**generally** 15:13,15
**getting** 9:16 38:9
**give** 7:5 24:3 36:6 38:21
**given** 60:8
**go** 10:2 11:14,16 16:4,13,14 17:13 17:18 20:5 24:9 25:2,20 26:12 31:16 32:8 35:4 38:24 40:19 41:11 41:19 42:6,9 45:14,23 46:3,17 47:10 49:23 52:24

53:6,17 57:13
**goes** 13:16
**going** 5:3 11:13,14 11:24 17:13,24 21:14,21 24:8 28:7,11,23 31:11 32:23 33:18,19,19 34:3 36:20 41:3 42:12 46:12,22,25 47:7 48:3 50:7 52:4 59:8
**good** 5:21 6:2,5,20 6:21 7:13
**goodbye** 59:3
**gotshal** 2:11 6:7

**ground** 14:16,17
**guess** 31:7,15 33:4 37:7 39:10,25 40:15
**guidelines** 9:14
**guy** 48:9
**guys** 11:22 50:24 55:12

**h**

**h** 4:8 6:12
**hach** 3:4 5:23
**hagens** 2:4 6:3 22:3 25:18
**half** 52:10
**handling** 40:22
**hard** 20:23 22:24 31:25 35:5,8,22 50:6
**hart** 34:6,10,21 37:12 40:11 41:8 50:14,25 51:12,21
**hazard** 15:9
**hear** 30:16 52:14 52:16
**heard** 17:9,11 30:23 34:8,14,19 34:25 37:5,9 38:5 38:6 41:9 43:5 49:25 50:13,24
**held** 5:14
**hire** 14:9
**hope** 12:3
**hour** 11:15 58:20
**hours** 45:14
**houston** 44:23 45:6,7,8 52:13
**hum** 16:23 17:20 19:21,22,25 24:25 26:5,23 28:25 31:15 37:2,7 43:14 53:9 55:6

56:6 57:2,20

**i**

**ident** 4:10
**identification** 22:7
   24:12 31:19 35:16
   53:25
**identify** 5:20
   34:23 37:5 40:19
   41:7 50:16
**identifying** 40:10
**illinois** 2:7
**important** 13:19
**include** 23:22
**included** 23:18
**incorrectly** 38:15
**increase** 56:10
**increases** 26:16
   37:6 42:23 43:13
   49:11,20 50:12
   57:5 58:5
**increasing** 32:23
   34:4,19
**individually** 1:5
**individuals** 34:20
**industry** 55:13
**ingrid** 2:19
**interested** 19:11
   60:13
**investigator** 4:14
   4:16 8:5 10:19,20
   40:5
**investigator's**
   25:19
**involved** 13:7
   14:11,25 15:10
   48:4,6 50:2 51:25
   52:8
**involvement** 15:20
   15:25
**issued** 22:14

**item** 56:15

**j**

**j** 1:19 60:19
**jennifer** 2:25
**jerrod** 2:9 6:3
**jpc** 1:8
**jsr** 5:13
**judge** 10:12
**july** 19:11,14
   20:16,25 27:5
**june** 8:6,10 9:9
   12:16 16:22 18:19
   19:3,10,19 22:4,14
   23:16 27:5 35:13
   36:2 37:3,21
   44:17 47:18 53:13
   56:5 57:3,18 58:3
   58:9

**k**

**kevin** 5:16
**kind** 15:12 37:9
**kinds** 48:8
**knew** 17:13 27:25
   28:7,14 29:6,16,17
   30:8 31:9,10,10
   34:8 37:13 38:6
   40:16 41:2,2
   42:23 47:20 49:11
   49:19,24 50:7,8,11
   50:18 52:3 53:12
   54:23 56:10 57:5
   58:5
**know** 7:8,11,14
   13:12,20 14:2,14
   14:20 15:6,14,18
   16:18 17:15 18:4
   18:6,16,25 19:7
   20:18 21:4,8,12
   22:19,24 23:4,6
   24:15 25:11 26:7

27:18,19,24 28:4,5
28:12,14,16,18,22
29:5,8,20 30:10
31:8,10 34:16
36:9,19 37:8,10,15
37:17 38:4,7,10
39:4,16,23,24 40:7
40:18,21,23 41:3,5
42:15 43:3,5,8
45:16 46:2,20
48:4,6,10,12,16
49:7,16 50:4,8
51:19 52:5,6,17
54:14,24,25 55:2,5
55:16,24 56:3,11
56:14,19 57:9
58:10
**knowledge** 28:2
   28:20 29:11,22
   31:4 43:9,11,12,20
   43:21 48:13,16,17
   48:21 49:4,5,14
   50:11
**known** 17:16

**l**

**lack** 43:21
**lau** 2:25
**law** 5:22 18:19
   19:15 22:2
**laws** 61:9
**lawyer's** 58:23
**lawyers** 12:10
   55:12
**lccp** 7:20 8:13,23
   9:3 12:17 14:24
   15:22 16:9 29:13
   30:23 44:12,20
   48:14 50:11 58:5
**lccp's** 29:23
**leak** 38:5

**learn** 22:9
**learned** 22:13
**left** 13:3 14:20
   47:12 55:6
**legal** 5:18
**letting** 25:11
**light** 37:9
**limit** 17:15
**limited** 1:9 5:10
**lindsey** 1:5 5:9
**line** 10:2,2 62:11
   62:12,13,14,15,16
   62:17,18,19,20,21
   62:22,23,24 63:3,4
   63:5,6,7,8,9,10,11
   63:12,13,14,15,16
**lines** 10:12
**little** 9:5 13:25
   14:4 31:8 38:3
   39:12 47:12 58:20
**llp** 2:4,11 3:4
**longer** 18:16
**look** 18:7 19:23
   22:23 24:21 25:5
   25:12 26:3 31:25
   32:21 33:7,13
   36:6 41:13 52:19
   54:14 56:15
**looking** 25:8 28:4
   56:14
**loose** 31:8
**lot** 12:10 13:11
   14:11 15:11 27:23
   28:11,15,17 29:18
   52:3
**luna** 2:17

**m**

**m** 6:12
**machine** 60:7
**madison** 3:6

**[main - paragraphs]**

main 40:16

managed 41:4 48:9

management 17:3 44:4,12 47:20 48:2,24 49:6,10,19 50:10,18 53:12 54:22 58:5

management's 43:9,11,21 48:13

manager 8:2 12:22 13:17 34:7 34:12 40:25 48:3 50:2 51:5,6,15,19

managers 37:14 49:15

managing 14:7

manges 2:11

mark 53:22

marked 22:7 24:12 31:19 35:16 53:25

matter 1:18 5:9

mean 21:18 28:14 29:6 31:9 35:2 37:8 39:5 40:3,16 48:18 55:2,20 57:14

means 8:18

meant 9:4

media 5:6 47:7

meetings 13:11 17:3 30:9 31:9 48:8,24 49:2

memo 4:16

mentioned 6:22 27:4 35:3

mentions 34:5

middle 33:2

midway 46:19

mine 23:14

minimize 36:17

minor 55:10,20,22

minute 32:6 33:6 54:4

model 15:9

modifications 27:20

money 17:14 27:23 28:11 50:6

months 20:12,12 23:3,4,5,9

moore 1:19 5:17 60:19

morning 5:21 6:2 6:5,20,21

moshell 1:5 5:9 61:3 62:3

motion 10:16

muffled 30:17

musa 34:5,6,20 41:8 50:13

musa's 51:3

**n**

n 2:2 3:2 4:3

name 5:15 60:15 61:3 62:3,4

nearly 47:13

neither 60:12

never 12:25 33:23 36:11

new 1:3,22 2:15,15 3:7,7 5:12 60:3 61:9

notary 1:21 6:14

notes 4:14 35:11 38:13

noth 2:6

nqwababa 1:9

number 5:6,13 26:4 32:2 33:9

35:9 53:23

numbers 24:21,23 24:24 29:12,14,15

**o**

o 6:12

object 7:6 11:21 12:5 16:11 38:21 38:22 43:23 46:14 46:15

objecting 12:5

objection 9:10 10:9 11:11 12:6 16:17 23:12 25:24 30:5,13 31:6 33:17,22 36:5,12 37:23 42:2 44:13 49:21 50:20 57:11

objects 12:2,4

occasionally 45:13

occasions 37:20

occuring 19:13

october 7:23,23

odd 7:14

office 13:9 15:6 45:8,9 52:9

oh 24:14 25:22 26:18 54:3

okay 7:12,13,18 12:8 17:22 18:4 19:8,23,25 20:14 21:25 23:7 24:9 24:14,20 25:13,22 26:12,14,17 27:3 32:2,8,10,17,17 33:4,5,15 35:9,14 35:24,25 36:4,24 36:25 38:23 40:8 41:15,17,21,22 42:6,8,11,11,14,17 44:9,9,19,21 46:22 47:11,14 50:23

52:22,24 53:2,5,8 53:10,18,21 54:3,7 54:12,23,25 55:7 57:8,24,25 58:13 58:18,25

once 46:13,17

open 17:21

operations 27:22

opportunity 38:21

order 1:19 9:13,13

ordered 9:21,25

original 60:9

overall 17:9 29:23 37:14 40:24 51:9 51:11 55:21

overrun 27:17

overruns 43:22 50:19

oversaw 8:23 9:2

**p**

p 2:2,2 3:2,2

p.m. 35:12

package 18:3

page 4:5 22:19 24:21 25:8 26:13 32:8,17,21 33:2,5 33:11,11 36:21 41:13,17 42:6 52:22,24 53:7,8 56:15 62:11,12,13 62:14,15,16,17,18 62:19,20,21,22,23 62:24 63:3,4,5,6,7 63:8,9,10,11,12,13 63:14,15,16

pages 32:12

paid 23:13

paragraph 54:20

paragraphs 9:17 10:3

**[pardon - record]**

**pardon** 40:12
**parsons** 51:17
**part** 8:21 9:3
  12:18 13:23,24
  15:3 48:5 56:19
**participated** 18:22
**particularly** 7:15
**parts** 8:23
**party** 60:14
**patterson** 2:9 6:2
  6:3 11:18,24
  16:11 17:23 18:18
  18:22 19:4,16,20
  20:19 21:13,20
  22:15 23:16,25
  25:23 30:13 32:3
  33:16,21 36:3
  37:4 38:14,17
  40:10 41:25 43:16
  43:23 44:6,13,16
  46:14 47:18 49:21
  53:3 55:4,9
**patterson's** 25:17
**paul** 1:10
**penalty** 61:2,8
**people** 14:8 28:22
  37:11 38:6 40:16
  40:21 43:5 48:4
  50:17 52:5
**period** 20:17
**perjury** 61:2,8
**permission** 23:17
  23:21
**permitted** 10:13
**person** 51:16
**perspective** 58:24
**pertains** 60:9
**phase** 13:18
**phases** 14:10
**phone** 18:21 19:3
  19:7 21:3

**phrased** 11:7
**physically** 52:12
**place** 19:12 60:4
**plaintiff** 2:5 24:23
**plaintiffs** 1:7 6:4
  8:5 10:18,19
  18:18 19:15 22:2
  40:4
**planning** 13:5
  14:11
**plaza** 2:6
**please** 17:21 30:20
  31:17 38:19 53:4
**pnid** 15:9
**point** 19:9 36:20
  47:3
**points** 10:22
**portion** 12:24 21:4
  22:19,20
**position** 51:18
**preparation** 12:25
  13:24 15:21 29:23
**preparing** 8:19
**present** 5:19
**preserve** 12:4
**pretty** 17:16 21:8
  26:22 27:18 28:21
  51:24 52:16 55:20
**previously** 57:22
**primarily** 14:25
**prior** 53:12 54:23
  60:5
**probably** 13:19
  23:2 24:8 45:14
  46:20 58:21
**proceed** 6:10
**proceeding** 10:11
**proceedings** 47:3
  60:4,5,6,10
**process** 34:12
  51:14

**produced** 25:17
  35:7,23
**professional** 1:20
**project** 7:20 8:24
  9:3 13:3,18 14:24
  15:2 28:6,20
  29:13,15 32:23
  34:4,6,19 37:15
  40:23,24 41:4
  46:13 47:21 48:3
  48:5,14 49:15
  50:2 51:4,6,18
  52:2,6
**projected** 29:12
  37:5
**projection** 29:24
**projects** 28:15
**properly** 13:13
**provide** 22:3
  23:17,21 35:22
**provided** 16:18
  20:22,24 55:8
**public** 1:21 6:14
**pursuant** 1:19
**push** 28:10
**pushback** 38:8
**pushing** 27:22
**putting** 14:18

**q**

**question** 11:2,7
  12:12 16:18 18:14
  26:3 30:16,17,19
  38:20 41:6 44:7
  44:10 54:16
**questioning** 10:14
  11:17 33:23 42:3
  56:8
**questions** 7:8 9:20
  9:25 16:21 25:24
  27:9 42:13,22
  44:21 47:16,19,24

  49:9,18 50:10,17
  57:4,21 58:4,8,15
  59:5,7
**quick** 46:23
**quite** 55:14
**quote** 32:22

**r**

**r** 2:2 3:2 6:12,12
  6:12 60:1
**rasani** 2:23
**read** 19:6 21:3
  22:18,20,21 26:20
  36:17 42:14 54:15
**ready** 12:8 18:5,6
  24:15 36:9,20
  42:16
**really** 14:23 27:12
  39:3 48:9 56:21
**realtime** 1:21
**reason** 38:11 62:7
  62:11,12,13,14,15
  62:16,17,18,19,20
  62:21,22,23,24
  63:3,4,5,6,7,8,9,10
  63:11,12,13,14,15
  63:16
**recall** 16:24 18:9
  18:17,23 19:17
  27:16 32:7 34:2
  37:19,25 39:23
  40:2,3,6,9 42:9,21
  42:25 47:19 49:8
  55:19,25 56:24
**received** 22:24
**recess** 47:4
**recognize** 25:25
  54:8
**recollection** 26:10
  39:17 41:19 43:17
**record** 5:3,20 47:2
  47:8 52:20 57:24

**[record - simple]**

59:9 60:6,8 62:8
**recorded** 5:7
 39:11
**refer** 11:10
**referencing** 50:14
**referring** 10:10
 15:16 19:3
**reflect** 26:8 33:25
**reflects** 26:24
**refresh** 41:18
**regard** 16:25
**registered** 1:20
**related** 27:13
**relative** 60:13
**reliable** 34:15
 40:17
**remember** 19:5,22
 39:2,6,7 48:22,23
**repeat** 11:17 12:11
 12:13 30:19
**rephrase** 7:9
**reporter** 1:20,21
 5:17 6:9 60:3
**reporting** 16:9
**represent** 11:21
 31:2
**requested** 60:11
**required** 24:2
 27:21
**respect** 44:19
**response** 47:23
 49:17,20 50:9,17
 56:8 58:8
**responsibilities**
 9:6,8 14:4 15:17
**responsibility**
 13:25 15:25 16:8
**responsible** 8:18
**rest** 52:11
**restate** 30:15

**review** 10:25
 13:12 23:10 60:10
**reviewed** 9:23
 22:16 23:9
**reviews** 15:9,9,10
**revise** 55:15
**right** 11:20 12:4
 18:20 20:20 25:12
 27:2 33:20 34:22
 38:2 39:22 41:16
 46:23 57:16

**role** 8:8,14 11:5,5
 12:17 16:8 26:9
 51:3,13
**rose** 3:4 5:23
**roughly** 29:17
**rpr** 60:20

**rumor** 34:16,24
**rumors** 27:5,10,17
 29:3,4,6 30:12,23
 31:4,7,13 32:22
 33:18 34:3,19
 36:23 37:5,8,16,21
 38:4,16 39:8
 40:14 41:9 50:13
 56:17

**s**

**s** 2:2 3:2 4:8
**safety** 27:22
**sasol** 1:9 5:10 6:23
 16:10 17:4 34:11
 34:11 49:10 51:22
 51:23 57:5 61:3
 62:3
**sasol's** 16:2 47:20
 48:13 49:18 50:18
 58:4
**save** 11:25
**saying** 32:22 56:22
**says** 24:23 25:21
 35:12 36:23 53:11
 54:22 56:16
**schedule** 17:8 28:8
**schirripa** 3:4,9
 5:21,22,23 7:5
 9:10 10:8 12:2
 16:16 21:23 23:12
 25:4 30:5,15 31:6
 32:11,16 33:7
 36:5,10,15 37:23
 38:18 50:20 57:11
 59:6
**schoeman** 1:10
**scope** 16:12 43:24
 46:15,15
**screen** 33:13 36:16
 36:21 53:4

**scroll** 36:17
**second** 22:11 25:5
 25:5 26:20 36:6
**section** 26:15
 41:19
**securities** 6:24
**see** 21:23 24:22
 25:3,20,22 26:15
 26:17 31:23 32:14
 32:24 35:12,18
 41:22 53:11
**seeing** 32:7
**seen** 20:2 24:17,19
 31:21 33:24 36:11
 39:10 42:4
**senior** 16:9 17:3
 42:22 43:9,11,11
 43:20 44:4,11
 47:20 48:2,13
 49:6,9,10,18,19
 50:10,18 53:12
 56:9 57:4,15 58:4
**sent** 20:11 27:19
**separated** 52:13
**series** 9:12 24:24
**set** 60:5
**shapiro** 2:4
**share** 21:15 53:3
**shareholders** 16:2
**sharing** 17:24
**sheet** 62:2 63:2
**shorthand** 60:3,7
**show** 35:6
**showed** 41:12
 54:21
**shown** 10:23 38:13
**signature** 60:19
**signed** 54:6
**similarly** 1:6
**simple** 18:14

site   13:4 29:19
   44:20 45:6,11,13
   45:23 46:7
situated   1:6
six   18:12
skip   25:7
slow   7:3
sobol   2:4
solutions   5:18
   7:19
sorry   16:4 20:5
   21:17 32:3 42:9
   44:5 46:4
sounds   7:13
source   34:15,24
   40:14,17,17 41:9
south   34:11 51:22
   51:24
southern   1:3 5:12
space   28:16
speak   19:14
specific   9:14,24
   22:10 25:8,9
   29:12,14,15
specifically   9:23
   10:13 11:2,7
speech   10:7,9
spoke   8:4,9 9:22
   11:4,8 12:15
   16:21 18:9,18
   23:15,25 27:10
   34:25 42:18 45:2
   46:5 47:17 48:12
   48:19 49:11 56:4
   56:25 57:18 58:2
standing   25:24
   33:17,22 36:12
   42:2
start   8:14,20 13:16
   46:12

started   11:3 13:4
   14:13 27:5 46:17
starting   28:5,9
   41:20
starts   41:14
startup   48:10
state   1:21 60:3
   61:9
stated   53:12
statements   20:18
   22:10 23:18
states   1:2 5:11
stephan   1:10
stephen   1:10,19
   5:17 60:19
stock   7:19
strike   46:4
stronger   38:4
   39:13
stuff   13:5 52:14
   55:20
subcontractors
   14:9
subject   10:15
   63:17
subscribed   60:15
subsequent   43:15
substance   9:16
   55:21
substantially   56:2
substantiating
   27:10
substantive   10:4
summarized   38:15
summer   46:20
supposed   9:15
sure   12:7 13:12
   24:14 26:2 30:21
   57:23
swear   6:9

sworn   6:13 60:6

**t**

t   4:8 6:12 60:1,1
tab   19:24 22:12
   24:9 31:17 35:4,6
   35:6,19 41:11,15
   52:20,22 53:19
take   7:3,10 19:23
   24:21 25:5 26:20
   32:5,21 46:23
   52:19 54:13
taken   5:8 19:12
   38:13 60:4
talk   7:4,4 43:4
   56:11 57:9,14
   58:10
talked   22:15 49:2
talking   37:13 38:7
team   28:20
technical   48:9
technip   52:7,9,15
technip's   45:9
tell   9:4 12:20
   15:19,24 16:3,7
   17:10 24:5 27:8
   29:10,21 30:2,3
   43:7 44:10,15
   45:3,10,17,21,22
   46:6,16 48:11
   50:12 58:21
telling   42:25
tenure   14:15
   45:25
term   37:8,17 38:4
   39:3,8,11,19,21
terminology   55:14
   55:17
terms   12:17 21:25
testified   6:15 56:7
   57:22

testify   24:6
testifying   60:6
testimony   56:13
   60:8
thank   5:25 21:22
   21:24 36:18 58:15
   59:2,3
thanks   39:15
   46:24
thereof   43:21
thing   30:8 49:22
   49:24
things   10:22 13:13
   13:14 15:10 21:10
   28:16 30:9 48:7
   49:3 50:3,5 55:10
   55:11,16,22
think   18:11,15,24
   20:12 22:5,15,19
   23:2 26:18 29:9
   31:7 32:5,20 35:3
   36:15 37:16 39:12
   43:18 45:15 54:5
   55:20 57:12
thinking   49:6
thought   21:16
   27:21
three   9:12 18:10
   18:15 23:3,5,8
   37:20 38:12 39:19
tight   17:14 27:23
time   5:19 7:15 8:2
   8:13 10:22 11:13
   11:23,25 14:13,23
   17:12,15,17 20:16
   20:17,21 22:22
   23:10,25 25:10
   27:19 28:3,4,7,10
   29:17 39:9 40:7
   45:4 47:12 54:14
   58:16 60:4

**[times - zalka]**

**times** 18:10,12,13 39:19
**title** 7:25
**today** 58:17
**today's** 5:4
**told** 8:12,22 12:21 12:23 13:21 15:4 15:19 21:3 23:20 26:23,25 27:12 30:9 34:18 43:3,8 43:10 44:4,5,14 45:5,12,15 46:8,9 46:19 47:25 48:5 48:15,20,24 49:16 49:24 50:23 56:10 57:8 58:9
**top** 12:6 35:12 53:6
**topic** 17:6
**total** 29:15
**transcribed** 60:7
**transcript** 10:11 11:2,11 25:14 39:10,24 44:8 60:8,9,11 63:18,21
**transcription** 4:18 62:10
**traveled** 45:6
**trees** 14:17
**trial** 24:6
**trs** 7:19,22 8:2,13 14:23 45:4,19
**true** 29:7 60:8 61:10 63:19,22
**try** 7:4,4,8 17:15
**trying** 11:23 15:5 25:10 27:20 29:9 50:4,5
**twice** 46:13,17
**two** 18:15 23:3,5,8 32:11,13 34:20

35:2 45:13 46:9 52:6

**u**

**ultimate** 36:22
**um** 16:23 17:20 19:21,22,25 24:25 26:5,23 28:25 31:15 37:2,7 43:14 53:9 55:6 56:6 57:2,20
**undersigned** 60:2
**understand** 7:7 14:21 21:21 29:10 56:21
**understanding** 12:3
**unfortunate** 37:17
**unfortunately** 35:21
**unit** 5:6 12:22,25 13:5,13,19,20 14:14 15:8 27:21 34:7,12 41:2 51:7 51:7,10,15
**united** 1:2 5:11
**units** 52:4,11
**unrealistic** 36:23 53:14 56:18
**upper** 48:24
**usama** 34:5 37:12 40:11,13,24 50:25 51:16
**usually** 28:15

**v**

**v** 1:8 61:3 62:3
**veritext** 5:18
**versus** 5:10
**victor** 1:10
**video** 5:7

**videographer** 5:2 5:16 6:8 46:25 47:6 59:4,8
**videotaped** 1:17
**virtual** 1:17 5:15
**virtually** 7:16 17:24
**vis** 14:25,25

**w**

**wait** 54:3
**want** 7:10 10:2,25 18:7 36:16 39:14 39:16 56:20 57:23
**wanted** 36:25 38:9 44:20 47:15
**waste** 11:13,23 25:10
**wasting** 11:22
**way** 13:16
**week** 45:15 46:9 46:13,18
**weil** 2:11 6:7
**went** 13:4 18:24 21:9 45:11,12,12 45:25 46:7,8,9
**whereof** 60:14
**widespread** 56:17
**witness** 1:18 2:13 3:5 5:24 6:9,13 10:17 11:22 16:14 58:18,25 60:14 62:4
**witnesses** 10:15 23:11 60:5
**word** 31:13 38:16 40:6
**wording** 55:11
**work** 7:19 55:13
**worked** 28:15 45:7 45:19 51:8,21

**working** 8:13 14:24 28:20 34:7
**worley** 51:17
**wrangling** 12:10
**write** 37:22,24
**written** 29:18 39:19 55:3,4 56:2
**wrong** 33:5 40:12

**x**

**x** 1:4,13 4:3,8 60:11

**y**

**yeah** 7:13 8:21 9:5 12:13 16:5,19 17:7 18:6,11,20,23 19:5,17 20:4 25:13 26:18,19,22 27:12 31:15 32:2 32:13 33:15,20 35:19 36:4,14,24 36:24 39:18 42:5 44:4 45:5 48:22 54:22,24 56:23
**year** 8:6 28:5 45:19,21 46:20
**years** 29:7 51:20 51:23
**york** 1:3,22 2:15 2:15 3:7,7 5:13 60:3 61:9

**z**

**zalka** 2:21 4:7 6:5 6:6,18,23 10:6,10 11:20 12:7 18:2 21:16 26:2 32:5 36:13 38:19 42:5 44:6 46:4,22 53:22 58:14,19 59:3

**[zoom - zoom]**                                                                  Page 11

**zoom**   5:15 7:16

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.