# EXHIBIT 4

**(Unredacted Version Filed Under Seal)**

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x

CHAD LINDSEY MOSHELL, Individually

and on Behalf of All Others

Similarly Situated,

                    Plaintiffs,         Case no.

                    v.              1:20-cv-01008-JPC

SASOL LIMITED, DAVID EDWARD

CONSTABLE, BONGANI NQWABABA,

STEPHEN CORNELL, PAUL VICTOR, and

STEPHAN SCHOEMAN,

                    Defendants.

----------------------------------------x

                    3:56 p.m.

                    December 2, 2020


          VIDEOTAPED VIRTUAL DEPOSITION of ▇▇▇▇▇

▇▇▇▇▇▇, a Witness in the above entitled matter,

pursuant to Order, before Stephen J. Moore, a

Registered Professional Reporter, Certified

Realtime Reporter and Notary Public of the State

of New York.

Page 2

A P P E A R A N C E S:

        HAGENS BERMAN SOBOL SHAPIRO LLP

                Attorneys for Plaintiff

                455 Noth Cityfront Plaza

                Chicago, Illinois 60611


        BY:    LUCAS GILMORE, ESQ.

                - and -

                NICOLLE GRUENEICH, ESQ.

        WEIL, GOTSHAL & MANGES, LLP

                Attorneys for Defendants and the

                Witness

                767 Fifth Avenue

                New York, New York 10153-0119


        BY:    LUNA BARRINGTON, ESQ

                - and -

                CAROLINE ZALKA, ESQ.

                - and

                AMAMA RASANI, ESQ.

                - and -

                JONATHAN POLKES, ESQ.

                - and -

                JENNIFER LAU, ESQ.

Page 3

████████████████

EXAMINATON BY                                          PAGE

MR. GILMORE                                             5

E X H I B I T S

Exhibit 1   Verizon phone bill                    6   15

Exhibit 2   String of text messages              22    3

Exhibit 3 - NOT USED

Exhibit 4   Handwritten notes   Bates            38   17
            stamped Nardello-000010

Page 4

THE VIDEOGRAPHER:  We are now going on the record at approximately 3:56 p.m.  Today's date is December 2, 2020.

This is media unit number 1 of the video recorded deposition of ███████ █████████ taken by counsel for the Plaintiffs, in the matter of Chad Lindsey Moshell, et al., versus Sasol Limited., et al.

It is filed in the United States District Court, Southern District of New York.  The deposition is being held via Zoom virtual conferencing.

My name is Kevin Gallagher, I am the videographer, the court reporter is Stephen Moore, and our concierge is David Johnson.  We are all from the firm of Veritext Legal Solutions.

At this time attorneys participating in the conferencing will identify themselves for the record.

MR. GILMORE:  Yes, good afternoon, Lucas Gilmore for the

Page 5

███████████████

Plaintiffs.

MS. BARRINGTON:  Good afternoon, Luna Barrington for the Defendants and the witness.

THE VIDEOGRAPHER:  Okay, then, at this time our court reporter will swear the witness and we can proceed.

██████████    ███████████          called as a witness, having been first duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY
MR. GILMORE:

Q    Mr. ████████, you own a cell phone, correct?

A    No, sir, I'm calling from my computer.

Q    Do you own a cell phone?

A    Yes, I own a cell phone.

Q    And your cell phone number is ████████████?

Page 6

██████████████

A        Yes, that's my cell phone number.

Q        On May 6, 2020, at 4:11 p.m. Eastern time, you were contacted on your cell phone by Lynnley Browning of On Point Investigations, correct?

A        I was contacted by her.  I don't know if that was the exact date.

Q        Can I have you take a look at what's been previously marked as Exhibit 1. That's tab 1 for you.

A        Okay.

            (The above described document was marked Exhibit 1 for identification as of this date.)

A        Okay, I am looking at it.

Q        Can I have you turn to the third page of that document, and the bottom right-hand corner, it should be 980?

A        Yes.

Q        Do you see where the entry, it says May 6 at 4:11 p.m., do you see that?

A        Yes.

Q        You were contacted by Ms.

Page 7

Browning at 4:11 p.m. Eastern time, correct?

A     I don't know if it was Eastern time.  If this is what her phone records are in, then that would be correct, but I can't attest to that.

Q     Do you recall Ms. Browning leaving a voicemail message for you on May 6, 2020?

A     I don't recall it, but if she did, then she did.

Q     Okay.  Ms. Browning left a two minute voicemail message for you, correct?

A     I can't confirm that, but --

Q     You have no reason to dispute that she left, that Ms. Browning left a two minute voicemail message for you, correct?

MS. BARRINGTON:  Objection, asked and answered.  Go ahead, ▇▇▇▇▇▇▇

A     She has left a voicemail, but I don't know if this two minute duration is a voicemail or not.  I can't state that.

Q     Ms. Browning left a voicemail message for you on May 6th introducing herself as working for On Point Investigations,

Page 8

correct?

A     I don't recall the May 6th voicemail.

Q     You have no reason to dispute that Ms. Browning left a voicemail introducing herself as working for On Point Investigations?

MS. BARRINGTON:  Objection, asked and answered.

Go ahead, ███████, you can answer.

A     As I said, I don't know the -- what was stated in that supposed voicemail.

Q     Ms. Browning asked you to call her back, correct?

A     Well, my answer is not going to change.  I don't know the context of the voicemail.

Q     Okay.

On May 6, 2020 at 6:05 p.m. you spoke on the phone with Ms. Browning, correct?

A     If this call log is accurate, then that would be correct.

Q     You don't have any kind of documents to suggest that it's inaccurate, correct?

████████████

A       I haven't looked, it's not been a desire of me to go and look through my phone records.

Q       You initiated that call on May 6, 6:05 p.m., correct?

MS. BARRINGTON:  Objection, form.

A       I'm not exactly -- I guess it says incoming call and these are her phone records, so yes, if this call log is accurate, then yes.

Q       Okay.  And so you called -- the purpose of the call was to return Ms. Browning's call, correct?

A       That would be correct.

Q       Okay, and you don't dispute that you returned her call within two hours, correct?

A       If this call log is accurate, then that would be correct.

Q       Okay.

A       But I have no reason to --

Q       You spoke to Ms. Browning for 84 minutes, correct?

A       I don't recall the duration of

█████████████

the phone call, but if this 84 minutes here, that I'm assuming is the time that she answered and we both hung up, so I mean, that's what this log is indicating.

I don't know when we conversed if we conversed for the entire 84 minutes.

Q    At the time of this call with Ms. Browning, Ms. Browning was a stranger to you, correct?

A    Well, define stranger.

Q    You had no previous interaction with Ms. Browning, correct?

A    That would be correct.

Q    Is it your practice to have calls with strangers for 84 minutes?

MS. BARRINGTON:  Objection, outside the scope.

Q    Please answer, Mr. █████████.

A    You are asking -- can you repeat the question, please?

Q    Yes, is it your practice to have calls for 84 minutes with strangers?

A    It's not a practice, but I have before.  I have talked to AT&T for longer than

████████████

that.

Q      And do you consider an 84 minute call to be brief?

A      Depending on the context.

Q      In any kind of context, do you consider an 84 minute conversation to be brief?

MS. BARRINGTON:  Objection, asked and answered.

Go ahead, ████████.

A      Do I consider it to be brief? I've had longer phone calls with other people, so I don't really fully understand where you're going.

Q      Sure.  So you think it's accurate to characterize an 84 minute conversation with a stranger to be brief?

MS. BARRINGTON:  Objection, misstates his testimony, asked and answered.

A      I didn't state it was brief.

MR. GILMORE:  Okay, Ms. Barrington, I would ask that you limit your objections to form and stop coaching the witness.

Page 12

Q        Mr. ████████, do you characterize an 84 minute conversation to be brief?

A        Do I characterize an 84 minute conversation to be brief?

It can be brief and it cannot be brief.

Q        Okay, you think that a reasonable person would characterize an 84 minute conversation with a stranger to be brief?

MS. BARRINGTON:   Objection, outside the scope.

A        Sorry, define a reasonable person.

Q        Okay.

On the May 6th call, Ms. Browning interviewed you about your experience at Sasol, correct?

A        I don't know if it was an interview, but we talked about it.

Q        Okay.  You did not hang up the phone on Ms. Browning, correct?

A        Well, I had to, because the

phone call ended.

Q      You didn't abruptly discontinue the conversation, correct?

A      That's correct.

Q      Toward the end of the call you said that what Sasol had done to its shareholders was "bullshit."  Correct?

A      No, I don't recall making that statement.

Q      Do you deny making that statement?

A      I don't recall making it.

Q      You have no reason to believe that you didn't make the statement, correct?

MS. BARRINGTON:  Objection, asked and answered.  Let's move on.

A      I don't recall it.  Yes, sir, I don't recall making the statement.

Q      You told Ms. Browning that, "At the end of the day, do I want justice for these shareholders?  Of course I do."

A      I don't recall making that statement.

Q      Okay.

██████████████████

You said to Ms. Browning that, as to Sasol and their senior executives, "They clearly did not disclose the real health of the project forecasting and scheduling from the people who were paid to do that, which is me"?

A   They disclosed it to the market, so the cost forecast over and above the latest estimate was disclosed to the public.

Q   No, I am asking you a different question.

You told Ms. Browning that, as to Sasol and their senior executives, "They clearly did not disclose the real health of the project forecasting and scheduling from the people who were paid to do that, which was me"?

A   I don't know what was disclosed from the project team to the Board of Directors.

Q   Okay, different question, though.

I'm asking whether you said this statement, you said to Ms. Browning, "They clearly did not disclose the real health of the project forecasting and scheduling from the

people who were paid to do that, which was me?"

A      After I left Sasol, they disclosed to the market an increase in the LCCP price tag several times.

Q      Okay, but you are still not answering my question, respectfully, Mr. ▮▮▮▮▮▮.

You made the statement to Ms. Browning saying, "They clearly did not disclose the real health of the project forecasting and scheduling from the people who were paid to do that, which was me"?

MS. BARRINGTON:  Objection, asked and answered for three times.

A      Yes, I was paid to forecast the cost and the schedule, that's what a project controls manager does.

Sasol disclosed to the public an increase in the forecasted cost, so.

Q      At the end of the call you agreed to have a follow-up call with Sasol's investors' counsel, correct?

A      Excuse me?

Q      At the end of the call with Ms.

Page 16

Browning, you agreed to have a follow-up call with Sasol's investors' counsel, correct?

A    Sasol investors' counsel?  No, I don't recall saying that.

Q    Okay.

Ms. Browning, during the call on May 6th, told you that she was working for counsel for Sasol's shareholders, correct?

A    Counsel for Sasol's shareholders, I believe that would be correct, yes -- to be correct, yes.

Q    Ms. Browning told you it was in connection with litigation that Sasol shareholders had against Sasol and executive Defendants, correct?

A    Possibly, yeah, but I don't know the details of what was disclosed.

Q    At the end of the call you said that you would be willing to answer additional questions, correct?

A    I don't recall stating that.

Q    Do you dispute saying that?

MS. BARRINGTON:  Objection, asked and answered.

███████████

A      I don't recall, I don't recall making that statement, and I don't believe I answered any of her other phone calls.

Q      So it's your testimony you didn't answer any further calls from Ms. Browning?

A      I would have to go and check my call log for that, but in the context of that initial discussion, I would have to check my call log, so I can't attest to that.

Q      Okay.

You said to Ms. Browning at the end of your conversation at May 6th that you may be able to provide Ms. Browning with documents, correct?

A      I don't recall making that statement.

Q      Do you dispute making that statement?

A      I don't have any documents to disclose to her, so I don't recall why I would say that.

Q      Okay.

You said to Ms. Browning that

████████████████

you had documents that included letters between

Sasol and Fluor, correct?

      A     Absolutely not.

      Q     On the call you said that you

were worried about your name, title and dates

of employment becoming public through this

lawsuit, correct?

      A     I did not want any involvement

in this lawsuit.

      Q     You did not want your name,

title and dates of employment becoming public

through this lawsuit, correct?

      MS. BARRINGTON:  Objection, asked

and answered.

      Go ahead, ████████

      A     Yeah, I didn't want any

involvement with this lawsuit, so that would be

my name, my job title, dates of employment.

      Q     On May 13, 2020, Ms. Browning

called you at 10:57 a.m., correct?

      A     10:57 a.m.

      Yeah, it's in the call log here,

so if the call log is accurate, then that would

be correct.

██████████████

Q        And again, you have no information currently that suggests that that's incorrect, correct?

A        Correct.

Q        And you spoke with Ms. Browning for one minute?

A        The phone call was a minute long.  I don't recall speaking with her, I don't know.

Was it a voicemail or was a phone call?  Is there a way to tell?

Q        The purpose of the call was to set up a convenient time for you to speak with Sasol shareholders' counsel to follow up on your previous comments, correct?

MS. BARRINGTON:  Objection, form.

A        I don't know the context of that one minute phone call or voicemail.

Q        Do you recall having discussions with Ms. Browning about setting up a convenient time for you to have a discussion with Sasol's counsel?

MS. BARRINGTON:  Objection, form.

A        With Sasol's counsel?

Page 20

████████████████

Q        Excuse me, do you recall having discussions with Ms. Browning to set up a call with Sasol's shareholders' counsel?

A        No, I don't recall ever having that conversation.

MS. BARRINGTON:  Objection.

Q        On May 13th, 2020 at 6:24 p.m. Ms. Browning called you and left a one minute voicemail?

A        I'm looking at the call log.  So there was a minute phone call.  I don't know if it was a voicemail or --

Q        Okay.

A        It's on the log here, so --

Q        And was it your -- do you have any kind of recollection where Ms. Browning was attempting to contact you on May 13th to set up a call between you and Sasol's investors' counsel?

MS. BARRINGTON:  Objection.

A        I think I answered that already. No, I don't.

Q        And you have no information to dispute these entries of calls on May 13th,

**Page 21**

████████████

correct?

MS. BARRINGTON:  Objection, asked and answered.

A       No information to dispute it?

I could go to my AT&T phone bill, but no, I mean, this seems okay.

Q       Okay.  On May 14th, Ms. Browning left a two minute voicemail with you, correct?

A       I see there was a two minute call.  I don't know if it was a voicemail or a conversation.

Q       On that voicemail Ms. Browning was attempting to set up a convenient time for you to speak with Plaintiffs' counsel about your prior comments, correct?

MS. BARRINGTON:  Objection.

A       I don't recall the context of a voicemail or a conversation regarding that.

Q       Can I have you take a look at tab 2, please.

A       Sure.

MR. GILMORE:  Tab 2 is a string of text messages that have been marked as Exhibit 2.

Page 22

(The above described document was marked Exhibit 2 for identification as of this date.)

A    Um-hum.

Q    On May 14th, Ms. Browning and you exchanged a series of text messages, correct?

A    Yeah, it looks to be.

Q    And the text message string begins with Ms. Browning stating, "██████ ████████████████████ ████████ ████████████████████? "███████████████████████████ ██████    ████████████████. "

A    Yes.

Q    Did you receive that text?

A    Yeah, likely.  I responded to it.

Q    Okay, and then you responded, "███████████████████████████ ██████████████████████████. "█████████████████████ ████████████████████████████ █████████████████████████████ "

Page 23

████████████

        That was your response, correct?

        A        Yup.

        Q        And when you wrote to Ms. Browning tell the law firm, you are referring to Sasol investors' law firm, correct?

        A        Yeah.

        Q        And you are referring to my firm, correct?

        A        I don't know if it's your firm.

        Q        You were referring to the firm that Ms. Browning told you she was working for, correct?

        A        Well, what firm do you work for?

        Q        You understood that when you said the law firm, it was the law firm representing Sasol investors, correct?

        A        Correct.

        Q        So you understood that Sasol's investors' law firm was attempting to contact you, correct?

        A        No, that's incorrect.

        Q        But you said, "tell the law firm," right?

        A        Um-hum.

Page 24

[REDACTED]

Because she works for you, she works for your law firm.

Q    Yeah, and then you wanted to convey --

MS. BARRINGTON:  Let the witness finish answering the question, please.

MR. GILMORE:  Ms. Barrington, with your speaking objections, limit them.

Q    You said, "[REDACTED]," correct?

A    Correct, yeah, it's written right here.

Q    And when you reference data in your text, you are referring to the documents in your possession?

MS. BARRINGTON:  Objection.

A    I didn't hear the last part.

Q    When you reference data in your text message, you are referring to the documents in your possession concerning Sasol?

A    I didn't hear the last part.

THE VIDEOGRAPHER:  Counsel, it

█████████████

seems when you are swinging your head to the left or your right, it works.

Then when you come back forward it's not working.  So maybe getting closer will help out the situation.

MR. GILMORE:  Sorry about that.

THE VIDEOGRAPHER:  No problem, it's going to happen.

Q       I want to focus on your use of the term "data."

A       Okay.

Q       When you reference the term data in your text, you are referring to documents in you possession concerning Sasol?

MS. BARRINGTON:  Objection to form.

A       No, that's incorrect.

I already said I don't have any.

Q       But you said that you had data, correct?

A       Well, data is knowledge, it's not documentation.  Data covers a wide range of definition.

Q       Other than knowledge, what else

Page 26

would it include?

        A       I don't know, I would have to go
and pull up the definition of data and read
through it.

        Q       I don't think you need to do
that, because I want to understand what you
meant when you told Ms. Browning that you had
data.

                MS. BARRINGTON:  Objection.

        A       I don't have any data.  The only
data that I have is my experience working on
the project.

        Q       Okay.  But you told her that
this data isn't for free, right?

        A       That's what it says.

        Q       Well, you said that, right?

        A       Yes, "██████████████████████
███████████████████████," yeah.

        Q       And so what you were conveying
to Ms. Browning was that you had valuable data
for Sasol's investors' counsel, correct?

        A       Incorrect.

                What I was doing here was trying
to get the lady to stop calling me and texting

Page 27

me and leaving voice messages, because it was
disruptive.

MS. BARRINGTON:  Lucas, let him
finish.

A       Disruptive, and I stated
multiple times to that lady I don't want
anything to do with this, and now here I am,
and so be it.

Q       Do you have any other text
messages with Ms. Browning?

A       Not that I recall.

Q       Okay.

In the text message string that
you see in Exhibit 2, do you say stop
contacting me?

A       Let me see, let me read it.

Q       I can tell you it doesn't,
Mr. ███████.

MS. BARRINGTON:  You can -- hold
on, Mr. ███████.

Q       You --

MS. BARRINGTON:  If he would like
to read the text message, the exhibit,
so would you allow him the time to read

it, please, because this is your

exhibit.

            MR. GILMORE:  Ms. Barrington,

please, enough.

      Q      When you said, "▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮," you use that term,

correct?

            MS. BARRINGTON:  Lucas, you are

asking him about the text message.  He

asked to take the time to read it, so

you have to give him an opportunity to

read the exhibit.

      A      I do recall a text message where

I told her the communication will stop, but

it's not in what is your string of messages

here.

      Q      Okay.  We can get to that later.

            I want to focus on this text

message where you said that you wanted a proper

structure of protection in place, correct?

      A      That's what it says.

      Q      And what you meant by that was

you wanted an agreement with the investors' law

firm not to disclose your identity to Sasol,

right?

MS. BARRINGTON:  Objection.

A    In all honesty, I don't know what I meant.  The only thing that I wanted to do with this string of text messages was to get the lady to stop calling me, messaging me, that's it; so.

Q    You state in that text that you wanted to have a compensation model in place, correct?

A    That's correct, and the reason being is I didn't want anything to do with her anymore, her --

Q    When you said compensation model, you're expressing the desire to be paid by investors' counsel, correct?

A    No, incorrect.  What I am conveying here is a text message to her that I know I will stop communication, that was my point.

Q    But you didn't use those words, you said you wanted a compensation model, correct?

A    That is what it says, but that

Page 30

is not the intention of my text message, okay?

Q        But you agree as read you're expressing the desire to be paid by Plaintiffs' investors' counsel, correct?

MS. BARRINGTON:   Objection, asked and answered.

A        I mean, reading on the four corners of the paper, right, that's what it says.

But that's not the intention.  I think I have conveyed what the intention was, was I didn't want anything to do with this, and I got drug into it, and I wanted the phone calls and the text messages to stop, because I've got a normal life, I work, this is disruptive to me.

MS. BARRINGTON:   Lucas, let him finish.

Q        You said that as to the compensation model, you wanted it to be a lot, right?

A        That's what it says, yeah.

Q        So you wanted to be paid in exchange for your data and assistance, right?

Page 31

A       No.  I think I have told you --

Q       That's what your text message says, correct?

MS. BARRINGTON:  Lucas, you have to let the witness finish.  ████████ please, you can continue answering the question.

A       So for the last time, no, and my answer is not going to change, irregardless of how you ask it to me.

This text message exchange was, the sole purpose, my intention to get her to stop contacting me.

Q       Okay, Ms. Browning responded to your text message asking for compensation as,

████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████
███████ .

"████████████████████████
████████████     █████████████████     ███████
█████████████████████████ .

"████████████████████████

Page 32

█████████

██████████████████."

You received that text, correct?

A        Yeah, it's right here.

Q        And then you replied to that text, correct?

A        It looks like it.

Q        Okay, and you replied, "███████

████████████████████

████████████████████

████████████████████

██████████████," correct?

A        That's what it says.  But going back to this whole string of text messages, I just didn't want to be involved, and I wanted the phone calls and the text messages and the voicemails to stop.

Q        Okay.

And then later, you then say, "████████████████████

███████████████████

███████████████."

Those are your words, correct?

A        Those are my words.  And the intention of those words is exactly what I have

been stating here for the last five minutes, that I wanted to convey a strong message to her that would ultimately end up in her not contacting me.

Q        And then, you then wrote, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮," right?

A        That's what it looks to say, and it's the same context of not wanting her to call me anymore, text me, voicemail me, e-mail me, send me a telegram.

Q        You said, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" right?

A        Well, that's what it says, yeah.

Q        Okay, so you're saying that if you're not paid money you are going to claim that you never made these statements to Ms. Browning, correct?

A        No, incorrect.

MS. BARRINGTON:  Objection.

A        Incorrect.  Referring back to her text messages, it says that they don't compensate for data or interviews, no one

████████████

credible does.

Q    But you agree that the message in here is that you wanted $5 million in exchange for your data, correct?

A    Incorrect.

MS. BARRINGTON:  Objection.

A    Incorrect.  As I have stated, this string of text messages was a way for me to try to get her to stop contacting me, that's Lynnley Browning, who I didn't want to talk to or deal with anymore.

Q    And my firm has not paid you, correct?

A    Correct.

Q    Okay.  On June 2, 2020, Ms. Browning called you at 12:30, correct?

A    I don't know.

Q    Do you have any reason to dispute that?

A    What date?

Q    June 2, 2020.

A    Give me a second.

Yeah, there was a phone call at 12:30.  I don't know if that's Eastern or

Page 35

█████████████

Central time, per this log that you gave me.

Q       Okay.

But you have no reason to dispute that she left a voicemail message for you at this time, correct?

A       I can't confirm that, but -- I can't confirm that she left a voicemail or I listened to it.

Q       Is it your same testimony that you couldn't confirm that when she left the voicemail she had said that she was calling for an update on the Complaint that my firm would be filing?

MS. BARRINGTON:  Objection.

A       I don't recall.  I may not have even listened to her voicemails when I saw the New Haven pop up there, New Haven.

Q       On September 10, 2020, Ms. Browning called you at 4:24 p.m. Eastern time, correct?

A       That's what it log says.

Q       And again, you have no information to dispute that, right?

A       Not with me.

▮

Q       Okay.

On October 13, 2020, you spoke with a gentleman by the name of Mr. Thomas Feeney of the Nardello firm, correct?

A       On October 13th, what's his name?

Q       Yeah, I'm moving away from Exhibit 1.  I am asking you on October 13, 2020, you spoke with a gentleman by the name of Mr. Thomas Feeney of the Nardello firm, correct?

A       That rings a bell, that name does.  I didn't know the firm name.

Q       You understood that that firm that you were speaking to to works for Sasol, correct?

A       Yes, and that was the first time that the allegations attributed to me were actually read to me, and the first time that I knew that there was allegations attributed to me in a -- submitted to the court.

Q       Okay.

And during the conversation with Mr. Feeney, the issue of having signed a

████████████

nondisclosure agreement came up, correct?

A       I believe I referenced a nondisclosure agreement when we were putting together the cost estimate in 2016.

The people that were involved have to sign that.

Q       That was a nondisclosure agreement between you and Sasol, correct?

A       It would have been between whoever signed it and the LCCP project.  I don't know if it was all Sasol.

Q       Okay.

But either way you referenced a nondisclosure agreement that you signed prohibiting you from disclosing certain information relating to the LCCP, correct?

MS. BARRINGTON:  Objection.

A       Correct, during the time we were finalizing the estimate prior to them making it public.

I don't know the scope and the duration of that NDA, in all honesty.

Q       You were asked about whether words attributed to you in the Complaint were

accurate, correct?

        A       Correct.

        Q       And you told Mr. Feeney if she recorded, words may be right, correct?

        A       I don't recall making that statement.

        Q       Can I have you take a look at tab 3, please -- excuse me, tab 4?

        A       Tab 4.

        Q       Yes, that is tab 4 which has been previously marked as Exhibit 4.

                I want to direct your attention to page 15 on the bottom right-hand corner. I'm sorry, 16.

                (The above described document was marked Exhibit 4 for identification as of this date.)

        Q       Are you with me?

        A       Nardello-000016?

        Q       Yes, that's correct.

        A       Okay.

        Q       Do you see where it says the number 2, do you see that?

        A       The number 2, maybe 1 to 2 phone

calls?

Q    No, I am referring below that where it says 2, "If she recorded, words may be right."  Do you see that?

A    It's hard to read.

She recorded, "Words may be right, but they need to" -- what does it say, retrace?

Q    Let me reframe my question.

You told Mr. Feeney, "If she recorded, words may be right," correct?

A    I don't recall making that, this is what he wrote in his notes.

Q    Do you dispute making that statement?

A    I just don't recall making it.

Q    Okay.  And you were referring to Ms. Browning, correct?

A    Yeah, because up above it was 1 to 2 phone calls.

Yeah.

Q    So you told Mr. Feeney if Ms. Browning was recording, the words might be right?

Page 40

MS. BARRINGTON:    Objection, asked and answered.

A        I don't recall making that statement.

Q        On October 13th, 2020, after having spoken to the Nardello firm, you called Ms. Browning, correct?

A        Correct.

Q        You called her at 5:43 p.m., correct?

A        Let's get back to the log.
         What date, sir?

Q        October 13th.

A        5:43 p.m.  Yes.

Q        And that was a call that you initiated, correct?

A        Yes.

Q        And you spoke for 13 minutes with Ms. Browning, correct?

A        That's the duration of the phone call, was 13 minutes.

Q        Okay, and you said that you had received a call from a guy regarding your role in the Complaint, correct?

████████████████

A    Correct.

Q    And you were referring to Mr. Thomas Feeney of Nardello, Sasol's investigator, correct?

A    Correct.

Q    And you repeatedly asked Ms. Browning on the call whether she had recorded your May 6th, 2020 conversation, correct?

A    I don't believe I stated May 6, 2020 conversation, nor did I make -- what did you say?  Repeat it?

Q    On the call on October 13th, you asked Ms. Browning whether Ms. Browning had recorded conversations with you, correct?

A    Correct, because I never got a transcribed copy of her notes.

Q    You told her, "Did you record me?"

A    I asked if the phone call that we had was recorded; yes.

Q    Okay, on that same October 13th call you told Ms. Browning that you should be "considered a whistle blower" correct?

A    I don't -- I recall whistle

Page 42

blower coming up, and she told me that I was not one.

Q        Okay.

You raised the issue that you were a whistle blower, correct?

MS. BARRINGTON:  Objection.

A        I don't recall how that came up.

Q        In the context -- but you agree the issue of whistle blower came up, correct?

A        Correct, I don't know how whistle blower is defined.

Q        Okay, and Ms. Browning wasn't the whistle blower, right?

A        Ms. Browning wasn't the whistle blower?  Well, is there the whistle blower?

I don't understand where you're coming from.

Q        I want -- you were referring to yourself as a whistle blower?

MS. BARRINGTON:  Objection.

A        I am not a whistle blower, nor do I know the definition of what a whistle blower is.

Q        But the issue of you being a

whistle blower came up during this call, correct?

MS. BARRINGTON:  Objection, misstates his testimony, asked and answered.

A       What do you want?

Q       The issue of you being a whistle blower came up, correct?

A       The issue of me being a whistle blower, the topic of it?

Q       Yes.

A       The topic or the issue?

Q       Whichever, I'm just trying to get that there was a discussion about you being a whistle blower.

MS. BARRINGTON:  Objection, asked and answered.

Q       Correct?

A       I don't recall all of the conversation.  I do recall whistle blower as a term being used in that conversation.

Q       And that was a term that you used during that conversation, correct?

MS. BARRINGTON:  Objection.

Page 44

▮▮▮▮▮▮▮▮

A    I don't recall the exact conversation.  If a whistle blower term was referenced, I could have stated whistle blower and she could have stated whistle blower.

Q    In that discussion it was in the context of you being a whistle blower of Sasol's misconduct, correct?

MS. BARRINGTON:  Objection, asked and answered like five different times.

A    No.

MR. GILMORE:  Ms. Barrington, your objections are improper.  If we have another speaking objection I'm going to involve the court.

We agreed on our deposition protocol to limit to form.  Please stop.

Q    Mr. ▮▮▮▮▮ --

A    Yeah.

Q    -- you referred to yourself as a whistle blower on the October 13th call with Ms. Browning, correct?

A    I don't recall referring to myself as a whistle blower.

Q    You said, "I'm a whistle

███████████████

blower"?

MS. BARRINGTON:  Objection.

A       I don't recall making that statement.  You keep asking me over and over again, and my answer is not going to change.

Q       Did the topic of you being a whistle blower came up during your call with Ms. Browning, correct?

A       There was a topic brought up about being a whistle blower on the phone call.

Q       And being a whistle blower, that would be you being a whistle blower, correct?

MS. BARRINGTON:  Objection.

A       I don't recall the context of how that was transcribed.  I know that her law firm has a -- not law firm, excuse me, investigation firm on their website has something regarding whistle blowers.

Q       You told Ms. Browning that you hadn't been given an opportunity to review your comments in the Complaint, correct?

A       Correct.

Q       And Ms. Browning reminded you of your May 14th text, correct?

Page 46

A       My May 14th text was directed towards Lynnley Browning, not the Plaintiffs' attorneys that submitted the second amended agreement.

Q       Different question, though.
Ms. Browning reminded you of your May 14th text in response to that, correct?

A       Yes, that's why she said, all communication was done per my text message, which I don't read in this transcription that you gave me.

Q       And you responded by saying, "Fair enough," correct?

A       I don't recall how I responded.

Q       Is it your testimony that you initiated no further calls to Ms. Browning?

A       Is it my testimony that I initiated no further calls?

Q       Yes.

A       I don't know if I initiated any further calls.

Q       Okay.

A       But I can't state I did or

Page 47

didn't without looking at my phone records.

This whole thing, this process we are going

through, there are more important things in my

life to keep track of.

Q       Understood, but on October 14th,

2020, you called Ms. Browning, correct?

A       October 14, 2020.

That's what it says here, there

is a six minute phone call.

Q       Okay.

And then on October 21st, 2020,

you called Ms. Browning, correct?

A       Yeah, that's what it says on

this phone record.

Q       I want to go back to the initial

conversation on May 6th, 2020.

A       Okay.

Q       You told Ms. Browning that you

worked for Sasol as a project controls manager,

correct?

A       I did not work for Sasol, I was

through an agency, but yeah, that would be

correct, but I was not a Sasol employee.

Q       And you told Ms. Browning that

██████████████████

you worked in that position from August 2014 to July 2018, right?

A    Correct, that's the duration of my time on LCCP.

Q    And you told her that you were based out of Sasol's Houston office, right?

A    No, that's incorrect.

I was based at Fluor's engineering office from August until November of 2016, and then I relocated to the Lake Charles chemicals project construction site.

Q    You told Ms. Browning that you reported to a project director named ████████████████, correct?

A    Correct.

Q    And you said that ████████ was a South African national, right?

A    Yeah, he came over from South Africa.

Q    And you told Ms. Browning that ████████████████ worked in Houston and Lake Charles?

A    I don't recall when he got here. I think he only worked in Lake Charles. I

can't confirm whether he worked in Houston.

Q       Understood.

And you told Ms. Browning that

███████████ reported to what you call the four

horseman, correct?

A       That would be correct, there was

a group of four individuals, I think it was

four, that were --

MS. BARRINGTON:  Hold on.  ██████

go ahead, finish.

A       No, no, yeah, that's correct.

Q       And these were all executives

that were also from South Africa, correct?

A       Yeah, I mean they had Vice

President titles or Senior Vice President, but

I don't know if that means you are an

executive, so I can only tell you what their

titles were.

Q       You said that the four horsemen

were Johan Duvenhage, Anton Heyneke, Johan

Barnard and an engineer whose name you did not

recall?

A       I believe so, yeah, you

mispronounced their names, but I believe that's

Page 50

what I stated, yeah.

Q    I'm sorry for the pronunciation there.

You said you made a presentation with slides detailing costs to ███████ and the four horsemen every two weeks?

A    Every two weeks?  We were doing it weekly.

Q    Got it.

A    They weren't slides, they were -- you know, we had weekly cost report, two monthly cost reports, but everything during the life cycle of the project changed in terms of reporting.

Q    And on the call with Ms. Browning, you recounted an incident in 2016 in which Johan Barnard, one of the four horsemen, pressured you to violate Sarbanes-Oxley rules, correct?

A    No, that's incorrect.

MS. BARRINGTON:  Objection.

A    The statement that corrected the record from what was submitted in the second amendment Complaint, it's clear as to when that

Page 51

███████████████

happened and what the proceedings were after

that.

Q      Okay.

You recounted an incident in

which you were directed by Mr. Barnard to lower

the value of work, correct?

MS. BARRINGTON:  Objection.

A      Correct.

Q      And the value of work, that's an

accounting term, correct?

A      The value of work done?

Q      Yes.

A      It's not exactly an accounting

term, but it's a term that that -- it's

basically all the costs that are incurred that

are contractually invoiceable.

Q      And you told Ms. Browning that

Mr. Barnard said, "Reduce the value of work

done," correct?

A      Correct.

MS. BARRINGTON:  Objection.

Q      And what Mr. Barnard was looking

to do was to lower the value of work to reduce

the amount of liabilities on the LCCP's project

Page 52

███████████

balance sheet, correct?

MS. BARRINGTON:  Objection, outside the scope.  And then also, Lucas, I just want to make it clear for the record you are reading from notes that the witness has not had an opportunity to see, you haven't shown it to him.

I just want to make that clear on the record.

MR. GILMORE:  Ms. Barrington, I am looking at a deposition outline, so you don't know what I am looking at.

Q     Mr. ████████ ████████ said reduce the value of work done, correct?

A     Yeah, he did, and I did not.

Q     You told him, "I'm not going to do that.  I don't want to share a jail cell with you," correct?

A     Yes, sir.

Q     You told Ms. Browning that the horsemen, "took my cost reports, rolled them up and added in unsubstantiated accrual," correct?

MS. BARRINGTON:  Objection.

Page 53

A    I don't -- yes, but I don't understand the -- we had an official cost report, which was in the Prediction Plus software.

I only saw that unsubstantiated accruals in an Excel version of a cost report, nor do I know if that actually went into the project books or balance sheet or liabilities or whatever you call them, because I wasn't privileged to that information.

Q    And you contacted other project -- excuse me, other cost project managers about this incident, correct?

MS. BARRINGTON:  Objection.

A    Project controls managers and cost control, yeah.

Q    And you told them about what ████████████ had instructed you to do, correct?

MS. BARRINGTON:  Objection, outside the scope.

A    We discussed that, and I said my position of I'm not reducing the value of work done, and recommend they do the same, if they stand behind their numbers.

Page 54

Q        And you told Ms. Browning that the practice that you were asked to do was illegal, correct?

MS. BARRINGTON:  Objection.

A        I don't recall making that statement that it was illegal.  If something goes into the financials that misrepresents your actual liabilities or revenues, then -- I am not a Sarbanes-Oxley expert, but I think that if you misrepresent your balance sheet and your liabilities, that that's probably illegal.

But I can't say for a fact, because I'm not that type of accountant, or a lawyer.

Q        What ███████████ instructed you to do was wrong, correct?

MS. BARRINGTON:  Objection, outside the scope.  If you keep asking -- if you keep doing this, we will tell the witness not to answer.

A        I don't think I was instructed, I was told, would be the appropriate term.

Q        You told Ms. Browning that you attended meetings with other LCCP cost managers

Page 55

and LCCP management, correct?

A       Of course, yeah.

Q       And you told Ms. Browning that at one point during one of these meetings the cost control managers all told management, "You may as well fire us and hire a graphics designer or artist who can paint the picture you want to see."

Correct?

MS. BARRINGTON:  Hold on, objection.  Again, you're just reading from notes, because you're quoting from them, Lucas, and you won't show the witness them.

MR. GILMORE:  Limit your objections to form.

MS. BARRINGTON:  I am just making that clear for the record.

MR. GILMORE:  No, you are speaking and you are testifying for him.

Q       Mr. ████████, you told Ms. Browning that at one point the cost control managers all told Sasol management, "You may as well fire us and hire a graphics designer or

Page 56

artist who can paint the picture you want to see," correct?

A    Yeah, but I don't remember the context of the meeting, I don't know if it was on cost, schedule, risk management, or you know, what the topic of the meeting was.

I thought it was an interesting term that resonated and stuck with me.

Q    And what you were expressing with that term was that management was exerting pressure on cost controllers to submit false reporting concerning the LCCP, correct?

MS. BARRINGTON:    Objection, outside the scope.

A    That's incorrect.    I don't mind answering; that's incorrect.

I don't remember the context of what that particular statement was made regarding risk, schedule, cost, I don't know.

I just remember the statement.

Q    Okay, but in that statement you're conveying to Ms. Browning that management was exerting pressure on cost controllers to submit a false picture, correct?

████████████████████

MS. BARRINGTON:   Objection.

A       I will answer again the same way I answered previously.  I don't know the context of that particular meeting.  I went to lots and lots of meetings.

Q       Okay.

You also had discussions with Ms. Browning about Sasol's accounting for Fluor's "self-performing construction," correct?

A       Fluor's self-performing construction did come up, yes.

Q       Okay.

You said that, "At one point the LCCP stipulated $36 million of negative value for Fluor self-performing construction," correct?

A       The estimate had an opportunity, which would have been an indirect savings had Fluor self-performed the construction.

Q       And you said that this was wrong, because "Fluor was never going to be performing self-construction on this job," correct?

Page 58

MS. BARRINGTON:  Objection.

A        At the time the estimate was issued, that's when the opportunity went into the estimate.

So it's possible that they could have self-performed the construction, because there was so much time left to do so.

The contracts that we have with the other companies scope shifted from company to company all the time.

Q        But you questioned that entry, correct?

MS. BARRINGTON:  Objection.

A        Not initially.  I only learned about it in about 2018.

Because I didn't have a negative budget on the scope of utilities off sites and infrastructure, which was --

Q        You told Ms. Browning that Fluor was never going to be performing self-construction on this job, correct?

MS. BARRINGTON:  Objection.

A        I don't recall making that exact statement, but it's -- at the time the estimate

█████████

was produced it was a possibility.

Q        I had an interview with the lady after the project has more or less been completed, so I know they didn't self-perform.

Q        You also questioned Sasol's accounting for management negotiated savings, correct?

A        Yes, I did not understand what that -- I believe it was a $55 million opportunity in the estimate, but I don't understand the context of that amount, because that wasn't a control account that I knew anything about.

Q        And you also said that Sasol had two other negative numbers for entries, correct?

MS. BARRINGTON:   Objection.

A        I don't recall how many other numbers that they had, if it was just those two specifically or if there was more, I don't recall.

Q        But you told Ms. Browning that none of those negative numbers should have been in there?

██████████████

MS. BARRINGTON:   Objection.

A        I don't recall making that statement.  They can be in there, but I don't know the context of the negotiated savings or the, you know, there was an indirect opportunity for Fluor to self-perform when the estimate was put together.

But going forward, that opportunity would diminish with every month of work that's been completed, right?

Q        You were also asked about the LCCP cost and schedule estimates on your call with Ms. Browning, correct?

A        Regarding what?

Q        Well, you said that you looked at the estimate for the ████████ unit, correct?

A        Correct.

Q        And you said that the -- that estimate was a pile of crap, correct?

A        No.  I did not make that statement.  That's not a statement that I would use.

I would use a different one, probably not as nice as that one, but my

statement was that the piping installation rates for ████████ were low relative to Gulf Coast benchmarks.

Q       Okay.

You also told Ms. Browning that the LCCP project was behind schedule?

A       I don't remember making that statement.

Q       Do you recall having discussions with Ms. Browning about unplanned absenteeism?

A       Yeah, I do.

Q       You told Ms. Browning that one reason for cost and schedule overruns was unplanned absenteeism by rank and file construction workers, correct?

A       There was a high unplanned absenteeism relative to what you would expect on another project.

Q       Got it.

And then you also said that as a result of the unplanned absenteeism the productivity factor was low, correct?

MS. BARRINGTON:  Before you answer, ████████ Mr. Videographer, can I

get a time check, please?

MR. GILMORE:  Ms. Barrington, stop interfering with my examination.

Q    Mr. ▆▆▆▆▆ --

A    Yeah.

Q    You told her that the productivity factor was too low, correct?

A    I didn't say it was too low.  I said unplanned absenteeism could be a contributor to productivity factors not being achieved.

Q    You also discussed when you were transferred to a different unit, correct?

A    Correct.

Q    Okay.

And that was in June of 2016, correct?

A    I think it was in June, that seems right.

Q    And at that point you were -- what element of the LCCP were you charged to?

A    Utilities off sites and infrastructure.

Q    And that was the highest cost of

███████████████

the LCCP, that portion, correct?

A        It was the highest portion of
the project estimate.

Q        And was -- were you told -- you
told Ms. Browning that the cost for your -- for
that area was undervalued, correct?

MS. BARRINGTON:  Objection.  It's
also 4:56, it's been one hour, so we are
going to shut this deposition down now.

MR. GILMORE:  No, actually you
have prolonged it with your speaking
objections, so I would like the witness
to answer.

MS. BARRINGTON:  No, Lucas, it's
a one hour deposition, so ordered by the
court, and so we are done.

MR. GILMORE:  We can take this up
with the court.

MS. BARRINGTON:  It's 4:56, it's
been one hour.  Mr. Videographer, can
you please confirm that it's been 60
minutes?

THE VIDEOGRAPHER:  It has been
one hour.

Page 64

███████████████

MS. BARRINGTON:  So thank you very much.

MR. GILMORE:  So you are shutting the deposition down and you are not allowing the witness to answer the question?

I want to get that straight, because we are going to talk to the court about your speaking objections.

MS. BARRINGTON:  It's been 60 minutes, it's a one hour deposition. You've taken up your time, and so that's it, the deposition is over.

Q    Mr. ████████ please answer my final question.  You told --

MS. BARRINGTON:  No, no, this deposition is over.

Q    Mr. ████████ you told Ms. Browning that your portion of the project was undervalued, correct?

MS. BARRINGTON:  Mr. ████████ you can answer this final question and then this deposition is over.

A    No, I didn't say it was

Page 65

undervalued.  Estimates are estimates.  There are control accounts that are high, there are control accounts that are low.

I've never been on a project where every single cost control account hit the exact estimate number.

There was aspects of UO & I, like the 69 kV cable pulling, which was lower than desirable, but that was what I said.

MS. BARRINGTON:  Okay.

THE VIDEOGRAPHER:  Off the record?

MS. BARRINGTON:  Yes, please.

THE VIDEOGRAPHER:  We are now going off the record at approximately 4:58 p.m.

Page 66

I, the undersigned, a Certified Shorthand Reporter of the State of New York, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction;

That the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case before completion of the proceedings, review of the transcript [ ] was [x ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: December 4, 2020

_____
            Stephen J. Moore
            RPR, CRR

Page 67

DECLARATION UNDER PENALTY OF PERJURY

Case Name: MOSHELL v. SASOL

Date of Deposition: December 2, 2020

I, ███████████████ , hereby certify

Under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

Executed this _____ day of _____, 2020, at _____.

_____

████████████

Page 68

DEPOSITION ERRATA SHEET
Case Name: MOSHELL v. SASOL
Name of Witness: █████████████
Date of Deposition: December 2, 2020
Reason Codes:  1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page 69

DEPOSITION ERRATA SHEET

Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____

_____ Subject to the above changes, I certify that the transcript is true and correct

_____ No changes have been made. I certify that the transcript  is true and correct.

_____

**[& - answer]**

**&**

**&** 2:11 65:8

**0**

**000010** 3:14
**000016** 38:20
**01008** 1:8

**1**

**1** 3:7 4:6 6:11,12
6:15 36:9 38:25
39:20 68:7
**10** 35:19
**10153-0119** 2:15
**10:57** 18:21,22
**12:30** 34:17,25
**13** 18:20 36:3,9
40:19,22
**13th** 20:8,18,25
36:6 40:6,14
41:13,22 44:21
**14** 47:8
**14th** 21:8 22:6
45:25 46:2,8 47:6
**15** 3:7 38:14
**16** 38:15
**17** 3:13
**1:20** 1:8

**2**

**2** 1:14 3:9 4:4
21:21,23,25 22:3
27:15 34:16,22
38:24,25,25 39:4
39:21 67:4 68:5,9
**2014** 48:2
**2016** 37:5 48:11
50:17 62:17
**2018** 48:3 58:16
**2020** 1:14 4:5 6:4
7:9 8:19 18:20
20:8 34:16,22
35:19 36:3,10

40:6 41:9,11 47:7
47:8,12,17 66:17
67:5,12 68:6
**20932** 66:19
**21st** 47:12
**22** 3:9

**3**

**3** 3:9,11 38:9
68:10
**36** 57:16
**38** 3:13
**3:56** 1:14 4:4

**4**

**4** 3:13 38:9,10,11
38:12,17 66:17
**455** 2:5
**4:11** 6:4,23 7:2
**4:24** 35:20
**4:56** 63:9,20
**4:58** 65:17

**5**

**5** 3:3 32:10 34:4
**55** 59:10
**5:43** 40:10,15

**6**

**6** 3:7 6:4,23 7:8
8:19 9:6 41:10
**60** 63:22 64:11
**60611** 2:6
**69** 65:9
**6:05** 8:19 9:6
**6:24** 20:8
**6th** 7:24 8:3 12:18
16:8 17:14 41:9
47:17

**7**

**767** 2:14

**8**

**84** 9:23 10:2,7,16
10:23 11:3,7,16
12:3,5,10

**9**

**949-981-8117** 5:25
**980** 6:20

**a**

**a.m.** 18:21,22
**able** 17:15
**abruptly** 13:3
**absenteeism** 61:11
61:15,18,22 62:10
**absolutely** 18:4
**account** 59:13
65:6
**accountant** 54:14
**accounting** 51:11
51:14 57:9 59:7
**accounts** 65:3,4
**accrual** 52:24
**accruals** 53:7
**accuracy** 33:7
**accurate** 8:21 9:10
9:19 11:16 18:24
38:2
**achieved** 62:12
**action** 32:20 66:14
66:15
**actual** 54:9
**added** 52:24
**additional** 16:20
**africa** 48:20 49:14
**african** 48:18
**afternoon** 4:25 5:3
**agency** 47:23
**agree** 30:3 34:3
42:9
**agreed** 15:22 16:2
44:16

**agreement** 28:24
37:2,4,9,15 46:5
**ahead** 7:19 8:10
11:10 18:16 49:11
**al** 4:10,11
**allegations** 36:19
36:21
**allow** 27:25
**allowing** 64:6
**amama** 2:21
**amended** 46:4
**amendment** 50:25
**amount** 51:25
59:12

**answer** 8:10,15
10:19 16:20 17:6
31:10 45:6 54:21

**[answer - calls]** Page 2

57:3 61:25 63:14
64:6,15,23
**answered** 7:19 8:9
10:3 11:9,20
13:17 15:15 16:25
17:4 18:15 20:22
21:4 30:7 40:3
43:6,18 44:10
57:4
**answering** 15:7
24:7 31:7 56:17
**anton** 49:21
**anymore** 29:14
32:11 33:11 34:12
**appropriate** 54:23
**approximately** 4:3
65:16
**area** 63:7
**arnold** 48:14
**artist** 55:8 56:2
**asked** 7:18 8:8,13
11:8,19 13:16
15:14 16:24 18:14
21:3 28:11 30:6
37:24 40:2 41:7
41:14,20 43:5,17
44:9 54:3 60:12
**asking** 10:20
14:10,22 28:10
31:16 36:9 45:5
54:20
**aspects** 65:8
**assistance** 30:25
**assuming** 10:3
**at&t** 10:25 21:6
**attempting** 20:18
21:14 23:20
**attended** 54:25
**attention** 38:13
**attest** 7:6 17:11

**attorney** 66:14
**attorneys** 2:4,12
4:21 33:14 46:4
**attributed** 36:19
36:21 37:25
**august** 48:2,10
**avenue** 2:14
**avoided** 31:24

**b**

**b** 3:5
**back** 8:14 25:4
32:14 33:23 40:12
47:16
**balance** 52:2 53:9
54:11
**barnard** 49:22
50:18 51:6,19,23
52:15 53:19 54:16
**barrington** 2:17
5:3,4 7:18 8:8 9:7
10:17 11:8,18,23
12:13 13:16 15:14
16:24 18:14 19:17
19:24 20:7,21
21:3,17 24:6,8,19
25:16 26:10 27:4
27:20,23 28:4,9
29:3 30:6,18 31:5
33:22 34:7 35:15
37:18 40:2 42:7
42:21 43:4,17,25
44:9,12 45:3,14
49:10 50:22 51:8
51:22 52:3,12,25
53:15,20 54:5,18
55:11,18 56:14
57:2 58:2,14,23
59:18 60:2 61:24
62:3 63:8,15,20
64:2,11,17,22
65:11,14

**based** 48:7,9
**basically** 51:16
**bates** 3:13
**becoming** 18:7,12
**begins** 22:11
**behalf** 1:5
**believe** 13:14
16:11 17:3 31:18
37:3 41:10 49:24
49:25 59:10
**bell** 36:13
**benchmarks** 61:4
**berman** 2:3
**bill** 3:7 21:7
**blower** 41:24 42:2
42:6,10,12,14,16
42:16,20,22,24
43:2,9,11,16,21
44:3,4,5,7,21,24
45:2,8,11,12,13
**blowers** 45:19
**board** 14:18
**bongani** 1:9
**books** 53:9
**bottom** 6:19 38:14
**brief** 11:4,7,11,17
11:21 12:4,6,7,8
12:12
**brought** 45:10
**browning** 6:6 7:2
7:7,12,16,23 8:6
8:13,20 9:23 10:9
10:9,13 12:19,24
13:20 14:2,12,23
15:10 16:2,7,13
17:7,13,15,25
18:20 19:6,21
20:3,9,17 21:8,13
22:6,11,12 23:5,12
26:8,21 27:11
31:15 33:20 34:11

34:17 35:20 39:19
39:24 40:8,20
41:8,14,14,23
42:13,15 44:22
45:9,20,24 46:3,7
46:18 47:7,13,19
47:25 48:13,21
49:4 50:17 51:18
52:22 54:2,24
55:4,23 56:23
57:9 58:20 59:23
60:14 61:6,11,13
63:6 64:20
**browning's** 9:14
**budget** 58:18
**bullshit** 13:8

**c**

**c** 2:2
**cable** 65:9
**call** 8:13,21 9:5,9
9:10,13,14,17,19
10:2,8 11:4 12:18
13:2,6 15:21,22,25
16:2,7,19 17:9,11
18:5,23,24 19:8,12
19:13,19 20:3,11
20:12,19 21:11
32:11 33:11 34:24
40:16,22,24 41:8
41:13,20,23 43:2
44:21 45:8,11
47:10 49:5 50:16
53:10 60:13
**called** 5:10 9:12
18:21 20:9 34:17
35:20 40:7,10
47:7,13
**calling** 5:20 26:25
29:7 35:12
**calls** 10:16,23
11:12 17:4,6

[calls - correct]

20:25 30:15 32:16 39:2,21 46:18,20 46:23
**caroline** 2:19
**case** 1:7 32:9 66:11 67:3 68:3
**cell** 5:18,22,23,24 6:2,5 52:19
**central** 35:2
**certain** 37:16
**certified** 1:19 66:3
**certify** 66:4,13 67:7 69:18,21
**chad** 1:5 4:9
**chance** 32:9
**change** 8:16 31:10 45:6
**changed** 50:14
**changes** 69:18,20
**characterize** 11:16 12:3,5,10
**charged** 62:22
**charles** 48:12,23 48:25
**chat** 31:25
**check** 17:8,10 62:2
**chemicals** 48:12
**chicago** 2:6
**cityfront** 2:5
**claim** 33:18
**clarify** 68:7
**class** 32:20
**clear** 50:25 52:5 52:10 55:19
**clearly** 14:4,14,24 15:10
**closer** 25:5
**coaching** 11:25
**coast** 61:4
**codes** 68:7

**come** 25:4 57:13
**comes** 33:8
**coming** 42:2,18
**comments** 19:16 21:16 45:22
**commodity** 22:22 24:12 26:19
**communication** 28:15 29:20 46:11
**companies** 58:10
**company** 58:10,11
**compensate** 31:22 33:25
**compensation** 22:25 29:10,15,23 30:21 31:16
**complaint** 35:13 37:25 40:25 45:22 50:25
**completed** 59:5 60:11
**completion** 66:11
**computer** 5:21
**concerning** 24:23 25:15 56:13
**concierge** 4:18
**conferencing** 4:15 4:22
**confirm** 7:14 35:7 35:8,11 49:2 63:22
**conform** 68:9
**connection** 16:14
**consider** 11:3,7,11
**considered** 41:24
**constable** 1:9
**construction** 48:12 57:10,13,17 57:21,24 58:7,22 61:16

**contact** 20:18 23:20
**contacted** 6:5,8,25 53:12
**contacting** 27:16 31:14 33:5 34:10
**context** 8:16 11:5 11:6 17:9 19:18 21:18 33:10 42:9 44:7 45:15 56:5 56:18 57:5 59:12 60:5
**continue** 31:7
**contracts** 58:9
**contractually** 51:17
**contributor** 62:11
**control** 53:17 55:6 55:23 59:13 65:3 65:4,6
**controllers** 56:12 56:25
**controls** 15:18 47:20 53:16
**convenient** 19:14 19:21 21:14
**conversation** 11:7 11:17 12:3,6,11 13:4 17:14 20:6 21:12,19 36:24 41:9,11 43:21,22 43:24 44:3 47:17
**conversations** 41:15
**conversed** 10:6,7
**convey** 24:5 33:3
**conveyed** 30:12
**conveying** 26:20 29:19 56:23
**copy** 41:17

**cornell** 1:10
**corner** 6:20 38:14
**corners** 30:9
**correct** 5:19 6:7 7:2,5,13,17 8:2,14 8:20,22,25 9:6,14 9:15,18,20,24 10:10,13,14 12:20 12:24 13:4,5,8,15 15:23 16:3,9,11,12 16:16,21 17:16 18:3,8,13,21,25 19:4,5,16 21:2,9 21:16 22:8 23:2,6 23:9,13,17,18,21 24:13,14 25:21 26:22 28:8,21 29:11,12,17,24 30:5 31:4 32:3,6 32:12,23 33:20 34:5,14,15,17 35:6 35:21 36:5,12,17 37:2,9,17,19 38:2 38:3,5,21 39:12,19 40:8,9,11,17,20,25 41:2,5,6,9,15,16 41:24 42:6,10,11 43:3,9,19,24 44:8 44:22 45:9,13,22 45:23,25 46:9,15 47:7,13,21,24 48:4 48:15,16 49:6,7,12 49:14 50:20 51:7 51:9,11,20,21 52:2 52:16,20,24 53:14 53:19 54:4,17 55:2,10 56:3,13,25 57:11,18,25 58:13 58:22 59:8,17 60:14,17,18,20 61:16,23 62:8,14

[correct - executed]                                                              Page 4

62:15,18 63:2,7 64:21 67:10 68:10 69:19,22
corrected  50:23
cost  14:8 15:17,20 37:5 50:12,13 52:23 53:3,7,13,17 54:25 55:6,23 56:6,12,20,24 60:13 61:14 62:25 63:6 65:6
costs  50:6 51:16
counsel  4:8 15:23 16:3,4,9,10 19:15 19:23,25 20:4,20 21:15 24:25 26:22 29:17 30:5
course  13:22 55:3
court  1:2 4:13,17 5:7 36:22 44:15 63:17,19 64:9
covers  25:23
crap  60:20
credible  31:23 33:15 34:2
crr  66:21
currently  19:3
cv  1:8
cycle  50:14

**d**

d  5:10,10
data  22:21 24:12 24:16,21 25:11,13 25:20,22,23 26:4,9 26:11,12,15,18,21 30:25 31:17,22 32:10 33:25 34:5
date  4:4 6:9,16 22:4 34:21 38:18 40:13 66:16 67:4 68:5

dated  66:17
dates  18:6,12,19
david  1:9 4:18
day  13:21 67:11
deal  34:12
december  1:14 4:4 66:17 67:4 68:5
declaration  67:2
defendants  1:12 2:12 5:4 16:16
define  10:11 12:15
defined  42:12
definition  25:24 26:4 42:23
deny  13:11
depending  11:5
deposition  1:16 4:7,14 44:16 52:13 63:10,16 64:5,12,14,18,24 66:11 67:4 68:2,5 69:2
described  6:14 22:2 38:16
designer  55:8,25
desirable  65:10
desire  9:3 29:16 30:4
detailing  50:6
details  16:18
different  14:10,20 44:10 46:6 60:24 62:14
diminish  60:10
direct  38:13
directed  46:2 51:6
direction  66:8
director  48:14
directors  14:19
disclose  14:4,14,24 15:10 17:22 28:25

disclosed  14:7,9 14:17 15:4,19 16:18
disclosing  37:16
discontinue  13:3
discussed  53:22 62:13
discussion  17:10 19:22 43:15 44:6
discussions  19:20 20:3 57:8 61:10
dispute  7:15 8:5 9:16 16:23 17:19 20:25 21:5 34:20 35:5,24 39:15
disruptive  27:3,6 30:17
district  1:2,3 4:13 4:13
document  6:14,19 22:2 38:16
documentation  25:23
documents  8:24 17:16,21 18:2 24:17,23 25:14
doing  26:24 50:8 54:20
drug  30:14
duly  5:11 66:7
duration  7:21 9:25 37:23 40:21 48:4
duvenhage  49:21

**e**

e  2:2,2 3:5 5:10,10 33:11
eastern  6:5 7:2,3 34:25 35:20
edward  1:9
either  37:14

element  62:22
employee  47:24 66:14
employment  18:7 18:12,19
ended  13:2
engineer  49:22
engineering  48:10
entire  10:7
entitled  1:17
entries  20:25 59:16
entry  6:22 58:12
errata  68:2 69:2
errors  68:10
esq  2:8,10,17,19 2:21,23,25
estimate  14:9 37:5 37:20 57:19 58:3 58:5,25 59:11 60:8,17,20 63:4 65:7
estimates  60:13 65:2,2
et  4:10,10
exact  6:9 44:2 58:24 65:7
exactly  9:8 32:25 51:14
examination  5:15 62:4
examinaton  3:2
examined  5:12
excel  53:7
exchange  30:25 31:12 34:5
exchanged  22:7
excuse  15:24 20:2 38:9 45:17 53:13
executed  67:11

executive   16:15 49:18
executives   14:3,13 49:13
exerting   56:11,24
exhibit   3:7,9,11,13 6:11,15 21:25 22:3 27:15,24 28:3,13 36:9 38:12,17
expect   61:18
experience   12:19 26:12
expert   54:10
expressing   29:16 30:4 56:10

**f**

fabricated   32:12
fact   54:13
factor   61:23 62:8
factors   62:11
facts   68:9
fair   46:15
false   56:12,25
federal   66:11
feeney   36:5,11,25 38:4 39:11,23 41:4
fifth   2:14
file   61:15
filed   4:12
filing   35:14
final   64:16,23
finalizing   37:20
financially   66:14
financials   54:8
finish   24:7 27:5 30:19 31:6 49:11
fire   55:7,25
firm   4:19 22:21 23:5,6,9,10,11,14

23:16,16,20,24 24:3,11 28:25 34:13 35:13 36:5 36:11,14,15 40:7 45:17,17,18
first   5:11 36:18,20
five   33:2 44:10
fluor   18:3 57:17 57:21,23 58:20 60:7
fluor's   48:9 57:10 57:12
focus   25:10 28:19
follow   15:22 16:2 19:15
follows   5:13
forecast   14:8 15:16
forecasted   15:20
forecasting   14:5 14:15,25 15:11
foregoing   66:5,6,9 66:10 67:10
form   9:7 11:24 19:17,24 25:17 44:17 55:17
forth   66:6
forward   25:4 60:9
four   30:8 49:5,8,9 49:20 50:7,18
free   22:22 26:15
fully   11:13
further   17:6 46:18 46:20,23 66:10,13

**g**

gallagher   4:16
gentleman   36:4,10
getting   25:5
gilmore   2:8 3:3 4:24,25 5:16 11:22 21:23 24:8

25:7 28:4 44:12 52:12 55:16,20 62:3 63:11,18 64:4
give   28:12 34:23
given   45:21 66:9
go   7:19 8:10 9:3 11:10 17:8 18:16 21:6 26:3 47:16 49:11
goes   54:8
going   4:3 8:15 11:14 25:9 31:10 32:13 33:18 44:15 45:6 47:3 52:18 57:23 58:21 60:9 63:10 64:9 65:16
good   4:24 5:3
gotshal   2:11
graphics   55:7,25
group   49:8
grueneich   2:10
guess   9:8
gulf   61:3
guy   40:24

**h**

h   3:5 5:10
hagens   2:3
hand   6:20 38:14
handwritten   3:13
hang   12:23
happen   25:9
happened   51:2
hard   39:6
haven   35:18,18
head   25:2
health   14:4,14,24 15:11
hear   24:20,24
held   4:14

help   25:6 32:10
heyneke   49:21
hi   22:11
high   61:17 65:3
highest   62:25 63:3
hire   55:7,25
hit   65:6
hold   27:20 49:10 55:11
honesty   29:4 37:23
horseman   49:6
horsemen   49:20 50:7,18 52:23
hour   63:9,16,21 63:25 64:12
hours   9:17
houston   48:7,22 49:2
hum   22:5 23:25
hung   10:4

**i**

identification   6:15 22:3 38:17
identify   4:23
identity   28:25
illegal   54:4,7,12
illinois   2:6
important   31:17 47:4
improper   44:13
inaccurate   8:24
incentive   32:2
incident   50:17 51:5 53:14
include   26:2
included   18:2
incoming   9:9
incorrect   19:4 23:22 25:18 26:23 29:18 33:21,23

34:6,8 48:8 50:21
56:16,17
**increase** 15:4,20
**incurred** 51:16
**indicating** 10:5
**indirect** 57:20
60:6
**individually** 1:5
**individuals** 49:8
**information** 19:3
20:24 21:5 35:24
37:17 53:11
**infrastructure**
58:19 62:24
**initial** 17:10 47:16
**initially** 58:15
**initiated** 9:5 40:17
46:18,20,22
**installation** 61:2
**instructed** 53:19
54:16,22
**intention** 30:2,11
30:12 31:13 32:25
**interaction** 10:12
**interested** 66:14
**interesting** 56:8
**interfering** 62:4
**interview** 12:22
59:3
**interviewed** 12:19
**interviews** 31:23
33:25
**introducing** 7:24
8:6
**investigation**
45:18
**investigations** 6:7
7:25 8:7
**investigator** 41:5
**investors** 15:23
16:3,4 20:19 23:6

23:17,20 26:22
28:24 29:17 30:5
**invoiceable** 51:17
**involve** 44:15
**involved** 32:15
37:6
**involvement** 18:9
18:18
**irregardless** 31:10
**issue** 36:25 42:5
42:10,25 43:8,10
43:13
**issued** 58:4

**j**

**j** 1:18 66:20
**jail** 52:19
**jennifer** 2:25
**job** 18:19 57:24
58:22
**johan** 49:21,21
50:18
**johnson** 4:19
**jonathan** 2:23
**jpc** 1:8
**july** 48:3
**june** 34:16,22
62:17,19
**justice** 13:21

**k**

**keep** 45:5 47:5
54:19,20
**kevin** 4:16
**kind** 8:23 11:6
20:17
**knew** 36:21 59:13
**know** 6:9 7:3,21
8:11,16 10:6
12:21 14:17 16:17
19:10,18 20:12
21:11 22:14 23:10

26:3 29:4,20
34:18,25 36:14
37:12,22 42:11,23
45:16 46:22 49:17
50:12 52:14 53:8
56:5,7,20 57:4
59:5 60:5,6
**knowledge** 25:22
25:25
**kv** 65:9
**kwraeuz** 48:15,18
48:22 49:5 50:6

**l**

**lady** 26:25 27:7
29:7 59:3
**lake** 48:11,22,25
**latest** 14:8
**lau** 2:25
**law** 22:21 23:5,6
23:16,16,20,23
24:3,11 28:24
45:16,17
**laws** 67:9
**lawsuit** 18:8,10,13
18:18 32:20
**lawyer** 54:15
**lawyers** 31:19
32:21
**lccp** 15:4 37:11,17
48:5 54:25 55:2
56:13 57:16 60:13
61:7 62:22 63:2
**lccp's** 51:25
**learned** 58:15
**leaving** 7:8 27:2
**left** 7:12,16,16,20
7:23 8:6 15:3 20:9
21:9 25:3 35:5,8
35:11 58:8
**legal** 4:20

**letters** 18:2
**liabilities** 51:25
53:9 54:9,12
**life** 30:16 47:5
50:14
**limit** 11:23 24:9
44:17 55:16
**limited** 1:9 4:10
**lindsey** 1:5 4:9
**line** 68:11,12,13
68:14,15,16,17,18
68:19,20,21,22,23
68:24 69:3,4,5,6,7
69:8,9,10,11,12,13
69:14,15,16
**listened** 35:9,17
**litigation** 16:14
**llp** 2:3,11
**log** 8:21 9:10,19
10:5 17:9,11
18:23,24 20:11,15
35:2,22 40:12
**long** 19:9
**longer** 10:25 11:12
**look** 6:10 9:3
21:20 38:8
**looked** 9:2 60:16
**looking** 6:17 20:11
47:2 51:23 52:13
52:14
**looks** 22:9 32:7
33:9
**lot** 22:25 30:21
**lots** 57:6,6
**low** 61:3,23 62:8,9
65:4
**lower** 51:6,24 65:9
**lucas** 2:8 4:25 27:4
28:9 30:18 31:5
52:5 55:14 63:15

**luna**   2:17 5:4
**lynnley**   6:6 22:12
   34:11 46:3

**m**

**machine**   66:8
**mail**   33:11
**making**   13:9,11,13
   13:19,23 17:3,17
   17:19 32:22 37:20
   38:6 39:13,15,17
   40:4 45:4 54:6
   55:18 58:24 60:3
   61:8
**management**   55:2
   55:6,24 56:6,11,24
   59:7
**manager**   15:18
   47:20
**managers**   53:14
   53:16 54:25 55:6
   55:24
**manges**   2:11
**marked**   6:11,15
   21:24 22:3 38:12
   38:17
**market**   14:7 15:4
**matter**   1:17 4:9
**mean**   10:4 21:7
   30:8 49:15
**means**   49:17
**meant**   26:8 28:23
   29:5
**media**   4:6
**meeting**   56:5,7
   57:5
**meetings**   54:25
   55:5 57:6
**message**   7:8,13,17
   7:24 22:10 24:22
   27:14,24 28:10,14
   28:20 29:19 30:2

31:3,12,16 33:3
   34:3 35:5 46:11
**messages**   3:9
   21:24 22:7 27:2
   27:11 28:16 29:6
   30:15 32:14,16
   33:24 34:9
**messaging**   29:7
**million**   32:10 34:4
   57:16 59:10
**mind**   56:16
**minute**   7:13,17,21
   11:3,7,16 12:3,5
   12:11 19:7,8,19
   20:9,12 21:9,10
   47:10
**minutes**   9:24 10:2
   10:7,16,23 33:2
   40:19,22 63:23
   64:12
**misconduct**   44:8
**mispronounced**
   49:25
**misrepresent**
   54:11
**misrepresents**
   54:8
**misstates**   11:19
   43:5
**model**   22:25 29:10
   29:16,23 30:21
**money**   32:22
   33:14,18
**month**   60:10
**monthly**   50:13
**moore**   1:18 4:18
   66:20
**moshell**   1:5 4:10
   67:3 68:3
**move**   13:17

**moving**   36:8
**multiple**   27:7

**n**

**n**   2:2 5:10
**name**   4:16 18:6,11
   18:19 36:4,7,10,13
   36:14 49:22 66:16
   67:3 68:3,4
**named**   48:14
**names**   49:25
**nardello**   3:14 36:5
   36:11 38:20 40:7
   41:4
**national**   48:18
**nda**   37:23
**need**   26:6 39:8
**negative**   57:16
   58:17 59:16,24
**negotiated**   59:7
   60:5
**neither**   66:13
**never**   33:19 41:16
   57:23 58:21 65:5
**new**   1:3,21 2:15,15
   4:13 35:18,18
   66:4 67:9
**nice**   60:25
**nicolle**   2:10
**nondisclosure**
   37:2,4,8,15
**normal**   30:16
**notary**   1:20 5:12
**notes**   3:13 39:14
   41:17 52:6 55:13
**noth**   2:5
**november**   48:10
**nqwababa**   1:9
**number**   4:6 5:24
   6:3 38:24,25 65:7
**numbers**   53:25
   59:16,20,24

**o**

**o**   5:10,10
**objection**   7:18 8:8
   9:7 10:17 11:8,18
   12:13 13:16 15:14
   16:24 18:14 19:17
   19:24 20:7,21
   21:3,17 24:19
   25:16 26:10 29:3
   30:6 33:22 34:7
   35:15 37:18 40:2
   42:7,21 43:4,17,25
   44:9,14 45:3,14
   50:22 51:8,22
   52:3,25 53:15,20
   54:5,18 55:12
   56:14 57:2 58:2
   58:14,23 59:18
   60:2 63:8
**objections**   11:24
   24:9 44:13 55:17
   63:13 64:10
**october**   36:3,6,9
   40:6,14 41:13,22
   44:21 47:6,8,12
**office**   48:7,10
**official**   53:3
**okay**   5:6 6:13,17
   7:12 8:18 9:12,16
   9:21 11:22 12:9
   12:17,23 13:25
   14:20 15:6 16:6
   17:12,24 20:14
   21:7,8 22:20
   25:12 26:14 27:13
   28:18 30:2 31:15
   32:8,18 33:17
   34:16 35:3 36:2
   36:23 37:13 38:22
   39:18 40:23 41:22
   42:4,13 46:24

**[okay - quoting]**                                        Page 8

47:11,18 51:4
56:22 57:7,14
61:5 62:16 65:11
**ones**  32:22
**opportunity**  28:12
45:21 52:8 57:19
58:4 59:11 60:7
60:10
**order**  1:18
**ordered**  63:16
**original**  66:10
**outline**  52:13
**outside**  10:18
12:14 52:4 53:21
54:19 56:15
**overruns**  61:14
**oxley**  50:19 54:10

**p**

**p**  2:2,2
**p.m.**  1:14 4:4 6:4
6:23 7:2 8:19 9:6
20:8 35:20 40:10
40:15 65:17
**page**  3:2 6:19
38:14 68:11,12,13
68:14,15,16,17,18
68:19,20,21,22,23
68:24 69:3,4,5,6,7
69:8,9,10,11,12,13
69:14,15,16
**paid**  14:6,16 15:2
15:12,16 29:16
30:4,24 33:18
34:13
**paint**  55:8 56:2
**paper**  30:9
**part**  24:20,24
**participating**  4:22
**particular**  56:19
57:5

**party**  66:15
**paul**  1:10
**pay**  32:10
**penalty**  67:2,8
**people**  11:12 14:6
14:16 15:2,12
37:6
**perform**  59:5 60:7
**performed**  57:21
58:7
**performing**  57:10
57:12,17,24 58:21
**perjury**  67:2,8
**person**  12:10,16
**pertains**  66:10
**phone**  3:7 5:19,22
5:23,24 6:2,6 7:4
8:20 9:3,9 10:2
11:12 12:24 13:2
17:4 19:8,12,19
20:12 21:6 30:14
32:16 34:24 38:25
39:21 40:21 41:20
45:11 47:2,10,15
**picture**  55:8 56:2
56:25
**pile**  60:20
**piping**  61:2
**place**  22:24 28:7
28:21 29:10 66:5
**plaintiff**  2:4
**plaintiffs**  1:7 4:9
5:2 21:15 30:4
46:3
**plaza**  2:5
**please**  10:19,21
21:21 22:14 24:7
28:2,5 31:7 38:9
44:17 62:2 63:22
64:15 65:14

**plus**  53:4
**point**  6:6 7:25 8:7
22:12 29:21 55:5
55:23 57:15 62:21
**polkes**  2:23
**pop**  35:18
**portion**  63:2,3
64:20
**position**  48:2
53:23
**possession**  24:18
24:23 25:15
**possibility**  59:2
**possible**  58:6
**possibly**  16:17
**practice**  10:15,22
10:24 54:3
**prediction**  53:4
**presentation**  50:5
**president**  49:16,16
**pressure**  56:12,24
**pressured**  50:19
**previous**  10:12
19:16
**previously**  6:11
38:12 57:4
**price**  15:5 33:8
**prior**  21:16 37:20
66:6
**privileged**  53:11
**probably**  54:12
60:25
**problem**  25:8
**proceed**  5:8
**proceedings**  51:2
66:5,6,7,11
**process**  47:3
**produced**  59:2
**productivity**
61:23 62:8,11

**professional**  1:19
**prohibiting**  37:16
**project**  14:5,15,18
14:25 15:11,17
26:13 37:11 47:20
48:12,14 50:14
51:25 53:9,13,13
53:16 59:4 61:7
61:19 63:4 64:20
65:5
**prolonged**  63:12
**pronunciation**
50:3
**proper**  22:24 28:6
28:20
**protected**  31:21
**protection**  22:24
28:7,21
**protocol**  44:17
**provide**  17:15
**public**  1:20 5:12
14:9 15:19 18:7
18:12 37:21
**pull**  26:4
**pulling**  65:9
**purpose**  9:13
19:13 31:13
**pursuant**  1:18
**put**  60:8
**putting**  37:4

**q**

**question**  10:21
14:11,20 15:7
24:7 31:8 39:10
46:6 64:7,16,23
**questioned**  58:12
59:6
**questions**  16:21
**quoting**  55:13

**[r - schedule]**                                                              Page 9

| r | | | |
| --- | --- | --- | --- |

**r**  2:2 5:10,10
**raised**  42:5
**range**  25:23
**rank**  61:15
**rasani**  2:21
**rates**  61:3
**read**  26:4 27:17,24
  27:25 28:11,13
  30:3 36:20 39:6
  46:12
**reading**  30:8 52:6
  55:12
**real**  14:4,14,24
  15:11
**really**  11:13
**realtime**  1:20
**reason**  7:15 8:5
  9:22 13:14 29:12
  34:19 35:4 61:14
  68:7,11,12,13,14
  68:15,16,17,18,19
  68:20,21,22,23,24
  69:3,4,5,6,7,8,9,10
  69:11,12,13,14,15
  69:16
**reasonable**  12:10
  12:15
**recall**  7:7,10 8:3
  9:25 13:9,13,18,19
  13:23 16:5,22
  17:2,2,17,22 19:9
  19:20 20:2,5
  21:18 27:12 28:14
  35:16 38:6 39:13
  39:17 40:4 41:25
  42:8 43:20,21
  44:2,23 45:4,15
  46:16 48:24 49:23
  54:6 58:24 59:19
  59:22 60:3 61:10

**receive**  22:17
**received**  32:3
  40:24
**recollection**  20:17
**recommend**  53:24
**record**  4:3,23
  41:18 47:15 50:24
  52:6,11 55:19
  65:13,16 66:7,9
  68:8
**recorded**  4:7 38:5
  39:4,7,12 41:8,15
  41:21
**recording**  39:24
**records**  7:4 9:4,10
  47:2
**recounted**  50:17
  51:5
**reduce**  51:19,24
  52:16
**reducing**  53:23
**reference**  24:16,21
  25:13
**referenced**  37:3
  37:14 44:4
**referred**  44:20
**referring**  23:5,8
  23:11 24:17,22
  25:14 33:23 39:3
  39:18 41:3 42:19
  44:23
**reframe**  39:10
**regarding**  21:19
  40:24 45:19 56:20
  60:15
**registered**  1:19
**relating**  37:17
**relative**  61:3,18
  66:14
**relocated**  48:11

**remember**  56:4,18
  56:21 61:8
**reminded**  45:24
  46:7
**repeat**  10:20 41:12
**repeatedly**  41:7
**replied**  32:5,8
**report**  50:12 53:4
  53:7
**reported**  48:14
  49:5
**reporter**  1:19,20
  4:17 5:7 66:4
**reporting**  50:15
  56:13
**reports**  50:13
  52:23
**representing**
  23:17
**requested**  66:12
**resonated**  56:9
**respectfully**  15:7
**responded**  22:18
  22:20 31:15 46:14
  46:16
**response**  23:2 46:8
**result**  61:22
**retrace**  39:9
**return**  9:13
**returned**  9:17
**revenues**  54:9
**review**  45:21
  66:11
**rich**  32:21
**right**  6:20 23:24
  24:15 25:3 26:15
  26:17 29:2 30:9
  30:22,25 32:4
  33:8,15 35:24
  38:5,14 39:5,8,12
  39:25 42:14 48:3

  48:7,18 60:11
  62:20
**rings**  36:13
**risk**  56:6,20
**role**  40:24
**rolled**  52:23
**rpr**  66:21
**rules**  50:19

| s | | | |
| --- | --- | --- | --- |

**s**  2:2 3:5 5:10
**sarbanes**  50:19
  54:10
**sasol**  1:9 4:10
  12:20 13:7 14:3
  14:13 15:3,19
  16:4,14,15 18:3
  19:15 23:6,17
  24:23 25:15 28:25
  36:16 37:9,12
  47:20,22,24 55:24
  59:15 67:3 68:3
**sasol's**  15:22 16:3
  16:9,10 19:22,25
  20:4,19 23:19
  26:22 41:4 44:8
  48:7 57:9 59:6
**savings**  57:20 59:7
  60:5
**saw**  35:17 53:6
**saying**  15:10 16:5
  16:23 33:17 46:14
**says**  6:23 9:9
  26:16 28:22 29:25
  30:10,23 31:4
  32:13 33:16,24
  35:22 38:23 39:4
  47:9,14
**schedule**  15:17
  56:6,20 60:13
  61:7,14

**[scheduling - talk]**

scheduling 14:5 14:15,25 15:12

schoeman 1:10

scope 10:18 12:14 37:22 52:4 53:21 54:19 56:15 58:10 58:18

second 34:23 46:4 50:24

see 6:22,23 21:10 27:15,17 38:23,24 39:5 52:8 55:9 56:3

self 57:10,12,17,21 57:24 58:7,22 59:5 60:7

send 33:12

senior 14:3,13 49:16

september 35:19

series 22:7

set 19:14 20:3,18 21:14 66:6

setting 19:21

shapiro 2:3

share 52:19

shareholders 13:8 13:22 16:9,11,15 19:15 20:4

sheet 52:2 53:9 54:11 68:2 69:2



shifted 58:10

shorthand 66:4,8

show 55:14

shown 52:8

shut 63:10

shutting 64:4

sign 37:7

signature 66:19

signed 36:25 37:11 37:15

sill 48:15,17,22 49:5 50:6

similarly 1:6

single 65:6

sir 5:20 13:18 40:13 52:21

site 48:12

sites 58:18 62:23

situated 1:6

situation 25:6

six 47:10

slides 50:6,11

sobol 2:3

software 53:5

sole 31:13

solutions 4:20

sorry 12:15 25:7 32:20 38:15 50:3

south 48:18,19 49:14

southern 1:3 4:13

speak 19:14 21:15 22:13,23 31:19

speaking 19:9 24:9 36:16 44:14 55:21 63:12 64:10

specifically 59:21

spoke 8:20 9:23 19:6 36:3,10 40:19

spoken 40:7

stamped 3:14

stand 33:7 53:25

state 1:20 7:22 11:21 29:9 46:25 66:4 67:9

stated 8:12 27:6 33:15 34:8 41:10 44:4,5 50:2

statement 13:10 13:12,15,19,24 14:23 15:9 17:3 17:18,20 38:7 39:16 40:5 45:5 50:23 54:7 56:19 56:21,22 58:25 60:4,22,22 61:2,9

statements 33:19

states 1:2 4:12

stating 16:22 22:11 33:2

stay 22:15

stephan 1:10

stephen 1:10,18 4:18 66:20

stipulated 57:16

stop 11:24 26:25 27:15 28:15 29:7 29:20 30:15 31:14 32:17 34:10 44:17 62:4

straight 64:8

stranger 10:9,11 11:17 12:11

strangers 10:16,23

string 3:9 21:23 22:10 27:14 28:16 29:6 32:14 34:9

strong 33:3

structure 22:24 28:6,21

stuck 56:9

subject 69:17

submit 56:12,25

submitted 36:22 46:4 50:24

subscribed 66:16

suggest 8:24

suggests 19:3

supposed 8:12

sure 11:15 21:22

swear 5:7

swinging 25:2

sworn 5:11 66:7

**t**

t 3:5

tab 6:12 21:21,23 38:9,9,10,11

tag 15:5

take 6:10 21:20 28:11 38:8 63:18

taken 4:8 64:13 66:5

talk 31:19 32:2 33:13 34:11 64:9

**talked** 10:25 12:22
**team** 14:18
**telegram** 33:12
**tell** 19:12 22:21
  23:5,23 24:11
  27:18 49:18 54:21
**term** 25:11,13
  28:7 43:22,23
  44:3 51:11,15,15
  54:23 56:9,11
**terms** 50:14
**testified** 5:13
**testifying** 55:21
  66:7
**testimony** 11:19
  17:5 35:10 43:5
  46:17,19 66:9
**text** 3:9 21:24 22:7
  22:10,17 24:17,22
  25:14 27:10,14,24
  28:10,14,19 29:6,9
  29:19 30:2,15
  31:3,12,16 32:3,6
  32:14,16 33:11,24
  34:9 45:25 46:2,8
  46:11
**texting** 26:25
**thank** 22:15 64:2
**thing** 29:5 31:18
  47:3
**things** 47:4
**think** 11:15 12:9
  20:22 26:6 30:12
  31:2 48:25 49:8
  54:10,22 62:19
**third** 6:18
**thomas** 36:4,11
  41:4
**thought** 56:8
**three** 15:15

**time** 4:21 5:7 6:5
  7:2,4 10:3,8 19:14
  19:22 21:14 27:25
  28:11 31:9 35:2,6
  35:20 36:18,20
  37:19 48:5 58:3,8
  58:11,25 62:2
  64:13 66:5
**times** 15:5,15 27:7
  44:10
**title** 18:6,12,19
**titles** 49:16,19
**today** 32:12
**today's** 4:4
**told** 13:20 14:12
  16:8,13 23:12
  26:8,14 28:15
  31:2 32:12 38:4
  39:11,23 41:18,23
  42:2 45:20 47:19
  47:25 48:6,13,21
  49:4 51:18 52:18
  52:22 53:18 54:2
  54:23,24 55:4,6,22
  55:24 58:20 59:23
  61:6,13 62:7 63:5
  63:6 64:16,19
**topic** 43:11,13
  45:7,10 56:7
**track** 47:5
**transcribed** 41:17
  45:16 66:8
**transcript** 66:9,10
  66:12 69:18,21
**transcription**
  46:12 68:10
**transferred** 62:14
**true** 66:9 67:10
  69:19,22
**try** 34:10

**trying** 26:24 43:14
**turn** 6:18
**two** 7:12,16,21
  9:17 21:9,10 50:7
  50:8,13 59:16,20
**type** 54:14

**u**

**ultimately** 33:4
**um** 22:5 23:25
**undersigned** 66:3
**understand** 11:13
  26:7 42:17 53:3
  59:9,12
**understood** 23:15
  23:19 36:15 47:6
  49:3
**undervalued** 63:7
  64:21 65:2
**unit** 4:6 60:17
  62:14
**united** 1:2 4:12
**unplanned** 61:11
  61:15,17,22 62:10
**unsubstantiated**
  52:24 53:6
**uo** 65:8
**update** 35:13
**use** 25:10 28:7
  29:22 60:23,24
**utilities** 58:18
  62:23

**v**

**v** 1:8 67:3 68:3
**valuable** 22:21
  24:12 26:18,21
**value** 51:7,10,12
  51:19,24 52:16
  53:23 57:16
**veritext** 4:20

**verizon** 3:7
**version** 53:7
**versus** 4:10
**vice** 49:15,16
**victor** 1:10
**video** 4:7
**videographer** 4:2
  4:17 5:6 24:25
  25:8 61:25 63:21
  63:24 65:12,15
**videotaped** 1:16
**violate** 50:19
**virtual** 1:16 4:15
**voice** 27:2
**voicemail** 7:8,13
  7:17,20,22,23 8:4
  8:6,12,17 19:11,19
  20:10,13 21:9,11
  21:13,19 33:11
  35:5,8,12
**voicemails** 32:17
  35:17

**w**

**w** 5:10,10
**walk** 31:20,25
**want** 13:21 18:9
  18:11,17 25:10
  26:7 27:7 28:19
  29:13 30:13 32:9
  32:9,15 34:11
  38:13 42:19 43:7
  47:16 52:5,10,19
  55:9 56:2 64:8
**wanted** 24:4 28:20
  28:24 29:5,10,23
  30:14,21,24 32:15
  33:3 34:4
**wanting** 33:10
**way** 19:12 34:9
  37:14 57:3

**[website - zoom]**                                           Page 12

**website**  45:18

**weekly**  50:9,12

**weeks**  50:7,8

**weil**  2:11

**went**  53:8 57:5
  58:4

**whereof**  66:15

**whichever**  43:14

**whistle**  41:24,25
  42:6,10,12,14,15
  42:16,20,22,23
  43:2,8,10,16,21
  44:3,4,5,7,21,24
  44:25 45:8,11,12
  45:13,19

**wide**  25:23

**willing**  16:20

**windows**  22:13

**winning**  32:9

**witness**  1:17 2:13
  5:5,8,11 11:25
  24:6 31:6 52:7
  54:21 55:15 63:13
  64:6 66:15 68:4

**witnesses**  66:6

**words**  29:22 32:23
  32:24,25 37:25
  38:5 39:4,7,12,24

**work**  23:14 30:16
  47:22 51:7,10,12
  51:19,24 52:16
  53:23 60:11

**worked**  47:20 48:2
  48:22,25 49:2

**workers**  61:16

**working**  7:25 8:7
  16:8 23:12 25:5
  26:12

**works**  22:14 24:2
  24:3 25:3 36:16

**world**  22:22 24:13
  26:19 31:18

**worried**  18:6

**written**  24:14

**wrong**  54:17 57:23

**wrote**  23:4 33:6
  39:14

**x**

**x**  1:4,13 3:5 66:12

**y**

**yeah**  16:17 18:17
  18:23 22:9,18
  23:7 24:4,14
  26:19 30:23 32:4
  33:16 34:24 36:8
  39:20,22 44:19
  47:14,23 48:19
  49:12,15,24 50:2
  52:17 53:17 55:3
  56:4 61:12 62:6

**york**  1:3,21 2:15
  2:15 4:14 66:4
  67:9

**yup**  23:3

**z**

**zalka**  2:19

**ziegler**  60:17 61:3

**zoom**  4:15

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.