# EXHIBIT 5

## (Unredacted Version Filed Under Seal)

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------x

CHAD LINDSEY MOSHELL, Individually

and on Behalf of All Others

Similarly Situated,

                    Plaintiffs,          Case no.

                    v.               1:20-cv-01008-JPC

SASOL LIMITED, DAVID EDWARD

CONSTABLE, BONGANI NQWABABA,

STEPHEN CORNELL, PAUL VICTOR, and

STEPHAN SCHOEMAN,

                    Defendants.

-------------------------------------------x

                    2:00 p.m.

                    November 24, 2020

          VIDEOTAPED DEPOSITION of DEPONENT, a

███████████████, a Witness in the above entitled

matter, pursuant to Order, before Stephen J.

Moore, a Registered Professional Reporter,

Certified Realtime Reporter and Notary Public of

the State of New York.

APPEARANCES:

HAGENS BERMAN SOBOL SHAPIRO LLP
         Attorneys for Plaintiff
         455 Noth Cityfront Plaza
         Chicago, Illinois 60611

BY:     LUCAS GILMORE, ESQ.

WEIL, GOTSHAL & MANGES, LLP
         Attorneys for Defendants and the
         Witness
         767 Fifth Avenue
         New York, New York 10153-0119

BY:     JONATHAN POLKES, ESQ.
         - and -
         LUNA BARRINGTON, ESQ
         - and -
         ANNA GORDAN, ESQ.
         - and -
         CAROLINE ZALKA, ESQ.

Page 3

EXAMINATION BY                                  PAGE

MR.  LUCAS                                      5

Page 4

THE VIDEOGRAPHER:  We are now going on the record at approximately 2:01 p.m.  Today's date is November 24, 2020.

This is media unit 1 of the video recorded deposition of ████████████ taken by counsel for Plaintiff in the matter of Moshell versus Sasol limited filed in the United States District Court, Southern District of New York, case number 1;20-CV-01008-JSR.

This deposition is being held via Zoom virtual conferences.  My name is Ryan Gallagher.  I'm the videographer.

The court reporter is Stephen Moore.  We are both from the firm Veritext Legal Solutions.

At this time all attorneys present will identify themselves for the record.

MR. GILMORE:  Luke Gilmore on behalf of the Plaintiffs.

MS. BARRINGTON:  Luna Barrington of Weil, Gotshal & Manges on behalf of the witness and the Defendants.

Page 5

MR. POLKES:  John Polkes, just have me on the record, Luna is going to be on the only speaker.  Jonathan Polkes from Weil, Gotshal.

THE VIDEOGRAPHER:  At this time the court reporter will swear in the witness and we can proceed.

▆▆▆▆▆▆▆▆▆▆▆  ▆▆▆▆▆▆▆▆▆▆,  called as a witness, having been first duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY

MR. LUCAS:

        Q       ▆▆▆▆▆▆▆▆  do you own a cell phone?

        A       I am not.  This is all through computer.

        Q       No, no, my question is you own a cell phone?

        A       Correct, yes.

        Q       And your cell phone number is

Page 6

████████████████

████████████, correct?

A        Correct.

Q        And on May 5, 2020 at 2:30 p.m. Eastern time you were contacted on your cell phone by Lynnley Browning of On Point Investigations, correct?

A        That appears to be correct.

Q        And Ms. Browning's number is 203-858-9937, correct?

A        According to my cell phone records, that's correct.

Q        And Ms. Browning called you on May 5th, correct?

A        Correct.

Q        And on the May 5th call, Ms. Browning told you that she was assisting a law firm with a case, correct?

A        Correct.

Q        A case on behalf of shareholders of Sasol, Ltd., correct?

A        That's my understanding, yes.

Q        And Ms. Browning confirmed that you were no longer employed by Sasol, correct?

A        She did.

Q        And you agreed to speak with Ms. Browning, correct?

A        Off the record I agreed to speak with Ms. Browning.

Q        You agreed to speak with Ms. Browning, correct?

A        Off the record as a casual conversation, for background only, I agreed to speak with Ms. Browning.

Q        You never hung up the phone on her, correct?

A        On June 1st I certainly did.

Q        On the May 5th call you did not hang up the phone on her, correct?

A        That is correct.

Q        And you spoke with Ms. Browning on the phone for 27 minutes, correct?

A        That appears to be correct. From my cell phone records, yes.

Q        And at the conclusion of the call, you said that Ms. Browning was free to contact you again, correct?

A        And she did, yes.

Q        You said that she could contact

Page 8

you again, correct?

         A       If she had follow-up questions,
yes.

         Q       Okay.

                 On May 18, 2020 at 9:51 Eastern
time you spoke on the phone with Ms. Browning
again, correct?

         A       That's correct.

         Q       And the purpose of the call was
Ms. Browning wanted to follow up on information
that you had provided to her on May 5th,
correct?

         A       Yes, that's what she did.

         Q       And you agreed to speak with her
again, correct?

         A       I spoke with her again, but
that's the final call where we spoke for more
than a couple of minutes at a time.

         Q       The conversation, the first May
18th conversation, that lasted for 27 minutes,
correct?

         A       Correct.

         Q       You did not hang up the phone on
her, correct?

███████████████

A      Nope; did not.

Q      You stopped the conversation because you had an upcoming meeting, correct?

A      I don't recall, that may be correct.

Q      Okay.

But you agreed that Ms. Browning could call you later that day after your meeting?

A      I don't recall.  I seem -- from my cell phone records she called back for 7 minutes more in another -- well, almost an hour later.

Q      You didn't tell her that she couldn't call you back again, correct?

A      Not at that time at that point; but I was very curt, because she got increasingly insistent.

Q      Understood, but just -- we will be able to go over that, but just answer my question.

Later on May 18, at 11:44 a.m. you spoke with Ms. Browning again, correct?

A      That would be correct, same day,

Page 10

[REDACTED]

11:44.

Q       And the purpose of the call was for -- Ms. Browning wanted to follow up on information that you had provided to her on May 5th and earlier on the day on May 18th, correct?

A       That would be correct.

Q       And you again agreed to speak with her, correct?

A       She didn't ask permission, but I did speak with her.

Q       You didn't say to her I don't want to speak with you, correct?

A       No.

Q       And that conversation lasted for seven minutes, correct?

A       That would be correct.

Q       And during that call you didn't hang up the phone on her, correct?

A       Did not, no.

Q       Okay, and the call concluded by you saying that you had provided Ms. Browning all of the information that you were willing to convey, correct?

A       I don't have a transcript of it, but I would assume that my patience had run out with her at that point, so yes.

Q       And you told Ms. Browning that -- but you did tell Ms. Browning that you remained open to further contact from her, correct?

A       I don't recall that.

Q       Do you dispute that you told Ms. Browning that you remained open to further contact, on the May 18th call?

A       I don't recall saying that.

Q       Okay.

On June 1st, 2020 at 10:54 a.m. you spoke with Ms. Browning again, correct?

A       That's right.

Q       Okay, and the purpose of the June 1st call was Ms. Browning wanted to set up a call with you, her and a Sasol investor attorney, correct?

A       The term Sasol investor attorney I -- somebody that represented your legal team, that's my understanding.

Q       Okay, and to go -- the purpose

of setting up the future call with the legal

team was to go over information that you had

previously provided on May 5th and May 18th,

correct?

A      That was her stated purpose.

My purpose was to clarify that

you had no right to cite me in that four minute

call that happened later that day on June 1st.

Q      With all due respect, we can get

into that, but just answer my questions and

then we will get into that.

MS. BARRINGTON:  You know, you

have to let the witness respond and give

his full responses.

MR. GILMORE:  Limit your

objections to form.

Q      You agreed to speak with her

again, correct?

A      At 5:00 p.m. on June 1st, yes.

Q      And focusing on the June 1st

call at 10:54, you didn't hang up the phone on

her, correct?

A      That would be correct.

Q      And the conversation lasted for

another eight minutes, correct?

         A       That's how long it took to find a mutual time where we could speak.

         Q       On the call, on this call you expressed concern to Ms. Browning about being subpoenaed, correct?

         A       I don't recall that.

         Q       Do you dispute that you expressed concern to Ms. Browning about being subpoenaed?

         A       I was very clear that I had no desire to be involved in this case whatsoever. I don't recall specifically addressing a subpoena or not.

                 But you had no right to cite me in this case.

         Q       You were concerned that Sasol would learn about your communications with the investigator, correct?

         A       Not correct, not my words.

         Q       You expressed concern about being subpoenaed by Sasol, correct?

         A       I expressed concern about being involved in this case whatsoever, period.

Q       You did not want Sasol to know about your communications with the investigator, correct?

A       No, not true.

Q       You agreed to schedule a call with Ms. Browning and the Sasol shareholder attorney later that day at 5:00 eastern, correct?

A       Yeah, so that your legal team would hear that I had no desire to be involved in your case.

Q       Please limit your -- it's a yes or no question, okay?

MR. POLKES:  Lucas, I'm sorry --

MR. GILMORE:  Mr. Polkes, you don't have standing.  Ms. Barrington is defending, please put yourself on mute.

MR. POLKES:  You have to let the witness answer the questions.  You are stepping over him.

You are interrupting him.  Just let him answer, that's all.

MR. GILMORE:  Please stop the timing, and we are not going to have any

▋

of these objections.

Q    On June 1, 2020 Ms. Browning and attorney named Jerrod Patterson contacted you at 5:01, correct?

A    Give me one second.

How do you spell Jerrod, please?

Q    J-e-r-r-o-d.

A    I never did get the name of the associate, so -- an associate and she were to speak with me at 5:00 that afternoon.

Q    And you spoke for four minutes, correct?

A    At which point I hung up, yes.

Q    And you were told that the purpose of the call was to follow up on statements that you had made to Ms. Browning, correct?

A    That was her agenda, yes, that was not my purpose in taking the call.

Q    And the purpose of the call was to follow up on statements that you made to Ms. Browning to be included in a complaint against Sasol, correct?

A    Which I did not agree to

████████████████

participate in.

Q    On the call you acknowledged to Mr. Patterson that you had previously spoken to Ms. Browning, correct?

A    The call was premised on previous conversations, I think that's correct.

Q    You expressed to Mr. Patterson a fear of being subpoenaed, correct?

A    I don't recall that, I recall saying I didn't want to be involved personally or professionally in this case.

Q    Mr. Patterson told you that his firm can fight tooth and nail to protect you from being subpoenaed, correct?

A    I don't recall that.

Q    Do you dispute that Mr. Patterson told you that?

A    I would, because I have no recollection of it.

Q    Mr. Patterson told you that he could not guarantee that you would not be subpoenaed, correct?

A    Again, no recollection of this call of four minutes, I literally said three

things on it.

If you want me to reiterate in my own words what I said, I will, but it ended, I thought that was the end of it, because I was very clear that you had no right to cite me at all.

Q    You then said, "I guess I have no conversation with you," and hung up the phone, correct?

A    Correct.

A    Well, I don't -- let me be clear.  I don't recall the words of "I have no conversation with you."

I do recall saying I have nothing to say and that I'm not participating.

Q    On September 10, 2020 at 4:34 p.m. Ms. Browning left a one minute voicemail for you, correct?

A    Ms. Browning, after I had blocked, and I blocked the number at that point, so she had no way of contacting me from her personal cell phone.

But I received subsequent contacts through -- from her from an e-mail

Page 18

[REDACTED]

account which she tried to go through LinkedIn; it was like being stalked.

Q        Okay, that's not my question, though.

On September 10, 2020 at 4:34 p.m. Ms. Browning left a one minute voicemail message for you, correct?

A        I don't have a voicemail, I remember a text message.

Q        Okay, can I have you look at Exhibit 1, that would be tab 2.

A        Exhibit 1, tab 2.

Yes.

Q        I want you to take a look at the last page of that document, it's labeled 5040.

Do you see that?

MS. BARRINGTON:   On the bottom right, [REDACTED].

A        Okay.

Q        Do you see the entry September 10, 4:34 minute 1, do you see that?

A        I do.

Q        I'll ask you the question again.

On September 10, 2020 at 4:34

████████████

Ms. Browning left a one minute voicemail for you, correct?

A       The text message that I received from her said your mailbox is full so, she may have attempted to call, but I have no -- I don't recall having a voicemail from her.

Q       Okay.

Can I have you take a look at tab 4, it's been previously marked Exhibit 2.

A       Tab 4, Exhibit 2.

Oh, okay, your mailbox is full.

Q       On September 10, 2020 at 6:50 p.m. eastern Ms. Browning sent you a text message, correct?

A       We had no -- she had no right to contact me thereafter, but this is --

MS. BARRINGTON:  Lucas, let him finish.  Lucas, objection, let the witness answer and finish his answers.

MR. GILMORE:  Please limit your objections.

Q       On September 10 --

A       But this is spam, Lucas.  At this point, that's all it is.  It's blocked.

Page 20

Q       We will get into that later, but just answer my question.

On September 10th, 2020 at --

MS. BARRINGTON:  He is answering.

Q       (Continuing) --  at 6:50 Eastern Ms. Browning sent you a text message, correct?

A       It appears she did.

Q       And the text message, you received this, correct?

A       Is it says delivered, so that if it says delivered it must have gone to my phone; whether or not I read it.

Q       Okay.

And the text message, it said that Ms. Browning had an update for you on the case and asked that you call back within the next 24 hours, correct?

A       That's what's written here, but again, I, from my standpoint, had nothing to do with your case.

Q       Okay, and you did not return the text message, correct?

A       No, I blocked the source of it, which I believe was a Gmail account, if

Page 21

[REDACTED]

that's -- this is the one because it didn't come from the phone number.

Q     You did not return Mrs. Browning's earlier call, correct?

A     No, because I had already been amply clear that you had no right to involve me in your case.

Q     You had no further contacts with Ms. Browning, correct?

A     Correct.

Q     You had no further contact with my firm, correct?

A     Correct.

Q     Okay.

I want to go back to the May 5th call that you had with Ms. Browning.

On that call you told Ms. Browning that you worked as [REDACTED] [REDACTED], U.S. Mega Projects for South and North America, correct?

A     That was my role, correct.

Q     You told Ms. Browning that you worked in this position from April 2013 through October 2015, correct?

Page 22

A        Correct.

Q        And you said that you were based in Sasol N.A.'s Houston, Texas office, right?

A        Correct.

Q        On the May 5th call you discussed -- one of the topics that you discussed was the LCCP's estimated costs, correct?

A        Yes, correct.

Q        To be specific, the estimated total end of job cost for the LCCP, correct?

A        We didn't use that terminology. That was never --

Q        But you did discuss estimated costs for development of the LCCP?

A        That would be correct.

Q        And you discussed that in March 2015 Sasol publicly stated the estimated cost for the LCCP was $$8.9 billion, correct?

A        I was consistent in saying that I was at best fuzzy in terms of specific dates and numbers.

So I did not confirm any specific numbers to her from corresponding to a

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Page 23

date.

Q       You discussed at one point Sasol's estimated cost for the LCCP being $8.9 billion, correct?

A       I did say that was my understanding, but I couldn't be specific about exactly when that happened.

Q       Okay, and you said that you did not know why Sasol landed on an $8.9 billion cost for the LCCP, correct?

A       I don't recall saying that at all, those wouldn't be my words.

Q       Do you dispute that you told Ms. Browning that you did not know how Sasol came to the $8.9 billion cost figure?

MS. BARRINGTON:  Lucas, asked and answered, objection.

A       And it's demonstrably false, given my role, so, yeah.

Q       All I want to know is you discussed with Ms. Browning the $8.9 billion cost estimate and you said you did not know how Sasol came to that?

A       I did not say that.

Page 24

MS. BARRINGTON:  Objection, ██ , hold on, objection, asked and answered.

Q    You said that Mr. Cornell would have been the "ultimate arbiter of determining the estimated LCCP cost," correct?

A    Out of context; not correct.

Q    You did not tell Ms. Browning that Mr. Cornell would have been the "ultimate arbiter of determining the estimated LCCP"?

MS. BARRINGTON:  Objection, asked and answered.

Go ahead, ██ .  Asked and answered.

A    Asked and answered.

Q    No, no, you have to answer.

A    Again, out of context and you are not going to put words in my mouth.

Q    But you said that, correct, that he was the ultimate arbiter?

A    Well, let's --

MS. BARRINGTON:  Objection.

A    If you want me in my words to answer this I will be glad to, but we discussed multiple things that made it clear that

Page 25

Mr. Cornell was in a position of responsibility.

But I was so clear with the investigator that I did not know what Mr. Cornell did or did not see.

We recounted that I was not part of the executive committee, she asked --

MR. GILMORE:  Okay, move to strike as non-responsive.

MS. BARRINGTON:  Lucas, you have to let --

A    You have to listen.

Lucas, you have a problem, man, you have to listen.

MS. BARRINGTON:  Lucas, you need to let the witness answer the question. You don't like the answer, that's not our problem.  You need to let the witness --

A    You are not going to box me into -- you have to --

Q    I am going to ask you questions and you are going to answer.

MS. BARRINGTON:  He has been

Page 26

███████████

answering.

A      I am trying to give you a complete and honest answer, Mr. Gilmore.

Q      Let's move on.

Ms. Browning told you that other witnesses she spoke with characterized the $8.9 billion estimate as "ridiculously low," is that correct?

A      If somebody else said that, I don't know, but you attributed that to me in your Complaint and that's not true.

Q      No, Ms. Browning -- listen to my question.

Ms. Browning told you that other witnesses she had spoken to characterized the $8.9 billion estimate as "ridiculously low," correct?

A      I don't believe that is correct, because as I recall she was at the very front end of her investigation, hadn't spoken to many people, and she was asking me who is on the Ex Com; basic stuff.

So no, I don't believe that's correct at all.

Page 27

Q        Okay.

You did not agree with Ms. Browning that the $8.9 billion estimate was low?

A        Not just no, but hell no.

Q        Okay.

You said that -- you told Ms. Browning that Sasol had received an estimate for the LCCP's costs from Fluor, correct?

A        We mentioned estimates from Fluor, from Technip, from Westney, some of which validated the $8.9 billion number.

Q        You said that the estimated cost of the LCCP from Fluor was higher than $8.9 billion, correct?

A        That's my understanding, but I wasn't specific and didn't recall the number.

Q        You told Ms. Browning that the estimated cost of the LCCP from Fluor was higher than $8.9 billion, correct?

MS. BARRINGTON:   Objection, Lucas, asked and answered.

A        I also told Ms. Browning that as contractors Fluor and Technip had a

Page 28

self-incentive as part of a negotiation to talk up the cost of the project, we talked about the --

MR. GILMORE:  Move to strike as non-responsive.

A       You don't get to strike this. This is all part of the context.  You are trying to put words in my mouth.

Again, this is not going to happen, Lucas.

Q       It's a yes or no question.

A       It is not a yes or no question.

MS. BARRINGTON:  Hold on, Lucas, you have to allow ▆▆▆▆▆▆ to answer the question, and if you don't like the answer, that's too bad, but he needs to finish.

He has to be allowed to finish his answer.

MR. GILMORE:  Ms. Barrington, your objections have to be to form.

Your speaking objections are delaying this.

MS. BARRINGTON:  You are

████████████

interrupting the witness and cutting him off, so I have to speak up.

Q    You said the estimated cost of the LCCP from Fluor was higher than $8.9 billion, correct?

A    I believe both Fluor and Technip had higher estimates than $8.9.

Q    That's my next question, you said to Ms. Browning that Technip had an estimated cost of the LCCP that was higher than $8.9 billion, correct?

A    Correct.

Q    You said to Ms. Browning that Sasol had received an estimate from Westney Consulting for the estimated cost of the LCCP?

A    Yes, correct.

Q    And you said at that time the estimated costs from Westney consulting was also higher than $8.9 billion, correct?

A    Not correct, in fact the discussion was it was all around amount versus probability and it validated the $8.9 billion number if things were executed properly.

Q    You said that Ms. Browning

███████████

should get copies of the Fluor, Technip and Westney cost estimate, correct?

A    She asked what resources those are the sources.

Q    And you told Ms. Browning that she needed to get the weekly committee notes, correct?

A    I don't know if they were weekly or monthly, but I suggested to her that Sasol has very good governance, and I mentioned that everything in terms of executive committee documentation, that anything in the way of numbers or changes to numbers would have been documented in those.

So if she did her homework properly, and I was not affirming her suppositions about what the costs were and when, but the documentation would be there.

Q    As to the Fluor, Technip cost estimates, you said they are really good?

A    I don't recall saying that.

Q    Do you dispute that you said that?

A    I would dispute that -- I don't

█████████████

characterize external cost estimates and to me --

MS. BARRINGTON:  Objection.

A      (Continuing) --  to me if you have a self-interested contractor that's trying to talk up the cost of the project, that kind of speaks for itself, because at that point it is a negotiation.

Q      On October 9th, 2020, you were contacted by Thomas Eno of the Nardello firm, correct?

A      I'm sorry, is this a Sasol investigator.  I am trying to --

Q      Yes, you were?

A      I didn't write down the date of that, so and I didn't get the name either.

Q      Okay, you were --

A      But I did get contacted by a Sasol investigator and that was the first time at which I was aware that despite my express wishes that something actually got filed, it's also the first time -- that's the first time I saw anything.

Q      Move to strike as

Page 32

non-responsive.

MS. BARRINGTON:  Keep going, October.

Q        On October 9th you were contacted by a Sasol investigator, correct?

A        I don't have the date to confirm, but I believe that's correct.

Q        Okay.

You were asked about statements that were attributed to you in a second amended Complaint, correct?

A        That was what is described to me for the first time, yes.

Q        And one of the statements that you were asked about was Fluor and Technip estimates being higher than $8.9 billion, correct?

A        I would have to go back through -- yeah, I don't recall the specifics of exactly that, but the biggest thing that's in that second amended Complaint, and he was kind enough to make sure that I got a copy of that, was this reference to a fabrication of an $11 billion budget number, which is a pure

Page 33

fabrication and a lie from your team because I made no reference ever to that.

Q        Okay.

Can I have you take a look at previously marked Exhibit 3, it's tab 3 for you, ▮▮▮▮▮▮▮

A        Tab 3, okay.  All right.

Q        Can I have you take a look at Nardello 11, that's the second page, bottom hand right?

A        Okay.

Q        You see about -- do you see the statement where it says, "True that estimates were higher than $8.9 billion."

Do you see that?

A        What line, I'm sorry?

Q        It's above -- let's see, it's five, five lines up from the bottom, do you see that?

A        Yeah, this is paraphrased, it's obviously not word for word.

Q        Understood, but do you see where it says, "True that estimates were higher than $8.9 billion."

Do you see that?

A        And that would have been in reference to Fluor and Technip, but not Westney.

Q        Okay, I will ask that question again.

One of the statements that you were asked about was Fluor and Technip estimates being higher than $8.9 billion, correct?

MS. BARRINGTON:    Objection, form. Go ahead, ███.

Do you want him to repeat the question?

A        Yeah, I thought I did, I believe this was, and I am reading it off of paraphrased words, I believe it was in reference to the Fluor and Technip estimates, it doesn't say that here, but my recollection is that those numbers were higher.

Q        Okay, and I'm sorry, the court reporter is transcribing my questions and your answers, so that's why I am insistent on answers so that I get a clear record.

One of the statements that you were asked about by the Nardello firm was about Fluor and Technip estimates being higher than $8.9 billion, correct?

A        Based on these notes and my recollection, I can't confirm that for you, sorry.

Q        You told the Nardello firm that it was true that the estimates for the cost of the LCCP were higher than $8.9 billion, correct?

A        That's demonstrably not true for all estimates from Fluor and Technip, I believe theirs were higher, Westney was not, the costs, the company's own position and what it believed certainly was not.

Q        You told the Nardello firm that it was true that the Fluor and Technip estimates were higher than $8.9 billion, correct?

MS. BARRINGTON:  Asked and answered.

A        I believe that was the case, but again from these notes its incomplete, it's

Page 36

▮▮▮▮▮▮▮▮

paraphrased, I can't tell.

Q        Understood, and I am asking from your independent recollection.

A        My independent recollection, but you could show me if you have the document and we can confirm or deny whether those two estimates were higher than that number, I don't -- but again, this is consistent with what I told your staff back on June 1st, that I'm fuzzy on the recollection of the specific dates and numbers on this.

Q        Can I have you turn to the next page?

A        Would that be Nardello 12?

Q        That's correct.  I just want you to have it here, but I am going to ask you questions independent of that, okay?

A        Thank you.

Q        You told the Nardello firm that the numbers are in the cost record, correct?

A        Be clear, when you say the numbers are in the cost record, what do you mean?

Q        I'm asking did you use that

███████████████████

phrase with Nardello?

        A       The numbers are in the cost
record.  Show me, I don't know.

        Q       Well, I can show you where --

        A       Point me.

        Q       If you take a look at the second
paragraph, and again, these are notes, and I am
showing this to help refresh your recollection,
but in the notes it reads on the second
paragraph, you see where it says, "Numbers are
in the cost record."

                Do you see that?

        A       Nardello 1, second paragraph,
I'm having trouble reading it.  Please read the
paragraph that you are talking about.

        Q       Okay.

                Do you see where the paragraph
begins with, "Socialized," do you see that?

        A       I do see that.

        Q       Can you skip down a couple of
sentences where it begins with "numbers?"

        A       Let me look at the context,
because I found what you are referring to, but
give me a second.

So, the notes as I am reading it, the paraphrasing, no, no, no, was clear that Sasol has as good a governance as any quote then -- it doesn't say quote, it just says numbers are in the cost record.

I don't know what that -- that is obviously not word for word, I don't know what it refers to.

But there is not a single cost record other than if you were going back through and look at the history of the official numbers on the project.

Q     You said that the 11 -- you told the Nardello investigator that the $$11 billion estimate figure I think management knew, correct?

A     Absolutely not, no, no, no, there was no $11 -- this is a complete lie from your firm.

I did not talk about $11 billion at any point, no.

Now, I can point to, if you give me the time to go, I can walk you through both multiple conversations with your investigator

Page 39

█████████████████████

and also my statement with your damn attorney present saying that it was on time and on budget for $8.9 billion.

That was the correct number, nobody believed differently, and you're fabricating something to try to prove it differently.

Q    You confirmed --

A    You put words in my mouth in this case, against my express wishes, and you made it up.

That's got to be illegal.

Q    There is no question pending. ████████████████ you confirmed that Mr. Cornell was in a role where he would have known about costs and schedule, correct?

MS. BARRINGTON:  Objection to form, these are not his notes, but go ahead, ████.

A    You asked me earlier and I told you, I believe Mr. Cornell is in a responsible position where he would have had, you know, reasonable responsibility to know certain things.

[redacted]

But in my role, I was also clear with the investigator that I did not know exactly what Mr. Cornell did or did not know, and for that reason I recommended that your investigator interview executive committee members.

Q     Can I have you take a look at previously marked Exhibit 5 tab 14?

A     Yes, what page?

Q     Well, this is a declaration that --

A     Yes, yes, yes.

Q     This was a declaration that was prepared by the Weil, Gotshal firm, correct?

A     That is correct.

Q     And can I -- I would like to -- you had communications with the Weil, Gotshal firm about coming to this eventual declaration that was submitted to the court, correct?

A     Correct.

Q     I'm going to ask my paralegal Nicole, can you please show the witness Exhibit 6.

███████████

MS. GRUENEICH:  Yes, one second.

MS. BARRINGTON:  Lucas, just to confirm, we are obviously not going to get into any privileged communications with Weil once he retained us, so I want to make that very clear.

Q        Okay, ███████████, I'm showing you what's been marked as Exhibit 6, I want to direct your attention to the e-mail in the middle that you sent to Ms. Barrington.

Do you see that?

A        Yes; I do.

Q        I want to direct your attention to number 2.

Do you see that where it says I traced my cell phone?

A        Um-hum.

Q        Okay, and you write, "I traced my cell phone incoming calls and discovered the contact information for the Plaintiff's investigator.

"I added specific dates on which she first and last contacted me and can confirm that the time cited in the statement are

Page 42

accurate."

Did I accurately read that?

A    Verbatim, yes.

Q    And you did, in fact, go back and look at your cell phone incoming calls before signing the declaration, correct?

A    Yeah, I was referring to those as we walked through your chronology earlier.

Q    And I want you to look back at Exhibit 5.  This is your declaration.

A    Yes.

Q    In your declaration in paragraph 2 you referenced your call on May 5th with the investigator, correct?

A    Yes.

Q    Okay.

In your declaration you make no reference to your first call on May 18th with the Plaintiff's investigator, correct?

A    My first call was May 5th, we went through that.

Q    No, we also went through a call on May 18th, the first call that lasted 27 minutes, your declaration makes no reference of

that, correct?

    A    I have recounted the initial call on May 5th and the last call, and we didn't get into blow by blow of anything in between.

    Q    Sure.

        So it makes no reference, correct?

        MS. BARRINGTON:  Asked and answered, objection.

    A    Correct, but I was also clear from the very beginning that I had no desire to be involved in this case, and really nothing to add.

        And frankly based on the actual evidence, nothing I have helps your case.

    Q    Your declaration makes no reference to your second call on May 18th with Ms. Browning, correct?

        MS. BARRINGTON:  Objection, asked and answered, Lucas.

    A    Correct.

    Q    And your declaration makes no reference to your initial call on June 1 with

███████████████

Ms. Browning setting up the call with the attorney, correct?

A        Correct, a time, just to arrange a time to tie this off.

Q        Your declaration makes no reference to the fact that there were Fluor and Technip estimates higher than $8.9 billion, correct?

A        Let me look back through it.

My statement here does not make any reference to Fluor or Technip, but it completely disavows any knowledge of your estimate of $11 billion as being the budget, which is false.

Q        Understood, understood, but you understood this was a declaration to be presented to the court, correct?

A        Yeah, and I made it very clear you had no right to cite me and what you put in was false.

Q        Okay.

And you did not tell the court about your knowledge of Fluor and Technip estimates being higher than $8.9 billion,

████████████████

correct?

A       I also didn't tell them that the Westney estimate confirmed the $8.9 billion.

Q       I want to go back to your call on May 5th with Ms. Browning.

On that call you discussed individuals who were knowledgeable at Sasol about the LCCP, correct?

A       Correct, I believe.

Q       And on the -- and you identified Shane McNammara to Ms. Browning, correct?

A       Correct.

Q       You said that Mr. McNamara was a Sasol director for derivatives, correct?

A       I didn't know his title.

Q       Okay.

You said that Mr. McNamara had a major role at the LCCP, correct?

A       He did, yes.

Q       You said that Mr. McNamara worked within Fluor's office in Houston, correct?

A       Correct.

Q       You said that Mr. McNamara knew

█████████████

everything of "when the rubber hits the road, project, scope and cost," correct?

A        I believe that's true.

He was in his role probably the closest from the project site, because he was embedded with Fluor at that point, but I believe, I don't know exactly when he came into the project, you would have to check, but I'm pretty sure it was post final investment decision.

So it was in the execution phase.

Q        Understood.

You also identified George Kavaris to Ms. Browning as a potential witness, correct?

A        I mentioned that he -- she asked who were the executive committee members and I mentioned him among them.

Q        You spoke about the LCCP executive committee, correct?

A        Yes.

Q        You told Ms. Browning that Sasol had an "elaborate decision-making process,"

████████████

correct?

A    In the context of good governance, yes.

Q    You said that Sasol had "committees reporting to committees," correct?

A    That is correct.

Q    And you referred to the executive committee as the Exec Come, correct?

A    Ex Com is the term that was used.

Q    Ex Com, okay.

You said that the Ex Com had legal responsibility for decisions pertaining to the LCCP, correct?

A    That's my understanding.  It doesn't make it true, but at the time I joined Sasol, it was my understanding that if you were not part of the executive committee that you didn't, yeah, that that was a different level of executive responsibility.

Q    You said that the Ex Com were the "key decision makers for LCCP?"

A    As much as you can be a key decision maker when you are a cog in the

machine, if you will.

They were informed, they were making project recommendations, and then the decisions have to be taken through those committee structures.

Q    You said that Steve Cornell was a member of the Ex Com, correct?

A    That's my understanding, yes.

Q    And you said that as between David Constable and Steve Cornell, Cornell was the "more important executive for the LCCP," correct?

A    I don't recall characterizing it that way, but Stephen Cornell was local in Houston at that time, where David Constable was South African based.

So I believe the whole purpose in hiring Mr. Cornell was that he came in to work on this project.

Q    You said that Mr. Cornell became "the main person steering the project," correct?

A    That's my understanding.

Q    And you said that Cornell was

███████████

the "ultimate decision maker for the LCCP,"
correct?

A     Let's put that in context again
with this governance structure, because no one
person has ultimate decision-making authority.

Q     You said that Cornell, given his
role, would have been "100 percent informed and
involved with issues concerning LCCP
contracting," correct?

A     I believe that position has a
responsibility to be involved, but to be clear,
and as we stated before already today, I have
no personal knowledge of what he did or did not
know.

And only through interviews with
the Ex Com members would you be able to piece
that together.

I could not be a source on that.

Q     You said that Mr. Constable and
Mr. Nqwababa would get "readouts" from
Mr. Cornell about the results of the Ex Com
meetings, correct?

A     I believe all of the executives
back in South Africa got periodic updates

███████████████

through the committee structure, and at least in recounting some of my final responsibilities with Sasol before I left for a great job, I recounted my last trip to South Africa and the discussions, and frankly, those discussions, both at the executive level and with the corporate risk team, confirmed that there was no evidence that the project was likely to escalate or go off its timeline at that point.

So everything from a data standpoint tracked to the $8.9 billion estimate, and it was tracking, the project was working very well in the fall of 2015.

Q    Okay, you said that you were not a part of the Ex Com, correct?

A    That is correct.

Q    But you said that you would make presentations to the Ex Com once a month, correct?

A    Not every month, I created a presentations that went to the Ex Com every month, and on rare occasion was invited to come in and make the presentation.

Q    And you said that when, for

meetings that you did attend that, "the biggest concern at the time was the contracting strategy," correct?

A    I don't see that in the Complaint.  I did have discussions with the investigator about the contracting strategy and it's true in the sense that -- and I am trying to recall the risks that we went through.

The contracting strategy always was a significant risk and would be for any mega project like this.

Q    And you said that the contracting strategy was a concern because, "you want competition among vendors and contractors for each piece of the project.  If you don't manage it right and depend on just one contractor, you don't want that."

That's correct, right?

A    Actually that is correct, and I know the company's express intent was to create as much competition as possible for that reason.

Q    You encouraged Ms. Browning to contact Timothy Garvin about contracting,

Page 52

correct?

A    He was another executive committee member and he was the one who focused on contracting.

Q    And you said that Mr. Garvin was Sasol general counsel, correct?

A    I don't -- I don't recall his exact title, that may be.

Q    You told Ms. Browning that Mr. Garvin was a member of the executive committee?

A    I believe he was.

Q    You said that Mr. Garvin was responsible for negotiating contracts with vendors and contractors?

A    I believe -- I don't recall telling the investigator what his responsibilities were.

If you are asking me about it, I think there were some of the engineering procurement and construction company contracts where he was involved with that.

Q    You told Ms. Browning that at executive committee meetings you overheard

██████████████

Mr. Garvin say, "Make it up as you go along," correct?

A    Absolutely not.

Q    You --

A    And I can't -- no statement like that would ever be uttered in an executive committee meeting, no.

Q    Did you ever -- are you saying that you never heard Mr. Garvin say, "make it up as you go along?"

MS. BARRINGTON:  Objection, asked and answered.

A    I've already answered you, it's not a familiar term.

Q    Okay.

You told Ms. Browning that the LCCP was a business case of what not to do, correct?

A    No, I did not say that, and the reference where it shows up in your second amended Complaint is where you made reference to a third-party study that supposedly, and I had heard as a rumor secondhand and I confirmed to her, she was asking what resources you might

Page 54

look for, I had heard secondhand that such a case exists that characterized the case that way, but it wasn't my characterization, I haven't seen such a document and I have no other knowledge of it.

Q    Okay.

You told Ms. Browning that what ultimately became of the LCCP was "quite shocking," correct?

A    I think that's completely true.

Q    Okay.

You said "ex-post, it's clear there was a breakdown."

Correct?

A    Well, something must have broken, but I don't recall specifically saying that to her.

But she really prodded to try to get me to speculate on what would have gone wrong.

Now I have no knowledge, I have no -- again, everything was on time, on budget for $8.9 billion and looking good as of the fall of 2015.

Page 55

█████████████

Q       You attributed one of the reasons for the LCCP cost errors to a "rotisserie of managers," correct?

A       I did use that phrase, she asked is there one criticism, continuity of management is one thing that can help with managing these things and there was a lot of turnover.

Q       You said that you were told by former colleagues that information was not getting shared out of the project team in Lake Charles, correct?

A       I did not have any problems like that during my tenure there, so I can't -- I can't say that.

Q       Let me rephrase.

You told Ms. Browning that you were told by former colleagues that information was not getting shared out of the project team in Lake Charles?

A       I don't have any recollection of saying that.

Q       You said that that is a definition in a breakdown of controls, correct?

Page 56

A    Again, no recollection, and I haven't spoken about controls in the project at all with anybody.

Q    In your May 18th, 2020 calls you had discussions with Ms. Browning about LCCP executive committee meetings, correct?

A    Give me context, because I'm not sure.

Q    Sure.

You told Ms. Browning that the executive committee met locally in Houston, Texas at headquarters at Sasol North America, correct?

A    I believe that's correct.

Q    And you said that Mr. Cornell's office was physically there, correct?

A    It was, yes.

Q    And you said that Cornell would attend the weekly meetings, correct?

A    To the best of my knowledge, but he also had a travel schedule, so I don't know how many of them -- and again, I wasn't there on a regular basis to be able to tell you when he attended, or how often.

Q        And you told Ms. Browning that you made presentations based on data you received from risk managers overseeing the cracker and its six components, correct?

A        That's not correct, that's not accurate.

The way the risk function works is -- I mean I and another member of my team, we were ███████████████ , ████████████████ ████████████ , and our job was to interface with the subject matter experts across the entire organization.

So we were in touch constantly with everything above and below ground, meeting with the teams, understanding relative to the existing business case point forward what were the things that could go right or wrong, that would either make it go better or worse than estimated, and that's why I think it's ridiculous when you try to hang your hat on was the $8.9 billion exactly right.

I discussed with your investigator that there is a range of uncertainty upwards of 20 percent that's common

Page 58

for any of these kinds of projects.

The independent estimate that we had from Westney validated the number if you do things right, and all of the risks would go into -- if it goes right and you mitigate it and you mitigate things at a cost how does it play out, and again it was going really well on the front end of it when I was there in the fall of 2015.

Q    As to the Westney estimate, you told the Nardello firm that it would have to be -- you would have to remain perfect to stay within the $8.9 billion estimate, correct?

A    Not necessarily perfect, but things largely had to go correct.

You always have contingency for things that you may or may not -- and there will be pluses and minuses on any project like this.

It would be impossible for it to be otherwise.

Q    Can I have you turn back to Exhibit 3, tab 3, the notes for the Nardello --

A    Something was muted with your

audio.  Would you repeat the question, please?

Q     Sorry.  Can I have you turn back to Exhibit 3, it was your tab 3, it's the notes from Nardello.

A     Tab 3, got it, okay.

Q     Can you turn to page 12?

A     Done.

Q     Do you see that?

A     Where on page 12 are you directing me?

Q     The very top the second line.

It says, "Fact, that everything had to go perfect to hit $8 billion number."

Do you see that?

A     Okay, well, I mean if you wanted to come in $900 million under budget you would have to do everything right.

Q     I will ask you that question again, you told the Nardello firm that in order to meet the Westney quote, everything had to go perfect, correct?

MS. BARRINGTON:  Objection, asked and answered.

A     No, but these notes clearly

Page 60

refer to $8 billion not $8.9, so again, there

is a range of uncertainty around this, and if

you want to come in under budget, you have to

do everything right.

Q        Okay.

Going back to your May 18th

discussion with Ms. Browning, you said that you

remembered a meeting at Fluor headquarters

where Shane McNamara had cost overruns in some

areas, correct?

A        I don't recall the specifics of

that conversation, but there were always pluses

and minuses, and again, the project overall was

both on time and on budget.

I am also aware that there were

things including materials that were coming in

well under budget.

Q        You said that up to that point

at the Fluor headquarters meeting you had

thought that your information was accurate?

A        I think all the information I

had throughout my tenure there was accurate.

Q        But you said that at a later

point, at a point later after the Fluor

headquarters meeting you had some questions about the accuracy of information being presented to you, correct?

A    No, I don't recall saying anything like that, and I also take issue with the characterization that there was a Fluor headquarters meeting.

I met with Shane McNamara there on a pretty regular basis.

If I was going to do these monthly reports for Ex Com, that's an ongoing conversation, you don't -- I would say probably 40 or 50 percent of my time was spent going either to the Fluor building or to wherever we had people embedded.

Q    You said that at one point that project accounting did not have the level of transparency that you wanted, correct?

A    No, absolutely not.

MS. BARRINGTON:  Court reporter, can I --

A    I didn't opine on the project accounting whatsoever.

Q    On your May 5 call with Ms.

Page 62

▮▮▮▮▮▮▮

Browning you discussed your LinkedIn profile, correct?

A      She asked about it and she urged me, she asked about the $11 billion number that I was reflecting which was at that -- actually it was out of date at that point, but I pointed out to her I had previously updated per the company's estimates, so on LinkedIn you would have found numbers at one point said $9 billion, $10 billion as they kept going up, $11 billion.

I never updated it beyond that.

As soon as she pointed it out, I took it off.

But it was only representative of the fact that I worked on large multi-billion dollar projects and, frankly, was really proud of the work that we did on it.

Q      And your LinkedIn profile referenced an $11 billion cost for LCCP, correct?

A      It reflected the company's public statement about the cost of the project.

Q      After your call with Ms.

███████████████ Browning you changed your description of your LinkedIn profile for your time at Sasol, correct?

A    I took the reference to the number out so there would be no question.

Q    Okay.

On your calls with Ms. Browning, you told her that you were currently employed, correct?

A    I am, yes.

Q    You told her that you're currently employed by the American Petroleum Industry, correct?

A    Let me ask on this, my biggest concern and why I think you falsely represented and attributed words to me in this Complaint, is that you've been trying to leverage my credibility professionally and impugn it.

So I really don't want my employer involved in this case, whatsoever.

Q    Understood, but I am just asking you told Ms. Browning you were the ██████ ██████████████████████████████████████, correct?

Page 64

A    That's my current role, yes.

Q    And that is a ███████████

██████████████████████████████

███████, correct?

A    It's also ████████████████

██████████████████████████ .

Q    Have you -- you've had discussions with the Weil, Gotshal firm, correct?

A    Only since the record that you have, yes.

Q    I am not asking you the content of your discussion, but did the subject of your separation agreement from Sasol come up in your discussions with Weil, Gotshal?

A    Never, no.

Q    Is it your practice to supply the names of prior employers as references when applying for a job?

A    Absolutely.

MS. BARRINGTON:    Objection to form.

A    I can assure you that I have never left off an employer.

Page 65

MS. BARRINGTON:  Videographer, can you confirm that we only have about four minutes left in this deposition?

THE VIDEOGRAPHER:  We have been on the record for 57 minutes and 14 seconds.

MS. BARRINGTON:  So 3 minutes, thank you.

MS. BARRINGTON:  You will let us know when we hit the 1 hour mark, please?

THE VIDEOGRAPHER:  Sure.

Q       ███████████ you told Ms. Browning that the $11 billion cost for LCCP at the time you were there was "socialized," correct?

MS. BARRINGTON:  Objection, misstates his testimony.

A       This is wrong on a couple of levels.  First, I never referred to an $11 billion cost estimate, period, that's your fabrication, a complete lie, made up by your team.

Don't associate that with

anything that I said; ever.

And this should be criminal, I hope the judge in this case takes this into consideration and sanctions you.

Because you had a legal team member present when I was very clear that this was on time, on budget for $8.9 billion, and based on everything that I knew, and on top of that gave you no permission, none, to cite me in this case, yet you dragged me into it.

So I am angry about that, and frankly I hope you get sanctioned.

Q    You used the term socialized with Ms. Browning, correct?

A    The term socialized, it's not -- you've misled and misrepresented what you put in the case.

Because you were talking about socialization relative to $11 billion, and that's not correct.

By socialization, what I was describing to the investigator was that the cost studies, all of them, were socialized and shared with the executive committee.

They saw those numbers.

Q    And you were referring to the Fluor and Technip estimates, those were socialized with Sasol management, correct?

A    Fluor, Technip, Westney, all of the information to the executive committee would have been available.

Q    And the Fluor and Technip estimates, those were at $11 billion?

A    I don't know; and I was clear earlier I don't recall specific amounts.

The only thing I could tell you is I believe they were higher than the $8.9 billion.

MR. GILMORE:  Okay.

I have no further questions, thank you 

That completes your deposition.

THE VIDEOGRAPHER:  We are now going off the record at approximately 3:01 p.m.

I, the undersigned, a Certified Shorthand Reporter of the State of New York, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction;

That the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case before completion of the proceedings, review of the transcript [ ] was [x ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated:  November 25, 2020.

Stephen J. Moore
RPR, CRR

Page 69

DECLARATION UNDER PENALTY OF PERJURY

Case Name: MOSHELL v. SASOL

Date of Deposition: November 24, 2020

I, ███████████████ hereby certify

Under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

Executed this _____ day of

_____, 2020, at

_____.

_____

Page 70

**DEPOSITION ERRATA SHEET**
**Case Name: MOSHELL v. SASOL.**
**Name of Witness:** ███████████
**Date of Deposition: November 24, 2020**
**Reason Codes:  1. To clarify the record.**
**2. To conform to the facts.**
**3. To correct transcription errors.**

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

███████████████

**DEPOSITION ERRATA SHEET**

Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____

_____ Subject to the above
changes, I certify that the transcript is
true and correct

_____ No changes have been
made. I certify that the transcript  is
true and correct.

_____

███████████████

**[& - answered]** Page 1

| & | | |
|---|---|---|
| **&** 2:11 4:24 | | |

**&** 2:11 4:24

**0**

**01008** 1:8 4:12

**1**

**1** 4:6,12 15:3 18:12,13,22 37:14 43:25 65:11 70:7
**10** 17:17 18:6,22 18:25 19:13,23 62:11
**100** 49:8
**10153-0119** 2:15
**10:54** 11:15 12:22
**10th** 20:4
**11** 32:25 33:10 38:14,15,19,21 44:14 62:5,11,21 65:15,21 66:20 67:10
**11:44** 9:23 10:2
**12** 36:15 59:7,10
**14** 40:9 65:6
**18** 8:6 9:23
**18th** 8:21 10:6 11:12 12:4 42:19 42:24 43:19 56:5 60:7
**1:20** 1:8
**1st** 7:13 11:15,19 12:9,20,21 36:10

**2**

**2** 18:12,13 19:10 19:11 41:15 42:14 70:9
**20** 4:12 57:25
**2013** 21:24
**2015** 21:25 22:19 50:14 54:25 58:10

**2020** 1:14 4:5 6:4 8:6 11:15 15:3 17:17 18:6,25 19:13 20:4 31:10 56:5 68:16 69:5 69:12 70:6
**203-858-9937** 6:10
**20932** 68:18
**24** 1:14 4:4 20:18 69:4 70:5
**25** 68:16
**27** 7:18 8:21 42:24
**2:00** 1:14
**2:01** 4:4
**2:30** 6:4

**3**

**3** 33:6,6,8 58:24,24 59:4,4,6 65:8 70:10
**3:01** 67:22

**4**

**4** 19:10,11
**40** 61:14
**455** 2:6

**5**

**5** 3:4 6:4 40:9 42:11 61:25
**50** 61:14
**5040** 18:16
**57** 65:6
**5:00** 12:20 14:8 15:11
**5:01** 15:5
**5th** 6:14,16 7:14 8:12 10:6 12:4 21:16 22:6 42:14 42:21 43:4 45:6

**6**

**6** 40:24 41:9
**60611** 2:7

**7**

**7** 9:12
**767** 2:14

**8**

**8** 59:14 60:2
**8.9** 22:20 23:4,10 23:16,22 26:7,17 27:4,13,15,21 29:5 29:12,20,23 32:17 33:15,25 34:10 35:5,11,20 39:4 44:8,25 45:4 50:12 54:24 57:22 58:14 60:2 66:8 67:14
**8.9.** 29:8
**832-803-9489** 6:2

**9**

**9** 62:10
**900** 59:17
**9:51** 8:6
**9th** 31:10 32:5

**a**

**a.m.** 9:23 11:15
**able** 9:21 49:17 56:24
**absolutely** 38:18 53:4 61:20 64:21
**account** 18:2 20:25
**accounting** 61:18 61:24
**accuracy** 61:3
**accurate** 42:2 57:7 60:21,23

**accurately** 42:3
**acknowledged** 16:3
**action** 68:13,14
**actual** 43:16
**add** 43:15
**added** 41:23
**addressing** 13:14
**affirming** 30:17
**africa** 49:25 50:5
**african** 48:17
**afternoon** 15:11
**agenda** 15:19
**agree** 15:25 27:3
**agreed** 7:2,4,6,9 8:15 9:8 10:9 12:18 14:6
**agreement** 64:15
**ahead** 24:13 34:13 39:20
**allow** 28:15
**allowed** 28:19
**amended** 32:11,22 53:22
**america** 21:21 56:13
████████
**amount** 29:22
**amounts** 67:12
**amply** 21:7
**angry** 66:12
**anna** 2:21
**answer** 9:21 12:11 14:20,23 19:20 20:3 24:16,24 25:17,18,24 26:4 28:15,17,20
**answered** 23:18 24:3,12,14,15 27:23 35:23 43:11 43:22 53:13,14

**[answered - calls]**                                                                     Page 2

59:24
**answering**   20:5
  26:2
**answers**   19:20
  34:24,25
**anybody**   56:4
**appears**   6:8 7:19
  20:8
**applying**   64:20
**approximately**   4:3
  67:21
**april**   21:24
**arbiter**   24:5,10,20
**areas**   60:11
**arrange**   44:4
**asked**   20:17 23:17
  24:3,11,13,15 25:8
  27:23 30:4 32:10
  32:16 34:9 35:3
  35:22 39:21 43:10
  43:21 46:18 53:12
  55:5 59:23 62:4,5
**asking**   26:22 36:3
  36:25 52:20 53:25
  63:22 64:13
**assisting**   6:17
**associate**   15:10,10
  65:25
**assume**   11:3
**assure**   64:24
**attempted**   19:6
**attend**   51:2 56:20
**attended**   56:25
**attention**   41:10,14
**attorney**   11:21,22
  14:8 15:4 39:2
  44:3 68:13
**attorneys**   2:5,12
  4:19
**attributed**   26:11
  32:11 55:2 63:17

**audio**   59:2
**authority**   49:6
**available**   67:8
**avenue**   2:14
**aware**   31:21 60:16

**b**

**back**   9:12,16
  20:17 21:16 32:19
  36:10 38:11 42:5
  42:10 44:10 45:5
  49:25 58:23 59:3
  60:7
**background**   7:9
**bad**   28:17
**barrington**   2:19
  4:23,23 12:13
  14:17 18:18 19:18
  20:5 23:17 24:2
  24:11,22 25:11,16
  25:25 27:22 28:14
  28:21,25 31:4
  32:3 34:12 35:22
  39:18 41:3,11
  43:10,21 53:12
  59:23 61:21 64:22
  65:2,8,10,18
**based**   22:3 35:6
  43:16 48:17 57:3
  66:9
**basic**   26:23
**basis**   56:24 61:10
**beginning**   43:13
**begins**   37:19,22
**behalf**   1:5 4:22,24
  6:20 64:4
**believe**   20:25
  26:19,24 29:7
  32:8 34:16,18
  35:14,24 39:22
  45:10 46:4,8
  48:18 49:11,24

52:13,17 56:15
  67:14
**believed**   35:16
  39:6
**berman**   2:4
**best**   22:22 56:21
**better**   57:19
**beyond**   62:13
**biggest**   32:21 51:2
  63:15
**billion**   22:20 23:5
  23:10,16,22 26:8
  26:17 27:4,13,16
  27:21 29:6,12,20
  29:23 32:17,25
  33:15,25 34:10
  35:5,11,20 38:15
  38:21 39:4 44:8
  44:14,25 45:4
  50:12 54:24 57:22
  58:14 59:14 60:2
  62:5,11,11,12,18
  62:21 65:15,22
  66:8,20 67:10,15
**blocked**   17:21,21
  19:25 20:24
**blow**   43:5,5
**bongani**   1:9
**bottom**   18:18
  33:10,19
**box**   25:21
**breakdown**   54:14
  55:25
**broken**   54:17
**browning**   6:6,13
  6:17,23 7:3,5,7,10
  7:17,22 8:7,11 9:8
  9:24 10:4,23 11:5
  11:6,11,16,19 13:6
  13:10 14:7 15:3
  15:17,23 16:5

17:18,20 18:7
  19:2,14 20:7,16
  21:10,17,19,23
  23:15,22 24:8
  26:6,13,15 27:4,9
  27:19,24 29:10,14
  29:25 30:6 43:20
  44:2 45:6,12
  46:16,24 51:24
  52:10,24 53:17
  54:8 55:18 56:6
  56:11 57:2 60:8
  62:2 63:2,8,23
  65:15 66:15
**browning's**   6:9
  21:5
**budget**   32:25 39:4
  44:14 54:23 59:17
  60:4,15,18 66:8
**building**   61:15
**business**   53:18
  57:17

**c**

**c**   2:2
**call**   6:16 7:14,22
  8:10,18 9:9,16
  10:3,19,22 11:12
  11:19,20 12:2,9,22
  13:5,5 14:6 15:16
  15:20,21 16:3,6,25
  19:6 20:17 21:5
  21:17,18 22:6
  42:14,19,21,23,24
  43:4,4,19,25 44:2
  45:5,7 61:25
  62:25
**called**   5:10 6:13
  9:12
**calls**   41:20 42:6
  56:5 63:8

[caroline - correct]                                                Page 3

caroline  2:23
case  1:7 4:11 6:18
  6:20 13:13,17,25
  14:12 16:12 20:17
  20:21 21:8 35:24
  39:11 43:14,17
  53:18 54:3,3
  57:17 63:21 66:4
  66:11,18 68:10
  69:3 70:3
casual  7:8
cell  5:18,23,25 6:5
  6:11 7:20 9:12
  17:23 41:17,20
  42:6
certain  39:24
certainly  7:13
  35:17
certified  1:20 68:2
certify  68:3,12
  69:7 71:18,21
chad  1:5
changed  63:2
changes  30:14
  71:18,20
characterization
  54:4 61:7
characterize  31:2
characterized
  26:7,16 54:3
characterizing
  48:14
charles  55:13,21
check  46:9
chicago  2:7
████████
chronology  42:9
cite  12:8 13:16
  17:6 44:20 66:10
cited  41:25

cityfront  2:6
clarify  12:7 70:7
clear  13:12 17:6
  17:13 21:7 24:25
  25:4 34:25 36:22
  38:3 40:2 41:7
  43:12 44:19 49:12
  54:13 66:7 67:11
clearly  59:25
closest  46:6
codes  70:7
cog  47:25
colleagues  55:11
  55:19
com  26:23 47:10
  47:12,13,22 48:8
  49:17,22 50:16,19
  50:22 61:12
come  21:3 47:9
  50:23 59:17 60:4
  64:15
coming  40:19
  60:17
committee  25:8
  30:7,12 40:6
  46:19,22 47:9,19
  48:6 50:2 52:4,12
  52:25 53:8 56:7
  56:12 66:25 67:7
committees  47:6,6
common  57:25
communications
  13:19 14:3 40:18
  41:5
company  52:22
company's  35:16
  51:21 62:9,23
competition  51:15
  51:22
complaint  15:23
  26:12 32:12,22

51:6 53:22 63:17
complete  26:4
  38:19 65:23
completely  44:13
  54:11
completes  67:19
completion  68:10
components  57:5
computer  5:21
concern  13:6,10
  13:22,24 51:3,14
  63:16
concerned  13:18
concerning  49:9
concluded  10:22
conclusion  7:21
conferences  4:14
confirm  22:24
  32:8 35:7 36:7
  41:4,24 65:3
confirmed  6:23
  39:9,15 45:4 50:8
  53:24
conform  70:9
consideration  66:5
consistent  22:21
  36:9
constable  1:9
  48:11,16 49:20
constantly  57:14
construction
  52:22
consulting  29:16
  29:19
contact  7:23,25
  11:7,12 19:17
  21:12 41:21 51:25
contacted  6:5 15:4
  31:11,19 32:6
  41:24

contacting  17:22
contacts  17:25
  21:9
content  64:13
context  24:7,17
  28:8 37:23 47:3
  49:4 56:8
contingency  58:17
continuing  20:6
  31:5
continuity  55:6
contracting  49:10
  51:3,7,10,14,25
  52:5
contractor  31:6
  51:18
contractors  27:25
  51:16 52:16
contracts  52:15,22
controls  55:25
  56:3
conversation  7:9
  8:20,21 9:3 10:16
  12:25 17:9,14
  60:13 61:13
conversations
  16:7 38:25
convey  10:25
copies  30:2
copy  32:23
cornell  1:10 24:4,9
  25:2,6 39:16,22
  40:4 48:7,11,11,15
  48:19,21,25 49:7
  49:22 56:19
cornell's  56:16
corporate  50:8
correct  5:24 6:2,3
  6:7,8,10,12,14,15
  6:18,19,21,24 7:3
  7:7,12,15,16,18,19

**[correct - e]**

7:23 8:2,8,9,13,16 8:22,23,25 9:4,6 9:16,24,25 10:7,8 10:10,14,17,18,20 10:25 11:8,16,21 12:5,19,23,24 13:2 13:7,20,21,23 14:4 14:9 15:5,13,18,24 16:5,7,9,15,23 17:10,11,19 18:8 19:3,15 20:7,10,18 20:23 21:5,10,11 21:13,14,21,22,25 22:2,5,9,10,12,17 22:20 23:5,11 24:6,7,19 26:9,18 26:19,25 27:10,16 27:21 29:6,12,13 29:17,20,21 30:3,8 31:12 32:6,8,12,18 34:11 35:5,12,21 36:16,21 38:17 39:5,17 40:15,16 40:20,21 42:7,15 42:20 43:2,9,12,20 43:23 44:3,4,9,18 45:2,9,10,12,13,15 45:19,23,24 46:3 46:17,22 47:2,6,7 47:9,15 48:8,13,23 49:3,10,23 50:16 50:17,20 51:4,19 51:20 52:2,7 53:3 53:19 54:10,15 55:4,13,25 56:7,14 56:15,17,20 57:5,6 58:14,16 59:22 60:11 61:4,19 62:3,22 63:4,10,14 63:25 64:5,10 65:17 66:15,21

67:5 69:10 70:10 71:19,22
**corresponding** 22:25
**cost** 22:12,19 23:4 23:11,16,23 24:6 27:14,20 28:3 29:4,11,16 30:3,20 31:2,7 35:10 36:21,23 37:3,12 38:6,10 46:3 55:3 58:7 60:10 62:21 62:24 65:15,22 66:24
**costs** 22:8,16 27:10 29:19 30:18 35:15 39:17
**counsel** 4:8 52:7
**couple** 8:19 37:21 65:20
**court** 1:2 4:10,16 5:7 34:22 40:20 44:18,23 61:21
**cracker** 57:5
**create** 51:21
**created** 50:21
**credibility** 63:19
**criminal** 66:3
**criticism** 55:6
**crr** 68:20
**current** 64:2
**currently** 63:9,13
**curt** 9:18
**cutting** 29:2
**cv** 1:8 4:12

| d |
| --- |

**d** 15:8
**damn** 39:2
**data** 50:11 57:3
**date** 4:4 23:2 31:16 32:7 62:7

68:15 69:4 70:5
**dated** 68:16
**dates** 22:22 36:12 41:23
**david** 1:9 48:11,16
**day** 9:9,25 10:6 12:9 14:8 69:11

██████████████

██████████

**decision** 46:11,25 47:23,25 49:2,6
**decisions** 47:14 48:5
**declaration** 40:11 40:14,19 42:7,11 42:13,18,25 43:18 43:24 44:6,17 69:2
**defendants** 1:12 2:12 4:25
**defending** 14:18
**definition** 55:25
**delaying** 28:24
**delivered** 20:11,12
**demonstrably** 23:19 35:13
**deny** 36:7
**depend** 51:17
**deponent** 1:16
**deposition** 1:16 4:7,13 65:4 67:19 68:10 69:4 70:2,5 71:2
**derivatives** 45:15
**described** 32:13
**describing** 66:23
**description** 63:2
**desire** 13:13 14:11 43:13
**despite** 31:21

**determining** 24:5 24:10
**development** 22:16
**different** 47:20
**differently** 39:6,8
**direct** 41:10,14
**directing** 59:11
**direction** 68:7
**director** 45:15
**disavows** 44:13
**discovered** 41:20
**discuss** 22:15
**discussed** 22:7,8 22:18 23:3,22 24:24 45:7 57:23 62:2
**discussion** 29:22 60:8 64:14
**discussions** 50:6,6 51:6 56:6 64:9,16
**dispute** 11:10 13:9 16:17 23:14 30:23 30:25
**district** 1:2,3 4:10 4:11
**document** 18:16 36:6 54:5
**documentation** 30:13,19
**documented** 30:15
**dollar** 62:18
**dr** 5:18 33:7 39:15 65:14 67:18
**dragged** 66:11
**due** 12:10
**duly** 5:11 68:6

| e |
| --- |

**e** 2:2,2 5:10,10 15:8 17:25 41:10

**[earlier - form]** Page 5

earlier   10:6 21:5 39:21 42:9 67:12
eastern   6:5 8:6 14:8 19:14 20:6
edward   1:9
eight   13:2
either   31:17 57:19 61:15
elaborate   46:25
embedded   46:7 61:16
employed   6:24 63:9,13
employee   68:13
employer   63:21 64:25
employers   64:19
encouraged   51:24
ended   17:4
energy   64:4
engineering   52:21
eno   31:11
entire   57:12
entitled   1:17
entry   18:21
errata   70:2 71:2
errors   55:3 70:10
escalate   50:10
esq   2:9,17,19,21 2:23
estimate   23:23 26:8,17 27:4,9 29:15 30:3 38:16 44:14 45:4 50:13 58:3,11,14 65:22
estimated   22:8,11 22:15,19 23:4 24:6,10 27:14,20 29:4,11,16,19 57:20

estimates   27:11 29:8 30:21 31:2 32:17 33:14,24 34:10,19 35:4,10 35:14,20 36:8 44:8,25 62:9 67:4 67:10
eventual   40:19
evidence   43:17 50:9
ex   26:22 47:10,12 47:13,22 48:8 49:17,22 50:16,19 50:22 54:13 61:12
exact   52:9
exactly   23:8 32:21 40:4 46:8 57:22
examination   3:2 5:15
examined   5:12
exec   47:9
executed   29:24 69:11
execution   46:12
executive   25:8 30:12 40:6 46:19 46:22 47:9,19,21 48:12 50:7 52:3 52:11,25 53:7 56:7,12 66:25 67:7
executives   49:24
exhibit   18:12,13 19:10,11 33:6 40:9,23 41:9 42:11 58:24 59:4
existing   57:17
exists   54:3
experts   57:12
express   31:21 39:11 51:21

expressed   13:6,10 13:22,24 16:8
external   31:2

**f**

f   5:10
fabricating   39:7
fabrication   32:24 33:2 65:23
fact   29:21 42:5 44:7 59:13 62:17
facts   70:9
fall   50:14 54:25 58:10
false   23:19 44:15 44:21
falsely   63:16
familiar   53:15
fear   16:9
federal   68:10
fifth   2:14
fight   16:14
figure   23:16 38:16
filed   4:10 31:22
final   8:18 46:10 50:3
financially   68:13
find   13:3
finish   19:19,20 28:18,19
firm   4:17 6:18 16:14 21:13 31:11 35:3,9,18 36:20 38:20 40:15,19 58:12 59:20 64:9
first   5:11 8:20 31:20,23,23 32:14 41:24 42:19,21,24 65:21
five   33:19,19
fluor   27:10,12,15 27:20,25 29:5,7

30:2,20 32:16 34:4,9,19 35:4,14 35:19 44:7,12,24 46:7 60:9,20,25 61:7,15 67:4,6,9
fluor's   45:22
focused   52:4
focusing   12:21
follow   8:3,11 10:4 15:16,22
follows   5:13
foregoing   68:4,5,8 68:9 69:10

form   12:17 28:22 34:12 39:19 64:23

**[███ - involved]**

**███**

**former** 55:11,19
**forth** 68:5
**forward** 57:17
**found** 37:24 62:10
**four** 12:8 15:12
    16:25 65:4
**frankly** 43:16 50:6
    62:18 66:13
**free** 7:22
**front** 26:20 58:9
**full** 12:15 19:5,12
**function** 57:8
**further** 11:7,11
    21:9,12 67:17
    68:9,12
**future** 12:2
**fuzzy** 22:22 36:11

**g**

**gallagher** 4:15
**garvin** 51:25 52:6
    52:11,14 53:2,10
**general** 52:7
**george** 46:15
**getting** 55:12,20
**gilmore** 2:9 4:21
    4:21 12:16 14:16
    14:24 19:21 25:9
    26:4 28:5,21
    67:16
**give** 12:14 15:6
    26:3 37:25 38:23
    56:8
**given** 23:20 49:7
    68:8
**glad** 24:24
**gmail** 20:25
**go** 9:21 11:25 12:3
    18:2 21:16 24:13
    32:19 34:13 38:24
    39:19 42:5 45:5

50:10 53:2,11
57:18,19 58:5,16
59:14,21
**goes** 58:6
**going** 4:3 5:3
    14:25 24:18 25:21
    25:23,24 28:10
    32:3 36:17 38:11
    40:22 41:4 58:8
    60:7 61:11,14
    62:11 67:21
**good** 30:11,21
    38:4 47:3 54:24
**gordan** 2:21
**gotshal** 2:11 4:24
    5:5 40:15,18 64:9
    64:16
**governance** 30:11
    38:4 47:4 49:5
**great** 50:4
**ground** 57:15
**group** 64:4
**grueneich** 41:2
**guarantee** 16:22
**guess** 17:8

**h**

**hagens** 2:4
**hand** 33:11
**hang** 7:15 8:24
    10:20 12:22 57:21
**happen** 28:11
**happened** 12:9
    23:8
**hat** 57:21
**headquarters**
    56:13 60:9,20
    61:2,8
**hear** 14:11
**heard** 53:10,24
    54:2

**held** 4:13
**hell** 27:6
**help** 37:9 55:7
**helps** 43:17
**higher** 27:15,21
    29:5,8,11,20 32:17
    33:15,24 34:10,21
    35:4,11,15,20 36:8
    44:8,25 67:14
**hiring** 48:19
**history** 38:12
**hit** 59:14 65:11
**hits** 46:2
**hold** 24:3 28:14
**homework** 30:16
**honest** 26:4
**hope** 66:4,13
**hour** 9:13 65:11
**hours** 20:18
**houston** 22:4
    45:22 48:16 56:12
**hum** 41:18
**hung** 7:11 15:14
    17:9

**i**

**identified** 45:11
    46:15
**identify** 4:20
**illegal** 39:13
**illinois** 2:7
**important** 48:12
**impossible** 58:21
**impugn** 63:19
**incentive** 28:2
**included** 15:23
**including** 60:17
**incoming** 41:20
    42:6
**incomplete** 35:25
**increasingly** 9:19

**independent** 36:4
    36:5,18 58:3
**individually** 1:5
**individuals** 45:8

**████████**
**███**

**information** 8:11
    10:5,24 12:3
    41:21 55:11,19
    60:21,22 61:3
    67:7
**informed** 48:3
    49:8
**initial** 43:3,25
**insistent** 9:19
    34:24
**intent** 51:21
**interested** 31:6
    68:13
**interface** 57:11
**interrupting** 14:22
    29:2
**interview** 40:6
**interviews** 49:16
**investigation**
    26:21
**investigations** 6:7
**investigator** 13:20
    14:4 25:5 31:14
    31:20 32:6 38:15
    38:25 40:3,6
    41:22 42:15,20
    51:7 52:18 57:24
    66:23
**investment** 46:10
**investor** 11:20,22
**invited** 50:23
**involve** 21:7
**involved** 13:13,25
    14:11 16:11 43:14
    49:9,12 52:23

**[involved - members]**                                                      Page 7

63:21
**issue** 61:6
**issues** 49:9

**j**

**j** 1:18 15:8 68:19
**jerrod** 15:4,7
**job** 22:12 50:4
  57:11 64:20
**john** 5:2
**joined** 47:17
**jonathan** 2:17 5:4
**jpc** 1:8
**jsr** 4:12
**judge** 66:4
**june** 7:13 11:15,19
  12:9,20,21 15:3
  36:10 43:25

**k**

**kavaris** 46:16
**keep** 32:3
**kept** 62:11
**key** 47:23,24
**kind** 31:7 32:23
**kinds** 58:2
**knew** 38:16 45:25
  66:9
**know** 12:13 14:2
  23:10,15,21,23
  25:5 26:11 30:9
  37:4 38:7,8 39:23
  39:24 40:3,4
  45:16 46:8 49:15
  51:21 56:22 65:11
  67:11
**knowledge** 44:13
  44:24 49:14 54:6
  54:22 56:21
**knowledgeable**
  45:8

**known** 39:17

**l**

**l** 5:10,10
**labeled** 18:16
**lake** 55:12,21
**landed** 23:10
**large** 62:17
**largely** 58:16
**lasted** 8:21 10:16
  12:25 42:24
**law** 6:17
**laws** 69:9
**lccp** 22:12,16,20
  23:4,11 24:6,10
  27:15,20 29:5,11
  29:16 35:11 45:9
  45:19 46:21 47:15
  47:23 48:12 49:2
  49:9 53:18 54:9
  55:3 56:6 62:21
  65:15
**lccp's** 22:8 27:10
**learn** 13:19
**left** 17:18 18:7
  19:2 50:4 64:25
  65:4
**legal** 4:18 11:23
  12:2 14:10 47:14
  66:6
**level** 47:20 50:7
  61:18
**levels** 65:21
**leverage** 63:18
**lie** 33:2 38:19
  65:23
**limit** 12:16 14:13
  19:21
**limited** 1:9 4:9
**lindsey** 1:5
**line** 33:17 59:12
  70:11,12,13,14,15

70:16,17,18,19,20
70:21,22,23,24
71:3,4,5,6,7,8,9,10
71:11,12,13,14,15
71:16
**lines** 33:19
**linkedin** 18:2 62:2
  62:9,20 63:3
**listen** 25:13,15
  26:13
**literally** 16:25
**llp** 2:4,11
**lobbies** 64:4
**lobby** 64:3
**local** 48:15
**locally** 56:12
**long** 13:3
**longer** 6:24
**look** 18:11,15 19:9
  33:5,9 37:7,23
  38:12 40:8 42:6
  42:10 44:10 54:2
**looking** 54:24
**lot** 55:8
**low** 26:8,17 27:5
**lucas** 2:9 3:4 5:16
  14:15 19:18,19,24
  23:17 25:11,14,16
  27:23 28:11,14
  41:3 43:22
**luke** 4:21
**luna** 2:19 4:23 5:3
**lynnley** 6:6

**m**

**m** 5:10
**machine** 48:2 68:7
**mail** 17:25 41:10
**mailbox** 19:5,12
**main** 48:22
**major** 45:19

**maker** 47:25 49:2
**makers** 47:23
**making** 46:25 48:4
  49:6
**man** 25:14
**manage** 51:17
**management**
  38:16 55:7 67:5
  ████████████
**managers** 55:4
  57:4,10
**managing** 55:8
**manges** 2:11 4:24
**march** 22:18
**mark** 65:11
**marked** 19:10
  33:6 40:9 41:9
**materials** 60:17
**matter** 1:18 4:9
  57:12
**mcnamara** 45:14
  45:18,21,25 60:10
  61:9
**mcnammara**
  45:12
**mean** 36:24 57:9
  59:16
**media** 4:6
**meet** 59:21
**meeting** 9:4,10
  53:8 57:15 60:9
  60:20 61:2,8
**meetings** 49:23
  51:2 52:25 56:7
  56:20
**mega** 21:20 51:12
**member** 48:8 52:4
  52:11 57:9 66:7
**members** 40:7
  46:19 49:17

**[mentioned - participate]** Page 8

**mentioned** 27:11
30:11 46:18,20
**message** 18:8,10
19:4,15 20:7,9,15
20:23
**met** 56:12 61:9
**middle** 41:11
**million** 59:17
**minuses** 58:19
60:14
**minute** 12:8 17:18
18:7,22 19:2
**minutes** 7:18 8:19
8:21 9:13 10:17
13:2 15:12 16:25
42:25 65:4,6,8
**misled** 66:17
**misrepresented**
66:17
**misstates** 65:19
**mitigate** 58:6,7
**month** 50:19,21,23
**monthly** 30:10
61:12
**moore** 1:19 4:17
68:19
**moshell** 1:5 4:9
69:3 70:3
**mouth** 24:18 28:9
39:10
**move** 25:9 26:5
28:5 31:25
**multi** 62:18
**multiple** 24:25
38:25
**mute** 14:18
**muted** 58:25
**mutual** 13:4

**n**

**n** 2:2 5:10
**n.a.'s** 22:4
**nail** 16:14
**name** 4:14 15:9
31:17 68:15 69:3
70:3,4
**named** 15:4
**names** 64:19
**nardello** 31:11
33:10 35:3,9,18
36:15,20 37:2,14
38:15 58:12,24
59:5,20
**necessarily** 58:15
**need** 25:16,19
**needed** 30:7
**needs** 28:17
**negotiating** 52:15
**negotiation** 28:2
31:9
**neither** 68:12
**never** 7:11 15:9
22:14 53:10 62:13
64:17,25 65:21
**new** 1:3,21 2:15,15
4:11 68:3 69:9
**nicole** 40:23
**non** 25:10 28:6
32:2
**nope** 9:2
**north** 21:20 56:13
**notary** 1:20 5:12
**notes** 30:7 35:6,25
37:8,10 38:2
39:19 58:24 59:4
59:25
**noth** 2:6
**november** 1:14
4:4 68:16 69:4
70:5

**nqwababa** 1:9
49:21
**number** 4:11 5:25
6:9 17:21 21:3
27:13,18 29:24
32:25 36:8 39:5
41:15 58:4 59:14
62:5 63:6
**numbers** 22:23,25
30:14,14 34:21
36:12,21,23 37:3
37:11,22 38:6,13
62:10 67:2

**o**

**o** 5:10 15:8
**objection** 19:19
23:18 24:2,3,11,22
27:22 31:4 34:12
39:18 43:11,21
53:12 59:23 64:22
65:18
**objections** 12:17
15:2 19:22 28:22
28:23
**obviously** 33:22
38:8 41:4
**occasion** 50:23
**october** 21:25
31:10 32:4,5
**office** 22:4 45:22
56:17
**official** 38:12
**oh** 19:12
**okay** 8:5 9:7 10:22
11:14,18,25 14:14
18:4,11,20 19:8,12
20:14,22 21:15
23:9 25:9 27:2,7
31:18 32:9 33:4,8
33:12 34:6,22
36:18 37:17 41:8

41:19 42:17 44:22
45:17 47:12 50:15
53:16 54:7,12
59:6,16 60:6 63:7
67:16
**once** 41:6 50:19
**ongoing** 61:12
**open** 11:7,11
**opine** 61:23
**order** 1:18 59:20
**organization**
57:13 64:7
**original** 68:9
**overall** 60:14
**overheard** 52:25
**overruns** 60:10
**overseeing** 57:4

**p**

**p** 2:2,2
**p.m.** 1:14 4:4 6:4
12:20 17:18 18:7
19:14 67:22
**page** 3:2 18:16
33:10 36:14 40:10
59:7,10 70:11,12
70:13,14,15,16,17
70:18,19,20,21,22
70:23,24 71:3,4,5
71:6,7,8,9,10,11
71:12,13,14,15,16
**paragraph** 37:8
37:11,14,16,18
42:13
**paralegal** 40:22
**paraphrased**
33:21 34:18 36:2
**paraphrasing** 38:3
**part** 25:7 28:2,8
47:19 50:16
**participate** 16:2

**[participating - reason]**

**participating** 17:16
**party** 53:23 68:14
**patience** 11:3
**patterson** 15:4 16:4,8,13,18,21
**paul** 1:10
**penalty** 69:2,8
**pending** 39:14
**people** 26:22 61:16
**percent** 49:8 57:25 61:14
**perfect** 58:13,15 59:14,22
**period** 13:25 65:22
**periodic** 49:25
**perjury** 69:2,8
**permission** 10:11 66:10
**person** 48:22 49:6
**personal** 17:23 49:14
**personally** 16:11
**pertaining** 47:14
**pertains** 68:9
███████████
███
**phase** 46:13
**phone** 5:19,23,25 6:6,11 7:11,15,18 7:20 8:7,24 9:12 10:20 12:22 17:10 17:23 20:13 21:3 41:17,20 42:6
**phrase** 37:2 55:5
**physically** 56:17
**piece** 49:17 51:16
**place** 68:4

**plaintiff** 2:5 4:8
**plaintiff's** 41:21 42:20
**plaintiffs** 1:7 4:22
**play** 58:8
**plaza** 2:6
**please** 14:13,18,24 15:7 19:21 37:15 40:23 59:2 65:12
**pluses** 58:19 60:13
**point** 6:6 9:17 11:4 15:14 17:22 19:25 23:3 31:8 37:6 38:22,23 46:7 50:10 57:17 60:19 60:25,25 61:17 62:7,10
**pointed** 62:7,14
**polkes** 2:17 5:2,2,4 14:15,16,19
**position** 21:24 25:2 35:16 39:23 49:11
**possible** 51:22
**post** 46:10 54:13
**potential** 46:16
**practice** 64:18
**premier** 64:6
**premised** 16:6
**prepared** 40:15
**present** 4:19 39:3 66:7
**presentation** 50:24
**presentations** 50:19,22 57:3
**presented** 44:18 61:4
**pretty** 46:10 61:10
**previous** 16:7

**previously** 12:4 16:4 19:10 33:6 40:9 62:8
**prior** 64:19 68:5
**privileged** 41:5
**probability** 29:23
**probably** 46:5 61:13
**problem** 25:14,19
**problems** 55:14
**proceed** 5:8
**proceedings** 68:4 68:5,6,10
**process** 46:25
**procurement** 52:22
**prodded** 54:19
**professional** 1:19
**professionally** 16:12 63:19
**profile** 62:2,20 63:3
**project** 28:3 31:7 38:13 46:3,6,9 48:4,20,22 50:9,13 51:12,16 55:12,20 56:3 57:11 58:19 60:14 61:18,23 62:24
**projects** 21:20 58:2 62:18
**properly** 29:24 30:17
**protect** 16:14
**proud** 62:19
**prove** 39:7
**provided** 8:12 10:5,23 12:4
**public** 1:20 5:12 62:24

**publicly** 22:19
**pure** 32:25
**purpose** 8:10 10:3 11:18,25 12:6,7 15:16,20,21 48:18
**pursuant** 1:18
**put** 14:18 24:18 28:9 39:10 44:20 49:4 66:17

**q**

**question** 5:22 9:22 14:14 18:4,24 20:3 25:17 26:14 28:12,13,16 29:9 34:6,15 39:14 59:2,19 63:6
**questions** 8:3 12:11 14:20 25:23 34:23 36:18 61:2 67:17
**quite** 54:9
**quote** 38:5,5 59:21

**r**

**r** 2:2 5:10,10 15:8 15:8
**range** 57:24 60:3
**rare** 50:23
**read** 20:13 37:15 42:3
**reading** 34:17 37:15 38:2
**readouts** 49:21
**reads** 37:10
**really** 30:21 43:14 54:19 58:8 62:19 63:20
**realtime** 1:20
**reason** 40:5 51:23 70:7,11,12,13,14 70:15,16,17,18,19

**[reason - saying]**

70:20,21,22,23,24
71:3,4,5,6,7,8,9,10
71:11,12,13,14,15
71:16
**reasonable** 39:24
**reasons** 55:3
**recall** 9:5,11 11:9
11:13 13:8,14
16:10,10,16 17:13
17:15 19:7 23:12
26:20 27:18 30:22
32:20 48:14 51:9
52:8,17 54:17
60:12 61:5 67:12
**received** 17:24
19:4 20:10 27:9
29:15 57:4
**recollection** 16:20
16:24 34:20 35:7
36:4,5,11 37:9
55:22 56:2
**recommendations**
48:4
**recommended**
40:5
**record** 4:3,20 5:3
7:4,8 34:25 36:21
36:23 37:4,12
38:6,11 64:11
65:6 67:21 68:6,8
70:8
**recorded** 4:7
**records** 6:12 7:20
9:12
**recounted** 25:7
43:3 50:5
**recounting** 50:3
**refer** 60:2
**reference** 32:24
33:3 34:4,19
42:19,25 43:8,19

43:25 44:7,12
53:21,22 63:5
**referenced** 42:14
62:21
**references** 64:19
**referred** 47:8
65:21
**referring** 37:24
42:8 67:3
**refers** 38:9
**reflected** 62:23
**reflecting** 62:6
**refresh** 37:9
**registered** 1:19
**regular** 56:24
61:10
**reiterate** 17:3
**relative** 57:16
66:20 68:13
**remain** 58:13
**remained** 11:7,11
**remember** 18:10
**remembered** 60:9
**repeat** 34:14 59:2
**rephrase** 55:17
**reporter** 1:19,20
4:16 5:7 34:23
61:21 68:3
**reporting** 47:6
**reports** 61:12
**representative**
62:16
**represented** 11:23
63:16
**requested** 68:11
**resources** 30:4
53:25
**respect** 12:10
**respond** 12:14
**responses** 12:15

**responsibilities**
50:3 52:19
**responsibility**
25:3 39:24 47:14
47:21 49:12
**responsible** 39:22
52:15
**responsive** 25:10
28:6 32:2
**results** 49:22
**retained** 41:6
**return** 20:22 21:4
**review** 68:10
**ridiculous** 57:21
**ridiculously** 26:8
26:17
**right** 11:17 12:8
13:16 17:6 18:19
19:16 21:7 22:4
33:8,11 44:20
51:17,19 57:18,22
58:5,6 59:18 60:5



**risks** 51:9 58:5
**road** 46:2
**role** 21:22 23:20
39:16 40:2 45:19
46:5 49:8 64:2
**rotisserie** 55:4
**rpr** 68:20
**rubber** 46:2
**rumor** 53:24
**run** 11:3





**ryan** 4:14

**s**

**s** 2:2 5:10,10
**sanctioned** 66:13
**sanctions** 66:5
**sasol** 1:9 4:9 6:21
6:24 11:20,22
13:18,23 14:2,7
15:24 22:4,19
23:10,15,24 27:9
29:15 30:10 31:13
31:20 32:6 38:4
45:8,15 46:24
47:5,18 50:4 52:7
56:13 63:3 64:15
67:5 69:3 70:3
**sasol's** 23:4
**saw** 31:24 67:2
**saying** 10:23 11:13
16:11 17:15 22:21
23:12 30:22 39:3
53:9 54:17 55:23
61:5

**[says - taken]**                                                       Page 11

**says**  20:11,12
  33:14,24 37:11
  38:6 41:16 59:13
**schedule**  14:6
  39:17 56:22
**schoeman**  1:10
**scope**  46:3
**second**  15:6 32:11
  32:22 33:10 37:7
  37:10,14,25 41:2
  43:19 53:21 59:12
**secondhand**  53:24
  54:2
**seconds**  65:7
**see**  18:17,21,22
  25:6 33:13,13,16
  33:18,19,23 34:2
  37:11,13,18,19,20
  41:12,16 51:5
  59:9,15
**seen**  54:5
**self**  28:2 31:6
  ▮▮▮▮▮▮▮
**sense**  51:8
**sent**  19:14 20:7
  41:11
**sentences**  37:22
**separation**  64:15
**september**  17:17
  18:6,21,25 19:13
  19:23 20:4
**set**  11:19 68:5
**setting**  12:2 44:2
  64:7
**seven**  10:17
**shane**  45:12 60:10
  61:9
**shapiro**  2:4
**shared**  55:12,20
  66:25

**shareholder**  14:7
**shareholders**  6:20
**sheet**  70:2 71:2
**shocking**  54:10
**shorthand**  68:3,7
**show**  36:6 37:4,5
  40:23
**showing**  37:9 41:8
**shows**  53:21
**signature**  68:18
**significant**  51:11
**signing**  42:7
**similarly**  1:6
**single**  38:10
**site**  46:6
**situated**  1:6
**six**  57:5
**skip**  37:21
**sobol**  2:4
**socialization**  66:20
  66:22
**socialized**  37:19
  65:16 66:14,16,24
  67:5
**solutions**  4:18
**somebody**  11:23
  26:10
**soon**  62:14
**sorry**  14:15 31:13
  33:17 34:22 35:8
  59:3
**source**  20:24
  49:19
**sources**  30:5
**south**  21:20 48:17
  49:25 50:5
**southern**  1:3 4:11
**spam**  19:24
**speak**  7:2,4,6,10
  8:15 10:9,12,14
  12:18 13:4 15:11

  29:3
**speaker**  5:4
**speaking**  28:23
**speaks**  31:8
**specific**  22:11,22
  22:25 23:7 27:18
  36:11 41:23 67:12
**specifically**  13:14
  54:17
**specifics**  32:20
  60:12
**speculate**  54:20
**spell**  15:7
**spent**  61:14
**spoke**  7:17 8:7,17
  8:18 9:24 11:16
  15:12 26:7 46:21
**spoken**  16:4 26:16
  26:21 56:3
**staff**  36:10
**stalked**  18:3
**standard**  64:6
**standing**  14:17
**standpoint**  20:20
  50:12
**state**  1:21 68:3
  69:9
**stated**  12:6 22:19
  49:13
**statement**  33:14
  39:2 41:25 44:11
  53:6 62:24
**statements**  15:17
  15:22 32:10,15
  34:8 35:2
**states**  1:2 4:10
**stay**  58:13
**steering**  48:22
**stephan**  1:10
**stephen**  1:10,18
  4:16 48:15 68:19

**stepping**  14:21
**steve**  48:7,11
**stop**  14:24
**stopped**  9:3
**strategy**  51:4,7,10
  51:14
**strike**  25:10 28:5,7
  31:25
**structure**  49:5
  50:2
**structures**  48:6
**studies**  66:24
**study**  53:23
**stuff**  26:23
**subject**  57:12
  64:14 71:17
**submitted**  40:20
**subpoena**  13:15
**subpoenaed**  13:7
  13:11,23 16:9,15
  16:23
**subscribed**  68:15
**subsequent**  17:24
**suggested**  30:10
**supply**  64:18
**supposedly**  53:23
**suppositions**  30:18
**sure**  32:23 43:7
  46:10 56:9,10
  65:13
**swear**  5:7
**sworn**  5:11 68:6

t

**tab**  18:12,13 19:10
  19:11 33:6,8 40:9
  58:24 59:4,6
**take**  18:15 19:9
  33:5,9 37:7 40:8
  61:6
**taken**  4:8 48:5
  68:4

**[takes - voicemail]**                                    Page 12

takes  66:4
talk  28:2 31:7
  38:21
talked  28:3
talking  37:16
  66:19
team  11:23 12:3
  14:10 33:2 50:8
  55:12,20 57:9
  65:24 66:6
teams  57:16
technip  27:12,25
  29:7,10 30:2,20
  32:16 34:4,9,19
  35:4,14,19 44:8,12
  44:24 67:4,6,9
tell  9:15 11:6 24:8
  36:2 44:23 45:3
  56:24 67:13
telling  52:18
tenure  55:15
  60:23
term  11:22 47:10
  53:15 66:14,16
terminology  22:13
terms  22:22 30:12
testified  5:13
testifying  68:6
testimony  65:19
  68:8
texas  22:4 56:13
text  18:10 19:4,14
  20:7,9,15,23
thank  36:19 65:9
  67:17
theirs  35:15
thing  32:21 55:7
  67:13
things  17:2 24:25
  29:24 39:25 55:8
  57:18 58:5,7,16,18

60:17
think  16:7 38:16
  52:21 54:11 57:20
  60:22 63:16
third  53:23
thomas  31:11
thought  17:5
  34:16 60:21
three  16:25
tie  44:5
time  4:19 5:6 6:5
  8:7,19 9:17 13:4
  29:18 31:20,23,23
  32:14 38:24 39:3
  41:25 44:4,5
  47:17 48:16 51:3
  54:23 60:15 61:14
  63:3 65:16 66:8
  68:4
timeline  50:10
timing  14:25
timothy  51:25
title  45:16 52:9
today  49:13
today's  4:4
told  6:17 11:5,10
  15:15 16:13,18,21
  21:18,23 23:14
  26:6,15 27:8,19,24
  30:6 35:9,18
  36:10,20 38:14
  39:21 46:24 52:10
  52:24 53:17 54:8
  55:10,18,19 56:11
  57:2 58:12 59:20
  63:9,12,23 65:14
tooth  16:14
top  59:12 66:9
topics  22:7
total  22:12

touch  57:14
traced  41:17,19
tracked  50:12
tracking  50:13
trade  64:3
transcribed  68:7
transcribing  34:23
transcript  11:2
  68:8,9,11 71:18,21
transcription
  70:10
transparency
  61:19
travel  56:22
tried  18:2
trip  50:5
trouble  37:15
true  14:5 26:12
  33:14,24 35:10,13
  35:19 46:4 47:17
  51:8 54:11 68:8
  69:10 71:19,22
try  39:7 54:19
  57:21
trying  26:3 28:9
  31:6,14 51:8
  63:18
turn  36:13 58:23
  59:3,7
turnover  55:9
two  36:7 57:10

**u**

u  5:10
u.s.  21:20
ultimate  24:5,9,20
  49:2,6
ultimately  54:9
um  41:18
uncertainty  57:25
  60:3

undersigned  68:2
understanding
  6:22 11:24 23:7
  27:17 47:16,18
  48:9,24 57:16
understood  9:20
  33:23 36:3 44:16
  44:16,17 46:14
  63:22
unit  4:6
united  1:2 4:10
upcoming  9:4
update  20:16
updated  62:8,13
updates  49:25
upwards  57:25
urged  62:4
use  22:13 36:25
  55:5
uttered  53:7

**v**

v  1:8 69:3 70:3
validated  27:13
  29:23 58:4
vendors  51:15
  52:16
verbatim  42:4
veritext  4:17
versus  4:9 29:22
victor  1:10
video  4:6
videographer  4:2
  4:15 5:6 65:2,5,13
  67:20
videotaped  1:16
virtual  4:14
voicemail  17:18
  18:7,9 19:2,7

**[walk - zoom]**

| w |
|---|

**walk** 38:24
**walked** 42:9
**want** 10:14 14:2 16:11 17:3 18:15 21:16 23:21 24:23 34:14 36:16 41:6 41:9,14 42:10 45:5 51:15,18 60:4 63:20
**wanted** 8:11 10:4 11:19 59:16 61:19
**way** 17:22 30:13 48:15 54:4 57:8
**weekly** 30:7,9 56:20
**weil** 2:11 4:24 5:5 40:15,18 41:6 64:9,16
**went** 42:22,23 50:22 51:9
**westney** 27:12 29:15,19 30:3 34:5 35:15 45:4 58:4,11 59:21 67:6
**whatsoever** 13:13 13:25 61:24 63:21
**whereof** 68:14
**willing** 10:24
**wishes** 31:22 39:11
**witness** 1:17 2:13 4:25 5:8,11 12:14 14:20 19:20 25:17 25:20 29:2 40:23 46:16 68:14 70:4
**witnesses** 26:7,16 68:5
**word** 33:22,22 38:8,8

**words** 13:21 17:4 17:13 23:13 24:18 24:23 28:9 34:18 39:10 63:17
**work** 48:20 62:19
**worked** 21:19,24 45:22 62:17
**working** 50:14
**works** 57:8
**worse** 57:19
**write** 31:16 41:19
**written** 20:19
**wrong** 54:21 57:18 65:20

| x |
|---|

**x** 1:4,13 68:11

| y |
|---|

**yeah** 14:10 23:20 32:20 33:21 34:16 42:8 44:19 47:20
**york** 1:3,21 2:15 2:15 4:11 68:3 69:9

| z |
|---|

**zalka** 2:23
**zoom** 4:14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.