# EXHIBIT 30

## (Unredacted Version Filed Under Seal)

**From:** "Lucas Gilmore" <lucasg@hbsslaw.com>
**To:** "fschirripa@hrsclaw.com" <fschirripa@hrsclaw.com>
**Subject:** Sasol - ██████
**Date:** Thu, 5 Nov 2020 01:19:58 +0000
**Importance:** Normal
**Attachments:** 2020-11-05_Declaration_of_███████████docx; 2020-11-05_Declaration_of_██████████(1368006.1).pdf

_____

**Lucas Gilmore** | Senior Counsel
**Hagens Berman Sobol Shapiro LLP**
715 Hearst Avenue, Suite 202, Berkeley, CA 94710
Direct: (510)725-3052
LucasG@hbsslaw.com | www.hbsslaw.com

Firm News | Cases | Twitter | Facebook

Hagens Berman Logo

Named 2018 Titan of the Plaintiffs' Bar by _Law360_ and received the Plaintiffs' Trailblazer Award in 2017 from _The National Law Journal_

HIGHLY CONFIDENTIAL                                          PLAINTIFFS004357

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHAD LINDSEY MOSHELL, Individually
and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

SASOL LIMITED, DAVID EDWARD
CONSTABLE, BONGANI NQWABABA,
STEPHEN CORNELL, PAUL VICTOR,
and STEPHAN SCHOEMAN,

Defendants.

Case No. 1:20-cv-01008-JCP

Hon. John Peter Cronan

**DECLARATION OF** ▮▮▮▮▮▮▮▮

---

I, ▮▮▮▮▮▮▮, hereby declare as follows:

1.    I worked for Sasol as the ▮▮▮▮▮▮▮▮▮▮ responsible for the Lake Charles Chemical Plant's ("LCCP") ethylene cracker unit in Lake Charles, Louisiana, from approximately October 2014 to October 2015.  I was based at ▮▮▮▮▮▮▮▮▮▮, a two-hour drive west of the LCCP, but I was very frequently on site at the core ethane cracker and its six downstream chemical units.

2.    On May 4, 2020, I spoke by telephone with a private investigator named Lynnley Browning.  Ms. Browning told me that she was hired by attorneys who were prosecuting securities fraud claims on behalf of a class of investors against Sasol and certain of its senior executives. Ms. Browning asked me if I could answer some questions about my experience at Sasol to assist the attorneys with their litigation, and I agreed to do so.  Before proceeding with the interview, Ms. Browning told me not to disclose any confidential or privileged information I learned during my tenure at Sasol.  I then participated in an interview with Ms. Browning.  Thereafter, I participated in follow up interviews with Ms. Browning on May 12, 2020, and again with Ms. Browning and

- 1 -

010886-11/1368006 V1

HIGHLY CONFIDENTIAL                                                PLAINTIFFS004358

attorney Jerrod C. Patterson on June 1, 2020.  At no time was I told during these interviews that

my comments would remain confidential.

3.        I have had the opportunity to review the statements attributed to me in the Second

Amended Complaint.  Specifically, I understand that the following statements have been attributed

to me:

> 78. . . . A Fluor contractor who started before the Class Period and left in October
> 2015, CW-3, worked in Houston and on-site at the LCCP. CW-3's role was to
> commission, or start up, the ethane cracker. CW-3's responsibilities included working on
> the procedures and processes to get every operational component of the plant up and
> running in terms of performance, reliability, safety, and information reporting. CW-3
> stated that Sasol's senior management was trying to "fast track" the project at the expense
> of safety amid persistent rumors of cost overruns. In addition, two Commissioners who
> oversaw the project at the time (Nadine Kruger and Oscar A. Febres Cordero) lacked the
> experience to supervise the project. Mr. Cordero in particular represented that he was an
> "engineer," when in fact he was not.  Mr. Cordero had no experience commissioning a
> project, and had a "phony resume." Overall, CW-3 stated that Kruger and Cordero were
> "amateurs."

> 79. . . . CW-3 stated that CW-3 was brought into the mega-project "way too early. I
> almost had a full team there, and it was at least two years before start up." According to
> CW-3, typically commissioners are brought into the project when construction is 70%
> complete. But for LCCP, CW-3 and CW-3's team were brought in before Sasol had even
> broken ground on the project: "They were trying to fast track everything, but it doesn't
> work like that. It was way too early for me to be there." For example, part of
> commissioning involving cleaning compressors and pumps, drying out the load catalyst
> and reviewing engineering drawings. But CW-3 could not complete those tasks because
> "there was nothing to commission." Part of the problem was that, even as they sought to
> fast-track the project, Sasol's management kept changing its mind about how to do it.
> First, management wanted to do a traditional "stick build" of the plant, then switched to a
> "modular build" approach.

> 80.  CW-3 provided the following example of mismanagement. Cordero and Kruger
> wanted to "flush out" modules in China, then ship them back to Lake Charles for
> assembly and installation. But "that's crazy; you can't do that," according to CW-3,
> because the modules would just corrode again once placed in the hull of a ship.

> 81.  More broadly, CW-3 said that, starting at least in June or July of 2015, there were
> widespread rumors that the $8.9 billion cost estimate was unrealistic, and at that time
> senior management knew that they were not going to make that budget. Similar to CW-
> 2's observations, CW-3 stated that Fluor/Technip "didn't care about streamlining" project
> costs because they operated on a reimbursable contract under which they were paid
> regardless of whether they worked or not. According to CW-3, "[e]veryone knew they

- 2 -

010886-11/1368006 V1

HIGHLY CONFIDENTIAL

PLAINTIFFS004359

didn't do anything but were billing hours to the company." CW-3 said Cordero in particular was intent on bringing on as many people as possible on Sasol's payroll, even as CW-3 and CW-3's team was able to do the work.

82.  CW-3 also provided an example of what CW-3 described as dangerous engineering. CW-3 delivered a presentation to Cordero and Kruger on the "dangerous flaws" in the plant's water cooling system. CW-3 contended that there was not an effective means to circulate fluid through the large pumps needed for the project, but Cordero and Kruger "totally missed the whole point" and did not see the need for the changes CW-3 was proposing. CW-3 also opposed Cordero and Kruger's idea to install a 72-inch line in a water cooling unit with a butterfly valve, which would have required a worker to go down a concrete box with 135,000 gallons of water running through it a minute. CW-3 stated the worker "would have needed a scuba outfit" and that "the way they were designing stuff wasn't right; it was dangerous, you know."

83.  CW-3 decided to write a letter to Cordero's boss, Richard Brink, Sasol's VP of Commissioning and Operations Readiness for LCCP that Cordero was "incompetent and dangerous." CW-3 was fired a week later. According to Cordero's LinkedIn page, in contrast Cordero remained as Sasol until July 2019. From CW-3's perspective, "It was a terrible project. I was happy to get out of there. I didn't think it was safe. It was poorly managed."

4.    These allegations accurately reflect the substance of my statements made during the above-referenced interviews.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed in ███████████████, on November 5, 2020.

- 3 -

010886-11/1368006 V1

HIGHLY CONFIDENTIAL                                                    PLAINTIFFS004360