UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHAD LINDSEY MOSHELL, Individually and On Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br>v.<br><br>SASOL LIMITED, DAVID EDWARD CONSTABLE, BONGANI NQWABABA, STEPHEN CORNELL, PAUL VICTOR, and STEPHAN SCHOEMAN,<br><br>     Defendants. | Case No. 1:20-cv-01008-JPC<br><br>Hon. John P. Cronan<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR RECONSIDERATION OF THE COURT'S AUGUST 24, 2020 MEMORANDUM ORDER; MOTION FOR SANCTIONS; AND MOTION FOR STAY OF DISCOVERY** |

010886-11/1427005 V1

**TABLE OF CONTENTS**

**Page**

I.    PRELMINARY STATEMENT.................................................................................1

II.   LEGAL BACKGROUND .......................................................................................6

      A.    Confidential witnesses have become a staple of securities
            litigation. ..............................................................................................6

      B.    Confidential witnesses frequently recant their initial accounts after
            being identified to defendants. ..............................................................6

      C.    Courts repeatedly reject attempts to impose sanctions or reconsider
            motion to dismiss rulings based on "recanting" statements
            procured by defendants' counsel. ..........................................................7

III.  STATEMENT OF FACTS .......................................................................................8

      A.    Background. ...........................................................................................8

      B.    Hagens Berman conducted a thorough and rigorous investigation. .......8

      C.    The Confidential Witnesses and their accounts. ....................................9

      D.    Relevant procedural history. ................................................................14

IV.   THE EVIDENCE OBTAINED TO DATE RAISES SERIOUS
      CREDIBILITY ISSUES CONCERNING THE RECANTING CW**S'**
      TESTIMONY .......................................................................................................16

      A.    The investigator's contemporaneous notes and investigation
            memoranda are consistent with each other and with the allegations
            of the Complaint. .................................................................................16

      B.    The three CWs not represented by Defendants' counsel confirmed
            the accuracy of the Complaint's allegations. .......................................18

      C.    The three Recanting CWs made demonstrably untrue
            representations and material omissions in their affidavits,
            undermining the remainder of their testimony......................................20

      D.    The three Recanting CWs testified to the truth of key portions of
            Browning's investigation memoranda, including details not
            included in the Complaint.....................................................................22

      E.    The three Recanting CWs felt pressured to repudiate the
            allegations attributed to them...............................................................25

010886-11/1427005 V1

V.    HAGENS BERMAN'S POST-FILING INVESTIGATION FURTHER
      VALIDATES THE COMPLAINT'S ALLEGATIONS....................................................26

VI.   ARGUMENT..............................................................................................................27

      A.    Defendants' motion for reconsideration has no merit...........................................27

            1.    The Recanting CWs' testimony raises, at most, credibility
                  issues that cannot be resolved at this stage. .............................................27

            2.    Even if the Court were to credit the recanted statements,
                  this "new evidence" would not alter the reasoning or the
                  result reached by Judge Rakoff in denying in part
                  Defendants' motion to dismiss...................................................................31

      B.    Defendants violated Rule 11(c)(2)'s safe harbor provision. ...............................33

      C.    Plaintiffs undertook an "inquiry reasonable under the
            circumstances." .....................................................................................................34

            1.    Lead Counsel conducted an in-depth, thorough
                  investigation. ..............................................................................................34

            2.    Recanted witness statements do not support Rule 11
                  sanctions......................................................................................................36

            3.    Lead Counsel were entitled to rely on their investigator. ...........................37

      D.    Plaintiffs' attorneys did not violate their duty of candor to the
            Court – Not Even Close. .......................................................................................39

      E.    Even if dismissal were appropriate, Plaintiffs should be entitled to
            amend.....................................................................................................................40

VII.  CONCLUSION.........................................................................................................40

010886-11/1427005 V1

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*In re Applied Micro Circuits Corp. Sec. Litig.*,
  2002 WL 34716875 (S.D. Cal. Oct. 4, 2002) ...................................................................7, 28

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  579 F.3d 143 (2d Cir. 2009)...................................................................................................34

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
  851 F. Supp. 2d 1299 (S.D. Fla. 2011) ..........................................................................7, 28, 37

*In re BofI Holding Inc., Sec. Litig.*,
  2016 WL 5390533 (S.D. Cal. Sept. 27, 2016)...........................................................................6

*Campo v. Sears Holdings Corp.*,
  371 F. App'x 212 (2d Cir. 2010) .............................................................................4, 29, 30, 31

*Campo v. Sears Holdings Corp.*,
  635 F. Supp. 2d 323 (S.D.N.Y. 2009)....................................................................................30

*City of Livonia Employees' Ret. Sys. v. Boeing Co.*,
  2011 WL 824604 (N.D. Ill. Mar. 7, 2011), *aff'd in part, vacated in part sub
  nom. City of Livonia Emps.' Ret. Sys. v. Boeing Co.*, 711 F.3d 754 (7th Cir.
  2013) ......................................................................................................................29, 30, 31, 38

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
  952 F. Supp. 2d 633 (S.D.N.Y. 2013).............................................................................. *passim*

*Dep't of the Treasury of N.J. v. Cliffs Nat. Res.*,
  2015 WL 6870110 (N.D. Ohio Nov. 6, 2015).............................................................7, 28, 39

*In re Dynex Capital, Inc. Sec. Litig.*,
  2011 WL 2581755 (S.D.N.Y. Apr. 29, 2011).......................................................16, 28, 36, 40

*ESI, Inc. v. Coastal Corp.*,
  61 F. Supp. 2d 35 (S.D.N.Y. 1999)........................................................................................33

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
  2013 WL 1896934 (S.D.N.Y. May 7, 2013) ............................................................................6

*Fort Worth Emps.' Ret. Fund v. J. P. Morgan Chase*,
  301 F.R.D. 116 (S. D. N. Y. 2014) ...........................................................................................7

010886-11/1427005 V1

*In re Genworth Fin., Inc. Sec. Litig.*,
  2016 WL 858679 (S.D.N.Y. Mar. 3, 2016) ...........................................................................4, 7

*Gilpin v. Phillip Morris Int'l*,
  2002 WL 1461433 (S.D.N.Y. July 8, 2002) ...............................................................................40

*Hadges v. Yonkers Racing Corp.*,
  48 F.3d 1320 (2d Cir. 1995)........................................................................................................33

*Hatamian v. Advanced Micro Devices, Inc.*,
  2015 WL 511175 (N.D. Cal. Feb. 6, 2015) ..................................................................................7

*Homkow v. Musika Records, Inc.*,
  2009 WL 721732 (S.D.N.Y. Mar. 18, 2009) ..............................................................................33

*In re JDS Uniphase Corp. Sec. Litig.*,
  2008 WL 753758 (N.D. Cal. Mar. 19, 2008)........................................................................36, 37

*Manchester Mgmt. Co., LLC v. Echo Therapeutics, Inc.*,
  297 F. Supp. 3d 451 (S.D.N.Y. 2018).........................................................................................34

*McClellan v. Smith*,
  439 F.3d 137 (2d Cir. 2006)...........................................................................................................4

*In re Millennial Media, Inc. Securities Litigation*,
  2015 WL 3443918 (S.D.N.Y. May 29, 2015) .......................................................................38, 39

*Moshell v. Sasol Ltd.*,
  2020 WL 2115410 (S.D.N.Y. May 4, 2020) .................................................................................1

*Moshell v. Sasol Ltd.*,
  2020 WL 4931997 (S.D.N.Y. Aug. 24, 2020)...................................................................... *passim*

*In re Netbank, Inc. Sec. Litig.*,
  2009 WL 2432359 (N.D. Ga. Jan. 29, 2009)...............................................................................28

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)...........................................................................................................6

*In re Pennie & Edmonds LLP*,
  323 F.3d 86 (2d Cir. 2003)..........................................................................................................33

*In re Pfizer Inc. Sec. Litig.*,
  2012 WL 983554 (S.D.N.Y. Mar. 22, 2012) .........................................................................2, 7, 16, 28

*Safe-Strap Co. v. Koala Corp.*,
  270 F. Supp. 2d 407 (S.D.N.Y. 2003)..........................................................................................34

010886-11/1427005 V1

*In re SLM Corp. Sec. Litig.*,
2011 WL 611854 (S.D.N.Y. Feb. 15, 2011)..................................................................6

*In re Sony Corp.*,
268 F.R.D. 509 (S.D.N.Y. 2010) ...............................................................................37

*Star Mark Mgmt., Inc. v. Koon Chun Hing Keey Soy & Sauce Factory, Ltd.*,
682 F.3d 170 (2nd Cir. 2012)....................................................................................33

*Union Asset Mgmt. Holding AG v. Sandisk LLC*,
227 F. Supp. 3d 1098 (N.D. Cal. 2017) .......................................................................7

*Univ. v. Consulting Serv. Group, L.P.*,
48 F. Supp. 2d 765 (N.D. Ill. 1999) ..........................................................................36

*In re Veeco Instruments, Inc. Sec. Litig.*,
2007 WL 274800 (S.D.N.Y. Jan. 29, 2007) ................................................................6

*Wu Grp. v. Synopsys, Inc.*,
2005 WL 1926626 (N.D. Cal. Aug. 10, 2005) ...........................................................36

010886-11/1427005 V1

**GLOSSARY OF DEFINED TERMS**

| Term | Definition |
|---|---|
| ███████ Dep. | Deposition testimony of Paul ███████ ECF No. 115-1. |
| CWs | Confidential Witnesses. |
| Class Period | March 10, 2015 to January 13, 2020, inclusive. |
| ███████ Dep. | Deposition testimony of ███████ ECF No. 115-6. |
| Complaint | The Amended Complaint for Violations of Federal Securities Laws (ECF No. 59) and Second Amended Complaint for Violations of the Federal Securities Law (ECF No. 81), collectively. |
| Defendants | Sasol Limited ("Sasol"), David Edward Constable ("Constable"), Bognani Nqwababa (Nqwababa"), Stephen Cornell ("Cornell"), Paul Victor ("Victor"), and Stephan Schoeman ("Schoemann"), collectively. |
| Ex. or Exs. | All references herein to "Ex." or "Exs." are to the exhibits attached to the Gilmore Declaration, unless otherwise indicated. |
| ███████ Dep. | Deposition testimony of ███████ ECF No. 115-5. |
| Gilmore Decl. | Declaration of Lucas E. Gilmore, filed concurrently herewith. |
| ███████ Dep. | Deposition testimony of ███████ ECF No. 115-3. |
| Hagens Berman or the Firm | Hagens Berman Sobol Shapiro LLP. |
| LCCP | The ethane cracker and derivatives complex in Louisiana known as the Lake Charles Chemicals Project. |
| ███████ Dep. | Deposition testimony of ███████, ECF No. 115-2. |
| Plaintiffs | Lead Plaintiff David Cohn and Additional Representative Plaintiff Chad L. Moshell, collectively. |
| "¶" | All references herein to "¶" are to the Lynnley Browning Declaration (Exhibit 1), unless otherwise indicated. |
| ███████ Dep. | Deposition testimony of ███████ ECF No. 115-4. |
| Supp. Mem. | Supplemental Memorandum of Law and Report of Investigation in Support of Defendants' Motion for Reconsideration of the Court's August 24, 2020 Memorandum Order and Motion for Sanctions, ECF No. 114. |

- vi -

## I.    PRELMINARY STATEMENT

Defendants' motions and baseless attacks on Plaintiffs' attorneys are a continuation of their well-documented efforts to suppress evidence of their fraud at the LCCP. To believe the story Defendants peddle—that the CWs told Plaintiffs' investigator of no wrongdoing and that the LCCP consistently remained on time and on budget—Defendants first ask the Court to ignore reality. Throughout the Class Period, Sasol repeatedly announced massive cost and schedule overruns, coupled with assurances that the Company would stick to the new schedule and budget, only to disclose more cost and schedule overruns. This pattern of misstatements became so pronounced that Sasol's Board commissioned an external audit and concluded that the cause of these false LCCP cost and schedule forecasts was the "inappropriate," "not transparent" conduct of Sasol's most senior management. ECF No. 81 ¶ 116.

Defendants then urge the Court to believe that Plaintiffs' counsel, a leading class action law firm: (i) plotted to commit a fraud on the Court; (ii) conspired with a respected private investigations firm; and (iii) generated false notes, memoranda, and emails documenting the CW interviews. Defendants' story of collusion is preposterous, and their attempt to tarnish Plaintiffs' counsel's reputation should be summarily rejected.[1]

Defendants' defamatory filing follows a familiar pattern: viciously attack anyone who dares to expose their fraud. Indeed, the evidence of Defendants' wrongdoing—even at this early

---

[1] Hagens Berman has received praise from numerous judges in this District. *See, e.g.*, *In re Elec. Books Antitrust Litig.*, No. 11-md-02293, ECF No. 474 at 2 (S.D.N.Y. Dec. 9, 2013) (Cote, J.) ("Class Counsel have conducted the action and achieved settlements with skill, perseverance and diligent advocacy on behalf of the Plaintiffs and the Settlement Classes as a whole."); *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-mc-02543, ECF No. 427 at 7 (S.D.N.Y. Dec. 18, 2020) (Furman, J.) ("The Court observes that the quality of Class Counsel's representation of the Class was consistently high[.]"). The Court recognized the Firm's track record of success in appointing it Lead Counsel. *Moshell v. Sasol Ltd.*, 2020 WL 2115410, at *3 (S.D.N.Y. May 4, 2020) (Rakoff, J.).

- 1 -

stage—is compelling. It begins with the results of the Independent Review that Sasol's Board released in October 2019—after the Company announced that LCCP's once $8 billion budget would reach as high as $12.9 billion. ECF No. 81 ¶¶ 116, 214. The Independent Review exposed a top-down effort at Sasol to defraud investors. *Id.* The external audit revealed "errors, omissions, and inaccuracies in the LCCP cost estimate," "inappropriate conduct and an improper tone at the top of the LCCP, including an excessive focus on maintaining cost and schedule estimates at the expense of providing accurate cost and schedule estimation to oversight bodies," and "[i]nadequate procedures to ensure that internal ethics complaints as to the LCCP were escalated appropriately." *Id.* In response, Sasol fired virtually all of the LCCP's executive leadership. *Id.* The Court found these allegations sufficient to raise a strong inference of scienter in its order on motion to dismiss. MTD Order at *5.[2] Since then, Plaintiffs have uncovered additional supporting evidence, which Plaintiffs will submit to the jury at trial.[3]

To foreclose presentation of this evidence, Defendants move the Court to reconsider the MTD Order and impose terminating sanctions. Defendants offer a single argument for this extraordinary relief: three of the six CWs cited in the Complaint now purport to disclaim, via affidavits (drafted by Defendants' counsel) and deposition testimony, some of the allegations attributed to them. But even if the Court were to consider this extrinsic evidence at the pleading stage, their testimony does not change the reasoning or result of the MTD Order.[4] The Court found sufficient particularized allegations of scienter in the complaint, apart from the CW

---

[2] *See Moshell v. Sasol Ltd.*, 2020 WL 4931997 (S.D.N.Y. Aug. 24, 2020) ("MTD Order").

[3] *See, e.g.*, Exs. 6, 39–42.

[4] *See In re Pfizer Inc. Sec. Litig.*, 2012 WL 983554, *5 (S.D.N.Y. Mar. 22, 2012) (denying reconsideration based on recanting CW declarations, holding that court cannot consider extrinsic evidence in ruling on renewed 12(b)(6) motion and that such evidence did not show a fraud on the court).

- 2 -

statements; namely, the Independent Review, the Board's remediation plan, and the executive departures. MTD Order at *5. None of these facts depend on the CWs' statements. *Id.*

In addition, the three most prominently featured CWs—CW-1, CW-3, and CW-6—have each declared that the Complaint's allegations "accurately reflect the substance of [their] statements made during the[ir] interviews." Ex. 3 ¶ 4; Ex. 4 ¶ 4; Ex. 5 ¶ 4. These witnesses confirmed the same at their depositions. ▮▮▮▮ Dep. at 34:15–35:17; ▮▮▮▮ Dep. at 54:8–56:3; ▮▮▮▮ Dep. at 15:1–16:21. Defendants' charge that CW-1 has disavowed his account about the Fluor $11.7 billion Change Order mischaracterizes the Complaint's allegations and CW-1's testimony. The Complaint does not allege CW-1 as saying that Sasol is bound every time Fluor issues a change order. Rather, CW-1 states that—given the publicly approved plans for the LCCP; the nature of the EPC Contract, which pays Fluor on a time and materials basis; the limited progress and costs already incurred at the LCCP by that time; and the amount of remaining work to be done—Defendants had no practical basis for negotiating down Fluor's costs, which alone exceeded the total publicly disclosed $8.9 billion budget by 30%. ECF No. 81 ¶¶ 65–68, 72–73; *see also* ▮▮▮▮ Dep. at 20:12–21:18, 23:7–26:7. Thus, as the MTD Order found, Defendants knew that their publicly stated estimate for the LCCP was "entirely unrealistic." MTD Order at *2. Defendants have cherry-picked portions of CW-1's testimony in an effort to gin up a fake controversy, as CW-1 has now repeatedly explained the basis for his statements in the context of Fluor's issuance of Change Orders. *See* ¶¶ 42–43.

Similarly, the three CWs who are partially recanting (the "Recanting CWs") each confirmed that the Complaint accurately describes important information, including their respective job titles, tenures, and responsibilities, and that "a person in the position occupied by the source would possess the information alleged." MTD Order at *4; *see also* ▮▮▮▮ Dep. at

- 3 -

26:13–33:12; ▊▊▊▊ Dep. at 47:19–50:15; ▊▊▊▊ Dep. at 21:16–22:17. The Recanting CWs also affirmed or did not deny key factual allegations credited to them in the Complaint and relied on in the MTD Order. And the limited factual allegations these three witnesses—represented by Defendants' counsel—now repudiate are belied by the public record and easily explained by the pressures on them to recant.[5]

Despite the Recanting Witnesses' serious credibility issues, Defendants ask the Court to *assume* the truth of the Recanting CWs' affidavits and testimony, and to *assume* the falsity of the Recanting CWs' information in the Complaint, provided at a time when the CWs' identities were confidential and had no incentive to lie. But as Defendants' own authorities make clear, the Court cannot choose whose version is the truth on this record.[6] This determination requires credibility assessments, choices between conflicting versions of the events, and the weighing of evidence—matters for the jury to decide at trial.[7] Consequently, the reconsideration motion fails.

Defendants' request for terminating sanctions is similarly dead on arrival. While repeatedly asserting that the CW allegations were fabricated, Defendants disregard that the CW allegations mirror Plaintiffs' investigator's memoranda prepared from notes taken contemporaneously with her interviews of the CWs. Exs. 10, 11, 13, 15, 18, 20, 21, 23, 25, 27, 29, 31, 35. Indeed, after reviewing the record, Professor Michael J. Kaufman, a leading authority

---

[5] *See City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 952 F. Supp. 2d 633, 636 (S.D.N.Y. 2013) (recognizing CWs changed their accounts because of financial and other pressures former employer had brought to bear upon them); *In re Genworth Fin., Inc. Sec. Litig.*, 2016 WL 858679, at *1 (S.D.N.Y. Mar. 3, 2016) (denying reconsideration motion based on recanting CWs' testimony since they would not change the result of the motion to dismiss order).

[6] *See Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 216 n.4 (2d Cir. 2010) ("The court made no credibility determinations, nor did it weigh competing testimony.").

[7] *See McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) ("It is a settled rule that *credibility assessments*, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury.") (emphasis added) (quotation marks and citation omitted).

- 4 -

on confidential witness interview practices, opines that "Plaintiffs' partial reliance on confidential witnesses to corroborate allegations in the complaint in this case is consistent with professional standards and customary practices in litigation governed by the PSLRA" and "Federal Rule of Civil Procedure 11." Ex. 2 at 6. And, as discussed below, Plaintiffs' investigation has yielded new witnesses and documents validating Plaintiffs' allegations. So even if the Court were to find dismissal warranted, Plaintiffs and the Class should be granted leave to amend to ensure protection of their "due process rights." *See, e.g.*, Exs. 6, 39–42.

Indeed, it is Defendants' counsel who has engaged in misconduct. In their zeal to serve Defendants, they filed demonstrably false affidavits from the Recanting CWs. Defendants' counsel also repeatedly misrepresent the record and make frivolous arguments. Ex. 38 (chart summarizing Defendants' counsel's misrepresentations). As one of the best examples of Defendants' don't-believe-your-own-eyes arguments, they claim that CW-4's text demanding ███ from Plaintiffs' investigator to continue cooperating was simply an effort to "stop the PI's repeated, harassing contact." Supp. Mem. at 12. The text makes clear that CW-4 made this demand because, in his words, ████████████████████████ and ████████████████████████ ███████████████ Ex. 26 (text messages between Browning and ██████ on May 14, 2020). The notion that CW-4 is simply trying to make the PI go away is not just spin—it is pure fiction. And Defendants *doubled down* on this ridiculous story as it scrambled to keep this embarrassing text under seal. ECF No. 124 at 1. Finally, Defendants' counsel flouted Rule 11's safe harbor requirement by filing their sanctions motion with the Court without prior notice. This violation was not a technical error; it was a calculated attempt to tarnish Plaintiffs' counsel's reputation prior to appearing before a newly-assigned judge.

- 5 -

In sum, Defendants' motions should be denied, and Plaintiffs respectfully request that the Court promptly lift the stay of discovery.

## II.    LEGAL BACKGROUND

### A.    Confidential witnesses have become a staple of securities litigation.

Securities fraud plaintiffs often rely on accounts from insiders to establish scienter.[8] Recognizing the risk of retaliation, the Second Circuit has endorsed the practice of identifying these sources anonymously. *See Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). CWs have played a critical role in protecting investors from corporate misconduct and promoting the integrity of financial markets.[9]

### B.    Confidential witnesses frequently recant their initial accounts after being identified to defendants.

As in this case, defendants almost always seek discovery of CWs to test whether they will confirm the information attributed to them. Many courts have barred such discovery as contrary to public policy and the attorney work product doctrine.[10] Other courts, however, have ordered disclosure of their identities.[11] If the CWs' identities are disclosed, a common tactic by defense counsel is to urge the CWs to recant their alleged statements in an affidavit. Experts, including Prof. Kaufman, have recognized that CWs often falsely "recant," denying their truthful initial account out of fear of retaliation or pressure.[12] Many courts have agreed, viewing recanting

---

[8] *See, e.g.*, *In re BofI Holding Inc., Sec. Litig.*, 2016 WL 5390533, at *16, *30–31 (S.D. Cal. Sept. 27, 2016) ("[C]onfidential witnesses have become a staple of securities litigation.").

[9] Several of the largest securities class action recoveries relied on CW accounts. *See, e.g.*, *In re Tyco Int'l Ltd., Sec., Derivative & "ERISA" Litig.*, No. 02-cv-00266, ECF No. 71 (D.N.H.); *In re Nortel Networks Corp. Sec. Litig.*, No. 01-cv-01855, ECF No. 26 (S.D.NY.).

[10] *See, e.g.*, *In re SLM Corp. Sec. Litig.*, 2011 WL 611854, at *1 (S.D.N.Y. Feb. 15, 2011); *In re Veeco Instruments, Inc. Sec. Litig.*, 2007 WL 274800, at *1 (S.D.N.Y. Jan. 29, 2007).

[11] *See, e.g.*, *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 2013 WL 1896934, at *1 (S.D.N.Y. May 7, 2013).

[12] Ex. 2 at 34–35.

- 6 -

witness testimony with skepticism.[13]

**C.    Courts repeatedly reject attempts to impose sanctions or reconsider motion to dismiss rulings based on "recanting" statements procured by defendants' counsel.**

Here, Defendants present the Recanting Witnesses' affidavits and testimony as unimpeachable proof that certain statements attributed to them are false. But that misstates the law. Courts have repeatedly rejected attempts to discredit well-pled CW allegations through recanting witness testimony. *See Pfizer*, 2012 WL 983554, at *4; *Genworth*, 2016 WL 858679, at *1. These courts have held that "it would clearly be inappropriate for the [c]ourt to simply treat the [former employee's] declaration as true," as "*it might be false, because the witness feels intimidated by the defendants*." *Union Asset Mgmt. Holding AG v. Sandisk LLC*, 227 F. Supp. 3d 1098, 1099 (N.D. Cal. 2017) (emphasis added). Determining which version of the witness's account is true "boils down to an issue of credibility to be determined by a trier of fact."[14] Courts similarly do not impose sanctions simply because the CW's testimony is at odds with what the witness previously stated to plaintiff's investigator and relied on by counsel in drafting the complaint.[15] The Court should follow the same tact here.

---

[13] *See, e.g.*, *Lockheed Martin*, 952 F. Supp. 2d at 637–38 (CWs often are "pressured into denying outright statements they had actually made"); *see also Fort Worth Emps.' Ret. Fund v. J. P. Morgan Chase*, 301 F.R.D. 116 (S.D.N.Y. 2014).

[14] *In re Applied Micro Circuits Corp. Sec. Litig.*, 2002 WL 34716875, at *11 (S.D. Cal. Oct. 4, 2002); *see also Dep't of the Treasury of N.J. v. Cliffs Nat. Res.*, 2015 WL 6870110, at *4–5 (N.D. Ohio Nov. 6, 2015) ("[T]he issues of fact and credibility raised by [d]efendants' witness declarations *cannot be determined at the pleading stage*.") (emphasis added); *Hatamian v. Advanced Micro Devices, Inc.*, 2015 WL 511175, at *2 (N.D. Cal. Feb. 6, 2015).

[15] *See, e.g.*, *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 851 F. Supp. 2d 1299, 1311 (S.D. Fla. 2011).

### III.    STATEMENT OF FACTS

**A.    Background.**

Throughout the Class Period, Defendants misrepresented the cost and timeline for the LCCP's construction. Sasol consistently claimed the LCCP was progressing "on track." In truth, Defendants knew that the LCCP's true cost exceeded their public statements. Defendants also knew that the disclosed schedule was false in light of massive delays, labor inefficiencies, and serious safety violations. Investors suffered losses when Sasol ultimately disclosed that: (i) the LCCP's true cost was nearly $13 billion (or 60% greater than initially disclosed); (ii) beneficial operation at the LCCP would not occur until years after Sasol promised; (iii) according to Sasol's Board's independent review of the LCCP, "errors, omissions, and inaccuracies in the project cost estimate" stemmed from "inadequate control procedures," "inappropriate conduct," and "an improper tone at the top"; (iv) a multitude of Sasol senior executives, including three of the Individual Defendants, were forced to leave; and (v) safety violations and risks materialized with a devastating explosion at the LCCP.

**B.    Hagens Berman conducted a thorough and rigorous investigation.**

After the Court appointed Hagens Berman as Lead Counsel, the Firm retained On Point Investigations, a well-known investigative firm, to assist in its investigation. *See* ¶ 12. Lynnley Browning, a Princeton-educated, renowned journalist, acted as the lead investigator. ¶¶ 2–10. On Point's Founder and President, Christopher Szechenyi, supervised Browning's work. ¶ 8.

Plaintiffs' counsel directed On Point's investigation at all times. ¶ 13. Plaintiffs' counsel developed an investigation plan with On Point, including a witness questionnaire. *Id.* At Plaintiffs' counsel's direction, Browning identified former Sasol employees who might have relevant information. ¶ 14. Browning then contacted them by phone for interview. ¶ 13. Browning told the witnesses cited in the Complaint that she was contacting them on behalf of

- 8 -

counsel investigating potential securities fraud by Sasol, that the information provided might be included in a complaint, that the individual would be identified as a confidential witness bearing the individual's job title and tenure, and that she could not guarantee their anonymity. *Id.*

Browning took notes contemporaneously with each witness interview. ¶ 14. Browning then promptly prepared a detailed memorandum of the interview, which On Point provided to Plaintiffs' counsel for review. *Id.* Plaintiffs' counsel and On Point were in frequent communication, discussing the witness memos and strategy. ¶ 15. Plaintiffs' counsel also provided follow-up interview questions based on the evidence developed to date. *Id.*

Plaintiffs' counsel utilized the memoranda in drafting the Complaint. ¶¶ 16–17. Plaintiffs' counsel sought follow-up interviews of each witness cited in the Complaint to confirm the essential allegations attributed to them. ¶¶ 32, 50, 66, 85, 101, 114. For those witnesses who agreed to do so, Plaintiffs' counsel read verbatim the allegations attributed to the witness to confirm their accuracy. ¶¶ 32, 66, 114. As discussed herein, for those witness who declined follow up interviews, Plaintiffs' counsel ensured the alleged witnesses' statements in the memoranda were reliable and supported by information elicited from other witnesses and the public record. These investigative policies and practices meet or exceed the standard within the industry. Ex. 2 at 22–29.

**C.    The Confidential Witnesses and their accounts.**

Plaintiffs ultimately relied on six CWs in the Complaint, as summarized below.

█████████ *(CW-1)*: On May 28, 2020, ██████ a former LCCP engineer, participated in a 55 minute interview with Browning. ¶ 25. ██████ discussed cost overruns and delays at the LCCP. ¶ 26. In this regard, ██████ identified an October 2015 External Cost Report authored by Sasol management. *Id.* ██████ stated that he and other project cost controllers—including ██████████ (CW-4)—"used to laugh" at the October 2015 External Cost Report, agreeing

- 9 -

its estimate of the LCCP's total costs at around $9.5 billion to be grossly underreported. *Id.* The next day, ████ participated in two additional interviews with Browning, lasting a total of nearly 30 minutes, answering follow-up questions provided by Plaintiffs' counsel. ¶ 28. On June 2, 2020, ████ spoke with Browning and Plaintiffs' counsel for 71 minutes. ¶ 32. ████ confirmed Defendants' receipt of a "Change Order" from Sasol's subcontractor Fluor in February 2016 that stated that Fluor's costs alone would be at least $11.7 billion, a figure much higher than the $8.9 billion cost estimate that Defendants publicized at that time. *Id.* ████ further explained that based on the time-and-materials contract with Fluor, and the minimal progress and cost incurred to date, Sasol was obligated to pay that amount and not in position to reject the Change Order. *Id.* Before the call concluded, counsel read to ████ verbatim the allegations in the complaint attributed to him. *Id.*; *see also* Exs. 12–13. After ████ made a few technical corrections, which counsel entered contemporaneously into the draft complaint, ████ confirmed the accuracy of these statements. ¶ 32. ████ later provided Plaintiffs' counsel a list of witnesses who could corroborate his account, including ████ ¶ 35.

████ *(CW-2)*: On May 5, 2020, Browning spoke with ████ ████ ████████████████████████████████████████████████████ projects, on three occasions for a total of 75 minutes. ¶ 44. On the first voicemail, Browning introduced herself as an investigator working for a law firm representing shareholders in a lawsuit against Sasol. ¶ 45. ████ subsequently agreed to talk later that day. ¶ 46. During the second call, which lasted 22 minutes, ████ immediately asked whether she could be compensated for providing information; Browning told her no. ¶ 47. ████ also asked how the information would be used and whether her identity would be kept confidential. *Id.* Browning told ████ that her name would not be disclosed in the complaint, but would refer to her as a confidential witness,

- 10 -

010886-11/1427005 V1

with a general description of her job functions and approximate dates of employment. *Id.* Browning told ████████ that she could not guarantee that Sasol would not eventually learn her identity. *Id.* Although ████████ was anxious about potentially being identified, she agreed to go forward with the interview. *Id.*

After the call disconnected, Browning called ████████ back and interviewed ████████ for an additional 49 minutes. ¶ 48. During the call, ████████ told Browning that it was "clear from the beginning" that the LCCP was going to cost more than publicly disclosed estimates, that ████████ had direct contact with Defendants Nqwababa, Cornell, and Victor, and on several occasions told each of them about concerns regarding the cost overruns and timeline for completion of the project. Ex. 18 at 2. In particular, ████████ identified Sasol's "unusual" contract with Fluor/Technip, which compensated them on a time and materials basis with no fixed price limitation, leaving the subcontractor with limited risk. *Id.* at 6–7. ████████ explained that she was not surprised to see costs "unspool" in 2015, as there wasn't much work for the contractor to do because LCCP was still in its early stages but still, "there were too many people brought on too early." *Id.* at 7. At no point during the May 5, 2020 calls did Browning tell ████████ that the interview was for "background purposes only" or that her statements would be "off the record." ¶ 49. ████████ never told Browning she did not have permission to use ████████ statements in the lawsuit. *Id.*

After receiving a memo summarizing the call, Plaintiffs' counsel instructed Browning to arrange a follow-up interview with Plaintiffs' counsel. ¶ 50. Although Browning left several voicemail messages for ████████ to discuss her account with Plaintiffs' counsel, ████████ did not return those calls. ¶¶ 50–54.

- 11 -

███████████ *(CW-3)*: On May 4, 2020, ██████ a former contractor working at the LCCP, participated in a 65 minute interview with Browning. ¶ 61. On May 12 and May 13, 2020, ██████ participated in follow up interviews with Browning lasting a total of 48 minutes, and provided Browning with a power point presentation corroborating his account of being dismissed after raising safety risk concerns to Sasol management. ¶¶ 62–63. On May 25, 2020, ██████ spoke with Browning again for 13 minutes, answering follow up questions provided by Plaintiffs' counsel. ¶ 64. On June 2, 2020, ██████ participated in a conference call with Browning and Plaintiffs' counsel, during which Plaintiffs' counsel read to ██████ verbatim the allegations in the draft complaint that were attributed to ██████ which ████████. *Id.*

████████████ *(CW-4)*: During the course of the investigation, Browning spoke with ██████ a former Sasol employee who worked on LCCP accounting matters, on five occasions, for a total of 106 minutes. ¶¶ 71, 72, 77, 80, 82. On May 6, 2020, after receiving a voicemail message, ██████ called Browning and spoke for 84 minutes. ¶ 71. During the call, ██████ told Browning from the moment he started at Sasol (August 2014), he saw the LCCP project was behind schedule. Ex. 25 at 2. He also stated that both the March 2015 $8.9 billion cost estimate and the revised June 2016 $11.1 billion estimate were too low. *Id.* at 3, 5. ██████ described multiple instances of Sasol's management's improper accounting for LCCP's construction and engineering costs, including pressuring LCCP controllers to violate Sarbanes-Oxley. *Id.* at 6. The call concluded with ██████ agreeing to a follow-up interview with Plaintiffs' counsel and saying he may be able to provide supporting documents. ¶ 71.

But on May 13, 2020, ██████ texted Browning, demanding he be paid ██████ for his "data" supporting his statements and continued cooperation. Ex. 26. ██████ stated that ████████████████████████████████████████████

- 12 -



████████████████████████ *Id.* █████████████████████████████████

███████████ *Id.* After Defendants' counsel learned ████████ identity and Defendants'

investigator read to ████████ the statements attributed to him, ████████ called Browning

telling her that he was ██████████████████████████████████ ¶ 77. On the call,

████████ expressed concern over whether his previous calls with Browning—including his 87

minute initial interview—were recorded. *Id.* At no point during these calls did ████████ recant

anything he previously said. ¶ 79. ████████ also stated—unprompted by Browning—that he

was a ████████████ ¶ 30.

████████████████████ *(CW-5)*: Browning spoke with ████████ ████████████

████████████ on five separate occasions, for a total of 73 minutes. ¶¶ 97–101. On May 5, 2020,

████████ participated in an initial 27-minute interview, during which ████████ urged Browning

to get Fluor's and Technip's LCCP cost estimates along with the weekly Executive Committee

minutes, which showed figures greater than Sasol's publicly disclosed estimates. ¶ 97. After the

May 5 interview, Browning noticed that ████████ LinkedIn profile stated that the LCCP was an

$11 billion project, when Sasol's publicly cited figures during his tenure were no higher than

$8.9 billion. Browning conducted a series of follow up interviews with ████████ on May 18,

2020 lasting a total of 34 minutes to discuss this discrepancy. ¶¶ 98–99. ████████ replied, █

███████████████████████████████████████████████████████

████████████████████ Ex. 29 at 3. ████████ further confirmed that when he said on the May 5 call

that the LCCP project in early 2015 was "on budget," "on budget" meant $11 billion. *Id.* at 1.[16]

---

[16] ████████ subsequently amended his LinkedIn profile to eliminate the reference to the
LCCP as an $11 billion project. ¶ 107.

010886-11/1427005 V1

On June 1, 2020, ▮▮▮▮ agreed to participate in a call with Plaintiffs' counsel and Browning. On the call, Plaintiffs' counsel confirmed that ▮▮▮▮ had spoken with Browning on prior occasions. However, when Plaintiffs' counsel told ▮▮▮▮ that they could neither guarantee that his identity would remain confidential nor prevent Defendants from subpoenaing him, he stated, ▮▮▮▮▮▮▮▮▮▮▮▮ and hung up. ¶ 102. At no point during the four minute call did ▮▮▮▮ tell Plaintiffs' counsel that the LCCP was on time and on budget for $8.9 billion when he left Sasol or otherwise recant any of his prior statements. ¶ 101.

▮▮▮▮▮▮ *(CW-6)*: On June 4, 2020, Plaintiffs' counsel interviewed ▮▮▮▮ a scheduler for part of the LCCP, for a total of 59 minutes, with Browning taking contemporaneous notes. ¶¶ 113–114. ▮▮▮▮ separate counsel, Steven Hahn, also participated. *Id.* At the end of the call, Plaintiffs' counsel read verbatim from the draft complaint the allegations attributed to ▮▮▮▮ ▮▮▮▮ made technical changes; and Plaintiffs' counsel rewrote the statements in response to ▮▮▮▮ changes. ¶ 114. Plaintiffs' counsel then read the final version to ▮▮▮▮ and his attorney Mr. Hahn, who confirmed its accuracy. *Id.*

## D.    Relevant procedural history.

After the filing of the Amended Complaint on June 4, 2020, Defendants have pursued a singular strategy of attacking the credibility of the CWs' accounts in complete isolation, without consideration of the "very strong additional evidence of scienter." MTD Order at *5. Defendants initially raised this defense in its motion to dismiss, arguing that the CWs' accounts could not establish Defendants' scienter. ECF No. 66 at 17–23. In denying in part Defendants' motion, the Court agreed that "[s]tanding alone, [the CWs'] allegations do not support a strong inference that these defendants actually knew they were making false statements." MTD Order at *5. The Court ruled that "[t]he testimony of the CWs, however, must not be reviewed independently or in isolation," and must be "taken collectively" with other alleged evidence of scienter. *Id.*

- 14 -

(quotation marks and citation omitted). The Court noted the "very strong additional evidence" of

scienter that must be considered holistically:

> [M]ost particularly, Sasol's October 2019 disclosure of the results of an
> independent review and audit of the LCCP (the "internal review"). Sasol
> explained that the internal review uncovered not only "errors, omissions, and
> inaccuracies in the [LCCP] cost estimate," but also "inappropriate conduct and an
> improper tone at the top of the LCCP, including an excessive focus on
> maintaining cost and schedule estimates at the expense of providing accurate cost
> and schedule estimation to oversight bodies." *Id.* ¶ 117. Taken in the light most
> favorable to plaintiff, this strongly indicates that some individuals managing the
> LCCP actually knew announced cost and schedule estimates were false and were
> simply trying to hide the truth. Sasol's "remediation plan" for this problem
> indicates at least some defendants were among those who knew of and tried to
> hide the truth. Sasol explained that "[a]s a result of" the internal review, Sasol
> "remov[ed] from all work responsibilities and initiat[ed] disciplinary action
> against the Executive Vice President previously in charge of LCCP," *Id.* ¶ 220,
> who the complaint identifies as defendant Schoeman. Additionally, Sasol
> announced the resignation of its Joint Presidents and CEOs, defendants
> Nqwababa and Cornell. *Id.* ¶ 215. This is strong evidence of knowing falsity on
> the part of these three defendants.

*Id.* The Court also rejected Defendants' request to depose the CWs in connection with their

motion, holding that it was "entirely unwarranted in a case such as this, where the CWs'

testimony is ***corroborated by external evidence such as the internal review***." *Id.* at *8 (emphasis

added).

Following this ruling, Defendants immediately demanded that Plaintiffs *informally*

disclose the identities of each of the CWs. ECF No. 105-7. Plaintiffs objected to disclosure of

their identities without a Court order on attorney work product and privacy grounds, but agreed

to include the CWs' names and contact information together with other witnesses in their Rule

26 disclosures. ECF Nos. 105-8, 105-10, 105-11. While the Court ultimately ordered Plaintiffs to

disclose the CWs' identities, the Court agreed with Plaintiffs that their names and contact

- 15 -

information should remain "Attorney's Eyes Only." ECF No. 105-13.[17] Defendants then sought expedited depositions of the three non-recanting CWs, including taking all three depositions in a single day on October 30 when Defendants knew that the three non-recanting CWs were being represented by the same counsel. ECF No. 105-18. But despite the fact that Defendants had requested that Plaintiffs produce the CWs' custodial files a month earlier, Defendants refused to produce a single document from the CWs' custodial files. *Id.* Plaintiffs accordingly objected to the timing of the depositions of these three CWs. *Id.*

On October 30, 2020, Defendants filed the instant motions for reconsideration and sanctions, again seeking to isolate and adjudicate the CW allegations. ECF No. 104. In doing so, Defendants failed to provide Plaintiffs with the requisite Rule 11(c)(2) safe harbor notice. *Id.*

## IV.    THE EVIDENCE OBTAINED TO DATE RAISES SERIOUS CREDIBILITY ISSUES CONCERNING THE RECANTING CWS' TESTIMONY

### A.    The investigator's contemporaneous notes and investigation memoranda are consistent with each other and with the allegations of the Complaint.

Browning has confirmed the thorough investigative procedures used in this case, and has affirmed that her interview notes, memoranda, and Complaint accurately reflect the CWs' statements made during their lengthy interviews. ¶¶ 18–19. Plaintiffs produced Browning's interview notes and memoranda. The Complaint's allegation are consistent with the investigation memoranda, which are consistent with the interview notes. *Id.* This consistency is highly probative of the accuracy of the Complaint's allegations.[18]

---

[17] Thus, far from the sinister motive Defendants suggest, Plaintiffs' counsel opposed disclosure of CW identities to address their expressed concerns regarding disclosure of their identity to Sasol. In fact, Judge Rakoff recognized Plaintiffs counsel's good faith motivation at the telephonic conference, agreeing that CWs were entitled to certain protections. *Id.*

[18] *See, e.g.*, *Pfizer*, 2012 WL 983554, at *3 (denying reconsideration and terminating sanctions since "the statements attributed to the Quoted Former Employees in the CCAC are taken verbatim from Plaintiffs' investigators' interview memos"); *see also In re Dynex Capital, Inc. Sec. Litig.*, 2011 WL 2581755, at *4 (S.D.N.Y. Apr. 29, 2011) (denying terminating

Defendants' position on Browning's work product is incoherent. When Browning's memos run counter to their narrative, they claim Browning fabricated the witnesses' statements, such as ▉▉▉▉▉ statements concerning the $11 billion budget "socialized" among Sasol management during his tenure. *Cf.* Ex. 29 at 3 & Supp. Mem. at 13. But when Defendants stumble upon snippets of the memos that suit them, they rely on them and take them out of context to advance the fallacy that the CWs told Plaintiffs' counsel their legal theory was unsupported. For instance, Defendants emphasize that Browning's ▉▉▉▉ interview notes say, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ *Id.* at 8. That notation, however, pertains to ▉▉▉▉▉ impression of the LCCP when she first joined Sasol in fall 2014 when construction commenced. Ex 18 at 5. Defendants omit ▉▉▉▉▉ statements of the ▉▉▉▉ that occurred in 2015. *Id.* ("But by 2015, things had begun to change.").[19]

Defendants also baselessly assert that Plaintiffs' counsel fabricated ▉▉▉▉ account that Defendant Schoeman stated that "'things are not good' with the [LCCP] project based on the updates on progress and costs." Supp. Mem. at 18. ▉▉▉▉ has repeatedly confirmed the accuracy of this allegation several times, including four days before the filing of this Opposition.

---

sanctions based on recanting confidential witness testimony where complaint's allegations mirrored interview notes).

[19] Defendants similarly misstate the record with respect to ▉▉▉▉▉ interviews. For example, they suggest Ms. Browning's email to her supervisor stating that ▉▉▉▉▉ interview was difficult ▉▉▉▉▉ meant she did not understand or accurately reflect conversation. Supp. Mem. at 11. Instead, the email was clearly meant to convey that ▉▉▉▉ had provided a wealth of information and was looking to her supervisor for assistance in organizing it in the interview memo. ¶ 90; *see* ECF No. 115-11. Defendants wrongly claim Ms. Browning's notes reflect that ▉▉▉▉ was not involved in the LCCP cost estimate. Supp. Mem. at 12. However, the note is in reference to ▉▉▉▉ not being involved in Sasol's October 2014 Board's FID; Ms. Browning's work product clearly demonstrates that ▉▉▉▉ spoke about his involvement in the LCCP's cost estimates. ¶ 90.

- 17 -

¶ 43; ███████ Dep. at 34:15–35:17. Tellingly, Defendants' counsel did not ask ███████ about this allegation at his deposition.[20]

## B.    The three CWs not represented by Defendants' counsel confirmed the accuracy of the Complaint's allegations.

███████ ███████ and ███████ have signed declarations stating that the allegations attributed to them accurately reflect the substance of their statements made during their interviews. *See* Exs. 3–5. Before doing so, they discussed the declarations with Plaintiffs' counsel on the phone, reviewed them with their separate counsel who also participated on the calls, and signed the affidavits. ███████ Dep. at 34:15–35:17; ███████ Dep. at 54:8–56:3; ECF Nos. 115-30-33. Later, ███████ ███████ and ███████ affirmed the same at their depositions. *Id.*; *see also* ███████ Dep. at 15:1–16:21. "[T]he fact that the [three] credible CWs testified to the accuracy of what [the investigator] had reported them as saying would justify a reasonable fact-finder in inferring that his report of his findings to plaintiff's counsel was accurate in all material respects." *See Lockheed Martin*, 952 F. Supp. 2d at 637.

Defendants erroneously argue that ███████ repudiated his statements concerning the $11.7 billion Fluor Change Order. Contrary to Defendants' interpretation, the Complaint does not allege ███████ said that any Fluor Change Order is *per se* legally binding upon Sasol. Rather, ███████ alleged statements concerning the "non-negotiable" and "contractually obligated" nature of the Change Order must be read in context of his other statements.[21] As pled in the Complaint and as explained by ███████ at his deposition, given Sasol's represented construction

---

[20] After Defendants filed their supplemental memorandum, Plaintiffs' counsel and Ms. Browning spoke with ███████ and his counsel on January 13, 2021, and confirmed the accuracy of this specific allegation and his Fluor Change Order statements once again. ¶ 43.

[21] Defendants wrongly claim there is no record of ███████ saying the Change Order was "legally binding." Supp. Mem. at 17. Plaintiffs' counsel drafted these allegations live during ███████ June 2 follow up interview, after which ███████ confirmed they were accurate. ¶¶ 43; ███████ Dep. at 34:15–35:17.

- 18 -

plans for the LCCP, the nature of the Sasol-Fluor EPC contract which paid Fluor on a times and material basis, the costs incurred and limited progress to date on the project, and the remaining work to be done, Sasol had no ability to effectively negotiate Fluor's Change Order. ECF No. 81 ¶¶ 65-68, 72–73; *see also* ▮▮▮▮ Dep. at 20:12–21:18, 23:7–26:7. ▮▮▮▮ further explained a Change Order of this magnitude would be discussed and negotiated by the parties' senior management in advance of issuance. ECF No. 81 ¶ 72; ▮▮▮▮ Dep. at 33:17–34:10 (repeatedly referring Defendants' counsel to ECF No. 81 ¶ 72). Thus, as the Court reasoned, Defendants knew that their publicly stated $8.9 billion budget was "unrealistic." MTD Order at *2.[22]

To further dispute CW-1's account concerning the Fluor Change Order, Defendants offer affidavits from a Fluor representative and Sasol representative named Liester Niemand, a witness neither identified by CW-1 as receiving the Fluor Change Order nor identified in Defendants' Rule 26 disclosures. *Cf*. ECF Nos. 105-5, 105-6 and Ex. 43 (Sasol Defs.' Initial Disclosures). This disputed extrinsic evidence is completely outside the pleadings and the limited scope of the CW discovery, and in any event do not deny Fluor's submission of an $11.7 billion Change Order in February 2016. Instead, they merely parrot Defendants' spin that they are unaware of a "binding" $11.7 billion Change Order in February 2016, based on their understanding of the parties' rights under the Fluor-Sasol EPC contract. Accordingly, these affidavits are irrelevant.

---

[22] Defendants also erroneously claim that ▮▮▮▮ could not confirm Schoeman's involvement in decoupling the schedules. ECF No. 114 at 20. But ▮▮▮▮ testified as to the basis for this statement; specifically, an email forwarded to him from his boss Nadine Kruger stating that Schoeman had ordered the decoupling, discussions with supervisors Ms. Kruger and Mike Kane about the subject, and that when Mr. Schoeman came on site the costs were actually uncoupled. ▮▮▮▮ Dep. at 23:6–27:13, 30:15–32:12, 36:15–24.

- 19 -

**C.**    **The three Recanting CWs made demonstrably untrue representations and material omissions in their affidavits, undermining the remainder of their testimony.**

At their depositions, Plaintiffs established that the Recanting CWs' affidavits dramatically understated the length and number of calls they had with Browning, presumably to show their lack of cooperation and to suggest they did not have time to convey the information attributed to them. Two of the Recanting CWs, █████████ and █████████ also failed to disclose that they sought compensation from Plaintiffs' counsel for providing helpful information. These undisputed facts make it all the more likely that Browning accurately memorialized their initial accounts and brings the rest of their deposition testimony about those calls into question. *See Lockheed Martin*, 952 F. Supp. 2d at 637.

For example, in his affidavit, █████████ testifies as to having spoken only "briefly" with Plaintiffs' investigator in May 2020. ECF No. 105-3 ¶ 3. But, confronted with telephone records, █████████ was forced to concede that his May 2020 call with Browning, which █████████ initiated, lasted 84 minutes. █████████ Dep. at 9:23–10:7. █████████ affidavit also failed to disclose the text exchange with Browning, ████████████████████████████████████████████ ██████████████████████████████████████████████. Ex. 26. In the text, ███████████████████████████████████████████ *Id.* █████████ affidavit further omits that he told Defendants' investigator, as reflected in that investigator's notes, if Browning recorded his interview, the account attributed to him in the complaint █████ █████████ x. 44 at NARDELLO-000016 ████████████████████████ █████ affidavit also falsely suggests that Browning harassed her through persistent phone calls, and that he made it clear he did not want to speak with her. ECF No. 105-3 ¶ 3. Yet, after reviewing telephone records, █████████ admitted to initiating several subsequent calls to Browning. █████████ Dep. at 40:6–17, 47:6–15. █████████ confirmed that in one of those calls, which

- 20 -

immediately followed his call with Defendants' investigator, he demanded to know from Browning whether his initial May 2020 call was recorded. *Id.* at 41:13–17. Given that ████ had already learned about the statements attributed to him in the complaint, he was clearly concerned that his recantation pressed on him by Defendants' counsel would be obliterated by a recorded conversation. In another of the calls with Browning that he initiated, ████ did not deny that he referred to himself as a ████████ in the case. *Id.* at 41:22–44:5.

Similarly, in her affidavit, ████ falsely testified as to having spoken only once with Plaintiffs' investigator for about 20 minutes. ECF No. 105-2 ¶ 2. But, confronted with telephone records, ████ conceded that she had three separate conversations with Browning totaling 75 minutes, the final call lasting 49 minutes. ████ Dep. at 10:25–13:5, 19:17–20:13. In her Declaration, ████ states that Plaintiffs' counsel "did nothing to verify with me the accuracy of what is attributed to me in the Second Amended Complaint." 105-2 ¶ 2. At her deposition, ████ did not deny receiving several voicemails from Browning trying to set up a follow up interview with Plaintiffs' counsel, and that she did not respond. ECF No. 115-2 at 21:3–24:20. ████ also did not deny that she asked to be compensated. *Id.* at 13:10–14:19.

In another variation of this theme, ████ references only his May 5, 2020 call with Browning lasting approximately 20 minutes, and his June 1, 2020 call with Browning and Plaintiffs' counsel. ECF No. 105-4 ¶¶ 2–3. ████ affidavit neglects to mention his two follow up interviews with Browning on May 18 lasting a total of 34 minutes, during which Browning confirmed key details, including senior management's acceptance that the LCCP's budget was $11 billion. ¶ 106. During his deposition, ████ testified that the omission of his May 18 calls was a conscious decision, as he reviewed his phone records prior to signing the affidavit. *See* Ex. 45; ████ Dep. at 41:8–44:5. Moreover, Sasol's investigator's own notes

- 21 -

contradict ████████ denial that he told Browning that the LCCP's budget was $11 billion during his tenue. In documenting their October 9, 2020 conversation, Sasol's investigator states that ████████ said that as to the $11 billion cost estimate of the LCCP, ████████ ████████ Ex. 46 at NARDELLO-000012.

As recognized by Judge Rakoff in *Lockheed Martin*, 952 F. Supp. 2d at 637, the recanting CWs' misrepresentations and omissions about the length and number of contacts they had with plaintiffs' investigator cast doubt on the veracity of their testimony concerning the content of those discussions.

### D.    The three Recanting CWs testified to the truth of key portions of Browning's investigation memoranda, including details not included in the Complaint.

Although Defendants imply the Recanting CWs wholly repudiate the statements attributed to them, this suggestion is absolutely untrue. At their depositions, the CWs confirmed the accuracy of the vast majority of those allegations. Ex. 37 (chart detailing corroboration of complaint allegations by Recanting CWs). And at their depositions, the Recanting CWs not only confirmed matters from Browning's interviews with them that Plaintiffs *did* use in the Complaint, but also matters Plaintiff did *not* use in the Complaint. The corroboration of the content of Browning's memoranda about matters both included and not included in the complaint strengthens the conclusion that Browning accurately reported to Plaintiffs' counsel what the three Recanting CWs told her in all material respects.

For example, at deposition, ████████ affirmed that the complaint accurately described his title, tenure and work responsibilities. ████████ Dep. at 47:19–50:15. Although not alleged in the Complaint, ████████ confirmed Browning's memoranda accurately reflected who he reported to, including four South African senior managers whom he referred to as the "Four Horsemen." *Id.* at 49:4–50:2.

- 22 -

010886-11/1427005 V1

The Complaint attributes allegations to ██████ regarding forecasted costs exceeding budget estimates, violations of the Sarbanes-Oxley Act, and other accounting gimmicks. ECF No. 81 ¶¶ 85–93. Tellingly, in neither his affidavit nor deposition did ██████ recant any of these allegations. For example, ██████ still confirms that it was "his opinion that the man-hours on the Ziegler Expansion Project were too low" when compared to the budget estimate. ECF No. 105-3 ¶ 8; ██████ Dep. at 60:16–61:4. ██████ also admitted that in connection with the revised $11.1 billion LCCP estimate, the ████ estimate also "appeared aggressive" when compared to its budget estimate. ECF No. 105-3 ¶ 9. ██████ also acknowledges that Sasol management asked him to reduce the amount of accrued liabilities—a violation of the Sarbanes-Oxley Act. ██████ Dep. at 51:5–52:21. Consistent with Browning's notes but not alleged in the Complaint, ██████ identified Johan Barnard, one of the four horsemen, as the Sasol manager who told him to engage in this accounting fraud. *Id.*

██████ also confirmed that Sasol engaged in other "accounting gimmicks," including stipulating to $36 million of negative value for Fluor for "self-performing construction," and maintaining a $55 million negative number on the books for "management negotiated savings" that "should not have been there." ECF No. 81 ¶¶ 85–93; ██████ Dep. at 57:8–60:11. He also does not deny his initial account that: "a $300 million contingency on the project, with only 8% of the project to complete, was 'mindblowing'"; and, that "there should not be a high contingency near the end of the project." ECF No. 81 ¶ 92; ECF No. 105-3. And finally, ██████ admitted that cost control managers told Sasol management that "you might as well fire us and hire a graphics designer who can paint the picture you want to see" and that he told his supervisor he "didn't want to share a jail cell" with him. ECF No. 105-4 ¶¶ 12, 14; ██████ Dep. at 52:18–21, 55:22–56:21.

- 23 -

Similarly, ▮▮▮▮ confirmed that the Complaint accurately described her tenure at Sasol and her responsibilities, affirming that as ▮▮▮▮▮▮▮▮▮▮ she was responsible for all regional financial and information management activities, including cost control, accumulation of the information as it related to budgeting and forecasting from the individuals that were responsible for the project, treasury, reporting of financial results, and tax reporting as it related to the LCCP. ▮▮▮▮ Dep. at 26:13–33:12. ▮▮▮▮ also claimed she could not recall and therefore was unable to deny that she discussed the following with Browning: that the Fluor contract was "unusual" in that it wasn't a fixed contract, but as a times and materials contract and therefore the contractor had no shared risk; during her tenure there was not much for the contractor to do because the LCCP was still in its early stages, but at the same time there were too many people brought on too early at the LCCP. *Id.* at 35:25–41:16.

▮▮▮▮ further confirmed she had direct contact with Defendants Nqwababa, Cornell, and Victor while at Sasol. *Id.* at 41:17–42:22. While ▮▮▮▮ denies raising concerns regarding *specific* cost or schedule overruns, ▮▮▮▮ could not recall and therefore was unable to deny saying that she told Browning that she raised scheduling concerns generally, or that she raised concerns about Sasol's contracting at the LCCP to these Defendants. *Id.* at 42:24–44:9, 49:14–24. Further, ▮▮▮▮ confirmed she resigned due to Sasol's culture, where South African leadership had very strong opinions and closed to the opinions of others. *Id.* at 44:16–49:13.

Finally, consistent with the Complaint's allegations, ▮▮▮▮ confirmed his awareness of LCCP estimates from Fluor and Technip that were higher than the $8.9 billion publicly figure represented at the time of his tenure, and confirmed that the Fluor and Technip estimates were "socialized" among Sasol management. ▮▮▮▮ Dep. at 29:8–18, 29:4–13, 66:14–67:15.

▮▮▮▮ confirmed that in light of his position, Defendant Cornell would have been informed of

- 24 -

cost overruns and construction delays. *Id.* at 39:15–25. ███████ also confirmed there is a third party case study on LCCP as a model of what not to do. *Id.* at 53:17–54:6. Likewise, ███████ confirmed details in Browning's memorandum, but not present in the Complaint, including: witnesses whom ███████ urged Browning to contact (*id.* at 51:24–23); the inner workings of Sasol's LCCP Executive Committee or ExecCom, its membership and subject matters discussed during meetings (*id.* at 56:5–25); that contracting strategy was viewed by the ExecCom as the greatest risk during his tenure; and that LCCP cost errors were a result of a "rotisserie of managers." *Id.* at 50:25–51:23, 55:2–9.

In sum, the misstatements of the Recanting CWs' actual testimony, and the misstatements by the CWs themselves, cast significant doubt on whether these limited recantations can be taken seriously at all—particularly when they now have a strong motive to recant. Ex. 2 at 37–39. A chart detailing these misstatements is attached hereto as Ex. 38.

**E.     The three Recanting CWs felt pressured to repudiate the allegations attributed to them.**

Each of the Recanting CWs admitted to expressing concerns about their identity being disclosed to Sasol. ¶¶ 47, 71, 100. The CWs also cited additional facts and circumstances that courts and experts have recognized create significant incentive for CWs to disclaim the information they initially provided to Plaintiffs' investigator. Ex. 2 at 34–35. For example, ███████ expressed concern about his Non-Disclosure Agreement with Sasol that he and other project cost managers had to sign in developing the new $11.1 billion LCCP cost estimate to the Board. Ex. 25 at 6. ███████ noted that the issue of his NDA was raised in his communications with Sasol's investigator. ███████ Dep. at 36:24–37:23; Ex. 44 at NARDELLO-000016.

In addition, ███████ and ███████ testified that they continue to work in the energy industry, and that their employer's knowledge of their involvement as a confidential witness in

- 25 -

the litigation against their former employer would damage their reputation. ████████ Dep. at 16:19–24; ████████ Dep. at 63:8–64:7. Courts and experts have observed that witnesses often recant where defendants are in a position to exert pressure by virtue of confidentiality or severance agreements, or fear of being excluded in their industry for having assisted investors' representatives in assembling evidence of defendants' fraud.[23]

## V.    HAGENS BERMAN'S POST-FILING INVESTIGATION FURTHER VALIDATES THE COMPLAINT'S ALLEGATIONS

Since filing the Complaint, Plaintiffs' have amassed more evidence corroborating their claims. For example, Plaintiffs' counsel interviewed a former ████████████████████ ████████████████████, reporting to ████████ successor, who confirmed the LCCP costs were consistently over budget throughout her tenure. Ex. 6 ██████ Decl.), Exhibit A at 2–4. The witness confirmed the costs overruns were discussed in daily tax team meetings and reflected in internal and Fluor Standard Project Management Reports. *Id.* In 2017, there was consensus among Sasol management that costs would exceed $12 billion, particularly given that Sasol could not renegotiate its contractors' contracts and costs. *Id.* By summer 2018, knew the LCCP's anticipated cost would be closer to $13 billion, a fact not disclosed until May 2019. *Id.*

In addition, the limited document discovery Plaintiffs received from Sasol support Plaintiffs' claims. For example, consistent with the CWs' accounts of Mr. Schoemann's wrongful conduct, Defendants produced a 2018 Performance Evaluation of Defendant Schoemann. Ex. 39. The document confirms the Individual Defendants' knowledge of ethical complaints concerning Schoeman's conduct at the LCCP, noting that ████████████████████

---

[23] *See Lockheed Martin*, 952 F. Supp. 2d at 636 (plaintiffs' contention that "the recanting CWs had changed their stories because of financial and other pressures Lockheed had brought to bear upon them once they had been identified by name … might arguably have been sufficient to deny summary judgment" on the purported "recantations"); *see also* Ex. 2 at 34–35.

- 26 -



*Id.* Similarly, while throughout 2018 the Individual Defendants repeatedly assured investors that Sasol was "on track" with LCCP cost and schedule estimates, a consulting report Sasol produced revealed that by January 2018 the

Ex. 40. Internal Sasol email communications also reflect that despite the Individual Defendants' knowing of serious productivity losses in Fall 2018 (Ex. 41) and massive line items in Fluor ▮▮▮▮▮▮▮▮ reports, Sasol's Project Management Team ▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 42. Further, after increasing the LCCP's budget in February 2019, internal emails amongst the Individual Defendants admit that Sasol ▮▮▮▮▮▮▮▮▮▮▮ Ex. 47.

In short, even limited discovery to date corroborates the SAC's allegations and the CWs' initial accounts, and undermines the credibility of the Recanting CWs.

## VI.    ARGUMENT

### A.    Defendants' motion for reconsideration has no merit.

#### 1.    The Recanting CWs' testimony raises, at most, credibility issues that cannot be resolved at this stage.

Defendants rely exclusively on disputed extrinsic evidence in an attempt to discredit the Complaint's CW allegations. But as courts have repeatedly explained, "[w]hether the

- 27 -

confidential witnesses initially made the statements attributed to them in the complaints is essentially a credibility question," which cannot be determined at the pleading stage.[24]

*Pfizer* is instructive. There, Defendants moved for reconsideration of a motion to dismiss order after procuring affidavits from CWs following the exact same form as the recanting CWs' affidavits here.[25] *Pfizer* held, however, that the record was "insufficient to warrant reconsideration." *Id.* at *5. The court reasoned that the applicable Rule 12(b)(6) standard obliges courts to test the sufficiency of a complaint by taking the factual representations as true, and excluding matters outside the complaint. Since "the allegations set forth in the [complaint] are sufficient to address scienter," the court denied the motion. *Id.*

*Pfizer* similarly held that the record did not warrant terminating sanctions. Plaintiffs offered investigator memoranda detailing interviews with the CWs. Judge Swain noted that, at most, the record showed "an aggressive approach to inferences, in combination with selective quotations from identified individuals," which did not "demonstrate clearly the level of bad faith conduct that might warrant the imposition of a terminal sanction dismissing the Plaintiffs' claims. *Id.* at *5.

---

[24] *BankAtlantic*, 851 F. Supp. 2d at 1312; *see Applied Micro Circuits*, 2002 WL 34716875, at *11 (accuracy of CW allegations "boils down to an issue of credibility to be determined by a trier of fact"); *Dynex*, 2011 WL 2581755, at *4 ("[T]he Court accepts that it is entirely possible that the witnesses, when their identities were no longer shielded by confidentiality, may have sought to disavow having made incriminating statements against Dynex."); *In re Netbank, Inc. Sec. Litig.*, 2009 WL 2432359, at *6 (N.D. Ga. Jan. 29, 2009) (at pleading stage, "th[e] court may not inquire into the truthfulness of Plaintiffs' allegations … nor engage in the process of weighing the credibility of those allegations"); *Cliffs*, 2015 WL 6870110, at *4 (same).

[25] *Pfizer*, 2012 WL 983554, at *1 (the quoted witnesses in *Pfizer* stated they "[w]ere surprised to learn of the existence of the litigation"; "[h]ad no knowledge of the filing of any complaint, or that the [complaint] relied on statements attributed to them in alleging claims of wrongdoing against [d]efendants"; and "[b]elieve their statements were presented to the [c]ourt in a misleading fashion").

010886-11/1427005 V1

The two cases Defendants cite undermine their position.[26] In *Boeing*, plaintiffs' case hinged on a single confidential witness, who was supposedly a Boeing employee privy to internal communications among top company officials regarding stress test results showing Boeing's planes were unfit to fly. *Boeing*, 711 F.3d at 759–60. After surviving a motion to dismiss, the CW repudiated the allegations attributed to him, testified he was never employed at Boeing, and denied having any access to both the internal communications and test results. *Id.* at 760. Plaintiffs neither disputed the witness's testimony nor offered controverting evidence. To the contrary, plaintiff's investigator, the only one who had spoken to the source, had no interview notes and acknowledged that she could not verify what the witness had told her. The investigator also raised a "red flag" to plaintiff's counsel about the witness's reliability because he provided names of Boeing's chain of command that were inconsistent with her investigation. As a result, plaintiffs decided not to use the witness at trial. *Id.* at 760. The district court, upon a motion for reconsideration, dismissed the claim with prejudice. On appeal, the Seventh Circuit affirmed, finding plaintiffs' "abandonment" of the CW crucial because the CW was plaintiffs' "only possible source of access" to the stress test results, the very thing that Boeing purportedly misrepresented. *Id.* at 761.

The record here bears no resemblance to *Boeing*. The Complaint does not rely on a single confidential witness, but instead identifies multiple sources giving rise to a strong inference, including the Board's Independent Review, key executive terminations, corroborating confidential witness testimony, and executive compensation packages showing motive. In addition, Plaintiffs offer affidavits and supporting documents verifying exactly what the CWs

---

[26] *Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 215 n.4 (2d Cir. 2010); *City of Livonia Employees' Ret. Sys. v. Boeing Co.*, 2011 WL 824604 (N.D. Ill. Mar. 7, 2011), *aff'd in part, vacated in part sub nom. City of Livonia Emps.' Ret. Sys. v. Boeing Co.*, 711 F.3d 754 (7th Cir. 2013)).

010886-11/1427005 V1

told the investigator and Plaintiffs' counsel, which mirrors what was alleged in the Complaint. The Recanting CWs confirmed that the Complaint accurately identifies their position, tenure and reporting structure at Sasol, and that given their roles and responsibilities they were privy to the information attributed to them. ███████ Dep. at 26:13–33:12; ███████ Dep. at 47:19–50:15; ███████ Dep. at 21:16–22:17. None of the facts attributed to the Recanting Witnesses has been proven to be false; rather, their statements are corroborated by other evidence, witness accounts, and public facts.[27]

The record similarly bears no resemblance to *Campo*. There, relying on CW accounts, the plaintiffs alleged that the individual defendants knew or should have known they were misstating the value of the company's real estate because they had access to internal reports reflecting leasehold values. *Campo*, 371 F. App'x at 216. Although the court initially denied defendants' motion to dismiss without prejudice, Judge Sprizzo characterized the CW allegations as "thin" and ordered their depositions.[28] Defendants then offered the CWs' uncontroverted deposition testimony that the referenced internal reports neither reflected the company's leaseholds nor overall real estate values. The CWs also had no knowledge of the individual defendants receiving the reports. On appeal, the Second Circuit stated in *dicta* that the district court did not

---

[27] Defendants falsely analogize Plaintiffs' counsel's urging of Ms. Browning to set up follow up calls with the Recanting CWs and preparation of additional questions to the "red flag" described in *Boeing*. But neither counsel nor Ms. Browning had concerns about the CWs' reliability. And far from the "ostrich tactics" described in *Livonia*, these documents reflect Plaintiffs' counsel's due diligence, and a belief that further inquiry of these witnesses would generate even stronger evidence of Defendants' scienter.

[28] *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 330 n.54 (S.D.N.Y. 2009); *see In re Sears Holdings Corp. Sec. Litig.*, No. 06-cv-04053, Mem. of Law in Further Support of Defs.' Mot. to Dismiss the Consol. Class Action Compl., ECF No. 65, at 1 (S.D.N.Y. 2008). Judge Sprizzo had a basis for concern. Unlike the CWs here, who undisputedly were in positions to know the information attributed to them, two of the three witnesses in *Campo* "left the company before the Class Period." *Campo*, 635 F. Supp. 2d at 335.

err in considering the uncontroverted CW deposition testimony for purposes of assessing the good faith basis for making factual and legal contentions in the complaint since ***"[t]he court made no credibility determinations, nor did it weigh competing testimony***." *Id.* at 216 n.4 (emphasis added).

Thus, unlike the courts in *Campo* and *Boeing*, here the Court is being asked to weigh competing evidence and judge the credibility of witnesses, all without the benefit of a full record developed through merits discovery. Plaintiffs have provided persuasive evidence that all of the CWs, including the Recanting CWs, did in fact provide the information used in the Complaint. Other witnesses, documents and publicly available information corroborate this information, and additional discovery is likely to continue to validate the allegations of the Complaint and further impugn the testimony of the Recanting CWs.

**2.    Even if the Court were to credit the recanted statements, this "new evidence" would not alter the reasoning or the result reached by Judge Rakoff in denying in part Defendants' motion to dismiss.**

Even if the Court were to accept wholesale the Recanting CWs' accounts, the MTD would remain unchanged, and the SAC barely changes at all.[29] Contrary to Defendants' assertion, the Court did not deny their earlier Motion to Dismiss by "dint" of the allegations supplied by the CWs. Supp. Mem. at 1. The Court specifically found that the CWs' accounts, in isolation, "do not support a strong inference that these defendants actually knew they were making false statements." MTD Order at *5. Instead, the Court found sufficient particularized factual allegations, apart from the alleged CW statements, to give rise to a strong inference of scienter; namely the Internal Review's Findings, the Board's Remediation Plan, and the

---

[29] Attached as Ex. 36 is the factual allegations section of the complaint, with the directly recanted statements in yellow. As this exhibit illustrates, almost all of the factual allegations have not been directly refuted.

010886-11/1427005 V1

executive departures. *Id.* Thus, Judge Rakoff made clear that, even if the CW allegations are disregarded, there is ample additional evidence of Defendants' scienter and their Motion to Dismiss must be denied.

That the Court recognized the adequacy of Plaintiffs' scienter allegations as to Defendant Constable, even though the information from the CWs the Court addressed did not even mention Constable, further confirms that reconsideration is unwarranted. *Id.* at *6. The Court necessarily concluded that Plaintiffs' other scienter allegations were, by themselves, sufficient to uphold the Complaint as to the Individual Defendants. Thus, even if the Court were to believe only the Recanting CWs' modified testimony, it would make no difference to the Court's scienter determination.

Finally, the few statements that the CWs actually deny making were immaterial to the Court's decision. For example, although ████████ somewhat repudiates his statement that an $11 billion cost estimate was "socialized among senior management" from the beginning,[30] the Court gave little weight to this allegation because it "never specifies any one defendant's knowledge beyond asserting that defendant Cornell 'would have' known about the cost issues as the 'ultimate arbiter of costs.'" *Id.* at *5. And, while the Court did find ████████ account that "[s]he expressed concerns about the cost and timeline of the LCCP to defendants Nqwababa, Cornell, and Victor on several occasions," ¶ 76, and that they rejected h[er] criticism,"— statements ████████ does not directly recant—to be "far more particularized," the Court

---

[30] Although ████████ denies that Sasol's budget for the LCCP was $11 billion from the beginning, he admitted that LCCP budget submissions from Fluor and Technip, which were larger than the represented $8.9 billion figure, were "socialized among senior management." ████████ did not deny these bids were as much as $11 billion, claiming he did not remember the figure. *See* ████████ Dep. at 29:8–18, 29:4–13, 66:14–67:15.

ultimately found that this account, even when coupled with ███████ verified account, amounts

only to recklessness. MTD Order at \*5.

**B.    Defendants violated Rule 11(c)(2)'s safe harbor provision.**

Nor is Defendants' Rule 11 motion procedurally sound. Rule 11(c)(2) contains a "safe

harbor" procedural safeguard that a movant must satisfy. The safe harbor requires that a party's

motion for sanctions "not be filed or be presented to the court if the challenged paper, claim,

defense, contention, or denial is withdrawn or appropriately corrected within 21 days after

service." The safe harbor allows the responding party "the opportunity ... to correct or withdraw

the challenged submission." *In re Pennie & Edmonds LLP*, 323 F.3d 86, 90 (2d Cir. 2003). The

safe harbor requirement is a "strict procedural requirement." *Star Mark Mgmt., Inc. v. Koon*

*Chun Hing Keey Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 175 (2nd Cir. 2012); *Hadges v.*

*Yonkers Racing Corp.*, 48 F.3d 1320, 1328 (2d Cir. 1995). "If a party seeking Rule 11 sanctions

fails to comply with the safe-harbor provision ... the motion must be denied." *Homkow v. Musika*

*Records, Inc.*, 2009 WL 721732, at \*20 (S.D.N.Y. Mar. 18, 2009) (collecting cases).

Here, the sanctions motion should be summarily denied because Defendants filed this

motion without serving Plaintiffs with notice of the challenged factual contentions, let alone

allow them 21 days to address Defendants' claims. Defendants' failure to abide by the safe

harbor provisions is inexcusable. The violation does not stem from any technical error; rather,

they filed the motion without any prior notice in a calculated attempt to tarnish the reputation of

Plaintiffs' counsel on the parties' first appearance before the Court. Plaintiffs could have

amended the CW allegations by apprising the Court that the Recanting Witnesses now repudiate

portions of their account, and supplement the complaint with the new information Plaintiffs have

uncovered through their investigation. The Court accordingly cannot consider the merits of

Defendants' Rule 11 motion for sanctions. *See ESI, Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35, 68

010886-11/1427005 V1

(S.D.N.Y. 1999) (denying motion for sanctions "without discussion of the merits" due to failure to comply with "mandatory" safe harbor provision).

Nor may Defendants justify their failure to satisfy Rule 11's safe harbor requirements by relying on 15 U.S.C. § 78u-4(c) ("Sanctions for abusive litigation"). Although this section does not contain the safe harbor provisions of Rule 11, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 579 F.3d 143, 152 (2d Cir. 2009), the PSLRA imposes an obligation on the ***Court*** to conduct a Rule 11 inquiry upon "***final adjudication of the action***."[31] It does ***not*** permit a party to move for sanctions before final adjudication without satisfying Rule 11's safe harbor requirements. The PSLRA's mandate that a court's Rule 11 inquiry arise only at the end of the case is consistent with common law, which seeks to avoid collateral proceedings and determinations on a complete record. *See Safe-Strap Co. v. Koala Corp.*, 270 F. Supp. 2d 407, 417 (S.D.N.Y. 2003) ("Courts ordinarily defer this determination until the end of the litigation.") (collecting cases).

## C.    Plaintiffs undertook an "inquiry reasonable under the circumstances."

Although Defendants attempt to impugn the quality of Plaintiffs' investigation, arguing that it did not comport with Rule 11(b)'s requirement of an "inquiry reasonable under the circumstances," that effort fails for numerous reasons. If anything, the limited discovery has revealed severe inaccuracies in Defendants' arguments, factual assertions, and statements of the recanting CWs.

### 1.    Lead Counsel conducted an in-depth, thorough investigation.

Lead Counsel took precautions to ensure that the allegations in the Complaint were accurate and formed after a reasonable inquiry, including, among other things: (i) retaining a

---

[31] While the PSLRA does not define the term "final adjudication," courts in this District interpret "adjudication" as a terminating decision of the case, such as a verdict, summary judgment or dismissal with prejudice without leave to amend. *See Manchester Mgmt. Co., LLC v. Echo Therapeutics, Inc.*, 297 F. Supp. 3d 451, 465 (S.D.N.Y. 2018) (collecting cases).

- 34 -

licensed investigation firm with substantial experience in securities-related investigations to conduct interviews of former Sasol employees; (ii) providing detailed guidance to On Point concerning the subject matter of the investigation; (iii) carefully reviewing On Point's memoranda, and, where needed, requesting that the investigators seek further information from witnesses; (iv) having frequent discussions with On Point concerning the direction of the investigation and the witness interviews it conducted; (vi) seeking to arrange follow up interviews with each of the witnesses quoted in the complaint, wherein counsel read the allegations verbatim and the witness approved; and (vii) exhaustively reviewing news articles and analyst reports concerning Sasol and the company's SEC filings, press releases, and conference call transcripts. Based on this thorough investigation, Lead Counsel reasonably concluded that the allegations at issue, which were set forth in On Point's memoranda, were corroborated by all witnesses, and adequately supported and consistent with the other information that Lead Counsel had obtained.

This conclusion is shared by Professor Kaufman, who after reviewing the record opines that Plaintiffs' counsel pre-filing inquiry was "reasonable under the circumstances." Ex. 2 at 22. Professor Kaufman notes that "all of the[] indicia of the reliability of the confidential witnesses are present," including that they "held a position that suggested access to the information that the witness purports to have; provides a sufficient level of detail of the allegations; [and] corroborates the allegations with other reliable sources." *Id* at 28–29. Moreover, Professor Kaufman concludes that "although Rule 11 does not require counsel to perform 'best practices' or to pursue optimal strategies, Plaintiffs' counsel in this case did in fact utilize these best practices and strategies," including attempting to confirm each of the CWs' statements. *Id.* at 24. Accordingly, sanctions here would be inappropriate.

010886-11/1427005 V1

### 2.    Recanted witness statements do not support Rule 11 sanctions.

Defendants suggest that Plaintiffs failed to conduct a proper inquiry because some of the CWs disavowed making certain of the statements attributed to them in the Complaint. But even the Recanting CW depositions support much of what is attributed to the CWs in the Complaint. *See* Ex. 37 (chart setting out CW allegations in the Complaint and relevant portions of the CW depositions). In any case, sanctions are not properly imposed because a subsequent deposition of a confidential witness is at odds with what was previously stated by the witness to plaintiff's investigator and relied on by counsel in drafting a complaint.[32] As Professor Kaufman notes, "After defendants' counsel has spoken with a confidential witness, it is not uncommon for the witness to become concerned about getting involved in the litigation and to try to recant." Ex. 2 at 33 Judge Rakoff and other federal judges in the Southern District have also recognized the frequency of this practice, declaring that confidential witnesses who had previously given information to investigators corroborating a complaint's allegations later will feel "pressured into denying outright statements they had actually made." *Lockheed Martin*, 952 F. Supp. 2d at 636–37. Plaintiffs cannot be sanctioned for this unavoidable phenomenon.

For example, in *Dynex*, the court, relying on sworn statements from counsel that the confidential witnesses had indeed made the statements attributed to them, denied the sanctions motion, accepting "that it is entirely possible that the witnesses, when their identities were no longer shielded by confidentiality, may have sought to disavow having made incriminating statements against Dynex." *Dynex*, 2011 WL 2581755, at *4. Similarly, in *JDS Uniphase*, the court summarily rejected a motion for sanctions based on the allegation that certain confidential

---

[32] *See Wu Grp. v. Synopsys, Inc.*, 2005 WL 1926626, at *12–13 (N.D. Cal. Aug. 10, 2005); *In re JDS Uniphase Corp. Sec. Litig.*, 2008 WL 753758, at *3–4 (N.D. Cal. Mar. 19, 2008); *Univ. v. Consulting Serv. Group, L.P.*, 48 F. Supp. 2d 765, 768–70 (N.D. Ill. 1999).

witnesses disavowed statements attributed to them in the pleading. The *JDS Uniphase* complaint was drafted based in part on interviews of certain confidential witnesses by investigators for Plaintiffs' attorneys who created contemporaneous interview memoranda. The sanctions motion was denied because the allegations in the complaint attributed to confidential witnesses were supported by the investigator memoranda. *JDS Uniphase*, 2008 WL 753758 at *3.

Courts also deny sanctions when a confidential witness changes his/her story even without evidence of external pressures or influences.[33] Here, the CW depositions took place several months after the witnesses made their statements to Plaintiffs' investigators, resulting in (as the CWs acknowledge) faded memories, and therefore inconsistencies between the witnesses' statements and their deposition testimony is not surprising.

### 3.      Lead Counsel were entitled to rely on their investigator.

Defendants contend that the extraordinary remedy of sanctions is warranted because Plaintiffs' counsel did not speak personally to the three Recanting Witnesses, and instead relied on their investigator. Yet Defendants fail to cite a single case holding that an allegation confirmed by the attorney's investigator has no basis and is sanctionable unless an attorney later confirms the same information with the witness personally. This is an artificial standard concocted by Defendants' counsel that has no support in the law. An attorney signing a complaint must comply with Rule 11, but she can still rely on information obtained by other persons such as an investigator. *BankAtlantic*, 851 F. Supp. 2d at 1311. Indeed, as Professor Kaufman notes, "In the field of securities litigation, [] attorneys do not commonly interview

---

[33] *See, e.g.*, *In re Sony Corp.*, 268 F.R.D. 509, 518 (S.D.N.Y. 2010) ("The mere fact that the confidential sources testified, subsequent to the submission of the SAC, in a manner contradictory to the statements attributed to them in the SAC is not sufficient evidence to establish that Counsel for [ ] Plaintiffs acted in an objectively unreasonable manner; the apparent contradictions might just as easily be attributable to the confidential sources' changing or refreshed recollections.").

- 37 -

confidential witnesses or gather sources themselves. Attorneys usually rely upon the work of investigators to conduct the interviews with confidential witnesses." Ex. 2 at 23.

Defendants' reliance on *In re Millennial Media, Inc. Securities Litigation*, 2015 WL 3443918 (S.D.N.Y. May 29, 2015), is misplaced for several reasons. *First*, Judge Engelmayer's comments with respect to CW allegations are *dicta*, not based on any controlling authority, and represent a significant departure from accepted practices for the handling of witness statements. *See id.* at *1, *14 (acknowledging opinion dealt with "collateral matters" and "predominately, [not] issues of law."); Ex. 2 at 23–24. In this context, *Millennial Media* suggests that counsel might want to personally reconfirm every CW statement with the witnesses. And while the court stated its preference that CWs be provided with complaints prior to their filing, the court acknowledged that this preference was "not one of law." Yet Defendants urge this Court to impose sanctions on Lead Plaintiff here for not following this unrequired process.

*Second*, the principal authority cited in *Millennial Media*—*Boeing*—is not binding and does not support its conclusion. As noted above, in *Boeing*, a law firm was admonished for misrepresenting the statements of a CW who was the ***sole source*** for fraud allegations. *Millennial Media*, 2015 WL 3443918, at *11. But *Boeing* does not impose or even support a requirement that counsel must reconfirm every CW statement made to its investigator in every context. Instead, *Boeing* indicates only that counsel should reconfirm when they cannot reasonably trust the accuracy of the CW information. *Boeing*, 2011 WL 824604, at *6.

*Third*, the practices *Millennial Media* articulates goes well beyond the procedural or verification requirements for CW allegations in *Boeing* or any other Court of Appeals decision. Ex. 2 at 23. As a result, several courts, including in this District, have criticized or refused to

010886-11/1427005 V1

adopt *Millennial Media*.[34]

**D.    Plaintiffs' attorneys did not violate their duty of candor to the Court – Not Even Close.**

Defendants blatantly misrepresent the record in arguing Plaintiffs' counsel violated their duty of candor. ***First***, Plaintiffs' counsel did not falsely respond to Judge Rakoff's questioning as to whether counsel confirmed ██████ statements. ██████ made these statements in his June 2 interview with Plaintiffs' counsel, and before filing, ██████ confirmed their accuracy. ¶ 32. ***Second***, Plaintiffs' counsel's statement to the Court that "the Complaint accurately alleges … all of the CW accounts" is a true statement. As promised, Plaintiffs produced notes, memorandum and affidavits showing that Plaintiffs' counsel faithfully alleged what the CWs said at their interviews. ¶ 18. ***Third***, Defendants erroneously claim that Plaintiffs' counsel statement that there is "a trail of communications that our investigator[,] had with each of these confidential witnesses, that are going to show that the confidential witnesses were cooperat[ing]," is unsupported. But the record shows that Browning had lengthy initial and follow-up interviews with each of the Recanting Witnesses, who volunteered information supportive of Plaintiffs' claims and directed them to additional evidentiary sources. ¶¶ 35, 63, 71, 106. ***Fourth***, Defendants fault Plaintiffs' counsel for not informing the Court that ██████ purportedly told counsel on his June 1, 2020 call they had no permission to include him in this suit. But ██████ never made this statement during the brief four minute call. ¶ 110. ***Fifth***, Defendants' claim that Plaintiffs' counsel's statement that, "The three recanting CWs' affidavits … are verifiably wrong," is untrue. But the record now shows that the Recanting CWs' affidavits grossly

---

[34] *See Cliffs*, 2015 WL 6870110, at *4 n.5 (stating *MM* is "*dicta*, not followed by at least one other court in that district, ha[s] no precedential effect on this Court, and relate[s] only to the facts of that case."); *see also Kiken v. Lumber Liquidators Holdings, Inc.*, No. 13-cv-00157, ECF No. 141, slip op. at *16 (E.D. Va. Dec. 21, 2015) (rejecting Defendants' arguments under *MM*).

- 39 -

understate the length and number of their communications with Plaintiffs' investigator. ***Finally***, contrary to Defendants' assertion, ███████ never claimed his initial account was a lie. Instead, ███████ threatened that he would recant his statements if he was not paid ███████ from Plaintiffs' counsel.

**E.      Even if dismissal were appropriate, Plaintiffs should be entitled to amend.**

"Dismissal is the harshest sanction available to a district court, and should thus 'be imposed only in extreme circumstances.'" *Gilpin v. Phillip Morris Int'l*, 2002 WL 1461433, at *3 (S.D.N.Y. July 8, 2002) (citation omitted). By no stretch have Defendants adduced "clear and convincing" evidence of a fraud on the Court. *Dynex*, 2011 WL 2581755, at *4. And case-dispositive sanctions "would unfairly penalize class members who played no role in the alleged wrongdoing." *Id.* at *3. Such as a result here would be "unduly harsh," given that Defendants purposefully denied Plaintiffs' counsel of any opportunity to cure the perceived factual deficiencies. Accordingly, to the extent the Court were to believe that dismissal is appropriate, the Court should allow Plaintiffs leave to amend.

## VII.    CONCLUSION

For all the reasons above, Defendants' motion should be denied in its entirety.

DATED: January 19, 2021                      Respectfully submitted,

By */s/ Steve W. Berman*
    STEVE W. BERMAN
Steve W. Berman (admitted *Pro Hac Vice*)
Jerrod C. Patterson (admitted *Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
jerrodp@hbsslaw.com

- 40 -

- 41 -

Lucas E. Gilmore (admitted *Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
lucasg@hbsslaw.com

*Counsel for Lead Plaintiff David Cohn and*
*Additional Representative Plaintiff Chad L. Moshell*

- 42 -

## CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

*/s/ Steve W. Berman*
STEVE W. BERMAN

010886-11/1427005 V1