# EXHIBIT 3

## [REDACTED VERSION]

DocuSign Envelope ID: 98687EFE-FB08-4898-9B63-6B32BDDEDB12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHAD LINDSEY MOSHELL, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SASOL LIMITED, DAVID EDWARD CONSTABLE, BONGANI NQWABABA, STEPHEN CORNELL, PAUL VICTOR, and STEPHAN SCHOEMAN,<br><br>Defendants. | Case No. 1:20-cv-01008-JCP<br><br>Hon. John Peter Cronan<br><br>██████████████████████ |

I, ███████████ hereby declare as follows:

1. I worked as a ███████████████ for Sasol North America's Lake Charles Chemical Plant ("LCCP") Mega Project in Lake Charles, Louisiana, from approximately September 2015 to July 2016. ████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████

2. On May 28, 2020, I spoke by telephone with a private investigator named Lynnley Browning. Ms. Browning told me that she was hired by attorneys who were prosecuting securities fraud claims on behalf of a class of investors against Sasol and certain of its senior executives. Ms. Browning asked me if I could answer some questions about my experience at Sasol to assist the attorneys with their litigation, and I agreed to do so. Before proceeding with the interview, Ms. Browning told me not to disclose any confidential or privileged information I learned during my tenure at Sasol. I then participated in an interview with Ms. Browning. Thereafter, I participated

- 1 -

010886-11/1368245 V1

HIGHLY CONFIDENTIAL

PLAINTIFFS004146

in follow up interviews with Ms. Browning on May 29, 2020, and again with Ms. Browning and attorney Jerrod C. Patterson on June 2, 2020. At no time was I told during these interviews that my comments would remain confidential.

3.      I have had the opportunity to review the statements attributed to me in the Second Amended Complaint. Specifically, I understand that the following statements have been attributed to me:

64. CW-1 served as a senior engineer for the LCCP project from early fall 2015 to mid-summer July 2016, and worked as a subcontractor for Fluor, the main subcontractor on the project. CW-1 worked both in Sasol's Houston office, and on-site at Lake Charles. CW-1 was responsible for undertaking reviews and estimates and processing invoices for indirect costs, including expenses related to maintaining OSHA compliance. CW-1 used Sasol's proprietary Contract Management System ("CMSi") for payment, monthly accruals, and cost forecasting, and used CMSi to generate a report of LCCP's indirect costs every two weeks. CW-1's reports were incorporated into a consolidated cost report, also generated through CMSi that went to LCCP's project leader and managers. CW-1 saw these consolidated costs reports in the course of CW-1's work.

65. CW-1 stated that, in February 2016, Fluor submitted a Change Order for $11.7 billion for the LCCP project — which is nearly $3 billion more than Sasol's $8.9 billion disclosure on March 9, 2015. (Sasol waited several months to disclose its cost overruns, and even then its June 2016 disclosure only reported that costs "could" increase to $11 billion, which Constable described as a "worst case scenario," and underreporting the true costs by $700 million). A Change Order is a formal notice by a contractor to its client that a project's initial, approved budget has been exhausted and that more money is needed to continue work. CW-1 saw this Change Order because it covered both direct and indirect costs for LCCP, and CW-1 was responsible for indirect costs. CW-1 remembered this change because it was such a huge increase. Sasol did not disclose to shareholders a revised cost of $11.6 - $11.8 billion until February 25, 2019 — three years after the Fluor Change Order. The Change Order cited "lack of progress" on LCCP construction and a request by Fluor to "increase the indirects" (referring to indirect costs). CW-1 stated Fluor was requesting payment despite construction delays because projects "are based on time and materials. Whether they're getting done or not."

66. CW-1 stated that the public disclosure in June 2016 that capital expenditures "could" equal $11 billion was a "fraud" and "wrong," because the capital expenditures were known to be at least $11.7 billion at that time. The cost of the project is straightforward — it is based on quantity multiplied by price. There was no basis for Sasol to renegotiate or bargain down the price; Sasol was contractually obligated to pay Fluor's costs because it was based on a simple time and materials formulation. To that extent, Sasol was not in a position to reject the Change Order, but instead was contractually obligated to pay that amount as it came due.

- 2 -

010886-11/1368245 V1

HIGHLY CONFIDENTIAL                    PLAINTIFFS004147

67. In addition, the Fluor contract does not represent the full price of the project. Sasol entered into separate stand-alone contracts for certain major equipment, such that the $11.7 billion Change Order represents the floor of what the project will cost. When told that senior management, in June 2016, stated that the $11 billion figure was a "worst case scenario," CW-1 stated that there was no basis to make that claim.

68. CW-1 stated that Sasol's senior management (including Defendants Constable, Cornell, and Nqwababa) "would have had to have known" that the LCCP project was behind schedule and over budget, partly through Sasol's reports on LCCP's external costs. It was also apparent because the work was not getting done, even as Sasol continued to spend money on the project. CW-1 stated the executive team would have received monthly reports summarizing the status of the progress and the cost estimates. In fact, Defendant Schoeman told CW-1 "things are not good" with the project based on the updates on progress and costs.

69. In addition, Sasol was reporting internally a $300 million negative contingency every month. Contingencies are funds that are set aside by Sasol in case of a "black swan" event – unforeseen events that substantially alter the cost estimates of the project, like dramatic weather events. According to CW-1, the $300 million contingency would not be part of the $11.7 billion Change Order: in fact, typically contingencies are an internal figure that is not disclosed to the contractor or subcontractor. (In truth, in an August 2016 Form 6-K, Sasol disclosed that the $11 billion estimate did include a $300 million contingency, which means in June 2016 Sasol underreported the true costs of the project by at least $1 billion). As a result, as the project nears completion, the contingency should "minimize as progress progresses." To that extent, CW-1 stated that a $300 million contingency for a project that was nearly complete does not make sense, because at that point Sasol would have been confident that its costs estimates were accurate, and that there was little likelihood of "black swan" events occurring prior to the project coming online.

70. CW-1 believed that Sasol used the contingency as a means of hiding the true anticipated costs of the project; CW-1 characterized it as a "dark art" and a "shell game." In particular, Sasol's use of a contingency on a project it reported as nearly complete means "you're hiding something." CW-1 also stated that it was unusual for Sasol to book the $300 million at the beginning of a month, remove at the end of the month, and then re-book it the following month. Typically, a contingency was put on the books for a specified period of time (e.g., 24 months).

71. This $300 million contingency was reported in an October 2015 External Cost Report, which would have been sent to senior management (including the Executive Defendants). As a result, senior management would have known about the $300 million contingency. Finally, CW-1 noted that when in May 2019 Sasol disclosed a $300 million contingency for a project that it reported was 96% complete; this figure is a "very large number" for a project that is near completion. In CW-1's opinion, LCCP will ultimately cost around $17 billion. CW-1 based this estimate on the delays in the project, the costs associated with the project, and the fact that the plant is still not complete or earning a profit.

- 3 -

010886-11/1368245 V1

DocuSign Envelope ID: 98687EFE-FB08-4898-9B63-6B32BDDEDB12

72. CW-1 stated that, as a matter of standard practice, Fluor would have given Sasol executives a "heads up" in the weeks before it issued the Change Order that the official document was coming their way. According to CW-1, the Change Order would have gone to Jim Shoriak, Sasol's Vice President of U.S. Mega Projects, who in turn would have submitted the Change Order to the senior executives. CW-1 stated that Fluor "would not have expended that money [the additional $3 billion] until Sasol approved it."

73. When told that Sasol did not disclose to shareholders a revised LCCP cost of $11.6 billion - $11.8 billion until February 2019, CW-1 stated, "That is out of order. That is just wrong."

74. CW-1 stated that a colleague (CW-6) told CW-1 that CW-6 was asked to "mess around with the [LCCP] schedule" – to falsely report that the project would be complete in advance of its actual estimated completion date. CW-6 responded that CW-6 refused to do this, and CW-6 quit the Company in protest.

4. These allegations accurately reflect the substance of my statements made during the above-referenced interviews.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed in ▮▮▮▮▮▮▮▮▮ on November 5, 2020.

▮▮▮▮▮▮▮▮▮▮▮▮

- 4 -

010886-11/1368245 V1

HIGHLY CONFIDENTIAL

PLAINTIFFS004149