# EXHIBIT 36

## [REDACTED VERSION]

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Sasol and Its Business

52.    Sasol was founded in 1950 during the apartheid era of South Africa. It is headquartered in Johannesburg. The Company produces various liquid fuels, chemicals, and electricity. It employs approximately 30,100 individuals, and operates in 33 countries. Sasol is listed on the Johannesburg Stock Exchange, and trades its ADRs on the New York Stock Exchange under the ticker symbol SSL.

53.    Sasol began as an effort to develop its own gasoline production facilities as other countries imposed restrictions on trade with South Africa's apartheid regime. Now, Sasol operates as an integrated chemical and energy company in South Africa. From the beginning, Sasol relied on the LCCP project to diversify its business and deliver continued profitability for the Company. As it described in an August 23, 2016 "Investor Fact Sheet," "Despite the current cost estimate of $11 billion, we still consider the LCCP to be a sound strategic investment that is of significant importance to Sasol's future growth and will return value to our shareholders for many years into the future. LCCP will transform the existing Lake Charles site into an integrated, multi-asset site that will allow fixed and infrastructure costs to be spread over multiple product lines, and provide opportunities for investment in additional downstream chemical facilities in the future."

54.    Sasol and the Executive Defendants continually referred to Lake Charles as pivotal to its future success. For example, on a November 23, 2017 investor call, Nqwababa explained that, "[f]ollowing a structural shift to a low oil price environment, our chemical business has increased its contribution to grow profit from 40% to 50%. This will further increase cost commissioning of the LCCP. We believe that Sasol's diversified revenue base covering different geographies, sectors and currencies will remain a strong component of Sasol's

1

ability to remain robust through different oil and chemical price cycles." He also described

LCCP as a "game changer for Sasol. Once commissioned, this well-scaled petrochemical

complex will triple our chemical production capacity in the U.S., enabling Sasol to further

strengthen our position in a growing global chemicals market."

55.    Given the sheer size of the LCCP investment, Defendants repeatedly highlighted

the effectiveness of the Company's controls over the project. For example, in a February 2, 2015

Sasol Site Visit conference with investors led by Defendant Cornell, Defendants highlighted the

"Excellent Project Controls team in place to: monitor cost and schedule; give accurate

predictability:



56.    Despite this rosy picture painted by Sasol executives, as detailed below, during

the Class Period Defendants made numerous materially false and misleading statements

regarding Sasol's business, and deliberately omitted and withheld material information about its

operations. These included knowingly false estimates and failure to disclose material LCCP cost

and schedule overruns, and – as described in Sasol's 2019 Management's annual report on

internal control over financial reporting – "material weakness in internal control over financial

reporting with respect to the capital cost estimation process implemented in connection with the

2

LCCP, which resulted from the aggregation of a series of individual control and project-related control environment deficiencies." As result of this conduct and failure to manage the LCCP project, Defendants deliberately concealed the negative impact of the project on Sasol's financial results, which – when finally made public to investors – caused Sasol's stock price to drop significantly. In addition, in the rush to complete the project even based on the extended timeline, Sasol management cut corners and created what a former Sasol employee described as an unsafe environment, which on January 14, 2020 resulted in an explosion and shutdown of the most critical unit at the plant.

**B.      The Lake Charles Chemicals Project (LCCP)**

57.      On October 27, 2014, Sasol announced its intent to construct an $8.1 billion ethane cracker and derivatives complex in Lake Charles, Louisiana, which came to be known as the Lake Charles Chemicals Project ("LCCP"). "Cracking" refers to the process of breaking down long-chain hydrocarbons into short-chain hydrocarbons. An "ethane cracker" processes ethane (a natural gas) and cracks or converts it into ethylene by subjecting ethane to extremely hot temperatures. Ethylene is the most commonly produced petrochemical used in the manufacturing of plastics, resins, adhesives, and synthetic products. Ethane crackers can emit large amounts of ethylene, propylene, and other highly reactive volatile organic compounds. Below is a schematic diagram outlining the anticipated flow of LCCP's operations, including the LDPE unit which comprised a major part of the production at LCCP.

3

**Exhibit 84: LCCP process flow**



58.    Sasol announced that the LCCP would include seven manufacturing units, including a facility dedicated to the production of low-density polyethylene ("LDPE"), and a separate facility manufacturing Ziegler alcohol, ethoxylates, and Guerbet alcohol. Sasol promised that, "once commissioned, this world-scale petrochemicals complex will roughly triple the company chemical production in the United States, enabling Sasol to further strengthen its position in a growing global chemicals market."

59.    Sasol referred to the project as a "mega-project." The LCCP work site is approximately 3 million square meters, and the plant size is approximately 540,000 square meters. As Sasol describes, the development of this project (along with another project in Mozambique) "is a capital-intensive process carried out over long durations and requires us to

010886-11/1426678 V1

commit significant capital expenditure and devote considerable management resources in utilizing our existing experience and know-how."[1]

60.     Investors were initially bullish on LCCP. A September 1, 2015 report from Deutsche Bank gave Sasol a "buy" rating, noting that "Sasol stands out among EM oil stocks via its low leverage, dividend certainty and growth plans related to the construction of the Lake Charles chemical facility. As Sasol shifts from a predominantly oil company to a chemical company, we believe its rating will rise closer to global chemical company multiples."

**C.     Sasol's Troubled History on New Projects**

61.     Sasol's failure to disclose the true costs of the LCCP was nothing new.  Sasol has a history of cost overruns and incomplete disclosures; according to Forbes, "Sasol had a history of shaky performance on managing big projects."[2] For example, prior to LCCP Sasol had attempted to launch a wax factory project in Sasolburg, South Africa. According to Bloomberg, this project "provided warning signs about potential cultural problems earlier."[3] This project – known as FTWEP (FT Wax Expansion Project") – incurred cost overruns "of about 40%, for which Sasol took a 1.5 billion rand ($100 million) write-down." *Id.* The South African law firm, Werksmans Attorneys, was commissioned by the Sasol Board to investigate the issue in 2013,

---

[1] Sasol 2015 Form 20-F, https://www.sasol.com/sites/default/files/financial_reports/Sasol%20Form%2020-F%2C%2030%20June%202005.pdf (last visited June 3, 2020).

[2] *See* Christopher Helman, *Sasol's ECO Odd Couple Talk Up their $11 Billion Bet on Louisiana,* Forbes (Dec. 13, 2017), https://www.forbes.com/sites/christopherhelman/2017/12/13/sasols-co-ceos-talk-up-their-11-billion-bet-on-louisiana/#1f8882084202.

[3] *See* Antony Sguazzin and Paul Burkhardt, *A Management 'Culture of Fear' Derailed a South African Icon*, Bloomberg (Feb. 20, 2020), https://www.bloombergquint.com/businessweek/a-management-culture-of-fear-derailed-south-africa-s-sasol.

010886-11/1426678 V1

and found that management exchanged emails about problems with the project as early in August 2012, but did not fully disclose the cost overruns until May 2013. *Id.* The law firm cited problems with "transparency, conflicts of interest, and 'potentially gross negligence.'" The law firm's report, which Bloomberg had reviewed, also found "that there are attempts at withholding information from business units and from the Sasol Ltd. board and that there are attempts to make the picture that is FTWEP look better than it actually is." It also revealed that Executive Defendant Paul Victor "had cautioned against giving investors too much detail about the problems with the wax facility, saying in a February 2013 email that it would 'not go down well,' according to the probe. Victor was financial controller at the time." *Id.* In the end, "the 2013 warning by [the South African law firm] proved prescient for Lake Charles, where costs swelled before and throughout construction." *Id.* The warnings, which must have been known by top management and each director, clearly showed Defendant Victor's mindset against "giving investors too much detail about the problems," including at LCCP.

62.     Because of this history, Sasol's senior management was attuned to and cognizant of the materiality of its representations regarding costs and cost overruns, and the timeliness of completion of the projects. Similarly, investors and analysts – as reflected in Forbes' comments cited above – paid particularly close attention to the veracity and accuracy of Sasol's disclosures and representations based on Sasol's previous difficulties with timely and accurate disclosures.

**D.     From the Beginning, Defendants Knew Their Cost and Timeline Estimates Were False, as Confirmed by Confidential Witnesses**

63.     Sasol initially announced that its expected capital expenditure for LCCP would be $8.9 billion. But according to well-placed insiders at the company, the LCCP was plagued by cost overruns and mismanagement almost from the start, even as Sasol falsely claimed that the project was on budget and would be delivered on time. One of these employees stated that

6

Sasol's June 6, 2016 disclosure of an $8.9 billion cost estimate was a "fraud" and "wrong"

because it was directly contradicted by a Change Order, submitted by Fluor, that senior

executives must have seen. The accounts of these insiders, recounted below, are corroborated by

each other, by Sasol's eventual admissions of misconduct, and Sasol's eventual decision to fire

or replace key personnel on the project.

> **1.    CW-1: A February 2016 Change Order for $11.7 Billion Confirms Sasol Did Not Timely Disclose True Cost.**

64.     CW-1 served as a senior engineer for the LCCP project from early fall 2015 to

mid-summer July 2016, and worked as a subcontractor for Fluor, the main subcontractor on the

project. CW-1 worked both in Sasol's Houston office, and on-site at Lake Charles. CW-1 was

responsible for undertaking reviews and estimates and processing invoices for indirect costs,

including expenses related to maintaining OSHA compliance. CW-1 used Sasol's proprietary

Contract Management System ("CMSi") for payment, monthly accruals, and cost forecasting,

and used CMSi to generate a report of LCCP's indirect costs every two weeks. CW-1's reports

were incorporated into a consolidated cost report, also generated through CMSi that went to

LCCP's project leader and managers. CW-1 saw these consolidated costs reports in the course of

CW-1's work.

65.     CW-1 stated that, in February 2016, Fluor submitted a Change Order for $11.7

billion for the LCCP project — which is nearly $3 billion more than Sasol's $8.9 billion

disclosure on March 9, 2015. (Sasol waited several months to disclose its cost overruns, and even

then its June 2016 disclosure only reported that costs "could" increase to $11 billion, which

Constable described as a "worst case scenario," and underreporting the true costs by $700

million). A Change Order is a formal notice by a contractor to its client that a project's initial,

approved budget has been exhausted and that more money is needed to continue work. CW-1

saw this Change Order because it covered both direct and indirect costs for LCCP, and CW-1 was responsible for indirect costs. CW-1 remembered this change because it was such a huge increase. Sasol did not disclose to shareholders a revised cost of $11.6 - $11.8 billion until February 25, 2019 — three years after the Fluor Change Order. The Change Order cited "lack of progress" on LCCP construction and a request by Fluor to "increase the indirects" (referring to indirect costs). CW-1 stated Fluor was requesting payment despite construction delays because projects "are based on time and materials. Whether they're getting done or not."

66.    CW-1 stated that the public disclosure in June 2016 that capital expenditures "could" equal $11 billion was a "fraud" and "wrong," because the capital expenditures were known to be at least $11.7 billion at that time. The cost of the project is straightforward — it is based on quantity multiplied by price. There was no basis for Sasol to renegotiate or bargain down the price; Sasol was contractually obligated to pay Fluor's costs because it was based on a simple time and materials formulation. To that extent, Sasol was not in a position to reject the Change Order, but instead was contractually obligated to pay that amount as it came due.

67.    In addition, the Fluor contract does not represent the full price of the project. Sasol entered into separate stand-alone contracts for certain major equipment, such that the $11.7 billion Change Order represents the floor of what the project will cost. When told that senior management, in June 2016, stated that the $11 billion figure was a "worst case scenario," CW-1 stated that there was no basis to make that claim.

68.    CW-1 stated that Sasol's senior management (including Defendants Constable, Cornell, and Nqwababa) "would have had to have known" that the LCCP project was behind schedule and over budget, partly through Sasol's reports on LCCP's external costs. It was also apparent because the work was not getting done, even as Sasol continued to spend money on the

8

project. CW-1 stated the executive team would have received monthly reports summarizing the status of the progress and the cost estimates. In fact, Defendant Schoeman told CW-1 "things are not good" with the project based on the updates on progress and costs.

69.     In addition, Sasol was reporting internally a $300 million negative contingency every month. Contingencies are funds that are set aside by Sasol in case of a "black swan" event – unforeseen events that substantially alter the cost estimates of the project, like dramatic weather events. According to CW-1, the $300 million contingency would not be part of the $11.7 billion Change Order: in fact, typically contingencies are an internal figure that is not disclosed to the contractor or subcontractor. (In truth, in an August 2016 Form 6-K, Sasol disclosed that the $11 billion estimate *did* include a $300 million contingency, which means in June 2016 Sasol underreported the true costs of the project by at least $1 billion). As a result, as the project nears completion, the contingency should "minimize as progress progresses." To that extent, CW-1 stated that a $300 million contingency for a project that was nearly complete does not make sense, because at that point Sasol would have been confident that its costs estimates were accurate, and that there was little likelihood of "black swan" events occurring prior to the project coming online.

70.     CW-1 believed that Sasol used the contingency as a means of hiding the true anticipated costs of the project; CW-1 characterized it as a "dark art" and a "shell game." In particular, Sasol's use of a contingency on a project it reported as nearly complete means "you're hiding something." CW-1 also stated that it was unusual for Sasol to book the $300 million at the beginning of a month, remove at the end of the month, and then re-book it the following month. Typically, a contingency was put on the books for a specified period of time (e.g., 24 months).

9

71.    This $300 million contingency was reported in an October 2015 External Cost Report, which would have been sent to senior management (including the Executive Defendants). As a result, senior management would have known about the $300 million contingency. Finally, CW-1 noted that when in May 2019 Sasol disclosed a $300 million contingency for a project that it reported was 96% complete; this figure is a "very large number" for a project that is near completion. In CW-1's opinion, LCCP will ultimately cost around $17 billion. CW-1 based this estimate on the delays in the project, the costs associated with the project, and the fact that the plant is still not complete or earning a profit.

72.    CW-1 stated that, as a matter of standard practice, Fluor would have given Sasol executives a "heads up" in the weeks before it issued the Change Order that the official document was coming their way. According to CW-1, the Change Order would have gone to Jim Shoriak, Sasol's Vice President of U.S. Mega Projects, who in turn would have submitted the Change Order to the senior executives. CW-1 stated that Fluor "would not have expended that money [the additional $3 billion] until Sasol approved it."

73.    When told that Sasol did not disclose to shareholders a revised LCCP cost of $11.6 billion - $11.8 billion until February 2019, CW-1 stated, "That is out of order. That is just wrong."

74.    CW-1 stated that a colleague (CW-6) told CW-1 that CW-6 was asked to "mess around with the [LCCP] schedule" – to falsely report that the project would be complete in advance of its actual estimated completion date. CW-6 responded that CW-6 refused to do this, and CW-6 quit the Company in protest.

### 2. CW-2: The Executive Defendants Were Told of Cost Overruns and Delays in Project Timeline.

75.     One high-ranking former employee ("CW-2") came on board around the time that the Sasol board authorized its Final Investment Decision of $8.1 billion for LCCP in October 2014, and worked out of Sasol's Houston office. CW-2 left in mid-summer July 2015. CW-2 was responsible for all financial matters for Sasol's U.S. projects, including cost control, budgeting, forecasting, treasury, financial reporting, and tax reporting. As a result, CW-2 had a direct window into LCCP's burgeoning costs, internal control weaknesses, financial reporting, and management knowledge of cost overruns and delays with the LCCP mega project. CW-2 stated that it was "clear from the beginning" that the mega project was going to cost more than $8.1 billion. CW-2 had direct contact with Defendants Nqwababa, Cornell, and Victor, and on several occasions told each of these Defendants about CW-2's concerns regarding the cost overruns and timeline for completion of the project.

> Although ▮ ▮▮ now claims not to recall making these statements, Ms. Browning's interview memorandum, based on her contemporaneous notes, demonstrates that ▮▮ made these statements. See Ex 18 at 2.

76.     In particular, LCCP had subcontracted with two companies for the mega-project, Fluor and Technip FMC, which proved to be a "disaster." According to a Fluor press release, Fluor "provided front-end engineering and design and, in a joint venture with TechnipFMC, served as the primary engineering, procurement and construction management contractor."[4] Fluor and Technip were paid for their time and materials spent on the project, regardless

> This paragraph refers to the engineering, procurement and construction contract as a "disaster." ▮▮ ▮▮ denies referring to the "subcontracting *relationship*" as a 'disaster,' but does not deny referring to the contract itself as a "disaster." *See* ▮▮ Dec. ¶ 13.

---

[4] *See* Fluor Projects: Sasol Ethane Cracker and Derivatives Project, Fluor Corp., https://www.fluor.com/projects/construction-management-ethane-cracker-sasol.

of whether work was completed or not; there was no fixed price set by contract, which meant that both subcontractors had limited risk with respect to actual or timely completion of the project — an arrangement that CW-2 called "unusual."

77.    CW-2 efforts to raise concerns with Sasol's executive management in Houston (including Defendants Cornell and Nqwababa), "fell on deaf ears," particularly because the South Africans in management were "very dogmatic" and not open to constructive criticism or change. They exercised absolute control over the project. At the same time, CW-2 stated that Sasol was launching a mega project in a new for the first time, and doing so in the United States, where Sasol had limited experience. CW-2 ultimately left the company out of frustration with mismanagement and the lack of ability of CW-2 to fulfill CW-2's job responsibilities.

**3.    CW-3: Senior Management Knew LCCP Would Exceed Its Budget before It Disclosed Upward Cost Estimates.**

78.    CW-1 and CW-2's observations are echoed by others at the Company. A Fluor contractor who started before the Class Period and left in October 2015, CW-3, worked in Houston and on-site at the LCCP. CW-3's role was to commission, or start up, the ethane cracker. CW-3's responsibilities included working on the procedures and processes to get every operational component of the plant up and running in terms of performance, reliability, safety, and information reporting. CW-3 stated that Sasol's senior management was trying to "fast track" the project at the expense of safety amid persistent rumors of cost overruns. In addition, two Commissioners who oversaw the project at the time (Nadine Kruger and Oscar A. Febres Cordero) lacked the experience to supervise the project. Mr. Cordero in particular represented

010886-11/1426678 V1

that he was an "engineer," when in fact he was not.[5] Mr. Cordero had no experience commissioning a project, and had a "phony resume." Overall, CW-3 stated that Kruger and Cordero were "amateurs."

79.     Consistent with CW-2's recollection, CW-3 stated that CW-3 was brought into the mega-project "way too early. I almost had a full team there, and it was at least two years before start up." According to CW-3, typically commissioners are brought into the project when construction is 70% complete. But for LCCP, CW-3 and CW-3's team were brought in before Sasol had even broken ground on the project: "They were trying to fast track everything, but it doesn't work like that. It was way too early for me to be there." For example, part of commissioning involving cleaning compressors and pumps, drying out the load catalyst and reviewing engineering drawings. But CW-3 could not complete those tasks because "there was nothing to commission." Part of the problem was that, even as they sought to fast-track the project, Sasol's management kept changing its mind about how to do it. First, management wanted to do a traditional "stick build" of the plant, then switched to a "modular build" approach.

80.     CW-3 provided the following example of mismanagement. Cordero and Kruger wanted to "flush out"[6] modules in China, then ship them back to Lake Charles for assembly and installation. But "that's crazy; you can't do that," according to CW-3, because the modules would just corrode again once placed in the hull of a ship.

---

[5] It is notable that Mr. Cordero's LinkedIn profile provides no information at all on his educational background. *See* Oscar A. Febres Cordero, LINKEDIN, https://www.linkedin.com/in/oscar-a-febres-cordero-60a3382a/ (last visited June 3, 2020).

[6] The "flush out' process involves cleaning out the scale and dirt on carbon steel pipes, then applying dry air or nitrogen to prevent corrosion.

010886-11/1426678 V1

81.     More broadly, CW-3 said that, starting at least in June or July of 2015, there were widespread rumors that the $8.9 billion cost estimate was unrealistic, and at that time senior management knew that they were not going to make that budget. Similar to CW-2's observations, CW-3 stated that Fluor/Technip "didn't care about streamlining" project costs because they operated on a reimbursable contract under which they were paid regardless of whether they worked or not. According to CW-3, "[e]veryone knew they didn't do anything but were billing hours to the company." CW-3 said Cordero in particular was intent on bringing on as many people as possible on Sasol's payroll, even as CW-3 and CW-3's team was able to do the work.

82.     CW-3 also provided an example of what CW-3 described as dangerous engineering. CW-3 delivered a presentation to Cordero and Kruger on the "dangerous flaws" in the plant's water cooling system. CW-3 contended that there was not an effective means to circulate fluid through the large pumps needed for the project, but Cordero and Kruger "totally missed the whole point" and did not see the need for the changes CW-3 was proposing. CW-3 also opposed Cordero and Kruger's idea to install a 72-inch line in a water cooling unit with a butterfly valve, which would have required a worker to go down a concrete box with 135,000 gallons of water running through it a minute. CW-3 stated the worker "would have needed a scuba outfit" and that "the way they were designing stuff wasn't right; it was dangerous, you know."

83.     CW-3 decided to write a letter to Cordero's boss, Richard Brink, Sasol's VP of Commissioning and Operations Readiness for LCCP that Cordero was "incompetent and dangerous." CW-3 was fired a week later. According to Cordero's LinkedIn page, in contrast

14

010886-11/1426678 V1

Cordero remained as Sasol until July 2019. From CW-3's perspective, "It was a terrible project. I was happy to get out of there. I didn't think it was safe. It was poorly managed."

       **4.**        **CW-4: Senior Management Disclosed Inaccurate Information About the Project's Cost and Schedule, and Defendant David Constable Knew About Double-Counting in Accounting.**

84.       A fourth individual at Sasol (CW-4) corroborated CW-1, CW-2, and CW-3's accounts of persistent problems at Sasol and LCCP. CW-4 worked on accounting matters for infrastructure, offsite facilities, and utilities for six downstream chemical units. CW-4 provided presentations regarding costs to five individuals, who in turn reported to the Sasol's Group Executive Committee ("GEC"), which included Sasol's most senior executives (including Defendants Nqwababa, Cornell, Victor, and Schoeman) and some board members. Each of the Executive Defendants was a member of the GEC.  CW-4 started before the Class Period, and left in mid-summer 2018.

85.       According to CW-4, from the moment CW-4 started working at Sasol in summer 2014, he/she saw that the LCCP project was behind schedule, and saw that both the initial $8.9 billion cost estimate and the revised $11.1 billion cost estimate, both presented to shareholders and investors, were too low. Based on CW-4's calculations of the cost and reported  progress made to date (which CW-4 conducted in part after CW-4 left Sasol), CW-4 believed that Defendant Cornell was aware of the construction delays and the too-low cost estimates.

Although ▓▓▓▓ stated that "I do not believe" he made these statements about cost calculations," he did not directly recant these statements, or deny making these cost calculations.  *See* ▓▓▓▓ Dec. ¶ 10.

86.       According to CW-4, Sasol's accounting for LCCP "stinks to high heaven." As CW-4 described it, "They [management] clearly did not disclose the real health of the project forecasting and scheduling from the people who were paid to do that, which was me. They didn't disclose it

Ms. Browning's interview memorandum, based on her contemporaneous notes, demonstrates that ▓▓▓▓ made this statement. *See* Ex. 25, at 5.

15

to the market. We gave them indications very early on." CW-4 provided the following example of accounting irregularities: an accounting gimmick that Sarbanes-Oxley outlawed is the practice of reducing on the books the value of work already performed in order to improve earnings reports. One of the five individuals to whom CW-4 reported instructed him to "reduce the value of work done." CW-4 stated, "I'm not gonna do that; I don't want to share a jail cell with you." CW-4 stated the five individuals referenced above "took my cost reports, rolled them up and added in unsubstantiated accrual." This means that CW-4 was asked to lower the value of work done by reducing the amount of accrued liabilities (expenses that have been incurred but not yet paid; not including expenses owed reduces the apparent cost of a project). In effect, he said that Sasol was "double counting.' This practice – which CW-4 said David Constable knew about – continued over a period of months in 2016.

87.    CW-4's colleagues were also suspicious of the accounting, and some control managers would not sign the reports created by the five individuals referenced above. At one point, CW-4 was in a meeting with other cost control managers, and they all told management "you may as well fire us and hire a graphics designer or artist who can paint the picture you want to see. They [management] heard it [our message] clearly."

Ms. Browning's interview memorandum, based on her contemporaneous notes, demonstrates that ▮▮▮▮▮ made this statement. *See* Ex. 25, at 6.

88.    There were other accounting irregularities as well. For example, the LCCP project stipulated $36 million of negative value for Fluor "self-performing construction" (which means

16

that Fluor would perform the work on its own). But this was "ridiculous," CW-4 said, because "Fluor was never going to be performing self-construction on this job"; as CW-4 told senior management, the contracts for the work Fluor was allegedly going to self-perform was already contracted out to other third parties. CW-4 also noted that there was a $55 million negative number on the books for "management negotiated savings," which should not have been there.

89.     From the first moment CW-4 began working at Sasol (shortly before LCCP was officially launched), CW-4 saw that the LCCP project was behind schedule. According to CW-4, the initial $8.9 billion estimate was "ridiculously low," and the revised $11.1 billion estimate was too low as well. CW-4 believed Defendant Cornell knew about the construction delays and knew that the cost estimates were too low, but Defendant Cornell was incentivized to push the project to completion: all of the South African executives with Sasol shares stood to benefit from any boosts to Sasol's stock price. CW-4 believed that Defendant Nqwababa – who was ultimately fired in October 2019 – "knew nothing about executing projects."

90.     One example of Defendant Cornell's knowledge was the massive rainfall that hit Lake Charles in late 2018, which was twice the annual norm. This rainfall had a substantial negative impact on productivity. Nevertheless, Defendant Cornell told investors in November 2018 that the project was on track, when it was clear it was not.

Ms. Browning's interview memorandum, based on her contemporaneous notes, demonstrates that ███████ made this statement. *See* Ex. 25, at 6.

91.     In June 2016, after Sasol publicly revised the cost estimate up to $11.1 billion, it brought over executives from South Africa to work on the LCCP project and supposedly get it on track. But these executives "had no idea how to administer contracts in the U.S. . . . they were

17

the wrong people to run it." CW-4 said these executives were not well regarded or liked, in either a professional or personal sense, by their American counterparts.

92.   CW-4 further corroborated CW-1's statements about how the use of a high contingency late in the project reflects cost overruns and delays in the project. As CW-4 explains it, "how could you have $300 million of contingency on 8 percent of work to go? It's mind-blowing, so much contingency."

93.   Overall, CW-4 believed that Sasol executives would go to any lengths to keep up the appearance of LCCP being on track because they wanted to cash in on their Sasol shares.

**5.   CW-5: Defendant Cornell Was "100% Informed and Involved" On Cost Overruns and Construction Delays.**

94.   A fifth individual (CW-5) provides yet more corroboration of the accounts of CW-1, -2, -3, and -4. At Sasol, CW-5 worked as a risk assessor for the LCCP project, starting before the Class Period and leaving in the fall of 2015. In 2015, CW-5 believed that the project was "on budget" – but CW-5 said "on budget" throughout 2015 means the $11 billion budget, which Sasol did not disclose to shareholders until June 2016. "I would never put down that it was an $8 billion project. Absolutely when I was there, we were talking $11 billion." (This statement is corroborated by CW-1's account of a February 2016 change order reflecting LCCP's costs were $11.7 billion.) CW-5 agreed with the characterization that the $8.9 billion cost estimate was "ridiculously low," particularly because the estimates from Fluor and Technip were higher than that. The $11 billion cost estimate from the beginning was "socialized" among senior management — meaning that it was an estimate that was widely promulgated as the truth from upper management; "whatever the board saw was a really low

> Ms. Browning's interview memorandum, based on her contemporaneous notes, demonstrates that ▮▮▮▮▮ made the statements highlighted in this paragraph. *See* Ex. 29, at 1-3.

number." CW-5 knew this because C-5 heard everyone talking about that number. In light of his role on the GEC, CS-5 said, Defendant Cornell would have been "100% informed and involved" with issues concerning contracting, cost overruns, and construction delays. CW-5 stated that Defendant Cornell would have been the "ultimate arbiter" of costs, meaning that Cornell knew about the cost issues and made the decisions about costs. Cornell "became the main person steering the project. He was the ultimate decision maker" when CW-5 was on the project. CW-5 believes that there is a third party case study on LCCP as a model of what not to do.

### 6. CW-6: Management Directed Me to "Manipulate" the Schedule to Make It Look Better On Paper.

95.     CW-6 worked as a scheduler for one of the main LCCP units in Lake Charles from early summer 2018 to late winter 2019. CW-6 was a contractor through Sasol's contracting agreement with TRS Staffing Solutions, and was based at LCCP's site in Lake Charles. CW-6 said that, from the time CW-6 arrived, "we were significantly behind schedule" on construction and commissioning in CW-6's group.

96.     As a result, CW-6 stated that management directed CW-6 or CW-6's colleagues to change anticipated completion dates for projects to make it appear on paper that the project would be completed on time by compressing the remaining schedule to meet the beneficial operating date. For example, for a given construction issue, "they would say, change it to two days from 7-8, and we were saying, you can't do that. We would present something, they'd say that doesn't work, go back and make it hit the dates." CW-6 stated it was a "continuous revision" and described his duties as "pencil whipping." CW-6 stated that this practice occurred over a

large number of projects, such that the probability of completing the projects according to the schedule was extremely small.

97.     CW-6 said senior Sasol executives, including Defendant Schoeman and Mike Kane, decided to decouple LCCP's construction schedules from its commissioning, or startup, schedules, to show that more work had been completed on LCCP than actually had been. The altered construction schedules "showed we were further along than what was happening." CW-6 stated that "this was schedule manipulation." CW-6 described Schoeman as very detail-oriented.

Although ▮▮▮▮▮ testified that it was his best "guess" or an "estimate" as to who made the decision to decouple the schedules, Ms. Browning's contemporaneous notes and interview memorandum do not reflect ▮▮▮▮▮ expressing it in this manner. *See*. Ex. 35, at 3. And ▮▮▮▮▮ testified that he did say this to the investigator, and that it was based on an email from his supervisor to which he no longer had access. ▮▮▮▮ Dep. Tr. at 32:6-12.

98.     CW-6 said he/she quit in part because the requests and practice were "highly unusual" and "not normal industry standard practice."

**E.     Defendants Falsely Stated It was on Track with Initial Estimate**

99.     The Class Period begins on March 10, 2015. On the day prior (March 9, 2015), Sasol disclosed in SEC filings for the first time that the cost estimates for the project increased from $8.1 billion to $8.9 billion. Even as it made this disclosure, it reassured investors that the project was on track. Sasol stated that "[w]e are making steady progress with the advancement of our US$8.9 billion ethane cracker and downstream derivatives complex (including infrastructure and utilities) in Lake Charles, Louisiana. Site preparation is underway, and we expect that the plant will achieve beneficial operation during the 2018 calendar year."

20

100.    Investors responded enthusiastically. On March 9, 2015, Deutsche Bank released a "Buy" recommendation for Sasol's ADRs.

101.    From the beginning of the Class Period, through the initial partial disclosure in June 2016, Sasol continually reassured investors that the project was on track and making good progress. For example, on September 7, 2015, Sasol disclosed that "[c]ash flow generation remains robust, which, together with our solid, ungeared balance sheet, enables us to execute our growth projects in Southern Africa and the United States. Our US$8.9 billion world-scale ethane cracker and downstream derivatives complex in Lake Charles, Louisiana remains on track to reach beneficial operation in 2018." On March 7, 2016, Sasol announced that the "Lake Charles Chemicals Project (LCCP) is progressing. The engineering and procurement are at an advanced stage and site construction, mostly civil related, has fully commenced. We had some initial challenges associated with ground work due to the very heavy rainfall in 2015 and the regulatory need to relocate a small waterway. Cost control remains a primary focus for the team."

102.    This reassuring disclosure did not change investors' views of the project. In a March 8, 2016 report, Deutsche Bank noted, "Execution of Lake Charles Chemicals Project is being paced . . . Sasol reported yesterday that USD3.7bn (42% of total budget) had been invested into LCCP to date. It said it had slightly modified the commissioning phase with the launch of the cracker and some derivative units still scheduled for 2018, while full beneficial operation on the smaller derivative units moving into CY19. This change has no impact on our estimates, as we had already assumed a gradual commissioning of the project during CY19."

**F.    The Executive Defendants Knew, Must Have Been Aware or Recklessly Disregarded the Non-Disclosure and Omissions of Adverse Facts**

103.    As corroborated by the former Sasol employees, the Executive Defendants possessed the power and authority to control the contents of Sasol's SEC filings, press releases,

21

and other market communications. The Executive Defendants were provided with copies of Sasol's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Sasol, and their access to material information available to them but not to the public, the Executive Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Executive Defendants are liable for the false statements and omissions pleaded herein.

104.    In addition, it is inconceivable that the senior management was not following this project closely and monitoring its developing. Well-placed former employees, including all six of the former employees cited above, confirmed as much, particularly through the reporting to the General Executive Group, which included the Executive Defendants. Former employees, including all six of the former employees cited above, report that the GEC was kept up to date regarding cost overruns and project delays, but GEC did not disclose this information to the public because the individual members were incentivized to pump up the stock price for their own benefit. Moreover, the management exhibited, as disclosed by the CWs above, and as revealed by Sasol in October 2019, conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care, such that the danger of misleading investors was either known to the Defendants or so obvious that the Defendants must have been aware of it.

G.    **Defendants' Partial Disclosures of the True Cost and Scheduling Estimates, Lack of Controls and Malfeasance at the LCCP**

105.    Beginning on June 6, 2016, Defendants started to dribble out the truth about the correct estimates for LCCP. On June 6, 2016, in a Form 6-K filing, Sasol announced that "the expected total capital expenditure for the [LCCP] could increase up to US$11 billion, including

22

site infrastructure and utility improvements"; a slower rate of capital "resulted in an extended project schedule and contributed to further project cost increases"; "[t]he expected returns for the project have reduced due to changes in long-term price assumptions and the higher capital estimates"; and "[t]he increase in the estimated LCCP capital cost and extended schedule will reduce the expected project returns by approximately the same amount as the Company's lower long-term price assumptions."

106.    Following this disclosure, Sasol sought to reassure investors that the new $11 billion would be the outer bound of cost expenditures, and that Sasol would work to complete the project under budget. CEO Constable, on a call with investors that same day, stated "[w]e really want to strongly message that we are confident that we'll be able to push the CapEx down." He also described it as a "worst-case scenario," and that the $11 billion figure was an "extremely comfortable number for us." He also assured investors that the "management team remains closely involved in guiding the project team, so that we can minimize capital expenditure and further optimize overall project efficiency. To support these efforts, we have also bolstered the senior staffs' resources on the ground to enable an even greater focus on a range of execution activities."

107.    Investors were skeptical. A June 7, 2016 Deutsche Bank analysis reported that "[w]hile the company was adamant that the new capex guidance of $11bn (+24%) includes a number of unspecified contingencies and represents the maximum possible spend, we believe it is prudent to take the full $11bn estimate at face value, until further details are revealed in September."

108.    Following these disclosures, Sasol's ADR price fell $3.53 per share, or 10.99%, to close at $28.60 per share on June 6, 2016.

23

**H.    From June 2016 to February 2019, Sasol Continued to Make False Reassuring Statements about the Costs and Timeline of the Project, and Falsely Characterized Its Own Disclosures**

109.    After its June 2016 disclosure, and up through February 2019, Sasol made only one adjustment to its cost expenditures, although it also made a transparently false statement about its prior disclosures. On September 12, 2016, Defendants confirmed that the total capital cost for the LCCP "is expected to be US$11 billion, which includes site infrastructure and utility improvements," but assured the market that the amount contained an industry-norm contingency, the schedule had not been impacted, and that the "cost and schedule review process, which was completed in August 2016, has set a solid platform for the continued execution of this project, " Following this disclosure, the market only pushed the ADR price down $0.14 per share, or 0.51%, to close at $27.21 per share on September 12, 2016.

110.    Other than this disclosure (and misrepresentation), during this period Sasol continued to reassure investors that its economic outlook remained "robust," that it was "on track" to complete the project on time, and that cost expenditures "remained within" the disclosed budget. During this period, on August 27, 2018, Sasol's ADRs reached a high of $39.26 per share.

111.    On November 23, 2017, Sasol (through its co-CEO Nqwababa) made the new disclosure that cost expenditures will increase from $11 billion to $11.13 billion, but sought to soften the blow by claiming that "you'll remember that we did give a guidance that the contingence was between $400 million and $500 million when we revised our estimate in August last year. And we were also very clear that the estimate of $11 billion does not include event-driven risks, like a hurricane or some other event like that." This is false: Sasol never disclosed in August 2016 that Sasol retained a "contingence between $400 and $500 million." Sasol made

24

no disclosure in August 2016 about the specific amount of contingency, other than to state that it was smaller compared to its prior contingency of $300 million.

I.      **Beginning in February 2019, Sasol Begins to Slow-Roll the True and Accurate Cost and Scheduling Estimates, and Known Lack of Internal Controls**

112.    On February 8, 2019, during pre-market hours, Sasol filed a Form 6-K with the SEC, disclosing that "the overall [LCCP] project capital cost estimate [was] revised from US$11.13 billion to a range of US$11.6 – 11.8 billion," and with the disclosure of a five month delay in the project, the market grew increasingly skeptical of Sasol's prospects. Analysts began to suspect Sasol's credibility as the ADR price fell as much as 5.7%, ending in a drop of $1.18 per share, or 3.94%, in closing at $28.79 per share. Wall Street Journal reporter Maria Armental reported that HSBC analysts said "there comes a point where a causal relationship between disappointing execution and cheap valuation is established," and adds that Sasol may be well past that point now. But within days, on February 13, 2019, Sasol reported that the first of its seven productions units was online, countering this bad news.

113.    Then, on May 22, 2019, during pre-market hours, Sasol disclosed that "the cost estimate for the LCCP has been revised to a range of $12.6 to $12.9 billion which includes a contingency of $300 million." Sasol cited a $530 million change in the project's cost forecast because of a "[c]orrection for duplication of investment allowances of approximately $230 million"; a "[c]orrection for certain contracts and variation orders managed by Sasol, outside the primary engineering, procurement and construction contract, of approximately $180 million"; and forecast improvements that were "not expected to be realised and adjustments for potential insurance claims and procurement back-charges of approximately $120 million." Sasol also announced:

> Following this announcement a number of changes were made to
> the management of the LCCP, with project accountability

25

immediately reassigned to the Executive Vice President of Chemicals, Fleetwood Grobler and the strengthening of our project controls organisation.

This team became concerned regarding the accuracy of the project's cost forecast and, as a consequence, our third quarter Business Performance Metrics announcement in April 2019 indicated that the LCCP's cost was tracking the upper end of the range. Management also initiated a full review of the costs and schedule until project completion with input from independent technical and financial advisers.

This review identified significant additional concerns related to the LCCP forecasting process and a marked increase in the projected total cost.

****

The Board has also commissioned a review to be conducted by independent external experts. This review will cover the circumstances that may have delayed the prompt identification and reporting of the above-mentioned matters. Upon conclusion of the review, the Board will take appropriate action to address the findings.

114.    Following these disclosures, Sasol's ADR price fell $4.50 per share, or 14.93%, to close at $25.64 per share on May 22, 2019. With near-immediate analyst downgrades, on May 23, 2019, Sasol's ADRs dropped $.95 – a further drop of 3.7% – to close at $24.69.

115.    Later, on August 16, 2019, during pre-market hours, Sasol issued a press release disclosing that it was delaying the announcement of its 2019 financial results "*because of possible LCCP control weaknesses.*" Sasol stated that "[t]he board has decided to delay the announcement of Sasol's 2019 financial results until the independent review and external audit has been completed. . . . The board therefore expects to announce the 2019 financial results on Sept. 19," a month later than planned. Following this disclosure, on that same day Sasol's ADR price fell $0.74 per share, or 4.02%, to close at $17.67 per share. Then, as Sasol's stock price was battered to lows not seen since 2004, on August 26, 2019 Sasol announce the consequence

010886-11/1426678 V1

of these technical issues and the revised beneficial operation dates: the LCCP earnings before interest, tax, depreciation and amortization (EBITDA) guidance for the 2020 financial year has been adjusted from US$300-350 million to US$150-300 million.

**J.    Sasol Reveals Executive Malfeasance at the LCCP and Lack of Adequate Financial Controls in Board-Commissioned Investigative Report**

116.    On October 28, 2019, Sasol disclosed that its review of the LCCP control weaknesses had brought to light "errors, omissions, and inaccuracies in the [LCCP] cost estimate," and "inappropriate conduct and an improper tone at the top of the LCCP, including an excessive focus on maintaining cost and schedule estimates at the expense of providing accurate cost and schedule estimation to oversight bodies (including the Joint Chief Executive Officers) within the Company." Sasol also announced the agreed upon resignation or firing of several members of its executive leadership, including its Joint Presidents and Chief Executive Officers, Senior Vice Presidents, and other individuals previously charged with responsibility of the LCCP.

117.    The Company expressed its "profound regret" over the failures with the LCCP project, as follows:

> However, it is a matter of profound regret for the Board that shortcomings in the execution of the LCCP have negatively impacted our overall reputation, led to a serious erosion of confidence in the leadership of the Company and weakened the Company financially. Sadly, the LCCP challenges have tarnished the entire Company, which has world-class assets and teams that have delivered a consistently strong performance.

118.    As the market digested this news, and analyst downgrades, Sasol's ADR price fell $2.18 or 10.7% from $20.28 on October 28, 2019 to $18.10 on October 31, 2019.

010886-11/1426678 V1

**K.    LCCP's Lack of Internal Controls Culminate in Plant Explosion**

119.    Finally, even more of the undisclosed effects of the "inappropriate conduct and an improper tone at the top of the LCCP, including an "excessive focus on maintaining cost and schedule estimates at the expense of providing accurate cost and schedule estimation to oversight" came to roost with the devastating explosion and near destruction of the Lake Charles facility.

120.    On January 13-14, 2020, Sasol confirmed and then issued a press release detailing that on January 13, 2020, the Company "experienced an explosion and fire at its LCCP low-density polyethylene (LDPE) unit." Sasol stated that "[t]he unit was in the final stages of commissioning and startup when the incident occurred" and "has been shut down and an investigation is underway to determine the cause of the incident, the extent of the damage and resulting impact on the LDPE unit's [beneficial operation] schedule."

121.    Following these disclosures, Sasol's ADR price fell $1.70 per share, or 7.84%, over the following two trading days, closing at $19.99 per share on January 15, 2020. The stock then continued to drop over the next three months as investors assessed the impact of the fire and explosion at the company's $13 billion LCCP. On January 31, 2020, Sasol said told the market that the explosion would have a material impact on future earnings, as summed up in an article published by Bloomberg, entitled, "Sasol Cuts Lake Charles Guidance as Grim News Keeps Coming":

> South Africa's biggest fuel and chemicals producer said the Lake Charles Chemicals Project will make a smaller contribution to earnings, cutting its guidance for the second time in five months.
>
> The stock fell as much as 12% (Bloomberg) – to the lowest level since November 2008. The shares are down 22% this year, the worst performer in an index of South Africa's 40 largest companies.

28

010886-11/1426678 V1

A fire and an explosion at one of the U.S. project's units about two weeks ago means LCCP will only add $50 million to $100 million to earnings before interest, tax, depreciation and amortization, Johannesburg-based Sasol said in a statement.

"It has been one disappointment after another," said Cassie Treurnicht, a portfolio manager at Gryphon Asset Management Ltd. in Cape Town. "If you've been invested all along you simply reach a point where you are so fed up with management that you sell the share for emotional reasons rather than numerical ones."

The setback comes as Sasol said first-half profit will plunge as much as 79%, weighed down by a weak macroeconomic environment that resulted in lower margins and operating profit. Earnings before one-time items in the six months through December will decline to between 4.79 rand and 7.11 rand per share from 23.25 rand ($1.57).

## L.    Sasol Enters Downward Spiral Following January 2020 Explosion

122.    Following the explosion at the plant, the market noted that the project (and Sasol's value) continued to deteriorate.  On February 28, 2020, J.P. Morgan Cazenove analyst Alex Comer noted the stock had continued to fall more than 25% in 10 days and 55% since its December 2019 high and remained cautious on LCCP:

> Though we expect LCCP to materially contribute to Sasol's ability to de-lever, a series of cost overruns and delays has left us skeptical around project implementation and we also see downside risk from a bearish petrochemicals outlook. Thus, while we still see upside from LCCP we are Neutral until we see evidence of completion within updated cost guidance ranges.

123.    The ADRs continued to fall to $12.15 on March 4, 2020 before the Coronavirus pandemic began to hit the stocks of its competitors as well.

124.    Then, on April 23, 2020, Sasol again reduced the EBITDA for LCCP from a positive USD 50 million to USD 100 million to a loss of the same for fiscal year 2020. At the same time Sasol announced it was trying to find a buyer for a stake in LCCP.

125.    Between January 15, and April 23, 2020, Sasol's ADR price plunged from $19 to as low as $7.66 on June 3, 2020, reflecting in part the uncertainty of the state of LCCP as a result

29

of the malfeasance identified above, the continual lowering of LCCP EBITDA estimates, and the

wait for the LDPE and other units to come online.

010886-11/1426678 V1