# EXHIBIT 37

## [REDACTED VERSION]

### MOSHELL V. SASOL
### CASE NO. 1:20-CV-01008-JCP

**COMPARISON OF SAC ALLEGATIONS, THE INVESTIGATOR'S MEMORANDA AND NOTES, AND PORTIONS OF CWS' DECLARATIONS**

| SAC TEXT | LYNNLEY BROWNING INTERVIEW MEMOS AND NOTES ARE FULLY CONSISTENT WITH COMPLAINT | CWS DO NOT DENY MAKING KEY STATEMENTS TO THE INVESTIGATOR |
|---|---|---|
| **CW-2 (          )** | | |
| ¶ 75: O          rmer employee ("CW-2") came on board around the time that the Sasol board authorized its Final Investment Decision of $8.1 billion for LCCP in October 2014, and worked out of Sasol's Houston office. CW-2 left in mid-summer July 2015. CW-2 was responsible for all financial matters for Sasol's U.S. projects, including cost control, budgeting, forecasting, treasury, financial reporting, and tax reporting. As a result, CW-2 had a direct window into LCCP's burgeoning costs, internal control weaknesses, financial reporting, and management knowledge of cost overruns and delays with the LCCP mega project. CW-2 stated that it was "clear from the beginning" that the mega project was going to cost more than $8.1 billion. CW-2 had direct contact with Defendants Nqwababa, Cornell, and Victor, and on several occasions told each of these Defendants about CW-2's concerns regarding the cost overruns and timeline for completion of the project. |  | • "In the routine course of my role as ____, I had numerous general conversation Messrs. Nqwababa, Cornell and Victor about the potential risks and mitigation strategies for Sasol's North America [sic], including the LCCP. Contrary to what is alleged in the Second Amended Complaint, however, I did not raise any concerns regarding specific cost overruns or regarding the timeline for completion of the projection that I knew or believed rendered the then $8.9 billion estimate or then–current schedule false. ____ Decl. ¶ 11.<br><br>• "Before leaving Sasol, I had a conversation with Mr. Cornell and Mr. Nqwababa regarding some of my general concerns with the culture at Sasol, however, these concerns were not specifically related to the LCCP. To my knowledge, at the time of my departure, there were no significant deficiencies or material weaknesses related to external financial reporting of the LCCP by Sasol." ____ Decl. ¶ 12. |

- 1 -

010886-11/1426455 V1

| SAC Text | Lynnley Browning Interview Memos and Notes Are Fully Consistent with Complaint | CWs Do Not Deny Making Key Statements to the Investigator |
|---|---|---|
| | ███████████████ | ███████████████ at 26:3–26:25, 29:2–32:17. <br> • ███████████ testified that she had direct contact with Defendants Nqwababa, Cornell, and Victor while at Sasol. ██████████ Dep. at 41:17–42:22. <br> • ████imony, while ████████████ denies raising concerns regarding *specific* cost or schedule overruns, ███████████ could not recall and therefore was unable to deny saying that she told Ms. Browning that she raised scheduling concerns generally, or that she raised concerns about Sasol's contracting at the LCCP to these Defendants. ██████████Dep. at 42:24–44:9, 49:14–24. |
| ¶ 76: In particular, LCCP had subcontracted with two companies for the mega-project, Fluor and Technip FMC, which proved to be a "disaster." According to a Fluor press release, Fluor "provided front-end engineering and design and, in a joint venture with Technip FMC, served as the primary engineering, procurement and construction management contractor." Fluor and Technip were paid for their time and materials spent on the project, regardless of whether work | ███████████████ | • "Finally, I did find Sasol's contract with Fluor to lack some controls based on my industry experience (because Fluor was compensated based on time and materials rather than achievement of project milestones), however, I did not tell plaintiffs' investigator that the |

010886-11/1426455 V1

| SAC Text | Lynnley Browning Interview Memos and Notes Are Fully Consistent With | CWs Do Not Deny Making Key Statements to the Investigator |
|---|---|---|
| was completed or not; there was no fixed price set by contract, which meant that both subcontractors had limited risk with respect to actual or timely completion of the project — an arrangement that CW-2 called "unusual." | ██████████████████████████ | subcontracting relationship with Fluor was a 'disaster.'" ████████ Decl. ¶ 13.[1] <br> • ████████████ testified that she did not █████████ fore was unable to deny that she discussed the following with Ms. Browning: that the Fluor contract was "unusual" in that it wasn't a fixed contract, but as a times and materials contract and therefore the contractor had no shared risk; and during her tenure there was not much for the contractor to do because the LCCP was still in its early stages, but at the same time there were too many people brought on too early at the LCCP. ████████ Dep. at 35:25–41:16. |
| ¶ 77: CW-2 efforts to raise concerns with Sasol's executive management in Houston (including Defendants Cornell and Nqwababa), "fell on deaf ears," particularly because the South Africans in management were "very dogmatic" and not open to constructive criticism or change. They exercised absolute control over the project. At the same time, CW-2 stated that Sasol was launching a mega project in a new for the first time, and doing so in the United States, where Sasol had limited experience. CW-2 ultimately left the company out of frustration with mismanagement and the lack of ability of CW-2 to fulfill CW-2's job responsibilities. | ██████████████████████████ | • ████████████ testified that she resigned due the culture at Sasol, where South African leadership had very strong opinions and closed to the o █████ thers and new ideas and concepts. ████████ Dep. at 44:16–49:13. |

---

[1] Note that the SAC refers to the *contract* as a "disaster"; ████████████ denies referring to the "subcontracting relationship" as a 'disaster," but does not deny referring to the contract itself as

| SAC Text | Lynnley Browning Interview Memos and Notes Are Fully Consistent with Complaint | CWs Do Not Deny Making Key Statements to the Investigator |
|---|---|---|
| | ██████████████████████ | |
| **CW-4 (** ████████████ **)** | | |
| ¶ 84: A ████████ Sasol (CW-4) corroborated CW-1, CW-2, and CW-3's accounts of persistent problems at Sasol and LCCP. CW-4 worked on accounting matters for infrastructure, offsite facilities, and utilities for six downstream chemical units. CW-4 provided presentations regarding costs to five individuals, who in turn reported to the Sasol's Group Executive Committee ("GEC"), which included Sasol's most senior executives (including Defendants Nqwababa, | ██████████████████████ | • ████████ testified that he worked for ████████████ ██████████████ ████████████ Dep. at 47:19– • ████████ testified that provided egarding costs to "Four |

- 4 -

| SAC Text | Lynnley Browning Interview Memos and Notes Are Fully Consistent with Complaint | CWs Do Not Deny Making Key Statements to the Investigator |
|---|---|---|
| Cornell, Victor, and Schoeman) and some board members. Each of the Executive Defendants was a member of the GEC. CW-4 started before the Class Period, and left in mid-summer 2018. | [REDACTED] | Horsemen" Sasol executives. [REDACTED] Dep. at 49:4–50:15.<br>• "In various places, plaintiffs state that I believe what Mr. Cornell or Mr. Constable knew. Since Sasol disclosed to the market that schedule delays and cost over-runs were forecasted, I can only assume that Mr. Constable and Mr. Cornell knew about the delays. However, I had no personal interactions with Mr. Cornell or Mr. Constable, and do not have any personal knowledge regarding what they knew or did not know. I had no direct insight into any information provided to either Mr. Cornell or Mr. Constable." [REDACTED] Decl. ¶ 15. |
| ¶ 85: According to CW-4, from the moment CW-4 started working at Sasol in summer 2014, he/she saw that the LCCP project was | [REDACTED] | • "Although I do recall stating my opinion an-hours on the [REDACTED] were too low |

| SAC Text | Lynnley Browning Interview Memos and Notes Are Fully Consistent with Complaint | CWs Do Not Deny Making Key Statements to the Investigator |
|---|---|---|
| behind schedule, and saw that both the initial $8.9 billion cost estimate and the revised $11.1 billion cost estimate, both presented to shareholders and investors, were too low. Based on CW-4's calculations of the cost and reported progress made to date (which CW-4 conducted in part after CW-4 left Sasol), CW-4 believed that Defendant Cornell was aware of the construction delays and the too-low cost estimates. | ███████████████████████ | when I received the ██████ estimate, that was only a small po███ the overall $8.9 billion estimate for the LCCP. At no time did I examine the entire $8.9 billion dollar [sic] estimate to conclude that the overall estimate was too low. It was not my responsibility to do so." ████████ Decl. ¶ 8.<br>• ████████████ similarly testified that it was ███ t the man-hours on the ████████████████ were too low ████████ get estimate. ████████ Dep. at 60:16–61:4.<br>• "Similarly, when I transferred to the ██████ unit in 2016, this was one aspect of t overall LCCP estimate. Although I thought portions of the ██████ estimate appeared aggressive whe███ eived that discrete portion of the overall $11.1 billion estimate, I did not form any opinion as to whether the many other pieces of the LCCP budget were aggressive or not. I do not have any personal basis to think or give the opinion that the $11.1 billion estimate for the overall project was too low, as is attributed to me in the Second Amended Complaint." ████████ Decl. ¶ 9.<br>• With respect to the other allegations in paragraph 85, I do not believe that I told the plaintiffs' investigator that I calculated cost estimates after my employment ended, nor would such a statement even make sense. I only had the ability to forecast costs during |

| SAC TEXT | LYNNLEY BROWNING INTERVIEW MEMOS AND NOTES ARE FULLY CONSISTENT WITH COMPLAINT | CWs DO NOT DENY MAKING KEY STATEMENTS TO THE INVESTIGATOR |
|---|---|---|
| | | the term of my employment, and even then only for the ▮▮▮ and ▮▮▮ units when I worked at e    ect re    ively, as opposed to the overall LCCP project. I did not have access to project information after I left the LCCP in July 2018." ▮▮▮ Decl. ¶ 10. |
| ¶ 86: According to CW-4, Sasol's accounting for LCCP "stinks to high heaven." As CW-4 described it, "They [management] clearly did not disclose the real health of the project forecasting and scheduling from the people who were paid to do that, which was me. They didn't disclose it to the market. We gave them indications very early on." CW-4 provided the following example of accounting irregularities: an accounting gimmick that Sarbanes-Oxley outlawed is the practice of reducing on the books the value of work already performed in order to improve earnings reports. One of the five individuals to whom CW-4 reported instructed him to "reduce the value of work done." CW-4 stated, "I'm not gonna do that; I don't want to share a jail cell with you." CW-4 stated the five individuals referenced above "took my cost reports, rolled them up and added in unsubstantiated accrual." This means that CW-4 was asked to lower the value of work done by reducing the amount of accrued liabilities (expenses that have been incurred but not yet paid; not including expenses owed reduces the apparent cost of a project). In | ▮▮▮ | • "Likewise, during my time as ▮▮▮ ▮▮▮ on the ▮▮▮ I    ceedin    get, but it is my understanding that Sasol also disclosed increases in the cost of the LCCP to the market." ▮▮▮ Decl. ¶ 11. <br> • "*While I           elling the plaintiffs' investigator that I was told           uce the value of work done in the ▮▮▮ accrual submission form as part of           fficial cost report in either late Q1 2018 or early to mid Q2 2018*, I also told the plaintiffs' investigator that I refused to do so. I recalled making a comment to my supervisor that 'I don't want to share a jail cell with [him],' and the report I ultimately submitted was accurate and based on my calculations. As for the allegation that Sasol was 'double-counting,' I do not understand what this allegation means, do not understand the context behind it, and do not believe I ever said it in regards to the context of the allegation." ▮▮▮ Decl. ¶ 12 (emphasis added). <br> • ▮▮▮ testified that Sasol           sked him to reduce the |

| SAC Text | Lynnley Browning Interview Memos and Notes Are Fully Consistent With | CWs Do Not Deny Making Key Statements to the Investigator |
|---|---|---|
| effect, he said that Sasol was "double counting.' This practice – which CW-4 said David Constable knew about – continued over a period of months in 2016. | ███████████ | amount of accrued liabilities—a violation of the Sarbanes-Oxley Act. Consistent with Ms. Browning's notes, ████████ identified Johan Barnar ████ our horsemen, as the Sasol manager who told him to engage in this accounting fraud. ████ Dep. at 51:5–52:21. |
| ¶ 87: CW-4's colleagues were also suspicious of the accounting, and some control managers would not sign the reports created by the five individuals referenced above. At one point, CW-4 was in a meeting with other cost control managers, and they all told management "you may as well fire us and hire a graphics designer or artist who can paint the picture you want to see. They [management] heard it [our message] clearly." | ███████████ | • "I also do not recall stating that my colleagues were suspicious of the reporting but I do recall calling my counterparts to state my position about not reducing the value of the work done and recommended that they not do so if told." ████ Decl. ¶ 13.<br>• "The statement in paragraph 87 that 'you may as well fire us and hire a graphics designer' is also inaccurate and misleading as it is presented in the Second Amended Complaint. While I recall the statement, I do not remember the context of the meeting in which the statement was made and whether it was related to cost, schedule, risk management, or some other component." ████ Decl. ¶ 14.<br>• ████ similarly testified that cost control managers told Sasol management that "you might as well fire us and hire a graphics designer who can paint the picture you want to see" and that he told his supervisor he "didn't want to share a jail cell" with him. ████ Dep. at 52:18–21, 55:22–56:21. |

010886-11/1426455 V1

| SAC TEXT | LYNNLEY BROWNING INTERVIEW MEMOS AND NOTES ARE FULLY CONSISTENT WITH | CWS DO NOT DENY MAKING KEY STATEMENTS TO THE INVESTIGATOR |
|---|---|---|
| ¶ 88: There were other accounting irregularities as well. For example, the LCCP project stipulated $36 million of negative value for Fluor "self-performing construction" (which means that Fluor would perform the work on its own). But this was "ridiculous," CW-4 said, because "Fluor was never going to be performing self-construction on this job"; as CW-4 told senior management, the contracts for the work Fluor was allegedly going to self-perform was already contracted out to other third parties. CW-4 also noted that there was a $55 million negative number on the books for "management negotiated savings," which should not have been there. | ████████████████████ | • ████████████ testified that Sasol engaged ███████████ nting gimmicks, including stipulating to $36 million of negative value for Fluor for self-performing construction, and maintaining a $55 million negative number on the books for "management negotiated savings" that he questioned. ████████ Dep. at 57:8–60:11. |
| ¶ 89: From the first moment CW-4 began working at Sasol (shortly before LCCP was officially launched), CW-4 saw that the LCCP project was behind schedule. According to CW-4, the initial $8.9 billion estimate was "ridiculously low," and the revised $11.1 billion estimate was too low as well. CW-4 believed Defendant Cornell knew about the construction delays and knew that the cost estimates were too low, but Defendant Cornell was incentivized to push the project to completion: all of the South African executives with Sasol shares stood to benefit from any boosts to Sasol's stock price. CW-4 believed that Defendant Nqwababa – who was | ████████████████████ | • "With respect to the allegation in paragraph 89, I do recall making the statement that Bongani 'knew nothing about executing projects,' but that was purely speculation because I understood Nqwababa to come from a heavy finance background." ████████ Decl. ¶ 19. |

| SAC TEXT | LYNNLEY BROWNING INTERVIEW MEMOS AND NOTES ARE FULLY CONSISTENT WITH COMPLAINT | CWS DO NOT DENY MAKING KEY STATEMENTS TO THE INVESTIGATOR |
|---|---|---|
| ultimately fired in October 2019 – "knew nothing about executing projects." | ███████████ | |
| ¶ 90: One example of Defendant Cornell's knowledge was the massive rainfall that hit Lake Charles in late 2018, which was twice the annual norm. This rainfall had a substantial negative impact on productivity. Nevertheless, Defendant Cornell told investors in November 2018 that the project was on track, when it was clear it was not. | ███████████ | |

- 10 -

| SAC Text | Lynnley Browning Interview Memos and Notes Are Fully Consistent with | CWs Do Not Deny Making Key Statements to the Investigator |
|---|---|---|
| | ▮▮▮▮▮▮▮▮ | |
| ¶ 91: In June 2016, after Sasol publicly revised the cost estimate up to $11.1 billion, it brought over executives from South Africa to work on the LCCP project and supposedly get it on track. But these executives "had no idea how to administer contracts in the U.S. . . . they were the wrong people to run it." CW-4 said these executives were not well regarded or liked, in either a professional or personal sense, by their American counterparts. | ▮▮▮▮▮▮▮ | • [▮▮▮▮▮ does not reference or recant ▮▮▮▮▮ n his Declaration.] |
| ¶ 92: CW-4 further corroborated CW-1's statements about how the use of a high contingency late in the project reflects cost overruns and delays in the project. As CW-4 explains it, "how could you have $300 million of contingency on 8 percent of work to go? It's mind-blowing, so much contingency." | ▮▮▮▮▮▮▮ | • "With respect to the allegation in paragraph 92 that 'CW-4 further corroborated CW-1's statements about how the use of a high contingency late in the project reflects cost overruns and delays in the project,' that is not true. I do not agree that applying a high contingency late in the project reflects cost overruns and delays in the project so I do not attest to corroborating CW-1's inaccurate statement." ▮▮▮▮ Decl. ¶ 17. |
| ¶ 93: Overall, CW-4 believed that Sasol executives would go to any lengths to keep up the appearance of LCCP being on track because they wanted to cash in on their Sasol shares. | ▮▮▮▮▮▮▮ | • "Finally the statement in the Second Amended Complaint that I 'believed that Sasol executives would go to any lengths to keep up the appearances of LCCP being track because they wanted to cash in on their Sasol shares' misrepresents my conversation with plaintiffs' investigator. The phrase 'go to any length' [sic] is not a phrase I would use, and I am not aware of |

- 11 -

| SAC Text | Lynnley Browning Interview Memos and Notes Are Fully Consistent with Complaint | CWs Do Not Deny Making Key Statements to the Investigator |
|---|---|---|
| | | the quantity o        asol executives had Sasol stock." ▉▉▉▉ Decl. ¶ 19. |
| **CW-5 (** ▉▉▉▉▉▉▉▉ **)** | | |
| ¶ 94: A ▉▉▉▉▉ W-5) provides yet more corroboration of the accounts of CW-1, -2, -3, and -4. At Sasol, CW-5 worked as a risk assessor for the LCCP project, starting before the Class Period and leaving in the fall of 2015. In 2015, CW-5 believed that the project was "on budget" – but CW-5 said "on | | • ▉▉▉▉▉▉  testified that he worked as ▉▉▉▉▉▉▉▉▉ |

010886-11/1426455 V1

| SAC TEXT | LYNNLEY BROWNING INTERVIEW MEMOS AND NOTES ARE FULLY CONSISTENT WITH COMPLAINT | CWS DO NOT DENY MAKING KEY STATEMENTS TO THE INVESTIGATOR |
|---|---|---|
| budget" throughout 2015 means the $11 billion budget, which Sasol did not disclose to shareholders until June 2016. "I would never put down that it was an $8 billion project. Absolutely when I was there, we were talking $11 billion." (This statement is corroborated by CW-1's account of a February 2016 change order reflecting LCCP's costs were $11.7 billion.) CW-5 agreed with the characterization that the $8.9 billion cost estimate was "ridiculously low," particularly because the estimates from Fluor and Technip were higher than that. The $11 billion cost estimate from the beginning was "socialized" among senior management — meaning that it was an estimate that was widely promulgated as the truth from upper management; "whatever the board saw was a really low number." CW-5 knew this because C-5 heard everyone talking about that number. In light of his role on the GEC, CS-5 said, Defendant Cornell would have been "100% informed and involved" with issues concerning contracting, cost overruns, and construction delays. CW-5 stated that Defendant Cornell would have been the "ultimate arbiter" of costs, meaning that Cornell knew about the cost issues and made the decisions about costs. Cornell "became the main person steering the project. He was the ultimate decision maker" when CW-5 was on the project. CW-5 believes that there is a third | | • ███████ confirmed his awareness of ███ tes from Fluor and Technip that were higher than the $8.9 billion publicly figure represented at the time of his tenure, and confirmed that the Fluor and Technip estimates w ███ d" among Sasol management. ███████ at 29:8– 18, 29:4–13, 66:14– <br>• ███████ testified that in light of his ███ endant Cornell would have been informed of co ███ s and construction delays. ███████ Dep. at 39:15–25. <br>• ███████ also confirmed there is a third ███ dy on LCCP as a model of what not to do. ███████ Dep. at 53:17– 54:6. |

- 13 -

| SAC TEXT | LYNNLEY BROWNING INTERVIEW MEMOS AND NOTES ARE FULLY CONSISTENT WITH COMPLAINT | CWs DO NOT DENY MAKING KEY STATEMENTS TO THE INVESTIGATOR |
|---|---|---|
| party case study on LCCP as a model of what not to do. | | |

010886-11/1426455 V1