**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHAD LINDSEY MOSHELL, Individually and On Behalf of All Others Similarly Situated, | |
| Plaintiff, | Case No. 1:20-CV-01008-JPC |
| -v- | Hon. John P. Cronan |
| SASOL LIMITED, DAVID EDWARD CONSTABLE, BONGANI NQWABABA, STEPHEN CORNELL, PAUL VICTOR, and STEPHAN SCHOEMAN, | |
| Defendants. | |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR RECONSIDERATION OF THE COURT'S AUGUST 24, 2020 MEMORANDUM ORDER AND MOTION FOR SANCTIONS**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

*Attorneys for Defendants Sasol Limited, David Edward Constable, Bongani Nqwababa, Stephen Cornell, Paul Victor, and Stephan Schoeman*

February 9, 2021

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................1

I.    COUNSEL ABANDON THE COMPLAINT'S KEY ALLEGATIONS AND
      ADMIT THE WORST OF THEIR MISCONDUCT. ..........................................................3

      A.    COUNSEL ABANDON CW-1'S CHANGE ORDER ALLEGATION. .......................4

      B.    COUNSEL ABANDON CW-2'S ALLEGATIONS OF DEFENDANTS'
            ACTUAL KNOWLEDGE AND ADMIT TO CW-2'S MISTREATMENT. ...............7

      C.    COUNSEL ABANDON CW-4 BY CLAIMING HE WAS UNRELIABLE. ..............9

      D.    COUNSEL CANNOT DISPUTE THEIR MISTREATMENT OF CW-5. .................11

      E.    THE ONLY CWS COUNSEL FULLY STAND BY ARE IRRELEVANT. ...............13

II.   COUNSEL'S DESPERATE GRAB BAG OF ADDITIONAL ARGUMENTS
      CANNOT AVERT DISMISSAL AND SANCTIONS. ......................................................14

III.  CONCLUSION....................................................................................................................16

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
　579 F.3d 143 (2d Cir. 2009)..................................................................................16

*Campo v. Sears Holdings Corp.*,
　371 F. App'x 212 (2d Cir. 2010) ...........................................................................13

*City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*,
　711 F.3d 754 (7th Cir. 2013) .................................................................................13

*City of Livonia Emps.' Ret. Sys. v. Boeing Co.*,
　2011 WL 824604 (N.D. Ill. Mar. 7, 2011),
　*aff'd in part, vacated in part sub nom.*
　*City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*,
　711 F.3d 754 (7th Cir. 2013) ...................................................................................9

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
　952 F. Supp. 2d 633 (S.D.N.Y. 2013)....................................................................13

*In re Dynex Cap., Inc. Sec. Litig.*,
　2011 WL 2581755 (S.D.N.Y. Apr. 29, 2011)..........................................................15

*In re JDS Uniphase Corp. Sec. Litig.*,
　2008 WL 753758 (N.D. Cal. Mar. 19, 2008)..........................................................15

*Johnson v. Smithkline Beecham Corp.*,
　2015 WL 1004308 (E.D. Pa. Mar. 9, 2015).............................................................3

*In re Millennial Media, Inc. Sec. Litig.*,
　2015 WL 3443918 (S.D.N.Y. May 29, 2015) ........................................................15

*New Hampshire v. Maine*,
　532 U.S. 742 (2001)................................................................................................6

*Nguedi v. Fed. Rsrv. Bank of N.Y.*,
　2019 WL 1083966 (S.D.N.Y. Mar. 7, 2019),
　*aff'd*, 813 F. App'x 616 (2d Cir. 2020).....................................................................9

*Novak v. Kasaks*,
　216 F.3d 300 (2d Cir. 2000)...................................................................................16

*Perpetual Sec., Inc. v. Tang*,
　290 F.3d 132 (2d Cir. 2002)...................................................................................16

*In re Pfizer Inc. Sec. Litig.*,
    2012 WL 983554 (S.D.N.Y. Mar. 22, 2012) ..........................................................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...........................................................................................................3, 16

*Wright v. Ernst & Young LLP*,
    152 F.3d 169 (2d Cir. 1998)..................................................................................................15

**Rules**

Fed. R. Civ. P. 11(b) ..................................................................................................................7

Fed. R. Civ. P. 11(c)(2)..............................................................................................................16

Fed. R. Civ. P. 11(c)(3)..............................................................................................................16

Defendants respectfully submit this memorandum in further support of their Motion for Reconsideration of the Court's August 24, 2020 Memorandum Order and Motion for Sanctions under Rules 11 and 54(b) of the Rules and the PSLRA (the "Motion") [ECF No. 104].[1]

## PRELIMINARY STATEMENT

Based on the "rather troubling" record set forth in Defendants' opening Motion, the Court ordered discovery and a review of Counsel's conduct regarding the CW allegations in the Complaint. Nov. 10 Tr. at 2:21. Specifically, the Court instructed that "the issue is a pretty straightforward one, what did the CWs tell the plaintiffs regarding [what] was later represented in the complaint. How did those communications occur; how were they memorialized; how were they represented in the complaint; [and] were the CWs shown a copy of the complaint and . . . how their statements would be characterized." *Id.* at 37:4-10.

Defendants presented the results of that review in the Supplement. Set forth there in detail, with extensive citations to the evidentiary record, were these incontrovertible facts:

- Counsel used three CWs without permission and against their express wishes.

- Counsel proceeded without telling these CWs that they would use them, without giving them the opportunity to confirm or correct the allegations, and without letting the CWs know after the fact that they had been injected into a litigation.

- When the CWs saw the Complaint for the first time, and again in their Court-ordered depositions, they unequivocally disclaimed ever making the key allegations that Counsel attributed to them and that Judge Rakoff relied upon in his Motion to Dismiss ruling.

- CWs testified that they told Counsel before the Complaint was filed *the exact opposite* of allegations attributed to them, accounts that negate the entire premise of the fraud Counsel alleged.

- Contemporaneous notes, emails, and memos from Counsel and their PI confirm that Counsel *never* had a good-faith basis for the key CW allegations. No internal records

---

[1] Capitalized terms not otherwise defined herein have the same meanings as in the Motion and the *Supplemental Memorandum of Law and Report of Investigation* [ECF No. 116] (the "Supplement" or "Supp.").

demonstrate that the CWs ever said what was attributed to them in the Complaint. Many records squarely contradict the Complaint.

- Internal contemporaneous records also show that Counsel were aware of and warned that allegations they made were false. Contemporaneous text messages show Counsel used CW allegations even after the CW said that everything he had told them was false.

- Counsel covered up this misconduct by refusing routine discovery requests for the identities of the CWs, refusing to agree to a court conference to address that dispute, and obstructing CW depositions.

- Counsel lied about all of the above to this Court.

Faced with this record, Counsel's principal defense is to assert that their own CWs are lying now when they deny making the statements in the Complaint. This defense does not fly. It is now a matter of record that Counsel included the CW allegations despite the refusals of the CWs to participate, never telling the CWs that they did so, never showing them drafts of the Complaint, and never giving them the opportunity to confirm the attributions. As this Court recognized, referencing *Millennial Media*, "it's difficult to come up with a good reason why counsel would not attempt to confirm, with a witness, the accuracy of the statements that are going to be attributed to the witness [in] the complaint." *Id.* at 16:17-21. Having failed to follow this fundamental rule, Counsel cannot now baselessly accuse the CWs of perjury when those CWs corrected the record immediately, the first time they became aware of it.

Moreover, the deposition testimony of the CWs is vivid and compelling—and fully supported by the contemporaneous records created by Counsel and their PI. Conversely, there is no contemporaneous record of the CWs ever saying what Counsel attributed to them in the key allegations of the Complaint. Counsel's after-the-fact, self-serving hearsay assertions cannot overcome the CWs' sworn testimony and the contemporaneous evidentiary record.

Pivoting in the face of this damning record, Counsel argue that none of their misconduct matters. In particular, discovery showed that the critical Change Order allegation (that CW-1 said

the February 2016 Change Order was "legally binding" on Defendants) was false; indeed, CW-1 agreed that a Change Order is not legally binding and never stated to Counsel that it was. In response, Counsel do not even try to defend their allegation, they simply abandon it. Although it has been the cornerstone of their Complaint, Counsel now claim for the first time that they *never* said a Change Order was legally binding and that this issue makes no difference. But (i) the Complaint and (ii) the Motion to Dismiss briefs and (iii) the oral argument transcript and (iv) Judge Rakoff's decision all say otherwise. Counsel's pleading and repeated insistence that the Change Order legally imposed an $11.7 billion obligation on Defendants has been the most important and hotly contested allegation in the Complaint since day one. That Counsel would pretend otherwise in a court filing is in itself a sanctionable offense.

Beyond that, Counsel erect a straw man, arguing that it is normal to use CWs and PIs in securities cases—which no one denies—and conclude that their having done so here is "best practices." This sweeps aside Counsel's specific misconduct *in this case.* Allowing this action to proceed on this unrebutted record of troubling misconduct would open Pandora's Box. Counsel's claim that their misconduct represents "best practices"—or anything other than fraud on the Court requiring dismissal and sanctions—flies in the face of the PSLRA, Rule 11, and everything Congress and courts have done to "curb perceived abuses of the § 10(b) private action." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007). This is all the more so in light of Counsel's having been previously sanctioned for similar misconduct. *See Johnson v. Smithkline Beecham Corp.*, 2015 WL 1004308 (E.D. Pa. Mar. 9, 2015).

I.     **COUNSEL ABANDON THE COMPLAINT'S KEY ALLEGATIONS AND ADMIT THE WORST OF THEIR MISCONDUCT.**

At the hearing before this Court, Counsel claimed that they "absolutely" stand by "all of the CW accounts" because "each of these confidential witnesses [was] cooperating" and that

3

"[t]here have been no fabrications, no exaggerations, period, and we'll submit evidence to the Court proving this." Nov. 10 Tr. at 2:23-3:13; *see also* Opp. at 30 ("None of the facts attributed to the Recanting Witnesses has been proven to be false."). The actual record in this matter proves Counsel's statement to have been false in all key respects.

A.    **COUNSEL ABANDON CW-1'S CHANGE ORDER ALLEGATION.**

The single most important allegation in this case was Counsel's claim, attributed to CW-1, that Sasol received a "legally binding" Change Order in February 2016 for $11.7 billion. AC ¶ 21; *see id.* ¶ 67 ("Sasol . . . was contractually obligated to pay that amount."). This was critical because Plaintiffs alleged that, as of that date, Defendants knew with certainty that their public $8.9 billion estimate was false. If, on the other hand, the Change Order was merely an estimate that would kick-off a negotiation process, then that would jibe with a public disclosure made by Defendants shortly after the Change Order was received. *See* Sasol MTD at 21-22. Thus Defendants argued in their Motion to Dismiss that there was no such thing as a legally binding Change Order and asked to depose the CWs. *See id.* at 34 (arguing that the "Change Order story does not pass muster" under Rule 11). But Counsel strenuously opposed CW depositions and responded that "CW-1 describe[d] . . . [the] legally binding nature of the Change Order." MTD Opp. at 23.

Given this critical dispute, Judge Rakoff asked Counsel directly about the allegation at the oral argument on the Motion to Dismiss. Counsel confirmed that "[CW-1] knew it was legally binding." Aug. 20 Tr. at 22:17-19. Judge Rakoff asked two more times, "want[ing] to be absolutely sure": "Your representation is that CW-1 told you that he had seen this change order and that he saw from it and from other documents he had seen that it was a binding order. Do I have that right?" *Id.* at 26:25-27:4; *see id.* at 26:15-16 (asking again). Counsel responded: "Your Honor, to be exactly correct, it would be told a colleague in our firm, but, yes, we – yes." *Id.* at 27:5-6; *see id.* at 26:19 ("That is the CW's statement. We confirmed it."). With Counsel's affirmance on the

4

record, this "[p]articularly damning" allegation formed the basis of Judge Rakoff's denial of the Motion to Dismiss. MTD Order at 4; *see id.* at 11 ("Most notably"); *id.* at 14 ("Perhaps most significantly"); *id.* at 18 (distinguishing the Change Order from a "nonbinding" bid).

But the Court-ordered investigation quickly exposed that the Change Order allegation was false from the get-go: Counsel *never* had a good-faith basis to make this allegation, much less to repeatedly stand by it. In his deposition, CW-1 immediately disavowed ever making this statement. When asked "if you told them that as a matter of contract all Fluor has to do is revise its estimate and Sasol is legally obligated . . . to pay whatever Fluor tells it to pay," CW-1 responded "No." CW-1 Tr. 26:9-15. CW-1 explained that a Change Order is precisely what Defendants always said it was: "an estimate," *id.* at 17:16-19, that would be "reviewed," "discussed," and "[n]egotiated," *id.* at 27:3-9, and not "acted upon unless it's approved by the client," *id.* at 18:19-20.

Contemporaneous documents confirm that CW-1 never said the Change Order was legally binding. ███████████████████████ PI notes explain, CW-1 ███████████ ████████ and CW-1 confirmed that ████████████████████████ ████████ Supp. at 17. The PI's notes likewise confirm that Counsel knew the Change Order was an ████████ and that they were not ██████████████████ *Id.* at 18.

Counsel do not dispute any of this. Counsel instead *abandon* the legally binding Change Order allegation around which they built their case. Counsel now say—after saying the exact opposite to this Court for months[2]—that the Change Order was *not* legally binding: "The Complaint does not allege CW-1 as saying that Sasol is bound every time Fluor issues a change order," Opp. at 3, and CW-1 never "said that any Fluor Change Order is *per se* legally binding,"

---

[2] Even if this argument was defensible, judicial estoppel bars Counsel from "assum[ing] a contrary position" now "simply because [their] interests have changed." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001).

*id.* at 18-19.[3] Now Counsel say only that "Sasol had no ability to effectively negotiate" the Change Order. *Id.* But this is itself another brazen falsehood. This eleventh-hour invention of the Change Order being "effectively" non-negotiable is not supported by CW-1's testimony any more than the original theory. More fundamentally, Counsel cannot spin away what their own Complaint says in black and white—that the Change Order was "legally binding"—nor can they erase months of briefs and transcripts showing that Counsel emphasized this again and again, including in response to direct questions from Judge Rakoff.

The investigation also disproved another critical allegation attributed to CW-1—that "defendant Schoeman told him that 'things are not good' with the [LCCP]." MTD Order at 14 (quoting AC ¶ 69). This statement was critical because it was one of only two allegations that ascribed scienter to Defendants. *See id.* at 14, 19-20. But no contemporaneous records show CW-1 attributing this statement to Schoeman; to the contrary, both Counsel's and the PI's notes confirm that CW-1 attributed it to a much more junior executive. The record further revealed that the PI raised this issue to Counsel in a fact check of a draft Complaint, explaining that ██████████ ███████████████████████████████████████████████ Supp. at 19. Counsel included this knowingly false allegation in the Complaint anyway.[4]

Counsel's claim that neither allegation really matters, because even accepting all of the above "the MTD would remain unchanged," beggars belief. Opp. at 31-33. The undisputed record reflects that Counsel built their case around these allegations, "certified that to the best of the[ir]

---

[3] At other times, the Opposition seems to suggest that CW-1 confirmed this allegation and continues to stand by it. *See, e.g.*, Opp. at 18 n.21 ("Defendants wrongly claim there is no record of [CW-1] saying the Change Order was 'legally binding.'"). Beyond the fact that this claim contradicts Counsel's own statements about the Change Order elsewhere in the Opposition, CW-1's deposition testimony shows it to be untrue. *See, e.g.*, CW-1 Tr. at 26:9-26:15.

[4] In response, Counsel claim falsely that CW-1 "confirmed the accuracy of this allegation," including after Defendants filed the Supplement. Opp. at 17-18 & n.20. They ignore that all the contemporaneous evidence shows CW-1 attributed this statement to the junior executive; they do not even try to explain the fact-check memo from the PI stating that the Complaint was false. *See* Supp. at 18-19.

knowledge" their contentions "ha[d] evidentiary support," Fed R. Civ. P. 11(b), repeatedly affirmed to the Court that the allegations had a direct evidentiary basis, and allowed the Court to deny Defendants' Motion to Dismiss squarely relying upon them. *See* MTD Order at 4, 11, 14, 18.[5] And, in any event, Counsel's argument assumes their failure to comply with Rule 11 exactly as charged, and then in effect asks "so what?"

**B.**    **COUNSEL ABANDON CW-2'S ALLEGATIONS OF DEFENDANTS' ACTUAL KNOWLEDGE AND ADMIT TO CW-2'S MISTREATMENT.**

CW-2, the only "high-ranking" CW, *id.* at 12, supposedly said that "it was 'clear from the beginning' that the [LCCP] was going to cost more than $8.1 billion" and voiced specific concerns about the LCCP's budget to Individual Defendants on multiple occasions. AC ¶ 76. Judge Rakoff relied on CW-2 as one of only two CWs—along with CW-1—supporting the requisite element of Defendants' scienter. *See* MTD Order at 14, 19-20.[6]

Discovery has revealed that these key allegations were fabricated: CW-2 simply never said these things. When questioned directly in her deposition "[d]id you, in fact, raise concerns with Mr. Cornell, Nqwababa and Victor about the risk of Sasol exceeding LCCP cost estimates?" CW-2 responded with a conclusive "No." CW-2 Tr. 43:10-13. And the PI's contemporaneous notes, far from confirming the Complaint's allegations, instead show the exact opposite, as they recount CW-2 making clear that she ███████████████████████████ Supp. at 8. Indeed, as

---

[5] Counsel also implausibly claim that, even writing off *all* of the CW allegations, Sasol's 2019 public disclosures were alone sufficient to allege fraud with particularity for the whole five-year class period. *See* Opp. at 31-32. But were the CW allegations not "material[,]" as Judge Rakoff described them, MTD Order at 3, and were Sasol's disclosures sufficient, it boggles the mind why Judge Rakoff would spend the lion's share of his opinion discussing the CWs. Rather, the opinion makes clear that the 2019 disclosures are relevant only in combination with the CW allegations: "The testimony of the CWs suggests that the defendants had access to the Change Order and other information that contradicted their public cost and schedule estimates. The results of the internal investigation . . . indicate that these defendants did not simply recklessly disregard *this information*, but instead knowingly misrepresented cost and schedule estimates to keep up appearances." *Id.* at 19 (emphasis added).

[6] Counsel's bizarre attempt to minimize the significance of the allegations they attributed to CW-2 does nothing to negate the fact that Judge Rakoff relied on these allegations. *See* Opp. 32-33.

CW-2 testified: "based on what I knew, the project was on time and on budget. That's what I am saying here. And during – it appears that you're trying to twist my words and put words in my mouth, and that appears to be what the investigator did as well. And I really don't appreciate it, it's inappropriate and unethical. . . . All I'm saying is based on my knowledge at the time the project was on time and on budget." CW-2 Tr. 53:18-54:2, 54:12-14. Counsel's bizarre claim that "[CW-2] does not directly recant" statements "rais[ing] scheduling concerns *generally*," Opp. at 24, 32-33 (emphasis added), cannot be squared with CW-2's sworn testimony. *See also* CW-2 Decl. ¶ 11 ("Contrary to what is alleged in the Second Amended Complaint . . . I did not raise any concerns regarding specific cost overruns or regarding the timeline for completion of the project that I knew or believed rendered the then $8.9 billion estimate or then-current schedule false.").

The investigation also confirmed CW-2's adamant refusal to participate in this action: "I continuously told [the PI] I was not interested in being a part of this lawsuit." CW-2 Tr. 15:17-19. And Counsel were aware of this at the time because, as reflected in contemporaneous notes, the PI told Counsel CW-2's concern that her ██████████████████████████████████ Supp. at 9. But as CW-2 testified, not only did Counsel reject her wishes, they lied to her: "[The PI] misled me by saying that I would not be a part of the lawsuit . . . I shouldn't be sitting here if she had honored my wishes." CW-2 Tr. 18:9-12. Counsel's Opposition hardly disputes any of this, admitting that they included CW-2 in the Complaint without her consent, doing so in the face of her repeated refusal and despite telling her she would not be included.

Left with no other option, Counsel fall back on calling CW-2 a liar. Specifically, Counsel's PI claims that CW-2 actually made the allegations as recounted in the Complaint that CW-2 was never shown, and that CW-2's denials under oath are perjured. *See* Opp. at 11. But having admitted they never showed CW-2 a draft or otherwise gave her a chance to confirm the allegations before

filing the Complaint, Counsel cannot now make baseless accusations that CW-2 is lying. CW-2 denied the allegations immediately, the first time she ever saw them. It is too late for Counsel to offer as a replacement their and their own PI's self-serving hearsay recollections in a brief. *See City of Livonia Emps.' Ret. Sys. v. Boeing Co.,* 2011 WL 824604, at *4 (N.D. Ill. Mar. 7, 2011) ("[T]his unseemly conflict between plaintiff's confidential source and plaintiff's investigators could have been avoided by reasonable inquiry on the part of plaintiffs' counsel before filing the second amended complaint[.]"), *aff'd in part, vacated in part sub nom. City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754 (7th Cir. 2013).[7]

Moreover, Counsel have no contemporaneous notes supporting their accusations. Instead, Counsel point to meaningless details that the Complaint did get right (like CW-2's job title), Opp. at 24, and meaningless details that CW-2 got wrong (like the length of phone calls), *id.* at 21, to somehow prove that her under-oath repudiation of the Complaint's key allegations cannot be trusted. But asserting without basis that an adverse witness is lying is not enough to negate their under-oath testimony, especially where (as here) it is corroborated by documentary evidence.[8]

## C.   COUNSEL ABANDON CW-4 BY CLAIMING HE WAS UNRELIABLE.

The Complaint alleged that CW-4 "saw that both the initial $8.9 billion cost estimate and the revised $11.1 billion cost estimate . . . were too low." AC ¶ 86.[9] CW-4 was indispensable to

---

[7] Counsel suggest, without a shred of evidentiary support, that CW-2 and other CWs "felt pressured" by Defendants to repudiate. Opp. at 25. The record is directly to the contrary. *See, e.g.*, ECF No. 130-44 ("We want to make sure you are 100% comfortable with the document"; also reflecting CW-5's edits to his declaration). And Counsel forfeited the right to make this argument by failing to ask the CWs in their depositions even one question about whether Defendants pressured them to repudiate. Counsel cannot avoid asking the question—presumably for fear of what they might hear—only to offer their own preferred answer.

[8] *Cf. Nguedi v. Fed. Rsv. Bank of N.Y.*, 2019 WL 1083966, at *6 (S.D.N.Y. Mar. 7, 2019) ("To assert that [a] witnesses may be lying, without any evidence to contradict the witnesses' testimony cannot defeat a motion for summary judgment."), *aff'd*, 813 F. App'x 616 (2d Cir. 2020).

[9] Judge Rakoff also pointed to CW-4's supposed allegation that "Sasol employees were directed to manipulate accounting to hide increasing costs" as evidence that "Sasol's public cost estimates and schedule were entirely inconsistent with the reality of progress at the LCCP." MTD Order at 10-11.

Counsel, and they knew it. Contemporaneous records show Counsel stating they needed CW-4 to ███████████████████████████████ for much of the Class Period: ███████████████████ ██████████████████ Counsel wrote to their PI, but ██████████████████████████ █████████████████████████████████████████████████ Supp. at 10-11.

But the Court-ordered investigation made clear that Counsel had no good-faith basis—much less CW-4's consent—for attributing any allegations to him. And far from confirming the Complaint's allegations, CW-4 repudiated them *before the Complaint was even filed*. The investigation confirmed that CW-4 said ██████████████ that he was not ████████████ ██████████████ and that CW-4 ████████████████ *Id.* at 11. And—after Counsel raised significant questions requiring follow-up—CW-4 texted the PI that ██████████████ ██████████████████████ *Id.* at 12. The PI recognized the obvious implication: █████ ██████████████████████ the PI emailed Counsel. *Id.* The PI's notes and CW-4's deposition further undermine the basis for attributing any claim about the overall project budget to CW-4, as they confirm that he ████████████████████████ not the whole project. *Id.* Despite all of this, Counsel included CW-4 and attributed these allegations to him.

Counsel's Opposition does not (and cannot) dispute these alarming revelations. Instead, Counsel weakly claim that CW-4 did not recant the allegations "regarding forecasted costs exceeding budget estimates, violations of the Sarbanes-Oxley Act, and other accounting gimmicks." Opp. at 23. But even this is just another falsehood. CW-4 directly refused to accept these attributions during his deposition. *See* CW-4 Tr. at 50:16-65:10. Relatedly, Counsel claim that CW-4 confirmed that *portions* of the project were over budget. *See* Opp. at 17 n.19, 23. But Counsel yet again ignore CW-4's sworn testimony that he had no insight into the overall project budget—which was the allegation attributed to him. *See* CW-4 Tr. 60:12-61:4. And in further

contradiction of the record, Counsel state that "[a]t no point . . . did [CW-4] recant anything he previously said." Opp. at 13; *see id.* at 40 (CW-4 "never claimed his initial account was a lie"). It is hard to know how Counsel can write this when the record includes text messages from CW-4 stating, before the Complaint was filed, ████████████████████████████████ and ███████████████████████████████████ Supp. at 12.[10]

Finally, as with CW-2, Counsel try to claim that CW-4's repudiation "raises, at most, credibility issues," arguing that CW-4 is lying now but that the allegations attributed to him in the Complaint are perfectly trustworthy. Opp. at 27; *see id.* at 20-23. This argument fails for CW-4 for all the same reasons as it fails for CW-2. *See supra* at 9. And then some, since CW-4 told the PI before the Complaint was filed that he was lying. If CW-4 cannot be trusted, as Counsel now press, there is no reason to credit any allegation attributed to him; it is no basis to allow Counsel to pick and choose which allegations survive. The investigation leaves no doubt that Counsel lacked a good faith basis for attributing allegations to CW-4—allegations CW-4 had already repudiated— yet did so without his consent and over his express refusal to participate.

### D.    COUNSEL CANNOT DISPUTE THEIR MISTREATMENT OF CW-5.

Counsel alleged that CW-5 said (in his only allegation cited by Judge Rakoff) "that an $11 billion cost estimate was 'socialized among senior management' from the beginning" and "defendant Cornell 'would have' known about the cost issues." MTD Order at 14.

Once again, the record makes clear that Counsel never had a good-faith basis for including CW-5 or these allegations in the Complaint. When Counsel asked CW-5 in his deposition if he had said that management knew about an $11 billion estimate, CW-5 answered, "Absolutely not,

---

[10] Counsel even go so far as to accuse Defendants of misconduct for the "pure fiction" that CW-4's texts show that he was trying to put an end to the PI's harassment. Opp. at 5. However, this is not a "fiction" created by Defendants, it was CW-4's own under-oath explanation. CW-4 Tr. 26:24-27:3 ("[I] was trying to get the lady to stop calling me and texting me and leaving voice messages, because it was disruptive.").

11

no, no, no . . . this is a complete lie from your firm. I did not talk about $11 billion at any point, no." CW-5 Tr. 38:14-22. And when Counsel asked whether CW-5 had agreed with Counsel's PI "that the $8.9 billion estimate was low," CW-5 replied, "Not just no, but hell no." *Id.* at 27:3-6. CW-5 instead explained that he had told Counsel the exact opposite—indeed, the exact opposite of Counsel's core theory of this case: "I can walk you through both multiple conversations with your investigator and also my statement with your damn attorney present saying that [the LCCP] was on time and on budget for $8.9 billion. That was the correct number, nobody believed differently, and you're fabricating something to try to prove it differently." *Id.* at 38:24-39:8. This testimony is further corroborated by Counsel's own records, as the PI's contemporaneous notes confirm that CW-5 said that ███████████████████████████████████████ and document CW-5's refusal to participate in the litigation. Supp. at 13-14. "[I] gave you no permission, none, to cite me in this case, yet you dragged me into it," CW-5 explained in his deposition, "I am angry about that, and frankly I hope you get sanctioned." CW-5 Tr. at 66:10-13.

Yet again, Counsel cannot dispute—and thus concede—the investigation's most troubling revelations. Instead, Counsel call CW-5 a liar and ask the Court to disregard the depositions and document discovery that the Court ordered. *See* Opp. at 4. Counsel cite hearsay from their PI—who Defendants had no opportunity to depose—to claim that "[a]t no point . . . did [CW-5] tell Plaintiffs' counsel that the LCCP was on time and on budget," *id.* at 14,[11] and that CW-5 never refused to participate, *id.* at 39. And, as with CW-2 and CW-4, they list meaningless details that CW-5 got right or wrong in an attempt to distract from what really matters. *Id.* at 4, 21, 25. But as

---

[11] Counsel also suggest that when CW-5 said the LCCP was "on budget," this meant $11 billion, not $8.9 billion. Opp. at 13. But CW-5 explained in no uncertain terms that "on budget" meant $8.9 billion. See CW-5 Tr. at 65:21-24 ("I never referred to an $11 billion cost estimate, period, that's your fabrication, a complete lie.").

with the other repudiating CWs, Counsel's and their PI's say-so cannot overcome the actual evidence, including their own PI's contemporaneous notes, which amply confirm that CW-5 told Counsel that the LCCP was on time and on budget, adamantly refused to participate in the case, and was never shown a draft of the Complaint to correct its falsehoods. *See supra* at 11-12.

**E.    THE ONLY CWS COUNSEL FULLY STAND BY ARE IRRELEVANT.**

Finally, Counsel claim CW-3 and CW-6 "confirmed the accuracy of the Complaint's allegations." Opp. at 18-19. But this cannot remedy the inconsistencies Defendants identified in these CWs' testimony, and, in any event, these two CWs were irrelevant to Judge Rakoff's ruling. *See* Supp. at 19-20. Counsel thus cannot plausibly rely on *Lockheed* to claim that because CW-3 and CW-6 supposedly "testified to the accuracy of what [the PI] had reported . . . a reasonable fact-finder [could] infer[] that [the PI's] report . . . was accurate in all material respects." Opp. at 18 (quoting *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 952 F. Supp. 2d 633, 637 (S.D.N.Y. 2013)). In *Lockheed*, there was just one "statement attributed to the CWs . . . that the Court found clearly inaccurate" and "the Court relied on other evidence" in denying the motion at issue. 952 F. Supp. 2d at 637-38. Here, by contrast, there are myriad clearly inaccurate allegations, including all of the allegations Judge Rakoff critically relied on. *See supra* at 5-8, 11-12.[12]

---

[12] Counsel's reliance on *Pfizer* is unavailing. *See* Opp. at 28. In *Pfizer*, the court denied reconsideration and dismissal where the CW allegations were "taken verbatim from [PI] interview memos" and the CWs were "equivocal as to whether they made the statements." *In re Pfizer Inc. Sec. Litig.*, 2012 WL 983554, at \*3, \*5 (S.D.N.Y. Mar. 22, 2012). Here, CWs testified unequivocally—and contemporaneous documents corroborate—that the Complaint's allegations were falsified. *See* Supp. at 7-21. This case instead is just like *Boeing* and *Campo*. *See* Motion at 14-15. There, courts granted reconsideration and dismissal where depositions revealed that CWs did not stand by the complaints' core allegations. Counsel's attempt to distinguish those cases on the grounds that "other evidence" in the record here "mirrors what was alleged" and requires the Court to "judge the credibility of witnesses," Opp. at 29-31, not only ignores the record in this case, *see supra* at 3-13, but mischaracterizes *Boeing* and *Campo*, in which the Courts found no need "to determine when [a CW] had been lying and when telling the truth," *City of Livonia Employees' Retirement System & Local 295/Local 851 v. Boeing Co.*, 711 F. 3d 754, 760-61 (7th Cir. 2013), and "relied upon the deposition testimony for the limited purpose of determining whether the confidential witnesses acknowledged the statements attributed to them," *Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 216 n.4 (2d Cir. 2010).

II.     **COUNSEL'S DESPERATE GRAB BAG OF ADDITIONAL ARGUMENTS CANNOT AVERT DISMISSAL AND SANCTIONS.**

In the face of all of this, Counsel devote much of the Opposition to building a straw man: they say that CW allegations are often included in complaints, that PIs are commonly used to secure those allegations, and that CWs occasionally recant their allegations. *See* Opp. at 6-7, 26, 34-39. Counsel even go so far—outside the scope of the Court-ordered investigation—as to commission an academic expert review on the topic. *See* ECF No. 130-2. The goal apparently is to convince this Court that Counsel "utilize[d] best practices." Opp. at 35.

That CWs and PIs are common is not at issue. What is at issue is the Court-ordered record of Counsel's particular conduct here. And the claim that Counsel used "best practices" in this case boggles the mind. It disregards how CW depositions and contemporaneous documents contradicted the Complaint's core allegations and revealed that Counsel were told *the exact opposite* of what they alleged in the Complaint. It disregards how Counsel dragged CWs into this litigation over their express refusal. It disregards how the CWs and even Counsel's own PI put Counsel on notice that allegations were false and could not be made in good faith. And it disregards the record of Counsel's repeated misrepresentations to the Court. In response, Counsel claim they were "seeking to arrange follow up interviews" with the repudiating CWs and that their allegations were "consistent with the other information [Counsel] had obtained." *Id*. But Counsel's perceived need for follow-up, which was met with refusal and red flags, only confirms the inadequacy of their initial diligence. It is a violation of Rule 11 to include unverified and knowingly false information in a signed filing even if some other information seems to cut in the same direction. There is no world in which Counsel's brazen misconduct can be described as "best practices."

Given the overwhelming record of Counsel's misconduct, the only difference between this case and *Millennial Media* is that counsel there had the "professional responsibility" to withdraw

14

their defective and ill-conceived complaint. Counsel here defend their misconduct as best practices. *In re Millennial Media, Inc. Sec. Litig.*, 2015 WL 3443918, at *14 n.11 (S.D.N.Y. May 29, 2015).[13] The few cases Counsel cite rejecting sanctions on much less troubling evidentiary records only confirm that sanctions are justified here. *See* Opp. at 36-37.[14] Indeed, even Counsel's expert, *see id*. at 6-8, 36-37—no doubt concerned about his own reputation—studiously avoids discussing the actual record. *See, e.g.*, ECF No. 130-2, at ¶ 52 (relying on the PI's account without addressing underlying documents or depositions). He certainly never says that proceeding in the face of CWs' refusal to participate, refusing to show them a draft or giving them a chance to correct a pleading, proceeding with a Complaint with a CW that says he has been lying, or alleging things that contradict one's own contemporaneous notes, are best practices.

Next, Counsel avoid the evidentiary record by trying to create a new one, offering documents Defendants produced in discovery after the denial of the Motion to Dismiss and a brand new CW, which supposedly "corroborat[e] their claims." Opp. at 26-27. But Counsel cannot rely on any of this to salvage their defective Complaint or rehabilitate their rank misconduct—these new documents should be stricken and not considered. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) ("[A] party is not entitled to amend its complaint through statements made in motion papers."). All of this information is outside the scope of the Court-ordered investigation into Counsel's conduct. And the discovery from Defendants was procured only as a

---

[13] Counsel's attempts to distinguish *Millennial* on the ground that it is dicta, extends beyond Circuit precedent, and has not been followed (citing only out-of-District cases for this last point), are red herrings. *See* Opp. at 38-39. Defendants nowhere argue that *Millennial* is binding, only that it is the leading statement in this District on what Rule 11, the PSLRA, and "basic decency" require in the face of "problematic" CW practices, including "unreasonabl[y] failing to undertake rudimentary fact-checking with a witness." *Millennial Media*, 2015 WL 3443918, at *6, *12, *14.

[14] In *In re Dynex Capital, Inc. Sec. Litig.*, it was critical to the denial of sanctions that the CWs' repudiations were "entirely uncorroborated." 2011 WL 2581755, at *4-5 (S.D.N.Y. Apr. 29, 2011). Here, contemporaneous notes corroborate the CWs' repudiations. In *In re JDS Uniphase Corp. Sec. Litig.*, sanctions were denied where depositions were taken "years after the witnesses originally spoke to Plaintiffs[]" and contemporaneous notes corroborated nearly all of the complaint's allegations—neither is true here. 2008 WL 753758, at *3 (N.D. Cal. Mar. 19, 2008).

result of Counsel improperly surmounting the PSLRA's mandatory stay of discovery—it has no role in reconsideration of the original Motion to Dismiss.

Finally, Counsel attempt to avoid dismissal of their defective Complaint by grumbling that they had no opportunity to withdraw it. *See* Opp. at 33-34, 40 (citing Fed. R. Civ. P. 11(c)(2)).[15] But this argument fails twice over. First, in cases under the PSLRA, "[t]he PSLRA sanctions provision forecloses the kind of safe harbor afforded in Rule 11(c)(2)." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 579 F.3d 143, 152 (2d Cir. 2009). Second, noncompliance with Rule 11's safe-harbor requirement is harmless where a party shows "no indication" of withdrawing the offending filing. *Perpetual Sec., Inc. v. Tang*, 290 F.3d 132, 142 (2d Cir. 2002).

III.     **CONCLUSION**

Congress enacted the PSLRA—with its heightened pleading standard, automatic stay of discovery, and mandatory Rule 11 sanctions—precisely to ensure that plaintiffs and counsel could not offer flimsy or falsified allegations of fraud and force defendants into invasive and expensive discovery with the hopes of forcing settlement or later discovering wrongdoing. *See Tellabs*, 551 U.S. at 320; *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (noting that plaintiffs "abuse [] the discovery process to impose costs so burdensome that it is often economical for the victimized party to settle"). Plaintiffs' and Counsel's actions here represent exactly the abuse Congress sought to prevent. Indeed if Plaintiffs' and Counsel's extreme misconduct entitles them to pursue this action any further, their disturbing actions—which violate the letter and the spirit of the PSLRA and Rule 11—will quickly become "best practices" in this District and beyond, for courts and parties will have no reason to expect anything better.

---

[15] Even if the Court denies Defendants' Motion, it may impose sanctions *sua sponte*. Fed. R. Civ. P. 11(c)(3).

Dated: New York, New York
      February 9, 2021

Respectfully submitted,

 /s/ *Jonathan D. Polkes*
Jonathan D. Polkes
Caroline H. Zalka
Luna N. Barrington
Nicole E. Prunetti
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

*Counsel for Defendants Sasol Limited, David Edward Constable, Bongani Nqwababa, Stephen Cornell, Paul Victor, and Stephan Schoeman*