# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHAD LINDSEY MOSHELL, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> SASOL LIMITED, DAVID EDWARD CONSTABLE, BONGANI NQWABABA, STEPHEN CORNELL, PAUL VICTOR, and STEPHAN SCHOEMAN, <br><br> Defendants. | Case No. 1:20-cv-01008-JPC <br><br> Hon. John P. Cronan <br><br> **EXPERT DECLARATION OF MICHAEL J. KAUFMAN, DATED JANUARY 19, 2021** |

1

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ...............................................................................................................1

    A.  My Qualifications ....................................................................................................1

    B.  Scope of Assignment ..............................................................................................6

        1. Whether Plaintiffs' partial reliance on confidential witnesses to
           corroborate allegations in the complaint in this case is
           consistent with professional standards and customary practices
           in litigation governed by the Private Securities Litigation
           Reform Act of 1995, 15 U.S.C. §§ 77a et. seq., ("PSLRA");......................6

        2. Whether Plaintiffs' partial reliance on confidential witnesses to
           corroborate allegations in the complaint in this case is
           consistent with professional standards and customary practices
           in litigation governed by Federal Rule of Civil Procedure 11;...................6

        3. Whether it is common practice in securities fraud litigation for
           confidential witnesses to modify their earlier statements after a
           complaint is filed and whether any such modifications in this
           case are attributable to unprofessional conduct by Plaintiffs'
           counsel. ..................................................................................................6

    C.  Summary of Opinions..............................................................................................6

        1.  Plaintiffs' partial reliance on confidential witnesses to
            corroborate allegations in the complaint in this case is
            consistent with professional standards and customary practices
            in litigation governed by the PSLRA;..........................................................6

        2.  Plaintiffs' partial reliance on confidential witnesses to
            corroborate allegations in the complaint in this case is
            consistent with professional standards and customary practices
            in litigation governed by Federal Rule of Civil Procedure 11;
            and...............................................................................................................6

        3.  It is common practice in securities fraud litigation for
            confidential witnesses to modify their earlier statements after a
            complaint is filed and any such modifications in this case are
            not attributable to unprofessional conduct by Plaintiffs'
            counsel. .......................................................................................................7

II. OVERVIEW OF MATERIALS AND METHODOLOGY ...............................................7

A.  Materials Considered ...................................................................................7

B.  Methodology Employed...............................................................................7

III.  RELEVANT FACTS AND LITIGATION HISTORY ..........................................8

IV.  OPINION #1: PLAINTIFFS' PARTIAL RELIANCE ON CONFIDENTIAL WITNESSES TO CORROBORATE ALLEGATIONS IN THE COMPLAINT IN THIS CASE IS CONSISTENT WITH PROFESSIONAL STANDARDS AND CUSTOMARY PRACTICES IN LITIGATION GOVERNED BY THE PSLRA........................................................................13

A.  Plaintiffs Regularly Rely on Confidential Witnesses to Satisfy the PSLRA's Pleading Standards. ....................................................................13

B.  Plaintiffs' Reliance on Confidential Witnesses in this case to Corroborate Additional Strong Evidence of Defendants' Scienter Satisfied the PSLRA's Pleading Standards............................................17

C.  Even if three of the Confidential Witnesses credibly modified their earlier statements, Plaintiffs have still met the PSLRA's Pleading Standards.................................................................................................18

D.  The Investigator's Declaration and Supporting Contemporaneous Evidence Confirms the Accuracy of the Allegations Attributed to the Confidential Witnesses who are now attempting to recant.....................18

E.  Defendants' Challenge to the Credibility of the Recanting Confidential Witnesses is Improper at this Stage of the Litigation. ..........................20

V.  OPINION #2: PLAINTIFFS' PARTIAL RELIANCE ON CONFIDENTIAL WITNESSES TO CORROBORATE ALLEGATIONS IN THE COMPLAINT IN THIS CASE IS CONSISTENT WITH PROFESSIONAL STANDARDS AND CUSTOMARY PRACTICES IN LITIGATION GOVERNED BY FEDERAL RULE OF CIVIL PROCEDURE 11. ...............................21

A.  Plaintiffs' Counsels' Pre-filing Inquiry Was Reasonable in these Circumstances because they relied on an Investigator to Conduct Interviews with Confidential Witnesses under their Supervision and Direction. ...................................................................................................22

B.  Although Counsel need not attempt to follow best practices or optimal litigation strategies to conduct a reasonable pre-filing inquiry under Rule 11, Plaintiffs' Counsel did so in this case. ...................................23

C.  Although Counsel need not establish the credibility of witnesses as part of a reasonable pre-filing inquiry under Rule 11, Plaintiffs' Counsel did so in this case..................................................................................28

D.      Defendants' Suggestion that Plaintiffs' Counsel did Not Treat the Recanting Confidential Witnesses with Human Decency has no Legitimate Evidentiary Support.............................................................29

E.      Defendants' Sanctions Motion is Also Facially Improper under the Regime Established by Rule 11 and the PSLRA.....................................30

VI.   OPINION #3: IT IS COMMON PRACTICE IN SECURITIES FRAUD LITIGATION FOR CONFIDENTIAL WITNESSES TO MODIFY THEIR EARLIER STATEMENTS AFTER A COMPLAINT IS FILED AND ANY SUCH MODIFICATIONS IN THIS CASE ARE NOT ATTRIBUTABLE TO UNPROFESSIONAL CONDUCT BY PLAINTIFFS' COUNSEL. ...............................32

A.      It is Common for Confidential Witnesses to Attempt to modify their Earlier  Truthful Statements....................................................................33

B.      Because of the serious risk that confidential witnesses will be pressured into making false recantations after their identity becomes known, the courts have adhered to the PSLRA's prohibition on discovery of these witnesses at the motion to dismiss stage of the litigation. ...............................................................................................33

C.      Some of the Common reasons that Confidential Witnesses try to alter their prior truthful statements are present in this case. ...........................34

D.      None of these reasons that the Confidential Witnesses may have tried to modify their earlier truthful statements are attributable to the diligence used by Plaintiffs' counsel in relying on the witnesses' earlier truthful statements to corroborate allegations in the Complaint.................35

E.      The Usual Incentives for Confidential Witnesses to try to modify their Earlier Truthful Statements are Particularly Strong in this case because the Confidential Witnesses are now being represented by Defendants' Counsel. ...............................................................................................37

VII.  RESERVATION OF RIGHTS...........................................................................39

## I.    INTRODUCTION

### A.    My Qualifications

1.    A true and correct copy of my Curriculum Vitae, which describes my specialized knowledge, skill, experience, training, and education, and a list of my publications, is attached to this Declaration as Appendix A.

2.    As described in the Curriculum Vitae, I am the Dean of Loyola University Chicago School of Law and a tenured Professor of Law at Loyola University Chicago School of Law.  I have served as Dean of the School of Law since March, 2017, after being Interim Dean from July 2016 to March 2017.

3.    I have been a professor at Loyola University Chicago School of law for more than 34 years. I joined the Loyola faculty in 1986, after graduating from the University of Michigan Law School, clerking for the Honorable Nathaniel R. Jones of the United States Court of Appeals for the Sixth Circuit, and practicing civil litigation at a private law firm in Chicago, Illinois.

4.    Throughout my 34 years as a law professor, I have taught many law school classes, including securities litigation, securities regulation, business organizations, and civil procedure. I am very familiar with the standard practices employed by all participants and attorneys in securities litigation, including the standard practices of counsel for Plaintiffs in investigating and litigating claims of securities fraud and the standard practices employed by counsel for Defendants in trying to avoid liability for securities fraud. For instance, the material in my law school classes includes the federal statutes and regulatory provisions governing securities regulation and securities litigation, pleading standards in securities fraud cases, the professional responsibilities of attorneys in civil litigation, Rule

11 of the Federal Rules of Civil Procedure, standards for determining whether to grant motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), class action law and practice, pre-filing investigations in securities litigation and other civil litigation, and the use of confidential witnesses to corroborate allegations in a complaint.

5.    I also have authored and co-authored treatises, casebooks, law review articles, and peer reviewed articles in professional journals in the field of securities litigation, including books and articles that analyze the prevailing law and common practice governing the use of confidential witnesses to corroborate allegations in securities fraud class actions. See e.g., Michael J. Kaufman, *Rule 10b-5 Private Securities-Fraud Litigation* (West ed. 2020)(with J. Wunderlich) (annual Supplements since 2014); Michael J. Kaufman, *The Judicial Access Barriers to Remedies for Securities Fraud*, Law and Contemporary Problems, at 55 (2012) (with J. Wunderlich); Michael J. Kaufman, *Resolving the Continuing Controversy Regarding Confidential Informants in Private Securities Fraud Litigation,* 19 Cornell J.L. & Pol'y 637 (2010) (with J. Wunderlich); Michael J. Kaufman, *Congress, the Supreme Court and the Proper Role of Confidential Informants in Securities Fraud Litigation,* 36 Sec. Reg. L.J. 345 (2008) (with J. Wunderlich).

6.    I am the author of a multi-volume treatise regarding the availability of remedies in various kinds of securities fraud cases: Michael J Kaufman, *Securities Litigation: Damages; Vol. 26, and Vol. 26A* (West 2020) (annual Supplements since 1989).  I am also the co-author of the textbook, *Securities Litigation: Law, Policy, and Practice* (Carolina Academic Press 2016) and the three-volume treatise, *Blue Sky Law* (Thomson Reuters 2020) (with J. Wunderlich) (annual Supplements since 2016).   In addition to these textbooks and

treatises, my Curriculum Vitae includes the citations to many published articles that I have authored and co-authored in the field of securities law and litigation practice.

7.      In 2010, I founded the Loyola University Chicago Institute for Investor Protection. Under my direction, the Institute supports annual conferences, research, publications, and resources regarding securities litigation, practice, and regulation. The Institute is a non-partisan, neutral, and independent forum for research, analysis, professional presentations, and discourse regarding the law and practice in securities litigation.  Federal judges, leading scholars, Nobel Prize winning economists, regulators, and practicing attorneys who have prosecuted and defended securities fraud cases attend the Institute's annual conference to present their research, practical experience, and professional perspectives. The federal judges from the United States District Court for the Southern District of New York often contribute to the Institute's programs, including Judge Jed S. Rakoff.

8.      Among the issues that are addressed at the Institute is the reliance by counsel for defrauded investors upon confidential witnesses to support allegations of securities fraud. The Institute has presented sessions specifically addressing the issue of the use of confidential witnesses to corroborate allegations in a securities fraud complaint. On October 23, 2013, for example, the Institute's annual conference was dedicated to "Strategies for Investigating and Pleading Securities Fraud Claims." Judge Rakoff spoke on a panel titled, "The Effective and Ethical Use of Confidential Witnesses." His presentation at the Institute regarding the use of confidential witnesses in securities fraud litigation was subsequently published in the Loyola University Chicago Law Journal: Judge Jed S. Rakoff, *Confidential Informants and Securities Class Actions: Mixed Messages and Motives*, 45 Loy. U. Chi. L.J. 571 (2014).

9.    I am also a prolific scholar in the field of civil procedure and civil litigation. As further detailed in my Curriculum Vitae, my research and scholarship in civil procedure and civil litigation has been published in many books and law review articles over the past three decades. For example, I co-authored the textbook, *"Learning Civil Procedure,"* (West 3rd. ed. 2018), which includes sections about Federal Rule of Civil Procedure 11 and the professional responsibilities of attorneys throughout the litigation process.

10.    In the ordinary course of my work as a Dean of the School of Law, Professor of Law, and legal scholar, I regularly canvass the case law, professional articles, academic literature, data, research, and statutory and regulatory changes in the field of professional responsibility, securities regulation, securities litigation, civil litigation, and civil procedure. I update my treatises and textbooks on an annual basis and remain current on any developments in the law or practice in my fields of expertise.

11.    My published research has been relied upon and cited as authority many times by other experts in my field and by many federal courts, including the United States Court of Appeals for the Second Circuit and the United States District Court for the Southern District of New York.

12.    I also have been appointed as a Public Arbitrator for securities fraud matters and have served as the Chair of arbitration panels in securities fraud cases. I have been qualified as a testifying expert witness in an investment fraud case involving the professional responsibilities of attorneys, and I have been relied upon by the United States Securities and Exchange Commission, the Chicago Stock Exchange, and the Office of the Illinois Attorney General as a consulting expert in securities fraud matters. In addition, I was appointed by the United States Securities and Exchange Commission and the Consumer

- 4 -

Financial Protection Bureau to develop professional training materials and conduct programs for the lawyers and investigators who litigate securities and consumer fraud matters on their behalf. In addition, I am regularly invited to make presentations in the areas of my expertise, and have delivered lectures regarding securities and corporate law to hundreds of thousands of law school graduates preparing to take the Bar examination in states throughout the country.

13. I have been a member of the Bar of the State of Illinois and have been licensed to practice law since 1984. In the course of my practice, I have served as counsel for Plaintiffs, Defendants, and regulators in federal court securities litigation matters.

14. I am compensated for my work on this matter at the rate of $1200 per hour for the first 25 hours and $1500 per hour thereafter. My compensation is not contingent in any way on the content of my opinions, my testimony at deposition or trial, or the outcome of this litigation.

15. My opinions are based on the documents and materials I have reviewed to date. If additional information becomes available to me, I may conduct new analyses or supplement my opinions.

16. The purpose of my declaration is to offer my specialized knowledge and expert opinions about professional standards and customary practices in connection with the use of confidential witnesses to corroborate allegations of securities fraud in private securities fraud litigation.

- 5 -

**B.**     **Scope of Assignment**

17.     I have been asked by counsel for the Plaintiffs to analyze all relevant documents, briefs, hearings, and testimony in this matter in light of my specialized knowledge, skill, experience, training, and education, and to offer an expert opinion regarding:

1. Whether Plaintiffs' partial reliance on confidential witnesses to corroborate allegations in the complaint in this case is consistent with professional standards and customary practices in litigation governed by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 77a et. seq., ("PSLRA");

2. Whether Plaintiffs' partial reliance on confidential witnesses to corroborate allegations in the complaint in this case is consistent with professional standards and customary practices in litigation governed by Federal Rule of Civil Procedure 11;

3. Whether it is common practice in securities fraud litigation for confidential witnesses to modify their earlier statements after a complaint is filed and whether any such modifications in this case are attributable to unprofessional conduct by Plaintiffs' counsel.

**C.**     **Summary of Opinions**

18.     Based on my specialized knowledge, skill, experience, training, and education, I have analyzed the relevant materials in this matter and have reached the following opinions:

1.     Plaintiffs' partial reliance on confidential witnesses to corroborate allegations in the complaint in this case is consistent with professional standards and customary practices in litigation governed by the PSLRA;

2.     Plaintiffs' partial reliance on confidential witnesses to corroborate allegations in the complaint in this case is consistent with professional standards and customary practices in litigation governed by Federal Rule of Civil Procedure 11; and

3.      It is common practice in securities fraud litigation for confidential witnesses to modify their earlier statements after a complaint is filed and any such modifications in this case are not attributable to unprofessional conduct by Plaintiffs' counsel.

## II.     OVERVIEW OF MATERIALS AND METHODOLOGY

### A.      Materials Considered

19.    In preparing this Declaration, I have relied on my specialized knowledge, skill, experience, training, and education as discussed in Section I.A. of this Declaration and in my Curriculum Vitae as well as the materials researched, cited, and referenced therein. Among them, I have reviewed and considered the research and academic literature in my field and materials generated and produced by the parties in this litigation.

20.    I have considered carefully the positions expressed by all parties in this litigation, including the positions expressed by Defendants' counsel in their motions, briefs, oral arguments, and in the declarations submitted by the confidential witnesses whom Defendants' counsel now represent. A list of documents I have relied upon is contained in Appendix B.

### B.      Methodology Employed

21.    In reaching all of the expert opinions included in this Declaration, I have relied upon principles and methods commonly used by experts in my field, including: legal analysis; legal research and scholarly publications and authorities relied upon therein; professional publications and authorities relied upon therein; presentations by and panels with judges, plaintiff's counsel, defendant's counsel, regulators, and scholars at professional and academic conferences including those sponsored by the Institute for Investor Protection; construction and analysis of judicial opinions, case law, statutes, and rules of procedure, professional responsibility, and evidence; principles of stare decisis, precedent, and

- 7 -

jurisdictional authority; academic literature, research, and scholarship; experience with professional practice and professional responsibilities within the field of securities law and practice, securities litigation, civil procedure, and civil litigation; and regular canvasses of the case law, professional articles, academic literature, data, research, and statutory and regulatory changes in the field of securities regulation, securities litigation, civil procedure, and civil litigation.

22.     I regularly employ these principles and methods as part of my work as a law professor, legal scholar, and law school dean, outside of the context of any particular lawsuit. Throughout this Declaration, I have reached my expert opinions by applying these reliable principles and methods to analyze the relevant facts and materials that are specific to the record in this case. The facts and materials upon which I have based my opinions and inferences reflected in this Declaration are of a type reasonably relied upon by experts in my field.

## III.    RELEVANT FACTS AND LITIGATION HISTORY

23.     This is a putative class action filed by Lead Plaintiff David Cohn and Additional Representative Plaintiff Chad L. Moshell pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and U.S. Securities and Exchange Commission Rule 10-b5 promulgated thereunder, on behalf of themselves and all other persons or entities who purchased or otherwise acquired American Depository Receipts of Sasol, Ltd. ("Sasol"), a South African chemical and energy company.

24.     On May 4, 2020, Judge Jed S. Rakoff, of the United States District Court for the Southern District of New York, appointed the law firm of Hagens Berman Sobol Shapiro LLP ("Hagens Berman") as lead counsel for the class. In doing so, Judge Rakoff found that

Hagens Berman "possesses experience litigating securities class actions and has had success in these matters in the past," and Judge Rakoff expressed "confidence in Hagens Berman's professionalism." *Moshell v. Sasol Ltd.*, 2020 WL 2115410, at *3 (S.D.N.Y. May 4, 2020).

25. In July, 2020, Defendants then moved to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), arguing principally that the allegations attributed to six confidential witnesses cannot give rise to a strong inference that Defendants made their material misrepresentations with actual knowledge or scienter. On August 24, 2020, Judge Rakoff denied Defendants' motion to dismiss in part, rejecting Defendants' challenges to the complaint's reliance on confidential witnesses to corroborate the allegations of Defendants' actual knowledge and scienter. *Moshell v. Sasol Ltd.*, 2020 WL 4931997, at *6 (S.D.N.Y. Aug. 24, 2020).

26. Judge Rakoff also denied Defendants' request to depose the six confidential witnesses who corroborated the complaint's allegations, stating that: "The court is somewhat perplexed by this request, as it amounts to Defendants requesting discovery at the very time that the Private Securities Litigation Reform Act denies discovery." *Id.* at *8.

27. On September 11, 2020, after Judge Rakoff denied Defendants' motion to dismiss in part, Plaintiffs filed their Second Amended Complaint. That complaint alleges, *inter alia*, that Sasol and individual Defendants made false and misleading statements related to the construction of a new ethane cracker and derivatives complex in Louisiana, known as the Lake Charles Chemicals Project ("LCCP"). Specifically, it is alleged that "Sasol concealed from investors and the public that Sasol's upper management knew or recklessly disregarded that Sasol's projected LCCP costs were continually and

- 9 -

deliberately underreported to investors and the public, in an effort to artificially prop up Sasol's securities prices and trigger lucrative executive bonus packages. Sasol also concealed from investors and the public that Sasol's upper management knew or recklessly disregarded that Sasol's anticipated timeline for completion of the project was deliberately understated, to misleadingly suggest that the project was going to be on time, when in fact upper management knew that the project was substantially behind schedule." Second Amended Complaint, ¶ 2.

28. The Second Amended Complaint begins by averring that Plaintiffs' allegations are based upon an "ongoing independent investigation of undersigned counsel, including from the following sources: (i) Sasol's public filings with the SEC; (ii) research reports from securities and financial analysts; (iii) Company press releases and reports; (iv) Company website and marketing materials; (v) news and media reports concerning the Company and other facts related to this action; (vi) price and volume data for Sasol ADRs; (vii) consultation with experts; (viii) accounts from former Sasol employees; and (ix) additional materials and data concerning the Company and industry…." Second Amended Complaint at page 1.

29. Throughout the Second Amended Complaint, Plaintiffs have alleged that Defendants made material misrepresentations with "scienter," including in ¶¶ 62-98 and ¶¶ 228-233.

30. As they did in the First Amended Complaint, Plaintiffs have included information derived from six confidential witnesses among the totality of evidence confirming their allegations that Defendants knew or were reckless in not knowing that their cost and timeline estimates were false. For example, the Complaint includes allegations regarding CW1's corroboration of a February 2016 Change Order for $11.7 Billion confirming that Sasol

did not timely disclose true cost; CW2's corroboration that Defendants were told of cost overruns and delays in the project timeline; CW3's corroboration that Senior Management knew LCCP would exceed its budget before it disclosed upward cost estimates; CW4's corroboration that Senior Management disclosed inaccurate information about the project's cost and schedule; CW5's corroboration that Defendant Cornell was aware of cost overruns and construction delays; and CW6's corroboration that management directed efforts to "manipulate" the schedule to make it look better on paper. See e.g., Second Amended Complaint, ¶¶ 64-98.

31.    The allegations in the Second Amended Complaint attributed to the confidential witnesses were based upon an investigation conducted by Plaintiffs' counsel with the assistance of a licensed investigation firm that acted under counsels' supervision and direction.  See Browning Decl., ¶¶ 1, 2.  The professional investigator, Lynnley Browning of the firm of On Point Investigations, who worked under the supervision and direction of Plaintiffs' counsel, has submitted a personal declaration in which she re-affirms in precise detail that the allegations in the complaint attributed to the confidential witnesses accurately reflected the information they provided to her as part of her investigation. See Browning Decl., ¶¶ 13, 18, 23-116. Throughout the declaration, the investigator provides evidence of her attestations from contemporaneous notes, memoranda, correspondence, and communications records of her interviews with each one of the confidential witnesses. Browning Decl., ¶¶ 23-115.

32.    After their motion to dismiss the complaint was denied in part, Defendants obtained information about the identity of the six confidential witnesses who had confirmed the complaint's allegations. It is my understanding that, after obtaining the identities of the

six confidential witnesses, Defendants' counsel immediately tried to contact all of them. Defendants' counsel then quickly entered into attorney-client relationships with three of those six confidential witnesses: CW 2, 4, and 5. Defendants' lawyers now represent these three individual confidential witnesses at the same time that they also represent the company whose fraud those witnesses had helped to corroborate. After they began representing these three confidential witnesses, Defendants' counsel obtained and submitted declarations from these witnesses indicating their intention to modify some of their earlier statements corroborating Defendants' fraud.

33.     Plaintiffs moved for class certification on October 2, 2020. ECF No. 82. On October 16, 2020, this action was transferred from Judge Rakoff to Judge John P. Cronan (ECF No. 90). Two weeks after the case was reassigned to Judge Cronan, Defendants filed a Motion for Reconsideration of Judge Rakoff's August 24, 2020 Memorandum Order and a Motion for Sanctions under Federal Rule of Civil Procedure 11. ECF No. 74. Defendants argue that because three of the six confidential witnesses purportedly no longer support some of the statements attributable to them in the complaint, the court should dismiss the entire Second Amended Complaint with prejudice and sanction Plaintiffs' counsel under Federal Rule of Civil Procedure 11.

34.     Judge Cronan has permitted the parties to engage in discovery in this case regarding the confidential witnesses and the assertions made in Defendants' motions. The confidential witnesses have submitted declarations and have been deposed. Three confidential witnesses (CWs 1, 3, and 6) have provided personal declarations confirming that all of the allegations in the complaint attributed to them "accurately reflect" the statements that they

made to Plaintiffs' investigator and counsel before the operative complaint was filed. Gilmore Declaration Exhibits 3-5.

35.    The three other confidential witnesses, who are now represented by Defendants' counsel, have submitted declarations in which they attempt to modify some of the statements they had made to the investigator before they were represented by Defendants' counsel. ECF Nos. 101-1, 101-2, 101-3.

36.    In support of their current motions, Defendants now assert that the complaint should be dismissed with prejudice and Plaintiffs' lawyers should be sanctioned because the three confidential witnesses whom they now represent were supposedly never informed about their role in the litigation and the statements attributed to them in the complaint are false. See Defendants' Supplemental Memorandum in Support of their Motions for Reconsideration of the Court's August 24, 2020 Order and Motion for Sanctions at 1.

## IV.    OPINION #1: PLAINTIFFS' PARTIAL RELIANCE ON CONFIDENTIAL WITNESSES TO CORROBORATE ALLEGATIONS IN THE COMPLAINT IN THIS CASE IS CONSISTENT WITH PROFESSIONAL STANDARDS AND CUSTOMARY PRACTICES IN LITIGATION GOVERNED BY THE PSLRA

37.    As described above, I have developed specialized knowledge regarding the professional standards and customary practices in connection with the use of confidential witnesses to corroborate allegations of securities fraud under the regime established by the PSLRA.

### A.    Plaintiffs Regularly Rely on Confidential Witnesses to Satisfy the PSLRA's Pleading Standards.

38.    In the PSLRA, Congress created procedural pathways through which victims of securities fraud must litigate their claims. Among those pathways is the requirement that a plaintiff's securities fraud complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" in defrauding investors." 15 U.S.C. §78u-4(b)(1)-(2)(2012).

- 13 -

39.    In order to state a claim for securities fraud, Plaintiffs must allege that the Defendants acted with the required state of mind of "scienter." In *City of Pontiac v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359 (S.D. N. Y. 2012), Judge Rakoff wrote that scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319* (2007). Allegations that support a strong inference that the Defendants acted with "reckless disregard for the truth" are sufficient to establish scienter.

40.    The PSLRA also instituted an automatic discovery stay until the resolution of a defendant's motion to dismiss. 15 U.S.C. § 78u-4(b)(1) (2012). As a result, a federal securities plaintiff must usually plead facts giving rise to a strong inference of scienter without the benefit of the formal discovery process.

41.    In my work, I have become aware of the fact that Plaintiffs regularly satisfy this requirement by relying on statements attributed to former company employees or insiders, usually referred to as confidential witnesses or CWs. In my experience, confidential sources have become critical to unearthing fraud, preventing financial harm to investors, and prosecuting corporate misconduct. My experience is also reflected in the academic literature. A company's own current and former employees are a significant source of fraud detection. See, Alexander Dyck, et al., *Who Blows the Whistle On Corporate Fraud?,* Nat'l Bureau of Econ. Research, Working Paper No. 12882, at 3 (2007), available at https://www.nber.org/system/files/working_papers/w12882/w12882.pdf.  Current and former employees are able to uncover facts concealed from public investors because these employees have access to information that has not been disclosed to the public.

42. Federal judges and legal scholars, including those who have presented their research and experiences at the Institute that I direct, have recognized that plaintiffs' reliance on confidential witnesses to corroborate allegations of securities fraud under the PSLRA has become ubiquitous and endemic. At the Institute's 2013 annual conference, for instance, Judge Rakoff observed that, in his experience, confidential witnesses are used frequently in securities fraud litigation under the PSLRA. Similarly, Professor Gideon Mark, who also participated in the Institute's program, has concluded. "[t]he vise-like combination of the PSLRA's strict pleading requirements and discovery stay explains the ubiquity of CWs. Plaintiffs must plead their cases with particularity, but they are generally barred from obtaining discovery to bolster their scienter and other allegations before all motions to dismiss have been resolved. The result has been almost universal reliance by plaintiffs in class action securities complaints on information provided by confidential witnesses." Gideon Mark, *Recanting Confidential Witnesses in Securities Litigation,* 45 Loy. U. Chi. L.J. 575, 578-579 (2014).

43. In the course of my experience, which is summarized in Section IA above and in my Curriculum Vitae, I also have become cognizant of the prominence of Judge Rakoff's Opinions and scholarly articles regarding the proper weight to be assigned to allegations corroborated by confidential witnesses.  As he did in this case, Judge Rakoff appreciates the necessity of plaintiffs' counsel's routine reliance on confidential witnesses in securities fraud litigation and rejects efforts like those by Defendants here to undermine the credibility of confidential witnesses. In *City of Pontiac v. Lockheed Martin Corp.*, 952 F.Supp.2d 633, 638 (S.D.N.Y. 2013), for example, Judge Rakoff wrote an opinion specifically to "focus attention on the way in which the PSLRA and decisions like *Tellabs*

have led Plaintiffs' counsel to rely heavily on private inquiries of confidential witnesses…." Based upon his extensive experience with securities fraud litigation and the role of confidential witnesses in corroborating allegations of scienter, Judge Rakoff has concluded: "I see no reason why such statements should be inherently discounted at the pleading stage just because the informants are unidentified." Judge Jed S. Rakoff, *Confidential Informants and Securities Class Actions: Mixed Messages and Motives,* 45 Loy. U. Chi. L.J. 571, 573 (2014).

44.    Under the PSLRA, for an inference of scienter to be sufficiently "strong," it must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 324 (2007). Under *Tellabs*, a federal district court must ask, as Judge Rakoff did in rejecting Defendants' arguments in this case, whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. *Tellabs* requires courts to consider both culpable and nonculpable inferences; but the culpable inference must be only as likely as the competing nonculpable inference. Even in the absence of evidence corroborating the confidential witness' information, *Tellabs* requires that the tie goes to the plaintiff and therefore, the claim should survive based on the allegations supported by a confidential witness. See e.g., Kaufman, *Congress, The Supreme Court and the Proper Role of Confidential Informants in Securities Fraud Litigation,* 36 Sec. Reg. L.J. 345 (2008) (with J. Wunderlich).

45.    In *Novak v. Kasaks*, 216 F.3d 300 (2d. Cir. 2000), the Second Circuit validated the use of confidential witnesses to establish allegations of scienter as long as the witnesses are

described in the complaint with sufficient particularity. The Second Circuit recognized that imposing a requirement of disclosure of the identities of confidential witnesses would "deter informants from providing critical information in meritorious cases or invite retaliation against them." See also Kaufman, *Congress, The Supreme Court and the Proper Role of Confidential Informants in Securities Fraud Litigation,* 36 Sec. Reg. L.J. 345 (2008) (with J. Wunderlich).

**B.      Plaintiffs' Reliance on Confidential Witnesses in this case to Corroborate Additional Strong Evidence of Defendants' Scienter Satisfied the PSLRA's Pleading Standards.**

46.      In his August 24, 2020 Order Granting in part and Denying in part Defendants' Motion to Dismiss in this case, Judge Rakoff relied on *Novak*, and, in keeping with the prevailing law and practice under the PSLRA, rejected Defendants' arguments attacking the complaints' reliance on confidential witnesses to corroborate allegations of scienter. Judge Rakoff concluded:

> "Defendants counter that the Court should not take account of the CWs testimony at all. For a complaint to rely on information provided by confidential sources, however, such a source need only be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.' *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). The complaint meets this burden. It alleges that CW-1 was an LCCP engineer responsible for undertaking cost reviews; that CW-2 was high-ranking employee responsible for all financial matters for Sasol's U.S. projects; that CW-3 was a contractor working at the LCCP; that CW-4 was a Sasol employee who worked on LCCP accounting matters; that CW-5 worked as a risk assessor for the LCCP; and finally that CW-6 was a scheduler for part of the LCCP. In short, the complaint alleges that each CW was working directly on the LCCP in a manner that would have provided him or her with direct, contemporaneous information about the costs and schedule for the LCCP. Thus, the Court may credit their testimony…."

> *Moshell v. Sasol Ltd*., 2020 WL 4931997, at *4 (S.D.N.Y. Aug. 24, 2020)

47.      In their current motions, Defendants now ask this court to discard Judge Rakoff's recent Opinion, in which he found that the Second Amended Complaint satisfies the pleading

- 17 -

requirements under the PSLRA. *Id.* Instead, Defendants assert that Judge Rakoff's Opinion must be overturned because three of the six confidential witnesses on whom Plaintiffs relied to corroborate their allegations of strong evidence of fraud have purportedly modified some of their earlier statements.

**C.   Even if three of the Confidential Witnesses credibly modified their earlier statements, Plaintiffs have still met the PSLRA's Pleading Standards.**

48.   Based upon my specialized experience and knowledge, I can opine that Plaintiffs have met the prevailing pleadings standards under the PSLRA—notwithstanding the fact that three of the confidential witnesses in this case may have tried to walk back some of their earlier statements. In my opinion, even if these three confidential witnesses have modified their earlier statements corroborating the strong evidence of fraud, that would not change the conclusion that the complaint meets the pleading standards established by the PSLRA. In this particular case, Plaintiffs' counsel: alleged strong and uncontroverted evidence of securities fraud, even apart from any allegations supported by confidential witnesses; placed only partial reliance on six confidential witnesses to corroborate their other strong evidence of securities fraud; obtained personal declarations from three of the confidential witnesses re-confirming each and every one of the corroborating allegations attributed to them; and established that all six of the corroborating confidential witnesses were in a position to have personal access to the information alleged.

**D.   The Investigator's Declaration and Supporting Contemporaneous Evidence Confirms the Accuracy of the Allegations Attributed to the Confidential Witnesses who are now attempting to recant.**

49.   My opinion that Plaintiffs' reliance on confidential witnesses to corroborate evidence of fraud satisfies professional standards and customary practices under the PSLRA is fully supported by the declaration submitted by the investigator in this case. The investigator has submitted contemporaneous evidence with her declaration demonstrating in precise

- 18 -

line by line detail that the attempts by CW 2, 4 and 5 to recant are contrary to the contemporaneous evidence in this case. Browning Decl., ¶¶ 55-58; 83-90; 105-110.

50.  The investigator  presents contemporaneous evidence re-confirming the accuracy of the allegations attributed to the confidential witnesses in this case, particularly those confidential witnesses who have tried to recant their earlier statements after being represented by Defendants' counsel. The investigator specifically affirms that: "The Second Amended Complaint accurately reflects the CWs' statements." The investigator "reviewed" the memos that she wrote "summarizing my conversations with the CWs," and declared that those "memos accurately summarize my conversations with the CWs." Browning Decl.  ¶¶ 17-19.

51.  In the wake of Defendants' motions, the investigator re-reviewed on multiple occasions her contemporaneous notes, memos, the complaint's allegations, emails, and her phone records of 55 phone calls of nearly 12 hours of interviews with the confidential witnesses. Browning Decl. ¶ 116. Based on this review, the investigator concludes: "everything attributed to the CWs in the complaint is substantively correct based on what they told me during the investigation.  In contrast, the Supplemental Memorandum filed by defense counsel misstates the record in several crucial respects, including misstatements about my own emails, and relies on declarations and deposition testimony from [the CWs who are attempting to recant]  that I can testify are unequivocally false." *Id.*

52.  Under these circumstances, in which the investigator is prepared to testify that the allegations attributed to the confidential witnesses are supported by overwhelming contemporaneous evidence and that the contrary assertions which form the basis for Defendants' current motions are "unequivocally false," I can opine that Plaintiffs'

counsel's partial reliance on confidential witnesses to corroborate allegations in the complaint is consistent with professional responsibilities and customary practices within the securities litigation landscape created by provisions of the PSLRA.

**E.**    **Defendants' Challenge to the Credibility of the Recanting Confidential Witnesses is Improper at this Stage of the Litigation.**

53.    At best, Defendants' current motions and supporting papers have only highlighted a dispute among the parties about the credibility of three of the six confidential witnesses. Whether or not recanting confidential witnesses in fact made truthful statements attributed to them in a complaint is essentially a credibility question.  Based on my experience as a law professor and legal scholar with expertise in the field of civil procedure and civil litigation, I can attest that under the system established by the Federal Rules of Civil Procedure, a motion to dismiss for failure to state a claim in a complaint is not the proper vehicle to test the credibility of witnesses.

54.    My opinion is supported by controlling judicial authorities.  In *Tellabs,* for example, the Supreme Court reaffirmed that it is "within the jury's authority to assess the credibility of witnesses, resolve genuine issues of fact, and make the ultimate determination whether [Defendants] acted with scienter." 551 U.S. 308, 328 (2007). See also Gideon Mark, *Recanting Confidential Witnesses in Securities Litigation*, 45 Loy. U. Chi. L.J. 575, 591 (2014). To the extent that Defendants have raised a credibility question about three of the six confidential witnesses that cannot provide a legitimate basis for changing Judge Rakoff's Opinion denying in relevant part their motion to dismiss for failure to state a claim in the complaint.

55.    In light of my experience as a law professor, legal scholar, institute founder, public arbitrator, litigation counsel, and expert consultant, therefore, it is clear that within the

- 20 -

professional landscape created by the requirements of the PSLRA, which has rendered reliance on confidential witnesses, critical to uncovering and litigating securities fraud, Plaintiffs' counsel's use of information provided by six confidential witnesses in this case to corroborate their allegations of securities fraud is consistent with professional standards and customary practices in this field.

**V.    OPINION #2: PLAINTIFFS' PARTIAL RELIANCE ON CONFIDENTIAL WITNESSES TO CORROBORATE ALLEGATIONS IN THE COMPLAINT IN THIS CASE IS CONSISTENT WITH PROFESSIONAL STANDARDS AND CUSTOMARY PRACTICES IN LITIGATION GOVERNED BY FEDERAL RULE OF CIVIL PROCEDURE 11.**

56.    As a result of my specialized knowledge and experience, I also have developed specialized knowledge regarding the professional standards and customary practices in connection with the use of confidential witnesses to corroborate allegations of securities fraud as a part of a reasonable pre-filing inquiry under Federal Rule of Civil Procedure 11.

57.    In the early stages of this litigation, Defendants have moved for sanctions, arguing that Plaintiffs' counsels' reliance on confidential witnesses to confirm allegations in their complaint constitutes a violation of Federal Rule of Civil Procedure 11(b). That Rule provides in relevant part: "By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:…(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."

58.    Defendants contend that because three of the six confidential witnesses purportedly did not expressly consent to the inclusion in the complaint of information attributed to them, and have now modified some of their accounts after being represented by Defendants'

- 21 -

counsel, Plaintiffs' counsel must be sanctioned because the complaint was not filed after an inquiry reasonable under the circumstances under Rule 11(b).

**A.**   **Plaintiffs' Counsels' Pre-filing Inquiry Was Reasonable in these Circumstances because they relied on an Investigator to Conduct Interviews with Confidential Witnesses under their Supervision and Direction.**

59.   As a result of my specialized knowledge and experience, it is clear that Defendants' contention is not based on a proper understanding of what constitutes a reasonable inquiry in this circumstance.  Contrary to Defendants' position, plaintiffs' counsel in a securities fraud litigation may conduct a reasonable pre-filing inquiry without showing confidential witnesses advance copies or drafts of the allegations in a complaint which are based on the witnesses' prior statements to an investigator. Nor does a reasonable inquiry require counsel to exact from any witness--confidential or otherwise--their consent to include information obtained from their statements as part of the pleadings in the litigation.

60.   In this case, Plaintiffs' counsels' reliance on a private investigator was an inquiry reasonable under the circumstances. Based on my specialized knowledge and experience, I can confirm that plaintiffs' attorneys often employ investigators to find former employees who held positions at the defendant company such that they may have information about an alleged fraud. The frequency of this practice has been confirmed in the research and academic literature in the field, see e.g., Leigh H. Smollar, *The Importance of Conducting Thorough Investigations of Confidential Witnesses in Securities Fraud Litigation*, 46 Loy. U. Chi. L.J. 503 (2015).

61.   Throughout their papers, Defendants rely heavily on Judge Engelmayer's opinion in *In re Millennial Media, Inc. Sec. Litig.,* 2015 WL 3443918 (S.D.N.Y. May 29, 2015). But as Judge Engelmayer recognized, "To be clear, Rule 11's command that counsel conduct 'an

- 22 -

inquiry reasonable under the circumstances' does not require counsel personally to participate in an initial witness interview. It is, of course, permissible and customary, not to mention economical, for facts to be gathered first by investigators." *Id*. At 11.

62.    In my experience in the field of securities litigation, therefore, attorneys do not commonly interview confidential witnesses or gather sources themselves. Attorneys usually rely upon the work of investigators to conduct the interviews with confidential witnesses. See e.g., Gideon Mark, *Confidential Witness Interviews in Securities Litigation*, 96 N.C. L. Rev. 789, 809 (2018).

63.    Even if an investigator may not have followed optimal procedures, this does not undermine an attorney's reliance on statements made by the witnesses to that investigator. That is particularly true here. In this case, Judge Rakoff concluded that the statements made to the investigator were not contrary to other evidence in the case; rather they were consistent with and corroborated by other evidence in the case. See, *Moshell v. Sasol Ltd*, 2020 WL 4931997, at *6 (S.D.N.Y. Aug. 24, 2020).

**B.    Although Counsel need not attempt to follow best practices or optimal litigation strategies to conduct a reasonable pre-filing inquiry under Rule 11, Plaintiffs' Counsel did so in this case.**

64.    Defendants here and in other cases have argued that an attorney's failure to abide by all "best practices" in reliance on an investigator's findings is a violation of Rule 11. But even Judge Engelmayer in *Millennial Media,* recognized the difference between "best practices" and ethical obligations under Rule 11. See also Leigh H. Smollar, *The Importance of Conducting Thorough Investigations of Confidential Witnesses in Securities Fraud Litigation,* 46 Loy. U. Chi. L.J. 503 (2015); Gideon Mark, *Recanting Confidential Witnesses in Securities Litigation,* 45 Loy. U. Chi. L.J. 575, 601 (2014).

65. Although Rule 11 does not require counsel to perform best practices or to pursue optimal strategies, Plaintiffs' counsel in this case did in fact utilize these best practices and strategies. Ultimately, Judge Engelmayer in *Millennial Media,* concluded that before filing a complaint, counsel must "attempt to confirm with the witness the statements that counsel proposes to attribute to him and to assure that the Complaint is presenting these statements in fair context."  2015 WL 3443918, at *11 (S.D.N.Y. May 29, 2015).

66.  In light of my specialized knowledge, it is clear that Plaintiffs' counsel have met this standard under the circumstances of this case. They did confirm the accuracy of the challenged witnesses' statements, with the investigator and with the witnesses themselves. In her detailed declaration, the investigator affirmed that: "[t]hroughout my investigation, I was supervised and received direction from the Hagens Berman attorneys preparing the complaint.  Specifically, I worked primarily with Hagens Berman attorneys Lucas Gilmore and Jerrod Patterson.  After we drafted an initial series of questions based on our review of the complaint, the supervising attorneys at Hagens Berman provided feedback by editing the questions and providing additional questions.  These questions were then incorporated into a template that I used throughout the investigation." Browning Decl. ¶ 13. The investigator also confirms that she was "in consistent contact with Hagens Berman counsel during the investigation, including through numerous conference calls and emails." Browning Decl. ¶ 15.

67. In this case, Plaintiffs' counsel did not merely rely upon their investigator's contemporaneous notes, communications records, and memos. They worked with the investigator to fact-check the investigator's memoranda for each one of the six confidential witnesses. Plaintiffs' counsel also questioned the investigator to confirm the

- 24 -

investigator's written memoranda memorializing her investigations with each witness to ensure that the allegations attributed to the witness in the complaint accurately replicated the investigator's memoranda.

68. In her declaration, the investigator also confirms that she "typed contemporaneous notes" of all of her interviews with each confidential witness and "relied on those notes and my own recollection to prepare an investigator memorandum summarizing the conversation promptly thereafter." She then sent the "memo to the supervising attorneys at Hagens Berman. Hagens Berman counsel used the memoranda in drafting the CW allegations in the First Amended Complaint and Second Amended Complaint." Browning Decl. ¶ 14.

69. Furthermore, in advance of filing the complaint, "Hagens Berman counsel sent [the investigators] iterations of the complaint during the drafting process, so that we could review the CW statements contained in the complaint for accuracy. The investigator reviewed the complaint…and provided comments to counsel to confirm the complaint is accurate." Browning Decl. ¶ 17.

70. Accordingly, Plaintiffs' counsel's pre-filing inquiry included relying upon the work of a careful, thorough, and professional investigator over whom they exercised supervision and direction and with whom they had regular interactions. But in this case, Plaintiffs' counsel's pre-filing inquiry exceeded even that level of diligence. Here, Plaintiffs' counsel did in fact attempt to contact each confidential witness to re-confirm that the complaint's allegations attributed to them were accurate and to discuss the next steps in the litigation. Three of those witnesses have explicitly declared that each and every one of the allegations attributed to them in the complaint accurately reflects the information they provided to the investigator. See Gilmore Declaration, Exhibits 3-5.

- 25 -

71. Plaintiffs' counsel also diligently attempted to personally contact the three now-recanting witnesses to re-confirm the veracity of their earlier statements made to, and memorialized by, the investigator. The investigator's declaration affirms that: "As the complaint was being drafted, I was instructed to reach out again to each of the CWs to schedule follow-up interviews with the CWs and Hagens Berman counsel to reconfirm their initial accounts and address follow-up questions." Follow-up interviews in fact were scheduled with four of the CWs and Hagens Berman counsel, including CW5. But CW2 did not return calls and CW4 refused to speak with counsel. Browning Decl. ¶ 16.

72. As to CW3, for example, the investigator provides contemporaneous evidence documenting the fact that Plaintiffs' counsel participated in the interview and confirmed that the allegations in the complaint attributed to CW3 were accurate: "On June 2, 2020, I called [CW3] at 2:19 p.m., with Mr. Patterson [Plaintiffs' counsel] on the line. We spoke for 45 minutes. *See* Ex. A PLAINTIFFS004985. During the call, Mr. Patterson read verbatim the allegations in the draft complaint that were attributed to CW3. After a few minor technical corrections, CW3 agreed that the statements in the draft complaint attributed to him were accurate." Browning Decl., ¶ 66.

73. Similarly, the investigator attests that a follow up meeting was scheduled with CW5, the investigator, and Plaintiffs' counsel so that Plaintiffs' counsel could interview the witness. At that meeting, CW5 "acknowledged speaking with [the investigator] on two occasions." Browning Decl. ¶ 101. But CW5 "declined to participate in a further conversation about his statements." *Id.* The investigator confirms, however, that during that interview with counsel present, CW5 "did not recant anything he said in his two interviews." Browning Decl. ¶¶ 100-101.

- 26 -

74.    The investigator also attests that CW4 initially seemed willing to schedule a follow-up conversation with counsel, but then expressed concern that CW4's identity would become public and refused to speak with counsel without being compensated. Browning Declaration ¶¶ 71-74. Similarly, CW2 did not return calls attempting to schedule a follow-up meeting with counsel. The investigator documents CW2's request to be compensated for providing any information and CW2's concern about her identity being disclosed within her industry. CW2 was "anxious about potentially being identified, citing her continuing work and prominence in the oil and gas industry." Browning Decl. ¶ 47. But, in any event, the investigator affirms that CW2 was informed about her role in the litigation, and never refused to grant the investigator or counsel permission to use her statements to corroborate allegations in the complaint. Browning Decl. ¶ 49. The investigator also demonstrates in step by step detail that CW2's attempt to modify her earlier statements is contrary the contemporaneous evidence of the statements that CW2 made to the investigator before CW2's identity was disclosed and before CW2 was represented by Defendants' counsel. Browning Decl. ¶¶ 55-58.

75.    Because it is not uncommon for confidential witnesses to modify their prior statements after their identity becomes known to the defendant and particularly after they become represented by defendants' counsel, see e.g., Gideon Mark, *Recanting Confidential Witnesses in Securities Litigation,* 45 Loy. U. Chi. L.J. 575, 578-579 (2014), plaintiffs' counsels' attempts to re-confirm the witnesses' earlier statements may make it easier for them to impeach a witness who tries to change those prior statements after being contacted or represented by defendants' counsel.  Plaintiffs'  counsel in this case did exercise best practices and optimal strategies by carefully reviewing the memoranda of the interviews

with the confidential witnesses that have been compiled by their investigator and ensuring that the allegations in the complaint accurately capture the information given by the witnesses to their investigator.

76. While these "best practices" may be strategically helpful to challenging the credibility of a confidential witness who tries to recant, they are not required as part of a "reasonable" pre-filing inquiry. Under Rule 11, a "reasonable" pre-filing inquiry does not require an attorney to adjudicate the credibility of witnesses and the weight to be assigned to competing evidence before filing a complaint. Such matters of witness credibility and evidence-weighing are within the sole province of the fact-finder at trial.

**C.  Although Counsel need not establish the credibility of witnesses as part of a reasonable pre-filing inquiry under Rule 11, Plaintiffs' Counsel did so in this case.**

77. Even if Rule 11 required Plaintiffs' counsel to establish the credibility of the original statements made by recanting witnesses as part of a pre-filing inquiry, Plaintiffs' counsel have also met that burden here. Their pre-filing inquiry in fact produced reliable witness statements that were corroborated by other strong evidence alleged in the complaint.

78. Even the declarations which have been submitted by the three CWs now represented by Defendants' counsel corroborate the essential allegations attributed to them in the complaint. In conducting their reasonable pre-filing inquiry in this case, Plaintiffs' counsel also relied on the factors which federal courts use to determine whether a confidential witness is credible, including whether the witness: bases allegations on personal knowledge or hearsay; was employed by the defendant during the time at issue; held a position that suggested access to the information that the witness purports to have; provides a sufficient level of detail of the allegations; corroborates the allegations with other reliable sources, including with a sufficient number of other sources and sources

spread throughout the company and across geographic areas; and offers a cohesive, plausible tale, including one that is consistent across time and space. Michael J. Kaufman, *Rule 10b-5 Private Securities-Fraud Litigation, §3.6 at p. 153* (West ed. 2020) (with J. Wunderlich) (annual Supplements since 2014).

79.    In this matter, all of these indicia of the reliability of the confidential witnesses are present. The evidence of the reliability of the original statements made by the recanting witnesses therefore could properly lead a factfinder at trial to credit their statements as part of the totality of the evidence and lead a factfinder to conclude that there is a legally sufficient evidentiary basis for Defendants' scienter. If the statements of confidential witnesses in this case are sufficiently reliable to allow a factfinder to find scienter on the merits, they are *a fortiori* sufficiently reliable to enable Plaintiffs' counsel to include them in a complaint without violating Rule 11's pre-filing standards.

**D.    Defendants' Suggestion that Plaintiffs' Counsel did Not Treat the Recanting Confidential Witnesses with Human Decency has no Legitimate Evidentiary Support.**

80.    Based on my review of the evidentiary record in this matter in light of my specialized knowledge, I can also opine that Defendants' additional suggestion that Plaintiffs' counsel deceived the confidential witnesses about the nature of their involvement in the litigation or treated them with a lack of human decency is not supportable.

81.    Plaintiffs' counsels' investigator followed a template in all of her interviews with every confidential witness in this case. Browning Decl. ¶ 13. The template directed the investigator to conduct the interviews in a professional and respectful manner, and to be forthcoming about the circumstances of the lawsuit and the roles of the various parties. Specifically, in response to any question from the witness, the investigator was required to inform the witness that the investigator works for Plaintiffs' counsel and that: "The

- 29 -

information you give me might be used in a complaint against the companies I mentioned above. You won't be named in the complaint other than as a confidential witness with your title, and dates of employment. But I cannot guarantee you confidentiality since the defense might discover your name through the legal proceedings or a judge might force the law firm to reveal the names of their confidential witnesses." Browning Decl. ¶ 13. In my opinion, therefore, the suppositions on which Defendants' Rule 11 motion are based are contrary to the evidentiary record in this case.

**E.**     **Defendants' Sanctions Motion is Also Facially Improper under the Regime Established by Rule 11 and the PSLRA.**

82.     Even if the new statements obtained by Defendants' counsel from three of the six confidential witnesses called into question some of the allegations in the complaint, Rule 11 would still not be violated in this case. Rule 11 only would preclude Plaintiffs' counsel from "later advocating" the challenged allegations. Plaintiffs' counsel may decide to seek an amendment to their complaint to update the challenged allegations with the newly discovered information, assuming that it is credible. But, significantly, Rule 11 does not even require such an amendment in this situation.

83.     In the course of my work as a Professor of Law and legal scholar, I have become familiar with the role played by the United States Supreme Court's Advisory Committee on the Federal Rules of Civil Procedure. Under the authority of the United States Supreme Court, the Advisory Committee consists of judges, practitioners, and scholars who draft the rules of civil procedure and publish guidelines for their interpretation. In their published Notes to Federal Rule of Civil Procedure 11(b), the Civil Rules Advisory Committee explicitly states: "Subdivision (b) does not require a formal amendment to pleadings for which evidentiary support is not obtained, but rather calls upon a litigant not thereafter to

- 30 -

advocate such claims or defenses." In this case, therefore, the remedy for any Rule 11 concern is for Plaintiffs' counsel to refrain in the future from advocating on behalf of the specific challenged allegations. It is not a motion for sanctions under Rule 11.

84.    In light of my specialized knowledge and experience teaching and researching issues involving an attorney's professional responsibilities to conduct a reasonable pre-filing inquiry, it is also clear that Defendants' motion for sanctions under Rule 11 is improper on its face at this stage of the litigation. Rule 11(c) prohibits the parties from engaging in costly, disruptive, and distracting satellite litigation involving motions and cross-motions for Rule 11 sanctions throughout the lawsuit. In order to help avoid that satellite litigation, Rule 11(c)(2) requires that "the motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." The Advisory Committee Notes make clear that this provision is intended to provide a type of "safe harbor" against motions under Rule 11. A party will not be subject to sanctions on the basis of another party's Rule 11 motion unless, after receiving the motion, it refuses to withdraw or correct its challenged pleading or refrain from advocating its challenged position. See e.g., *In Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, (S.D.N.Y. Mar. 12, 2020). Defendants have disregarded this threshold Rule 11 requirement in this case. Instead, Defendants improperly filed their motion through ECF without serving Plaintiffs' counsel in advance or even affording Plaintiffs' counsel *any* advance notice of their motions.

85.    Nor does the PSLRA absolve Defendants of their responsibility to satisfy this clear Rule 11 requirement. Under the PSLRA, the court cannot make any Rule 11 inquiry until after

- 31 -

"final adjudication of the action." 15 U.S.C. § 78u-4(c)(1). By requiring that any Rule 11 inquiry await "final adjudication of the action," Congress preserved Rule 11's prohibition on satellite motions for sanctions in the middle of a securities fraud lawsuit. The PSLRA's requirement that any Rule 11 inquiry await the "final adjudication of the action" is also consistent with Rule 11's requirement that a party moving for Rule 11 sanctions allow a 21 day safe harbor period. See e.g., *Blaser v. Bessemer Trust*, 2002 WL 31359015 , at *4 (S.D.N.Y. Oct. 21, 2002) (Under the PSLRA, the Court "cannot otherwise impose sanctions pursuant to Rule 11 because [plaintiff] withdrew her complaint well before the expiration of Rule 11(c)(1)'s 21-day safe harbor period.") A party who voluntarily dismisses or amends a challenged complaint within the 21 day Rule 11 safe harbor period cannot be found to have violated Rule 11, and in any event, the PSLRA does not allow the court to undertake any Rule 11 inquiry before a final adjudication of the action. See *Manchester Mgmt. Co., LLC v. Echo Therapeutics*, Inc., 297 F. Supp. 3d 451,465-66 (S.D.N.Y. 2018).

86.    Accordingly, Defendants' Rule 11 motion in this case, which was not filed after a final adjudication of the action and which was not filed after allowing any 21 day safe harbor period, is improper on its face under the regime established by Rule 11 and the PSLRA.

## VI.    OPINION #3: IT IS COMMON PRACTICE IN SECURITIES FRAUD LITIGATION FOR CONFIDENTIAL WITNESSES TO MODIFY THEIR EARLIER STATEMENTS AFTER A COMPLAINT IS FILED AND ANY SUCH MODIFICATIONS IN THIS CASE ARE NOT ATTRIBUTABLE TO UNPROFESSIONAL CONDUCT BY PLAINTIFFS' COUNSEL.

87.    Based on my specialized knowledge and experience, I can attest that it is common for confidential witnesses to change their earlier statements after Defendants become aware of their identities.

**A.**     **It is Common for Confidential Witnesses to Attempt to modify their Earlier  Truthful Statements.**

88.     After defendants' counsel has spoken with a confidential witness, it is not uncommon for the witness to become concerned about getting involved in the litigation and to try to recant. Judge Rakoff and other federal judges in the Southern District of New York have recognized the frequency of this practice, declaring that confidential witnesses who had previously given information to investigators corroborating a complaint's allegations later will feel "pressured into denying outright statements they had actually made." *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin*, 952 F. Supp. 2d 633, 636-637 (S.D.N.Y. 2013). See also *Fort Worth Employees Retirement Fund v. J. P. Morgan Chase*, 301 F.R.D. 116 (S. D. N. Y. 2014); *In re Pfizer Inc. Securities Litigation*, 2012 WL 983554 (S.D.N.Y. 2012).

**B.**     **Because of the serious risk that confidential witnesses will be pressured into making false recantations after their identity becomes known, the courts have adhered to the PSLRA's prohibition on discovery of these witnesses at the motion to dismiss stage of the litigation.**

89.     In light of my experience, Judge Rakoff's denial of Defendants' request "to depose Plaintiff's CWs and file a supplemental brief in support of their motion to dismiss" was not only consistent with the PSLRA, it was in keeping with his recognition that discovery of these witnesses may subject them to undue influence from Defendants and their counsel.

90.     Accordingly, Judge Rakoff was "perplexed by [Defendants' request for discovery of confidential witnesses], as it amounts to Defendants requesting discovery at the very time that the PSLRA denies discovery." *Moshell v. Sasol Ltd*., 2020 WL 4931997, at *8 (S.D.N.Y. Aug. 24, 2020).  But Judge Rakoff also found that Defendants' request to

engage in discovery of the confidential witnesses "is entirely unwarranted in a case such as this, where the CWs' testimony is corroborated by external evidence such as the internal review. Furthermore, while Defendants suggest that the CWs' allegations are false and not made in good faith, they provide no basis for this suggestion beyond their own unsubstantiated assertions that 'CW-l's allegations are utterly false.' Deft. Mem. at 34. Accordingly, the Court declines to grant this alternative relief." *Id.*

**C.     Some of the Common reasons that Confidential Witnesses try to alter their prior truthful statements are present in this case.**

91.     In my experience, there are many reasons why confidential witnesses may change their earlier statements after their identity has been disclosed to Defendants and their counsel, including: evolving recollections, fear that their confidentiality might be exposed, financial disincentives or the absence of financial incentives, pressure from defense counsel, pressure from their defendant-employer, fear of retaliation in myriad ways by their defendant-employer, incentives from their defendant–employer, a perception that other employers in their industry may decline to hire them or work with them, peer pressure, concern about being associated with a company that engages in fraud, and cold-feet about the litigation process.  See e.g., Michael J. Kaufman, *Congress, The Supreme Court and the Proper Role of Confidential Informants in Securities Fraud Litigation,* 36 Sec. Reg. L.J. 345 (2008) (with J. Wunderlich).

92.     In this case, there is evidence that some of these common reasons that confidential witnesses may try to alter their prior statements are present, including that the witnesses were exposed and contacted by attorneys for the defendant-company charged with securities fraud; that the witnesses requested compensation for continuing to provide evidence of the fraud, and that the witnesses have decided to no longer cooperate in the

litigation process without a subpoena. For example, CWs 2, and 4 were concerned about their identities being disclosed. Browning Decl. ¶¶ 47, 71-72. CW2 was "anxious about potentially being identified, citing her continuing work and prominence in the oil and gas industry." Browning Decl. ¶ 47. In addition, the investigator declares that CW5 "expressed concern to me about being subpoenaed by Defendants in the litigation." Browning Decl. ¶ 100. During the interview with Plaintiffs' counsel, CW5 explicitly "again expressed fear of being subpoenaed. When told by [Plaintiffs' counsel] that there was no guarantee of confidentiality, [CW5] said 'then I guess I have no conversation with you' and hung up the phone." Browning Decl. ¶ 102. Moreover, the investigator documents CW2's and CW4's request to be compensated for providing any additional information. Browning Decl. ¶¶ 47, 71-74.

**D.    None of these reasons that the Confidential Witnesses may have tried to modify their earlier truthful statements are attributable to the diligence used by Plaintiffs' counsel in relying on the witnesses' earlier truthful statements to corroborate allegations in the Complaint.**

93.    In light of my specialized knowledge and experience, it is clear that in this case, none of the reasons why confidential witnesses commonly change their earlier statements has anything to do with the diligence and care used by Plaintiffs' counsel in relying on the witnesses' earlier statements to corroborate allegations in the complaint. As detailed above, the fact that Plaintiffs' counsel in this case satisfied all of the controlling professional standards and customary practices in connection with their pre-filing investigation is fully supported by the investigator's declaration and contemporaneous evidence demonstrating their reasonable inquiry and their justifiable reliance on confidential witnesses.

94.    In the course of my work as a law professor and legal scholar, I also have become aware that there are many reasons why the recantations of confidential witnesses are themselves false, including those that are present in this case. As courts and commentators have recognized, the reasons why confidential witnesses are motivated to offer false recantations include pressure from the Defendants' counsel, the desire to remain in a former employer's good graces once the protection of confidentiality has been removed, and actual retaliation or the legitimate fear of retaliation in countless forms. See e.g., Gideon Mark, *Recanting Confidential Witnesses in Securities Litigation*, 45 Loy. U. Chi. L.J. 575, 596-601 (2014).

95.    In *City of Pontiac*, for instance, the Plaintiffs argued that the confidential witnesses had changed their earlier statements "because of financial and other pressures Lockheed had brought to bear upon them once they had been identified by name," and Judge Rakoff found that the recanting confidential witnesses "felt pressured into denying outright statements they had actually made." *City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 952 F. Supp. 2d 633, 636-637 (S.D.N.Y. 2013).

96.    One scholar has observed that, "some and perhaps much of the recanting by CWs in securities cases that has occurred in recent years has been a direct result of pressure and/or fear of retaliation by Defendants. In turn, the opportunity for this pressure to be exerted is a direct result of the unmistakable trend for courts to compel discovery of the names of confidential witnesses once the discovery stay has been lifted (and sometimes earlier)." Gideon Mark, *Recanting Confidential Witnesses in Securities Litigation,* 45 Loy . U. Chi. L.J. 575, 600-601 (2014).

97. In the current landscape of securities litigation, confidential witnesses commonly modify their prior statements and make false recantations for reasons having nothing to do with the diligence and professionalism of Plaintiffs' counsel in conducting a pre-filing inquiry. As Judge Rakoff has recognized, in cases like this, it is not uncommon for confidential witnesses to modify their earlier truthful statements because of pressure by Defendants or their counsel. As detailed above, there is evidence in this case that the confidential witnesses have tried to modify their earlier statements not because of any lack of diligence by Plaintiffs' counsel, but rather because they became concerned about exposure, industry retaliation, being subpoenaed by Defendants' counsel and even the lack of compensation for their information.

**E.   The Usual Incentives for Confidential Witnesses to try to modify their Earlier Truthful Statements are Particularly Strong in this case because the Confidential Witnesses are now being represented by Defendants' Counsel.**

98. The confidential witnesses whose original statements corroborated Sasol's securities fraud are now being represented by the same attorneys who represent Sasol. That relationship presents a particularly strong opportunity for pressure to be placed on the confidential witnesses to try to walk back their earlier truthful statements.

99. The Rules of Professional Responsibility, including the New York Rules of Professional Conduct, generally preclude attorneys from concurrent representation of clients where there is a significant risk that the attorney's representation of one client will be materially limited by the attorney's simultaneous responsibilities to another client. See e.g., New York Rule of Professional Conduct 1.7; American Bar Association's Model Rules of Professional Responsibility, Rule 1.7.

100.    Defendants' counsels' representation of the three recanting confidential witnesses at the same time they also represent the Defendants charged with securities fraud in this case implicates the concerns undergirding the prohibitions on concurrent representation contained in Rule 1.7. As attorneys for Sasol, Defendants' lawyers have a professional obligation to defend the company from allegations of securities fraud and an incentive to undercut truthful statements corroborating those same allegations supplied by the same confidential witnesses whom they now also represent. Even if defense counsel can establish that their concurrent representation does not violate Rule 1.7, their dual role nonetheless presents an opportunity for them to exert the kind of pressure on confidential witnesses that may lead to false recantations.

101.    As Judge Rakoff has suggested, there is a structural incentive for Defendants' counsel to exert "pressure" on these confidential witnesses to recant so as to benefit their corporate client.  In addition, the confidential witnesses, who have now entered into an attorney-client relationship with Defendants' lawyers, will typically be inclined to follow the advice of those lawyers, even if their advice serves the interests of only the company they are defending. See e.g., *City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 952 F. Supp. 2d 633, 636-637 (S.D.N.Y. 2013).

102.    The reasons why confidential witnesses commonly change their earlier statements after a complaint is filed, and especially after they are contacted and represented by Defendants' counsel, may be relevant to a fact-finder's assessment of their credibility in addressing the underlying merits of a securities fraud action. But the fact that confidential witnesses commonly change their earlier statements after the complaint has been filed and they have

been contacted or even represented by Defendants' counsel does not implicate the sufficiency of counsel's investigation before the complaint was filed.

103. That is particularly true in this case. As Judge Rakoff indicated, there is a likelihood that these three confidential witnesses have experienced pressure to recant and there is ample evidence alleged in the complaint of securities fraud even in the absence of their altered statements.

## VII.  RESERVATION OF RIGHTS

104. I reserve the right to amend, modify, or supplement this report in the event new information is made available to me based on further discovery and preparation in this action, including my review of testimony by any witness and my review of any expert report, declaration, or testimony by any expert witness in this case.  I also reserve the right to supplement this report to address any information obtained, or positions taken, based on any new information that comes to light.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed this 19th day of January, 2021, in Chicago, Illinois.

MICHAEL J. KAUFMAN

**APPENDIX A**
**Curriculum Vitae of Michael J. Kaufman**

1

# CURRICULUM VITAE

# MICHAEL J. KAUFMAN

Loyola University Chicago School of Law
25 East Pearson St., Chicago, IL 60611
mkaufma@luc.edu ▪ (312) 915-7143

## UNIVERSITY LEADERSHIP POSITIONS

| | |
|---|---|
| Dean of the School of Law, Loyola University Chicago (Interim Dean, 2016-17) | **2016-present** |
| Vice Provost, Loyola University Chicago (Interim Vice Provost, 2018-19) (Vice Provost for Academic Strategy, 2020-present) | **2018-present** |
| Associate Dean for Academic Affairs, Loyola University Chicago School of Law | **2005-2016** |
| Founding Director of Loyola University Chicago Institute for Investor Protection | **2010-present** |
| Founding Director of Loyola University Chicago Education Law and Policy Institute | **2005-present** |

## ACADEMIC POSITIONS

| | |
|---|---|
| Professor of Law, Loyola University Chicago School of Law Subjects include: Securities Regulation, Securities Litigation, Business Organizations, | **1996-present** |
| Associate Professor of Law, Loyola University Chicago School of Law (received tenure in 1992) | **1989-1992** |
| Assistant Professor of Law, Loyola University Chicago School of Law | **1986-1989** |

2

## ELECTED PUBLIC OFFICES

Elected to three terms, Board of Education **1997-2009**
Illinois North Shore School District 112, a large, diverse public school
district in the Chicago area.

President of the Board of Education **2001-2004**
Illinois North Shore School District 112

Vice-President of the Board of Education **1999-2001**
Illinois North Shore School District 112

## PROFESSIONAL LEGAL POSITIONS

Sachnoff & Weaver Ltd (now Reed Smith LLP)_ **1984-1986**
Civil Litigation

The Honorable Nathaniel R. Jones, United States Court **1983-1984**
of Appeals for the Sixth Circuit, Judicial Clerk

## PUBLICATIONS

### A.    BOOKS

Kaufman, **Rule 10b-5 Private Securities-Fraud Litigation** (West 2020) (with J. Wunderlich) (Annual Supplements since 2014)

Kaufman, **Blue Sky Law** (Thomson Reuters 2020) (Three Volume Treatise) (with J. Wunderlich)(Annual Supplements since 2016)

Kaufman, Vol. 26, **Securities Litigation: Damages** (West 2020) (Annual Supplements since 1989)

Kaufman, Vol. 26A, **Securities Litigation: Damages** (West 2020) (Annual Supplements since 1989)

Kaufman, **Illinois Civil Trial Procedure** (Second Edition West 2020) (Annual Supplements since 2009)

Kaufman, **Badges and Incidents: A Transdisciplinary History of the Right to Education in America** (Cambridge University Press 2019)

3

Kaufman, **Education Law, Policy and Practice: Cases and Materials** (Fourth Edition, Aspen, 2018) (with S. Kaufman)

Kaufman, **Teacher's Manual to Education Law, Policy and Practice: Cases and Materials** (Fourth Edition, Aspen, 2018) (with S. Kaufman)

Kaufman, **The Pre-K Home Companion: Learning the Importance of Early Childhood Education and Choosing the Best Program for Your Family** (Rowman & Littlefield, 2016) (with S. Kaufman and E. Nelson)

Kaufman, **Learning Together: The Law, Policy, Pedagogy, Economics, and Neuroscience of Early Childhood Education** (Rowman & Littlefield, 2015) (with S. Kaufman and E. Nelson)

Kaufman, **Learning Civil Procedure** (Third Edition West 2018)(with Baicker-McKee, Coleman, Herr and Stempel)

Kaufman, **Teacher's Manual to Learning Civil Procedure** (Third Edition West 2018)(with Baicker-McKee, Coleman, Herr and Stempel)

Kaufman, **Depositions: Law, Strategy and Technique** (West 2020) (with Lisnek) (Annual Supplements since 1995)

Kaufman, **Securities Litigation: Law, Policy, and Practice** (Carolina Academic Press 2016) (with M. Steinberg, W. Couture, and D. Morrissey)

Kaufman, **Professor's Manual to Securities Litigation: Law, Policy, and Practice** (Carolina Academic Press 2016) (with M. Steinberg, W. Couture, and D. Morrissey)

Kaufman, **Learning Civil Procedure** (Second Edition West 2015) (with Baicker-McKee, Coleman, Herr and Stempel)

Kaufman, **Teacher's Manual to Learning Civil Procedure** (Second Edition West 2015) (with Baicker-McKee, Coleman, Herr and Stempel)

Kaufman, **Education Law, Policy and Practice: Cases and Materials** (Third Edition, Aspen, 2013) (with S. Kaufman)

Kaufman, **Teacher's Manual to Education Law, Policy and Practice: Cases and Materials** (Third Edition, Aspen, 2013) (with S. Kaufman)

Kaufman, **Learning Civil Procedure** (First Edition West 2013) (with Baicker-McKee, Coleman, Herr, and Stempel)

Kaufman, **Teacher's Manual to Learning Civil Procedure** (First Edition West 2013)

4

(with Baicker-McKee, Coleman, Herr, and Stempel)

Kaufman, **Expert Witnesses: Securities Cases** (West 2012) (Annual Supplements since 2008)

Kaufman, **Education Law, Policy and Practice: Cases and Materials** (with S. Kaufman) (Second Edition, Aspen 2009)

Kaufman, **Teacher's Manual to Education Law, Policy and Practice: Cases and Materials** (with S. Kaufman) (Second Edition, Aspen 2009)

Kaufman, **Illinois Civil Trial Procedure**, (First Edition West 2008) (Annual Supplements since 1996)

Kaufman, **Education Law, Policy and Practice** (First Edition Aspen 2005)

Kaufman, **Teacher's Manual** to **Education Law, Policy and Practice** (First Edition Aspen 2005)

Kaufman, **Supplement** to Vol. 3 **Richard A. Michael's Illinois Civil Procedure Before Trial**, (West 2004) (Annual Supplements since 1994)

Kaufman, **Supplement** to Vol. 4 **Richard A. Michael's Illinois Civil Procedure Before Trial**, (West 2004) (Annual Supplements since 1994)

Kaufman, **Nichols' Illinois Civil Procedure Before Trial** (West 2002)

Kaufman, **Depositions: Procedure, Strategy and Technique**, (Lawyers Edition) (West 1995) (with Lisnek) (Annual Supplements 1990-1995)

Kaufman, **Depositions:  Procedure, Strategy and Technique**, (Student Edition) (West 1995) (with Lisnek) (Annual Supplements 1990-1995)


B.    SELECTED LAW REVIEW ARTICLES

Kaufman, **From *Texas Gulf Sulphur* to *Laudato Si'*: *Mining Equitable Principles from Insider Trading Law***, 71 S.M.U. L. Rev. 811 (2018)

Kaufman, ***Social Justice and the American Law School Today: Since We are Made for Love,*** 40 Seattle L. Rev. 1187 (2017)

Kaufman, ***Paving the Delaware Way: Legislative and Equitable Limits on Fee Shifting By Laws after ATP,*** 93 Wash. Univ. L. Rev. 335 (2015) (with J. Wunderlich)

Kaufman, *The Bromberg Balance: Proper Portfolio-Monitoring Agreements in Securities Class Actions,* 68 S.M.U. L. Rev. 771 (2015) (with J. Wunderlich)

Kaufman, *Leave Time for Trouble: The Limitations Periods Under the Securities Laws,* 40 J. Corp. Law 143 (2014) (with J. Wunderlich)

Kaufman, *Foreword: Behavioral Economics and Investor Protection,* 44 Loy. U. Ch. L.J. 1323 (2013)

Kaufman, *Behavioral Economics and Investor Protection: Keynote Address by Daniel Kahneman* (edited and transcribed), 44 Loy. U. Ch. L.J. 1333 (2013)

Kaufman, *Messy Mental Markers: Inferring Scienter from Core Operations in Securities Fraud Litigation,* 73 Ohio St. L.J. 507 (2012) (with J. Wunderlich)

Kaufman, *The Judicial Access Barriers to Remedies for Securities Fraud*, 74 Law and Contemporary Problems, 55 (2012) (with J. Wunderlich)

Kaufman, *Fraud Created the Market*, 63 Ala. L. Rev. 275 (2012)) (with J. Wunderlich)

Kaufman, *Summary Pre-Judgment,* 43 Loy. U. Ch. L.J. 593 (2012)

Kaufman, *Toward a Just Measure of Repose: The Statute of Limitations for Securities Fraud*, 52 William & Mary L. Rev. 1547 (2011) (with J. Wunderlich)

Kaufman, *Section 16(b) and its Limitations period: The Case for Equitable Tolling,* 39 Sec. Reg. L. J. 169 (2011)

Kaufman, *Resolving the Continuing Controversy Regarding Confidential Informants in Private Securities Fraud Litigation,* 19 Cornell J. Law & Pol. 637 (2010) (with J. Wunderlich).

Kaufman, *The Unjustified Judicial Creation of Class Certification Merits Trials in Securities Cases*, 43 U. Mich. J. Law Ref. 323 (2010) (with J. Wunderlich).

Kaufman, *Regressing: The Troubling Dispositive Role of Event Studies in Securities Fraud Litigation*, 15 Stan. J. L. Bus. & Fin. 183 (2009) (with J. Wunderlich).

Kaufman, *Congress, The Supreme Court and the Proper Role of Confidential Informants in Securities Fraud Litigation,* 36 Sec. Reg. L. J. 345 (2008) (with J. Wunderlich).

Kaufman, *From Proposition 209 to Proposal 2: Examining the Effects of Anti-Affirmative Action Voter Initiatives*, 13 U. Mich. J. Race & Law 461 (Spring 2008) (transcription).

6

Kaufman, *PICS in Focus: A Majority of the Supreme Court Reaffirms the Constitutionality of Race-Conscious School Integration Strategies*, 35 Hastings Const.L.Q1 (2007).

Kaufman, *(Still) Constitutional De-Segregation Strategies: Teaching Racial Literacy to Secondary School Students and Preferencing Racially-literate Applicants to Higher Education*, 13:1 U. Mich. J. Race & Law, 1 (Fall 2007).

Kaufman, *Reading, Writing and Race: The Constitutionality of Educational Strategies Designed to Teach Racial Literacy,* 41 U. Rich. L. Rev. 707 (2007).

Kaufman, *The Law and Policy of Universal Preschool*, 27 Child. Leg. Rights. J 1 (Spring 2007) (Forward).

Kaufman, *Nationalizing Ethical Standards for Securities Lawyers,* 46 Wash. L. Rev. 109 (2006).

Kaufman, *At a Loss, The Supreme Court, Congress and Causation Under the Federal Securities Laws,* 2 N.Y.U. J. Law & Bus. 1 (2005).

Kaufman, *Beyond Presumptions and Peafowl: Reconciling the Legal Principle of Equality with the Pedagogical Benefits of Gender Differentiation,* 53:4 Buff. L. Rev. 1059 (2005).

Kaufman, *Rhetorical Questions Concerning Justice and Equality in Educational Opportunities,* 36 Loy. U.L.J. 495 (2004).

Kaufman, *Loss Causation Revisited,* 32:4 Sec. Reg. L.J. 357 (2004).

Kaufman, *A Model Resource for Students and Practitioners of Business Law and Ethics*, 28 U. Iowa J. Corp. L.313 (Winter 2003)

Kaufman, *Mending the Weathered Jurisdictional Fences in the Supreme Court's Securities Fraud Decisions*, 49 S.M.U.L. Rev. 159 (1996).

Kaufman, *New Frontier in Securities Litigation: Do Interests in Limited Liability Companies Constitute Securities?*  4 ABA Sec. Lit. Nw. 2 (1995).

Kaufman, *A Little "Right" Musick: The Unconstitutional Judicial Creation of Private Rights of Action Under Section 10(b) of the Securities Exchange Act*, 72 Wash. U.L.Q. 287 (1994).

Kaufman, *The Value of Friendship in Law and Literature*, 60 Ford. L. Rev. 645 (1992).

Kaufman, *Loss Causation: Exposing a Fraud on Securities Law Jurisprudence*, 24 Ind.

7

L. Rev. 357 (1991).

Kaufman, *The Uniform Rule of Liability Under the Federal Securities Laws: The Judicial Creation of a Comprehensive Scheme of Investor Insurance*, 63:1 Temple L. Rev. 61 (1990); reprinted in Langevoort, Securities Law Review, 23 Sec. L. Rev. 321 (1991).

Kaufman, *Living in a Material World: Strict Liability Under Rule 10b-5*, 19 Cap. U.L. Rev. 1 (1990).

Kaufman, *No Foul, No Harm: The Real Measure of Damages Under Rule 10b-5*, 39 Cath. U.L. Rev. 29 (1989).

Kaufman, *The Lawyer's Role in Civil Litigation: Obstructers Rather than Facilitators of Justice*, 77 Ill. B.J. 202 (Dec. 1988).

Kaufman, *Federal and State Handicapped Discrimination Laws: Toward an Accommodating Legal Framework*, 18 Loy. U.L.J. 1119 (1987).

Cooper & Kaufman, *Preemption and Removal: Time and Money*, 12 Sup. Ct. Rev. 423 (1987), reprinted in 36 Law R. Digest 49 (1987).


## APPOINTED PUBLIC AND ACADEMIC POSITIONS

| | |
|---|---|
| Public Arbitrator, Securities Cases | **1987-present** |
| Expert Consultant<br>Securities and Exchange Commission | **1990-present** |
| Expert Consultant<br>Illinois Attorney General's Office | **2012-present** |
| Expert Consultant<br>Federal and State Court Litigation | **1990-present** |
| Committee Member<br>Illinois Attorney General's Special Education Committee | **2012-present** |
| Academic Affiliate,<br>National Economic Research Associates | **2012-present** |

8

Board of Academic Advisors                                          **2014-present**
Institute for Law and Economic Policy


## EDUCATION

The University of Michigan Law School, J.D. 1983
American Judicature Society Award.
Appointed Teacher, Law School Writing and Advocacy Class.

Kenyon College, B.A. *magna cum laude,* 1980
High Honors in Political Science and English Literature.
Phi Beta Kappa.


## AWARDS AND HONORS

Loyola University Chicago School of Law Faculty Member of the Year (2016-2017)

Loyola University Chicago School of Law Faculty Member of the Year (2009-2010)

The Freedom and Justice Award (presented by Access Living and the Americans Disabled for Accessible Public Transportation for successful advocacy work on behalf of persons with physical disabilities)

The Friend of the Family Award (presented by Family Network for Volunteer work on behalf of children and families)


## REPRESENTATIVE SPEECHES, PRESENTATIONS, AND MEDIA

*Bar Examination Review Lectures* -- Federal Procedure, State Procedure, Securities, Corporations, Partnership, Agency, and Unincorporated Associations lectures for the Bar Examination in Alabama, Arizona, Arkansas, California, Colorado, Delaware, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nevada, New Hampshire, New York, North Carolina, Ohio, Oregon, Utah, Vermont, Virginia, Washington, and Washington, D.C., (1988 to present).


*National Institute Trial Advocacy (NITA)—* teach professional development programs in trial practice, deposition, and negotiations skills for attorneys in private law firms and regulatory agencies. (2010—present)

9

*"Loyola's New Interim Law Dean to Focus on School's Visibility,"* Chicago Daily Law Bulletin (July 21, 2016)

*"Education Law Year in Review: Congress and the Supreme Court,"* Loyola University Chicago School of Law (June 22, 2016)

*"How to Reform Chicago's School System? Early and Often,"* Crain's Chicago Business (Dec. 5, 2014)

"*Reimagining Early-Childhood Education*," Vol. 34 Education Week 22-24 (October 15, 2014)

"*Agency and Partnership*," Law School Legends (Gilbert Law Summaries-Lecture and Audiotape).

"*Reliance and Causation in Securities Fraud Litigation,"* Institute for Law and Economic Policy Symposium.

"*Behavioral Economics and Investor Protection,"* Loyola University Chicago School of Law Conference.

*"Education Law,"* Law School Legends (Gilbert Law Summaries--Lecture and Audiotape).

*"Judicial Access Barriers to Remedies for Securities Fraud Victims,"* Institute for Law and Economic Policy Symposium.

"*Summary Pre-Judgment,"* presentation at Seattle University School of Law Symposium.

"*Piercing the Corporate Veil and Alternative Business Organizations,"* MCLE Presentations for the Illinois Attorney General's Office.

"*Existing and Emerging Efforts to Remedy K-12 Educational Disparities,"* University of Michigan Law School.

"*Racial Equality and Public Education*," Constitutional Rights Foundation Conference.

*"Where is the Supreme Court Headed?"* Institute for High School Law.

"*Current Issues in Securities Litigation Damages*," Northwestern University Garrett Corporate and Securities Law Institute (with C. Westover and S. Wolff).

*National Law Journal,* featured and quoted in article regarding securities fraud issues in the Supreme Court.

10

*"Satisfying the Constitution and Proposition 209,"* The Warren Institute on Race, Ethnicity and Diversity at the University of California.

*"Introduction to Civil Litigation,"* Loyola University Magis Program.

*"Commercial Litigation and Consumer Law,"* Illinois Judicial Conference.

*National Institute for Legal Education -- Civil Procedure* (Stanford University, American University and Loyola University Chicago).
*"The Lessons of Enron,"* Loyola University Faculty Symposium.

*"Integrating Case Studies into the Law School Curriculum,"* Enhancing the Teaching Culture, Loyola University Chicago.

*"The 1993 Amendments to the Federal Rules of Civil Procedure,"* NAACP Tenth annual Lawyers' CLE Seminar.

*"Accountant's Role in Avoiding Fraud,"* Seminar for Accountants' Continuing Professional Education (CPE).

*"Accountants' Liability Under the Federal Securities Laws,"* Seminar for Accountants' Continuing Professional Education (CPE).

*"The Fourth Amendment and Drug Testing,"* Keynote Address to National Conference of Christians and Jews.

*"The Impact of the Judicial Improvements and Access to Justice Act,"* Illinois Institute of Continuing Legal Education.

*"Materiality and Fraud on the Market Under Rule 10b-5,"* American Bar Association Securities Law Committee.

*"The Use of RICO in Securities Fraud Indictments,"* Interview on Cable News Network (CNN) "Money Line."

*"Handicapped Discrimination in Public Transportation,"* Speech at United States Department of Transportation Convention, Seattle, Washington.

*"Handicapped Discrimination in Public Transportation,"* Speech at Washington State Transportation Conference.

*"The Lawyer's Role in Civil Litigation,"* Presentation of Position Paper to Illinois State Bar Association, Allerton House, Civil Practice Convention.

*"Motion Practice in Federal and State Court,"* Continuing Legal Education.

## APPENDIX B
### Documents Relied Upon

- Rakoff, *Confidential Informants and Securities Class Actions: Mixed Messages and Motives*, 45 Loy. U. Chi. L.J. 571 (2014);

- Kaufman, *Rule 10b-5 Private Securities-Fraud Litigation* (West ed. 2020)(with J. Wunderlich) (annual Supplements since 2014);

- Kaufman, *The Judicial Access Barriers to Remedies for Securities Fraud*, Law and Contemporary Problems, 55 (2012) (with J. Wunderlich);

- Kaufman, *Resolving the Continuing Controversy Regarding Confidential Informants in Private Securities Fraud Litigation,* 19 Cornell J.L. & Pol'y 637 (2010) (with J. Wunderlich);

- Kaufman, *Congress, The Supreme Court and the Proper Role of Confidential Informants in Securities Fraud Litigation,* 36 Sec. Reg. L.J. 345 (2008) (with J. Wunderlich);

- Kaufman, *Securities Litigation: Damages*; Vol. 26 and Vol 26A (West 2020) (annual Supplements since 1989);

- Kaufman, *Securities Litigation: Law, Policy, and Practice* (Carolina Academic Press 2016) and the three-volume treatise, Blue Sky Law (Thomson Reuters 2020) (with J. Wunderlich) (annual Supplements since 2016);

- Kaufman, *Learning Civil Procedure,* (West 3rd. ed. 2018);

- Dyck, Alexander et al., *Who Blows the Whistle On Corporate Fraud?,* Nat'l Bureau of Econ. Research, Working Paper No. 12882, at 3 (2007), available at https://www.nber.org/system/files/working_papers/w12882/w12882.pdf;

- Mark, Gideon, *Recanting Confidential Witnesses in Securities Litigation*, 45 Loy. U. Chi. L.J. 575, 591 (2014);

- Mark,, Gideon, *Confidential Witness Interviews in Securities Litigation*, 96 N.C. L. Rev. 789, 809 (2018);

- Smollar, Leigh, *The Importance of Conducting Thorough Investigations of Confidential Witnesses in Securities Fraud Litigation*, 46 Loy. U. Chi. L.J. 503 (2015);

- Class Action Complaint, Filed February 5, 2020;

- Memorandum Opinion Of United States District Court Judge Jed Rakoff Appointing David Cohn Lead Plaintiff, And Cohn's Chosen Counsel, Hagens Berman Sobol Shapiro Llp ("Hagens Berman"), As Lead Counsel, May 4, 2020;

- Amended Complaint, Filed June 4, 2020;

- Order Granting In Part And Denying In Part Defendants' Motion To Dismiss, August 24, 2020;

- Case Management Plan, August 28, 2020;

- Confidentiality Stipulation And Protective Order, Filed September 10, 2020;

- Second Amended Complaint, Filed September 11, 2020;

- Defendants' Motion For Reconsideration Of The Court's August 24, 2020 Memorandum Order And Motion For Sanctions, Filed October 30, 2020;

- Memorandum Of Law In Support Of Defendants' Motion For Reconsideration Of The Court's August 24, 2020 Memorandum Order; Motion For Sanctions; And Motion For Stay Of Discovery, Filed October 30, 2020;

- Supplemental Memorandum Of Law And Report Of Investigation, Filed December 15, 2020;

- Declaration Of Luna Barrington; Filed October 30, 2020;

- Declaration Of Luna Barrington; filed December 15, 2020;

- Nov. 10, 2020 Hearing Transcript;

- Deposition Transcripts from the six CWs; (taken in November and December 2020);

- Declaration of Lynnley Browning; filed January 19, 2021;

- Declaration of Lucas E. Gilmore; filed January 19, 2021;

- PLAINTIFFS004985;

- Cases cited in my January 19, 2021 Declaration;

- Rules cited in my January 19, 2021 Declaration; and

- Academic books and articles cited in my January 19, 2021 Declaration.