# EXHIBIT 45

## [REDACTED VERSION]

| **From:** | Barrington, Luna </O=WEILX/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=NGANLUNA> |
|---|---|
| **Sent:** | Monday, October 12, 2020 8:26 PM |
| **To:** | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| **Cc:** | Polkes, Jonathan <Jonathan.Polkes@weil.com>; Zalka, Caroline <caroline.zalka@weil.com> |
| **Subject:** | RE: Sasol Litigation Team - Introduction |
| **Attach:** | Second Amended Complaint.pdf; Redline - Declaration of ▮▮▮▮▮▮ (CW5)-97661232-v6 and Declaration of ▮▮▮▮▮▮ (CW5)-97661232-v7.pdf; Declaration of ▮▮▮▮▮▮ (CW5)_WEIL_97661232_7.DOCX |

Hi ▮▮▮▮, no problem. Attached is a revised draft reflecting your edits, along with a redline. With respect to the quoted paragraph, the typos appear in the second amended complaint itself but we've bracketed the edits to make clear that the complaint is referring to CW-5. I've also attached a copy of the second amended complaint for your reference. The paragraphs discussing CW-5 can be found on page 36, paragraph 94 and page 52, paragraph 132. We've highlighted those paragraphs for your convenience.

Please let me know if you need anything further or have any other questions. Many thanks.

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Monday, October 12, 2020 6:28 PM
**To:** Barrington, Luna <Luna.Barrington@weil.com>
**Cc:** Polkes, Jonathan <Jonathan.Polkes@weil.com>; Zalka, Caroline <caroline.zalka@weil.com>
**Subject:** Re: Sasol Litigation Team - Introduction

Hi Luna--

Thank you for the revised statement. I wanted to reflect upon and double-check it before signing and sending it. A minor revision is attached in redline format with three edits:

1) In the paragraph that quotes the second amended filing on page 3 of the statement, would you please check for typos where it refers to C-5 and CS-5 instead of CW-5. I don't know to whom or what C-5 and CS-5 would refer, but the paragraph appears to make more sense if it consistently referred to CW-5, which I changed in the attachment. I could not locate the paragraphs in the version of the complaint/order that I downloaded online, so may I ask you please to send me the document it cites.

2) I traced my cell phone incoming calls and discovered the contact information for the plaintiff's investigator. I added the specific dates on which she first and last contacted me -- and can confirm that the times cited in the statement are accurate.

3) I also re-worded the last sentence in section 7.

Would you please advise as to whether the changes to CW-5 in point #1 are appropriate and once finalized if I should electronically sign a PDF or, alternatively, print, sign and scan the document.

Regards,

▮▮▮▮▮

On Sunday, October 11, 2020, 03:17:27 PM EDT, Barrington, Luna <luna.barrington@weil.com> wrote:

Hi ▮▮▮▮ attached is a revised version reflecting your changes. We did some minor clean-up, all of which is

▮▮▮▮▮▮000099

also reflected in the redline pdf for your review. At your convenience, can you please sign, scan and email the declaration back to me? We'll keep you posted on next steps. If you have any questions in the meantime, please feel free to call or email me anytime. Thanks so much.

---

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Sunday, October 11, 2020 12:26 PM
**To:** Barrington, Luna <Luna.Barrington@weil.com>
**Cc:** Polkes, Jonathan <Jonathan.Polkes@weil.com>; Zalka, Caroline <caroline.zalka@weil.com>
**Subject:** Re: Sasol Litigation Team - Introduction

Hi Luna--

You all did an excellent job capturing the series of events and information. My edits are minor and attached in redline format.

Regards,

▮▮▮▮

On Saturday, October 10, 2020, 06:20:11 PM EDT, Barrington, Luna <luna.barrington@weil.com> wrote:

Sounds good, thanks ▮▮▮

> On Oct 10, 2020, at 6:12 PM, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ wrote:

Hi Luna,

It was good speaking with you, and I received the draft declaration. I will review it and revert with you tomorrow. Thank you.

Regards,

CONFIDENTIAL

▮▮▮▮▮▮000100



▮

Sent from my iPhone

On Oct 10, 2020, at 5:23 PM, Barrington, Luna <Luna.Barrington@weil.com> wrote:

Hi ▮ attached please find a draft of your declaration. We did our best to accurately capture our conversation from Friday. If you have any changes at all, please let us know. We want to make sure you are 100% comfortable with the document. We're also happy to schedule another call if you'd like to discuss. Thanks and look forward to hearing from you.

Best, Luna

**From:** Barrington, Luna
**Sent:** Friday, October 9, 2020 5:12 PM
**To:** ▮
**Cc:** Polkes, Jonathan <Jonathan.Polkes@weil.com>; Zalka, Caroline <caroline.zalka@weil.com>
**Subject:** Sasol Litigation Team - Introduction

Hi ▮

Thanks so much again for taking the time to talk to me this afternoon. I want to introduce my partners Jonathan Polkes and Caroline Zalka (copied here). We represent Sasol in the securities case, *Moshell v. Sasol, et. al.*, Case No. 1:20-cv-01008. I've also provided links to our firm bios so you have our contact information.

As I mentioned on the call, we will send you a draft declaration in the next day or two based on our conversation today. After you've had a chance to review, we can schedule a follow-up call to discuss any changes you may have.

Thanks again and have a good weekend.

https://www.weil.com/people/jonathan-polkes

https://www.weil.com/people/caroline-zalka

https://www.weil.com/people/luna-barrington

CONFIDENTIAL                                                                                       ▮000101

**Luna Barrington**

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
luna.barrington@weil.com
+1 212 310 8421 Direct
+1 212 310 8007 Fax

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

<Declaration of ▆▆▆▆▆▆▆ (CW5)_WEIL_97661232_5.DOCX>

CONFIDENTIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHAD LINDSEY MOSHELL, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SASOL LIMITED, DAVID EDWARD CONSTABLE, BONGANI NQWABABA, STEPHEN CORNELL, PAUL VICTOR, and STEPHAN SCHOEMAN,<br><br>Defendants. | Case No. 1:20-cv-01008-JSR<br><br><u>CLASS ACTION</u><br><br>**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

010886-11/1340463 V1

CONFIDENTIAL

000103

it, "how could you have $300 million of contingency on 8 percent of work to go? It's mind-blowing, so much contingency."

93.    Overall, CW-4 believed that Sasol executives would go to any lengths to keep up the appearance of LCCP being on track because they wanted to cash in on their Sasol shares.

5.    **CW-5: Defendant Cornell Was "100% Informed and Involved" On Cost Overruns and Construction Delays.**

94.    A fifth individual (CW-5) provides yet more corroboration of the accounts of CW-1, -2, -3, and -4. At Sasol, CW-5 worked as a risk assessor for the LCCP project, starting before the Class Period and leaving in the fall of 2015. In 2015, CW-5 believed that the project was "on budget" – but CW-5 said "on budget" throughout 2015 means the $11 billion budget, which Sasol did not disclose to shareholders until June 2016. "I would never put down that it was an $8 billion project. Absolutely when I was there, we were talking $11 billion." (This statement is corroborated by CW-1's account of a February 2016 change order reflecting LCCP's costs were $11.7 billion.) CW-5 agreed with the characterization that the $8.9 billion cost estimate was "ridiculously low," particularly because the estimates from Fluor and Technip were higher than that. The $11 billion cost estimate from the beginning was "socialized" among senior management — meaning that it was an estimate that was widely promulgated as the truth from upper management; "whatever the board saw was a really low number." CW-5 knew this because C-5 heard everyone talking about that number.  In light of his role on the GEC, CS-5 said, Defendant Cornell would have been "100% informed and involved" with issues concerning contracting, cost overruns, and construction delays. CW-5 stated that Defendant Cornell would have been the "ultimate arbiter" of costs, meaning that Cornell knew about the cost issues and made the decisions about costs.  Cornell "became the main person steering the project. He was

- 36 -

010886-11/1340463 V1

000143

CONFIDENTIAL

<mark>the ultimate decision maker" when CW-5 was on the project. CW-5 believes that there is a third</mark> <mark>party case study on LCCP as a model of what not to do.</mark>

6.    **CW-6: Management Directed Me to "Manipulate" the Schedule to Make It Look Better On Paper.**

95.    CW-6 worked as a scheduler for one of the main LCCP units in Lake Charles from early summer 2018 to late winter 2019. CW-6 was a contractor through Sasol's contracting agreement with TRS Staffing Solutions, and was based at LCCP's site in Lake Charles. CW-6 said that, from the time CW-6 arrived, "we were significantly behind schedule" on construction and commissioning in CW-6's group.

96.    As a result, CW-6 stated that management directed CW-6 or CW-6's colleagues to change anticipated completion dates for projects to make it appear on paper that the project would be completed on time by compressing the remaining schedule to meet the beneficial operating date. For example, for a given construction issue, "they would say, change it to two days from 7-8, and we were saying, you can't do that. We would present something, they'd say that doesn't work, go back and make it hit the dates." CW-6 stated it was a "continuous revision" and described his duties as "pencil whipping." CW-6 stated that this practice occurred over a large number of projects, such that the probability of completing the projects according to the schedule was extremely small.

97.    CW-6 said senior Sasol executives, including Defendant Schoeman and Mike Kane, decided to decouple LCCP's construction schedules from its commissioning, or startup, schedules, to show that more work had been completed on LCCP than actually had been. The altered construction schedules "showed we were further along than what was happening." CW-6 stated that "this was schedule manipulation." CW-6 described Schoeman as very detail-oriented.

- 37 -

010886-11/1340463 V1

000144

CONFIDENTIAL

The new cracker complex would roughly triple the capacity of the Lake Charles site. Furthermore, our product slate distinguishes our investment from most of the other crackers that have been announced.

Our project combines commodity and specialty products which will leverage low-cost US ethane feed stocks. And note that the specialty chemicals produced will deliver high-value returns even as chemical markets fluctuate.

***To oversee the execution phase of the projects we have an extremely experienced owner's team in place and have progressed several key milestones. Site work is proceeding safely and efficiently and we expect that the plant will achieve mechanical completion at the end of calendar-year 2017. Beneficial operations are on track for the first half of calendar-year 2018.***

132.    Defendants' March 9, 2015 statements regarding the LCCP were false and misleading and omitted material facts. Contrary to Defendants' statements, Sasol was not making "good progress" on the LCCP, the true cost of the investment in the LCCP was not $8.9 billion, and the project's economics were not robust. As stated above, Defendants knew by virtue of internal reports that their October 2014 cost estimate failed to account for multiple issues which substantially increased the cost of the project well beyond $8.9 billion. In addition, Defendants knew that the construction and operation of the LCCP was plagued by poor, inexperienced leadership, construction defects, control weaknesses, delays, rising costs, and technical issues, making the project an unsafe and inefficient worksite and taking the LCCP well off track from achieving mechanical completion at the end of calendar-year 2017 and having beneficial operations by the first half of calendar-year 2018. Indeed, as discussed above, Defendants knew from the beginning (before the project even started) that the true budget was going to be approximately $11 billion (even as it ended up being at least $12.6 billion), as CW-2 told senior management directly (including Defendants Nqwababa, Cornell, and Victor) "from the beginning" that the project was going to cost more than $8.9 billion, but Defendants did not

- 51 -

000158

CONFIDENTIAL

disclose this material fact until fifteen months later, on June 6, 2016. CW-3 stated that senior management knew prior to June 2016 that the $8 billion budget was unrealistic. CW-4 stated that CW-4 believed that Defendant Cornell knew the $8.9 billion budget, and even the $11.1 billion budget, was too low, but neither Cornell nor anyone else at senior management disclosed this fact. CW-5 stated that Defendant Cornell would have been "100% informed and involved with issues concerning cost overruns and construction delays," including the fact that the $8.9 billion budget was disclosed, but this fact was not disclosed to investors.

**B.     Sasol's September 7, 2015 Filings Failed to Reveal True Cost Estimates and Delays**

133.     On September 7, 2015, Sasol released its full year results for the year ended June 30, 2015 by issuing a press release and Annual Report and filing a Current Report of Foreign Issuer on Form 6-K with the SEC.

134.     In the September 7, 2015 press release, Defendant Nqwababa updated investors on the LCCP project, stating, "Our US$8,9 billion world-scale ethane cracker and downstream derivatives complex in *Lake Charles, Louisiana* remains on track to reach beneficial operation in 2018."

135.     In the Form 6-K, Defendants similarly stated the cost and development of the LCCP remained "on track":

> Our US$8.9 billion world-scale ethane cracker and downstream derivatives complex in Lake Charles, Louisiana remains on track to reach beneficial operation in 2018.
>
> * * *
>
> Following the [decision] to proceed with our world-scale ethane cracker and downstream derivatives complex in Lake Charles, Louisiana (LCCP) at the end of October 2014, significant progress has been made in detailed engineering and infrastructure work at the site. We expect to achieve BO [beneficial operation] during the 2018 calendar year. The final estimated project cost remains at US$8.9 billion (including infrastructure and utilities). Approximately 80%

- 52 -

010886-11/1340463 V1

000159

CONFIDENTIAL

DATED: September 11, 2020       Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By /s/ Steve W. Berman
    STEVE W. BERMAN
Steve W. Berman (admitted *Pro Hac Vice*)
Jerrod C. Patterson
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
jerrodp@hbsslaw.com

Reed R. Kathrein
Lucas E. Gilmore (admitted *Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com
danielles@hbsslaw.com

*Counsel for Lead Plaintiff David Cohn and
Additional Representative Plaintiff Chad L. Moshell*

- 115 -

010886-11/1340463 V1

CONFIDENTIAL

000222

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2020, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-

mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List,

and I hereby certify that I have mailed a paper copy of the foregoing document via the United

States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List

generated by the CM/ECF system.

/s/ Steve W. Berman
STEVE W. BERMAN

010886-11/1340463 V1

000223

CONFIDENTIAL

DocuSign Envelope ID: B653E2F6-0905-49C9-6701-A9B7D18E8EB6
Case 1:20-cv-01008-JPC    Document 143-5    Filed 02/22/21    Page 13 of 25
Case 1:20-cv-01008-JSR    Document 81    Filed 09/11/20    Page 122 of 123

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAW

The individual or institution listed below ("Plaintiff") declares as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed a complaint alleging securities fraud against Sasol Limited (SSL) and various of its officers and directors, and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel in order to participate in this private action or any other litigation under the federal securities law.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth in the Chart attached.

5.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in the following actions filed under the federal securities laws.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

By: _____
(Signature of Representative Plaintiff and Authorization to File a Complaint)

Date Signed:    Sep 3, 2020 | 4:14 PM PDT

Name (print): _____

Street Address: _____

City, State, Zip: _____

County/Country: _____

Phone: _____

000224

CONFIDENTIAL

## Sasol Limited (SSL) Transactions - Chad Moshell
### Class Period 03/10/15 - 01/13/20

| Date | Shares | Transaction Type | Share Price |
|---|---|---|---|
| 07/24/15 | 150.000 | Purchase | $33.0000 |
| 10/23/15 | 3.350 | Purchase (Dividend Reinvestment)* | $31.5860 |
| 04/22/16 | 1.471 | Purchase (Dividend Reinvestment) | $32.1500 |
| 10/14/16 | 3.028 | Purchase (Dividend Reinvestment) | $27.8545 |
| 03/31/17 | 1.523 | Purchase (Dividend Reinvestment) | $29.3193 |
| 09/22/17 | 2.582 | Purchase (Dividend Reinvestment) | $28.4753 |
| 04/02/18 | 1.496 | Purchase (Dividend Reinvestment) | $33.6531 |
| 09/21/18 | 1.710 | Purchase (Dividend Reinvestment) | $37.7347 |
| 03/29/19 | 1.628 | Purchase (Dividend Reinvestment) | $31.0872 |

*The original certification contained errors to the dividend reinvestments, which have been corrected in this schedule.*

CONFIDENTIAL

000225

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHAD LINDSEY MOSHELL, Individually and
On Behalf of All Others Similarly Situated,

               Plaintiff,

    vs.

SASOL LIMITED, DAVID EDWARD
CONSTABLE, BONGANI NQWABABA,
STEPHEN CORNELL, PAUL VICTOR, and
STEPHAN SCHOEMAN,

               Defendants.

Case No. 1:20-cv-01008-JPC

Hon. John Peter Cronan

**DECLARATION OF** ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ hereby declares as follows:

1.    From April 2013 through October 2015, I served as the ▮▮▮▮▮▮▮ ▮▮▮▮▮ for ▮▮▮▮▮▮▮▮▮ at Sasol. In this capacity, I worked on the Lake Charles Chemical Project ("LCCP") in Lake Charles, Louisiana, ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

2.    ~~Several months ago~~On May 5, 2020, a private investigator contacted me and told me that she worked on behalf of lawyers who wished to bring a lawsuit against Sasol. I spoke to her briefly on that occasion for approximately 20 minutes. I expressly stated that I did not want to be involved in any litigation concerning Sasol and that she did not have permission to attribute any statements to me. Plaintiffs' investigator said that that she was simply seeking background information on Sasol and the LCCP. At no time did plaintiffs' investigator inform me that plaintiffs intended to attribute statements to me in a federal complaint.

1

CONFIDENTIAL ▮▮▮▮▮▮▮000226

3.     The last time I spoke with plaintiffs' investigator was ~~over the summer of~~on June 1, 2020. Plaintiffs' investigator was joined by an attorney on this call. The call lasted less than five minutes, during which I reiterated that I did not want to be involved in any litigation concerning Sasol and then hung up.

4.     Notwithstanding this, I continued to receive harassing phone calls and text messages from plaintiffs' investigator and was forced to block her phone number to make the contact stop.

5.     Last week, a different investigator contacted me, this time on behalf of Sasol. He made me aware of this lawsuit and – for the first time – the fact that plaintiffs had filed a complaint against Sasol. I was alarmed to learn that, notwithstanding what I had said, plaintiffs included in their Second Amended Complaint certain statements that they claim I made, attributed to "Confidential Witness 5."

6.     Plaintiffs did not provide me with a draft or final version of the Second Amended Complaint before or after it was filed. Plaintiffs did not provide me with a summary of the statements purportedly attributed to me before they included them in their Second Amended Complaint. Plaintiffs did not inform me that they intended to attribute statements to me, even though I had specifically and repeatedly told the investigator that she did not have my permission to use any statements by me. Plaintiffs did not inform me that they intended to use my falsely attributed statements to corroborate those allegedly made by other confidential witnesses.

7.     I have now had the opportunity to review the description of statements attributed to me in the Second Amended Complaint. To be clear, plaintiffs have falsely represented—in every critical respect—what I told their investigator and what I believe. As I

CONFIDENTIAL

describe below, I did not make these statements as quoted, and I do not believe themy to beare untrue.

8.      Specifically, I understand that plaintiffs have claimed to attribute the following statements to me:

> 94.     A fifth individual (CW-5) provides yet more corroboration of the accounts of CW-1, -2, -3, and -4. At Sasol, CW-5 worked as a risk assessor for the LCCP project, starting before the Class Period and leaving in the fall of 2015. In 2015, CW-5 believed that the project was "on budget" – but CW-5 said "on budget" throughout 2015 means the $11 billion budget, which Sasol did not disclose to shareholders until June 2016. "I would never put down that it was an $8 billion project. Absolutely when I was there, we were talking $11 billion." (This statement is corroborated by CW-1's account of a February 2016 change order reflecting LCCP's costs were $11.7 billion.) CW-5 agreed with the characterization that the $8.9 billion cost estimate was "ridiculously low," particularly because the estimates from Fluor and Technip were higher than that. The $11 billion cost estimate from the beginning was "socialized" among senior management — meaning that it was an estimate that was widely promulgated as the truth from upper management; "whatever the board saw was a really low number." CW-5 knew this because C-C[W]-5 heard everyone talking about that number. In light of his role on the GEC, CS-C[W]-5 said, Defendant Cornell would have been "100% informed and involved" with issues concerning contracting, cost overruns, and construction delays. CW-5 stated that Defendant Cornell would have been the "ultimate arbiter" of costs, meaning that Cornell knew about the cost issues and made the decisions about costs. Cornell "became the main person steering the project. He was the ultimate decision maker" when CW-5 was on the project. CW-5 believes that there is a third party case study on LCCP as a model of what not to do.

> 132.    CW-5 stated that Defendant Cornell would have been "100% informed and involved with issues concerning cost overruns and construction delays," including the fact that the $8.9 billion budget was disclosed, but this fact was not disclosed to investors.

9.      These allegations in the Second Amended Complaint are categorically false.

10.     I did not tell plaintiffs' investigator that "we were talking $11 billion" in connection with the LCCP cost estimate during the time that I was employed at Sasol. Indeed, I told the plaintiffs' investigator the *exact opposite*. During one conversation,

CONFIDENTIAL
000226.0002

plaintiffs' investigator repeatedly suggested to me that the LCCP budget had reached $11 billion while I was still employed with Sasol. The investigator urged me to say that I was aware of an $11 billion cost estimate because my LinkedIn profile noted that I had worked on an $11 billion project at Sasol.

11.     I expressly rejected this theory outright. I told plaintiffs' investigator that my LinkedIn profile was intended to document and quantify that I worked on complex multi-billion dollar projects, and my profile had previously reflected a lower dollar amount consistent with Sasol's public declarations about the project costs. This reference to an "$11 billion project" was only added to my LinkedIn profile following Sasol's public increase of the LCCP cost estimate to that level, and I was clear with the investigator that I had *no knowledge* that the company considered the LCCP to be an "$11 billion project" while I was at Sasol.

12.     In fact, I told plaintiffs' investigator that when I left my employment at Sasol, the LCCP *was both on time and on budget for the initial $8.9 billion cost estimate based on everything I knew*. Thus every critical aspect of paragraph 94 of the Second Amended Complaint is false.

13.     In terms of Mr. Cornell, I merely described what I understood his role to be as one of the primary persons in senior management who oversaw the project. I certainly never said, and have no basis to believe, that while I was at Sasol, Stephen Cornell "knew" that the project would ultimately cost $11 billion.

14.     Plaintiffs have falsely represented my statements, and I submit this declaration to correct the record.

CONFIDENTIAL                                                                   000226.0003

I declare under the penalty of perjury that the foregoing is true and correct.

Executed in _____, on _____. 2020.

████████████

CONFIDENTIAL

████████████000226.0004

| Summary report: Litera® Change-Pro for Word 10.8.2.11 Document comparison done on 10/12/2020 8:20:01 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://WEILDMS/WEIL/97661232/6 | |
| **Modified DMS:** iw://WEILDMS/WEIL/97661232/7 | |
| **Changes:** | |
| Add | 8 |
| Delete | 7 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 15 |

CONFIDENTIAL

000226.0005

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CHAD LINDSEY MOSHELL, Individually and On Behalf of All Others Similarly Situated, | : | |
| | : | |
| | : | |
| Plaintiff, | : | Case No. 1:20-cv-01008-JPC |
| vs. | : | |
| | : | Hon. John Peter Cronan |
| SASOL LIMITED, DAVID EDWARD CONSTABLE, BONGANI NQWABABA, STEPHEN CORNELL, PAUL VICTOR, and STEPHAN SCHOEMAN, | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |

### DECLARATION OF ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ hereby declares as follows:

1. From April 2013 through October 2015, I served as the ▮▮▮▮▮▮ ▮▮▮▮ for ▮▮▮▮▮▮▮▮▮ at Sasol. In this capacity, I worked on the Lake Charles Chemical Project ("LCCP") in Lake Charles, Louisiana, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮

2. On May 5, 2020, a private investigator contacted me and told me that she worked on behalf of lawyers who wished to bring a lawsuit against Sasol. I spoke to her briefly on that occasion for approximately 20 minutes. I expressly stated that I did not want to be involved in any litigation concerning Sasol and that she did not have permission to attribute any statements to me. Plaintiffs' investigator said that that she was simply seeking background information on Sasol and the LCCP. At no time did plaintiffs' investigator inform me that plaintiffs intended to attribute statements to me in a federal complaint.

1

CONFIDENTIAL
▮▮▮▮▮▮000227

3.    The last time I spoke with plaintiffs' investigator was on June 1, 2020. Plaintiffs' investigator was joined by an attorney on this call. The call lasted less than five minutes, during which I reiterated that I did not want to be involved in any litigation concerning Sasol and then hung up.

4.    Notwithstanding this, I continued to receive harassing phone calls and text messages from plaintiffs' investigator and was forced to block her phone number to make the contact stop.

5.    Last week, a different investigator contacted me, this time on behalf of Sasol. He made me aware of this lawsuit and – for the first time – the fact that plaintiffs had filed a complaint against Sasol. I was alarmed to learn that, notwithstanding what I had said, plaintiffs included in their Second Amended Complaint certain statements that they claim I made, attributed to "Confidential Witness 5."

6.    Plaintiffs did not provide me with a draft or final version of the Second Amended Complaint before or after it was filed. Plaintiffs did not provide me with a summary of the statements purportedly attributed to me before they included them in their Second Amended Complaint. Plaintiffs did not inform me that they intended to attribute statements to me, even though I had specifically and repeatedly told the investigator that she did not have my permission to use any statements by me. Plaintiffs did not inform me that they intended to use my falsely attributed statements to corroborate those allegedly made by other confidential witnesses.

7.    I have now had the opportunity to review the description of statements attributed to me in the Second Amended Complaint. To be clear, plaintiffs have falsely represented—in every critical respect—what I told their investigator and what I believe. As I describe below, I did not make these statements as quoted, and they are untrue.

000227.0001

8.    Specifically, I understand that plaintiffs have claimed to attribute the

following statements to me:

> 94.    A fifth individual (CW-5) provides yet more corroboration of the accounts of CW-1, -2, -3, and -4. At Sasol, CW-5 worked as a risk assessor for the LCCP project, starting before the Class Period and leaving in the fall of 2015. In 2015, CW-5 believed that the project was "on budget" – but CW-5 said "on budget" throughout 2015 means the $11 billion budget, which Sasol did not disclose to shareholders until June 2016. "I would never put down that it was an $8 billion project. Absolutely when I was there, we were talking $11 billion." (This statement is corroborated by CW-1's account of a February 2016 change order reflecting LCCP's costs were $11.7 billion.) CW-5 agreed with the characterization that the $8.9 billion cost estimate was "ridiculously low," particularly because the estimates from Fluor and Technip were higher than that. The $11 billion cost estimate from the beginning was "socialized" among senior management — meaning that it was an estimate that was widely promulgated as the truth from upper management; "whatever the board saw was a really low number." CW-5 knew this because C[W]-5 heard everyone talking about that number. In light of his role on the GEC, C[W]-5 said, Defendant Cornell would have been "100% informed and involved" with issues concerning contracting, cost overruns, and construction delays. CW-5 stated that Defendant Cornell would have been the "ultimate arbiter" of costs, meaning that Cornell knew about the cost issues and made the decisions about costs. Cornell "became the main person steering the project. He was the ultimate decision maker" when CW-5 was on the project. CW-5 believes that there is a third party case study on LCCP as a model of what not to do.

> 132.    CW-5 stated that Defendant Cornell would have been "100% informed and involved with issues concerning cost overruns and construction delays," including the fact that the $8.9 billion budget was disclosed, but this fact was not disclosed to investors.

9.    These allegations in the Second Amended Complaint are categorically false.

10.    I did not tell plaintiffs' investigator that "we were talking $11 billion" in connection

with the LCCP cost estimate during the time that I was employed at Sasol. Indeed, I told

the plaintiffs' investigator the *exact opposite*. During one conversation, plaintiffs'

investigator repeatedly suggested to me that the LCCP budget had reached $11 billion

while I was still employed with Sasol. The investigator urged me to say that I was aware

000227.0002

of an $11 billion cost estimate because my LinkedIn profile noted that I had worked on an $11 billion project at Sasol.

11.    I expressly rejected this theory outright. I told plaintiffs' investigator that my LinkedIn profile was intended to document and quantify that I worked on complex multi-billion dollar projects, and my profile had previously reflected a lower dollar amount consistent with Sasol's public declarations about the project costs. This reference to an "$11 billion project" was only added to my LinkedIn profile following Sasol's public increase of the LCCP cost estimate to that level, and I was clear with the investigator that I had *no knowledge* that the company considered the LCCP to be an "$11 billion project" while I was at Sasol.

12.    In fact, I told plaintiffs' investigator that when I left my employment at Sasol, the LCCP *was both on time and on budget for the initial $8.9 billion cost estimate based on everything I knew*. Thus every critical aspect of paragraph 94 of the Second Amended Complaint is false.

13.    In terms of Mr. Cornell, I merely described what I understood his role to be as one of the primary persons in senior management who oversaw the project. I certainly never said, and have no basis to believe, that while I was at Sasol, Stephen Cornell "knew" that the project would ultimately cost $11 billion.

14.    Plaintiffs have falsely represented my statements, and I submit this declaration to correct the record.

CONFIDENTIAL

I declare under the penalty of perjury that the foregoing is true and correct.

Executed in _____, on _____. 2020.

CONFIDENTIAL