UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
CHAD LINDSEY MOSHELL, *individually and on*                       :
*behalf of all others similarly situated*,                        :
                                                                  :
                                          Plaintiffs,             :          20 Civ. 1008 (JPC)
                                                                  :
              -v-                                                 :          OPINION AND ORDER
                                                                  :
SASOL LIMITED et al.,                                             :
                                                                  :
                                          Defendants.             :
                                                                  :
------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      In this putative class action, Plaintiffs allege that Defendants Sasol Limited ("Sasol") and

five of its executives, David Edward Constable, Bongani Nqwababa, Stephen Cornell, Paul Victor,

and Stephen Schoeman (the "Executive Defendants"), violated sections 10(b) and 20(a) of the

Securities Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder,

17 C.F.R. § 240.10b-5.  Plaintiffs' claims concern alleged misrepresentations relating to costs

associated with the construction of a complex in Lake Charles, Louisiana, known as the Lake

Charles Chemicals Project ("LCCP").  On August 24, 2020, the Honorable Jed S. Rakoff, to whom

this case was previously assigned, granted in part and denied in part Defendants' motion to dismiss

the Amended Complaint.  Dkt. 74 ("August 24, 2020 Order").  In holding that Plaintiffs adequately

pleaded violations of the federal securities laws, the Court relied on, among other things,

statements attributed to six confidential witnesses (the "CWs") and a mid-construction "Change

Order" that allegedly reflected a significantly higher budget for the project and was contractually

binding on Defendants.

      Soon after discovery commenced, Defendants moved for reconsideration and for sanctions,

arguing that evidence they obtained revealed that certain statements attributed to the CWs in the

Amended Complaint as well as the binding nature of the Change Order were fabricated.   On November 10, 2020, after this case was reassigned to the undersigned, the Court stayed general discovery and class certification briefing, but allowed limited discovery relevant to Defendants' motions.

For reasons discussed below, the Court denies Defendants' motion for reconsideration because it implicates credibility issues and factual disputes that cannot be resolved at this stage. The Court also denies Defendants' motion for sanctions under Rule 11 because of their failure to comply with the requirements of that rule, and declines to issue sanctions *sua sponte* given the absence of sufficient evidence of sanctionable conduct by Plaintiffs' counsel.

## I.  Background

### A.  Factual Allegations[1]

The following factual allegations are taken from the Amended Complaint, which was filed on June 4, 2020.  Dkt. 59 ("Am. Compl.").[2]

Sasol is a South African energy company that trades American depository receipts ("ADRs") on the New York Stock Exchange.  *Id.* ¶ 53.  On October 27, 2014, in an attempt to diversify its business, Sasol announced the construction of the LCCP, an ethane cracker and

---

[1] In the August 24, 2020 Order, Judge Rakoff dismissed the cause of action against Defendant Fleetwood Grobler, August 24, 2020 Order at 20, as well as Plaintiffs' Rule 10b-5 claim to the extent it relied on alleged misrepresentations concerning the adequacy of Sasol's internal controls over financial reporting and management of the LCCP, *id.* at 22-23.  Because these holdings are not material to the pending motions, the Court does not recite any allegations that are relevant only to Grobler or to the adequacy of Sasol's internal controls claim.

[2] The current operative complaint is the Second Amended Complaint, which was filed on September 11, 2020.  Dkt. 81.  Defendants' motions, however, concern the Amended Complaint: Defendants move for reconsideration of Judge Rakoff's denial, in part, of dismissal of the Amended Complaint, and they move for sanctions for Plaintiffs' counsel's supposed failure to conduct a reasonable investigation before filing the Amended Complaint.  The factual allegations in the Amended Complaint, including the statements attributed to the CWs, are substantively identical to those in the Second Amended Complaint.  The Court therefore cites to the Amended Complaint throughout this Opinion and Order.

derivative complex.[3]  *Id.* ¶¶ 54-55, 58.  Plaintiffs alleged in the Amended Complaint that over the course of approximately five years, between March 10, 2015 and January 13, 2020 (the "Class Period"), Sasol and the Executive Defendants made numerous materially false and misleading public statements concerning the cost estimates and scheduling of the LCCP, all while knowing that the project's true costs and completion timeline were well above what was being divulged to the public.  *Id.* ¶ 57.  Each of the Executive Defendants was a member of Sasol's senior management during various points of the Class Period.  *Id.* ¶¶ 40-50.  Constable was Sasol's President and Chief Executive Officer ("CEO") until June 30, 2016.  *Id.* ¶ 40.  Nqwababa and Cornell served as Joint Presidents and CEOs of Sasol from July 1, 2016 to October 31, 2019.  *Id.* ¶¶ 42, 44.  Victor was Sasol's Chief Financial Officer and sat on Sasol's Board of Directors as of July 1, 2016.  *Id.* ¶ 46.  And Schoeman was the Group Executive Committee member responsible for the construction of the LCCP until February 2019.  *Id.* ¶ 50.

On October 27, 2014, Sasol announced an initial cost estimate for the project of $8.1 billion.  *Id.* ¶¶ 7, 58.  On March 9, 2015, Sasol raised that estimate to $8.9 billion in a press release and a Form 6-K that it filed with the SEC.[4]  *Id.* ¶ 130.  Constable and Victor, on March 9, 2015, and Nqwababa, on September 7, 2015, all represented to investors that the project remained on track.  *Id.* ¶¶ 131-132, 135.  Less than a year later, however, in its June 6, 2016 Form 6-K, Sasol disclosed an increase in the estimated cost of the project to $11 billion.  *Id.* ¶ 145.  During a call

---

[3] An ethane cracker complex converts ethane, a natural gas, into ethylene, which is "the most commonly produced petrochemical used in the manufacturing of plastics, resins, adhesives, and synthetic products."  Am. Compl. ¶ 58.

[4] Sasol, as a foreign private issuer, was required to file Forms 6-K with the SEC.  *See* Am. Compl. ¶ 130 n.16.  A Form 6-K discloses any information that the filer's domicile requires to be public "or which it distributes or is required to distribute to its securities holders."  *In re Elan Corp. Sec. Litig.*, No. 02 Civ. 865 (RMB) (FM), 2004 WL 1305845, at *21 (S.D.N.Y. May 18, 2004) (Report and Recommendation); *see* Securities and Exchange Commission, Form 6-K, http://sec.gov/files/form6-k.pdf.

with investors the following day, and allegedly in an attempt to "assuage investors' fears about the rising costs and delays in completion of the project," Constable characterized this new $11 billion figure a "worst case type of scenario" that Sasol did not expect.  *Id.* ¶ 147.  Constable went on to assure the investors that "11 billion is an extremely comfortable number for" Sasol and an estimate that the company was "pushing . . . in a downward direction."  *Id.*  Constable also touted Sasol's efforts to "minimize capital expenditure and further optimize overall project efficiency," and stated that "the overall project economics for the LCCP remain resilient."  *Id.*  In an August 23, 2016 "Investor Fact Sheet," Sasol similarly described the new $11 billion estimate as an "upper end of the range," *id.* ¶ 152, and one that "includes a lower contingency allowance," *id.* ¶ 155.  The Amended Complaint further cited various representations made by Defendants over the following year, generally reporting that the project was progressing on track with the cost estimate remaining at $11 billion.  *Id.* ¶¶ 158, 165-166, 170-173, 176-177, 179.

During a November 23, 2017 investor call, Nqwababa, Victor, and Cornell disclosed that the cost for the LCCP had increased to $11.13 billion, citing "lower productivity levels [due to weather events]."  *Id.* ¶ 181.  Nqwababa defended this latest increase during the call by stating, "you'll remember that we did give a guidance that the contingence was between $400 million and $500 million when we revised our estimate in August [2016].  And we were also very clear that the estimate of $11 billion does not include event-driven risks, like a hurricane or some other event like that."  *Id.* ¶ 182.  According to Plaintiffs, Nqwababa's statement was false and misleading as Sasol did not disclose the exact amount of the contingency in August 2016, but instead stated that the contingency was lower than the previous $300 million contingency disclosed in October 2015.  *Id.* ¶ 185.  Throughout 2018, Defendants continued to assure investors that the LCCP remained on track as to both its schedule and its estimated cost of $11.13 billion.  *Id.* ¶¶ 187-195.

But that changed again by early 2019.  In a February 8, 2019 Form 6-K, Sasol not only again

raised its cost estimate for the LCCP, this time to a range of $11.16 billion to $11.8 billion, but also set out a new and delayed timeline for completion of the project. *Id.* ¶ 196.  Only a few months later, on May 22, 2019, Sasol filed another Form 6-K disclosing an updated $12.6 billion to $12.9 billion cost estimate range for the project. *Id.* ¶ 200.  To justify this sudden increase, Sasol explained to investors on a May 22, 2019 earnings call that LCCP management had failed to adequately verify the accuracy of their cost forecasts. *Id.* ¶ 205.  Sasol elaborated that "a relatively small team, the LCCP project management team, although working very hard, did not have adequate segregation of duties and failed to engage the wider financial organization to verify the accuracy of their forecast." *Id.*  In its Form 6-K filed that same day, Sasol described its efforts to remediate these issues, stating that it "implemented several changes since February 2019 to further strengthen the oversight, leadership for the project and frequency of reporting," that "[w]eaknesses in the project's integrated controls were identified and . . . being remediated," and that "[i]nitiatives to improve decision-making, transparency and documentation within the project management team are also in progress." *Id.* ¶ 204.  During an earnings call that day, Sasol further represented that "the new LCCP leadership has been instrumental in identifying and remedying these issues." *Id.* ¶ 205.  A few months later, Sasol issued a press release describing additional construction delays on certain units at the LCCP. *Id.* ¶ 207.

In its August 16, 2019 Form 6-K and press release, Sasol announced that it would delay announcement of its 2019 financial results because of uncovered "control weaknesses." *Id.* ¶¶ 210-211.  This news was soon followed by a Form 6-K, filed on August 26, 2019, reporting that Sasol "had halved expected earnings" due to delays in completion dates for several units at the LCCP. *Id.* ¶ 213.

A particularly significant event occurred on October 28, 2019, when Sasol announced in a

Form 20-F[5] the results of a May 2019 independent review "into the circumstances that may have delayed the prompt identification and reporting of the LCCP cost and schedule overruns." *Id.* ¶¶ 219-220.  As Sasol's October 28, 2019 Form 6-K explained, this review brought to light "errors, omissions, and inaccuracies in the [LCCP] cost estimate." *Id.* ¶ 215 (alteration in original).  Due to these errors and other "unethical and improper reporting activities," Sasol announced the resignations of Joint Presidents and CEOs Nqwababa and Cornell, effective November 1, 2019, and others previously in charge of the LCCP. *Id.*  The Form 20-F report disclosed various issues uncovered during the investigation, such as "inappropriate conduct and . . . improper tone at the top of the LCCP, including an excessive focus on maintaining cost and schedule estimates at the expense of providing accurate cost and schedule estimation to oversight bodies," and "inadequate control procedures within the LCCP control environment that allowed erroneous and/or unsupported reporting by the LCCP leadership." *Id.* ¶ 220.

Sasol's October 28, 2019 Form 6-K similarly stated that "[a]t the LCCP, the Company's executive leadership placed too much trust in the [LCCP's Project Management Team]," and that for "trust to be restored in the Company, a leadership reset is required." *Id.* ¶ 215.  The Form-20F report announced Sasol's detailed remediation plan that involved "[r]equiring . . . various employees involved in the LCCP and/or its oversight engage in additional training, including as to reporting obligations," and "[r]evising [Sasol's] procedures regarding the escalation of ethics complaints and internal investigation findings." *Id.* ¶ 220.  Sasol disclosed that it would also be "[e]ngaging in consequence management, including removing from all work responsibilities and

---

[5] "A Form 20-F is a form issued by the SEC that must be submitted by all foreign private issuers with equity shares listed on exchanges in the United States.  Form 20-F requires foreign private issuers to submit annual reports within six months of the end of a company's fiscal year." *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, No. 18 Civ. 4993 (NRB), 2021 WL 1178216, at *7 n.5 (S.D.N.Y. Mar. 29, 2021); *see* Securities and Exchange Commission, Form 20-F, http://sec.gov/files/form20-f.pdf.

initiating disciplinary action against the Executive Vice President previously in charge of [the] LCCP and negotiating the separation of the three Senior Vice Presidents with roles in the projects; as well as reducing compensation or bonuses to over a dozen individuals who had involvement in the project." *Id.*

The Class Period ended a few months later, on January 14, 2020, when Sasol issued a press release announcing an explosion and fire at a particular LCCP unit. *Id.* ¶ 223. After an investigation, Sasol's February 24, 2020 Form 6-K blamed "piping support structure . . . fail[ure] during commissioning" for the incident. *Id.* ¶ 225 (emphasis omitted).

The price of Sasol's ADRs declined following many of the disclosures mentioned above, and continued to plummet after the close of the Class Period. *Id.* ¶¶ 122-126, 149, 206, 208, 224, 228. Plaintiffs attributed the Form 6-K filings to the Executive Defendants and alleged that these individuals participated in earnings calls when materially false and misleading statements were made, directly participated in management, and "shared primary responsibility" for ensuring Sasol's SEC filings were "complete, accurate, and did not omit material information necessary under the circumstances not to make them misleading." *Id.* ¶¶ 41, 43, 45, 47, 51. Plaintiffs also asserted that Defendants knew that the cost and completion estimates they disclosed to the public were false, relying heavily on information sourced to six CWs ("CW-1" through "CW-6")—described in detail below—who worked on or had knowledge of the LCCP. *Id.* ¶¶ 133, 138, 144, 150, 163, 167, 174, 180, 199.

**B.  Procedural Background**

This case was initiated on February 5, 2020. Dkt. 1. Following the Court's appointment of David Cohn as Lead Plaintiff and Hagens Berman Sobol Shapiro LLP as Lead Counsel, Dkt. 52, the Amended Complaint was filed on June 4, 2020, Dkt. 59. Defendants moved to dismiss the Amended Complaint on July 2, 2020, Dkt. 65, and Judge Rakoff held oral argument on that motion

7

on August 20, 2020, Dkt. 77 ("8/20/20 Tr.").

### 1. The August 24, 2020 Order on Defendants' Motion to Dismiss

On August 24, 2020, Judge Rakoff granted in part and denied in part Defendants' motion to dismiss.  August 24, 2020 Order at 7-26.  As relevant here, Judge Rakoff denied dismissal of the Rule 10b-5 claim as to Sasol and the Executive Defendants.  *Id.* at 25-26.

After finding the alleged statements concerning the LCCP's estimated costs and completion deadlines to be forward-looking statements for purposes of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Judge Rakoff considered whether the statute's safe harbor applied.  *Id.* at 8-9 (citing 15 U.S.C. § 78u-5(i)(1)(A)).  Because Defendants did not contend that the alleged statements were immaterial, the Court focused on whether the statements were accompanied by sufficient cautionary language and whether Plaintiffs adequately alleged Defendants' knowledge of the false nature of the statements.  *Id.* at 9.

The Court assumed, but did not conclude, that the cautionary statements in the Forms 20-F were not boilerplate, but found the language nonetheless problematic because the Amended Complaint adequately pleaded them to be "misleading in light of historical fact."  *Id.* at 10-12 (quoting *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 770 (2d Cir. 2010)).  The Court explained that statements attributed to the CWs "demonstrate[] that Sasol's public cost estimates and schedule were entirely inconsistent with the reality of progress at the LCCP."  *Id.* at 10-11.  Judge Rakoff found "[m]ost notabl[e]" "CW-1's testimony that Sasol received a 'Change Order' from Sasol's subcontractor Fluor in February 2016 that contractually obligated Sasol to pay at least $11.7 billion to Fluor," which was "billions more than the cost estimates Sasol had announced, not just before, but for at least three years thereafter."  *Id.* at 11.

The Court then considered whether Plaintiffs sufficiently alleged that Defendants made the forward-looking statements with "knowing falsity."  *Id.* at 13-20.  While Judge Rakoff found that

the CWs statements, "standing alone," were only enough to "raise[] an inference of recklessness," *id.* at 15 (citing *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)), the Court held that when taken together with "other alleged evidence of scienter," in particular "Sasol's October 2019 disclosure of the results of an independent review and audit of the LCCP," *id.*, Plaintiffs pleaded "strong evidence of knowing falsity on the part of" Schoeman, Nqwababa, and Cornell, *id.* at 16. Judge Rakoff also found sufficient the allegations of Victor's knowledge, because he would have been present "during the period of time prior to the review," and because of "CW-2's specific allegations that he spoke with Victor on multiple occasions regarding the cost overruns and timeline of completion of the LCCP." *Id.* at 19-20.  Plaintiffs' claims against Constable also survived dismissal because the safe harbor could not apply to his June 2016 statement that the $11 billion cost estimate was a "worst case scenario," as it was not a forward-looking statement. *Id.* at 20.  Judge Rakoff, however, found the Amended Complaint's allegations of scienter to be insufficient as to Grobler and dismissed him from the suit. *Id.*

Judge Rakoff also denied Defendants' alternative request to depose the CWs, finding such depositions to be "entirely unwarranted in a case such as this, where the CWs' testimony is corroborated by external evidence such as the [May 2019] internal review." *Id.* at 25.

### 2.   Defendants' Motions for Reconsideration and Sanctions and the Court's Order Allowing Limited Discovery Concerning the Confidential Witnesses

Shortly after ruling on Defendants' motion to dismiss, Judge Rakoff entered a Case Management Plan and the parties proceeded with discovery.  Dkt. 76.  Plaintiffs filed a Second Amended Complaint on September 11, 2020, Dkt. 81, and moved for class certification on October 2, 2020, Dkt. 82.  The case was reassigned to the undersigned on September 29, 2020.

On October 30, 2020, Defendants moved for reconsideration of the Court's August 24, 2020 Order pursuant to Rule 54(b) of the Federal Rules of Civil Procedure and for sanctions pursuant to Rule 11, seeking dismissal with prejudice as relief.  Dkts. 102, 103, 104 ("Motion for

Reconsideration and Sanctions"). Defendants also requested a stay of discovery pending resolution of the issues raised in these motions. *See* Dkt. 102; Motion for Reconsideration and Sanctions at 24-25.

In their motions, Defendants argue that Plaintiffs falsified numerous pertinent allegations in the Amended Complaint, and attach sworn declarations from CW-2, CW-4, and CW-5 in which these witnesses contend that the statements attributed to them were either false or misrepresentations. Dkts. 105-2 ("CW-2 Declaration"), 105-3 ("CW-4 Declaration"), 105-4 ("CW-5 Declaration"). The Court held a conference to discuss Defendants' motions on November 10, 2020. Dkt. 109. At the conference, the Court stayed discovery and all deadlines for class certification, *id.* at 28, but allowed limited discovery concerning the six CWs, *id.* at 41-44.

After completing that limited discovery, Defendants filed a supplemental brief in support of reconsideration and sanctions on December 15, 2020. Dkt. 116 ("Supplemental Brief"). On January 19, 2021, Plaintiffs filed their opposition, Dkt. 127 ("Opposition"), and Defendants filed a reply on February 9, 2021, Dkt. 137 ("Reply"). In addition to the declarations of CW-2, CW-4, and CW-5, Defendants also have filed transcripts from the depositions of all six CWs. *See* Dkts. 117-1 ("CW-1 Deposition"), 117-2 ("CW-2 Deposition"), 117-3 ("CW-3 Deposition"), 117-4 ("CW-4 Deposition"), 117-5 ("CW-5 Deposition"), 117-6 ("CW-6 Deposition"). Defendants argue that these depositions evince Plaintiffs' counsel's falsification and misrepresentation of many of the allegations attributed to the CWs in the Amended Complaint. *See* Supplemental Brief at 2-4, 23-25.

In response, Plaintiffs have submitted the declarations of the three non-repudiating CWs, each of whom confirms that the allegations "accurately reflect the substance of" the statements those witnesses made to Plaintiffs' counsel and investigator. *See* Dkts. 128-1 ("CW-1 Declaration") ¶ 4, 128-2 ("CW-3 Declaration") ¶ 4, 128-3 ("CW-6 Declaration") ¶ 4. Plaintiffs

also have filed the Declaration of Lynnley Browning, a private investigator with On Point, the investigative firm Plaintiffs' counsel retained in this matter, Dkt. 143-1 ("Browning Declaration"), as well as a declaration from a law professor, Dkt. 143-2.  In sum, Plaintiffs argue that (1) the Court should deny the motion to reconsider the August 24, 2020 Order because the motion raises issues of credibility, Opposition at 27-31, (2) sanctions are unwarranted because Plaintiffs' counsel conducted a reasonable inquiry under the circumstances, *id.* at 34-40, and (3) in any event, Defendants' sanctions motion is procedurally defective for failing to abide by Rule 11(c)(2)'s "safe harbor" requirement, *id.* at 33-34.

Both parties also have submitted various other filings for the Court's consideration, including Browning's notes of her interviews of the CWs, memoranda she drafted synthesizing those notes, and communications between the CWs and both parties' counsel and investigators.[6]

### 3.   Discovery Related to the CWs

Because it informs the Court's analysis as to Defendants' requests both for reconsideration of the August 24, 2020 Order and for sanctions, the Court summarizes the allegations in the Amended Complaint that were attributed to the CWs, as well as new information submitted by the parties relating to those witnesses.

#### a.   Confidential Witness-1

Plaintiffs alleged that CW-1 was a senior engineer employed as a subcontractor by Fluor,

---

[6] The Court granted Plaintiffs' request to file under seal the interview notes, memoranda, and certain communications after finding that Plaintiffs demonstrated a compelling interest in limiting disclosure of these documents.  Dkts. 121, 142; *see Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 124-25 (2d Cir. 2006); *City of Almaty, Kazakhstan v. Ablyazov*, No. 15 Civ. 5345 (AJN) (KHP), 2019 WL 2865102, at *9 (S.D.N.Y. July 3, 2019) (collecting cases for the proposition that attorney work product includes the results of investigations taken at the behest of an attorney).  On July 8, 2021, the Court filed this Opinion and Order under seal and directed the parties to submit proposed redactions by July 21, 2021.  In the parties' July 21, 2021 joint letter, Plaintiffs proposed that the Opinion and Order be filed without any redactions and Defendants took no position on this issue.  Dkt. 153 at 1-2.  Accordingly, the Court publicly files this Opinion and Order in its entirety.

Sasol's main contractor on the LCCP.  Am. Compl. ¶ 65.  According to the Amended Complaint,

CW-1 worked on the LCCP from early Fall 2015 to July 2016 and was responsible for reviewing

and estimating invoices for indirect costs.  *Id.*  CW-1 allegedly stated that he/she saw a February

2016 "Change Order," submitted by Fluor to Sasol, which reflected a $11.7 billion budget, an

amount far above the $8.9 billion amount that Sasol disclosed to shareholders on March 9, 2015,

and even higher than the $11 billion dollar estimate later disclosed in June 2016.  *Id.* ¶ 66.  The

Amended Complaint described the Change Order as "a formal notice by a contractor to its client

that a project's initial, approved budget has been exhausted and that more money is needed to

continue work."  *Id.*  Importantly, Plaintiffs alleged that according to CW-1, "[t]here was no basis

for Sasol to renegotiate or bargain down the price" of the $11.7 billion Change Order because

"Fluor's costs . . . [were] based on a simple time and materials formulation" and Sasol "was

contractually obligated to pay that amount as it came due."  *Id.* ¶ 67.  Plaintiffs also pleaded that

the revised figure in the Change Order "was a legally binding amount that Sasol had to pay

pursuant to the terms of the contract."  *Id.* ¶ 21.  The Amended Complaint further alleged that CW-

1 described Sasol's June 2016 $11 billion dollar estimate as "a 'fraud' and 'wrong'" because it

was known that expenditures were higher at the time and Sasol executives were privy to "Sasol's

reports on LCCP's external costs."  *Id.* ¶¶ 67, 69, 73.  Plaintiffs also alleged that "Schoeman told

CW-1 'things are not good' with the project based on the updates on progress and costs."  *Id.* ¶ 69.

In her declaration, Browning states that she interviewed CW-1 on May 28, 2020 and May

29, 2020, prior to the filing of the Amended Complaint.  Browning Declaration ¶¶ 25, 28.  She

also states that, on June 2, 2020, Plaintiffs' counsel read CW-1 the allegations attributed to him/her

in the Amended Complaint and CW-1 confirmed the accuracy of those assertions.  *Id.* ¶ 32.

When questioned about the Change Order by Defendants' counsel at his/her deposition,

CW-1 testified that he/she told Plaintiffs' counsel that the Change Order was an estimate.  CW-1

Deposition at 17.   However, CW-1's testimony as to whether that estimate was binding was somewhat equivocal.   When first asked whether CW-1 told Plaintiffs' counsel or Browning "that a revised estimate is something that Sasol has no choice but to agree to," CW-1 responded, "I may have, but I can't remember." *Id.* at 25.[7]   Yet at the same deposition, CW-1 also testified that he/she did not tell Plaintiffs' counsel or Browning that Sasol was legally bound to pay the amount of the Change Order, *id.* at 26, and that he/she explained to Plaintiffs' counsel that the Change Order had to be negotiated by Sasol and Fluor before being approved, *id.* at 27.   But CW-1's deposition testimony also suggested that it was unlikely that Sasol would be able to negotiate down the price due to the nature of the contract between Fluor and Sasol.   For example, CW-1 stated that the estimate was grounded on "a firm number to go forward [on]," based on drawings and equipment ordered by Sasol, *id.* at 21, and that CW-1 had "never seen a contract . . . come down in price," *id.* at 26.

While the Amended Complaint alleged that "Sasol was contractually obligated to pay Fluor's costs," Am. Compl. ¶ 67, and that the Change Order was a "legally binding amount that Sasol had to pay," *id.* ¶ 21, Browning states in her declaration that CW-1 never specifically said "that as a matter of contract all Fluor has to do is revise its estimate, and Sasol is legally obligated at that point with no ability to say anything [and] . . . has to pay whatever Fluor tells it to pay," Browning Declaration ¶¶ 40-41 (quoting CW-1 Deposition at 26).   However, Browning claims that CW-1 was mistaken in stating that he/she told Browning that the Change Order could be "negotiated." *Id.* ¶ 42; *see* CW-1 Deposition at 27.   Instead, according to Browning, CW-1 told her that "Sasol would be required to pay pursuant to the Fluor Change Order."   Browning Declaration ¶ 42.   Plaintiffs also have submitted Browning's notes, taken during a June 2, 2020

---

[7]  CW-1 explained that he/she "discussed a lot of things" with Plaintiffs' counsel and could not remember exactly what was explained to counsel.   CW-1 Deposition at 24.

interview with CW-1, to support this part of her declaration.  *See* Dkt. 130-11 at 5 ("[A] CO is not a negotiation, [CW-1] agrees, it's this is what its ts' gonna be [sic]."); Dkt. 130-13 at 4.

Defendants also question the reliability of Plaintiffs' allegation, attributed to CW-1, that Schoeman said "things are not good" with the costs and progress on the LCCP.  Supplemental Brief at 18; *see* Am. Compl. ¶ 69.  After Plaintiffs' counsel confirmed the allegations in the Amended Complaint with CW-1 on June 2, 2020, they sent the Amended Complaint to Browning for a fact check on June 4, 2020.  *See* Dkt. 115-27.  In a reply to that email, Browning pointed to a possible discrepancy in the Amended Complaint, explaining that her notes reflected that CW-1 attributed this statement to a less senior executive, Olaf Muller.  *Id*. at 3.  Nonetheless, Plaintiffs proceeded with the Amended Complaint as confirmed by CW-1, and attributed the "things are not good" quote to Schoeman.  *See* Am. Compl. ¶ 69.  Defendants did not question CW-1 about this during the deposition.

Finally, Plaintiffs provide the declaration from CW-1, in which CW-1 attests that all the allegations attributed to CW-1 in the Amended Complaint "accurately reflect the substance of [CW-1's] statements made during" the interviews with Plaintiffs' counsel and Browning.  CW-1 Declaration ¶ 4.  Although, as noted above, CW-1 testified at his/her deposition that he/she did not tell Browning or Plaintiffs' counsel that the Change Order was legally binding, CW-1's declaration confirms the Amended Complaint's allegations that Sasol was "contractually obligated" to pay the amount included in the Change Order, as well as that Schoeman told CW-1 that "things are not good" with the LCCP budget.  *Id.* ¶ 3.

### b.  Confidential Witness-2

Plaintiffs alleged that CW-2 was a "high-ranking former employee" responsible for financial matters for Sasol's U.S. projects from October 2014 to mid-summer July 2015.  Am. Compl. ¶ 76.  The Amended Complaint alleged that CW-2 "stated that it was 'clear from the

beginning' that the mega project was going to cost more than $8.1 billion." *Id.* Plaintiffs also alleged that CW-2 had voiced concerns to Nqwababa, Cornell, and Victor regarding the cost overruns and delayed timeline for the project's completion. *Id.* CW-2 also allegedly described Sasol's agreement with its contractors, Fluor and Technic FMC ("Technip"), as a "disaster" because they were paid for time and materials spent on the LCCP without regard as to whether the work was completed. *Id.* ¶ 77 (quoting CW-2). The Amended Complaint alleged that CW-2's "efforts to raise concerns with Sasol's executive management in Houston (including Defendants Cornell and Nqwababa) 'fell on deaf ears'" because the management was "'very dogmatic' and not open to constructive criticism or change." *Id.* ¶ 78.

Browning explains that she interviewed CW-2 twice on May 5, 2020, but was unable to reach CW-2 again to schedule an interview with Plaintiffs' counsel despite calling five times between May 10, 2020 and June 2, 2020. Browning Declaration ¶¶ 47-48, 50-54. In his/her declaration, CW-2 insists that he/she never told Browning during their interviews that it was "clear from the beginning" that the cost of the LCCP would exceed the $8.1 billion disclosed to shareholders by Sasol. CW-2 Declaration ¶ 8. Instead, CW-2 states that when he/she left Sasol, "the LCCP was both on time and on budget for the $8.9 billion cost estimate based on everything [CW-2] knew." *Id.* ¶ 9. CW-2 also claims that he/she told Browning that he/she did not want to be involved in this litigation and that Browning "did not have permission to attribute any statements to [CW-2] in the contemplated lawsuit." *Id.* ¶ 2. CW-2 also states that Plaintiffs' counsel never told him/her that they planned to use his/her statements in the Amended Complaint or showed CW-2 those statements either before or after filing the Amended Complaint. *Id.* ¶ 4.

CW-2's deposition testimony was consistent with the assertions in CW-2's declaration. When asked whether CW-2 told Browning that "things unspooled after" CW-2 left the company, *see* Dkt. 115-8 at 3 (Browning's notes saying that CW-2 advised her that the "LCCP's costs were

'unspooling' from the day [CW-2] arrived in September 2014"), CW-2 denied: "No, that's not a word I would even use."  CW-2 Deposition at 34.  While CW-2 acknowledged having contact with Cornell, Nqwababa and Victor, *id.* at 41-42, CW-2 testified that he/she never told Browning that he/she raised specific concerns about the cost estimate and time completion of the project with these Defendants, *id.* at 43 ("[I] think words are being twisted.  That is not what I would have said."), 44 (when asked by Plaintiffs' counsel whether CW-2 "spoke to Ms. Browning about raising concerns with respect to the LCCP to Mr. Cornell, [Nqwababa], and Victor," CW-2 answering that he/she "do[es] not recall making that statement").

Plaintiffs, on the other hand, rely on Browning's notes and memorandum from her interview of CW-2.  Those materials reflect that CW-2 told Browning that the costs were higher than disclosed at the beginning of the project.  *See* Dkt. 115-7 at 6 ("re when things went from 8.1 to 8.9 – I don't remember exactly when it happened.  I think it was 8.9 when I started.  NEWS? Re the unspooling: it was clear, it was clear from the beginning"); Dkt. 115-8 at 3 ("[CW-2] said LCCP's costs were 'unspooling' from the day [CW-2] arrived in September 2014.")   And Browning's declaration is consistent with her notes.  She avers in her declaration that she "specifically remember[s] [CW-2]" stating that it was "clear from the beginning that the LCCP would cost more than $8.1 billion" as well as CW-2's use of the word "unspooling" to characterize the rising costs.  Browning Declaration ¶¶ 55-56.  Browning further states that CW-2 was "mistaken" in his/her deposition when CW-2 testified that he/she never told Browning that CW-2 raised concerns with Cornell, Nqwababa, and Victor concerning "the risk of staying on budget and schedule for completion of the project."  *Id.*  ¶ 57.  Browning also attests in her declaration that CW-2 told her that Sasol's contracts with its subcontractors were a "disaster" and that CW-2 raised this with Cornell, Nqwababa, and Victor, *id.*, and Plaintiffs provide Browning's notes and memorandum to support that recollection, *see* Dkts. 130-16 at 10, 130-17 at 6.

### c. Confidential Witness-3

According to the Amended Complaint, CW-3 was a Fluor contractor employed before the Class Period began until October 2016, assigned to commissioning and launching the ethane cracker at the LCCP.  Am. Compl. ¶ 79.  Plaintiffs alleged that "CW-3 stated that Sasol's senior management was trying to 'fast track' the project at the expense of safety amid persistent rumors of cost overruns." *Id.*  Plaintiffs also alleged that CW-3 identified several examples of mismanagement on site at the LCCP, and that "[m]ore broadly, CW-3 said that, starting at least in June or July of 2015, there were widespread rumors that the $8.9 billion cost estimate was unrealistic, and at that time senior management knew that they were not going to make that budget." *Id.* ¶ 82; *see id.* ¶¶ 138 (alleging that "CW-3 stated that senior management knew prior to June 2016 that the $8 billion budget was unrealistic"), 133 (similar allegations), 144 (similar allegations).  CW-3's declaration confirms the accuracy of the statements attributed to CW-3 in the Amended Complaint.  CW-3 Declaration ¶ 4.

CW-3 and Browning agree that CW-3 gave Plaintiffs' counsel permission to include the allegations attributed to him/her in the Amended Complaint after those allegations were read to CW-3 on June 1, 2020.  *See* CW-3 Deposition at 21-23; Browning Declaration ¶ 66.  At his/her deposition, CW-3 testified, however, that he/she had no contact with senior management, nor "firsthand knowledge concerning senior management's knowledge or lack thereof concerning cost overruns."  CW-3 Deposition at 43-44.  Nonetheless, CW-3 testified that at the time of CW-3's employment, "everyone . . . knew we were going to go over the budget, and they were very tight on money . . . . it was pretty commonly known at the time."  *Id.* at 17; *accord id.* at 27-28 ("[I]t was very common knowledge that we were over budget."), 34 (testifying that CW-3 had heard that the LCCP was going to be over budget from "a reliable source").  In fact, CW-3 commented that the Amended Complaint's use of the term "rumor" to describe the cost overruns "seems kind of

17

light," because he/she specifically heard that the project was not going to make its budget from managers who "knew what they were talking about." *Id.* at 37.

### d. Confidential Witness-4

CW-4 allegedly worked on accounting matters at the LCCP and reported to five individuals who reported to Sasol's Group Executive Committee, a Committee that included Nqwababa, Cornell, Victor, and Schoeman. Am. Compl. ¶ 85. According to the Amended Complaint, CW-4 stated that LCCP's accounting "stinks to high heaven," that "[management] clearly did not disclose the real health of the project forecasting and scheduling from the people who were paid to do that, which was [CW-4]," and "[t]hey didn't disclose it to the market." *Id.* ¶ 87 (quoting CW-4) (first alteration in original). The Amended Complaint included several examples of accounting "irregularities" that occurred on the LCCP, all sourced to CW-4. *Id.* ¶¶ 87, 89. The Amended Complaint also alleged that "[f]rom the first moment CW-4 began working at Sasol (shortly before the LCCP was officially launched), CW-4 saw that the LCCP project was behind schedule," *id.* ¶ 90, and that CW-4 called the initial $8.9 billion cost estimate "ridiculously low" and even the revised $11.1 billion "too low." *Id.* (quoting CW-4). Further, Plaintiffs alleged that "CW-4 believed Defendant Cornell knew about the construction delays and knew that the cost estimates were too low." *Id.*; *accord id.* ¶¶ 133, 138, 144.

Browning represents in her declaration that she interviewed CW-4 for 84 minutes on May 6, 2020, and that, despite several attempts to contact CW-4, she was unable to schedule any further interviews of CW-4 before the filing of the Amended Complaint. Browning Declaration ¶¶ 71-75. In arguing that Plaintiffs knew any information Browning obtained from CW-4 at that interview was "inadequate" or baseless, Defendants point to a text message chain between Browning and CW-4 about a week later on May 14, 2020. Supplemental Brief at 11-12. Browning initiated the chain by requesting a time to speak with CW-4. *See* Dkt. 130-25. CW-4 replied by

demanding "a lot" of financial compensation ("Tell the law firm [that] data is the most valuable commodity in the world; and it isn't free.") and requesting a "proper structure of protection." *Id.* Browning told CW-4 that she could arrange for CW-4 to speak with the lawyers about protection, but "[w]e do not compensate for data or interviews.  No one credible does . . . ." *Id.*  CW-4 responded by demanding $5 million "[i]f [the lawyers] want any chance of winning their case and want data to help them"; otherwise, CW-4 threatened, "everything I've told you to date has been fabricated." *Id.*  CW-4 continued, "I am protected by the utter fact everything I have stated to date may or may not be accurate.  Accuracy and something I can stand behind comes at a price." *Id.* CW-4 concluded by reiterating, "if no money, then I'm not 'credible' as you state it." *Id.*[8]

In his/her declaration, CW-4 claims that Plaintiffs' counsel never contacted CW-4 to affirm the truth of the statements attributed to him/her in the Amended Complaint.  CW-4 Declaration ¶ 4.  As noted, Browning disputes this, maintaining that she called CW-4 several times and left multiple voice messages for that very reason.  *See* Browning Declaration ¶ 85.  CW-4 further states that, "[a]lthough [CW-4] do[es] not recall the exact conversation" with Browning, "many of the allegations attributed to [CW-4 in the Amended Complaint] are fundamentally false or presented in a misleading manner."  CW-4 Declaration ¶ 8.  For example, CW-4 denies ever forming an opinion as to whether the earlier $8.9 billion estimate or the later $11.1 billion estimate for the overall project was too low.  *Id.* ¶¶ 8-9.  CW-4 similarly denies telling Browning "that Sasol's accounting for LCCP 'stinks to high heaven,'" noting that this was "not a phrase that [CW-4]" used.  *Id.* ¶ 11.  Browning disputes these repudiating statements as well.  Browning attests to remembering CW-4 making these statements, Browning Declaration ¶¶ 86-87, 89, and her

---

[8] In his/her deposition, CW-4 attempted to explain these text messages as efforts "to get [Browning] to stop calling me and texting me and leaving voice messages, because it was disruptive."  CW-4 Deposition at 26-27; *see id.* at 31 ("This text message exchange was, the sole purpose, my intention to get her to stop contacting me.").

interview notes and memorandum corroborate that recollection, *see* Dkt. 130-24 at 2 ("[CW-4] regarded LCCP's original $8.9 billion cost estimate as 'ridiculously low' from the outset."); *id.* at 3 ("Asked why was Sasol's initial $8.9 billion estimate so low, [CW-4] speculated that it was due either to 'incompetence' or to 'a desire' by then-CEO David Constable to 'push a mega project over the line'"); Dkt. 130-23 at 10 ("The productivity factor in the cost estimate of 11.1, and all of them, 8.9, was too low.").

During his/her deposition, CW-4 confirmed some allegations attributed to him/her in the Amended Complaint while denying others.  CW-4 testified that he/she was, in fact, directed to "reduce the value of work done" by a manager, but CW-4 declined to do so.  CW-4 Deposition at 52.  However, CW-4 testified that he/she did not recall telling Browning that the LCCP project was behind schedule, *id.* at 61, and denied telling Browning that the LCCP was undervalued, explaining "estimates are estimates," *id.* at 64-65.

CW-4 also testified that he/she first learned of the allegations attributed to him/her in the Amended Complaint from Defendants' counsel on October 13, 2020.  *Id.* at 36.  Plaintiffs submit notes taken by Defendants' investigator when he reached out to CW-4 at this time, which reflect that CW-4 told the investigator that "if [Browning] recorded, [CW-4's] words may be right but they need to retract all of those statements."  Dkt. 130-43 at 5.  CW-4 also called Browning later that day.  Browning Declaration ¶ 77; CW-4 Deposition at 40.  According to Browning, CW-4 repeatedly asked whether CW-4 had been recorded during the May 6, 2020 interview and "appeared to be scared and nervous."  Browning Declaration ¶ 77; Dkt. 130-23 at 3.  Browning contends that, during this call, as well as during calls on October 14, 2020 and October 21, 2020, CW-4 never indicated that the Amended Complaint inaccurately represented the information that CW-4 had provided to Browning.  Browning Declaration ¶¶ 80-82.

### e.  Confidential Witness-5

Plaintiffs alleged that CW-5 worked as a risk assessor on the LCCP, starting before the Class Period and ending in Fall 2015. Am. Compl. ¶ 95. The Amended Complaint maintained that "CW-5 believed that the project was 'on budget' – but CW-5 said 'on budget' throughout 2015 means the $11 billion budget, which Sasol did not disclose to shareholders until June 2016." *Id.* The Amended Complaint quoted CW-5 as stating, "I would never put down that it was an $8 billion project. Absolutely when I was there, we were talking $11 billion." *Id.* Plaintiffs also alleged that "CW-5 agreed with the characterization that the $8.9 billion cost estimate was 'ridiculously low,'" because "estimates from Fluor and Technip were higher than that." *Id.* Further, CW-5 allegedly stated that a $11 billion cost estimate was "socialized" among senior management from the very beginning of the project. *Id.* (quoting CW-5). Plaintiffs additionally quoted CW-5 as saying that Cornell would have been "100% informed and involved" of any problems in contracting, cost overruns, and construction delays on the project due to his position on the Group Executive Committee. *Id.*

In her declaration, Browning discusses interviews she conducted of CW-5 on May 5, 2020 and May 18, 2020, as well as some brief telephone conversations they had on June 1, 2020. *See* Browning Declaration ¶¶ 97-102. During the last call on June 1, 2020, CW-5 spoke with Plaintiffs' counsel for the first time and voiced concerns about being subpoenaed in this case. *Id.* ¶¶ 100-102. According to Browning, when Plaintiffs' counsel explained that CW-5's confidentiality could not be guaranteed, CW-5 responded, "then I guess I have no conversation with you," and hung up the phone. *Id.* ¶ 102; *see also* CW-5 Deposition at 7, 11-17.

Defendants have submitted a declaration from CW-5, stating that the allegations attributed to CW-5 in the Amended Complaint "are categorically false." CW-5 Declaration ¶ 9. When questioned by Defendants' counsel at his/her deposition, CW-5 testified that he/she never told Plaintiffs' counsel that the $8.9 billion estimate for the LCCP was low. CW-5 Deposition at 27

("Not just no, but hell no."). CW-5 did, however, confirm that he/she told Browning that Fluor's and Technip's cost estimates for the LCCP were higher than $8.9 billion. *Id.* at 29. CW-5 also confirmed that he/she told Browning that Cornell was in "a responsible position where he would have had . . . to know certain things" related to the costs of the project, but insisted that he/she was "clear with the investigator that [he/she] did not know exactly what Mr. Cornell did or did not know." *Id.* at 39-40. Further, CW-5 maintained that at the time of CW-5's employment, the $8.9 billion budget estimate "was the correct number" and "nobody believed differently," *id.* at 39, and denied discussing "an $11 billion cost estimate" with Browning, *id.* at 65. CW-5 also disputed that he/she said that the $11 billion cost estimate was "socialized" among management, instead maintaining that he/she only told Browning that general "cost studies," not the $11 billion estimate, "were socialized and shared with the executive committee." *Id.* at 66. CW-5 acknowledged, though, that the subcontractors' cost estimates, which CW-5 believed were higher than $8.9 billion, would have been available to the executive committee. *Id.* at 67.

Browning, however, claims to "independently remember" CW-5 telling her that the cost estimate for the LCCP was $11 billion during his time with Sasol. Browning Declaration ¶ 106. She also recalls asking CW-5 why his/her LinkedIn page stated that he/she worked on an $11 billion project when Sasol's publicly disclosed cost estimate at the time of CW-5's employment was $8.9 billion. *Id.* Plaintiffs provide a memorandum of that interview to corroborate that recollection. Dkt. 130-28 at 4 ("When asked why [CW-5] put the $11 billion figure on [his/her] LinkedIn profile, [he/she] said 'I would never put down that it was an $8 billion project. Absolutely when I was there, we were talking $11 billion.'"). Browning's memorandum also reflects that while CW-5 said that the project was "on time and on budget," "'on budget' in 2015 meant $11 billion." *Id.* at 2.

**f.   Confidential Witness-6**

22

Lastly, CW-6 allegedly was contracted by Sasol as a scheduler on one of the LCCP units. Am. Compl. ¶ 96.  According to the Amended Complaint, CW-6 stated that "from the time CW-6 arrived, '[CW-6 and CW-6's team] were significantly behind schedule' on construction and commissioning in CW-6's group." *Id.*  Plaintiffs alleged that CW-6 represented that "management directed" CW-6 "to change anticipated completion dates for projects to make it appear on paper that the project would be completed on time by compressing the remaining schedule to meet the beneficial operating date." *Id.* ¶ 97.  According to the Amended Complaint, CW-6 explained that CW-6's supervisors would direct CW-6 to change an estimated completion time from seven or eight days to two days. *Id.*  The Amended Complaint also attributed to CW-6 the contention that "senior Sasol executives, including . . . Schoeman and Mike Kane, decided to decouple LCCP's construction schedules from its commissioning, or startup, schedules, to show that more work had been completed on LCCP than actually had been" and that "[t]he altered construction schedules 'showed we were further along than what was happening,'" *id.* ¶ 98, which CW-6 called "schedule manipulation," *id.* (quoting CW-6).

CW-6's declaration confirms that these allegations accurately reflect the information that CW-6 provided to Browning and Plaintiffs' counsel.  CW-6 Declaration ¶ 4.  At CW-6's deposition, Defendants' counsel inquired about the allegation that Schoeman decided to decouple the construction schedules.  CW-6 testified that he/she told Browning that it was his/her "guess" that Schoeman was the one who ordered the decoupling.  CW-6 Deposition at 21-22.  Browning responds that, during their interview, CW-6 never "express[ed] Mr. Schoeman's role in the decoupling in terms of a 'guess' or an 'estimate.'"  Browning Declaration ¶ 115.  Browning's memorandum of that interview similarly states: "[CW-5] said [he/she] was asked by senior Sasol executives, including Sasol senior manager Stephanus Schoeman and Kane, to decouple LCCP's construction schedules . . . to falsely show that more construction work had been completed on

23

LCCP than actually had been." Dkt. 130-34 at 3. CW-6 further testified at his/her deposition to lacking direct firsthand knowledge as to who gave CW-6 "the order to break the schedule." CW-6 Deposition at 22-23; *see id.* at 25-26 ("Yes, I believe I stated that I believed Schoeman to be the originator of it . . . .").

## II. Defendants' Motion for Reconsideration

Defendants seeks reconsideration of the August 24, 2020 Order, arguing that the Amended Complaint relied on false CW allegations and, if their actual statements are considered, Plaintiffs' securities fraud claim cannot survive dismissal. Supplemental Brief at 13-21. As discussed below, however, this argument fails because Plaintiffs continue to stand behind the allegations in the Amended Complaint and the new evidence cited by Defendants raises credibility issues and factual disputes that cannot be resolved at this stage.

## A. Legal Standards for a Motion for Reconsideration

The standard for granting a motion for reconsideration "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). Local Civil Rule 6.3 provides that a motion for reconsideration must be "served within fourteen (14) days after the entry of the Court's determination of the original motion." Loc. Civ. R. 6.3. "However, '[a] Rule 54(b) motion is not untimely under Local Rule 6.3 if the evidence upon which the motion is based is newly-discovered.'" *JP Morgan Chase Bank, N.A. v. Reifler*, No. 11 Civ. 4016 (DAB), 2013 WL 12177061, at *3 (S.D.N.Y. Sept. 20, 2013) (quoting *Sys. Mgmt. Arts Inc. v. Avesta Techs., Inc.*, 160 F. Supp. 2d 580, 583 (S.D.N.Y. 2001) (alteration in original)).

In considering whether reconsideration under Rule 54(b) is appropriate based on newly discovered evidence, "a movant must demonstrate that (1) the proffered evidence was unavailable

despite the exercise of due diligence and (2) manifest injustice will result if a court does not reconsider its earlier decision." *Id.* (citing *Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 339 (S.D.N.Y. 2012)). "[T]o establish manifest injustice, a movant must demonstrate that the new evidence is of such importance that it probably would have changed the outcome of the prior ruling." *Geo-Grp. Commc'ns, Inc. v. Shah*, No. 15 Civ. 1756 (KPF), 2020 WL 5743516, at *10 (S.D.N.Y. Sept. 25, 2020), *reconsideration denied*, 2020 WL 6729181 (S.D.N.Y. Nov. 16, 2020) (internal quotation marks and citation omitted).

## B. Defendants' Motion for Reconsideration is Denied

Defendants rely on various decisions in which courts have granted reconsideration in similar postures. These cases are largely distinguishable because, unlike here, there were no credibility issues or factual disputes for those courts to resolve.

Defendants first cite to the Second Circuit's non-precedential summary order in *Campo v. Sears Holdings Corp.*, 371 F. App'x 212 (2d Cir. 2010). There, the district court permitted depositions of confidential witnesses in aid of resolving the defendants' motion to dismiss. *Id.* at 216 n.4. The Second Circuit's approval of this procedure in *Campo* was tempered by the district court "ma[king] no credibility determinations" in using the depositions of the confidential witnesses. *Id.* As shown above, however, discovery here has revealed that much evidence relating to the CWs is in dispute. There is undoubtedly a degree of tension between Browning's recollection of the CWs' interviews—supported by her memoranda and notes—and certain testimony of the CWs in their depositions and declarations. *See, e.g.*, Browning Declaration ¶¶ 42 (stating that CW-1 was "mistaken" when he/she testified that he/she told Browning the Change Order could be negotiated), 55-57 (disputing, among other things, CW-2's testimony that CW-2 never told Browning that it was "clear from the beginning that the LCCP would cost more than $8.1 billion"), 83 (testifying that CW-4's declaration "contains several inaccuracies and

omissions"), 106 (claiming that statements made by CW-5 during his/her deposition were inaccurate), 115 (disagreeing with CW-6's deposition testimony that Browning was told by CW-6 that he/she was only "guess[ing]" or "estimat[ing]" as to Schoeman's role in the decoupling of schedules).  In certain instances, the evidence is directly conflicting.  For example, Browning asserts that she specifically remembers CW-2 telling her that she raised her concerns as to the LCCP's budget and completion schedule with Cornell, Nqwababa, and Victor, *id.* ¶ 57, and claims that CW-5 did in fact tell her that the project's cost was $11 billion during CW-5's employment with Sasol, *id.* ¶ 106.

For similar reasons, Defendants' reliance on *City of Livonia Employees' Retirement System & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754 (7th Cir. 2013), also is unpersuasive.  There, Boeing's shareholders alleged securities fraud stemming from the defendants' disclosures of the estimated timeline for a newly developed airplane.  *Id.* at 757.  The lower court dismissed the first amended complaint for insufficiently pleading the defendants' scienter.  *Id.* at 758.  The plaintiffs filed a second amended complaint, this time including information sourced to a confidential witness who allegedly worked for Boeing and had personal knowledge of internal communications that demonstrated scienter.  *Id.* at 759.  The district court denied the defendants' renewed motion to dismiss, relying on the allegations attributed to this new witness.  *Id.* at 759-60.  Discovery later revealed, however, that this individual was employed by Boeing's contractor rather than Boeing directly and was unlikely to have access to the information that the court relied on.  *Id.*  When deposed, he denied "everything [the plaintiffs'] investigator had reported," and testified that he did not work for Boeing during the relevant times, nor did he ever work on the model of the plane at issue.  *Id.*  The plaintiffs' counsel later walked away from this witness, explaining that this individual would no longer be a witness for the plaintiffs.  *Id.*  The district court reconsidered its denial of the motion to dismiss, and dismissed the complaint with prejudice.  *Id.*

26

The Seventh Circuit affirmed the dismissal, finding "[t]he plaintiffs' abandonment of their sole confidential source," who was "their only possible source of access" to a database with email communications to support scienter, to be fatal to the plaintiffs' claims. *Id.* at 760-61. Rejecting the plaintiffs' argument that the lower court improperly relied on extrinsic evidence, the Seventh Circuit emphasized that without the confidential source, the action could not survive. *Id.* at 761; *see id.* (explaining that without evidence from this witness, "the first dismissal stood, its validity unassailable").

*Livonia*, therefore, is distinguishable for a few reasons. While the amended complaint in *Livonia* relied on a lone confidential source to avoid dismissal, and the plaintiffs walked away from that witness, at least three CWs in this litigation have submitted declarations standing by the allegations attributed to them in the Amended Complaint. *See* CW-1 Declaration; CW-3 Declaration; CW-6 Declaration. Nor is it clear that Plaintiffs have walked away from relying on CW-2, CW-4, and CW-5 or conceded that their statements in the Amended Complaint were inaccurate, notwithstanding those witnesses' recent repudiations of those statements. Plaintiffs instead point to interview notes and memoranda from Browning, as well as her declaration, to corroborate that CW-2, CW-4, and CW5 made the statements that they now deny. *See* Browning Declaration ¶¶ 55-58 (CW-2), ¶¶ 83-95 (CW-4), ¶¶ 105-110 (CW-5); Dkts. 117-7, 8, 14, 18, 19.

In addition, while CW-2, CW-4, and CW-5 have challenged the accuracy of the statements attributed to them, their repudiations are notably different from what occurred in *Livonia*. For example, these three CWs do not dispute that they worked on the LCCP during the periods alleged in the Amended Complaint. *See* CW-2 Deposition at 28; CW-4 Deposition at 47-48; CW-5 Deposition at 21-22. And portions of the deposition testimonies of these CWs are not completely at odds with what was alleged in the Amended Complaint. CW-5, for example, testified that he/she told Browning that Sasol's subcontractors estimated the costs for the project to be higher than $8.9

billion, and that the executive committee would have been aware of this. CW-5 Deposition at 67. CW-4 testified about being asked to misrepresent Sasol's financial information so the situation at the LCCP project would look better than it was, consistent with the allegations in the Amended Complaint. CW-4 Deposition at 51-54.[9]

The Court notes, however, that the Amended Complaint's allegation that Sasol was "contractually obligated" to pay the amount of the Change Order, Am. Compl. ¶ 67, is somewhat dubious in the face of information obtained during discovery. As mentioned above, Judge Rakoff relied on this allegation, among others, in concluding that Plaintiffs sufficiently alleged that the forward-looking statements were misleading as to a historical fact because "even at the time they were announced, Sasol's public cost estimates and projected schedules totally failed to account for the already existing cost overruns and delays." *See* August 24, 2020 Order at 11. Judge Rakoff particularly pointed to CW-1's statement that the Change Order contractually obligated Sasol to pay $11.7 billion, well above the disclosed cost estimate at the time. *Id.* CW-1's deposition testimony, though, suggests that the Change Order could be negotiated and had to be approved by Sasol. CW-1 Deposition at 20, 26-27. CW-1 still maintained, however, that in a practical sense,

---

[9] Defendants also cite *Belmont Holdings Corp. v. Suntrust Banks, Inc.*, 896 F. Supp. 2d 1210, 1223 (N.D. Ga. 2012), for the proposition that "[i]n the securities litigation context . . . a district court may reconsider an order denying a motion to dismiss, even where defendant relies upon extrinsic evidence outside the pleadings." *See* Motion for Reconsideration and Sanctions at 14. *Belmont Holdings*—which of course is not binding on this Court—too is distinguishable for a few reasons. First, in its initial denial of dismissal, the court made clear that it would reevaluate that ruling if new information came to light. *Belmont Holdings Corp.*, 896 F. Supp. 2d at 1220 (quoting the court's previous order stating that if the confidential source did not have personal knowledge of the relevant events, "the Court will consider later whether these allegations support a violation of the pleading standards under the Federal Rules of Civil Procedure"). Further, similar to *Livonia*, the court in *Belmont Holdings* also relied on a single confidential witness who later recanted. *Id.* at 1228. Here, there remain three CWs who have not repudiated the statements attributed to them in the Amended Complaint, as well as the May 2019 internal review, which revealed unethical conduct at the ranks of Sasol's senior management. *See* Am. Compl. ¶ 117. Finally, the *Belmont Holdings* court held that reconsideration was appropriate because there were no issues of credibility to be resolved in that case, 896 F. Supp. 2d at 1225-27—which plainly is not the situation here.

Sasol had to pay the amount of the Change Order and that he/she had never seen a Change Order be negotiated down in price. *Id.* at 26.[10]  While there is certainly a difference between a negotiable contract and one that is legally binding, that distinction is less significant for purposes of assessing the sufficiency of allegations concerning Defendants' knowledge of the falsity of their statements about the LCCP's estimated cost.

But most importantly, considerable evidence of Defendants' scienter would remain in the Amended Complaint, even if the information attributed to CW-2, CW-4, and CW-5 and the legally binding nature of the Change Order were disregarded.  This includes the report of "unethical and improper reporting activities" uncovered during the May 2019 independent review, Am. Compl. ¶ 215, as well as CW-6's allegations that he/she was directed to engage in practices that would make Sasol's costs or completion time look better than they in fact were, *see id.* ¶ 97; CW-6 Declaration ¶ 4; CW-6 Deposition at 20-21 (confirming that "someone up above" directed CW-6 to decouple the construction schedule from the commissioning schedule).  CW-1 similarly stands by his/her statement that Sasol's $11 billion estimate in July 2015 "was a 'fraud' and 'wrong'" because capital expenditures were known to be at least $11.7 billion at the time, Am. Compl. ¶ 67, as well as his/her recollection of Schoeman saying that "things are not good" with the LCCP, *id.* ¶ 69; s*ee* CW-1 Declaration ¶ 4.  CW-3 also has been consistent in stating that it was well known that the LCCP was going over budget, including among managers at Sasol.  CW-3 Deposition at 17, 27-28, 34, 37.  Even CW-4, whose declaration disavows the allegations attributed to him/her in the Amended Complaint, CW-4 Declaration ¶ 6, testified that he/she was directed to misrepresent Sasol's liabilities, *see* CW-4 Deposition at 54.  And CW-5, who also signed a

---

[10] CW-1's deposition testimony here is somewhat corroborated by CW-2's testimony that the contract that Sasol had with Fluor was irregular, in that Fluor was paid for all work done and material expended on the project rather than the contract setting a fixed sum for definite portions of work to complete.  CW-2 Deposition at 36-40.

repudiating declaration, CW-5 Declaration ¶ 7, testified at his/her deposition that the subcontractors' costs, which CW-5 stated were over $8.9 billion, would have been available to Sasol's executive committee, *see* CW-5 Deposition at 67.

Thus, the limited discovery authorized by the Court has unearthed factual disputes and credibility issues that cannot be considered and resolved at this stage. *See, e.g.*, *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) ("Because a Rule 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence, a court adjudicating such a motion may review only a narrow universe of materials."); *Kardovich v. Pfizer, Inc.*, 97 F. Supp. 3d 131, 140 (E.D.N.Y. 2015) ("[I]ssues of fact, credibility, and the weight of the evidence are not properly considered on a motion to dismiss . . . ."). Accordingly, Defendants' motion for reconsideration is denied.

### III. Defendants' Motion for Sanctions

Defendants move for sanctions under Rule 11, arguing that Plaintiffs' counsel's "falsification of allegations in the Complaint and ongoing scheme to obstruct discovery . . . is conduct unbecoming of officers of this Court and separately and independently justifies a sanction of dismissal with prejudice." Motion for Reconsideration and Sanctions at 21; *see also* Supplemental Brief at 24-25. Defendants allege that Plaintiffs' counsel violated Rule 11 by pleading unsupported factual contentions attributed to the CWs, misrepresenting facts to the Court, and improperly obstructing discovery. Supplemental Brief at 24-25. For reasons described below, the Court denies Defendants' motion for failure to comply with Rule 11's 21-day safe harbor provision. *See* Fed. R. Civ. P. 11(c)(2). Even if the Court were to exercise its discretion to consider sanctions *sua sponte*, the current record does not support such relief.

### A. Legal Standards for a Rule 11 Motion

As relevant here, Rule 11 provides that an attorney, "[b]y presenting to the court a pleading,

written motion, or other paper . . . certifies . . . to the best of the [attorney's] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," that the filing is (1) "not . . . presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation," (2) "the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law," and (3) "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(1)-(3).

Rule 11(c) sets forth the procedural requirements that a party moving for sanctions must meet. One requirement is that the motion "not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." Fed. R. Civ. P. 11(c)(2). The requirement that the nonmoving party be afforded 21 days to remediate or withdraw the allegedly sanctionable filing is commonly known as Rule 11's safe harbor provision and is a "strict procedural requirement." *Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 175 (2d Cir. 2012). "A motion that fails to comply with the safe harbor provision of Rule 11 must be denied." *Behrens v. JPMorgan Chase Bank N.A.*, No. 16 Civ. 5508 (VSB), 2019 WL 1437019, at *14 (S.D.N.Y. Mar. 31, 2019) (collecting cases). Rule 11 also vests a court with authority to impose sanctions *sua sponte*, without affording the offending party a safe harbor period, *see* Fed. R. Civ. P. 11(c)(3), but such sanctions require a higher showing of misconduct, *see In re Pennie & Edmonds LLP*, 323 F.3d 86, 91 (2d Cir. 2003); *accord Muhammad v. Walmart Stores E., L.P.*, 732 F.3d 104, 108-09 (2d Cir. 2013) ("[L]ike contempt, *sua sponte* sanctions [under Rule 11] . . . should issue only upon a finding of subjective bad faith.").

If a Rule 11 motion is filed by a party, and if that party complies with the safe harbor

requirement, then sanctions are appropriate against the non-moving party only upon "a showing of objective unreasonableness on the part of the attorney or client signing the papers." *ATSI Commc'ns v. Shaar Fund, Ltd.*, 579 F.3d 143, 150 (2d Cir. 2009) (quoting *Ted Lapidus, S.A. v. Vann*, 112 F.3d 91, 96 (2d Cir. 1997)). "The reasonableness of an inquiry depends upon the surrounding circumstances, including such factors as how much time for investigation was available to the signer; whether he had to rely on a client for information as to the facts underlying the pleading . . .; or whether he depended on forwarding counsel or another member of the bar." *Goldman v. Barrett*, No. 15 Civ. 9223 (PGG), 2018 WL 11214828, at *8 (S.D.N.Y. Sept. 4, 2018) (quoting *Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1329 (2d Cir. 1995) (internal quotation marks omitted)). "Doubts as to the viability of a signed pleading, are to be resolved in favor of the signer." *Id.* at *9 (quoting *O'Malley v. N.Y.C. Transit Auth.*, 896 F.2d 704, 706 (2d Cir. 1990)). "[A]n erroneous statement of fact in a pleading 'can give rise to the imposition of sanctions only when the particular allegation is utterly lacking in support.'" *In re AOL, Inc. Repurchase Offer Litig.*, No. 12 Civ. 3497 (DLC), 2013 WL 6331802, at *3 (S.D.N.Y. Dec. 5, 2013) (quoting *Kiobel v. Millson*, 592 F.3d 78, 81 (2d Cir. 2010)).

When the accuracy of statements attributed to a witness in a complaint is at issue, the witness's subsequent repudiation of those statements is not dispositive of whether the plaintiff's counsel met their Rule 11 obligations. *See In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 851 F. Supp. 2d 1299, 1312 (S.D. Fla. 2011) ("Whether the confidential witnesses initially made the statements attributed to them in the complaint[] is essentially a credibility question. In this context, Rule 11 sanctions are not appropriate."), *aff'd sub nom. Hubbard v. BankAtlantic Bancorp., Inc.*, 503 F. App'x 677 (11th Cir. 2012); *In re Sony Corp. v. SXRD Rear Projection Television Mktg., Sales Pracs. and Prods. Liab. Litig.*, 268 F.R.D. 509, 518 (S.D.N.Y. 2010); *see also Union Asset Mgmt. Holding AG v. Sandisk LLC*, 227 F. Supp. 3d 1098, 1100 (N.D. Cal. 2017) ("[T]he fact that

a confidential witness later reports that a plaintiff's complaint does not accurately describe his statements doesn't necessarily mean that the allegations in the complaint were made in bad faith or that a sanctions motion would be justified.").[11]

Further, Rule 11 does not require counsel to "personally . . . participate in an initial witness interview" because it is "permissible and customary, not to mention economical, for facts to be gathered first by investigators." *In re Millennial Media, Inc. Sec. Litig.*, No. 14 Civ. 7923 (PAE), 2015 WL 3443918, at *11 (S.D.N.Y. May 29, 2015). While it may be good practice for counsel to secure a witness's consent before including that person's allegations in a complaint, Rule 11 also does not impose such a requirement. But counsel's failure to affirm the truth of the statements attributed to a witness may factor in to the analysis of whether counsel conducted a reasonable pre-filing investigation. *See id.* at *14 ("The practice revealed by this case, in which plaintiffs' counsel makes literally no attempt to confirm the quotes of a witness on whom counsel proposes to rely in a public filing, sits at best uneasily alongside [Rule 11].").

Finally, even if a district court finds that a party has violated Rule 11, "the decision whether or not to impose sanctions is a matter for the court's discretion." *Perez v. Posse Comitatus*, 373 F.3d 321, 325 (2d Cir. 2004). "The Second Circuit has cautioned . . . that decisions regarding the imposition of Rule 11 sanctions should be 'made with restraint and discretion.'" *Goldman*, 2018

---

[11] Courts have reached similar conclusions outside the context of Rule 11 motions. *See In re Dynex Cap., Inc. Sec. Litig.*, No. 05 Civ. 1897 (HB) (DF), 2011 WL 2581755, at *4-5 (S.D.N.Y. Apr. 29, 2011), *report and recommendation adopted*, 2011 WL 241267 (S.D.N.Y. June 21, 2011) ("[T]he Court accepts that it is entirely possible that the witnesses, when their identities were no longer shielded by confidentiality, may have sought to disavow having made incriminating statements against [the defendant]."); *City of Pontiac Gen. Emps' Ret. Sys. v. Lockheed Martin Corp.*, 952 F. Supp. 2d 633, 636-37 (S.D.N.Y. 2013) (describing "the competing pressures [the judicial process] had placed on the confidential witnesses and the impact such pressures had on their ability to tell the truth" and finding that "some, though not all, of the CWs had been lured by the investigator into stating as 'facts' what were often mere surmises, but then, when their indiscretions were revealed, felt pressured into denying outright statements they had actually made").

WL 11214828, at *9 (quoting *Schlaifer Nance & Co. v. Est. of Warhol*, 194 F.3d 323, 334 (2d Cir. 1999)).

## B.  Defendants Failed to Comply with Rule 11(c)(3)'s Safe Harbor Requirement

Plaintiffs argue that "Defendants failed to provide Plaintiffs with the requisite Rule 11(c)(2) safe harbor notice" when moving for sanctions on October 30, 2020.  Opposition at 16. Defendants do not dispute this failure, but argue that "noncompliance with Rule 11's safe-harbor requirement is harmless where a party shows 'no indication' of withdrawing the offending filing," citing *Perpetual Securities, Inc. v. Tang*, 290 F.3d 132, 142 (2d Cir. 2002).  Reply at 16.  But the Second Circuit in *Perpetual Securities, Inc.* held, without going to the merits of Rule 11, that it was an abuse of discretion for the district court to impose sanctions "in contravention of the explicit procedural requirements of Rule 11."  *Id.*  Instead of reversing the district court on the imposition of sanctions as it did in *Hadges*, 48 F.3d at 1327, where it was clear that the sanctioned party would have withdrawn the offending filing if given the chance, the Second Circuit vacated the sanctions and remanded for further consideration.  *See Perpetual Sec., Inc.*, 290 F.3d at 142.

Defendants also argue that Rule 11's safe harbor does not apply "in cases under the PSLRA" in light of that statute's sanctions provision.  Reply at 16.  The relevant section of the PSLRA provides:

> In any private action arising under the [Securities Exchange Act], upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion.

15 U.S.C. § 78u-4(c)(1).  Defendants may not avail themselves of this provision because there has not been a "final adjudication" of this case.  *Id.*  While the PSLRA does not define "final adjudication," courts in this district have applied the "ordinary or natural" meaning of the term as a "decision finally resolving the parties' claims."  *Manchester Mgmt. Co., LLC v. Echo*

*Therapeutics, Inc.*, 297 F. Supp. 3d 451, 465-66 (S.D.N.Y. 2018) (collecting cases and adopting an "ordinary or natural" meaning of the term).  The Court's August 24, 2020 Order was a denial of a motion to dismiss, not a final adjudication of this action.

The Court therefore denies Defendants' motion for sanctions pursuant to Rule 11 for failure to comply with the rule's safe harbor provision.  *See Star Mark Mgmt., Inc.*, 682 F.3d at 176; *Castro v. Mitchell*, 727 F. Supp. 2d 302, 305-06 (S.D.N.Y. 2010).

## C.  Defendants' Motion for Sanctions Fails on the Merits

With Defendants' Rule 11 motion procedurally barred, the Court turns to Defendants' invitation for this Court to impose *sua sponte* sanctions on Plaintiffs' counsel pursuant to Rule 11(c)(3).  Reply at 16 n.15.  The Court also retains inherent power to sanction a party for perpetrating fraud on the court.  *See Chambers v. Nasco*, 501 U.S. 32, 44-45 (1991) ("[A] court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud."); *In re Dynex Cap., Inc. Sec. Litig.*, 2011 WL 2581755, at *3 (invoking the court's inherent authority to determine whether sanctions are appropriate when the defendants argued that the plaintiffs' counsel "concocted a number of allegations" in a securities class action complaint through the use of confidential sources).  As previously noted, *sua sponte* Rule 11 sanctions are only appropriate upon a finding of subjective bad faith.  *See Muhammad*, 732 F.3d at 108.  The same standard applies to imposing sanctions pursuant to this Court's inherent power to deter fraud on the court.  *See Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 235 (2d Cir. 2020) ("[C]lear and convincing evidence of bad faith is a prerequisite to an award of sanctions under the court's inherent power.").  For reasons that follow, the current record does not support a finding that Plaintiffs' counsel's conduct is sanctionable.

### 1.  Plaintiffs' Counsel's Inclusion of the CWs' Allegations in the Amended Complaint

At various points throughout their briefs, Defendants argue that Plaintiffs' counsel falsified

allegations in the Amended Complaint and filed that document in the face of "glaring red flags" as to the veracity of allegations attributed to some of the CWs.  Supplemental Brief at 2.

As discussed more fully above, however, Plaintiffs have provided the interview notes and memoranda of Browning, their investigator, which supports many of the statements attributed to the CWs in the Amended Complaint—including statements that have been repudiated.  *See, e.g.*, Dkt. 130-17 at 3; Dkt. 130-24 at 2-3; Dkt. 130-28 at 3.  Additionally, after each initial interview, Browning claims that she attempted to schedule subsequent interviews with the CW and Plaintiffs' counsel.  *See* Browning Declaration ¶¶ 31, 51, 65, 72, 100, 112.  Plaintiffs' counsel was able to speak with CW-1, CW-3, and CW-6 and read them the allegations attributed to them in the Amended Complaint before filing.  *Id.* ¶¶ 32, 66, 114.  While Plaintiffs' counsel was unable to do so with CW-2, CW-4, and CW-5, *see id.* ¶¶ 54, 74-76, 102-104, Browning's interview notes and memoranda reflecting those witnesses' statements contradict Defendants' suggestion that Plaintiffs' counsel created these allegations out of whole cloth.  *See* Dkt. 130-17 at 3 (CW-2); Dkts. 130-23 at 9, 130-24 at 3 (CW-4); Dkt. 130-28 at 4 (CW-5).[12]  Although certain allegations attributed to the repudiating CWs are in dispute, it remains unclear whether it is Browning or the repudiating CWs whose credibility is compromised or whose recollection is faulty.

The Court is somewhat troubled, however, by Plaintiffs' counsel's failure to more thoroughly confirm the Amended Complaint's allegations that CW-1 reported that Schoeman said that "things are not good" with the LCCP, Am. Compl. ¶ 69, and that the Change Order was a contractual obligation, *id.* ¶ 67.  In a June 3, 2020 email to Plaintiffs' counsel, Browning specifically raised a concern that the "things are not good" quote should not be attributed to

---

[12] Defendants seems to suggest that Plaintiffs' repeated unsuccessful attempts to contact CW-2 and CW-4 showed a recognition of the deficiencies in those CWs' initial interview statements.  Supplemental Brief at 8-9, 11.  Such an inference does not necessarily follow.  Plaintiffs' counsel's attempts to arrange follow-up interviews before filing the Amended Complaint could instead be seen as efforts to confirm the allegations attributed to those witnesses.

36

Schoeman, explaining that her notes reflected that CW-1 stated that a less senior manager made that statement. Dkt. 115-27 at 3. In addition, certain parts of Browning's notes of her interview with CW-1 suggest that the Change Order was an estimate rather than a legally binding obligation. *See* Dkt. 115-22 at 4. On the latter point, as discussed above, parts of CW-1's deposition testimony suggest that the Change Order could be negotiated and had to be approved by Sasol. CW-1 Deposition at 20-22, 26-27. CW-1, however, testified that Plaintiffs' counsel read the statements attributed to him/her in the Amended Complaint before it was filed, CW-1 Deposition at 15, and Browning likewise has attested that she and Plaintiffs' counsel confirmed the accuracy of those statements with CW-1 on June 2, 2020, which included counsel reading the relevant allegations to CW-1 verbatim. Browning Declaration ¶ 32. It certainly would have been prudent for Plaintiffs' counsel to directly address with CW-1 whether the specific "things are not good" quote should be attributed to Schoeman—in light of Browning's June 3, 2020 email—and whether the Change Order was legally binding—in light of Browning's notes of her interview of CW-1—and it does not seem that counsel did so. But considering all the circumstances surrounding these factual allegations, including counsel's confirmation of their accuracy with CW-1, Plaintiffs' counsel's decision to include these statements in the Amended Complaint does not warrant sanctions.

Defendants further argue that Plaintiffs' attorneys were aware of "critical gaps" in the information attained from CW-4's sole interview, yet they still included the allegations attributed to CW-4 in the Amended Complaint. Supplemental Brief at 11-12. Plaintiffs' counsel relied on Browning's interview notes and memorandum to plead the allegations attributed to CW-4, and Browning repeatedly attempted to speak with CW-4 again to confirm those allegations. Further, Defendants rely on the May 14, 2020 text messages between Browning and CW-4 to question the reliability of the information attributed to CW-4. *Id.* This exchange, during which CW-4 demanded sizable financial compensation and appeared to threaten to walk away from his/her prior

37

statements if not paid, *see* Dkt. 130-25, does not necessarily demonstrate that CW-4's prior statements were false.  Accordingly, Plaintiffs' counsel's inclusion of allegations attributed to CW-4 in the Amended Complaint does not warrant sanctions.

### 2. Defendants' Allegations that Plaintiffs' Counsel Obstructed Discovery and Made False Statements to the Court

Defendants also argue that Plaintiffs' counsel made misrepresentations to the Court and "obstruct[ed] scrutiny of their CW allegations."  Motion for Reconsideration and Sanctions at 10; *id* at 23 (accusing Plaintiffs of "engag[ing] in an aggressive, unlawful, and exceedingly desperate series of maneuvers designed to delay and avoid depositions of the CWs").  Defendants first argue that Plaintiffs' counsel lied to Judge Rakoff when counsel affirmed CW-1's statements at oral argument on Defendants' motion to dismiss.  *See* 8/20/2020 Tr. at 26 ("All of that paragraph is [CW-1's] statement, and we were careful in providing it to the court.  That is the [CW-1's] statement.  We confirmed it.").  But as already discussed, both Browning and CW-1 have averred that CW-1 confirmed the veracity of the allegations attributed to him/her in the Amended Complaint.  *See* Browning Declaration ¶ 32; CW-1 Declaration ¶ 4.

Defendants also assert that Plaintiffs' counsel improperly refused to divulge the CWs' identities to Defendants after the August 24, 2020 Order, "in direct contravention of the law and norms of this District."  Motion for Reconsideration and Sanctions at 23.  But as one court in this District has noted, "the case law regarding the application of the work product doctrine to motions to compel the names of a witness referenced but not named in a complaint is not uniform."  *In re Bear Stearns Cos. Inc. Sec., Derivative & ERISA Litig.*, No. 08 MD 1963 (RWS), 2012 WL 259326, at *3 (S.D.N.Y. Jan. 27, 2012).  While Judge Rakoff rejected Plaintiffs' position, it was not the type of frivolous legal argument that is sanctionable.  *See E. Gluck Corp. v. Rothenhaus*, 252 F.R.D. 175, 179 (S.D.N.Y. 2008) ("Courts maintain a high bar for establishing a Rule 11 violation given judicial concern for encouraging zealous advocacy.").

Finally, Defendants argue that when they subpoenaed CW-1, CW-3, and CW-6 for depositions to occur in October 2020, Plaintiffs "unlawfully" subpoenaed those same witnesses for December depositions after the deadline for Defendants' opposition to Plaintiffs' motion for class certification, despite the Case Management Plan allowing for only a single deposition of an individual.  Motion for Reconsideration and Sanctions at 23-24; *see* Dkt. 87 at 7.  Defendants accuse this of being an effort "to avoid scrutiny of [Plaintiffs'] allegations."  Motion for Reconsideration and Sanctions at 24.  Plaintiffs, however, argued that deposing these three CWs in October 2020 would have prejudiced them because certain files pertaining to the CWs had not yet been produced by Defendants.  *See* Dkt. 97 at 2-3.  Plaintiffs also challenged the need to take these depositions in October 2020, questioning their relevancy as to the motion for class certification.  *Id.* at 3.  The Court does not find these arguments to be frivolous such that sanctions would be warranted.

## IV. Conclusion

For the above-mentioned reasons, Defendants' motions for reconsideration and for sanctions are denied.  Defendants' request for oral argument, which the Court finds unnecessary, is also denied.

Because the Court stayed both discovery and briefing on Plaintiffs' motion for class certification pending disposition of these motions, the parties are directed to meet and confer and file a revised proposed scheduling order as to these matters by August 9, 2021.

The Clerk of Court is respectfully directed to close the motions pending on Docket Numbers 95, 102, 103, and 138.

SO ORDERED.

Dated: July 24, 2021
New York, New York

_____
JOHN P. CRONAN
United States District Judge

39