UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHAD LINDSEY MOSHELL, Individually and On Behalf of All Others Similarly Situated, <br><br>                    Plaintiff, <br><br> v. <br><br> SASOL LIMITED, DAVID EDWARD CONSTABLE, BONGANI NQWABABA, STEPHEN CORNELL, PAUL VICTOR, and STEPHAN SCHOEMAN, <br><br>                    Defendants. | Case No. 1:20-cv-01008-JPC <br><br> <u>CLASS ACTION</u> <br><br> **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION** |

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

HISTORY AND BACKGROUND OF THE ACTION .........................................................4

ARGUMENT .............................................................................................................................4

I.      THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL ..........................4

    A.      The Proposed Settlement Is Procedurally Fair.......................................................5

        1.      Plaintiffs and Lead Counsel Have Adequately Represented the Class.................................................................................................................6

        2.      The Settlement Was Reached After Arm's-Length Negotiations with the Assistance of an Experienced Mediator and Following Substantial Discovery ...........................................................6

    B.      The Settlement Is Substantively Fair Under the *Grinnell* Factors...........................8

        1.      The Complexity, Expense, and Likely Duration of the Litigation Justifies the Settlement.................................................9

        2.      The Reaction of the Class to the Settlement ..............................................10

        3.      The Stage of the Proceedings and Discovery Completed..........................11

        4.      The Reasonableness of the Settlement in Relation to the Risk of Establishing Liability............................................................12

        5.      The Risks of Maintaining the Class Action Through Trial.......................15

        6.      The Ability of Defendants to Withstand a Greater Judgment...................15

        7.      The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation ................16

    C.      All Other Factors Set Forth in Rule 23(e)(2)(C) Support Approval of the Settlement.......................................................................18

    D.      The Settlement Treats Class Members Equitably Relative to Each Other ............................................................................19

II.     THE PLAN OF ALLOCATION IS FAIR AND ADEQUATE .......................................19

III.    NOTICE TO THE CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS ......................................................................21

IV.     CONCLUSION...................................................................................................................22

010886-11/1967680 V1

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
  298 F.R.D. 171 (S.D.N.Y. 2014) ........................................................................22

*In re Am. Bank Note Holographics, Inc.*,
  127 F. Supp. 2d 418 (S.D.N.Y. 2001)..................................................................21

*In re Barrick Gold Sec. Litig.*,
  2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015).........................................................13

*In re Barrick Gold Sec. Litig.*,
  314 F.R.D. 91 (S.D.N.Y. 2016) ............................................................................6

*Beecher v. Able*,
  575 F.2d 1010 (2d Cir. 1978)..............................................................................20

*Christine Asia Co., Ltd. v. Yun Ma*,
  2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) ...............................................5, 9, 11

*In re Citigroup Inc. Sec. Litig.*,
  2014 WL 2112136 (S.D.N.Y. May 20, 2014) ........................................................4

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974)...................................................................... .. *passim*

*City of Providence v. Aéropostale, Inc.*,
  2014 WL 1883494 (S.D.N.Y. May 9, 2014) ....................................................9, 21

*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir. 2001).....................................................................................7

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
  343 F. Supp. 3d 394 (S.D.N.Y. 2018)....................................................................7

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010).......................................................20

*In re Gilat Satellite Networks, Ltd.*,
  2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) .......................................................9

*Guevoura Fund Ltd. v. Sillerman*, ,
  2019 WL 6889901 (S.D.N.Y. Dec. 18, 2019) .............................................*passim*

*Hefler v. Wells Fargo & Co.*,
  2018 WL 6619983 (N.D. Cal. Dec. 18, 2018) .......................................................................19

*In re Indep. Energy Holdings PLC*,
  2003 WL 22244676 (S.D.N.Y. Sept. 29, 2003) ......................................................................7

*Lea v. Tal Educ. Grp.*,
  2021 WL 5578665 (S.D.N.Y. Nov. 30, 2021) .........................................................................8

*Melito v. Am. Eagle Outfitters, Inc.*,
  2017 WL 3995619 (S.D.N.Y. Sept. 11, 2017) .......................................................................21

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  246 F.R.D. 156 (S.D.N.Y. 2007) ...........................................................................................17

*In re Patriot Nat'l, Inc. Sec. Litig.*,
  828 F. App'x 760 (2d Cir. 2020) ...........................................................................................17

*In re Polaroid ERISA Litig.*,
  240 F.R.D. 65 (S.D.N.Y. 2006) ...............................................................................................6

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010) ...................................................................................................12

*In re Telik, Inc. Sec. Litig.*,
  576 F. Supp. 2d 570 (S.D.N.Y. 2008) .....................................................................................7

*Vaccaro v. New Source Energy Partners L.P.*,
  2017 WL 6398636 (S.D.N.Y. Dec. 14, 2017) .......................................................................17

*In re Veeco Instr. Inc. Sec. Litig.*,
  2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) .........................................................................20

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
  396 F.3d 96 (2d Cir. 2005) ........................................................................................4, 5, 8, 21

*Weinberger v. Kendrick*,
  698 F.2d 61 (2d Cir. 1982) .......................................................................................................7

*In re WorldCom, Inc. Sec. Litig.*,
  388 F. Supp. 2d 319 (S.D.N.Y. 2005) ...................................................................................19

- iii -

Pursuant to Rules 23(b)(3) and 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiff David Cohn ("Lead Plaintiff") and Additional Representative Plaintiff Chad L. Moshell (collectively, "Plaintiffs"), by and through their counsel Hagens Berman Sobol Shapiro LLP ("Hagens Berman" or "Lead Counsel"), respectfully move this Court for an order approving the proposed settlement of the above-captioned class action (the "Action") and the proposed Plan of Allocation of settlement proceeds, each of which this Court preliminarily approved by its Order Granting Lead Plaintiff's Motion for Preliminary Approval of Class Action Settlement dated April 18, 2022 ("Preliminary Approval Order") (Dkt. No. 204).[1]

## PRELIMINARY STATEMENT

Subject to Court approval, Plaintiffs have agreed to settle all claims in the Action in exchange for a cash payment of $24 million, which has been deposited into an escrow account. Plaintiffs respectfully submit that the proposed Settlement is an outstanding result for the Settlement Class and satisfies the standards for final approval under Federal Rule of Civil Procedure 23(e)(2). As detailed in the accompanying Declaration of Steve Berman ("Berman Declaration" or "Berman Decl.") and summarized below, the Settlement: (i) is the culmination of over two years of vigorous litigation by Plaintiffs and Lead Counsel; (ii) is the product of an extensive mediation process conducted under the guidance of experienced class action mediators; and (iii) represents a substantial portion of the reasonably recoverable damages in this case.

At the time of reaching the agreement to settle, Plaintiffs and Lead Counsel had a well-developed understanding of the strengths and weaknesses of the Action. Lead Counsel had, among other things, (i) conducted an extensive investigation into the claims asserted, including through a

---

[1] All capitalized terms not defined herein have the same meanings set forth in the Stipulation and Agreement of Settlement ("Stipulation"), previously filed with the Court. Dkt. No. 203-1.

detailed review and analysis of the voluminous public record, interviews with numerous confidential witnesses, and discussions with experts and consultants in economics, engineering and the use of confidential witnesses in securities class actions; (ii) researched and drafted amended complaints, including the operative 115-page Second Amended Class Action Complaint (the "Complaint"); (iii) researched and briefed Lead Plaintiff's successful (in significant part) opposition to Defendants' motion to dismiss the Complaint; (iv) prepared Lead Plaintiff's motion for class certification, which incorporated records produced by Defendants as a result of contentious class certification discovery motion to compel briefing and expert opinions and analysis of complex issues such as market efficiency, loss causation, and a classwide damages model; (v) completed substantial discovery, including collecting and producing Plaintiffs' responsive documents, obtaining and analyzing over 700,000 pages of documents from Defendants, and participating in nine depositions; and (vi) engaging in extensive arm's-length settlement negotiations, which involved the exchange of detailed mediation statements followed by two full-day mediation sessions overseen by experienced and respected mediators of complex litigations, Honorable Daniel Weinstein (Ret.) and Ambassador David Carden, which culminated in a recommendation by the mediators that this Action be settled for $24 million. *See* Berman Decl. at ¶¶ 6, 88.

The Settlement is particularly favorable given the substantial risks of continued litigation. *See id.* ¶¶ at 54-66. This case required Plaintiffs to prove Defendants committed a brazen fraud over a nearly five-year Class Period by making materially false and misleading statements relating to the true costs and schedule associated with the end of job construction of a complex in Lake Charles, Louisiana, known as the Lake Charles Chemicals Project ("LCCP"). *Id.* at ¶ 16. As explained below, Defendants had significant arguments regarding liability and damages, which, if

successful, would have resulted in a recovery that was substantially smaller than the Settlement, or no recovery at all. *See id.* at ¶¶ 54-66.

Absent the Settlement, Plaintiffs faced the possibility of dismissal through Defendants' interlocutory appeal of the Court's order denying Defendants' Motion for Reconsideration and Sanctions. *See id.* at ¶¶ 32-38. In addition, there was no guarantee the class would have been certified, as proposed by Plaintiffs. *Id.* at ¶¶ 7, 32-44. And even if Plaintiffs surpassed these hurdles, the Parties faced the prospect of protracted litigation through full fact discovery (including potentially overseas depositions), expert discovery, summary judgment, pre-trial motion practice, a complex trial, post-trial motion practice, individual class member loss causation and damages challenges, and ensuing appeals. *See id.* at ¶¶ 54-66. The Settlement avoids these risks and delays while providing a substantial, certain, and immediate benefit to the Class in the form of a $24 million cash payment. *Id.* at ¶ 62.

The Settlement has the full support of the Court-appointed Lead Plaintiff Cohn, as well as Additional Representative Plaintiff Mr. Moshell, the same investor that initiated this suit by filing the original complaint. *Id.* at ¶ 8. Both are sophisticated retail investors and accountants that worked in the energy industry and who took an active role in supervising the litigation and participated in the settlement negotiations. *See* Exs. 1-2 to Berman Decl. (supporting declarations of Messrs. Cohn and Moshell).

The reaction of members of the Settlement Class to the Settlement further demonstrates the reasonableness of Plaintiffs' decision to agree to the Settlement. Berman Decl. at ¶¶ 67-74. As of the date of this Memorandum, which is only one week prior to the deadline for the submission of objections and requests for exclusion, no objectors or requests for exclusion have been filed. *Id.* at

¶ 73. Accordingly, the reaction of the Settlement Class strongly supports the inference that the Settlement and Plan of Allocation are fair, reasonable, and adequate.

Given these considerations and the other factors discussed below, Plaintiffs respectfully submit that the Settlement is fair, reasonable, and adequate and warrants final approval by the Court. In addition, the Plan of Allocation is a fair and reasonable method for distributing the Net Settlement Fund to the members of the Settlement Class and should also be approved by the Court.

## HISTORY AND BACKGROUND OF THE ACTION

The Court is respectfully referred to the Berman Declaration concurrently filed herewith for a full discussion of, *inter alia*, the factual background and procedural history of the Action, the litigation efforts of counsel for the Plaintiffs, the significant risks of continued litigation, and a discussion of the negotiations leading to this Settlement.

## ARGUMENT

## I.    THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL

A class action settlement should be approved if the Court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The Court should examine both the negotiating process leading to the settlement and the settlement's substantive terms. *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) ("*Visa*"); *In re Citigroup Inc. Sec. Litig.*, 2014 WL 2112136, at *2-3 (S.D.N.Y. May 20, 2014).

Rule 23(e)(2), amended on December 1, 2018, states that the Court should consider whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be

identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Historically, the Second Circuit has held that district courts should consider the following factors set forth in *Grinnell* in evaluating a class action settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) (citations omitted), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000); *see also Visa*, 396 F.3d at 117.

Accordingly, Plaintiffs herein address the fairness, reasonableness, and adequacy of the Settlement in relation to the four factors set forth in Rule 23(e)(2), and address each of the *Grinnell* factors. *See Christine Asia Co., Ltd. v. Yun Ma*, 2019 WL 5257534, at *8 (S.D.N.Y. Oct. 16, 2019) ("The factors set forth in Rule 23(e)(2) have been applied in tandem with the Second Circuit's *Grinnell* factors and 'focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal.'") (quoting the Advisory Committee Notes to 2018 Amendments, 324 F.R.D. 904, 918 (Apr. 26, 2018)).

## A.    The Proposed Settlement Is Procedurally Fair

"Rule 23(e)(2)(A), which requires adequate representation, and Rule 23(e)(2)(B), which requires arm's-length negotiations, constitute the procedural analysis of the fairness inquiry." *Christine Asia Co.*, 2019 WL 5257534, at *9 (citations and internal quotation marks omitted). Each of these factors strongly supports approval of the proposed Settlement.

1.      **Plaintiffs and Lead Counsel Have Adequately Represented the Class**

The "adequacy requirement entails inquiry as to whether: 1) plaintiffs' interests are antagonistic to the interest of other members of the class and 2) plaintiffs' attorneys are qualified, experienced and able to conduct the litigation." *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 99 (S.D.N.Y. 2016) (internal quotation marks omitted). Here, Plaintiffs and Lead Counsel have adequately represented the Class in their vigorous prosecution of the Action for over two years and in the negotiation and achievement of the Settlement. Plaintiffs have claims that are typical of and coextensive with those of other Settlement Class Members and have no interest antagonistic to those of other Settlement Class Members. Indeed, Lead Plaintiff and Lead Counsel added Mr. Moshell, who invested in Sasol very early on in the Class Period, as an additional class representative to provide the Settlement Class with more fulsome representation. Berman Decl. at ¶ 30. Moreover, like other Settlement Class Members, Plaintiffs have an interest in obtaining the largest possible recovery from Defendants. *See In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict[.]"). In addition, Lead Counsel is highly qualified and experienced in securities litigation, as set forth in its firm resume (*see* Ex. 5 to Berman Decl.), and successfully conducted the litigation against skilled opposing counsel.

Accordingly, Plaintiffs and Lead Counsel have adequately represented the Class.

2.      **The Settlement Was Reached After Arm's-Length Negotiations with the Assistance of an Experienced Mediator and Following Substantial Discovery**

The Court should also consider whether the settlement "was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). Courts have traditionally considered other related circumstances in determining the "procedural" fairness of a settlement, including: (i) counsel's understanding of the strengths and weakness of the case based on factors such as "the stage of the proceedings and the

amount of discovery completed," *Grinnell*, 495 F.2d at 463, (ii) the "absence of any indication of collusion" in the settlement negotiations, *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982), and (iii) a "mediator's involvement" in the negotiations, *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001). These circumstances strongly support the approval of the Settlement here.

The Parties reached the settlement only after extensive arm's-length negotiations between experienced counsel, which included two full-day mediation sessions under the guidance of the Mediators, which included extensive mediation submissions and presentations. Berman Decl. at ¶¶ 6, 45. Moreover, the Settlement is the product of a recommendation made by well-respected mediators with a track record for resolving similar complex securities class actions. "[T]hat the Settlement was reached . . . with the assistance of a private mediator experienced in complex litigation, is further proof that it is fair and reasonable." *In re Indep. Energy Holdings PLC*, 2003 WL 22244676, at *4 (S.D.N.Y. Sept. 29, 2003); *see also In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 576 (S.D.N.Y. 2008) (in approving securities class action settlement, court observed, "Judge Weinstein's role in the settlement negotiations strongly supports a finding that they were conducted at arm's-length and without collusion."); *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 343 F. Supp. 3d 394, 408-09 (S.D.N.Y. 2018), *aff'd sub nom. In re Facebook, Inc.*, 822 F. App'x 40 (2d Cir. 2020) (finding proposed settlement was procedurally fair, given that "[t]he $35 million amount is based on the suggestion by a neutral mediator, Judge Weinstein of the JAMS").

Further, as noted above, the Parties and their counsel were extremely well informed about the strengths and weaknesses of the case before reaching the agreement to settle. Plaintiffs and Lead Counsel had completed substantial discovery, which included obtaining and analyzing over 700,000 pages of documents from Defendants, and participating in nine depositions. Berman Decl. at ¶¶ 6, 42, 88. Lead Counsel researched and engaged in extensive dispositive motion briefing, as

well as completed the motion for class certification, which entailed analysis of complex, expert-driven legal issues such as market efficiency, loss causation, and damages. *See id.* at ¶ 6. Also, in connection with the mediation process, the Parties exchanged detailed written mediation submissions and made oral presentations concerning liability and damages, which more fully informed Plaintiffs and their counsel of the strengths and weaknesses of their case. *See id.* at ¶¶ 6, 45. Where, as here, a settlement was "reached in arms' length negotiations between experienced, capable counsel after meaningful discovery," it is entitled to a "presumption of fairness, adequacy, and reasonableness." *See Visa*, 396 F.3d at 116; *see Lea v. Tal Educ. Grp.*, 2021 WL 5578665, at *8 (S.D.N.Y. Nov. 30, 2021) (courts should hesitate to substitute their judgement for that of the parties and experienced counsel who negotiated the settlement).

The conclusion of Plaintiffs and Lead Counsel that the Settlement is in the best interests of the Class also supports approval. Plaintiffs, who both were accountants in the energy industry and are sophisticated retail investors that closely supervised this litigation, recommend that the Settlement be approved. *See* ¶ 9, Ex. 1 to Berman Decl.; ¶ 10, Ex. 2 to Berman Decl. Likewise, Lead Counsel has extensive experience in prosecuting securities class actions, both in this District and nationally, and has also concluded that the Settlement is in the best interests of the Class. *See* Ex. 5 to Berman Decl.

In sum, all of the Rule 23(e) considerations confirm the reasonableness of the Settlement. Thus, the Settlement is entitled to the presumption of procedural fairness.

**B.    The Settlement Is Substantively Fair Under the *Grinnell* Factors**

The Court must consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal." Fed. R. Civ. P. 23(e)(2)(C)(i). Rule 23(e)(2)(C)(i) incorporates the nine-factor test set forth in *Grinnell* for determining whether a

settlement is substantively fair, reasonable, and adequate. *Christine Asia Co.*, 2019 WL 5257534, at *10.

## 1.    The Complexity, Expense, and Likely Duration of the Litigation Justifies the Settlement

"'The expense and possible duration of the litigation should be considered in evaluating the reasonableness of a settlement.'" *Guevoura Fund Ltd. v. Sillerman*, 2019 WL 6889901, at *7 (S.D.N.Y. Dec. 18, 2019) (citation omitted). Here, the litigation was certain to be complex and likely would have lasted for quite some time. In fact, courts have noted the complexity of securities class actions. *Id.* ("Securities class actions are notoriously complex[.]"); *In re Gilat Satellite Networks, Ltd.*, 2007 WL 1191048, at *10 (E.D.N.Y. Apr. 19, 2007) ("Securities class actions are generally complex and expensive to prosecute."); *see also City of Providence v. Aéropostale, Inc.*, 2014 WL 1883494, at *5 (S.D.N.Y. May 9, 2014) ("Indeed, securities class actions are by their very nature complicated and district courts in this Circuit have 'long recognized' that securities class actions are 'notably difficult and notoriously uncertain' to litigate.") (citations omitted).

This litigation certainly follows suit. This was a highly complex case that required proving Defendants made two categories of materially false and misleading statements over a nearly five-year Class Period concerning the costs and schedule for the end of job construction of the LCCP. Berman Decl. at ¶ 16. These claims were highly complicated, necessarily involving expert evaluation and analysis of internal, third party and independent job costing for projects, labor, materials, and overhead on a mega project, as well as the nuances of determining the LCCP's cost and construction progress tracking with internal and third-party projections, while accounting for ever-changing project-specific and global trends such as labor supply, inflation, and weather. *See id.* at ¶ 6. The litigation of damages and loss causation were also highly complex, as the sought-after Class Period included six disclosure events, many of which were confounded by the

disclosure of non-fraud related information, the impact of which had to be disaggregated from the stock price declines. *See id.* at ¶¶ 54-62.

In addition, achieving a litigated verdict would have required substantial additional time and expense. In the absence of the Settlement, the continued litigation of the Action would have required: (i) defeating Defendants' interlocutory appeal of the Court's order denying Defendants' Motion for Reconsideration and Sanctions; (ii) prevailing on Plaintiffs' motion for class certification; (iii) the conclusion of fact discovery, which would entail deposition discovery, including potential overseas depositions of the South-African based Individual Defendants and other relevant Sasol executives; (iii) briefing and defeating Defendants' expected motion for summary judgment; (iv) substantial pre-trial motion practice in the form of *Daubert* motions and motions *in limine*; (v) a trial involving substantial fact and expert testimony; (vi) post-trial motions, including a contested individual claims procedure; and (vii) whatever the outcome at trial, a lengthy appeal. *See id.* In contrast, the Settlement provides an immediate recovery of $24 million for the Class.

## 2.    The Reaction of the Class to the Settlement

The reaction of the Class to the Settlement is a significant factor in assessing its fairness and adequacy, and "'[t]he absence of objectors may itself be taken as evidencing the fairness of a settlement.'" *Guevoura Fund*, 2019 WL 6889901, at *7 (citation omitted). "The absence of negative feedback from Class Members evidences an overall favorable response of the Class Members to the Settlement." *Id.*

The Claims Administrator, Strategic Claims Services ("SCS"), mailed or emailed 89,110 copies of the Notice and Proof of Claim Form (together, the "Settlement Notice Packet") to potential Class Members and their nominees. *See* Berman Decl. at ¶ 70; ¶ 7, Ex. 3 to Berman Decl. The Notice set out the Settlement's essential terms and informed potential Class Members of,

among other things, their right to opt out or object to the Settlement, as well as the procedure for submitting Claim Forms. While the July 28, 2022 deadline for Class Members to exclude themselves or object has not yet passed, to date, not one request for exclusion or objection to the Settlement or Plan of Allocation has been lodged. Berman Decl. at ¶ 73. Likewise, no request for exclusion has been received. *Id*; ¶ 13, Ex. 3 to Berman Decl. Lead Plaintiff will file reply papers by August 11, 2022, addressing all requests for exclusion and objections received, if any. But thus far, the reaction of the Settlement Class underscores the value of the Settlement and provides additional support for approval of the Settlement.

### 3.      The Stage of the Proceedings and Discovery Completed

"When considering this *Grinnell* factor, the question is whether . . . counsel possessed a record sufficient to permit evaluation of the merits of Plaintiffs' claims, the strengths of the defenses asserted by Defendants, and the value of Plaintiffs' causes of action for purposes of settlement." *Christine Asia Co.*, 2019 WL 5257534, at *11 (citation omitted). As explained above, when the Settlement was reached, Plaintiffs and Lead Counsel had a sufficient record to intelligently assess the strengths and weakness of their claims and the value of the case. Lead Counsel had conducted a thorough investigation into the claims; opposed Defendants' motions to dismiss the Complaint, reconsideration and sanctions and interlocutory appeal; briefed class certification; obtained and reviewed voluminous document productions; participated in depositions of six confidential witnesses, Plaintiffs, and Dr. Hartzmark; consulted with several subject matter experts; and participated in an extensive mediation process. *See* Berman Decl. at ¶ 6. Accordingly, this factor supports approval of the Settlement.

4.      **The Reasonableness of the Settlement in Relation to the Risk of Establishing Liability**

Courts should consider the "risks of establishing liability [and] the risks of establishing damages." *Grinnell*, 495 F.2d at 463 (citation omitted). While Lead Plaintiff believes that its claims have merit, it recognizes that this Action presented substantial risks to establishing both liability and damages. This was not a case filed on the heels of a regulatory enforcement action or subsequent to a restatement of financial results providing Plaintiffs with a roadmap for discovery. On the contrary, Lead Plaintiff faced several significant risks at each stage of the case that created serious doubt as to whether the Class would ultimately succeed at trial.

(a)      **Risks to Proving Liability**

*The Safe Harbor Provision*. Plaintiffs faced significant risks that, at either the summary judgment stage or after a trial, Defendants would prevail in demonstrating that the alleged false and misleading statements concerning the projected cost and schedule for the LCCP are barred by the PSLRA's Safe Harbor Provision. As the Court already ruled, all of "defendants' LCCP cost and schedule estimates do constitute, contrary to plaintiff's argument, forward-looking statements as defined by the PSLRA" (ECF No. 74, Memorandum Order, dated Aug. 24, 2020, at 8-9). Framed in the disjunctive, the Safe Harbor Provision applies if a forward-looking statement is "identified and accompanied by meaningful cautionary language or is immaterial or the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010). Defendants argued that two separate prongs of the Safe Harbor Provision independently dispose of Plaintiffs' Section 10(b) claim. Berman Decl. at ¶ 55.

First, Defendants contended that each of the challenged disclosures was accompanied by meaningful cautionary language. Although the Court rejected Defendants' arguments as to the

- 12 -

sufficiency of the cautionary language at the motion to dismiss stage, the Court did so by relying on Plaintiffs' theory that the cautionary language was "misleading in light of historical fact." Defendants argued that the evidentiary record would not conclusively show that Sasol had internally determined that the LCCP cost and schedule projections would be higher than what was publicly disclosed. *Id.* at ¶ 56.

Second, Defendants argued that Sasol's statements were separately protected under the Safe Harbor Provision because Plaintiffs could not prove that Defendants had "actual knowledge" that the LCCP projections were contemporaneously false when made—which this Court and others have recognized constitutes a more demanding mental element of a person's intention than the traditional scienter element. ECF No. 74, Memorandum Order, dated Aug. 24, 2020, at 13; *see also In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *10 (S.D.N.Y. Apr. 1, 2015) (finding that, while internal company reports suggesting that project would not be complete within publicly disclosed cost and time frame "plausibly allege[d] recklessness," "they do not support a strong inference that the estimates were announced with actual knowledge of their falsity"). Defendants argued that the evidentiary record would demonstrate that the persons who made the challenged statements—Constable, Cornell, Nqwababa, and Victor—genuinely believed the projections were accurate. If Defendants prevailed on either of those arguments, virtually the entirety of the alleged misstatements would be dismissed, and Plaintiffs may have been prevented from obtaining any recovery for investors in this Action. *Id.* at ¶ 57.

***Scienter***. Plaintiffs also faced the risk of not proving the element of scienter. Defendants argued that there was no "motive and opportunity" evidence suggesting that anyone benefited economically from the alleged fraud. Likewise, Defendants argued that even assuming *arguendo*, that a theory of recklessness could establish scienter in this action, the evidentiary record

foreclosed Plaintiffs' ability to prove it. If Defendants prevailed on their scienter arguments, Plaintiffs' claims would have been dismissed, resulting in no recovery. *Id.* at ¶ 58.

***Loss Causation***. Plaintiffs also faced the risk of not proving the essential element of loss causation. For instance, in opposing class certification, Defendants argued that the Court should end the Class Period on August 16, 2019, contending that the final alleged disclosure event occurring on January 14, 2020, when Sasol revealed that the Company had "experienced an explosion and fire at its LCCP low-density polyethylene (LDPE) unit" on January 13, 2020, did not "correct" their alleged misstatements. Defendants' Opp. to Class Cert. at 22-24 (ECF No. 169). Defendants would have further asserted that many of the corrective events were confounded by the disclosure of information unrelated to the alleged fraud, such as the declining energy prices and reduced guidance. Defendants would have contended that when one disaggregates the impact of non-fraud related information from the stock price declines, none or only a small portion of some of the declines were recoverable as damages. If Defendants prevailed on this loss-causation argument, recoverable damages would have declined significantly. *Id.* at ¶ 59.

### (b)    Risks to Proving Damages

Plaintiffs also faced substantial risks of offering an admissible damages theory and calculating class-wide damages. In particular, Defendants would likely argue that since the nature and value of misrepresented and omitted material facts during the Class Period purportedly changed during the Class Period (i.e., the size in the deviation between Sasol's internal projections of the cost and schedule of the LCCP versus Defendants' public statements), the standard constant dollar methodology—which assumes that the amount of artificial stock inflation dissipated on each corrective disclosure was present in the stock price going back to the beginning of the Class Period—would not be appropriate here. According to Defendants, Plaintiffs would therefore have to "scale" the artificial inflation for each day over the Class Period, which Defendants would likely

aver Plaintiffs could not do through a reliable methodology supported by the evidence. Defendants would also likely argue that on the dates for many of the corrective disclosures for which Plaintiffs claimed damages, Sasol also released non-fraudulent, company-specific information adversely affecting Sasol's ADR prices, which losses in turn would need to be "parsed" from investors' recoverable damages. If Defendants prevailed on these "scaling" and "parsing" arguments, then recoverable damages would have declined significantly. *Id.* at ¶ 61.

5.      **The Risks of Maintaining the Class Action Through Trial**

Plaintiffs' motion for class certification was fully briefed at the time the Settlement was reached and Defendants had vigorously opposed Plaintiffs' motion. There was no guarantee that the Court would certify the class, and even further, no guarantee that the class would be maintained throughout trial, as the Court may always exercise its discretion to re-evaluate the appropriateness of class certification at any time. *See id.* at ¶ 65. Thus, the uncertainty in maintaining the putative class weighs in favor of settlement.

6.      **The Ability of Defendants to Withstand a Greater Judgment**

A court may also consider a defendant's ability to withstand a judgment greater than that secured by settlement, although it is not generally one of the determining factors. *Guevoura Fund*, 2019 WL 6889901, at *9 ("In assessing a proposed settlement, the Court should consider the defendants' ability to withstand a judgment greater than that secured by settlement.") (citation omitted). Courts, however, generally do not find the ability of a defendant to withstand a greater judgment to be an impediment to settlement when the other factors favor the settlement, and Defendants' ability in the abstract to potentially pay more money does not render the Settlement unreasonable in light of the significant hurdles to establishing liability and damages discussed above. *See id.* ("[T]he reasonableness of the Settlement is better analyzed in light of the amount of

the Settlement compared to the substantial risks Lead Plaintiff faced in proving liability and damages, and not on whether [Defendants] could have paid more.").

### 7. The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation

The Settlement is also reasonable when considered in relation to the range of potential recoveries that might be recovered if Plaintiffs prevailed at trial, which was far from certain for the reasons noted above. Lead Plaintiff's damages expert estimated that maximum damages for the entirety of the Class Period and attributable to the six alleged fraud-related disclosure dates ranged from $158.6 million to $202.5 million. Accordingly, the $24 million that will be available for claimants represents approximately 12% to 15% of the maximum recoverable damages. However, this "best case" scenario does not disaggregate any non-fraud related causes of downward stock movement on the six alleged corrective disclosure dates and assumes a constant dollar inflation throughout the entirety of the Class Period. This calculation also does not net gains on pre-Class Period purchases accrued during the Class Period, which Defendants argued should be removed.[2] Berman Decl. at ¶ 64.

Lead Plaintiff's expert also considered other scenarios based on the factual record, Defendants' arguments, and risks related thereto. For instance, Defendants argued vehemently that that there could be no liability for alleged misstatements before June 6, 2016, when construction at the LCCP was in the early stages. Defendants further contended that Plaintiffs faced significant risk for establishing liability on alleged misstatements before March 19, 2018, only after which

---

[2] Assuming that gains on pre-Class Period purchases accrued during the Class Period are removed or "netted," Plaintiffs' expert estimated maximum damages for the entirety of the Class Period and attributable to the six alleged fraud-related disclosure dates was approximately $116 million. Accordingly, the $24 million settlement equates to more than 20% of the recoverable damages.

the Company released a series of large cost increases and schedule delays over a short period of time. Similarly, as noted above, Defendants aggressively challenged loss causation with respect to the January 14, 2020 disclosure. If Defendants were successful at convincing the Court at class certification or summary judgment, or a jury at trial, that there was no liability for certain earlier time periods or no loss causation for certain alleged corrective disclosures, then the Class Period would effectively be shortened, significantly reducing recoverable damages. The below table provides a range of possible outcomes and percentages of recovery, assuming various permutations of liability over various potential Class Periods and without netting for alleged gains: *Id.* at ¶ 65.

| Class Period | Maximum Damages | Percentage of Recovery ($24 million settlement) |
|---|---|---|
| 06/06/2016 – 01/13/2020 | $86.9M – 109.8M | 22% – 28% |
| 06/06/2016 – 08/15/2019 | 69.8M – $87.3M | 29% – 34% |
| 03/19/2018 – 01/13/2020 | $55.1M – 63.9M | 38% – 44% |
| 03/19/2018 – 08/15/2019 | $42.2M – $49.1M | 49% – 57% |

These percentages of recovery are well-above the range of settlements that have received approval within this District. *See, e.g.*, *In re Patriot Nat'l, Inc. Sec. Litig.*, 828 F. App'x 760, 762 (2d Cir. 2020) (affirming district court's approval of settlement representing 6.1% of the maximum potentially recoverable damages); *Vaccaro v. New Source Energy Partners L.P.*, 2017 WL 6398636, at *6 (S.D.N.Y. Dec. 14, 2017) (approving settlement representing 6.5% of the maximum recoverable damages and noting that the settlement amount is "in line with other settlements in securities class actions"); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 246 F.R.D. 156, 167 (S.D.N.Y. 2007) (approving settlement that was "between approximately 3% and 7% of estimated damages"). Berman Decl. at ¶ 65.

*         *         *

- 17 -

Accordingly, Plaintiffs submit that this Court should find that the *Grinnell* factors, taken together, weigh in favor of settlement and that the Settlement should be approved.

## C.      All Other Factors Set Forth in Rule 23(e)(2)(C) Support Approval of the Settlement

Rule 23(e)(2)(C) also instructs courts to consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment;" and "any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv). Each of these factors also supports approval of the Settlement or is neutral and does not suggest any basis for inadequacy of the Settlement.

First, the procedures for processing Class Members' claims and distributing the proceeds of the Settlement are well-established, effective methods that have been widely used in securities class action litigation. Here, the proceeds of the Settlement will be distributed to Class Members who submit eligible Claim Forms with required documentation to the Claims Administrator, SCS. SCS, an independent company with extensive experience handling the administration of securities class actions, will review and process the Claims under the supervision of Lead Counsel; provide Claimants with an opportunity to cure any deficiencies in their Claims or request review of the denial of their claim by the Court; and then mail or wire claimants their *pro rata* share of the Net Settlement Fund upon approval of the Court. *See* Berman Decl. at ¶¶ 48-53.

Second, the relief provided for the Class is also adequate when the terms of the proposed award of attorney's fees are taken into account. As discussed in the accompanying Fee Memorandum,[3] the proposed attorneys' fees of 22% of the Settlement Fund, net of expenses, to

---

[3] Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Compensatory Awards to Plaintiffs ("Fee Memorandum") concurrently filed herewith.

be paid upon approval by the Court, are reasonable in light of the efforts of Lead Counsel and the risks in the litigation. Approval of attorneys' fees is entirely separate from approval of the Settlement, and neither Lead Plaintiff nor Lead Counsel may terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees. *See* Stipulation ¶ 19.

Lastly, the amended Rule 23 asks the Court to consider the fairness of the proposed settlement in light of any agreements required to be identified under Rule 23(e)(3). *See* Fed. R. Civ. P. 23(e)(2)(C)(iv). Here, the only such agreement (other than the Stipulation itself) is the Parties' confidential Supplemental Agreement, which sets forth the conditions under which Defendants would be able to terminate the Settlement if the number of Class Members who request exclusion from the Class reaches a certain threshold. This type of agreement is a standard provision in securities class actions and has no negative impact on the fairness of the Settlement. *See Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at *7 (N.D. Cal. Dec. 18, 2018).

**D.    The Settlement Treats Class Members Equitably Relative to Each Other**

Rule 23(e)(2)(D) requires that the Court assess whether "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). As discussed below in Part II, pursuant to the Plan of Allocation, eligible claimants approved for payment by the Court will receive their *pro rata* share of the recovery based on their transactions in Sasol ADRs. Plaintiffs will receive precisely the same level of *pro rata* recovery (as calculated under the Plan of Allocation) as all other Class Members. *See* Berman Decl. at ¶¶ 10, 76.

## II.    THE PLAN OF ALLOCATION IS FAIR AND ADEQUATE

The standard for approval of a plan of allocation is the same as the standard for approving the settlement as a whole: "'namely, it must be fair and adequate.' . . . A plan of allocation is fair and reasonable as long as it has a 'reasonable, rational basis.'" *Guevoura Fund*, 2019 WL 6889901, at *10 (citations omitted); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 343 (S.D.N.Y.

2005). "'Courts have recognized that 'the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information.'" *Guevoura Fund*, 2019 WL 6889901, at *10 (citation omitted). "Moreover, courts give great weight to the opinion of experienced and informed counsel when assessing a proposed plan of allocation as part of a settlement agreement." *Id.* at 11. Further, courts enjoy "broad supervisory powers over the administration of class-action settlements to allocate the proceeds among the claiming class members . . . equitably." *Beecher v. Able*, 575 F.2d 1010, 1016 (2d Cir. 1978).

The Plan of Allocation, which was fully described in the Notice, has a rational basis and is fair and equitable. Under the proposed Plan of Allocation, the Net Settlement Fund will be allocated to five purchasing time frames within the Settlement Class Period as follows:

| Proposed Allocation of Settlement Proceeds | | | | |
| --- | --- | --- | --- | --- |
| Mar. 10, 2015 to Sept. 6, 2015 | Sept. 7, 2015 to June 5, 2016 | June 6, 2016 to Feb. 26, 2017 | Feb. 27, 2017 to Aug. 15, 2019 | Aug. 16, 2019 to Jan. 13, 2020 |
| (4%) | (23%) | (25%) | (44%) | (4%) |

The proposed allocation of settlement proceeds accounts for the reduced likelihood of success of the claims for investors who bought early in the Settlement Class Period and recognizes the relative strength of those who bought later in the Settlement Class Period. The proposed allocation also acknowledges the significant risk of the dismissal of the final January 14, 2020, disclosure event. Berman Decl. at ¶ 10; *see, e.g.*, *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, at *21 (S.D.N.Y. Nov. 8, 2010) (approving allocation plan granting larger portion of settlement proceeds to investors who bought during time periods with stronger claims); *In re Veeco Instr. Inc. Sec. Litig.*, 2007 WL 4115809, at *13 (S.D.N.Y. Nov. 7, 2007) (same); *see*

*also In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 429 (S.D.N.Y. 2001) ("Allocation formulas, including certain discounts for certain securities, are recognized as an appropriate means to reflect the comparative strengths and values of different categories of the claim.").

As noted above, 89,110 copies of the Settlement Notice Packet, which contains the Plan of Allocation and advises Class Members of their right to object to it, have been sent to potential Settlement Class Members and their nominees. *See* Berman Decl. at ¶ 70; ¶ 7, Ex. 3 to Berman Decl. To date, no objections to the proposed Plan of Allocation have been received. Berman Decl. ¶ 73; ¶¶ 13-14, Ex. 3 to Berman Decl.

Accordingly, the proposed Plan of Allocation is designed to fairly and rationally allocate the proceeds of the Settlement among the Settlement Class Members. Notably, no Settlement Class Member has objected to this straightforward Plan of Allocation to date. Accordingly, Plaintiffs respectfully request that this Court approve the Plan of Allocation.

### III.    NOTICE TO THE CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS

The Notice provided to the Settlement Class satisfied the requirements of Rule 23(c)(2)(B), which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *City of Providence*, 2014 WL 1883494, at *2. The Notice also satisfied Rule 23(e)(1), which requires that notice must be provided in a "reasonable manner"—i.e., it must "'fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings.'" *Melito v. Am. Eagle Outfitters, Inc.*, 2017 WL 3995619, at *15 (S.D.N.Y. Sept. 11, 2017) (citation omitted); *Wal-Mart*, 396 F.3d at 114 (quoting *Weinberger*, 698 F.2d at 70).

Both the substance of the Notice and the method of its dissemination to potential members of the Class satisfied these standards. The Court-approved Notice includes all the information required by Federal Rule of Civil Procedure 23(c)(2)(B) and the PSLRA, 15 U.S.C. § 78u-4(a)(7), including: (i) an explanation of the nature of the Action and the claims asserted; (ii) the definition of the Class; (iii) the amount of the Settlement; (iv) a description of the Plan of Allocation; (v) an explanation of the reasons why the Parties are proposing the Settlement; (vi) a statement indicating the attorneys' fees and costs that will be sought; (vii) a description of Class Members' right to opt out of the Class or to object to the Settlement, the Plan of Allocation or the requested attorneys' fees or expenses; and (viii) notice of the binding effect of a judgment on Class Members. Berman Decl. at ¶¶ 48-53, 67-74.

Pursuant to the Preliminary Approval Order, SCS began mailing copies of the Settlement Notice Packet to potential Class Members and their nominees. ¶ 3, Ex. 3 to Berman Decl. A total of 89,110 Settlement Notice Packets were mailed. ¶ 7, Ex. 3 to Berman Decl. SCS also caused the Summary Notice to be published in *GlobeNewswire* and in the *Investor's Business Daily* on May 16, 2022 (ECF No. 209). ¶ 10, Ex. 3 to Berman Decl. Copies of the Notice, Claim Form, Stipulation, and Complaint were made available on the Settlement website maintained by SCS. ¶ 12, Ex. 3 to Berman Decl. This combination of individual mail to all Class Members who could be identified with reasonable effort, supplemented by notice in an appropriate, widely circulated publication, transmitted over the newswire, and set forth on internet websites, was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 182-83 (S.D.N.Y. 2014).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court approve the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate.

DATED: July 21, 2022                    Respectfully submitted,

                                        HAGENS BERMAN SOBOL SHAPIRO LLP

                                        By:  */s/ Steve W. Berman*
                                             STEVE W. BERMAN

                                        Steve W. Berman (admitted *Pro Hac Vice*)
                                        Jerrod C. Patterson (admitted *Pro Hac Vice*)
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        1301 Second Avenue, Suite 2000
                                        Seattle, WA 98101
                                        Telephone: (206) 623-7292
                                        Facsimile: (206) 623-0594
                                        steve@hbsslaw.com
                                        jerrodp@hbsslaw.com

                                        Lucas E. Gilmore (admitted *Pro Hac Vice*)
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        715 Hearst Avenue, Suite 202
                                        Berkeley, CA 94710
                                        Telephone: (510) 725-3000
                                        Facsimile: (510) 725-3001
                                        lucasg@hbsslaw.com

                                        *Counsel for Lead Plaintiff David Cohn and*
                                        *Additional Representative Plaintiff Chad L. Moshell*

- 23 -