UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHAD LINDSEY MOSHELL, Individually and On Behalf of All Others Similarly Situated,<br><br>             Plaintiff,<br><br>v.<br><br>SASOL LIMITED, DAVID EDWARD CONSTABLE, BONGANI NQWABABA, STEPHEN CORNELL, PAUL VICTOR, and STEPHAN SCHOEMAN,<br><br>             Defendants. | Case No. 1:20-cv-01008-JPC<br><br>CLASS ACTION<br><br>**DECLARATION OF STEVE W. BERMAN IN SUPPORT OF (I) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND COMPENSATORY AWARDS TO PLAINTIFFS** |

010886-11/1967170 V1

I, Steve W. Berman, declare, under penalty of perjury pursuant to 28 U.S.C. §1746, as follows:

## I. INTRODUCTION

1. I am the Managing Partner of Hagens Berman Sobol Shapiro LLP ("Hagens Berman"), which represents the Court-appointed Lead Plaintiff David Cohn ("Mr. Cohn") and Additional Plaintiff Representative Chad L. Moshell ("Mr. Moshell") in this action (collectively, "Plaintiffs"), and which the Court appointed as Lead Counsel by Order dated May 4, 2020. ECF No. 52. I am licensed to practice law in Illinois and Washington, and I am admitted *pro hac vice* in this action.

2. I have personal knowledge of the facts set forth herein based on my active supervision and participation in the prosecution and settlement of the above-captioned action (the "Action") and, if called to testify, could and would testify competently thereto.

3. I respectfully submit this Declaration in support of Plaintiffs' motion, under Rule 23(e)(2) of the Federal Rules of Civil Procedure, for final approval of the proposed settlement of the Action with Defendants Sasol Limited ("Sasol" or the "Company"), David Edward Constable ("Constable"), Bongani Nqwababa ("Nqwababa"), Stephen Cornell ("Cornell"), Paul Victor ("Victor"), and Stephan Schoeman ("Schoeman") (collectively, the "Individual Defendants" and, together with Sasol, "Defendants") for $24,000,000 in cash (the "Settlement").

4. I also respectfully submit this Declaration in support of: (i) Plaintiffs' motion for approval of the proposed plan for allocating the proceeds of the Net Settlement Fund to eligible Settlement Class Members (the "Plan of Allocation"); and (ii) Lead Counsel's motion for an award of attorneys' fees in the amount of 22% of the Settlement Amount, net of expenses; payment of litigation expenses incurred by Lead Counsel in the total amount of $431,703.42, and payment of $20,000 to Mr. Cohn and $15,000 to Mr. Moshell ($35,000 in total to Plaintiffs) for reimbursement

010886-11/1967170 V1

of their reasonable costs and expenses directly associated with their representation of the Settlement Class.

5. In support of these motions, Plaintiffs and Lead Counsel are also submitting: (i) the exhibits attached hereto; (ii) the Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation (the "Settlement Memorandum"); (iii) the Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Compensatory Awards to Plaintiffs (the "Fee Memorandum").

6. The proposed Settlement provides for the resolution of all claims in the Action in exchange for a cash payment of $24 million for the benefit of the Settlement Class. This beneficial Settlement was achieved as a direct result of Plaintiffs' and Lead Counsel's efforts to diligently investigate, prosecute, and negotiate a resolution of the Action against highly skilled opposing counsel under complex circumstances. As discussed in more detail below, Lead Counsel's efforts in the Action included, among other things:

 (a) Performing a comprehensive investigation that involved, among other things, a review of publicly available information regarding Sasol, interviews of confidential witnesses, and conferring with consultants;

 (b) Drafting and filing detailed amended complaints (including the operative and detailed 115-page operative Second Amended Class Action Complaint for Violations of the Federal Securities Laws), which incorporated material from conference call transcripts, press releases, news articles, and other public statements issued by or concerning Defendants; financial analyst research reports concerning the Company and reports and other documents filed publicly by Sasol with the U.S. Securities and Exchange Commission

("SEC"); Sasol's corporate website; interviews with several confidential witnesses; and other publicly available information;

(c)     Successfully opposing (in significant part) Defendants' motion to dismiss the Amended Complaint by researching and drafting a substantial opposition brief responding to Defendants' arguments (*see* ECF Nos. 65-69, 74);

(d)     Preparing and filing Lead Plaintiff's motion for class certification (ECF Nos. 82-84), which included extensive briefing and working with an expert to prepare a report on market efficiency and the availability of class-wide damages methodologies, defending the depositions of Plaintiffs and expert, seeking and moving to compel class certification discovery, reviewing materials produced by Defendants in connection with class certification, and preparing a reply in support of the class certification motion;

(d)     Successfully opposing Defendants' motion for reconsideration and for sanctions, including producing and reviewing documents produced in connection with the motion and taking or participating in the depositions of six confidential witnesses;

(e)     Engaging in full briefing on Defendants' petition, pursuant to Rule 23(f) of the Federal Rules of Civil Procedure (the "Rule 23(f) Petition"), for leave to appeal the Court's Order denying Defendants' motion for reconsideration and for sanctions to the United States Court of Appeals for the Second Circuit;

- 3 -

(f)   Engaging in significant fact discovery, including collecting and producing documents from Plaintiffs and reviewing and analyzing over 700,000 pages of documents produced by Defendants;

(g)   Consulting with experts regarding market efficiency, loss causation, damages and industry standards and practices for use of confidential witnesses in securities class action litigation and establishing budgets and schedules for the end of job construction on large energy projects;

(f)   Engaging in intensive, arm's-length negotiations with Defendants, including the submission of detailed mediation statements concerning liability and damages, and participating in two full-day mediation sessions before the the Honorable Daniel Weinstein (Ret.) and Ambassador David Carden, which ultimately culminated in the mediator's recommendation to settle the Action for $24 million in cash, which the parties accepted; and

(h)   Drafting and negotiating the Settlement Stipulation and related settlement documentation.

7.   The proposed Settlement represents an outstanding result for the Class, considering the significant risks in the Action and the amount of the potential recovery. The Settlement provides a considerable benefit to the Class by conferring a substantial, certain, and immediate recovery while avoiding the significant risks and expense of continued litigation, including the risk that the Class could recover nothing or substantially less than the Settlement Amount after years of additional, costly litigation and delay. As discussed in more detail below, if this case continued to be litigated, there is no guarantee that Lead Plaintiff would have been able to establish Defendants' liability, either in full or in part, with respect to Defendants' alleged misstatements

- 4 -

relating to costs associated with the construction of a complex in Lake Charles, Louisiana, known as the Lake Charles Chemicals Project ("LCCP"), which presented unique issues both on the merits and on class certification.

8.      The close attention paid and oversight provided by Plaintiffs throughout this case is another factor in favor of the reasonableness of the Settlement. Here, Plaintiffs, two sophisticated retail investors, were actively involved in overseeing the litigation and settlement negotiations and have endorsed the Settlement as fair and reasonable. *See* Declaration of David Cohn in Support of (i) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (ii) Lead Counsel's Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Compensatory Awards to Plaintiffs ("Cohn Declaration"), attached as exhibit as **Exhibit 1**, at ¶¶ 5-9; Declaration of Chad Lindsey Moshell in Support of (i) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (ii) Lead Counsel's Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Compensatory Awards to Plaintiffs ("Moshell Declaration"), attached as **Exhibit 2**, at ¶¶ 6-10.

9.      Plaintiffs and Lead Counsel believe that the Settlement is in the best interests of the Class. Due to their substantial efforts, Plaintiffs and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and they believe that the Settlement represents a highly favorable outcome for the Class.

10.      In addition to seeking final approval of the Settlement, Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable. The Plan of Allocation, which was developed in consultation with Plaintiffs' damages consultant, provides for the distribution of the Net Settlement Fund on a *pro rata* basis to Settlement Class Members who submit Claim Forms. Each Claimant's share of the Net Settlement Fund will be calculated based on the individual

010886-11/1967170 V1

Settlement Class Member's losses attributable to the alleged misstatements and omissions, taking into account the different types of claims possessed by different Settlement Class Members and their relative strength. Based on the nature of the claims and defenses, evidence uncovered, and the Parties' mediation presentations, Plaintiffs propose allocating the Net Settlement Fund to five purchasing time frames within the Settlement Class Period as follows:

| Proposed Allocation of Settlement Proceeds | | | | |
|---|---|---|---|---|
| Mar. 10, 2015 to Sept. 6, 2015 | Sept. 7, 2015 to June 5, 2016 | June 6, 2016 to Feb. 26, 2017 | Feb. 27, 2017 to Aug. 15, 2019 | Aug. 16, 2019 to Jan. 13, 2020 |
| (4%) | (23%) | (25%) | (44%) | (4%) |

11.    In particular, the proposed allocation of settlement proceeds accounts for the reduced likelihood of success of the claims for investors who bought early in the Settlement Class Period and recognizes the relative strength of those who bought later in the Settlement Class Period. The proposed allocation also acknowledges the significant risk of the dismissal of the final January 14, 2020 disclosure event.

12.    Lead Counsel worked diligently and efficiently to achieve the proposed Settlement in the face of significant risks. Lead Counsel prosecuted this case on a fully contingent basis, incurred significant litigation expenses, and bore all the risk of an unfavorable result. For their efforts in prosecuting the case and negotiating the Settlement, Lead Counsel is applying for an award of attorneys' fees in the amount of 22% of the Settlement Amount. As discussed in the Fee Memorandum, the 22% fee request is within the range of fees that courts in this Circuit and elsewhere have awarded in securities class actions with comparable recoveries. The 22% fee request is based on an agreement entered into with Lead Plaintiff at the outset of the litigation, which was previously reviewed by the Court and considered in appointing Mr. Cohn as Lead

010886-11/1967170 V1

Plaintiff and Hagens Berman as Lead Counsel. *See* ECF No. 52 at 8 (the Court conducted an *in camera* review of Hagens Berman's retainer agreement with Mr. Cohn). The 22% fee request is well within the range of fees that courts in this Circuit and elsewhere have awarded in securities and other complex class actions with comparable recoveries on a percentage basis. Moreover, the requested fee represents a multiplier of approximately 1.4 on Lead Counsel's total lodestar, which is on the lower end of the range of multipliers typically awarded in class actions with significant contingency risks such as this one, and thus, the lodestar cross-check also supports the reasonableness of the fee.

13.     Lead Counsel also seeks payment of litigation expenses incurred by Lead Counsel in connection with the institution, prosecution, and settlement of the Action totaling $431,703.42, plus reimbursement of $35,000 to Plaintiffs ($20,000 for Mr. Cohn and $15,000 for Mr. Moshell) for their reasonable costs and expenses directly related to their representation of the Settlement Class, as authorized by the PSLRA.

14.     For all the reasons discussed in this Declaration and in the accompanying supporting memoranda and declarations, Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are fair, reasonable, and adequate in all respects, and that the Court should approve them under Federal Rule of Civil Procedure 23(e)(2). For similar reasons, and for the additional reasons discussed below, I respectfully submit that Lead Counsel's fee request and Plaintiffs' award request is also fair and reasonable and should be approved.

## II.     PROSECUTION OF THE ACTION

### A.     Background

15.     Sasol is organized under the laws of the Republic of South Africa, with principal executive offices located at Sasol Place, 50 Katherine Street, Sandton, 2196, South Africa. Sasol's American Depository Receipts ("ADRs") are listed and trade on the New York Stock Exchange

- 7 -

("NYSE") under the ticker symbol "SSL." Because Sasol ADRs are sponsored Level II ADR, Sasol must comply with the Securities and Exchange Commission's ("SEC") full registration and reporting requirements.

16.     The operative Second Amended Complaint alleges that Defendants misled investors by misrepresenting and failing to disclose that: (1) Sasol conducted insufficient due diligence into, and did not account for multiple issues with, Sasol's Lake Charles chemical plant ("LCCP"), as well as its true cost; (2) construction and operation of the LCCP was plagued by control weaknesses, delays, rising costs, and technical issues; and (3) Sasol's top-level management exacerbated these issues by engaging in improper and unethical behavior concerning financial reporting for, and oversight of, the LCCP.

17.     On May 22, 2019, investors began to learn the truth of Sasol's operations when Sasol raised the LCCP project's cost estimate by $1 billion and disclosed an internal review into the project's costs and construction schedule. The company admitted to weaknesses in the project's integrated controls, as well as significant additional concerns related to the project's forecasting process.

18.     On October 27, 2019, Sasol terminated its co-CEOs following an internal probe showing that the LCCP project management team acted inappropriately, lacked experience, and was overly focused on maintaining cost and schedule estimates instead of providing accurate information.

19.     On January 13, 2020, Sasol disclosed an explosion and fire at its LCCP project's low-density polyethylene unit, requiring the Company to shut down the unit.

20.     Following these revelations, the price of Sasol ADSs declined sharply.

- 8 -

010886-11/1967170 V1

**B.      Initiation of the Action and Appointment of Lead Plaintiff and Lead Counsel**

21.      On February 2, 2020, Additional Representative Plaintiff Chad Lindsey Moshell commenced the Action by filing a putative securities class action against Sasol and various of its current and former executives in the United States District Court for the Southern District of New York (the "Court"), on behalf of himself and all other persons or entities who purchased or otherwise acquired ADRs of Sasol during the period from March 10, 2015, to January 13, 2020, inclusive (the "Settlement Class Period"), alleging violations of the federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

22.      On May 4, 2020, the Court entered an Order appointing David Cohn as Lead Plaintiff and approving his selection of Hagens Berman Sobol Shapiro LLP as lead counsel ("Lead Counsel") (ECF No. 52).

**C.      Lead Plaintiff's Investigation and Preparation of the Amended Complaint**

23.      Following the appointment of Mr. Cohn as Lead Plaintiff, Lead Counsel launched a comprehensive investigation of the alleged fraud in order to prepare the detailed Amended Complaint. In preparing the Amended Complaint, Lead Counsel conducted a comprehensive factual investigation, hired an outside investigation firm, interviewed confidential witnesses, reviewed voluminous publicly available information that Sasol provided its investors, and conducted detailed analysis of the potential claims that could be asserted on behalf of investors in Sasol ADRs related to the alleged fraud.

24.      On June 4, 2020, Lead Plaintiff filed a detailed 115-page Amended Class Action Complaint (the "Amended Complaint") for violations of the federal securities laws based on alleged misstatements by defendants Sasol, Constable, Nqwababa, Cornell, Victor, Fleetwood

010886-11/1967170 V1

Grobler ("Grobler"), and Schoeman concerning the projected cost and schedule of Sasol's Lake Charles Chemicals Project ("LCCP") in Lake Charles, Louisiana, and concerning Sasol's internal controls (ECF No. 59).

### D.   Defendants' Motion to Dismiss the Amended Complaint

25.    On July 2, 2020, Defendants moved to dismiss the Amended Complaint (ECF No. 66), and the motion was fully briefed on August 10, 2020 (ECF No. 69).

26.    On August 24, 2020, the Court partially granted and partially denied the motion to dismiss. The Court granted the motion to dismiss as to the internal controls claims but denied the motion to dismiss concerning the projected LCCP cost and schedule claims, and granted the motion as to Mr. Grobler but denied the motion to dismiss as to defendants Sasol, Constable, Nqwababa, Cornell, Victor, and Schoeman (ECF No. 74).

### E.   Discovery and the Second Amended Complaint

27.    Thereafter, Lead Counsel immediately set out to vigorously prosecute the case.

28.    On August 28, 2020, the Court adopted the parties' proposed case schedule. While negotiating the case schedule, the parties also negotiated a Protective Order and an ESI Protocol that would govern the case, which the Court entered (ECF Nos. 75-80).

29.    Discovery commenced in late August 2020. Lead Plaintiff and Defendants served initial disclosures, served and responded to requests for production of documents, and began document production.

30.    On September 11, 2020, Lead Plaintiff filed a detailed 115-page Second Amended Class Action Complaint (the "Second Amended Complaint"), adding Chad Lindsey Moshell as Additional Plaintiff Representative to provide the Class with more robust representation and

removing certain allegations related to certain dismissed claims and all claims against Defendant Grobler (ECF No. 81).

31.    On September 30, 2020, the Action was reassigned from the Honorable Jed. S. Rakoff to the Honorable John P. Cronan.

**F.    Motion for Class Certification, Motion for Reconsideration, Discovery Stay, and Interlocutory Appeal**

32.    On October 2, 2020, Plaintiffs moved for Class Certification, Appointment of Class Representatives and Appointment of Class Counsel (the "Motion for Class Certification") (ECF No. 83), which included, among other things, a report from market efficiency expert Michael L. Hartzmark, Ph.D.

33.    On October 16, 2020, Defendants filed and served their Answer to the Second Amended Complaint (ECF No. 93).

34.    On October 30, 2020, Defendants filed a Motion for Reconsideration of the Court's August 24, 2020 Memorandum and Order; Motion for Sanctions; and Motion for Stay of Discovery (the "Motion for Reconsideration") (ECF No. 104), alleging that certain statements attributed to certain Confidential Witnesses ("CWs") in the Second Amended Complaint were false and made without those CWs' consent or knowledge.

35.    On November 10, 2020, after holding a conference, the Court stayed all discovery and deadlines for class certification pending resolution of the Motion for Reconsideration (ECF No. 104) and ordered limited discovery concerning the six CWs identified in the Second Amended Complaint.

36.    On December 15, 2020, after the parties completed the limited scope discovery, which included an exchange of documents and the depositions of the six CWs, Defendants filed a Supplemental Memorandum of Law and Report of Investigation in Support of Defendants' Motion

010886-11/1967170 V1

for Reconsideration (ECF No. 116). Plaintiffs opposed Defendants' Motion on January 19, 2021 (ECF No. 127). Plaintiffs' opposition papers included a declaration from the private investigator Lead Counsel retained in this matter and who interviewed the CWs (ECF No. 143-1), together with a declaration from law Professor Michael J. Kaufman, a leading authority on confidential witness interview practices. ECF No. 143-2. Defendants filed their reply on February 9, 2021 (ECF No. 137).

37.    On July 7, 2021, the Court issued an Opinion and Order denying Defendants' Motion for Reconsideration and lifting the discovery stay (ECF No. 155).

38.    On July 16, 2021, Defendants filed a Motion to Certify the Court's July 7, 2021, Opinion and Order for Interlocutory Appeal and to Stay Further Proceedings Pending Appeal ("Motion to Certify for Interlocutory Appeal") (ECF No. 151). The Motion to Certify for Interlocutory Appeal was fully briefed as of August 9, 2021 (ECF No. 159).

39.    On August 9, 2021, the Parties filed a Revised [Proposed] Scheduling Order (ECF No. 160), which the Court ordered on September 7, 2021 (ECF No. 162).

40.    The Parties re-started discovery in August 2021. In the months that followed, Defendants produced hundreds of thousands of documents.

41.    Defendants' document productions were the product of numerous meet-and-confers and extensive negotiations that Lead Counsel engaged in with Defendants' Counsel over the scope and adequacy of Defendants' discovery responses, including relating to search terms to be used, custodians whose documents should be searched, applicable timeframes, and other parameters.

42.    In total, Lead Counsel obtained and reviewed over 730,000 pages of documents from Defendants. As Lead Counsel received documents, it reviewed and analyzed those

010886-11/1967170 V1

documents through regular team meetings, running targeted searches aimed at locating the most relevant documents, analyzing the document trail on several key issues and creating timelines of events germane to the case.

43.     On September 24, 2021, after deposing both Plaintiffs and Dr. Hartzmark, Defendants filed their opposition to Plaintiffs' Motion for Class Certification (ECF No. 169).

44.     On December 10, 2021, after filing letter motions to compel Defendants' compliance with Plaintiffs' Class Certification Discovery Requests (ECF Nos. 173, 180) and receiving Defendants' production of responsive materials, Plaintiffs filed their reply in support of class certification. (ECF No. 192).

### G.    Mediation and Settlement

45.     On February 16 and 17, 2022, the Parties engaged in a confidential mediation in California before the Honorable Daniel Weinstein (Ret.) and Ambassador David Carden (the "Mediators"), two highly experienced third-party neutrals. Prior to the mediation, the Parties exchanged detailed mediation statements on February 8, 2022, addressing liability and damages issues with numerous exhibits. During the two-day mediation session, counsel made extensive presentations relating to liability and damages. After substantial negotiation throughout the mediation process, the Parties reached an agreement in principle to settle the Action on February 17, 2022, based on a recommendation by the Mediators. Thereafter, the Parties worked diligently to negotiate the full settlement terms, which are set forth in the Stipulation.

### H.    Preliminary Approval of Settlement and Preliminary Certification of the Class

46.     On April 5, 2022, Plaintiffs filed their Unopposed Motion for Preliminary Approval of Proposed Class Action Settlement (ECF Nos. 201-203), which requested that the Court (i) grant preliminary approval of the proposed Settlement; (ii) preliminarily certify, for settlement purposes

- 13 -

only, the proposed Settlement Class; (iii) approve the Parties' proposed form and method of giving notice to the proposed Settlement Class; and (iv) set a date for the Final Approval Hearing and deadlines for mailing and publication of the Notice, the filing of Settlement Class Member objections, the filing of Settlement Class Member opt-out notices, the filing of Plaintiffs' motion for final approval, and the filing of Lead Counsel's motion for attorneys' fees, litigation expenses, and Plaintiffs' awards.

47.     On April 19, 2022, the Court entered its Order Granting Lead Plaintiff's Motion for Preliminary Approval of Class Action Settlement (ECF No. 204). The Court preliminarily certified the Settlement Class for purposes of the Settlement only, appointed Lead Plaintiff as the Class Representative for the Settlement Class, and appointed Lead Counsel as Lead Counsel for the Settlement Class. The Court set the Final Approval Hearing for August 18, 2022.

## I.      Notice to the Settlement Class

48.     Pursuant to the Court's April 19, 2022, Preliminary Approval Order, the Claims Administrator, Strategic Claims Services ("SCS"), printed and mailed the Notice of Pendency and Proposed Settlement of Class Action and Proof of Claim and Release Form to potential members of the Settlement Class. *See* Declaration of Margery Craig Concerning: (a) Mailing of the Notice and Claim Form; (b) Publication of the Summary Notice; and (c) Report on Requests for Exclusion and Objections ("Craig Declaration") attached as **Exhibit 3**, at ¶ 3. Pursuant to the Preliminary Approval Order, SCS also caused the Summary Notice of Pendency and Proposed Class Action Settlement ("Summary Notice") to be published in *Investor's Business Daily* and transmitted over *GlobeNewswire* on May 16, 2022. *Id.* at ¶ 10.

49.     The Notice informs potential Settlement Class Members about the material terms of the Settlement, attorneys' fees sought, litigation expenses sought, and the award to Plaintiffs

- 14 -

sought. The Notice also informs potential Settlement Class Members that written requests for exclusion from the Settlement are to be mailed to SCS such that they are received no later than July 28, 2022. SCS has been monitoring all mail received for this case. *Id.* at ¶ 13. Further, according to the Notice, Settlement Class Members seeking to object to the Settlement, any part of the Settlement, and/or Lead Counsel's motion for attorneys' fees and expenses and application for an Award to Lead Plaintiff are required to submit their objection in writing such that the objection is received by Counsel for Lead Plaintiff and Counsel for Defendant, as well as filed with the Clerk of the Court, no later than July 28, 2022. *Id.* at ¶ 14.

50.    In total, as of the date of this declaration, 89,110 copies of the Notice and Proof of Claim have been mailed or emailed to potential Settlement Class Members and nominees. *Id.* at ¶ 7. Out of the 78,209 Notice and Proof of Claims mailed (and not emailed), 3,271 were returned as undeliverable. Of the 3,271 returned, 213 were returned with a forwarding address provided by United States Postal Service, and SCS immediately remailed another Notice and Proof of Claim. A skip trace address search was run using Experian for the remaining 3,058 returned Notice and Proof of Claim to obtain updated addresses. SCS obtained 977 updated addresses from the skip trace efforts and mailed out another Notice and Proof of Claim to the updated addresses. *Id.* at ¶ 8.

51.    On April 27, 2022, SCS also sent the Depository Trust Company ("DTC") a Notice and Proof of Claim to publish on its Legal Notice System ("LENS"). LENS provides DTC participants the ability to search and download legal notices as well as receive e-mail alerts based on particular notices or particular CUSIPs once a legal notice is posted. *Id.* at ¶ 9.

52.    On April 26, 2022, SCS's website was updated to include a specific webpage for this Settlement (www.strategicclaims.net/sasol/). The webpage contains the current status of the case, important Settlement-related deadlines, downloadable copies of the Notice and Proof of

- 15 -

Claim, the Preliminary Approval Order, and the Stipulation as well as an online claim filing link. *Id.* at ¶ 12.

53.     SCS maintains a toll-free telephone number (1-866-274-4004) for Settlement Class Members to call and obtain information about the Settlement. SCS has promptly responded to each telephone inquiry received and will continue to address Settlement Class Member inquiries. *Id.* at ¶ 11.

### III.    RISKS OF CONTINUED LITIGATION

54.     Plaintiffs faced numerous risks and uncertainties at the time of Settlement. Plaintiffs and Lead Counsel recognize the expense and length of litigation through trial and appeals, as well as the very substantial risks they would face in establishing liability and damages.

### A.    Risks to Establishing Liability

55.     Plaintiffs faced significant risks that, at either the summary judgment stage or after a trial, Defendants would prevail in demonstrating that the alleged false and misleading statements concerning the projected cost and schedule for the LCCP are barred by the PSLRA's Safe Harbor Provision. As the Court already ruled, all of "defendants' LCCP cost and schedule estimates do constitute, contrary to plaintiff's argument, forward-looking statements as defined by the PSLRA" (ECF No. 74, Memorandum Order, dated Aug. 24, 2020, at 8-9). Framed in the disjunctive, the Safe Harbor Provision applies if a forward-looking statement is "identified and accompanied by meaningful cautionary language or is immaterial or the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010). Defendants argued that two separate prongs of the Safe Harbor Provision independently dispose of Plaintiffs' Section 10(b) claim.

56.     First, Defendants contended that each of the challenged disclosures was accompanied by meaningful cautionary language. Although the Court rejected Defendants'

- 16 -

arguments as to the sufficiency of the cautionary language at the motion to dismiss stage, the Court did so by relying on Plaintiffs' theory that the cautionary language was "misleading in light of historical fact." Defendants argued that the evidentiary record would not conclusively show that Sasol had internally determined that the LCCP cost and schedule projections would be higher than what was publicly disclosed.

57.     Second, Defendants argued that Sasol's statements were separately protected under the Safe Harbor Provision because Plaintiffs could not prove that Defendants had "actual knowledge" that the LCCP projections were contemporaneously false when made—which this Court and others have recognized constitutes a more demanding mental element of a person's intention than the traditional scienter element. ECF No. 74, Memorandum Order, dated Aug. 24, 2020, at 13; *see also In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at \*10 (S.D.N.Y. Apr. 1, 2015) (finding that, while internal company reports suggesting that project would not be complete within publicly disclosed cost and time frame "plausibly allege[d] recklessness," "they do not support a strong inference that the estimates were announced with actual knowledge of their falsity"). Defendants argued that the evidentiary record would demonstrate that the persons who made the challenged statements—Constable, Cornell, Nqwababa, and Victor—genuinely believed the projections were accurate. If Defendants prevailed on either of those arguments, virtually the entirety of the alleged misstatements would be dismissed, and Plaintiffs may have been prevented from obtaining any recovery for investors in this Action.

58.     Plaintiffs also faced the risk of not proving the element of scienter. Defendants argued that there was no "motive and opportunity" evidence suggesting that anyone benefited economically from the alleged fraud. Likewise, Defendants argued that even assuming *arguendo*, that a theory of recklessness could establish scienter in this action, the evidentiary record

- 17 -

foreclosed Plaintiffs' ability to prove it. If Defendants prevailed on their scienter arguments, Plaintiffs' claims would have been dismissed, resulting in no recovery.

59.     Plaintiffs also faced the risk of not proving the essential element of loss causation. For instance, in opposing class certification, Defendants argued that the Court should end the Class Period on August 16, 2019, contending that the final alleged disclosure event occurring on January 14, 2020, when Sasol revealed that the Company had "experienced an explosion and fire at its LCCP low-density polyethylene (LDPE) unit" on January 13, 2020, did not "correct" their alleged misstatements. Defendants' Opp. to Class Cert. at 22-24 (ECF No. 169). If Defendants prevailed on this loss-causation argument, recoverable damages would have declined significantly.

60.     For all these reasons, I believe that Plaintiffs faced significant risks in establishing liability and the Settlement is favorable in light of those risks.

## B.     Risks to Establishing Damages

61.     Plaintiffs also faced substantial risks of offering an admissible damages theory and calculating class-wide damages. In particular, Defendants would likely argue that since the nature and value of misrepresented and omitted material facts during the Class Period purportedly changed during the Class Period (i.e., the size in the deviation between Sasol's internal projections of the cost and schedule of the LCCP versus Defendants' public statements), the standard constant dollar methodology—which assumes that the amount of artificial stock inflation dissipated on each corrective disclosure was present in the stock price going back to the beginning of the Class Period —would not be appropriate here. According to Defendants, Plaintiffs would therefore have to "scale" the artificial inflation for each day over the Class Period, which Defendants would likely aver Plaintiffs could not do through a reliable methodology supported by the evidence. Defendants would also likely argue that on the dates for many of the corrective disclosures for which Plaintiffs

010886-11/1967170 V1

claimed damages, Sasol also released non-fraudulent, company-specific information adversely affecting Sasol's ADR prices, which losses in turn would need to be "parsed" from investors' recoverable damages. If Defendants prevailed on these "scaling" and "parsing" arguments, then recoverable damages would have declined significantly.

*    *    *    *    *

62.    Based on all the above, Plaintiffs and Lead Counsel respectfully submit that it was in the best interest of the Settlement Class to accept the immediate and substantial benefit conferred by the $24 million Settlement instead of incurring the significant risk that the Settlement Class would recover a lesser amount, or nothing at all, through further litigation.

## IV.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE IN LIGHT OF THE POTENTIAL RECOVERY IN THE ACTION

63.    On all of the above issues, Plaintiffs would have to prevail at several stages—on a motion for class certification, on a motion for summary judgment, and at trial; and if they prevailed on those, on the appeals that would likely follow—which would have taken years. At each stage, there were very significant risks attendant to the continued prosecution of the Action, as well as considerable expense and delay. The Settlement is desirable because it will provide a prompt and certain benefit to the Class rather than the mere possibility of a recovery after additional years of costly litigation and appeals.

64.    The Settlement is also reasonable when considered in relation to the range of potential recoveries that might be recovered if Plaintiffs prevailed at trial, which was far from certain for the reasons noted above. Lead Plaintiff's damages expert estimated that maximum damages for the entirety of the Class Period and attributable to the six alleged fraud-related disclosure dates ranged from $158.6 million to $202.5 million. Accordingly, the $24 million that will be available for claimants represents approximately 12% to 15% of the maximum recoverable

- 19 -

damages. However, this "best case" scenario does not disaggregate any non-fraud related causes of downward stock movement on the six alleged corrective disclosure dates and assumes a constant dollar inflation throughout the entirety of the Class Period. This calculation also does not net gains on pre-class period purchases accrued during the class period, which Defendants argued should be removed.[1]

65.    Lead Plaintiff's expert also considered other scenarios based on the factual record, Defendants' arguments, and risks related thereto. For instance, Defendants argued vehemently that that there could be no liability for alleged misstatements before June 6, 2016, when construction at the LCCP was in the early stages. Defendants further contended that Plaintiffs faced significant risk for establishing liability on alleged misstatements before March 19, 2018, only after which the Company released a series of large cost increases and schedule delays over a short period of time. Similarly, as noted above, Defendants aggressively challenged loss causation with respect to the January 14, 2020 disclosure. If Defendants were successful at convincing the Court at class certification or summary judgment, or a jury at trial, that there was no liability for certain earlier time periods or no loss causation for certain alleged corrective disclosures, then the Class Period would effectively be shortened, significantly reducing recoverable damages. The below table provides a range of possible outcomes and percentages of recovery, assuming various permutations of liability over various potential Class Periods and without netting for alleged gains:

---

[1] Assuming that gains on pre-class period purchases accrued during the class period are removed or "netted," Plaintiffs' expert estimated maximum damages for the entirety of the Class Period and attributable to the six alleged fraud-related disclosure dates was approximately $116 million. Accordingly, the $24 million settlement equates to more than 20% of the recoverable damages.

| Class Period | Maximum Damages | Percentage of Recovery ($24 million settlement) |
|---|---|---|
| 06/06/2016 – 01/13/2020 | $86.9M – 109.8M | 22% – 28% |
| 06/06/2016 – 08/15/2019 | 69.8M – $87.3M | 29% – 34% |
| 03/19/2018 – 01/13/2020 | $55.1M – 63.9M | 38% – 44% |
| 03/19/2018 – 08/15/2019 | $42.2M – $49.1M | 49% – 57% |

These percentages of recovery are well-above the range of settlements that have received approval within this District. *See, e.g.*, *In re Patriot Nat'l, Inc. Sec. Litig.*, 828 F. App'x 760, 762 (2d Cir. 2020) (affirming district court's approval of settlement representing 6.1% of the maximum potentially recoverable damages); *Vaccaro v. New Source Energy Partners L.P.*, 2017 WL 6398636, at *6 (S.D.N.Y. Dec. 14, 2017) (approving settlement representing 6.5% of the maximum recoverable damages and noting that the settlement amount is "in line with other settlements in securities class actions"); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 246 F.R.D. 156, 167 (S.D.N.Y. 2007) (approving settlement that was "between approximately 3% and 7% of estimated damages"). Accordingly, I believe that the recovery obtained here would be a good recovery as compared to the average securities action.

66.    For all these reasons, Plaintiffs and Lead Counsel respectfully submit that the Settlement is fair, reasonable, and adequate, and that it is in the best interests of the Settlement Class to accept the immediate and substantial benefit conferred by the Settlement. In the absence of the Settlement, there is a significant risk that the Settlement Class might recover a lesser amount, or nothing at all, after additional protracted and arduous litigation, particularly in light of Defendants' damages arguments.

010886-11/1967170 V1

## V.    ISSUANCE OF NOTICE OF THE SETTLEMENT TO THE SETTLEMENT CLASS AND THE REACTION OF THE SETTLEMENT CLASS TO DATE

67.    The Court's Preliminary Approval Order directed that notice of the Settlement be provided to the Settlement Class, including mailing of the Notice and notice of, among other things: (i) the proposed Settlement, including providing copies of the Stipulation; (ii) the Final Approval Hearing; (iii) publication of the Summary Notice; (iv) the Proof of Claim Form; (v) the amount of attorneys' fees and reimbursement of expenses requested by Lead Counsel; and (vi) the awards sought by Plaintiffs.

68.    Pursuant to the Preliminary Approval Order, Lead Counsel instructed the Claims Administrator, Strategic Claims Services ("SCS"), to begin disseminating copies of the Notice and Proof of Claim Form (together, the "Settlement Notice Packet") by mail. The Notice contains, among other things, a description of the Action, the Settlement, the proposed Plan of Allocation, and Settlement Class Members' rights to participate in the Settlement, or object to the Settlement, the Plan of Allocation, and contact information for Lead Counsel and the Claims Administrator. The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for attorneys' fees in an amount not to exceed 22% of the Settlement Amount and for payment of litigation expenses incurred in connection with the institution, prosecution, and resolution of the Action in an amount not to exceed $600,000. Settlement Class Members were also notified of Plaintiffs' intent to seek awards of $20,000 and $15,000 for their representation of the Settlement Class.

69.    SCS disseminated the Settlement Notice Packet to all potential Settlement Class Members who had previously been identified in the prior mailing of the Notice, as well as to any additional potential Settlement Class Members who were identified in response to dissemination of the Settlement Notice Packet. *See* Craig Declaration, at ¶¶ 2-9.

- 22 -

70.     In total, as of the date of this Declaration, SCS mailed or emailed 89,110 copies of the Settlement Notice Packet to potential Settlement Class Members and nominees. *See* Craig Declaration, at ¶ 7. Out of the 78,209 Notice and Proof of Claims mailed, 3,271 were returned as undeliverable. Of the 3,271 returned, 213 were returned with a forwarding address provided by United States Postal Service, and SCS immediately remailed another Notice and Proof of Claim. A skip trace address search was run using Experian for the remaining 3,058 returned Notice and Proof of Claim to obtain updated addresses. SCS obtained 977 updated addresses from the skip trace efforts and mailed out another Notice and Proof of Claim to the updated addresses. *Id.* at ¶ 8.

71.     In addition to mailed notice, SCS caused the Summary Notice to be published in *GlobeNewswire* and in the *Investor's Business Daily* on May 16, 2022 (ECF No. 209). *Id.* at ¶ 10.

72.     Lead Counsel also caused SCS to update the dedicated website for the Action, https://www.strategicclaims.net/sasol/, to provide potential Settlement Class Members with information concerning the Settlement, including important dates and deadlines in connection therewith, and access to downloadable copies of the Notice and Proof of Claim Form, as well as copies of the Stipulation and other relevant documents. *Id.* at ¶ 12. Additionally, SCS maintains an active telephone number to respond to inquiries regarding the Settlement. *Id.* at ¶ 11.

73.     The deadline for Settlement Class Members to file exclusions and objections to the Settlement, the Plan of Allocation, and/or the attorneys' fees and Plaintiffs' awards request is July 28, 2022. To date, no objections or requests for exclusions have been received. *Id.* at ¶¶ 13-14.

74.     The Notice also informed Settlement Class Members that if they wished to participate in the Settlement they must submit a Proof of Claim Form to SCS, with supporting documentation, postmarked (if mailed), or submitted online by July 5, 2022. SCS has continued

- 23 -

to receive and process Proof of Claim Forms through that deadline and will recommend their acceptance for payment from the Settlement, subject to the Court's approval.

## VI.    PROPOSED ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

75.    The Plan of Allocation proposed by Plaintiffs and Lead Counsel is set forth in detail in the Notice. If approved, the Plan of Allocation will govern how the Net Settlement Fund will be distributed among Authorized Claimants.

### A.    The Proposed Plan of Allocation is Fair and Reasonable

76.    The Settlement, like most securities class action settlements, will be effectuated with the assistance of SCS. SCS will employ a well-tested protocol for the processing of claims in a securities class action. Namely, a potential class member will submit, either by mail or online using the Settlement website, the Court-approved Claim Form. Based on the trade information provided by claimants, SCS will determine each claimant's eligibility to participate by, among other things, calculating their respective "Recognized Claims" based on the Court-approved Plan of Allocation, and ultimately determine each eligible claimant's *pro rata* portion of the Net Settlement Fund. *See* Stipulation ¶ 25. Plaintiffs' claims will be reviewed in the same manner.

77.    Based on the nature of the claims and defenses, evidence uncovered, and the Parties' mediation presentations, Plaintiffs propose allocating the Net Settlement Fund to five purchasing time frames within the Settlement Class Period as follows:

| Proposed Allocation of Settlement Proceeds | | | | |
| --- | --- | --- | --- | --- |
| Mar. 10, 2015 to Sept. 6, 2015 | Sept. 7, 2015 to June 5, 2016 | June 6, 2016 to Feb. 26, 2017 | Feb. 27, 2017 to Aug. 15, 2019 | Aug. 16, 2019 to Jan. 13, 2020 |
| (4%) | (23%) | (25%) | (44%) | (4%) |

- 24 -

010886-11/1967170 V1

78.    The proposed allocation of settlement proceeds accounts for the reduced likelihood of success of the claims for investors who bought early in the Class Period and recognizes the relative strength of those who bought later in the Class Period. The proposed allocation also acknowledges the significant risk of the dismissal of the final January 14, 2020 disclosure event.

79.    Claimants will be notified of any defects or conditions of ineligibility and be given the chance to contest the rejection of their claims. Stipulation ¶ 29(d)-(e). Any claim disputes that cannot be resolved will be presented to the Court for a determination. *Id.*

80.    After the Settlement reaches its Effective Date (*id*. ¶ 36) and the claims process is completed, Authorized Claimants will be issued payments. If there are unclaimed funds after the initial distribution, and it would be feasible and economical to conduct a further distribution, the Claims Administrator will conduct a further distribution of remaining funds (less the estimated expenses for the additional distribution, Taxes, and unpaid Notice and Administration Expenses). Additional distributions will proceed in the same manner until it is no longer economical to conduct further distributions. At this point, unclaimed funds shall be donated to Public Justice, P.C.

81.    The Settlement does not improperly grant preferential treatment to either Lead Plaintiff, Additional Representative Plaintiff, or any segment of the Settlement Class. Rather, all members of the Settlement Class, including Lead Plaintiff and Additional Plaintiff Representative, will receive a distribution from the Net Settlement Fund pursuant to the Plan of Allocation approved by the Court. Moreover, Plaintiffs' proposed allocation of the settlement proceeds granting those investors with stronger relative claims a higher percentage of the settlement proceeds, based on plaintiffs' counsel and their experts' determination of the merits of class

- 25 -

members' claims and corresponding recoverable damages, have been routinely recognized as an appropriate way to equitably distribute settlement proceeds.

## VII.   THE FEE, LITIGATION EXPENSE, AND PLAINTIFFS' AWARD APPLICATION

82.   In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying to the Court for an award of attorneys' fees in the amount of 22% of the Settlement Amount (the "Fee Application"). Lead Counsel also requests payment for expenses that they incurred in connection with the prosecution of the Action from the Settlement Amount of no more than $600,000. Plaintiffs also request reimbursement in the aggregate amount of $35,000 for reasonable costs and expenses incurred directly related to their representation of the Settlement Class. The legal authorities supporting these requests are set forth in the Fee Memorandum. The primary factual bases for the requested fees and expenses are summarized below.

### A.   The Fee Application

83.   For their efforts on behalf of the Settlement Class, Lead Counsel is applying for a fee award to be paid from the Settlement Amount on a percentage basis. As set forth in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interest of the Settlement Class in achieving the maximum recovery in the shortest amount of time required under the circumstances, and has been recognized as appropriate by the U.S. Supreme Court and the Second Circuit for cases of this nature.

84.   Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks and complexities of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is reasonable

and should be approved. As discussed in the Fee Memorandum, a 22% fee award is fair and reasonable for attorneys' fees in common fund cases such as this, particularly given the facts and circumstances of this case, as well as within the range of percentages awarded in securities class actions in this Circuit.

### 1.    Plaintiffs and the Court Have Authorized the Fee Application

85.    Plaintiffs are sophisticated retail investors that have closely supervised, monitored, and actively participated in the prosecution and settlement of the Action. Cohn Declaration at ¶¶ 3-8; Moshell Declaration at ¶¶ 3-9.

86.    Plaintiffs have evaluated the Fee Application and fully support the fee requested. Cohn Declaration at ¶¶ 10-13; Moshell Declaration at ¶¶ 11-14. Lead Plaintiff entered into a retainer agreement with Lead Counsel at the outset of the litigation. The 22% fee request was negotiated and approved by Lead Plaintiff and previously reviewed by the Court and considered in appointing Mr. Cohn as Lead Plaintiff and Hagens Berman as Lead Counsel. *See* ECF No. 52 at 8 (the Court conducted an *in camera* review of Hagens Berman's retainer agreement with Mr. Cohn).

87.    Moreover, after reaching the Settlement, Plaintiffs again reviewed and approved the requested fee and believe it is fair and reasonable in light of the result obtained for the Settlement Class, the substantial risks in the litigation, and the quality of the work performed by Lead Counsel. Cohn Declaration at ¶¶ 10-11; Moshell Declaration at ¶¶ 11-12. Plaintiffs' endorsement of Lead Counsel's fee request further demonstrates the fee request's reasonableness and should be given weight in the Court's consideration of the fee award.

## 2.    The Time and Labor Devoted to the Action by Lead Counsel

88.    Lead Counsel has expended substantial time and effort pursuing this Action on behalf of the Settlement Class. Prior to entering into the Settlement, Plaintiffs and Lead Counsel: (i) investigated and drafted detailed amended complaints, including the operative Second Amended Complaint; (ii) defeated in part Defendants' motion to dismiss; (iii) successfully opposed Defendants' motions for reconsideration and request for sanctions; (iv) engaged in substantial discovery, which involved (a) obtaining and reviewing more than 730,000 pages of documents produced by Defendants; and (b) participating in nine separate fact and expert witness depositions, including those of Plaintiffs; (v) opposed Defendants' request for interlocutory appeal of the Court's Order denying reconsideration and sanctions; (vi) moved for class certification; and (vii) attended a mediation session, spanning two days, under the auspices of experienced and highly respected mediators, the Honorable Daniel Weinstein (Ret.) and Ambassador David Carden, during the course of the litigation.

89.    Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this Action. As the lead attorney on this case, I personally monitored and maintained control of the work performed by lawyers at my firm throughout the litigation. Other experienced attorneys at my firm were also involved in the drafting of pleadings, motion papers, and in the settlement negotiations. More junior attorneys and paralegals worked on matters appropriate to their skill and experience level.

90.    Attached hereto as **Exhibit 4** is Lead Counsel's fee and expense declaration ("Fee and Expense Declaration") in support for attorneys' fees and litigation expenses. The Fee and Expense Declaration includes a schedule summarizing the lodestar of Lead Counsel's firm and the

- 28 -

litigation expenses incurred. The Fee and Expense Declaration indicate the amount of time spent on the Action by attorneys and professional support staff and the lodestar calculations based on current hourly rates. The Fee and Expense Declaration was prepared from contemporaneous daily time records regularly maintained and prepared by Lead Counsel, which are available at the request of the Court.

91.     As set forth in Exhibit 4, Lead Counsel collectively expended a total of 6,050 hours in the investigation and prosecution of the Action. The resulting lodestar is $3,774,677.50.

92.     The requested fee of 22% of the Settlement Amount is $5,280,000, plus interest accrued at the same rate as the Settlement Amount, and therefore represents a multiplier of approximately 1.4 on Lead Counsel's lodestar. As discussed in further detail in the Fee Memorandum, the requested multiplier cross-check is within the range of fee multipliers typically awarded in comparable securities class actions and in other class actions involving significant fee risk in this Circuit and elsewhere.

### 3.     The Experience and Standing of Lead Counsel

93.     As demonstrated by Lead Counsel's firm resume, included as **Exhibit 5** hereto, Lead Counsel ranks among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases, and is consistently ranked among the top plaintiffs' firms in the county. I believe my firms' extensive experience in the field and the ability of my firm's attorneys added valuable leverage during settlement negotiations.

### 4.     The Standing and Caliber of Defendants' Counsel

94.     The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Here, Defendants were

- 29 -

represented by Weil Gotshal & Manges LLP, a leader among international litigation firms with well-noted expertise in corporate litigation practices. Defendants' counsel vigorously represented its clients. In the face of this skillful opposition, Lead Counsel was nonetheless able to negotiate with Defendants to settle this case on terms that are favorable to the Settlement Class.

> **5.    The Risks of the Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases**

95.    The prosecution was undertaken by Lead Counsel on an entirely contingent basis. The risks assumed by Lead Counsel in prosecuting the Action to a successful conclusion are described above. Those risks are also relevant to an award of attorneys' fees.

96.    From the outset of my firm's retention, Lead Counsel understood that it was embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover considerable litigation costs that a case such as this requires. With an average lag time of several years for such cases to conclude, the financial burden on contingent-fee counsel is far greater than on firms that are paid on an ongoing basis. Indeed, Lead Counsel received no compensation during the course of the Action and have collectively incurred $431,703.42 in litigation expenses in prosecuting the Action for the benefit of the Settlement Class.

97.    Lead Counsel also bore the risk that no recovery would be achieved. Despite the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured. As discussed herein, from the outset, this case presented multiple risks and uncertainties that could have resulted in no recovery whatsoever or a judgment that could not be enforced.

010886-11/1967170 V1

98.     Lead Counsel knows from experience that the commencement and ongoing prosecution of a class action does not guarantee a settlement. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and legal arguments that are needed to sustain a complaint or win at class certification, summary judgment and trial, or on appeal, or to cause sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

99.     Lead Counsel's extensive and persistent efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class, as described above. In circumstances such as these, and in consideration of the hard work and the excellent result achieved, I believe the requested fee is reasonable and should be approved.

**6.      The Reaction of the Settlement Class to the Fee Application**

100.    As stated above, through July 5, 2022, 89,110 Settlement Notice Packets have been mailed to potential Settlement Class Members advising them that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 22% of the Settlement Amount. *See* Craig Declaration at ¶ 7. In addition, the Court-approved Summary Notice was published in *GlobeNewswire* and in the *Investor's Business Daily* on May 16, 2022 (ECF No. 209). *Id.* at ¶ 10. To date, no objections to the request for attorneys' fees has been received.

101.    In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the favorable result obtained, the quality of the work performed, the risks of the Action, and the fully contingent nature of the representation, Lead Counsel respectfully submits that a fee award of 22% is fair and reasonable, and is consistent with and supported by the fee awards that courts have granted in other comparable cases.

010886-11/1967170 V1

B.    **The Litigation Expense and Plaintiffs' Awards Application**

102.    Lead Counsel also seeks payment from the Settlement Fund of $431,703.42 in litigation expenses that were reasonably incurred by Lead Counsel in connection with commencing, litigating, and settling the claims asserted in the Action.

103.    From the outset of the action, Lead Counsel was aware that it might not recover any of its expenses and, even in the event of a recovery, would not recover any of its out-of-pocket expenditures until such time as the Action might be successfully resolved. Lead Counsel also understood that, even assuming that the case was ultimately successful, a subsequent award of expenses would not compensate Lead Counsel for the lost use of the funds advanced by Lead Counsel to prosecute the Action. Accordingly, Lead Counsel was motivated to and did take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the Action.

104.    Lead Counsel has incurred a total of $431,703.42 in litigation expenses in connection with the prosecution of this Action. These expenses are summarized in Exhibit 4, which identifies each category of expenses. These expense items are billed separately by Lead Counsel and such charges are not duplicated in Lead Counsel's hourly rates. Further, the expenses for which Lead Counsel seeks reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, routine expenses related to copying, court fees, postage and shipping, phone charges, legal research, and travel and transportation, as well as expenses for experts, consultants, investigators, and costs arising from the investigation, database management charges for the documents produced in the litigation, and mediation fees.

105.    The largest expense, by far, is for retention of Lead Plaintiff's experts and consultants, in the amount of $323,926.00, or approximately 75% of Lead Counsel's total expenses. *See* Ex. 4 to Berman Declaration (Lead Counsel's Fee and Expense Declaration, Ex. B). Lead Counsel consulted extensively with experts in the fields of market efficiency, loss causation and damages, the use of confidential witnesses in securities class actions, and budgeting and scheduling for mega-projects, among others. In addition, Hagens Berman incurred costs associated with the investigation of the Settlement Class's claims, including the retention of an outside investigation firm and reimbursement of attorney's fees for the representation of three confidential witnesses.  Each of the parties retained was instrumental in Lead Counsel's prosecution of the Action and in bringing about the outstanding result achieved.

106.    All of the litigation expenses incurred by Lead Counsel were reasonable and necessary to the successful litigation of the Action, and have been approved by Plaintiffs. Cohn Declaration at ¶¶ 10-13; Moshell Declaration at ¶¶ 11-14.

107.    In addition, Plaintiffs seek reimbursement of the reasonable costs that they incurred directly in connection with their representation of the Settlement Class. Such payments are expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee Memorandum. Lead Plaintiff David Cohn seeks reimbursement of $20,000. Cohn Declaration at ¶ 13. Additional Plaintiff Representative Chad L. Moshell seeks reimbursement of $15,000. Moshell Declaration at ¶ 14.

108.    The Notice informs potential Settlement Class Members that Lead Counsel would seek reimbursement of litigation expenses in an amount not to exceed $600,000 and a total of $35,000 as an award for reasonable costs and expenses incurred by Plaintiffs. To date, no objections to these requests have been received.

109.    In sum, the expenses incurred by Lead Counsel and Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement. Accordingly, Lead Counsel respectfully submits that the application for payment of these expenses and awards should be approved.

## VIII.    EXHIBITS

110.    Attached hereto are true and correct copies of the following documents previously cited in this Declaration:

**Exhibit 1**: Declaration of David Cohn in Support of (i) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (ii) Lead Counsel's Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Compensatory Awards to Plaintiffs

**Exhibit 2**: Declaration of Chad Lindsey Moshell in Support of (i) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (ii) Lead Counsel's Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Compensatory Awards to Plaintiffs

**Exhibit 3**: Declaration of Margery Craig Concerning: (a) Mailing of the Notice and Claim Form; (b) Publication of the Summary Notice; and (c) Report on Requests for Exclusion and Objections

**Exhibit 4**: Lead Counsel's Fee and Expense Declaration

**Exhibit 5**: Lead Counsel's firm resume

## IX.    CONCLUSION

111.    For all the reasons set forth above, Plaintiffs and Lead Counsel respectfully submit that the Settlement and Plan of Allocation should be approved as fair, reasonable, and adequate. Lead Counsel further submits that the requested fee in the amount of 22% of the Settlement Amount should be approved as fair and reasonable, and the request for Lead Counsel's litigation expenses in the amount of $431,703.42 and Plaintiffs' award of reasonable costs and expenses, in the total amount of $35,000, should also be approved.

010886-11/1967170 V1

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 21, 2022
Seattle, WA

By: */s/ Steve W. Berman*
    STEVE W. BERMAN

- 35 -