M8IBBAGH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ROBERT VICTOR BAGLEY, *et al*,

                Plaintiffs,

        v.                              20 Civ. 1008 (JPC)

DAVID EDWARD CONSTABLE, *et al*,

                Defendants.
                                        Conference
------------------------------x
                                        New York, N.Y.
                                        August 18, 2022
                                        9:30 a.m.

Before:

                    HON. JOHN P. CRONAN,

                                        District Judge

                        APPEARANCES

HAGENS BERMAN SOBOL SHAPIRO, LLP
     Attorneys for Plaintiffs
BY:  LUCAS E. GILMORE, ESQ.

WEIL, GOTSHAL & MANGES, LLP
     Attorneys for Defendants
BY:  NICOLE PRUNETTI, ESQ.
     LUNA BARRINGTON, ESQ.

M8IBBAGH

(Case called; appearances noted)

THE COURT:  Good morning.  Before we begin and before I forget, under our current protocols in the courthouse when counsel is speaking or at the table, you're welcome to take off your mask.  You're certainly not required to.  If you're more comfortable doing so, we're allowed to do that.

We're here on a motion for approval of a class action settlement, as well as a plan allocation.  The motion is brought by the court-appointed lead plaintiff, David Cohn, and the additional class representative Chad L. Moshell on behalf of themselves and the class.  I'll refer to them collectively as the plaintiffs.  I've reviewed the filings including the materials in support of the motion and the proposed allocation and the proposed attorneys' fees.

First of all, I'm aware of no objections, but let me confirm that.  I think the reply brief from August 11 reported there still had been no objections to this settlement or requested attorneys' fees.  Is that still the case?

MR. GILMORE:  That is correct, your Honor.

THE COURT:  That's defendant's understanding as well?

MS. PRUNETTI:  Yes.

THE COURT:  Did that include any state or federal official?  Has there been any objection from a state or federal official to the settlement?

MR. GILMORE:  No, there has not, your Honor.

M8IBBAGH

THE COURT:  And also, is there anyone in the courtroom today who wishes to object to the settlement?  And there did not appear to be.  Also, can the parties confirm that they did not pay or provide any consideration to anyone to forego or withdraw an objection?

MR. GILMORE:  Confirmed, your Honor.

MS. PRUNETTI:  Confirmed from the defendants, your Honor.

THE COURT:  And what about exclusions from the class.  The reply brief also reported that there were no request for exclusion from the class.  Is that still the case?

MR. GILMORE:  Yes, your Honor, that is still the case.

THE COURT:  In terms of any side agreements or supplemental agreements, aside from the supplemental agreement that is referenced in paragraph 40 of the stipulation and agreement of settlement, have there been any other side agreements in this case in connection with the settlement?

MR. GILMORE:  Your Honor, no, there have not, other the standard provisions that we identified for the Court, there have not been.

THE COURT:  Ms. Prunetti, is that correct?

MS. PRUNETTI:  That is correct.

THE COURT:  As I mentioned, I reviewed the submissions.  I'm happy to hear anything further from plaintiffs' counsel and defendants' counsel.  I also may have a

M8IBBAGH

couple of questions and then I'll potentially rule on the record. So let me first hear from Mr. Gilmore. Is there anything further from the plaintiffs?

MR. GILMORE: Your Honor, we briefed this extensively in our papers, but we would just want to reiterate that we're very pleased to provide this settlement before the Court for the $24 million settlement. We believe it to be an outstanding recovery for the class. It was reached after two very hard fought years of litigation, and it was as a result of an extensive mediation process before two renowned mediators at the mediator's recommendation. As far as other securities class action go, this is a substantial portion of the reasonably recoverable damages, particularly in light of the complexity and risk of the litigation. So we're proud to put this before the class.

We also think that our requested attorneys' fee percentage of 22 percent is reasonable and fair, wanted to point out to the Court that this was guided by an agreement that we reached with the lead plaintiff before the inception of the litigation. And it was something that was viewed by the previous judge, Judge Rakoff, in appointing us as lead counsel. In terms of a multiplier, we believe it's well within the range for a comparable settlement at 1.4., if you take a look at the lodestar.

As far as our expenses, our expenses of 431,703.42, we

M8IBBAGH

believe that to be reasonable and incurred necessary to the prosecution of the action.  The large bulk of that, 75 percent, have to do with experts and consultants and the investigation and prosecution of the case.  We've also asked for reimbursement to the plaintiffs for the extensive amount of time.  In addition to the amount of time that we put forward, they added real value to the case.

THE COURT:  How did you arrive at $200 an hour for the two of them?

MR. GILMORE:  Your Honor, that was a difficult decision.  I have to -- we looked at what previous awards were. We thought that was in line.  Our lead plaintiff is long been retired so we didn't think it was appropriate to come up with an hourly manner.  And one has a private alcohol business, so really couldn't come up with an hourly rate, but we think it's fair and reasonable particularly in light of the amount of time that they spent, and certainly in line with other orders with the Court.

And then if we just point to the overwhelming reaction, positive reaction from the class. We mailed out I believe over 90,000 claim packets.  We receive 47,000 claims, which is for nearly 96 million in realized losses, so it's an outstanding reaction from the class in seeking claims.  And as we mentioned to the Court, there's been no request for exclusion and no objections.

M8IBBAGH

THE COURT:  I guess this goes to the litigation risk issue.  Is the interlocutory appeal still pending?  That was filed as to the motion for reconsideration.

MR. GILMORE:  That is correct.

THE COURT:  And can you say a little bit more about the division of the Net Settlement Fund, how the allocation would work based on the investment period.  And in particular, whether that division disproportionately benefits either Mr. Cohn or Mr. Moshell.

MR. GILMORE:  Sure.  So in the plan of allocation, it was largely tailored by our education and learning from the case through the documents that were produced, and particularly in the mediation and the parties' presentations.  We have allocated it according to various different time periods, and that's really on lead counsels in consultation with our experts and consultants review of the evidence and review of the relative strengths of the case.

We begin our class on March 10 of 2015, and for those investors who invested earlier based on our review of the evidence, it was going to be very difficult to establish falsity and scienter because the project was at a very, very early stage.  It's weighted more towards the middle of the class period where you have cost increases, and then more heavily weighted towards the period of February 27 through August 25th, and that's where you have the series of very

M8IBBAGH

significant increases over the case. And that's where the evidence lied, where the statements lied, where the strongest portions of the case are.

THE COURT: And August 16, 2019, was a big date, which is I guess why it changes on that date because that was the announcement about uncovered control weaknesses; is that right?

MR. GILMORE: Yes, that's correct. And so thereafter, the only real event that we had was the explosion, and as referenced in the defendant's class certification. And defendants were likely to argue that that was not corrective, and so that we faced a major uphill battle. You asked a specific question as to the plaintiffs' trade patterns. Certainly for Mr. Moshell, it would not benefit him. He was an earlier trader. We brought him on, though, specifically to provide robust leadership. Now for Mr. Cohn, he did invest in the fourth window. But in terms of assessing, that had no basis in terms. And the settlement is fully supported by both plaintiffs and we've gone over these issues with him.

THE COURT: Mr. Gilmore, there's also a request to increase the cost allowances for the claims administrators. Can you say a little bit more about why the allowance should go from 150,000 to 250,000?

MR. GILMORE: Yes. At the initial outset, we got a reasonable bid from SCS. We anticipated that the cost were going to exceed 150,000, but it's our practice to really keep

M8IBBAGH

them to a tight budget.  They've incurred 150 thus far.  We've negotiated with them further.  They've provided a reasonable estimation of 100,000 extra, and that's going to be for -- in terms of the actual work and consulting with other claims members and coming up with that, answering questions, and then the actual printing out and mailing of checks.  So we believe that that's reasonable and we're proud of the work that we did to really control cost in that manner.

THE COURT:  And the proposed order for that additional amount was submitted as an exhibit, as exhibit 2 I believe to Mr. Berman's declaration.  Is that right?

MR. GILMORE:  That's correct.

THE COURT:  Okay.  Thank you.  Anything further from the plaintiffs?

MR. GILMORE:  No, unless the Court has further questions.

THE COURT:  Go to the defendants.  Anything from you? I have one question about the CAFA notice, referring to the notice served on federal and state officials and preferences that this may fall into the category of technicality.  The CAFA notice as I read the statute is supposed to go out no later than 10 days after the proposed settlement is filed in court. It looks like it may have been 14 days here.  Unless I'm missing something, it appears the packets were mailed on April 19th, and the proposed settlement is at docket 201.  It was

M8IBBAGH

filed on April 5th.  I believe it would be 14 days.  Do you know whether that was an oversight or --

MS. PRUNETTI:  Thank you, your Honor.  I will have to look into that.  I don't think I have an answer for that right now.  I will look into that, and we can report back to the Court if that's something that you would like provided.

THE COURT:  I don't think it's needed from what I could tell that given the number of months that have gone by from when the notice went out and the absence of any objections which was one of the reasons I wanted to confirm there were no state or federal official objections to the problem.

The other thing that I'll just flag as well, the CAFA notice said that the defendants do not currently have access to information sufficient to identifying provided the names of potential class members who reside in each state to make a reasonable estimate of the number of potential class members residing in each state.  That's certainly understandable in a case like this and a size like this and this may be an issue with the drafting of CAFA.

But when I read 28, U.S. Code 1715(b)(7),  it looks like there's two options.  One where it would be feasible the notice must give the names of class members who reside in each state and the estimated proportion of shares of the claims of each state's members for the entire settlement.  And then for larger class actions when it's not feasible to list the names,

M8IBBAGH

then the defendant must provide a reasonable estimate of the claims members in each state and the proportionate share attributable to each state.  In other words, this section seems to -- and again, probably is not realistic in a case like this, but it seems to think about either -- or in the worst case scenario if an estimate -- if listing all the plaintiffs or at least estimate.  So I was wondering -- I guess, first of all, if you think I'm reading that statute wrong.  And if I'm not, is this a technical error that should not preclude approval here?

MS. PRUNETTI:  Thank you, your Honor.  I think that's right, that is a technicality.  I think, as you know, this is a federal securities action where the class is likely national in scope.  We were also dealing with a roughly five-year class period in this instance.  We did under the settlement agreement endeavor to get plaintiff's counsel information that we could from our client that would enable and facilitate their distribution of the settlement.  And so I think for that purpose, we endeavored to comply with this to the extent possible.

THE COURT:  Let me also ask the parties if there is any objection to me making findings of facts and conclusions of law with respect to approval on the record today rather than a written opinion?  It looks like there are two provisions of the law that would require written opinion in class action

M8IBBAGH

settlements.  I don't think either of them applies.  One is if the settlement would require a class member to pay sums to class counsel that resulted in a net loss to the class member. And the other is for coupon settlements, and I don't think either is a case here.  Is there an objection for me ruling on the record this morning?

MR. GILMORE:  No action from the plaintiffs.

MS. PRUNETTI:  No objection from the defendants, your Honor.

THE COURT:  Well, I will now issue my findings and rule on the motion to approve the class action settlement and allocation as well as request for attorneys 'fees.  I will assume the parties' familiarity with the background of this litigation, as well as the terms of the proposed settlement. And I will grant the motion to approve for the reasons that follow.

I begin with whether the class members had adequate notice of the proposed settlement.  For notice to be adequate, it must meet the requirements under Federal Rule of Civil Procedure 23, the United States Constitution, Local Rule 23.1, and the Private Securities Litigation Reform Act or the PSLRA. "The standard for the adequacy of a settlement notice in a class action under either the due process clause or the federal rules is measured by reasonableness." The cite for that is *Wal-Mart Stores, Inc. v. Visa U.S.A, Inc.*,  396 F.3d 96, 113

M8IBBAGH

(2d Cir. 2005).   Although there are no rigid rules to determine whether notice is sufficient, notice by mail usually suffices when it informs class members about the time and place of the fairness hearing, how to obtain more information about the settlement, the timeliness and procedural requirements set by the court for objecting to the settlement, and the key terms of the settlement in sufficiently understandable language to permit class members to decide whether to object and to frame their objections.

A cite for that is *Fleisher v. Phoenix Life Insurance Company*, 2015 WL 10847814.  A decision from Judge McMahon on September 9, 2015.  Local Rule 23.1 also requires that class notice include a statement of the names and addresses of the applicant for attorneys' fees and the amounts requested respectively and shall disclose any fee sharing agreements with anyone.  The PSLRA adds another layer of requirements for settlement notices.  Under this law, any notice must include a statement of plaintiff recovery, statement of potential outcome of case, statement of attorneys' fees or cost sought, identification of lawyers' representatives, reasons for settlement and any other information required by the court, and it also requires a page summarizing these statements.

Here, the settlement notice packet included the settlement amount, the reasons why the parties are proposing the settlement, the class definition and inclusions from it,

M8IBBAGH

the estimated average recovery per ADR purchased, the maximum attorneys' fees and expenses sought, the right of class members to object to the settlement, the binding effect of a judgment on class members, the dates and deadlines for certain settlement-related events, the opportunity to obtain more information about the action in the settlement by calling a toll free number, contacting class counsel or the claims administrator or visiting the website, the allocation plan and information on how to submit a claim form to be eligible to receive a distribution from the settlement fund.  And that is largely in the *Craig* declaration which is at docket 214 exhibit 3.

The class notice administrator Strategic Claims services or SCS mailed the settlement notice packet to all potential class members and nominees whom it identified through reasonable effort.  That is at the *Craig* declaration paragraph four through nine.  SCS published the summary settlement notice in *Investor's Business Daily* and over *GlobeNewswire* on May 16, 2022.  On April 26, 2022, SCS also updated the website for class notice, www.strategicclaims.net/sasol, to provide information about the settlement, including download of all copies of the settlement notice, claim form, stipulation, preliminary approval order, and an online claim filing link.

I find that the notice of the settlement complied with my preliminary approval order.  The notice also complied with

M8IBBAGH

best notice practicable under the circumstances, amounted to a notice that was reasonably calculated to inform class members of their rights under the settlement, and complied with Federal Rule of Civil Procedure 23, Local Rule 23.1, the United States Constitution and the PSLRA.

Defendants in a class action have another notice requirement under the Class Action Fairness Act or CAFA. Under that law, each defendant that is participating in the proposed settlement must serve the appropriate federal and state officials -- typically the Attorney General the United States and the person in the state who has the primary regulatory or supervisory responsibility with respect to the defendant. That's 28 U.S. Code, Section 1715(a) and (b), and they must do so not later than 10 days after a proposed settlement is filed in court. And that is Section 1715(b). The notice must include the complaint and any amended complaint, notice of any scheduled judicial hearing, any proposed or final notice to class members of their rights to request exclusion if such rights exist and of the proposed settlement, any proposed or final class settlement, any settlement or other agreement contemporaneously made between class counsel and counsel for the defendants, any final judgment or notice of dismissal, either the names of class members who reside in the state, if feasible, or if not feasible a reasonable estimate of the number of class members residing in the state, and then any

M8IBBAGH

written judicial opinion relating to the materials described in the third through six requirements I just mentioned. Sasol meaningfully complied with CAFA's requirements. Kroll Settlement Administration LLC sent CAFA notice packets on behalf of Sasol to 57 state and federal officials, including the attorneys general of the United States, each of the 50 states, the District of Columbia and the U.S. territories. Although these CAFA notice packets included nearly all the materials required by Section 1715, as discussed earlier, it appears they failed to strictly comply with the statute in two respects, which I'll mention briefly. However, these two technical errors do not bar approval.

First, it appears that the CAFA notice packets were mailed 14 days after the proposed settlement was filed, rather than 10 days. The proposed settlement was filed on April 5, 2022, and it appears from docket 207, exhibit A, that the packets were mailed on April 19, 2022. And second, technically speaking the seventh CAFA requirement was not met. The cover letter stated that defendants do not currently have access to information sufficient to identify and provide the names of potential class members who reside in each state, or to make a reasonable estimate of the number of potential class members residing in each state. But 28 U.S. Code, Section 1715(b)(7) requires defendants to provide notice to state officials with either the names of class members who reside in the state, if

M8IBBAGH

feasible, or if not feasible a reasonable estimate of the number of class members residing in the state. CAFA does not contemplate a scenario where it is not feasible for a defendant to at least estimate the number of class members in a state.

Still, CAFA's purpose suggests that technical errors such as these should not bar approval of the settlement. To quote the 8th Circuit in, *In re Uponor, Inc., F1807 Plumbing Fittings Products Liability Litigation,* 716 F.3d 1057 at 1064-65 "Congress enacted the CAFA notice requirement to provide a check on inequitable settlements, and it emphasized that the statute was not intended to allow settlement class members to walk away from an improved settlement based on a technical noncompliance."

So, when, as here, no federal or state official has objected to the proposed settlement agreement, courts have found that a technical error concerning the timing of sending CAFA notice packets does not warrant declined to approve the class settlement. Some examples are *Emeterio v. A & P Restaurant Corp*., 22 WL 252065. A decision now in this district from January 26, 2022. *T.K. Through Leshore v. Bytedance Technology Company*, 2022 WL 888943, a Northern District of Illinois decision from March 25, 2022. And *Beaty v. Continental Automobile Systems*, U.S. 2012 WL 1886134, a Northern District of Alabama decision from May 21, 2012. All of those cases involved granting final approval of class action

M8IBBAGH

settlements even though the CAFA notice went out more than 10 days after the settlement was filed. And courts have also approved class action settlements when defendants have failed to meet the seventh CAFA requirement.

Going back to *Uponor*, which I mentioned a moment ago, the 8th Circuit upheld a class action settlement when the CAFA only stated that it was not feasible to provide the names of all class members in each state, and no state attorney objected. A similar outcome was reached by the 6th Circuit in, *In re Packaged Ice Antitrust Litigation*, 2018 WL 4520931, May 24, 2018 decision. In fact I, myself recently approved such a settlement on the record on July 22, 2022 in, *In re Luckin Coffee Inc*. that's 20 Civ. 1293, where the CAFA noticed failed to at least estimate the number of class members in the state.

So although the notice requirements under CAFA may not have been fully met on a technical basis, the substance of the requirements have been satisfied insofar as giving federal and state officials sufficient notice of the opportunity to be heard concerning the settlement. And I also note that in the primary case I'm aware of where a court has rejected a settlement based on non-compliance with CAFA's requirements, the state Attorneys General received notice only ten days before the settlement hearing, and 25 of those state AGs had objected. That case was *True v. American Honda Motor Company*, 749 F.Supp. 2d 1052. That was a Central District of California

M8IBBAGH

case out of 2010.

To be sure nothing similar has occurred in this case, approximately four months have passed since the Attorneys General received CAFA notice, and none have objected.  Since even given sufficient opportunity, none of the relevant officials have objected, I find that Sasol's two technical errors do not prevent my approval of the settlement.

And lastly, because 90 days had passed since Kroll served the appropriate federal and state officials, CAFA does not bar approving the class settlement today.  Citation for that is 28 U.S. Code, Section 1715(d).

The parties complied with Rule 23(e)(5)(B)(i) because they did not pay, or provide other consideration, to anyone to forego or withdraw an objection.

Under Rule 23(e)(2), I also may approve a proposed class settlement that finds -- I'm sorry.  I should under Rule 23(e)(2), I may only approve a proposed class settlement that binds class members if, after a holding a hearing, I find that the settlement is fair, reasonable and adequate.  In reviewing your proposed settlement, I act as a fiduciary who must serve as a guardian of the rights of absent class members.  A cite for that is *McDaniel v. County of Schenectady*, 595 F.3d 411, (2d Cir. 2010).

After a 2018 amendment to Rule 23, Rule 23(e)(2) now lists several factors that I must consider in making this

M8IBBAGH

assessment.  These factors are not, however, exclusive.  The Advisory Committee's notes on Rule 23(e)(2) say that the amendment does not displace any factor previously adopted by any United States Court of Appeals.  Instead, the listed factors are meant to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal.  Many of the factors in Rule 23(e)(2) have long been used in this circuit in the nine-factor test adopted in 1974 in *City of Detroit v. Grinnell Corporation*, 495 F.2d 448.

To the extent that certain *Grinnell* factors are not encompassed by the analysis in Rule 23(e)(2), I will discuss those factors separately.  And in deciding whether the settlement is fair reasonable and adequate, the courts must consider both the settlement terms and the negotiating process leading to a settlement.  *Wal-Mart*, 396 F.3d at 166 is a cite for that again.  In other words, courts must review settlements for both procedural and substantive fairness.

I'll start with the procedural fairness of the settlement.  Rule 23(e)(2)(A), which requires adequate representation, and Rule 23(e)(2)(B), which requires arm's-length negotiations constitute the procedural analysis of the fairness inquiry.  And I cite *Christine Asia Company v. Yun Ma*, 2019 WL 5257534, a October 16, 2019 from Judge McMahon for that proposition.  These factors largely track how courts

M8IBBAGH

traditionally analyzed procedural fairness.  A proposed settlement is procedurally fair when it is reached through arm's length on negotiations between experienced, capable counsel and after meaningful discovery.  A cite for that is *In re Bear Stearns Companies, Inc. Securities, Securities and Derivative ERISA Litigation*, 909 F.Supp. 2d 259, a 2012 decision in this district.

The presence of an experienced private mediator is further proof that it is fair and reasonable.  And a cite for that is *In Re Independent Energy Holdings PLC*, 2003 WL 22244676, a Southern District of New York case from September 29, 2003.

The parties have amply satisfied the standard for procedural fairness.  As I will discuss in greater detail when addressing attorneys' fees, the parties are represented by highly experienced and capable counsel.  They engaged in substantial arm's-length negotiation, including two days of mediation.  Moreover, the plaintiffs have invested significant time overseeing this case, referring to the lead plaintiff Mr. Cohn and the additional class representative Mr. Moshell.

And the plaintiffs have engaged in meaningful discovery.  They reviewed over 70,000 pages of documents, participated in nine depositions, consulted numerous experts, and even hired an outside investigative firm.  This has provided the lead plaintiffs and class counsel with sufficient

M8IBBAGH

information to assess the adequacy of the settlement.  I, therefore, find that the settlement is procedurally fair.  I'll now analyze the substantive fairness of the settlement, and I find the settlement to be substantively fair as well.  Prior to the 2018 amendment to 23(e), the Second Circuit instructed that, when, as here, a settlement emerging from arm's-length negotiations between experienced, capable counsel after meaningful discovery, it is afforded a presumption of fairness, adequacy, and reasonableness.  *Wal-Mart*, 396 F.3d at 116.  But even if this presumption were not to survive the rule amendment, I would still find the settlement to be substantively fair for the reasons that follow.  And I will begin with Rule 23(e)(2)(C) which considers whether the relief to the class is adequate.  Rule 23(e)(2)(C)(i) considers the cost, risks, and delay of a trial and appeal.  Securities class actions are by their nature very complicated.  This case is certainly no exception.  This is a complex action involving alleged fraud over nearly a five-year class period.  In over two years class counsel has expended over 6,000 hours litigating this action.  Class counsel has hired an outside investigation firm, interviewed confidential witnesses, and even engaged in a two-day mediation session.

If this case proceeds, the costs would only continue to rise.  Plaintiffs will still need to litigate defendants' interlocutory appeal of the Court's order denying defendants'

M8IBBAGH

motion for reconsideration of sanctions. And if the claim survived that appeal, discovery would continue, potentially involving overseas depositions since Sasol is a South African company. Some of that discovery might even lie outside my subpoena power. And also to establish liability, the plaintiffs may need to depend on the testimony of witnesses who are employees, agents or affiliates of Sasol, and therefore may be hostile. There are also challenges involving class certification. I only certified the class for settlement purposes. If I deny this settlement and the case were to proceed, the defendants would likely oppose any motion for class certification. A contested motion would increase the parties' expenses and further delay proceedings.

And even assuming I were to certify the class, multiple subclasses might emerge for different groups of investors based on, for instance, when the investors bought and sold the securities. And other challenges abound. There are the inherent complexities in calculating damages and establishing the loss causation in securities class actions. This would likely involve a battle of experts to resolve these issues. All these facts point toward approving the settlement.

I will now turn to 23(e)(2(C()(ii), which looks at the effectiveness of the proposed method of distributing relief to the class, including the method of processing class-members claims. The proposed distribution method here is effective and

M8IBBAGH

adequate as well.  It tracks the standard method routinely approved in securities class action cases.  The claims administrator SCS will review and process all claims received, and provide claimants with an opportunity to cure any deficiency or request judicial review of the denial of their claims, and will ultimately mail or wire authorized claimants there *pro rata* share of the Net Settlement Fund as calculated under the plan.  That is set forth in the Berman declaration at paragraph 48 through 53.  And Judge McMahon in *Christian Asia Company*, which I mentioned earlier, 2019 WL 5257534, found a similar process to be appropriate when she approved the settlement in that case.  And I also note that none of the settlement will revert to Sasol, ensuring that the class will receive the full amount of the relief.

Rule 23(e)(2)(C)(iii) considers the terms of any proposed award of attorneys' fees, including the timing of any payment.  I've considered the request of attorneys' fee and find that the proposed award and timing is fair, reasonable, and accurate.  As I will detail later, the propose 22 percent in attorneys' fees, and $431,703.42 in litigation expenses are reasonable given the work that plaintiffs' counsel, their investment resources in the case, their prosecution of the action for the benefit of the class, the risk that they faced in the litigation, and the overall benefit of the settlement achieved.  Again the cite for that is *Christine Asia Company*.

M8IBBAGH

Importantly, the settlement agreement does not hinge on me approving the requested fees and expenses, and neither the plaintiffs nor lead counsel may terminate the settlement based on this Court's or any Appellate Court's ruling with respect to the attorneys' fees. That's at paragraph 19 of the stipulation and agreement of settlement. And several courts have found that to be a significant consideration, including *Christine Asia Company* and *Hudson's Bay*, which is at 2022 WL 2063864.

Rule 23(e)(2(C)(iv) considers any agreement that must be identified under Rule 23(e(3). Rule 23(e)(3), in turn, requires the parties seeking judicial approval of a class settlement to file a statement identifying any agreement made in connection with the proposal. As this rule makes clear, this statement need not describe the side agreement's terms, but rather only identify the agreement. The only side agreement that the parties entered into was a confidential supplemental agreement which allows defendants to terminate the defendant if too many class members request exclusion. And that's at paragraph 40 of the stipulation and agreement settlement. Since the parties adequately identified side agreement under 23(e)(3) in its quite typical language, I find this requirement met as well.

The plan of allocation distributes the Net Settlement Fund among authorized claimants based on the date in which they

M8IBBAGH

purchases Sasol ADRs.  I find that this treatment proposed treats class members equitably relative to each other.  The plan would be as follows: 4 percent for the period of March 10, 2015 to September 6, 2015, inclusive; 23 percent for the period of September 7, 2015 to June 5, 2016, inclusive; 25 percent for the period of June 6, 2016 to February 26, 2017, inclusive; 44 percent for the period of February 27, 2017 to August 15, 2019, inclusive; and 4 percent for the period of August 16, 2019 to January 13, 2020, inclusive.

I asked Mr. Gilmore some additional questions this morning about the proposed plan allocation, and he explained, as well as in the submissions I received advance of this hearing, that the division is due to the relative weakness of the claims of individuals who purchased early in the settlement class period, and also the risk that the final disclosure event which occurred on January 14, 2022, would be dismissed.  He explained the basis for the division based on the date when purchases of Sasol ADRs were made.  And I find this allocation to treat class members equitable relative to each other.

Plaintiffs' counsel also cite settlements approved in this district that employed a similar method of dividing the settlement funds based on the strengths of the case.  For example, *In re American Bank Note Holographics*, 127 F.Supp 2d 418, which was a Southern District of New York case from 2001. There, the court commented that allocation formulas, including

M8IBBAGH

certain discounts for certain securities are recognized as an appropriate means to reflect comparative strengths and values of different categories in the claims.

I find that this allocation plan treats class members equitably relative to each other for purposes of Rule 23(e)(2)(D). Plans like the one here are standard in securities class actions. And courts routinely say that they are equitable. And that makes sense. The plan permits all authorized claimants to receive their *pro rata* share of the Net Settlement Fund based on the amount of their recognized loss calculated under the plan of allocation. And allocation formulas are commonly used in this district to reflect the relative strengths and weaknesses of different types of claims. And I just mentioned a citation for that which is *In re American Bank Note Holographics*.

I'll now turn to the remaining *Grinnell* factors. In reviewing the settlement, I've considered all the *Grinnell* factors and find that they point to affirming the class settlement. In analyzing the Rule 23(e)(2)'s factors moments ago, I applied many of the *Grinnell* factors, including the complexity, expense, and likely duration of the litigation, the stage of the proceedings and the amount of discovery, the risk of establishing liability and damages, and the risk of maintaining class action through trial.

I will now address the remaining *Grinnell* factors.

M8IBBAGH

The reaction of the class is among the most significant *Grinnell* factors.  The cite for that is *In re IMAX Securities Litigation*, 283 F.R.D. 178, a Southern District of New York case From 2012.  Here, the class reacted very favorably to the proposed settlement. After sending out almost 90,000 settlement notices, no one has objected.  That is rather unusual and heavily favors approval.  Additionally, no one has requested exclusion.  The absence of requests for exclusion strengthens the case for approval.

Next, I find the settlement size is reasonable compared to the possible recovery.  In considering this factor, I must judge the settlement in light of the strengths and weaknesses of the plaintiffs' case, and not in comparison with the possible recovery in the best of all possible worlds.  In other words, I must examine whether the settlement amount lies within a range of reasonableness reflecting the uncertainties of the law and facts in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.  And I cite again to *Wal-Mart*, 396 F.3d at 119.

Here, the plaintiffs' damages consultant has estimated the class's maximum aggregate damages to be approximately $202.5 million.  That's at paragraph 64 of the Berman declaration. That means that the $24 million settlement represents approximately 11.9 percent of the maximum damages that the class could establish.  Given the inherent risks and

M8IBBAGH

possible weaknesses in plaintiffs' case, this settlement amount is within the range of reasonableness. And to say a little bit more about that and to touch on some issues I alluded to earlier, there are a number of risks in this highly complicated case which is being litigated by extremely sophisticated and experienced counsel. Those risk include the pending interlocutory appeal of my order denying the defendants' motion for reconsideration and sanctions, the pending motion for class certification, litigation at the summary judgment and trial stage concerning whether the alleged statements are protected by the PSLRA's safe harbor provision, litigation issues regarding scienter on the part of the defendants, and litigation over loss causation and plaintiffs' damages theory.

I also note that the average settlement is securities class actions range from 3 percent to 7 percent of the class' total estimated losses. And I'm citing *In Re Giant Interactive Group, Inc., securities Litigation*, 279 F.R.D. 151, a Southern District of New York case from 2011. And the Second Circuit relatively recently upheld a settlement representing only 6.1 percent of the maximum potential recovery of 106 million, and that was in *In re Patriot National Inc., Securities Litigation*, 828 Fed.App'x 760. The Second Circuit issued that summary order in 2020. Thus, I find this settlement in this case is reasonable in light of the maximum possible recovery.

Lastly, I find that the ability of the defendants to

M8IBBAGH

withstand greater judgment is neutral on whether to approve the proposed settlement.  When, as here, the other factors weigh in favor of approval, this factor alone does not suggest that settlement is unfair.

To warrant approval, the plan of allocation also must meet the standards by which the settlement was scrutinized -- namely, it must be fair, adequate and reasonable.  *In re WorldCom Inc., Securities Litigation* is a cite for that. That's at 388 F. Supp. 2d, 319, Southern District of New York case from 2005.  As many courts have need, a plan of allocation need not be perfect. Rather, an allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel, and *WorldCom* is the cite for that as well.  Thus, in determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel.  The cite for that is *In re EVCI Career Colleges Holding Corporation, Securities Litigation*, 2007 WL 2230177. A Judge McMahon decision from July 27, 2007.  Generally, a plan of allocation should reimburse class members based on the relative strength and value of their claims.  Now, as I discussed moments ago, the proposed plan of allocation has sought to do just that.  The plan reflects the strength of plaintiffs' claims depending on when they purchased the ADRs. The claim has a clear rational basis, equitably treats the class members, and was devised by experienced and estimable

M8IBBAGH

class counsel. I therefore find the plan to be fair, reasonable and adequate.

And now I will turn to the requested attorneys' fees. Class counsel seeks a fee award of 22 percent of the settlement fund of $24 million along with reimbursement for litigation expenses.

In reviewing a fee application, I must act as a fiduciary who serves as a guardian of the rights of absent class members and must perform a searching assessment regarding attorneys' fees. *McDaniel*, 595 F.3d at 419 is a cite for that. The fee award must reflect the actual effort made by the attorney to benefit the class. In common fund cases, courts typically use either the lodestar method or the percentage of fund method to compute attorneys' fees. Under both approaches, courts consider various factors in assessing the reasonableness of a fee, including the time and labor expended by counsel, the magnitude and complexity of the litigation, the risk of the litigation, the quality of representation, the requested fee in relation to the settlement and public policy considerations. And the cite for that is *Goldberger v. Integrated Resources Inc.*, 209 F.3d 43, a Second Circuit case from 2000. And those six factors are also often referred to as the *Goldberger* factors.

In the end, it's up to me rather than counsel to choose whether to use the lodestar or percentage method. With

M8IBBAGH

that said, in common fund cases, the percentage-of-funds method is generally preferable because that method directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation.  And the cite again for that is *Wal-Mart,* 396 F.3d 121.  The lodestar method, in contrast, creates an unanticipated disincentive to early settlements, tempts lawyers to run up their hours, and compels district courts to engage in a gimlet-eyed review of line item fee audits.  Again, *Walmart* is the cite for that.  Besides the general disincentives of the lodestar method, there are statutory considerations in securities fraud cases.  The PSLRA expressly contemplates that attorneys' fees should be calculated using the percentage method.  *Woburn Retirement System v. Salix Pharmaceutical Limited* is a cite for that.  That decision from Judge Wood is at 2017 WL 3579892.  And, indeed, the PSLRA says that total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class.  That's at 15 U.S.C. Section 78u-4(a(6).

I will, therefore, follow the general trend in this Circuit of using the percentage method, but I will use the lodestar method to crosscheck the awarded attorneys' fees to ensure they are reasonable.  But as Judge McLaughlin put it in

M8IBBAGH

*Goldberger* I believe, when using the lodestar method as a crosscheck, I will not resurrect the ghost of Ebenezer Scrooge by overly scrutinizing the hours documents by counsel.

Other point before analyzing the requested fee. Plaintiff entered a retainer agreement with lead counsel at the outset of this litigation that authorized a 22 percent fee request. One of the arguments made at that under the PSLRA, I must afford a presumption of reasonableness to that requested fee in the retainer agreement, or I should afford a presumption of reasonableness to the fee being requested in light of the retainer agreement. And that's the view of the Third Circuit and some judges in this district have adopted the view -- namely that before the fact litigation agreements with lead plaintiffs create a presumption of reasonableness. But it remains open in this Circuit whether the PSLRA creates a presumption of reasonableness for fees agreed upon by the lead plaintiff. The cite for that is *In re Nortel Networks Corporate Securities Litigation*, 539 F.3d 129, Second Circuit case from 2008.

I'm not going to reach that issue. It's not necessary to. As I will explain in a moment, even without this presumption I find that the requested fee is reasonable. In analyzing the requested fee, I am, however, giving serious consideration to the negotiated fee because PSLRA lead plaintiffs often have a significant financial stake in the

M8IBBAGH

settlement.  And the Second Circuit mentioned that in the *Nortel* case I just mentioned.

I will start with the *Goldberger* factor:  The first *Goldberger* factor is the time and labor expended by counsel. Counsel expended extensive time and labor in prosecuting this case and achieving the settlement.  They extensively investigated the claims, including reviewing public sources, hiring an outside investigative firm, and interviewing confidential witnesses.  They drafted briefs, defeated motions, consulted experts, participated in depositions, negotiated for the provisional certification of the class and conducted extensive negotiations, including, as I mentioned, a two-day mediation session that yielded a fair and reasonable settlement.  Class counsel Hagens Berman Sobol Shapiro LLP have submitted time records showing the significant work that went into this case.  In total, counsel expended over 6,050 hours prosecuting the case.

I will pause now to conduct the lodestar crosscheck. The lodestar amount allows me to evaluate the extent of time and labor expended in comparison to the percentage of the fund requested as attorneys' fees.  As of the date of filing for approval of the proposed attorneys' fees, counsel had spent collectively over 6,050 hours of attorney and other professional support time prosecuting this action for the benefit of the class.  Taking into account the hourly rates for

M8IBBAGH

each attorney and paraprofessional, this equates to a total lodestar value of counsel's work, not including expenses of $3,774,677.50.  Again, counsel has requested 22 percent of the settlement fund, which equates to $5,280,000, plus interest earned.  Thus, the requested fee yields a 1.4 lodestar multiplier.

In complex litigation, lodestar multipliers between two and five are commonly awarded, and fee awards resulting in multipliers as high as six have also been approved.  The cite for that is *In re Signet Jewelers Limited Securities Litigation*, 2020 WL 4196468.  Generally, multipliers around 1.5 are standard for class action settlements of this size.  And courts in this Circuit have approved fees with even higher lodestars and percentages for similar settlement amounts.

And as I mentioned earlier, the lodestar method is just a crosscheck. Too careful scrutiny of the lodestar multiplier would risk discouraging quick and valuable settlements, misaligning the desires of counsel and class members.  Therefore, I find that the lodestar crosscheck also support the requested attorneys' fees.

The magnitude and complexity of the case also supports the requested fee.  Securities class action litigation is notably difficult and also notoriously uncertain.  This case was complex and required consulting experts and interviewing confidential witnesses.

M8IBBAGH

I also find that the risk of litigations support the requested fee.  This factor is perhaps the foremost factor to be considered in determining whether to award an enhancement, under *Goldberger*.  Class actions, in general, are risky. Securities class actions are especially so. And as I mentioned when analyzing the fairness of the class settlement, plaintiffs faced substantial hurdles to recovery.  Despite these risks, counsel took on the case on a contingency basis and used a significant outlay of cash and personnel resources during the litigation.

As Judge McMahon put it in another case, *In re Marsh ERISA Litigation*, 265 F.R.D. 128, there was significant risk of nonpayment in this case and plaintiffs' counsel should be rewarded for having borne and successfully overcome that risk.

Next, class counsel are experienced class-action leaders, frequently serving as either lead or co-lead counsel in significant securities class actions.  And defendant's counsel, Weil Gotshal, is an unquestioned leader in class action litigation.  Class counsel's ability to obtain a favorable settlement for the class in the face of such formidable legal opposition confirms the quality of their representation of the class.

In considering whether the requested fee is reasonable, I have kept in mind that the percentage used in calculating any given fee award must follow a sliding-scale and

M8IBBAGH

must bear an inverse relationship to the amount of the settlement. That's *Wal-Mart* 396 F.3d, 96.  And as I noted, a 22 percent fee on a $24 million settlement is well within the range of awards made by district courts in this Circuit.  I therefore find that the 22 percent fee compared to the settlement amount is reasonable.

I also find that public policy concerns favor granting the requested fees.  Public policy supports granting attorneys' fees that are sufficient to encourage plaintiffs' counsel to bring securities class actions that supplement the efforts of the Securities Exchange Commission. *In re Flag Telecom Holdings Limited Securities Litigation* is a cite for that, 2010 WL 4537550.

To carry out this goal, courts should award fees which will adequately compensate lead counsel for the value of their efforts, taking into account the enormous risks they undertook. And as I mentioned, given the inherent risks in complex securities fraud cases like this one here.  Given those risks, I further find that a 22 percent fee will incentivize lawyers to bear the risk to bring cases like this one to further the objective of the federal securities laws to protect investors and consumers against fraud and other deceptive practices.

Lastly, many courts have noted that the lack of an objection from members of the class is one of the most important factors in determining the reasonableness of a

M8IBBAGH

requested fee.  The settlement notice advised class members that class counsel intended to apply for attorneys' fees of 25 percent of the settlement fund, and up to $600,000 in litigation expenses plus interest on both amounts.  Despite this notice, no one objected to the July 28, 2022 deadline.  The overwhelming positive response to date by the class attests to the approval of the class with respect to both the settlement and the fee and expense application.

I find that the requested $431,703.42 in litigation expenses are reasonable as well.  It is well-settled that attorneys may be compensated for reasonable out-of-pocket expenses incurred as long as they were incidental and necessary to the representation of their clients.  In this Circuit expense requests are usually granted as a matter of course, as long as the expenses were of the type customarily charged to clients.  The largest expense, by far, went toward experts and consultants in the amount of $323,926.00, or about 75 percent of lead counsel's total expenses, which also are commonly reimbursed, and a significant amount went to the private investigator firm as well.  As I just mentioned, the notice to the class litigation expenses would note exceed $600,000 and those expenses have not.  And there are were no objections to that request.  Under these circumstances, I find that the requested expenses are reasonable, and I therefore approve them as well.

M8IBBAGH

Second to last I turn to the requested $20,000 in costs and expenses incurred by Mr. Cohn, and $15,000 incurred by Mr. Moshell.  The PSLRA allows for reimbursements to representative plaintiffs in securities class actions.  And in considering whether to reimburse the representative plaintiffs, courts in this Circuit routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place.  *Christine Asia Company* is a cite for that.

Once again here, Mr. Cohn and Mr. Moshell devoted at least 175 hours to prosecute this action.  They communicated and consulted extensively with counsel along with reviewing pleadings and briefs. I therefore find that the requested $20,000 to Mr. Cohn and $15,000 to Mr. Moshell in costs and expenses are reasonable under the circumstances.  And now, lastly, I will also increase the cost allowance for the claims administrator to administer the settlement from $150,000 as set in the preliminary approval order to $250,000.

Thank you, counsel, for your patience as I went through that.  Are there any other matters you think I need to address in connection with this approval?

MR. GILMORE:  Your Honor, nothing from the plaintiffs. We submitted proposed forms of order by Word document.  To the

M8IBBAGH

extent you would like us to resubmit that for the Court's convenience, we're happy to do that.

MS. PRUNETTI:  Nothing further from defendants, your Honor.

THE COURT:  Mr. Gilmore, did you say you did submit them by Word?

MR. GILMORE:  Yes.

THE COURT:  Okay.  First, in sum, I approve the settlement and the requested attorneys' fees and costs.  So that means in terms of attorneys' fees, I award 22 percent of the settlement fund in fees, $431,703.42 for the reasonable expenses incurred by plaintiffs' counsel, and $20,000 to reimburse Mr. Cohn's cost, and $15,000 to reimburse Mr. Moshell's cost and expenses.

In terms of the proposed judgment, I will make just one small change based on my ruling today.  Previously there was language regarding the CAFA notice compliance that read, the Court further finds that the notice provisions of the Class Action Fairness Act, 28 United States Code, Section 1715, were fully discharged.

I will just slightly tweak that to read, The Court further finds that the notice provisions of the Class Action Fairness Act, 28 United States Code, Section 1715, were substantially complied with.

And if we have trouble finding the Word version, we'll

M8IBBAGH

let you know, but we should be able to make that change pretty easily. I will also enter the order, which is at docket number 216-2. That's a proposed order approving additional allowance for the administration of the settlement to allow for up to $100,000 in additional costs and expenses for the claims administrator, thus increasing the cost allowance to $250,000. I believe that covers everything. Is there anything further from counsel?

MR. GILMORE: Nothing further. We certainly appreciate the Court's attention and detail to the papers.

THE COURT: Thank you.

MS. PRUNETTI: Nothing further from the defendants.

THE COURT: I certainly appreciate the excellent work from the parties and the submissions here and glad that you all were able to get to where you sit. I hope you all have a good rest of the day. Take care.

(Adjourned)